**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **J.B.D.L. Corp. d/b/a** ) | |
| **BECKETT APOTHECARY, et al.,** ) | **Civil Action No. C-1-01-704** |
| ) | |
| **Plaintiffs,** ) | **Judge Sandra S. Beckwith** |
| ) | **Magistrate Judge Timothy S. Hogan** |
| **v.** ) | |
| ) | |
| **WYETH-AYERST LABORATORIES, INC.,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM IN SUPPORT OF WYETH'S MOTION
TO COMPEL THE PRODUCTION OF DOCUMENTS FROM
<u>CARDINAL HEALTH, INC. AND AMERISOURCE BERGEN CORP.</u>**

Pursuant to Fed. R. Civ. P. 37 & 45, and Local Rule 37.2, Defendants Wyeth and

Wyeth Pharmaceuticals (collectively, "Wyeth") respectfully submit this memorandum in

support of their motion to compel the production of documents by Cardinal Health, Inc.

("Cardinal") and Amerisource Bergen Corp. ("Amerisource Bergen"), two major

wholesalers who are members of the class.

Cardinal and Amerisource Bergen combined are responsible for nearly half (48%)

of all Premarin purchases by the entire class during the class period.[1] Wyeth served

limited, targeted document demands upon these companies seeking critically important

---

[1]    Although the class certified in this case consists of thousands of direct purchasers of
Premarin, most of the class members (including the named plaintiffs) are small
companies that account for just a tiny fraction of the Premarin sold during the class
period.

information that is not in the possession of the named plaintiffs. Wyeth's requests are focused on a central issue in this litigation – namely, whether Wyeth's "list prices" would have been lower if Wyeth had not used the allegedly exclusionary contracts that plaintiffs are challenging.[2] As the documents sought by Wyeth will show, the major wholesalers, including Cardinal and Amerisource Bergen, have not pressed Wyeth to reduce list prices; rather, they have relied on regular price <u>increases</u> by manufacturers (including Wyeth) to sustain their profitability during the class period. This practice by wholesalers is known in the trade as "speculative purchasing."[3] Specifically, wholesalers stockpile products in anticipation of manufacturer price increases, and then make money by raising their resale prices on such products after the manufacturers actually implement their price increases. It is a classic example of "buying low and selling high."

The information requested is directly relevant to the following issues in this case:

- Whether elimination of Wyeth's alleged "exclusive dealing" contracts with managed care organizations and pharmacy benefit managers (collectively referred to as "MCOs") would have resulted in lower list prices for direct purchasers, when the largest purchasers profited from list price increases. If, as Wyeth contends, list prices were unaffected by Wyeth's allegedly unlawful contracts, then class members suffered no antitrust injury and have no antitrust claim. In many industries, wholesalers oppose price increases by manufacturers and exercise their bargaining power to deter such increases. Here, in contrast, the information requested will show that large purchasers such as Cardinal and Amerisource Bergen have the opposite incentive and use the price increases from manufacturers such as Wyeth to enhance their profit

---

[2]     The class members contend that they pay list prices for Premarin, and that these list prices were artificially inflated through Wyeth's contracts at issue in this case.

[3]     <u>See</u>, <u>e.g.</u>, Cardinal's 2003 10-K (noting that Cardinal has "historically invested capital in pharmaceutical inventory to take advantage of relevant market dynamics, including anticipated manufacturer price increases"); Amerisource Bergen 2001 10-K (noting that its increased inventories reflected "inventory purchased to take advantage of buy-side gross profit margin opportunities associated with manufacturer price increases and negotiated deals").

as part of their own business model.  Such information will support Wyeth's argument that list price increases were not a result of allegedly exclusionary contracts, but rather were a result of other market factors, including wholesalers who profited from such increases.

- The circumstances surrounding the list price increases challenged by plaintiffs, including the reasons Wyeth implemented the price increases, the willingness of key customers to accept such price increases, and the effects of such increases on the marketplace.  Under the antitrust rule of reason, a defendant is entitled to show "all the circumstances" surrounding the alleged restraint on trade.  Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 986 (6th Cir. 2001) (quoting Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988)).

- Whether the named plaintiffs can adequately represent the interests of all class members given the evidence that key class members benefited from the price increases challenged by the named class representatives (or whether the class should be de-certified).  See Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181 (11th Cir. 2003) (de-certifying a direct purchaser class where "downstream discovery" demonstrated a "fundamental conflict" between named plaintiffs and large wholesalers who would be disadvantaged by lower prices).

