**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| J.B.D.L. Corp. d/b/a<br>BECKETT APOTHECARY, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>WYETH-AYERST LABORATORIES, INC.,<br>　et al.,<br><br>　　　　　　Defendants. | Civil Action No. C-1-01-704<br><br>Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Hogan |
| CVS MERIDIAN, INC. AND RITE AID<br>CORP.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>WYETH,<br><br>　　　　　　Defendant. | Civil Action No. C-1-03-781<br><br>Judge Sandra S. Beckwith |

**MEMORANDUM IN SUPPORT OF WYETH'S
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
<u>FROM CVS MERIDIAN, INC. AND RITE AID CORP.</u>**

Pursuant to Fed. R. Civ. P. 37 and Local Rule 37.2, Defendant Wyeth respectfully submits this memorandum in support of its motion to compel the production of documents from plaintiffs CVS Meridian, Inc. ("CVS") and Rite Aid Corp. ("Rite Aid") (collectively "plaintiffs"), two major retail pharmacies that opted out of the related direct purchaser class action and filed this action against Wyeth.

# INTRODUCTION

Wyeth served narrowly tailored document requests on plaintiffs seeking information that is clearly relevant to disputed claims in this case. Plaintiffs objected to many of Wyeth's requests, and after their "meet and confer" with Wyeth, they continue to refuse to produce documents relating to the following material issues:

- Whether counsel for CVS and Rite Aid – Hangley Aronchick Segal & Pudlin ("Hangley Aronchick") – engaged in an improper conflict of interest by representing CVS and Rite Aid in preparing this suit against Wyeth while at the same time representing Wyeth on other matters. Wyeth has substantial cause to believe that such a conflict of interest has occurred, and seeks documents from plaintiffs that bear directly upon this issue – specifically, documents that will show whether Hangley Aronchick engaged in such a conflicting representation.

- Whether Cenestin was unavailable to customers of managed care organizations (as plaintiffs allege), or, whether Cenestin was in fact widely available to such customers, often at the same co-payment level as Premarin (as Wyeth contends).

- The extent to which plaintiffs engaged in "speculative purchasing" practices based on Wyeth's list price increases, and thus willingly accepted such price increases. The prevalence of such speculative purchasing practices would undermine plaintiff's core argument that Wyeth's price increases were the result of allegedly exclusionary contracts with third-party PBMs, rather than a result of other market forces (such as the willingness of customers to accept price increases).

- Whether the "relevant market" in this case should be limited to "conjugated estrogens" (as plaintiffs contend), or should also include other hormone therapy products (as Wyeth contends)

- Whether Wyeth's allegedly exclusionary contracts are consistent with standard industry practice, and whether plaintiffs themselves have entered into agreements similar to those that they seek to condemn here.

All of the information sought by Wyeth is relevant to key issues in this case. There are no grounds for denying Wyeth the right to obtain this discovery.

## FACTS

Plaintiffs in this lawsuit are opt-outs from a certified class action in which entities that purchased Premarin directly from Wyeth seek recovery for alleged overcharges in the prices they paid Wyeth. J.B.D.L. v. Wyeth-Ayerst Laboratories, No. C-1-01-704 (Beckwith, J.). This case was originally assigned to Judge Dlott, but pursuant to the terms of the amended case management order entered in the class action, the case was consolidated with the class action and reassigned to Judge Beckwith.

The law firm of Hangley Aronchick Segal & Pudlin ("Hangley Aronchick") represents plaintiffs in this matter. Hangley Aronchick also represented Wyeth over the past three years with regard to global supply matters, and in fact worked on matters for Wyeth as recently as November 7, 2003 – three days before the firm filed the complaint in this case against Wyeth. Based on these facts, Wyeth has reason to believe that Hangley Aronchick was actively engaged in the preparation of this lawsuit against Wyeth at the same time that Wyeth was its client on other matters. To obtain definitive evidence on this issue before moving to disqualify or take other appropriate action, Wyeth has requested information relating to the timing of CVS' and Rite Aid's retention of Hangley Aronchick to sue Wyeth and the work that Hangley Aronchick performed on that matter.

