**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| J.B.D.L. Corp. d/b/a<br>BECKETT APOTHECARY, et al.<br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>WYETH<br>　　　　　　Defendant. | NO.  C-1-01-704<br><br>Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Hogan |
| CVS MERIDIAN, INC. and<br>RITE AID CORPORATION,<br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>WYETH<br>　　　　　　Defendant. | No. C-1-03-781<br><br>Judge Sandra S. Beckwith |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
WYETH'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
FROM CVS MERIDIAN, INC. AND RITE AID CORPORATION**

**INTRODUCTION**

Defendant Wyeth has moved to compel production of various documents from Plaintiffs CVS Meridian, Inc. ("CVS") and Rite Aid Corporation ("Rite Aid"). As Plaintiffs show in the following discussion, Wyeth's motion should be denied because the information sought is either irrelevant to any claim or defense, and/or would pose an undue burden on

Plaintiffs to produce the requested documents. Furthermore, much of the information sought is already in Wyeth's possession in some form.

## ARGUMENT

**I.    DOCUMENTS CONCERNING THE AVAILABLILTY OF CENESTIN TO MCO CUSTOMERS**

Wyeth requests production of records relating to CVS' and Rite Aid's individual transactions with literally thousands of their customers as well as the contracts between Plaintiffs and their customers' managed care organizations ("MCOs"). Wyeth contends that all of this information is necessary in order to determine the co-payments that customers made on their purchases of Premarin, Cenestin, and other products and to determine the reimbursements received by Plaintiffs. Plaintiffs have objected to production of this information for numerous reasons, but particularly due to the incredible burden posed by the production of a vast number of individual customer records. Furthermore, much of the information sought is almost certainly already in Wyeth's possession.

In Request No. 25, Wyeth requests "all contracts, agreements, or arrangements with insurance companies or MCOs that relate to their payment or reimbursement to [Rite Aid and CVS] for dispensing prescriptions of Premarin, Cenestin, or other ET or HT products." This request apparently relates to Plaintiff's allegation that Wyeth's contracts with MCOs required that Premarin be the only conjugated estrogen product on an MCO's formulary thereby preventing Cenestin from appearing on the formulary. If a drug store filled a prescription for Cenestin for a patient whose formulary did not include Cenestin, the drug store would not be entitled to reimbursement from the MCO and thus the patient would be required to pay the entire

cost of the drug out of his or her pocket. Thus by requiring Premarin to be the sole conjugated estrogen product on a formulary, Wyeth was able to foreclose competition.

The only possible relevance for Wyeth's request seeking all contracts with MCOs that set reimbursement rates for all ET or HT products is to determine which MCOs did not reimburse for Cenestin, thereby indicating that Cenestin was not on that MCO's formulary. Therefore, to the extent it includes reimbursement information concerning any other product, the request is overbroad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

To the extent that the request seeks information concerning reimbursement rates for Premarin and Cenestin, Wyeth already has the information it seeks in its possession. Wyeth obviously has its own contracts that it entered into with MCOs which show which MCOs were contractually bound to list Premarin as the sole conjugated estrogen product on their formularies and which would therefore not reimburse retail drug stores for dispensing Cenestin. It would also have its contracts with MCOs which required preferential listing of Premarin on formularies. With respect to information involving Cenestin, Wyeth would have received this information in the *Duramed* litigation in documents from the MCOs (including copies of their formularies) and in Duramed documents showing Cenestin's status on various formularies. Rite Aid and CVS should not be required to undertake a burdensome production of information that Wyeth already has in its possession.

In Request Nos. 26, 27, and 29, Wyeth seeks customer-specific information concerning Plaintiffs' dispensing of Premarin, Cenestin, and other drugs. Request No. 26 seeks documents relating to "any occasion where a prescription for Premarin, Cenestin, or any ET or HT product has not been filled . . . because the product was not on an MCO formulary." Request

3

No. 27 requests documents relating to any occasion where Cenestin was dispensed to a customer and an MCO required the customer to pay a higher co-pay than it would have charged for Premarin or provided no reimbursement thereby requiring the customer to pay in full. Request No. 29 seeks production in electronic form of specific information relating to each time Plaintiff dispensed a prescription for Premarin, Cenestin, or other HT product to a managed care customer.[1]

