## DECLARATION OF DAVID M. SCOLNIC

1. I am a shareholder in the law firm of Hangley Aronchick Segal & Pudlin ("HASP") and make this declaration in support of Plaintiff Rite Aid's and CVS' opposition to Defendant Wyeth's motion to compel production of documents.

2. Prior to the representation of CVS and Rite Aid in the antitrust case against Wyeth involving the drug Premarin, HASP represented Wyeth on certain contract matters which were in no way related to the antitrust case. I was the HASP attorney with primary responsibility for the Wyeth contract matters.

3. In April 2003, seven (7) months before CVS' and Rite Aid's Complaint in the Premarin matter was filed, I advised Wyeth's in-house counsel Anne Keck ("Keck") that HASP was in negotiations with attorney Steve Shadowen ("Shadowen") and that he might be joining the HASP firm.

4. I advised Keck that Shadowen had, in the past, worked on two matters adverse to Wyeth. I also told Keck that I could only continue to work on Wyeth matters if I could get some assurance that Wyeth would waive the conflict of interest that might arise if Shadowen were to bring a future antitrust action against Wyeth.

5. Keck was to forward this issue to her management for consideration and I followed-up on this with her several times.

6. Throughout the period from April 18, 2003 through July 2003, in full knowledge of the potential conflict issue and after my repeated attempts to obtain a resolution of that issue, Wyeth accelerated it's delivery of contract matters for HASP to handle. Keck

**Exhibit 1**

expressly advised me that it was her hope that if the situation ever required HASP's withdrawal, the firm would, at the very least, be able to retain the work that had been previously sent, thus indicating that she thought a workable solution was possible.

7.  On August 22, I received an e-mail from Keck advising me that Wyeth had no problem with the acquisition of the Shadowen practice, but recognizing that if a suit arose, a meeting would be necessary to "determine the path forward."

8.  I advised Keck that a more structured resolution was necessary and that a meeting should be held to formulate a solution. Keck agreed and a meeting was held on September 10, 2003.

9.  I attended the September 10 meeting along with Ms. Keck, her superior, Art Cohen, Esq. ("Cohen"), and Jason Smith, Esq. Wyeth's in-house antitrust counsel. At this meeting, the parties outlined a process to deal with potential conflicts. This process was subsequently committed to paper and entitled "Hangley Aronchick Segal & Pudlin Proposal on Dealing with Potential Conflicts." The most important component of this plan was that if an antitrust case developed against Wyeth, the company would either waive the conflict or allow HASP to withdraw from representing Wyeth in pending contract matters and provide HASP with a limited waiver for the purpose of affording the Firm sufficient time to wind down the then existing matters. This proposal was intended to be forwarded by Keck to Wyeth's upper management for approval. A true and correct copy of the proposal is attached hereto as Exhibit A.

10.  Soon after the September 10 meeting, Shadowen advised me that CVS and Rite Aid had received a Notice of Class Action concerning the pending Premarin litigation and that the drug chains were considering whether or not they should opt out of the Class. After

2

being informed of this, I immediately advised Keck that CVS and Rite Aid were contemplating a case against Wyeth, with Shadowen as their counsel. Although I did not initially identify the case as involving Premarin, I did so within a few days thereafter.

11. By September 25, 2003, anticipating that Wyeth would not consent to HASP continuing to work on contract matters while an antitrust claim involving Premarin was being prosecuted, Keck sent the waiver proposal to her superiors and Wyeth's antitrust counsel. Even before a decision was made, Keck and I discussed introducing Keck to another attorney so that alternative counsel would be ready if HASP were compelled to withdraw.

12. By the first week in October 2003 the decision was made by Wyeth that HASP would have to withdraw.

13. On or about October 13, I introduced Keck and Cohen to attorney Ed Ghisu at the Ballard Spahr firm and began transition of Wyeth's files from HASP.

14. During the last two weeks of October, I transferred the Wyeth contract matters to Ghisu and during this transition period performed only limited substantive work.

15. The transition was, for all practical purposes, completed by the end of October, the only exception being a few brief telephone calls I fielded during the first few days of November to wrap up the transition.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 18, 2004

David M. Scolnic

3

## HANGLEY ARONCHICK SEGAL & PUDLIN
## PROPOSAL ON DEALING WITH POTENTIAL CONFLICTS

As we discussed previously, Steve Shadowen, along with a few colleagues primarily based in Harrisburg, PA, joined this firm effective July 1. Steve's primary business focuses on anti-trust matters arising out of Hatch-Waxman; he primarily represents CVS and Rite-Aid in those matters. This firm has made the determination that, if we are to continue to handle matters for Wyeth, we need to find an ethically responsible way of proceeding should a conflict arise.

At our meeting last week, we discussed the possibility of the following road-map:

(1) For the time being, this firm will continue to represent Wyeth on global sourcing and other contract matters (as well as other matters at our mutual agreement).

(2) We will take steps internally to make sure that Mr. Shadowen and those others involved in the antitrust litigation involving the pharmaceutical industry are screened from all Wyeth matters.

(3) If an antitrust case develops against Wyeth, this firm will be permitted to take that case, and Wyeth will elect one of the following courses of action:

   (a) Wyeth will waive the conflict and this firm will continue to be engaged on contract matters; or

   (b) Wyeth will not waive the conflict generally but will consent to this firm's withdrawal from representing Wyeth. In this event, the withdrawal will occur over a period of time to be determined by Wyeth in light of the existing matters and may involve, at Wyeth's option, the completion of pending matters by this firm. If Wyeth desires this firm to complete pending matters, it will provide a limited waiver of the conflict so that this firm can commence and prosecute the action against Wyeth.

We hope that we will be able to come to some resolution at this time so that we can continue to foster our excellent relationship with Wyeth.

**Exhibit A**