**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **CVS MERIDIAN INC.** and **RITE AID CORPORATION,** | ) ) ) ) **Civil Action No. C-1-03-781** |
| Plaintiffs, | ) ) **Judge Sandra S. Beckwith** |
| v. | ) **Magistrate Judge Timothy S. Hogan** ) ) |
| **WYETH,** | ) ) |
| Defendant. | ) ) ) |

**WYETH'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO COMPEL
THE PRODUCTION OF DOCUMENTS FROM CVS AND RITE AID**

Defendant Wyeth respectfully submits this reply brief in further support of its motion to compel plaintiffs to produce documents encompassed by Wyeth's document requests.

**INTRODUCTION**

Wyeth's discovery requests sought documents that are clearly relevant to a number of issues in this complex antitrust case. Plaintiffs, however, offered no more than a token production in response to these requests. Their opposition brief provides no justification for their refusal to comply fully.

First, plaintiffs do not offer any support for their assertion of the "attorney-client" privilege as grounds for refusing to produce documents that will show when the Hangley Aronchick firm began to represent CVS and Rite Aid in this matter. This information is relevant to the issue of whether Hangley Aronchick, which represented Wyeth in other matters until a few days before suing Wyeth on behalf of plaintiffs, has violated conflict

of interest rules that would preclude that firm's representation of plaintiffs in this case. Plaintiffs do not contest the relevance of the documents sought by Wyeth, and they do not cite any precedents suggesting that the documents sought by Wyeth are privileged. Rather, they simply try to defend their conduct in suing Wyeth. That issue will be briefed if Wyeth files a motion to disqualify. The only issue before the Court, however, is discovery, and Wyeth obviously needs the documents requested in order to make a reasonable assessment of the extent of the apparent conflict of interest.

Second, plaintiffs object to producing documents concerning the core allegation in the complaint – i.e., that Cenestin was somehow unavailable to consumers notwithstanding that it was freely available to CVS and Rite Aid. They contend – without evidence – that collecting some of the responsive materials would consume "hundreds of hours." This objection is unfounded. Wyeth has produced over 700,000 pages of documents in this coordinated litigation and has devoted thousands of employee and attorney hours to document production issues. CVS and Rite Aid, by contrast, have produced fewer than 1,000 pages of material (and three computer discs) between them. Wyeth's requests are directed at information that is central to plaintiffs' claims in this case; it is not too much to expect plaintiffs to collect and produce such critical information and comply with their obligations under Rules 26 and 34 of the Federal Rules of Civil Procedure.

Third, plaintiffs categorically refuse to respond to Wyeth's discovery requests that seek documents concerning "speculative purchasing" by plaintiffs. They repeat the same arguments (based on a misreading of the Supreme Court's *Hanover Shoe* decision) that have been put forth by wholesaler class members who received similar document

requests in the *J.B.D.L.* case. This issue is fully briefed in connection with Wyeth's pending motion to compel production from wholesalers in *J.B.D.L*, and this Court should compel production by plaintiffs here for the same reasons.[1]

Fourth, Wyeth is entitled to discovery relating to the issue of whether the relevant market can be limited to "conjugated estrogens" – as plaintiffs contend – or whether it should include other estrogen and hormone therapy products. The scope of the relevant market is a threshold issue in this case, and plaintiffs offer no reasonable basis for refusing to produce documents relevant to that issue.

Finally, there is no basis for CVS and Rite Aid's refusal to produce documents showing whether they have have entered into contractual arrangements that are essentially identical to the contracts that they attack in this case. As courts have often noted, the fact that a specific type of contract is widely used by non-defendants in an industry is relevant to the assessment of whether that contract should be deemed an unreasonable restraint of trade.

