IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| J.B.D.L. Corp. d/b/a<br>BECKETT APOTHECARY, et al., | )<br>)<br>)<br>) | Civil Action No. C-1-01-704<br><br>Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Hogan |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| WYETH-AYERST LABORATORIES,<br>INC., et al., | )<br>)<br>) | |
| Defendants. | ) | |

**DIRECT PURCHASER CLASS PLAINTIFFS'
NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR
OPPOSITION TO WYETH'S MOTION FOR SUMMARY JUDGMENT**

Class Plaintiffs submit this Notice to apprise the Court of the recent precedential decision in *U.S. v. Dentsply Int'l, Inc.*, No. 03-4097, 2005 U.S. App. LEXIS 3219 (3d Cir. Feb. 24, 2005) (attached at Tab A), which was decided after Class Plaintiffs filed their summary judgment opposition brief. This Third Circuit decision provides highly relevant and helpful legal analysis on the very issues raised by Wyeth's motion for summary judgment that are now pending before this Court. The *Dentsply* court reversed the district court's entry of judgment for the defendant, and concluded that exclusionary conduct in the form of a "policy imposed by a manufacturer on its dealers" – analogous to the conduct Wyeth engaged in here – violated Section 2 of the Sherman Act. *Dentsply* reaffirms and elucidates the applicable standards for liability and causation applicable to this case. As discussed in Class Plaintiffs' Memorandum of Law in Opposition to Wyeth's Motion for Summary Judgment (Doc. #143 at 68-70, 100, 102-03) ("SJ

Opp. Br."), the Sixth Circuit has articulated a similar approach to exclusionary conduct cases. *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002). Also notable is that *Dentsply* relies upon the decisions of *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc) and *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), two cases that Class Plaintiffs discuss extensively in their summary judgment opposition brief.

In *Dentsply*, the Third Circuit found that exclusionary contracting practices by an artificial teeth manufacturer with monopoly power (Dentsply) violated § 2 of the Sherman Act because, by requiring its dental supply dealers to limit sales of rival artificial teeth products, Dentsply's contracts (1) were inherently coercive; (2) reduced rivals' access to the most favorable and efficient modes of distribution (though not all such modes); and (3) harmed competition. In reaching this conclusion, the Third Circuit firmly rejected the very same defenses Wyeth raises here, *e.g.*, that: (a) the contracts at issue were terminable at will; (b) a substantial percentage of dealers' sales were of rival brands, so that "rivals [were] not entirely excluded from the market;" and, (c) the monopolist's main rivals allegedly did not actively promote their products, which the monopolist argued was the root cause of the rivals' lack of market share.

Like Wyeth has in the ERT market pertinent here, Dentsply had long dominated the market for artificial tooth manufacturing, with a unit market share of 67%. *Dentsply*, supra at *4. As Wyeth did toward managed care, Dentsply "operated under a policy that discouraged its dealers from adding competitors' teeth to their lines of products." *Id.*. The contractual provision at issue in *Denstply* was called "Dealer Criterion 6," which provided that dealers "may not add further tooth lines to their product offering." *Id.* Just as Wyeth's punitive rebate provisions

2

coerced PBMs and MCOs into shunning market rivals, Dentsply's policy presented dealers with "an 'all-or-nothing' choice": reject rival artificial tooth lines or suffer the penalty of being barred from selling Dentsply teeth. *Id.* at *36-37.

The district court, while finding that Dentsply's purported business justification for Dealer Criterion 6 was "pretextual" and that the contracts were indeed "designed expressly to exclude its rivals from access to dealers," *Id.* at *6-7, nevertheless concluded that Dentsply's conduct did not violate the Sherman Act. The district court's opinion was based upon two specific factors, namely, that: (1) Dentsply's rivals could, and did, avail themselves of other dealers and other methods of distribution; and (2) dealers were free to leave Dentsply's network at any time. *Id.* "Dentsply's tactics did not preclude [rivals] from marketing their products directly to the dental laboratories," the district court found. *Id.* at *16. Moreover, Dealer Criterion 6 permitted dealers to "sell competing grandfathered brands of teeth," which sales constituted a substantial share of the market. *Id.* at *5. The district court also found, similar to Wyeth's arguments here, that "the failure of Dentsply's two main rivals . . . to obtain significant market shares resulted from their own business decisions to concentrate on other product lines, rather than implement active sales efforts for teeth." *Id.* at *16-17.

