# EXHIBIT 19

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
2003 WL 23715981 (D.Or.)
(Cite as: 2003 WL 23715981 (D.Or.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Oregon.
CONFEDERATED TRIBES OF SILETZ
INDIANS OF OREGON, Smokey Point
Hardwoods, Inc.,
and Ross-Simmons Hardwood Lumber Company,
Inc., Plaintiffs,
v.
WEYERHAEUSER COMPANY, Defendant.
No. CV 00-1693-PA.

Jan. 21, 2003.
Michael E. Haglund, Michael K. Kelley, Timothy J. Jones, Haglund Kirtley Kelley Horngren & Jones, LLP, Portland, OR, for Plaintiffs.

Julia E. Markley, Michael H. Simon, Thomas R. Johnson, Perkins Coie, LLP, Portland, OR, for Defendants.

OPINION

PANNER, J.

*1 Plaintiffs Confederated Tribes of Siletz Indians of Oregon, Smokey Point Hardwoods, Inc., and Ross-Simmons Hardwood Lumber Co., bring this antitrust action against Defendant Weyerhaeuser Company. The Third Amended Complaint alleges that "Plaintiffs are the owners and operators of three alder sawmills in Oregon and Washington that were forced out of business in 1998-2001 as a result of defendant's illegal anti-competitive actions." Plaintiffs seek a total of $36.6 million in compensatory damages, before trebling, plus attorney fees and costs.

Defendant has moved for summary judgment. Also pending are Defendant's Motion to Exclude Plaintiffs' Experts' Testimony, and Defendant's Motion to Strike Plaintiffs' New Expert Testimony. Defendant's reply brief also requests that certain of Plaintiffs' exhibits be stricken. All of the foregoing motions are denied.

*Defendant's Motions to Exclude and to Strike*
1. Defendant's Motion to Exclude (Rasmussen, Tedder, and Zerbe)

This motion seeks to exclude the testimony of Plaintiffs' expert witnesses on *Daubert* grounds. Rule 702 provides that:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendant argues that economists Mark Rasmussen, Dr. Philip Tedder, and Dr. Richard Zerbe failed to use what Defendant believes to be the only proper methodology for defining the relevant market and showing that the Defendant possesses monopoly power. Although the Supreme Court has expanded *Daubert* to other expert fields, this does not appear to be what the Court had in mind when it authorized the trial courts to exclude "junk science." Rather, Defendant is arguing the merits of this antitrust case under the cloak of a *Daubert* motion. In deciding whether to grant summary judgment, this court is free to look beyond the expert's bottom-line conclusions. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir.1995). If the expert opinions fail to establish the essential elements of Plaintiffs' case, then the remedy would be to grant summary judgment, not to exclude those opinions as "unreliable."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23715981 (D.Or.)
(Cite as: 2003 WL 23715981 (D.Or.))

Page 2

2. Defendant's Motion to Exclude (Nelson)

Defendant moves to exclude the expert opinion of William Nelson on the ground he is unqualified to offer an opinion because he is not an economist by training. Nelson has over 25 years of experience managing alder sawmills in the Pacific Northwest. Knowledge of the local lumber market, the suppliers, their purchasing practices, historical prices, plus an understanding of the reasons why customers purchase alder (rather than some other hardwood) for a particular application, are all useful in defining the relevant market and understanding whether Weyerhaeuser possesses, or has attempted to acquire, monopoly power.

*2 Defendant also contends this opinion should be excluded because Nelson failed to fully disclose the "methodology" underlying his conclusions, or provide the "quantitative data supporting that opinion." Instead of books and academic theories, Nelson based his opinion upon his extensive personal experience and knowledge of the timber market in this region. Under the circumstances of this case, that does not justify excluding his opinion. Cf. Lucas Automotive Engrg, Inc. v. Bridgestone/Firestone, Inc., 275 F.3d 762, 768 n. 3 (9th Cir.2001). The opinion of an expert derived from real world experience can be as valid as the opinion of an economist whose only knowledge of a sawmill comes from reading National Geographic. [FN1] Defendant may cross-examine Nelson and offer its own expert opinions. The jury will decide how much weight to give to their respective conclusions.

