# EXHIBIT 21

Westlaw.

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Page 1

H

Motions, Pleadings and Filings

United States District Court, W.D. Michigan,
Southern Division.
N.W.S. MICHIGAN, INC., Plaintiff,
v.
GENERAL WINE & LIQUOR COMPANY, INC.
Defendant.
No. 4:00-CV-179.

June 6, 2001.

Morton Siegel, Ballard Jay Yelton, III, Miller, Canfield, Paddock & Stone, Kalamazoo, MI, Sherry L. Katz-Crank, Miller, Canfield, Paddock & Stone, Lansing, MI, Ingham, for N.W.S. Michigan, Inc., pltf.

Frederick M. Baker, Jr., Honigman, Miller, Schwartz & Cohn, Lansing, MI, for General Wine & Liquor Company, Inc., deft.

ORDER

QUIST, J.

*1 In accordance with the Opinion filed this date,

IT IS HEREBY ORDERED that Defendant's Motion To Dismiss Pursuant to F.R. Civ. P. 12(b)(6) (docket no. 10) is GRANTED IN PART. Counts I and II of Plaintiff's First Amended Complaint are DISMISSED.

IT IS FURTHER ORDERED that Counts III through V of Plaintiff's First Amended Complaint are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

This case is closed.

OPINION

Plaintiff, N.W.S. Michigan, Inc. ("NWS"), has sued Defendant, General Wine & Liquor Company, Inc. ("General Wine"), pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging violations of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. NWS also alleges state law claims of civil conspiracy, intentional interference with contracts, and intentional interference with prospective contractual relation. Now before the Court is General Wine's motion to dismiss NWS's first amended complaint. [FN1]

FN1. General Wine's motion to dismiss was initially directed at NWS's original complaint. After General Wine filed its motion, NWS filed a first amended complaint in an attempt to cure the pleading deficiencies alleged by General Wine in its motion. The Court has permitted General Wine and NWS to file supplemental briefs regarding the sufficiency of the first amended complaint and will consider the instant motion as being addressed to the first amended complaint.

Facts

For many years following the repeal of prohibition, the State of Michigan was a "control state" with respect to the distribution of spirits. Pursuant to the Michigan Liquor Control Act of 1933 (the "1933 Act"), M.C.L. §§ 436.1-436.58, the State, through the Liquor Control Commission ("Commission"), was the exclusive distributor and warehouser of spirits. Under that authority, the Commission purchased spirits from suppliers, maintained the product in warehouses, and sold the product to licensed retailers.

In 1997, the State decided to privatize the functions of warehousing and distribution of spirits it had been performing since 1933. These functions are now performed by private parties appointed by the Commission and referred to as Authorized Distribution Agents ("ADA"). Pursuant to contractual arrangements with vendors of spirits (also referred to herein as "suppliers"), ADA's warehouse and deliver spirits to licensed retailers. Currently there are three ADA's in the State, NWS, General Wine, and a third ADA known as Transcon.

In 1998, the State repealed the 1933 Act when it enacted the Michigan Liquor Control Code of 1998 (the "1998 Act"), M.C.L. §§ 436.1101 to 436.2303. The 1998 Act imposes various restrictions on ADA's. For example, ADA's are prohibited from having a direct or indirect interest in a supplier of spirits or in a licensed retailer. See M.C.L. § 436.1205(3).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Page 1

**Motions, Pleadings and Filings**

United States District Court, W.D. Michigan,
Southern Division.
N.W.S. MICHIGAN, INC., Plaintiff,
v.
GENERAL WINE & LIQUOR COMPANY, INC.
Defendant.
No. 4:00-CV-179.

June 6, 2001.

Morton Siegel, Ballard Jay Yelton, III, Miller, Canfield, Paddock & Stone, Kalamazoo, MI, Sherry L. Katz-Crank, Miller, Canfield, Paddock & Stone, Lansing, MI, Ingham, for N.W.S. Michigan, Inc., pltf.

Frederick M. Baker, Jr., Honigman, Miller, Schwartz & Cohn, Lansing, MI, for General Wine & Liquor Company, Inc., deft.

*ORDER*

QUIST, J.

*1 In accordance with the Opinion filed this date,

IT IS HEREBY ORDERED that Defendant's Motion To Dismiss Pursuant to F.R. Civ. P. 12(b)(6) (docket no. 10) is GRANTED IN PART. Counts I and II of Plaintiff's First Amended Complaint are DISMISSED.

IT IS FURTHER ORDERED that Counts III through V of Plaintiff's First Amended Complaint are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

This case is closed.

