IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| J.B.D.L. Corp. d/b/a<br>BECKETT APOTHECARY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WYETH-AYERST LABORATORIES,<br>INC., et al.,<br><br>Defendants. | Civil Action No. C-1-01-704<br><br>Judge Sandra S. Beckwith<br>Magistrate Judge Timothy S. Hogan |

DIRECT PURCHASER CLASS PLAINTIFFS'
SUR-REPLY MEMORANDUM OF LAW IN FURTHER
OPPOSITION TO WYETH'S MOTION FOR SUMMARY JUDGMENT

Theresa L. Groh
**MURDOCK GOLDENBERG
SCHNEIDER & GROH, L.P.A.**
35 East Seventh St., Suite 600
Cincinnati, OH 45202
Tel: (513) 345-8291
Fax: (513) 345-8294

*Local Counsel for Direct Purchaser Class*

H. Laddie Montague, Jr.
Eric L. Cramer
Peter R. Kohn
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4606

Eugene A. Spector
Jay S. Cohen
**SPECTOR ROSEMAN & KODROFF,
 P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611

*Co-Lead Counsel for Direct Purchaser
Class*

Dated: April 12, 2005

In its March 9, 2005 Reply Brief in Support of Summary Judgment ("Wyeth Reply Br."), Wyeth raises some wholly new arguments and misstates the record. Direct Purchaser Class Plaintiffs ("Plaintiffs") respectfully submit this short Sur-Reply to answer briefly *some* of these *new* arguments and inaccurate assertions.[1]

1. Wyeth's assertion that Plaintiffs have argued that conduct is exclusionary only where "it was 'impossible' for Cenestin to compete with Wyeth's rebates"[2] is false. While, in fact, as Plaintiffs have shown, it was indeed *virtually impossible* for Wyeth's ERT rivals to compete fairly in the face of Wyeth's exclusionary practices, that simply shows the strength of Plaintiffs' evidence. But, *impossibility* is hardly the relevant legal test. As the ABA sample jury instructions summarize the applicable law: "Predatory or exclusionary conduct is conduct that has the effect of preventing or excluding competition or frustrating or impairing the efforts of other firms to compete for customers within the relevant market." 3 ABA SAMPLE JURY INSTR. CIV. ANTITRUST CASES C20, Sec. 9 (1999).[3] "Frustrating or impairing" is the standard – not impossibility.

---

[1] To be sure, Wyeth's Reply Brief is replete with numerous errors, omissions, and/or misstatements, but Plaintiffs' opposition brief fully and completely refutes these arguments.

[2] Wyeth Reply Br. at 8; *see also id.* at 13 ("'impossible' for Cenestin to gain placement on formularies"); *id.* at 14 ("impossible"); *id.* at 16 ("theory of impossibility"); *id.* at 57 ("impossible for Cenestin to compete").

[3] *See also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (*quoting* 3 Areeda & Turner, ANTITRUST LAW 78 (1978) (conduct is exclusionary where it, *inter alia*, "tends to impair the opportunities of rivals")); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784-89 (6th Cir. 2002) (§ 2 liability even though it was not impossible for Conwood to compete); *LePage's, Inc. v. 3M*, 324 F.3d 141, 157 (3rd Cir. 2003) (*en banc*) (defendant is liable under § 2 when bundled rebates merely "magnify" amounts rival would have to discount); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062, 1065 (3d Cir. 1978) ("[t]he effect of the 3% bundled rebate was magnified by the volume of [defendant's] product sold, so that in order to offer a rebate of the same net dollar amount as [defendant's], [plaintiff] had to offer purchasers of

(continued...)

2.      Wyeth argues that Plaintiffs' case is "inherently flawed" because Plaintiffs assume that Wyeth bundled rebates on all of Wyeth's products, rather than "only" on the various blockbuster products that made up the "Premarin Family" bundle. Wyeth Reply Br. at 55-59. In addition to constituting a key admission on one of Plaintiffs' main charges, *i.e.*, the fact and exclusionary effect of the bundling of rebates "just" on multiple "Premarin Family" products, Wyeth's argument contains fatal errors and misstatements of the record.

*First*, neither Plaintiffs nor Dr. Leitzinger, one of Plaintiffs' economic experts, has ever stated or implied that conduct is improperly exclusionary *only* in *extreme* cases where, by leveraging market power and bundling products, monopolists force rivals to pay out more than their rivals' entire potential product revenues, *i.e.*, force rivals to charge "negative prices."[4] Yet, that is precisely what Wyeth implies in claiming that "a ratio of *less* than 1.0 meant that Cenestin *was* able to compete and could have matched Wyeth's rebates." Wyeth's Reply Br. at 58 (emphasis in original).

