UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| J.B.D.L. CORPORATION, d/b/a BECKETT APOTHECARY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:01-cv-704 |
| v. | ) ) | Judge Sandra S. Beckwith Magistrate Judge Timothy S. Hogan |
| WYETH-AYERST LABS., INC., et al., | ) ) | |
| Defendants. | ) ) ) | |
| CVS MERIDIAN, INC. and RITE AID CORP., | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:03-cv-781 |
| v. | ) ) | Judge Sandra S. Beckwith Magistrate Judge Timothy S. Hogan |
| WYETH, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS FROM INTRODUCING THE
TESTIMONY OR ANALYSIS OF DAVID J. GIBSON**

Defendants Wyeth Pharmaceuticals (formerly known as Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly known as American Home Products Corporation) (collectively "Wyeth") through its attorneys, hereby respectfully move this Court to prohibit Plaintiffs J.B.D.L. Corporation, et al., and CVS Meridian, Inc. and Rite Aid Corporation (collectively "Plaintiffs") from introducing the testimony or analysis of David J. Gibson. In support of this motion, Wyeth submits and incorporates on the attached memorandum of law.

Dated:  May 13, 2005                    Respectfully submitted,


                                        s/*Grant S. Cowan*
                                        Grant S. Cowan  (0029667)
                                        FROST BROWN TODD LLC
                                        2200 PNC Center
                                        201 East Fifth Street
                                        Cincinnati, Ohio  45202-4182
                                        Telephone:  (513) 651-6745
                                        Facsimile:  (513) 651-6981
                                        gcowan@fbtlaw.com

                                        Trial Attorney for Defendants
                                        Wyeth and Wyeth Pharmaceuticals

                                        OF COUNSEL

                                        WINSTON & STRAWN LLP
                                        35 West Wacker Drive
                                        Chicago, Illinois  60601-9703
                                        Telephone:  (312) 558-5600
                                        Facsimile:  (312) 558-5700

                                        ARNOLD & PORTER LLP
                                        555 Twelfth Street, N.W.
                                        Washington, D.C.  20004-1206
                                        Telephone:  (202) 942-5000
                                        Facsimile:  (202) 942-5999

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| J.B.D.L. CORPORATION, d/b/a BECKETT APOTHECARY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:01-cv-704 |
| v. | ) ) | Judge Sandra S. Beckwith Magistrate Judge Timothy S. Hogan |
| WYETH-AYERST LABS., INC., et al., | ) ) ) | |
| Defendants. | ) ) | |
| CVS MERIDIAN, INC. and RITE AID CORP., | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:03-cv-781 |
| v. | ) ) | Judge Sandra S. Beckwith Magistrate Judge Timothy S. Hogan |
| WYETH, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFFS FROM INTRODUCING
THE TESTIMONY OR ANALYSIS OF DAVID J. GIBSON**

Dan K. Webb
W. Gordon Dobie
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-5600

Grant S. Cowan  (0029667)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202-4182
Telephone: (513) 651-6745

Douglas L. Wald
David S. Eggert
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Telephone: (202) 942-5000

Counsel for Defendants Wyeth and Wyeth Pharmaceuticals

Dated: May 13, 2005

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND BACKGROUND ...................................................... 1

II.   LEGAL STANDARD ................................................................................... 2

    A.    Federal Rule of Civil Procedure 26(a) ................................................ 2

    B.    Federal Rule of Civil Procedure 702 and the *Daubert* Test ...................... 3

    C.    Federal Rule of Evidence 403 ........................................................... 4

III.  DR. GIBSON'S REPORT AND TESTIMONY SHOULD BE BARRED .............. 5

    A.    Numerous Portions of Dr. Gibson's Report Are Impermissibly
        Taken from Others' Work and Outside Documents and Do
        Not Represent His Own Analysis ....................................................... 5

        1.    Dr. Gibson copied the report of Duramed expert
            Dale Bystrom ....................................................................... 6

Numerous sections of Dr. Gibson's expert report are copied directly from the expert report of a different witness in prior, related litigation without attribution. As a result, Dr. Gibson cannot meet the requirement in Federal Rule of Civil Procedure 26(a)(2) that his report be "prepared and signed by the witness." Additionally, such copying is a tacit admission that Dr. Gibson lacks the expertise necessary to opine on these topics as required by Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

        2.    Dr. Gibson also copied other documents ...................................12

Numerous other sections of Dr. Gibson's expert report are copied directly from other sources without proper citation. As a result, Dr. Gibson cannot meet the requirement in Federal Rule of Civil Procedure 26(a)(2) that his report be "prepared and signed by the witness." Additionally, such copying is a tacit admission that Dr. Gibson lacks the expertise necessary to opine on these topics as required by Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

    B.    Dr. Gibson Is Not Qualified to Testify About Contracts Between
        Pharmaceutical Manufacturers and PBMs or MCOs ............................15

Dr. Gibson is not qualified to comment on managed care contracting; additionally he has done only minimal work with P&T committees and is not qualified to comment on the effect that formulary status has on pharmaceuticals. Given his

lack of experience, he is not qualified to offer expert testimony in these areas under the parameters set forth in Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

**C.    Dr. Gibson Is Not Qualified to Testify About Pharmaceutical Marketing ................................................................................. 20**

Dr. Gibson has no pharmaceutical marketing experience and is not qualified to opine on Wyeth's marketing of Premarin, including the "Premarin Preemptive Plan." Due to his lack of experience, he cannot meet the requirements of Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

**D.    Dr. Gibson Is Not Qualified to Testify About Pharmacy Issues ............... 22**

Dr. Gibson lacks retail pharmacy experience and is not qualified to discuss pharmacy reimbursement issues. Accordingly, for these issues he cannot meet the requirements of Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

**E.    Dr. Gibson Offers Inadmissible Conjecture as to Wyeth's Corporate Intent ......................................................................... 24**

Dr. Gibson speculates impermissibly as to Wyeth's corporate intent regarding its promotion and sale of Premarin. Questions of intent are factual issues traditionally left to a jury to determine. *Woods v. LeCureux*, 110 F.3d 1215, 1221 (6th Cir. 1997). Additionally, such testimony strays far beyond Dr. Gibson's purported areas of expertise and cannot meet the requirements of Federal Rules of Evidence 104(a) and 702, and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

**F.    Dr. Gibson Offers Inadmissible Legal Conclusions ............................. 27**

Dr. Gibson offers testimony asserting Wyeth has a "monopoly" or engages in "monopolistic behavior." Such testimony presents an impermissible legal conclusion. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994).