Given the direct relevance of this information to key issues, Wyeth's ability to mount a defense in this case will be significantly impaired if it is denied such discovery.

In refusing to produce numerous categories of relevant documents, Cardinal and Amerisource Bergen raise a red herring by arguing that discovery of documents relating to wholesalers' speculative purchasing is somehow barred by the Supreme Court's ruling in Hanover Shoe v. United Shoe Machinery, Inc., 392 U.S. 481, 494 (1968).  Hanover Shoe simply held that when a price-fixing conspiracy is proved, the conspirator-defendants cannot avoid paying damages to plaintiff-purchasers by showing that their illegal price increase was "passed on" by plaintiff-purchasers to their customers.  Wyeth, however, seeks documents from wholesalers for the entirely different – and clearly relevant – purpose of demonstrating that its list price increases were the result of other market factors (such as the speculative purchasing of large wholesalers), and were not

caused by the allegedly exclusionary contracts challenged in this case. <u>Hanover Shoe</u> is

inapplicable in this context. Indeed, the Eleventh Circuit recently reversed a district court

that had improperly invoked <u>Hanover Shoe</u> to forbid a defendant from obtaining

information about reseller pricing that was relevant to issues other than a "pass on"

defense. <u>Valley Drug Co.</u> v. <u>Geneva Pharmaceuticals, Inc.</u>, 350 F.3d 1181 (11th Cir.

2003) (ruling that "downstream discovery" relating to a conflict between named plaintiffs

and large wholesalers should have been permitted).[4]

## FACTS

This lawsuit is a certified class action in which thousands of entities that purchase

the prescription drug Premarin from Wyeth seek recovery for allegedly anticompetitive

overcharges in the prices they paid Wyeth. The class members contend that they paid

"list prices" for Premarin, and that these list prices were artificially inflated by Wyeth's

contracts with MCOs. MCOs manage the drug benefit programs of health insurers and

employers and negotiate with drug manufacturers to secure rebates off the price of

---

[4]    Cardinal and Amerisource Bergen also asserted a general objection that, because
they are absent class members, they essentially have no obligation to respond to Wyeth's
discovery requests. This position is untenable as a matter of law and also fundamentally
unfair to Wyeth given the significance of these entities as Premarin purchasers. <u>See</u>
<u>Transamerican Refining Corp.</u> v. <u>Dravo Corp.</u>, 139 F.R.D. 619, 621 (S.D. Tex. 1991)
(noting that the majority of courts have permitted discovery against absent class members
where the information is (1) relevant to the common issues in the case, (2) the requests
are tendered in good faith, and (3) the same information is not available from class
representatives; <u>see</u> <u>also</u> <u>Brennan</u> v. <u>Midwestern United Life Ins. Co.</u>, 450 F.2d 999, 1004
(7th Circuit, 1971) (holding that discovery from absent class members was appropriate);
<u>Robertson</u> v. <u>National Basketball Ass'n</u>, 67 F.R.D. 691, 699 (S.D.N.Y. 1975) (permitting
discovery from absent class members). However, as both Cardinal and Amerisource
have agreed to produce documents in response to some of Wyeth's requests, they have
apparently abandoned this meritless objection and Wyeth therefore will not address it in
detail herein.

prescription drugs.  A key issue in the case is whether Wyeth's contracts with MCOs caused Wyeth to charge higher list prices to drug wholesalers and retailers (i.e., direct purchasers who comprise the class in this case).  Wyeth contends that they did not, and the class contends that they did.[5]

The Court certified the class on May 12, 2003.  The Court recognized in its decision that the key issue on certification was whether "Plaintiffs have a sound method for demonstrating class-wide impact of the alleged anticompetitive conduct."  (Order at 22).  In certifying the class, the Court cited plaintiffs' theory that class-wide impact might be proved if list prices were artificially inflated by Wyeth's contracts with MCOs.  The Court did not opine on whether list prices actually were affected by Wyeth's contracts, because the merits of plaintiffs' claims were not relevant to the Court's class certification analysis.  Rather, the Court simply accepted plaintiffs' "list price" theory of liability for purposes of ruling on the class certification motion.  Wyeth, however, intends to offer proof on the merits that Wyeth's contracts with MCOs did not cause list prices to be higher.