As in the J.B.D.L. class action, the core allegation in this lawsuit is that Wyeth entered into "exclusive" and "disguised exclusive" contracts with pharmacy benefit managers and other managed care organizations ("MCOs") – i.e., entities that manage the drug benefit programs of health insurers and negotiate with drug manufacturers to secure rebates off the price of prescription drugs. Plaintiffs allege that Wyeth's exclusionary

contracts restricted the "availability" of a competing drug, Cenestin, and that MCO customers were forced to pay "artificially inflated prices" for Premarin (Compl. ¶¶ 3, 41, 43). Wyeth contends that Cenestin was widely available to MCO customers, often at the same co-payment level as Premarin. Wyeth also contends that its price increases during this period were unrelated to its contracts with MCOs, and were actually the product of legitimate market forces – including the "speculative purchasing" practices of many large customers.

     Discovery is now ongoing. On December 23, 2003, Wyeth served document requests on plaintiffs CVS and Rite Aid.[1] On January 22, 2004, counsel for plaintiffs served responses and objections to Wyeth's document requests, in which they refused to produce numerous categories of responsive documents.[2] On February 4, 2004, Wyeth had a lengthy "meet and confer" discussion with plaintiffs' counsel. Despite Wyeth's best efforts to resolve this matter without judicial intervention, plaintiffs have categorically refused to provide any discovery in response to many of Wyeth's document requests.[3]

---

[1] Wyeth's document requests to CVS and Rite Aid are attached as Exhibits A and B.

[2] CVS and Rite Aid's responses to Wyeth's document requests are attached as Exhibits C and D.

[3] Plaintiffs have agreed to produce some documents in response to certain requests that are not the subject of this motion. See Exhibit E (February 13, 2004 letter from Gordon A. Einhorn to David S. Eggert). An affidavit of counsel for Wyeth setting forth the efforts made to resolve these issues, as required by Fed. R. Civ. P. 3 and Rule 37.2 of this Court, is attached hereto as Exhibit F. We note that, while plaintiffs have agreed to produce some documents, the extent of their production to date is (1) a computer disc from Rite Aid with some purchase data for Premarin and Cenestin, (2) a partial organization chart from Rite Aid, and (3) four agreements between CVS and drug wholesalers. Plaintiffs advise that a few more documents will be produced but that their volume will be insubstantial.

4

**ARGUMENT**

I. **WYETH'S DOCUMENT REQUESTS ARE CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE**

To sustain a discovery request, it is sufficient to demonstrate that the request is reasonably calculated to lead to the discovery of admissible evidence. As the Sixth Circuit held in Coleman v. American Red Cross, 23 F.3d 1091 (6th Cir. 1994), "[i]t is axiomatic that 'the discovery of evidence, whether hearsay or not, is permitted if it is at all possible that it will lead to the discovery of admissible evidence.'" Id. at 1097. All of the discovery requests at issue easily meet this standard.

    A. **Documents Relating to the Hangley Aronchick Law Firm's Representation of CVS, Rite Aid, and Wyeth**

Wyeth seeks information relating to the timing of Hangley Aronchick's work for CVS and Rite Aid, in order to verify the existence of an apparent conflict of interest by that firm.[4] Specifically, Hangley Aronchick represented Wyeth for more than three years on matters involving global supply sourcing contracts. In August and September 2003, after Hangley Aronchick became affiliated with an attorney (Steve Shadowen) who had previously sued drug manufacturers on behalf of CVS and Rite Aid, Hangley Aronchick requested that Wyeth waive (in the abstract) any objection to potential future conflicts of