Plaintiffs initially objected to these three requests because they would impose an incredible burden. Plaintiffs would be required to search thousands of individual customer records to identify situations where prescriptions were not filled because the drugs were not on formulary and to identify situations where Cenestin was dispensed at a higher co-pay than Premarin or with the full cost being borne out of pocket by the customer. If such a search was even physically possible, it would involve untold hours to accomplish. However, Plaintiffs' initial objections are now academic. In researching the level of difficulty of providing the requested information, it has been determined that Plaintiffs' systems do not capture and retain rejected responses from the customer's insurance plan nor do they retain information where Cenestin was dispensed despite a higher co-pay.

In any event, this information in generalized form is already in Wyeth's possession. Wyeth states that the information is relevant because it will show to what extent Cenestin was subjected to higher co-payments than Premarin and the extent to which Cenestin was included on MCO formularies. As previously discussed, Wyeth has this information in its

---

[1] For each transaction, Wyeth seeks the date, the name of the MCO, the formulary or coverage status of the prescribed drug, the NDC Code, the quantity dispensed, the amount of co-payment paid by the customer, the average wholesale price for the prescribed drug at the time of sale, the amount Plaintiff was reimbursed by an MCO, the name of the physician and the amount of any dispensing fee received.

4

own contracts with MCOs in which Premarin was given exclusive status (thereby eliminating Cenestin from the formulary) and in the MCO formularies it has in its possession from the *Duramed* litigation showing the relative status of Premarin and Cenestin.

Request No. 29 seeks information concerning thousands of dispensed prescriptions in electronic form. Wyeth may believe that because the information is requested in electronic form, it is available at the push of a few buttons. This is most certainly not the case. Collectively, CVS and Rite Aid have more than 7,500 stores and analyzing all of this voluminous data for production would be a huge task. Both chains only keep transactional data on their systems for 24 months before it is archived. In order to access data that is still on the system, custom software programs would have to be written in order to collect the data in the form that it has been requested by the Defendant. Data that is more than 24 months old and has already been archived would be even more difficult to collect in that it would require the restoration of archived back-up tapes and a reconstruction of the database. This would require a significant programming effort, the analysis of multiple databases, and the additional task of excluding confidential information, including patient name and identification, that retail pharmacies are prohibited by law from disclosing. All told, it would take hundreds of hours of time to recover the information that the defendant has requested. Once again, however, to the extent that the information is relevant, it is already in Wyeth's possession on a more generalized basis. It is not necessary for the Defendant to have evidence of each individual transaction between Plaintiffs and their customers.

## II. DOCUMENTS CONCERNING PLAINTIFFS' "SPECULATIVE PURCHASING" AND PROFITS FROM THE SALE OF PREMARIN

Wyeth seeks an order compelling production of documents relating to profits Plaintiffs have earned from the sale of Premarin and Cenestin and concerning speculative

5

purchasing in which they may have engaged and profited from with respect to Premarin. The specific requests for which Wyeth seeks an order compelling production are as follows:

> Request No. 7: All documents reflecting actual, potential, or anticipated increases in the prices you paid for Premarin or other pharmaceutical products, including but not limited to any business plan or budget which anticipates such price increases.
>
> Request No. 8: All documents which relate to "speculative purchasing" of Premarin or other pharmaceutical products.
>
> Request No. 9: All documents which relate to whether your business model, or wholesalers business models, have relied upon price increases by manufacturers or average wholesale price increases for Premarin and other products in order for you or wholesalers to maintain or increase profitability.
>
> Request No. 11: All documents relating to your guidelines policies, procedures, or practices in setting prices for Premarin, Cenestin, or any products purchased using "speculative purchasing" practices.
>
> Request No. 17: All documents relating to the amount of profits or percentage of profit you earned from sales of Premarin and Cenestin.
>
> Request No. 18: All documents relating to whether you have received an economic benefit from price increases of Premarin.

CVS and Rite Aid objected to these requests on the grounds that they were overly broad, unduly burdensome, sought production of irrelevant information and were not reasonably calculated to lead to the discovery of admissible evidence.