When all is said and done, plaintiffs seem to believe that they can launch a massive antitrust attack upon Wyeth, and demand broad discovery from Wyeth, yet somehow remain immune from discovery themselves. Plaintiffs have provided only a paltry production of documents in response to Wyeth's requests. Plaintiffs cannot expect

---

[1] Wyeth incorporates by reference herein the arguments set forth in the following recently filed briefs: (i) Wyeth's Motion to Compel The Production of Documents From Cardinal Health, Inc. and Amerisource Bergen Corp. (filed 2/9/04); (ii) Wyeth's Reply Brief In Support of Its Motion To Compel Discovery And Brief In Opposition To Cross Motions To Modify Or Quash Subpoenas (filed 3/19/04); and (iii) Wyeth's Opposition To Direct Purchaser Class Plaintiffs' Motion For Protective Order (filed 2/24/04).

to deny Wyeth critical information needed to defend the case, simply because they might incur some expense in collecting and producing relevant documents that are in their files. Wyeth's motion to compel should be granted.

**ARGUMENT**

I. **DOCUMENTS RELATING TO THE HANGLEY ARONCHICK LAW FIRM'S REPRESENTATION OF CVS, RITE AID, AND WYETH**

Plaintiffs' law firm – Hangley Aronchick – represented Wyeth on other matters until days before the filing of this lawsuit. Wyeth believes that Hangley Aronchick began its adverse representation of CVS and Rite Aid while Wyeth was still its client. Wyeth has sought limited, focused discovery to determine when Hangley Aronchick began working on this case for CVS and Rite Aid, in order to determine whether there are grounds to move to disqualify that firm.

Plaintiffs objected to this request by asserting that the requested documents (i.e., the retainer agreement and documents sufficient to show when work was performed for CVS and Rite Aid) were all protected by the attorney-client privilege and the work product doctrine. No other objection was asserted to those specific requests.

In its opening brief, Wyeth cited controlling precedent from the Sixth Circuit that the types of documents requested by Wyeth are *not* protected by the attorney-client privilege or the work product doctrine.[2] In their opposition, plaintiffs do not argue otherwise; indeed, they offer no defense of the privilege objection they asserted. For this reason alone, Wyeth's motion to compel should be granted.

---

[2] *See United States v. Goldfarb,* 328 F.2d 280, 282 (1964); *Humphreys, Hutcheson & Moseley v. Donovan,* 755 F.2d 1211, 1219 (6th Cir. 1985).

Rather than defend their privilege objection, plaintiffs attempt to argue the merits of a disqualification motion that Wyeth has not yet filed. This Court obviously need not decide at this time the ultimate issue of whether Hangley Aronchick violated applicable ethical rules by agreeing to represent these two large retail pharmacy chains in contemplation of a lawsuit against its client, Wyeth. The discovery sought by Wyeth is relevant to the issue of disqualification and therefore is discoverable. The issue of disqualification should be resolved only after the relevant materials have been produced.

In any event, since plaintiffs insist on putting forward their version of the facts surrounding the Hangley firm's representation of Wyeth, it should be noted that there exists a fundamental factual dispute concerning those facts, as demonstrated by the attached declaration of Wyeth in-house counsel, Ann Keck. Hangley Aronchick claims that approximately two months before this suit was filed, David Scolnic, a partner in the firm, *orally* advised Ms. Keck that his partner, Steve Shadowen, had been retained to represent CVS and Rite Aid in a lawsuit against Wyeth involving Premarin. Ms. Keck, however, states that Mr. Scolnic never advised her of the actual conflict. The documentary record supports Ms. Keck's version of events. In particular:

- On September 11, 2003 – after a meeting with Wyeth to discuss his request for a general advance waiver of *potential* conflicts that might arise in the future due to the nature of Mr. Shadowen's work – Mr. Scolnic sent a written "proposal" to Wyeth for dealing with such "potential" conflicts. The proposal stated that Mr. Shadowen "has no current cases pending or contemplated against Wyeth" and that "there is no existing conflict." Keck Decl., ¶ 6 & Ex. B. It then outlined a process whereby "if an antitrust case develops against Wyeth," Hangley Aronchick would be "permitted to take that case" and Wyeth could either "waive the conflict" or "provide a limited waiver" for the purpose of winding-down then existing matters. Keck Decl., ¶ 6 & Ex. B.