The Third Circuit not only reversed, *but also directed entry of judgment for the Government.* The court first explained, just as Plaintiffs stated in their opposition to Wyeth's summary judgment motion, that "[b]ehavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist," and that "exclusive dealing arrangements can be an improper means of maintaining a monopoly." *Dentsply*, supra at *10. Then, articulating the legal standard to be applied, the Third Circuit stated that "[u]nlawful

maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." *Id.* at *11. *Accord Conwood*, 290 F.3d at 783-84; *Re/Max Int'l Inc. v. Realty One, Inc.*, 173 F.3d 995, 1000 (6th Cir. 1999).

In conducting its analysis, the *Dentsply* court first reviewed documents and testimony from Dentsply that are strikingly similar to those elicited from Wyeth in this case. Dentsply's documents demonstrated that Dealer Criterion 6 was designed to "block competitive distribution points," "not allow competition to achieve toeholds," and "tie up dealers." *Dentsply*, supra *18. The court deemed these "clear expressions of a plan to maintain monopolistic power." *Id.* at *19. The court then noted "some ten separate incidents" – analogous similar exclusionary conduct here (*see, e.g.*, SJ Opp. Br., Doc# 143 at 37-51) – "in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth," threatening the sanction of being deprived of all Dentsply products. *Id.* at *20. The court found that these incidents "demonstrated conclusively that Dentsply had supremacy over the dealer network." *Id.* at *20 & *32 (dealers faced with losing 90% of tooth sales revenue if they added a non-Dentsply product line).

Just as Plaintiffs do here, the *Dentsply* court analogized to *LePage's*, where the rival "simply could not match the discounts that 3M provided." *Id.* at *31 & *35 ("[a]s in *LePage's*, the rivals simply could not provide dealers with a comparable economic incentive to switch"). *See* SJ Opp. Br., Doc. #143 at 57-58, 87-95. Just as PBMs in this case could not afford to place Wyeth's rivals in an advantageous formulary position due to Wyeth's exclusionary contracting practices, no Dentsply rival could have replaced the lost Dentsply revenues (not only on artificial

4

teeth, but bundled with other Dentsply products) that a dealer would suffer from adding the rival's line of artificial teeth, due to the large, inelastic base of Dentsply sales:

> The levels of sales that competitors could project in wooing dealers were minuscule compared to Dentsply's, whose long-standing relationships with these dealers included sales of other dental products. For example, Dentsply threatened Zahn with termination if it started selling Ivoclar teeth. *At the time, Ivoclar's projected $1.2 million in sales were 85% lower than Zahn's $8 million in Dentsply sales.*

*Dentsply*, supra at *33 (emphasis added). Because of rivals' inability to offset the penalty Dentsply would impose on dealers who dared to violate Dealer Criterion 6, the Third Circuit concluded that the "District Court's theory that any new or existing manufacturer may 'steal' a Dentsply dealer by offering a superior product at a lower price" was not realistic. "To the contrary, purloining efforts have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions," the court observed. *Id.* (citation omitted).

Although Dentsply pointed to undisputed evidence of alternative distribution routes and methods available to rivals – analogous to the supposed "open formulary" and non-managed-care sales Wyeth has pointed to in this case[3] – the Third Circuit concluded that these modes of distribution did not present a "practical alternative." *Id.* at *17, *24 & *37. "The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market." *Id.* at *37. On this point, the Court reasoned:

> That some manufacturers resort to direct sales and are even able to stay in business by selling directly is insufficient proof that direct selling is an effective means of competition. The proper inquiry is not whether direct sales enable a competitor to "survive" *but rather whether direct selling "poses a real threat" to*

---

[3]*See, e.g.*, SJ Opp. Br., Doc. #143 at 20, 98 (discussing the fallacy of Wyeth's "open formulary" argument); 17-19, 25-27 (discussing the dominance and importance of managed care to the distribution of prescription drugs).

*defendant's monopoly.* The minuscule 5% and 3% market shares eked out by direct-selling manufacturers Ivoclar and Vita, Dentsply's "primary competitors," reveal that direct selling poses little threat to Dentsply.

*Id.* at *30. (citations omitted) (emphasis added).[4]

By contrast, the distribution channel that Dentsply targeted through its Dealer Criterion 6 had certain advantages over other distribution routes. *Dentsply*, supra *26-*28 & 38 ("[d]ealers also provide benefits to manufacturers, perhaps the most obvious of which is efficiency of scale. Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks"); *id.* at *28 ("dealers provide manufacturers more marketplace exposure and sales representative coverage than manufacturers are able to generate on their own").