> FN1. That is a general principle, not a characterization of the particular expert retained by Defendant. Dr. Pozdena's report indicates that he has more than 20 years of experience researching the forest products industry.

3. Defendant's Motion to Strike New Expert Testimony (Rasmussen, Zerbe, and Ehinger)

After Defendant moved to strike Plaintiffs' expert testimony because the experts did not analyze the data in the manner that Defendant contends is legally required, Plaintiffs instructed their experts to perform the analysis that Defendant said was missing. Defendant now moves to strike the expert affidavits of Rasmussen and Zerbe on the ground that these additional conclusions were not disclosed to Defendant until November 12, 2002. Defendant argues that any expert studies had to be completed by October 24, 2002, when expert discovery closed.

I deny the motion. The supplemental expert testimony was generated in direct response to Defendant's attack upon the original expert reports. Plaintiffs first learned of Defendant's contentions after the discovery deadline, and acted promptly to remedy the alleged deficiency. Some courts have granted a motion to strike in similar circumstances, reasoning that a Plaintiff may not wait until the Defendant files for summary judgment, and points to the holes in the Plaintiff's case, before belatedly plugging those holes with a new expert opinion. However, that rationale places undo emphasis on law as a contest of skill between rival lawyers, at the expense of doing justice. At this stage of the proceedings, if there is sufficient evidence to support the Plaintiffs' case, I will not exclude that evidence simply because Plaintiffs failed to anticipate the need for it until the defect was pointed out by their opponent. The court is not grading a law school moot court exercise. Nor is this a situation in which the Plaintiff has completely changed the version of events he told at deposition in order to forestall defeat, i.e., a "sham" affidavit. Finally, trial is not until April 2003, so there is little risk of unfair prejudice.

Defendant also moves to strike the expert testimony of Paul Ehinger, on the ground his report was not disclosed until November 11, 2002, and because it allegedly addresses a "new" issue. Plaintiffs counter that this report simply responds to Defendant's motion for summary judgment, which asserts that Plaintiffs cannot show significant barriers to entry of the relevant market, which is an essential element of their antitrust claim.

*3 Plaintiffs should have anticipated the need for testimony on this issue, and not waited until a summary judgment motion was pending before obtaining an expert report that was necessary to establish an essential element of their case. However, I will not preclude Plaintiffs from presenting that evidence now that the deficiency has been called to their attention. In addition, Plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23715981 (D.Or.)
(Cite as: 2003 WL 23715981 (D.Or.))

Page 3

told Defendant on Oct. 24 that they were in the process of obtaining an expert affidavit from Ehinger, and disclosed the subject matter (though not the substance) of his testimony. Defendant was on notice that Ehinger had been retained and the general scope and purpose of his report.

Given the time remaining until trial (Defendant received this report in early November and the trial is not until April), there is little *unfair* prejudice in allowing this testimony. Having to go to trial, instead of prevailing on summary judgment, is not unfair prejudice. If Defendant requests, I will allow Defendant to depose any new experts (or on any new opinions) and file any responsive expert disclosure reports.

4. Defendant's Motion (in footnote 11 of its Reply Brief) to Strike Various Documents

Defendant seeks to strike various deposition excerpts because Plaintiffs' counsel neglected to attach the court reporter's certification. That defect can easily be remedied (and, in fact, was cured almost two months before oral argument). Defendant also complains that Plaintiffs didn't cite the specific line numbers of the testimony they rely upon, citing the page numbers instead. Again, the defect (if any) is readily curable.

Next, Defendant seeks to strike evidence concerning conduct that pre-dates the 4-year limitations period. However, evidence of events occurring more than four years prior to the filing of an antitrust complaint may still be admissible for various purposes, *e.g.*, to establish the wrongful nature and character of the defendant's conduct during the limitations period. *See Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1305-06 (9th Cir.1983). Therefore, I deny that request.

Defendant raises other arguments, none of which have merit. All of Defendant's motions to strike and to exclude testimony are denied.

*Defendant's Motion for Summary Judgment*
Plaintiffs cite a handful of musty cases for the proposition that summary judgment is disfavored in antitrust cases. That is no longer true. The usual summary judgment standards apply. *See, e.g.,*

*Geneva Pharmaceuticals Tech. Corp. v. Barr Labs.*, 201 F.Supp.2d 236, 266 (S.D.N.Y.2002) (rejecting identical argument).