*OPINION*

Plaintiff, N.W.S. Michigan, Inc. ("NWS"), has sued Defendant, General Wine & Liquor Company, Inc. ("General Wine"), pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging violations of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. NWS also alleges state law claims of civil conspiracy, intentional interference with contracts, and intentional interference with prospective contractual relation. Now before the Court is General Wine's motion to dismiss NWS's first amended complaint. [FN1]

> FN1. General Wine's motion to dismiss was initially directed at NWS's original complaint. After General Wine filed its motion, NWS filed a first amended complaint in an attempt to cure the pleading deficiencies alleged by General Wine in its motion. The Court has permitted General Wine and NWS to file supplemental briefs regarding the sufficiency of the first amended complaint and will consider the instant motion as being addressed to the first amended complaint.

Facts

For many years following the repeal of prohibition, the State of Michigan was a "control state" with respect to the distribution of spirits. Pursuant to the Michigan Liquor Control Act of 1933 (the "1933 Act"), M.C.L. §§ 436.1-436.58, the State, through the Liquor Control Commission ("Commission"), was the exclusive distributor and warehouser of spirits. Under that authority, the Commission purchased spirits from suppliers, maintained the product in warehouses, and sold the product to licensed retailers.

In 1997, the State decided to privatize the functions of warehousing and distribution of spirits it had been performing since 1933. These functions are now performed by private parties appointed by the Commission and referred to as Authorized Distribution Agents ("ADA"). Pursuant to contractual arrangements with vendors of spirits (also referred to herein as "suppliers"), ADA's warehouse and deliver spirits to licensed retailers. Currently there are three ADA's in the State, NWS, General Wine, and a third ADA known as Transcon.

In 1998, the State repealed the 1933 Act when it enacted the Michigan Liquor Control Code of 1998 (the "1998 Act"), M.C.L. §§ 436.1101 to 436.2303. The 1998 Act imposes various restrictions on ADA's. For example, ADA's are prohibited from having a direct or indirect interest in a supplier of spirits or in a licensed retailer. See M.C.L. § 436.1205(3).

Not Reported in F.Supp.2d                                                                                                              Page 2
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Similarly, the 1998 Act imposes various restrictions on wine wholesalers (a wholesaler is "a person who sells beer, wine, or mixed spirit drink only to retailers or other licensees," see M.C.L. 436.1113(7)). For example, wholesalers and other parties are prohibited from "hav[ing] any financial interest, directly or indirectly, in the establishment, maintenance, operation, or promotion of the business of any other vendor," M.C.L. § 436.1603(1), and from "aid[ing] or assist[ing] any other vendor by gift, loan of money or property of any description, or other valuable thing, or by the giving of premiums or rebates." M.C.L. § 436.1609.

*2 The 1998 Code also contains restrictions that affect the extent to which an ADA may also act as a wholesaler of wine. In particular, an ADA that became a licensed wholesaler of wine after September 24, 1996, may not sell or distribute a brand of wine in an area in which another wholesaler has already been assigned or authorized to sell that brand of wine. See M.C.L. § 436.1205(3). However, M.C.L. § 436.1205(3) contains a grandfather clause for wine wholesalers licensed before September 24, 1996. Similarly, the 1998 Code prohibits a wine wholesaler that becomes an ADA after September 24, 1996, from selling or distributing a brand of wine in an area for which another wholesaler has been appointed or authorized to sell or distribute that brand of wine, unless the wholesaler was selling or distributing that brand of wine in that area prior to September 24, 1996. See id.

General Wine has been a licensed wine wholesaler in the State since 1967 and has the largest share of the wine distribution market in the Metropolitan Detroit Area, approximately 42%. (1st Am.Compl.¶ 25.) In the State, General Wine's share of the wine distribution market is approximately 20%. (Id.) General Wine and Transcon are the only two entities that were licensed as a wine wholesaler and certified as an ADA of spirits prior to September 24, 1996. NWS was not a licensed wine wholesaler in the State prior to September 24, 1996. According to NWS, because NWS was not licensed as a wine wholesaler prior to September 24, 1996, and due to current regulations on wine wholesalers and suppliers, as a practical matter NWS is prohibited from acting as a wholesaler of wine in Michigan. (Id. ¶ 24.)

The central theme of NWS's first amended complaint is that General Wine is violating the 1998 Act because it is using its status as an ADA and a wine wholesaler to provide rebates and cross subsidies to entities that supply both wine and spirits ("dual suppliers"). According to NWS, General Wine has offered dual suppliers, in exchange for their sole utilization of General Wine to warehouse and distribute both spirits and wine products, to (a) rebate or kick-back to the dual supplier a portion of the statutorily-regulated ADA warehousing fee in the form of advertisement and/or promotion of the dual supplier's products and/or (b) cross subsidize or leverage warehousing and distribution costs for wine and spirit products. NWS alleges that as a result of General Wine's unlawful promotions, three of NWS' suppliers have canceled their contracts with NWS and a fourth has given notice of its intent to terminate NWS as a broker and ADA.