The ratio referred to is a measure of the power of Wyeth's market share maintenance and product bundling provisions. It specifically reflects the total absolute dollar value of all rebates on all products in the Wyeth bundle that would be lost if a PBM shifted 10% market share from Premarin to Cenestin, over the total revenues potentially generated by those shifted Cenestin sales. It therefore measures the total value of Wyeth's threat to the PBMs/MCOs for supporting even small

---

[3](...continued)
[plaintiff's product] rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals").

[4]Not even Wyeth's own expert, Dr. Carlton, would require "negative" rival pricing as a precondition to finding the incumbent's conduct anticompetitive. Carlton Dep. (II) at 254-55 ("Q. It's fair to say that there is some . . . incremental price above a negative price that can still be exclusionary in your view; right? A. Yes. I mean, that I would object to or that I might object to. * * * Q. Where you might object as being possibly anticompetitive? A. Yes.") (P27).

shifts in market share away from Premarin. If the ratio is greater than 1, it means that a rival would have to pay out more than 100% of its potential product revenues to the PBM just to make the PBM whole for supporting a 10% shift in share from Premarin to the rival's product. A ratio of less than 1 (say, 0.8) means that a rival would have to pay out 80% of its potential revenues simply to make that PBM whole.

Wyeth's position is that it is perfectly legitimate for an admitted monopolist to (a) leverage its monopoly power by, *e.g.*, bundling its products together, (b) make high market share targets a necessary condition of receipt of modest percentage rebates (of below 10%) that apply to each product in the bundle and all units (even the inelastic base), and (c) thereby force smaller rivals with only one product and a far smaller percentage of the market to rebate disproportionately large portions of their total sales revenues (or even far more than that), simply to match the effect of the monopolist's modest rebate/bundle arrangement. Here's the key point: the mere fact that a rival could somehow conceivably come up with enough money out of its revenues to match a far more modest rebate by the monopolist hardly means that the conduct is not "impairing and frustrating" a rival, raising that rival's costs, and allowing the monopolist to harm competition (as Wyeth did in this case) by raising its list prices at an unprecedented rate. *See, e.g., SmithKline*, 575 F.2d at 1062, 1065 (§ 2 liability attached where defendant's bundled 3% rebate forced rival to offer rebates of 16% to 35%).

As Plaintiffs explained in their opposition brief, "for six of the seven PBMs for which negative prices were not endemic, Duramed would have had to pay the PBM/MCO a huge portion of prospective total revenues (from 37% to 93%) just to make the PBM/MCO indifferent to the modest market share shift." Pl. Mem. at 91. While Plaintiffs have not evaluated the accuracy of

3

Wyeth's new "corrected" calculations (Wyeth Reply Br. at 58, column 2),[5] taken at face value, far from supporting Wyeth, the chart *confirms* Plaintiffs' point. It clearly shows that Wyeth's practice of bundling rebates "just" on Premarin Family products imposed formidable and disproportionate burdens on Wyeth's rivals. For example, Wyeth's own chart shows that at DPS, Humana, Prudential, Express Scripts, and Medco, Duramed would have had to rebate approximately 80% (or more) of its total sales revenues from Cenestin in order just to match the Premarin Family rebates that the PBM/MCO would lose if just 10% of its Premarin utilization shifted to Cenestin. Meanwhile, Wyeth was paying rebates of *less than* 10% to these entities, at the same time that it was raising its list prices over 40%.

Wyeth claims that Duramed's being forced to rebate around 80% of its revenues from Cenestin, simply to level the playing field given Premarin's rebate bundling on Premarin Family products, means that "Cenestin *was* able to compete and could have matched Wyeth's rebates" (Wyeth Reply Br. at 58), and that in the face of that Wyeth-imposed disadvantage Duramed simply "chose not to offer the level of discounts or rebates necessary to be an effective competitor" (Wyeth Reply Br. at 61). That is *not* the law. Again, for Section 2 liability to attach, a rival need not surrender 100% or more of its sales revenues, as Wyeth now implies. *E.g., SmithKline*, 575 F.2d at 1062, 1065. Here, Duramed would have been forced to offer rebates as (and more) disproportionate

---

[5] As discussed below, Plaintiffs do not agree with the characterization of Wyeth's new calculations as "correcting" Plaintiffs' calculations. The new calculations simply change the divisor (*i.e.*, the amount of the bundled Wyeth rebates) against which the dividend (*i.e.*, Cenestin's sales revenues from a 10% shift in utilization away from Premarin and towards Cenestin) is measured. Since Wyeth's threats to PBM/MCOs were to cancel Wyeth rebates on Premarin Family products or alternatively on *all* Wyeth products, *both* Plaintiffs' divisor and Wyeth's divisor are accurate reflections of the value/effect of these different threats.