**IV.    CONCLUSION ................................................................................... 28**

Defendants Wyeth Pharmaceuticals (formerly known as Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly known as American Home Products Corporation) (collectively "Wyeth") submit this Memorandum in Support of Its Motion for an Order precluding Plaintiffs J.B.D.L. Corporation, *et al.*, and CVS Meridian, Inc. and Rite Aid Corporation (collectively "Plaintiffs") from introducing the testimony or analysis of Plaintiffs' purported expert, David J. Gibson. In support of this motion, Wyeth states as follows:

## I.    INTRODUCTION AND BACKGROUND

Wyeth manufactures and markets Premarin, an estrogen therapy prescription pharmaceutical product commonly prescribed to relieve symptoms associated with menopause. Plaintiffs allege that Wyeth violated provisions of the Sherman Act by entering into anticompetitive rebate contracts with managed care organizations ("MCOs") and pharmacy benefit managers ("PBMs"). Plaintiffs allege that Cenestin, an estrogen therapy pharmaceutical product, was unable to compete effectively because of Wyeth's contracts and assert antitrust claims of monopolization and exclusive dealing. Wyeth denies Plaintiffs' allegations that Cenestin was foreclosed from the market for estrogen therapy products and will submit substantial evidence at trial that Cenestin's limited success was not the result of Wyeth's rebate agreements but instead was attributable to Cenestin's weakness as a product, its lack of therapeutic indications, its lack of dosage strengths, its lack of scientific studies supporting the product, its relatively small product promotion, its parity pricing strategy and numerous other problems. Wyeth further asserts that Cenestin was available throughout the market place and that the average consumer during the relevant time period would pay almost the same for Premarin or Cenestin regardless of Wyeth's contracts or Cenestin's formulary status.

2

Plaintiffs retained David J. Gibson, M.D., as an expert to submit a report in this case.  (Gibson J.B.D.L. Report is attached hereto as Exhibit 1).[1]  Dr. Gibson received his medical degree in 1971 and last practiced medicine in 1984.  Since that time Dr. Gibson has been involved in several businesses in fields relating to health care – focusing on an unsuccessful attempt to bring hand-held prescribing technology to physician offices.

Dr. Gibson's sole previous retention as an expert has been in the related *Duramed* litigation.  Dr. Gibson has never been certified as an expert by any court.

Dr. Gibson's proffered report and testimony are glaringly deficient in a number of aspects.  The vast majority of Dr. Gibson's report is lifted whole cloth from other people's work; the report fails to indicate that these analyses and opinions are not his own.  Dr. Gibson presents very little of his own analysis and is, in fact, not properly qualified to comment on the subject matters covered in his report.  Additionally, Dr. Gibson offers impermissible opinion concerning Wyeth's corporate intent and impermissible legal conclusions concerning Wyeth's behavior in the market.  Dr. Gibson's report and testimony falls outside the scope of Federal Rules of Evidence 403 and 702 as well as the standards contemplated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  As such, this Court should exclude Dr. Gibson's report and testimony.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 26(a)

Federal Rule of Civil Procedure 26(a)(2) requires expert witnesses to provide a "written report prepared and signed by the witness."  Fed. R. Civ. P. 26(a)(2).  Federal Rule of

---

[1]    Class plaintiffs J.B.D.L. Corporation, *et al.*, initially retained Dr. Gibson and his report states that he was retained by J.B.D.L.  During his deposition, however, Dr. Gibson stated that he was informed that he was also submitting his testimony on behalf of the opt-out plaintiffs in this case, CVS and Rite Aid.  (Ex.2, Gibson 5/18/04 Dep. at 117:4-118:3).

Civil Procedure 37(c) directs that, where a party fails to comply with Rule 26(a), it generally may not use the corresponding evidence at trial. Fed. R. Civ. P. 37(c)(1).

      **B.**      **Federal Rule of Civil Procedure 702 and the *Daubert* Test**

      Before a court may consider the substance of an expert's proposed testimony, it must address the "[p]reliminary questions concerning the qualifications of a person to be a witness." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 requires that to qualify as an expert, a witness must first establish his or her expertise by reference to "knowledge, skill, experience, training or education." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, n.10 (1993). The Sixth Circuit has stated that the trial court must examine the expert's qualifications, not in the abstract, but with regard to "whether those qualifications provide a foundation for a witness to answer a specific question" and "whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (abrogated on other grounds) (citations and quotations omitted). The Sixth Circuit has repeatedly held that an expert may not testify to subjects that are beyond his or her area of expertise. *See, e.g.*, *Smelser*, 105 F.3d at 305 (holding lower court erred in admitting the testimony of expert concerning seatbelt injuries where testimony went outside expert's field of biomechanics); *Berry v. City of Detroit*, 25 F.3d 1342, 1351-52 (6th Cir. 1994) (finding expert in "police policies and practices" lacked qualifications to testify as to whether disciplinary problems in a police force caused a shooting death); *In re Meridia Prods. Liab.*, 328 F. Supp. 2d 791, 805 (N.D. Ohio 2004) (holding pharmacist may not testify on subjects properly directed to a cardiologist). The proponents of the expert bear the burden of showing that he or she is qualified

to render an expert opinion on matters related to the case. *In re Meridia Prods. Liab.*, 328 F. Supp. 2d at 804.

   If an expert is properly qualified, his or her testimony must satisfy three prerequisites outlined in Federal Rule of Evidence 702 before being admitted: (1) the testimony must be based upon sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the witness must have applied the principles and methods reliably to the facts of this case. Fed. R. Evid. 702. In a case following and applying *Daubert*, the Supreme Court held that a court must determine "whether the principles and methodology underlying the testimony itself are valid." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "Where [the expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question" the trial court must evaluate that testimony before allowing it to be admitted. *Id.* at 149 (citations omitted).

  **C.**  **Federal Rule of Evidence 403**

   Additionally, even if proffered expert analysis can withstand *Daubert* scrutiny, it must also meet the requirements of Federal Rule of Evidence 403. Under Rule 403, evidence must be excluded, even if it is relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Thus, a court confronted with expert analysis that passes the *Daubert* test must still determine if the proffered evidence survives Rule 403 scrutiny. *See Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 388 (W.D. Mich. 1996). Evidence may be excluded under Rule 403 if "the expert's opinion rests on a foundation so unreliable that it should be excluded from consideration." *Robinson v. Union Carbide Corp.*, 805 F. Supp. 514, 523 (E.D. Tenn. 1991); *see also Wolfel v. Holbrook*, 823 F.2d 970, 973-74 (6th Cir. 1987).

## III.    DR. GIBSON'S REPORT AND TESTIMONY SHOULD BE BARRED

Much of Dr. Gibson's report does not represent his own analysis and Dr. Gibson lacks the expertise to testify on the subject matters covered in his report.  Additionally, Dr. Gibson's report and testimony presents inadmissible conjecture as to Wyeth's corporate intent and inadmissible legal conclusions.  Dr. Gibson's report fails to meet the basic requirements of Federal Rule of Civil Procedure 26(a) and his report and testimony fails under Federal Rule of Civil Procedure 702 and the *Daubert* test, and should be excluded under Federal Rule of Evidence 403.  More specifically:

- The vast majority of Dr. Gibson's report is lifted entirely from other people's work and from other documents; Dr. Gibson has failed to provide proper citation, or indicate in any other manner, that these discussions and analyses are not his own.

- Dr. Gibson has no pharmaceutical contracting experience and is not qualified to comment on Wyeth's contracts.