Discovery is now ongoing.  On December 1, 2003, shortly after the expiration of the class opt-out period, Wyeth served subpoenas on eight large members of the class, who collectively account for approximately 88% of the total purchases of Premarin by the class.  Four of the subpoenaed entities are large "wholesalers" (i.e., entities that

---

[5]    The allegations of the lawsuit are set forth at greater length in this Court's May 12, 2003 decision certifying the class and will not be repeated here.  See Order dated May 12, 2003, at 2-3.

purchase drugs from manufacturers and resell them to retailers).[6] The other four subpoenaed entities are large, direct-purchasing retailers.[7]

On December 23, 2003, counsel for the class served objections to Wyeth's subpoenas to each of the eight subpoenaed class members.[8] At or about the same time, each of the four wholesalers, including Cardinal and Amerisource Bergen, served individual objections to Wyeth's subpoenas (virtually identical to those asserted by class counsel), and refused to produce any documents.[9] Wyeth had lengthy "meet and confer" discussions with class counsel and counsel for each of the eight subpoenaed class members. As a result of these discussions, McKesson, a major wholesaler similar to Cardinal and Amerisource Bergen, agreed to fully comply with Wyeth's subpoena.[10] Cardinal and Amerisource Bergen, however, have categorically refused to provide any discovery in response to a number of Wyeth's subpoena requests despite Wyeth's best efforts to resolve this matter without judicial intervention.[11] Facing a fact discovery cutoff date of March 19, 2004, Wyeth must now seek relief from the Court.[12]

---

[6]     In addition to Cardinal and Amerisource Bergen, Wyeth issued subpoenas to McKesson Corp. ("McKesson") and Quality King Distributors ("Quality King"). The subpoenas to Cardinal and Amerisource Bergen are attached hereto as Exhibits A and B.

[7]     The four retailers are Kroger Co., Wal-Mart, Walgreen Co., and Eckerd Corporation.

[8]     The objections of class counsel are attached hereto as Exhibit C.

[9]     The objections of Cardinal and Amerisource Bergen are attached hereto as Exhibits D and E.

[10]    Wyeth is still engaged in discussions with Quality King and the four subpoenaed retail pharmacies, and is still hopeful that these entities will comply with Wyeth's subpoenas.

[11]    Cardinal and Amerisource Bergen have agreed to produce some documents in response to certain requests that are not the subject of this motion. See Exhibit F

[Footnote is continued on next page]

**ARGUMENT**

Cardinal and Amerisource Bergen (and class counsel) are relying on an unfounded objection in refusing to produce relevant documents in response to Wyeth's subpoenas.  They assert that Wyeth is seeking discovery concerning the "passing on" of price increases by wholesalers to their downstream customers, which they contend is barred under the doctrine of <u>Hanover Shoe</u> v. <u>United Shoe Machinery, Inc.</u>, 392 U.S. 481, 494 (1968).  The objection that such discovery is barred by <u>Hanover Shoe</u> is without merit.

<u>Hanover Shoe</u> merely holds that a "pass on" defense to price-fixing is not permitted; <u>Hanover Shoe </u> does not address the issue of whether evidence is discoverable, and it does not remotely suggest that the evidence relating to wholesalers' purchasing practices that Wyeth seeks would not be relevant to the issue here (<u>i.e.</u>, whether Wyeth's list prices were "artificially inflated" by exclusionary practices, or instead reflected

---

[Footnote continued from previous page]

(February 2, 2004 letter from Thomas L. Long, counsel for Cardinal, to Matthew Meisner).  An affidavit of counsel for Wyeth setting forth the efforts made to resolve these issues, as required by Fed. R. Civ. P. 37 and Rule 37.2 of this Court, is attached hereto as Exhibit G.  Wyeth has also provided notice to class counsel and counsel for Cardinal and Amerisource Bergen of its intention to file this motion to compel, as required by Fed. R. Civ. P. 45.