---

[4] See Request No. 1 ("Documents sufficient to show, for each day prior to November 10, 2003, the number of hours that the law firm of Hangley Aronchick Segal & Pudlin worked for you in connection with the filing of this lawsuit, including but not limited to any investigation, consideration, or preparation prior to the filing of this lawsuit"); Request No. 2 ("All documents relating to your retention of Hangley Aronchick Segal & Pudlin as counsel in this case, including but not limited to the retainer agreement between you and Hangley Aronchick Segal & Pudlin, and all documents sufficient to show the date you first communicated with Hangley Aronchick Segal & Pudlin concerning potential representation in this matter"); Request No. 3 ("All documents related to your retention of Steve Shadowen, or any other attorney to represent you in connection with any matter relating to your purchases of Premarin").

5

interest by Hangley Aronchick involving possible lawsuits brought by Mr. Shadowen. Hangley Aronchick said nothing to Wyeth about the possibility of representing CVS or Rite Aid as opt-outs in this case. Wyeth refused to grant the requested generalized waiver.

In September 2003, however, Wyeth decided to begin transferring its global sourcing work to a different law firm. Hangley Aronchick continued its representation of Wyeth until November 7, 2003 – a mere three days before the firm sued Wyeth on behalf of Rite Aid and CVS. On November 10 – the day the lawsuit was filed – Hangley Aronchick sent a "final bill" to Wyeth. It is our understanding that at no time prior to the filing of this lawsuit did Hangley Aronchick ever advise Wyeth that they had been retained by CVS or Rite Aid to sue Wyeth in this case. Nor did Wyeth ever provide a waiver for such conflicting representation. Nevertheless, it seems likely (almost certain) that Hangley Aronchick was preparing to sue Wyeth at the same time that it was acting as Wyeth's counsel on other matters. To confirm this fact, Wyeth sought targeted document discovery from plaintiffs that would demonstrate whether Hangley Aronchick had violated applicable ethics rules – in particular, documents that would demonstrate *when* plaintiffs retained Hangley Aronchick and when Hangley Aronchick performed work for plaintiffs against Wyeth. Wyeth stresses that it is not yet demanding disqualification of the Hangley firm. Instead, it is first prudently seeking documents that will show whether or not a conflict existed. Plaintiffs (and Hangley) have refused to provide any of the requested information.[5]

---

[5] In their February 13 letter (Exhibit E), plaintiffs indicated that they were still considering their response to these requests. However, on February 25, 2004 plaintiffs'
Footnote continued on next page

6

1. **The Documents Requested Are Necessary to Determine Whether Hangley Aronchick Has Breached Its Duty of Loyalty to Wyeth**

Hangley Aronchick breached its professional duty of loyalty to Wyeth if it initiated its representation of CVS and Rite Aid adverse to Wyeth during the same time that it served as counsel to Wyeth. Such adverse representation is "prima facie improper." Henry Filters Inc. v. Peabody Barnes, Inc., 611 N.E.2d 873, 877 (Ohio Ct. App. 1992) (quoting Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d. Cir. 1976) (cited with approval in Estate of Roth v. Roth, Lucas App. No. L-90-291, (Ohio Jan. 2, 1991))). To confirm that such an impropriety occurred, Wyeth has requested certain basic documents relating to Hangley Aronchick's representation of Rite Aid and CVS, including billing records and documents relating to the retention of Hangley Aronchick by CVS and Rite Aid.

2. **The Requested Documents Are Not Protected by the Attorney-Client Privilege or Work Product Doctrine**

Rite Aid and CVS have objected to Wyeth's request for documents relating to Hangley Aronchick's representation, claiming that such documents are protected by the attorney-client privilege and the work product doctrine. But the applicable case law clearly holds that this type of information is not protected by either of these privileges.

It has long been held that the underlying circumstances of the attorney-client relationship – as opposed to the substance of attorney-client advice – are not protected by

---

Footnote continued from previous page
counsel advised Wyeth that they would not produce any documents responsive to these requests. (Plaintiffs' counsel advised that they are preparing a "chronology" of their version of the communications with Wyeth that preceded the filing of the complaint, but reiterated that they will not produce the requested documents).