The information sought by Wyeth is not relevant nor calculated to lead to the discovery of admissible evidence in that it seeks evidence of the "downstream" sale of Premarin by Plaintiffs. It is well established that where, as here, Plaintiffs seek damages based on an overcharge theory, information pertaining to Plaintiffs' subsequent sale of the goods, i.e. "downstream" sales, is of no relevance. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968). The Supreme Court held in *Hanover Shoe* that if an overcharge is illegal, an antitrust defendant cannot employ a "pass on" defense, arguing that although the

6

Plaintiff was overcharged, he "passed on" the illegal overcharge to his customers and therefore suffered no injury or even benefited from the overcharge. *Id.*

The information sought here by Wyeth is classic downstream information. Request Nos. 17 and 18 seek documents relating to "profits", "percentage of profit", and "economic benefit from price increases" related to Premarin. The other requests relate to "speculative purchasing" and seek information that Plaintiffs may have profited from Wyeth's price increases on Premarin by buying large quantities of the drug prior to a price increase and reselling it at a higher price after a price increase had been announced.

Wyeth tries to circumvent the general prohibition concerning evidence of downstream sales by conjuring up several defenses which it contends require the downstream information but do not, according to Wyeth, violate *Hanover Shoe*.

First, Wyeth contends that the information concerning "speculative purchasing" will show that Wyeth's list price increases were not caused by the exclusive contracts Wyeth had with managed care organizations (as Plaintiffs allege) but were the result of normal market forces such as speculative buying by large customers like the Plaintiffs. In other words, according to Wyeth, Plaintiffs relied upon price increases and speculative purchasing to increase their profits and therefore exerted pressure on Wyeth to increase its prices for Premarin.

Wyeth's second theory, also asserted in an attempt to circumvent *Hanover Shoe*, is that speculative purchasing and the profits it purportedly generates for Plaintiffs are a part of how the pharmaceutical industry works and under antitrust rule of reason analysis, the jury is entitled to know "all the circumstances" surrounding the alleged restraint on trade. This theory is essentially a variation on Wyeth's first theory, both based on the premise that the profits Plaintiffs received as a result of speculative purchasing of Premarin was a market force that

7

would have kept Wyeth from lowering its prices even if there had been greater competition from Cenestin.

Wyeth acknowledges the holding in *Hanover Shoe* but dismisses its importance, arguing that the decision's prohibition on the use of downstream information is applicable only when a defendant intends to use it to make a "pass on" defense, which Wyeth is not doing. Wyeth, however, ignores those cases since *Hanover Shoe* that have determined that the Supreme Court's restriction on downstream information was not strictly limited to the narrow context of that case. In *In re Polyester Staple Antitrust Litigation*, MDL No. 3:03-CV-1516 (W.D.N.C. Feb. 5, 2004) the defendants, like Wyeth here, argued that downstream information should be permitted for a purpose other than to support a pass on defense, *i.e.* to demonstrate "alternative explanations justifying or offsetting any alleged illegal price increase" and thereby showing the Plaintiffs did not suffer any injury. The Court rejected this argument holding that "a review of the pertinent case law reveals that this argument is one routinely made by defendants in antitrust actions – an argument routinely rejected by various federal courts . . . downstream data is not relevant to any defense defendants may assert at trial." *Id.* at 5.[2]

Similarly, in *In re Folding Carton Antitrust Litigation*, No. MDL 250 (N.D. Ill. May 5, 1978)[3] the defendants argued that downstream information was irrelevant to determine whether large and prosperous purchasers of folding cartons exercised "countervailing power" on the market. Citing *Hanover Shoe* and *Illinois Brick Co. v. Ill.*, 431 U.S. 720 (1977), the district

---

[2] A copy of the decision in *In re Polyester Staple Antitrust Litigation* was previously submitted to the Court as an exhibit to the Direct Purchaser Class Plaintiffs' Memorandum in Opposition to Wyeth's Motion to Compel (Docket No. 87, Exh. 1).