- On September 16, 2003, Mr. Scolnic sent a revised proposal to Wyeth, which revised certain aspects of the "wind-down" option. The revision also, without

      explanation, deleted the prior representation that Mr. Shadowen had "no current cases pending or contemplated against Wyeth." Nevertheless, it failed to disclose any actual or specific conflict. Moreover, the proposal was still described as a proposal to deal with "potential" conflicts and to outline procedures to be employed "if an antitrust case develops against Wyeth." Keck Decl., ¶ 7 & Ex. C.[3]

- According to Ms. Keck, "Mr. Scolnic never indicated to me or, to my knowledge, anyone at Wyeth that his firm had begun or intended to begin working on a matter adverse to Wyeth, including any case involving Premarin." Keck Decl., ¶ 9.

Furthermore, even under Hangley Aronchick's version of events, Wyeth never agreed to waive any conflicts. Although Hangley Aronchick requested an advance waiver, it was denied. Keck Decl., ¶ 4. Although Hangley then proposed a procedure whereby it could be given at least a limited "wind down" waiver for potential conflicts, Wyeth never agreed to that proposal either. Scolnic Decl., ¶ 11; Keck Decl., ¶ 8. Moreover, on one point there is no dispute: namely, Hangley Aronchik never obtained from Wyeth a *written* waiver with respect to the conflict.

However, the factual disputes between plaintiffs and Wyeth – and the issue of whether Hangley Aronchick should be disqualified – are diversions from the issues raised by this *discovery* motion. Regardless of how the issue of disqualification ultimately is resolved, Wyeth is plainly entitled to the requested documents, which are relevant and are in no way barred by any privilege doctrine.

---

[3] The declaration submitted by Mr. Scolnic discusses (and attaches) the revised (September 16) Hangley Aronchick proposal, but fails to mention the original (September 11) proposal, which specifically advised Wyeth that Mr. Shadowen had "no current cases pending or contemplated against Wyeth" and that "there is no existing conflict." Mr. Scolnic has yet to provide any explanation for the removal of this language in the revised proposal.

## II.   DOCUMENTS CONCERNING THE AVAILABILITY OF CENESTIN TO MCO CUSTOMERS

The central allegation in this case is that consumers were somehow foreclosed from purchasing Cenestin due to Wyeth's contracts with MCOs. Nevertheless, CVS and Rite Aid have refused to produce a single document relating to the core issue of whether consumers were actually foreclosed. By their own account, plaintiffs operate over 7,500 retail outlets and represent about 13% of the entire retail drug industry. Pl. Mem. at 5, 10. If Wyeth's contracts have had the adverse impact on consumers alleged in the complaint, one would think that there would be some evidence to this effect in plaintiffs' files. However, they refuse to produce any such documents showing whether any consumer was ever foreclosed from purchasing Cenestin in any of their stores.

Plaintiffs allege that Wyeth's contracts "foreclosed Cenestin from being on [MCO] formularies" (Compl. at ¶ 34), and thus "strictly limited [MCOs] from making Cenestin . . . available to their members." (Compl. at ¶ 3). Wyeth intends to prove that, regardless of Cenestin's formulary status, Cenestin was often (indeed, usually) reimbursed by MCOs, and often was reimbursed at the same co-payment level as Premarin. Such evidence will substantially undermine plaintiffs' claim that Wyeth's contracts rendered Cenestin "unavailable" to consumers or somehow "foreclosed" Cenestin from the market.

Wyeth's requests are narrowly tailored to obtain the information necessary to establish this defense, including the extent to which Cenestin prescriptions were reimbursed by MCOs notwithstanding its formulary status, and the extent to which Cenestin was subjected to higher co-payments than Premarin. Plaintiffs are two of the largest retail pharmacies in the country, and thus are uniquely positioned to address these

key issues, in light of their contractual relationships with MCOs and their direct interactions with customers seeking to fill Cenestin prescriptions.