Like the PBM and MCO channel Wyeth targeted with its contracting strategy in this case (SJ Opp. Br., Doc. #143 at 17-27), the channel targeted by Dentsply was the "preferred" distribution channel, but not the only one. *Dentsply*, supra at *28-29.[5] "There are other ways across the 'river' to consumers, but high volume retailers provided the most effective bridge," the Third Circuit recognized. *Id.* at *38. Thus, because "overwhelming numbers" of sales were made through dealers, compared with other available distribution routes, Dentsply had foreclosed competitors from a "substantial percentage of the available opportunities for product distribution" through a "heavily traveled channel." *Id.* at *21 (citing *Microsoft*, 253 F.3d at 70-

---

[4]"Direct sales" refers to sales of artificial teeth not through distributors but instead directly to dental laboratories.

[5]Of course, the PBM/MCO distribution channel in this case is not merely the "preferred" method of getting drugs to patients, it is far and away the most important means of doing so such that failure to have access to this channel can directly result in failure of a drug to gain market share.

6

71).

Under Section 2 of the Sherman Act, the Third Circuit recounted, "it is not necessary that all competition be removed from the market." The test is not total foreclosure, but "whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit," the Court said. *Id.* at *24 (citing *LePage's*, 324 F.3d at 159-60; *Microsoft*, 253 F.3d at 69). The Third Circuit ultimately held:

> By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly. It helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition.

*Id.* at *24. Accordingly, judgment in favor of Dentsply was not only reversed, but was entered in favor of the Government on its Sherman Act § 2 claim, using the very standard for § 2 cases contained in the Sixth Circuit's *Conwood* and *Re/Max* decisions. *See* SJ Opp. Br., Doc. #143 at 67-68.

The Third Circuit also rejected Dentsply's arguments, like Wyeth's here, concerning the technically short duration of the contracts containing Dealer Criterion 6 and regarding what Dentsply characterized as its rivals' own contribution to their low market share. *Dentsply*, supra at *31. On the "duration" argument, the court held that even if "rivals could theoretically convince a dealer to buy their products and drop Dentsply's line," that would not exonerate Dentsply. *Id.* at *17. The court held that "in spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth," because "the economic elements involved -- the large share of the market held by Dentsply and its conduct excluding competing manufacturers -- realistically make the

7

arrangements here as effective as those in written contracts." *Id.* at *30.

With regard to Dentsply's argument that its rivals' poor business judgment was the cause of their low market share, the Third Circuit not only rejected Dentsply's argument, *Dentsply*, supra at *16-18, but effectively found Dentsply's evidence *irrelevant as a matter of law*. "Logically, Dealer Criterion 6 cannot be both a cause of the competitors' lower promotional expenditures which hurt their market positions, and at the same time, be unrelated to their exclusion from the marketplace," the Court ruled. *Id.* at *39. This directly applies here, where Wyeth argues that its rival, Duramed, did not adequately market Cenestin. In light of Wyeth's exclusionary contracting practices, such arguments are similarly irrelevant.

In sum, *Dentsply* is further authority demonstrating that Wyeth's motion for summary judgment should be denied.

                                                  Respectfully submitted,

                                                  s/Theresa L. Groh
                                                  Theresa L. Groh (29806)
                                                  **MURDOCK GOLDENBERG**
                                                  **SCHNEIDER & GROH, L.P.A.**
                                                  35 E. Seventh Street, Suite 600
                                                  Cincinnati, Ohio 45202
                                                  Tel: (513) 345-8291
                                                  Fax: (513) 345-8294
                                                  *Local Counsel for Direct Purchaser Class*

                                                  H. Laddie Montague
                                                  Ruthanne Gordon
                                                  Eric L. Cramer
                                                  **BERGER & MONTAGUE, P.C.**
                                                  1622 Locust Street
                                                  Philadelphia, PA 19103

>Eugene A. Spector
>Jay S. Cohen
>**SPECTOR, ROSEMAN & KODROFF, P.C.**
>1818 Market Street, Suite 2500
>Philadelphia, PA 19103
>*Co-Lead Counsel for Direct Purchaser Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

>s/ Theresa L. Groh