The elements of a claim for monopolization under Section 2 of the Sherman Act are "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "Monopoly power" is "the power to control prices or exclude competition" from the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). The plaintiff must also show that it suffered a "causal antitrust injury." *Smilecare Dental Group v. Delta Dental Plan of Calif., Inc.*, 88 F.3d 780, 783 (9th Cir.1996). [FN2]

> FN2. "Causal antitrust injury" means an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield v. USA Petroleum*, 495 U.S. 328, 334 (1990). "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Id.* at 344.

*4 A claim for attempted monopolization under Section 2 of the Sherman Act requires proof of the following: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of successfully achieving market power in the relevant market; and (4) causal antitrust injury. *Id.*

The Third Amended Complaint, simply stated, alleges that the Plaintiffs owned alder sawmills in Oregon and Washington, but did not have their own timber supply (or at least not enough logs to keep their mills running). The plaintiffs had to buy logs on the open market. Weyerhaeuser allegedly took various wrongful actions aimed at tying up the available alder timber, intentionally raising the price

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 23715981 (D.Or.)  
(Cite as: 2003 WL 23715981 (D.Or.))

Page 4

that Plaintiffs had to pay for logs, and otherwise preventing the Plaintiffs from obtaining an adequate supply of red alder logs, at a reasonable price, to operate their sawmills. The net effect (and intent) was to destroy competition, leaving Weyerhaeuser with a monopoly in the alder market in this region, able to dictate both the price paid to alder producers for their logs and the price paid by consumers for finished alder lumber.

For purposes of this motion only, Weyerhaeuser concedes that its intentions are a disputed factual question. Assuming the truth of the evidence proffered by Plaintiffs, a jury could find that Defendant has engaged in wrongful conduct aimed at destroying competition, and which might be viewed as economically irrational but for its adverse effect on competition. [FN3] The record also suggests that the number of non-Weyerhaeuser alder sawmills in this region has declined precipitously in recent years, though the parties dispute the reasons for (and legal significance of) that decline.

> FN3. I recognize that Defendant has evidence it believes depicts a very different picture of Weyerhaeuser's actions, and the reasons why the Plaintiffs' sawmills are now out of business. However, on a motion for summary judgment the evidence must be viewed in the light most favorable to the non-moving party.

Weyerhaeuser's principal argument for summary judgment is that it does not possess a monopoly in the relevant market, properly defined. The relevant market for antitrust purposes is generally defined in terms of the "product market" and "geographic market." "[A] product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F .2d 1369, 1374 (9th Cir.1989). *See also E.I. du Pont de Nemours*, 351 U.S. at 394-95 (commodities reasonably interchangeable by consumers for the same purposes constitute the product market). *But cf. Rebel Oil*, 51 F.3d at 1436 (court must consider elasticity of supply as well as that of demand).

"Cross-elasticity of demand" between products is "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 469 (1992). For instance, if consumers would simply shift to Chevrolet cars in the event that Ford cars become too expensive, then the relevant market may be "cars" in a particular price range and not just the universe of "Ford cars." "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir.1999).

*5 The "geographic market" is the area of effective competition where buyers can turn for alternate sources of supply. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991). If small changes in the price of a product in one location will cause customers to turn to alternatives available in another location, then these sources are part of the same relevant market.

The definition of the relevant market is, ultimately, a mixed question of fact and law for the jury. *See Forsyth*, 114 F.3d at 1476. Unless the Plaintiffs' market definition is wrong as a matter of law, or unsupported by the record, it is an issue for the jury to decide. *Id.* at 1477 (denial of summary judgment proper even though the court thought the defendant's evidence was more persuasive).

Defendant contends the relevant market is *all* finished hardwood lumber, nationwide (or perhaps even internationally), and that Weyerhaeuser controls just over two percent of this market. Plaintiffs point to two relevant markets: [FN4] (1) the market for finished *alder* lumber, of which Weyerhaeuser allegedly has a 75 percent share, and (2) the market for alder sawlogs in the Pacific Northwest, of which Weyerhaeuser allegedly has a 65 percent share.