Motion Standard

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. Allard v. Weitzman (In re DeLorean Motor Co.), 991 F.2d 1236, 1240 (6th Cir.1993)(citing Schied v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, Moore's Federal Practice, ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)(citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)).

Discussion
I. Antitrust Claims

*3 NWS alleges an unlawful agreement to restrain trade under Section 1 of the Sherman Act and actual monopolization and attempt to monopolize under Section 2 of the Sherman Act. See 15 U.S.C. §§ 1, 2. General Wine raises several grounds for dismissal of NWS's antitrust claims. As set forth below, the Court concludes that NWS lacks standing to assert federal antitrust claims because NWS's first amended complaint fails to allege antitrust injury. Although dismissal may be warranted on other grounds raised by General Wine, the Court will only address NWS's lack of standing, which, by itself, is sufficient to

Not Reported in F.Supp.2d                                                                                                    Page 2
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Similarly, the 1998 Act imposes various restrictions on wine wholesalers (a wholesaler is "a person who sells beer, wine, or mixed spirit drink only to retailers or other licensees," see M.C.L. 436.1113(7)). For example, wholesalers and other parties are prohibited from "hav[ing] any financial interest, directly or indirectly, in the establishment, maintenance, operation, or promotion of the business of any other vendor," M.C.L. § 436.1603(1), and from "aid[ing] or assist[ing] any other vendor by gift, loan of money or property of any description, or other valuable thing, or by the giving of premiums or rebates." M.C.L. § 436.1609.

*2 The 1998 Code also contains restrictions that affect the extent to which an ADA may also act as a wholesaler of wine. In particular, an ADA that became a licensed wholesaler of wine after September 24, 1996, may not sell or distribute a brand of wine in an area in which another wholesaler has already been assigned or authorized to sell that brand of wine. See M.C.L. § 436.1205(3). However, M.C.L. § 436.1205(3) contains a grandfather clause for wine wholesalers licensed before September 24, 1996. Similarly, the 1998 Code prohibits a wine wholesaler that becomes an ADA after September 24, 1996, from selling or distributing a brand of wine in an area for which another wholesaler has been appointed or authorized to sell or distribute that brand of wine, unless the wholesaler was selling or distributing that brand of wine in that area prior to September 24, 1996. See id.

General Wine has been a licensed wine wholesaler in the State since 1967 and has the largest share of the wine distribution market in the Metropolitan Detroit Area, approximately 42%. (1st Am.Compl.¶ 25.) In the State, General Wine's share of the wine distribution market is approximately 20%. (Id.) General Wine and Transcon are the only two entities that were licensed as a wine wholesaler and certified as an ADA of spirits prior to September 24, 1996. NWS was not a licensed wine wholesaler in the State prior to September 24, 1996. According to NWS, because NWS was not licensed as a wine wholesaler prior to September 24, 1996, and due to current regulations on wine wholesalers and suppliers, as a practical matter NWS is prohibited from acting as a wholesaler of wine in Michigan. (Id. ¶ 24.)

The central theme of NWS's first amended complaint is that General Wine is violating the 1998 Act because it is using its status as an ADA and a wine wholesaler to provide rebates and cross subsidies to entities that supply both wine and spirits ("dual suppliers"). According to NWS, General Wine has offered dual suppliers, in exchange for their sole utilization of General Wine to warehouse and distribute both spirits and wine products, to (a) rebate or kick-back to the dual supplier a portion of the statutorily-regulated ADA warehousing fee in the form of advertisement and/or promotion of the dual supplier's products and/or (b) cross subsidize or leverage warehousing and distribution costs for wine and spirit products. NWS alleges that as a result of General Wine's unlawful promotions, three of NWS' suppliers have canceled their contracts with NWS and a fourth has given notice of its intent to terminate NWS as a broker and ADA.

Motion Standard

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *Allard v. Weitzman (In re DeLorean Motor Co.),* 991 F.2d 1236, 1240 (6th Cir.1993)(citing *Schied v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, *Moore's Federal Practice,* ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)(citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957)).