than those that triggered § 2 liability in *SmithKline*.[6]

***Second***, Wyeth *says* that it was *Plaintiffs' expert*, Dr. Leitzinger, who somehow spawned the idea of "calculat[ing] the total value of Wyeth's rebates for all products," rather than "simply" the value of rebates for those Wyeth products that made up the Premarin Family (Wyeth Reply Br. at 55). Yet, as Dr. Leitzinger clearly testified, what he did in one portion of his broader analysis was reduce to tabular form computations contained in Wyeth's own "field spread sheets" from Wyeth's own Cenestin Impact Model ("CIM").[7]

Dr. Leitzinger's discussion of the CIM, and its exclusionary implications, represents one part

---

[6]Thus, Wyeth's statement that "[u]nder Dr. Leitzinger's mode of analysis . . . a ratio of 1.0 or higher," corresponding with 100% of Cenestin revenues or higher, "meant that it was impossible for Cenestin to compete . . . [and] a ratio of less than 1.0," meaning less than 100% of Cenestin revenues, "meant that Cenestin was able to compete and could have matched Wyeth's rebates" (Wyeth Reply Br. at 57-58) is just plain wrong. Consequently, also wrong is Wyeth's statement that "a market share shift as low as 10% would allow an 'equally efficient' competitor to match Wyeth's rebates and win formulary status at 18 of the 20 plans that plaintiffs' expert (Dr. Leitzinger) assumes were 'foreclosed' to Cenestin." Wyeth Reply Br. at 61.

[7]As Dr. Leitzinger explained, the Wyeth-produced Cenestin Impact Model field spread sheets themselves were "part of the material that I identified and referred to in my original report." Leitzinger Rebuttal Dep. at 76 (P69); *see also id.* at 53-60, 75-76 (P69). When asked about this analysis, Dr. Leitzinger testified that although the calculation "is readily demonstrable from the [Wyeth-produced] spread sheets themselves" (Leitzinger Rebuttal Dep. at 76 (P69)), he was trying to "capture in one place in a tabular form what I thought I understood from having reviewed [Wyeth's field spread sheets from the Cenestin Impact Model]" (*id.* at 137-40). The table was provided to Wyeth's counsel and was the subject of extensive cross-examination in November 2004. *Id.* at 125-40. Wyeth's complaints of "untimeliness" thus ring hollow given that (a) the opinion was not new; and (b) the further explication and clarification about which Wyeth now complains was not late. *See, e.g., Cetlinski v. Brown*, 91 Fed. Appx. 384, 391, 2004 WL 68540, *6 (6th Cir. 2004) (ability to depose expert and otherwise prepare for trial vitiates claim of surprise) (Exhibit "A" hereto); *McHugh v. Olympia Entertainment, Inc.*, 37 Fed. Appx. 730, 735-36, 2002 WL 1065948 *4 (6th Cir. 2002) ("[n]othing in Rule 26, however, precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case," especially where "[h]is testimony was not a departure from the general scheme of his report") (Exhibit "B" hereto).

of the mountain of evidence Plaintiffs proffered to demonstrate the exclusionary nature of Wyeth's conduct. As explained in detail in Plaintiffs' Opposition Brief, the CIM was comprised of calculations *Wyeth itself performed* as part of *Wyeth's multifaceted campaign* to demonstrate to key PBM/MCOs the harmful financial effects to the PBM of supporting even a small amount of Cenestin sales growth among the plan members. Pl. Mem. at 34-37 & Ex. P102; *id.* at 37-57, 75-76, 88-91, 97. These computations were designed to show precisely how much money in Wyeth rebates a PBM/MCO would forfeit if that PBM supported a shift of just 10% market share from Premarin to Cenestin (or to other ERT rivals). By including a "no [Wyeth] contract" scenario in these calculations, Wyeth was threatening PBM/MCOs that it would cancel *the entire Wyeth contract* – and all of the rebates that went along with that contract – if that PBM/MCO supported even a small market share shift to Wyeth's competition, especially Cenestin.[8] Through bundling not "just" Premarin Family products but *all* of its products in this way,[9] Wyeth leveraged market power inherent in its dominant Premarin market share, and its entire diverse product line, in order to "frustrat[e] or impair[] the efforts of other firms to compete for customers within the relevant market."