- Dr. Gibson has no pharmaceutical marketing experience and is not qualified to comment on Wyeth's marketing of Premarin.

- Dr. Gibson has no pharmacy experience and is not qualified to discuss pharmacy issues.

- Dr. Gibson has insufficient managed care experience and is not qualified to comment on the effects of managed care formularies.

- Dr. Gibson offers inadmissible conjecture as to Wyeth's corporate intent.

- Dr. Gibson offers inadmissible legal conclusions.

### A.    Numerous Portions of Dr. Gibson's Report Are Impermissibly Taken From Others' Work and Outside Documents and Do Not Represent His Own Analysis

Dr. Gibson's report is compiled chiefly from text that has been "cut and pasted" from other documents with little or no attribution to the actual authors.  Very little of Dr. Gibson's report actually represents his own analysis of the managed care industry or the

pharmaceutical industry. Dr. Gibson's blatant plagiarism violates the basic requirements of Federal Rule of Civil Procedure 26(a) and is a tacit admission of his lack of expertise.

### 1. Dr. Gibson copied the report of Duramed expert Dale Bystrom

A large portion of the text in Dr. Gibson's report is taken without attribution from the expert report submitted by Dale Bystrom, R.Ph., in the related litigation, *Duramed Pharmaceuticals v. Wyeth-Ayerst Laboratories, Inc.*, C-1-00-735 (S.D. Ohio), that preceded this class action. As discussed below, Dr. Gibson's conduct is an implicit admission of what he previously admitted expressly: he is not an expert in these areas.

The plaintiff in the *Duramed* case retained Dr. Gibson and Dale Bystrom as experts. Both Dr. Gibson and Mr. Bystrom submitted expert reports on behalf of Duramed. (Gibson's Duramed report is attached hereto as Exhibit 3; Bystrom's Duramed report is attached hereto as Exhibit 4). In this case, Plaintiffs did not retain Mr. Bystrom as an expert. Instead, Dr. Gibson copied virtually all of Mr. Bystrom's Duramed report and inserted it into his report in this case. (A highlighted version of Bystrom's Duramed report indicating portions of text copied by Dr. Gibson is attached hereto as Exhibit 12).

Dr. Gibson testified in the *Duramed* litigation that he suggested Duramed's counsel retain Mr. Bystrom expressly because Dr. Gibson did not believe he possessed the requisite expertise to testify in several areas. (Ex. 5, Gibson 7/26/02 Dep. at 83:4-85:23). In his 2002 deposition Dr. Gibson explained:

> A.     Actually, I suggested that [Duramed's counsel, Susman Godfrey] bring in several people. . . . And as I – I got into this case, I recognized that, though I am knowledgeable about a lot of things in health care – you know, I've – I've managed medical groups; I've – I've been the CEO of insurance companies; I have been active involved as a consultant – my knowledge is broad but not deep everywhere. *I'm deep in some places but not others. So it was my recommendation that they bring someone knowledgeable*

> *in on the business side of the pharmacy, which would have been*
> *Dale Bystrom . . . .*

(Ex. 5, Gibson 7/26/02 Dep. at 83:4-85:23 (emphasis added); *see also* Ex. 2, Gibson 5/18/04

Dep. at 98:2-100:7, 102:24-104:18). Even though Dr. Gibson conceded that he is not an expert,

Plaintiffs in this case chose to eliminate Mr. Bystrom as an expert and now improperly attempt to

resurrect his report as part of Dr. Gibson's.

Indeed, many of the discussions and analyses that appear in Dr. Gibson's report

in this case are actually plagiarized word for word from Mr. Bystrom's Duramed report:

> Q.     Didn't you essentially just simply cut and paste this from
> Mr. Bystrom's report and now put it into yours?
>                             * * *
> A.     It could have been. I don't – I don't recall if it was or not,
> but it could have been.
>
> Q.     And you haven't attributed any of this to Mr. Bystrom,
> have you?
>
> A.     I attribute – there's one – there's one reference –
> particularly when we get back into the area of NDC blocks and soft
> edits and hard edits. . . . See, that would have been –
>
> Q.     That's on Page 44.
>
> A.     Is that where it is? So you see the footnote there. But I
> didn't – I was asking if he'd seen Footnote 51, which he had. But I
> didn't – *I didn't footnote every section of the text that I used from*
> *his report.*
>                             * * *
> Q.     Where in this report do you say that you're actually quoting
> or – or basically taking wholesale Mr. Bystrom's entire discussion
> on a particular area and putting it into your report?
>                             * * *
> A.     I don't have any other footnotes from Mr. Bystrom than the
> one that's referenced.

(Ex. 2, Gibson 5/18/04 Dep. at 123:16-133:5 (emphasis added); *see also* Ex. 2 at 129:16-133:5

(confronting Dr. Gibson with specific incidents of plagiarism)).

The copying of Mr. Bystrom's report is obvious throughout Dr. Gibson's report. (A highlighted version of Dr. Gibson's report in this case indicating incidents of plagiarism of Mr. Bystrom's Duramed report and other documents is attached hereto as Exhibit 6). Specifically:

- The vast majority of the text on pages 12, 13 and 14 of Dr. Gibson's report is taken verbatim from pages 5, 6 and 7 of Mr. Bystrom's report.

- The vast majority of the text under the section heading, "The PBM's role in the distribution process," on pages 17 and 18 of Dr. Gibson's report is lifted from pages 8 and 9 of Mr. Bystrom's report.

- The vast majority of the text on pages 19 and 20 of Dr. Gibson's report, under the heading "PBM services/client contracts" is taken from page 10 of Mr. Bystrom's report.

- Portions of text on pages 24 and 25 of Dr. Gibson's report, under the heading "PBM Consolidation" is taken from pages 9 and 10 of Mr. Bystrom's report, as is the text under the graph on page 29 of Dr. Gibson's report.

- The vast majority of the text on pages 30, 31, 32 and 33 of Dr. Gibson's report, under the heading "Drug Formularies" is copied from pages 10 and 11 of Mr. Bystrom's report with the same heading.

- The vast majority of the section beginning on page 33 of Dr. Gibson's report entitled "Copayment structure description" is copied from page 12 of Mr. Bystrom's report.

- The vast majority of the discussion on pages 37 and 38 of Dr. Gibson's report concerning two-tier and three-tier co-payment plans are copied from page 12 of Mr. Bystrom's report.

- The section beginning on page 38 of Dr. Gibson's report entitled "PBM adjudication interface with pharmacy providers" is copied verbatim from a section with the same heading on page 13 of Mr. Bystrom's report.

- The vast majority of the discussion of rebates on page 40 and 41 of Dr. Gibson's report is taken from pages 13 and 14 of Mr. Bystrom's report.

- The sub-sections entitled "Rebate amount and allocation of the PBM's clients" and "Factors influencing rebate levels" on pages 42 and 43 of Dr. Gibson's report are lifted almost entirely from pages 14, 15 and 16 of Mr. Bystrom's report.