[12]     The Cardinal subpoena was issued out of this District.  Although the Amerisource Bergen subpoena was issued out of the Eastern District of Pennsylvania, counsel for Amerisource Bergen has consented to the jurisdiction of this Court with respect to Wyeth's motion.  <u>See</u> Exhibit G (Affidavit of Matthew D. Meisner).  In any event, this Court clearly has jurisdiction to resolve this discovery dispute because (i) the wholesalers are members of the certified class; and (ii) the objections are raised by class counsel.  <u>See</u>, <u>e.g.</u>, <u>Brennan</u> v. <u>Midwestern United Life Insurance Co.</u>, 450 F.2d 999 (7th Cir. 1971) (trial court has jurisdiction to order discovery against absent class members as if they were parties).

market conditions – including "speculative purchasing" practices by large wholesalers). Wyeth is not asking this Court to allow Wyeth to avoid liability by showing that illegal price increases were "passed on" by plaintiffs to their customers. Instead, Wyeth seeks the requested information for undeniably proper purposes that have nothing to do with asserting a "pass-on" defense. Wyeth seeks documents that will help it to establish that these wholesalers – the largest purchasers in the class – actually depended upon regular price increases in order to sustain their profitability.

## I.    WYETH'S SUBPOENA IS CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.

To sustain a discovery request, it is sufficient to demonstrate that the request is reasonably calculated to lead to the discovery of admissible evidence. As the Sixth Circuit held in Coleman v. American Red Cross, 23 F.3d 1091 (6th Cir. 1994), "[i]t is axiomatic that 'the discovery of evidence, whether hearsay or not, is permitted if it is at all possible that it will lead to the discovery of admissible evidence.'" Id. at 1097.

As described in greater detail below, each of the requests in Wyeth's subpoenas satisfies the Rule 26(e) requirement that they be reasonably calculated to lead to the discovery of admissible evidence.

### A.    Documents Concerning Increases in List Prices or Business Models Used by Wholesalers That Depend Upon Such Price Increases.

Cardinal and Amerisource Bergen refuse to produce documents concerning their use of business models that rely upon regular price increases by pharmaceutical manufacturers such as Wyeth. The document requests at issue (see Nos. 2-4, 6, 8, 9,

12[13], 13[14], and 17[15]) seek documents reflecting "anticipation of price increases for Premarin, . . . including but not limited to any business plan or budget which anticipates such price increases" (No. 2); and documents relating to whether "your business model has relied upon price increases for Premarin and other products in order for you to maintain or increase your profitability" (No. 4).[16]  As set forth below, these requests are plainly calculated to discover information relevant to this lawsuit.

### 1.    "Speculative Purchasing" is Commonplace.

Drug wholesaling is a low-margin business.  As a result, wholesalers historically have engaged in a practice known as "speculative purchasing" or "forward buying."  In essence, speculative purchasing is a type of arbitrage.  Wholesalers stock up on large quantities of a pharmaceutical product at existing prices when they anticipate a list price increase by the manufacturer.  When the anticipated list price increase actually occurs, the wholesaler resells its inventory to downstream purchasers at prices which reflect the increased list prices, thus enhancing its profit margin.

---

[13]    This numbering is based on the Amerisource Bergen subpoena, and corresponds to Request No. 13 in the Cardinal subpoena.

[14]    This numbering is based on the Amerisource Bergen subpoena, and corresponds to Request No. 14 in the Cardinal subpoena.

[15]    This numbering is based on the Amerisource Bergen subpoena, and corresponds to Request No. 16 in the Cardinal subpoena.

[16]    Similarly, Request No. 3 seeks documents that relate to "speculative purchasing of Premarin . . . ."  Wyeth also requested documents related to guidelines for "setting the price of Premarin, Cenestin, or other products purchased using 'speculative purchasing' practices" (No. 6), documents relating to "whether you receive an economic benefit from price increases of Premarin" (No. 13), documents "discussing profits you earn from sales of Premarin as opposed to sales of Cenestin" (No. 12), and organizational charts listing individuals involved in "speculative purchasing" practices (No. 17).

Large wholesalers have repeatedly admitted in public filings that they historically have depended upon such speculative purchasing. For example, Cardinal's 2003 10-K states that it has "historically invested capital in pharmaceutical inventory to take advantage of relevant market dynamics, including anticipated manufacturer price increases." Cardinal 10-K, at 16. Indeed, the same filing noted that certain manufacturers had recently taken actions to "limit the ability of the company to invest capital in pharmaceutical inventories in advance of price increases" and that these changes could "have a negative impact on [Cardinal's] investment inventory margins." Id. at 5; see also id. at 16 ("CHANGES IN VENDOR SUPPLY CHAIN MANAGEMENT POLICIES . . . IN THE PHARMACEUTICAL DISTRIBUTION INDUSTRY COULD ADVERSELY IMPACT THE COMPANY'S RESULTS OF OPERATIONS."). Other public documents confirm the extent of speculative purchasing by large pharmaceutical wholesalers:

- Cardinal's 2002 10-K stated that "[t]he Company maintains a high level of inventory in order to be able to take advantage of price changes. . . ." Cardinal's 2002 10-K at 6.