7

the attorney-client privilege. In laying out the elements of the attorney-client privilege, the Sixth Circuit noted in United States v. Goldfarb, 328 F.2d 280, 282 (1964), *cert. denied*, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), that the attorney-client privilege "does not envelope everything arising from the existence of an attorney-client relationship." In particular, the Sixth Circuit has held that "the attorney-client privilege only precludes disclosure of communications between attorney and client and does not protect against disclosure of the facts underlying the communication . . . . In general, the *fact of legal consultation or employment*, clients' identities, attorney's fees, and *the scope and nature of employment* are not deemed privileged." Humphreys, Hutcheson, & Moseley v. Donovan, 755 F.2d 1211, 1219 (6th Cir. 1985) (emphasis added). *See also* United States v. Skeddle, 989 F.Supp. 890, 904 (N.D. Ohio, 1997) ("[a]ttorneys' bills and communications regarding retainer agreements are not privileged," *quoting* Duttle v. Bandler & Kass, 127 F.R.D. 46, 52 (S.D.N.Y. 1989)).

Likewise, the documents Wyeth seeks in requests 1, 2, and 3 are not protected by the attorney work product doctrine. Wyeth does not seek any details regarding the substance of the legal advice that Hangley Aronchick provided to plaintiffs; rather, it merely seeks billing records and similar documents that would establish when that firm was retained, the hours it worked, and the scope of its retention. These are simply "business" records, not privileged "attorney-client" communications or "work product."

Indeed, much of the information that Rite Aid and CVS have refused to provide is the same information that must ordinarily be revealed in a privilege log.[6] In any

---

[6] Although plaintiffs have asserted privileges, they have failed to produce a privilege log.

litigation, a party withholding privileged information "shall describe the nature of the documents, communications, or things not produced or disclosed in such a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Fed. R.Civ. P. 26(b)(5). Such descriptions typically include dates, sender(s), and recipient(s) and a general description of the subject matter.

This is exactly the sort of information that Wyeth seeks from plaintiffs, and that should confirm whether Hangley Aronchick engaged in an impermissible conflict of interest by preparing to sue an existing client. If any of the billing records, retainer agreements, or similar retention documents in fact contain client confidences or litigation strategy (which is unlikely), Rite Aid and CVS could simply redact the privileged information before producing the documents. Plaintiffs' categorical refusal to produce these relevant documents is unjustifiable.

### B. Documents Concerning the Availability of Cenestin to MCO Customers

Plaintiffs also refuse to produce documents relating to their allegation that Cenestin was prevented from competing against Premarin by Wyeth's allegedly exclusionary contracts with MCOs. Wyeth's requests (see Nos. 25-27, 29) seek contracts with MCOs "that relate to their payment or reimbursement to you for dispensing" Cenestin (as well as Premarin and other ET or HT products) (No. 25), and documents reflecting occasions where: (i) a Cenestin prescription "has not been filled by you because the product was not on an MCO formulary" (No. 26); or (ii) "an MCO determined either to charge a co-payment [for Cenestin] higher than the co-payment it

9

would have charged for Premarin or determined not to reimburse for the purchase at all" (No. 27).[7]

These requests are plainly calculated to discover information relevant to this lawsuit. Plaintiffs contend that the ability to market a drug product effectively "depends upon securing favorable formulary and reimbursement status" from MCOs. (Compl. at ¶ 31.) Plaintiffs further claim that Wyeth's contracts "foreclosed Cenestin from being included on [MCO] formularies." (Compl. at ¶ 34.) As a result of such alleged formulary exclusion, plaintiffs contend that Cenestin was "typically subjected to substantially higher out-of-pocket expenses [higher co-payments]." (Compl. at ¶ 30.) Thus, plaintiffs claim that Wyeth's contracts "strictly limited [MCOs] from making Cenestin . . . available to their members" (Compl. at ¶ 3), which resulted in the "unlawful exclusion" of Cenestin from the market (Compl. at ¶ 42).