[3] A copy of the decision in *In re Folding Carton Antitrust Litigation* was previously submitted to the Court as an exhibit to the Direct Purchaser Class Plaintiffs' Motion for Protective Order (Docket No. 78, Exh. 13).

court rejected this argument, holding that "whether purchaser absorbed, passed on, or made a profit on the overcharges in comparison with the industry generally is irrelevant, and investigations into such matters are prescribed by Illinois Brick." *Id.* at 8.[4]

The cases cited by Wyeth do not dispel the conclusion that downstream discovery should not be permitted in this case. The Court in *In re Infant Formula Antitrust Litigation*, MDL 878 (N.D. Fla. 1992) did not engage in any discussion of *Hanover Shoe* or its progeny that have denied downstream discovery. *Blue Cross and Blue Shield of NJ v. Phillip Morris, Inc.*, 138 F. Supp. 2d 357 (E.D.N.Y. 2001) was not an antitrust case but involved a RICO fraud claim. The court held that "pass on" evidence concerning the insurance industry should be allowed to avoid improper speculation by the jury. However, the court itself described the decision as an "apparent anomaly" and its narrow holding should not be extended beyond the facts of that particular case. *Id.* at 360.[5]

Finally, the information sought by these requests, if it exists, would already be in Wyeth's possession. Wyeth contends that Plaintiffs liked price increases because they allowed them to increase their profits through speculative purchasing and Plaintiffs therefore exerted pressure on Wyeth to increase prices on Premarin. If this in fact occurred, Wyeth must have in its possession some way of documenting the pressure it experienced. Plaintiffs' supposed desire for ever-increasing prices would have been communicated in some way that Wyeth certainly

---

[4] *See also*, *In re Vitamins Antitrust Litigation*, 198 F.R.D. 296 (D.C.D.C. 2000) (Denying downstream discovery); *In re Wirebound Boxes Antitrust Litigation*, 131 F.R.D. 578 (D. Minn. 1990) (same).

[5] Wyeth also cites *Valley Drug Company v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003). This case, however, dealt with the issue of the discoverability of downstream information in the context of a class certification decision. It is therefore wholly inapplicable in the present context.

would be able to document. The requested downstream discovery is therefore both improper and unnecessary.

### III. DOCUMENTS RELATING TO HORMONE THERAPY PRODUCTS OTHER THAN PREMARIN AND CENESTIN

Wyeth also seeks production of all communications between Plaintiffs and any person relating to the price, availability, coverage, or reimbursement for all ET and HT products (Request No. 5) and records from Plaintiffs showing their purchases of all these products (Request No. 10). Rite Aid and CVS have agreed to provide the requested information as it relates to Premarin and Cenestin but have objected to the production of information concerning other products on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Wyeth's primary argument for the production of this information is that the Plaintiffs define the relevant product market narrower than does Wyeth and that it is entitled to discovery on this disputed issue. Wyeth, however, does not even attempt to explain how the production of Plaintiffs' purchase data for these other products (and the related information) would help to resolve the disputed market definition issue. To the extent that Wyeth intends to show that Premarin occupies a certain percentage of the market, the information sought from Plaintiffs would serve no real purpose. CVS and Rite Aid together represent approximately 13% of the retail drug industry. The information that Wyeth seeks would only be of use if it intends to go to every drug store nationwide to learn what percentage of the market Premarin and other products occupy. It is quite clear, however, that Wyeth has no intention of doing that. The reason for this is that the information that Wyeth seeks is available on a nationwide scale from commercial data services such as IMS, from which large pharmaceutical companies such as Wyeth regularly purchase data. This data

provides the prices (and rates of price increases) that Wyeth contends that it needs and would do so for all products, no matter how the relevant market is ultimately defined. For these reasons, Wyeth's request to compel production of documents responsive to Requests Nos. 5 and 10 should be denied.

### IV. DOCUMENTS RELATING TO THE HANGLEY ARONCHICK LAW FIRM'S REPRESENTATION OF CVS, RITE AID, AND WYETH

Wyeth also seeks production of documents relating to CVS' and Rite Aid's retention of the law firm Hangley Aronchick Segal & Pudlin ("HASP") to represent them in this litigation. Specifically, Wyeth requests documents showing 1) how many hours HASP worked on this litigation prior to the filing of the Complaint; 2) documents relating to HASP's retention, including the retainer agreement; and 3) all documents relating to Plaintiffs' retention of Steve Shadowen or any other attorney to represent them in any matter relating to purchases of Premarin.