Plaintiffs urge that the discovery is somehow cumulative and unnecessary because (a) Wyeth can learn the formulary status of Premarin and Cenestin from other sources and (b) formulary status is the same as reimbursement status. Second, plaintiffs contend that the discovery is burdensome and would require plaintiffs to devote "hundreds of hours" to assemble responsive materials. Neither objection stands up to scrutiny.

The first objection is based on a false factual premise. Plaintiffs contend that if Cenestin is not on an MCO's formulary, the MCO "would therefore not reimburse retail drug stores for dispensing Cenestin." Pl. Mem. at 3. This unsupported assertion is inaccurate. In reality, exclusion from a formulary ordinarily does not result in denial of reimbursement.[4] Rather, the vast majority of MCOs administer either "open" formularies or "tiered" formularies. Under open formularies, non-formulary products are reimbursed at the same co-payment level as formulary products. Under tiered formularies, non-preferred products are reimbursed by the MCO, but at a somewhat higher co-payment level. Thus, Wyeth has reason to believe that Cenestin prescriptions dispensed by plaintiffs *were* in fact reimbursed by MCOs, often at the same co-payment level as

---

[4] *See, e.g.*, Memorandum in Support of Wyeth's Motion for Summary Judgment (filed 10/1/02 in the Duramed v. Wyeth litigation, at 53-55) (citing Duramed's own estimates that over 60% of managed care consumers can obtain Cenestin at the same co-pay as Premarin even when Cenestin is not on formulary); Declaration of Edward Adamcik, Senior Director of Pharmaceutical Contracting for Merck-Medco (Appendix I-49 to Wyeth's summary judgment motion) (Merck-Medco was 90% "open" as of late 1999); Deposition of Marty Carter at 273-74 (Appendix C-4 to Wyeth's summary judgment motion) (confirming that 60-65% of consumers subject to managed care are in open formularies and can thus obtain Cenestin for the same co-payment as Premarin).

Premarin. Wyeth needs the requested pharmacy-level data to conclusively establish that – at least in plaintiffs' stores, which account for a substantial portion of all sales in the relevant market – Cenestin was not foreclosed.

Counsel's assertion that Wyeth's requests would require "hundreds of hours" of employee time – unsupported by any evidence – is insufficient to avoid plaintiffs' obligation to produce the requested discovery. *See e.g.*, *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan. 1997) ("The objecting party must show specifically how each discovery request is burdensome or oppressive by submitting affidavits offering evidence revealing the nature of the burden. . . . [a]n unsubstantiated allegation that a substantial period of time would be required to respond to the request does not carry the objecting party's burden"); *Chubb Integrated Systems Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 59-60 (D.D.C. 1984) ("An objection must show specifically how [a discovery request] is overly broad, burdensome oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden").

Even if complying with Wyeth's request to produce relevant materials would consume significant employee time, that is simply a cost of litigation that a large corporation must be willing to pay when it chooses to file a complex antitrust case against another company. *See e.g.*, *Oleson*, 175 F.R.D. at 565 ("Discovery requests in every case require a significant amount of time for response").[5]  Moreover, Wyeth has

---

[5] Plaintiffs also note that they may have no documents responsive to some of Wyeth's requests. Pl. Mem. at 4. If that is so, it is no ground for objecting to the request. Instead, plaintiffs should simply respond to the request by stating that no responsive documents exist after performing a search as required by the federal rules of civil procedure.

devoted enormous amounts of time to producing hundreds of thousands of responsive documents in this case, and has conducted numerous electronic document and data searches. CVS and Rite Aid, by contrast, have provided less than a thousand pages and three computer discs.

### III.    DOCUMENTS CONCERNING "SPECULATIVE PURCHASING" BY CVS AND RITE AID

Plaintiffs refuse to produce documents concerning their reliance on and/or anticipation of regular price increases by pharmaceutical manufacturers such as Wyeth. As is the case with Wyeth's pending motion to compel similar discovery from certain wholesaler members of the *J.B.D.L.* "direct purchaser" class, the requested discovery is directly relevant to a central issue in this litigation – whether Wyeth's allegedly unlawful contracts led to anticompetitive price increases. Wyeth seeks information on the speculative purchasing practices of its largest customers (including plaintiffs) to establish that its prices are the product of legitimate, competitive market forces – including the willingness of its large customers to accept such price increases as part of their own business model.