> FN4. Plaintiffs repeatedly use the term "submarket," as do some Ninth Circuit opinions. *See, e.g., Morgan, Strand, Wheeler & Biggs*, 924 F.2d at 1490 ("A submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 23715981 (D.Or.)  
(Cite as: 2003 WL 23715981 (D.Or.))

Page 5

larger market.") However, the concept of a "submarket" adds little to the analysis. *See, e.g.,* Phillip Areeda, ANTITRUST LAW, ¶ 533 (2d. ed 2002) ("[s]peaking of 'submarkets' merely confuses the issue"). The task is to define the relevant market in a given case, which is a fact-based inquiry. That the relevant market may be defined more narrowly in a given case does not change the ultimate inquiry.

Red alder is harvested in commercial quantities almost exclusively in the Pacific Northwest. According to Plaintiffs' experts, sawlogs must be processed soon after cutting, and cannot feasibly be transported long distances or stockpiled indefinitely. There are special sawmills dedicated to producing alder lumber, as opposed to other species. Those mills cannot readily utilize other varieties of timber, nor are sufficient quantities of other hardwood sawlogs available in this region to keep a mill running, and it is not feasible to import sawlogs from other regions even if they were available. Alder is distinct from other hardwoods, both in uses, grading, and pricing. *See, e.g.,* Wheeler Declaration. Defendant's expert disputes many of these assertions, but the court cannot resolve that dispute on summary judgment.

Defendant also relies upon Plaintiff Smokey Point's response to Request for Admission No. 5, [FN5] but the question was ambiguous. It is unclear whether Smokey Point was admitting that red alder lumber can serve as a substitute for other hardwoods--because of alder's superior qualities--or admitting that other hardwoods can readily replace alder. In addition, there are varying degrees of substitutability. *See* Pozdena Report, p. 11; Wheeler Decl. *See also Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1271 (9th Cir.1975) ("where there is a *high degree* of substitutability ... two [products] should be considered in the same market") (emphasis added). Finally, the record indicates that particular grades of alder are used for very different purposes. It may be that other hardwood species are readily substituted for the low grade alder used to make pallets, but not for the high grade alder used to make furniture or guitars. On this record, I cannot say. The requested admission lacks essential details and cannot bear the great weight Defendant places upon it.

> FN5. The identical question and answer are in the requests for admissions posed to the other Plaintiffs (though numbered differently).

*6 Defendant next argues that sawlogs are not the end product, and the antitrust laws exist to protect consumers, so the only relevant market is finished lumber. However, the antitrust laws apply to inputs as well as outputs. *See Telcor Communications, Inc. v. Southwestern Bell Tel. Co.,* 305 F.3d 1124, 1132-36 (10th Cir.2002) (relevant market from perspective of those Plaintiffs was pay phone locations, rejecting contention that relevant market must be viewed from perspective of retail end-users, for whom cell phones could be a substitute product).

The protections of the Sherman Act are not limited to individual retail consumers. "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236 (1948) (citations omitted). [FN6] *See also American Ad Management, Inc. v. General Tel. Co. of Calif.,* 190 F.3d 1051, 1057-58 (9th Cir.1999) (a plaintiff need not be a consumer to establish antitrust injury).

> FN6. The continuing validity of this principle was restated in *Blue Shield v. McCready,* 457 U.S. 465, 472 (1982).

Much of the finished alder lumber is itself an "input" that will be purchased by other businesses and transformed into furniture, guitars, and other products. Nevertheless, the antitrust laws guard against a monopoly in the sale of those inputs. *Cf. R.C. Dick Geothermal Corp.,* 890 F.2d 139, 143-44 (9th Cir.1989) (en banc) (relevant market was steam, which is not a final retail consumer product but merely an input to be used by other businesses); *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 457 (9th Cir.1966) (relevant market was oranges available at a reasonable price to orange juice manufacturer, even though oranges was not the final product but only an input), *reversed on*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23715981 (D.Or.)
(Cite as: 2003 WL 23715981 (D.Or.))