Discussion

I. Antitrust Claims

*3 NWS alleges an unlawful agreement to restrain trade under Section 1 of the Sherman Act and actual monopolization and attempt to monopolize under Section 2 of the Sherman Act. See 15 U.S.C. §§ 1, 2. General Wine raises several grounds for dismissal of NWS's antitrust claims. As set forth below, the Court concludes that NWS lacks standing to assert federal antitrust claims because NWS's first amended complaint fails to allege antitrust injury. Although dismissal may be warranted on other grounds raised by General Wine, the Court will only address NWS's lack of standing, which, by itself, is sufficient to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

require dismissal of all antitrust claims.

Antitrust standing is more narrow than constitutional standing. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31 (1983). One element of the standing analysis is "antitrust injury," i.e., an injury of the type the antitrust laws were intended to prevent. *See Axis. S.p.A. v. Micafil, Inc.,* 870 F.2d 1105, 1111 (6th Cir.1989). "Under the caselaw, it is not enough for the plaintiff to claim economic injury: 'Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " *Valley Prods. Co. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.,* 128 F.3d 398, 402 (6th Cir.1997)(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977)). Courts emphasize the requirement of antitrust injury to ensure that the antitrust laws are used to promote rather than restrict competition. As the Supreme Court has often made clear: "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 891-92 (1993). In this regard, the Sixth Circuit has observed:

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

*4 *HyPoint Tech., Inc. v. Hewlett-Packard Co.,* 949 F.2d 874, 877 (6th Cir.1991); *accord Indeck Energy Servs., Inc. v. Consumers Energy Co.,* No. 99-1433, 2000 WL 33316525, at *3 (6th Cir. Oct. 6, 2000).

*Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 97 S.Ct. 690 (1977), is one of the seminal cases on the issue of antitrust injury. In *Brunswick,* the plaintiffs, three small bowling alleys, alleged that the acquisition by Brunswick, a "giant" in the bowling industry, of failing bowling alleys in the same markets as the plaintiffs violated Section 7 of the Clayton Act by substantially lessening competition or creating a **monopoly**. The theory advanced by the plaintiffs in support of their claim for damages under Section 4 of the Clayton Act was that had Brunswick not acquired the failing bowling alleys, the plaintiffs' profits would have increased. Although it was conceded by Brunswick that a jury could have found the acquisition itself unlawful, the issue posed to the Court was whether the plaintiffs could recover antitrust damages "where the sole injury alleged is that competitors were continued in business, thereby denying [plaintiffs] an anticipated increase in **market shares**." *Id.* at 484, 97 S.Ct. at 695. In answering the question in the negative, the Court rejected the notion that antitrust damages may be recovered solely on the basis that the injury was proximately caused by a violation of the antitrust laws:

> If the acquisitions here were unlawful, it is because they brought a "deep pocket" parent into a market of "pygmies." Yet respondents' injury--the loss of income that would have accrued had the acquired centers gone bankrupt--bears no relationship to the size of either the acquiring company or its competitors. [Plaintiffs] would have suffered the identical "loss"--but no compensable injury--had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents.... Thus, [plaintiffs'] injury was not of "the type that the statute was intended to forestall," *Wyandotte Co. v. United States,* 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967).

*Id.* at 487-88, 97 S.Ct. at 697 (citation and footnote omitted). The Court concluded that although the plaintiffs' damages--loss of profits they would have otherwise received--occurred because of the acquisition by Brunswick, the loss did not occur because of the conduct that made the acquisition illegal under antitrust law. *Id.* at 488-89, 97 S.Ct. at 697. Thus, under *Brunswick,* a court must examine "whether the conduct [causing the injury] was anticompetitive, and if it was not anticompetitive, standing is not shown." *HyPoint Tech., Inc.,* 949 F.2d at 877.

In *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884 (1990), the Court examined antitrust standing in the context of a suit brought by a competitor regarding pricing practices. The plaintiff

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Page 3

require dismissal of all antitrust claims.

Antitrust standing is more narrow than constitutional standing. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31 (1983). One element of the standing analysis is "antitrust injury," i.e., an injury of the type the antitrust laws were intended to prevent. *See Axis. S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir.1989). "Under the caselaw, it is not enough for the plaintiff to claim economic injury: 'Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " *Valley Prods. Co. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.*, 128 F.3d 398, 402 (6th Cir.1997)(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977)). Courts emphasize the requirement of antitrust injury to ensure that the antitrust laws are used to promote rather than restrict competition. As the Supreme Court has often made clear: "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 891-92 (1993). In this regard, the Sixth Circuit has observed:

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing ensures that antitrust litigants use the laws to prevent anticompetitive action and makes certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

*4 *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir.1991); *accord Indeck Energy Servs., Inc. v. Consumers Energy Co.*, No. 99-1433, 2000 WL 33316525, at *3 (6th Cir. Oct. 6, 2000).

*Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690 (1977), is one of the seminal cases on the issue of antitrust injury. In *Brunswick*, the plaintiffs, three small bowling alleys, alleged that the acquisition by Brunswick, a "giant" in the bowling industry, of failing bowling alleys in the same markets as the plaintiffs violated Section 7 of the Clayton Act by substantially lessening competition or creating a monopoly. The theory advanced by the plaintiffs in support of their claim for damages under Section 4 of the Clayton Act was that had Brunswick not acquired the failing bowling alleys, the plaintiffs' profits would have increased. Although it was conceded by Brunswick that a jury could have found the acquisition itself unlawful, the issue posed to the Court was whether the plaintiffs could recover antitrust damages "where the sole injury alleged is that competitors were continued in business, thereby denying [plaintiffs] an anticipated increase in market shares." *Id.* at 484, 97 S.Ct. at 695. In answering the question in the negative, the Court rejected the notion that antitrust damages may be recovered solely on the basis that the injury was proximately caused by a violation of the antitrust laws:

> If the acquisitions here were unlawful, it is because they brought a "deep pocket" parent into a market of "pygmies." Yet respondents' injury--the loss of income that would have accrued had the acquired centers gone bankrupt--bears no relationship to the size of either the acquiring company or its competitors. [Plaintiffs] would have suffered the identical "loss"--but no compensable injury--had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents.... Thus, [plaintiffs'] injury was not of "the type that the statute was intended to forestall," *Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967).

*Id.* at 487-88, 97 S.Ct. at 697 (citation and footnote omitted). The Court concluded that although the plaintiffs' damages--loss of profits they would have otherwise received--occurred because of the acquisition by Brunswick, the loss did not occur because of the conduct that made the acquisition illegal under antitrust law. *Id.* at 488-89, 97 S.Ct. at 697. Thus, under *Brunswick*, a court must examine "whether the conduct [causing the injury] was anticompetitive, and if it was not anticompetitive, standing is not shown." *HyPoint Tech, Inc.*, 949 F.2d at 877.

In *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884 (1990), the Court examined antitrust standing in the context of a suit brought by a competitor regarding pricing practices. The plaintiff

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
**(Cite as: 2001 WL 822337 (W.D.Mich.))**

Page 4

in *Atlantic Richfield,* an independent dealer of gasoline, sued Atlantic Richfield (ARCO) for conspiring with ARCO's dealers to fix the maximum prices at which the dealers resold gasoline. The plaintiff alleged that it was injured by the vertical price fixing conspiracy, which at that time was subject to a per se presumption of unreasonableness, [FN2] because it was forced to charge a depressed price in order to compete with ARCO's dealers. The Court held that the plaintiff failed to meet the antitrust injury requirement because the plaintiff was a competitor of ARCO and therefore may have benefitted from ARCO's pricing policies. In reaching this conclusion, the Court distinguished its decision in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869 (1968), in which the Court found that a vertical, maximum price-fixing scheme, pursuant to which the publisher of newspapers sought to prevent its distributors from charging more than the suggested retail price, was unlawful per se because it threatened to become a minimum price-fixing scheme. The plaintiff in *Albrecht* was a distributor who was disciplined by the publisher for charging his customers more than the retail price. In holding that the agreement was illegal, the Court found that it presented the possibility of pricing some distributors out of the market by setting the price too low to allow them to provide services and conveniences to customers and by channeling distribution through a few large dealers. The *Atlantic Richfield* Court found the two cases distinguishable because "in *Albrecht* we held such an agreement *per se* unlawful because of its potential effects on dealers and consumers, not because of its effects on *competitors.*" *Atlantic Richfield,* 495 U.S. at 336, 110 S.Ct. at 1890 (emphasis in original). The Court wrote:

> FN2. The Supreme Court subsequently held that vertical maximum price fixing agreements do not constitute a per se violation but rather are governed by the rule of reason analysis. See *State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275 (1997).

*5 When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation. A firm complaining about the harm it suffers from nonpredatory price competition "is really claiming that it [is] unable to raise prices ." This is not *antitrust* injury; indeed, "cutting prices in order to increase business often is the very essence of competition." The antitrust laws were enacted for "the protection of *competition,* not *competitors.*" "To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share."

*Id.* at 337-38, 110 S.Ct. at 1891 (internal citations omitted) (alterations in original). Thus, the Court held that "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect" to give rise to antitrust injury. *Id.* at 339, 110 S.Ct. at 1892.