---

[8] *See* P102 at 118082 (calculations for Cigna "with Cenestin impact and *no* contract" in lower left-hand corner; "if the contract is cancelled" in upper right-hand corner); *id.* at -083 (same for Foundation); *id.* at -084 (same for Kaiser); *id.* at -085 through -101 (same for other PBM/MCOs); *see also* Dep. of Charles Schneider (Wyeth), at 53-56 (PBM/MCO's putting Cenestin on formulary would result in cancellation of entire Wyeth contract and thus nonpayment of rebates on all Wyeth products), 119-21 (same), 250-51 (same), 259-60 (same), 345-46 (same) (P99). Because the version of the Cenestin Impact Plan produced by Wyeth and attached as P120 to Plaintiffs' Appendix is only partially legible, Plaintiffs are separately filing under seal a Notice of Substitution of Exhibit, which contains a more-legible version that may be substituted for P120 in Plaintiffs' Appendix.

[9] Wyeth's economic expert, Dr. Carlton, conceded the existence of such bundling. Carlton Dep. II at 115-16 (P27).

Using the divisor appropriate to Wyeth's threat, contained in the CIM, of cancelling rebates on *all* Wyeth products, Dr. Leitzinger calculated ratios that showed that in order to make a PBM/MCO whole for supporting even a small market share shift away from Premarin in light of Wyeth's exclusionary conduct, the rival, in many cases, would have had to implement negative prices, *i.e.*, pay the PBM potentially several times its potential revenues simply to compete on an equal playing field with Wyeth. *E.g.*, Leitzinger Report at 22-26, 29-30 (Def. Appx. C-7); Leitzinger Rebuttal Rep. at 2-3, 7-9, 17-22 (Def. Appx. C-8); Leitzinger Rebuttal Dep. at 53-85, 125-40 (P69). The left-hand column of the chart that Wyeth replicates, in part, on page 58 of its brief, is simply a tabular representation of one of Dr. Leitzinger's "negative pricing" analyses using such a divisor. Wyeth's new calculations use a divisor appropriate if Wyeth's threats were limited to rebate penalties bundled "only" on Premarin Family products.

In sum, Wyeth is correct that, as explained above, Dr. Leitzinger's CIM calculations to which Wyeth draws the Court's attention on pages 56-57 of its reply brief, were based on assuming a total loss of Wyeth rebates across all product lines, and not "just" on losing "Premarin Family" rebates (Leitzinger Rebuttal Dep. at 136 (P69)). But again, that hardly undermines Plaintiffs' case; indeed, it bolsters it. It shows that Wyeth itself was communicating to PBMs/MCOs a more-severe threat: support small market share shifts to Cenestin and lose *all* of your Wyeth rebates, not just those on Premarin Family products. Moreover, as Wyeth's own chart shows, even restricting the "value" of Wyeth's threat to "Premarin Family" products, Wyeth's conduct undoubtedly "frustrated" and "impaired" the ability of Duramed, or any actual or potential rival, to mount a competitive challenge to Wyeth's dominance. And, by eliminating those competitive threats, Wyeth empowered itself to implement aggressive and unprecedented list price increases.

3.      Though not emphasized in Wyeth's Opening Brief, in its rebuttal Wyeth elevates the unreported decision of *N.W.S. Michigan, Inc. v. Gen. Wine & Liquor Co.*, 58 Fed. Appx. 127 (6th Cir. 2003), to its touchstone, purportedly requiring this Court to view Wyeth's conduct in this case as "pricing," because "rebates are simply a form of discount pricing." Wyeth Reply Br. at 35. Not only does Wyeth completely ignore the multiple ways in which Plaintiffs distinguished *N.W.S. Michigan* from this case (Pl. Mem. at 70-73), Wyeth also fails to apprise the Court of the basis for the dismissal of *N.W.S. Michigan* in the district court:

> Taking NWS's allegations as true, all that is alleged is a violation of state law. NWS does not claim that the rebates, the so-called kickbacks, or the cross subsidization resulted in higher prices to retailers or consumers; it does not claim that availability of brands of spirits or wine was restricted; nor does it claim that a superior product or a lower-cost alternative was eliminated from the market. In short, there is no injury to competition under the facts alleged.