9

- The section entitled "Retail Vendors" on pages 44, 45, 46 and 47 of Dr. Gibson's report is lifted almost entirely from pages 17, 18, 19 and 20 of Mr. Bystrom's report with the same subheadings.

- The introduction on page 54 of Dr. Gibson's report under the heading "Wyeth-Ayerst Laboratories, Inc.'s [M]arketing Strategy" is copied verbatim from page 22 of Mr. Bystrom's report.

- The discussion on page 65 of Dr. Gibson's report under the heading "Wyeth's use of its market power as an offensive weapon against Cenestin" is taken from page 22 of Mr. Bystrom's report.

- Almost the entire discussion on pages 70, 71, 72 and 73 of Dr. Gibson's report under the headings "Negotiated and enforced market share agreements to protect its single source status," "Wyeth enforced the terms of their contracts," "Wyeth threatened MCOs with loss of their rebate income," "Wyeth used their market position to negotiate exclusive contracts," and "Wyeth worked with PBMs/MCOs to exclude Cenestin from their formularies" comes from pages 23, 24, 25, 27, 28, 29 and 30 of Mr. Bystrom's report.

- Portions of the discussion on page 74 of Dr. Gibson's report under the heading "The Managed Care Cost Analysis" are taken from page 30 of Mr. Bystrom's report.

- The section on pages 77 and 78 of Dr. Gibson's report entitled "Wyeth enhanced their contract terms with certain accounts to protect their existing exclusive formulary position" is taken verbatim from text found on pages 25, 26, 32 and 33 of Mr. Bystrom's report.

Dr. Gibson now claims that the copied text was the result of a large-scale collaborative effort. The deposition testimony of Mr. Bystrom and Dr. Gibson taken in 2002, however, directly contradicts any such explanation. Mr. Bystrom testified in the *Duramed* litigation that he wrote his own report and was not assisted by anyone.

Q.     Let's see.  If I could ask you to turn to your report. Incidentally, did you – did you write the first draft of this report?

A.     Yes.

Q.     *And did anyone assist you in writing the report?*

A.     *No.*

Q.     So you didn't have any other assistance or other persons working with you.  Did you type it yourself?

A.     Yes.

(Ex. 7, Bystrom 7/18/02 Dep. at 42:13-23 (emphasis added)).  Mr. Bystrom, in fact, specifically

denied having conversations on the substance of his report with Dr. Gibson:

Q.     Did you and Mr. Gibson discuss your reports – or Dr. Gibson – discuss your reports with each other before they were submitted?

A.     We knew that we were both working on reports and that his was focused on the physician area and mine was focused on pharmacy and PBM.

*Q.     Did you have conversations with Dr. Gibson about the substance of your report?*

*A.     Not necessarily, no.*

(Ex. 7, Bystrom 7/18/02 Dep. at 218:9-17 (emphasis added)).

Similarly, Dr. Gibson testified in 2002 that he had not reviewed any other expert

reports and wrote his entire report:

Q.     Have you reviewed any of the other expert reports?

A.     Any of the what?

Q.     Any of the other Duramed expert reports.

A.     No.

*Q.     Now, did you write your entire expert report?*

*A.     I sure did.*

Q.     All right.

A.     Typed it myself.

(Ex. 5, Gibson 7/26/02 Dep. at 102:17-25 (emphasis added)).

Once confronted with the obvious plagiarism in his 2004 report, however, Dr. Gibson changed his story and claimed that he and Mr. Bystrom had collaborated on both of their Duramed reports in 2002. As is apparent from the following deposition transcript, Dr. Gibson's account of this is muddled at best:

> Q.  Sir, I'm a little confused. Did – did you work on part of Mr. Bystrom's report in the last instance? Is that what you're saying?
>
> A.  What I'm saying is that there was a report that was generated by both of us that towards the end of the editing process was split into two portions. And what you saw as the finished product was what Dale had and what you had as the finished product was mine. *However, a lot of the actual text in Dale's was written by me and a lot of the text in mine was written by Dale.*

(Ex. 2, Gibson 5/18/04 dep. at 121:24-123:5 (emphasis added)).

> Q.  [I]s this the Dale Bystrom report that you're referring to?
>
> A.  I assume that this is his final report in the – in the Duramed case.
>
> Q.  And is it your testimony that you wrote part of this report, sir?
>
> A.  It is my – my statement that I collaborated on big portions of this report.
>
> Q.  All right. And if Mr. Bystrom – Mr. Bystrom testified that he wrote the entire report himself, would that be a lie?
>
> A.  No. He did write the report, but he didn't say that he didn't have any input from anybody else.
>
> Q.  Okay. But I'm talking about the actual verbiage, the words that are here in this report. Is it accurate to say that Mr. Bystrom wrote these words or did you write the words?
>
> *  *  *
>
> A.  *Every – every portion of the final report he wrote. That's what he turned in. Every portion of what I turned in I wrote.*

(Ex. 2, Gibson 5/18/04 Dep. at 128:5-129:5 (emphasis added)).

###### 2.     Dr. Gibson also copied other documents

In addition to copying Mr. Bystrom's report, Dr. Gibson also inserts text and graphics from other articles and works in his report, without adequate citation or verification of accuracy. (*See* Ex. 6, documenting incidents of text copied from Mr. Bystrom and other sources). In one example, Dr. Gibson admits to having lifted two paragraphs of text verbatim from a publication, Managed Care Weekly, without adequate citation:

> Q.     And if you turn to your report, which is Exhibit 1, and go to Page 16.
>
> A.     Okay.
>
> Q.     You actually have simply just lifted wholesale from this document and put it into your report; correct?
>                         * * *
> A.     The – let's see. We're – we're on Page 16?
>                         * * *
> Q.     Starting with the second sentence, "As companies put the finishing touches on 2004 employer benefit design changes," those two paragraphs are set forth in your expert report on the bottom of Page 16 running over to 17; correct?
>
> A.     Right. They were getting back to the article on managing direct costs in Managed Care Weekly.
>
> Q.     Okay. And again, why did you not – why didn't you put quotations that you had actually just quoted this directly from – from the managed drug cost article here on pharmacy benefit management?
>
> A.     I thought my footnoting was adequate.

(Ex. 2, Gibson 5/18/04 Dep. at 137:10-138:19; *see also* Ex. 2 at 138:19-145:15.) Gibson also admitted to copying from another article:

> Q.     . . . So, for example, the next two paragraphs of your report as well as on Page 17, "The most common plan design changes for 2004," that's – again, if you look at the second page of Exhibit 9, that's the same language that's in your report; correct?

A.    Which is what I wanted to say.

Q.    And if you go down to the – let's see, two more paragraphs in the article where it says, "Employers generally are more aggressive" –

A.    Uh-huh.

Q.    – than are health insurers in pushing" – right.  There what you've done is you've edited out the fact that that was actually a quote from AdvancePCS's CEO, David Halbert; correct?

A.    Yes.

Q.    All right.  So this is a quote from the chief executive officer of AdvancePCS and you've removed that and then just put that in your – in your report; correct?