- "Amerisource Bergen also continues to rely on forward buying. The Company 'has invested more heavily in spec inventory this year than either of the combined companies did in the past because we have the financial resources to do such." Pink Sheet, Aug. 12, 2000 (Vol. 64, No. 32; p. 26).

- In its 2001 10-K, Amerisource Bergen noted that its increase in inventories reflected "inventory purchased to take advantage of buy-side gross profit margin opportunities including opportunities associated with manufacturer price increases and negotiated deals." 2001 10-K for Amerisource Bergen.

- In its 2003 10-K, Amerisource Bergen elaborated that "we have been able to lower our overall cost of goods and increase our profit margins by purchasing surplus inventory from pharmaceutical manufacturers in advance of anticipated price increases . . . ." 2003 10-K for Amerisource Bergen.

**2.    Evidence Concerning Speculative Purchasing Is Relevant to Key Issues in This Case.**

Information concerning the speculative purchasing practices of the four wholesalers is directly relevant to disputed issues in this case.

<u>First</u>, in order to prevail on their motion for class certification, plaintiffs took the position that Wyeth's allegedly exclusionary contracts resulted in higher list prices. Accordingly, list prices are now central to this litigation.  If – as Wyeth contends – list prices were unaffected by Wyeth's allegedly exclusionary contracts,[17] then class members suffered no antitrust injury and have no antitrust claim.  The requested evidence of speculative purchasing practices will show that, during the class period, large wholesalers employed business models that both anticipated and relied upon regular increases in list prices by manufacturers such as Wyeth.  This evidence will support Wyeth's argument that list price increases were not a result of Wyeth's "exclusionary" contracts, but rather were the result of other market factors, including wholesalers who profited from such increases.  Because list price increases were integral to the wholesalers' profitability, any supposed increase in competition from Cenestin in the absence of the allegedly exclusionary MCO contracts would simply have resulted, at best, in price changes in those contracts, and would not have affected the list prices to the wholesalers and other direct purchasers who comprise the class in this case.  Put another way, the challenged MCO contracts did not cause Wyeth's list prices to class members to increase; list prices would have increased with or without those contracts.

---

[17]    <u>See</u> Expert Report of Janusz Ordover ("Ordover Report"), filed in connection with Wyeth's opposition to class certification, at 39-43.

        Second, the discovery is relevant to an even more fundamental aspect of Wyeth's

defense – namely, showing how pricing in the pharmaceutical industry works.  Under the

antitrust rule of reason,[18] a defendant is entitled to show – and the jury is entitled to know

– "all the circumstances" surrounding the alleged restraint on trade.  Ezzo's Investments,

Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 986 (6th Cir. 2001) (quoting Business

Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988)); see also

Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918) (under Rule of Reason,

court must "consider the facts peculiar to the business to which the restraint is applied").

        As described by Wyeth's economic expert at the class certification stage (Ordover

Rep. at 13, ¶¶ 21-22), the pharmaceutical market differs from other markets in that direct

purchasers of pharmaceutical products are not a significant source of price competition.

This is because these purchasers are largely incapable of creating demand; instead, they

respond to downstream demand (reflected in physician prescriptions).  Id.  The discovery

sought by Wyeth will be critical to showing the fact-finder why increased competition

between Wyeth and other manufacturers would not likely lead to lower list prices for

direct purchasers.  Even accepting plaintiffs' dubious argument that Wyeth's contracts

dampened competition between Premarin and Cenestin, it is far more likely that

increased competition with Cenestin would have caused Wyeth to provide increased

_____

[18]   Under section 1 of the Sherman Act, 15 U.S.C. § 1, alleged restraints are subject to
either (1) the per se rule (which applies only to conduct so pernicious to competition that
there is no need in a given case to assess its competitive impact in order to determine its
legality), or (2) the rule of reason (which assesses the net competitive effect of a
challenged activity and holds it to be legal unless that net effect is substantially adverse).
Plaintiffs' claims in this case relating to Wyeth's allegedly exclusive dealing contracts are
governed by the rule of reason.  See, e.g., Jefferson Parish Hosp. v. Hyde, 466 U.S. 2
(1984).

discounts, incentives, or similar benefits to persons <u>other</u> than direct purchasers (<u>e.g.</u>,

MCOs).  By educating the fact-finder about the competitive realities of this unusual

marketplace, Wyeth will show that list prices of Premarin would likely have been the

same regardless of the existence of the alleged "exclusive dealing" contracts.  Under the

rule of reason, such evidence is not simply relevant, it is fundamental to the viability of

Wyeth's defense.