Accordingly, based on plaintiffs' own allegations, the following issues are unquestionably material to issues in dispute in this case:

- The extent to which Cenestin was included on MCO formularies

- The extent to which Cenestin prescriptions were reimbursed by MCOs, notwithstanding whether or not it was on MCO formularies

- The extent to which Cenestin was subjected to higher co-payments than Premarin

CVS and Rite Aid are two of the largest retail pharmacy chains in the country. Given their contractual relationships with MCOs (which dictate the reimbursement terms

---

[7] Similarly, Request No. 29 seeks electronic data providing key information about prescriptions of Premarin, Cenestin, and other HT products dispensed by plaintiffs, including "the formulary or coverage status of the prescribed drug", the "amount of co-payment paid by the customer", and the "amount you were reimbursed by an MCO."

10

for Cenestin and Premarin), and their direct interactions with managed care customers seeking to fill prescriptions, plaintiffs are uniquely positioned to address each of these key issues. If – as plaintiffs allege – Wyeth's contracts with MCOs caused Cenestin prescriptions to be blocked or unfilled, the evidence would be in the hands of retailers like the plaintiffs, where consumers go to fill their prescriptions. Wyeth's requests are narrowly tailored to obtain this critically important information.

### C. Documents Concerning "Speculative Purchasing" by CVS and Rite Aid

CVS and Rite Aid also refuse to produce documents concerning their reliance on and/or anticipation of regular price increases by pharmaceutical manufacturers such as Wyeth. The document requests at issue (see Nos. 7-9, 11, 17, 18) seek documents reflecting "anticipated increases in the prices you paid for Premarin or other pharmaceutical products, including but not limited to any business plan or budget which anticipates such price increases" (No. 7); and documents relating to whether plaintiffs' business models "have relied upon price increases" for Premarin and other products in order to "maintain or increase your profitability" (No. 9).[8]

The relevance of "speculative purchasing" by large pharmaceutical customers is addressed in detail in Wyeth's pending motion in J.B.D.L. to compel the production of documents from Cardinal Health, Inc. ("Cardinal") and Amerisource Bergen Corp.

---

[8] Similarly, Request No. 8 seeks documents that relate to "speculative purchasing" of Premarin or other pharmaceutical products. Wyeth also requested documents related to guidelines for "setting prices of Premarin, Cenestin, or any products purchased using 'speculative purchasing' practices" (No. 11), documents "discussing profits you earn from sales of Premarin as opposed to sales of Cenestin" (No. 12), documents relating to "the amount of profits, or percentage of profit, you earn from sales of Premarin and Cenestin (No. 18), and documents relating to "whether you receive an economic benefit from price increases of Premarin" (No. 19).

("Amerisource Bergen"), filed on February 9, 2004. Speculative purchasing is a type of arbitrage, whereby large resellers stockpile quantities of a pharmaceutical product at existing prices, in anticipation of a list price increase by the manufacturer. The stockpiled product is resold (at a marked-up price) after the manufacturer announces a list price increase.

Documents relating to "speculative purchasing" are clearly relevant to a central liability issue in this case – i.e., whether Wyeth's list price increases were caused by its allegedly exclusionary contracts with MCOs (as plaintiffs allege) or were instead the normal result of market forces such as speculative purchasing by large customers. A manufacturer (such as Wyeth) has greater ability to raise its list prices when its largest customers profit from such price increases, and hence willingly support them. The requested evidence of speculative purchasing practices should show whether CVS and Rite Aid employed business models that both anticipated and relied upon regular increases in list prices by manufacturers such as Wyeth. This evidence will relate to Wyeth's argument that list price increases were not caused by Wyeth's "exclusionary" contracts with MCOs, but rather were the result of other market factors, including retail pharmacies that profited from such increases.