Wyeth contends this information is discoverable because prior to the present case, HASP represented Wyeth on certain contract matters and Wyeth contends that the firm's representation of CVS and Rite Aid in the present case presents a conflict of interest which should result in HASP's disqualification. In fact, Wyeth's counsel (at least its in-house counsel) is well aware that HASP advised Wyeth of a potential conflict months before the filing of the present case and that appropriate steps were taken to avoid the exact situation which Wyeth now suggests may have occurred. Wyeth's claim that "at no time prior to the filing of this lawsuit did Hangley Aronchick ever advise Wyeth they had been retained by CVS and Rite Aid to sue Wyeth in this case" is demonstratively false. HASP not only advised Wyeth that its clients CVS and Rite Aid were contemplating this litigation but also actively engaged with Wyeth in discussions on how a conflict could be avoided and ultimately worked with Wyeth to transfer the

11

contract matters to another firm. The confidential and privileged documents that Wyeth seeks relating to HASP's retention in this case are of no relevance and are clearly sought only to harass plaintiffs and divert attention from the real issues in this case.

According to the erroneous chronology provided in Wyeth's brief, when attorney Steve Shadowen ("Shadowen") joined HASP, HASP sought only, in the abstract, a generalized waiver of potential future conflicts of interest involving possible future lawsuits brought by Shadowen on behalf of CVS and Rite Aid. According to Wyeth, nothing was ever said to Wyeth about the possibility of HASP's representation of CVS and Rite Aid in the Premarin case. This chronology is incomplete, inaccurate, and ultimately misleading.

Rite Aid's and CVS' Complaint was filed on November 10, 2003 by attorney Shadowen. In April 2003, a full seven (7) months before the Complaint was filed, another HASP attorney, David Scolnic ("Scolnic"), who was responsible for the Wyeth matters then handled by HASP, advised Wyeth's in-house counsel, Anne Keck ("Keck"), that HASP was in negotiations with attorney Shadowen and that he might be joining the HASP firm. (Declaration of David M. Scolnic ["Scolnic Dec."] at ¶ 3). Scolnic advised Keck that Shadowen had in the past worked on two matters adverse to Wyeth. (*Id.* at ¶ 4) Scolnic also stated that he could only continue to work for Wyeth if he could get some assurance that Wyeth would waive the conflict of interest that might arise if Shadowen were to bring a future antitrust action against Wyeth. (*Id.*) Scolnic followed-up on this several times with Keck who was to forward this issue to her management for consideration. (*Id*. at ¶ 5)

Throughout the period from April 18, 2003 through July 2003, in full knowledge of the potential conflict issue and after repeated attempts by Scolnic to obtain a resolution of that issue, Wyeth accelerated its delivery of contract matters for Scolnic to handle. (*Id.* at ¶ 6) Keck

12

expressly advised Scolnic that it was her hope that if the situation ever required HASP's withdrawal, the firm would, at the very least, be able to retain the work that had been previously sent, thus indicating that she thought a workable solution was possible. (*Id.*)

On August 22, Scolnic received an e-mail from Keck advising him that Wyeth had no problem with the acquisition of the Shadowen practice, but recognizing that if a suit arose, a meeting would be necessary to "determine the path forward." (*Id.* at ¶ 7) Scolnic advised Keck shortly thereafter that a more structured resolution was necessary and that a meeting should be held to formulate a solution. (*Id.* at ¶ 8) Keck agreed and a meeting was held on September 10, 2003, with Scolnic, Keck, her superior, Art Cohen, Esq. ("Cohen"), and Jason Smith, Esq., Wyeth's in-house antitrust counsel. (*Id.* at ¶ 9) At this meeting, the parties outlined a process to deal with potential conflicts. This was subsequently committed to paper and entitled "Hangley Aronchick Segal & Pudlin Proposal on Dealing with Potential Conflicts." (*Id.*) The most important component of this plan was that if an antitrust case developed against Wyeth, the company would either waive the conflict or allow HASP to withdraw from representing Wyeth in pending contract matters and provide HASP with a limited waiver for the purpose of affording the Firm sufficient time to wind down the then existing matters. This proposal was intended to be forwarded to Wyeth's upper management for approval. (*Id.*)

Soon after the September 10 meeting, Shadowen advised Scolnic that CVS and Rite Aid had received a Notice of Class Action concerning the pending Premarin litigation and that the drug chains were considering whether or not they should opt out of the Class. (*Id.* at ¶ 10) After this conversation, Scolnic immediately advised Keck that CVS and Rite Aid were contemplating a case against Wyeth, with Shadowen as their counsel. (*Id.*) Although Scolnic