Thus, the requested speculative purchasing information is critical to resolving the threshold issue of liability (i.e., whether Wyeth's price is illegal). Contrary to plaintiffs' assertions, Wyeth is not barred by the limitations on proving a "pass-on" defense, that were established in *Hanover Shoe*. Wyeth seeks speculative purchasing information for a variety of legitimate reasons unrelated to the "pass-on" defense. These reasons have been fully briefed in pending motions in *J.B.D.L.*, and will not be repeated here. If Wyeth's motions in *J.B.D.L.* are granted, the same ruling will presumably be applicable here.

### IV. DOCUMENTS CONCERNING THE USE OF REBATES OR DISCOUNTS BASED ON MARKET SHARE, EXCLUSIVITY, OR PREFERENTIAL PRODUCT POSITIONING

Plaintiffs' complaint attacks Wyeth's use of allegedly "exclusive" and "disguised" exclusive contracts with MCOs – i.e., contracts that provide for the payment of rebates based on Premarin's market share among the MCOs members and, in some instances, based on the MCOs' agreement to give Premarin preferential formulary positioning. Wyeth believes that its managed care contracts are a legitimate form of price competition, which are entirely consistent with standard practice in the pharmaceutical industry.

To support its defense of these contracts, Wyeth issued narrowly tailored requests to CVS and Rite Aid seeking basic information about similar contracting practices. The applicable case law confirms the relevance of the requested information. *See Trace X Chem. Inc. v. Canadian Indus. Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) (sustaining market share incentive contracts challenged under Section 2 of the Sherman Act when "such a practice was a normal competitive tool within the stern drive manufacturing industry"); *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 925–28 (10th Cir. 1975) (reversing district court monopolization finding because antitrust laws are not meant to prohibit successful firm's "adoption of legal and ordinary marketing methods already used by others in the market").[6]

---

[6] *See also Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 2001-1 Trade Cas. (CCH) ¶ 73,215, 89,943, 2001 WL 8586, at *11-12 (E.D. La. 2001) (no violation when exclusive contracts with MCOs were common practice in the patient care

[*Footnote is continued on next page*]

Plaintiffs claim that, since their claims were brought under Section 2 of the Sherman Act rather than Section 1, the "rule of reason analysis does not apply" and thus the information requested by Wyeth is irrelevant. This argument distorts well-established law governing proof in a Sherman Act § 2 case. The "rule of reason" attempts to assess both the pro-competitive benefits and the anti-competitive effects of conduct in order to determine the reasonableness of such conduct and its impact on the marketplace. The same is true in a Sherman Act § 2 case. The fact that the term "rule of reason" is primarily used in Section 1 cases is a distinction without a difference – the analysis in a Section 2 case overlaps to a large extent with the analysis in a Section 1 "rule of reason" case. Thus, the extent to which a challenged practice is common in an industry is just as relevant in Section 2 monopolization cases as in cases brought under Section 1. In fact, the cases cited by Wyeth actually involved Section 2 monopolization claims.[7]

It is also noteworthy that plaintiff CVS owns a major PBM – Pharmacare. Wyeth is entitled to inquire whether Pharmacare has entered into agreements with pharmaceutical manufacturers that are essentially identical to the agreements that its parent (CVS) challenges in this case.

---

[*Footnote continued from previous page*]

industry and were a reasonable competitive response to competition); *Joyce Beverages, Inc. v. Royal Crown Cola Co.*, 555 F. Supp. 271, 277-78. (S.D.N.Y. 1983) (alleged exclusive dealing practice upheld in part because virtually all soft drink bottlers had employed similar practices "[s]ince the dawn of the industry.").