Page 6

other grounds, 389 U.S. 384 (1967). Likewise, a business can also be a "consumer." If Weyerhaeuser has monopolized the market for alder sawmill logs, it is immaterial that the victims are other mills. *Cf. Case-Swayne,* 369 F.2d at 457 (immaterial that plaintiff was rival juice manufacturer rather than ultimate consumer, and market monopolized was the input and not the retail juice market).

Defendant argues that such an antitrust claim has to be asserted by a seller of timber, not a rival buyer of logs. However, the Plaintiffs in *Telcor* were not sellers of pay phone locations, but would-be competitors of Southwestern Bell unable to gain a toehold in the market because of Southwestern Bell's alleged stranglehold over pay phone locations that was perpetuated by anti-competitive practices. Likewise, the plaintiff in *Case-Swayne* was a rival juice manufacturer unable to obtain oranges due to Sunkist's alleged anti-competitive practices. Plaintiffs make analogous allegations here.

*7 It also seems appropriate to limit the sawlog market geographically. From the Plaintiffs' perspective, it is of little solace that cherry sawlogs may be available in the southeastern United States, if--as a result of anti-competitive conduct--no logs are available, at a reasonable cost, to feed their mills here in the Pacific Northwest. *Cf. Mandeville Island Farms,* 334 U.S. at 236 ("Nor is the amount of the nation's sugar industry which the California refiners control relevant, so long as control is exercised effectively in the area concerned.")

As Defendant acknowledges, this is an area of antitrust law on which even experts disagree. For purposes of this summary judgment motion, it is not necessary to resolve all those disagreements or to articulate a grand theory of antitrust law. I am satisfied that Plaintiffs have stated a claim upon which they may be entitled to relief, assuming the jury finds that the evidence at trial supports Plaintiffs' contentions.

Defendant next argues that there are no significant barriers to entry, [FN7] based upon the cost of opening a sawmill, and the alleged entrance of other competitors. Some of these facts are disputed. *See, e.g.,* Ehinger Decl., ¶ 10. A jury could also find other barriers to entry beyond the mere cost to outfit a sawmill, including the alleged monopolization of inputs (*i.e.,* alder sawlogs) and a history of alleged anti-competitive conduct. *Cf. Telcor Communications,* 305 F.3d 1124 (prospective competitors unable to obtain suitable locations for their pay phones, coupled with history of anti-competitive conduct by Southwestern Bell).

FN7. Entry barriers are "additional long-run costs that were not incurred by the incumbent firms but must be incurred by new entrants ." *Rebel Oil,* 51 F.3d at 1439, citing *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427-28 (9th Cir.1993). Examples of such barriers include: (1) license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and (5) economies of scale. *Id.*

Defendant also asserts that " 'raising rivals' costs,' at least in the form that Plaintiffs present in this case, has never been accepted by any court as the basis for the predatory conduct element of a Section 2 claim, especially in the absence of proof that such conduct caused the defendant to operate at a loss or that such conduct raised the costs of the defendant's rivals disproportionately greater than it raised the defendant's own costs." Defendant further argues that "even if predatory pricing may be considered to be predatory conduct in violation of Section 2, merely reducing one's profit margins to gain a competitive advantage while still selling at a profitable level can *never* be predatory conduct as a matter of law."

In *Forsyth v. Humana,* the Ninth Circuit held that a hospital's "alleged policy of funneling indigent and low-paying patients to competitors raises a factual question whether such conduct *increased the operating costs of those competitors* by imposing on them the costs of caring for indigent patients." 114 F.3d at 1478 (emphasis added). "[T]hese anticompetitive practices enabled Sunrise to, and it did, charge higher prices for hospital services. These higher prices translated into higher copayments and premium payments. Such an increase in consumer prices caused by the asserted conduct would constitute antitrust injury of the type

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23715981 (D.Or.)
(Cite as: 2003 WL 23715981 (D.Or.))

Page 7

the antitrust laws were designed to prevent." *Id.*

*8 *Forsyth* may be distinguishable because the plaintiffs were employees and employers complaining about high health care premiums, rather than competitors of Humana. However, *Forsyth* cited other authorities. *See, e.g., Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.,* 63 F.3d 1540, 1553 (10th Cir.1995) (monopolist's practice of scheduling courses to conflict with competitor's course could raise competitor's costs, and therefore, "would qualify as anticompetitive conduct"); *Premier Electrical Const. Co. v. Nat'l Electrical Contractor's Ass'n,* 814 F.2d 358, 368 (7th Cir.1987) (when defendant raised its rivals' costs, it raised the market price to its own advantage); T. Krattenmaker & S. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price,* 96 YALE L.J. 209, 235-62 (1986). [FN8] Purposely inflating a competitor's costs can, in some instances, be anti-competitive.