In this case NWS alleges that it was injured (by the loss of three or four customers) by reason of rebates or kickbacks and/or cross subsidization arrangements which General Wine offered to dual suppliers that used NWS as an ADA for warehousing and distribution of spirits. [FN3] In other words, the heart of this case is General Wine's use of efficiencies available to it by virtue of its participation in two separate, but related, markets. By passing these efficiencies along to dual suppliers, General Wine is, in effect, lowering the cost of its services. Thus, at bottom, because NWS is a competitor and its complaint is about pricing practices, under *Atlantic Richfield,* NWS must allege that General Wine engaged in predatory pricing in order to demonstrate antitrust injury. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Id.* at 340, 110 S.Ct. at 1892. Using efficiencies to gain a competitive edge does not suppress competition; it is the essence of competition. NWS failed to include in its first amended complaint any allegation that General Wine's alleged practices constituted below-cost pricing and, in fact, at oral argument NWS's counsel conceded that NWS is not alleging predatory pricing. Therefore, the requirement of antitrust injury is not met here.

> FN3. The term "suppliers", as it relates to ADA's such as NWS and General Wine, is really a misnomer because NWS and General Wine are actually the suppliers of warehousing and distribution services.

In spite of the Court's conclusion that this case *is* about pricing, NWS vigorously contends that the focus of this case is General Wine's illegal conduct, namely, offering dual suppliers rebates and cross subsidizing ADA and wine wholesaling services in violation of Michigan liquor control statutes and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Page 4

in *Atlantic Richfield,* an independent dealer of gasoline, sued Atlantic Richfield (ARCO) for conspiring with ARCO's dealers to fix the maximum prices at which the dealers resold gasoline. The plaintiff alleged that it was injured by the vertical price fixing conspiracy, which at that time was subject to a per se presumption of unreasonableness, [FN2] because it was forced to charge a depressed price in order to compete with ARCO's dealers. The Court held that the plaintiff failed to meet the antitrust injury requirement because the plaintiff was a competitor of ARCO and therefore may have benefitted from ARCO's pricing policies. In reaching this conclusion, the Court distinguished its decision in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869 (1968), in which the Court found that a vertical, maximum price-fixing scheme, pursuant to which the publisher of newspapers sought to prevent its distributors from charging more than the suggested retail price, was unlawful per se because it threatened to become a minimum price-fixing scheme. The plaintiff in *Albrecht* was a distributor who was disciplined by the publisher for charging his customers more than the retail price. In holding that the agreement was illegal, the Court found that it presented the possibility of pricing some distributors out of the market by setting the price too low to allow them to provide services and conveniences to customers and by channeling distribution through a few large dealers. The *Atlantic Richfield* Court found the two cases distinguishable because "in *Albrecht* we held such an agreement *per se* unlawful because of its potential effects on dealers and consumers, not because of its effects on *competitors.*" *Atlantic Richfield,* 495 U.S. at 336, 110 S.Ct. at 1890 (emphasis in original). The Court wrote:

> FN2. The Supreme Court subsequently held that vertical maximum price fixing agreements do not constitute a per se violation but rather are governed by the rule of reason analysis. See *State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275 (1997).

*5 When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation. A firm complaining about the harm it suffers from nonpredatory price competition "is really claiming that it [is] unable to raise prices ." This is not *antitrust* injury; indeed, "cutting prices in order to increase business often is the very essence of competition." The antitrust laws were enacted for

"the protection of *competition,* not *competitors.*" "To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share."

*Id.* at 337-38, 110 S.Ct. at 1891 (internal citations omitted) (alterations in original). Thus, the Court held that "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect" to give rise to antitrust injury. *Id.* at 339, 110 S.Ct. at 1892.

In this case NWS alleges that it was injured (by the loss of three or four customers) by reason of rebates or kickbacks and/or cross subsidization arrangements which General Wine offered to dual suppliers that used NWS as an ADA for warehousing and distribution of spirits. [FN3] In other words, the heart of this case is General Wine's use of efficiencies available to it by virtue of its participation in two separate, but related, markets. By passing these efficiencies along to dual suppliers, General Wine is, in effect, lowering the cost of its services. Thus, at bottom, because NWS is a competitor and its complaint is about pricing practices, under *Atlantic Richfield,* NWS must allege that General Wine engaged in predatory pricing in order to demonstrate antitrust injury. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *Id.* at 340, 110 S.Ct. at 1892. Using efficiencies to gain a competitive edge does not suppress competition; it is the essence of competition. NWS failed to include in its first amended complaint any allegation that General Wine's alleged practices constituted below-cost pricing and, in fact, at oral argument NWS's counsel conceded that NWS is not alleging predatory pricing. Therefore, the requirement of antitrust injury is not met here.

> FN3. The term "suppliers", as it relates to ADA's such as NWS and General Wine, is really a misnomer because NWS and General Wine are actually the suppliers of warehousing and distribution services.