*N.W.S. Michigan, Inc. v. General Wine & Liquor Co., Inc.*, 2001 WL 822337, *5 (W.D. Mich. 2001) (Wyeth Reply Br. Ex. 21). This basis for dismissal of the plaintiff in *N.W.S.* is utterly inapplicable here, where Plaintiffs have alleged, and have amassed substantial evidence, that Wyeth's conduct *has* resulted in higher prices and restricted consumer choice. Moreover, Wyeth's own witnesses have expressly *denied* that Wyeth's rebates were "a form of discount pricing." Pl. Mem. at 29 n.87. *N.W.S.* is simply inapplicable to the case at bar.[10]

---

[10]*N.W.S.* is inapplicable for the additional reason that neither Wyeth nor its experts appear to seriously take the position that Wyeth must price Premarin below *Wyeth's* costs for liability to attach under § 2. That is, both Wyeth and its economic expert, Dr. Carlton, appear to have accepted that the relevant analysis is how Wyeth's *rival* must, in the face of Wyeth's bundled rebates, price the *rival's* product in relation to the *rival's* own revenues. *See* Carlton Dep. II at 234-47 (analyzing, irrespective of relationship of Premarin price to Premarin costs, extent to which *Duramed's* pricing of *Cenestin* would need to be disproportionately lowered, or negative, to induce share shift from Premarin) (P27); *id.* at 254-55 (same); Wyeth Reply Br. at 56-59 (reanalyzing foreclosure based upon *Cenestin* pricing). By conducting such analysis, Wyeth and Dr. Carlton belie Wyeth's
(continued...)

8

4. In its Reply Brief, Wyeth *for the first time* offers a purported "valid business reason" for its challenged contracts. Wyeth now asserts that they were implemented to prevent Cenestin from "free riding" on Premarin's "hard-earned reputation as a 'conjugated estrogen.'" Wyeth Reply Br. at 7. Had Wyeth raised this argument before, Plaintiffs would have noted, first, that the record does not support it. Indeed, Wyeth's principal economic expert explicitly testified that he was "not intending to give an opinion about free-riding." Carlton (Def.) Dep. II (9/3/04) at 93 (P27). And, none of Wyeth's other experts even mentions "free riding" as a justification for Wyeth's conduct. Jamie Durocher, the Premarin brand manager during the relevant time, testified that the possibility of confusion between Cenestin and Premarin was "never the basis" for Wyeth's insertion of a sole-CE clause into PBM/MCO contracts. Durocher (Def.) Dep. (2/7/02) at 205-06 (P101).

Plaintiffs would have also pointed out that the mere assertion of a "valid business justification" constitutes, finally, a recognition on Wyeth's part that its conduct was not merely another form of "discounting." Simple discounting does not need to be defended by a "valid business reason." **Only improper exclusionary conduct needs such a defense**.

For the foregoing additional reasons, Wyeth's motion for summary judgment should be denied in its entirety.

---

[10](...continued)
supposed view that the Court must view this case as sounding in predatory pricing.

9

Dated: April 12, 2005

*SUBMITTED AS ATTACHMENT TO MOTION FOR LEAVE,* /s/ Theresa L. Groh
_____
Theresa L. Groh
**MURDOCK GOLDENBERG
  SCHNEIDER & GROH, L.P.A.**
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
Tel: (513) 345-8291
Fax: (513) 345-8294

*Local Counsel for Direct Purchaser Class*

H. Laddie Montague, Jr.
Eric L. Cramer
Peter R. Kohn
Candice J. Enders
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Co-Lead Counsel for Direct Purchaser Class*

Eugene A. Spector
Jay S. Cohen
**SPECTOR ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611

*Co-Lead Counsel for Direct Purchaser Class*

*Additional Class Counsel*:

Barry S. Taus
Jan Bartelli
**GARWIN BRONZAFT GERSTEIN
  & FISHER, L.L.P.**
1501 Broadway, Suite 1416
New York, NY 10036
Tel.: (212) 398-0055
Fax: (212) 764-6620

10

Kendall Zylstra
**SCHIFFRIN & BARROWAY, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 677-7706
Fax: (610) 667-7056

John P. McCarthy
**LAW OFFICES OF JOHN P. McCARTHY**
217 Bay Avenue
Somers Point, NJ 08224
Tel: (609) 653-1094
Fax: (609) 653-3021

11

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2005, I electronically filed the Direct Purchaser Class Plaintiffs' Sur-Reply Memorandum of Law in Further Opposition to Wyeth's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James R. Adams
Grant S. Cowan
**FROST BROWN TODD LLC**
2200 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
Tel: (513) 651-6800

David S. Eggert
Matthew D. Meisner
**ARNOLD & PORTER**
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, D.C. 20004
Tel: (202) 942-5000

Dan K. Webb
W. Gordon Dobie
Peggy M. Balesteri
**WINSTON & STRAWN**
35 West Wacker Dr.
Chicago, Illinois 60601
Tel: (312) 558-5600

_____
Theresa L. Groh, No. 0029806