A.    Correct.

Q.    All right.  And then the next paragraph that starts, "Employers are now" – "generally are more aggressive," that's again word for word taken from this article with the exception that you removed the fact that that again came from Mr. Halbert, the chief executive officer of AdvancePCS; correct?

A.    Correct.

(Ex. 2, Gibson 5/18/04 dep. at 140:20-142:1; 139:24-145:16).

        Not only did Dr. Gibson lift his analysis verbatim from other authors without using quotation marks, he also admits that he did nothing to verify whether the copied text or charts were accurate or even correct.  (Ex. 2, Gibson 5/18/04 Dep. at 142:4-145:15, 157:19-159:17).  It is not surprising that, given the minimal amount of analysis in the report that actually comes from Dr. Gibson himself, that he admitted that any reasonable observer could reach his same conclusions based on a review of the same material.  (Ex. 2, Gibson 5/18/04 Dep. at 160:6-13).

14

Federal Rule of Civil Procedure 26(a)(2) requires expert witnesses to provide a "written report prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2). "'Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.'" *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 293 (E.D. Va. 2001) (quoting *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715 (N.D. Ill. May 18, 1999)). Dr. Gibson's report fails to meet this basic requirement because Dr. Gibson did not, in fact, prepare much of his report. Rather, large segments of the research and analysis presented were actually created and prepared by Mr. Bystrom and others.

Other courts in this Circuit have precluded the testimony of an expert witness on similar grounds. *Jackson Nat'l Life Ins. Co. Premium Litig.*, No. 96-MD-1122, 2000 WL 33654070, at *1-*2 (W.D. Mich. Feb. 8, 2000) (attached hereto as Exhibit 8). In *Jackson*, the Court found that the "undeniable substantial similarities between Mr. Bieluch's report and the report of another expert . . . demonstrate that counsel's participation so exceeded the bounds of legitimate 'assistance' as to negate the possibility that Mr. Bieluch actually prepared his own report within the meaning of Rule 26(a)(2)." *Id.* at *1. Indeed, Federal Rule of Civil Procedure 37(c) directs that, where a party fails to comply with Rule 26(a), it generally may not use the corresponding evidence at trial. Fed. R. Civ. P. 37(c)(1).

Dr. Gibson's plagiarizing the work of others, however, demonstrates a larger, more substantive problem than simply a failure to satisfy the technical requirements of Rule 26. In substituting others' analysis for his own, Dr. Gibson has both explicitly and implicitly conceded that he is not qualified as an expert to analyze the issues relevant to his opinions. Indeed, Dr. Gibson admitted just that in his *Duramed* deposition and for that reason had strongly

recommended that counsel find a true expert in the areas in which he now opines.  (Ex. 5, Gibson 7/26/02 Dep. at 83:4-85:23).

In *Mercurio v. Nissan Motor Corp.*, the Northern District of Ohio addressed a similar, albeit less serious, situation.  81 F. Supp. 2d 859 (N.D. Ohio 2000).  There, the court explained that where an expert would "do little more than regurgitate the conclusions of several journal articles he has read," his testimony was not admissible under the *Daubert* test.  *Id.* at 863. Similarly, in *Trigon Insurance Co. v. United States*, the Eastern District of Virginia explained that, "if opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of Fed. R. Evid. 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology."  204 F.R.D. 277, 294 (E.D. Va. 2001); *see also Bouchard v. American Home Prods. Corp.*, No. 3:98 CV 7541, 2002 WL 32597992, at *5-*6 (N.D. Ohio May 24, 2002) (attached hereto as Exhibit 9) (excluding expert's testimony where it "would merely involve 'parroting' information he obtained through other literature"). Dr. Gibson's obvious plagiarism of discussions and analysis authored by others is clear evidence that his report and testimony fails to meet the requirements of Federal Rule of Civil Procedure 26(a)(2), lacks a proper foundation and does not satisfy the standards set out in *Daubert* and Federal Rule of Evidence 702.

**B.    Dr. Gibson Is Not Qualified to Testify About Contracts Between Pharmaceutical Manufacturers and PBMs or MCOs**

The failings of Dr. Gibson's report are underscored by his lack of qualifications to opine on the subjects contained therein.  First, Dr. Gibson is not qualified to comment on managed care contracting; additionally he has done only minimal work with P&T committees and is not qualified to comment on the effect that formulary status has on pharmaceuticals.

Dr. Gibson has never negotiated pharmaceutical contracts with manufacturers and does not review such contracts in his work.  In the *Duramed* case, Dr. Gibson admitted that he did not have any experience and was not an authority on managed care contracting:

> Q.     Have you ever negotiated any sort of – of a pharmaceutical – a manufacturer's – a contract with a pharmaceutical manufacturer?
>
> A.     No.
>
> Q.     Ever negotiate any sort of market share rebates or anything like that –
>
> A.     No.
>
> Q.     – with a pharmaceutical company?
>
> A.     No.

(Ex. 5, Gibson 7/26/02 Dep. at 87:25-88:18).

> Q.     . . . [A]re you – are you aware of the situations where it's common to seek an exclusive [contract]?
>
> A.     I can't think of something right off the top of my head.  If you have an example, I can react to it, but I – I can't think of something or an incidence where –
>                                     * * *
> Q.     But it's – I mean, again, I'm getting a little bit outside of your expertise –
>
> A.     Yeah, you are.
>
> Q.     – in fairness?  Okay.
>
> A.     Again, those would be – I think Dale [Bystrom] would be much more knowledgeable about that than I am.

(Ex. 5, Gibson 7/26/02 Dep. at 183:1-183:22).

> Q.     Sir, given that you've never negotiated a rebate contract with a manufacturer, do you know how common exclusives are in the industry?

> A.    I've asked that question of people that know more about it than I do, and the answer I've received is it's somewhat unusual, but that's as far as I could go in responding to that question.
>
> *Q.    It's not something that you have knowledge of?*
>
> *A.    No. I've not – I've not seen a broad body of contracts, and therefore I'm not an authority on that.*

(Ex. 5, Gibson 7/26/02 Dep. at 142:17-143:1 (emphasis added); *see also* Ex. 5 at 29:13-24, 77:24-78:4, 88:3-18).   Since his deposition 2002, Dr. Gibson has not gained any personal knowledge regarding managed care contracting.

> Q.    Sir, I want to talk about your experience with contracting with pharmaceutical companies.   At the time of your last deposition, you told me that you didn't have any experience negotiating with manufacturers of pharmaceutical products; correct?
>
> A.    Correct.
>
> Q.    And since your deposition, you haven't gained any experience in terms of negotiating with manufacturers of – of pharmaceutical products; correct?
>
> A.    Direct contracting, no.
>
> Q.    And you haven't negotiated any market share rebates or anything like that with any pharmaceutical companies since your – your last deposition; correct, sir?
>
> A.    Correct.

(Ex. 2, Gibson 5/18/04 Dep. at 162:18-163:11).   The only "experience" Dr. Gibson claims to have received since then is having conversations with three individuals, who, as it turns out, also have only limited experience in negotiating contracts with pharmaceutical manufacturers.   (Ex. 2, Gibson 5/18/04 Dep. at 163:22-167:4, 178:16-180:18, 250:21-251:19).