 <u>Third</u>, the speculative purchasing practices of wholesaler class members are

highly relevant to the question of whether named plaintiffs can adequately represent the

interests of all class members.  Evidence that key class members <u>benefited</u> from the price

increases challenged by the named class representatives would demonstrate a basic

conflict between the named representatives and the class that might well lead this Court

to de-certify the class.[19]  A recent Eleventh Circuit case, <u>Valley Drug Co.</u> v. <u>Geneva</u>

<u>Pharmaceuticals, Inc.</u>, 350 F.3d 1181 (11th Cir. 2003), is instructive in this regard.  In

<u>Valley Drug</u>, an antitrust case involving the pharmaceutical industry,[20] the Eleventh

Circuit reversed an order certifying a class of direct purchasers, based on a finding that

the district court failed to evaluate whether the "adequacy of representation" requirement

of Rule 23 "could be satisfied by the named representatives despite the fact that the most

---

[19] Under Federal rule of Civil Procedure 23(c)(1), a court may alter or amend a
decision on class certification "before the decision on the merits."  The Court is obligated
to monitor the decision on class certification and amend or alter the decision as needed in
light of evidentiary developments.  <u>Daenzer</u> v. <u>Wayland Ford, Inc.</u>, 210 F.R.D. 202, 205
(W.D. Mich. 2002) (citing <u>Richardson</u> v. <u>Byrd</u>, 709 F.2d 1016, 1019 (5th Cir. 1983) and
<u>Reed</u> v. <u>Town of Babylon</u>, 914 F. Supp. 843, 848-49 (E.D.N.Y. 1996)).

[20] <u>Valley Drug</u> involved allegations that a branded drug manufacturer conspired with
the manufacturer of a potentially competing generic drug product to prevent or delay the
entry of a lower priced generic drug product into the market.

significant members of the certified class [the three largest wholesalers] arguably experienced a net gain from the conduct alleged to be illegal by the named representatives." Id. at 1188. See also id. at 1190 ("To our knowledge, no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class").

**B.      Discovery Concerning Speculative Purchasing Is Not Foreclosed by Hanover Shoe.**

Cardinal and Amerisource Bergen (and class counsel) insist that Wyeth's requested discovery is somehow foreclosed by the Supreme Court's holding in Hanover Shoe. This contention is baseless, as Hanover Shoe is irrelevant to the discoverability of speculative purchasing evidence.

In Hanover Shoe, the Supreme Court held that if an overcharge is illegal (i.e., if it is the result of price-fixing), an antitrust defendant cannot reduce a plaintiff's damages by showing that the plaintiff "passed on" the illegal overcharge to its own customers in the form of higher resale prices. Instead, the Court held that a plaintiff may normally recover the full amount of an illegal overcharge even if it did pass on some or all of the overcharge to its customers. This case does not involve Hanover Shoe issues. Wyeth does not contend that if a price increase is illegal, it can reduce the damages recoverable by class members by showing that they passed on some or all of that price increase. Indeed, Wyeth's discovery is focused on the timing and nature of the wholesaler's purchases from Wyeth – the "direct" purchases that form the basis for their antitrust claim.

- 14 -

The case law confirms that such discovery is permissible, even if it were entirely focused on the "downstream" aspects of wholesaler pricing.  For example, the court allowed discovery of "downstream" pricing information from plaintiffs in In re Infant Formula Antitrust Litigation, MDL 878 (N.D. Fla. 1992) (Ex. H).  The defendants sought to develop evidence to support their contention that retail pharmacies "hold prices of all infant formulas steady, regardless of fluctuations in wholesale prices."  They urged that "[w]ith this pricing scheme in place, the manufacturers have no incentive to lower wholesale prices:  to do so would not increase market share, but would rather only cut profits."  Id. at 7.  Likewise, Wyeth wishes to develop evidence that the speculative purchasing of wholesalers meant that Wyeth lacked any incentive to lower wholesale prices.  As in Infant Formula, "[i]t is not necessary that [this theory] be proven before discovery thereon will be allowed"; it is sufficient that the information sought might lead to admissible evidence relating to pricing.  Id. at 7-8.