Second, discovery of speculative purchasing practices is also relevant to an even more fundamental aspect of Wyeth's defense – namely, showing how pricing in the pharmaceutical industry works. Under the antitrust rule of reason,[9] a defendant is entitled

---

[9] Under section 1 of the Sherman Act, 15 U.S.C. § 1, alleged restraints are subject to either (1) the per se rule (which applies only to conduct so pernicious to competition that there is no need in a given case to assess its competitive impact in order to determine its legality), or (2) the rule of reason (which assesses the net competitive effect of a challenged activity and holds it to be legal unless that net effect is substantially adverse).
Footnote continued on next page

to show – and the jury is entitled to know – "all the circumstances" surrounding the alleged restraint on trade. Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 986 (6th Cir. 2001) (quoting Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723 (1988)); see also Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918) (under Rule of Reason, court must "consider the facts peculiar to the business to which the restraint is applied").

The discovery sought by Wyeth will be used to assist the fact-finder in understanding why increased competition between Wyeth and other manufacturers would not likely lead to lower list prices for direct purchasers. Even accepting plaintiffs' allegation that Wyeth's contracts dampened competition between Premarin and Cenestin, it is likely that increased competition between Premarin and Cenestin would at best have caused Wyeth to provide increased discounts, incentives, or similar benefits to persons other than direct purchasers (e.g., MCOs). By educating the fact-finder about the competitive realities in the pharmaceutical marketplace, including speculative purchasing, Wyeth will show that list prices of Premarin would likely have been the same regardless of the existence of the alleged "exclusive dealing" contracts. Under the rule of reason, such evidence is not simply relevant; it is fundamental to the viability of Wyeth's defense.

---

Footnote continued from previous page
Plaintiffs' claims in this case relating to Wyeth's allegedly exclusive dealing contracts are governed by the rule of reason. See, e.g., Jefferson Parish Hosp. v. Hyde, 466 U.S. 2 (1984).

13

CVS and Rite Aid object to these requests primarily on relevance grounds.[10] While not explicitly stated, CVS and Rite Aid apparently contend that discovery is somehow foreclosed by the Supreme Court's holding in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968). This contention is baseless, as set forth in detail in Wyeth's motion to compel pending in the J.B.D.L. class action. To avoid undue repetition, Wyeth will not repeat the arguments why Hanover Shoe is irrelevant, but rather will simply summarize them below.

In Hanover Shoe, the Supreme Court held that if an overcharge is illegal, an antitrust defendant cannot reduce a plaintiff's damages by showing that the plaintiff "passed on" the illegal overcharge to its own customers in the form of higher resale prices. But the Hanover Shoe doctrine is not a rule of discovery; it is simply a rule limiting a defendant's ability to reduce damages by arguing that an illegal overcharge was "passed on" to the defendant's downstream customers. Nothing in Hanover Shoe indicates that mere discovery of customer pricing information is precluded – especially when it is relevant to other issues in the lawsuit. This case does not involve Hanover Shoe "pass on" issues.

The case law confirms that Hanover Shoe does not preclude discovery for purposes other than establishing a "pass on" defense. See, e.g., In re Infant Formula Antitrust Litigation, MDL 878 (N.D. Fla. 1992) (Ex. H to Wyeth's motion to compel in J.B.D.L.) (allowing discovery of customer pricing information despite Hanover Shoe

---

[10] CVS and Rite Aid also objected on the grounds that such requests are "unduly burdensome" and "overly broad," but have not provided any basis for these objections and appear to be relying primarily on a relevance objection.

objections); Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 138 F. Supp. 2d. 357 (E.D.N.Y. 2001) ("pass-on" evidence was relevant (and admissible at trial) under Hanover Shoe as "permissible background information" to show how the insurance business operated).[11]