13

did not initially identify the case as involving Premarin, he did so within a few days thereafter. (*Id.*)

By September 25, 2003, anticipating that Wyeth would not consent to HASP's continuing to work on contract matters while an antitrust claim involving Premarin was being prosecuted, Keck sent the waiver proposal to her superiors and Wyeth's antitrust counsel. (*Id.* at ¶ 11) Even before a decision was made, Keck and Scolnic discussed introducing Keck to another attorney so that alternative counsel would be ready if HASP were compelled to withdraw. (*Id.*)

By the first week in October 2003 the decision was made by Wyeth that HASP would have to withdraw. (*Id.* at ¶ 12) On or about October 13, Scolnic introduced Keck and Cohen to attorney Ed Ghisu at the Ballard Spahr firm and the transition of Wyeth's files from HASP was started. (*Id.* at ¶ 13) During the last two weeks of October, Scolnic transferred the Wyeth contract matters to Ghisu and during this transition period performed only limited substantive work. (*Id.* at ¶ 14) The transition was, for all practical purposes, completed by the end of October with Scolnic fielding only a few brief telephone calls during the first few days of November to wrap up the transition. (*Id.* at ¶ 15)

This chronology makes clear that Wyeth's underlying factual premise for its motion to compel has no basis in fact. While Wyeth contends that HASP sought only a generalized waiver for potential antitrust matters that might arise in the future and that the Premarin case was never discussed, in fact, the potential conflict involving the Premarin matter was taken to Wyeth as soon as Rite Aid and CVS informed Shadowen they were contemplating opting out of the Class. Of equal importance is the fact that after Shadowen joined HASP, but before any Premarin matter was contemplated, HASP and Wyeth's in-

14

house counsel developed a mechanism whereby, in the event a potential conflict was identified, Wyeth would grant a limited waiver to allow the firm sufficient time to wind down the existing contract matters. Indeed, shortly after this mechanism was discussed, Scolnic put Wyeth on notice that CVS and Rite Aid were contemplating a Premarin action. Wyeth's argument that the Premarin matter was never discussed and that HASP took no steps to avoid a potential conflict of interest is inaccurate. The complete facts make clear that there is no basis for Wyeth's conflict of interest allegations and no basis to compel discovery of confidential and privileged documents to support those baseless claims.

V. **DOCUMENT CONCERNING THE USE OF REBATES OR DISCOUNTS BASED ON MARKET SHARE, EXCLUSIVITY, OR PREFERENTIAL PRODUCT POSITIONING**

Wyeth has moved to compel the production of documents relating to *all* products (pharmaceutical and otherwise), for which Plaintiffs have entered into agreements for rebates or discounts based on market share, exclusivity or product placement. The specific requests are as follows:

> Request No. 13: All documents relating to contracts, agreements, or other arrangements you have entered into with any person that provide for discounts or rebates with respect to any product you have sold, based on market share, exclusivity, or preferential product position (e.g. shelf space) within your store.
>
> Request No. 20: All documents discussing or concerning the use of restrictive formulary policies or market share incentive rebates by pharmaceutical manufacturers other than Wyeth.

Plaintiffs have objected to both of these requests on the grounds that they are overly broad, unduly burdensome, seek irrelevant information, and are not reasonably calculated to lead to the discovery of admissible evidence.

With respect to Request No. 20, Wyeth argues that because Plaintiffs have alleged in their Complaint that Wyeth's exclusive and disguised exclusive contracts with managed care

15

organizations which provide for rebates and preferential formulary positioning are unlawful, it is entitled to discovery of all documents concerning restrictive formulary policies or incentive rebates. Wyeth contends that this information is relevant because it will purportedly show that its own contracts are entirely consistent with the standard practice in the pharmaceutical industry and will provide information concerning the competitive context in which Wyeth operates in order to assess whether Wyeth's contracts are lawful under a rule of reason analysis.