[7]   In addition, the companion *J.B.D.L.* case with which this case is consolidated *does* contain a Rule of Reason claim under Section 1 of the Sherman Act.

**V.     DOCUMENTS RELATING TO HORMONE THERAPY PRODUCTS OTHER THAN PREMARIN AND CENESTIN**

Plaintiffs refuse to produce documents relating to the hormone therapy products that Wyeth believes (and the evidence developed thus far in the litigation strongly suggests) compete with Premarin and Cenestin. The requested documents relate to the prices paid by Plaintiffs for such products as well as the extent to which such products were reimbursed by MCOs. This information is relevant on several grounds.

First, the requested information is relevant to whether Cenestin was in fact foreclosed by Wyeth's actions. The requested discovery may shed light on any differences in formulary and/or reimbursement status between Cenestin and other hormone therapy products, and the reasons for such differences. Plaintiffs' allegations that Wyeth's contracts caused MCOs to disfavor Cenestin will obviously be undermined if it is shown that MCOs also treat other hormone therapy products (in addition to Premarin) more favorably than Cenestin.

Second, the documents sought by Wyeth are relevant to the issue of how to define the relevant market in this case. Plaintiffs' communications with MCOs regarding all hormone therapy products – such as documents that compare the therapeutic benefits of such products, their pricing, or other attributes – are likely to lead to the discovery of admissible evidence as to whether such products compete in the same relevant market.

Lastly, the purchase information requested by Wyeth is relevant to the issue of whether plaintiffs suffered any injury. Plaintiffs allege that they paid artificially inflated prices for Premarin. The prices paid by plaintiffs for other hormone therapy products during the same time period may aid in the evaluation of this claim. As plaintiffs point out, list price data is available at the national level through pricing services. However,

such data cannot demonstrate the actual prices paid by CVS and Rite Aid nearly as well as their own internal records.

## CONCLUSION

Wyeth has a compelling need for the discovery requested from CVS and Rite Aid. Wyeth's targeted document requests seek important information relating to several material issues in this case, including:

- Whether counsel for CVS and Rite Aid engaged in an improper conflict of interest by representing CVS and Rite Aid in preparing this suit against Wyeth while at the same time representing Wyeth on other matters.

- Whether Cenestin was unavailable to customers of managed care organizations (as plaintiffs allege), or, whether Cenestin was in fact widely available to such customers, often at the same co-payment level as Premarin (as Wyeth contends).

- Whether Wyeth's price increases were the result of allegedly exclusionary contracts with third-party PBMs, rather than a result of other (lawful) market forces (such as the willingness of customers to accept price increases).

- Whether the "relevant market" in this case should be limited to "conjugated estrogens" (as plaintiffs contend), or should also include other hormone therapy products (as Wyeth contends).

- Whether Wyeth's allegedly exclusionary contracts are consistent with standard industry practice, and whether plaintiffs themselves have entered into agreements similar to those that they seek to condemn here.

Plaintiffs' objections to Wyeth's requests, based on attorney-client privilege and relevance, are unfounded. Moreover, plaintiffs' have failed to adequately establish that Wyeth's requests are unduly burdensome.

Respectfully submitted,


s/*Grant S. Cowan*
James R. Adams  (0008253)
Grant S. Cowan   (0029667)
**FROST BROWN TODD LLC**
2200 PNC Center
201 E. Fifth Street
Cincinnati, Ohio  45202-4182

William J. Baer
David S. Eggert
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000

Dan K. Webb
W. Gordon Dobie
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois  60601-9703
(312) 558-5600


Counsel for Defendants


Dated:  March 30, 2004

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the foregoing has been served electronically this 30th day of March, 2004 on all Counsel of Record with CM/ECF Registration and by U.S. mail, postage prepaid and Facsimile upon the following:

Eliot Long
**BUCHANAN INGERSOLL**
1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985
Facsimile: 215-665-8760


s/*Grant S. Cowan*
Grant S. Cowan, Esq.
Frost Brown Todd LLC