> FN8. *Cf. Oahu Gas Service, Inc. v. Pacific Resources Inc.,* 838 F.2d 360, 368-69 (9th Cir.1988) (discussing when a monopolist's refusal to aid a competitor violates the antitrust laws). Clearly antitrust liability may be premised upon theories other than mere predatory retail pricing.

Defendant is correct that, at least in the foregoing instances, the increase in costs disproportionately favored the Defendant. However, when competitors lack deep pockets, a monopolist may be willing to raise both its competitor's costs, and its own costs, in the short run, to be rid of those competitors in the long run. That is little different from predatory pricing aimed at putting the competition out of business.

In addition, Weyerhaeuser allegedly would have earned a much greater profit on alder sales, at least in the short run, but for the anti-competitive conduct complained of. I see no practical difference between predatory pricing that results in a company purposely selling a product at a loss of one cent per unit, versus selling the same product at a profit of only one cent per unit when the company would have earned a larger profit but for its anti-competitive conduct. Assuming the truth of the Plaintiffs' contentions, a jury could find that the conduct Weyerhaeuser allegedly engaged in would have been "economically irrational but for its adverse effect on competition." Some courts have deemed this sufficient to constitute anti-competitive or predatory conduct for purposes of proving a Section 2 violation. *See also* Pozdena Depo. at 33-34 (such conduct might be proscribed by the antitrust laws if it "had no legitimate purpose" and was aimed at destroying competition).

Of course, there is a critical distinction between deliberately driving up costs for the purpose of destroying competition and letting logs rot in the yard just to keep competitors from obtaining those logs for their own mills, versus outbidding rivals for scarce resources that both companies require with any price increase resulting from normal market forces when demand exceeds supply. The former may be unlawful anti-competitive behavior, while the latter is simply business. The antitrust laws exist to protect competition, not to protect specific companies from the effects of legitimate competition. A firm may also acquire and maintain a monopoly simply by being a better competitor or having better production methods; the Sherman Act does not outlaw such monopolies nor is it intended to shield inefficient competitors from competition. *See Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir.1991). However, at this stage in the proceedings the court is unable to say, as a matter of law, that Weyerhaeuser's conduct did not violate the Sherman Act.

*9 Defendant also argues that Plaintiffs' theory of the case is irrational, because Defendant could have bought the Plaintiffs' mills for less than it allegedly spent to drive them out of business through other means. Even assuming those figures are accurate, it does not mandate a grant of summary judgment. For one thing, this argument assumes that Defendant knew the eventual cost from the start. That is not always the case, as many a car owner has discovered after spending more money to repeatedly repair the car than it would have cost to simply replace it at the outset. A jury might ultimately find Defendant's argument persuasive, but it does not carry the day here.

Defendant advances several other arguments, but they do not alter the result. Plaintiffs have made a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 23715981 (D.Or.)  
(Cite as: 2003 WL 23715981 (D.Or.))

Page 8

sufficient showing to survive a motion for summary judgment. There are conflicting expert opinions, theories of the case, and explanations for Weyerhaeuser's conduct and the reasons why the Plaintiff sawmills went out of business. The parties also are far apart on the issue of damages, if Plaintiffs do prevail on liability.

*Conclusion*

Defendant's Motion (# 46) to Exclude Plaintiffs' Experts' Testimony is DENIED. Defendants' Motion (# 67) to Strike Plaintiffs' New Expert Opinions is DENIED. Defendant's additional Motions to Strike (contained in footnote 11 of its Reply brief, # 66) are DENIED. Defendants' Motion (# 42) for Summary Judgment is DENIED.

2003 WL 23715981 (D.Or.)

**Motions, Pleadings and Filings (Back to top)**

. 3:0001693 (Docket)
(Dec. 08, 2000)

. 3:00CV01693 (Docket)
(Dec. 08, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.