In spite of the Court's conclusion that this case *is* about pricing, NWS vigorously contends that the focus of this case is General Wine's illegal conduct, namely, offering dual suppliers rebates and cross subsidizing ADA and wine wholesaling services in violation of Michigan liquor control statutes and

Not Reported in F.Supp.2d                                                                                                         Page 5
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

regulations, thereby securing an unfair and illegal advantage over NWS. NWS contends that an antitrust violation occurs whenever a defendant engages in illegal conduct in order to gain a competitive advantage. The problem with NWS's argument is that in order to accept it, the Court would have to ignore *Brunswick's* requirement that the cause of the injury-- in this case, the allegedly illegal rebates and cross subsidies--must be anticompetitive conduct. Assuming (only for purposes of this motion) that General Wine's conduct is illegal under state law, that alone is insufficient to show antitrust injury. *See A.D.M. Corp. v. Sigma Instruments, Inc., 628 F.2d 753, 754 (1st Cir.1980)*(per curiam)(stating that "[w]hile it is not inconceivable that 'mere' unfair business practices, or business torts, could in the proper situation constitute an antitrust violation, the transmutation of these state law torts into federal antitrust violations would have to be based upon a finding that the injuries for which compensation is sought have an unreasonable effect on competition") (citations omitted); *Turner v. Johnson & Johnson, 809 F.2d 90, 102 (1st Cir.1986)*("The alleged injury to plaintiffs here unquestionably flowed from the alleged [violations of state law] and not from suppressed competition in the ... market"). Taking NWS's allegations as true, all that is alleged is a violation of state law. NWS does not claim that the rebates, the so-called kickbacks, or the cross subsidation resulted in higher prices to retailers or consumers; it does not claim that availability of brands of spirits or wine was restricted; nor does it claim that a superior product or a lower-cost alternative was eliminated from the market. In short, there is no injury to competition under the facts alleged. In fact, if anything, General Wine's conduct has a positive impact on competition because it reduces prices to suppliers who, in theory, pass the savings on to retailers and, ultimately, consumers, even though NWS may have lost profits. [FN4] *See Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 88 (6th Cir.1989)*(stating that "the fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened"). Furthermore, the legality of General Wine's conduct has no bearing on NWS's injury. In this Court's view, the real cause of the injury to NWS is the Michigan legislature's decision, for reasons unknown to this Court, to limit the number of wine wholesalers in a particular area, but to exclude from this limitation wholesalers such as General Wine falling within the grandfather clause. The injury results to NWS because NWS is unable to offer the same deal General Wine is able to offer to dual suppliers. General Wine's conduct may or may not violate state law, but under either scenario, NWS suffers the same injury. *Cf. Hodges v. WSM, Inc., 26 F.3d 36, 38 (6th Cir.1994)*("It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an antitrust injury")(quoting district court).

> FN4. The cases cited by NWS do not support a finding of antitrust injury in this case. In *Farley Transportation Co. v. Santa Fe. Trail Transportation Co., 786 F.2d 1342 (9th Cir.1985)*, the Court likened the defendant's violation of tariff regulations to predatory pricing, a situation not present in this case. *National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories, 850 F.2d 904 (2d Cir.1988)* is not relevant to this case because it involved the publication of false and misleading information, which is also a situation not present in this case.

II. State Law Claims

*6 Having determined that NWS's federal claims should be dismissed, the Court finds it appropriate to dismiss NWS's remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254 (6th Cir.1996)*(citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank of Detroit, 738 F.2d 163, 166 (6th Cir.1984))*. In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc., 994 F.2d 1178, 1182 (6th Cir.1993)*(affirming district court's order granting summary judgment on federal claim and dismissing state law claims without prejudice). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson, 89 F.3d at 1254-55* (citing *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7 (1988)*).

The Court finds that the balance of considerations in this case weighs against the Court exercising its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
**(Cite as: 2001 WL 822337 (W.D.Mich.))**

Page 6

supplemental jurisdiction. There are no significant issues of judicial economy because the case is not so far advanced that litigation in a different court would result in a duplication or waste of judicial resources. Furthermore, discovery is in its early stages and there would be no prejudice to either party from a dismissal.

In addition, the Court finds that dismissal the state law claims is proper under § 1367(c)(1) because the claim involves interpretation of Michigan liquor control statutes and regulations which present "novel or complex issue [s] of state law." 28 U.S.C. § 1367(c)(1). Therefore, the Court will dismiss Counts III, IV, and V of NWS's first amended complaint without reaching the merits of those claims.