Additionally, Dr. Gibson's experience on pharmacy and therapeutics committees ("P&T committees") is limited.   Dr. Gibson has served only briefly on two P&T committees, for

Omni HealthCare from May 1996 to January 1998 and for Pharmaceutical Care Network ("PCN") from May 2002 to the present.  (Ex. 2, Gibson 5/18/04 Dep. at 231:3-21; Ex. 1, Gibson Report at 82).  While at Omni, the P&T committee met only three or four times during which they never discussed Premarin, Cenestin or the estrogen therapy category; since Dr. Gibson has been at PCN, the P&T committee had only "met" through telephone calls concerning formulary issues four or five times.  (Ex. 2, Gibson 5/18/04 Dep. at 40:16-46:18, 231:3-232:12, 173:22-175:13).  During his 2004 deposition, Dr. Gibson was completely unaware of his own company's (PCN's) formulary or that Premarin was listed on PCN's formulary – *not* Cenestin – more than 3 years after first rendering an opinion that such a listing was wrong.  (Ex. 2, Gibson 5/18/04 Dep. at 173:22-175:13).

Given Dr. Gibson's inexperience with contracts between pharmaceutical manufacturers and MCOs and PBMs, and his relatively limited experience working on P&T committees, it is not surprising he also lacks expertise concerning the effect of formulary status on pharmaceutical products.  When asked in his 2004 deposition, Dr. Gibson identified that his basis for drawing his conclusions concerning formulary status was documents produced in this case, not expertise or study in this field:

> Q.    So – so then in terms of your – your experience and the ability to testify as to what impact exclusives or sole contracts within a therapeutic category have in the marketplace, being on formulary or off formulary, if you haven't – and you don't know which products are or aren't in exclusive position, how can you give an opinion as to the impact of those exclusives, what that would have in the marketplace beyond the physician-patient realm?
>
> A.    Well, the major access I have that gives me authority in this instance is the documents supplied by Wyeth in discovery.

(Ex. 2, Gibson 5/18/04 Dep. at 195:24-196:12).

Reviewing litigation documents, however, does not provide expertise. Under established case law, expert testimony should be based on more than opinions derived from litigation documents alone. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (in determining reliability, courts should consider whether the expert is proposing to testify on matters based on research he has conducted independent of the litigation, or whether he developed his opinions expressly for the purposes of testifying); *cf. Mercurio*, 81 F. Supp. 2d at 862-63 ("The fact that [the expert] has reviewed a significant number of articles discussing the [subject matter] does not, in the absence of evidence tending to show personal expertise in the area, render [the expert] anything other than an educated lay witness who has read a few articles on the subject.").

Despite Dr. Gibson's lack of experience, Dr. Gibson's report comments extensively on contracts between pharmaceutical manufacturers and MCOs and PBMs, and specifically on the content of Wyeth's contracts. Further, Dr. Gibson speculates on the effect these contracts have on physician prescriptions. Despite admitting in his deposition that he knows little about this subject, Dr. Gibson summarizes:

> This report will describe how managed care influence on the pharmaceutical industry has resulted in evolving complex contractual relationships between pharmaceutical manufacturers, PBMs, MCOs and pharmacy providers. These contractual relationships have directly influenced physician prescribing choices, and pharmaceutical product market share.

(Ex. 1, Gibson Report at 11). Specific sections of Dr. Gibson's report addressing these areas include "Drug Formularies" (Ex. 1, Gibson Report at 30-33); "Rebates paid by pharmaceutical manufacturers to PBMs and MCOs" (Ex. 1 at 39-43); "Wyeth Managed Care's documents indicate that formulary structure was of importance to the company" (Ex. 1 at 54-65); "Wyeth Rebate requirements and tactics" (Ex. 1 at 65-68); "Negotiated and enforced market share

20

agreements to protect its single source status" (Ex. 1 at 70-71); "Wyeth used their market position to negotiate exclusive contracts" (Ex. 1 at 72-73); "Wyeth worked with PBMs/MCOs to exclude Cenestin from their formularies" (Ex. 1 at 73); "Wyeth enhanced their contract terms with certain accounts to protect their existing exclusive formulary position" (Ex. 1 at 77-78); "The effect formulary exclusion of Cenestin had on physicians" (Ex. 1 at 78-80).    Not surprisingly, much of these sections are copied from Mr. Bystrom and other sources and do not represent Dr. Gibson's own analysis.

Given Dr. Gibson's admitted statement that he is not an expert in managed care and pharmaceutical contracting, he should not be permitted to render expert testimony on these topics.  His testimony on these subjects lacks foundation and does not meet the standards in established in *Daubert* or Rule 702.  Further, this testimony's probative value is outweighed by the risk of prejudice and misleading the jury and should be excluded under Federal Rule of Evidence 403.

**C.    Dr. Gibson Is Not Qualified to Testify About Pharmaceutical Marketing**

Dr. Gibson also lacks experience concerning pharmaceutical marketing.  Dr. Gibson has never worked for a pharmaceutical company, never taught pharmaceutical marketing, never marketed a pharmaceutical product, never served on any advisory panels, and never written a scholarly article on pharmaceutical marketing.

> Q.    Let me ask you about your experience with pharmaceutical marketing.  You have never marketed a pharmaceutical product; correct?
>
> A.    Correct.
>
> Q.    And again, you've never worked for a pharmaceutical manufacturer, served on an advisory committee as it related to any issue whatsoever; correct?

> A.    Correct.
>
> Q.    And you've never taught pharmaceutical marketing?
>
> A.    No.

(Ex. 2, Gibson 5/18/04 Dep. at 223:8-19; *see also* Ex. 2 at 86:23-87:4).  Additionally, Dr. Gibson has no published peer-reviewed literature in the field of managed care and has an extremely limited publication of opinion pieces referencing pharmaceutical marketing in the broadest sense. (Ex. 2, Gibson 5/18/04 Dep. at 88:3-91:7, 223:20-225:8).

Rather, most of Dr. Gibson's "knowledge" of pharmaceutical marketing was gained by reviewing documents produced in this case.

> Q.    Is there any other marketing, pharmaceutical, or any other background that you have, sir, that qualifies you to give an expert opinion on pharmaceutical marketing that we haven't talked about?
> * * *
> A.    I think – I think my most detailed view of – of how marketing really works in the pharmaceutical sector was through the discovery documents within this case.

(Ex. 2, Gibson 5/18/04 Dep. at 228:10-23).

Despite this admitted lack of qualification, Dr. Gibson's Report opines on pharmaceutical marketing and Wyeth's marketing of Premarin.  Dr. Gibson summarizes:  "The last portion of the report examines Wyeth's marketing strategy.  Early in the process of bringing Cenestin to the market, Wyeth targeted this drug as a threat to its women's health care 'conjugated estrogen single source and exclusive franchise.'"  (Ex. 1, Gibson Report at 8).  As promised, the last section of the Report entitled, "Wyeth-Ayerst Laboratories, Inc.'s marketing Strategy" deals with Wyeth's marketing strategy.  (Ex. 1, Gibson Report at 54-78).  This section includes a sub-section entitled, "Wyeth developed a sophisticated offensive marketing strategy

known as the 'Premarin Preemptive Plan' to attack Cenestin as it was introduced into the market."  (Ex. 1, Gibson Report at 69-70).