In another case – Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 138 F. Supp. 2d. 357 (E.D.N.Y. 2001) – the court held that "pass-on" evidence was relevant (and admissible at trial) as "permissible background information" to show how the insurance business operated.  The plaintiff argued that any evidence relating to  "pass on" of damages was precluded by Hanover Shoe. The court disagreed, holding that the jury was entitled to know how insurers set premiums.  Any danger that the jury might misuse the evidence to inappropriately reduce damages would be obviated by a limiting instruction.  Id. at 371.

The doctrine of Hanover Shoe is not a rule of discovery; it is simply a rule limiting a defendant's ability to reduce damages by arguing that an illegal overcharge

was "passed on" to the defendant's downstream customers.  Nothing in <u>Hanover Shoe</u>

indicates that mere <u>discovery</u> of downstream pricing information is precluded –

especially when it is relevant to other issues in the lawsuit.  Nothing in <u>Hanover Shoe</u>

suggests that speculative purchasing (or any argument that a challenged practice did not

impact prices) is not relevant in antitrust cases alleging inflated pricing.

In fact, the <u>Valley Drug</u> court confirmed that <u>Hanover Shoe</u> is inapplicable to

issues relating to class certification.  The court ruled that it was necessary "to permit

'downstream discovery' to determine whether a fundamental conflicts exists among the

class members."  350 F.3d at 1195.  <u>See</u> <u>also</u> <u>id</u>. at 1192 ("neither <u>Hanover Shoe</u> nor

<u>Illinois Brick</u> addressed a party's burden to satisfy the class certification prerequisites

established by Rule 23(c)").  Just as <u>Valley Drug</u> held that <u>Hanover Shoe</u> is not "a

talisman warding away the requirements of Rule 23," <u>id</u>. at 1192, it should not be

regarded as a barrier to discovery relevant to the issues of class certification and liability

in this case.

## **CONCLUSION**

Wyeth has a compelling need for the discovery requested from Cardinal and

Amerisource Bergen, two of its largest customers.  The information sought relates to a

central issue in this litigation – whether Wyeth's list prices would have been lower if

Wyeth had not used the allegedly exclusionary contracts plaintiffs are challenging.

Cardinal and Amerisource Bergen have not demonstrated any undue burden associated

with responding to Wyeth's document requests.  For the foregoing reasons, Wyeth

respectfully requests that the motion to compel be granted.

Respectfully submitted,


s/Grant S. Cowan
Trial Attorney for Defendants

James R. Adams   (0008253)
Grant S. Cowan    (0029667)
**FROST BROWN TODD LLC**
2200 PNC Center
201 E. Fifth Street
Cincinnati, Ohio  45202-4182
(513) 651-6745

William J. Baer
David S. Eggert
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000

Dan K. Webb
W. Gordon Dobie
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois  60601-9703
(312) 558-5600


Dated:  February 9, 2004

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a copy of the foregoing

Memorandum in Support of Wyeth's Motion to Compel the Production of Documents

from Four Wholesalers has been served electronically this 9th day of February, 2004 on

Theresa L. Groh, Murdock, Goldberg, Schneider & Groh, 700 Walnut Street, Suite 400,

Cincinnati, Ohio 45202-2011 and W.B. Markovits, Markovits & Greiwe, Co., L.P.A.,

119 E. Court Street, Cincinnati, Ohio 45202 and by UPS overnight delivery upon the

following:

Steve D. Shadowen
**HANGLEY ARONCHICK SEGAL & PUDLIN**
30 North Third Street, Suite 700
Harrisburg, PA 17101-1810
Facsimile:  787-364-1020

Jay S. Cohen
**SPECTOR, ROSEMAN & KODROFF**
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Facsimile: 215-496-6611

Ruthanne Gordon
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA   19103
Facsimile: 215-875-4606

Thomas L. Long
**BAKER & HOSTETLER LLP**
Capitol Square, Suite 2100
65 East State Street
Columbus, OH 43215-4260
Facsimile: 614-462-2616

Eliot Long
**BUCHANAN INGERSOLL**
1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985
Facsimile: 215-665-8760


s/Grant S. Cowan
Grant S. Cowan
Frost Brown Todd LLC