### D.      Other Categories of Documents

#### 1.      Documents relating to Hormone Therapy Products Other Than Premarin and Cenestin

Plaintiffs also objected to document requests by Wyeth seeking basic information concerning hormone therapy products that Wyeth contends compete with Premarin and Cenestin – including the "price, availability, coverage, or reimbursement" of such products (Request No. 5) and records of CVS and Rite Aid's purchases of such products (Request No. 10).   While plaintiffs have agreed to produce documents responsive to these requests with respect to Premarin and Cenestin, they have refused to produce any documents relating to the other hormone therapy products that compete with Premarin and Cenestin.[12]

Specifically, plaintiffs claim that since they have alleged a narrower market, "conjugated estrogens," which precludes all hormone therapy products other than

---

[11]  See also Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1192 (11th Cir. 2003) ("neither Hanover Shoe nor Illinois Brick addressed a party's burden to satisfy the class certification prerequisites established by Rule 23(c)").  Just as Valley Drug held that Hanover Shoe is not "a talisman warding away the requirements of Rule 23," id. at 1192, it should not be regarded as a barrier to discovery relevant to the issues of liability in this case.

[12]   Plaintiffs did indicate that they would consider producing information relating to products other than Premarin and Cenestin if Wyeth provided a list of the products encompassed by these requests.  See Exhibit E (February 13, 2004 letter from Gordon A. Einhorn to David S. Eggert).  However, Mr. Einhorn subsequently made clear that plaintiffs have no intention to produce this information.  See Exhibit G (correspondence between Matthew Meisner and Gordon Einhorn of Hangley Aronchick).

15

Premarin and Cenestin, information relating to other hormone therapy products is not relevant. However, the scope of the market is a disputed issue in this case. Wyeth contends (and the evidence developed thus far in the litigation strongly supports Wyeth's contention) that the actual market is considerably broader than the market alleged by plaintiffs, and includes other hormone therapy products that are used to treat the same conditions as Premarin and Cenestin.[13] Plaintiffs cannot foreclose discovery into the area of market definition simply by alleging an unduly narrow product market. Wyeth is entitled to discovery on the disputed issue of market definition.

Moreover, the relevance of the information requested is not limited to market definition issues. The core of plaintiffs claim is that, "[a]s a result of Wyeth's unlawful conduct, plaintiffs were compelled to pay, and did pay, artificially inflated prices" for Premarin. (Compl. at ¶ 44.) In evaluating this charge, it may well be relevant to consider the prices (and rates of price increase) for other hormone therapy products that are used for the very same purpose as Premarin and Cenestin.

### 2. Documents Concerning the Use of Rebates or Discounts Based on Market Share, Exclusivity, or Preferential Product Positioning

Plaintiffs' complaint focuses on Wyeth's allegedly "exclusive" and "disguised exclusive" contracts with MCOs. The challenged provisions in Wyeth's contracts provide for the payment of rebates by Wyeth to certain MCOs based on the market share

---

[13] Notably, in the predecessor *Duramed* litigation, while Duramed initially alleged the relevant market was conjugated estrogens, Duramed's own economic expert eventually conceded for purposes of his analysis that the relevant market was oral estrogens, a market which is much broader than the conjugated estrogens market alleged by plaintiffs herein.

16

of Premarin among the MCOs' members (typically as compared to Premarin national market share) and, in some instances, based on the MCOs' agreement to give Premarin preferential positioning on their drug formularies. Wyeth believes that its contracts (including both the market share rebates and the so-called "exclusive" formulary provisions) are a legitimate form of price competition, and that such contracts are entirely consistent with standard practice in the pharmaceutical industry. Request No. 20 (which seeks documents relating to "the use of restrictive formulary policies or market share incentive rebates by pharmaceutical manufacturers other than Wyeth") is narrowly tailored to elicit information about the contracting practices of Wyeth's competitors. This information is necessary to understand the competitive context in which Wyeth operates, in order to assess whether Wyeth's contracts are lawful under the applicable rule of reason standard. That plaintiffs are likely to have relevant information is underscored by the fact that one plaintiff (CVS) owns a pharmacy benefit manager, known as Pharmacare. Wyeth is confident that Pharmacare has entered into rebate agreements with numerous manufacturers. The other plaintiff (Rite Aid) once owned a PBM which is now part of one of the largest PBMs in the country, Advance PCS.