However, CVS and Rite Aid have brought a claim against Wyeth only under Section 2 of the Sherman Act and rule of reason analysis does not apply as it would in a Section 1 claim. Furthermore, the types of rebate agreements that other pharmaceutical companies may enter into with managed care organizations are completely irrelevant to any defense Wyeth may raise. While rebate contracts between manufacturers and managed care organizations are extremely common in the pharmaceutical industry, the nature of Wyeth's exclusive and disguised exclusive contracts was not common and violated antitrust law, as described in Plaintiffs' Complaint. What other pharmaceutical companies may or may not do is irrelevant nor would it lead to the discovery of admissible evidence. Finally, the request is overly broad and unduly burdensome in that it seeks production of contracts relating to all pharmaceuticals and not just those that are in competition with Premarin.

With respect to Request No. 13, Wyeth seeks agreements relating to *any* products for which Plaintiffs have received discounts or rebates based on exclusivity, shelf space, etc. This request is clearly overbroad in that it encompasses the full range of products sold in Plaintiff's stores, from razor blades to potato chips. Once again, Wyeth contends that such information is necessary to bolster Wyeth's argument that such arrangements are common, lawful business practices. Again, any such arrangements concerning other products are

completely irrelevant with respect to Plaintiffs' monopolization claim and any possible Wyeth defense. As such, Wyeth's request for this information should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs CVS Meridian, Inc. and Rite Aid Corporation respectfully request that Defendant Wyeth's motion to compel be denied.

                Respectfully submitted,

                HANGLEY ARONCHICK SEGAL & PUDLIN

By: */s/ Gordon A. Einhorn*
Steve D. Shadowen, I.D. No. 41953
Gordon A. Einhorn, I.D. No. 59006
30 North Third Street, Suite 700
Harrisburg, PA 17101
(717) 364-1004
(717) 364-1020 – facsimile

W.B. Markovits (0018514)
Markovits & Griewe, Co. L.P.A.
119 E. Court Street
Cincinnati, OH 45202
(513) 977-4774

*Attorneys for Plaintiffs CVS Meridian, Inc. and Rite Aid Corporation*

Dated: March 19, 2004

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing has been served this 19th day of March 2004 via facsimile and first class mail.

| | |
|---|---|
| Grant S. Cowan<br>FROST BROWN TODD LLC<br>2200 PNC Center<br>201 East Fifth Street<br>Cincinnati, OH  45202<br>Facsimile:  513 651-6981 | Kenneth A. Wexler<br>KENNETH A. WEXLER AND ASSOCIATES<br>One North LaSalle, Suite 2000<br>Chicago, IL  60602<br>Facsimile:  312 346-0022 |
| Theresa L. Groh<br>MURDOCK, GOLDENBERG, SCHNEIDER & GROH<br>700 Walnut Street, Suite 400<br>Cincinatti, OH  45202<br>Facsimile:  513 345-8294 | Daniel E. Gustafson<br>HEINS MILLS & OLSON, P.C.<br>700 Northstar East<br>608 Second Avenue South<br>Minneapolis, MN  55402<br>Facsimile:  612 338-4692 |
| Jay S. Cohen<br>SPECTOR, ROSEMAN & KODROFF<br>1818 Market Street, Suite 2500<br>Philadelphia, PA  19103<br>Facsimile:  215 496-6611 | Joseph E. Conley, Jr.<br>BUECHEL & CONLEY<br>25 Crestview Hills Mall Road, Suite 104<br>Crestview Hills, KY  41017<br>Facsimile:  859 578-6609 |
| Ruthanne Gordon<br>BERGER & MONTAGUE, P.C.<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Facsimile:  215 875-4604 | Marc H. Edelson<br>HOFFMAN & EDELSON<br>45 West Court Street<br>Doylestown, PA 18901<br>Facsimile: |
| David S. Eggert<br>ARNOLD & PORTER<br>555 Twelfth Street, N.W.<br>Washington, DC  20004<br>Facsimile:  202 942-5999 | Patrick E. Cafferty<br>MILLER FAUCHER & CAFFERTY LLP<br>101 N. Main Street, Suite 885<br>Ann Arbor, MI  48104<br>Facsimile:  734 769-1207 |
| Janet G. Abaray<br>LOPEZ, HODES, RESTAINO, MILMAN, SKIKOS & POLOS<br>312 Walnut Street, Suite 2090<br>Cincinnati, OH  45202<br>Facsimile: 513 852-5611 | |

/s/Gordon A. Einhorn_____