### Conclusion

For the foregoing reasons, the Court will grant General Wine's motion to dismiss with regard to the antitrust claims and dismiss the state law claims and counterclaims without prejudice pursuant to 28 U.S.C. § 1367(c).

An Order consistent with this Opinion will be entered.

2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354

**Motions, Pleadings and Filings (Back to top)**

. 4:00CV00179 (Docket) (Oct. 26, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354
(Cite as: 2001 WL 822337 (W.D.Mich.))

Page 5

regulations, thereby securing an unfair and illegal advantage over NWS. NWS contends that an antitrust violation occurs whenever a defendant engages in illegal conduct in order to gain a competitive advantage. The problem with NWS's argument is that in order to accept it, the Court would have to ignore *Brunswick's* requirement that the cause of the injury-- in this case, the allegedly illegal rebates and cross subsidies--must be anticompetitive conduct. Assuming (only for purposes of this motion) that General Wine's conduct is illegal under state law, that alone is insufficient to show antitrust injury. See *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir.1980)(per curiam)(stating that "[w]hile it is not inconceivable that 'mere' unfair business practices, or business torts, could in the proper situation constitute an antitrust violation, the transmutation of these state law torts into federal antitrust violations would have to be based upon a finding that the injuries for which compensation is sought have an unreasonable effect on competition") (citations omitted); *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir.1986)("The alleged injury to plaintiffs here unquestionably flowed from the alleged [violations of state law] and not from suppressed competition in the ... market"). Taking NWS's allegations as true, all that is alleged is a violation of state law. NWS does not claim that the rebates, the so-called kickbacks, or the cross subsidation resulted in higher prices to retailers or consumers; it does not claim that availability of brands of spirits or wine was restricted; nor does it claim that a superior product or a lower-cost alternative was eliminated from the market. In short, there is no injury to competition under the facts alleged. In fact, if anything, General Wine's conduct has a positive impact on competition because it reduces prices to suppliers who, in theory, pass the savings on to retailers and, ultimately, consumers, even though NWS may have lost profits. [FN4] See *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir.1989)(stating that "the fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened"). Furthermore, the legality of General Wine's conduct has no bearing on NWS's injury. In this Court's view, the real cause of the injury to NWS is the Michigan legislature's decision, for reasons unknown to this Court, to limit the number of wine wholesalers in a particular area, but to exclude from this limitation wholesalers such as General Wine falling within the grandfather clause. The injury results to NWS because NWS is unable to offer the same deal General Wine is able to offer to dual suppliers. General Wine's conduct may or may not violate state law, but under either scenario, NWS suffers the same injury. Cf. *Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir.1994)("It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an antitrust injury")(quoting district court).

> FN4. The cases cited by NWS do not support a finding of antitrust injury in this case. In *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342 (9th Cir.1985), the Court likened the defendant's violation of tariff regulations to predatory pricing, a situation not present in this case. *National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories*, 850 F.2d 904 (2d Cir.1988) is not relevant to this case because it involved the publication of false and misleading information, which is also a situation not present in this case.

II. State Law Claims

*6 Having determined that NWS's federal claims should be dismissed, the Court finds it appropriate to dismiss NWS's remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996)(citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank of Detroit*, 738 F.2d 163, 166 (6th Cir.1984)). In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir.1993)(affirming district court's order granting summary judgment on federal claim and dismissing state law claims without prejudice). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson*, 89 F.3d at 1254-55 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7 (1988)).

The Court finds that the balance of considerations in this case weighs against the Court exercising its

Not Reported in F.Supp.2d  
2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354  
**(Cite as: 2001 WL 822337 (W.D.Mich.))**

Page 6

supplemental jurisdiction. There are no significant issues of judicial economy because the case is not so far advanced that litigation in a different court would result in a duplication or waste of judicial resources. Furthermore, discovery is in its early stages and there would be no prejudice to either party from a dismissal.

In addition, the Court finds that dismissal the state law claims is proper under § 1367(c)(1) because the claim involves interpretation of Michigan liquor control statutes and regulations which present "novel or complex issue [s] of state law." 28 U.S.C. § 1367(c)(1). Therefore, the Court will dismiss Counts III, IV, and V of NWS's first amended complaint without reaching the merits of those claims.

### Conclusion

For the foregoing reasons, the Court will grant General Wine's motion to dismiss with regard to the antitrust claims and dismiss the state law claims and counterclaims without prejudice pursuant to 28 U.S.C. § 1367(c).

An Order consistent with this Opinion will be entered.

2001 WL 822337 (W.D.Mich.), 2001-2 Trade Cases P 73,354

**Motions, Pleadings and Filings (Back to top)**

. 4:00CV00179 (Docket) (Oct. 26, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.