A proposed witness should not be qualified as an expert when their expertise consists of nothing more than reading documents produced by one side or the other in a case. *See, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts . . . have developed their opinions expressly for purposes of testifying."); *see also In re Meridia Prods. Liab. Litig*., 328 F. Supp. 2d 791, 804 (N.D. Ohio 2004) (citing advisory committee notes to Federal Rule of Evidence 702 stating that courts should consider whether the expert has conducted research independent of the litigation).  Given Dr. Gibson's lack of expertise in this area, he is not qualified to offer expert opinion under Federal Rules of Evidence 104(a) and 702.  Further, because his testimony lacks a reliable foundation it falls outside of the scope of *Daubert* and Federal Rule of Evidence 403 and should be excluded.

### D.    Dr. Gibson Is Not Qualified to Testify About Pharmacy Issues

Dr. Gibson lacks experience in retail pharmacy and, accordingly, is not qualified to testify on the pharmacy industry and pharmacy reimbursement issues.  In his 2002 deposition, Dr. Gibson explained that Dale Bystrom, not himself, was the expert on the subject of reimbursement issues:

> Q.    If you can walk into a Longs and buy Cenestin for $15 and the third-tier cop-pay for the product is 20, what will the patient pay if they've got health insurance?  Will they pay the 20 or will they pay the 15, if you know?
>                          * * *
> Q.    Do you have any experience that it would – that – related to that?
>
> A.    I think this was covered again in [Bystrom's] depo so –

Q.     Yeah.  I think he –

A.     *– I'll defer to him.*

Q.     *You'll defer to Dale –*

A.     *Yeah.*

                      * * *

Q.     *You're not an expert –*

A.     *He's – I'm not an expert.  He's the – he's the one who would actually know the answer to that.*

(Ex. 5, Gibson 7/26/02 Dep. at 174:21-177:5 (emphasis added); *see also* Ex. 2 at 83:4-85:23,

242:23-244:8).  Since disclaiming he was an expert in the field of pharmacy reimbursements

during the *Duramed* litigation, Dr. Gibson has gained no significant experience.  Specifically,

Dr. Gibson identified having read an article in the *Wall Street Journal* and having informal

discussions with several pharmacists as the basis for his new-found expertise.

Q.     I asked you in your last deposition if you knew if a patient walked into a pharmacy and had a product on the third tier, for example, Cenestin – say Cenestin was on the third tier – whether you know whether the pharmacist would dispense the product and charge them a cash price, a third-tier copay, or something else, and you deferred to Mr. – Mr. Bystrom on questions like that, including that question.

Have you done anything on the work side that now has educated you in terms of how that process works in the marketplace?

                      * * *

A.     Okay.  Yes, I have.  In my activities with pharmacists across the state of California, I will frequently ask them informally how they handle this situation.  Do they – do they charge the copay if it's higher than the acquisition cost or do they go with the lower of the two.

(Ex. 2, Gibson 5/18/04 Dep. at 199:13-200:10).

Q.     Other than having discussions with these [four] individuals where they've – where they've told you this, do you have any

> other basis to offer an opinion as to how it would work in the
> pharmacy side?
>
> A.      I think that that and – and based on reading, that would be
> the two sources.
>
> Q.      Okay.  And the reading is the Wall Street Journal article.
> Anything else?
>
> A.      That's – that would be the major article.

(Ex. 2, Gibson 5/18/04 Dep. at 211:12-22; *see also* Ex. 2 at 206:1-211:11).

Given Dr. Gibson's prior admitted lack of expertise and lack of personal experience since then, he is not qualified to provide analysis or comment concerning the retail side of pharmacies.  Dr. Gibson report, however, features a number of discussions concerning retail pharmacies and pharmacy reimbursement issues, including numerous sections copied from Mr. Bystrom's report.  (Ex. 1, Gibson Report at 33-38, 44-47; Comparative Ex. 6).

Dr. Gibson's testimony fails to meet the prerequisites posed by Federal Rules of Evidence 104(a) and 702, as well as the reliability standard articulated in *Daubert*, as should be excluded.

### E.      Dr. Gibson Offers Inadmissible Conjecture as to Wyeth's Corporate Intent

A significant portion of Dr. Gibson's report contains inadmissible conjecture as to Wyeth's corporate intent.  Not only is Dr. Gibson not qualified to opine on Wyeth's corporate intent, this is an inquiry that has traditionally been directed to the jury and is inappropriate for an expert witness.

Specifically, in the opening paragraph of his report, Dr. Gibson asserts, "Wyeth identified Cenestin as a threat to its conjugated estrogen franchise and set about to attack its market entrance by addressing all levels of the prescribing and distribution chain for pharmaceutical products."  (Ex. 1, Gibson Report at 8).  And again in the "Summary" Gibson

writes, "[e]arly in the process of bringing Cenestin to the market, Wyeth targeted this drug as a threat to its women's health care 'conjugated estrogen single source and exclusive franchise.'" (Ex. 1, Gibson Report at 8). Later, in the section entitled, "Wyeth's use of its market power as an offensive weapon against Cenestin," Dr. Gibson speculates extensively as to Wyeth's intent behind much of its marketing and managed care contracts relating to Premarin claiming, among other things, that, "Wyeth viewed Cenestin as a challenge to their monopolistic position for conjugated estrogen products" and "Wyeth's plan was to protect Premarin's market share and effectively exclude Cenestin from appearing on the formularies of the largest PBMs/HMOs that control the majority of health plan members in the U.S." (Ex. 1, Gibson Report at 65-77).

Such testimony – which is nothing more than Dr. Gibson's interpretation of Wyeth's internal documents – is clearly impermissible for two reasons. First, as a preliminary matter, Rule 702 requires expert testimony to be based on knowledge and does not permit expert witnesses to offer opinions without the proper foundation. *See, e.g.*, *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (stating that Rule 702's "requirement of 'knowledge' guards against the admission of subjective or speculative opinions"); *Weil v. Seltzer*, 873 F.2d 1453, 1464 (D.C. Cir. 1989) ("'[T]he expert witness must have knowledge of the subject area sufficient to aid the trier of fact in its search for the truth.'") (citation omitted).