      Similarly, Wyeth should be allowed to explore the extent to which plaintiffs have entered into agreements similar to those challenged in this action. See Request No. 13 (seeking documents relating to agreements plaintiffs have entered into "that provide for discounts or rebates . . . based on market share, exclusivity, or preferential product positioning (e.g., shelf space)" within their stores). The purpose of this request is not to show that plaintiffs have done anything wrong, but rather to bolster Wyeth's contention that such arrangements are common, lawful business practices.

17

## **CONCLUSION**

Wyeth has a compelling need for the discovery requested from CVS and Rite Aid. The information sought relates to several material issues in this case, including:

- Whether counsel for CVS and Rite Aid engaged in an improper conflict of interest by representing CVS and Rite Aid in preparing this suit against Wyeth while at the same time representing Wyeth on other matters.

- Whether Cenestin was unavailable to customers of managed care organizations (as plaintiffs allege), or, whether Cenestin was in fact widely available to such customers, often at the same co-payment level as Premarin (as Wyeth contends).

- Whether Wyeth's price increases were the result of allegedly exclusionary contracts with third-party PBMs, rather than a result of other (lawful) market forces (such as the willingness of customers to accept price increases).

- Whether the "relevant market" in this case should be limited to "conjugated estrogens" (as plaintiffs contend), or should also include other hormone therapy products (as Wyeth contends)

- Whether Wyeth's allegedly exclusionary contracts are consistent with standard industry practice, and whether plaintiffs themselves have entered into agreements similar to those that they seek to condemn here.

Plaintiffs objections to Wyeth's requests, based on attorney-client privilege and relevance, are simply unfounded. Moreover, plaintiffs have not demonstrated any undue burden associated with responding to Wyeth's document requests. For the reasons set forth above, Wyeth's motion to compel should be granted.

       Respectfully submitted,


       <u>s/*Grant S. Cowan*</u>
       James R. Adams  (0008253)
       Grant S. Cowan   (0029667)
       **FROST BROWN TODD LLC**
       2200 PNC Center
       201 E. Fifth Street
       Cincinnati, Ohio  45202-4182

       William J. Baer
       David S. Eggert
       **ARNOLD & PORTER LLP**
       555 Twelfth Street, N.W.
       Washington, D.C.  20004-1206
       (202) 942-5000

       Dan K. Webb
       W. Gordon Dobie
       **WINSTON & STRAWN LLP**
       35 West Wacker Drive
       Chicago, Illinois  60601-9703
       (312) 558-5600

       Counsel for Defendants

Dated:  February 27, 2004

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a copy of the foregoing has been served electronically this 27th day of February, 2004 on all counsel of record with CM/ECF registration and by U.S. mail, postage prepaid and Facsimile upon the following:

Ruthanne Gordon
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA  19103
Facsimile: (215) 875-4606

Marc H. Edelson, Esq.
**HOFFMAN & EDELSON**
45 West Court Street
Doylestown, PA  18901

Steve D. Shadowen
Gordon A. Einhorn
**HANGLEY ARONCHICK SEGAL & PUDLIN**
30 North Third Street, Suite 700
Harrisburg, PA 17101-1810
Facsimile: (787)364-1020

Daniel E. Gustafson, Esq.
**GUSTAFSON GLUEK PLLC**
725 Northstar E.
608 2nd Ave. S.
Minneapolis, MN 55402

Thomas L. Long, Esq.
**BAKER & HOSTETLER LLP**
Capitol Square, Suite 2100
65 East State Street
Columbus, OH  43215

Eliot Long, Esq.
**BUCHANAN INGERSOL**
1835 Market Street, 14th Floor
Philadelphia, PA  19103

s/*Grant S. Cowan*_____
Grant S. Cowan
Frost Brown Todd LLC