Dr. Gibson can only speculate but is not competent to testify about Wyeth's corporate intent. The Court should exclude such testimony. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 (excluding expert testimony and finding that "the opinions of these [expert] witnesses on the intent, motives, or states of mind of corporations . . . have no basis in

any relevant body of knowledge or expertise"); *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (finding District Court erred by permitting expert testimony regarding a company's motive or purpose because the expert "lacked any scientific basis for an opinion about the motives of GM's designers"; "the whole point of *Daubert* is that experts can't 'speculate'"); *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 n.11 (9th Cir. 1980) (finding that permitting a witness to opine on the unexpressed subjective intent of the parties when entering into a written agreement was "erroneous" and "improper"). Dr. Gibson has no personal knowledge of Wyeth's corporate intent. Such testimony is pure conjecture and speculation and lacks the requisite foundation for opinion. The Court must exclude such testimony. *See DePaepe*, 141 F.3d at 720 (finding that the District Court erred by permitting expert testimony of a company's motive stating "experts can't 'speculate'").

Second, a determination of corporate intent is a factual issue properly left to the jury to determine. *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) (attached hereto as Exhibit 10) ("The question of intent is a classic jury question and not one for experts . . . ."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 (finding testimony regarding intent or motive "is improper because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help'"). Expert testimony must "assist," not supplant, the trier of fact. Fed. R. Evid. 702; *see also* Fed. R. Evid. 704 advisory committee's notes ("Under Rules 701 and 702, opinions must be helpful to the trier of fact . . . . These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

Dr. Gibson's opinions concerning Wyeth's intent in this case are on all fours with those excluded in *H.C. Smith Investments, LLC v. Outboard Marine Corp*., 181 F. Supp. 2d 746 (W.D. Mich. 2002). In *H.C. Smith Investments*, the Western District of Michigan excluded expert testimony explaining:

> The substance of this testimony surrounds both the intent of [the plaintiff] in contracting and the legal interpretation of the contract. Both of these subjects are generally taboo in terms of expert testimony because it is the role of the judge to instruct on the law and the role of the jury to decide ultimate questions of fact, particularly those respecting the intent and truth-telling of the parties.

*Id*. at 751. Courts are clear that expert testimony must assist the trier of fact through application of scientific, technical or specialized knowledge. Where the trier of fact is capable of drawing their own conclusions based on the evidence presented without the assistance of the expert, the expert's testimony should be excluded. *See Kesselring v. United Tech. Corp.*, 753 F. Supp. 1359, 1369 (S.D. Ohio 1991). Dr. Gibson's opinions as to Wyeth's intent fall squarely within this category and should be excluded.

## F.    Dr. Gibson Offers Inadmissible Legal Conclusions

Finally, portions of Dr. Gibson's report offer inadmissible legal conclusions and should be excluded. Dr. Gibson's report opens with the assertion that, "Wyeth, a large and sophisticated marketing organization, used its market dominance in the conjugated estrogen therapy/hormone therapy (ET/HT) market to target and limit competition." (Ex. 1, Gibson Report at 8). Dr. Gibson states the report will describe "Wyeth's leveraging of its established dominant market position to systematically damage a competitor's entry into the market," and "Wyeth's use of its market position to enforce its dominance through the contracts it negotiated." (Ex. 1, Gibson Report at 8-9). Similarly, Dr. Gibson uses the term "monopoly" throughout his report. (Ex. 11, Gibson 5/19/04 Dep. at 347:6-348:23; *see also* Ex. 1, Gibson Report at 65).

It is well established that expert witnesses may not testify concerning legal conclusions. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (excluding expert testimony as to presence of "gross negligence" and "deliberate indifference"); *Ohio v. Louis Trauth Dairy, Inc*., 925 F. Supp. 1247, 1254 (S.D. Ohio 1996) (prohibiting legal conclusions concerning the presence of an illegal conspiracy); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 (excluding legal conclusions because such "testimony 'usurp[s] . . . the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it'") (modifications in original) (citation omitted). Dr. Gibson's characterizations of "monopolies" and "monopolistic behavior" fall squarely within this category. *Compare with* 15 U.S.C. § 2 (prohibiting monopolies and attempts to monopolize). Similarly, his characterizations of Wyeth as possessing "market dominance" and using it to make contracts to "limit competition" embrace legal conclusions. *Compare with* 15 U.S.C. § 1 (prohibiting contracts made in restraint of trade).

Dr. Gibson is not an expert on the law and his presentation of legal opinions in this case are clearly impermissible. Accordingly, Dr. Gibson's legal conclusions should be excluded.

## IV.    CONCLUSION

This Court should issue an Order excluding Dr. Gibson's expert report and testimony. Dr. Gibson's report does not satisfy the requirements of Federal Rule of Civil Procedure 26(a) because he has not, in fact, prepared many sections in his report. Further, the deficiencies in the report expose a more serious problem: Dr. Gibson is not qualified to offer opinion on the topics contained in his proposed testimony. Dr. Gibson's lack of qualifications are exposed through his plagiarism, his own explicit admissions, and by examining his

curriculum vitae.  Finally, Dr. Gibson offers inadmissible opinion as to Wyeth's corporate intent, and inadmissible legal conclusions.  For these reasons, Dr. Gibson's report and proposed testimony do not satisfy the requirements of the Federal Rules of Evidence and relevant case law, and should be excluded.

Dated: May 13, 2005                              Respectfully submitted,


                                                 s/*Grant S. Cowan*
                                                 Grant S. Cowan  (0029667)
                                                 FROST BROWN TODD LLC
                                                 2200 PNC Center
                                                 201 East Fifth Street
                                                 Cincinnati, Ohio  45202-4182
                                                 Telephone:  (513) 651-6745
                                                 Facsimile: (513) 651-6981
                                                 gcowan@fbtlaw.com

                                                 Trial Attorney for Defendants
                                                 Wyeth and Wyeth Pharmaceuticals

                                                 OF COUNSEL

                                                 WINSTON & STRAWN LLP
                                                 35 West Wacker Drive
                                                 Chicago, Illinois  60601-9703
                                                 Telephone:  (312) 558-5600
                                                 Facsimile:  (312) 558-5700

                                                 ARNOLD & PORTER LLP
                                                 555 Twelfth Street, N.W.
                                                 Washington, D.C.  20004-1206
                                                 Telephone:  (202) 942-5000
                                                 Facsimile:  (202) 942-5999

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that a copy of the foregoing Motion to Exclude Plaintiffs from Introducing the Testimony or Analysis of David J. Gibson and Memorandum in Support thereof has been served electronically on all counsel of record with CM/ECF Registration on this 13th day of May, 2005, and by regular U.S. mail, postage prepaid upon the following:

Eliot G. Long, Esq.  
**BUCHANAN INGERSOLL PC**  
1835 Market Street  
14th Floor  
Philadelphia, PA 19103  

Krishna Narine, Esq.  
**SCHIFFRIN & BARROWAY LLP**  
Three Bala Plaza East  
Suite 400  
Bala Cynwyd, PA 19004  

Marc H. Edelson, Esq.  
**HOFFMAN & EDELSON**  
45 West Court Street  
Doylestown, PA 18901  

Barry S. Taus, Esq.  
**GARWIN BRONZAFT GERSTEIN &**  
**FISHER L.L.P.**  
1501 Broadway, Suite 1416  
New York, NY 10036  

s/*Grant S. Cowan*
Grant S. Cowan, Esq.  
Frost Brown Todd LLC