```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4                      * * *
 5   J.B.D.L. CORP. d/b/a     :  CIVIL ACTION
     BECKETT APOTHECARY, et al.    :
 6                             :
          vs.                  :
 7                             :
     WYETH-AYERST LABORATORIES,   :
 8   INC., et al.              :  NO. C-1-01-704
 9                      * * *
10              MAY 18, 2004
11                      * * *
12        Videotape deposition of DAVID J.
13   GIBSON, M.D., taken pursuant to notice, was held at
14   the law offices of REED SMITH LLP, 2500 One Liberty
15   Place, 1650 Market Street, Philadelphia,
16   Pennsylvania 19103-7301, beginning at 10:19 a.m.,
17   before McKinley Wise, a Registered Professional
18   Reporter and an approved Reporter of the United
19   States District Court.
20
21                      * * *
22          ESQUIRE DEPOSITION SERVICES
          1880 John F. Kennedy Boulevard
23                  15th Floor
          Philadelphia, Pennsylvania 19103
24             (215)  988-9191
```

---

```
 1                    I N D E X
 2   Testimony of DAVID J. GIBSON, M.D.
 3   By Mr. Dobie                                    6
 4                      * * *
 5              GIBSON EXHIBITS
 6   NO.          DESCRIPTION                    PAGE
 7   1   Expert report of David J. Gibson, M.D.     5
 8   2   Article                                   11
 9   3   Enrollment and credentialing program      16
10   4   Expert report of David J. Gibson, M.D.    70
11   5   Article                                   87
12   6   Transcript of deposition of Dale Bystrom 100
13   7   E-mails                                  105
14   8   Expert report of Dale Bystrom, R.Ph.     128
15   9   Article                                  135
16   10  Article                                  152
17   11  Third-party cost comparison              218
18   12  Document entitled "Prescription Drug Benefit
19       Plans: A Buyer's Guide"                  220
20   13  E-mail to Dobie from Napior              259
21   14  Presentation                             277
22
23                      * * *
24
```

---

```
 1   A P P E A R A N C E S :
 2
 3      JAY S. COHEN, ESQUIRE
        SPECTOR, ROSEMAN & KODROFF, P.C.
 4        1818 Market Street, Suite 2500
          Philadelphia, Pennsylvania  19103
 5        (215-496-0300)
 6      -- Representing Direct Purchaser Plaintiffs
 7
        W. GORDON DOBIE, ESQUIRE
 8      BROOKE B. WARD, ESQUIRE
        WINSTON & STRAWN LLP
 9        35 West Wacker Drive
          Chicago, Illinois  60601
10        (312-558-5691)
11      -- Representing Wyeth-Ayerst Laboratories,
           Inc.
12
13      GORDON A. EINHORN, ESQUIRE
        HANGLEY ARONCHICK SEGAL & PUDLIN
14        One Logan Square, 27th Floor
          Philadelphia, Pennsylvania  19103
15        (215-568-6200)
16      -- Representing Rite Aid and CVS Pharmacies
17
     A L S O   P R E S E N T :
18
        MICHAEL PANICHELLI, Videographer
19
                     * * *
20
21
22
23
24
```

---

```
 1              DEPOSITION SUPPORT INDEX
 2   Direction to Witness Not to Answer
 3   Page   Line   Page   Line
 4
 5   (None)
 6
 7
 8   Request for Production of Documents
 9   Page   Line   Page   Line
10
11   (None)
12
13
14   Questions Marked
15   Page   Line   Page   Line
16
17   (None)
18
19                   * * *
20
21
22
23
24
```

5/18/2004  Gibson, David

**Page 5**

```
 1              * * *
 2      (Whereupon, Gibson Exhibit 1 was
 3  marked for identification.)
 4              * * *
 5      THE VIDEOGRAPHER:  Good morning.
 6  Here begins Videotape No. 1 in the
 7  deposition of David J. Gibson in the matter
 8  of J.B.D.L. versus Wyeth in the United
 9  States District Court, Southern District of
10  Ohio.
11      Today's date is May 18th, 2004, and
12  the time is 10:19 a.m.  This deposition is
13  being taken at One Liberty Place in the law
14  offices of Reed Smith.  The videographer is
15  Michael Panichelli here on behalf of Esquire
16  Deposition Services, located at 1880 JFK
17  Boulevard, Philadelphia, Pennsylvania
18  19103.
19      Would counsel and all present please
20  identify yourselves and state whom you
21  represent.
22      MR. COHEN:  Jay Cohen for direct
23  purchaser plaintiffs.
24      MR. EINHORN:  Gordon Einhorn for
```

**Page 7**

```
 1      A.      Sacramento, California.
 2      Q.      And what's your address there?
 3      A.      4830 Oak Vista Drive, Carmichael,
 4  California.
 5      Q.      And how long have you lived in
 6  Sacramento?
 7      A.      About seven years.
 8      Q.      Sir, I want to ask you some
 9  questions about the expert report that you've
10  prepared in connection with this case, and we've
11  gone ahead and marked it as Gibson Exhibit 1.
12      A.      Thank you.
13      Q.      Take a moment and look at that.  Is
14  that the expert report that you did, in fact,
15  prepare in this case, sir?
16      A.      It appears to be.
17      Q.      And before we get into the substance
18  of the report, let me just go over some ground
19  rules for the deposition here today.
20      First, if you would be careful to
21  let me finish my question before you begin to
22  respond, even though you probably know where I'm
23  going with my question or you think you may know.
24  If we do that, it will be much easier for the
```

5/18/2004  Gibson, David

**Page 6**

```
 1  Rite Aid and CVS.
 2      MR. DOBIE:  Gordon Dobie for the
 3  defendant Wyeth.
 4      MS. WARD:  Brooke Ward, also on
 5  behalf of the defendant Wyeth.
 6      THE VIDEOGRAPHER:  The court
 7  reporter is Mac Wise, and he will now swear
 8  in the witness.
 9              * * *
10      DAVID J. GIBSON, M.D., after having
11  been first duly sworn, was examined and
12  testified as follows:
13              * * *
14      THE COURT REPORTER:  Any statements
15  for the record, counsel?
16      Hearing none, your witness, sir.
17              * * *
18              EXAMINATION
19              * * *
20  BY MR. DOBIE:
21      Q.      Sir, would you state your name for
22  the record?
23      A.      David Gibson.
24      Q.      Mr. Gibson, where do you reside?
```

**Page 8**

```
 1  court reporter to get it down and we'll have a
 2  much clearer record.  Fair enough?
 3      A.      I reread our prior meeting on the
 4  way out and I saw I stepped on your lines often,
 5  so I'll try to do better today.
 6      Q.      Okay.  Second, if you can make sure
 7  you respond verbally to the questions, because
 8  again a nod of the head, an uh-huh just doesn't
 9  work that well on paper.
10      A.      I understand.
11      Q.      Okay.  And finally if any of my
12  questions are unclear, if you let me know, and
13  I'll try to rephrase the question.  Fair enough?
14      A.      Fair enough.
15      Q.      Before we get into the substance of
16  the report, I want to talk with you a little bit
17  more about your background, what you've been doing
18  since the deposition that you gave in connection
19  with the case Duramed versus -- versus Wyeth.
20      MR. DOBIE:  And Jay, just as kind of
21  a preliminary matter, with most of the
22  depositions in the case or all the
23  depositions, I think we've taken the
24  position that depositions and documents from
```

1    the Duramed case can also be used in the --

2    in the J.B.D.L. and the other cases.

3         Is that fair enough with this

4    witness?  Because he does have a hundred-

5    page report and I'm trying -- going to try

6    to avoid going line -- line by line and

7    covering things that I did last time unless

8    I have to clarify a point or something like

9    that.

10        MR. COHEN:  Sure.  That would be

11   very much appreciated.

12        MR. DOBIE:  Okay.

13   BY MR. DOBIE:

14   Q.    Mr. Gibson, since your -- your last

15   deposition, looking at your background, I notice

16   you've undertaken some additional jobs, and one of

17   them is mentioned on Page 6 of your report.  Up at

18   the top on Page 6 of your report, you state, "I

19   have also started a second company, the Fraud

20   Prevention Institute, that specializes in fraud

21   prevention within the health care industry.  FPI

22   is made up of former Medi-Cal and FBI

23   investigators who have been working on

24   investigating and prosecuting fraudulent activity

1    little confused.  Mr. Cates doesn't work for the

2    Fraud Prevention Institute, does he?

3    A.    No one works for the Fraud

4    Prevention Institute at the present time.  We have

5    no employees.  We have a -- it's a non -- not-for-

6    profit company and each of us is either working on

7    a nonpaid basis or as a consultant as we bring

8    this company up from the start.

9    Q.    And is Mr. Cates a -- it's a

10   nonprofit.  Are there -- do you have members,

11   shareholders?

12   A.    It's a business association is the

13   rough classification for this.  We have -- we have

14   a not-for-profit shell in the state of California.

15   We do not -- we have not yet cleared the hurdles

16   with IRS and the franchise board.

17        * * *

18        (Whereupon, Gibson Exhibit 2 was

19        marked for identification.)

20        * * *

21   BY MR. DOBIE:

22   Q.    Okay. let me show you what I've

23   marked as Exhibit 2.  Sir, I'm handing you what we

24   marked as Exhibit 2.  Exhibit 2 is a document that

1    within health care for many years."

2         So that's an -- that's an additional

3    responsibility since your last deposition?

4    A.    Correct.

5    Q.    And your position with the Fraud

6    Prevention Institute is chief executive officer?

7    A.    Correct.

8    Q.    And who are these FBI investigators

9    and Medi-Cal investigators who are working for

10   FPI?

11   A.    The two principals would be a fellow

12   by the name of Alan Cates, who is -- was appointed

13   by the governor, our former governor, Davis, to

14   head an investigative unit for the Department of

15   Health Services to -- to find and help control

16   fraud within the Medi-Cal program.  And the second

17   person is Ed O'Donnell, O-D-o-n-n-e-l-l, who was a

18   special agent for -- in the FBI.  He was awarded

19   the -- he was awarded the outstanding agent of the

20   year -- I may not have the exact award, but it was

21   awarded by the FBI director to him as being the

22   outstanding special agent on fraud investigations

23   a couple of years ago.

24   Q.    Now, here's where I'm -- I was a

1    we pulled off the Web on May 15th of 2004.  This

2    discuss an entity that's called the Medi-Cal Fraud

3    Prevention Bureau and it mentions that Governor

4    Davis had -- had appointed Alan Cates, who you

5    mentioned, to be the director of the Medi-Cal

6    Fraud Prevention Bureau.  Do you see that?

7    A.    I do.

8    Q.    Okay.  And it's the Medi-Cal Fraud

9    Prevention Bureau, is it not, sir, that's in the

10   business of investigating Medi-Cal fraud?

11   A.    It is.

12   Q.    All right.  And the Medi-Cal Fraud

13   Prevention Bureau is the group that has the FBI

14   agents and others that are out investigating

15   Medi-Cal fraud; correct?

16   A.    It has in the past.  That's correct.

17   Q.    All right.  And -- and continues to

18   do so even today, doesn't it, sir?

19   A.    It does.

20   Q.    All right.  And, for example, when

21   we talk about Medi-Cal fraud, some of the things

22   that -- that have been investigated recently, if

23   you're familiar with it, is -- include physician

24   and pharmacist fraud in California.  Are you

1  familiar with that?

2      A.      Uh-huh.

3      Q.      And various -- I guess various

4  prosecutions of physicians and people known as

5  runners that are submitting or assisting in

6  submission of fraudulent claims to Medi-Cal for

7  payment?

8      A.      Correct.

9      Q.      Is that correct?  And the group that

10  you're involved in, FPI, sir --

11      A.      Yes.

12      Q.      -- that's actually something that

13  was started four years ago; correct?

14      A.      No.  We got our -- we -- we

15  incorporated last year, end of last year.

16      Q.      Okay.  You don't -- you don't work

17  for the Medi-Cal Fraud Prevention Bureau, do you?

18      A.      No.

19      Q.      You don't have a contract with them?

20      A.      No, we -- I do not.

21      Q.      And -- your group is not

22  actually going out and investigating or

23  prosecuting Medi-Cal fraud, is it, sir?

24          MR. COHEN:  Object -- object to the

1          form as in what you referred to as "your

2          group."

3  BY MR. DOBIE:

4      Q.      The FPI?

5      A.      I'll try to be brief.  This could be

6  a long discussion.  But Fraud Prevention Institute

7  is -- takes the experience from the Fraud

8  Prevention Bureau and moves it into a different

9  sphere.  The Fraud Prevention Bureau was involved

10  in prosecution of -- and felonies.  The Fraud

11  Prevention Institute deals in the arena of

12  contract law, and the way the Fraud Prevention

13  Institute works is it is funded by membership in a

14  network of health care providers who contractually

15  agree to not engage in fraudulent activities, and

16  we monitor those activities.

17      Q.      How many members do you have right

18  now, sir?

19      A.      At present, we have about 70.  We've

20  started with an organization in Los Angeles called

21  UPNI, or United Pharmacist Network, Inc.  And

22  we're working with them to position them as a

23  recognized nonfraudulent network in an area of

24  California that has been a hot spot in the past

1  for fraudulent activity.

2      Q.      The membership that you're talking

3  about, the 70 members, does that include -- you

4  said the United Pharmacist Network.  Who else?

5      A.      That's it.

6      Q.      That's it?

7      A.      That's our first contract.

8      Q.      All right.

9          MR. COHEN:  Just for clarification,

10      I think he said 70.  Did you say seven

11      members?

12          THE WITNESS:  70.

13          MR. COHEN:  I'm sorry.  I misheard.

14          THE WITNESS:  And these are mostly

15      independent pharmacies.

16          MR. COHEN:  Okay.

17          THE WITNESS:  Community-based.

18  BY MR. DOBIE:

19      Q.      But those 70 pharmacies are all

20  members of this United Pharmacist Network?

21      A.      Correct.

22      Q.      So your contract is with United

23  Pharmacist Network?

24      A.      That's correct.

1      Q.      All right.  You don't have a

2  contract with the Medi-Cal Fraud Prevention

3  Bureau?

4      A.      No, we do not.  We would like to

5  have a contract with the Department of Health

6  Services, but we do not as yet have that.

7              * * *

8          (Whereupon, Gibson Exhibit 3 was

9          marked for identification.)

10              * * *

11  BY MR. DOBIE:

12      Q.      All right.  Let me show you what's

13  been marked as Exhibit 3.  Have you ever seen this

14  document before, sir?

15      A.      No, I have not.

16      Q.      This is -- I'll represent to you for

17  the record this is a document that again we pulled

18  off the Web relating to the United Pharmacist

19  Network that you were just referring to and it

20  also discusses this group FPI.

21          Let me ask you to turn -- the pages

22  aren't numbered -- to the fourth page.  At the

23  bottom, it says "The Fraud Prevention Institute."

24  Do you see that?

5/18/2004  Gibson, David

**Page 17**

1    A.    I do.

2    Q.    And it turns over to the next page.
3  And going to the third paragraph, it talks about
4  "A recent four-year pilot of the FPI approach by
5  the Medi-Cal Fraud Prevention Bureau involving
6  over 6,000 providers eradicated over $300 million
7  in fraud with undue disruption to the normal" --
8  "without undue disruption to the normal operations
9  of the vast majority of honest providers."  Do you
10  see this?

11    A.    I do, yes.

12    Q.    Okay.  Now, you mentioned that this
13  FPI group was just created in 2003.  Are you
14  familiar with any four-year pilot that began all
15  the way in I guess the year 2000 by FPI?

16    A.    It doesn't say that.  What it says
17  is that the recent four-year pilot of the FPI
18  approach and the methodology that FPI came out of
19  the ground with was the technology developed by
20  the Fraud Prevention Bureau under Alan Cates'
21  directorship.

22    Q.    Okay.  The technology that we're
23  talking about is something called the Safe
24  Provider Program?

---

**Page 18**

1    A.    Correct.

2    Q.    And that's the -- that's the idea
3  that you -- that you developed?

4    A.    Correct.

5    Q.    And is it an idea of FPI or is it an
6  idea of the United Pharmacist Network?

7    A.    No.  It's the idea of FPI.

8    Q.    Okay.  Is there a computer program
9  that's called the Safe Provider Program?

10    A.    It's a -- the Safe Provider Program
11  is a credentialing program.  It's very similar
12  to -- are you familiar with the term "IPA,"
13  Independent Practice Association?

14    Q.    Why don't you explain what that is
15  on the record if you want to do that.

16    A.    IPA would be a contracting group of
17  health care providers.  It's commonly used in
18  managed care and it commonly in the past has been
19  used for a group of physicians.  This is quite
20  analogous to an IPA with pharmacies and we -- FPI
21  is part of the credentialing process that is
22  ongoing within the network to give the buyer, in
23  this case the Medi-Cal HMOs in California, the
24  confidence that the network has -- is -- is

---

**Page 19**

1  screened for and monitored in an ongoing way for
2  fraud -- fraudulent activities.

3    Q.    You mentioned the Medi-Cal HMOs
4  would be the buyers.  Do you have any Medi-Cal
5  HMOs that are buyers of this product?

6    A.    There -- there are several accounts
7  they are competing for, UPNI, but currently, no.

8    Q.    All right.  And the -- I guess I
9  didn't understand when you -- you mentioned that
10  this is a credentialing program.  Is there -- is
11  there some software that FPI has developed that's
12  part of --

13    A.    No.

14    Q.    No.

15    A.    The program is an inspection by an
16  investigator filling out a paper-based
17  questionnaire.  That questionnaire then is scored
18  and a risk -- a risk factor is assigned to each
19  individual pharmacy and those with high risk
20  scores are then monitored more closely.

21    Q.    Okay.  And I assume from your prior
22  answers that none of these inspections by
23  investigators filling out these questionnaires and
24  assigning risk factors is actually taking place

---

**Page 20**

1  yet?

2    A.    We are now in the phase of educating
3  the network as to what the program is going to be.
4  So there's a series of programs for the 70
5  pharmacies to bring their people in and Alan Cates
6  is giving them talks on what the program consists
7  of and what we're looking for.  It's more of an
8  educational process.

9    Q.    So the answer to my question is no,
10  you haven't begun any of these investigations?

11    A.    We haven't started any
12  investigations, correct.

13    Q.    Okay.  Now, are you actually
14  yourself, sir, familiar with the investigations
15  that have been -- that have taken place to date by
16  the Medi-Cal Fraud Prevention Bureau?

17    A.    I'm somewhat familiar.

18    Q.    Okay.  Just from reading the
19  newspapers?

20    A.    No.  I've actually gone out on some
21  investigations with -- with the investigators.

22    Q.    All right.  And do any of those
23  investigations that you're familiar with,
24  personally familiar with, involve pharmaceutical

5/18/2004  Gibson, David
5/18/2004  Gibson, David

**Page 21**

1  manufacturers?
2      A.    The investigation that I went out on
3  involved medical supplies.
4      Q.    Okay.  And so the answer is no, it
5  doesn't involve pharmaceutical --
6      A.    Not --
7      Q.    -- manufacturers?
8      A.    My visit did not.
9      Q.    Okay.  And -- and you mentioned
10 before how the Medi-Cal Fraud Prevention Bureau
11 has -- has successfully undertaken prosecutions of
12 physicians and pharmacists; correct?
13     A.    Correct.
14     Q.    Are you familiar with any Medi-Cal
15 fraud investigation that involves the
16 pharmaceutical industry?
17     A.    The short answer is no.
18     Q.    All right.  And does any of your
19 work in connection with FPI involve negotiating
20 contracts with pharmaceutical manufacturers?
21     A.    No.
22     Q.    Negotiating with PBMs?
23     A.    No.
24     Q.    Negotiating with HMOs?

**Page 23**

1      Q.    What you're doing -- based on what
2  you said before, you're using "we."  Okay.  None
3  of the things that you just described actually
4  involve you; correct?
5      A.    Well, except for this one
6  investigation that I was involved in --
7      Q.    Okay.
8      A.    -- that's correct.
9      Q.    Well, then explain for me that
10 investigation so I understand completely what
11 that -- what that involved.
12     A.    This -- this followed pretty much
13 what I've just told you.  We -- it was a durable
14 goods company.
15     Q.    What was the name of the company?
16     A.    As I recall, it was called the
17 Golden Supply Company or something like that.  It
18 was in San Francisco.  And it mostly consisted
19 of -- it was durable goods, which is where the --
20 where the highest percentage of fraud occurs
21 within the Medi-Cal program.  And this happened to
22 be a business that served for the most part the
23 Russian immigrant community in San Francisco, and
24 we were involved in an investigation where you

5/18/2004  Gibson, David
5/18/2004  Gibson, David

**Page 22**

1      A.    No.
2      Q.    Has it given you any more
3  familiarity with rebates, pharmaceutical rebates?
4      A.    It's given me -- it's given me a
5  more in-depth street knowledge of how -- of the
6  effects of rebates on the market.
7      Q.    How so?
8      A.    It's a -- again, this is a big
9  subject.
10           There are a number of activities at
11 the pharmacy level in particular where fraudulent
12 players have learned how to game the system.  The
13 system consists of obtaining external sources for
14 evidence, and our investigators will look at the
15 books for a vendor, say a durable goods company, a
16 medical transportation company, a pharmacy, and
17 they will determine what the -- what the -- what
18 the vendor says that they sold and billed for and
19 then we will go back to the supplier and determine
20 whether or not the wholesaler actually delivered
21 the product to the vendor.  We will then go to the
22 patients who received the supply and determine
23 whether or not the patient actually received it.
24           Am I going off course here for you?

**Page 24**

1  looked at -- the investigators.  I was not part of
2  this.  They looked at the -- at the company
3  initially, and out of that process a high risk
4  score was attached to the -- to the vendor, and
5  then I came back in with the investigator and
6  spent a day.  We looked at the books of the vendor
7  and his bank statements.  We then went and visited
8  with some of the patients who were -- who had
9  received the supplies.  We had previous -- the
10 investigator had previously authenticated with the
11 wholesaler that they had, in fact, delivered
12 inventory.
13     Q.    What was the product?
14     A.    Well, durable goods are usually
15 things like oxygen supply for patients at home,
16 wheelchairs.  Interestingly enough, the most
17 frequent area of fraud in Medi-Cal is adult
18 diapers.
19           So determining that, in fact, these
20 supplies have been delivered to this -- this
21 company by the wholesaler was one of the steps.
22           And then we went to the physician,
23 who was one of the more prominent prescribers, and
24 asked, Did you prescribe these entities?  The way

5/18/2004  Gibson, David

```
1    the process works is the most common source for
2    fraud in -- in the Medi-Cal or in any aspect of
3    medicine is identity theft, so that supplies are
4    billed to a person who does -- isn't aware that
5    they are occurring or physicians are reported to
6    have prescribed drugs that they didn't prescribe.
7              So you're looking throughout the
8    system for evidence of identity theft as the start
9    of the criminal investigation under -- under the
10   Fraud Prevention Bureau.
11        Q.    How much time did you spend on this
12   one investigation you're talking about?
13        A.    I spent a day and a half.
14        Q.    Have you done any other
15   investigations?
16        A.    No.
17        Q.    The pharmacists that you have signed
18   up as part of the United Pharmacist Network, you
19   mentioned tried to do some auditing to prevent
20   fraud, those -- those types of things.
21              Is there a problem with fraud in
22   your experience at -- at the pharmacy level?
23        A.    Yes.  Would you like that
24   quantitated?
```

5/18/2004  Gibson, David

```
1         Q.    Yes, sir.
2         A.    Fraud in health care overall is
3    about 10 percent.  About 10 percent of all
4    transactions in health care are by FBI figures
5    siphoned off into fraudulent activity.  The
6    incidence of fraud at the pharmacy level can run
7    somewhere north of 40 percent and the incidence of
8    fraud in durable goods can run up to 90 percent of
9    the transactions are fraudulent.
10        Q.    Did -- have you had any -- have you
11   had any discussions with any of the -- with any of
12   the folks that are -- that are pharmacies that are
13   plaintiffs in this case about the fraudulent
14   activity that you're talking about?
15        A.    I'm sorry.
16        Q.    Have you had -- for example, are you
17   aware of any fraudulent situations that involve
18   CVS and Rite Aid, for example --
19        A.    Oh, no, not at all.
20        Q.    -- Mr. Einhorn's clients?  Okay.
21   Are you --
22        A.    CVS -- CVS for the most part is not
23   a California company.  Rite Aid is.  But generally
24   speaking, these are not involving the chains.
```

5/18/2004  Gibson, David

```
1         Q.    All right.  So these are --
2         A.    Fraud does occur at chains, but it's
3    a different kind.  This is more of a street crime
4    type level crime.
5         Q.    What's the fraud that occurs in the
6    chain that you're become familiar with?
7         A.    Well, it usually is complex
8    litigation involving reimbursement rules for
9    Medicare.  I'm not personally familiar with it
10   other than what I'd read in the paper.  That's not
11   our area of expertise.
12        Q.    Okay.  All right.  The second group
13   that you've become involved in since your last
14   deposition is something called Illumination
15   Medical, Inc., which in your report on Pages 5 and
16   6 you state that you currently own a privately
17   held company --
18        A.    Did you want this back?
19        Q.    No.  That will be one of the
20   exhibits.
21        A.    Should from now when I'm finished
22   give this to the reporter?
23        Q.    We'll just have a stack right here.
24        A.    Okay.
```

5/18/2004  Gibson, David

```
1         Q.    That's fine.  Even this one, too.
2    Your report you'll probably --
3         A.    Sorry to step on your lines.  I've
4    broken my -- my goal already.
5         Q.    Okay.  The Illumination Medical,
6    Inc.  You state in your report that you currently
7    own a privately held company, Illumination
8    Medical, Inc.  The company specializes in data
9    mining.  Illumination Medical analyzes medical and
10   pharmacy claims to predict serious chronic illness
11   in a population of beneficiaries before the
12   disease process becomes catastrophic."
13             How much of your time do you spend
14   on Illumination Medical, sir?
15        A.    I'd say I spend about 60 -- 60
16   percent of my time, roughly.
17        Q.    Do you -- in your resume, you state
18   that you're the partner and chief operating
19   officer since -- from 2003 to the present?
20        A.    Correct.
21        Q.    Do you have any other employees?
22        A.    No.  Just my partner and I.
23        Q.    Who's your partner?
24        A.    Her name is Lillie DuVale,
```

**Page 29**

1    D-u-V-a-l-e.

2    Q.    And --

3    A.    Capital V.

4    Q.    Is this -- is this still in the

5    startup phase?

6    A.    It is.  But we have clients.  I'm

7    not sure when startup goes to not.  We aren't

8    drawing much in the way of money from it yet.  So

9    I guess it's startup.

10    Q.    Okay.  And can you tell us more

11    what -- what you mean by saying that your company

12    specializes in -- in data mining?

13    A.    This is a very -- this is a -- this

14    is a very important area within health care today.

15          For the most part, all of the

16    techniques that we've used in the past to try to

17    control medical costs, including prior

18    authorizations and authorizations for referrals

19    and authorizations for hospitalizations and the

20    whole list as it goes on, has not worked.  And the

21    payers in the system, the insurance companies, the

22    employers, have had self-funded trusts called

23    ERISA, E-R-I-S-A, trusts, and the labor unions

24    that have Taft-Hartley trusts, T-a-f-t-

---

**Page 30**

1    H-e-a-r-t-l-y trusts, are now looking at a

2    different approach, and that approach is to build

3    off the realization that 1 percent of any

4    beneficiary pool produces most of the cost.  And

5    there's an interesting finding, the 5 percent who

6    have chronic illnesses that will likely lead to

7    high cost and being able to intervene before they

8    do so.

9          And that's what our company does.

10    We work as a consultant to consultants.  We put

11    all of the medical and pharmacy claims data into a

12    data warehouse and then we model that data to be

13    able to predict who's going to get sick and who's

14    likely to have catastrophic complications.

15    Q.    And when you say you try to figure

16    out who's going to get sick and who will have

17    catastrophic complications, do you do that on an

18    individual person basis or you try to look at

19    certain -- certain groups, like an actuary, I

20    guess I'm thinking?

21    A.    Well, an actuary looks backwards.

22    We look forwards.  That -- that's the big

23    difference between us and actuaries.

24          What I've described to you sounds

---

**Page 31**

1    more complex than it really is.  The reality is

2    most of the cost in health care can be identified

3    as occurring within a small group of people that

4    are sick, people with congestive heart failure,

5    people with asthma, people with hypertension.  So

6    if you can identify within a population of

7    beneficiaries all those individuals who carry that

8    diagnosis and then bounce the care that those

9    people are receiving off of national recognized

10    standards, for instance, how do you treat

11    congestive heart failure as indicated by the

12    American Heart Association, and when you find that

13    people who carry these diagnoses are not receiving

14    therapy within those guidelines, that becomes a

15    target for intervention.

16    Q.    How do you go about identifying what

17    is the small group of people that are likely to

18    get sick?

19    A.    I put the population through a

20    series of filters on the computer.  I look at

21    total cost that they've generated in the past.

22    And in general I'm looking for not people that

23    generate a hundred thousand dollars in the past

24    year, but around 10,000.  I look at their -- what

---

**Page 32**

1    drugs they're receiving and by class identify

2    whether or not there are drugs that are likely,

3    that -- that -- instances where generics are more

4    appropriate than brand.  I look at the -- what are

5    call HEDIS criteria, that's H-E-D-I-S, and it's --

6    it stands for Health Employer Data Information

7    Sets.

8          And these are criteria that

9    employers use to rate one health plan as opposed

10    to another for quality.

11          So there are all sorts of criteria

12    that you can look at, including whether children

13    are getting immunized, women are getting Pap

14    smears and mammograms.  I look for instances

15    within chronic disease.  For instance, we just

16    completed an analysis, and I look at all the

17    patients within a plan that have atrial

18    fibrillation, which is a condition of -- where the

19    heart beats irregularly.  And I will then look to

20    see whether or not those patients are on

21    anticoagulants.  That's important, because an

22    irregular heartbeat precipates blood clots in the

23    heart that break away and then produce strokes or

24    emboli to the kidneys or to some other -- produce

5/18/2004  Gibson, David

1  some other catastrophic complication.

2          So I look for all of the patients,

3  all of the beneficiaries in the plan who carry

4  diagnosis of atrial fibrillation who are not on

5  anticoagulants, and of those who are on

6  anticoagulants, are they getting blood-clotting

7  studies done on at least a monthly basis.  Now, I

8  don't know the results of the blood-clotting

9  study.  I just know that the health plan paid for

10  the test.

11          Likewise, I'll look at congestive

12  heart failure.  The national standards for therapy

13  are that these patients are on ACE inhibitors,

14  A-C-E inhibitors, and beta blockers.  If they're

15  not, the recidivism rate for visits to the

16  emergency room are exceedingly high.  And sudden

17  death as well.

18      Q.      Aren't there confidentiality

19  concerns in connection with employers sharing that

20  information?

21      A.      There are absolutely -- the issue is

22  known as HIPAA, which is H-I-P-P-A, which is the

23  Health Insurance Portability Act, also known as

24  the Kennedy-Kassebaum Act, and within the

---

5/18/2004  Gibson, David

1      Q.      -- that are high risk?

2      A.      Go ahead.

3      Q.      Here's my question.  How do you know

4  that the employers, in fact, intervene by giving

5  them, let's say, the medical care as opposed to

6  working them towards termination or something like

7  that?

8      A.      Oh.  I don't know how the plan would

9  administrate.  That would be --

10      Q.      Be wrong; right?

11      A.      Almost -- I can't imagine that they

12  would use it for that nefarious purpose, the

13  reason being that most of these are long-term

14  employer arrangements.  Certainly the Taft-

15  Hartleys wouldn't be an option with the unions.

16      Q.      Does -- does any of this work that

17  you've done with -- with Medical Imaging, does

18  that involve negotiating contracts with

19  pharmaceutical manufacturers?

20      A.      No.

21      Q.      Negotiating with PBMs?

22      A.      No.

23      Q.      Negotiating with HMOs?

24      A.      No.

---

5/18/2004  Gibson, David

1  structure of that we function as a business

2  associate for the plan.  So the plan creates a

3  confidentiality structure and we function within

4  their umbrella as a subcontracting business

5  associate.  That's well recognized within HIPAA.

6      Q.      Okay.  How many plans have you done

7  this type of analysis for?

8      A.      We've done two thus far.  We have

9  several more on the way.  Our -- our focus is

10  generally on plans that are 10,000 or so.

11  Usually -- our first two was a multistate employer

12  for supplying electrical products and the second

13  was a union in California.  We have several other

14  unions that we anticipate bringing aboard and we

15  have a -- we also market heavily into ERISA trusts

16  that would typically be school districts or

17  hospitals.

18      Q.      Sir, in the instances where

19  you've -- the two instances where you've made this

20  type of analysis, I assume you prepare a report?

21      A.      I do.

22      Q.      And then there's a proposed plan of

23  intervention for those folks --

24      A.      There is.

---

5/18/2004  Gibson, David

1      Q.      Rebates, exclusive contracts,

2  anything like that?

3      A.      No.

4      Q.      Oh, I'm sorry.  The name of the

5  company is Medical Illumination.

6      A.      Illumination.

7      Q.      You -- you knew what I meant.

8      A.      I do.

9      Q.      I'm sorry.

10      A.      Illumination Medical.

11      Q.      Okay.  How do you divide your time

12  currently between the Fraud Prevention Institute,

13  Medical -- I'm sorry, Illumination Medical and

14  PCN?

15      A.      I function at PCN as a part-time

16  medical director, which is about 20 percent of my

17  time.

18      Q.      Do you have an office there?

19      A.      I have a cubicle.

20      Q.      Do you have a staff of any kind?

21      A.      No.  I -- my area of responsibility

22  at the company is primarily the pharmacy and

23  therapeutics committee and the quality assurance

24  activities, and there are staffs for those

5/18/2004 Gibson, David

1 committees, but I really don't manage those
2 staffs. And the one other area that I am involved
3 in in the company is we --we have a program called
4 Med Intelligence, which if you went out on the Web
5 and pulled it off, you probably are aware of, and
6 it gives counsel to physicians as to the
7 medications that patients are on and it -- those
8 communications are letter based and all the
9 letters that go out are over my signature. And
10 the staff for that activity, also I don't manage
11 that staff.
12    Q.    Okay. Why would a -- why would PCN
13 sent out letters under -- as part of Med
14 Intelligence to physicians?
15    A.    There's a lot that goes on in the
16 life of a patient that doctors don't know about.
17 For instance, patients are seen by multiple
18 doctors and are prescribed medications by multiple
19 doctors and frequently a doctor isn't aware that a
20 patient is taking a certain drug that would
21 interact with a drug that he may have prescribed.
22    Likewise, one of the biggest
23 problems in health care is noncompliance on the
24 part of the patient, such that the doctor gives a

1    Q.    Okay. I'm just -- I'm just trying
2 to get your best estimate as to whether or not --
3    A.    Hardly any.
4    Q.    Hardly any? Once, twice?
5    A.    The total number of letters sent out
6 each month are in the thousands and -- high end
7 thousands. And if we sent out two or three for
8 that, I'd be surprised.
9    Q.    But they'd be under your signature?
10    A.    Yes, but the signature is automated,
11 so I don't see every single letter that goes out.
12    Q.    Okay. But you are -- you are aware
13 of the fact that PCN does send out letters for
14 products when a physician does prescribe a product
15 that's off formulary; correct?
16    A.    Again, I don't want to be absolute,
17 but I'm just saying it's virtually -- it's not
18 common. The most common thing that the letters
19 involve is are you aware that this patient has
20 another drug that they're on that the literature
21 would indicate is contraindicated for this patient
22 to be taking.
23    Q.    Doctor, I'm not trying to figure out
24 what the most common is. I want to get your

5/18/2004 Gibson, David

1 patient a prescription and for whatever reason the
2 patient doesn't get it filled at the pharmacy.
3 And so our ability to communicate to the
4 prescribing physician that his patients, say, with
5 congestive heart failures didn't get their
6 prescriptions for ACE inhibitors filled is very
7 helpful to that doctor.
8    Q.    Do you also send out letters, sir,
9 to physicians where they prescribe a product that
10 is not on the PCN formulary?
11    A.    That's infrequent, because just
12 about every drug is on the formulary. It may be
13 at the third tier. But those types of
14 restrictive, almost enforcement activity that I'm
15 sure we'll talk at about at length today is not
16 something we generally do much of.
17    Q.    How frequently have you sent letters
18 like that for -- to physicians where they
19 prescribe a product that's off formulary?
20    A.    Well, again, the only -- most
21 everything is taken care of at the -- at the
22 dispensing site with the pharmacy. As I
23 mentioned, third tier for our formularies
24 encompass just about all drugs.

1 understanding --
2    A.    Yes.
3    Q.    -- as to whether or not you're aware
4 that letters are sent out to physicians that
5 prescribe products that are off formulary under
6 your signature.
7    MR. COHEN: Objection. Asked and
8 answered.
9    A.    Again, I'm sure if we went through
10 the whole list, we could find some of those
11 letters. It -- it doesn't leap to my mind that we
12 do it. I can't recall instances where it has
13 happened, but I'm sure that occasionally you have
14 it.
15 BY MR. DOBIE:
16    Q.    Okay. How often does the P&T
17 committee meet at PCN since -- let me back up.
18    At the time you had your deposition
19 in June of 2002, the P&T committee had not met.
20 Since June of 2002 --
21    A.    Right.
22    Q.    That's correct. Since June of 2002,
23 has the PCN P&T committee met?
24    A.    Yes.

5/18/2004  Gibson, David

**Page 41**

```
1    Q.    On how many occasions?
2    A.    We meet -- we've been meeting now
3  for about a year and we meet roughly on a
4  quarterly basis.
5    Q.    So since the beginning of '03,
6  you've been meeting?
7    A.    Yes.
8    Q.    And you've had how many meetings?
9    A.    We've --
10   Q.    Four or five?
11   A.    I'd say we've had about four or five
12 meetings.
13   Q.    Who are the other members of the P&T
14 committee at PCN?
15   A.    There's about seven or so members.
16 It consists of both pharmacists and -- academic
17 pharmacists and physicians.
18   Q.    Are any of the staff folks at PCN
19 that you mentioned members of the PCN P&T
20 committee?
21   A.    They're not members.  I'm the only
22 member of the committee.  They -- they serve a
23 support function for it, frequently research the
24 drugs and make presentations to the committee.
```

4/1/2005 2:24 PM                                          41

5/18/2004  Gibson, David

**Page 42**

```
1    Q.    I'm sorry.  I thought you said there
2  were seven members of the committee.
3    A.    There are.
4    Q.    Okay.  Then you -- did you say
5  you're the only member?
6    A.    I'm the only one from PCN.
7    Q.    I understand.  Okay.  So there's --
8  you're the only member from PCN and the other six
9  members are academic --
10   A.    Are external.
11   Q.    Understood.  And why is the
12 committee organized in that -- in that fashion?
13 Why don't you have the staff members as -- as
14 members of the P&T committee?
15   A.    That's a good question.  I think a
16 lot of it has to do with tradition.  If you -- if
17 you study the history of formularies, they started
18 as -- in hospitals.  This was back in the '50s.
19 And it was where the hospital determined it
20 couldn't stock every drug.  So there was a limited
21 number of drugs in the pharmacy and they
22 instituted P&T committees consisting of members of
23 the medical staff that would consult as to what
24 drugs were in the -- in the formulary for the
```

4/1/2005 2:24 PM                                          42

5/18/2004  Gibson, David

**Page 43**

```
1  hospital and it's pretty much stayed that way to
2  the present.  It's nice to have outside physicians
3  and pharmacists looking in on this process.
4    Q.    How many -- how many -- of the six
5  other members, how many are physicians?
6    A.    All but one.
7    Q.    Okay.  So you've got -- you've got
8  five physicians.  Are any of them OB-GYNs?
9    A.    One.
10   Q.    Who is that?
11   A.    Victor Chen, C-h-e-n, is an OB-GYN
12 physician in Sacramento who's also a professor at
13 UC Davis.
14   Q.    Are any of them primary care
15 physicians, the other four?
16   A.    One is an emergency room physician.
17 I'm just -- I'll work my way through the list
18 here.
19         One is an endocrinologist.  One is a
20 rheumatologist.  One is a pediatrician.  I think
21 the pediatrician probably would be the primary
22 care.  And then, of course, the internists with
23 subspecialties also function as primary care.
24   Q.    There's one internist?
```

4/1/2005 2:24 PM                                          43

5/18/2004  Gibson, David

**Page 44**

```
1    A.    Well, no.  The rheumatologist --
2    Q.    Oh, the rheumatologist.
3    A.    -- the endocrinologist, and -- and
4  you could classify the emergency room physician as
5  a primary care physician.
6    Q.    All right.  So the -- you have these
7  meetings, four or five meetings a year.  How much
8  of your time, if you were to divide it up between
9  the P&T committee and the QA group and Med
10 Intelligence that we talked about -- how would you
11 say your time is roughly divided between those
12 three groups?
13   A.    I'd say about a third, a third, and
14 a third would be rough.
15   Q.    And since you have actually had the
16 P&T committee up and running, has PCN created its
17 own formulary?
18   A.    We have.
19   Q.    And when did PCN create its own
20 formulary?
21   A.    When the P&T committee was formed.
22 That was part of the process for us to bring
23 the -- bring the formulary back inhouse.
24   Q.    All right.  So that would have been
```

4/1/2005 2:24 PM                                          44

1   the beginning of 2000 --
2       A.      Early -- early --
3       Q.      Let me finish, if I could.  The
4   beginning of 2003?
5       A.      Correct.
6       Q.      All right.  And as -- as part of the
7   creation of a formulary, did members of the P&T
8   committee meet with any pharmaceutical
9   manufacturers?
10      A.      The P&T committee does not meet with
11  pharmaceutical manufacturers.
12      Q.      And why not?
13      A.      It's just not part of the process.
14  We -- we meet -- let me explain the meeting.
15              The meeting is in a virtual
16  environment, so people are in attendance from all
17  over the country but nobody's in Sacramento.  We
18  work off of conference calls and websites.  And
19  the staff will make a presentation generally
20  concerning four new drugs and we will hear a
21  presentation of the scientific information
22  available on the drug and then at the end make a
23  decision as to whether -- as to what category the
24  drug's going to fall in.

1       Q.      Okay.  So how about you yourself; as
2   medical director of PCN, have you met with medical
3   manufacturers as part of your responsibility on
4   the P&T committee?
5       A.      Occasionally I will attend a
6   presentation by a pharmacy manufacturer on one of
7   their new products as it comes through.  It --
8   it's more for me a lunch meeting that -- that is
9   primarily for the consulting pharmacists within
10  the company and I will just sit in on it
11  occasionally.
12      Q.      These -- these are people that are
13  detailing new products; right?
14      A.      They're detailing new products.
15      Q.      Okay.  But have you met with -- with
16  pharmaceutical manufacturers in connection with
17  the establishment of the PCN formulary?
18      A.      No.
19      Q.      All right.  How about the -- tell me
20  more about what the -- what the QA, quality
21  assurance, group does at PCN.
22      A.      When -- when a health plan contracts
23  out for the management of their pharmacy benefit,
24  the contracted entity has to conform to the

1   quality assurance criteria for the health plan
2   for the health plan to be able to be certified by
3   the NCQA.  That's the National Committee for
4   Quality Assurance.  This is certification that
5   this independent group gives.  It's kind of like
6   the Good Housekeeping Seal of Approval.  And we
7   have to function within the guide -- this is a
8   rather complex infrastructure, but we have to
9   function within the quality guidelines for the
10  health plan so we don't jeopardize their status
11  with the NCQA.
12              So we run a continuous monitoring on
13  all of the activities of the PBM to determine
14  things like how long people have to wait when they
15  call in on a phone or how long a delay might exist
16  for a special request from a prescribing physician
17  or if we have downtime on our computer systems,
18  how much is it per month.  Those sorts of things
19  are the ongoing monitoring of the quality of the
20  service that we provide as a PBM and then it feeds
21  directly into the NCQA documentation for the
22  various health plans that are our clients.
23      Q.      So you have to -- PCN, which is a
24  pharmacy benefit administrator, has to be

1   certified by the NCQA in order for people's health
2   plans and things to use it, basically?
3       A.      Two corrections.  First, PCN is a
4   PBM.  It's a pharmacy benefit manager.  It's just
5   the title within health care.  And no, we are not
6   certified by NCQA.  The health plan is.  We have
7   to conform to the health plan's quality criteria
8   on management systems or we could jeopardize the
9   health plan's NCQA certification.
10              It's very analogous to the issue we
11  discussed earlier dealing with HIPAA.  PCN is is
12  not HIPAA qualified.  It functions as a business
13  associate to the health plans that are the HIPAA
14  compliance entity.
15      Q.      So there's -- there's certain
16  standards that you as the PBM have to meet in
17  order for the health plan to be certified by the
18  NCQA?
19      A.      That's correct.
20      Q.      All right.  And -- and you mentioned
21  how long somebody waits on the phone and things
22  like that.
23      A.      Correct.
24      Q.      Are there -- are there standards for

5/18/2004  Gibson, David

**[Page 49]**

1  this that are -- that are promulgated by the NCQA?
2      A.    The NCQA -- and you can go out and
3  look at this.  It's a complex process.  But they
4  establish all these various criteria that they
5  want you to look at to -- so that you're
6  monitoring for quality within how you administer a
7  plan or how people get health care delivered to
8  them and so forth.
9          And the process is not so much
10  meeting a test score like you have in school.  You
11  know, if you get 90 or better, you get an A -- or
12  95 and better, you get an A and 85 and up, you get
13  a B.  It's not that way.  It is whatever your --
14  you look at your performance based on your initial
15  evaluation and then they want to see you close the
16  loop.  That means they -- that you recognize if
17  there's a problem, you create a plan, and then you
18  monitor to see if the plan improved performance.
19      Q.    Dr. Gibson, to go back to my
20  question, are there written standards the NCQA
21  promulgates that you as the PBM try to live by?
22      A.    There are criteria published and we
23  function within those criteria and monitor our
24  performance based on them.

**[Page 50]**

1      Q.    Do the -- do the criteria cover all
2  subjects like the creation of a formulary?
3      A.    No.
4      Q.    The payment of rebates to plans?
5      A.    No.
6      Q.    How you handle things like prior
7  authorizations?
8      A.    If we have prior authorizations, how
9  long does it take to grant them would be a
10  criteria that would be applied.
11      Q.    And what's -- what's the standard or
12  the criteria that you're trying to meet as it
13  relates to prior authorization in order to meet
14  the NCQA standard?
15      A.    Generally they try to turn around
16  prior authorization in a short period of time
17  during business hours.  I don't know exactly, but
18  I'd say it's within 24 hours.
19      Q.    Okay.  Are there other examples like
20  prior authorizations that you can think of that --
21  that you have to meet under the NCQA criteria?
22      A.    Well, again, the criteria we're
23  trying to meet is the criteria that the health
24  plan sets for NCQA and another one would typically

**[Page 51]**

1  be do we have downtime on our computers, which
2  would affect the pharmacy's ability to receive
3  hard and soft edits and things that we'll talk
4  about later, I'm sure.
5      Q.    Okay.  Let's go on to another
6  position that's mentioned in your report.
7          In your current report on your
8  resume, you state that you've been the president
9  of the Pacific Development Group from 2000 to the
10  present; correct?
11      A.    Correct.
12      Q.    Okay.  Now, the report that you
13  filed in the Duramed case said that you were the
14  president of the Pacific Development Group
15  beginning in 1998.
16          Can you explain for me the reason
17  for the difference?
18      A.    No.
19      Q.    Okay.  When did the Pacific
20  development group -- was that founded?
21      A.    I started it roughly when I left
22  Omni.
23      Q.    But at the time of your last
24  deposition, you said that you were spending half

**[Page 52]**

1  of your time on the Pacific Development Group.
2          How much of your time are you
3  spending on the Pacific Development Group now?
4      MR. COHEN:  Today?
5      MR. DOBIE:  Yes, sir.
6      A.    I would say 10 percent of my time.
7  BY MR. DOBIE:
8      Q.    And is it essentially consulting
9  with physician groups and -- on business issues?
10      A.    No.  It's a very specialty-based
11  consulting practice and it has evolved over the
12  years.
13      Q.    What is it doing currently?
14      A.    What's it doing currently?
15      Q.    Yes, sir.
16      A.    I'm working with a group of
17  pharmacists that are primarily based at USC in Los
18  Angeles to explore the development of an infusion
19  therapy network.
20      Q.    And what's an infusion therapy
21  network?
22      A.    Health -- the nature of the
23  pharmaceutical products is changing.  We're going
24  from pills that people take at home to drugs that

5/18/2004 Gibson, David

5/18/2004 Gibson, David

1  are -- with high potency that require injections.
2  And your client has one of those products.  It
3  will be Enbrel.  But these are products that
4  require a clinical presence during administration.
5       Q.    Okay.  And -- and you said that
6  you're working with the pharmacists at the USC,
7  University of Southern California University?
8       A.    Correct.  Not -- not at it.  These
9  are mostly alumni and affiliated with the School
10  of Pharmacy at USC.
11      Q.    Okay.  Does -- does the project have
12  anything to do with the University of Southern
13  California other than these are alumni?
14      A.    It may.  The project's evolving at
15  the present time.  It may bear the USC nameplate.
16      Q.    So this is a -- this is a project
17  that is --
18      A.    It's a development project.
19      Q.    And at this point, what are you
20  trying to help the pharmacists do as it relates
21  to, as you -- as you explain it, physicians having
22  to have a more clinical presence during the
23  administration of the pharmaceuticals?  What's --
24  what's the interface between your client group,

1  distribute the product, assuming that there was a
2  prescription from a physician, as opposed to
3  having the physician give the product?
4       A.    In essence, yes.
5       Q.    Okay.  At the time of your last
6  report, you had still on your -- your resume that
7  RxPhysician was from January of 1998 to the
8  present.
9             Do I take it that RxPhysician
10  currently is -- at least your involvement has
11  ceased?
12      A.    RxPhysician is inactive.
13      Q.    There's -- there's a website that's
14  out there now.  It's still RxPhysician.
15            Do you have any involvement --
16      A.    It's not --
17      Q.    -- with that?
18      A.    It's not ours.  At least, I don't
19  know about it.
20      Q.    All right.  It sells Viagra, weight
21  loss drugs, things like that?
22      A.    That's not us.
23      Q.    That's not you.  Okay.
24            With RxPhysician, we spent a fair

5/18/2004 Gibson, David

5/18/2004 Gibson, David

1  the pharmacists, and what you've described before,
2  which is the need to have doctors have -- have
3  a -- I guess be more involved with the
4  administration of pharmaceuticals?
5       A.    I don't recall that I said that, but
6  why don't I back up a little and maybe I can make
7  this a little clearer.
8       Q.    Sure.
9       A.    Currently these specialty drugs,
10  Enbrel being an example, are typically
11  administered either in the doctor's office or in
12  the emergency room.  There are a lot of problems
13  that are resulting from that current platform and
14  the pharmacists are exploring the opportunity to
15  create their own infusion therapy centers that are
16  community based.
17      Q.    So in essence, replace the doctors
18  and have the pharmacists provide the infusion
19  therapy?
20      A.    Physicians could be present during
21  the infusion process, but it has more to do with
22  how product is distributed.
23      Q.    Right.  But is the idea essentially
24  that you'd have the pharmacist be able to

1  amount of time talking about it in your last
2  deposition, so I don't want to repeat it.  I just
3  want to make sure I understand something, because
4  we had some correspondence back and forth with --
5  with Mr. Cohen trying to make sure that we had an
6  understanding of -- of some data issues.
7             First, am I correct that the data
8  that you developed -- let me back up.
9             Tell us generally what
10  RxPhysician -- what you were trying to do as it
11  related to the PBA project for RxPhysician?
12      A.    We were trying to develop a digital-
13  based ordering system for prescribing medications
14  for physicians in the clinical setting.
15      Q.    Okay.  And there was a study that
16  was done in this clinic in Santa Barbara and a
17  study that was done at the Straub Clinic in
18  Hawaii; correct?
19      A.    Correct.
20      Q.    And in connection with that study,
21  you developed certain, I think as you put it in
22  your last deposition, anecdotal data.  Do you
23  recall that?
24      A.    Correct.

1    Q.    And that data was never formalized

2 into a report; correct?

3    A.    No.  It was proprietary.

4    Q.    And -- well, not only wasn't it --

5 let me make sure I'm being clear.

6          I understand it was proprietary, but

7 you never prepared a report with that data either;

8 correct?

9    A.    Correct.

10    Q.    And you don't have that data here

11 today?

12    A.    No, I do not.

13    Q.    All right.  And do you know who has

14 the data?

15    A.    I have the data.

16    Q.    Oh, you do have the data?

17    A.    It's in my head.

18    Q.    Oh.

19    A.    I know the outcome of those

20 evaluations of physician work environments.

21    Q.    All right.  If somebody wanted to

22 test the information, to look for themselves at

23 the information that came from the study at the

24 Straub Clinic in Hawaii or the Santa Barbara

1 prescribing.  And a number of the -- of the

2 electronic medical records companies that wanted

3 to add a digital ordering module to their product

4 would have done those kind of studies.

5    Q.    Potentially a big market.

6    A.    The potential market was great.  It

7 was an incredible flop.

8    Q.    Okay.  None of these companies ever

9 brought a product to market; correct?

10    A.    No.  Almost everybody brought a

11 product to market.  The issue wasn't having

12 technology that worked or even technology that

13 doctors would use.  The problem was being able to

14 make it -- the business model work.

15    Q.    Okay.  We -- we covered some of that

16 in your last deposition, so I don't want -- I

17 don't want to repeat all that.

18          The anecdotal information that

19 you -- that you gathered, you mentioned last time

20 that you hadn't done any sort of double blind

21 study or as you said perfect science.  How many

22 physicians were in the study that -- that was done

23 at the Santa Barbara Clinic?

24    A.    We had about 10 to 15 physicians at

1 Clinic, is there any source or any information by

2 which someone could test that information?

3    A.    No.  Let me just back up.

4          I suppose you could talk to some of

5 the physicians that were involved in the -- in the

6 project, but that you -- you as an -- a

7 dispassionate observer that would want to go and

8 read about it, you -- you wouldn't.  It's not

9 published.

10    Q.    Is there -- is there any other

11 published literature that you're familiar with

12 that has done a study like what you did at

13 RxPhysician?

14    A.    I think just about every one of the

15 digital-based ordering companies did similar type

16 studies to be able to develop their products.

17    Q.    Okay.  Did any of those -- talking

18 about the digital-based ordering companies.  Who

19 are those companies?

20    A.    Well, most of them now are defunct.

21 But one was called IScribe.  Another was called

22 EPhysician.  WebMD was -- at that time was called

23 Healthion.  That was a predecessor.  They -- they

24 merged into WebMD.  Did a lot of work on digital

1 the Santa Barbara Clinic and a similar number at

2 the Straub Clinic.  And if I -- if may, let me

3 just say that that was the second generation of

4 our work.  We did -- the first generation was in

5 Sacramento, where we -- where we deployed our

6 first effort, and then the round with Straub and

7 the Santa Barbara Clinic was the second round.

8    Q.    What was the -- you didn't tell me

9 about that in your last dep, I don't believe.

10 What was the clinic in Sacramento?

11    A.    It wasn't a clinic.  This was in

12 individual physician offices.  We were dealing --

13 and I won't go into great detail here, unless you

14 want me to, but the first generation of this was

15 with wide-area network infrastructure for the

16 handheld PDA devices, and that consisted of using

17 cellular phone technology to link the handheld

18 device to -- to the system.

19          We -- that was -- that was not -- we

20 determined that that technology was not going to

21 work because there's a lot of -- if you have a

22 cell phone, you know that there's a lot of black

23 holes with cell phones, where they just won't

24 work.  And that was what we discovered.

5/18/2004  Gibson, David

```
1        So in the Santa Barbara Clinic and
2   in the Straub Clinic, we deployed with a local-
3   area network which was wireless, and that
4   consisted of communication to a server within the
5   clinic using wireless connectivity within the
6   clinic itself.
7        Q.    How many physicians were in the
8   Sacramento study?
9        A.    About 10 to 15.  I don't recall the
10  exact number.  Mostly primary care.
11       Q.    And in Santa Barbara with the --
12  with the product, did you have any sort of a lead
13  physician that you were working through?
14       A.    We worked with the department of
15  ambulatory care, and I'd say I worked with all the
16  docs down there.  I spent a fair amount of time in
17  Santa Barbara and I would spend time in their
18  offices.  I spent time with their nurses.  I spent
19  time with the pharmacists that received the
20  communications.  And through that I got a feel for
21  how the flow of a practice works, how much time
22  was spent on the prescribing part of the practice
23  and how we could improve that using electronic
24  data.
```

4/1/2005  2:24 PM                                    61

---

5/18/2004  Gibson, David

```
1        Q.    The department of ambulatory care
2   that you mentioned --
3        A.    It was -- the community medicine
4   department was its exact name.
5        Q.    And did you have a contract with the
6   community medicine department?
7        A.    No, we didn't have a contract.  They
8   permitted us to come in and use the technology, in
9   that they were interested it as well.  They
10  were -- they were intrigued by whether this would
11  improve the practice within their clinic.
12       Q.    Who was your primary contact in that
13  facility?
14       A.    Well, let's see.  The CEO of the
15  clinic at that time -- I have to go back in my
16  records.  But we worked through the clinic
17  administration, the CEO of the clinic and the
18  chief operating officer of the clinic and the
19  chief information officer of the clinic, because
20  we were installing information technology.
21       Q.    So when -- so when you went in to
22  pitch the RxPhysician.com product, the pitch was
23  in essence to the administrators?
24       A.    Correct.  And let me correct you on
```

4/1/2005  2:24 PM                                    62

---

5/18/2004  Gibson, David

```
1   one item there.
2             It wasn't the pitch to sell a
3   product to them.  We provided all of the
4   technology, all the software, all the support,
5   free.  This was -- our -- our interest was to see
6   if we could develop a system that they'd actually
7   use and it would help in their practice.
8        Q.    How long did the project go on at
9   the --
10       A.    For about two months.
11       Q.    Right.
12       A.    Six weeks to two months.
13       Q.    And at the end of the two months,
14  did the administrators ask you for a report of any
15  kind?
16       A.    No.
17       Q.    They just said, Okay.  We've been
18  using your technology.  You've taken our time --
19       A.    We collectively determined that it
20  wasn't ready for show time.
21       Q.    Okay.  And when you say
22  "collectively," did that include the
23  administrators at the community medical --
24       A.    Yes.
```

4/1/2005  2:24 PM                                    63

---

5/18/2004  Gibson, David

```
1        Q.    -- group?
2        A.    Yes.  It was -- it was apparent to
3   everyone involved that this -- this -- rather than
4   improving productivity, it decreased productivity
5   for the physician and there was not any financial
6   benefit to the physician that resulted from that
7   inhibition -- or that reduction in productivity.
8        Q.    All right.  And then the Straub
9   Clinic in Hawaii.  Was that again a similar-type
10  deal where you would talk to the administrators
11  in --
12       A.    Right.
13       Q.    -- the first instance?  Who -- who
14  were the administrators of the Straub Clinic that
15  you were dealing with?
16       A.    I'm sorry.  I'd have -- I'd have to
17  go back in -- in my records on that.  But we
18  were -- we were more -- we were multilocation with
19  Straub instead of one location at the Santa
20  Barbara Clinic.  We -- we were -- Straub is -- has
21  clinical facilities throughout all of Hawaii.  So
22  all five islands they have clinical facilities.
23  And we were involved in -- we were -- we were --
24  we were mainly in the Honolulu area.  But we -- we
```

4/1/2005  2:24 PM                                    64

5/18/2004 Gibson, David

1  had -- we deployed in three or four different
2  clinical settings and all of it was on the local-
3  area network infrastructure.  And there was a
4  broader spread of the background of the physicians
5  involved.  We had pediatricians, we had family
6  physicians, we had some specialists in internal
7  medicine --
8      Q.    How about --
9      A.    -- as I recall, endocrinology.
10     Q.    How about OB-GYN?  I'm sorry.
11     A.    I think we might have had one OB-GYN
12 doc.
13     Q.    Do you recall that or --
14     A.    I don't recall clearly.  But I
15 recall we visited with the OB-GYN department and I
16 believe we had one doc that came up on the system.
17     Q.    Okay.  And then similar result with
18 the Straub Clinic in Hawaii as in Santa Barbara?
19     A.    As far as the outcome?
20     Q.    Yes, sir.
21     A.    Correct.
22     Q.    And did the Straub Clinic in Hawaii
23 ever ask you for a report in terms of --
24     A.    No.

5/18/2004 Gibson, David

1      Q.    Let me finish.  -- how the -- how
2  the project had gone?
3      A.    No.
4            Let me just say one other thing on
5  that.  Hawaii is an interesting place.  It's not
6  like --
7      Q.    For many reasons.
8      A.    Yes.  And it tends to have
9  monopolies and the insurance company -- health
10 insurance company over there that's -- that
11 dominates Hawaii is called HMSA, which is really
12 the Blue Cross plan, and they elected to go with a
13 contract with a company called All Scripts that
14 was exploring digital prescribing.  And so it --
15 not only did we not feel that our technology was
16 ready for deploying.  We -- we would then have had
17 to compete heads up with All Scripts and HMSA and
18 we just -- it was apparent that we should pull the
19 plug.
20     Q.    Did -- did All Scripts -- is that
21 something that was owned by HMSA?
22     A.    No.  All Scripts is a company --
23 it's publicly traded.  It's out of Illinois, close
24 to your home base, and I think they lost their

5/18/2004 Gibson, David

1  shirt on this project in Hawaii.
2      Q.    Do you know whether or not All
3  Scripts ever put the project in place with more
4  than one -- let's say 10 or 15 physicians?
5      A.    It's my understanding they did and
6  they did it with -- with a contract with HMSA, and
7  I think it was a performance-based contract.  So
8  that if the physicians would use it, they would
9  get paid.  And I don't believe -- I'm not privy to
10 any of the details of how it went.  I just have
11 heard.
12     Q.    Well, did you hear the physicians
13 didn't use it and so they didn't get paid?
14     A.    I heard that it was deployed and the
15 equipment was delivered, but the actual number of
16 scripts that went through the system were
17 disappointing.
18     Q.    The process or the project that you
19 did at the Straub Clinic in Hawaii, how many weeks
20 did that go on?
21     A.    Oh, that was a couple of months.
22     Q.    And in the process of the -- of it
23 going on, tell me what kind of -- and this is true
24 for Santa Barbara.  You don't even need to

5/18/2004 Gibson, David

1  distinguish between Santa Barbara or Hawaii.
2            What would be the -- generally
3  speaking, how would the data flow from the
4  physicians to make it back to you and your -- your
5  partner at RxPhysician.com?
6      A.    Well, all the transactions went
7  through a server and we were online with that
8  server.
9      Q.    Okay.  So you could -- you could see
10 through -- through monitoring the server what
11 physicians were doing?
12     A.    Correct.
13     Q.    All right.  I think I understand
14 why -- so it's not like physicians are filling out
15 surveys of how they like it or things like that?
16     A.    No.  We were -- we were real time.
17 And the real essence was we roughly knew how many
18 scripts the docs were writing every day.  We knew
19 roughly what they were writing for.  Because
20 that's how we loaded up the system.  We didn't
21 load it up with every drug that had an NDC code.
22 And we could monitor percentage of usage based on
23 that.
24     Q.    Okay.  And what -- generally

1    speaking, what was the percentage usage in the --
2    in the Straub Clinic in Hawaii?
3        A.    It varied by doctor depending on how
4    committed they were to the whole idea.  Some
5    people didn't use it at all.  Some used for half
6    of their prescriptions.  It never really rose to
7    the level of clinical acceptance.  If you're going
8    to run an electronic system and you're going to
9    store records and you're going to have
10   information, you pretty much have to -- everybody
11   has to use it all the time.  Same is true with
12   electronic medical records.  You can't opt in and
13   opt out or you get these gaping holes in your
14   database.
15         So we never got even close to what
16   I -- what I would call acceptable utilization
17   rates.
18       Q.    Okay.  Do you -- do you remember
19   offhand whether the doctor that was the OB-GYN was
20   the doctor that never used it at all versus used
21   it half the time?
22       A.    My memory is foggy here, but my --
23   my best estimate would be that if we included him,
24   he didn't use it.

1        Q.    On the Santa Barbara Clinic, do you
2    know whether or not -- let me back up.
3          With the Santa Barbara Clinic, is
4    that a similar experience in terms of some doctors
5    using half the time, some not at all?
6        A.    Yes.  These systems are real touchy
7    and, you know, not only does it take more time to
8    order a script than to write one, but electronic
9    systems don't always work.  So it was -- if you
10   didn't have a physician who was really committed
11   to this, the aggravation that resulted from it
12   would turn them off.
13       Q.    Okay.  Omni Health Care.  We can
14   jump over there for a minute.  You were the vice
15   president, medical affairs, and chief medical
16   officer from May of 1996 through January of 1998;
17   correct?
18       A.    I don't know the month, but it would
19   have been '96 to '98.  It would have been a couple
20   of years.
21         MR. DOBIE:  Let us just mark this as
22       the next exhibit.
23               * * *
24         (Whereupon, Gibson Exhibit 4 was

1    marked for identification.)
2               * * *
3    BY MR. DOBIE:
4        Q.    I hand you what we marked as Exhibit
5    4.  Dr. Gibson, do you recognize Exhibit 4?
6        A.    Do I -- I'm sorry?
7        Q.    Do you recognize Exhibit 4?
8        A.    Yes.
9        Q.    This is -- this is the report that
10   you prepared in the Duramed versus Wyeth case?
11       A.    I would -- I believe that's
12   accurate.
13       Q.    Okay.  In the -- in your CV that's
14   attached thereto, you've got the time period Omni
15   Health Care as May of '96 to June of '98.  Does
16   that refresh your recollection that that was the
17   time?
18       A.    It helps, yes.  Thank you.
19         Are we done with this?
20       Q.    Not quite.  Not quite.
21         In this resume, you state, and this
22   is on Page 14 -- we're talking about Omni.  You
23   state that "As the VP, medical affairs, I also
24   chaired the pharmacy and therapeutics committee

1    for the health plan."  Do you see that?  The very
2    last line.
3        A.    I see that.
4        Q.    Okay.  Now, in your -- your current
5    resume that we've attached to -- or you've
6    attached to your report at Exhibit 1, you have a
7    description of Omni Health Care and you've deleted
8    that sentence as having been the head of the P&T
9    committee at Omni Health Care.  I'm wondering why
10   that -- why was that sentence deleted.
11       A.    It was an inadvertent editorial.
12       Q.    In which way?
13       A.    It didn't have any -- it didn't have
14   any bearing to experience or change.  It's just
15   what I included as my responsibilities.
16       Q.    Okay.  And so as it relates to --
17   the resume that's attached to your current report,
18   that's the accurate situation?
19       A.    I chaired --
20         MR. COHEN:  Objection to the form.
21         -- the committee.
22   BY MR. DOBIE:
23       Q.    Oh, you did chair the committee?
24       A.    I did chair the committee.  I

1    just -- I didn't happen to write it in this
2    report.
3        Q.    Oh, I see.
4        A.    Or in this CV.  I did a lot of
5    things and you just pick and select what you put
6    in it.  This CV that you have here is generally
7    used when I'm involved in a consulting engagement
8    and --
9        Q.    Which one for the record?
10       A.    The one that is in the current
11   report.  And to chair a P&T committee for a lay
12   reader, it doesn't have a lot of meaning for most
13   people.  It does within this context, but it
14   wouldn't, say, with the owner of a business who
15   wanted to engage Illumination Medical.
16       Q.    Well, sir, you picked the resume to
17   attach to your report; correct?
18       A.    Correct.
19       Q.    Okay.  And did you think it was
20   relevant whether you did or didn't serve as the
21   chairman of the P&T committee at Omni Health Care?
22           MR. COHEN:  Objection.
23       Argumentative.
24       A.    I think it's relevant.  If I were to

1    redo it, I would have included it.  I did,
2    however, include it at the front of the report
3    that I chaired it.
4    BY MR. DOBIE:
5        Q.    Actually, your report says that you
6    have been the CEO of three different HMOs.  That's
7    on Page 5 on your background.  And looking through
8    the resume, and I tried to add them up and count
9    them up, I didn't come up with you being the CEO
10   of three different HMOs.
11           What are the three different HMOs
12   that you were the CEO of?
13       A.    I was the CEO of the Sisters of
14   Charity Health Plan in Houston.  I was the CEO of
15   the Tallahassee Physicians Association Health Plan
16   in Tallahassee, Florida.
17       Q.    I'm sorry.  The Sisters of
18   Charity --
19       A.    In Houston.
20       Q.    In Houston.  And then what's the one
21   in Tallahassee?
22       A.    It would have been the Tallahassee
23   Physicians Association Health Plan.
24       Q.    Okay.

1        A.    And I was the CEO of the Samaritan
2    Health Plan in Phoenix.
3        Q.    When were you the -- let's look at
4    your -- your report here.  Maybe you've got the
5    dates.
6        A.    Could we go back to one item?  You
7    had a question about whether or not --
8        Q.    Yes, sir.
9        A.    This issue of the P&T committee.
10           If you'll look on Page 5 under the
11   heading "Background," first paragraph, you'll see
12   the last sentence --
13       Q.    Oh, I see it.
14       A.    Okay?
15       Q.    When were you -- when were you the
16   CEO of the Sisters of Charity Health Plan?
17       A.    That was when I was at the -- these
18   were all activities involved with my ownership of
19   Avanti Health Plan.  Avanti -- or not Avanti --
20   Avanti Health Systems.  Avanti was a medical
21   development company and we developed all of those
22   health plans from scratch, moved them through to
23   licensure.  I functioned as the CEO of the health
24   plan during its startup and we would ultimately

1    replace ourselves with recruited full-time staff.
2        Q.    So where it says here Avanti Health
3    Health Systems, says 1984 through 1991, your --
4    your service as the CEO of the Sisters of Charity
5    Health Plan in Houston would have been at what
6    time period between 1984 and 1991?
7        A.    That would have been early, so it
8    would have been roughly '84, '85.  It was -- our
9    first client -- our first client in Texas was the
10   Baylor Health System, and my partner, whose name
11   is -- was Marty Dale, is -- his name, Marty Dale,
12   was responsible for that project and he served as
13   the CEO of the Baylor Health Plan in Dallas.  And
14   our second client was the Sisters of Charity in
15   Houston and I took responsibility for that
16   account.
17       Q.    Okay.  And -- and tell me more about
18   what the Sisters of Charity Health Plan -- what
19   that was.
20       A.    It was a Catholic health system
21   consisting of a number of hospitals distributed
22   around the United States but most of them in
23   Texas.  The primary area was Houston.  But they
24   stretched over to Beaumont, down to San Antonio,

1  and as I recall, there was one or two hospitals up
2  in northern Texas around the panhandle.
3     Q.    Okay.  But the Catholic health
4  system hospitals, I mean, that's been around
5  forever.  What -- tell me, explain for me what you
6  did in terms of the creation of the Sisters of
7  Charity Health Plan as it -- and how that fits
8  within the Catholic health system.
9     A.    Okay.  We're going to get into a
10  little lesson here about Catholics.
11     Q.    I've got plenty of them at home.
12     A.    The Catholic hospitals in the United
13  States are not one entity.  They are owned and
14  managed by various orders of sisters.  The Sisters
15  of Charity -- their full name was the Sisters of
16  Charity of the Incarnate Word.  Their -- their
17  base was in Houston.  And they started their first
18  hospital, as most Catholics did, during the great
19  flu epidemic of -- I think it was 1912 and people
20  were dying like crazy, and basically they created
21  a place for people to die with dignity.  And from
22  that they grew into a multibillion dollar
23  corporation and had hospitals distributed around.
24         When the HMO movement came into

1  health care, you will recall that prior to, oh,
2  1980, back during the Nixon years, the majority of
3  health care was paid for by indemnity health
4  insurance, where you would see a physician or a
5  hospital, you would pay for the service, and then
6  you would be reimbursed by the insurance company
7  after you had met a deductible.
8         We -- there was a massive move in
9  the market to first dollar coverage or these
10  health plans at about that time, and the Sisters
11  of Charity, like many other hospitals, were
12  interested in forming their own insurance company.
13  So it would be essentially an inhouse underwriter
14  of their services.
15         This came out of people admiring
16  Kaiser and the concept was a three-legged stool,
17  wherein Kaiser had their own hospitals, their own
18  medical group, and their insurance company, and
19  many of the larger hospital systems in the America
20  were experimenting with that model.  And we were
21  one of the major developers that could come in and
22  develop that for them.
23     Q.    I mean, what your resume says is
24  that you were a development and management firm,

1  Avanti Health Systems.
2     A.    That's right.
3     Q.    Okay.  It's kind of a very broad
4  description.  I'm just -- I'm trying to understand
5  when you talk about helping them and now you
6  mention Kaiser -- you know, did they -- did you
7  end up setting up a Kaiser-type shop for the
8  Sisters of Charity Health Plan?
9     A.    I mentioned Kaiser in the context of
10  this three-legged stool concept and hospitals and
11  their physicians were exploring a Kaiser-like
12  entity that could compete in the prepaid market.
13     Q.    All right.  And is that what the
14  Sisters of Charity Health Plan was?
15     A.    It was the -- one of the legs of the
16  stool.
17     Q.    All right.  Explain that for us, if
18  you will.
19     A.    We were the insurance company.
20     Q.    All right.  So you developed an
21  insurance company for the Sisters of Charity?
22     A.    Correct.
23     Q.    For this particular hospital in
24  Houston?

1     A.    No.  For their system.
2     Q.    Systemwide?
3     A.    Right.
4     Q.    And then you did the same thing for
5  the Tallahassee Physicians Health Plan?
6     A.    That was -- that was -- yes, that
7  was formed by the physicians in Tallahassee that
8  were in independent practice and they contracted
9  with us to form a health plan, which we were able
10  to take through development to licensure by the
11  state and ultimately federal licensure.
12     Q.    And so each of these is -- and then
13  the Samaritan Health Plan in --
14     A.    Phoenix.
15     Q.    In Phoenix.  Same thing.  You're
16  basically creating a health plan?
17     A.    Correct.
18     Q.    All right.  And these are just like
19  if -- if you have a company with 10,000 people.
20  You're describing four.  They may create a health
21  plan.  They might have consultants that advise
22  them in connection with the creation of a
23  particular health plan.  You mentioned before the
24  ERISA plans, the Taft-Hartley-type structures,

5/18/2004 Gibson, David

1   those are the types of health plans that you're --
2   that you -- that you created when you were at
3   Avanti Health Systems?
4   A.      No.
5   Q.      All right.  Explain that for me.
6   A.      The products that we developed at
7   Omni would be --
8   Q.      Omni or Avanti?
9   A.      Avanti.  Sorry.
10          Were two types.  One was an HMO
11  which was licensed by the state and federal
12  licensure.  And it was a -- it -- it delivered
13  first -- first dollar products that would be HMO
14  products.
15          The second type of an insurance
16  company we would create in tandem with that was an
17  indemnity insurance company that would stand
18  behind PPO products.  That would be -- stands for
19  preferred provider organizations.
20  Q.      Okay.  And the Sisters of Charity
21  Health Plan, as you mentioned before, was an
22  insurance company?
23  A.      The Sisters of Charity -- we formed
24  two companies for them.  One was the Sisters of

1   Charity Health Plan and the other was the Sisters
2   of Charity Indemnity Insurance Company, I believe.
3   Q.      Okay.  So you're -- you're helping
4   them form this company.  It -- after forming it,
5   did you play a role in connection with the
6   management of it?
7   A.      We did.
8   Q.      For how long?
9   A.      We developed the company and my
10  staff staffed the company until we recruited and
11  handed over to full-time -- full-time employees of
12  the health plan.  So I would serve as the CEO.  My
13  director of marketing served as the director of
14  marketing.  My network developer would develop the
15  physician networks.
16  Q.      All right.  And for how long did you
17  serve as the CEO of the Sisters of Charity Health
18  Plan?
19  A.      For about a year.
20  Q.      How long did you serve as the CEO of
21  the Tallahassee Physicians Health Plan?
22  A.      About six months.
23  Q.      And how long did you serve as the
24  CEO of the Samaritan Health Plan in Phoenix?

1   A.      I'd say around six months.
2   Q.      And --
3   A.      Maybe a little longer for the last.
4   It could have been 12 months.
5   Q.      Okay.  And with each of those three
6   plans, was -- was the pharmacy benefit carved out?
7   A.      The pharmacy benefit for the most
8   part really didn't exist in -- in its current
9   iteration until the early portion of 1990.
10  Q.      So is the answer yes, the pharmacy
11  benefit was carved out?
12  A.      Well, the pharmacy benefit was for
13  the most part a discount card.
14  Q.      Okay.
15  A.      So that -- that doesn't technically
16  fit the term "carved out."  It was an add-on
17  supplement that the purchaser could buy, but for
18  the most part they were not insurance products.
19  They were in many ways quite similar to what is
20  coming out of Medicare now.
21  Q.      Okay.  And I've asked you some other
22  questions about Avanti that I don't believe I need
23  to repeat.
24          You said you read your deposition on

1   the way out.  Was there anything in that
2   deposition that you felt the need to correct?
3   A.      I read -- I just glanced over it on
4   the plane coming out here.  In general, I think
5   it's fine.  I'm sure there will be minor things
6   that we'll go over as we spend the day, but
7   nothing --
8   Q.      Was that the first time you read it?
9   A.      I read it one other time after I --
10  you and I visited in Sacramento, because I had to
11  sign the deposition.  But those are the two times
12  I've read it.
13  Q.      Right.  And when you signed it, you
14  didn't have any -- any corrections to the
15  substance?
16  A.      I wouldn't have signed it if I did.
17  Q.      Okay.
18          MR. COHEN:  Gordon, are we at a time
19  to take a little break?
20          MR. DOBIE:  Sure.  It's been a
21  couple hours.
22          THE WITNESS:  Sounds good to me.
23          THE VIDEOGRAPHER:  This is the end
24  of Tape No. 1.  The time is 12:02 p.m.

1    We're now off the record.

2                    * * *

3         (Whereupon, a short recess was

4    taken.)

5                    * * *

6         THE VIDEOGRAPHER:  This is the

7    beginning of Tape No. 2.  The time is 12:20.

8    We're back on the record.

9    BY MR. DOBIE:

10   Q.    Dr. Gibson, I want to ask you a

11   little bit more about your -- your resume that you

12   attached to your report.

13        You mentioned in here some of your

14   certifications.  Are you a member of any

15   professional associations?

16   A.    I'm a member of the California

17   Medical Association.

18   Q.    Anything else?

19   A.    Not now.

20   Q.    Have you ever been a member of

21   the -- have you ever been a member of the American

22   Pharmaceutical Association?

23   A.    No.

24   Q.    Have you ever been a member of the

1    A.    No.

2    Q.    Do you serve on any industry

3    advisory panels with any -- or for any PBMs?

4    A.    No.

5    Q.    Publications are listed in

6    Attachment B to your bibliography, the last 10

7    years.  It looks like the last article that you

8    wrote involved fraud in health care, and this is

9    an article that discusses how fraud is a serious

10   problem that physicians are involved in in health

11   care in California; correct?

12   A.    Well, the article discusses the

13   issue of fraud in health care, and physicians

14   being part of the system, it discusses that, yes.

15   Q.    Okay.

16   A.    It didn't base its discussion that

17   physicians were the cause of fraud particularly.

18   Q.    No.  But the focus of the article is

19   physician fraud; correct?

20   A.    No.  The focus of the article was

21   fraud in health care.

22                    * * *

23        (Whereupon, Gibson Exhibit 5 was

24   marked for identification.)

1    California Pharmaceutical Association?

2    A.    I'm not a member.  I -- if you'll

3    recall, the California Pharmaceutical Association

4    owns PCN, and I work very closely with the

5    California Pharmacists Association primarily as a

6    consultant.

7    Q.    Right.  But are you a member of the

8    California --

9    A.    No.

10   Q.    -- Pharmaceutical Association?

11        Are you a member of the American

12   Managed Care Pharmacy Association?

13   A.    No.

14   Q.    Are you a member of the National

15   Association of Chain Drugstores?

16   A.    No.

17   Q.    Are you a member of the National

18   Council of Prescription Drug Programs?

19   A.    No.

20   Q.    Are you a member of the pharmacy

21   advisory committee for the California Medi-Cal?

22   A.    No.

23   Q.    Do you serve on any advisory panels

24   with any pharmaceutical manufacturers?

1                    * * *

2    BY MR. DOBIE:

3    Q.    I show you what we marked as Exhibit

4    5.  Sir, for the record, Exhibit 5 is a copy of

5    the article that we're just discussing, "Fraud in

6    Health Care," that you published in February of

7    '04; correct?

8    A.    Correct.

9    Q.    And this is -- the Sierra Sacramento

10   Valley Medical Society has a newsletter that

11   you -- you edit; correct?

12   A.    It's not a newsletter.  It's a --

13   it's a newspaper --

14   Q.    Okay.

15   A.    -- or a magazine.

16   Q.    A magazine?

17   A.    A better way to put it.  It's a

18   magazine.  And I serve on the editorial committee

19   and I'm the associate editor of the magazine.

20   Q.    And are any of the -- any of the

21   articles -- let's start with this one.  This is

22   not a peer-reviewed article; correct?

23   A.    Correct.

24   Q.    And are any of the articles that are

5/18/2004  Gibson, David

1  on your CV peer-reviewed articles?

2      A.     No, these are not peer-reviewed

3  articles.

4      Q.     Have you ever published anything

5  that's been peer reviewed?

6      A.     Many times, but it was earlier than

7  10 years ago.  It would have been back when I was

8  in academic positions at Harvard.

9      Q.     All right.  And the -- what are some

10  of the subjects that you've published on --

11      A.     My area --

12      Q.     Let me finish.  -- as it relates to

13  peer-reviewed articles?

14      A.     Most of them dealt with the area of

15  immunogenetics.  I was particularly interested in

16  the genetic background of children who got

17  arthritis, so I published in that area.  I did HLA

18  tissue typing.

19      Q.     All right.  And the -- have you ever

20  published any peer-reviewed article in the -- in

21  any -- have you ever published a peer-reviewed

22  article that relates to managed care issues?

23      A.     No, I have not and I've -- in

24  general, those types of articles aren't peer

5/18/2004  Gibson, David

1  reviewed.

2      Q.     And what are the -- what are the

3  publications that you're familiar with that

4  address managed care issues?

5      A.     Oh, there are hundreds.  It's

6  approached either from the insurance industry

7  perspective or from the pharmaceutical industry

8  perspective or the medical physician perspective

9  or the employer perspective.

10      Q.     Okay.  You said that most articles

11  on managed care are not peer reviewed.

12             Have you seen, for example, articles

13  that discuss topics like the impact of copays on

14  prescribing habits and things like that?

15      A.     Generally those types of articles

16  are not peer reviewed.  They -- they fall more

17  into the category of what you have in front of

18  you, which would be -- probably the best category

19  would be op-ed type pieces or editorials, or they

20  could include data, but they're not -- they're

21  not -- they -- they'd all fall into the -- when

22  I -- when I would publish for the New England

23  Journal of Medicine, say, that was heavily peer

24  reviewed by six or seven authorities in the field

5/18/2004  Gibson, David

1  before it would be published in the New England

2  Journal of Medicine.

3      Q.     Okay.  So just answer my question

4  then.  You have not published any peer-reviewed

5  article that relates to managed care issues;

6  correct?

7      A.     Correct.

8      Q.     All right.  We discussed in your

9  last deposition your prior service as an expert

10  witness in litigation.  I think you told me

11  that --

12      A.     Are we done with this?

13      Q.     Yes, sir.  -- that the -- that the

14  Duramed case was the first lawsuit that you'd --

15  that you'd been involved in; is that correct?

16      A.     Correct.

17      Q.     Have you been involved in any other

18  litigation since the Duramed case?

19      A.     The only other -- there -- there

20  were two instances, which really weren't

21  litigation.  They could have been.

22             One was I was rear-ended on

23  Interstate 80 and had a retired judge help me

24  settle the case with the insurance company.  That

5/18/2004  Gibson, David

1  was a matter of correspondence.

2             And the other was my daughter was

3  involved in a rear-end collision and our insurance

4  company worked with that.

5      Q.     But in terms of you working as an

6  expert in any litigation --

7      A.     Oh, no.

8      Q.     No.  And your report indicates that

9  you're being paid $300 per hour for research time

10  and $500 an hour for testimony.

11      A.     That's correct.

12      Q.     And in the Duramed case, you were

13  paid $300 an hour.  Why the difference in your

14  rates?

15      A.     I've gotten better.

16      Q.     All right.  How have you gotten

17  better?

18      A.     I have more experience.  You taught

19  me a lot in the last round.

20      Q.     All right.  Did -- did you, sir -- I

21  guess, why are you making the distinction between

22  time that you're spending on testimony versus time

23  that you're spending on research?

24      A.     This is more difficult.

```
 1      Q.     Have you ever commanded $500 an hour
 2   before for any of the other projects that you've
 3   done?
 4      A.     My -- my fees in consulting
 5   generally run between 3 and 5 hundred dollars an
 6   hour.
 7      Q.     And what company --
 8      A.     Plus expenses.
 9      Q.     What company -- which of your
10   companies have you charged clients 3 or 5 hundred
11   dollars an hour for?
12      A.     Well, we discussed UPNI earlier.
13   I'm charging them 300 an hour.
14      Q.     Who have you charged 500 an hour to?
15      A.     The charges for that range would
16   usually fall in the arena of retained fees or
17   deliverables.  So I'm not billing by the hour, but
18   it works out to that.
19      Q.     What -- what do you mean by
20   "retained fees" or --
21      A.     Well, for instance, Illumination
22   Medical charges on a per employee per month basis,
23   and those are based on deliverables.  So we
24   deliver a report quarterly to the client and they
```

```
 1   pay monthly based on a per employee basis.  So
 2   depending on how long it takes me to generate a
 3   report to the client is not based on hourly but
 4   the deliverable.
 5      Q.     Okay.  Is anybody -- can you name
 6   any other company that's actually agreed to pay
 7   you $500 an hour?
 8      A.     No.
 9      Q.     Do you maintain time records that
10   you spend in connection with this engagement?
11      A.     I do.
12      Q.     And how do you keep your time?
13   What's -- what's your process in connection with
14   this engagement?
15      A.     I usually log in each day how much
16   time I spend or if I spend nothing in a day, I
17   don't log anything in.  Keep it on an Excel
18   spreadsheet and turn in an invoice every couple of
19   weeks.
20      Q.     And how much time have you spent in
21   connection with your engagement in this case?
22      A.     I'd say -- I don't have the records
23   with me, but I'd say I've roughly spent about
24   three weeks in aggregate.  That's not three weeks
```

```
 1   solid.
 2      Q.     But about 120 hours or so?
 3      A.     I'd say more than that.  I would
 4   work -- when I -- when I'm billing, I work longer
 5   than an eight-hour day usually.
 6      Q.     That's why I gave you the 120.
 7      A.     Yes.
 8      Q.     What's the --
 9      A.     I'd say I'm more closer to 200
10   hours.
11      Q.     200 hours?  So how much have you
12   been paid so far in connection with this
13   engagement?
14      A.     Again, I don't have the records with
15   me, but I'd say probably around $60,000 or so.
16      Q.     So are you still owed $40,000 as
17   you're sitting here today?
18      A.     No.  Mr. Cohen has been very good
19   about reimbursing my invoices.
20      Q.     Okay.  Well -- all right.  So
21   it's -- I see.  $300 an hour times the 200 hours
22   is 60.  Got it.
23             Okay.  When were you retained to
24   work on this J.B.D.L. case?
```

```
 1      A.     Let's see.  As I recall, it was the
 2   latter part of last year.
 3      Q.     So late 2003?
 4      A.     Yes.  I recall that Mr. Cohen
 5   contacted me and we met in Sacramento, and as I
 6   recall, it was latter part of 2 --204 -- 203.
 7      Q.     Okay.  And what did Mr. Cohen tell
 8   you about the case when you met with him?
 9      A.     First he called and gave me a very
10   high-level look that -- as to who the plaintiffs
11   and the defendants were and roughly what the case
12   was about and then asked if I'd be interested, and
13   I said I would be interested in working on the
14   case.  And we scheduled an opportunity to have
15   lunch together in Sacramento and we walked around
16   the grounds of the capitol and visited and talked
17   about it.
18      Q.     What did he -- what did he -- tell
19   me what he said about his case, about the case
20   that was on file.
21      A.     He said that this was a suit between
22   your client, Wyeth, as the defendant, and a class
23   of -- of individuals or businesses that consisted
24   mostly of the -- of most of the distribution
```

1  chain -- chains, the distribution system within
2  the pharmaceutical industry in the United States.
3  That would include most of the wholesalers and
4  most of the retailers with the exception of Rite
5  Aid and CVS.
6       Q.     All right.  And what did you -- when
7  he described the case, what did you say in
8  response?
9       A.     I said that it looked interesting
10 and that I would be interested in working with him
11 as an expert witness on it.
12      Q.     Now, did you -- did you have some
13 understanding as to what area you were going to be
14 asked to be an expert in?
15      A.     I did.
16      Q.     And what was your understanding of
17 what area you were going to be asked to be an
18 expert in?
19      A.     My responsibility was to be able to
20 describe and explain how the health care system
21 works, how it works in its broad perspective,
22 including both the medical and the pharmaceutical
23 distribution systems, how their -- how money flows
24 through those systems, and how those systems can

1  on Page 6, you have a broader description of what
2  you've been asked to do.  You state that you were
3  asked to prepare a report in order to provide an
4  expert perspective on how Wyeth accomplished its
5  anticompetitive objective using exclusive dealing
6  and market share incentive-based contracts within
7  the health care systems.  You were going to
8  analyze the cumulative effect of this successful
9  marketing strategy and how it influenced the
10 decision making by American physicians as they
11 selected estrogen products in their patient and
12 that your report will analyze the consequences of
13 Cenestin being excluded as a result of Wyeth
14 successfully executing marketing strategy from
15 substantially all major managed care formularies
16 for Cenestin's market introduction in 1999 to the
17 present.  Do you see that?
18      A.     Yes.
19      Q.     Why the broader scope of this
20 report?
21      A.     This was what I was asked to -- to
22 evaluate and report on.
23      Q.     Weren't you asked to do the same
24 thing in the Duramed case and you suggested that

1  and were influenced.
2       Q.     Go back and look at what we marked
3  today as -- as Gibson Exhibit 4, if you would,
4  sir.
5       A.     Me?
6       Q.     Yes, sir.  You got your report as 1.
7  And there's your report there.
8       A.     Okay.
9       Q.     All right.  And on the second page
10 of this report, you state that you were asked to
11 prepare a report in order to provide an expert's
12 perspective on how restrictions of formulary
13 listings by major managed care organizations
14 affect the prescribing behavior of physicians.
15 "Specifically I will analyze the consequences of
16 Cenestin being excluded from substantially all
17 major managed care formularies from Cenestin's
18 market introduction in 1999 to the present."  Do
19 you see that?  Right at the top.
20      A.     Yes.  Okay.  Yes, I do see that.
21      Q.     All right.  And in your current
22 report, you state that you are now going to give
23 an expert opinion that extends -- this is on Page
24 6 of your current report.  In your current report

1  Mr. Susman would be better served by having Mr.
2  Bystrom play that role?
3            MR. COHEN:  Object to the form.
4       A.     I -- with -- on the Susman case, I
5  did recommend that the Susman firm bring in Mr.
6  Bystrom to comment on and report on the dispensing
7  side of the aisle and I kept the prescribing side.
8            *  *  *
9            (Whereupon, Gibson Exhibit 6 was
10      marked for identification.)
11           *  *  *
12 BY MR. DOBIE:
13      Q.     Let me show you what's been marked
14 as Bystrom Exhibit 6.  I'm sorry, Gibson Exhibit
15 6.  For the record, Exhibit 6 is a copy of the
16 Bystrom deposition that was taken on July 18th,
17 2002.
18           This is something that you reviewed
19 before your last deposition; correct?
20      A.     As I remember, I did read it.
21      Q.     All right.  And -- and if you turn
22 to Page 218 of that deposition.  It's towards the
23 back.
24      A.     Okay.

1    Q.    You were asked a series of
2    questions --
3    A.    I was?
4    Q.    Yes, sir.  I'm sorry.  Mr.
5    Bystrom --
6    A.    Bystrom.
7    Q.    -- was asked a series of questions
8    about his retention in this matter, and he was
9    asked, "Did you and Mr. Gibson discuss your
10   reports -- or Dr. Gibson discuss your reports with
11   each other before they were submitted?
12        *ANSWER:  We knew that we were both
13   working on reports and that his was focused on the
14   physician area and mine was focused on pharmacy
15   and PBM."
16        Next question:  "Did you have
17   conversations with Dr. Gibson about the substance
18   of your report?
19        *ANSWER:  No, not necessarily.
20        *QUESTION:  What sort of
21   conversations did you have with Dr. Gibson about
22   your report?
23        *ANSWER:  We talked about the fact
24   that originally he was the first person contacted

1    by Duramed through Susman to create a report that
2    was inclusive of pharmacy and PBM information; and
3    then he quickly realized that that's not where his
4    expertise was and recommended they contact me for
5    that.  So then I told him that I would be working
6    in that area, and those are the expert opinions
7    that were rendered based on the things in those
8    two weeks" and so on.
9        First let me ask you.  Is -- is Mr.
10   Bystrom correctly describing his conversation with
11   you back in this time period?
12   A.    He's pretty -- pretty accurate.
13   There were -- there -- there's some additions to
14   that that could be made.
15   Q.    Is it -- is it a true statement that
16   you said to him that your area of expertise was
17   not on the pharmacy and PBM side?
18   A.    At that time, my statement to him
19   was that I wanted him involved in the case to
20   buttress that.
21   Q.    Okay.
22   A.    So it could -- it comes out this
23   way.
24   Q.    All right.  I understand that you

1    asked him to do that.  My question is different.
2        Did you say to him that it was not
3    your area of expertise, that being pharmacy and
4    PBM information?
5    A.    Again, I was -- I was aware of
6    rebates and how they worked.  I did not feel that
7    my area of expertise was as deep as his at that
8    time and I felt it served the Susman firm better
9    if they brought him in.
10   Q.    And what do you mean by your area of
11   knowledge wasn't as deep as his?
12   A.    Well, Dale had started -- Mr.
13   Bystrom had started a PBM himself.  He started
14   Longs Drugstores PBM that ultimately became
15   RxAmerica.  So he had many years of experience in
16   the PBM industry, how -- how -- the minutiae of
17   how things worked, and he had years of experience
18   in the retail pharmacy.  So he had worked with the
19   information systems within the pharmacies and so
20   forth, which I had not done.
21   Q.    Given that, sir, why did you not
22   also recommend Mr. Bystrom as an expert in this
23   case?
24   A.    I didn't -- I didn't have a say as

1    to who would be the consultants or the experts on
2    this case, so I can only speculate on why Mr.
3    Bystrom was not asked.  My level of experience
4    within the PBM environment and how the pharmacies
5    actually work operationally changed considerably
6    from this time to the present.
7    Q.    All right.  What do you mean that
8    you didn't have a say?  Did you recommend to Mr.
9    Cohen or any of the other lawyers that they would
10   be better served to have Mr. Bystrom as an
11   additional expert in this case?
12   A.    I asked Mr. Cohen if he was going to
13   retain Mr. Bystrom and he said no.
14   Q.    Did he say why not?
15   A.    No.  He indicated that he wanted me
16   to cover these areas, and I left it at that.  And
17   I left it at that because I felt confident that I
18   could do this job for him.
19   Q.    We'll come back in a -- in a bit to
20   your additional expertise and experience, but I
21   want to go through some more questions as it
22   relates to your retention before we get back to
23   that.
24   A.    Are we done with this?

5/18/2004 Gibson, David

1    Q.    For the moment.  It will -- it will
2    be another -- you can put it in the stack there.
3            What materials have you reviewed to
4    prepare to testify and provide a report in this
5    case?
6    A.    Well, certainly everything that was
7    footnoted in my report was reviewed.  I believe
8    that Mr. Cohen delivered to you a list of articles
9    that -- or not articles, but discovered documents
10   that I had been given during the course of my
11   evaluation, and then my general ongoing reading in
12   both the lay and professional press.
13            * * *
14            (Whereupon, Gibson Exhibit 7 was
15        marked for identification.)
16            * * *
17   BY MR. DOBIE:
18    Q.    Okay.  For the record, Exhibit 7 is
19   a copy of the document that you were just
20   referring to, which is the e-mail from Mr. Cohen
21   that describes additional materials that you
22   reviewed.
23            And for the record, sir, are
24   these -- does this list that's included in Exhibit

1            In addition, it does not include any
2    of the documents that Dr. Gibson reviewed as
3    part of his charge in the Duramed case.
4    And, of course, all the documents he
5    reviewed in the Duramed case are also
6    documents that are part of the current case.
7    So he brought that knowledge with him into
8    the case.
9            So I apologize for interrupting
10   your -- your line of questioning, but I just
11   wanted to clarify that.
12        MR. DOBIE:  Okay.  That's -- that's
13   perfectly fair and actually helpful.
14        THE WITNESS:  Could I say just one
15   other thing too on that?
16   BY MR. DOBIE:
17    Q.    Yes.
18    A.    And that is after the Duramed case I
19   kept no documents.  So I didn't keep a box or
20   several boxes --
21   BY MR. DOBIE:
22    Q.    So you -- you destroyed all the
23   documents that you --
24    A.    I sent them back to Susman.

1    7, the third or fourth pages, together with the
2    documents that are cited in your report, together
3    with -- I think you said materials that were in
4    the lay or professional press constitute the
5    universe of information that you reviewed in
6    issuing your -- preparing your report?
7    A.    I would -- I would say so.  This --
8    these last two pages are a series of -- what's the
9    term that you have --
10    Q.    Bates numbers?
11    A.    Yes.  So I'm not sure that, you
12   know, for instance I saw WYE117064.  I probably
13   did.  But this looks about right.  I had several
14   boxes of discovered documents.
15    Q.    Okay.
16        MR. COHEN:  I'm sorry to interrupt
17   you, but just so the record is clear, and
18   since this is my report, Mrs. Ward asked --
19   Mrs. Ward asked me for this listing, and
20   because of time factors, it's not -- it's
21   not intended to be an all-inclusive list.
22   So, in other words, it may be duplicative of
23   what's cited and it may be on top of what's
24   cited.

1    Q.    Okay.  And so -- so you could --
2    whatever you could recall of the documents from
3    the Duramed case, I guess that would form in part
4    maybe some of your knowledge base that you're
5    telling us about here today and that's in your
6    report; correct?
7    A.    Yes.  I requested that the documents
8    cited in my report and many of the documents cited
9    in Dale -- Dale Bystrom's report be sent to me for
10   review.
11    Q.    Okay.  So -- so you received those
12   documents from counsel?
13    A.    I did.
14    Q.    All right.  And then -- and then how
15   did you go about selecting or deciding what else
16   to look at?
17    A.    I learned a great deal from the
18   first round, and what I learned was the way to
19   approach a complex subject like this is to start
20   with your outline.  So the first series of
21   exchange of documents between me and Mr. Cohen
22   dealt with creating the outline of what I was
23   going to write about.  So that went through
24   several iterations.  So I was focused on the

1  subject that I needed to cover.  For instance, I'm
2  not involved in the economics of the case.
3  There's another expert that will be dealing with
4  that.  Or the pricing per se of drugs.  So there
5  was a give-and-take between us on what the outline
6  would look like.
7      Once we got to a pretty complete
8  outline of what I was going to write about, then
9  I'd ask for his assistance in helping me find
10 documents that related to the issues I was going
11 to review.  So it was through that process that I
12 got my first pass at the documents that I would
13 review.
14      And then there was a -- there was a
15 document that came to light.  I don't recall
16 exactly how it came to light.  But it was the
17 contracting manual of Wyeth.  And that produced in
18 my mind a whole series of questions that I wanted
19 to get more detail on.  And so that -- that
20 produced an interest in documents for me.
21      So I think that -- that pretty well
22 explains how I wound up with the documents that I
23 did have and how I used them in writing my report.
24      Q.    Okay.  Can I -- can I just sum up

---

1  then and make sure I have it?
2      In essence, you -- you asked for and
3  received the documents that were cited in your
4  last report and in Mr. Bystrom's report?
5      A.    Right.  Some of them.  I didn't ask
6  for all of them, but I did select ones I wanted.
7      Q.    Okay.  Second, you -- you had
8  documents that were selected by Mr. Cohen as being
9  helpful to whatever you guys were thinking about
10 putting into the report based upon the outline?
11     A.    Correct.
12     Q.    Okay.  And then -- and then as you
13 mentioned before, there are documents that you may
14 have -- or articles that you might have seen in
15 the press?
16     A.    No.  The third thing I cited was the
17 issue of the -- Wyeth's contracting manual that
18 was in 1995.
19     Q.    Okay.  But that's -- I'd put that
20 within the group of documents that Mr. Cohen
21 brought to your attention.
22     A.    Oh.  I think that's how I -- I
23 wouldn't have known about it otherwise.
24     Q.    Okay.

---

1      A.    I think that he brought that to my
2  attention.  And then after reviewing that, I had a
3  lot of questions.
4      Q.    Okay.  So the -- so the -- again to
5  sum up, do I have it all then?  You've got --
6      A.    Yes, I think you've got --
7      Q.    -- the documents --
8      A.    I think you've got it all.
9      Q.    All right.  Just so the record is
10 clear.
11     We've got the documents that were
12 cited that you wanted to have additional copies
13 from either your last report or Mr. Bystrom's
14 report; the documents that were selected by Mr.
15 Cohen for you to review as part of the preparation
16 of the outline, which then makes its way into the
17 final report; and then last, documents that --
18 that you became interested in as a result of the
19 contract resource manual being brought to your
20 attention?
21     A.    I think that sums it up, yes.
22     Q.    All right.  And the specific
23 documents that you were interested in as a result
24 of your review of the contract resource manual

---

1  were what, sir?
2      A.    I was particularly interested in
3  how -- in examples of how the Wyeth personnel
4  included the verbiage from the contracting manual
5  in the actual consummated contracts on the market.
6      Q.    Sir, if you look back at Exhibit 7.
7      A.    Sorry.  I --
8      Q.    That's the e-mail from Mr. Cohen.
9      A.    Oh, okay.  Yes.  Okay.
10     Q.    Do you have that in front of you?
11     A.    I've got it here.
12     Q.    And if you look at the list of
13 documents, you don't mention Mr. Bystrom's report
14 as one of the things that you reviewed.  Why is
15 that?
16     MR. COHEN:  And again, Gordon, sorry
17     to interrupt, but Dr. Gibson didn't prepare
18     this.  I prepared this and that would be my
19     omission, not Dr. Gibson's.
20     MR. DOBIE:  All right.
21 BY MR. DOBIE:
22     Q.    So did you review this before
23 this -- this was sent to us?
24     A.    I -- these were inventories that

5/18/2004  Gibson, David
5/18/2004  Gibson, David

**Column 1 (page 113)**

1   were -- accompanied the times when he sent me

2   reports.  So no, I didn't actually see it before

3   it was sent off to you, but I recognize these as

4   the documents that accompanied the reports.

5        Q.    Okay.  So -- so the process was when

6   you got a -- you would get a series of documents

7   from Mr. Cohen.  Would you get a transmittal

8   letter that said enclosed is --

9        A.    Something like that, yes.

10       Q.    With the Bates numbers?

11       A.    Something like that or a covering

12  index of within this box you will find these

13  referenced document -- documents.

14       Q.    All right.  The -- and I see that

15  there is -- in your entire report, I didn't see

16  any documents that you cited that came from

17  Duramed.

18             Is there some reason why you didn't

19  cite any documents that came from Duramed?

20       A.    In -- in my report that I turned in?

21       Q.    Yes, sir.

22       A.    I can't think of a particular reason

23  why I didn't.

24       Q.    And the --

**Column 2 (page 115)**

1             MR. COHEN:  I understand.  I just

2        misunderstood how -- how you were stating

3        it.  I'm sorry.

4             MR. DOBIE:  All right.

5   BY MR. DOBIE:

6        Q.    And did you, sir, have the

7   opportunity to interview anybody from Duramed in

8   connection with the preparation of your report?

9        A.    No, I didn't.

10       Q.    Did you interview anybody from

11  Viking in connection with the preparation of your

12  report?

13       A.    No, I did not.

14       Q.    Did you review -- interview anybody

15  from Barr Labs in connection with the preparation

16  of your report?

17       A.    No.

18       Q.    Did you interview anybody from

19  Solvay in connection with the preparation of your

20  report?

21       A.    No.

22       Q.    Did you interview anybody from

23  Cardinal in connection with the preparation of

24  your report?

**Column 3 (page 114)**

1        A.    This report ran for almost a hundred

2   pages, so --

3        Q.    Right.  In the material that you

4   reviewed, I only see five pages that referenced

5   documents that came from Duramed.

6             Again, Mr. Cohen didn't send you

7   any -- any additional documents that came from

8   Duramed, to your recollection?

9        A.    Not to my recollection.

10            MR. COHEN:  I'm sorry, Gordon.  I'm

11       not sure that I understood what you just

12       said.

13            Did you just say that there were

14       five pages that referenced Duramed

15       documents?

16            MR. DOBIE:  Yes.

17            MR. COHEN:  Because there's only one

18       page that references any -- are you -- are

19       you saying that there's five Duramed cites?

20       Is that what you meant?

21            MR. DOBIE:  Yes.  If you look at --

22            MR. COHEN:  Okay.

23            MR. DOBIE:  You've got DUR35, DUR37,

24       again 36 --

**Column 4 (page 116)**

1        A.    No.

2        Q.    I assume you haven't spoken with

3   anybody at Wyeth in connection with the

4   preparation of your report?

5        A.    You can assume that, yes.

6        Q.    Did you speak with any witness in

7   this case that has knowledge of the situation with

8   Premarin and Duramed and the Cenestin product in

9   connection with the preparation of your report?

10       A.    Okay.  Now, you're asking did I

11  visit with any witness that was involved in the

12  prior suit, not this one that we're here on?

13       Q.    Yes, sir.

14       A.    Well, I visited -- visited many

15  times with Dale Bystrom.

16       Q.    Okay.  Anybody else?

17       A.    No.

18       Q.    Did you interview with any of the

19  witnesses in the J.B.D.L. case?

20       A.    No.

21       Q.    Have you had any discussions with --

22  with a particular plaintiff in this case, the

23  J.B.D.L. Pharmacy?

24       A.    No.

1    Q.    Have you had any discussions with
2  anybody from the Q Pharmacy?
3    A.    No.
4    Q.    Have you been retained by the
5  indirect purchasers class action as well?
6    A.    No.  I'm not sure what that one is.
7    Q.    All right.  So Mr. Cohen is the --
8  in his group, which is the direct purchasers, the
9  large wholesalers and retailers, they're the ones
10  that have retained you in connection with this
11  matter?
12    A.    Correct.
13          MR. COHEN:  And CVS and Rite Aid.
14          MR. DOBIE:  That was my next
15    question.
16  BY MR. DOBIE:
17    Q.    Have you -- have you been retained
18  by CVS and Rite Aid?
19    A.    It's understanding that I have been.
20    Q.    Okay.  When did that occur?
21    A.    I would have to defer on that.  I
22  don't know.  I've been working with Mr. Cohen, and
23  I understand that -- that Rite Aid and CVS is one
24  of the parties -- or is sharing the cost involved

1    A.    Around 2:00 in the afternoon.
2    Q.    What did you talk about in that
3  meeting?
4    A.    Mainly I went over our deposition --
5  my report with him.  I reviewed the components of
6  it.  We talked about what was likely to come up as
7  that document was reviewed today.  I think it was
8  just a matter of -- of my being able to really
9  focus on the document and go back to what the case
10  was all about so I understood exactly what I was
11  testifying -- how my testimony fit in here.
12    Q.    What did he say about how your
13  testimony would fit in here?
14    A.    He reiterated what my responsibility
15  was, my area of responsibility.  He indicated that
16  when I didn't know something, I should say I don't
17  know it.  He indicated that I didn't -- unless you
18  wanted to talk about it, that I really wasn't
19  responsible for discussing the broader economic
20  pictures or the -- how drugs got priced.
21          So it was more of a review of what I
22  was responsible for, what I wasn't responsible
23  for, and again he reiterated that I should try to
24  be brief in my answers, which I'm not sure I'm

1  in this case, but I -- until -- really until I
2  came for this -- this deposition, I was not fully
3  aware of that.
4    Q.    Had you met Mr. Einhorn before
5  today?
6    A.    No, I had not.
7    Q.    And have you ever had any discussion
8  with Mr. Einhorn or anybody else representing CVS
9  or Rite Aid before today?
10    A.    No.
11    Q.    How much did you -- did you come in
12  yesterday in connection with this -- with this
13  deposition?
14    A.    I came in on Sunday night.
15    Q.    Sunday night.  Did you meet with Mr.
16  Cohen?
17    A.    I did.
18    Q.    And when did you first meet with him
19  in connection with the preparation for the
20  deposition?
21    A.    I met with him yesterday morning at
22  9 o'clock.
23    Q.    And when did you finish your meeting
24  with Mr. Cohen?

1  doing very well with.
2    Q.    Is -- your report, you don't discuss
3  how -- how either Premarin or Cenestin were
4  priced; correct?
5    A.    I know generally how they were --
6  and what they -- what they were on the market for,
7  but I have no knowledge of what was -- what went
8  on behind the scenes as to how the companies
9  priced them.
10    Q.    You haven't reached any conclusions
11  or opinions as it relates to what impact any of
12  the activities or things that you talk about in
13  this report would have on the price of either
14  Premarin or Cenestin, have you?
15    A.    I do have opinion.
16    Q.    But it's not in your report, is it?
17    A.    No.
18    Q.    Right.  And -- and do you intend to
19  offer that opinion at trial if you haven't put it
20  in your report?
21    A.    I suppose if you ask.
22    Q.    Did you -- is there some reason why
23  you didn't put it in your report?
24    A.    Well, again, it was -- I think there

1    are people that can speak to that with much more
2    eloquence and experience than I have.
3         Q.     All right.  You -- you also mention
4    Mr. Cohen said there's certain areas that might
5    get focused on today.
6              What did he say in that regard?
7         A.     I can't recall.  I think -- I think
8    we discussed how the review of the contracts that
9    I included would be a matter of discussion.  I
10   think that there was a -- there was a give-and-
11   take on the documentation relating to time flow
12   studies for physicians.  I believe that we --
13   let's see.
14             I think we reviewed in general the
15   evolution of managed care, which was covered in
16   the report.  We talked again a bit about drug
17   formularies and copayment structures and so forth.
18             In general, I think we went through
19   the table of contents and looked at -- looked at
20   the report and just kind of generally chit-chatted
21   back and forth about what I've written and that --
22   you know, that these were going to be issues for
23   questions.
24        Q.     Who wrote your expert report, sir?

1    into two portions.  And what you saw as the
2    finished product was what Dale had and what you
3    had as the finished product was mine.  However, a
4    lot of the actual text in Dale's was written by me
5    and a lot of the text in mine was written by Dale.
6         Q.     And let me ask you this, sir:  You
7    mentioned that the -- where you had taken from Mr.
8    Bystrom, you had footnoted that in -- in your
9    expert report in this case.
10             If you turn to Exhibit 1 in this
11   case just as an example, your 12th page of your
12   report, the page you have right in front of you --
13        A.     Yes.  What page number?
14        Q.     Page 12.  I think you had it right
15   in front of you there.  Okay.
16             Didn't you essentially just simply
17   cut and paste this from Mr. Bystrom's report and
18   now put it into yours?
19        A.     I cut and pasted this from Mr.
20   Schondelmeyer's slide preparation.
21        Q.     You're talking about the chart?
22        A.     Yes.
23        Q.     Okay.  So the chart was cut and
24   pasted from Schondelmeyer.  How about the text

1         A.     I did.
2         Q.     Every word?
3         A.     I pulled some of the verbiage from
4    Dale Bystrom's report and footnoted it
5    accordingly.
6              And I would like to make a bit of a
7    comment about that.
8              Dale Bystrom and I worked throughout
9    most of the drafts of the Duramed documents as a
10   team.  We were in the same room, particularly down
11   in Houston, at Susman's law firm, where we had
12   access to all of the documents.  And we would --
13   we would routinely trade text.  We would -- we
14   would routinely trade portions of the text back
15   and forth between -- between ourselves.  It was
16   fairly late in the preparation of the final drafts
17   that we actually demarcated where my report would
18   end and his would begin.
19        Q.     Sir, I'm a little confused.  Did --
20   did you work on part of Mr. Bystrom's report in
21   the last instance?  Is that what you're saying?
22        A.     What I'm saying is that there was a
23   report that was generated by both of us that
24   towards the end of the editing process was split

1    that's up above and below it; that's all taken
2    from Mr. Bystrom, isn't it?
3         A.     It could have been.  I don't -- I
4    don't recall if it was or not, but it could have
5    been.
6         Q.     And you haven't attributed any of
7    this to Mr. Bystrom, have you?
8         A.     I attribute -- there's one --
9    there's one reference -- particularly when we get
10   back into the area of NDC blocks and soft edits
11   and hard edits, I put a reference to that.  See,
12   that would have been --
13        Q.     That's on Page 44.
14        A.     Is that where it is?  So you see the
15   footnote there.
16             But I didn't -- I was asking if he'd
17   seen Footnote 51, which he had.  But I didn't -- I
18   didn't footnote every section of the text that I
19   used from his report.
20        Q.     Actually, what the footnote says,
21   sir, is that "Many of the definitions used in this
22   section," and 51 refers -- there's a section here
23   that's called "Retail Vendors" -- "were developed
24   in collaboration with Dale Bystrom when we worked

1    together on the Duramed" -- and has the cite case.
2    You see that?
3         A.    I do.
4         Q.    Where in this report do you say that
5    you're actually quoting or -- or basically taking
6    wholesale Mr. Bystrom's entire discussion on a
7    particular area and putting it into your report?
8              MR. COHEN:  Object to the form.
9         A.    I don't have any other footnotes
10   from Mr. Bystrom than the one that's referenced.
11   BY MR. DOBIE:
12        Q.    Why do you say that it -- it says,
13   "Many of the definitions used in this section were
14   developed in collaboration with Dale Bystrom."
15   Why didn't you say most of the section relating to
16   the pharmaceutical distribution system, pharmacy
17   benefit managers, et cetera, all came from Dale
18   Bystrom's report and I simply put it into my
19   report?
20             MR. COHEN:  Object to the form.
21        A.    I didn't -- it didn't occur to me to
22   do it.  I could have done that.  However, the way
23   you describe it wouldn't have been the way I'd
24   have footnoted it.  I could have put in that

1    during the prescribing process.
2    BY MR. DOBIE:
3         Q.    Why did you say on Page 44, 51 -- on
4    Foot -- Footnote 51 that it's just many of the
5    definitions used were developed in collaboration
6    with Dale Bystrom?
7              MR. COHEN:  Object to --
8    BY MR. DOBIE:
9         Q.    Why did you limit it to "definitions
10   used"?
11             MR. COHEN:  Object to the form.
12   Asked and answered.
13             THE WITNESS:  Say again.
14             MR. COHEN:  You can go ahead.
15        A.    The business that Dale Bystrom
16   brought to his report that were really unique to
17   his report and I had little collaboration in were
18   these definitions.  You know, the business about
19   the NDC, the hard edits, the soft edits.  Those
20   were his -- those were areas that he had a great
21   deal of experience in.
22             MR. DOBIE:  Why don't we go ahead
23        and mark Dale Bystrom's report as Exhibit 8.
24                    * * *

1    segments of this report were in Dale Bystrom's
2    final report and that many or most of those areas
3    were areas that I coworked with him on when he was
4    developing his report.
5    BY MR. DOBIE:
6         Q.    Okay.
7         A.    So it didn't seem to me that it was
8    the same thing as citing a document that I was
9    merely reading and didn't have any involvement in.
10        Q.    Well, which of the -- which of the
11   sections that are in here that didn't come from
12   Mr. Bystrom did Mr. Bystrom also work on?
13        A.    Could you repeat that?
14             MR. COHEN:  Objection.
15   BY MR. DOBIE:
16        Q.    You said that both of you worked
17   collaboratively on one document.
18             Okay.  So my question for you is,
19   are there sections in -- in your report that Mr.
20   Bystrom also worked on?
21             MR. COHEN:  Object to the form.
22        A.    Yes, there were.  And he was able to
23   interface with my report on the dispensing
24   pharmacy interrelationship with the physician

1         (Whereupon, Gibson Exhibit 8 was
2         marked for identification.)
3                    * * *
4    BY MR. DOBIE:
5         Q.    I hand you for the record what was
6    marked as Exhibit 8.  Okay.  And if you -- first,
7    is this the Dale Bystrom report that you're
8    referring to?
9         A.    I assume that this is his final
10   report in the -- in the Duramed case.
11        Q.    And is it your testimony that you
12   wrote part of this report, sir?
13        A.    It is my -- my statement that I
14   collaborated on big portions of this report.
15        Q.    All right.  And if Mr. Bystrom --
16   Mr. Bystrom testified that he wrote the entire
17   report himself, would that be a lie?
18        A.    No.  He did write the report, but he
19   didn't say that he didn't have any input from
20   anybody else.
21        Q.    Okay.  But I'm talking about the
22   actual verbiage, the words that are here in this
23   report.  Is it accurate to say that Mr. Bystrom
24   wrote these words or did you write the words?

1    MR. COHEN:  Objection.  Asked and
2    answered.
3    A.    Every -- every portion of the final
4    report he wrote.  That's what he turned in.  Every
5    portion of what I turned in I wrote.
6    BY MR. DOBIE:
7    Q.    Okay.  So --
8    A.    And if I could just say, in this
9    report, everything that I wrote I wrote.  Now, I
10   might have left in it the verbiage from Mr.
11   Bystrom's report, but it would only have survived
12   my editing.
13   Q.    All right.  Well, let's look, for
14   example, at Page 12 of your report.
15   A.    Of --
16   Q.    Your report, Exhibit 1.  You keep
17   that handy.  Look at Page 12 of your report.
18   A.    My report.  Okay.
19   Q.    Keep Mr. Bystrom's report handy as
20   well.
21         All right.  Now, in your report, you
22   say -- at the top, you've got the pharmaceutical
23   distribution system; correct?
24   A.    Correct.

1    Mr. Schondelmeyer, that's also from Mr. Bystrom,
2    the next two paragraphs as well; correct?
3    A.    Correct.
4    MR. COHEN:  Objection.
5    BY MR. DOBIE:
6    Q.    And again no quotation to Mr. -- to
7    Mr. Bystrom or citation to him; correct?
8    A.    Correct.
9    Q.    And if we go to the bottom of the
10   page under the pharmaceutical payment system,
11   where it says "Payment Cycle for Pharmaceuticals,"
12   that too was lifted from Mr. Bystrom; correct?
13   A.    Portion of it was.  He didn't have
14   the graphic --
15   Q.    The graph you took from Mr.
16   Schondelmeyer; correct?
17   A.    Correct.
18   Q.    Right.  And then if we go on to
19   the -- to the next page, 13, that all comes from
20   Mr. Bystrom as well, doesn't it?
21   A.    Could you -- would you like me to --
22   Q.    Well, let's go -- go to the first
23   paragraph here, Page 13.  "Pharmacy patients can
24   be divided into two categories" and so on.  That's

1    Q.    All right.  And then if you turn to
2    Mr. Bystrom's report, at Page 5, he also has -- at
3    the top, it says the pharmaceutical distribution
4    system; right?
5    A.    Right.
6    Q.    And then you've added -- in your
7    report, you've got a paren that says "wholesalers,
8    mail order, and retail sales."  You've added a
9    first sentence that you wrote and then the rest of
10   the paragraph you just lifted directly from the --
11   Bystrom's report, which you said he would have
12   wrote the language that appeared in his final
13   report; correct?
14   MR. COHEN:  Object to the form.
15   A.    Correct.
16   BY MR. DOBIE:
17   Q.    And you didn't put a citation here
18   for Mr. Bystrom, did you?
19   A.    No.
20   Q.    And you don't put it in quotes, do
21   you?
22   A.    No.
23   Q.    And if you go to the paragraph right
24   behind -- right below the graph that you took from

1    from Mr. Bystrom on Page -- Page 5?  It's the
2    second paragraph.
3    A.    Page 5, the second paragraph.
4    Q.    So if you're looking at Mr.
5    Bystrom's report on Page 5, under the payment
6    cycle for pharmaceuticals, the second paragraph
7    where it says, "Pharmacy patients can be divded
8    into two categories"?
9    A.    Yes.
10   Q.    Okay.  So you took that paragraph
11   from Mr. Bystrom's report?
12   MR. COHEN:  Object to the form.
13   A.    Correct.
14   BY MR. DOBIE:
15   Q.    Right.  And then the next paragraph
16   where it says, "The payment cycle for
17   pharmaceuticals begins at the pharmacy with
18   patient and/or patient health plan," that too came
19   from Mr. Bystrom's report; correct?
20   A.    Correct.
21   Q.    And if we go through the pages
22   again, there's -- there's page after page that's
23   just lifted directly from Mr. Bystrom's report --
24   MR. COHEN:  Object --

BY MR. DOBIE:

Q.    -- without any quotation or
attribution to him; correct?

MR. COHEN:  Object to the form.

A.    Correct.

THE VIDEOGRAPHER:  Stand by.

(Pause.)

THE VIDEOGRAPHER:  Proceed.

BY MR. DOBIE:

Q.    Is there any other work that you
believe is necessary for you to do, sir, to form
an opinion on the issues that you've been asked to
render an opinion on?

A.    Is there any --

Q.    Is there other work that you need to
do in order to form an opinion on any of the
issues on which you've been asked to render an
opinion?

MR. COHEN:  Object to the form.

A.    I believe that I have completed the
work necessary to -- back up the report that I
turned in.

BY MR. DOBIE:

Q.    All right.  Is there any -- does the

---

report represent a complete statement and the
basis and the reasons for your opinion?

A.    Yes.

Q.    And is there any other work that you
feel you need to do in order to feel confident
about the opinions and conclusions that are set
forth in your report?

A.    No.

MR. DOBIE:  It's 1:15.  You guys
want to take a -- try to do a quick lunch
today?

MR. COHEN:  Yes.

THE VIDEOGRAPHER:  We're going off
the record.  The time is 1:20 p.m.

* * *

(Whereupon, a luncheon recess was
taken.)

* * *

---

* * *

AFTERNOON SESSION

* * *

(Whereupon, Gibson Exhibit 9 was
marked for identification.)

* * *

THE VIDEOGRAPHER:  We're back on the
record.  The time is 2:03 p.m.

BY MR. DOBIE:

Q.    Dr. Gibson, in -- in preparing your
report, you mentioned the outline process that you
had gone through towards working on the final.

Do you have copies of any of those
outlines?

MR. COHEN:  Could I just interpose,
Gordon, I think the agreement in the case is
that we're not going to be exploring drafts
or any of that type of thing.

MR. DOBIE:  Let's -- let's go off
the record just for a second.

THE VIDEOGRAPHER:  We're going off
the record.  The time is 2:03 p.m.

* * *

(Whereupon, a discussion was held

---

off the record.)

* * *

THE VIDEOGRAPHER:  We're back on the
record.  2:05 p.m.

BY MR. DOBIE:

Q.    Dr. Gibson, I'm not sure whether you
have drafts or not.  What -- what counsel is
telling me is that there's apparently an agreement
in place that the parties aren't going to take or
try to get copies of each other's drafts and
things like that.

I assume that this is -- though, is
something that you did prepare on your computer;
correct?

A.    Correct.

Q.    Okay.  And worked out over the
course of some time period?

A.    Correct.

Q.    And in addition to the things that
we covered before we broke for lunch, let me show
you the next document that I marked in this
series.  This is Gibson Exhibit 9, and for the
record, have you ever seen this before?

A.    Was this the -- was this the

1    reference document that I gave you in the -- as

2    footnoted in my report?

3        Q.    I believe that you did cite this in

4    your report, yes, sir.

5        A.    Then I saw this.

6        Q.    Okay.  You reviewed this?

7        A.    The main reason I went out and

8    sought this information was to be able to identify

9    AIS.

10       Q.    And what is AIS, for the record?

11       A.    It's primarily a publisher of --

12   it's a company that -- that writes articles and

13   publishes them in business-like periodicals.  And,

14   for instance, they issued here Managed Care Weekly

15   and -- oh, and Managed Care Weekly.

16       Q.    And if you turn to your report,

17   which is Exhibit 1, and go to Page 16.

18       A.    Okay.

19       Q.    You actually have simply just lifted

20   wholesale from this document and put it into your

21   report; correct?

22            MR. COHEN:  Object to the form.

23       A.    The -- let's see.  We're -- we're on

24   Page 16?

1    BY MR. DOBIE:

2        Q.    Yes.  So if you start at the bottom

3    under "Effect on Employers."

4        A.    I see.  Okay.

5        Q.    Starting with the second sentence,

6    "As companies put the finishing touches on 2004

7    employer benefit design changes," those two

8    paragraphs are set forth in your expert report on

9    the bottom of Page 16 running over to 17; correct?

10       A.    Right.  They were getting back to

11   the article on managing direct costs in Managed

12   Care Weekly.

13       Q.    Okay.  And again, why did you not --

14   why didn't you put quotations that you had

15   actually just quoted this directly from -- from

16   the managed drug cost article here on pharmacy

17   benefit management?

18       A.    I thought my footnoting was

19   adequate.

20       Q.    Okay.  Is it -- your normal practice

21   is if --

22       A.    Yes.

23       Q.    -- something's written in the New

24   England Journal of Medicine that you -- if you

1    were going to just quote articles, that you would

2    attribute the language to the actual author of the

3    article?

4            MR. COHEN:  Objection.

5            Argumentative.

6        A.    Not necessarily -- I would not

7    necessarily quote the exact -- if I -- if I put a

8    quote in, it's -- if I put a footnote in, it's

9    where I'm getting the material, but I don't

10   necessarily always put quotations around it.

11   BY MR. DOBIE:

12       Q.    You don't?

13       A.    No.

14       Q.    All right.  And so throughout this

15   report, do you know how much of this report

16   actually has your language and how much of it has

17   language that came from another source?

18            MR. COHEN:  Object to the form.

19       A.    I'd say most of it is my own

20   writing.  I have used sources similar to this and

21   what we discussed earlier.  Most of my opinion or

22   all of my opinion is my own writing.

23   BY MR. DOBIE:

24       Q.    Do you think that as much as 50

1    percent of your report was simply lifted from

2    other sources and then moved into your report?

3            MR. COHEN:  Object to the form.

4        A.    I don't -- I'm sorry.  When I --

5    when I used other material, I usually footnoted

6    it.  This article particularly dealing with

7    factual material is heavily footnoted.  Whether I

8    pulled the material and paraphrased it or used

9    directly out of the article, I'm -- I'm not

10   prepared to say what percentage.

11   BY MR. DOBIE:

12       Q.    Okay.  Well, you're the one who

13   prepared your report.  Do you remember what your

14   process was for doing it?

15       A.    I -- I -- if the material agreed

16   with what I wanted to say, I might use that and I

17   generally footnote it.

18       Q.    Okay.  Again without -- without --

19       A.    Without quotations.

20       Q.    Without quotation marks.  So, for

21   example, the next two paragraphs of your report as

22   well as on Page 17, "The most common plan design

23   changes for 2004," that's -- again, if you look at

24   the second page of Exhibit 9, that's the same

5/18/2004  Gibson, David

**Page 141**

1  language that's in your report; correct?

2     A.     Which is what I wanted to say.

3     Q.     And if you go down to the -- let's

4  see, two more paragraphs in the article where it

5  says, "Employers generally are more aggressive" --

6     A.     Uh-huh.

7     Q.     -- than are health insurers in

8  pushing" -- right.  There what you've done is

9  you've edited out the fact that that was actually

10  a quote from AdvancePCS's CEO, David Halbert;

11  correct?

12     A.     Yes.

13     Q.     All right.  So this is a quote from

14  the chief executive officer of AdvancePCS and

15  you've removed that and then just put that in

16  your -- in your report; correct?

17     A.     Correct.

18     Q.     All right.  And then the next

19  paragraph that starts, "Employers are now" --

20  "generally are more aggressive," that's again word

21  for word taken from this article with the

22  exception that you removed the fact that that

23  again came from Mr. Halbert, the chief executive

24  officer of AdvancePCS; correct?

4/1/2005 2:24 PM                                    141

5/18/2004  Gibson, David

**Page 142**

1     A.     Correct.

2            MR. COHEN:  Object to the form.

3  BY MR. DOBIE:

4     Q.     Now, when you remove or use language

5  that's like this, what effort did you make, sir,

6  to check the information that's contained in -- in

7  the article?

8            MR. COHEN:  You're referring to

9       Exhibit 9?

10            MR. DOBIE:  Yes, sir.

11  BY MR. DOBIE:

12     Q.     So the article says, for example,

13  "As companies put their" -- "the finishing touches

14  on 2004 employee benefit design changes, they are

15  stepping up adoption of time-tested approaches to

16  slow spending on prescription drugs - and are

17  evaluating a few new strategies."

18            What -- what did you do to confirm

19  the accuracy of the statement that's in this --

20  this article that you've quoted from?

21     A.     That's -- that -- any time I quoted

22  something like that or use material from something

23  like that, if it -- if it was consistent with my

24  experience in operational environment within a

4/1/2005 2:24 PM                                    142

5/18/2004  Gibson, David

**Page 143**

1  PBM, I didn't go further.  And this is completely

2  consistent with what I hear on a daily basis

3  within PCN environment.

4            Likewise, I could add just one other

5  piece.  It's very consistent with information I

6  get from working with the consultants in the

7  marketplace and with the ERISA trust and

8  Taft-Hartley trust that we're working with

9  Illumination.

10     Q.     Okay.  But go to the -- go to the

11  next paragraph there.  It says, "Techniques like

12  mandatory mail order fulfillment requirements and

13  a four-tier pharmacy design have been around for a

14  few years but used by a minority of payers."  Do

15  you see that?

16     A.     I do.

17     Q.     Okay.  How would you know, sir,

18  whether it was used by a minority or a majority of

19  payers other than from taking it from this

20  article?

21     A.     If you'll go ahead and look at the

22  documentation in the balance of the report, you'll

23  see the actual percentage numbers that relate to

24  tiers and copayments drawn from authoritative

4/1/2005 2:24 PM                                    143

5/18/2004  Gibson, David

**Page 144**

1  industry sources.

2     Q.     Okay.  But those -- again, those

3  are -- those are other industry sources that you have

4  taken from other industry sources and just put

5  into your report; correct?

6     A.     I used other industry sources in my

7  report to buttress issues of fact.

8     Q.     Okay.  But, I mean, just an example,

9  if you look at your report and you go to -- let's

10  just -- let's just use one as an example.  Page --

11  Page 13 we were looking at before, the chart

12  that's there.

13     A.     Uh-huh.

14     Q.     Okay.  You as an expert, sir, have

15  put into your report -- you've got the source of

16  payments for prescription drugs 1999.  This is --

17  this is something that you have taken from another

18  study and again placed it into your report;

19  correct?

20     A.     Correct.

21     Q.     All right.  But you don't know, for

22  example, whether in 1999 28 percent of

23  prescription drugs were purchased through chain

24  pharmacies or 6.8 percent through mass merchandise

4/1/2005 2:24 PM                                    144

1   pharmacies or so on.  You haven't done any

2   investigation into the accuracy of any of the

3   numbers that are contained in this chart; correct?

4       A.    What I -- what I -- what I know is

5   that the chart in general is consistent with my

6   understanding of how the market structures,

7   functions, and I pulled the chart from an

8   authoritative source.

9       Q.    Okay.  But to answer my question,

10  you don't know whether or not any of the numbers

11  that are in this chart are accurate; correct?

12          MR. COHEN:  Objection.  Asked and

13      answered.

14      A.    I did not verify back to original

15  research any of the numbers on the chart.

16  BY MR. DOBIE:

17      Q.    All right.  And you've never --

18  other than as an expert in this case, you've never

19  had a reason in your experience, sir, to prepare

20  or put together any chart like this yourself, have

21  you, breaking down the amount of -- whether

22  between private insurance, public insurance,

23  pharmacy benefit managers on a nationwide basis,

24  how payment for prescription drugs works across

---

1   published information roughly what their

2   percentage of the market they represent.  So I

3   know Bergen, for instance, is the wholesaler

4   that -- that works with most of them and I've have

5   had many conversations with Bergen as to what

6   percentage of the market the independent

7   pharmacies are.

8          So it's not -- the point I'm making

9   is I have verified everything in this report from

10  various sources just by the fact that I'm involved

11  in the market on a daily basis.

12      Q.    Has anyone ever hired you, sir, to

13  examine the -- to prepare any analysis that's like

14  on Page -- Page 13 of your report, the source of

15  payment for prescription drugs, to do that type of

16  an analysis?

17          We've gone through all your jobs and

18  we can go back to them.  I got all night.

19      A.    The closest I would get to -- to an

20  affirmative on that would be that I have worked

21  within PCN and the contracting officers for their

22  network.  It has been within that context that

23  I've gotten an understanding of what these

24  independent pharmacies are like, how many of them

---

1   the country?

2       A.    No, that's not correct.  I -- when

3   I'm working with segments of the market, I have to

4   understand their footprint in the industry.  So

5   that when I'm dealing with ERISA trusts or a more

6   recent example is with the independent pharmacists

7   in southern California, I get a feel in that

8   engagement as to how big a footprint in the

9   industry I'm dealing with.  And these numbers are

10  quite consistent with all of that background.

11      Q.    All right.  Take -- take the example

12  you just gave.  Pharmacists that want to dispense

13  a pharmaceutical product rather than having

14  doctors do that in southern California.  Okay.

15  How does your background in doing that give you a

16  foundation to know that the source of payment for

17  prescription drugs in 1999 came 64 percent from

18  private insurance, 19.7 percent from public

19  insurance, and so on, all the numbers that -- that

20  are in here?

21      A.    I know -- I know from the fact that

22  the independent pharmacists are my clients.  I

23  know during my conversations with them where their

24  payment sources generally come from.  I know from

---

1   they -- how -- how populous they are within the

2   networks.  And I've got a feel for where they get

3   their product and where they get paid.

4       Q.    Okay.  I understand you have a

5   general sense, okay, as somebody who's been in the

6   industry.  All right.  But as -- I mean, certainly

7   there are -- there are people, for example, the

8   folks that prepared this chart that you've now put

9   in your report, that actually have done studies

10  like this and have an understanding as to the

11  accuracy of the numbers that are in that chart.

12          And my point is, you might have a

13  general feel that yes, money comes from private

14  insurance, public insurance, and then goes down to

15  either retail pharmacies or institutional

16  pharmacies and on its way down to corner

17  drugstores and hospitals and stuff, but can you

18  attest under oath in front of a jury as to the

19  accuracy of the information that's here?

20          MR. COHEN:  Objection.

21      Argumentative.  Asked and answered.

22      A.    I can attest to the fact that I

23  pulled the data from an authoritative source.

24  BY MR. DOBIE:

1    Q.    Okay.  And what's the authoritative
2    source?
3    A.    Mr. Schondelmeyer I believe is the
4    authoritative source on this one.
5    Q.    Okay.  And --
6    A.    This was -- this was a slide that he
7    used in a presentation to the World Bank.
8    Q.    And where did you get it?  Off the
9    Web?
10   A.    I either got it off the Web or out
11   of an article that he had written earlier.
12   Q.    And do you know what Mr.
13   Schondelmeyer did to determine the accuracy of the
14   information that's contained here?
15   A.    I looked at his material and the
16   sources that he used, and in general he's pulling
17   data from published material that he's used
18   before.
19   Q.    Okay.  Have you had discussions with
20   Mr. Schondelmeyer about this data?
21   A.    No.
22   Q.    All right.  In the preparation
23   for -- for the other charts that are in your
24   report, for example, on Page 12, that also came

---

1    One is that you have a detailed
2    knowledge of -- and background on every issue that
3    you -- or every detail that you put in the report.
4    For instance, the slides that you've referenced
5    here in this last set of questions, knowing that a
6    given percentage of the distribution of product
7    goes to a given section would be a very few people
8    in the country that would actually know that.  You
9    would generally rely upon referenced authoritative
10   sources.  Likewise, there are other areas within
11   the report, for instance, dealing with rebates,
12   you could argue that the advantages to have
13   actually negotiated a rebate to be able to render
14   an authoritative opinion on rebate contracts.
15   There's a second way, however, to
16   look at all of this, which is where I come from on
17   preparing this report.  My background gives me a
18   broad overview of how the health care system
19   works.  I -- on creating the report as it related
20   to background information and data, I would pull
21   information that was consistent with my broad
22   experience in the industry, and that's how I would
23   include these items.
24   BY MR. DOBIE:

---

1    from --
2    A.    Same source.
3    Q.    -- from -- it says "PRIME Institute,
4    University of Minnesota."
5    A.    That's Mr. Schondelmeyer's
6    institute.
7    Q.    Okay.  And again, I assume you
8    haven't discussed it with Mr. Schondelmeyer?
9    A.    No.
10   Q.    And you haven't done anything to
11   confirm the accuracy of the numbers that are
12   contained in this chart?
13   A.    Correct.
14   Q.    Just a general matter, I just want
15   to understand how -- when you're putting your
16   expert report together and you're going around on
17   the Web finding things that you think are
18   supportive of your experience and then putting
19   them into your report, what was the -- what was
20   the standard that you applied in determining
21   whether or not you'd include it or not?
22   MR. COHEN:  Object to the form.
23   A.    There are two ways to look at
24   generating a report like this in my mind.

---

1    Q.    Okay.  So let me -- let's -- let's
2    just use another example.
3    MR. COHEN:  I'm sorry.  Were you
4    finished with your -- your answer?
5    A.    I was just going to say that I come
6    at this from the perspective of understanding the
7    mosaic, not the -- not the placement of one -- one
8    of the tiles within a mosaic.  And I did not add
9    anything to my mosaic that I was not comfortable
10   with and was not consistent with my overview of
11   how the industry works.
12   * * *
13   (Whereupon, Gibson Exhibit 10 was
14       marked for identification.)
15   * * *
16   BY MR. DOBIE:
17   Q.    Okay.  Let's look at Exhibit 10 for
18   a moment.  And for the record, Exhibit 10 is what,
19   sir?
20   A.    It is pulled from the Web from a
21   source that is entitled "HealthLeaders."
22   Q.    Okay.
23   A.    Information to lead.
24   Q.    And what is HealthLeaders?

1     A.    I believe HealthLeader is a -- I
2 believe that they are a publication.  I'm not
3 certain of that.
4     Q.    Have you ever used HealthLeaders
5 before for anything?
6     A.    I'm certain I've run across them in
7 general reading, but no.
8     Q.    Do you know Mr. Dickman, who is the
9 author of the article?
10    A.    I know that the exhibit here says
11 "By Tim Dickman."
12    Q.    Do you know Mr. Dickman?
13    A.    No.
14    Q.    Do you know whether or not he's an
15 authoritative source for the information that's
16 contained in the article?
17    A.    I -- no, I don't know much about Mr.
18 Dickman.
19    Q.    Do you consider HealthLeaders an
20 authoritative source for the information?
21    A.    It is -- I consider it to be a --in
22 the general category of trade journals.
23    Q.    All right.  And so does that mean
24 it's authoritative in your view?

1     Q.    Exhibit 10, if we could turn to
2 that.
3     A.    I'm sorry.  Can I just tell you?
4     Q.    Sure.
5     A.    It was on Page 37 and it was the --
6 AIS was the source for the slide dealing with
7 tiered copayment structures.
8     Q.    Okay.
9     A.    And as an example, that tiered
10 copayment structure looks about right.
11    Q.    For what time period, sir?
12    A.    This was back in the early 2000s.
13 This I think was referenced at 2002.
14    Q.    All right.  And when you say it
15 looks about right, what about it looks right to
16 you, sir?
17    A.    The definition of how the -- what --
18 what it says on the slide as far as your tiered
19 copayment, and I don't believe this particular
20 copy that I have has all of the information on it.
21 There may have been information above the columns.
22 But you have -- you have a general definition of
23 what the copayment is for a brand versus a
24 generic.

1     A.    I think it's -- I think it's a
2 reliable source of information.
3     Q.    Have you ever heard of it before you
4 did your report?
5     A.    I don't recall.  I think I have.
6     Q.    And what about the AIS Pharmacy
7 Benefit Group in this article that we marked
8 previously as Exhibit 9; is that an authoritative
9 source of information?
10    A.    That was a source in a source that
11 was authoritative.
12    Q.    What's the source within the source?
13    A.    If you'll pull --
14    Q.    It's right here.
15    A.    No.  But if you will pull the -- I
16 will have to go through my report to get it for
17 you, but one of the slides that I included
18 contained AIS as a source.
19    Q.    Okay.  And in going back to the
20 HealthLeaders article --
21    A.    Do you want to stay on this point or
22 not?
23    Q.    I heard your answer.
24    A.    Okay.

1           And then on the first tier and on
2 the second tier, it goes on to 15-20 for the first
3 month's supply and brand name drug with no generic
4 equivalent, and it generally outlines what the
5 tiered structure would look like, and that's
6 certainly consistent with my experience.
7     Q.    All right.  And the years that AIS
8 was looking at in connection with the preparation
9 of this chart, do you know if it's 2001, 2002, or
10 2000?
11    A.    I don't know, but I don't think it
12 makes much difference.
13    Q.    All right.  Okay.  And so when
14 you're saying that this is consistent with your
15 experience, do you know whether or not, just for
16 example, a third-tier copay in 2002 was on average
17 between $25 to $30?
18    A.    I think that's consistent with my
19 understanding.  I have more authoritative sources
20 quoted in the -- in the text.
21    Q.    Do you know in 2000 whether the
22 third-tier copays were between 25 and 30?
23    A.    I would refer you to -- on Page 36.
24 This is data from 1999 and this is IMS, which is

1 probably the most authoritative source.

2      Q.      Okay.  And what --

3      A.      And then just below that average

4 copayments, which is what you're asking for, in

5 the year 2002, and I use the reference Scott

6 Levin, which is pulled directly from Wyeth's

7 documents.

8      Q.      All right.  So in 2002, for example,

9 the Wyeth document says it's $34, is the average

10 co -- copayment.  The document that you have on

11 the next page of your report says it's 25 to 30

12 dollars.

13              What -- what is correct, or don't

14 you know?

15      A.      I don't know for sure.

16      Q.      All right.

17      A.      And I don't think again it makes a

18 lot of difference.

19      Q.      But at the end of the day, what you

20 did in preparing in your report, sir, is you just

21 took information from -- from other sources and

22 put it in your report?

23      A.      Yes.  I did not go out to the market

24 and do a market research study on what the

1 copayment values were by year to put in my report.

2      Q.      And, in fact -- let's go back to

3 Exhibit 10.  What you did do in your report is --

4 this is another -- it's right next to you.  This

5 is another example where you have simply taken

6 information from another author, put it in your

7 report without quotations, and then referenced the

8 source generally after the quotation; correct?

9      A.      I did not -- I did not put

10 quotations.  I did reference the article.

11      Q.      All right.

12      A.      And I did not put in material that I

13 did not find consistent with my experience.

14      Q.      In the -- on Page 23 of your report,

15 in the first paragraph on that page where it says,

16 "Critics charge, not altogether unfairly, that the

17 current rebate structure" -- do you see that?

18      A.      I do.

19      Q.      That was just lifted from the

20 HealthLeaders article word for word, wasn't it?

21      A.      It could be.  Do you -- do you have

22 the point on the HealthLeaders article where it

23 came from?

24      Q.      Well, you wrote your report, sir.

1 Do you remember where you got it?

2      A.      Well, give me a minute and I'll look

3 over the paper.

4      Q.      Look in the -- under "Disclosure of

5 Rebates," the second paragraph.

6      A.      Yes.  That's -- that's what's in

7 this article.

8      Q.      Okay.  Who are the critics that Mr.

9 Dickman is referring to?

10      A.      I don't know for sure who Mr.

11 Dickman was referring to.  I do know that what the

12 verbiage says is consistent with the -- over the

13 general reading I have done and the critical

14 comments about the rebate structures and PBMs'

15 method of doing business, and it's -- all you

16 would have to do is read the Wall Street Journal

17 to -- to confirm that.

18      Q.      Okay.  So somebody reading the Wall

19 Street Journal would understand that critics are

20 charging, not -- not altogether unfairly that the

21 current rebate structures create built-in

22 conflicts of interest?

23      A.      It's the basis for --

24              MR. COHEN:  Object to the form.

1      A.      It's the basis for most of the suits

2 that attorneys general in New Jersey -- in New

3 England and elsewhere have been filing against

4 PBMs, particularly the Merck-Medcos.

5 BY MR. DOBIE:

6      Q.      Okay.  And so Mr. Cohen, for

7 example, could he read this article and by the

8 same token reach the same conclusion?

9              MR. COHEN:  I'm probably a bad

10         example.

11      A.      I think any reasonable observer of

12 the industry reading regularly both the lay and

13 professional literature could make that statement.

14 BY MR. DOBIE:

15      Q.      Okay.  And is that true for -- for

16 most of this background material that you have,

17 sir, where you've -- where you've taken it from

18 other sources?

19      A.      Well, some of it, I've taken it from

20 others and some of it is -- is text that I've

21 generated.  And I've -- your -- we've made --

22 you've the point several times that I didn't use

23 the quotation marks, but I did try to put in the

24 references where I pulled material from.

1    Q.    In the discussion that you had
2  previously about -- let me back up a little bit.
3          The reference previously -- with the
4  exception of Mr. Bystrom's report; right?  The
5  only reference to Mr. Bystrom's report is in that
6  footnote that we were looking at before on Page
7  44; right?
8    A.    Correct.
9    Q.    All right.  This -- this process
10  that you described before that you and Mr. Bystrom
11  went through to prepare the reports in the Duramed
12  case, do you -- do you keep a computer, sir, at
13  your home?
14    A.    Sure.
15    Q.    And what kind of computer do you
16  have?
17    A.    It's a desktop computer.  It's made
18  by -- what's the company that looks like cows?
19    Q.    Gateway?
20    A.    Gateway.
21    Q.    How long have you had that computer,
22  sir?
23    A.    Three years -- three years or so.
24    Q.    So did you have it at the time that

---

1    A.    Correct.
2    Q.    And since your deposition, you
3  haven't gained any experience in terms of
4  negotiating with manufacturers of -- of
5  pharmaceutical products; correct?
6    A.    Direct contracting, no.
7    Q.    And you haven't negotiated any
8  market share rebates or anything like that with
9  any pharmaceutical companies since your -- your
10  last deposition; correct, sir?
11    A.    Correct.
12    Q.    And given that you haven't
13  negotiated rebate contracts with any
14  manufacturers, sir, do you know how common
15  exclusives are in the industry?
16          MR. COHEN:  I'm sorry.  Can you read
17       that question back?  I didn't -- I didn't
18       quite get it.
19          MR. DOBIE:  Yes, I'll just restate
20       it.
21  BY MR. DOBIE:
22    Q.    At the time of your last deposition,
23  sir, you told me that you had never negotiated a
24  rebate contract with a manufacturer and it's not

---

1  you did your report in the Duramed case?
2    A.    I don't recall if I had it at that
3  time or not.
4    Q.    Do you use e-mail?
5    A.    Yes.
6    Q.    Have you had the same e-mail service
7  in the last three years?
8    A.    MSN.com.
9    Q.    Do you have any other computers
10  besides the Gateway?
11    A.    Yes.  I have a laptop that's
12  provided to me by PCN and I have a PCN e-mail
13  address.
14    Q.    How long have you had the laptop
15  that you got from PCN?
16    A.    From the time I started with the
17  company.
18    Q.    Sir, I want to talk about your
19  experience with contracting with pharmaceutical
20  companies.
21          At the time of your last deposition,
22  you told me that you didn't have any experience
23  negotiating with manufacturers of pharmaceutical
24  products; correct?

---

1  something that you had -- because of that, you
2  didn't have knowledge of how common exclusive
3  contracts were in the industry; correct?
4    A.    Correct.
5    Q.    All right.  And you still don't?
6    A.    Incorrect.  Since that time two
7  years ago, I've been in an operating environment
8  in a PBM.  I didn't negotiate the contracts, but
9  I've had regular conversations with people who do.
10    Q.    Who do you have regular
11  conversations with at PCN that negotiate rebate
12  contracts?
13    A.    There was -- one of the
14  pharmacists -- first of all, I visited with John
15  Scull, who is the CEO of the company.  I visited
16  with David -- I can't remember the name.  The
17  chief financial officer for the company who's
18  regularly involved in these negotiations.  And
19  there is -- there was a pharmacist that was
20  involved.  His name is -- let's come back to that
21  and I'll give it to you.  It's just -- I'm not --
22  I didn't come prepared to give you that -- his
23  name.  But --
24    Q.    It's a he?

1    A.    It's a he.

2    Q.    And what's your understanding of his

3  responsibility, this pharmacist?

4    A.    His -- his responsibility was the

5  lead negotiator on the rebates when we brought the

6  formulary back inhouse.

7    Q.    And is this somebody who's an

8  existing employee?

9    A.    No, he's no longer with PCN, but he

10  was up until about the last month.

11    Q.    Okay.  So in the process of

12  preparing a formulary for PCN, did you have

13  discussions with the CEO of PCN, this pharmacist

14  that you can't remember the name of, and the CFO

15  concerning the question of how common exclusives

16  were in their experience?

17    A.    I asked that question, how often do

18  you see exclusive contracts negotiated, and

19  furthermore how often do you see these tied

20  contracts where you are tying multiple products

21  together.  And the answer I got -- what was that?

22    Q.    I was just asking you if the CEO and

23  the CFO had never before themselves negotiated a

24  manufacturer contract because PCN hadn't been

---

1  have percentages attached to it, but it was -- it

2  was not a common thing, and it was particularly

3  uncommon to have these tied relationships,

4  product-tied relationships.

5    Q.    Okay.  Let's make sure I understand

6  it.

7    Who was it that told you first that

8  exclusives are not that common?

9    A.    It is -- the first person that told

10  me that was John Scull.  The second person was

11  David -- I want to say Norwood, but that's not

12  right.  And the third was this pharmacist that I'm

13  having trouble with his name right now.

14    Q.    And they were telling you that based

15  upon this -- when was it that you had this

16  discussion with them?

17    A.    When?

18    Q.    Yes, sir.

19    A.    Some time in the last year.

20    Q.    Okay.  So in -- was it you were

21  asking them what were they seeing in the course

22  of -- of contracts that were being offered to

23  PCN --

24    A.    Right.

---

1  doing that.

2    A.    No, but they've been involved since

3  we brought it back inhouse.

4    Q.    In 2003?

5    A.    Correct.

6    Q.    Okay.  So in --

7    A.    And I'm just telling you that things

8  changed from my last -- from our last visit

9  together till now where we have an operating PBM

10  environment where this is routinely done.

11    Q.    All right.  So here's what I'm

12  getting at.  So you were asking them now that

13  we've brought it back inhouse, what are you seeing

14  in terms of what manufacturers are asking for in

15  terms of exclusive contracts?

16    A.    No.  I had been involved in the

17  Duramed case.

18    Q.    Right.

19    A.    And so I was curious.  Is this -- I

20  wasn't going to go into great detail, because I

21  had all the confidentiality agreements with the

22  Duramed.  But I just asked in general do you see

23  often these exclusive relation -- contracts, and

24  the answer was it's not that common.  It didn't

---

1    Q.    -- during 2003?

2    A.    Yes.

3    Q.    Okay.

4    A.    And -- and I would just say also

5  that -- and I apologize for the fact that I'm not

6  giving you the name right now, but the contracting

7  officer, the pharmacist that I'm referring to, had

8  also done this contracting at another PBM in the

9  past.  So it wasn't just he'd been brought in from

10  the outside to help with this.

11    Q.    Okay.  And the other person that --

12  you had John Scull, and then the CFO of the

13  company is the other person that told you this?

14    A.    I don't recall that the CFO told me.

15  It was John Scull and this contracting officer.

16    Q.    And the contract officer.  Okay.

17  And they both told you that based upon the --

18    A.    Their experience and understanding.

19    Q.    Can I finish the question, sir?

20    A.    Yes.

21    Q.    They told you that based upon --

22  let's start with Mr. Scull first.  All right.

23  Strike the question.

24    Mr. Scull told you that in this time

5/18/2004 Gibson, David

1  period since PCN began handling its own contracts
2  with manufacturers, which began in 2003, that he
3  did not find that exclusive contracts were that
4  common; is that correct?
5       A.    That was not the question I asked
6  nor the question that he answered.
7       Q.    All right.  Well, tell --
8       A.    The question I asked was, is it
9  your -- is it your experience based on both
10  branded formulary inhouse and on your general
11  understanding of the industry, because he's been
12  in it for many years -- is this an unusual thing
13  to see, and the answer was that I told you.
14      Q.    Okay.  So Mr. Scull told you that
15  exclusives were not that common?
16      A.    Correct.
17      Q.    All right.  And did he say that
18  exclusives were uncommon?
19      A.    I don't recall that he said it was
20  uncommon.  He just said that he didn't see it that
21  often.
22      Q.    Did he tell you that PCN had
23  exclusives?
24      A.    I don't recall that he told me.

4/1/2005 2:24 PM                                    169

5/18/2004 Gibson, David

1       Q.    Did -- did you -- did you -- after -- after
2  hearing this, did you yourself inquire as to
3  whether or not by exclusive -- let me back up.
4            When you asked him about exclusives,
5  were you talking about the only drug in a
6  therapeutic class?
7       A.    Yes.
8       Q.    Okay.  And -- and so when they said
9  that an exclusive -- exclusive is not that common,
10  they were saying that it's within a therapeutic
11  class; correct?
12      A.    Generally we would offer a couple or
13  more of brand products within a class.
14      Q.    All right.  And so, for example, in
15  the estrogen category, estrogen replacement
16  therapy category, PCN does, in fact, offer a
17  variety of products in that category; correct?
18      A.    Correct.
19      Q.    It does not have an exclusive on --
20  on conjugated estrogens; correct?
21      A.    I don't know.
22      Q.    All right.  And does it have a --
23      A.    Let me just back up one second.
24            It's very important here on

4/1/2005 2:24 PM                                    171

5/18/2004 Gibson, David

1       Q.    Did -- did you come to find out that
2  PCN had exclusives?
3       A.    I didn't pursue it further.
4       Q.    You had the discussion with this
5  pharmacy who is the contract manager --
6  pharmacist?
7       A.    Correct.
8       Q.    Okay.  And tell me exactly what he
9  said in terms of whether or not exclusives were
10  common.
11      A.    It was consistent with what John
12  Scull had told me and that I related in this
13  testimony.
14      Q.    Okay.  But I want to be as precise
15  as possible.
16            This pharmacist told you that
17  exclusives were not that common?
18      A.    Correct.
19      Q.    And did he say that PCN had, in
20  fact, exclusives?
21      A.    He didn't tell me that.
22      Q.    Did he say exclusives were not
23  uncommon?
24      A.    He said they were not common.

4/1/2005 2:24 PM                                    170

5/18/2004 Gibson, David

1  definitions.  For instance, what tier are we on
2  here?  In other -- you know, are you asking was
3  conjugated -- was Premarin the only conjugated
4  estrogen or the family of Premarin the only
5  conjugated estrogens on the second tier and -- and
6  the third tiers --
7       Q.    That's not my question.
8       A.    -- are different?
9       Q.    My -- my question is -- I'm
10  following up with you on your discussions with Mr.
11  Scull and with the pharmacist, the person that's
12  the contract manager.  All right.  And when
13  they're saying that exclusives are not that
14  common, what they were saying is that exclusives
15  are not that common in the therapeutic category,
16  within a therapeutic category?
17      A.    Yes.
18      Q.    You would not have only one branded
19  product within a whole therapeutic category;
20  correct?
21      A.    It would be unusual.
22      Q.    All right.  Do you know whether PCN,
23  in fact, has any exclusives within an entire
24  therapeutic category?

4/1/2005 2:24 PM                                    172

1     A.     No, I don't.

2     Q.     So as the head of the P&T committee,

3  have you ever reviewed PPIs, for example, at PCN?

4     A.     We did review -- let's see.  Did we?

5  We reviewed SSIs.  I don't know -- I don't recall

6  if we reviewed PPIs or not.

7     Q.     You've had four or five meetings?

8     A.     Yes.

9     Q.     And -- and do you know whether or

10  not you've reviewed the insulin category?

11     A.     No, I don't believe we reviewed

12  insulin.

13     Q.     Did you review the oral

14  contraceptive category?

15     A.     Let me -- let me back off a second

16  and here and answer --

17     Q.     Can you just -- can you just answer?

18     A.     The answer is no.

19     Q.     All right.  Did you review the COX

20  inhibitor category?

21     A.     No.

22     Q.     All right.  And do you know whether

23  or not -- even though you haven't reviewed those

24  as somebody who's the medical director of PCN, do

---

1     Q.     That's not my question.

2     A.     I will just tell you what I know.

3  Do you want --

4     Q.     No.  I want you to answer my

5  question, sir.

6          MR. DOBIE:  Would you read the

7     question back?

8                  * * *

9          (Whereupon, the requested portion of

10     the record was read.)

11                 * * *

12     A.     And the short answer to that is I

13  don't know.

14  BY MR. DOBIE:

15     Q.     So you don't know whether or not,

16  for example, estradiol is on the PCN formulary in

17  the second tier or even the first tier?

18     A.     If you pulled the -- if you pulled

19  the formulary, it doesn't appear on -- on the

20  formulary I pulled down off the net.

21     Q.     When did you do that, sir?

22     A.     I pulled it down just before I came

23  up here.

24     Q.     And the only product that you're

---

1  you know whether or not PCN, in fact, has an

2  exclusive -- and by that I mean the only one

3  within that therapeutic category -- for either

4  PPIs, COX inhibitors, oral contraceptives,

5  estrogen replacement therapy, and insulin?

6     A.     I will tell you on the estrogen

7  replacement, that on the second tier Premarin is

8  the -- and -- and the family of Premarin are the

9  drugs that are -- that are on the second tier.

10  Drugs like Cenestin are on the third tier.

11     Q.     So it's your understanding that you

12  have an -- you have an exclusive as it relates to

13  Cenestin within the estrogen therapy category --

14  I'm sorry.  Let me restate the question.

15          It's your -- it's your belief, sir,

16  that PCN has made Premarin and the Premarin family

17  of products an exclusive on the second tier of the

18  formulary since 2003?

19          MR. COHEN:  Object -- object to the

20     form in terms of the use of the word

21     "exclusive" with respect to the second tier.

22     A.     I do not know anything about the

23  contract with -- with --

24  BY MR. DOBIE:

---

1  showing on the second tier or first tier is

2  Premarin?

3     A.     Is Premarin family of drugs, is as I

4  recall what was on the second tier.

5     Q.     All right.  And did you -- at the

6  time that PCN created a formulary in 2003, did

7  you, sir, as the head of the P&T committee decide

8  to make Premarin the only product in the second

9  tier?

10     A.     No.

11     Q.     Do you know who did make that

12  decision?

13     A.     It was probably inherited from the

14  company that we had dealing with our formulary

15  before.

16     Q.     The company --

17     A.     That is PCS.

18     Q.     AdvancePCS, sir, in 2002 had

19  Cenestin on their formulary and not Premarin.

20     A.     Okay.  Then I don't know.

21     Q.     All right.  You're just speculating

22  when you said that you think it came from the

23  prior company?

24     A.     That's correct.

5/18/2004  Gibson, David

**Page 177**

1    Q.    All right.  So do you know who
2    within PCN would have made the decision to put
3    Premarin on the formulary in the second tier other
4    than you and the other members of the P&T
5    committee?
6    A.    No, I don't.  There's a lot here
7    that I'm not telling you, but we'll leave it.
8    Q.    We have a lot of questions and
9    answers --
10    A.    Yes.
11    Q.    -- still to go.
12         Do you know, sir, somebody the name
13    of Debrea Napior?
14    A.    The name is familiar.  Who -- could
15    you tell me who she is so that I could try to put
16    a name with a face?
17    Q.    Does that -- you don't -- that
18    doesn't ring a bell?
19    A.    I believe I have heard "Debrea
20    Napior," before but I don't -- I'm not putting it
21    together with the person.
22    Q.    is that -- do you know, is that
23    somebody who -- whose article that you cited as an
24    authoritative basis for anywhere in your report?

4/1/2005 2:24 PM                                   177

---

5/18/2004  Gibson, David

**Page 178**

1    Does that ring a bell?
2    A.    It is, but I don't -- it doesn't
3    jump to my mind right now.
4    Q.    And to go back to the question I
5    asked a moment ago, you -- you mentioned the
6    Premarin situation, but do you know whether or not
7    PCN had a single source or exclusive contract for
8    insulin products?
9    A.    No.
10    Q.    You don't know?
11    A.    We covered that and I didn't know.
12    Q.    Okay.  And you don't know as it
13    relates to PPIs or COX-2 inhibitors or oral
14    contraceptives either?
15    A.    Correct.
16    Q.    Sir, other than the discussion that
17    you had with Mr. Scull and the pharmacist whose
18    name you can't recall who told you that exclusives
19    are not that common within a therapeutic category,
20    is there any other experience that you've had that
21    allows you to provide an opinion as to whether or
22    not exclusive or sole conjugated estrogen-language
23    contracts is common or not within the industry?
24    A.    I had the same discussion with Mr.

4/1/2005 2:24 PM                                   178

---

5/18/2004  Gibson, David

**Page 179**

1    Bystrom, who indicated pretty much the same thing
2    as Mr. Scull has.
3    Q.    Okay.  So you had a discussion with
4    Mr. Bystrom.  Anything else, sir?
5    A.    I believe I had a discussion with
6    some of the officers in the California Pharmacists
7    Association, but I don't quote those as
8    authoritative because they're not -- these --
9    these rebate contracts aren't between the retail
10    level and the pharmaceutical manufacturers.
11    Q.    Well, there are -- there are --
12    there are contracts between retailers and
13    pharmaceutical manufacturers?
14    A.    Yes, but not rebates generally.
15    Q.    Are you familiar with pharmaceutical
16    manufacturers and retailers actually having rebate
17    contracts?
18    A.    No.  But I'm familiar with the fact
19    that the distribution of product can go directly
20    from the pharmacy manufacturer to the retailer.
21    Q.    All right.  That wasn't my question.
22    You are -- just answer the question.
23         You are not familiar with the
24    practice of pharmaceutical manufacturers paying

4/1/2005 2:24 PM                                   179

---

5/18/2004  Gibson, David

**Page 180**

1    rebates to retailers?
2    A.    Correct.
3    Q.    Sir, given at your deposition in
4    2002 you had no experience with these exclusive
5    contracts, as you yourself have testified, whether
6    it was common or not common, and you referred to
7    others, and you've had one discussion with Mr.
8    Scull, one discussion with this pharmacist, and a
9    discussion with Mr. Bystrom, how is it that you
10    think it appropriate for you to give an expert
11    opinion to a jury as to how common exclusives are
12    in the industry?
13    A.    I am giving an opinion based upon
14    conversations I've had with people in the industry
15    who do this regularly.
16    Q.    Okay.  Those three conversations
17    we've identified?
18    A.    Yes.
19    Q.    How do you know, sir -- all right.
20    So now that you've had these three people that
21    told you that exclusives are not that common
22    within the therapeutic category, how then, sir,
23    are you in a position to comment as to what impact
24    exclusives or sole -- sole product in the

4/1/2005 2:24 PM                                   180

5/18/2004 Gibson, David

5/18/2004 Gibson, David

**Page 181**

```
 1  therapeutic class agreements would have within the
 2  marketplace if you don't know within even your own
 3  company whether you have them or don't?
 4        A.     Well, those are two different
 5  issues.
 6        Q.     Okay.  Can you -- can you -- let's
 7  go to the first issue.
 8               You've told us your basis for
 9  whether you know about exclusives or not.  All
10  right.  What I'm now interested in is, are you
11  trying to give an opinion, given what I'll call
12  the limited basis of your knowledge, on how common
13  exclusives are?  Do you actually think you have
14  the expertise to then go the next step and give a
15  further opinion as to how common or what the
16  impact is of those --
17        A.     Absolutely.
18        Q.     -- agreements are in the
19  marketplace?
20        A.     Those are two -- two different
21  issues.  The first you're asking is my direct
22  knowledge of the incidence of exclusive contracts,
23  and i've given you hearsay information.  The
24  second part is my experience with what those kinds
```

4/1/2005 2:24 PM                                              181

**Page 183**

```
 1  in the clinical setting.  Exclusive contracts
 2  would limit those.
 3        Q.     Okay.  So exclusives would limit --
 4  when you're talking about in a clinical setting --
 5        A.     The drugs --
 6        Q.     -- you're talking about two
 7  physicians?
 8        A.     The drugs that are available to
 9  physicians and patients.
10        Q.     All right.  I understand your
11  expertise there.  All right.  I'm not quarreling
12  with you on that.
13               I mean, if what you're saying is
14  that you can testify as to how an exclusive would
15  limit the options for physicians and patients,
16  you're a physician and -- I mean, I've got your
17  resume.  I understand your expertise on that.
18  Okay.  What I am talking about -- is that what you
19  meant by your answer?
20        A.     Yes.
21        Q.     Okay.  All right.  Here's what -- is
22  it that -- are you trying to hold yourself out,
23  though, sir, as -- as somebody who can testify as
24  to the impact of an exclusive, not to physicians
```

4/1/2005 2:24 PM                                              183

**Page 182**

```
 1  of contracts do within the market once they're
 2  negotiated.
 3               MR. DOBIE:  Okay.  Let's -- he's got
 4        to change the tape.
 5               THE VIDEOGRAPHER:  This is the end
 6        of Tape No. 2.  The time is 2:59 p.m.  We're
 7        off the record.
 8                          * * *
 9               (Whereupon, a discussion was held
10        off the record.)
11                          * * *
12               THE VIDEOGRAPHER:  This is the
13        beginning of Tape No. 3.  The time is 3:01
14        p.m.  We're back on the record.
15  BY MR. DOBIE:
16        Q.     Dr. Gibson, let me ask you, if you
17  don't know whether or not exclusive contracts are
18  common or not, don't even know whether you have
19  them or don't have them on the PCN formulary, how
20  is it that you can testify as to the impact that
21  those agreements that may or may not exist even
22  within PCN have in the marketplace?
23        A.     Testifying as to the effect in the
24  marketplace deals with choices that are presented
```

4/1/2005 2:24 PM                                              182

**Page 184**

```
 1  and patients, but instead within the broader
 2  marketplace including, for example, to Duramed?
 3        A.     Well, it's -- as I see it, it's all
 4  pretty much the same thing.  Once -- once the
 5  options are limited contractually, it has an
 6  effect in the marketplace and it has to be
 7  reflected within the clinical setting because
 8  drugs are ordered there.
 9        Q.     All right.  Here's where I've got a
10  disconnect I think with you.
11               How is it -- I would assume that
12  you'd agree that there's a lot of different
13  attributes of a product that will lead to its
14  success in the marketplace; right?
15        A.     Yes.
16        Q.     A pharmaceutical product -- how
17  many -- whether it's a breakthrough product, for
18  example.
19        A.     Correct.
20        Q.     Whether it's a -- whether there's a
21  lot of folks out detailing and explaining the
22  product to physicians.
23        A.     Correct.
24        Q.     How much research that there is
```

4/1/2005 2:24 PM                                              184

1  behind the product.

2        A.     Correct.

3        Q.     Those are all different things that

4  I assume that you as a physician are familiar with

5  as can impact the uptake of a product in the

6  marketplace?

7        A.     Correct.

8        Q.     All right.  What I am -- what I'm --

9  what I'm wondering about is if you don't know in

10  any of these categories, for example, PPIs, COX

11  inhibitors, whether exclusives are or are not in

12  place at PCN or other pharmaceutical companies,

13  how is it that you can give a opinion as to

14  whether or not a product will or won't be

15  successful in the face of an exclusive?

16        A.     Well, first of all, the issue of

17  anyone being able to come in and testify as to the

18  existence of exclusives without benefit of a

19  discovery process similar to what we've gone

20  through in this case couldn't testify to that.

21               I think your issue is that you're

22  having difficulty that I don't happen to know the

23  status of those drugs at PCN, which in reality if

24  you look at the landscape of the pharmaceutical

---

1  formularies are for the competitors to PBM and

2  whether or not there's single options within a

3  therapeutic class on the branded side.  I have a

4  general feeling for that.  And that's -- that's --

5  that's exactly what an officer within a HMO would

6  have.  The officer in the HMO would not know if

7  these are exclusive contracts or not.  Those are

8  private contracts between the PBM and the

9  manufacturer.

10        Q.     You're saying that an officer of a

11  particular PBM as yourself?

12        A.     I'm not an officer of a PBM.

13        Q.     Let me -- well, let's not talk about

14  what other people know or don't know.  Let me ask

15  you what you know.

16               Do you know, for example, whether or

17  not there are exclusives in the PPI, oral

18  contraceptives, COX inhibitors, oral

19  contraceptives, estrogen, any of the other PBMs

20  separate and apart from the work you've done?

21        A.     I don't --

22               MR. COHEN:  Objection.  Asked and

23  answered.

24        A.     I don't know and I don't think

---

1  market is a pretty limited footprint.

2        Q.     Well, let me give you an example.

3               There are people who are hired by

4  health plans to negotiate with PBMs, the pharmacy

5  benefit, for the members of the plan; correct?

6        A.     Correct.

7        Q.     And people like that know, okay,

8  here's -- here is a -- the type of contract that

9  we would typically get with a -- with a particular

10  PBM and, you know, we typically see three or four

11  choices in insulin or we see one choice in PPIs.

12  There are people that are familiar with how common

13  multiple choices are within therapeutic categories

14  as a -- as a result of consulting with plans to

15  shape their -- the formulary choices of the

16  members; right?

17        A.     Correct.

18        Q.     You won't do that?

19        A.     That's not the question you've been

20  asking me.

21        Q.     Okay.  All right.  But if I ask --

22        A.     Am I aware of that?

23        Q.     -- you that, you don't do that?

24        A.     I'm aware in general what the

---

1  anybody else does in America other than the --

2  other than the people that actually negotiated so

3  that -- and a given PBM officer and a given

4  pharmaceutical company would know whether their

5  drug was an exclusive arrangement, but other

6  pharmaceutical companies wouldn't.

7  BY MR. DOBIE:

8        Q.     Okay.

9        A.     Nor would other PBMs.

10        Q.     But somebody consulting for a -- for

11  a health plan would know whether or not -- if they

12  go to Express Scripts, if they go to PCN, if they

13  go to Medco, whether or not they're -- what kind

14  of choices they're being offered?

15        A.     They'd know what choices.

16        Q.     And they --

17        A.     They wouldn't know if -- the terms

18  of the contracts they had with the manufacturers,

19  nor would they know if they were exclusives.

20        Q.     Let me finish.  Wouldn't they know

21  whether or not they were being offered a health

22  plan for their members that had more than one

23  product on formulary?

24        A.     They would know what the

1  formulary -- they would know what the health
2  plan's formulary is.
3        Q.     All right.  And --
4        A.     I mean the PBM's formulary.
5        Q.     Okay.  And they would know whether
6  or not the PBM was listing one product in the PPI
7  category or three; correct?
8        A.     Correct.
9        Q.     And they would know whether or not
10 there was one product or three in the COX
11 category?
12       A.     Correct.
13       Q.     Same thing.  One or three in the
14 oral contraceptives.
15             I mean, we could go through the
16 whole list.  They would know that much; right?
17       A.     They would.
18       Q.     And they would also know whether or
19 not -- if they asked, whether or not there were
20 rebate dollars that were going to be passed down
21 to them; correct?
22       A.     Correct.  But -- but what you're
23 asking is is there an expert who could tell you
24 what the contractual relationships are for

1  exclusive relationships across the industry, and I
2  would argue that nobody knows that.
3        Q.     Right.
4        A.     I mean, those are all proprietary
5  agreements.
6        Q.     All right.  But going back to the
7  example that -- that I gave, you're not in the
8  position -- you're not in the position, though, of
9  somebody like what I described before, who advises
10 the plan and can tell them what they're going to
11 get -- you're going to get, you know, one of one
12 insulin at -- with Express Scripts.  You're going
13 to get -- you're going to get two COX products at
14 Medco.  You're not a person that engages in that
15 type of consulting practice; right?
16       A.     I'll give you -- that I do, but it's
17 not exactly as we've discussed up till this point.
18             Within the context of the data
19 mining that I do, I know -- I know who the PBMs
20 are for the plan and I know all the drugs that
21 have been dispensed.  So I know exactly what's on
22 their formularies and what are coming out as
23 dispensed items.
24       Q.     Those are the --

1        A.     I don't know anything about the
2  underlying contractual relationships.
3        Q.     Okay.  But again, you've had two
4  projects as it relates to that; correct?
5        A.     No.  But you asked whether or not in
6  the course of my regular activities, if I would
7  have access to that kind of information, and I
8  would -- I'm giving you an instance where I do.
9        Q.     Okay.  In those two instances, you
10 know whether or not they typically prescribe
11 multiple or only one product within the
12 therapeutic class?
13       A.     I know by class every drug that was
14 dispensed.
15       Q.     That's all on a -- on a -- in
16 documents that you have?
17       A.     It's on the -- it's on the pharmacy
18 claims data --
19       Q.     All right.
20       A.     -- that goes into the data
21 warehouse.
22       Q.     Have you made any study, sir, that
23 examined how many products within a particular
24 therapeutic category the members are -- are being

1  prescribed for either of the two plans where
2  you've undertaken that process?
3        A.     Yes, I did on both.
4        Q.     You did.
5        A.     And --
6        Q.     And with both categories, did you --
7  with both of those two clients, did you -- did you
8  make any investigation in terms of whether or not
9  any of the products were prescribed pursuant to
10 prior authorization?
11       A.     No.
12       Q.     Did you make any examination in
13 terms of whether or not the products were either
14 in a first, a second, or a third tier?
15       A.     No.  I knew what was dispensed and
16 what was -- and what was paid.
17       Q.     All right.  And this report that
18 you're talking about, did you -- did you provide
19 that to the folks that -- that hired you in
20 connection with this --
21       A.     No.
22       Q.     -- project?  Do you have that report
23 today?
24       A.     No.

1    Q.    Why did you prepare the report?

2    A.    I prepared the report about four

3    weeks ago.

4    Q.    Okay.  On your computer?

5    A.    Uh-huh.

6    Q.    Which one?

7    A.    The one in my home office, the

8    desktop.

9    Q.    Did you retain it?

10   A.    I have it, yes.  The one --

11   Q.    And are you --

12   A.    -- problem here within --

13   Q.    Let me -- let me ask you this:  Are

14   you relying upon that data or information as part

15   of the conclusions and opinions that are -- you

16   are offering here today?

17   A.    It would only be tangentially.  The

18   issue came up in the context of the question you

19   asked.

20   Q.    Okay.  But you're -- you're telling

21   us that you are now -- well, I was asking you,

22   sir, about your experience with negotiating

23   contracts and whether or not you can give an

24   opinion as to the impact in the marketplace of

---

1    I'm not confident that I can give you that

2    information.  I'll be happy to do it if there's

3    not a -- if there's not a problem with it, and I

4    will check on it.  But certainly giving you a copy

5    of a report with patient names on it, I could not

6    do that.

7    Q.    You could delete the patient names.

8    What I'm -- what I'm trying to

9    understand, sir, is in this instance, as you just

10   described, if you don't know whether or not any of

11   the products that were dispensed were prior

12   authorized first, second, or third tier, what the

13   formularies were or weren't for either of those

14   plans, how is it that you can rely upon -- or are

15   you relying upon that work in forming your

16   opinions as --

17   A.    No.

18   Q.    Okay.

19   A.    I'm not -- I'm not relying on it,

20   but that was not what I was -- that wasn't the

21   question I was answering.

22   Q.    Well, we misunderstood each other

23   then.

24   So -- so then in terms of your --

---

1    exclusives.

2    A.    If I recall the question I was

3    answering, you were asking whether or not as an

4    individual involved with the industry, whether I

5    would know, like others do, whether health plans

6    had multiple options within class.  And I was

7    being responsive in answering that I do have

8    access to that information, though it's not a

9    major part of my practice yet.

10   Q.    Did you make an examination as to

11   whether any of the products that are -- that you

12   reviewed were either on formulary or off

13   formulary?

14   A.    No.  I made a -- I made -- I have

15   access to outcomes, what were actually dispensed.

16   Q.    As it relates to these -- these --

17   tell me the names of the two -- two groups for

18   whom you prepared this report.

19   A.    I'm not sure I'm prepared to give

20   you those names, given the fact that this is under

21   HIPAA.

22   Q.    I'm not asking for patient

23   information.

24   A.    I know, but even the clients' names,

---

1    your experience and the ability to testify as to

2    what impact exclusives or sole contracts within a

3    therapeutic category have in the marketplace,

4    being on formulary or off formulary, if you

5    haven't -- and you don't know which products are

6    or aren't in exclusive position, how can you give

7    an opinion as to the impact of those exclusives,

8    what that would have in the marketplace beyond the

9    physician-patient realm?

10   A.    Well, the major access I have that

11   gives me authority in this instance is the

12   documents supplied by Wyeth in discovery.

13   Q.    All right.

14   A.    Based on that, I know what contracts

15   were exclusive with the various MC -- MCOs that

16   had captive PBMs and the various PBMs in the

17   marketplace, the major PBMs that have footprints

18   in the market.

19   The reason I don't know the data

20   relating to PCN is it's a fairly marginal player.

21   So I didn't have access to PCN documents to be

22   able to review, but it's that information which

23   gives me the ability to comment on contracts and

24   their effects.

1    Q.    I just want to make sure I
2    understand that.
3          So -- so the -- we've identified now
4    your discussion with Mr. Scull, the discussion
5    with the pharmacist, the discussion with Mr.
6    Bystrom, and now you're saying that you've had
7    access to the documents in this case?
8    A.    Correct.
9    Q.    All right.  Is there anything else
10   that you can think of that gives you a basis to
11   form your opinion as to what effect an exclusive
12   contract has in the marketplace separate and apart
13   from how it may impact on patients and physicians
14   if the formulary is limited?
15   A.    In addition to the issues that I've
16   given to you, the conversations and the --
17   Q.    Yes, sir.
18   A.    -- contracts and all the rest is the
19   authoritative sources that I've quoted in my
20   report and footnote.
21   Q.    Okay.  Anything else?
22   A.    That would be it.  And allow -- let
23   me put in.  And general reading that I did not
24   put in the report or -- or footnote.

1    Q.    Well, if there's anything else that
2    forms the basis for your opinions, I'm entitled to
3    have that.  So can you identify any other general
4    reading that forms the basis for your opinions?
5    A.    I read all the time.  I read both
6    the professional and the lay literature all the
7    time.  If it didn't rise to the level of being
8    critical for this report, I didn't include it nor
9    footnote it.
10   Q.    All right.
11   A.    But I read generally constantly.  So
12   I can't, you know -- I read five newspapers every
13   day and read most of the medical journals.
14   Q.    All right.  Well, if -- the way that
15   the rules work and the way -- in terms of both
16   side is if there's some other source that forms
17   the basis for your opinions, I'm entitled to know
18   what it is, I'm entitled to review it and see
19   whether or not there's something in there that I
20   might ask you about to test the basis, the
21   foundation for your conclusions.
22   A.    Well, fair enough.
23   Q.    So --
24   A.    And I -- within the context of the

1    rules and the fairness issue, what I have written
2    and what I have footnoted is the basis on which
3    I'm forming my opinions.
4    Q.    Okay.  Fair enough.  All right.
5          Let me ask you about another area
6    that was previously covered by Mr. Bystrom, and
7    that relates to the pharmacy side.  And in your
8    last deposition, I asked you if you knew how it
9    worked between -- if a -- if products were on a
10   third tier, whether or not they'd be -- whether
11   they would be prescribed or -- strike the
12   question.
13         I asked you in your last deposition
14   if you knew if a patient walked into a pharmacy
15   and had a product on the third tier, for example,
16   Cenestin -- say Cenestin was on the third tier --
17   whether you knew whether the pharmacist would
18   dispense the product and charge them a cash price,
19   a third-tier copay, or something else, and you
20   deferred to Mr. -- Mr. Bystrom on questions like
21   that, including that question.
22         Have you done anything on the work
23   side that now has educated you in terms of how
24   that process works in the marketplace?

1    A.    "The work side" being the real world
2    or was that --
3    Q.    Separate and apart from litigation.
4    A.    Okay.  Yes, I have.  In my
5    activities with pharmacists across the state of
6    California, I will frequently ask them informally
7    how they handle this situation.  Do they -- do
8    they charge the copay if it's higher than the
9    acquisition cost or do they go with the lower of
10   the two.
11   Q.    All right.  So let me --
12   A.    Is that the question you're asking?
13   Q.    Yes.  Let me give you -- let me give
14   you a hypothetical.  All right.
15         If the cash price for Cenestin --
16   and you can write this down -- was, let's say,
17   $27.
18   A.    Okay.
19   Q.    And the negotiated --
20   A.    I'm not supposed to write on any of
21   this stuff, am I?
22   Q.    Try writing on there.
23   A.    Thanks.
24   Q.    If the cash price for Cenestin is,

5/18/2004 Gibson, David

```
1    let's say, $27 --
2               MR. COHEN:  Cenestin?
3               MR. DOBIE:  Yes, Cenestin.
4               MR. COHEN:  Not Premarin.  Okay.
5    BY MR. DOBIE:
6         Q.    Cenestin is $27.  It's on -- the
7    patient has a health plan that puts Cenestin on
8    the third tier, so that it's at $30 copay.  that
9    would be the second choice.  Or would the patient
10   be charged the negotiated price between their --
11   their pharmacy benefit manager and the retailer?
12   Let's say the negotiated price was an AWP on
13   Cenestin, $25, minus 10 percent, plus a -- which
14   would take it down to 22.50 plus a $2 handling
15   fee.  So that's 24.50.
16             Would they get charged the 24.50,
17   the negotiated price, in essence, would they get
18   charged the cash price of $27, or would they get
19   charged the copay for a third-tier product, again
20   assuming that the plan had put Cenestin in the
21   third tier of $30?
22             MR. COHEN:  So your hypothetical
23        is -- is not zeroing on in any particular
24        pharmacy chain, any particular type of
```

5/18/2004 Gibson, David

```
1    pharmacy?
2               MR. DOBIE:  No.
3               MR. COHEN:  Just broadly --
4               MR. DOBIE:  Just --
5               MR. COHEN:  -- any pharmacy?
6               MR. DOBIE:  -- his experience, his
7         understanding of how it works.
8         A.    You've got several things in that
9    question.
10   BY MR. DOBIE:
11        Q.    Okay.
12        A.    Okay.  First of all, you would not
13   normally pass on to the patient the dispensing fee
14   that you negotiated with the PBM.  You know, you
15   went from the $24 and added 2.50.  So --
16        Q.    Nor would -- the patient wouldn't --
17   they wouldn't pay that --
18        A.    The patient would normally also pay
19   2.50 if they'd been paid 2.50 for a dispensing fee
20   by the PBM.
21        Q.    So a pharmacist wouldn't normally
22   charge them the negotiated price in my example of
23   25 minus --
24        A.    I haven't gotten to that part yet.
```

5/18/2004 Gibson, David

```
1         Q.    Okay.
2         A.    I was just zeroing in on the
3    dispensing fee and whether or not in your
4    hypothetical it would be passed on to the patient.
5         Q.    The charge?
6         A.    Yes.
7         Q.    You don't think so?
8         A.    Well, the charge -- the 2.50 has
9    already been paid by the PBM to the pharmacy as a
10   dispensing fee.
11        Q.    I -- here -- let me make sure
12   you're clear on the hypothetical.
13             Okay.  This is a situation where --
14   where the patient has a Cenestin script.  It's on
15   the third tier because the plan has put it on the
16   third tier.
17        A.    Correct.  I'm with you there.
18        Q.    Okay.  So that we got the $30.
19        A.    You got the $30.
20        Q.    You got the $25 you walk in off the
21   street.  And then the last option is that there's
22   actually a negotiated price between the PBM and
23   the retailer where they have an AWP price, average
24   wholesale price, of $25 minus 10 percent, which is
```

5/18/2004 Gibson, David

```
1    the 22.50, but then they charge a $2 handling fee
2    or service fee on top of that.  24.50.
3         A.    Okay.  I'm -- I'm admittedly
4    focusing on part of your answer, not the whole one
5    here, and that's that 2.50 issue.
6         Q.    You don't think they'd be charged
7    that at all?
8         A.    They'd never be charged that.
9         Q.    Because the -- because the PBM would
10   pay that?
11        A.    It's already paid.
12        Q.    All right.  So would the patient --
13        A.    So the question boils down to would
14   they be charged the negotiated fee or the copay,
15   whichever --
16        Q.    Or the cash price.
17        Q.    -- is the greater.  Or the third
18   option would be the cash price.
19        Q.    Right.
20        A.    The --
21             MR. COHEN:  Could I just -- does the
22        patient that walks in have insurance or not?
23             MR. DOBIE:  This is -- this is
24        the -- I don't know if "insurance" is the
```

1  right word, Jay, but it's a -- the plan has
2  got a third-tier copay.  That's --
3       MR. COHEN:  This is not a cash-
4  paying customer.  It's a customer who has a
5  plan?
6       MR. DOBIE:  Yes.
7       MR. COHEN:  Correct?
8       MR. DOBIE:  Yes.
9  A.    There are no absolutes and
10  furthermore, there's no, to my knowledge,
11  published material to give you a footnote on this.
12       In general, the pharmacists charge
13  the greater of, the greater of the copay or the
14  acquisition -- well, they can't charge beyond the
15  copay.  But if the copay is greater, they'll
16  charge the copay.  That's consistent with their
17  behavior across the board for both brand and
18  generic products.
19       And though we won't go into it
20  unless you want to, the issue of how generics are
21  charged within the market, particularly the mail
22  order environment, is -- is overwhelmingly they're
23  charging the copay amount.
24  BY MR. DOBIE:

205

5/18/2004 Gibson, David

1  you this?  Can you name one?
2  A.    When I visited with people like
3  Walter Carey, who is president of a not-for-profit
4  in southern California that's affiliated with
5  UPNI, that was the feedback I would get.
6  Q.    When did you --
7  A.    I talked this over with a number of
8  the board members from California Pharmacists
9  Association, all of whom are practicing
10  pharmacists.
11       And to buttress it, the issue of the
12  literature, there was not more than a month ago a
13  major article in the Wall Street Journal dealing
14  with dispensing practices for generic drugs and
15  the pricing of the transaction.
16  Q.    What did the -- what do you recall
17  about the Wall Street Journal article?
18  A.    Wall Street Journal article
19  demonstrated how the dispensing of generics is the
20  highest profit margin within the system.  It's a
21  major reason why PBMs with mail orders are moving
22  the dispensing of those products to the mail order
23  pharmacy.  And the example they gave was for
24  generic Prozac.

207

5/18/2004 Gibson, David

1  Q.    Okay.  What's the basis for your
2  conclusion, sir, that -- that the pharmacists
3  would charge the greater of the copay or -- versus
4  either the cash price or the negotiated price?
5  A.    You -- you --
6  Q.    How do you know that?  You didn't
7  know that --
8  A.    At the --
9  Q.    -- in your last deposition?
10  A.    Between my last deposition and now,
11  I've had a lot more conversations with pharmacists
12  who are actually dispensing product.
13  Q.    In California?
14  A.    Mostly in California, not all, but
15  mostly in California, Oregon, Washington, and
16  Kentucky.
17  Q.    And they've told you that it's their
18  usual practice in these pharmacies that if their
19  cash price is -- is, let's say, $25, they
20  nevertheless go ahead and charge a higher copay
21  amount?
22  A.    Absolutely.  And --
23  Q.    Who are the -- who are the
24  pharmacists that you've talked to that have told

206

5/18/2004 Gibson, David

1  Q.    So the PBMs make more money on
2  generics than on branded products?
3  A.    They do now.
4  Q.    Do -- do the dispensing pharmacists
5  make more money on generics?
6  A.    They do now.  They always have.
7  Generics have always been more profitable than
8  brand for -- in a managed care environment for a
9  dispensing pharmacist.
10  Q.    Who are the board members of the
11  California Pharmacists Association that told you
12  that they charge higher of the copay or the cash
13  amount?
14  A.    I don't -- I don't -- I'm sorry, but
15  I'm not going to give you the names of the whole
16  California Pharmacists board.  I visited with
17  people at various times.  I've had this
18  conversation.  This is the feedback I've gotten.
19  But I'm not prepared to put quotation marks around
20  it and give you a footnote.
21  Q.    Well, we're entitled to know the
22  basis for your opinion, sir, and if there's
23  somebody who told you this -- you didn't have this
24  expertise.  They had another expert, Mr. Bystrom.

208

1    Okay?

2        A.    Right.

3        Q.    Now you've got that expertise,

4    you're telling us, and you want to tell the jury,

5    right, and so I'm entitled to know the basis for

6    that opinion that you want to offer.

7        A.    But what I'm telling you is I've

8    these conversations with these people and this is

9    the feedback I've gotten back, but I'm not

10   prepared to say that -- exactly which one of the

11   board members I had the conversation with and got

12   it back from.

13       Q.    Okay.  And I understand that you

14   would rather not say, but I'm entitled to know

15   that information.

16           MR. COHEN:  I'm just going to object

17       to -- and I'm not trying to characterize his

18       testimony, but it seemed to me he was

19       saying -- he was really saying he doesn't

20       recall which of these people it was rather

21       than he's withholding a name.

22           And if I'm wrong about that, he can

23       correct me.

24           THE WITNESS:  Well, that's -- that's

1    knowledgeable in the industry  like John Scull.

2    And I visited on several occasions with Dale

3    Bystrom.

4        Q.    Mr. Scull tell you that the practice

5    to his understanding was to charge for pharmacy --

6        A.    It was his understanding that in

7    general --

8        Q.    Can I finish the question?

9            That generally speaking, pharmacies

10   charge the higher of the copay or cash amount?

11       A.    Correct.

12       Q.    Other than having discussions with

13   these individuals where they've -- where they've

14   told you this, do you have any other basis to

15   offer an opinion as to how it would work in the

16   pharmacy side?

17       A.    I think that that and -- and based

18   on reading, that would be the two sources.

19       Q.    Okay.  And the reading is the Wall

20   Street Journal article.  Anything else?

21       A.    That's -- that would be the major

22   article.

23           MR. COHEN:  Gordon, are you at a

24       good break point?

1        really correct.

2            MR. DOBIE:  Thanks for that --

3        thanks for that hint, Jay.

4    BY MR. DOBIE:

5        Q.    So rather than you not being

6    prepared to tell me who it is, now you don't

7    recall who it is?

8        A.    This has come up in the context of

9    your question.

10       Q.    Yes.

11       A.    And I don't recall exactly who gave

12   me the information.  I generally know who I talked

13   to about it.

14       Q.    Okay.  Who generally do you know

15   that you talked to about this?

16       A.    I talked -- as I mentioned, Walter

17   Carey.

18       Q.    Yes.

19       A.    David Brazelton, who -- who is the

20   head of UPNI and also on the board of CPHA.  I

21   visited with a board member from Bakersfield,

22   Clark Gustafson.

23       Q.    Anyone else?

24       A.    And again, I visited with people

1            MR. DOBIE:  Sure.

2            MR. COHEN:  Thanks.

3            THE VIDEOGRAPHER:  We're going off

4        the record.  The time is 3:34 p.m.

5                * * *

6            (Whereupon, a short recess was

7        taken.)

8                * * *

9            THE VIDEOGRAPHER:  We're back on the

10       record.  The time is 3:47 p.m.

11   BY MR. DOBIE:

12       Q.    Sir, you mentioned the fact that you

13   discussed with Mr. Bystrom what was the process by

14   which it usually worked.  Do you recall that

15   testimony from a moment ago?

16       A.    I do.

17       Q.    And what did Mr. Bystrom tell you?

18       A.    As I recall, he was consistent with

19   what I have testified, that in the hypothetical

20   you are -- you are presenting, that the retail

21   pharmacy would charge the copay.

22       Q.    The higher copay?

23       A.    Yes.

24       Q.    All right.

**Page 213**

1    A.    He also said one other thing that
2  was interesting, too, as I recall.  It was either
3  he or John Scull.  That it really isn't important
4  what the -- what the retail rate was versus the
5  third tier in particularly your hypothetical.  The
6  real important thing is the difference between the
7  second-tier copay and either the retail or the
8  copay amount for the third tier.
9           So if -- if you have a second-tier
10  product in class sitting there at a $20 copay and
11  you have either a 27 or a 30 dollar copay, you're
12  still dealing with a significant delta or
13  difference.
14    Q.    And if it's a $5 copay difference?
15    A.    Well, you've got data that I quoted
16  in here from your own internal sources as to the
17  importance of brand seepage based upon the amount
18  of copay that is in the market.
19    Q.    No.  I'm talking about your
20  discussion with Mr. Bystrom or Mr. Scull.
21    A.    Oh.  We didn't get to --
22    Q.    You didn't get to that --
23    A.    -- that level of detail.
24    Q.    They just said that the bigger the

**Page 214**

1  difference in copay, the more significant --
2    A.    Sure.
3    Q.    -- that second versus third --
4    A.    Absolutely,
5    Q.    -- tier would be?
6    Q.    Dr. Gibson, if you let me finish the
7  question.  Otherwise, we're going to have a pretty
8  confused record here.
9           What the question was is what you
10  heard from Mr. Scull or what you heard from Mr.
11  Bystrom was that the most important thing was --
12  I'm not talking about what's in the documents.
13  I'm talking about what they told you -- was the
14  amount of the difference between the second- and
15  the third-tier copay.
16    A.    And what I said was the difference
17  between the second and third tier or the second
18  and the retail price.
19    Q.    Right.
20    A.    That was the point I was trying to
21  make.
22    Q.    Understood.  Sir, let me show you
23  what was previously marked today as Exhibit 6.
24  This is Mr. Gibson's deposition.  And sir, if I

**Page 215**

1  could turn your attention -- I'm sorry, Mr.
2  Bystrom's deposition -- to Line --Page 57 -- I'm
3  sorry, Page 56, Line 23.  He's asked -- Mr.
4  Bystrom is asked the question, "but they often --
5  in fact, almost always, negotiate special prices,
6  special negotiated prices; right?
7           "ANSWER:  Prices that managed care
8  negotiates with retail pharmacy providers has
9  normally several levels involved in it.  It's
10  usually a negotiated discount off the cost of the
11  medication plus a dispensing fee or a maximum
12  allowable cost called MAC or usual and customary,
13  and it defaults to whatever is the lesser of the
14  three.  So in some cases, it's possible that a
15  managed care patient would pay usual and retail,
16  usual and customary retail," period.
17           Do you see that?
18    A.    I do.
19    Q.    Okay.  Do you see here where Mr.
20  Bystrom is actually saying it's the lesser of the
21  three, not the higher of the three, which is your
22  testimony?
23    A.    We're mixing apples and oranges
24  again.  MAC pricing relates to generics, not

**Page 216**

1  brand.
2    Q.    I understand that.  He's -- but he's
3  saying that it defaults to the lesser of the
4  three, whether it's a negotiated discount off the
5  cost of the medication plus a dispensing fee or a
6  maximum allowable cost -- the first part relates
7  to the generic -- I'm sorry, relates to the brand.
8  The second one is how it works on a generic or
9  usual or customary and defaults to whatever is the
10  lesser of the three.
11           Does that refresh your recollection,
12  sir, as to what Mr. Bystrom may have told you?
13    A.    It didn't come up in this context
14  and that was not the answer I recall --
15    Q.    All right.  Well, let me --
16    A.    -- I asked.
17           MR. COHEN:  I'd just like to
18  interpose an objection.  It appears that
19  this -- that he's -- he's testifying about
20  what managed care negotiates with retail
21  pharmacies, not what somebody off the street
22  would pay.
23           THE WITNESS:  Right.
24           MR. DOBIE:  No.  He says it's the

5/18/2004  Gibson, David

1  patient.  We're talking -- Jay, your
2  example --
3  BY MR. DOBIE:
4      Q.    What you said to me was is this
5  somebody who has -- your -- your refinement on the
6  hypothetical, is this somebody who has the
7  benefits.
8      A.    No.  But what his answer is is the
9  price that managed care negotiates with the retail
10 pharmacy is the lesser of the three.
11     Q.    The managed care patient would pay
12 is usual and retail.  All right.  Let's -- let's
13 try --
14     A.    Did it say that?  Where does it say
15 that?
16     Q.    The very last line, sir.
17          Let me show -- let me show you
18 another document and let's -- we can move on.
19     A.    But it doesn't say in that sentence
20 what you alleged it to say.  It says that "So in
21 some cases, it's possible that a managed care
22 patient would pay usual and retail or usual and
23 customary retail."
24     Q.    Right.  The lesser of the three.

---

5/18/2004  Gibson, David

1  than the $25 copay for nonformulary products."
2          Were you aware, sir, that it was
3  Duramed's understanding of the marketplace that,
4  in fact, patients would, in fact, pay the lesser
5  of the cash price or the negotiated price as
6  opposed to the higher third-tier or nonformulary
7  branded product price?
8      A.    I had not seen this document before.
9  I'm not sure that that's what they're alleging is
10 that's the way the market works.  They're making
11 an artificial hypothetic as to how they price
12 their product and what it would cost if they were
13 charged -- if they were charging the retail on it.
14     Q.    Did you read Mr. Finneran's
15 deposition, for example, from Viking?
16     A.    No.
17     Q.    All right.  Did you read Marty
18 Carter, the head of managed care's, deposition
19 from Duramed?
20     A.    No.
21     Q.    So did you know what the -- what
22 their view is in terms of what they saw in the
23 actual marketplace, whether -- how Cenestin was
24 handled, whether it would be charged or whether

---

1      A.    It doesn't say three.  It says two.
2                      * * *
3          (Whereupon, Gibson Exhibit 11 was
4      marked for identification.)
5                      * * *
6  BY MR. DOBIE:
7      Q.    The document speaks for itself.
8          Let me show you a document, sir that
9  you haven't mentioned as having been identified,
10 so it may be the first time you're seeing it.
11          For the record, Exhibit 11 is a copy
12 of a document that was produced by -- by Duramed
13 in this case.  Have you ever seen this document
14 before?
15     A.    Not to my recollection, no.
16     Q.    Okay.  This is a document that was
17 identified as having been prepared by the folks
18 that were involved in the managed care group at
19 Duramed, and they have an example here of how a
20 Cenestin script would be paid at retail, and if
21 you look underneath the graph in the center of the
22 page, it says, "In the above example, the actual
23 cost of Cenestin to patient equals 15.74, since
24 this is the amount" -- "since this amount is less

---

1  it, in fact, was -- was the charge that a patient
2  would pay if they had a Cenestin script, whether
3  they would actually be charged the lesser of the
4  $25 copay or the negotiated price for the cash
5  price?
6      A.    No.  Until this conversation, I
7  didn't know their position.
8                      * * *
9          (Whereupon, Gibson Exhibit 12 was
10     marked for identification.)
11                     * * *
12 BY MR. DOBIE:
13     Q.    Sir, I'm handing you what's Exhibit
14 12.
15          For the record, Exhibit 12 is a copy
16 of a document prepared for the California Health
17 Care foundation by Mercer Human Resources
18 Consulting.  We pulled this off the Web as well.
19          Mercer, sir, is a -- is a group you
20 mentioned many times in your first deposition.
21 You recall that?
22     A.    I do.
23     Q.    This is a group that advises health
24 plans in terms of how to go about buying a

5/18/2004 Gibson, David

1   prescription drug benefit?

2       A.      Right.  Their primary -- their

3   primary consulting practice is with the buyer.

4       Q.      The buyer being a health plan?

5       A.      Well -- or the employer.  They're

6   employee benefits consulting specialists.

7       Q.      So if -- so if I'm an employer and I

8   want to buy basically health insurance or self-

9   insure, I might go to Mercer for advice on how to

10  do that?

11      A.      Uh-huh.

12      Q.      And is this a group that has

13  expertise in your view in terms of how common

14  different types of arrangements are, rebate

15  contracts, exclusives, things like that?

16      A.      I think they would be knowledgeable,

17  yes.

18      Q.      Do they have a database that has

19  information like that?

20      A.      I don't know.

21      Q.      There's a -- let me draw your

22  attention to -- have you ever seen this document

23  before?

24      A.      I don't recall that I have.  I've

---

5/18/2004 Gibson, David

1   disagreeing with -- with the statements by Mercer

2   in this report to the California Health Care

3   Foundation?

4       A.      No.

5       Q.      All right.

6       A.      Are we done with this?

7       Q.      Yes, sir, for the moment.

8       Let me ask you about your experience

9   with pharmaceutical marketing.  You have never

10  marketed pharmaceutical product; correct?

11      A.      Correct.

12      Q.      And again, you've never worked for a

13  pharmaceutical manufacturer, served on an advisory

14  committee as it related to any issue whatsoever;

15  correct?

16      A.      Correct.

17      Q.      And you've never taught

18  pharmaceutical marketing?

19      A.      No.

20      Q.      Have you ever written any articles

21  on pharmaceutical marketing?

22      A.      I have written articles with issues

23  of pharmaceutical marketing within them.

24      Q.      And which of the articles that are

---

5/18/2004 Gibson, David

1   seen a number of California Health Care Foundation

2   documents, but I don't believe I've seen this one.

3       Q.      Let me draw your attention to Page

4   15.  There -- there's a discussion about usual and

5   customary retail pricing.

6       A.      My document only goes up to 9.

7       Q.      It's in the lower right-hand corner.

8       A.      Still going here.

9       Here we go.  It starts at the top

10  with contracts between PBM and health plans?

11      Q.      Yes, sir.

12      A.      Okay.

13      Q.      And over on the right under "Usual

14  and customary" --

15      A.      Yes.

16      Q.      All right.  And the second sentence

17  says, "When the usual and customary retail price

18  is higher than the contracted price, the PBM pays

19  only the contracted price.  When the usual and

20  customary retail price is lower than the

21  contracted price, the PBM pays the usual and

22  customary price."  Do you see that?

23      A.      I do.

24      Q.      Do you have any basis for

---

5/18/2004 Gibson, David

1   attached to your report have pharmaceutical

2   marketing issues within them?

3       A.      As I recall, the article that I

4   wrote concerning the diminishing pharmacy benefit

5   contained issues of marketing.

6       Q.      This is the "Consumers can look

7   forward to deductibles, generic drugs, and online

8   Canadian purchases"?

9       A.      No.  That is -- that was my article

10  dealing with why pharmaceuticals are cheaper in

11  Canada, I believe, that -- that you're looking in

12  Organized Labor?

13      Q.      No.  I was looking at your list of

14  articles here, "The Diminishing Pharmacy Benefit."

15      A.      Let's see.  This was on -- yes, that

16  was it.

17      Q.      That is the article?

18      A.      I think there was a tangential

19  discussion about pharmaceutical marketing in that.

20  And let's see.  I'm not sure if the article

21  dealing with "What Comes after Managed Care" had

22  pharmaceutical issues.  It dealt mostly with

23  managed care and HMOs.  I think those are probably

24  the articles that might have some information

1    about pharmaceutical manufacturer marketing.
2          Q.    Okay.  And does -- does the
3    preparation of either two -- those two articles in
4    your view make you an expert to give an opinion on
5    pharmaceutical marketing to a jury in this case?
6          A.    I know -- I know how pharmaceutical
7    marketing works, but I'm not -- I'll leave it to
8    others as to whether I'm the expert or not.
9          Q.    Okay.  Well, do you -- do you
10   yourself view yourself as --
11         A.    I think I'm knowledgeable.
12         Q.    If I could finish the question.
13         Do you view yourself as an expert in
14   pharmaceutical marketing, having written two
15   articles, one of which has a tangential mention
16   of marketing, to use your terms?
17         A.    Again, that wouldn't be the only
18   reason I would claim to be an expert  or giving an
19   opinion.
20         The involvement in the market on a
21   daily basis, conversations both with the
22   prescribing physicians and the dispensing
23   physicians, and an overall reading knowledge of
24   how the market works would be the pillars on which

1    I would render opinions.
2          Q.    Okay.  And what I'm asking is is
3    whether that, talking to physicians and patients
4    and having written these two articles -- whether
5    you believe that that qualifies you to give an
6    opinion as to pharmaceutical marketing as an
7    expert.
8          A.    Okay.  That's a new question.  The
9    answer is yes.  That wasn't the one you asked
10   before.
11         Q.    And why -- why do you think that you
12   are an expert in pharmaceutical marketing based on
13   your experience?
14         A.    Because as with all the other issues
15   we've been discussing today, I have a much more
16   broad view of how the mosaic works.  I have never
17   claimed to have negotiated a rebate contract or
18   marketed a drug or any of the other issues we've
19   talked about.  I do have the overview of how the
20   market works and understand marketing's role in
21   that.
22         Q.    Is any -- is anybody -- well, strike
23   that.
24         Is your expertise in pharmaceutical

1    marketing -- strike that.
2          Isn't it true, sir, that in this
3    case, when you looked at the Premarin preemptive
4    plan, which is a marketing document, you didn't
5    even understand it and had to talk to Mr. Bystrom,
6    who does have more experience, about it?
7          A.    No, that's not correct at all.  When
8    we both first looked at it, neither of us
9    understood it.  We took -- it took us time to be
10   able to really study that document to understand
11   what all was in it.  By the time we were finished,
12   we both understood it.
13         Q.    And -- and having read it, then you
14   understood the -- in your view what Wyeth's
15   marketing plan was as it related to Premarin and
16   Cenestin?
17         A.    I understood the Premarin preemptive
18   plan.  I don't know that I understood their entire
19   marketing strategy, but I knew how they were using
20   the various legs of the Premarin preemptive plan
21   and how they were both rewarding and punishing
22   people who behaved in fashions that were not
23   consistent with what they wanted.
24         Q.    Is -- is that -- that review of the

1    document that you made, is that -- is that
2    something that if -- that if you showed it to a
3    member of the jury, they could understand that as
4    well, or Mr. Cohen?
5          A.    I think I could show exhibits to the
6    jury so they'd understand.  Is that your question?
7          Q.    No.  It's a different question.
8          This -- this view that you have that
9    the -- well, strike that.  Strike that.
10         Is there any other marketing,
11   pharmaceutical, or any other background that you
12   have, sir, that qualifies you to give an expert
13   opinion on pharmaceutical marketing that we
14   haven't talked about?
15         A.    We've been at this for several hours
16   now.  I think we've pretty well covered it.
17         Q.    No.  I'm talking about just as it
18   relates to pharmaceutical marketing, which we've
19   only been on for 10 minutes.
20         A.    I think -- I think my most detailed
21   view of -- of how marketing really works in the
22   pharmaceutical sector was through the discovery
23   documents within this case.
24         Q.    Okay.  Let's talk about the P&T

5/18/2004 Gibson, David

1    committee. We covered already your experience at
2    PCN with the P&T committee in some detail. We
3    covered briefly in your last deposition Omni, and
4    am I right that Omni simply had a -- had a
5    formulary that -- it was a -- it was a formulary
6    that you obtained from Integrated through PCN?
7        A.    Correct.
8        Q.    And it was essentially a two-tier
9    formulary?
10       A.    As I recall, it was two-tier.
11       Q.    And do you know whether or not
12   products that were not in the second tier --
13   strike that.
14             There's -- there's different ways to
15   have a two-tier formulary; right? You can have
16   branded and generic. You can branded, generic,
17   and then not covered. Do you know how it worked
18   at PCN?
19       A.    It was primarily generic versus
20   brand. The only reason you would slip a brand
21   into the first tier was if it was unique in class.
22       Q.    So basically patients would pay a
23   lower copay for any branded pharmaceutical at PCN;
24   is that correct?

1        A.    No. They pay a lower copay for
2    generics.
3        Q.    All right. They pay a lower copay
4    for generics and then if it was a branded product,
5    all branded products were on the -- in essence the
6    second tier?
7        A.    All of the branded products on
8    formulary were on -- were on the second tier
9    unless it was a unique product in class.
10       Q.    All right. Here's what I'm trying
11   to understand. There are -- there are two-
12   tier formularies when there is a generic and then
13   there is -- everything else is basically
14   considered covered except for certain exclusions,
15   whether it's -- it's certain very high-cost
16   products. There are other formularies that are
17   two tier where you have a generic and then you
18   have branded on formulary and then you have other
19   things that are not reimbursed at all.
20             Do you know what was the structure
21   of the two-tier formulary at Omni during the time
22   period that you were there?
23       A.    As I recall, if it wasn't on the
24   second tier, it wasn't reimbursed.

5/18/2004 Gibson, David

1        Q.    All right.
2        A.    Without a prior authorization.
3        Q.    And how often did the P&T committee
4    of Omni meet?
5        A.    It was fairly infrequent. As I
6    recall, it was like once every six months.
7        Q.    All right. And you were there 18
8    months, so maybe three meetings?
9        A.    A couple of years. What are the
10   dates?
11       Q.    We went through that at the
12   beginning. I think it was --
13       A.    Okay. Whatever the dates on the --
14   on my --
15       Q.    The earlier resume I think has the
16   precise dates. Right.
17       A.    Omni was '96 to '98. So it would be
18   a couple of years.
19       Q.    I think we did this earlier.
20             Let's look at Exhibit 4. You have
21   May of 1996 through January of '98.
22       A.    Yes. That would be the correct --
23   that would be the correct dates.
24       Q.    Okay. And so how many times would

1    the P&T committee have met during that time period
2    if they met every six months between May of '96
3    and June '98? Three or four?
4        A.    As I recall, we had three or four
5    meetings.
6        Q.    All right. And do you know whether
7    or not the estrogen class of products was reviewed
8    by Omni?
9        A.    I don't recall that it was.
10       Q.    Did Omni keep minutes of its P&T
11   committee?
12       A.    I don't know. I believe we did.
13       Q.    Were you the keeper of the minutes?
14       A.    No.
15       Q.    Do you know who was?
16       A.    It would have been Steve Ondel, who
17   was the chief of pharmacy benefit. He was a
18   pharmacist.
19       Q.    How many members were on the Omni
20   P&T committee, if you remember?
21       A.    It was a fairly broad group of
22   physicians who were from various specialties and
23   various locations within the Omni market. That
24   would -- as I recall, it was around 15 physicians

5/18/2004 Gibson, David

**Page 233**

1 and it consisted mostly of doctors from both
2 Sacramento and Stockton.
3     Q.     What was the staff's role at -- at
4 Omni as it related to say what drugs go on
5 formulary?
6     A.     There -- there's a difference here
7 between the formulary, the P&T committee at Omni
8 and the P&T committee that's operational at a PBM
9 level.  Did you want to go into that?
10     Q.     This is because you were -- you were
11 basically using the Integrated -- you were working
12 through Integrated and on to PCN?
13     A.     Yes.  There was -- this was an
14 opportunity to primarily get buy-in from the
15 prescribing physicians, that if, for instance,
16 there wasn't a drug on the formulary that there
17 was a strong feeling we should have it on the
18 formulary, that there was a voice -- there was an
19 opportunity for them to express themselves in that
20 fashion.  And if -- if that -- as I recall, it
21 didn't arise, but had it arised -- arisen, one of
22 the factors that the staff would bring back to the
23 committee was the financial implications of
24 breaking a contract.

4/1/2005 2:24 PM                                          233

**Page 234**

1     Q.     Okay.
2     A.     Now, incidentally, in your own Wyeth
3 documents, the company recognizes that this is a
4 not uncommon trend to have independent P&T
5 committees that have great say over what is or
6 isn't on the formulary and part of their strategy
7 in dealing with this was to --
8     Q.     I just want to -- we'll get to --
9 we'll get to -- if you could just answer my
10 questions, we'll actually get finished and I won't
11 have to bring you back or go out to Sacramento.
12         * * *
13         (Whereupon, a discussion was held
14     off the record.)
15         * * *
16         THE VIDEOGRAPHER:  Proceed.
17 BY MR. DOBIE:
18     Q.     Is what you're saying is that if
19 there -- if there was a specific demand as applied
20 to formulary, the P&T committee at Omni existed in
21 order to basically have another voice to in
22 essence tweak, to use your words, the formulary
23 and make some additional product placements?
24     A.     Yes, I think that's fair to say.

4/1/2005 2:24 PM                                          234

**Page 235**

1     Q.     And in the time that you were there,
2 there was never an occasion where the staff was
3 asked to make a -- some sort of a financial
4 analysis of the implications of breaking a
5 contract; right?
6     A.     Not that I know of, but had that
7 arisen, they would have been the one asked to do
8 it.
9     Q.     And at your time with the P&T
10 committee at PCN for some meetings that you guys
11 have had so far, have you ever had any
12 communications with any of the staff members at
13 PCN about the implications of breaking a contract
14 with a -- with a pharmaceutical company?
15     A.     No.
16     Q.     Let's go back to your report, which
17 is Exhibit 1, and if you turn to Page 12, you
18 state that the primary participants in the
19 distribution of pharmaceutical products are
20 pharmaceutical manufacturers, wholesale
21 distributors, retail pharmacies, mail order
22 pharmacies, government agencies, physicians, and
23 PBMs.  Do you see that?
24     A.     I do.

4/1/2005 2:24 PM                                          235

**Page 236**

1     Q.     Okay.  How are PBMs distributors of
2 pharmaceutical products?
3     A.     If they own mail order --
4         MR. COHEN:  Object -- object to the
5     form.
6     A.     If they own their mail order firm,
7 they are part of the distribution chain.
8 BY MR. DOBIE:
9     Q.     And what about in terms of
10 understanding the chain of distribution; what
11 are -- the customers, aren't they the end point of
12 that, the distribution chain?
13     A.     You're looking at the -- at the
14 slide?  Is that what you're looking at?
15     Q.     The slide, your discussion here
16 about the participants in the distribution system.
17 I didn't see any mention of the customers.
18     A.     Well, that's -- that's part of the
19 fundamental problem within the health care market,
20 is because so many rises, who is the customer?  Is
21 it the patient?  Is it the health plan?  Who's the
22 customer here?
23     Q.     So you didn't include the customer
24 either.  You didn't include the patient at least

4/1/2005 2:24 PM                                          236

5/18/2004 Gibson, David

**Page 237**

1  as somebody in the distribution system. You
2  don't -- you don't believe that they are, and
3  that's a criticism of --
4      A.   They --
5      Q.   -- the --
6      A.   They --
7      Q.   -- system. Would you let me finish?
8  Is that correct, sir?
9      A.   The customer is relevant in the
10  distribution system on cash payments, a
11  cash-paying customer.
12      Q.   So why didn't you include them in
13  the distribution system?
14      A.   Because they're the end user.
15  They're not part of distribution. They receive
16  the product at the end point.
17      Q.   We were talking before about the
18  chart that's on Page 13 that you got from Mr.
19  Schondelmeyer, and I was asking about how
20  comfortable you are with the data that's in there.
21  In fact, where it says at the top "Private
22  Insurance" and then there's a -- there's a little
23  circle there, do you see that?
24      A.   Uh-huh.

**Page 238**

1      Q.   It appears to show private insurance
2  contracting with pharmacy benefit managers. Do
3  you see that?
4      A.   I do.
5      Q.   And, in fact, isn't -- the truth of
6  the matter is in most instances it's various
7  employer plans, various -- as you mentioned,
8  Taft-Hartley union groups and others that are the
9  ones that are contracting with PBMs. It's not
10  really insurance, is it?
11      MR. COHEN:  Object to the form.
12      A.   It's part of a basket. For
13  instance, many times the insurance companies are
14  administering these ERISA trusts and Taft-
15  Hartleys. So a patient here in Philadelphia might
16  be carrying in their pocket a card from
17  Independence Blue Cross, but, in fact, they're
18  just administering the benefit for the teamsters.
19  And so the -- as the administrator, they
20  frequently would be responsible for generating the
21  contract with the pharmacy benefit manager,
22  particularly if it's an internal captive.
23  BY MR. DOBIE:
24      Q.   So it's -- there's a lot of

**Page 239**

1  administrators that are out there that, in fact,
2  deal with the pharmacy benefit manager and they
3  might have helped administer the medical side of
4  the equation along with the -- with the pharmacy
5  benefit; correct?
6      A.   There are two broad classes in this
7  circle. One is a fully insured product like Blue
8  Cross that is serving an ASO contract, which is
9  administrative services only. And there is a
10  second group, which would be the third-party
11  administrators, or TPAs, and it's not infrequent
12  in that environment that the consultant like
13  Mercer would have a good deal to say about which
14  PBM administers the benefit -- the pharmacy
15  benefit for the underwriter.
16      Q.   In the -- using your example before,
17  the teamsters union, that's a Taft-Hartley-type
18  situation. You used --
19      A.   Right.
20      Q.   -- another phrase. That would --
21  they would be a TPA in your definition?
22      A.   No. They're not a TPA.
23      Q.   What are they --
24      A.   They are the underwriter. They

**Page 240**

1  would fit in that circle, the private insurers,
2  but they would be administered by a TPA that's
3  serving as a contractor to the plan and they would
4  contract with a PBM.
5      Q.   All right. But if we're talking
6  about the sources of payment for prescription
7  drugs, at the end of the day, in the example that
8  you used, the teamsters -- have you got a
9  teamsters union -- they're the ultimate payer?
10      A.   That's correct.
11      Q.   All right. And do you know what
12  percentage of the marketplace is, as it relates to
13  pharmaceutical products, situations where it is --
14  the payer is a plan in essence versus what
15  percentage of the marketplace is the payer, an
16  insurance company that's basically taking a
17  premium in exchange for -- for assuming the risk
18  of the pharmacy benefit?
19      A.   What you're -- I'm not quite sure of
20  the answer. I will give you as close as I can
21  give you to the answer to respond.
22      The size of the fully insured
23  market, which would include the indemnity and the
24  HMO products, compared with the self-funded

1  market, which would be the ERISA and Taft-Hartley,
2  my bet is it's about two-thirds-one-third.  I
3  could easily get you that number.  But I don't --
4      Q.    Two-thirds-one-third which way?
5      A.    Two-thirds fully insured, one-
6  third -- and it varies by market.  There are some
7  markets -- take Hawaii, for instance, where
8  there's hardly any ERISA trusts.  There are other
9  markets where there is -- a high percentage of the
10  market is ERISA trusts.  So it's a market-by-
11  market issue.
12      Q.    So it's your belief that in -- as it
13  relates to -- let me -- let me see if I can refine
14  this.
15          It's your belief first that two-
16  thirds of the market is represented by fully
17  insured or indemnity-type situations and only one-
18  third is self-funded?
19      A.    Are within this private insurance
20  market circuit, yes.
21      Q.    Okay.
22      A.    And that again is just off the top
23  of my head without having a reference that I could
24  easily get you for you.

1      Q.    All right.  Do you know whether or
2  not that number changes as you go from general
3  health care, in other words, for physicians and
4  things like that, as opposed to pharmacy benefit?
5  In other words, isn't there a greater proportion
6  of folks that may go for full insurance as it
7  relates to a health benefit, but when you come to
8  a pharmacy benefit, that's carved out and they
9  will self-fund that?
10      A.    Carving out has been in the market
11  for a number of years.  It hasn't been a major
12  trend.  It exists.  The general reason why self-
13  funded and -- and Taft-Hartley trusts exist in any
14  given market depends more on what is going on
15  within the state.  For instance, if you have an
16  activist government that does a lot of mandated
17  covered benefits, let's say reproductive services,
18  within a given market, the incidence of self-
19  funded, which is federal law, goes up.
20      Q.    Let me ask you this, because this
21  is -- the reason I was asking you this, if you go
22  on to your report on Page 15, you state that "By
23  1999, only 8 percent of persons with employer-
24  sponsored health insurance coverage had

1  traditional indemnity insurance."
2          What did you mean by that?
3      A.    That's the old kind of insurance
4  where you could go see any doctor you wanted,
5  there were no fee schedules, you paid for service
6  at the time of service, and you would submit a
7  claim to the insurance company, and after you
8  reached a certain deductible, you would start to
9  get a percentage of whatever you paid back.
10      Q.    Where did the other 90 -- where is
11  this -- where does the other 92 percent fall?
12      A.    Most -- most of it is explained on
13  that chart here on Page 13.  The 90 percent would
14  be within the circle we were discussing on private
15  insurance.  They would have gone to managed care
16  products, particularly HMOs, and then the balance
17  would be in public insurance programs like
18  Medicare and Medi-Cal and in -- in government
19  programs of one sort or another like Healthy
20  Family programs and then the final would be the
21  uninsured, which would be the self-pay.
22      Q.    Okay.  In looking in -- at the
23  pharmaceutical market, how it works, which is the
24  discussion the first part of your report -- turn

1  to Page 40 of your report.
2      A.    I'm sorry.  Which page?
3      Q.    Page 40.
4      A.    40.  Okay.
5      Q.    You've got a chart there that says
6  "Follow the Money."
7      A.    Uh-huh.
8      Q.    "PBM play central role."  And again,
9  is this another document that you -- you
10  downloaded from the Internet?
11      A.    It's referenced right there where I
12  got it.
13      Q.    Okay.  And did you just -- again
14  just place it right into your report, make any
15  changes to it that you recall?
16      A.    Well, we're -- I suppose we're going
17  to go over this issue of quotations marks.  To me,
18  sourcing the document is the common way to
19  identify where I got that information.
20      Q.    Okay.  And you -- you believe it's
21  accurate and authorative?
22      A.    I do.
23      Q.    And in this example here, you've got
24  the pharmaceutical companies paying rebates to

1   PBMs.  See that?

2       A.    I do.

3       Q.    And then the percentage of the

4   manufacturers' rebates going to the HMO or

5   employer plan on the one instance and then in the

6   other instance, if it's a health plan enrollees,

7   we've got price discounts for enrollees.  Is that

8   your understanding of how that --

9       A.    I missed that last part of your

10  question.  I'm sorry.

11      Q.    I'm -- look -- look at the -- well,

12  let's break it down.

13            Is it your understanding consistent

14  with the document that's in your report that a

15  percentage of manufacturers' rebates are in turn

16  paid to HMO employer plans?

17      A.    It is.

18      Q.    All right.  And is it also your

19  experience that PBMs contract with pharmacies for

20  negotiated price discounts for their enrollees?

21      A.    Correct.

22      Q.    On Page 13 of your report -- let's

23  go back to that -- you say that there's

24  essentially two categories of pharmacy patients,

1   cash and third parties.

2            Do you know what percentage of

3   patients are cash and what percentage are third

4   party?

5       A.    Well, it's indicated here that as of

6   1999 about 11.6 percent of the market was self-pay

7   for a total of 16.7 billion.

8       Q.    And how much is third party?

9       A.    It would be the added or summated

10  value of private insurance, public insurance, and

11  government delivery.

12      Q.    On Page 13 of your report, again

13  talking about rebates, you say -- in the paragraph

14  that is right before the heading "Establishment,"

15  you say, "In some cases, the drug manufacturer

16  pays a rebate back to the PBM or MCO for specific

17  drugs dispensed to their members that are on the

18  PBM or MCOs' formularies"; right?

19      A.    Correct.

20      Q.    And then on Page 14, you talk

21  about -- in the one, two, three, four, fifth

22  paragraph down, you say that "PBMs also" -- "PBMs

23  also enter into contracts to obtain rebates from

24  manufacturers in exchange for placement on the

1   PBM's formulary"; right?

2       A.    Correct.

3       Q.    All right.  And again, this is an

4   area that you have no personal experience in?

5       A.    Let me rephrase that.  I have no

6   personal experience negotiating these contracts.

7   I never said that I had no experience with these

8   contracts or their effect in the market.

9       Q.    Well, the -- we've talked about the

10  effect of the market and we can -- we'll cover

11  that a little bit more.  But the fact of the

12  matter is is through your experience have you

13  learned that this is actually a fairly common

14  practice, for drug manufacturers to pay rebates to

15  managed care organizations?

16      A.    Yes, it is common to pay.  The

17  percentage is the issue.  The fact that they pay

18  part of the rebate initially -- okay.  I won't.

19      Q.    Is the answer yes?

20      A.    The answer is they do pay rebates.

21      Q.    And is it -- is it -- is it your

22  experience that PBMs enter into contracts to

23  obtain rebates from the manufacturers in exchange

24  for being placed on the formulary?

1       A.    Placement on the formulary?

2       Q.    Yes.

3       A.    Yes.

4       Q.    All right.

5       Q.    And --

6       A.    And Wyeth's documents support that.

7       Q.    All right.  What Wyeth documents are

8   you talking about?

9       A.    We can go through your contracts if

10  you'd like, but a placement on second versus third

11  tier had different rebate amounts paid to the

12  PBMs.

13      Q.    So it's your belief that Wyeth's

14  contracts pay rebates depending upon whether or

15  not they put Premarin on the second or the third

16  tier?

17      A.    That and about 18 other variables,

18  yes.

19      Q.    All right.  And do you know whether

20  or not there's any rebates that are payable at all

21  for simply putting Premarin on their formulary in

22  any contract?

23      A.    To put --

24      Q.    Let me repeat the question.

1   A.     You're going to have to --

2   Q.     In this case, sir, are you -- are

3   you aware of whether or not Wyeth paid rebates to

4   any PBM or any HMO for putting Premarin on

5   formulary?

6   A.     Yes.  Yes.  We have multiple

7   examples of where Wyeth paid rebates for being

8   placed on the formulary.

9   Q.     All right.  And let me make sure

10  I'm -- we're being clear on this.

11         One way to pay -- do you know what

12  access rebates are?

13  A.     I'm not -- explain the term and

14  I'll --

15  Q.     Are you familiar with the -- with

16  the practice of pharmaceutical companies to pay

17  access rebates or moneys to PBMs or managed care

18  organizations in exchange for being placed on

19  formulary?

20  A.     I'm familiar with rebates being paid

21  for being on a formulary, on a given position in

22  the formulary.

23  Q.     Are you -- are you familiar with the

24  practice -- of the differences between paying

1   A.     Market -- yes, my -- my

2   understanding is that it's common and is more

3   common now than it used to be that rebates are

4   tied to performance.

5   Q.     Right.  Do you know whether simply

6   obtaining -- how do you know that?

7   A.     Again, it's the discussion you and I

8   have had up till this point where I have had the

9   opportunity to talk with individuals in the

10  industry about it.

11  Q.     Okay.  And who are -- who are the

12  individuals, sir?

13  A.     Same cast of players that I gave to

14  you --

15  Q.     Mr. Scull.

16  A.     -- for the -- yes.

17  Q.     The pharmacist.  Mr. Bystrom.

18  A.     And Mr. Bystrom would be the chief

19  of -- that I would have as my sources.

20  Q.     All right.  And then the practice of

21  paying rebates for simply being on formulary as

22  opposed to hitting certain market share targets,

23  is that practice common in the industry?

24  A.     I think both are common in the

1   money for being placed on formulary as opposed to

2   manufacturers paying money for particular plans

3   achieving certain market -- certain market

4   share --

5   A.     Sure.

6   Q.     -- objectives?

7   A.     Yes.

8   Q.     All right.  How does -- how does

9   that work in the marketplace, if you know?

10  A.     Again, that's -- that's -- that's

11  documented through the footnotes on Wyeth's own

12  contracts.

13         You're referring to two kinds of

14  rebate contracts.  One is for inclusion on the

15  market -- on the rebate -- on the -- on the

16  formulary and the second is what would be a

17  performance-based contract that reimbursed based

18  on market share movement favorably towards

19  Premarin and in other instances on a performance

20  base the diminution of Cenestin's market position.

21  Q.     Do you -- do you know in this case,

22  sir, whether or not the -- or whether in the

23  industry, whether market share performance rebates

24  are common?

1   industry.  I think, though, that it is a moving

2   picture, not static, that the -- that the issue of

3   performance-based rebate contracts are much more

4   common today than they were five years ago.

5   Q.     Do you know how many manufacturers

6   today use performance-based rebates as opposed to

7   simply rebates for putting you on formulary?

8   A.     My -- my -- my understanding is

9   almost all of them use performance-based rebates.

10  Q.     Okay.  How about five years ago,

11  1999?

12  A.     Five years ago, it wasn't as common.

13  It was more common to be placed, because on a

14  second-tier arrangement it was -- you know, if

15  you're on the formulary, you're -- you -- that's

16  what you wanted.  If you're in a three- or four-

17  tier structure, the client has -- or the patient

18  has access to the third tier.  Then it becomes an

19  issue of how you structure the plan as far as the

20  amounts of the co-pays for the different tiers and

21  whether you put in place negative factors like

22  prior authorization, which Wyeth demanded on a

23  number of its -- wrote into a number of its

24  contracts, which would be a reason to increase the

1 rebate, because it moves market share.
2     Q. Do you know whether Duramed sought
3 performance rebates from any PBMs?
4     A. I do not.
5     Q. Do you know whether Duramed sought
6 access rebates from any PBMs?
7     A. Again, I do not know.
8     Q. In assessing what impact Wyeth's
9 rebate contracts may have had in the marketplace,
10 does it matter to you at all what type of
11 agreements or whether or not Duramed was seeking
12 to have rebate contracts itself?
13     A. My opinion -- good question. The
14 answer is that we're talking apples and oranges.
15 Wyeth is apples. Duramed is oranges. It's one
16 thing to be in a dominant position with a MCO or a
17 PBM relying on the revenue from your existing
18 contracts and a new player. And so I don't think
19 understanding Cenestin's strategy or rebate
20 structure made much difference, and I illustrated
21 that in a -- in a graph.
22     Q. Would it -- would it matter to you
23 at all in terms of if Duramed did not actually
24 seek a formulary position in any managed care

1 organizations? Would it matter to your opinion?
2     A. Yes, it would matter to my opinion.
3     Q. How so?
4     A. Again, you're -- you're good at
5 creating hypotheticals that are hard for me to
6 grasp.
7     Q. Let me -- let me -- let me say it
8 broader.
9     Does it -- would it matter to
10 your -- I mean, you told us you're not aware of
11 what type of rebate contracts Duramed did or
12 didn't offer to -- to managed care organizations;
13 right?
14     A. What I'm saying --
15     Q. Yes or no.
16     A. All right. Yes, it would make a
17 difference.
18     Q. Okay. And so it would make a
19 difference if Duramed, in fact, did not go out and
20 offer PBMs a managed care agreement, their own
21 managed care agreement, in terms of why they were
22 or weren't on formulary?
23     A. Yes. It would surprise me if a --
24 if a sophisticated marketer like Duramed would

1 bring a new product on the market and completely
2 ignore the rebate issues.
3     Q. All right. Would it surprise you if
4 you learned that Duramed decided not to seek
5 formulary position at certain managed care
6 organizations?
7     A. Well, it depends on the managed care
8 organizations. I mean, it's one thing not to go
9 for it on a dominant player like HealthNet in
10 California, and it's quite another to go for a
11 marginal player in California like, say, CIGNA.
12     Q. Right. So would it be -- would it
13 surprise you or would it be important for your
14 opinions to learn whether or not Duramed did, in
15 fact, seek or not seek formulary placement with
16 major managed care providers, PPMs and HMOs?
17     A. I think that would be helpful to
18 know.
19     Q. All right. And -- but to date, you
20 have not undertaken that inquiry?
21     A. No, I really haven't.
22     Q. Oh. I asked you a question in your
23 last deposition about whether or not it was common
24 to have rebate agreements with Medicaid or Medi-

1 Cal plans. Do you recall that?
2     A. I don't recall that, but I'm not
3 surprised that we discussed it.
4     Q. All right. Because, in fact, PCN
5 has a lot of Medicaid and Medi-Cal type plans that
6 it adminstered historically; correct?
7     A. Correct.
8     Q. And you're familiar with that?
9     A. Correct.
10     Q. Are you familiar with the fact that
11 PCN, in fact, does -- that there are rebates that
12 are earned in connection with products that are on
13 formulary, Medicaid and Medi-Cal formulary?
14     A. I'd be surprised if they didn't have
15 rebates on brand products.
16     Q. And when did you learn that, sir?
17     A. When did I learn they had rebates?
18     Q. Yes.
19     A. I didn't learn that. You -- you
20 asked me whether I'd be surprised, and I was
21 saying that I wouldn't be surprised, that you
22 would not leave money on the table.
23     Q. So is it -- is it your
24 understanding -- did you know -- do you know

1    sitting here today whether the plans -- Medicaid
2    or Medi-Cal type plans receive rebate dollars?
3        A.    My assumption is they do, but I
4    don't know it and I haven't seen the contract.
5        Q.    Do you know whether or not a hundred
6    percent of the rebate dollars are as a general
7    matter passed on to Medicaid and Medi-Cal plans by
8    PCN?
9        A.    They -- it is passed on -- not a
10   hundred percent, but it's passed on by PCN.  PCN
11   is noted in the industry as one of the most
12   transparent PBMs and passes through some of the
13   highest percentages within the industry of
14   rebates.  But it's not a hundred percent.  Usually
15   it's 80-20, I believe.
16       Q.    Have you ever seen your form
17   contract?
18       A.    No.
19       Q.    Have you ever had a discussion with
20   your pharmaceutical contracts administrator about
21   that?
22       A.    Yes.
23       Q.    And did they -- did they tell you
24   that they had a template?

1        A.    They -- they told me that in -- that
2    the number I just gave you on a 80-20 split is
3    what they usually put into the contract, but I
4    have not seen the contract.
5        Q.    When did you have the discussion?
6        A.    Again, this is over the course of
7    the past year and it would have been with the
8    players that I've identified, plus Sue Navis was
9    the network provider for the pharmacies, and the
10   chief of the professional services division at
11   PCN, which -- which was Amy Chin, as I recall,
12   told me about that.
13       Q.    Okay.  So in the 80-20 -- here's all
14   I'm trying to understand.  Do you have any
15   understanding as to the difference between what
16   the PCN contract template, what your typical
17   contract is when it's a Medicaid-Medi-Cal plan on
18   the one hand versus on the other hand a private
19   plan?
20       A.    In general, it's consistent across
21   the board, is my understanding, that PCN passes
22   through the majority of the rebate to the client.
23       Q.    And -- and you said 80 percent of it
24   in the instance of -- of a private plan.  Do you

1    know what it is if -- if it's a Medicaid or a
2    Medi-Cal plan?
3        A.    It's for both.
4        Q.    All right.  That -- that was my
5    question.
6        A.    However, the percent of rebates in
7    the Medi-Cal are lower because there's a much
8    higher percentage of generic on the formulary.
9                     * * *
10             (Whereupon, Gibson Exhibit 13 was
11          marked for identification.)
12                    * * *
13   BY MR. DOBIE:
14       Q.    Let me show you what we marked as
15   Exhibit 13.
16             For the record, Exhibit 13 is a
17   document produced by PCN's contract manager in
18   response to a subpoena that we served as part of
19   the preparation for this deposition, and as you --
20   as you can see here, she says that in
21   Pharmaceutical Care Network their boilerplate
22   contract is 80-20 rebate split on the commercial
23   business.  And then she's got another boilerplate
24   on the managed Medicaid accounts as well.

1              Sir, if I turn your attention to the
2    very -- the last page of the document.
3        A.    Are there two documents here or one?
4        Q.    It's -- I think I can walk you
5    through it.  Go to the very last page of
6    Exhibit -- Exhibit 13.  Exhibit 13 is just a
7    single page that differs from the prior contract
8    and -- go to Paragraph 6.7.
9        A.    On -- on the last page --
10       Q.    Yes, sir.
11       A.    -- of the exhibit?
12       Q.    And you'll notice that --
13       A.    6.7, it starts, "PCN will collect"?
14       Q.    Uh-huh.
15       A.    Okay.
16       Q.    And then the second sentence says,
17   "PCN will remit to payer 90 percent of the
18   reimbursement savings collected by PCN."  Do you
19   see that?  "The balance" --
20       A.    I do, yes.
21       Q.    -- of the reimbursement savings
22   collected, 10 percent, will be retained by PCN in
23   consideration of the performance of its
24   obligation"; right?

1     A.     Correct.

2     Q.     And then if you go to 6 point --

3     A.     Now, is this -- is this part of this

4   document or is this part of another document and

5   this is the only page from it?

6     Q.     This is -- this is the only page --

7   I think that your Medicaid boilerplate contract is

8   what --

9     A.     Okay.  And the other one is the

10  commercial?

11    Q.     Yes, sir.

12    A.     Okay.

13    Q.     But -- I guess the question that I

14  have for you, you've never seen either one of

15  these documents before?

16    A.     If I have, I don't recall it.

17    Q.     And turning to Paragraph 6.7 of the

18  first contract.

19    A.     That would be on Page 9 again?

20    Q.     No.  5 of the -- of the document.

21    A.     Okay.  Yes.

22    Q.     It notes that PCN will remit to

23  payers 80 percent of the reimbursement savings

24  collected by PCN and the balance of the

1   reimbursement savings collected, 20 percent, will

2   be retained by PCN in consideration of the

3   performance of its obligations.

4     A.     Right.

5     Q.     Right.  And sir -- so generally

6   speaking, at least at PCN, I assume that we can

7   agree that the rebate dollars that are collected

8   by PCN are passed on in the vast majority of

9   instances to the plans, whether it's a Taft-

10  Hartley or an ERISA plan or something else?

11    A.     At PCN, yes.

12    Q.     And -- and by -- by these rebates

13  being passed on to those plans, if it's a -- let's

14  say it's the teamster union, it lowers the

15  teamster union's cost for the pharmacy benefit

16  that it provides to the members; correct?

17    A.     Not necessarily.

18    Q.     Doesn't -- doesn't PCN's passing on

19  of the rebate to the -- to the union or whoever

20  it's administering the benefit for lower their

21  cost over what it would otherwise be for the

22  pharmaceutical product?

23    A.     Again, not necessarily.

24    Q.     Okay.  And why not?

1     A.     If you incentivize, through a rebate

2   structure, the use of a -- of a brand product when

3   a generic is appropriate, you're increasing the

4   cost to the client.

5     Q.     Well, in -- at PCN, is that what

6   you're doing?  Are you incentivizing people to use

7   generics or are you incentivizing them to use

8   branded?

9     A.     And are we talking -- at PCN, in

10  both the commercial and the Medi-Cal, we would be

11  encouraging the generics.

12    Q.     Okay.  So --

13    A.     Which is not the norm in the

14  industry.

15    Q.     But I'm talking about PCN.

16    A.     Got you.

17    Q.     So at PCN --

18    A.     Which is -- which also is just a

19  minor player in the industry.

20    Q.     At PCN, generally speaking, it would

21  generally be the case that passing on of the

22  rebate dollars, 80 percent of them or 90 percent

23  of them would lower the cost to the particular

24  employer plan or union plan that's paying for the

1   health care; right?

2     A.     You've -- you've -- you've built

3   walls around this, and the answer to that is yes.

4     Q.     I'm not trying to build walls around

5   it.  I'm talking about PCN.

6     A.     Yes.

7     Q.     Which is -- because that's where you

8   work; right?

9     A.     That's right.  It's a small plan and

10  it's unique in the way it administers the benefit.

11    Q.     All right.  But it's where you work

12  and it's where you have your experience; right?

13    A.     Well, I've got experience beyond

14  that.

15    Q.     I understand that.

16    A.     But yes.

17    Q.     All right.  But it's a significant

18  part of your experience and that at least at PCN

19  these rebate dollars that are paid would lower the

20  cost to the particular plans; right?

21    A.     Yes.

22    Q.     Okay.  Now --

23          MR. COHEN:  Gordon, excuse me.  I

24  have a request.  I know these -- this PCN

1    document is from the subpoena that you
2    issued against PCN. I made a request to
3    counsel for PCN to get served with whatever
4    they served you with, and I never got a
5    copy. So I would just make a request that
6    any documents that you -- you received, that
7    I get a copy of that.
8        MR. DOBIE: I actually thought he
9    was going to bring them today. That's what
10   she told me.
11       MR. COHEN: We never received that.
12       MR. DOBIE: The last I talked to her
13   was Friday afternoon, Jay, after you and I
14   spoke and -- well, over the weekend I was on
15   a Boy Scout trip with my kids and then
16   getting ready for a deal yesterday in
17   Florida on Sunday and Monday. And so we got
18   this in at some point over the weekend. And
19   that's it. That's the only document.
20       MR. COHEN: This is the only
21   document? And --
22       MR. DOBIE: I've asked her for
23   others and she promised that she would
24   provide others.

1        MR. COHEN: We haven't heard from
2    her.
3        Can I ask you -- this seems to be --
4    the page numbers are out of order. Did you
5    extract any pages from this or did they do
6    the extraction?
7        MR. DOBIE: She -- she sent us an
8    e-mail that had those documents and that
9    cover letter and nothing else.
10       MR. COHEN: So when it goes from
11   Page --
12       MS. WARD: And I'll represent that
13   there were two attachments to the e-mail and
14   it's referenced in her e-mail that says --
15   she says it's boilerplate with a Word
16   document, which is the first document I
17   attached to the e-mail, and that's a sample
18   contract. And the second page -- or the
19   final page of the exhibit --
20       MR. COHEN: The Page 9?
21       MS. WARD: Right. Was a PDF of one
22   page, and she represented in the e-mail that
23   "I've included it" -- well, there's a typo,
24   but "a copy of the page from one of our

1    managed Medicaid agreements so that you can
2    see the difference."
3        MR. COHEN: So I have what you have.
4        MR. DOBIE: You've got it.
5        MR. COHEN: Okay.
6        MR. DOBIE: But I'd like to get some
7    more. I was hoping -- but that's all we've
8    received.
9    BY MR. DOBIE:
10       Q.    Okay. And then -- sir, let me ask
11   you this: Have you read the depositions of any of
12   the executives from Medco that were deposed in
13   this case?
14       A.    I may have. I would have referenced
15   it in my footnotes if I had used it.
16       Q.    Okay. It's --
17       A.    And you've got a list of the
18   documents --
19       Q.    Yes.
20       A.    -- that I --
21       Q.    It's not either on your list of
22   documents and it's not in your -- any of the
23   footnotes. So is it safe to say that you haven't
24   read either of the depositions of the Medco

1    executives?
2        A.    I think so. I'll qualify it that I
3    could be wrong, but I don't think so.
4        Q.    Well, they weren't deposed in the
5    Duramed case, so -- Mr. Cohen pointed out before
6    there may be things that you saw in Duramed, but
7    they weren't deposed in that case.
8        So the only documents that you would
9    have reviewed were the documents from the Duramed
10   case, the materials that are cited previously in
11   your --
12       A.    Correct.
13       Q.    -- in the exhibit as well as in your
14   report; right?
15       A.    Right.
16       Q.    And would you have wanted to know
17   that at Medco, in fact, Premarin rebates were
18   passed on to health plans at between 83 and 90
19   percent of the time between 1999 and 2002?
20       A.    That's interesting news. However,
21   the rebates can take many forms. In other words,
22   you can have, as we discussed, positioning and --
23   and performance rebates. There's also
24   administrative rebates. I don't know if that's

5/18/2004 Gibson, David

```
1   included in that number or not.  And there's a
2   whole separate rebate structure for mail order.
3        Q.      Well, let me -- let me show you a
4   document here that's been marked as Exhibit 1, and
5   it discusses the two types of rebate dollars that
6   Medco received from Wyeth, and Mr. Odansik and the
7   other executive from Medco, Mr. Narden, testified
8   concerning Medco and the pass-on of rebates and
9   testified under oath, like at PCN, that they pass
10  on rebates at between 80 and 90 percent of the
11  time on Premarin.  Not on every product, but on
12  Premarin.
13       A.      So the first line here -- not -- the
14  first line is the date, but the first line is the
15  base formulary rebate pass back is 91, 83, 88, 90,
16  and 88?
17       Q.      Yes, sir.
18       A.      And what's the second line?
19       Q.      Those are incentive rebates and
20  those are generally, as you indicate -- as
21  indicated here, is only 2 percent passed on.
22       A.      Now, are these -- is this a summated
23  number, so that 91 plus 2 percent?
24       Q.      No.  The incentive rebates, those
```

5/18/2004 Gibson, David

```
1   are -- the witness testified that to the extent
2   that a plan achieved performance over -- above the
3   national market share of some very high
4   percentage, a percentage that rarely, if ever, was
5   hit by Medco, hence the Cenestin amendment and so
6   on, those rebates would only be passed on in --
7   at -- by contract at 2 percent of the time.
8        A.      So that's 2 percent of the total
9   rebate that they got --
10       Q.      Yes?
11       A.      -- or what does that mean?
12       Q.      That would be that by contract they
13  would only have to pass on --
14       A.      2 percent --
15       Q.      -- 2 percent.
16       A.      -- of the performance rebate.
17       Q.      If they ever hit the high -- no, not
18  of the performance rebate.  If they hit certain
19  tiers.
20               So if it's a contract that provides
21  that we will pay a rebate to the extent that the
22  plan is 5 percentage points over national -- let's
23  just use that as a -- as the example.  All right.
24  If Medco was successful in achieving that type of
```

5/18/2004 Gibson, David

```
1   performance through all sorts of activity,
2   whipping up action of physicians and sending out
3   their own folks, if they were able to achieve
4   that, that was a rebate dollar that Mr. -- Narden
5   and Mr. Odansik said they, pursuant to their
6   agreements with their health plans, could keep
7   that.
8        A.      Okay.
9        Q.      But -- but -- let me just finish.
10               But the top number is the number
11  that was actually where rebates were -- generally
12  came in.  In other words, if -- if you were within
13  zero to 2 percent of national market share or zero
14  and 3 percent -- and I'm using the numbers
15  loosely, but -- but essentially the vast majority
16  of Medco plans would have never hit the higher
17  threshold, the incentive rebate passback.
18       A.      Okay.
19       Q.      So he testified that, in fact, 90
20  percent of the rebates on Premarin were passed on.
21  All right?
22       A.      Well --
23               MR. COHEN:  I'm just going to
24  interject an objection to the form to the
```

5/18/2004 Gibson, David

```
1        extent that the transcript is being
2        characterized, that the transcript speaks
3        for itself.
4             MR. DOBIE:  That's fair.
5   BY MR. DOBIE:
6        Q.      But let's say hypothetically 80 to
7   90 percent of Premarin rebates were, in fact,
8   passed on by Medco to the health plans.
9               Is this the first time that you're
10  hearing that today, sir?
11       A.      Yes.
12       Q.      Would that have been relevant to
13  your opinions?
14       A.      It would be more relevant if I had
15  the rest of the chart.
16       Q.      Okay.  There's nothing else to the
17  chart.
18       A.      Well, there's more rebates than
19  this.  That may be all you've got on the chart.
20       Q.      This is all that Medco produced in
21  this case.
22       A.      Well, I'm just saying there's more
23  rebate structure in your own documents --
24       Q.      Why --
```

1    A.    -- how Wyeth contracted.

2    Q.    No, I'm not talking about how Wyeth

3    contracted.  I'm talking about between Medco and

4    the health plans.  All right.

5          Assume -- you can view this as a

6    hypothetical.  Assuming that the testimony -- the

7    undisputed testimony is that somewhere between 80

8    and 90 percent of Medco's rebates passed on to

9    health plans, that might impact your conclusions,

10   would it not, in terms of the benefit of rebates

11   on the Premarin product; right?

12   A.    I don't think I'm articulating my

13   problem here.  All right.

14         If that -- if this were the totality

15   of the rebate structure, this would be helpful.

16   It is not.  The rebate structure also contains

17   administrative fees which are well known in the

18   industry, and Medco's one of the most aggressive

19   players in that, and they are -- there are rebate

20   structures that exist for mail order, and Medco's

21   one of the most aggressive players there.  So

22   you've got -- as this sits here for me,

23   substantial portions of the rebate dollars aren't

24   accounted for.

1    Q.    Have you made any effort, sir, to

2    figure out whether or not -- the amount of Wyeth

3    rebate dollars paid to Medco versus the amounts of

4    administrative fees?

5    A.    All I know is the contracts that we

6    obtained through discovery and how those broke

7    out.

8    Q.    Okay.  You -- you never -- Mr. Cohen

9    or no one else ever sent you any information that

10   explained how rebates were, in fact, passed on by

11   Medco to the health plans and its clients?

12   A.    Not that I recall.

13   Q.    If, in fact, Medco did pass on

14   between 80 to 90 percent of the rebate dollars

15   that it received from Wyeth and --

16   A.    In total.

17   Q.    In total.  And the administrative

18   fees that they received from Wyeth were less than

19   1 percent of the rebate dollars that they

20   received, wouldn't it be a situation much like

21   what you believe the situation to be at PCN?

22   A.    It would.  I don't -- I find it not

23   credible, but it would.

24   Q.    Okay.  Let's go to another example.

1          THE WITNESS:  Can we take a quick

2    break?

3          MR. DOBIE:  Sure.

4          THE WITNESS:  I've been consuming a

5    lot of water.

6          MR. DOBIE:  Okay.

7          THE VIDEOGRAPHER:  Going off the

8    record.  The time is 5:01 p.m.

9          This is the end of Tape No. 3.  The

10   time is 5:02 p.m.  We're now off the record.

11              * * *

12         (Whereupon, a short recess was

13   taken.)

14              * * *

15         THE VIDEOGRAPHER:  This is the

16   beginning of Tape No. 4.  The time is 5:12

17   p.m.  We're back on the record.

18   BY MR. DOBIE:

19   Q.    Dr. Gibson, have you reviewed the

20   deposition of Blue Shield of California --

21   A.    No.

22   Q.    -- Lee Sagapi?

23   Q.    Did you review the deposition of

24   Express Scripts?

1    A.    No.  I did review some of the

2    Express Scripts contracts.

3    Q.    Have you reviewed any of the

4    documents that have been produced by any of the

5    PBMs in this case that address the issue about how

6    much rebate dollars are being passed on to health

7    plans?

8    A.    These would be in the depositions?

9    Q.    Yes, sir.

10   A.    The only deposition -- we'll make

11   this easy.  The only deposition I have read was in

12   my old deposition.  I believe in the Duramed case --

13   I don't know if I read Bystrom's deposition or

14   not.  But those were really the two depositions

15   I've read.

16   Q.    All right.  And wouldn't you want to

17   review the testimony concerning how much rebates

18   are passed on in order to reach the conclusions

19   that are in your report if you, in fact, knew that

20   there was such evidence?

21   A.    I wanted to know what the rebate

22   structure was between the manufacturer and the

23   PBM.  That was my primary interest.

24   Q.    And so you weren't interested to the

5/18/2004  Gibson, David

1  extent to which rebates were passed on between the
2  PBMs and the health plan sponsors?
3      A.    I did not look at that.
4      Q.    Okay.  And you weren't interested in
5  it?
6      A.    Not particularly.
7              * * *
8              (Whereupon, Gibson Exhibit 14 was
9      marked for identification.)
10             * * *
11 BY MR. DOBIE:
12     Q.    One of the documents that you did
13 cite in this case I've marked as Exhibit 14.
14             MR. COHEN:  Shouldn't this be 15?
15             MR. EINHORN:  I think the other one
16     was marked 14.
17             MR. DOBIE:  I'm sorry.  Oh, we
18     didn't mark it?  I just use the Medco --
19     okay.
20             MR. COHEN:  Okay.  I thought it was
21     marked.  I'm sorry.
22 BY MR. DOBIE:
23     Q.    For the record, Exhibit 15, sir, can
24 you identify for the record?

1  here in the report that, in fact, from 1998 to
2  2001 rebates that PBMs paid to the three Federal
3  Employee Health Benefit Programs effectively
4  reduced plans' annual spending on prescription
5  drugs by 3 to 9 percent.  Do you see that?
6      A.    I do.
7      Q.    All right.  Did you reference that
8  in your report in any way?
9      A.    No.
10     Q.    And why not?
11     A.    Because it is a complex number to
12 arrive at.
13     Q.    All right.  Did you think this --
14 this was a reliable source for other purposes?
15     A.    I did.  And I think that's a
16 reliable number, but it doesn't give you enough
17 information to really answer it -- or to use it.
18     Q.    Then don't you think as it relates
19 to the people who are members of the Federal
20 Employees' Health Benefit Program to see that
21 rebate dollars paid by PBMs to them reduce their
22 annual spending on prescription drugs 3 to 9
23 percent?
24     A.    It --

1      A.    Yes.  It is a -- it is a
2  presentation set of slides from the GAO dated June
3  26 of 2003 and it deals with the subject of
4  pharmacy benefit managers.
5      Q.    So "The Role of Pharmacy Benefit
6  Managers in Federal Employees' Health Benefits
7  Programs" is what it's entitled?
8      A.    Right.
9      Q.    Did you attend this meeting, by any
10 chance?
11     A.    No.
12     Q.    And where did you get this document?
13     A.    As I recall, I either found it
14 through a reference or I picked it up directly off
15 of a search on the Internet.
16     Q.    Can I draw your attention to Page 9,
17 if I could.
18     A.    Okay.
19     Q.    All right.  And this is a document
20 that you cited in your report; correct?
21     A.    The slide part of it?
22     Q.    Yes.
23     A.    Yes, it is.
24     Q.    And -- and you note -- or it notes

1      Q.    Isn't that a -- isn't that a useful
2  piece of information?
3      A.    It's an interesting piece of
4  information.  It's a useful piece of information.
5  It, however, is one dimensional in least a three-
6  dimensional world.
7      Q.    Do you understand whether or not the
8  same way that PCN passes on 90 percent or more of
9  its rebate dollars to Medi-Cal in California
10 plans, whether or not the  -- whether the other
11 PBMs, the major PBMs in the country, Express
12 Scripts, Medco, AdvancePCS, and others, whether
13 they, in fact -- they pass on an equally high
14 percentage of their rebate dollars?
15     A.    They do not.
16     Q.    How do you know that?
17     A.    That -- that is -- the best source
18 that I would give you on that -- and I don't have
19 the reference and I didn't put it in my
20 document -- was about two or three years ago the
21 then president of AdvancePCS gave an address to a
22 trade convention, a national trade convention.  He
23 showed -- and this has never been published -- a
24 graph with two Y axes.  On the X axis was time  by

1    year and on the first Y axis was revenue generated
2    by -- by service; i.e., administering the benefit
3    plan and processing claims and all of that sort of
4    thing.
5              On the second Y axis was the
6    percentage of revenue based on rebates.
7              The two graphs intersected with
8    the -- in the earlier years, back in the early
9    '90s, the majority of the revenue for the plans --
10   for the PBMs being generated from servicing the
11   account to very little of the revenue coming from
12   servicing the account, with the percentage of
13   revenue coming to the PBM from rebates going in
14   the opposite direction.
15       Q.    Do you know how they account for
16   rebate dollars, how a pharmacy benefit manager
17   accounts for -- do they -- do they take the rebate
18   dollars in in revenue in the first instance,
19   record that as revenue, and then account for it
20   differently as they pass it on to health plans?
21   Do you know how they do it as an account?
22       A.    I would think they probably all have
23   different accounting rules.
24       Q.    The --

1    A.    I can look at their annual statement
2    and then you could say.
3        Q.    Are you assuming, sir, that because
4    a high percentage of their revenues are rebate
5    dollars that that means that they don't pass on a
6    high percentage of the rebates to plans?  Is that
7    an assumption?
8        A.    I don't think they're as high as
9    you -- the question you asked was do I think that
10   their rebate dollars and percentages are as high
11   as the percentages that you find with -- with
12   PCN's.
13       Q.    To federal employee health plans.
14       A.    Yes, but understand what I'm saying.
15   It's a complex way in which rebates are accounted
16   for.  And your client is playing heavily in this
17   market with more and more of the rebate going to
18   administrative fees and to the mail orders.  The
19   reason for going with higher administrative fees
20   is it gives them a way of getting around the 15
21   percent number that is the upper limits -- roughly
22   the upper limits for rebate contracting with
23   commercial accounts, because it would affect the
24   Medicare and Medi-Cal rates.

1        Q.    We'll come back to the Medi-Cal and
2    Medicare reimbursement.
3              Do you -- but since you raise a
4    different point, which is -- has to do with --
5    with Wyeth's contracting as it relates to
6    administrative fees, do you know whether or not
7    Wyeth pays administrative fees or any other rebate
8    dollars to PBMs at any greater or lesser amount
9    than owner pharmaceutical companies?
10       A.    No.
11       Q.    Do you know --
12       A.    I know that -- I know that the
13   general range, they were in it, which is somewhere
14   between 2 and 5 percent.
15       Q.    Okay.  Do you know, for example, at
16   Express Scripts what amount of nonrebate revenue
17   Express Scripts received from Wyeth?
18       A.    Nonrebate revenue?
19       Q.    Yes, sir.
20       A.    Well, if you -- if you -- if you
21   classify rebate in the broadest sense like I just
22   did, both revenue for placement on the formulary
23   and positioning, revenue on rebate for -- for
24   performance, and all of the other things that I've

1    cited in my contract, plus administrative rebates,
2    plus mail order rebates, if -- if I'm answering
3    within that context, are you asking me how much
4    other things they pay?
5        Q.    What you're saying is that there's a
6    class of rebate dollars -- or it's a class of
7    dollars that's paid to the managed care -- to the
8    PBM that's not passed on; correct?  That's your
9    point?
10       A.    Right.
11       Q.    All right.  Do you know what
12   percentage Wyeth paid to Express Scripts that was
13   not passed on --
14       A.    No, I don't.
15       Q.    -- to health plans?
16       A.    I know that, for instance, what you
17   just gave us here on Medco, which I find not
18   credible.  But no, I don't.
19       Q.    All right.  And do you -- do you
20   know -- would you be interested --
21       A.    And actually, there -- there would
22   not be any reason that anyone would know that.
23   That's not -- that's not published.
24       Q.    Okay.  Well, you're an expert in

1  this case.  Did you ask --

2      A.    Yes, but this -- these are

3  proprietary things.  Just because you're an expert

4  doesn't mean you know proprietary information.

5      Q.    Let me finish the question.

6      Did you ask Mr. Cohen to review the

7  Express Scripts documents or the depositions to

8  see what portion of their revenues that they

9  received from Wyeth were passed on?

10     A.    No, I did not.

11     Q.    Did you ask to review what portion

12  of the revenues that they received from Wyeth were

13  rebate dollars that were passed on as opposed to

14  administrative fees or other things that were not?

15     A.    I confine my interest to what the

16  contract was between Wyeth and Express Scripts and

17  what those rebate structures were.

18     Q.    Okay.  But you've made assumptions

19  in your report that there are certain fees that

20  these managed care companies are -- are receiving

21  from pharmaceutical companies like Wyeth that are

22  not being passed on.  So why would you not have

23  been interested in seeing whether, in fact, a

24  major PBM like Express Scripts was, in fact,

---

1  structured, and how did they affect the market.

2     Q.    Okay.  And -- and I guess what I

3  would ask is, how can you say how they would

4  affect the market, which includes patients,

5  physicians, health plans, all of these other

6  groups that you say are part of the market,

7  without understanding how much those Wyeth rebate

8  dollars on Premarin were, in fact, passed on?

9        MR. COHEN:  Objection.  Asked and

10    answered.

11     A.    Because you have to understand how

12  the MCO or the HMO treats the rebate that comes

13  back in.  In other words, frequently it's not

14  carried on the books as a part of ongoing

15  operations.  They're treated as one-time infusions

16  of cash that are not part of the budget.

17      I know at Omni that's how we treated

18  the rebates.

19  BY MR. DOBIE:

20     Q.    You treat it as one-time infusions

21  of cash?

22     A.    These -- you couldn't budget and

23  count on it, so it was generally carried not as a

24  budget revenue but as one-time transactions on an

---

1  receiving rebate dollars that were passed on?

2     A.    I knew that they were passing it on.

3  I didn't know, you know, whether it was 50 percent

4  or 60 percent or 70 or, as they allege here,

5  higher.

6     Q.    All right.  Why would you not have

7  been interested in what percentage of revenues

8  that Express Scripts received from Wyeth were

9  rebate dollars that were passed on versus other

10  fees that were not?

11     A.    Because it's not the primary area of

12  my report.  My report's primary interest was how

13  these rebate structures changed the market, not

14  the amount of money that was saved by the PBM or

15  passed on to the third-party payer.  That would

16  primarily be the area of interest for those

17  testifying for economic issues within the plan.

18     Q.    Because you'd agree that certainly

19  if you were looking at this from an economic

20  matter, you would have to understand those issues?

21     A.    I'm not an economist.  I don't know

22  what an economist would need.

23      I know, though, that my primary

24  interest was did they have rebates, how were they

---

1  annual basis.

2      So I think the premise you're

3  making -- I don't want to put words in your

4  mouth -- is that these rebate dollars going back

5  somehow go back into the benefit of the payer, and

6  I don't -- I don't think that's consistent with

7  the market.

8     Q.    Okay.  And all I'm asking is is

9  you're saying that you don't think that that's

10  consistent with the market, but you haven't made a

11  study of whether it did or didn't happen in this

12  case, have you?

13     A.    No, I haven't.

14     Q.    Let me ask you about PBMs more

15  generally and the business.  On Page 41 of your

16  report --

17     A.    Are we done with this?

18     Q.    For that page, yes, sir.

19     A.    Okay.  You said 41?

20     Q.    Yes.

21     A.    Okay.

22     Q.    It's a headline, "Rebates now

23  represent" -- you see that?  In the third

24  paragraph, you state that "As the PBM" -- "PBM

1  industry competes aggressively for new clients* --
2  let me just stop right there and ask you about
3  that first -- that first part.
4          Is it your understanding that --
5  that PBMs do aggressively compete for new clients?
6      A.    I do, yes.
7      Q.    And so health plans would go to
8  various PBMs, whether it's -- it's your company,
9  PCN, or Express Scripts or Medco or these others,
10 and try to get the best deal that they can for a
11 pharmacy benefit; correct?
12     A.    Yes.
13     Q.    And if the -- if the PBMs did not
14 receive rebates or other administrative fees, do
15 you think -- in your experience, would that impact
16 what the PBM charge the client health plans and
17 MCOs for their services?
18     A.    You bet.  They can't operate on no
19 revenue.
20     Q.    All right.  And that the health
21 plan's cost in essence would then increase?
22     A.    That's a complex assumption.  If --
23 if the --
24     Q.    Well, you said they can't operate

1  of the pharmacy benefit.
2      Q.    Okay.  And is that how PCN does
3  business?
4      A.    That's not how PCN does business.
5      Q.    All right.  And at PCN, is it true
6  that the receipt of rebates and administrative
7  fees actually lower health plan costs to the --
8      A.    No, it's not.  That's the point I'm
9  trying to make here, but you keep limiting my
10 ability to respond.
11         PCN, because it does an 80-20 split
12 or better --
13     Q.    Right.
14     A.    -- charges for its administrative
15 services.  When we go into -- and I've been to
16 these marketing meetings when the Merck-Medcos and
17 the Express Scriptses come in -- they offer to
18 give those services away free.
19     Q.    And so they actually charge lower
20 rates to health plans than PCN?
21     A.    They do even better than that.
22 They'll come in and they'll offer a cash bonus to
23 get the business up front, which is some
24 percentage of the rebate up front.

1  with no --
2      A.    I said the PBM cannot operate with
3  no revenue.
4      Q.    Right.
5      A.    Let me describe to you what the
6  typical competition is like.
7      Q.    Let's -- we can do that in a little
8  bit, but can you just answer my question in terms
9  of whether the health plan's cost would increase
10 in your experience if the PBM did not pass on --
11 if the PBMs didn't receive rebates or
12 administrative fees?
13     A.    The cost for the -- the cost for the
14 administration of the health -- of the pharmacy
15 benefit would probably increase.  The overall cost
16 of the pharmacy benefit might drop, which is
17 what's really important.
18     Q.    Why do you think that?
19     A.    Again, it goes back to the function
20 of if you set up the product so that there is a
21 hundred-dollar branded product and a $20 generic
22 product and you incentivize the movement of the
23 market to the hundred-dollar product and then give
24 a $10 rebate, you've increased the cost of the --

1      Q.    And -- and these health plans that
2  are out there, the teamsters union, and so on,
3  that -- that we talked about, are they now
4  frequently advised by groups like Mercer that we
5  talked about, groups like that?
6      A.    The world is a very complex place.
7      Q.    Just generally.
8      A.    I'm going to tell you that the
9  Mercers do advise.  I'll leave at that, and if you
10 want more, I'll give it to you.
11     Q.    Do you think that -- is it your
12 experience that health plans are more often than
13 not -- do they have a consultant that they're
14 working with to advise them in connection with
15 establishing a PBM benefit?
16     A.    Most of the self-fundeds do.  The
17 large players like HealthNet, probably not.
18     Q.    All right.  And is it your
19 experience that these consultants that would be
20 helping health plans would have more than one
21 client?
22     A.    Sure.
23     Q.    So they would have reason to -- to
24 not only have visited with a company like yours,

1    Q.    All right.  And when you -- when you
2  say that it's commonly known in the industry, are
3  there -- are there any published studies that talk
4  about this rampant conflict between the folks that
5  are advising the health plans and the PBMs?
6        A.    Not that I know of.
7        Q.    All right.
8        A.    It could be, but it just --
9        Q.    You have never seen any?
10        A.    I haven't -- I haven't referenced
11  it.  I didn't discuss it.  I didn't footnote it.
12        Q.    Okay.  And the -- have you seen
13  any -- in your report, you talk about lawsuits
14  that have been filed against PBMs, and so are
15  there lawsuits against these consulting groups
16  because of their -- this -- this conflict between
17  them and the PBMs?
18        A.    No.  The primary -- the primary
19  legal cases that I've been referring to this
20  afternoon involve the steering of the market to
21  more expensive branded products and the games that
22  are being played with generics.
23        Q.    But it's -- it's your view, going
24  back to my question, sir, that -- that health

1  plans are not being well advised because of
2  conflicts from their consultants?
3        A.    I'm quite suspicious of that.  I
4  think everybody is, or most people are.
5        Q.    Is there any congressional
6  investigations which are aware of this or anything
7  like that?
8        A.    No.
9        Q.    When you say it's common -- commonly
10  known in the industry, who have you heard this
11  from?  Mr. Bystrom?
12        A.    Among others.
13        Q.    Anybody else you can think of?
14        A.    I heard it from the entire marketing
15  staff at PCN.
16        Q.    Anybody else?
17        A.    Let's see if I've heard it within
18  the consulting industry.  I think that I heard it
19  from some of the consultants in the market, but
20  I'm not -- I'm not going to be able to give you
21  the name.  I think it came from Anon, A-n-o-n, but
22  I don't --
23        Q.    A-o --
24        A.    I don't have a name.  A-n-o-n.

1  That's one of the large consulting houses.  And I
2  don't know if they participate in that.  I think
3  the one that's most involved is Express -- is
4  Mercer.
5        Q.    So somebody at Anon --
6        A.    Actually -- I'm sorry.  I actually
7  got feedback from one of the Mercer partners that
8  they have these PBMs as clients.  And it was the
9  partner in their Portland office, and I don't
10  recall --
11        Q.    What's his --
12        A.    -- his name.
13        Q.    What's his name?  But he's in the
14  Portland office.
15        The Anon, A-n-o-n, that you
16  mentioned --
17        A.    A-n-o-n.
18        Q.    -- does -- does that group provide
19  consulting to health plans?
20        A.    I don't believe they do.
21        Q.    What -- what business are they in?
22        A.    No.  I'm sorry.  They do provide
23  consulting, not to the PBMs.
24        Q.    How do you know that?

1        A.    We had a discussion about this
2  during the competitive meet marketing structure
3  for the city of Portland about a year to a year
4  and a half ago.
5        Q.    Okay.  So in the instance of
6  somebody like Anon that doesn't have the conflicts
7  that you described, are they advising the city of
8  Portland in connection --
9        A.    They are -- they are advising the
10  city of Portland.
11        Q.    All right.  And just let me finish
12  my question, if you would.
13        So in a case like Anon where they're
14  advising the city of Portland, they're presumably
15  in the position to examine the differences between
16  what Express Scripts is -- is offering in terms of
17  rebate dollars, what a Medco is offering in terms
18  of rebate dollars, what PCN is offering in terms
19  of rebate dollars, what each of them is charging
20  for administrative fees and to advise their
21  clients in terms of what's the best deal; right?
22        A.    They would -- that's correct.
23        Now, I'm going to qualify it again.
24  You can add up all the -- you can add up all the

**Page 301**

1    columns and when you have one company that is
2    offering administrative fees for the pharmacy
3    benefit that's straight up, Here's what we do and
4    charge you for it, versus someone who says, I will
5    come in and do it all for free and I'll give you a
6    check up front for a portion of the rebate, it's a
7    very hard thing for the -- for the customer or for
8    the client not to go with those options.
9           The reason I'm so skeptical of the
10   numbers that you're throwing around here for
11   Merck-Medco is these companies cannot survive --
12   and, in fact, they're some of the most profitable
13   in America -- on no revenue.  You know, they're
14   giving their core services away and you're telling
15   me that they're passing through almost all of
16   their rebates, and I just -- something doesn't
17   compute here.
18       Q.    What makes you think that Medco is
19   one of the most profitable companies in America,
20   sir?  Have you ever looked at their financial
21   statements?
22       A.    I have.  I can't --
23       Q.    Okay.  What's their net income?
24       A.    I've actually quoted their net

**Page 302**

1    income here, and again, I don't recall which year
2    it was.  But give me a second and I'll find it.
3        Q.    What you quoted, sir, was the number
4    of scripts from Medco, not their net income;
5    right?
6        A.    Well, just hold on a second.  I'll
7    give you the numbers.
8           Starting at Page 24, you have the
9    total number of lives covered and on Page 26 for
10   the Big Four, you have the PBM revenue given in
11   millions.  So 35 million -- no.  That's -- I think
12   that's 30 -- 35 million -- no, it isn't.  It's --
13   it's -- it is -- it's -- this is listed here as
14   35,000.  This is -- the source for this is from
15   Wyeth documents and it is for the year 2003,
16   September 2003.  And it's showing Medco's PBM
17   revenue in millions and the units on the Y axis --
18   this is 35,000.  So 35 -- if -- according to this
19   chart, it's 35 thousand million.  That's a lot.
20       Q.    Was this 35 billion?
21       A.    That's -- that's the way you'd read
22   that.
23       Q.    Is -- that's the way your chart has
24   it, at least?

**Page 303**

1        A.    That's my -- my chart.
2        Q.    All right.  And do you think they
3    have 35 billion in revenues?
4        A.    I will just tell you that HSG and
5    Managed Care Diagnostics' report indicated that.
6        Q.    Do you -- to go back to my question,
7    did you -- do you know how many -- do you know
8    what their net income is?  Let's assume they had
9    35 billion.
10       A.    Net versus gross.
11       Q.    Let's assume that they had 35
12   billion in revenue.  Okay.  All that money to pay
13   all their employees, pay for all -- everything
14   that they do.  Do you know -- do you know what the
15   net income would be of the company?
16       A.    This number is their gross income
17   that would include paying for product.  The net
18   would be after product was paid for, is the way I
19   read this.
20       Q.    This is their revenues; right?
21       A.    This is their gross revenues.
22       Q.    Right.  So do you know what their
23   net is?
24       A.    I'd have to look it up.

**Page 304**

1        Q.    You haven't looked?
2        A.    I did, but I don't happen to have it
3    on the top of my head here.
4        Q.    Do you know if it's -- if they have
5    a 1 percent net income or less?
6        A.    I think it's more.
7        Q.    Do you know if it's -- how much
8    more?
9        A.    I would -- again, I'm going out on a
10   limb here.  I have looked at their financial
11   statements.  My bet is that they're something less
12   than 5 percent.
13       Q.    Okay.  When you say -- you make
14   these --
15       A.    Probably somewhere around 3.
16       Q.    -- these grand statements, okay,
17   which you have a habit of doing, Dr. Gibson -- you
18   said they're one of the most profitable companies
19   in America.  All right.  And then I ask you what's
20   their net income.
21           What's the basis for you saying
22   they're the most profitable company in America if
23   you don't know what their net income is?
24       A.    I didn't say they -- they were a --

5/18/2004  Gibson, David
5/18/2004  Gibson, David

1 they were one of the more profitable companies in
2 America is what I said.
3     Q.    Okay.  And -- and how can you say
4 they were one of the more profitable companies in
5 America if you don't know what their net income
6 income is?
7         MR. COHEN:  Object to the form.
8     A.    I do -- I do know what it is.  I've
9 seen it.  I just don't happen to have it with me
10 right now.
11 BY MR. DOBIE:
12     Q.    Okay.  And do you -- and sitting
13 here today under oath, it's your belief that
14 they're one of the more profitable companies in
15 America, Merck-Medco is?
16     A.    They are a -- they are -- they are
17 viewed as a very profitable company.
18     Q.    And are you talking about measured
19 on the basis of -- of revenues to income in terms
20 of their margins?  Are you talking about the total
21 dollar amount of their net income?  What's --
22 what's the basis for your most profitable --
23     A.    Return to shareholders and the
24 profitability for shareholders.  These are

1         MR. COHEN:  Object to the form.
2         Mischaracterizes the testimony.
3     A.    That's -- that's not even close to
4 what I said.  What I -- I'll restate where I am.
5         I'm saying that you are presenting
6 data to us today that we've never seen before that
7 says that -- that Medco is returning percentage of
8 rebates in excess of what PCN does and at the same
9 time Medco is in the market providing their core
10 services at little or no fees to the customers.
11 And I'm telling you I find that not credible.  I
12 think that the data you're getting does not
13 include all of their rebate funding.
14 BY MR. DOBIE:
15     Q.    How many current lives does PCN
16 have, sir?
17     A.    1,200 -- 1.2 million.
18     Q.    And how many does -- does Medco
19 have?
20     A.    Medco as of June 2001 was stated to
21 have 65 million.
22     Q.    Do you -- do you think that they run
23 a more efficient operation than PCN, sir, and as a
24 result of that they're able to offer health plans

5/18/2004  Gibson, David
5/18/2004  Gibson, David

1 publicly traded companies.
2     Q.    Are you talking -- so are you
3 including the amount that their stock has gone up?
4     A.    The valuation of their stock.
5     Q.    Okay.  All right.  So -- so are
6 they -- okay.  So you're -- their market
7 capitalization has gone up?
8     A.    Which reflects their profitability.
9     Q.    And --
10     A.    And you -- then you can get the
11 exact number on profitability out of their annual
12 statements.
13     Q.    Now, we're going kind of around and
14 around here, but what you're -- what you're saying
15 is that it's impossible -- your conclusion is,
16 even though you haven't read the testimony of the
17 witnesses under oath, you hadn't ever looked at
18 the document before, but it's your conclusion, Dr.
19 Gibson, that it's impossible that they're paying
20 on 90 percent of their rebate on Premarin to
21 health plans because of the fact that their stock
22 price has increased, and that means that they're
23 one of the more profitable companies in America?
24     A.    That's --

1 a better deal than PCN?
2     A.    I have no opinion as to whether
3 they're more efficient.  I will tell you that
4 adminstrative fees are generally standard across
5 the industry.  In other words, you don't -- what
6 the customer sees are administrative fees that are
7 consistent.
8         I am telling you I do not find it
9 particularly credible that you are being told
10 that -- that Medco has no real substantial
11 revenue, that they give their core services away.
12 The only -- the only way that I could possibly
13 accept that that is realistic is that their 10
14 percent that they're saving or 20 percent that
15 they're saving, whatever the number is, to
16 themselves is so huge that it represents a
17 substantial amount of money that's not going
18 through to the client.
19     Q.    Or could it also be that they're
20 making money on other products, PPIs?  And, for
21 example, do you know how rebate dollars on -- in
22 this therapeutic class, estrogens, compare to the
23 rebate dollars that a PBM makes in other
24 therapeutic categories?

1    A.    Rebates are set by class for a whole
2  host of reasons.  I'm totally ignoring now
3  placement and tier positioning and all of that.
4  Within class, the rebate dollars tend to fluctuate
5  on the options available.
6          So that if -- if -- take the
7  category of serotonin reuptake inhibitors.  If
8  there are four options available, the product
9  obtaining favorable positioning on the formulary
10  will generally pay a higher rebate to obtain that
11  than a drug in a class that's exclusive.
12    Q.    Do you know, sir, how many
13  therapeutic classes PCN has on formulary?
14    A.    Classes?
15    Q.    Yes.  How many -- how many
16  therapeutic --
17    A.    Probably around 15.  I don't -- I
18  don't -- I don't know.
19    Q.    Okay.  Do you know what the rebate
20  dollars are in terms of what -- what class most of
21  the rebate dollars fall into?  For example, is it
22  in PPIs, is it in estrogens, is it in -- in beta
23  blockers?  I mean, do you know -- do you know
24  where most of the rebate dollars fall --

1    A.    You can --
2    Q.    -- at PCN?
3    A.    I'll say I do not know the exact
4  numbers.  I can infer where they are, and most
5  knowledgeable people can on just about any PBM's
6  product line.  It's a function of the volume of
7  drugs that are used.  If you have a low number,
8  the unit cost is low.  That's what makes Premarin
9  such an important player, because it's such a
10  commonly prescribed drug, so it doesn't need to be
11  a top-tier cost drug per unit.  It generates a lot
12  of rebate dollars because it's a big part of the
13  number of units moved.
14          If you look at any plan, the actual
15  dollars spent or the units dispensed, the highest
16  tier usually are mental health drugs.  Also high
17  frequently are analgesics, and that class can go
18  from nonsteroidals all the way to narcotic
19  analgesics.  Somewhere in the middle of the range
20  are usually drugs relating to women's health.
21    Q.    So it's your belief that the dollars
22  spent by a particular health plan on a pharmacy
23  benefit, women's health, that category would fall
24  sort of in the middle of the range, the cost of

1  the product?
2    A.    Yes, somewhere in the middle tier of
3  total spending would be women's, particularly
4  hormone replacement therapy.
5    Q.    Okay.  And do you know -- you've
6  given us your best estimate in terms of where --
7  where the dollars are spent as it relates to
8  different categories of products here and you've
9  got women's health in the middle.
10          Do you know whether rebate dollars
11  match that?  In other -- in other words, is -- is
12  it a -- do you have -- you said 15 -- 15 classes.
13          Let me finish the question so Mac
14  can get it down.
15          If you have 15 classes of products
16  at PCN, as you -- as you testified to, would --
17  would Premarin be 10 percent of the rebate
18  dollars, would it be 90 percent of the rebate
19  dollars?  Do you have any sense of that?
20    A.    Overall, Premarin's -- I'm thinking
21  out loud here to get you an answer.
22          Overall, the rebate structure for
23  Premarin is about 10 percent, according to what
24  I read in your documents, which, incidentally, in

1  the range of rebates is in the midrange.  If -- if
2  there were other conjugated estrogens they were
3  actually competing against heads up, it would --
4  you would expect it to be higher than 10 percent,
5  somewhere between 10 and 15 percent.
6          But if I could back into the number
7  for what would likely be the rebate number for --
8  for Premarin and hormonal replacement through
9  Premarin family of drugs, my calculating about 10
10  percent of what the total revenue -- total cost
11  was to the plan.  Now, how that relates to other
12  classes, I've never looked at that.
13    Q.    I mean, I guess what I'm wondering,
14  sir, is just to be clear, you never looked at what
15  percentage of Medco's rebate dollars come from the
16  Premarin family of products versus, let's say,
17  other categories?
18    A.    I don't think that would commonly be
19  available.
20    Q.    Right.
21    A.    Those are all, again, proprietary
22  numbers.  You get total numbers frequently, but
23  not -- not by class or by drug.
24    Q.    Have you looked at any documents in

5/18/2004 Gibson, David

**Page 313**

```
 1   this litigation that give you the amount of rebate
 2   dollars paid to any PBMs and compare the amount
 3   for Premarin versus any other product that Wyeth
 4   sells?
 5        A.    I didn't see or study contracts
 6   other than for Premarin-related products.
 7        Q.    Okay.  But did you look -- I wasn't
 8   asking about contracts.  I asked whether you
 9   looked at documents that talk about what
10   percentage of rebate dollars PBMs received from
11   Wyeth for Premarin as opposed to for other
12   products.
13        A.    No.
14        Q.    Okay.  So when you testified that
15   you can't believe -- let me -- let me back up.
16              Do you think these people from Medco
17   are lying?
18        A.    I'm just saying that I'm having
19   trouble with the data you're presenting to me
20   today for the first time.  I'm skeptical of that
21   data.
22        Q.    All right.  How about like Blue
23   Cross of California?  A hundred percent of the
24   rebates dollars passed on is there -- is the
```

4/1/2005 2:24 PM                                         313

5/18/2004 Gibson, David

**Page 314**

```
 1   testimony that the contract manager there.  Do you
 2   think -- do you think that's -- that's also hard
 3   to believe?
 4        A.    Is that a -- is that a captive PBM
 5   for Blue Cross of California?  I can't recall.
 6        Q.    I'm sorry.  Blue Shield of
 7   California.
 8        A.    Well, okay.  Yes.  That's a very
 9   interesting example.  They've got a very different
10   relationship.  They have a company known as Argus
11   that administers their pharmacy benefit.  That
12   means they do the claims processing.  The inhouse
13   people within Blue Shield negotiate all the
14   rebates, manage the network, and so I wouldn't be
15   at all surprised that they would have a hundred
16   percent.  I'd be surprised if it was otherwise,
17   because they have fractionated the PBM product
18   into its individual components and all the rebate
19   revenue stays within Blue Shield.
20        Q.    Okay.  So -- so it doesn't surprise
21   you that a hundred percent of the rebate dollars
22   would be passed on by -- by Blue Shield?
23        A.    In that model, you didn't -- the
24   word "Medco" didn't ever come up in that sentence.
```

4/1/2005 2:24 PM                                         314

5/18/2004 Gibson, David

**Page 315**

```
 1        Q.    In Blue Shield of California.
 2        A.    Yes.
 3        Q.    That doesn't -- that doesn't
 4   surprise you?
 5        A.    Not for that arrangement --
 6        Q.    All right.
 7        A.    -- with Argus.
 8        Q.    And -- and don't you think, as you
 9   mentioned before, given that this is a
10   competitive -- and you say on Page 41 of your
11   report, and you agreed with this, that the PBM
12   industry is aggressively competing for new
13   clients.
14              Given that that's the case, that
15   you've got people like PCN out there passing on 80
16   percent of the rebates, Blue Shield of California
17   passing on a hundred percent of the rebates,
18   wouldn't the other PBMs have to pass on a high
19   percentage of the rebates in order to compete with
20   you-all --
21              MR. COHEN:  Object to the form.
22        A.    No.
23   BY MR. DOBIE:
24        Q.    -- if they're advised by --
```

4/1/2005 2:24 PM                                         315

5/18/2004 Gibson, David

**Page 316**

```
 1        A.    Because --
 2        Q.    Let me finish the question.
 3              -- if they're being advised by
 4   consultants, as you -- as you indicated?
 5        A.    Even under consultation with a
 6   nonconflicted consultant, it's very hard for a
 7   customer to take a free gift of administration.
 8   Even though they know in the back of their mind
 9   that it's going to get paid for on the rebate
10   arrangement, they -- they don't budget the rebate
11   dollars in their yearly financial plan, and truly
12   there's an add-on at the end.  So in the marketing
13   environment, they get -- they can go -- these --
14   these -- these pharmacy managers or benefit
15   managers in most of the companies, like, say, the
16   city of Portland, are middle managers.  They're
17   not senior management.
18        Q.    All right.  But that's -- at the end
19   of the day, it's a decision that those plans are
20   making then whether to go with a PCN and get 80
21   percent of the rebates passed on, a Blue Shield of
22   California, a hundred percent of the rebates
23   passed on, or -- or a Medco and get some of the
24   money up front; correct?
```

4/1/2005 2:24 PM                                         316

1    A.    First of all, Blue Shield is not
2   selling their -- that PBM product as a -- as a --
3    Q.    Let me change my hypothetical.
4          At the end of the day, it's the --
5   it's then the decision on the part of these plans
6   whether they want to take some of the money up
7   front and get smaller rebates as opposed to going
8   with somebody like a PCN and having 80 percent or
9   more of the rebates passed on; right?
10         MR. COHEN:  Object -- object to the
11   form.
12    A.    We -- I'm starting to get lost here,
13   but I'm saying that the end of the day, it's the
14   customer that makes the decision.
15   BY MR. DOBIE:
16    Q.    Yes.
17    A.    We got into this conversation
18   wherein I was skeptical that you were giving me an
19   environment that's too good to be true, that you
20   have a Medco coming in with no administrative fees
21   and greater than the stated PCN rebate returns,
22   and I'm just saying that that doesn't smell right.
23    Q.    You're the one who's saying that
24   there's no administrative fees.  My hypothetical

1   small they were, quite frankly, in relation to the
2   rebate dollars, but you don't know about that
3   either.  I don't need to educate you, because you
4   haven't done -- you haven't looked at that.  It
5   wasn't necessary for you to render your opinions.
6    A.    Okay.
7    Q.    Right?
8    A.    No, it's not right.  What I'm --
9   what I'm asking you --
10    Q.    Was it -- was it --
11    A.    -- is did -- did he testify that he
12   was having administrative fees that he was passing
13   through in tandem with these rebate dollars that
14   you've presented to us.
15    Q.    I can't answer your questions.
16    A.    Oh.
17    Q.    Okay.
18         MR. COHEN:  Gordon, is this --
19    A.    But see, you're the one giving me
20   the --
21   BY MR. DOBIE:
22    Q.    I'm giving you a hypothetical.  I
23   want to get your opinion based upon a hypothetical
24   or a statement of facts from a witness.

1   is simply what the man testified to in his
2   deposition.  He didn't say they didn't have
3   administrative fees.  You've thrown that into my
4   hypothetical.
5    A.    Well, I'm telling you that that's --
6    Q.    That --
7    A.    It's my experience that that's
8   exactly what's going on with that.
9    Q.    Okay.  But what -- what I've said
10   is -- is exactly what the witness has testified to
11   under oath, which you haven't reviewed.
12    A.    Right.
13    Q.    All right.
14    A.    And you're saying that in that
15   deposition he said that they're charging
16   administrative fees and they are giving greater
17   rebates than what we have quoted here.  That's
18   what he testified to?
19    Q.    He testified that 90 percent of the
20   rebates on the Premarin product were passed on.
21    A.    And what did he say about the
22   administrative fees?
23    Q.    The administrative fees were -- were
24   discussed in relation to how big they were or

1    A.    And my -- my opinion is based on the
2   hypothetical you present is that it's not
3   realistic.
4         MR. COHEN:  Is this a good time to
5   break?
6         MR. DOBIE:  Sure.
7         THE VIDEOGRAPHER:  This concludes
8   today's proceeding in the deposition of
9   David Gibson.  The time is 6:03.  We're now
10   off the record.
11         * * *
12         (Whereupon, the deposition adjourned
13   at 6:03 p.m.)
14         * * *
15
16
17
18
19
20
21
22
23
24

5/18/2004  Gibson, David

5/18/2004  Gibson, David

```
 1         INSTRUCTIONS TO WITNESS

 2

 3         Please read your deposition over

 4  carefully and make any necessary corrections.  You

 5  should state the reason in the appropriate space on

 6  the errata sheet for any corrections that are made.

 7         After doing so, please sign the errata

 8  sheet and date it.

 9         You are signing same subject to the

10  corrections you have noted on the errata sheet,

11  which will be attached to your deposition.

12         It is imperative that you return the

13  original errata sheet to the deposing attorney

14  within thirty (30) days of receipt of the deposition

15  transcript by you.  If you fail to do so, the

16  deposition transcript may be deemed to be accurate

17  and may be used in court.

18

19

20

21

22

23

24
```

```
 1         ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4  certify that I have read the foregoing pages,

 5  _____, and that the same is a correct

 6  transcription of the answers given by me to the

 7  questions herein propounded, except for the

 8  corrections or changes in form or substance, if any,

 9  noted in the attached Errata Sheet.

10

11  _____

12  DATE

13

14

15  Subscribed and sworn to before me this

16

17  _____ day of _____,

18  200_.

19

20  My commission expires: _____

21

22  _____

23  Notary Public

24
```

5/18/2004  Gibson, David

```
 1              - - - - - - -

 2              E R R A T A

 3              - - - - - - -

 4  PAGE    LINE        CHANGE

 5  _____

 6  _____

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____
```

5/18/2004  Gibson, David

```
 1

 2         C E R T I F I C A T E

 3

 4         I hereby certify that the witness was

 5  duly sworn by me and that the deposition is a true

 6  record of the testimony given by the witness.

 7

 8         It was requested before completion of

 9  the deposition that the witness, DAVID J. GIBSON,

10  M.D., have the opportunity to read and sign the

11  deposition transcript.

12

13

14

15              _____

                McKINLEY WISE, CM

16              Dated: May 28, 2004

17

18  (The foregoing certification of this transcript does

19  not apply to any reproduction of the same by any

20  means, unless under the direct control and/or

21  supervision of the certifying shorthand reporter.)

22

23

24
```

5/18/2004  Gibson, David

```
1                    LAWYER'S NOTES
2    PAGE   LINE
3          _____
4          _____
5          _____
6          _____
7          _____
8          _____
9          _____
10         _____
11         _____
12         _____
13         _____
14         _____
15         _____
16         _____
17         _____
18         _____
19         _____
20         _____
21         _____
22         _____
23         _____
24         _____
```

4/1/2005  2:24 PM                                    325


5/18/2004  Gibson, David

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

4/1/2005  2:24 PM                                    326

**$**

**$10** [290:24]
**$2** [201:14] [204:1]
**$20** [213:10] [290:21]
**$24** [202:15]
**$25** [156:17] [201:13] [203:20,24] [206:19] [219:1] [220:4]
**$27** [200:17] [201:1,6,18]
**$30** [156:17] [201:8,21] [203:18,19]
**$300** [17:6] [92:9,13] [95:21]
**$34** [157:9]
**$40,000** [95:16]
**$5** [213:14]
**$500** [92:10] [93:1] [94:7]
**$60,000** [95:15]

**0**

**01** [1:8]
**03** [41:5]
**04** [88:7]

**1**

**1** [1:8] [3:7] [5:2,6] [7:11] [30:3] [72:6] [84:24] [98:6] [123:10] [129:16] [137:17] [235:17] [269:4] [274:19] [304:5]
**1,200** [307:17]
**1.2** [307:17]
**1:15** [134:9]
**1:20** [134:14]
**10** [3:16] [26:3] [52:6] [59:24] [61:9] [67:4] [87:6] [89:7] [152:13,17,18] [155:1] [158:3] [201:13] [203:24] [228:19] [260:22] [308:13] [311:17,23] [312:4,5,9]
**10,000** [31:24] [34:10] [80:19]
**10:19** [1:16] [5:12]
**100** [3:12]
**105** [3:13]
**11** [3:8,17] [218:3,11]
**11.6** [246:6]
**12** [3:18] [83:4] [123:14] [129:14,17] [149:24] [220:9,14,15] [235:17]
**12:02** [84:24]
**12:20** [85:7]
**120** [95:2,6]
**128** [3:14]
**12th** [123:11]
**13** [3:20] [131:19,23] [144:11] [147:14] [237:18] [243:13] [245:22] [246:12] [259:10,15,16] [260:6]
**135** [3:15]
**14** [3:21] [71:22] [246:20] [277:8,13,16]
**15** [59:24] [61:9] [67:4]

[156:2] [222:4] [232:24] [242:22] [277:14,23] [282:20] [309:17] [311:12,15] [312:5]
**15.74** [218:23]
**152** [3:16]
**1520** [156:2]
**15-20** [156:2]
**15th** [1:23] [12:1]
**16** [3:9] [137:17,24] [138:9]
**16.7** [246:7]
**1650** [1:15]
**17** [138:9] [140:22]
**18** [1:10] [231:7] [248:17]
**1818** [2:4]
**1880** [1:] [5:16]
**18th** [5:11] [100:16]
**19.7** [146:18]
**19103** [1:16,] [2:] [5:18]
**191037301** [1:16]
**19103-7301** [1:16]
**1912** [77:19]
**1980** [78:2]
**1984** [76:3,6]
**1990** [83:9]
**1991** [76:3,6]
**1995** [110:18]
**1996** [70:16] [231:21]
**1998** [51:15] [55:7] [70:16] [279:1]
**1999** [98:18] [99:16] [144:16,22] [146:17] [156:24] [242:23] [246:6] [252:11] [268:19]

**2**

**2** [3:8] [11:18,23,24] [85:7] [96:6] [182:6] [269:21,23] [270:7,8,14,15] [271:13] [283:14]
**2.50** [202:15,19] [203:8] [204:5]
**2:00** [119:1]
**2:03** [135:8,22]
**2:05** [136:4]
**2:59** [182:6]
**20** [36:16] [262:1] [308:14]
**200** [95:9,11,21] [323:18]
**2000** [17:15] [45:1] [51:9] [156:10,21]
**2000s** [155:12]
**2001** [156:9] [279:2] [307:20]
**2002** [40:19,20,22] [100:17] [155:13] [156:9,16] [157:5,8] [176:18] [180:4] [268:19]
**2003** [17:13] [28:19] [45:4] [96:3] [166:4] [168:1] [169:2] [174:18] [176:6] [278:3] [302:15,16]
**2004** [1:10] [5:11] [12:1] [138:6] [140:23] [142:14] [324:16]
**203** [96:6]
**204** [96:6]
**215** [1:24] [2:5,15]

**2154960300** [2:5]
**215-496-0300** [2:5]
**2155686200** [2:15]
**215-568-6200** [2:15]
**218** [3:17] [100:22]
**22.50** [201:14] [204:1]
**220** [3:19]
**23** [158:14] [215:3]
**24** [50:18] [302:8]
**24.50** [201:15,16] [204:2]
**25** [156:22] [157:11] [202:23]
**2500** [1:14] [2:4]
**259** [3:20]
**26** [278:3] [302:9]
**27** [213:11]
**277** [3:21]
**27th** [2:14]
**28** [144:22] [324:16]

**3**

**3** [3:9] [16:8,13] [93:5,10] [182:13] [271:14] [275:9] [279:5,22] [304:15]
**3:01** [182:13]
**3:34** [212:4]
**3:47** [212:10]
**30** [156:22] [157:11] [213:11] [302:12] [321:14]
**300** [93:13]
**312** [2:10]
**3125585691** [2:10]
**312-558-5691** [2:10]
**35** [2:9] [302:11,12,18,19,20] [303:3,9,11]
**35,000** [302:14,18]
**36** [114:24] [156:23]
**37** [155:5]

**4**

**4** [3:10] [70:24] [71:5,7] [98:3] [231:20] [275:16]
**40** [26:7] [244:1,3,4]
**41** [288:15,19] [315:10]
**44** [124:13] [127:3] [161:7]
**4830** [7:3]
**496** [2:5]

**5**

**5** [3:7,11] [27:15] [30:5] [74:7] [75:10] [87:23] [88:4] [93:5,10] [130:2] [132:1,3,5] [261:20] [270:22] [283:14] [304:12]
**5:01** [275:8]
**5:02** [275:10]
**5:12** [275:16]
**50** [139:24] [286:3]
**500** [93:14]
**50s** [42:18]
**51** [124:17,22] [127:3,4]
**558** [2:10]
**56** [215:3]
**568** [2:15]

**57** [215:2]

**6**

**6** [3:3,12] [9:17,18] [27:16] [98:24] [99:1] [100:9,14,15] [214:23] [261:2]
**6,000** [17:6]
**6.7** [260:8,13] [261:17]
**6.8** [144:24]
**6:03** [320:9,13]
**60** [28:15] [95:22] [286:4]
**60601** [2:]
**64** [146:17]
**65** [307:21]

**7**

**7** [3:13] [105:14,18] [106:1] [112:6]
**70** [3:10] [14:19] [15:3,10,12,19] [20:4] [286:4]

**8**

**8** [3:14] [127:23] [128:1,6] [242:23]
**80** [91:23] [257:15] [258:2,13,23] [259:22] [261:23] [263:22] [269:10] [272:6] [273:7] [274:14] [291:11] [315:15] [316:20] [317:8]
**8020** [257:15] [258:2,13] [259:22] [291:11]
**80-20** [257:15] [258:2,13] [259:22] [291:11]
**83** [268:18] [269:15]
**84** [76:8]
**85** [49:12] [76:8]
**87** [3:11]
**88** [269:15,16]

**9**

**9** [3:15] [118:22] [135:4] [136:22] [140:24] [142:9] [154:8] [222:6] [261:19] [266:20] [278:16] [279:5,22]
**90** [26:8] [49:11] [243:10,13] [260:17] [263:22] [268:18] [269:10,15] [271:19] [272:7] [273:8] [274:14] [280:8] [306:20] [311:18] [318:19]
**90s** [281:9]
**91** [269:15,23]
**92** [243:11]
**95** [49:12]
**96** [70:19] [71:15] [231:17] [232:2]
**98** [70:19] [71:15] [231:17,21] [232:3]
**988** [1:24]
**9889191** [1:24]
**988-9191** [1:24]

A

**a.m** [1:16] [5:12]
**ability** [38:3] [51:2] [196:1,23] [291:10]
**able** [30:7,13] [47:2] [54:24] [58:16] [59:13] [80:9] [97:19] [119:8] [126:22] [137:8] [151:13] [185:17] [196:22] [227:10] [271:3] [298:20] [307:24]
**aboard** [34:14]
**above** [124:1] [155:21] [218:22] [270:2]
**absolute** [39:16]
**absolutely** [33:21] [181:17] [206:22] [214:4]
**absolutes** [205:9]
**academic** [41:16] [42:9] [89:8]
**accept** [308:13]
**acceptable** [69:16]
**acceptance** [69:7]
**access** [122:12] [191:7] [194:8,15] [196:10,21] [197:7] [249:12,17] [252:18] [253:6]
**accompanied** [113:1,4]
**accomplished** [99:4]
**according** [302:18] [311:23]
**accordingly** [122:5]
**account** [76:16] [281:11,12 ,15,19,21]
**accounted** [273:24] [282:15]
**accounting** [281:23]
**accounts** [19:6] [259:24] [281:17] [282:23]
**accuracy** [142:19] [145:2] [148:11,19] [149:13] [150: 11]
**accurate** [71:12] [72:18] [102:12] [128:23] [145:11] [244:21] [321:16]
**ace** [33:13,14] [38:6]
**a-c-e** [33:14]
**achieve** [271:3]
**achieved** [270:2]
**achieving** [250:3] [270:24]
**acknowledgment** [323:1]
**acquisition** [200:9] [205:14]
**across** [145:24] [153:6] [190:1] [200:5] [205:17] [258:20] [308:4]
**act** [33:23,24]
**action** [1:5] [117:5] [271:2]
**activist** [242:16]
**activities** [14:15,16] [19:2] [22:10] [36:24] [47:13] [75:18] [120:12] [191:6] [200:5]
**activity** [9:24] [15:1] [26:5,14] [37:10] [38:14] [271:1]
**actual** [67:15] [112:5] [123: 4] [128:22] [139:2] [143:23] [218:22] [219:23] [310:14]

**actually** [13:12,22] [19:24] [20:13,20] [22:20,23] [23:3] [44:15] [63:6] [74:5] [94:6] [104:5] [107:13] [113:2] [122:17] [124:20] [125:5] [137:19] [138:15] [139:16] [141:9] [148:9] [151:8,13] [179:16] [181:13] [188:2] [194:15] [203:22] [206:12] [215:20] [220:3] [234:10] [247:13] [253:23] [265:8] [271:11] [284:21] [291:7,19] [299:6] [301:24] [312:3]
**actuaries** [30:23]
**actuary** [30:19,21]
**add** [59:3] [74:8] [83:16] [143:4] [152:8] [300:24] [316:12]
**added** [130:6,8] [202:15] [246:9]
**addition** [107:1] [136:19] [197:15]
**additional** [9:16] [10:2] [104:11,20] [105:21] [111: 12] [114:7] [234:23]
**additions** [102:13]
**addon** [83:16] [316:12]
**add-on** [83:16] [316:12]
**address** [7:2] [90:4] [162:13] [276:5] [280:21]
**adequate** [138:19]
**adjourned** [320:12]
**administer** [49:6] [239:3]
**administered** [54:11] [240: 2]
**administering** [238:14,18] [262:20] [281:2]
**administers** [239:14] [264: 10] [314:11]
**administrate** [35:9]
**administration** [53:4,23] [54:4] [62:17] [290:14] [316:7]
**administrative** [239:9] [268:24] [273:17] [274:4,17] [282:18,19] [283:6,7] [284:1] [285:14] [289:14] [290:12] [291:6,14] [293:9] [300:20] [301:2] [308:6] [317:20,24] [318:3,16,22,23] [319:12]
**administrator** [47:24] [238:19] [257:20]
**administrators** [62:23] [63:14,23] [64:10,14] [239:1,11]
**adminstered** [256:6]
**adminstrative** [308:4]
**admiring** [78:15]
**admittedly** [204:3]
**adoption** [142:15]
**adult** [24:17]
**advancepcs** [141:14,24] [176:18] [280:12,21] [294: 23] [295:1]

**advancepcss** [141:10]
**advantages** [151:12]
**advice** [221:9] [295:15] [296:8,9]
**advise** [80:21] [292:9,14] [293:7] [300:20]
**advised** [292:4] [295:13] [298:1] [315:24] [316:3]
**advisers** [293:19] [295:22]
**advises** [190:9] [220:23]
**advising** [297:5] [300:7,9,14]
**advisory** [86:21,23] [87:3] [223:13]
**affairs** [70:15] [71:23]
**affect** [51:2] [98:14] [282:23] [287:1,4]
**affiliated** [53:9] [207:4]
**affirmative** [147:20]
**afternoon** [119:1] [135:2] [265:13] [297:20]
**again** [8:8] [16:17] [22:8] [38:20] [39:16] [40:9] [50:22] [64:9] [95:14] [103:5] [111:4] [112:16] [114:6,24] [119:23] [120:24] [121:16] [127:13] [131:6] [132:22] [138:13] [140:18,23] [141:20,23] [144:2,18] [150:7] [157:17] [191:3] [201:19] [210:24] [215:24] [223:12] [225:17] [241:22] [244:8,13] [246:12] [247:3] [250:10] [251:7] [253:7] [254:4] [258:6] [261:19] [262:23] [290:19] [300:23] [302:1] [304:9] [312:21]
**against** [160:3] [265:2] [297:14,15] [312:3]
**agencies** [235:22]
**agent** [10:18,19,22]
**agents** [12:14]
**aggravation** [70:11]
**aggregate** [94:24]
**aggressive** [141:5,20] [273:18,21]
**aggressively** [289:1,5] [315:12]
**ago** [10:23] [13:13] [89:7] [164:7] [178:5] [193:3] [207:12] [212:15] [252:4,10 ,12] [280:20] [300:4]
**agree** [14:15] [184:12] [262:7] [286:18]
**agreed** [94:6] [140:15] [315:11]
**agreement** [135:16] [136:8] [254:20,21]
**agreements** [166:21] [181: 1,18] [182:21] [190:5] [253:11] [255:24] [267:1] [271:6]
**ahead** [7:11] [35:2] [127:14 ,22] [143:21] [206:20]
**aid** [2:16] [6:1] [26:18,23] [97:5] [117:13,18,23] [118:9]

**advancecpcs** [141:14,24]

**ais** [137:9,10] [154:6,18] [155:6] [156:7]
**aisle** [100:7]
**al** [1:8]
**alan** [10:12] [12:4] [17:20] [20:5]
**allege** [286:4]
**alleged** [217:20]
**alleging** [219:9]
**allinclusive** [106:21]
**all-inclusive** [106:21]
**allow** [197:22]
**allowable** [215:12] [216:6]
**allows** [178:21]
**almost** [35:11] [38:14] [59:10] [114:1] [215:5] [252:9] [293:21] [301:15]
**along** [239:4]
**already** [28:4] [203:9] [204: 11] [229:1]
**altogether** [158:16] [159:20]
**alumni** [53:9,13]
**always** [70:9] [139:10] [208:6,7] [215:5]
**am** [22:24] [37:2] [56:7] [180:13] [183:18] [185:8] [186:22] [200:21] [229:4] [307:4] [308:8]
**ambulatory** [61:15] [62:1]
**amendment** [270:5]
**america** [78:19] [188:1] [301:13,19] [304:19,22] [305:2,5,15] [306:23]
**american** [31:12] [85:21] [86:11] [99:10]
**among** [298:12]
**amount** [56:1] [61:16] [145:21] [205:23] [206:21] [208:13] [211:10] [213:8,17] [214:14] [218:24] [274:2] [283:8,16] [286:14] [305:21] [306:3] [308:17] [313:1,2] [319:3]
**amounts** [248:11] [252:20] [274:3]
**amy** [258:11]
**analagous** [18:20]
**analgesics** [310:17,19]
**analogous** [48:10]
**analysis** [32:16] [34:7,20] [147:13,16] [235:4]
**analyze** [98:15] [99:8,12]
**analyzes** [28:9]
**and/or** [132:18] [324:20]
**anecdotal** [56:22] [59:18]
**angeles** [14:20] [52:18]
**annual** [279:4,22] [282:1] [288:1] [306:11]
**anon** [298:21,24] [299:5,15 ,17] [300:6,13]
**a-n-o-n** [298:21,24] [299:15 ,17]
**answer** [4:2] [20:9] [21:4,17] [83:10] [91:3] [101:12,19,23] [145:9] [152:4] [154:23] [165:21] [166:24] [169:13] [173:16,17,18] [175:4,12]

**5/18/2004  Gibson, David**

[179:22] [183:19] [204:4]
[215:7] [216:14] [217:8]
[226:9] [234:9] [240:20,21]
[247:19,20] [253:14] [264:
3] [279:17] [290:8] [296:10]
[311:21] [319:15]
**answered** [40:8] [127:12]
[129:2] [145:13] [148:21]
[169:6] [187:23] [287:10]
**answering** [194:3,7] [195:21]
[284:2]
**answers** [19:22] [119:24]
[177:9] [323:6]
**anticipate** [34:14]
**anticoagulants** [32:21]
[33:5,6]
**anticompetitive** [99:5]
**antonio** [76:24]
**anybody** [94:5] [115:7,10,14
,18,22] [116:3,16] [117:2]
[118:8] [128:20] [188:1]
[226:22] [298:13,16]
**anyone** [147:12] [185:17]
[210:23] [284:22]
**anything** [36:2] [53:12]
[84:1] [85:18] [89:4] [94:17]
[150:10] [152:9] [153:5]
[163:8] [174:22] [179:4]
[191:1] [197:9,21] [198:1]
[199:22] [211:20] [298:6]
**anywhere** [177:24]
**ao** [298:23]
**a-o** [298:23]
**apart** [187:20] [197:12]
[200:3]
**apologize** [107:9] [168:5]
**apothecary** [1:]
**apparent** [64:2] [66:18]
**apparently** [136:8]
**appear** [175:19]
**appeared** [130:12]
**appears** [7:16] [216:18]
[238:1]
**apples** [215:23] [253:14,15]
**applied** [50:10] [150:20]
[234:19]
**apply** [324:19]
**appointed** [10:12] [12:4]
**appreciated** [11:5]
**approach** [17:4,18] [30:2]
[108:19]
**approached** [90:6]
**approaches** [142:15]
**appropriate** [32:4] [180:10]
[263:3] [321:5]
**appropriately** [295:13]
**approval** [47:6]
**approved** [1:18]
**area** [14:23] [24:17] [27:11]
[29:14] [36:21] [37:2]
[61:3] [64:24] [65:3] [76:23]
[89:11,14,17] [97:13,17]
[101:14] [102:6,16] [103:3
,7,10] [119:15] [124:10]
[125:7] [199:5] [247:4]
[286:11,16]

**areas** [104:16] [121:4]
[126:2,3] [127:20] [151:10]
**arena** [14:11] [93:16]
**arent** [16:22] [29:7] [33:18]
[89:24] [136:9] [179:9]
[196:6] [236:11] [273:23]
**argue** [151:12] [190:2]
**argumentative** [73:23]
[139:5] [148:21]
**argus** [314:10] [315:7]
**arise** [233:21]
**arised** [233:21]
**arisen** [233:21] [235:7]
**aronchick** [2:]
**around** [31:24] [50:15]
[76:22] [77:2,4,23] [83:1]
[95:15] [96:15] [119:1]
[139:10] [143:13] [150:16]
[208:19] [232:24] [264:3,4]
[282:20] [301:10] [304:15]
[306:13,14] [309:17]
**arrangement** [188:5] [252:
14] [294:13] [315:5] [316:10]
**arrangements** [35:14]
[221:14]
**arrive** [279:12]
**arthritis** [89:17]
**article** [3:8,11,15,16] [87:7,9
,12,18,20] [88:5,22] [89:20
,22] [91:5] [138:11,16]
[139:3] [140:6,9] [141:4,21]
[142:7,12,20] [143:20]
[149:11] [153:9,16] [154:7
,20] [158:10,20,22] [159:7]
[160:7] [177:23] [207:13,17
,18] [211:20,22] [224:3,9,17
,20]
**articles** [88:21,24] [89:1,3,13
,24] [90:10,12,15] [105:8,9]
[110:14] [137:12] [139:1]
[223:20,22,24] [224:14,24]
[225:3,15] [226:4]
**articulating** [273:12]
**artificial** [219:11]
**ask** [7:8] [16:21] [63:14]
[65:23] [85:10] [102:9]
[109:9] [110:5] [120:21]
[123:6] [182:16] [186:21]
[187:14] [193:13] [198:20]
[199:5] [200:6] [223:8]
[242:20] [266:3] [267:10]
[285:1,6,11] [287:3] [288:14]
[289:2] [304:19]
**asked** [24:24] [40:7] [83:21]
[96:12] [97:14,17] [98:10]
[99:2,3,21,23] [101:1,7,9]
[103:1] [104:3,12] [106:18
,19] [110:2] [127:12] [129:1]
[133:12,17] [145:12] [148:
21] [165:17] [166:22] [169:
5,8] [171:4] [178:5] [187:22]
[189:19] [191:5] [193:19]
[199:8,13] [215:3,4] [216:16]
[226:9] [235:3,7] [255:22]
[256:20] [265:22] [282:9]
[287:9] [313:8]

**asking** [116:10] [124:16]
[157:4] [165:22] [166:12,14]
[167:21] [172:2] [181:21]
[186:20] [189:23] [193:21]
[194:3,22] [200:12] [226:2]
[237:19] [242:21] [284:3]
[288:8] [313:8] [319:9]
**aso** [239:8]
**aspect** [25:2]
**assessing** [253:8]
**assigned** [19:18]
**assigning** [19:24]
**assistance** [109:9]
**assisting** [13:5]
**associate** [34:2,5] [48:13]
[88:19]
**association** [11:12] [18:13]
[31:12] [74:15,23] [85:17,22]
[86:1,3,5,10,12,15] [179:7]
[207:9] [208:11]
**associations** [85:15]
**assume** [19:21] [34:20]
[116:2,5] [128:9] [136:12]
[150:7] [184:11] [185:4]
[262:6] [273:5] [303:8,11]
**assuming** [55:1] [201:20]
[240:17] [273:6] [282:3]
**assumption** [257:3] [282:7]
[289:22]
**assumptions** [285:18]
**assurance** [36:23] [46:21]
[47:1,4]
**asthma** [31:5]
**atrial** [32:17] [33:4]
**attach** [73:17]
**attached** [24:4] [71:14]
[72:5,6,17] [85:12] [167:1]
[224:1] [266:17] [321:11]
[323:9]
**attachment** [87:6]
**attachments** [266:13]
**attend** [46:5] [278:9]
**attendance** [45:16]
**attention** [110:21] [111:2,20]
[215:1] [221:22] [222:3]
[260:1] [278:16]
**attest** [148:18,22]
**attorney** [321:13]
**attorneys** [160:2]
**attribute** [124:8] [139:2]
**attributed** [124:6]
**attributes** [184:13]
**attribution** [133:3]
**auditing** [25:19]
**authenticated** [24:10]
**author** [139:2] [153:9]
[158:6]
**authorative** [244:21]
**authoritative** [143:24]
[145:8] [148:23] [149:1,4]
[151:9,14] [153:15,20,24]
[154:8,11] [156:19] [157:1]
[177:24] [179:8] [197:19]
**authorities** [90:24]
**authority** [196:11]
**authorization** [50:13,16]

[192:10] [231:2] [252:22]
**authorizations** [29:18,19]
[50:7,8,20]
**authorized** [195:12]
**automated** [39:10]
**available** [45:22] [183:8]
[309:5,8] [312:19]
**avanti** [75:19,20] [76:2]
[79:1] [81:3,8,9] [83:22]
**average** [156:16] [157:3,9]
[203:23]
**avoid** [9:6]
**award** [10:20]
**awarded** [10:18,19,21]
**aware** [25:4] [26:17] [37:5,19]
[39:12,19] [40:3] [103:5]
[118:3] [186:22,24] [219:2]
[249:3] [254:10] [298:6]
**away** [32:23] [291:18]
[301:14] [308:11]
**awp** [201:12] [203:23]
**axes** [280:24]
**axis** [280:24] [281:1,5]
[302:17]

B

**back** [22:19] [24:5] [27:18]
[40:17] [42:18] [44:23]
[49:19] [54:6] [56:4,8]
[58:3] [62:15] [64:17]
[68:4] [70:2] [75:6] [78:2]
[85:8] [89:7] [98:2] [100:23]
[102:11] [104:19,22] [107:
24] [112:6] [119:9] [121:21]
[122:14] [124:10] [133:21]
[135:7] [136:3] [138:10]
[145:14] [147:18] [154:19]
[155:12] [158:2] [161:2]
[163:17] [164:20] [165:6]
[166:3,13] [171:3,23]
[173:15] [175:7] [178:4]
[182:14] [190:6] [209:9,12]
[212:9] [233:22] [234:11]
[235:16] [243:9] [245:23]
[246:16] [269:15] [275:17]
[281:8] [283:1] [287:13]
[288:4,5] [290:19] [297:24]
[303:6] [312:6] [313:15]
[316:8]
**background** [8:17] [9:15]
[65:4] [74:7] [75:11] [89:16]
[146:10,15] [151:2,17,20]
[160:16] [228:11]
**backwards** [30:21]
**bad** [160:9]
**bakersfield** [210:21]
**balance** [143:22] [243:16]
[260:19] [261:24]
**bank** [24:7] [149:7]
**barbara** [56:16] [57:24]
[59:23] [60:1,7] [61:1,11,17]
[64:20] [65:18] [67:24]
[68:1] [70:1,3]
**barr** [115:15]
**base** [66:24] [77:17] [87:16]

[108:4] [250:20] [269:15]

**based** [23:1] [37:8] [49:14,24]
[52:17] [54:16] [56:13]
[68:22] [93:23] [94:1,3]
[102:7] [110:10] [167:14]
[168:17,21] [169:9] [180:13]
[196:14] [211:17] [213:17]
[226:12] [250:17] [281:6]
[319:23] [320:1]

**basically** [48:2] [77:20]
[80:16] [125:5] [221:8]
[229:22] [230:13] [233:11]
[234:21] [240:16]

**basis** [11:7] [30:18] [33:7]
[41:4] [93:22] [94:1] [134:2]
[143:2] [145:23] [147:11]
[159:23] [160:1] [177:24]
[181:8,12] [197:10] [198:2
,4,17,20] [199:2] [206:1]
[208:22] [209:5] [211:14]
[222:24] [225:21] [288:1]
[304:21] [305:19,22]

**basket** [238:12]
**bates** [106:10] [113:10]
**baylor** [76:10,13]
**bear** [53:15]
**bearing** [72:14]
**beats** [32:19]
**beaumont** [76:24]
**became** [103:14] [111:18]
**beckett** [1:]
**become** [27:6,13]
**becomes** [28:12] [31:14]
[252:18]
**began** [17:14] [169:1,2]
**begin** [7:21] [122:18]
**beginning** [1:16] [41:5]
[45:1,4] [51:15] [85:7]
[182:13] [231:12] [275:16]
**begins** [5:6] [132:17]
**begun** [20:10]
**behalf** [5:15] [6:5]
**behaved** [227:22]
**behavior** [98:14] [205:17]
**behind** [81:18] [120:8]
[130:24] [185:1]
**belief** [174:15] [241:12,15]
[248:13] [305:13] [310:21]
**believe** [60:9] [65:16] [67:9]
[71:11] [82:2] [83:22]
[105:7] [121:12] [133:11,20]
[137:3] [149:3] [153:1,2]
[155:19] [173:11] [177:19]
[179:5] [222:2] [224:11]
[226:5] [232:12] [237:2]
[244:20] [257:15] [274:21]
[276:12] [299:20] [313:15]
[314:3]
**bell** [177:18] [178:1]
**below** [124:1] [130:24]
[157:3]
**beneficiaries** [28:11] [31:7]
[33:3]
**beneficiary** [30:4]
**benefit** [3:18] [46:23] [47:24]
[48:4] [64:6] [83:6,7,11,12]

[125:17] [138:7,17] [142:14]
[145:23] [154:7] [185:18]
[186:5] [201:11] [221:1]
[224:4,14] [232:17] [238:2
,18,21] [239:2,5,14,15]
[240:18] [242:4,7,8] [262:15
,20] [264:10] [273:10]
[278:4,5] [279:3,20] [281:2
,16] [288:5] [289:11] [290:15
,16] [291:1] [292:15] [293:3]
[301:3] [310:23] [314:11]
[316:14]
**benefits** [217:7] [221:6]
[242:17] [278:6]
**bergen** [147:3,5]
**besides** [162:10]
**best** [39:2] [69:23] [90:18]
[280:17] [289:10] [293:9]
[300:21] [311:6]
**bet** [241:2] [289:18] [293:17]
[304:11]
**beta** [33:14] [309:22]
**better** [8:5] [49:11,12]
[88:17] [92:15,17] [100:1]
[103:8] [104:10] [291:12,21]
[308:1]
**beyond** [196:8] [205:14]
[264:13]
**bibliography** [87:6]
**big** [22:8] [30:22] [59:5]
[128:14] [146:8] [293:21]
[294:3] [302:10] [310:12]
[318:24]
**bigger** [213:24]
**biggest** [37:22]
**billed** [218:1] [25:4]
**billing** [93:17] [95:4]
**billion** [246:7] [302:20]
[303:3,9,12]
**bit** [8:16] [85:11] [104:19]
[121:16] [122:6] [161:2]
[247:11] [290:8]
**black** [60:22]
**blind** [59:20]
**blockers** [33:14] [309:23]
**blocks** [124:10]
**bloodclotting** [33:6,8]
**blood-clotting** [33:6,8]
**blue** [66:12] [238:17] [239:7]
[275:20] [313:22] [314:5,6
,13,19,22] [315:1,16] [316:
21] [317:1]
**board** [11:16] [205:17]
[207:8] [208:10,16] [209:11]
[210:20,21] [258:21]
**boilerplate** [259:21,23]
[261:7] [266:15]
**boils** [204:13]
**bonus** [291:22]
**books** [22:15] [24:6] [287:14]
**bottom** [16:23] [131:9]
[138:2,9]
**boulevard** [1:] [5:17]
**bounce** [31:8]
**box** [107:19] [113:12]
**boxes** [106:14] [107:20]

**boy** [265:15]
**brand** [32:4] [155:23] [156:
3] [171:13] [205:17] [208:8]
[213:17] [216:1,7] [229:20]
[256:15] [263:2]
**branded** [169:10] [172:18]
[187:3] [208:2] [219:7]
[229:16,23] [230:4,5,7,18]
[263:8] [290:21] [297:21]
**brazelton** [210:19]
**break** [32:23] [84:19] [211:24]
[245:12] [275:2] [320:5]
**breaking** [145:21] [233:24]
[235:4,13]
**breakthrough** [184:17]
**brief** [14:5] [119:24]
**briefly** [229:3]
**bring** [11:7] [20:5] [44:22,23]
[100:5] [233:22] [234:11]
[255:1] [265:9]
**bringing** [34:14]
**broad** [79:3] [97:21] [151:18
,21] [226:16] [232:21]
[239:6]
**broader** [65:4] [99:1,19]
[119:19] [184:1] [254:8]
**broadest** [283:21]
**broadly** [202:3]
**broke** [136:20] [274:6]
**broken** [28:4]
**brooke** [2:8] [6:4]
**brought** [59:9,10] [103:9]
[107:7] [110:21] [111:1,19]
[127:16] [165:5] [166:3,13]
[168:9]
**budget** [287:16,22,24]
[316:10]
**build** [30:2] [264:4]
**built** [159:21] [264:2]
**builtin** [159:21]
**built-in** [159:21]
**bureau** [12:3,6,9,13] [13:17]
[14:8,9] [16:3] [17:5,20]
[20:16] [21:10] [25:10]
**business** [11:12] [12:10]
[23:22] [34:1,4] [48:12]
[50:17] [52:9] [59:14]
[73:14] [127:15,18] [137:13]
[159:15] [259:23] [288:15]
[291:3,4,23] [299:21]
**businesses** [96:23]
**businesslike** [137:13]
**business-like** [137:13]
**buttress** [102:20] [144:7]
[207:11]
**buy** [83:17] [221:8] [233:14]
**buyer** [18:22] [221:3,4]
**buyers** [3:19] [19:4,5]
**buyin** [233:14]
**buy-in** [233:14]
**buying** [220:24]
**bystrom** [3:12,14] [100:2,6
,14,16] [101:5,6] [102:10]
[103:13,22] [104:3,10,13]
[116:15] [122:8] [123:8]
[124:2,7,24] [125:10,14]

[126:12,20] [127:6,15]
[128:7,15,16,23] [130:18]
[131:1,7,12,20] [132:1]
[161:10] [179:1,4] [180:9]
[197:6] [199:6,20] [208:24]
[211:3] [212:13,17] [213:20]
[214:11] [215:4,20] [216:12]
[227:5] [251:17,18] [298:11]
**bystroms** [108:9] [110:4]
[111:13] [112:13] [122:4,20]
[123:17] [125:6,18] [126:1]
[127:23] [129:11,19] [130:
2,11] [132:5,11,19,23]
[161:4,5] [215:2] [276:13]

---

**C**

---

**c101704** [1:8]
**c-1-01-704** [1:8]
**cal** [256:1]
**calculating** [312:9]
**california** [7:1,4] [11:14]
[12:24] [14:24] [18:23]
[26:23] [34:13] [53:7,13]
[85:16] [86:1,3,5,8,21]
[87:11] [146:7,14] [179:6]
[200:6] [206:13,14,15]
[207:4,8] [208:11,16]
[220:16] [222:1] [223:2]
[255:10,11] [275:20] [280:
9] [313:23] [314:5,7] [315:1
,16] [316:22]
**call** [32:5] [47:15] [69:16]
[181:11]
**called** [12:2] [14:20] [17:23]
[18:9] [23:16] [27:14]
[29:22] [37:3] [58:21,22]
[66:11,13] [96:9] [124:23]
[215:12]
**calls** [45:18]
**canada** [224:11]
**canadian** [224:8]
**cannot** [290:2] [301:11]
**cant** [35:11] [40:12] [69:12]
[113:22] [121:7] [164:16]
[165:14] [178:18] [198:12]
[205:14] [289:18,24] [301:
22] [313:15] [314:5] [319:15]
**capital** [29:3]
**capitalization** [306:7]
**capitol** [96:16]
**captive** [196:16] [238:22]
[314:4]
**card** [83:13] [238:16]
**cardinal** [115:23]
**care** [9:21] [10:1] [14:14]
[18:17,18] [26:2,4] [29:14]
[31:2,8] [35:5] [37:23]
[38:21] [43:14,22,23]
[44:5] [48:5] [49:7] [61:10,15]
[62:1] [70:13] [71:15]
[72:7,9] [73:21] [78:1,3]
[86:12] [87:8,11,13,21]
[88:6] [89:22] [90:4,11]
[91:5] [97:20] [98:13,17]
[99:7,15] [121:15] [137:14

,15] [138:12] [151:18] [208:
8] [215:7,15] [216:20]
[217:9,11,21] [218:18]
[220:17] [222:1] [223:2]
[224:21,23] [236:19] [242:
3] [243:15] [247:15] [249:17]
[253:24] [254:12,20,21]
[255:5,7,16] [259:21]
[264:1] [284:7] [285:20]
[303:5]
**careful** [7:20]
**carefully** [321:4]
**cares** [219:18]
**carey** [207:3] [210:17]
**carmichael** [7:3]
**carried** [287:14,23]
**carry** [31:7,13] [33:3]
**carrying** [238:16]
**carter** [219:18]
**carved** [83:6,11,16] [242:8]
**carving** [242:10]
**case** [7:10,15] [8:19,22]
[9:1] [18:23] [26:13] [51:13]
[71:10] [91:14,18,24]
[92:12] [94:21] [95:24]
[96:8,11,14,19] [97:7]
[99:24] [100:4] [102:19]
[103:23] [104:2,11] [105:5]
[107:3,5,6,8,18] [108:3]
[109:2] [116:7,19,22]
[118:1] [119:9] [123:9,11]
[125:1] [128:10] [135:16]
[145:18] [161:12] [162:1]
[166:17] [185:20] [197:7]
[218:13] [225:5] [227:3]
[228:23] [249:2] [250:21]
[263:21] [267:13] [268:5,7
,10] [272:21] [276:5,12]
[277:13] [285:1] [288:12]
[300:13] [315:14]
**cases** [9:2] [215:14] [217:21]
[246:15] [297:19]
**cash** [199:18] [200:15,24]
[201:18] [204:16,18] [205:
3] [206:4,19] [208:12]
[211:10] [219:5] [220:4]
[237:10,11] [246:1,3]
[287:16,21] [291:22]
**cashpaying** [237:11]
**cash-paying** [237:11]
**cast** [251:13]
**catastrophic** [28:12] [30:14
,17] [33:1]
**categories** [131:24] [132:8]
[185:10] [186:13] [192:6]
[245:24] [308:24] [311:8]
[312:17]
**category** [45:23] [90:17,18]
[153:22] [171:15,16,17]
[172:15,16,19,24] [173:10
,14,20] [174:3,13] [178:19]
[180:22] [189:7,11] [191:24]
[196:3] [309:7] [310:23]
**cates** [10:12] [11:1,9] [12:4]
[17:20] [20:5]
**catholic** [76:20] [77:3,8,12]

**catholics** [77:10,18]
**cause** [87:17]
**ceased** [55:11]
**cell** [60:22,23]
**cellular** [60:17]
**cenestin** [98:16] [99:13]
[116:8] [120:3,14] [174:10
,13] [176:19] [199:16]
[200:15,24] [201:2,3,6,7,13
,20] [203:14] [218:20,23]
[219:23] [220:2] [227:16]
[270:5]
**cenestins** [98:17] [99:16]
[250:20] [253:19]
**center** [218:21]
**centers** [54:15]
**central** [244:8]
**ceo** [62:14,17] [74:6,9,12,13
,14] [75:1,16,23] [76:4,13]
[82:12,17,20,24] [141:10]
[164:15] [165:13,22]
**certain** [30:19] [37:20]
[48:15] [56:21] [121:4]
[153:3,6] [230:14,15]
[243:8] [250:3] [251:22]
[255:5] [270:18] [285:19]
**certainly** [35:14] [105:6]
[148:6] [156:6] [195:4]
[286:18]
**certification** [47:4] [48:9]
[324:18]
**certifications** [85:14]
**certified** [47:2] [48:1,6,17]
**certify** [323:4] [324:4]
**certifying** [324:21]
**cetera** [125:17]
**cfo** [165:14,23] [168:12,14]
**chain** [27:6] [86:15] [97:1]
[144:23] [201:24] [236:7,10
,12]
**chains** [26:24] [27:2] [97:1]
**chair** [72:23,24] [73:11]
**chaired** [71:24] [72:19]
[74:3]
**chairman** [73:21]
**chance** [278:10]
**change** [72:14] [182:4]
[317:3] [322:4]
**changed** [104:5] [166:8]
[286:13]
**changes** [138:7] [140:23]
[142:14] [242:2] [244:15]
[323:8]
**changing** [52:23]
**characterize** [209:17]
**characterized** [272:2]
**charge** [107:3] [158:16]
[199:18] [200:8] [202:22]
[203:5,8] [204:1] [205:12,14
,16] [206:3,20] [208:12]
[211:5,10] [212:21] [220:1]
[289:16] [291:19] [301:4]
**charged** [93:10,14] [201:10
,16,18,19] [204:6,8,14]
[205:21] [219:13,24] [220:
3]

**charges** [93:15,22] [291:14]
[293:10]
**charging** [93:13] [159:20]
[205:23] [219:13] [300:19]
[318:15]
**charity** [74:14,18] [75:16]
[76:4,14,18] [77:7,15,16]
[78:11] [79:8,14,21] [81:20
,23] [82:1,2,17]
**chart** [123:21,23] [144:11]
[145:3,5,7,11,15,20] [148:
8,11] [150:12] [156:9]
[237:18] [243:13] [244:5]
[272:15,17,19] [302:19,23]
[303:1]
**charts** [149:23]
**cheaper** [224:10]
**check** [142:6] [195:4] [301:
6]
**chen** [43:11]
**c-h-e-n** [43:11]
**chicago** [2:]
**chief** [10:6] [28:18] [62:18,19]
[70:15] [141:14,23] [164:17]
[232:17] [251:18] [258:10]
**children** [32:12] [89:16]
**chin** [258:11]
**chit** [121:20]
**chitchatted** [121:20]
**chit-chatted** [121:20]
**choice** [186:11] [201:9]
**choices** [182:24] [186:11,13
,15] [188:14,15]
**chronic** [28:10] [30:6]
[32:15]
**cigna** [255:11]
**circle** [237:23] [239:7]
[240:1] [243:14]
**circuit** [241:20]
**citation** [130:17] [131:7]
**cite** [113:19] [125:1] [137:3]
[277:13]
**cited** [106:2,23,24] [108:8]
[110:3,16] [111:12] [113:16]
[177:23] [268:10] [278:20]
[284:1]
**cites** [114:19]
**citing** [126:8]
**city** [300:3,7,10,14] [316:16]
**civil** [1:5]
**claim** [225:18] [243:7]
**claimed** [226:17]
**claims** [13:6] [28:10] [30:11]
[191:18] [281:3] [314:12]
**clarification** [15:9]
**clarify** [9:8] [107:11]
**clark** [210:22]
**class** [32:1] [96:22] [117:5]
[171:6,11,13] [181:1]
[187:3] [191:12,13] [194:6]
[213:10] [229:21] [230:9]
[232:7] [284:6] [308:22]
[309:1,4,11,20] [310:17]
[312:23]
**classes** [239:6] [309:13,14]
[311:12,15] [312:12]

**classification** [11:13]
**classify** [44:4] [283:21]
**clear** [57:5] [106:17] [111:10]
[203:12] [249:10] [312:14]
**cleared** [11:15]
**clearer** [8:2] [54:7]
**clearly** [65:14]
**client** [53:2,24] [76:9,14]
[93:24] [94:3] [96:22]
[252:17] [258:22] [263:4]
[282:16] [289:16] [292:21]
[294:2,14,20] [296:3,5]
[301:8] [308:18]
**clients** [26:20] [29:6] [47:22]
[93:10] [146:22] [192:7]
[194:24] [274:11] [289:1,5]
[293:8,14] [294:4,6,8]
[299:8] [300:21] [315:13]
**clinic** [56:16,17] [57:24]
[58:1] [59:23] [60:1,2,7,10
,11] [61:1,2,5,6] [62:11,15,16
,17,18,19] [64:9,14,20]
[65:18,22] [67:19] [69:2]
[70:1,3]
**clinical** [53:4,22] [56:14]
[64:21,22] [65:2] [69:7]
[183:1,4] [184:7]
**close** [49:15] [66:23] [69:15]
[240:20] [307:3]
**closely** [19:20] [86:4]
**closer** [95:9]
**closest** [147:19]
**clots** [32:22]
**cm** [324:]
**co** [157:10] [252:20]
**code** [68:21]
**cohen** [2:3] [5:22] [9:10]
[13:24] [15:9,13,16] [40:7]
[52:4] [56:5] [72:20] [73:22]
[84:18] [95:18] [96:4,7]
[100:3] [104:9,12] [105:8,20]
[106:16] [108:21] [110:8,20]
[111:15] [112:8,16] [113:7]
[114:6,10,17,22] [115:1]
[117:7,13,22] [118:16,24]
[121:4] [125:8,20] [126:14
,21] [127:7,11,14] [129:11]
[130:14] [131:4] [132:12,24]
[133:4,19] [134:12] [135:15]
[137:22] [139:4,18] [140:3]
[142:2,8] [145:12] [148:20]
[150:22] [152:3] [159:24]
[160:6,9] [163:16] [174:19]
[187:22] [201:2,4,22]
[202:3,5] [204:21] [205:3,7]
[209:16] [211:23] [212:2]
[216:17] [228:4] [236:4]
[238:11] [264:23] [265:11,20]
[266:1,10,20] [267:3,5]
[268:5] [271:23] [274:8]
[277:14,20] [285:6] [287:9]
[305:7] [307:1] [315:21]
[317:10] [319:18] [320:4]
**collaborated** [128:14]
**collaboration** [124:24]
[125:14] [127:5,17]

**collaboratively** [126:17]
**collect** [260:13]
**collected** [260:18,22] [261:24] [262:1,7]
**collectively** [63:19,22]
**collision** [92:3]
**columns** [155:21] [301:1]
**comfortable** [152:9] [237:20]
**coming** [83:20] [84:4] [190:22] [281:11,13] [317:20]
**commanded** [93:1]
**comment** [100:6] [122:7] [180:23] [196:23]
**comments** [159:14]
**commercial** [259:22] [261:10] [263:10] [282:23]
**commission** [323:20]
**committed** [69:4] [70:10]
**committee** [36:23] [40:17,19,23] [41:14,20,22,24] [42:2,12,14] [44:9,16,21] [45:8,10] [46:4] [47:3] [71:24] [72:9,21,23,24] [73:11,21] [75:9] [86:21] [88:18] [173:2] [176:7] [177:5] [223:14] [229:1,2] [231:3] [232:1,11,20] [233:7,8,23] [234:20] [235:10]
**committees** [37:1] [42:22] [234:5]
**common** [25:1] [39:18,24] [140:22] [163:14] [164:2] [165:15] [166:24] [167:2,8] [169:4,15] [170:10,17,24] [171:9] [172:14,15] [178:19,23] [180:6,11,21] [181:12,15] [182:18] [186:12] [221:13] [244:18] [247:13,16] [250:24] [251:2,3,23,24] [252:4,12,13] [255:23] [298:9]
**commonly** [18:17,18] [296:23] [297:2] [298:9] [310:10] [312:18]
**communicate** [38:3]
**communication** [61:4]
**communications** [37:8] [61:20] [235:12]
**community** [15:17] [23:23] [54:16] [62:3,6] [63:23]
**communitybased** [15:17]
**community-based** [15:17]
**companies** [29:21] [58:15,18,19] [59:2,8] [81:24] [93:10] [120:8] [138:6] [142:13] [162:20] [163:9] [185:12] [188:6] [238:13] [244:24] [249:16] [283:9] [285:20,21] [301:11,19] [304:18] [305:1,4,14] [306:1,23] [316:15]
**company** [9:19] [11:6,8] [22:15,16] [23:14,15,17] [24:2,21] [26:23] [27:17] [28:7,8] [29:11] [30:9] [36:5,22] [37:3] [46:10] [66:9,10,13,22] [75:21] [78:6,12,18] [79:19,21]

[80:19] [81:16,17,22] [82:2,4,9,10] [91:24] [92:4] [93:7,9] [94:6] [137:12] [161:18] [162:17] [164:15,17] [168:13] [176:14,16,23] [181:3] [188:4] [234:3] [235:14] [240:16] [243:7] [289:8] [292:24] [294:9] [301:1] [303:15] [304:22] [305:17] [314:10]
**compare** [308:22] [313:2]
**compared** [240:24]
**comparison** [3:17]
**compete** [66:17] [79:12] [289:5] [315:19]
**competes** [289:1]
**competing** [19:7] [312:3] [315:12]
**competition** [290:6]
**competitive** [300:2] [315:10]
**competitors** [187:1]
**complete** [109:7] [134:1]
**completed** [32:16] [133:20]
**completely** [23:10] [143:1] [255:1]
**completion** [324:8]
**complex** [27:7] [31:1] [47:8] [49:3] [108:19] [279:11] [282:15] [289:22] [292:6]
**compliance** [48:14]
**complication** [33:1]
**complications** [30:14,17]
**components** [119:5] [314:18]
**compute** [301:17]
**computer** [18:8] [31:20] [47:17] [136:13] [161:12,15,17,21] [193:4]
**computers** [51:1] [162:9]
**concept** [78:16] [79:10]
**concerning** [45:20] [165:15] [224:4] [269:8] [276:17]
**concerns** [33:19]
**concludes** [320:7]
**conclusion** [160:8] [206:2] [306:15,18]
**conclusions** [120:10] [134:6] [193:15] [198:21] [273:9] [276:18]
**condition** [32:18]
**conference** [45:18]
**confidence** [18:24]
**confident** [104:17] [134:5] [195:1]
**confidentiality** [33:18] [34:3] [166:21]
**confine** [285:15]
**confirm** [142:18] [150:11] [159:17]
**conflict** [293:16] [295:9,11] [297:4,16]
**conflicted** [293:19,22,24]
**conflicts** [159:22] [295:5,14,18] [296:9] [298:2] [300:6]
**conform** [46:24] [48:7]
**confused** [11:1] [122:19] [214:8]

**congestive** [31:4,11] [33:11] [38:5]
**congressional** [298:5]
**conjugated** [171:20] [172:3,5] [178:22] [312:2]
**connection** [7:10] [8:18] [21:19] [33:19] [46:16] [56:20] [80:22] [82:5] [94:10,13,21] [95:12] [115:8,11,15,19,23] [116:3,9] [117:10] [118:12,19] [156:8] [192:20] [256:12] [292:14] [300:8]
**connectivity** [61:5]
**consequences** [98:15] [99:12]
**consider** [153:19,21]
**considerably** [104:5]
**consideration** [260:23] [262:2]
**considered** [230:14]
**consisted** [23:18] [60:16] [61:4] [96:23] [233:1]
**consistent** [142:23] [143:2,5] [145:5] [146:10] [151:21] [152:10] [156:6,14,18] [158:13] [159:12] [170:11] [205:16] [212:18] [227:23] [245:13] [258:20] [288:6,10] [308:7]
**consisting** [42:22] [76:21]
**consists** [20:6] [22:13] [41:16]
**constantly** [198:11]
**constitute** [106:4]
**consult** [42:23]
**consultant** [11:7] [30:10] [86:6] [239:12] [292:13] [294:4] [316:6]
**consultants** [30:10] [80:21] [104:1] [143:6] [292:19] [298:2,19] [316:4]
**consultation** [316:5]
**consulting** [46:9] [52:8,11] [73:7] [93:4] [186:14] [188:10] [190:15] [220:18] [221:3,6] [296:4,7] [297:15] [298:18] [299:1,19,23]
**consumers** [224:6]
**consuming** [275:4]
**consummated** [112:5]
**contact** [62:12] [102:4]
**contacted** [96:5] [101:24]
**contained** [142:6] [145:3] [149:14] [150:12] [153:16] [154:18] [224:5]
**contains** [273:16]
**contents** [121:19]
**context** [73:13] [79:9] [147:22] [190:18] [193:18] [198:24] [210:8] [216:13] [284:3]
**continues** [12:17]
**continuous** [47:12]
**contraceptive** [173:14]
**contraceptives** [174:4] [178:14] [187:18,19] [189:

14]
**contract** [13:19] [14:12] [15:7,22] [16:2,5] [62:5,7] [66:13] [67:6,7] [111:19,24] [163:24] [165:24] [168:16] [170:5] [172:12] [174:23] [177:1] [186:8] [197:12] [226:17] [233:24] [235:5,13] [238:21] [239:8] [240:4] [245:19] [248:22] [250:17] [257:4,17] [258:3,4,16,17] [259:17,22] [260:7] [261:7,18] [266:18] [270:7,12,20] [284:1] [285:16] [314:1]
**contracted** [46:24] [80:8] [222:18,19,21] [273:1,3]
**contracting** [18:16] [109:17] [110:17] [112:4] [147:21] [162:19] [163:6] [168:6,8,15] [238:2,9] [282:22] [283:5]
**contractor** [240:3]
**contracts** [21:20] [35:18] [36:1] [46:22] [99:6] [112:5] [121:8] [151:14] [163:13] [164:3,8,12] [165:18,20] [166:15,23] [167:22] [169:1,3] [178:23] [179:9,12,17] [180:5] [181:22] [182:1,17] [183:1] [187:7,8] [188:18] [193:23] [196:2,14,23] [197:18] [221:15] [222:10] [246:23] [247:6,8,22] [248:9,14] [250:12,14] [252:3,24] [253:9,12,18] [254:11] [257:20] [274:5] [276:2] [296:8] [313:5,8]
**contractual** [189:24] [191:2]
**contractually** [14:14] [184:5]
**contraindicated** [39:21]
**control** [10:15] [219:17] [324:20]
**convention** [280:22]
**conversation** [102:10] [208:18] [209:11] [220:6] [317:17]
**conversations** [101:17,21] [146:23] [147:5] [164:9,11] [180:14,16] [197:16] [206:11] [209:8] [225:21]
**copay** [156:16] [199:19] [200:8] [201:8,19] [204:14] [205:2,13,15,16,23] [206:3,20] [208:12] [211:10] [212:21,22] [213:7,8,10,11,14,18] [214:1,15] [219:11] [220:4] [229:23] [230:1,3]
**copayment** [121:17] [155:7,10,19,23] [157:10] [158:1]
**copayments** [143:24] [157:4]
**copays** [90:13] [156:22] [252:20]
**co-pays** [252:20]
**copies** [111:12] [135:13] [136:10]

**copy** [88:4] [100:15] [105:19] [155:20] [195:4] [218:11] [220:15] [265:5,7] [266:24]
**core** [301:14] [307:9] [308:11]
**corp** [1:5]
**corporation** [77:23]
**correct** [10:4,7] [12:15,16] [13:8,9,13] [15:21,24] [18:1,4] [20:12] [21:12,13] [23:4,8] [28:20] [39:15] [40:22] [45:5] [48:19,23] [51:10,11] [53:8] [56:7,18,19,24] [57:2,8,9] [59:9] [62:24] [65:21] [68:12] [70:17] [73:17,18] [79:22] [80:17] [84:2] [87:11,19] [88:7,8,11,22,23] [91:6,7,15,16] [92:11] [100:19] [108:6] [110:11] [117:12] [120:4] [129:23,24] [130:13,15] [131:2,3,7,8,12,16,17] [132:13,19,20] [133:3,5] [136:14,15,18] [137:21] [138:9] [141:1,11,16,17,24] [142:1] [144:5,19,20] [145:3,11] [146:2] [150:13] [157:13] [158:8] [161:8] [162:24] [163:1,5,10,11] [164:3,4] [166:5] [169:4,16] [170:7,18] [171:11,17,18,20] [172:20] [176:24] [178:15] [180:2] [184:19,23] [185:2,7] [186:5,6,17] [189:7,8,12,21,22] [191:4] [197:8] [203:17] [205:7] [209:23] [210:1] [211:11] [223:10,11,15,16] [227:7] [229:7,24] [231:22,23] [237:8] [239:5] [240:10] [245:21] [246:19] [247:2] [256:6,7,9] [261:1] [262:16] [268:12] [278:20] [284:8] [289:11] [300:22] [316:24] [323:5]
**corrections** [48:3] [84:14] [321:4,6,10] [323:8]
**correctly** [102:10]
**correspondence** [56:4] [92:1]
**cost** [3:17] [30:4,7] [31:2,21] [117:24] [138:16] [200:9] [215:10,12] [216:5,6] [218:23] [219:12] [262:15,21] [263:4,23] [264:20] [289:21] [290:9,13,15,24] [310:8,11,24] [312:10]
**costs** [29:17] [138:11] [291:7] [293:9]
**couldnt** [42:20] [185:20] [287:22]
**council** [86:18]
**counsel** [5:19] [6:15] [37:6] [108:12] [136:7] [265:3]
**count** [74:8] [287:23]
**country** [45:17] [146:1] [151:8] [280:11]

**couple** [10:23] [67:21] [70:19] [84:21] [94:18] [171:12] [231:9,18]
**course** [22:24] [43:22] [105:10] [107:4] [136:17] [167:21] [191:6] [258:6]
**court** [1:1,19] [5:9] [6:6,14] [8:1] [321:17]
**cover** [50:1] [104:16] [109:1] [247:10] [266:9]
**coverage** [78:9] [242:24]
**covered** [59:15] [121:15] [136:20] [178:11] [199:6] [228:16] [229:1,3,17] [230:14] [242:17] [302:9]
**covering** [9:7] [113:11]
**coworked** [126:3]
**cows** [161:18]
**cox** [173:19] [174:4] [178:13] [185:10] [187:18] [189:10] [190:13]
**cox2** [178:13]
**cox-2** [178:13]
**cpha** [210:20]
**crazy** [77:20]
**create** [44:19] [49:17] [54:15] [80:20] [81:16] [102:1] [159:21]
**created** [17:13] [44:16] [77:20] [81:2] [176:6]
**creates** [34:2]
**creating** [80:16] [108:22] [151:19] [254:5] [295:5]
**creation** [45:7] [50:2] [77:6] [80:22]
**credentialing** [3:9] [18:11,21] [19:10]
**credible** [274:23] [284:18] [307:11] [308:9]
**crime** [27:3,4]
**criminal** [25:9]
**criteria** [32:5,8,11] [47:1] [48:7] [49:4,22,23] [50:1,10,12,21,22,23]
**critical** [159:13] [198:8]
**criticism** [237:3]
**critics** [158:16] [159:8,19]
**cross** [66:12] [238:17] [239:8] [313:23] [314:5]
**cubicle** [36:19]
**cumulative** [99:8]
**curious** [166:19]
**current** [51:7] [54:13] [72:4,17] [73:10] [83:8] [98:21,24] [107:6] [158:17] [159:21] [307:15]
**currently** [19:7] [27:16] [28:6] [36:12] [52:13,14] [54:9] [55:10]
**customary** [215:12,16] [216:9] [217:23] [222:5,14,17,20,22]
**customer** [205:4] [236:20,22,23] [237:9,11] [301:7] [308:6] [316:7] [317:14]
**customers** [236:11,17]

[307:10]
**cut** [123:17,19,23]
**cv** [71:13] [73:4,6] [89:1]
**cvs** [2:16] [6:1] [26:18,22] [97:5] [117:13,18,23] [118:8]
**cycle** [131:11] [132:16]
**cylce** [132:6]

___

D
___

**d/b/a** [1:5]
**daily** [143:2] [147:11] [225:21]
**dale** [3:12,14] [76:11] [103:12] [108:9] [116:15] [122:4,8] [123:2,5] [124:24] [125:14,17] [126:1] [127:6,15,23] [128:7] [211:2]
**dales** [123:4]
**dallas** [76:13]
**data** [28:8] [29:12] [30:11,12] [32:6] [56:6,7,22] [57:1,7,10,14,15,16] [61:24] [68:3] [90:20] [148:23] [149:17,20] [151:20] [156:24] [190:18] [191:18,20] [193:14] [196:19] [213:15] [237:20] [307:6,12] [313:19,24]
**database** [69:14] [221:18]
**date** [5:11] [20:15] [255:19] [269:14] [321:8] [323:12]
**dated** [278:2] [324:16]
**dates** [75:5] [231:10,13,16,23]
**daughter** [92:2]
**david** [1:12] [3:2,7,10] [5:7] [6:10,23] [141:10] [164:16] [167:11] [210:19] [320:9] [324:9]
**davis** [10:13] [12:4] [43:13]
**day** [24:6] [25:13] [68:18] [84:6] [94:15,16] [95:5] [157:19] [198:13] [240:7] [316:19] [317:4,13] [323:17]
**days** [321:14]
**deal** [64:10] [108:17] [127:21] [239:2,13] [265:16] [289:10] [293:9] [300:21] [308:1]
**dealing** [48:11] [60:12] [64:15] [99:5] [109:3] [140:6] [146:5,9] [151:11] [155:6] [176:14] [207:13] [213:12] [224:10,21] [234:7]
**deals** [14:11] [182:24] [278:3]
**dealt** [89:14] [108:22] [224:22]
**death** [33:17]
**debrea** [177:13,19]
**decide** [176:7]
**decided** [255:4]
**deciding** [108:15]
**decision** [45:23] [99:10] [176:12] [177:2] [316:19] [317:5,14]

**decreased** [64:4]
**deductible** [78:7] [243:8]
**deductibles** [224:7]
**deemed** [321:16]
**deep** [103:7,11]
**defaults** [215:13] [216:3,9]
**defendant** [6:3,5] [96:22]
**defendants** [96:11]
**defer** [117:21]
**deferred** [199:20]
**definition** [155:17,22] [239:21]
**definitions** [124:21] [125:13] [127:5,9,18] [172:1]
**defunct** [58:20]
**delay** [47:15]
**delete** [195:7]
**deleted** [72:7,10]
**deliver** [93:24]
**deliverable** [94:4]
**deliverables** [93:17,23]
**delivered** [22:20] [24:11,20] [49:7] [67:15] [81:12] [105:8]
**delivery** [246:11]
**delta** [213:12]
**demand** [234:19]
**demanded** [252:22]
**demarcated** [122:17]
**demonstrated** [207:19]
**dep** [60:9]
**department** [10:14] [16:5] [61:14] [62:1,4,6] [65:15] [247:14]
**depending** [69:3] [94:2] [248:14]
**depends** [242:14] [255:7]
**deployed** [60:5] [61:2] [65:1] [67:14]
**deploying** [66:16]
**deponent** [323:1]
**deposed** [267:12] [268:4,7]
**deposing** [321:13]
**deposition** [1:12,22] [3:12] [4:1] [5:7,12,16] [7:19] [8:18] [9:15] [10:3] [27:14] [40:18] [51:24] [56:2,22] [59:16] [83:24] [84:2,11] [91:9] [100:16,19,22] [118:2,13,20] [119:4] [162:21] [163:2,10,22] [180:3] [199:8,13] [206:9,10] [214:24] [215:2] [219:15,18] [220:20] [229:3] [255:23] [259:19] [275:20,23] [276:10,11,12,13] [318:2,15] [320:8,12] [321:3,11,14,16] [324:5,9,11]
**depositions** [8:22,23,24] [267:11,24] [276:8,14] [285:7]
**describe** [97:20] [125:23] [290:5]
**described** [23:3] [30:24] [54:1] [97:7] [161:10] [190:9] [195:10] [300:7]
**describes** [105:21]

describing [80:20] [102:10]
description [3:6] [72:7]
[79:4] [99:1]
design [138:7] [140:22]
[142:14] [143:13] [294:15]
desktop [161:17] [193:8]
destroyed [107:22]
detail [60:13] [109:19]
[151:3] [166:20] [213:23]
[229:2]
detailed [151:1] [228:20]
detailing [46:13,14] [184:21]
details [67:10]
determine [22:17,19,22]
[47:13] [149:13]
determined [42:19] [60:20]
[63:19]
determining [24:19] [150:20]
develop [56:12] [58:16]
[63:6] [78:22] [82:14]
developed [17:19] [18:3]
[19:11] [56:8,21] [75:21]
[79:20] [81:6] [82:9] [124:23]
[125:14] [127:5]
developer [82:14]
developers [78:21]
developing [126:4]
development [51:9,14,20]
[52:1,3,18] [53:18] [75:21]
[78:24] [80:10]
device [60:18]
devices [60:16]
diagnoses [31:13]
diagnosis [31:8] [33:4]
diagnostics [303:5]
diapers [24:18]
dickman [153:8,11,12,18]
[159:9,11]
didnt [19:9] [25:6] [38:5]
[60:8] [62:7] [67:13] [68:20]
[69:5,24] [70:10] [72:13]
[73:1,20] [74:9] [83:8]
[84:14] [87:16] [103:24]
[104:8] [107:19] [110:5]
[112:17] [113:2,15,18,23]
[114:6] [115:9] [119:16,17]
[120:23] [123:16] [124:16,17
,18] [125:15,21] [126:7,9,11]
[128:19] [130:17] [131:13]
[138:14] [143:1] [160:22]
[162:22] [163:17] [164:2,8
,22] [166:24] [169:20]
[170:3,21] [178:11] [196:21]
[198:7,8] [206:6] [208:23]
[213:21,22] [216:13] [220:
7] [227:4] [233:21] [236:17
,23,24] [237:12] [254:12]
[256:14,19] [277:18] [280:
19] [286:3] [288:11] [290:11]
[295:24] [296:15] [297:11]
[304:24] [313:5] [314:23,24]
[318:2]
die [77:21]
difference [30:23] [51:17]
[92:13] [156:12] [157:18]
[213:6,13,14] [214:1,14,16]

[233:6] [253:20] [254:17,19]
[258:15] [267:2]
differences [249:24] [300:15]
different [14:8] [27:3] [30:2]
[65:1] [74:6,10,11] [103:1]
[172:8] [181:4,20] [184:12]
[185:3] [221:14] [228:7]
[229:14] [248:11] [252:20]
[281:23] [283:4] [311:8]
[314:9]
differently [281:20]
differs [260:7]
difficult [92:24]
difficulty [185:22]
digital [56:12] [58:15,18,24]
[59:3] [66:14]
digitalbased [58:15,18]
digital-based [58:15,18]
dignity [77:21]
dimensional [280:5,6]
diminishing [224:4,14]
diminution [250:20]
direct [2:6] [5:22] [117:8]
[138:11] [163:6] [181:21]
[324:20]
direction [4:2] [281:14]
directly [47:21] [130:10]
[132:23] [138:15] [140:9]
[157:6] [179:19] [278:14]
director [10:21] [12:5]
[36:16] [46:2] [82:13]
[173:24]
directorship [17:21]
disagreeing [223:1]
disappointing [67:17]
disclosure [159:4]
disconnect [184:10]
discount [83:13] [215:10]
[216:4]
discounts [245:7,20]
discovered [60:24] [105:9]
[106:14]
discovery [185:19] [196:12]
[228:22] [274:6]
discuss [12:2] [90:13]
[101:9,10] [120:2] [297:11]
discussed [48:11] [91:8]
[93:12] [121:8] [139:21]
[150:8] [190:17] [212:13]
[256:3] [268:22] [318:24]
discusses [16:20] [87:9,12
,14] [269:5]
discussing [88:5] [119:19]
[226:15] [243:14]
discussion [14:6] [87:16]
[118:7] [121:9] [125:6]
[135:24] [161:1] [167:16]
[170:4] [178:16,24] [179:3
,5] [180:7,8,9] [182:9]
[197:4,5] [213:20] [222:4]
[224:19] [234:13] [236:15]
[243:24] [251:7] [257:19]
[258:5] [300:1]
discussions [26:11] [116:21]
[117:1] [149:19] [165:13]
[172:10] [211:12]

disease [28:12] [32:15]
dispassionate [58:7]
dispense [146:12] [199:18]
dispensed [190:21,23]
[191:14] [192:15] [194:15]
[195:11] [246:17] [310:15]
dispensing [38:22] [100:6]
[126:23] [202:13,19] [203:
3,10] [206:12] [207:14,19,22]
[208:4,9] [215:11] [216:5]
[225:22]
disruption [17:7,8]
distinction [92:21]
distinguish [68:1]
distribute [55:1]
distributed [54:22] [76:21]
[77:23]
distribution [96:24] [97:1,23]
[125:16] [129:23] [130:3]
[151:6] [179:19] [235:19]
[236:7,10,12,16] [237:1,10
,13,15]
distributors [235:21] [236:
1]
district [1:1,2,19] [5:9]
[294:9]
districts [34:16]
divded [132:7]
divide [36:11] [44:8]
divided [44:11] [131:24]
division [1:3] [258:10]
dobie [2:] [3:3,20] [6:2,20]
[8:20] [9:12,13] [11:21]
[14:3] [15:18] [16:11]
[40:15] [52:5,7] [70:21]
[71:3] [72:22] [74:4] [84:20]
[85:9] [88:2] [100:12]
[105:17] [107:12,16,21]
[112:20,21] [114:16,21,23]
[115:4,5] [117:14,16]
[125:11] [126:5,15] [127:2
,8,22] [128:4] [129:6] [130:
16] [131:5] [132:14] [133:1
,9,23] [134:9] [135:9,19]
[136:5] [138:1] [139:11,23]
[140:11] [142:3,10,11]
[145:16] [148:24] [151:24]
[152:16] [160:5,14] [163:19
,21] [174:24] [175:6,14]
[182:3,15] [188:7] [201:3,5]
[202:2,4,6,10] [204:23]
[205:6,8,24] [210:2,4]
[212:1,11] [216:24] [217:3]
[218:6] [220:12] [234:17]
[236:8] [238:23] [259:13]
[265:8,12,22] [266:7]
[267:4,6,9] [272:4,5] [275:
3,6,18] [277:11,17,22]
[287:19] [305:11] [307:14]
[315:23] [317:15] [319:21]
[320:6]
doc [65:12,16]
docs [61:16] [68:18]
doctor [37:19,24] [38:7]
[39:23] [69:3,19,20] [243:4]
doctors [37:16,18,19]

[54:2,11,17] [59:13] [70:4]
[146:14] [233:1]
document [3:18] [11:24]
[16:14,17] [105:19] [109:15]
[113:13] [119:7,9] [126:8,17]
[136:21] [137:1,20] [157:9
,10] [217:18] [218:7,8,12,13
,16] [219:8] [220:16] [221:22]
[222:6] [227:4,10] [228:1]
[244:9,18] [245:14] [259:17]
[260:2] [261:4,20] [265:1,19
,21] [266:16] [269:4] [278:12
,19] [280:20] [306:18]
documentation [47:21]
[121:11] [143:22]
documented [250:11]
documents [4:8] [8:24]
[105:9] [106:2,14] [107:2,4
,6,19,23] [108:2,7,8,12,21]
[109:10,12,20,22] [110:3,8
,13,20] [111:7,11,14,17,23]
[112:13] [113:4,6,13,16,19]
[114:5,7,15] [122:9,12]
[157:7] [191:16] [196:12,21]
[197:7] [214:12] [222:2]
[228:23] [234:3] [248:6,7]
[260:3] [261:15] [265:6]
[266:8] [267:18,22] [268:8
,9] [272:23] [276:4] [277:12]
[285:7] [302:15] [311:24]
[312:24] [313:9]
doesnt [8:8] [11:1] [12:18]
[17:16] [21:5] [38:2] [40:11]
[73:12] [83:15] [131:20]
[175:19] [177:18] [178:2]
[209:19] [217:19] [218:1]
[262:18] [279:16] [285:4]
[300:6] [301:16] [310:10]
[314:20] [315:3] [317:22]
doing [8:17] [23:1] [52:13,14]
[68:11] [120:1] [140:14]
[146:15] [159:15] [166:1]
[263:6] [304:17] [321:7]
dollar [77:22] [78:9] [81:13]
[213:11] [271:4] [305:21]
dollars [31:23] [93:5,11]
[157:12] [189:20] [257:2,6]
[262:7] [263:22] [264:19]
[269:5] [273:23] [274:3,14
,19] [276:6] [279:21] [280:9
,14] [281:16,18] [282:5,10]
[283:8] [284:6,7] [285:13]
[286:1,9] [287:8] [288:4]
[300:17,18,19] [308:21,23]
[309:4,20,21,24] [310:12,15
,21] [311:7,10,18,19] [312:
15] [313:2,10,24] [314:21]
[316:11] [319:2,13]
dominant [253:16] [255:9]
dominates [66:11]
done [25:14] [33:7] [34:6,8]
[35:17] [56:16,17] [58:12]
[59:4,20,22] [71:19] [91:12]
[93:3] [103:20] [104:24]
[125:22] [141:8] [145:1]
[148:9] [150:10] [159:13]

[166:10] [168:8] [187:20]
[199:22] [223:6] [288:17]
[296:17] [319:4]
**dont** [13:16,19] [16:1] [18:14]
[33:8] [35:8] [37:1,10,16]
[39:11,16] [42:13] [47:10]
[50:17] [54:5,6] [55:18]
[56:2] [57:10] [59:16,17]
[60:9] [61:9] [65:14] [67:9,24]
[70:9,18] [83:22] [94:17,22]
[95:14] [109:15] [112:13]
[117:22] [119:16] [120:2]
[124:3,4] [125:9] [127:22]
[130:20] [139:9,12] [140:4]
[144:21] [145:10] [153:17]
[154:5] [155:19] [156:11]
[157:13,15,17] [159:10]
[162:2] [164:5] [168:14]
[169:19,24] [171:21] [173:
1,5,11] [175:13,15] [176:20]
[177:6,17,20] [178:2,10,12]
[179:7] [181:2,3] [182:17,18
,19] [185:9,22] [186:23]
[187:14,21,24] [191:1]
[195:10] [196:5,19] [203:7]
[204:6,24] [208:14] [210:6
,11] [221:20,24] [222:2]
[227:18] [232:9,12] [237:2]
[241:3] [253:18] [256:2]
[257:4] [261:16] [268:3,24]
[273:12] [274:22] [276:13]
[279:18] [280:18] [282:5,8]
[284:14,18] [286:21] [288:
3,6,9] [295:6,8] [298:22,24]
[299:2,9,20] [302:1] [304:2
,23] [305:5,9] [308:5] [309:
17,18] [312:18] [315:8]
[316:10] [319:2,3]
**double** [59:20]
**down** [8:1] [61:16] [76:24]
[122:10] [141:3] [145:21]
[148:14,16] [175:20,22]
[189:20] [200:16] [201:14]
[204:13] [245:12] [246:22]
[311:14]
**downloaded** [244:10]
**downtime** [47:17] [51:1]
**dr** [49:19] [71:5] [85:10]
[101:10,17,21] [107:2]
[112:17,19] [135:10] [136:
6] [182:16] [214:6] [275:19]
[304:17] [306:18]
**drafts** [122:9,16] [135:17]
[136:7,10]
**draw** [221:21] [222:3] [278:
16]
**drawing** [29:8]
**drawn** [143:24]
**drive** [2:9] [7:3]
**drop** [290:16]
**drug** [3:18] [37:20,21]
[38:12] [39:20] [42:20]
[45:22] [68:21] [86:18]
[121:16] [138:16] [156:3]
[171:5] [188:5] [191:13]
[221:1] [226:18] [233:16]

[246:15] [247:14] [309:11]
[310:10,11] [312:23]
**drugs** [25:6] [32:1,2] [38:24]
[41:24] [42:21,24] [45:20,24]
[52:24] [54:9] [55:21]
[109:4] [119:20] [142:16]
[144:16,23] [145:24] [146:
17] [147:15] [174:9,10]
[176:3] [183:5,8] [184:8]
[185:23] [190:20] [207:14]
[224:7] [233:4] [240:7]
[246:17] [279:5,22] [310:7
,16,20] [312:9]
**drugstores** [86:15] [103:14]
[148:17]
**duly** [6:11] [324:5]
**duplicative** [106:22]
**dur35** [114:23]
**dur37** [114:23]
**durable** [22:15] [23:13,19]
[24:14] [26:8]
**duramed** [8:19] [9:1] [51:13]
[71:10] [91:14,18] [92:12]
[99:24] [102:1] [107:3,5,18]
[108:3] [113:17,19] [114:5
,8,14,19] [115:7] [116:8]
[122:9] [125:1] [128:10]
[161:11] [162:1] [166:17,22]
[184:2] [218:12,19] [219:19]
[253:2,5,11,15,23] [254:11
,19,24] [255:4,14] [268:5,6
,9] [276:12]
**durameds** [219:24]
**during** [50:17] [53:4,22]
[54:20] [75:24] [77:18]
[78:2] [105:10] [127:1]
[146:23] [168:1] [230:21]
[232:1] [300:2]
**duvale** [28:24] [29:1]
**d-u-v-a-l-e** [29:1]
**dying** [77:20]

_____

E

**earlier** [48:11] [89:6] [93:12]
[139:21] [149:11] [231:15,19]
[281:8]
**early** [45:2] [76:7] [83:9]
[155:12] [281:8]
**earned** [256:12]
**easier** [7:24]
**easily** [241:3,24]
**easy** [276:11]
**economic** [119:19] [286:17
,19]
**economics** [109:2]
**economist** [286:21,22]
**ed** [10:17]
**edit** [88:11]
**edited** [141:9]
**editing** [122:24] [129:12]
**editor** [88:19]
**editorial** [72:11] [88:18]
**editorials** [90:19]
**edits** [51:3] [124:10,11]
[127:19]

**educate** [319:3]
**educated** [199:23]
**educating** [20:2]
**educational** [20:8]
**effect** [99:8] [138:3] [182:23]
[184:6] [197:11] [247:8,10]
**effectively** [279:3]
**effects** [22:6] [196:24]
**efficient** [307:23] [308:3]
**effort** [60:6] [142:5] [274:1]
**eight** [95:5]
**eighthour** [95:5]
**eight-hour** [95:5]
**einhorn** [2:13] [5:24] [118:4
,8] [277:15]
**einhorns** [26:20]
**either** [11:6] [54:11] [57:7]
[90:6] [111:13] [120:3,13]
[148:15] [149:10] [174:3]
[178:14] [192:1,13] [194:12]
[195:13] [206:4] [213:2,7,11]
[225:3] [236:24] [261:14]
[267:21,24] [278:13] [319:
3]
**elected** [66:12]
**electrical** [34:12]
**electronic** [59:2] [61:23]
[69:8,12] [70:8]
**eloquence** [121:2]
**else** [15:4] [85:18] [108:15]
[116:16] [118:8] [128:20]
[179:4] [188:1] [197:9,21]
[198:1] [199:19] [210:23]
[211:20] [230:13] [262:10]
[266:9] [272:16] [274:9]
[298:13,16]
**elsewhere** [160:3]
**email** [3:20] [105:20] [106:18]
[112:8] [162:4,6,12] [266:8
,13,14,17,22]
**e-mail** [3:20] [105:20] [106:
18] [112:8] [162:4,6,12]
[266:8,13,14,17,22]
**emails** [3:13]
**e-mails** [3:13]
**emboli** [32:24]
**emergency** [33:16] [43:16]
[44:4] [54:12]
**employee** [93:22] [94:1]
[142:14] [165:8] [221:6]
[279:3] [282:13]
**employees** [11:5] [28:21]
[82:11] [278:6] [279:20]
[303:13]
**employer** [32:6] [34:11]
[35:14] [90:9] [138:7]
[221:5,7] [238:7] [242:23]
[245:5,16] [263:24]
**employers** [29:22] [32:9]
[33:19] [35:4] [138:3]
[141:5,19] [294:5]
**enbrel** [53:3] [54:10]
**enclosed** [113:8]
**encompass** [38:24]
**encouraging** [263:11]
**end** [13:15] [39:6] [45:22]

[63:13] [79:7] [84:23] [122:
18,24] [157:19] [182:5]
[236:11] [237:14,16] [240:
7] [275:9] [316:12,18]
[317:4,13]
**endocrinologist** [43:19]
[44:3]
**endocrinology** [65:9]
**enforcement** [38:14]
**engage** [14:15] [73:15]
**engagement** [73:7] [94:10,14
,21] [95:13] [146:8]
**engages** [190:14]
**england** [90:22] [91:1]
[138:24] [160:3]
**enough** [8:2,13,14] [9:3]
[24:16] [198:22] [199:4]
[279:16]
**enrollees** [245:6,7,20]
**enrollment** [3:9]
**enter** [246:23] [247:22]
**entire** [113:15] [125:6]
[128:16] [172:23] [227:18]
[298:14]
**entities** [24:24]
**entitled** [3:18] [152:21]
[198:2,17,18] [208:21]
[209:5,14] [278:7]
**entity** [12:2] [46:24] [48:14]
[77:13] [79:12]
**environment** [45:16] [104:4]
[142:24] [143:3] [164:7]
[166:10] [205:22] [208:8]
[239:12] [296:11] [316:13]
[317:19]
**environments** [57:20]
**ephysician** [58:22]
**epidemic** [77:19]
**equally** [280:13]
**equals** [218:23]
**equation** [239:4]
**equipment** [67:15]
**equivalent** [156:4]
**eradicated** [17:6]
**erisa** [29:23] [34:15] [80:24]
[143:7] [146:5] [238:14]
[241:1,8,10] [262:10]
**e-r-i-s-a** [29:23]
**errata** [321:6,7,10,13]
[323:9]
**esquire** [1:22] [2:3,,8,13]
[5:15]
**essence** [54:17] [55:4]
[62:23] [68:17] [110:2]
[201:17] [230:5] [234:22]
[240:14] [289:21]
**essentially** [52:8] [54:23]
[78:13] [123:16] [229:8]
[245:24] [271:15]
**establish** [49:4]
**establishing** [292:15]
**establishment** [46:17]
[246:14]
**estimate** [39:2] [69:23]
[311:6]
**estradiol** [175:16]

**5/18/2004  Gibson, David**

estrogen [99:11] [171:15]
[172:4] [174:5,6,13] [178:22]
[187:19] [232:7]
estrogenlanguage [178:22]
estrogen-language [178:22]
estrogens [171:20] [172:5]
[308:22] [309:22] [312:2]
et [1:8] [125:17]
evaluate [99:22]
evaluating [142:17]
evaluation [49:15] [105:11]
evaluations [57:20]
even [7:22] [12:18] [28:1]
[59:12] [67:24] [69:15]
[173:23] [175:17] [181:2]
[182:18,21] [194:24] [227:
5] [291:21] [306:16] [307:3]
[316:5,8]
ever [16:13] [59:8] [65:23]
[67:3] [85:20,21,24] [89:4,19
,21] [93:1] [118:7] [136:23]
[147:12] [153:4] [154:3]
[173:3] [218:13] [221:22]
[223:20] [235:11] [257:16,19]
[270:4,17] [274:9] [296:13]
[301:20] [306:17] [314:24]
every [38:12] [39:11] [42:20]
[58:14] [68:18,21] [94:18]
[122:2] [124:18] [129:3,4]
[151:2,3] [191:13] [198:12]
[231:6] [232:2] [269:11]
everybody [59:10] [69:10]
[298:4]
everyone [64:3]
everything [38:21] [105:6]
[129:9] [147:9] [230:13]
[303:13]
evidence [22:14] [25:8]
[276:20]
evolution [121:15]
evolved [52:11]
evolving [53:14]
exact [10:20] [61:10] [62:4]
[139:7] [306:11] [310:3]
exactly [50:17] [109:16]
[119:10] [170:8] [187:5]
[190:17,21] [209:10] [210:
11] [318:8,10]
examination [6:18] [192:12]
[194:10]
examine [147:13] [300:15]
examined [6:11] [191:23]
example [12:20] [26:16,18]
[54:10] [90:12] [123:11]
[129:14] [140:21] [142:12]
[144:8,10,22] [146:6,11]
[148:7] [149:24] [152:2]
[155:9] [156:16] [157:8]
[158:5] [160:7,10] [171:14]
[173:3] [175:16] [184:2,18]
[185:10] [186:2] [187:16]
[190:7] [199:15] [202:22]
[207:23] [217:2] [218:19,22]
[219:15] [239:16] [240:7]
[244:23] [270:23] [274:24]
[283:15] [293:23] [294:18]

[308:21] [309:21] [314:9]
examples [50:19] [112:3]
[249:7]
exceedingly [33:16]
excel [94:17]
except [23:5] [230:14]
[323:7]
exception [97:4] [141:22]
[161:4]
excess [307:8]
exchange [108:21] [240:17]
[246:24] [247:23] [249:18]
excluded [98:16] [99:13]
exclusions [230:14]
exclusive [36:1] [99:5]
[164:2] [165:18] [166:15,23]
[169:3] [171:3,9,19] [174:2
,12,17,21] [178:7,22] [180:
4] [181:22] [182:17] [183:1
,14,24] [185:15] [187:7]
[188:5] [190:1] [196:6,15]
[197:11] [309:11]
exclusives [163:15] [165:15]
[167:8] [169:15,18,23]
[170:2,9,17,20,22] [171:4]
[172:13,14,23] [178:18]
[180:11,21,24] [181:9,13]
[183:3] [185:11,18] [187:17]
[188:19] [194:1] [196:2,7]
[221:15]
excuse [264:23]
executing [99:14]
executive [10:6] [141:14,23]
[269:7]
executives [267:12] [268:1]
exhibit [5:2] [7:11] [11:18,23
,24] [16:8,13] [70:22,24]
[71:4,5,7] [72:6] [87:23]
[88:3,4] [98:3] [100:9,14,15]
[105:14,18,24] [112:6]
[123:10] [127:23] [128:1,6]
[129:16] [135:4] [136:22]
[137:17] [140:24] [142:9]
[152:13,17,18] [153:10]
[154:8] [155:1] [158:3]
[214:23] [218:3,11] [220:9
,13,15] [231:20] [235:17]
[259:10,15,16] [260:6,11]
[266:19] [268:13] [277:8,13
,23]
exhibits [3:5] [27:20] [228:5]
exist [47:15] [83:8] [182:21]
[242:13] [273:20]
existed [234:20]
existence [185:18]
existing [165:8] [253:17]
exists [242:12]
expect [312:4]
expenses [93:8]
expensive [297:21]
experience [14:7] [25:22]
[70:4] [72:14] [92:18]
[103:15,17] [104:3,20]
[121:2] [127:21] [142:24]
[145:19] [150:18] [151:22]
[156:6,15] [158:13] [162:19

,22] [163:3] [165:16] [168:18]
[169:9] [178:20] [180:4]
[181:24] [193:22] [196:1]
[202:6] [223:8] [226:13]
[227:6] [229:1] [245:19]
[247:4,6,7,12,22] [264:12,13
,18] [289:15] [290:10]
[292:12,19] [293:6] [318:7]
experimenting [78:20]
expert [3:7,10,14] [7:9,14]
[91:9] [92:6] [97:11,14,18]
[98:23] [99:4] [102:6]
[103:22] [104:11] [109:3]
[121:24] [123:9] [138:8]
[144:14] [145:18] [150:16]
[180:10] [189:23] [208:24]
[225:4,8,13,18] [226:7,12]
[228:12] [284:24] [285:3]
expertise [27:11] [102:4,16]
[103:3,7] [104:20] [181:14]
[183:11,17] [208:24] [209:
3] [221:13] [226:24]
experts [98:11] [104:1]
expires [323:20]
explain [18:14] [23:9] [45:14]
[51:16] [53:21] [77:5]
[79:17] [81:5] [97:20]
[249:13]
explained [243:12] [274:10]
explaining [184:21]
explains [109:22]
explore [52:18]
exploring [54:14] [66:14]
[79:11] [135:17]
express [188:12] [190:12]
[233:19] [275:24] [276:2]
[280:11] [283:16,17] [284:
12] [285:7,16,24] [286:8]
[289:9] [291:17] [293:1]
[294:21] [299:3] [300:16]
extends [98:23]
extent [270:1,21] [272:1]
[277:1]
external [22:13] [42:10]
extract [266:5]
extraction [266:6]
extracurricular [295:17]

F

face [177:16] [185:15]
facilities [64:21,22]
facility [62:13]
fact [7:14] [24:11,19] [35:4]
[39:13] [101:23] [141:9,22]
[144:7] [146:21] [147:10]
[148:22] [158:2] [168:5]
[170:20] [171:16] [172:23]
[174:1] [179:18] [194:20]
[212:12] [215:5] [219:4]
[220:1] [237:21] [238:5,17]
[239:1] [247:11,17] [254:19]
[255:15] [256:4,10,11]
[268:17] [271:19] [272:7]
[274:10,13] [276:19] [279:
1] [280:13] [285:23,24]

[287:8] [301:12] [306:21]
factor [19:18]
factors [19:24] [106:20]
[233:22] [252:21]
facts [319:24]
factual [140:7]
fail [321:15]
failure [31:4,11] [33:12]
failures [38:5]
fair [8:2,13,14] [9:3] [55:24]
[61:16] [107:13] [198:22]
[199:4] [234:24] [272:4]
fairly [122:16] [196:20]
[231:5] [232:21] [247:13]
fairness [199:1]
fall [45:24] [90:16,21] [93:16]
[243:11] [309:21,24] [310:
23]
familiar [12:23] [13:1] [17:14]
[18:12] [20:14,17,23,24]
[21:14] [27:6,9] [58:11]
[90:3] [177:14] [179:15,18
,23] [185:4] [186:12] [249:15
,20,23] [256:8,10]
familiarity [22:3]
family [65:5] [172:4] [174:8
,16] [176:3] [243:20] [312:9
,16]
far [34:8] [65:19] [95:12]
[155:18] [235:11] [252:19]
fashion [42:12] [233:20]
fashions [227:22]
favorable [309:9]
favorably [250:18]
fbi [9:22] [10:8,18,21] [12:13]
[26:4]
february [88:6]
federal [80:11] [81:11]
[242:19] [278:6] [279:2,19]
[282:13]
fee [201:15] [202:13,19]
[203:3,10] [204:1,2,14]
[215:11] [216:5] [243:5]
feedback [207:5] [208:18]
[209:9] [299:7]
feeds [47:20]
feel [61:20] [66:15] [103:6]
[134:5] [146:7] [148:2,13]
feeling [187:4] [233:17]
fees [93:4,16,20] [273:17]
[274:4,18] [282:18,19]
[283:6,7] [285:14,19]
[286:10] [289:14] [290:12]
[291:7] [300:20] [301:2]
[307:10] [308:4,6] [317:20
,24] [318:3,16,22,23] [319:
12]
fellow [10:11]
felonies [14:10]
felt [84:2] [103:8] [104:17]
few [142:17] [143:14] [151:
7]
fibrillation [32:18] [33:4]
field [90:24]
fifth [246:21]
figure [30:15] [39:23] [274:

**5/18/2004 Gibson, David**

2]
**figures** [26:4]
**file** [96:20]
**filed** [51:13] [297:14]
**filing** [160:3]
**filled** [38:2,6]
**filling** [19:16,23] [68:14]
**filters** [31:20]
**final** [111:17] [122:16]
[126:2] [128:9] [129:3]
[130:12] [135:12] [243:20]
[266:19]
**finally** [8:11]
**financial** [64:5] [164:17]
[233:23] [235:3] [294:12]
[301:20] [304:10] [316:11]
**find** [10:15] [31:12] [40:10]
[109:9] [113:12] [158:13]
[169:3] [170:1] [274:22]
[282:11] [284:17] [302:2]
[307:11] [308:8]
**finding** [30:5] [150:17]
**fine** [28:1] [84:5]
**finish** [7:21] [45:3] [66:1]
[89:12] [118:23] [168:19]
[188:20] [211:8] [214:6]
[225:12] [237:7] [271:9]
[285:5] [300:11] [311:13]
[316:2]
**finished** [27:21] [123:2,3]
[152:4] [227:11] [234:10]
**finishing** [138:6] [142:13]
**finnerans** [219:14]
**firm** [78:24] [100:5] [103:8]
[122:11] [236:6]
**first** [6:11] [7:20] [15:7]
[34:11] [48:3] [56:7] [60:4,6
,14] [64:13] [75:11] [76:9]
[77:17] [78:9] [81:13]
[84:8] [91:14] [96:9] [101:24]
[102:9] [108:18,20] [109:12]
[118:18] [128:6] [130:9]
[131:22] [156:1,2] [158:15]
[164:14] [167:7,9] [168:22]
[175:17] [176:1] [181:7,21]
[185:16] [192:14] [195:12]
[202:12] [216:6] [218:10]
[220:20] [227:8] [229:21]
[241:15] [243:24] [261:18]
[266:16] [269:13,14] [272:
9] [281:1,18] [289:3] [313:20]
[317:1]
**fit** [83:16] [119:11,13] [240:
1]
**fits** [77:7]
**five** [41:10,11] [43:8] [44:7]
[64:22] [114:4,14,19]
[173:7] [198:12] [252:4,10
,12]
**floor** [1:23] [2:14]
**flop** [59:7]
**florida** [74:16] [265:17]
**flow** [61:21] [68:3] [121:11]
**flows** [97:23]
**flu** [77:19]
**fluctuate** [309:4]

**focus** [34:9] [87:18,20]
[119:9]
**focused** [101:13,14] [108:24]
[121:5]
**focusing** [204:4]
**foggy** [69:22]
**folks** [26:12] [34:23] [41:18]
[148:8] [184:21] [192:19]
[218:17] [242:6] [271:3]
[297:4]
**follow** [244:6]
**followed** [23:12]
**following** [172:10]
**follows** [6:12]
**foot** [127:4]
**footnote** [124:15,17,18,20]
[127:4] [139:8] [140:17]
[161:6] [197:24] [198:9]
[205:11] [208:20] [297:11]
**footnoted** [105:7] [122:4]
[123:8] [125:24] [137:2]
[140:5,7] [197:20] [199:2]
**footnotes** [125:9] [250:11]
[267:15,23]
**footnoting** [138:18]
**footprint** [146:4,8] [186:1]
**footprints** [196:17]
**foregoing** [323:4] [324:18]
**forever** [77:5]
**form** [14:1] [72:20] [80:9]
[82:4] [100:3] [108:3]
[125:8,20] [126:21] [127:11]
[130:14] [132:12] [133:4,11
,16,19] [137:22] [139:18]
[140:3] [142:2] [150:22]
[159:24] [174:20] [197:11]
[236:5] [238:11] [257:16]
[271:24] [305:7] [307:1]
[315:21] [317:11] [323:8]
**formalized** [57:1]
**formed** [44:21] [80:7] [81:23]
**former** [9:22] [10:13]
**forming** [78:12] [82:4]
[195:15] [199:3]
**forms** [198:2,4,16] [268:21]
**formularies** [38:23] [42:17]
[98:17] [99:15] [121:17]
[187:1] [190:22] [195:13]
[230:12,16] [246:18]
**formulary** [38:10,12,19]
[39:15] [40:5] [42:24]
[44:17,20,23] [45:7] [46:17]
[50:2] [98:12] [165:6,12]
[169:10] [174:18] [175:16,19
,20] [176:6,14,19] [177:3]
[182:19] [186:15] [188:23]
[189:1,2,4] [194:12,13]
[196:4] [197:14] [229:5,9,15]
[230:8,18,21] [233:5,7,16,18]
[234:6,20,22] [247:1,24]
[248:1,21] [249:5,8,19,21,22]
[250:1,16] [251:21] [252:7
,15] [253:24] [254:22]
[255:5,15] [256:13] [259:8]
[269:15] [283:22] [309:9,13]
**forth** [49:8] [56:4] [103:20]

[121:17,21] [122:15] [134:7]
[138:8]
**forward** [224:7]
**forwards** [30:22]
**found** [278:13]
**foundation** [146:16] [198:21]
[220:17] [222:1] [223:3]
**founded** [51:20]
**four** [13:13] [17:4,14,17]
[41:10,11] [43:15] [44:7]
[45:20] [65:1] [80:20]
[143:13] [173:7] [186:10]
[193:2] [232:3,4] [246:21]
[252:16] [302:10] [309:8]
**fourth** [16:22] [106:1]
**fourtier** [143:13]
**four-tier** [143:13]
**fouryear** [17:4,14,17]
**four-year** [17:4,14,17]
**fpi** [9:21] [10:10] [13:10]
[14:4] [16:20] [17:4,13,15,17
,18] [18:5,7,20] [19:11]
[21:19]
**fractionated** [314:17]
**franchise** [11:16]
**francisco** [23:18,23]
**frankly** [319:1]
**fraud** [9:19,20] [10:5,16,22]
[11:2,3] [12:2,6,8,10,12,15
,21,24] [13:17,23] [14:6,7,9
,10,12] [16:2,23] [17:5,7,20]
[19:2] [20:16] [21:10,15]
[23:20] [24:17] [25:2,10,20
,21] [26:2,6,8] [27:2,5]
[36:12] [87:8,9,13,17,19,21]
[88:5]
**fraudulent** [9:24] [13:6]
[14:15] [15:1] [19:2] [22:11]
[26:5,9,13,17]
**free** [63:5] [291:18] [301:5]
[316:7]
**frequent** [24:17]
**frequently** [37:19] [38:17]
[41:23] [200:6] [238:20]
[287:13] [292:4] [310:17]
[312:22]
**friday** [265:13]
**front** [74:2] [90:17] [112:10]
[123:12,15] [148:18] [291:
23,24] [301:6] [316:24]
[317:7]
**fulfillment** [143:12]
**full** [76:1] [77:15] [82:11]
[242:6]
**fulltime** [76:1] [82:11]
**full-time** [76:1] [82:11]
**fully** [118:2] [239:7] [240:22]
[241:5,16]
**function** [34:1,3] [36:15]
[41:23] [43:23] [47:7,9]
[49:23] [290:19] [310:6]
**functioned** [75:23]
**functioning** [294:4]
**functions** [48:12] [145:7]
**fundamental** [236:19]
**funded** [14:13] [242:13,19]

**funding** [307:13]
**further** [143:1] [170:3]
[181:15]
**furthermore** [165:19] [205:
10]

G
—————————

**gained** [163:3]
**game** [22:12]
**games** [297:21]
**gao** [278:2]
**gaping** [69:13]
**gateway** [161:19,20] [162:10]
**gathered** [59:19]
**gave** [8:18] [95:6] [96:9]
[137:1] [146:12] [190:7]
[207:23] [210:11] [251:13]
[258:2] [280:21] [284:17]
**general** [31:22] [84:4] [89:24]
[105:11] [121:14,18] [145:
5] [148:5,13] [149:16]
[150:14] [153:7,22] [155:22]
[159:13] [160:2] [166:22]
[169:10] [186:24] [187:4]
[197:23] [198:3] [205:12]
[211:7] [242:2,12] [257:6]
[258:20] [283:13] [296:19]
**generally** [26:23] [34:10]
[38:16] [45:19] [50:15]
[56:9] [68:2,24] [73:6]
[90:15] [93:5] [120:5]
[121:20] [140:17] [141:5,20]
[146:24] [151:9] [156:4]
[158:8] [171:12] [179:14]
[198:11] [210:12,14] [211:
9] [262:5] [263:20,21]
[269:20] [271:11] [287:23]
[288:15] [292:7] [308:4]
[309:10]
**generate** [31:23] [94:2]
**generated** [31:21] [122:23]
[160:21] [281:1,10]
**generates** [310:11]
**generating** [150:24] [238:20]
**generation** [60:3,4,14]
**generic** [155:24] [156:3]
[205:18] [207:14,24] [216:
7,8] [224:7] [229:16,19]
[230:12,17] [259:8] [263:3]
[290:21]
**generics** [32:3] [205:20]
[207:19] [208:2,5,7] [215:24]
[230:2,4] [263:7,11] [297:22]
**genetic** [89:16]
**getting** [32:13] [33:6] [138:
10] [139:9] [166:12] [265:16]
[282:20] [296:8] [307:12]
**gibson** [1:13] [3:2,5,7,10]
[5:2,7] [6:10,23,24] [7:11]
[9:14] [11:18] [16:8] [49:19]
[70:24] [71:5] [85:10]
[87:23] [98:3] [100:9,14]
[101:9,10,17,21] [105:14]
[107:2] [112:17] [128:1]
[135:4,10] [136:6,22]

**5/18/2004  Gibson, David**

[152:13] [182:16] [214:6] [218:3] [220:9] [259:10] [275:19] [277:8] [304:17] [306:19] [320:9] [324:9]
**gibsons** [112:19] [214:24]
**gift** [316:7]
**give** [18:22] [27:22] [55:3] [98:22] [109:5] [121:10] [146:15] [159:2] [164:21,22] [180:10] [181:11,14] [185:13] [186:2] [190:16] [193:23] [194:19] [195:1] [196:6] [200:13] [205:11] [208:15,20] [225:4] [226:5] [228:12] [240:20,21] [279:16] [280:18] [290:23] [291:18] [292:10] [298:20] [301:5] [302:2 ,7] [308:11] [313:1]
**giveand** [121:10]
**give-and** [121:10]
**giveandtake** [109:5]
**give-and-take** [109:5]
**given** [22:2,4] [103:21] [105:10] [151:6,7] [163:12] [180:3] [181:11,23] [188:3] [194:20] [197:16] [242:14,18] [249:21] [302:10] [311:6] [315:9,14] [323:6] [324:6]
**gives** [37:6,24] [47:5] [151:17] [196:11,23] [197:10] [282:20]
**giving** [20:6] [35:4] [168:6] [180:13] [191:8] [195:4] [225:18] [301:14] [317:18] [318:16] [319:19,22]
**glanced** [84:3]
**go** [7:18] [22:19,21] [31:16] [35:2] [37:9] [49:2,19] [51:5] [58:7] [60:13] [62:15] [63:8] [64:17] [66:12] [67:20] [75:6] [84:6] [98:2] [104:21] [108:15] [119:9] [127:14,22] [130:23] [131:9,18,22] [132:21] [135:19] [137:17] [141:3] [143:1,10 ,21] [144:9] [147:18] [154:16] [157:23] [158:2] [166:20] [177:11] [178:4] [179:19] [181:7,14] [188:12,13] [189:15] [200:9] [205:19] [206:20] [220:24] [221:9] [222:9] [233:4,9] [234:11] [235:16] [242:2,6,21] [243:4] [244:17] [245:23] [248:9] [254:19] [255:8,10] [260:5,8] [261:2] [274:24] [288:5] [289:7] [291:15] [301:8] [303:6] [310:17] [316:13,20]
**goal** [28:4]
**goes** [29:7,20] [37:15] [39:11] [148:14] [151:7] [156:2] [191:20] [222:6] [242:19] [266:10] [290:19]
**going** [7:23] [9:5,6] [13:22] [17:3] [20:3] [22:24] [30:13

,16] [45:24] [52:23] [60:20] [67:23] [69:7,8,9] [77:9] [97:13,17] [98:22] [99:7] [104:12] [108:23] [109:8,10] [121:22] [134:13] [135:17,21] [136:9] [139:1] [150:16] [152:5] [154:19] [166:20] [189:20] [190:6,10,11,12,13] [208:15] [209:16] [212:3] [214:7] [222:8] [242:14] [244:16] [245:4] [249:1] [265:9] [271:23] [275:7] [281:13] [282:17,19] [288:4] [292:8] [296:24] [297:23] [298:20] [300:23] [304:9] [306:13] [308:17] [316:9] [317:7] [318:8]
**golden** [23:17]
**gone** [7:11] [20:20] [66:2] [135:12] [147:17] [185:19] [243:15] [306:3,7]
**good** [5:5] [42:15] [47:6] [84:22] [95:18] [211:24] [239:13] [253:13] [254:4] [317:19] [320:4]
**goods** [22:15] [23:14,19] [24:14] [26:8]
**gordon** [2:13] [5:24] [6:2] [84:18] [112:16] [114:10] [135:16] [211:23] [264:23] [319:18]
**gotten** [92:15,16] [147:23] [202:24] [208:18] [209:9]
**government** [235:22] [242:16] [243:18] [246:11]
**governor** [10:13] [12:3]
**grand** [304:16]
**grant** [50:9]
**graph** [130:24] [131:15] [218:21] [253:21] [280:24]
**graphic** [131:14]
**graphs** [281:7]
**grasp** [254:6]
**great** [59:6] [60:13] [77:18] [108:17] [127:20] [166:20] [234:5]
**greater** [204:17] [205:13,15] [206:3] [242:5] [283:8] [317:21] [318:16]
**grew** [77:22]
**gross** [303:10,16,21]
**ground** [7:18] [17:19]
**grounds** [96:16]
**group** [12:13] [13:9,21] [14:2] [16:20] [17:13] [18:16,19] [27:12] [31:3,17] [44:9] [46:21] [47:5] [51:9,14 ,20] [52:1,3,16] [53:24] [64:1] [78:18] [110:20] [117:8] [154:7] [218:18] [220:19,23] [221:12] [232:21] [239:10] [294:13] [299:18]
**groups** [30:19] [44:12] [52:9] [194:17] [238:8] [287:6] [292:4,5] [297:15]

**guess** [13:3] [17:15] [19:8] [29:9] [30:20] [54:3] [92:21] [108:3] [261:13] [287:2] [312:13]
**guide** [3:19] [47:7]
**guidelines** [31:14] [47:9]
**gustafson** [210:22]
**guys** [110:9] [134:9] [235:10]

**H**

**habit** [304:17]
**habits** [90:14]
**hadnt** [59:20] [165:24] [306:17]
**halbert** [141:10,23]
**half** [25:13] [51:24] [69:5,21] [70:5] [300:4]
**hand** [71:4] [128:5] [258:18]
**handed** [82:11]
**handheld** [60:16,17]
**handing** [11:23] [220:13]
**handle** [50:6] [200:7]
**handled** [219:24]
**handling** [169:1] [201:14] [204:1]
**handy** [129:17,19]
**hangley** [2:]
**happen** [73:1] [185:22] [288:11] [304:2] [305:9]
**happened** [23:21] [40:13]
**happy** [195:2]
**hard** [51:3] [124:11] [127:19] [254:5] [301:7] [314:2] [316:6]
**hardly** [39:3,4] [241:8]
**hartley** [80:24] [239:17] [262:10]
**hartleys** [35:15] [238:15]
**harvard** [89:8]
**hasnt** [242:11]
**havent** [20:10,11] [116:2] [120:10,19] [124:6] [145:1] [150:8,10] [163:3,7,12] [173:23] [196:5] [202:24] [218:9] [228:14] [255:21] [257:4] [266:1] [267:23] [288:10,13] [296:17] [297:10] [304:1] [306:16] [318:11] [319:4]
**having** [6:10] [53:21] [55:3] [59:11] [72:8] [100:1] [146:13] [167:13] [179:16] [185:22] [211:12] [218:9,17] [225:14] [226:4] [227:13] [241:23] [313:18] [317:8] [319:12]
**hawaii** [56:18] [57:24] [64:9,21] [65:18,22] [66:5,11] [67:1,19] [68:1] [69:2] [241:7]
**head** [8:8] [10:14] [57:17] [72:8] [173:2] [176:7] [210:20] [219:18] [241:23] [304:3]
**heading** [75:11] [246:14]

**headline** [288:22]
**heads** [66:17] [312:3]
**health** [9:21] [10:1,15] [14:14] [16:5] [18:17] [26:2,4] [29:14] [31:2] [32:6,9] [33:9,23] [37:23] [46:22] [47:1,2,10,22] [48:1,5,6,7,9,13,17] [49:7] [50:23] [52:22] [66:9] [70:13] [71:15] [72:1,7,9] [73:21] [74:14,15,23] [75:2,16,19,20,22,23] [76:2,3,5,10,13,18,20 ,23] [81:1,3,21] [82:1,12,17 ,21,24] [87:8,10,13,21] [88:6] [97:20] [99:7] [132:18] [141:7] [151:18] [186:4] [188:11,21] [189:1] [194:5] [201:7] [220:16,23] [221:4 ,8] [222:1,10] [223:2] [236:19,21] [242:3,7,24] [245:6] [264:1] [268:18] [271:6] [272:8] [273:4,9] [274:11] [276:6] [277:2] [278:6] [279:3,20] [281:20] [282:13] [284:15] [287:5] [289:7,16 ,20] [290:9,14] [291:7,20] [292:1,12,20] [295:12] [297:5,24] [299:19] [306:21] [307:24] [310:16,20,22,23] [311:9]
**healthion** [58:23]
**healthleader** [153:1]
**healthleaders** [152:21,24] [153:4,19] [154:20] [158:20 ,22]
**healthnet** [255:9] [292:17]
**healthy** [243:19]
**hear** [45:20] [67:12] [143:2]
**heard** [67:11,14] [154:3,23] [177:19] [214:10] [266:1] [298:10,14,17,18]
**hearing** [6:16] [171:2] [272:10]
**hearsay** [181:23]
**heart** [31:4,11,12] [32:19,23] [33:12] [38:5]
**heartbeat** [32:22]
**heartly** [30:1]
**h-e-a-r-t-l-y** [30:1]
**heavily** [34:15] [90:23] [140:7] [282:16]
**hed** [124:16] [168:9]
**hedis** [32:5]
**h-e-d-i-s** [32:5]
**held** [1:13] [27:17] [28:7] [135:24] [182:9] [234:13]
**help** [10:15] [53:20] [63:7] [91:23] [168:10]
**helped** [239:3]
**helpful** [38:7] [107:13] [110:9] [255:17] [273:15]
**helping** [79:5] [82:3] [109:9] [292:20]

helps [71:18] [294:15]
hence [270:5]
hereby [323:3] [324:4]
herein [323:7]
heres [10:24] [35:3] [166:11] [183:21] [184:9] [186:8] [230:10] [258:13] [301:3]
hes [102:12] [149:16,17] [153:14] [165:9] [169:11] [182:3] [209:21] [215:3] [216:2,19] [299:13]
high [19:19] [24:3] [30:7] [33:16] [35:1] [39:6] [53:1] [96:10] [230:15] [241:9] [270:3,17] [280:13] [282:4,6,8,10] [310:16] [315:18]
highcost [230:15]
high-cost [230:15]
higher [200:8] [206:20] [208:12] [211:10] [212:22] [215:21] [219:6] [222:18] [259:8] [271:16] [282:19] [286:5] [309:10] [312:4]
highest [23:20] [207:20] [257:13] [310:15]
highlevel [96:10]
high-level [96:10]
highly [295:16] [296:12]
hint [210:3]
hipaa [33:22] [34:5] [48:11,12,13] [194:21]
hippa [33:22]
h-i-p-p-a [33:22]
hired [147:12] [186:3] [192:19]
historically [256:6]
history [42:17]
hit [270:5,17,18] [271:16]
hitting [251:22]
hla [89:17]
hmo [77:24] [81:10,13] [187:5,6] [240:24] [245:4,16] [249:4] [287:12]
hmos [18:23] [19:3,5] [21:24] [35:23] [74:6,10,11] [224:23] [243:16] [255:16]
hmsa [66:11,17,21] [67:6]
hold [183:22] [302:6]
holes [60:23] [69:13]
home [24:15] [52:24] [66:24] [77:11] [161:13] [193:7]
honest [17:9]
honolulu [64:24]
hoping [267:7]
hormonal [312:8]
hormone [311:4]
hospital [42:19] [43:1] [77:18] [78:5,19] [79:23]
hospitalizations [29:19]
hospitals [34:17] [42:18] [76:21] [77:1,4,12,23] [78:11,17] [79:10] [148:17]
host [309:2]
hot [14:24]
hour [92:9,10,13] [93:1,6,11,13,14,17] [94:7] [95:21]

hourly [94:3]
hours [50:17,18] [84:21] [95:2,10,11,21] [228:15]
housekeeping [47:6]
houses [293:21] [296:4] [299:1]
houston [74:14,19,20] [76:5,15,23] [77:17] [79:24] [122:11]
however [74:2] [123:3] [125:22] [151:15] [259:6] [268:20] [280:5] [293:12]
hsg [303:4]
huge [308:16]
human [220:17]
hundred [9:4] [31:23] [93:5,10] [114:1] [257:5,10,14] [290:21,23] [313:23] [314:15,21] [315:17] [316:22]
hundreddollar [290:21,23]
hundred-dollar [290:21,23]
hundreds [90:5]
hurdles [11:15]
hypertension [31:5]
hypothetic [219:11]
hypothetical [200:14] [201:22] [203:4,12] [212:19] [213:5] [217:6] [273:6] [317:3,24] [318:4] [319:22,23] [320:2]
hypothetically [272:6]
hypotheticals [254:5]

—————————————

I

—————————————

i.e [281:2]
id [27:10] [28:15] [39:8] [41:11] [44:13] [50:18] [61:15] [64:16] [83:1] [94:22,23] [95:3,9,15] [96:12] [109:9] [110:19] [125:23] [139:19] [216:17] [256:14,20] [267:6] [303:24] [314:16]
idea [18:2,5,6,7] [54:23] [69:4]
identification [5:3] [11:19] [16:9] [71:1] [87:24] [100:10] [105:15] [128:2] [135:5] [152:14] [218:4] [220:10] [259:11] [277:9]
identified [31:2] [180:17] [197:3] [218:9,17] [258:8]
identify [5:20] [31:6] [32:1] [137:8] [198:3] [244:19] [277:24]
identifying [31:16]
identity [25:3,8]
ignore [255:2]
ignoring [309:2]
ill [8:5,13] [14:5] [16:16] [33:11] [43:17] [159:2] [163:19] [164:21] [181:11] [190:16] [195:2] [225:7] [249:14] [266:12] [268:2] [292:9,10] [301:5] [302:2,6]

[307:4] [310:3]
illinois [2:] [66:23]
illness [28:10]
illnesses [30:6]
illumination [27:14] [28:5,7,9,14] [36:5,6,10,13] [73:15] [93:21] [143:9]
illustrated [253:20]
im [7:22] [9:5] [10:24] [11:23] [15:13] [20:17] [26:15] [27:9,21] [29:6] [30:20] [31:22] [36:4,9,13] [38:14] [39:1,17,23] [40:9,13] [41:21] [42:1,6] [43:17] [51:4] [52:16] [57:5] [64:16] [65:10] [67:9] [71:6] [72:9] [73:7] [74:17] [79:4] [84:5] [85:16] [86:2] [88:19] [93:13,17] [95:4,9] [100:14] [101:4] [106:11,16] [109:1] [114:10] [115:3] [117:6] [119:24] [122:19,22] [128:21] [136:6] [139:9] [140:4,9] [146:3,5,9] [147:8,10] [152:3] [153:2,6] [155:3] [160:9] [163:16] [164:21] [166:7,11] [167:12] [168:5,7] [172:9] [174:14] [177:7,20] [179:18] [181:10] [183:11] [185:8,9] [186:24] [187:12] [191:8] [194:19,22] [195:1,8,19] [198:2,17,18] [199:3] [200:20] [203:11,17] [204:3] [208:14,15,19] [209:5,7,9,14,16,17,22] [213:19] [214:12,13] [215:1,2] [216:7] [219:9] [220:13] [221:7] [224:20] [225:7,8,11] [226:2] [228:17] [230:10] [240:19] [244:2] [245:10,11] [249:10,13,20] [254:14] [256:2] [258:14] [263:15] [264:4,5] [271:14,23] [272:22] [273:2,3,12] [277:17,21] [282:14] [284:2] [286:21] [288:8] [291:8] [292:8] [298:3,20] [299:6,22] [300:23] [301:9] [304:9] [307:5,11] [309:2] [311:20] [312:13] [313:18,20] [314:6] [317:12,13,22] [318:5] [319:8,9,22]
imagine [35:11]
imaging [35:17]
immigrant [23:23]
immunized [32:13]
immunogenetics [89:15]
impact [90:13] [120:11] [180:23] [181:16] [182:20] [183:24] [185:5] [193:24] [196:2,7] [197:13] [253:8] [273:9] [289:15]
imperative [321:12]
implications [233:23] [235:4,13]
importance [213:17]

important [29:14] [32:21] [171:24] [213:3,6] [214:11] [255:13] [290:17] [310:9]
impossible [306:15,19]
improve [61:23] [62:11]
improved [49:18]
improving [64:4]
ims [156:24]
inactive [55:12]
inadvertent [72:11]
inc [1:8] [2:] [14:21] [27:15] [28:6,8]
incarnate [77:16]
incentive [99:6] [269:19,24] [271:17]
incentivebased [99:6]
incentive-based [99:6]
incentivize [263:1] [290:22]
incentivizing [263:6,7]
incidence [26:6,7] [181:22] [242:18]
incidentally [234:2] [311:24]
include [12:23] [15:3] [63:22] [74:2] [90:20] [97:3] [107:1] [150:21] [151:23] [198:8] [236:23,24] [237:12] [240:23] [294:6,7] [303:17] [307:13]
included [69:23] [72:15] [74:1] [105:24] [112:4] [121:9] [154:17] [266:23] [269:1]
includes [287:4]
including [29:17] [32:12] [97:22] [184:2] [199:21] [306:3]
inclusion [250:14]
inclusive [102:2]
income [301:23] [302:1,4] [303:8,15,16] [304:5,20,23] [305:5,6,19,21]
incorporated [13:15]
incorrect [164:6]
increase [252:24] [289:21] [290:9,15]
increased [290:24] [306:22]
increasing [263:3]
incredible [59:7]
indemnity [78:3] [81:17] [82:2] [240:23] [241:17] [243:1]
indemnitytype [241:17]
indemnity-type [241:17]
independence [238:17]
independent [15:15] [18:13] [47:5] [80:8] [146:6,22] [147:6,24] [234:4]
indepth [22:5]
in-depth [22:5]
index [4:1] [113:12]
indicate [39:21] [269:20]
indicated [31:11] [104:15] [119:15,17] [179:1] [246:5] [269:21] [303:5] [316:4]
indicates [92:8]
indirect [117:5]

**individual** [19:19] [30:18] [60:12] [194:4] [314:18]
**individuals** [31:7] [96:23] [211:13] [251:9,12]
**industry** [9:21] [21:16] [87:2] [90:6,7] [97:2] [103:16] [144:1,4,6] [146:4,9] [148:6] [151:22] [152:11] [160:12] [163:15] [164:3] [169:11] [178:23] [180:12,14] [190:1] [194:4] [211:1] [250:23] [251:10,23] [252:1] [257:11,13] [263:14,19] [273:18] [289:1] [295:20] [296:23] [297:2] [298:10,18] [308:5] [315:12]
**infer** [310:4]
**influenceable** [296:12]
**influenced** [98:1] [99:9] [295:16]
**informally** [200:6]
**information** [32:6] [33:20] [45:21] [57:22,23] [58:1,2] [59:18] [62:19,20] [69:10] [102:2] [103:4,19] [106:5] [137:8] [142:6] [143:5] [147:1] [148:19] [149:14] [151:20,21] [152:23] [153:15,20] [154:2,9] [155:20,21] [157:21] [158:6] [181:23] [191:7] [193:14] [194:8,23] [195:2] [196:22] [209:15] [210:12] [221:19] [224:24] [244:19] [274:9] [279:17] [280:2,4] [285:4]
**infrastructure** [47:8] [60:15] [65:3]
**infrequent** [38:11] [231:5] [239:11]
**infusion** [52:18,20] [54:15,18,21]
**infusions** [287:15,20]
**inherited** [176:13]
**inhibition** [64:7]
**inhibitor** [173:20]
**inhibitors** [33:13,14] [38:6] [174:4] [178:13] [185:11] [187:18] [309:7]
**inhouse** [44:23] [78:13] [165:6] [166:3,13] [169:10] [314:12]
**initial** [49:14]
**initially** [24:3] [247:18]
**injections** [53:1]
**input** [128:19]
**inquire** [171:2]
**inquiry** [255:20]
**inspection** [19:15]
**inspections** [19:22]
**installing** [62:20]
**instance** [31:10] [32:15] [37:17] [64:13] [93:21] [106:12] [109:1] [122:21] [137:14] [147:3] [151:4,11] [172:1] [191:8] [195:9] [196:11] [233:15] [238:13]

[241:7] [242:15] [245:5,6] [258:24] [281:18] [284:16] [300:5]
**instances** [32:3,14] [34:18,19] [40:12] [91:20] [191:9] [238:6] [250:19] [262:9]
**instead** [64:19] [184:1]
**institute** [9:20] [10:6] [11:2 ,4] [14:6,11,13] [16:23] [36:12] [150:3,6]
**instituted** [42:22]
**institutional** [148:15]
**instructions** [321:1]
**insulin** [173:10,12] [174:5] [178:8] [186:11] [190:12]
**insurance** [29:21] [33:23] [66:9,10] [78:4,6,12,18] [79:19,21] [81:15,17,22] [82:2] [83:18] [90:6] [91:24] [92:3] [145:22] [146:18,19] [148:14] [204:22,24] [221:8] [237:22] [238:1,10,13] [240:16] [241:19] [242:6,24] [243:1,3,7,15,17] [246:10]
**insure** [221:9]
**insured** [239:7] [240:22] [241:5,17]
**insurers** [141:7] [240:1]
**integrated** [229:6] [233:11,12]
**intelligence** [37:4,14] [44:10]
**intend** [120:18]
**intended** [106:21]
**interact** [37:21]
**interest** [63:5] [109:20] [159:22] [276:23] [285:15] [286:12,16,24]
**interested** [62:9] [78:12] [89:15] [96:12,13] [97:10] [111:18,23] [112:2] [181:10] [276:24] [277:4] [284:20] [285:23] [286:7]
**interesting** [30:5] [66:5] [97:9] [213:2] [268:20] [280:3] [314:9]
**interestingly** [24:16]
**interface** [53:24] [126:23]
**interject** [271:24]
**internal** [65:6] [213:16] [238:22]
**internet** [244:10] [278:15]
**internist** [43:24]
**internists** [43:22]
**interpose** [135:15] [216:18]
**interrelationship** [126:24]
**interrupt** [106:16] [112:17]
**interrupting** [107:9]
**intersected** [281:7]
**interstate** [91:23]
**intervene** [30:7] [35:4]
**intervention** [31:15] [34:23]
**interview** [115:7,10,14,18,22] [116:18]
**intrigued** [62:10]
**introduction** [98:18] [99:16]
**inventories** [112:24]
**inventory** [24:12]

**investigated** [12:22]
**investigating** [9:24] [12:10 ,14] [13:22]
**investigation** [21:2,15] [23:6,10,24] [25:9,12] [145:2] [192:8]
**investigations** [10:22] [20:10,12,14,21,23] [25:15] [298:6]
**investigative** [10:14]
**investigator** [19:16] [24:5,10]
**investigators** [9:23] [10:8,9] [19:23] [20:21] [22:14] [24:1]
**invoice** [94:18]
**invoices** [95:19]
**involve** [20:24] [21:5,19] [23:4] [26:17] [35:18] [39:19] [297:20]
**involved** [13:10] [14:9] [21:3] [23:6,11,24] [27:13] [37:2] [54:3] [58:5] [64:3,23] [65:5] [73:7] [75:18] [87:8,10] [91:15,17] [92:3] [102:19] [109:2] [116:11] [117:24] [147:10] [164:18,20] [166:2,16] [194:4] [215:9] [218:18] [299:3]
**involvement** [55:10,15] [126:9] [225:20]
**involves** [21:15]
**involving** [17:5] [26:24] [27:8]
**ipa** [18:12,16,20]
**irregular** [32:22]
**irregularly** [32:19]
**irs** [11:16]
**iscribe** [58:21]
**islands** [64:22]
**isnt** [25:4] [37:19] [124:2] [213:3] [227:2] [234:6] [238:5] [242:5] [280:1] [302:12]
**issue** [33:21] [48:10] [59:11] [75:9] [87:13] [110:17] [151:2] [181:7] [185:16,21] [193:18] [199:1] [204:5] [205:20] [207:11] [223:14] [241:11] [244:17] [247:17] [252:2,19] [276:5]
**issued** [137:14] [265:2]
**issues** [52:9] [56:6] [89:22] [90:4] [91:5] [109:10] [121:22] [133:12,17] [144:7] [181:5,21] [197:15] [223:22] [224:2,5,22] [226:14,18] [255:2] [286:17 ,20]
**issuing** [106:6]
**item** [63:1] [75:6]
**items** [151:23] [190:23]
**iteration** [83:9]
**iterations** [108:24]
**itself** [61:6] [218:7] [253:12] [272:3]
**ive** [11:22] [20:20] [23:13]

[28:3] [30:24] [77:11] [83:21] [84:12] [89:23] [92:15] [94:23] [112:11] [117:22] [121:21] [147:4,23] [148:2] [153:6] [160:19,20,21] [164:7,9] [180:14] [181:23] [183:16] [184:9] [197:15,19] [206:11] [208:17,18] [209:7,9] [221:24] [222:2] [258:8] [264:13] [265:22] [266:23] [275:4] [276:15] [277:13] [283:24] [291:15] [297:19] [298:17] [301:24] [305:8] [312:12] [318:9]

---

**J**

---

**j.b.d.l** [1:5] [5:8] [9:2] [95:24] [116:19,23]
**january** [55:7] [70:16] [231:21]
**jay** [2:3] [5:22] [8:20] [205:1] [210:3] [217:1] [265:13]
**jeopardize** [47:10] [48:8]
**jersey** [160:2]
**jfk** [5:16]
**job** [104:18]
**jobs** [9:16] [147:17]
**john** [1:] [164:14] [167:10] [168:12,15] [170:11] [211:1] [213:3]
**journal** [90:23] [91:2] [138:24] [159:16,19] [207:13,17 ,18] [211:20]
**journals** [153:22] [198:13]
**judge** [91:23]
**july** [100:16]
**jump** [70:14] [178:3]
**june** [40:19,20,22] [71:15] [232:3] [278:2] [307:20]
**jury** [148:18] [180:11] [209:4] [225:5] [228:3,6]

---

**K**

---

**kaiser** [78:16,17] [79:6,7,9,11]
**kaiserlike** [79:11]
**kaiser-like** [79:11]
**kaisertype** [79:7]
**kaiser-type** [79:7]
**keep** [94:12,17] [107:19] [129:16,19] [161:12] [232:10] [271:6] [291:9]
**keeper** [232:13]
**kennedy** [1:] [33:24]
**kennedykassebaum** [33:24]
**kennedy-kassebaum** [33:24]
**kentucky** [206:16]
**kept** [100:7] [107:19]
**kidneys** [32:24]
**kids** [265:15]
**kind** [8:20] [27:3] [36:20] [47:5] [59:4] [63:15] [67:23] [79:3] [121:20] [161:15] [188:13] [191:7] [243:3]

[306:13]
**kinds** [181:24] [250:13]
**knew** [36:7] [68:17,18]
[101:12] [192:15] [199:8,14
,17] [227:19] [276:19]
[286:2]
**know** [7:22,23] [8:12] [33:8
,9] [35:3,8] [37:16] [49:11]
[50:17] [55:19] [57:13,19]
[60:22] [67:2] [70:2,7,18]
[79:6] [106:12] [117:22]
[119:16,17] [120:5] [121:22]
[127:18] [139:15] [143:17]
[144:21] [145:4,10] [146:16
,21,23,24] [147:3] [149:12]
[151:8] [153:8,10,12,14,17]
[156:9,11,15,21] [157:14,15]
[159:10,11] [163:14] [171:
21] [172:2,22] [173:5,9,22]
[174:1,22] [175:2,13,15]
[176:11,20] [177:1,12,22]
[178:6,10,11,12] [180:19]
[181:2,9] [182:17,18]
[185:9,22] [186:7,10]
[187:6,14,15,16,24] [188:4
,11,15,17,19,20,24] [189:1
,5,9,16,18] [190:11,19,20,21]
[191:1,10,13] [194:5,24]
[195:10] [196:5,14,19]
[198:12,17] [202:14] [204:
24] [206:6,7] [208:21]
[209:5,14] [210:12,14]
[219:21] [220:7] [221:20]
[225:6] [227:18] [229:11,17]
[230:20] [232:6,12,15]
[235:6] [240:11] [242:1]
[246:2] [248:19] [249:11]
[250:9,21] [251:5,6] [252:5
,14] [253:2,5,7] [255:18]
[256:24] [257:4,5] [259:1]
[264:24] [268:16,24] [274:
5] [276:13,21] [280:16]
[281:15,21] [283:6,11,12,15]
[284:11,16,20,22] [285:4]
[286:3,21,23] [287:17]
[294:9] [295:8] [296:10]
[297:6] [299:2,24] [301:13]
[303:7,14,22] [304:4,7,23]
[305:5,8] [308:21] [309:12
,18,19,23] [310:3] [311:5,10]
[316:8] [319:2]
**knowing** [151:5]
**knowledge** [22:5] [103:11]
[107:7] [108:4] [116:7]
[120:7] [151:2] [164:2]
[181:12,22] [205:10] [225:
23]
**knowledgeable** [211:1]
[221:16] [225:11] [310:5]
**known** [13:4] [33:22,23]
[110:23] [273:17] [296:23]
[297:2] [298:10] [314:10]
**knows** [190:2]
**kodroff** [2:]

**L**

**labor** [29:23] [224:12]
**laboratories** [1:] [2:11]
**labs** [115:16]
**landscape** [185:24]
**language** [130:12] [139:2,16
,17] [141:1] [142:4]
**laptop** [162:11,14]
**large** [117:9] [292:17] [293:
13] [299:1]
**larger** [78:19] [296:4]
**last** [9:7,14] [10:3] [13:15]
[27:13] [51:23] [55:5]
[56:1,22] [59:16,19] [60:9]
[72:2] [75:12] [83:3] [87:6,7]
[91:9] [92:19] [96:2] [100:19]
[106:8] [110:4] [111:13,17]
[122:21] [151:5] [162:7,21]
[163:10,22] [165:10] [166:
8] [167:19] [199:8,13]
[203:21] [206:9,10] [217:16]
[229:3] [245:9] [255:23]
[260:2,5,9] [265:12]
**late** [96:3] [122:16]
**later** [51:4]
**latter** [96:2,6]
**law** [1:14] [5:13] [14:12]
[122:11] [242:19]
**lawsuit** [91:14]
**lawsuits** [297:13,15]
**lawyers** [104:9] [325:1]
**lay** [73:11] [105:12] [106:4]
[160:12] [198:6]
**lead** [30:6] [61:12] [152:23]
[165:5] [184:13]
**leap** [40:11]
**learn** [255:14] [256:16,17,19]
**learned** [22:12] [108:17,18]
[247:13] [255:4]
**least** [33:7] [55:10,18]
[236:24] [262:6] [264:18]
[280:5] [293:10] [302:24]
**leave** [177:7] [225:7] [256:22]
[292:9]
**lee** [275:22]
**left** [51:21] [104:16,17]
[129:10]
**legal** [297:19]
**legs** [79:15] [227:20]
**length** [38:15]
**less** [218:24] [274:18]
[304:5,11]
**lesser** [215:13,20] [216:3,10]
[217:10,24] [219:4] [220:3]
[283:8]
**lesson** [77:10]
**let** [7:18,21] [8:12] [11:22]
[16:12,21] [40:17] [45:3,14]
[56:8] [57:5] [58:3] [60:2]
[62:24] [66:1,4] [70:2,21]
[89:12] [100:13] [102:9]
[123:6] [136:20] [152:1]
[161:2] [171:3,23] [173:15]
[174:14] [182:16] [186:2]

**lets** [35:5] [51:5] [62:14]
[67:4] [75:3] [88:21] [96:1]
[121:13] [129:13] [131:22]
[135:19] [137:23] [141:3]
[144:9,10] [152:1,17]
[158:2] [164:20] [167:5]
[168:22] [173:4] [181:6]
[182:3] [187:13] [200:16]
[201:1,12] [206:19] [217:12
,18] [224:15,20] [228:24]
[231:20] [235:16] [242:17]
[245:12,22] [262:13] [270:
22] [272:6] [274:24] [290:7]
[294:6] [298:17] [303:8,11]
[312:16]
**letter** [37:8] [39:11] [113:8]
[266:9]
**letters** [37:9,13] [38:8,17]
[39:5,13,18] [40:4,11]
**level** [22:11] [25:22] [26:6]
[27:4] [69:7] [104:3] [179:10]
[198:7] [213:23] [233:9]
**levels** [215:9]
**levin** [157:6]
**liberty** [1:14] [5:13]
**licensed** [81:11]
**licensure** [75:23] [80:10,11]
[81:12]
**lie** [128:17]
**life** [37:16]
**lifted** [130:10] [131:12]
[132:23] [137:19] [140:1]
[158:19]
**light** [109:15,16]
**likely** [30:6,14] [31:17]
[32:2] [119:6] [295:16]
[296:12] [312:7]
**likewise** [33:11] [37:22]
[143:4] [151:10]
**lillie** [28:24]
**limb** [304:10]
**limit** [127:9] [183:2,3,15]
**limited** [42:20] [181:12]
[184:5] [186:1] [197:14]
**limiting** [291:9]
**limits** [282:21,22]
**line** [4:3,9,15] [9:6] [72:2]
[107:10] [215:2,3] [217:16]
[269:13,14,18] [310:6]
[322:4] [325:2]
**lines** [8:4] [28:3]
**link** [60:17]
**list** [29:20] [40:10] [43:17]
[105:8,24] [106:21] [112:12]

[189:16] [224:13] [267:17,21]
**listed** [87:5] [302:13]
**listing** [106:19] [189:6]
**listings** [98:13]
**literature** [39:20] [58:11]
[160:13] [198:6] [207:12]
**litigation** [27:8] [91:10,18,21]
[92:6] [200:3] [313:1]
**little** [8:16] [11:1] [54:6,7]
[77:10] [83:3] [84:19]
[85:11] [122:19] [127:17]
[161:2] [237:22] [247:11]
[281:11] [290:7] [307:10]
**live** [49:21]
**lived** [7:5]
**lives** [302:9] [307:15]
**llp** [1:14] [2:]
**load** [68:21]
**loaded** [68:20]
**local** [61:2] [65:2]
**located** [5:16]
**location** [64:19]
**locations** [232:23]
**log** [94:15,17]
**logan** [2:14]
**long** [7:5] [14:6] [35:13]
[47:14,15] [48:21] [50:9]
[63:8] [82:8,16,20,23]
[94:2] [161:21] [162:14]
**longer** [83:3] [95:4] [165:9]
**longs** [103:14]
**longterm** [35:13]
**long-term** [35:13]
**look** [7:13] [22:14] [30:18,22]
[31:20,24] [32:4,12,14,16,19]
[33:2,11] [49:3,5,14] [57:22]
[75:3,10] [96:10] [98:2]
[108:16] [109:6] [112:6,12]
[114:21] [129:13,17] [140:
23] [143:21] [144:9] [150:23]
[151:16] [152:17] [156:5]
[159:2,4] [185:24] [218:21]
[224:6] [231:20] [245:11]
[277:3] [282:1] [303:24]
[310:14] [313:7]
**looked** [24:1,2,6] [97:9]
[121:19] [149:15] [227:3,8]
[301:20] [304:1,10] [306:17]
[312:12,14,24] [313:9]
[319:4]
**looking** [9:15] [20:7] [25:7]
[30:1] [31:22] [43:3] [74:7]
[132:4] [144:11] [156:8]
[161:6] [224:11,13] [236:13
,14] [243:22] [286:19]
**looks** [30:21] [87:7] [106:13]
[155:10,15] [161:18]
**loop** [49:16]
**loosely** [271:15]
**los** [14:20] [52:17]
**loss** [55:21]
**lost** [66:24] [317:12]
**lot** [37:15] [42:16] [54:12]
[58:24] [60:21,22] [73:4,12]
[92:19] [111:3] [123:4,5]
[157:18] [177:6,8] [184:12

,21] [206:11] [238:24] [242:
16] [256:5] [275:5] [302:19]
[310:11]
loud [311:21]
low [310:7,8]
lower [200:9] [222:7,20]
[229:23] [230:1,3] [259:7]
[262:20] [263:23] [264:19]
[291:7,19]
lowers [262:14]
lunch [46:8] [96:15] [134:10]
[136:20]
luncheon [134:16]
lying [313:17]

M

m.d [1:13] [3:2,7,10] [6:10]
[324:10]
mac [6:7] [215:12,24] [311:
13]
magazine [88:15,16,18,19]
mail [130:8] [143:12] [205:21]
[207:21,22] [235:21] [236:
3,6] [269:2] [273:20] [282:18]
[284:2]
main [137:7]
mainly [64:24] [119:4]
maintain [94:9]
major [78:21] [98:13,17]
[99:15] [194:9] [196:10,17]
[207:13,21] [211:21] [242:
11] [255:16] [280:11] [285:
24]
majority [17:9] [78:2] [143:
18] [258:22] [262:8] [271:15]
[281:9] [296:2]
making [92:21] [99:10]
[147:8] [219:10] [288:3]
[308:20] [316:20]
mammograms [32:14]
man [318:1]
manage [37:1,10] [314:14]
managed [18:18] [77:14]
[86:12] [89:22] [90:4,11]
[91:5] [98:13,17] [99:15]
[121:15] [137:14,15] [138:
11,16] [208:8] [215:7,15]
[216:20] [217:9,11,21]
[218:18] [219:18] [224:21,23]
[243:15] [247:15] [249:17]
[253:24] [254:12,20,21]
[255:5,7,16] [259:24]
[267:1] [284:7] [285:20]
[303:5]
management [46:23] [48:8]
[78:24] [82:6] [138:17]
[316:17]
manager [48:4] [170:5]
[172:12] [201:11] [238:21]
[239:2] [259:17] [281:16]
[314:1]
managers [125:17] [145:23]
[238:2] [278:4,6] [316:14,15
,16]
managing [138:11]

mandated [242:16]
mandatory [143:12]
manual [109:17] [110:17]
[111:19,24] [112:4]
manufacturer [46:6] [163:24]
[165:24] [179:20] [187:9]
[223:13] [225:1] [246:15]
[276:22]
manufacturers [21:1,7,20]
[35:19] [45:9,11] [46:3,16]
[86:24] [162:23] [163:4,14]
[166:14] [169:2] [179:10,13
,16,24] [188:18] [235:20]
[245:4,15] [246:24] [247:14
,23] [250:2] [252:5]
margin [207:20]
marginal [196:20] [255:11]
margins [305:20]
mark [70:21] [127:23] [277:
18]
marked [4:14] [5:3] [7:11]
[11:19,23,24] [16:9,13]
[71:1,4] [87:24] [88:3]
[98:2] [100:10,13] [105:15]
[128:2,6] [135:5] [136:21]
[152:14] [154:7] [214:23]
[218:4] [220:10] [259:11,14]
[269:4] [277:9,13,16,21]
market [1:15] [2:4] [22:6]
[34:15] [59:5,6,9,11] [78:9]
[79:12] [98:18] [99:6,16]
[112:5] [120:6] [145:6]
[146:3] [147:2,6,11] [157:23
,24] [163:8] [182:1] [186:1]
[196:18] [205:21] [213:18]
[219:10] [225:20,24] [226:
20] [232:23] [236:19] [240:
23] [241:1,6,10,11,16,20]
[242:10,14,18] [243:23]
[246:6] [247:8,10] [250:3,15
,18,20,23] [251:1,22] [253:
1] [255:1] [270:3] [271:13]
[282:17] [286:13] [287:1,4
,6] [288:7,10] [290:23]
[294:16] [297:20] [298:19]
[306:6] [307:9]
marketby [241:10]
market-by [241:10]
marketed [223:10] [226:18]
marketer [254:24]
marketing [82:13,14] [99:9
,14] [223:9,18,21,23] [224:
2,5,19] [225:1,5,7,14,16]
[226:6,12] [227:1,4,15,19]
[228:10,13,18,21] [291:16]
[298:14] [300:2] [316:12]
marketings [226:20]
marketplace [143:7] [181:2
,19] [182:22,24] [184:2,6,14]
[185:6] [193:24] [196:3,8,17]
[197:12] [199:24] [219:3,23]
[240:12,15] [250:9] [253:9]
markets [241:7,9]
marks [140:20] [160:23]
[208:19] [244:17]
marty [76:11] [219:17]

mass [144:24]
massive [78:8]
match [311:11]
material [114:3] [139:9]
[140:5,7,8,15] [142:22]
[149:15,17] [158:12] [160:
16,24] [205:11]
materials [105:3,21] [106:3]
[144:3] [268:10]
matter [5:7] [8:21] [92:1]
[101:8] [117:11] [119:8]
[121:9] [150:14] [238:6]
[247:12] [253:10,22] [254:
1,2,9] [257:7] [286:20]
maximum [215:11] [216:6]
may [1:10] [5:11] [7:23]
[10:20] [12:1] [37:21]
[38:12] [53:14,15] [60:2]
[70:16] [71:15] [80:20]
[106:22,23] [110:13] [155:
21] [182:21] [197:13] [216:
12] [218:10] [231:21] [232:
2] [242:6] [253:9] [267:14]
[268:6] [272:19] [321:16,17]
[324:16]
maybe [54:6] [75:4] [83:3]
[108:4] [231:8]
mc [196:15]
mckinley [1:17] [324:]
mco [246:16] [253:16]
[287:12]
mcos [196:15] [246:18]
[289:17]
mean [29:11] [77:4] [78:23]
[93:19] [103:10] [104:7]
[144:8] [148:6] [153:23]
[174:2] [183:13,16] [189:4
,15] [190:4] [243:2] [254:10]
[255:8] [270:11] [285:4]
[309:23] [312:13]
meaning [73:12]
means [49:16] [282:5]
[306:22] [314:12] [324:20]
meant [36:7] [114:20] [183:
19]
measured [305:18]
med [37:4,13] [44:9]
medco [188:13] [190:14]
[267:12,24] [268:17] [269:
6,7,8] [270:5,24] [271:16]
[272:8,20] [273:3] [274:3,11
,13] [277:18] [280:12]
[284:17] [289:9] [293:2]
[294:18] [300:17] [301:18]
[302:4] [307:7,9,18,20]
[308:10] [313:16] [314:24]
[316:23] [317:20]
medcos [273:8,18,20]
[302:16] [312:15]
medi [9:22] [10:9,16] [12:2,5
,8,10,12,15,21] [13:6,17,23]
[16:2] [17:5] [18:23] [19:3,4]
[20:16] [21:10,14] [23:21]
[24:17] [25:2] [86:21]
[243:18] [255:24] [256:5,13]
[257:2,7] [258:17] [259:2,7]

[263:10] [280:9] [282:24]
[283:1]
medicaid [255:24] [256:5,13]
[257:1,7] [258:17] [259:1,24]
[261:7] [267:1]
medicaidmedical [258:17]
medicaid-medi-cal [258:17]
medical [9:22] [10:9,16]
[12:2,5,8,10,12,15,21]
[13:6,17,23] [16:2] [17:5]
[18:23] [19:3,4] [20:16]
[21:3,10,14] [22:16] [23:21]
[24:17] [25:2] [27:15]
[28:5,8,9,14] [29:17] [30:11]
[35:5,17] [36:5,10,13,16]
[42:23] [46:2] [59:2] [63:23]
[69:12] [70:15] [71:23]
[73:15] [75:20] [78:18]
[85:17] [86:21] [88:10]
[90:8] [93:22] [97:22]
[173:24] [198:13] [239:3]
[243:18] [256:5,13] [257:2
,7] [259:2,7] [263:10] [280:
9] [282:24] [283:1]
medi-cal [9:22] [10:9,16]
[12:2,5,8,10,12,15,21]
[13:6,17,23] [16:2] [17:5]
[18:23] [19:3,4] [20:16]
[21:10,14] [23:21] [24:17]
[25:2] [86:21] [243:18]
[256:5,13] [257:2,7] [259:2
,7] [263:10] [280:9] [282:24]
[283:1]
medicare [27:9] [83:20]
[243:18] [282:24] [283:2]
medication [215:11] [216:5]
medications [37:7,18]
[56:13]
medicine [25:3] [62:3,6]
[65:7] [90:23] [91:2] [138:24]
meet [40:17] [41:2,3] [45:8,10
,14] [48:16] [50:12,13,21,23]
[118:15,18] [231:4] [300:2]
meeting [8:3] [41:2,6] [45:14
,15] [46:8] [49:10] [118:23]
[119:3] [278:9]
meetings [41:8,12] [44:7]
[173:7] [231:8] [232:5]
[235:10] [291:16]
member [41:22] [42:5,8]
[85:14,16,20,21,24] [86:2,7
,11,14,17,20] [210:21]
[228:3]
members [11:10] [14:17]
[15:3,11,20] [41:13,15,19,21]
[42:2,9,13,14,22] [43:5]
[45:7] [177:4] [186:5,16]
[188:22] [191:24] [207:8]
[208:10] [209:11] [232:19]
[235:12] [246:17] [262:16]
[279:19]
membership [14:13] [15:2]
memory [69:22]
mental [310:16]
mention [79:6] [112:13]
[121:3] [225:15] [236:17]

mentioned [9:17] [12:5] [17:12] [19:3,9] [21:9] [25:19] [38:23] [41:19] [48:20] [51:6] [59:19] [62:2] [79:9] [80:23] [81:21] [85:13] [110:13] [123:7] [135:11] [178:5] [210:16] [212:12] [218:9] [220:20] [238:7] [299:16] [315:9]
mentions [12:3]
mercer [220:17,19] [221:9] [223:1] [239:13] [292:4] [293:22] [294:13,15,19,23] [295:2,10,13] [296:4] [299:4,7]
mercers [292:9] [294:20]
merchandise [144:24]
merck [160:4] [291:16] [301:11] [305:15]
merckmedco [301:11] [305:15]
merck-medco [301:11] [305:15]
merckmedcos [160:4] [291:16]
merck-medcos [160:4] [291:16]
merely [126:9]
merged [58:24]
met [40:19,23] [46:2,15] [78:7] [96:5,8] [118:4,21] [232:1,2]
method [159:15]
methodology [17:18]
michael [2:] [5:15]
middle [310:19,24] [311:2,9] [316:16]
midrange [312:1]
million [17:6] [302:11,12,19] [307:17,21]
millions [302:11,17]
mind [40:11] [109:18] [150: 24] [178:3] [316:8]
mine [101:14] [123:3,5]
mining [28:9] [29:12] [190: 19]
minnesota [150:4]
minor [84:5] [263:19]
minority [143:14,18]
minus [201:13] [202:23] [203:24]
minute [70:14] [159:2]
minutes [228:19] [232:10,13]
minutiae [103:16]
mischaracterizes [307:2]
misheard [15:13]
missed [245:9]
misunderstood [115:2] [195:22]
mixing [215:23]
model [30:12] [59:14] [78:20] [314:23]
module [59:3]
moment [7:13] [105:1] [152:18] [178:5] [212:15] [223:7]

monday [265:17]
money [29:8] [97:23] [148:13] [208:1,5] [244:6] [250:1,2] [256:22] [286:14] [294:19,23 ,24] [295:2] [303:12] [308:17 ,20] [316:24] [317:6]
moneys [249:17]
monitor [14:16] [49:18,23] [68:22]
monitored [19:1,20]
monitoring [47:12,19] [49:6] [68:10]
monopolies [66:9]
month [39:6] [47:18] [70:18] [93:22] [165:10] [207:12]
monthly [33:7] [94:1]
months [63:10,12,13] [67:21] [82:22] [83:1,4] [156:3] [231:6,8] [232:2]
morning [5:5] [118:21]
mosaic [152:7,8,9] [226:16]
mostly [15:14] [23:18] [53:9] [61:10] [96:24] [206:14,15] [224:22] [233: 1]
mouth [288:4]
move [78:8] [217:18]
moved [75:22] [140:2] [310:13]
movement [77:24] [250:18] [290:22]
moves [14:8] [253:1]
moving [207:21] [252:1]
mr [3:3] [5:22,24] [6:2,20,24] [8:20] [9:10,12,13,14] [11:1,9,21] [13:24] [14:3] [15:9,13,16,18] [16:11] [26:20] [40:7,15] [52:4,5,7] [56:5] [70:21] [71:3] [72:20 ,22] [73:22] [74:4] [84:18,20] [85:9] [88:2] [95:18] [96:4,7] [100:1,3,5,12] [101:4,9] [102:9] [103:12,22] [104:2 ,8,10,12,13] [105:8,17,20] [106:16] [107:12,16,21] [108:21] [110:4,8,20] [111:13,14] [112:8,13,16,20 ,21] [113:7] [114:6,10,16,17 ,21,22,23] [115:1,4,5] [117:7,13,14,16,22] [118:4 ,8,15,24] [121:4] [122:20] [123:7,17,19] [124:2,7] [125:6,8,10,11,20] [126:5,12 ,14,15,19,21] [127:2,7,8,11 ,14,22] [128:4,15,16,23] [129:1,6,10,19] [130:2,14,16 ,18] [131:1,4,5,6,7,12,15,20] [132:1,4,11,12,14,19,23,24] [133:1,4,9,19,23] [134:9,12] [135:9,15,19] [136:5] [137:22] [138:1] [139:4,11 ,18,23] [140:3,11] [141:23] [142:2,3,8,10,11] [145:12,16] [148:20,24] [149:3,12,20] [150:5,8,22] [151:24] [152:3,16] [153:8,12,17]

[159:8,10,24] [160:5,6,9,14] [161:4,5,10] [163:16,19,21] [168:22,24] [169:14] [172: 10] [174:19,24] [175:6,14] [178:17,24] [179:2,4] [180:7,9] [182:3,15] [187:22] [188:7] [197:4,5] [199:6,20] [201:2,3,4,5,22] [202:2,3,4 ,5,6,10] [204:21,23] [205:3 ,6,7,8,24] [208:24] [209:16] [210:2,4] [211:4,23] [212:1 ,2,11,13,17] [213:20] [214: 10,24] [215:1,3,19] [216:12 ,17,24] [217:3] [218:6] [219:14] [220:12] [227:5] [228:4] [234:17] [236:4,8] [237:18] [238:11,23] [251: 15,17,18] [259:13] [264:23] [265:8,11,12,20,22] [266:1 ,7,10,20] [267:3,4,5,6,9] [268:5] [269:6,7] [271:4,5,23] [272:4,5] [274:8] [275:3,6,18] [277:11,14,15,17,20,22] [285:6] [287:9,19] [298:11] [305:7,11] [307:1,14] [315:21,23] [317:10,15] [319:18,21] [320:4,6]
mrs [106:18,19]
ms [6:4] [266:12,21]
msn.com [162:8]
multibillion [77:22]
multilocation [64:18]
multiple [37:17,18] [165:20] [186:13] [191:11] [194:6] [249:6]
multistate [34:11]

———————————————

N

name [6:21] [10:12] [23:15] [28:24] [36:4] [62:4] [76:10 ,11] [77:15] [94:5] [156:3] [164:16,20,23] [165:14] [167:13] [168:6] [177:12,14 ,16] [178:18] [207:1] [209:21] [298:21,24] [299:12,13]
nameplate [53:15]
names [194:17,20,24] [195:5,7] [208:15]
napior [3:20] [177:13,20]
narcotic [310:18]
narden [269:7] [271:4]
national [31:9] [33:12] [47:3] [86:14,17] [270:3,22] [271:13] [280:22]
nationwide [145:23]
nature [52:22]
navis [258:8]
ncqa [47:3,11,21] [48:1,6,9 ,18] [49:1,2,20] [50:14,21,24]
ndc [68:21] [124:10] [127:19]
necessarily [101:19] [139:6 ,7,10] [262:17,23]
necessary [133:11,21] [319:5] [321:4]
need [54:2] [67:24] [83:22]

[84:2] [133:15] [134:5] [286:22] [310:10] [319:3]
needed [109:1]
nefarious [35:12]
negative [252:21]
negotiate [164:8,11] [186:4] [215:5] [314:13]
negotiated [151:13] [163:7 ,13,23] [165:18,23] [182:2] [188:2] [200:19] [201:10,12 ,17] [202:14,22] [203:22] [204:14] [206:4] [215:6,10] [216:4] [219:5] [220:4] [226:17] [245:20]
negotiates [215:8] [216:20] [217:9]
negotiating [21:19,22,24] [35:18,21,23] [162:23] [163:4] [193:22] [247:6]
negotiations [164:18]
negotiator [165:5]
neither [227:8]
net [175:20] [301:23,24] [302:4] [303:8,10,15,17,23] [304:5,20,23] [305:5,21]
network [14:14,21,23] [15:4,20,23] [16:19] [18:6,22 ,24] [20:3] [25:18] [52:19,21] [60:15] [61:3] [65:3] [82:14] [147:22] [258:9] [259:21] [314:14]
networks [82:15] [148:2]
nevertheless [206:20]
new [45:20] [46:7,13,14] [90:22] [91:1] [138:23] [142:17] [160:2] [226:8] [253:18] [255:1] [289:1,5] [315:12]
news [268:20]
newsletter [88:10,12]
newspaper [88:13]
newspapers [20:19] [198:12]
next [17:2] [70:22] [101:16] [117:14] [131:2,19] [132:15] [136:21] [140:21] [141:18] [143:11] [157:11] [158:4] [181:14]
nice [43:2]
night [118:14,15] [147:18]
nixon [78:2]
no [1:8] [3:6] [5:6] [11:3,5] [13:14,18,20] [16:4,15] [18:7] [19:7,13,14] [20:9,20] [21:4,17,21,23] [22:1] [25:16] [26:19] [27:19] [28:22] [35:20,22,24] [36:3,21] [44:1] [46:18] [48:5] [50:3,5] [51:18] [52:10] [57:3,12] [58:3] [59:10] [62:7] [63:16] [65:24] [66:3,22] [68:16] [80:1] [81:4] [84:24] [85:7,23] [86:9,13,16,19,22] [87:1,4 ,18,20] [89:2,23] [92:7,8] [94:8] [95:18] [101:19] [104:13,15] [107:19] [110:

16] [113:2] [115:9,13,17,21]
[116:1,17,20,24] [117:3,6]
[118:6,10] [120:7,17]
[128:18] [130:19,22] [131:
6] [134:8] [139:13] [146:2]
[149:21] [150:9] [153:7,13
,17] [154:15] [156:3] [163:6]
[165:9] [166:2,16] [173:1,11
,18,21] [175:4] [176:10]
[177:6] [178:9] [179:18]
[180:4] [182:6,13] [191:5]
[192:11,15,21,24] [194:14]
[195:17] [202:2] [205:9,10]
[213:19] [216:24] [217:8]
[218:15] [219:16,20] [220:
6] [223:4,19] [224:9,13]
[227:7] [228:7,17] [230:1]
[232:14] [235:15] [239:22]
[243:5] [247:4,5,7] [254:15]
[255:21] [257:18] [261:20]
[269:24] [270:17] [273:2]
[274:9] [275:9,16,21]
[276:1] [278:11] [279:9]
[283:10] [284:14,18] [285:
10] [288:13] [289:18] [290:
1,3] [291:8] [294:8] [295:3]
[296:15,21] [297:18] [298:
8] [299:22] [301:13] [302:11
,12] [307:10] [308:2,10]
[313:13] [315:22] [317:20,24]
[319:8]
**nobody** [190:2]
**nobodys** [45:17]
**nod** [8:8]
**non** [11:5]
**noncompliance** [37:23]
**nonconflicted** [316:6]
**none** [4:5,11,17] [6:16]
[19:22] [23:2] [59:8]
**nonformulary** [219:1,6]
**nonfraudulent** [14:23]
**nonpaid** [11:7]
**nonprofit** [11:10]
**nonrebate** [283:16,18]
**nonsteroidals** [310:18]
**nor** [169:6] [188:9,19] [198:
8] [202:16]
**norm** [263:13]
**normal** [17:7,8] [138:20]
**normally** [202:13,18,21]
[215:9]
**north** [26:7]
**northern** [77:2]
**norwood** [167:11]
**notary** [323:23]
**note** [278:24]
**noted** [257:11] [321:10]
[323:9]
**notes** [261:22] [278:24]
[325:1]
**notfor** [11:5]
**not-for** [11:5]
**notforprofit** [11:14] [207:3]
**not-for-profit** [11:14] [207:
3]
**nothing** [84:7] [94:16]

[266:9] [272:16]
**notice** [1:13] [9:15] [260:12]
**number** [22:10] [39:5]
[42:21] [59:1] [60:1] [61:10]
[67:15] [76:21] [123:13]
[207:7] [222:1] [241:3]
[242:2,11] [252:23] [258:2]
[269:1,23] [271:10] [279:11
,16] [282:21] [302:3,9]
[303:16] [306:11] [308:15]
[310:7,13] [312:6,7]
**numbered** [16:22]
**numbers** [106:10] [113:10]
[143:23] [145:3,10,15]
[146:9,19] [148:11] [150:11]
[266:4] [271:14] [301:10]
[302:7] [310:4] [312:22]
**nurses** [61:18]

---

O

---

**oak** [7:3]
**oath** [148:18] [269:9] [305:13]
[306:17] [318:11]
**ob** [43:8,11] [65:10,11,15]
[69:19]
**obgyn** [43:11] [65:10,11,15]
[69:19]
**ob-gyn** [43:11] [65:10,11,15]
[69:19]
**obgyns** [43:8]
**ob-gyns** [43:8]
**object** [13:24] [100:3] [125:
8,20] [126:21] [127:7,11]
[130:14] [132:12,24] [133:
4,19] [137:22] [139:18]
[140:3] [142:2] [150:22]
[159:24] [174:19] [209:16]
[236:4] [238:11] [305:7]
[307:1] [315:21] [317:10]
**objection** [40:7] [72:20]
[73:22] [126:14] [129:1]
[131:4] [139:4] [145:12]
[148:20] [187:22] [216:18]
[271:24] [287:9]
**objective** [99:5]
**objectives** [250:6]
**obligation** [260:24]
**obligations** [262:3]
**observer** [58:7] [160:11]
**obtain** [246:23] [247:23]
[309:10]
**obtained** [229:6] [274:6]
**obtaining** [22:13] [251:6]
[309:9]
**occasion** [235:2]
**occasionally** [40:13] [46:5,11]
**occasions** [41:1] [211:2]
**occur** [27:2] [117:20] [125:
21]
**occurring** [25:5] [31:3]
**occurs** [23:20] [27:5]
**oclock** [118:22]
**odansik** [269:4,6] [271:5]
**odonnell** [10:17]
**o-d-o-n-n-e-l-l** [10:17]

**off** [12:1] [16:18] [22:24]
[26:5] [30:3] [31:9] [37:5]
[38:19] [39:15] [40:5]
[45:18] [70:12] [85:1]
[113:3] [134:13] [135:19,21]
[136:1] [149:8,10] [173:15]
[175:20] [182:7,10] [194:12]
[196:4] [203:20] [212:3]
[215:10] [216:4,21] [220:18]
[234:14] [241:22] [275:7,10]
[278:14] [320:10]
**offer** [120:19] [171:12,16]
[209:6] [211:15] [254:12,20]
[291:17,22] [307:24]
**offered** [167:22] [188:14,21]
**offering** [193:16] [293:3,8]
[294:16] [300:16,17,18]
[301:2]
**offhand** [69:19]
**office** [36:18] [54:11] [193:7]
[299:9,14]
**officer** [10:6] [28:19] [62:18
,19] [70:16] [141:14,24]
[164:17] [168:7,15,16]
[187:5,6,10,12] [188:3]
**officers** [147:21] [179:6]
**offices** [1:14] [5:14] [60:12]
[61:18]
**often** [8:4] [40:16] [165:17,19]
[166:23] [169:21] [215:4]
[231:3] [292:12]
**oh** [26:19] [35:8] [36:4]
[44:2] [57:16,18] [67:21]
[72:23] [73:3] [75:13]
[78:1] [90:5] [92:7] [110:22]
[112:9] [137:15] [213:21]
[255:22] [277:17] [319:16]
**ohio** [1:2] [5:10]
**okay** [8:6,11] [9:12] [11:22]
[12:8] [13:16] [15:16]
[17:12,22] [18:8] [19:21]
[20:13,18] [21:4,9] [23:2,7]
[26:20] [27:12,24] [28:5]
[29:10] [34:6] [36:11]
[37:12] [39:1,12] [40:16]
[42:4,7] [43:7] [46:1,15]
[50:19] [51:5,12,19] [53:5,11]
[55:5,23] [56:15] [58:17]
[59:8,15] [63:17,21] [65:17]
[68:9,24] [69:18] [70:13]
[71:13] [72:4,16] [73:19]
[74:24] [75:14] [76:17]
[77:3,9] [79:3] [81:20]
[82:3] [83:5,14,21] [84:17]
[87:15] [88:14] [90:10]
[91:3] [94:5] [95:20,23]
[96:7] [98:8,20] [100:24]
[102:21] [105:18] [106:15]
[107:12] [108:1,11] [109:24]
[110:7,12,19,24] [111:4]
[112:9] [113:5] [114:22]
[116:10,16] [117:20] [123:
15,23] [126:6,18] [128:6,21]
[129:7,18] [132:10] [136:16]
[137:6,18] [138:4,13,20]
[140:12,18] [143:10,17]

[144:2,8,14] [145:9] [146:14]
[148:4,5] [149:1,5,19]
[150:7] [152:1,17,22]
[154:19,24] [155:8] [156:13]
[157:2] [159:8,18] [160:6,15]
[165:11] [166:6] [167:5,20]
[168:3,11,16] [169:14]
[170:8,14] [171:8] [176:20]
[178:12] [179:3] [180:16]
[181:6] [182:3] [183:3,18,21]
[186:7,21] [188:8] [189:5]
[191:3,9] [193:4,20] [195:18]
[197:21] [199:4] [200:4,18]
[201:4] [202:11,12] [203:1
,13,18] [204:3] [206:1]
[209:1,13] [210:14] [211:19]
[215:19] [218:16] [222:12]
[225:2,9] [226:2,8] [228:24]
[231:13,24] [234:1] [236:1]
[241:21] [243:22] [244:4,13
,20] [247:18] [251:11]
[252:10] [254:18] [258:13]
[260:15] [261:9,12,21]
[262:24] [263:12] [264:22]
[267:5,10,16] [271:8,18]
[272:16] [274:8,24] [275:6]
[277:4,19,20] [278:18]
[283:15] [284:24] [285:18]
[287:2] [288:8,19,21]
[291:2] [293:18] [297:12]
[300:5] [301:23] [303:12]
[304:13,16] [305:3,12]
[306:5,6] [309:19] [311:5]
[313:7,14] [314:8,20]
[318:9] [319:6,17]
**old** [243:3] [276:12]
**omission** [112:19]
**omni** [51:22] [70:13] [71:14
,22] [72:7,9] [73:21] [81:7,8]
[229:3,4] [230:21] [231:4,17]
[232:8,10,19,23] [233:4,7]
[234:20] [287:17]
**once** [39:4] [109:7] [182:1]
[184:4] [231:6]
**ondel** [232:16]
**one** [1:14] [2:14] [5:13]
[9:16] [11:3] [23:5] [24:21,23]
[25:12] [27:19] [28:1]
[32:9] [37:2,22] [42:6]
[43:6,9,16,19,20,24] [46:6]
[50:24] [53:2] [58:14,21]
[63:1] [64:19] [65:11,16]
[66:4] [67:4] [70:8] [73:9,10]
[74:20] [75:6] [77:1,13]
[78:21] [79:15] [81:10,24]
[84:9] [88:21] [91:22]
[107:14] [112:14] [114:17]
[116:12] [117:6,23] [124:8
,9] [125:10] [126:17] [140:12]
[143:4] [144:10] [149:4]
[151:1] [152:7] [154:17]
[164:13] [171:23] [172:18]
[174:2] [180:7,8] [186:11]
[188:22] [189:6,10,13]
[190:11] [191:11] [193:6,7
,10] [204:4] [207:1] [209:10]

[213:1] [216:8] [222:2]
[225:15] [226:9] [233:21]
[235:7] [239:7] [241:2,4,5,17]
[243:19] [245:5] [246:21]
[249:11] [250:14] [253:15]
[255:8] [257:11] [258:18]
[260:3] [261:9,14] [266:21
,24] [273:18,21] [274:9]
[277:12,15] [280:5] [287:15
,20,24] [292:20] [299:1,3,7]
[301:1,19] [304:18] [305:1
,4,14] [306:23] [317:23]
[319:19]
**ones** [110:6] [117:9] [238:9]
**onetime** [287:15,20,24]
**one-time** [287:15,20,24]
**ongoing** [18:22] [19:1]
[47:19] [105:11] [287:14]
**online** [68:7] [224:7]
**op** [90:19]
**oped** [90:19]
**op-ed** [90:19]
**operate** [289:18,24] [290:2]
**operating** [28:18] [62:18]
[164:7] [166:9]
**operation** [307:23]
**operational** [142:24] [233:8]
**operationally** [104:5]
**operations** [17:8] [287:15]
**opinion** [98:23] [120:15,19]
[133:12,13,16,18] [134:2]
[139:21,22] [151:14] [178:
21] [180:11,13] [181:11,15]
[185:13] [193:24] [196:7]
[197:11] [208:22] [209:6]
[211:15] [225:4,19] [226:6]
[228:13] [253:13] [254:1,2]
[308:2] [319:23] [320:1]
**opinions** [102:6] [120:11]
[134:6] [193:15] [195:16]
[198:2,4,17] [199:3] [226:1]
[255:14] [272:13] [319:5]
**opportunity** [54:14] [96:14]
[115:7] [233:14,19] [251:9]
[324:10]
**opposed** [32:9] [35:5]
[55:2] [219:6] [242:4]
[250:1] [251:22] [252:6]
[285:13] [313:11] [317:7]
**opposite** [281:14]
**opt** [69:12,13]
**option** [35:15] [203:21]
[204:18]
**options** [183:15] [184:5]
[187:2] [194:6] [301:8]
[309:5,8]
**oral** [173:13] [174:4] [178:13]
[187:17,18] [189:14]
**oranges** [215:23] [253:14,15]
**order** [48:1,17] [50:13]
[70:8] [98:11] [99:3] [130:8]
[133:16] [134:5] [143:12]
[205:22] [207:22] [234:21]
[235:21] [236:3,6] [266:4]
[269:2] [273:20] [276:18]
[284:2] [315:19]

**ordered** [184:8]
**ordering** [56:13] [58:15,18]
[59:3]
**orders** [77:14] [207:21]
[282:18]
**oregon** [206:15]
**organization** [14:20]
**organizations** [81:19]
[98:13] [247:15] [249:18]
[254:1,12] [255:6,8] [293:13]
**organized** [42:12] [224:12]
**original** [145:14] [321:13]
**originally** [101:24]
**otherwise** [110:23] [214:7]
[262:21] [314:16]
**ourselves** [76:1] [122:15]
**outcome** [57:19] [65:19]
**outcomes** [194:15]
**outline** [108:20,22] [109:5,8]
[110:10] [111:16] [135:11]
**outlines** [135:14] [156:4]
**outside** [43:2] [168:10]
**outstanding** [10:19,22]
**overall** [26:2] [225:23]
[290:15] [311:20,22]
**overview** [151:18] [152:10]
[226:19]
**overwhelmingly** [205:22]
**owed** [95:16]
**own** [27:16] [28:7] [44:17,19]
[54:15] [78:12,17] [139:19
,22] [169:1] [181:2] [213:16]
[234:2] [236:3,6] [250:11]
[254:20] [271:3] [272:23]
**owned** [66:21] [77:13]
**owner** [73:14] [283:9]
**ownership** [75:18]
**owns** [86:4]
**oxygen** [24:15]

—————————

P

—————————

**p&t** [40:16,19,23] [41:13,19]
[42:14,22] [44:9,16,21]
[45:7,10] [46:4] [72:8]
[73:11,21] [75:9] [173:2]
[176:7] [177:4] [228:24]
[229:2] [231:3] [232:1,10,20]
[233:7,8] [234:4,20] [235:9]
**p.c** [2:]
**p.m** [84:24] [134:14] [135:8
,22] [136:4] [182:6,14]
[212:4,10] [275:8,10,17]
[320:13]
**pacific** [51:9,14,19] [52:1,3]
**page** [3:6] [4:3,9,15] [9:5,17
,18] [16:22] [17:2] [71:22]
[74:7] [75:10] [98:9,23]
[99:1] [100:22] [114:18]
[123:11,12,13,14] [124:13]
[127:3] [129:14,17] [130:2]
[131:10,19,23] [132:1,3,5,22]
[137:17,24] [138:9] [140:22
,24] [144:10,11] [147:14]
[149:24] [155:5] [156:23]
[157:11] [158:14,15] [161:

6] [215:2,3] [218:22] [222:3]
[235:17] [237:18] [242:22]
[243:13] [244:1,2,3] [245:22]
[246:12,20] [260:2,5,7,9]
[261:5,6,19] [266:4,11,18,19
,20,22,24] [278:16] [288:15
,18] [302:8,9] [315:10]
[322:4] [325:2]
**pages** [16:21] [27:15] [106:
1,8] [114:2,4,14] [132:21]
[266:5] [323:4]
**paid** [33:9] [67:9,13] [78:3]
[92:9,13] [95:12] [148:3]
[192:16] [202:19] [203:9]
[204:11] [218:20] [243:5,9]
[245:16] [248:11] [249:3,7
,20] [264:19] [274:3] [279:2
,21] [284:7,12] [303:18]
[313:2] [316:9]
**panels** [86:23] [87:3]
**panhandle** [77:2]
**panichelli** [2:] [5:15]
**pap** [32:13]
**paper** [8:9] [19:16] [27:10]
[159:3] [294:9]
**paperbased** [19:16]
**paper-based** [19:16]
**paragraph** [17:3] [75:11]
[130:10,23] [131:23] [132:
2,3,6,10,15] [141:19] [143:
11] [158:15] [159:5] [246:13
,22] [260:8] [261:17] [288:24]
**paragraphs** [131:2] [138:8]
[140:21] [141:4]
**paraphrased** [140:8]
**paren** [130:7]
**part** [18:21] [19:12] [23:22]
[24:1] [25:18] [26:22]
[29:15] [36:15] [37:13,24]
[44:22] [45:6,13] [46:3]
[61:22] [83:8,13,18] [87:14]
[96:2,6] [107:3,6] [108:3]
[111:15] [122:20] [128:12]
[181:24] [193:14] [194:9]
[202:24] [204:4] [216:6]
[234:6] [236:7,18] [237:15]
[238:12] [243:24] [245:9]
[247:18] [259:18] [261:3,4]
[264:18] [278:21] [287:6,14
,16] [289:3] [310:12] [317:5]
**participants** [235:18] [236:
16]
**participate** [299:2]
**particular** [22:11] [79:23]
[80:23] [113:22] [116:22]
[125:7] [155:19] [186:9]
[187:11] [191:23] [201:23,24]
[250:2] [263:23] [264:20]
[310:22]
**particularly** [87:17] [89:15]
[112:2] [122:10] [124:9]
[140:6] [160:4] [167:2]
[205:21] [213:5] [238:22]
[243:16] [277:6] [296:4]
[308:9] [311:3]
**parties** [117:24] [136:9]

[246:1]
**partner** [28:18,22,23] [68:5]
[76:10] [299:9]
**partners** [299:7]
**parttime** [36:15]
**part-time** [36:15]
**party** [246:4,8]
**pass** [109:12] [202:13]
[269:8,9,15] [270:13]
[274:13] [280:13] [281:20]
[282:5] [290:10] [315:18]
**passback** [271:17]
**passed** [189:20] [203:4]
[257:7,9,10] [262:8,13]
[268:18] [269:21] [270:6]
[271:20] [272:8] [273:8]
[274:10] [276:6,18] [277:1]
[284:8,13] [285:9,13,22]
[286:1,9,15] [287:8] [313:24]
[314:22] [316:21,23] [317:
9] [318:20]
**passes** [257:12] [258:21]
[280:8]
**passing** [262:18] [263:21]
[286:2] [301:15] [315:15,17]
[319:12]
**passon** [269:8]
**pass-on** [269:8]
**past** [12:16] [14:24] [18:18]
[29:16] [31:21,23] [168:9]
[258:7] [293:1]
**paste** [123:17]
**pasted** [123:19,24]
**patient** [22:23] [37:16,20,24]
[38:1,2] [39:19,21] [99:11]
[132:18] [194:22] [195:5,7]
[199:14] [201:7,9] [202:13
,16,18] [203:4,14] [204:12,22]
[215:15] [217:1,11,22]
[218:23] [220:1] [236:21,24]
[238:15] [252:17]
**patients** [22:22] [24:8,15]
[32:17,20] [33:2,13] [37:7,17]
[38:4] [131:23] [132:7]
[183:9,15] [184:1] [197:13]
[219:4] [226:3] [229:22]
[245:24] [246:3] [287:4]
**pause** [133:7]
**pay** [78:5] [94:1,6] [202:17,18]
[204:10] [215:15] [216:22]
[217:11,22] [219:4] [220:2]
[229:22] [230:1,3] [247:14
,16,17,20] [248:14] [249:11
,16] [270:21] [284:4] [294:19
,23] [295:2] [303:12,13]
[309:10]
**payable** [248:20]
**payer** [240:9,14,15] [260:17]
[286:15] [288:5]
**payers** [29:21] [143:14,19]
[261:23]
**paying** [179:24] [205:4]
[244:24] [249:24] [250:2]
[251:21] [263:24] [294:24]
[303:17] [306:19]
**payment** [13:7] [50:4] [131:

10,11] [132:5,16] [145:24]
[146:16,24] [147:15] [240:
6]
**payments** [144:16] [237:10]
**payrolls** [295:23]
**pays** [222:18,21] [246:16]
[283:7]
**pba** [56:11]
**pbm** [47:13,20] [48:4,16]
[49:21] [101:15] [102:2,17]
[103:4,13,14,16] [104:4]
[143:1] [164:8] [166:9]
[168:8] [186:10] [187:1,8,11
,12] [188:3] [189:6] [202:14
,20] [203:9,22] [204:9]
[222:10,18,21] [233:8]
[239:14] [240:4] [244:8]
[246:16,18] [249:4] [253:17]
[276:23] [281:13] [284:8]
[285:24] [286:14] [288:24]
[289:16] [290:2,10] [292:15]
[302:10,16] [308:23] [314:
4,17] [315:11] [317:2]
**pbms** [21:22] [35:21] [87:3]
[159:14] [160:4] [186:4]
[187:19] [188:9] [189:4]
[190:19] [196:16,17] [207:
21] [208:1] [235:23] [236:1]
[238:9] [245:1,19] [246:22]
[247:1,22] [248:12] [249:17]
[253:3,6] [254:20] [257:12]
[276:5] [277:2] [279:2,21]
[280:11] [281:10] [283:8]
[288:14] [289:5,8,13]
[290:11] [293:2,13,14]
[294:3,11] [295:4,14,23]
[296:5] [297:5,14,17]
[299:8,23] [310:5] [313:2,10]
[315:18]
**pcn** [36:14,15] [37:12]
[38:10] [39:13] [40:17,23]
[41:14,18,19] [42:6,8]
[44:16,19] [46:2,17,21]
[47:23] [48:3,11] [86:4]
[143:3] [147:21] [162:12,15]
[164:11] [165:9,12,13,24]
[167:23] [169:1,22] [170:2
,19] [171:16] [172:22]
[173:3,24] [174:1,16]
[175:16] [176:6] [177:2]
[178:7] [182:19,22] [185:12
,23] [188:12] [196:20,21]
[229:2,6,18,23] [233:12]
[235:10,13] [256:4,11]
[257:8,10] [258:11,16,21]
[260:13,17,18,22] [261:22
,24] [262:2,6,8,11] [263:5,9
,15,17,20] [264:5,18,24]
[265:2,3] [269:9] [274:21]
[280:8] [289:9] [291:2,4,5,11
,20] [293:1] [294:7] [295:2]
[298:15] [300:18] [307:8,15
,23] [308:1] [309:13] [310:2]
[311:16] [315:15] [316:20]
[317:8,21]
**pcns** [259:17] [262:18]

[282:12]
**pcs** [176:17]
**pda** [60:16]
**pdf** [266:21]
**pediatrician** [43:20,21]
**pediatricians** [65:5]
**peer** [88:22] [89:1,2,5,13,20
,21,24] [90:11,16,23] [91:4]
**peerreviewed** [88:22]
[89:1,2,13,20,21] [91:4]
**peer-reviewed** [88:22]
[89:1,2,13,20,21] [91:4]
**pennsylvania** [1:16,] [2:]
[5:17]
**people** [13:4] [20:5] [31:3,4
,5,9,13,17,22] [45:16]
[46:12] [47:14] [49:7]
[52:24] [69:5] [73:13]
[77:19,21] [78:15] [80:19]
[121:1] [148:7] [151:7]
[164:9] [180:14,20] [186:3
,7,12] [187:14] [188:2]
[207:2] [208:17] [209:8,20]
[210:24] [227:22] [263:6]
[279:19] [295:10] [298:4]
[310:5] [313:16] [314:13]
[315:15]
**peoples** [48:1]
**per** [47:18] [92:9] [93:22]
[94:1] [109:4] [310:11]
**percent** [26:3,7,8] [28:16]
[30:3,5] [36:16] [52:6]
[140:1] [144:22,24] [146:17
,18] [201:13] [203:24]
[242:23] [243:11,13] [246:
6] [257:6,10,14] [258:23]
[259:6] [260:17,22] [261:23]
[262:1] [263:22] [268:19]
[269:10,21,23] [270:7,8,14
,15] [271:13,14,20] [272:7]
[273:8] [274:14,19] [279:5
,23] [280:8] [282:21] [283:14]
[286:3,4] [304:5,12] [306:20]
[308:14] [311:17,18,23]
[312:4,5,10] [313:23]
[314:16,21] [315:16,17]
[316:21,22] [317:8] [318:19]
**percentage** [23:20] [68:22]
[69:1] [140:10] [143:23]
[147:2,6] [151:6] [240:12,15]
[241:9] [243:9] [245:3,15]
[246:2,3] [247:17] [259:8]
[270:4,22] [280:14] [281:6
,12] [282:4,6] [284:12]
[286:7] [291:24] [307:7]
[312:15] [313:10] [315:19]
**percentages** [167:1] [257:13]
[282:10,11]
**perfect** [59:21]
**perfectly** [107:13]
**performance** [49:14,18,24]
[67:7] [250:17,19,23]
[251:4] [252:3,6,9] [253:3]
[260:23] [262:3] [268:23]
[270:2,16,18] [271:1]
[283:24]

**performancebased** [67:7]
[250:17] [252:3,6,9]
**performance-based** [67:7]
[250:17] [252:3,6,9]
**period** [50:16] [71:14]
[76:6] [102:11] [136:17]
[155:11] [169:1] [215:16]
[230:22] [232:1]
**periodicals** [137:13]
**permitted** [62:8]
**person** [10:17] [25:4] [30:18]
[101:24] [167:9,10] [168:11
,13] [172:11] [177:21]
[190:14]
**personal** [247:4,6]
**personally** [20:24] [27:9]
**personnel** [112:3]
**persons** [242:23]
**perspective** [90:7,8,9]
[97:21] [98:12] [99:4]
[152:6]
**pharmaceutical** [20:24]
[21:5,16,20] [22:3] [35:19]
[45:8,11] [46:16] [52:23]
[85:22] [86:1,3,10,24]
[90:7] [97:2,22] [125:16]
[129:22] [130:3] [131:10]
[146:13] [162:19,23] [163:
5,9] [179:10,13,15,24]
[184:16] [185:12,24] [188:
4,6] [223:9,10,13,18,21,23]
[224:1,19,22] [225:1,5,6,14]
[226:6,12,24] [228:11,13,18
,22] [229:23] [235:14,19,20]
[236:2] [240:13] [243:23]
[244:24] [249:16] [257:20]
[259:21] [262:22] [283:9]
[285:21]
**pharmaceuticals** [53:23]
[54:4] [131:11] [132:6,17]
[224:10]
**pharmacies** [2:16] [15:15,19]
[18:20] [20:5] [26:12]
[103:19] [104:4] [144:24]
[145:1] [147:7,24] [148:15
,16] [206:18] [211:9] [216:21]
[235:21,22] [245:19] [258:
9]
**pharmacist** [12:24] [14:21]
[15:4,20,23] [16:18] [18:6]
[25:18] [54:24] [164:19]
[165:3,13] [167:12] [168:7]
[170:6,16] [172:11] [178:17]
[180:8] [197:5] [199:17]
[202:21] [208:9] [232:18]
[251:17]
**pharmacists** [21:12] [25:17]
[41:16,17] [43:3] [46:9]
[52:17] [53:6,20] [54:1,14,18]
[61:19] [86:5] [146:6,12,22]
[164:14] [179:6] [200:5]
[205:12] [206:2,11,24]
[207:8,10] [208:14,11,16]
**pharmacy** [19:19] [22:11,16]
[25:22] [26:6] [28:10]
[30:11] [36:22] [38:2,22]

[42:21] [46:6,23] [47:24]
[48:4] [53:10] [71:24]
[83:6,7,10,12] [86:12,20]
[101:14] [102:2,17] [103:3
,18] [116:23] [117:2] [125:16]
[126:24] [131:23] [132:7,17]
[138:16] [143:13] [145:23]
[154:6] [170:5] [179:20]
[186:4] [191:17] [199:7,14]
[201:11,24] [202:1,5]
[203:9] [207:23] [211:5,16]
[212:21] [215:8] [217:10]
[224:4,14] [232:17] [238:2
,21] [239:2,4,14] [240:18]
[242:4,8] [245:24] [262:15]
[278:4,5] [281:16] [289:11]
[290:14,16] [291:1] [293:3]
[301:2] [310:22] [314:11]
[316:14]
**pharmacys** [51:2]
**phase** [20:2] [29:5]
**philadelphia** [1:15,] [2:]
[5:17] [238:15]
**phoenix** [75:2] [80:14,15]
[82:24]
**phone** [47:15] [48:21] [60:17
,22]
**phones** [60:23]
**phrase** [239:20]
**physician** [12:23] [24:22]
[38:4] [39:14] [43:12,16]
[44:4,5] [47:16] [52:9]
[55:2,3] [57:20] [60:12]
[61:13] [64:5,6] [70:10]
[78:4] [82:15] [87:19]
[90:8] [101:14] [126:24]
[183:16] [185:4] [196:9]
**physicianpatient** [196:9]
**physician-patient** [196:9]
**physicians** [13:4] [18:19]
[21:12] [25:5] [37:6,14]
[38:9,18] [40:4] [41:17]
[43:2,5,8,15] [53:21] [54:20]
[56:14] [58:5] [59:22,24]
[61:7] [65:4,6] [67:4,8,12]
[68:4,11,14] [74:15,23]
[79:11] [80:5,7] [82:21]
[87:10,13,17] [98:14]
[99:10] [121:12] [183:7,9,15
,24] [184:22] [197:13]
[225:22,23] [226:3] [232:22
,24] [233:15] [235:22]
[242:3] [271:2] [287:5]
**pick** [73:5]
**picked** [73:16] [278:14]
**picture** [252:2]
**pictures** [119:20]
**piece** [143:5] [280:2,3,4]
**pieces** [90:19]
**pillars** [225:24]
**pills** [52:24]
**pilot** [17:4,14,17]
**pitch** [62:22] [63:2]
**place** [1:15] [5:13] [19:24]
[20:15] [66:5] [67:3] [77:21]
[136:9] [185:12] [244:14]

[252:21] [292:6]

**placed** [144:18] [247:24]
[249:8,18] [250:1] [252:13]
**placement** [152:7] [246:24]
[248:1,10] [255:15] [283:22]
[309:3]
**placements** [234:23]
**plaintiff** [116:22]
**plaintiffs** [2:6] [5:23] [26:13]
[96:10]
**plan** [32:9,17] [33:3,9]
[34:2,22] [35:8] [46:22]
[47:1,2,10] [48:6,17] [49:7
,17,18] [50:24] [66:12]
[72:1] [74:14,15,23] [75:2,16
,19,24] [76:5,13,18] [77:7]
[79:8,14] [80:5,9,13,16,21
,23] [81:21] [82:1,12,18,21
,24] [132:18] [140:22]
[186:5] [188:11,22] [190:10
,20] [201:7,20] [203:15]
[205:1,5] [221:4] [227:4,15
,18,20] [236:21] [240:3,14]
[245:5,6] [252:19] [258:17
,19,24] [259:2] [262:10]
[263:24] [264:9] [270:2,22]
[277:2] [281:3] [286:17]
[291:7] [293:8] [310:14,22]
[312:11] [316:11]
**plane** [84:4]
**plans** [3:19] [34:6,10] [47:22]
[48:2,7,9,13] [50:4] [75:22]
[78:10] [80:24] [81:1]
[83:6] [186:4,14] [189:2]
[192:1] [194:5] [195:14]
[220:24] [222:10] [238:7]
[245:16] [250:2] [256:1,5]
[257:1,2,7] [262:9,13]
[264:20] [268:18] [271:6,16]
[272:8] [273:4,9] [274:11]
[276:7] [279:4] [280:10]
[281:9,20] [282:6,13]
[284:15] [287:5] [289:7,16
,21] [290:9] [291:20] [292:1
,12,20] [295:12] [296:7]
[297:5] [298:1] [299:19]
[306:21] [307:24] [316:19]
[317:5]
**platform** [54:13]
**play** [82:5] [100:2] [244:8]
**played** [297:22]
**player** [196:20] [253:18]
[255:9,11] [263:19] [310:9]
**players** [22:12] [251:13]
[258:8] [273:19,21] [292:17]
**playing** [282:16]
**please** [5:19] [321:3,7]
**plenty** [77:11]
**plug** [66:19]
**plus** [93:8] [201:13,14]
[215:11] [216:5] [258:8]
[269:23] [284:1,2]
**pocket** [238:16]
**point** [9:8] [53:19] [147:8]
[148:12] [154:21] [158:22]
[160:22] [190:17] [211:24]

[214:20] [236:11] [237:16]
[251:8] [261:2] [265:18]
[283:4] [284:9] [291:8]
**pointed** [268:5]
**points** [270:22]
**pool** [30:4]
**population** [28:11] [31:6,19]
**populous** [148:1]
**portability** [33:23]
**portion** [83:9] [129:3,5]
[131:13] [175:9] [285:8,11]
[301:6]
**portions** [122:14] [123:1]
[128:14] [273:23]
**portland** [299:9,14] [300:3,8
,10,14] [316:16]
**position** [8:24] [10:5] [14:22]
[51:6] [180:23] [190:8]
[196:6] [220:7] [249:21]
[250:20] [253:16,24] [255:
5] [293:7] [300:15]
**positioning** [268:22] [283:23]
[309:3,9]
**positions** [89:8]
**possible** [170:15] [215:14]
[217:21]
**possibly** [308:12]
**potency** [53:1]
**potential** [59:6]
**potentially** [99:5]
**ppi** [187:17] [189:6]
**ppis** [173:3,6] [174:4] [178:
13] [185:10] [186:11] [308:
20] [309:22]
**ppms** [255:16]
**ppo** [81:18]
**practice** [18:13] [52:11]
[61:21,22] [62:11] [63:7]
[80:8] [138:20] [179:24]
[190:15] [194:9] [206:18]
[211:4] [221:3] [247:14]
[249:16,24] [251:20,23]
**practices** [207:14]
**practicing** [207:9]
**precipates** [32:22]
**precise** [170:14] [231:16]
**predecessor** [58:23]
**predict** [28:10] [30:13]
**preemptive** [227:3,17,20]
**preferred** [81:19]
**preliminary** [8:21]
**premarin** [116:8] [120:3,14]
[172:3,4] [174:7,8,16]
[176:2,3,8,19] [177:3]
[178:6] [201:4] [227:3,15,17
,20] [248:15,21] [249:4]
[250:19] [268:17] [269:11,12]
[271:20] [272:7] [273:11]
[287:8] [306:20] [310:8]
[311:17,23] [312:8,9,16]
[313:3,6,11] [318:20]
**premarinrelated** [313:6]
**premarin-related** [313:6]
**premarins** [311:20]
**premise** [288:2]
**premium** [240:17]

**prepaid** [79:12]
**preparation** [111:15] [115:
8,11,15,19,23] [116:4,9]
[118:19] [122:16] [123:20]
[149:22] [156:8] [225:3]
[259:19]
**prepare** [7:15] [34:20]
[98:11] [99:3] [105:4]
[112:17] [136:13] [145:19]
[147:13] [161:11] [193:1]
**prepared** [7:10] [57:7]
[71:10] [112:18] [140:10,13]
[148:8] [164:22] [193:2]
[194:18,19] [208:19] [209:
10] [210:6] [218:17] [220:16]
**preparing** [106:6] [135:10]
[151:17] [157:20] [165:12]
**prescribe** [24:24] [25:6]
[38:9,19] [39:14] [40:5]
[191:10]
**prescribed** [25:6] [37:18,21]
[192:1,9] [199:11] [310:10]
**prescribers** [24:23]
**prescribing** [38:4] [47:16]
[56:13] [59:1] [61:22]
[66:14] [90:14] [98:14]
[100:7] [127:1] [225:22]
[233:15]
**prescription** [3:18] [38:1]
[55:2] [86:18] [142:16]
[144:16,23] [145:24] [146:
17] [147:15] [221:1] [240:6]
[279:4,22]
**prescriptions** [38:6] [69:6]
**presence** [53:4,22]
**present** [5:19] [11:4] [14:19]
[28:19] [43:2] [51:10]
[53:15] [54:20] [55:8]
[98:18] [99:17] [104:6]
[320:2]
**presentation** [3:21] [45:19,21]
[46:6] [149:7] [278:2]
**presentations** [41:24]
**presented** [182:24] [319:14]
**presenting** [212:20] [307:5]
[313:19]
**president** [51:8,14] [70:15]
[207:3] [280:21]
**press** [105:12] [106:4]
[110:15]
**presumably** [300:14]
**pretty** [23:12] [43:1] [69:10]
[102:12] [109:7,21] [179:1]
[184:4] [186:1] [214:7]
[228:16]
**prevent** [25:19]
**prevention** [9:20,21] [10:6]
[11:2,4] [12:3,6,9,13]
[13:17] [14:6,8,9,11,12]
[16:2,23] [17:5,20] [20:16]
[21:10] [25:10] [36:12]
**previous** [24:9]
**previously** [24:10] [154:8]
[161:2,3] [199:6] [214:23]
[268:10]
**price** [120:13] [199:18]

[200:15,24] [201:10,12,17,18]
[202:22] [203:22,23,24]
[204:16,18] [206:4,19]
[214:18] [217:9] [219:5,7,11]
[220:4,5] [222:17,18,19,20
,21,22] [245:7,20] [306:22]
**priced** [119:20] [120:4,9]
**prices** [215:5,6,7]
**pricing** [109:4] [207:15]
[215:24] [222:5]
**primarily** [36:22] [46:9]
[52:17] [86:5] [137:11]
[229:19] [233:14] [286:16]
**primary** [43:14,21,23]
[44:5] [61:10] [62:12]
[76:23] [221:2,3] [235:18]
[276:23] [286:11,12,23]
[297:18]
**prime** [150:3]
**principals** [10:11]
**prior** [8:3] [19:21] [29:17]
[50:6,8,13,16,20] [78:1]
[91:9] [116:12] [176:23]
[192:10] [195:11] [231:2]
[252:22] [260:7]
**private** [145:22] [146:18]
[148:13] [187:8] [237:21]
[238:1] [240:1] [241:19]
[243:14] [246:10] [258:18,24]
**privately** [27:16] [28:7]
**privy** [67:9]
**probably** [7:22] [28:2]
[37:5] [43:21] [90:18]
[95:15] [106:12] [157:1]
[160:9] [176:13] [224:23]
[281:22] [290:15] [292:17]
[304:15] [309:17]
**problem** [25:21] [49:17]
[59:13] [87:10] [193:12]
[195:3] [236:19] [273:13]
**problems** [37:23] [54:12]
**proceed** [133:8] [234:16]
**proceeding** [320:8]
**process** [18:21] [20:8]
[24:3] [25:1] [28:12] [43:3]
[44:22] [45:13] [49:3,9]
[54:21] [67:18,22] [94:13]
[109:11] [113:5] [122:24]
[127:1] [135:11] [140:14]
[161:9] [165:11] [185:19]
[192:2] [199:24] [212:13]
**processing** [281:3] [314:12]
**produce** [32:23,24]
**produced** [109:17,20]
[218:12] [259:17] [272:20]
[276:4]
**produces** [30:4]
**product** [19:5] [22:21]
[24:13] [38:9,19] [39:14]
[54:22] [55:1,3] [59:3,9,11]
[61:12] [62:22] [63:3]
[116:8] [123:2,3] [146:13]
[148:3] [151:6] [167:4]
[172:19] [175:24] [176:8]
[179:19] [180:24] [184:13,16
,17,22] [185:1,5,14] [188:23]

[189:6,10] [191:11] [199:15
,18] [201:19] [206:12]
[213:10] [219:7,12] [223:10]
[230:4,9] [234:23] [237:16]
[239:7] [255:1] [262:22]
[263:2] [269:11] [273:11]
[290:20,21,22,23] [303:17
,18] [309:8] [310:6] [311:1]
[313:3] [314:17] [317:2]
[318:20]
production [4:8]
productivity [64:4,7]
products [34:12] [39:14
[40:5] [46:7,13,14] [52:23]
[53:2,3] [58:16] [81:6,13,14
,18] [83:18] [99:11] [162:24]
[163:5] [165:20] [171:13,17]
[174:17] [178:8] [190:13]
[191:23] [192:9,13] [194:11]
[195:11] [196:5] [199:9]
[205:18] [207:22] [208:2]
[219:1] [229:12] [230:5,7,16]
[232:7] [235:19] [236:2]
[240:13,24] [243:16] [256:
12,15] [297:21] [308:20]
[311:8,15] [312:16] [313:6
,12]
producttied [167:4]
product-tied [167:4]
professional [1:17] [85:15]
[105:12] [106:4] [160:13]
[198:6] [258:10]
professor [43:12]
profit [11:6] [207:20]
profitability [305:24] [306:8
,11]
profitable [208:7] [301:12,19]
[304:18,22] [305:1,4,14,17
,22] [306:23]
program [3:9] [10:16] [17:24]
[18:8,9,10,11] [19:10,15]
[20:3,6] [23:21] [37:3]
[279:20]
programs [20:4] [86:18]
[243:17,19,20] [278:7]
[279:3]
project [53:11,16,18] [56:11]
[58:6] [63:8] [66:2] [67:1,3
,18] [76:12] [192:22]
projects [53:14] [93:2]
[191:4]
prominent [24:23]
promised [265:23]
promulgated [49:1]
promulgates [49:21]
proportion [242:5]
proposed [34:22]
propounded [323:7]
proprietary [57:3,6] [190:4]
[285:3,4] [312:21]
prosecuting [9:24] [13:23]
prosecution [14:10]
prosecutions [13:4] [21:11]
provide [47:20] [54:18]
[98:11] [99:3] [105:4]
[178:21] [192:18] [265:24]

[299:18,22]
provided [63:3] [162:12]
provider [17:24] [18:9,10]
[81:19] [258:9]
providers [14:14] [17:6,9]
[18:17] [215:8] [255:16]
provides [262:16] [270:20]
providing [307:9]
prozac [207:24]
public [145:22] [146:18]
[148:14] [243:17] [246:10]
[323:23]
publication [153:2]
publications [87:5] [90:3]
publicly [66:23] [306:1]
publish [90:22]
published [49:22] [58:9,11]
[88:6] [89:4,10,17,20,21]
[91:1,4] [147:1] [149:17]
[205:11] [280:23] [284:23]
[297:3]
publisher [137:11]
publishes [137:13]
pudlin [2:]
pull [66:18] [151:20] [154:13
,15]
pulled [12:1] [16:17] [37:5]
[122:3] [140:8] [145:7]
[148:23] [152:20] [157:6]
[160:24] [175:18,20,22]
[220:18]
pulling [149:16]
punishing [227:21]
purchased [144:23]
purchaser [2:6] [5:23]
[83:17]
purchasers [117:5,8]
purchases [224:8]
purpose [35:12]
purposes [279:14]
pursuant [1:13] [192:9]
[271:5]
pursue [170:3]
pushing [141:8]
put [30:10] [31:19] [56:21]
[67:3] [73:5] [88:17] [105:2]
[110:19] [120:19,23] [123:
18] [124:11] [125:18,24]
[130:17,20] [137:20] [138:
6,14] [139:7,8,10] [141:15]
[142:13] [144:4,15] [145:20]
[148:8] [151:3] [157:22]
[158:1,6,9,12] [160:23]
[177:2,15] [197:23,24]
[201:20] [203:15] [208:19]
[248:15,23] [252:21] [258:
3] [280:19] [288:3]
puts [201:7]
putting [110:10] [125:7]
[150:15,18] [177:20] [248:
21] [249:4] [252:7]

___

Q

qa [44:9] [46:20]
qualified [48:12]

qualifies [226:5] [228:12]
qualify [268:2] [300:23]
quality [32:10] [36:23]
[46:20] [47:1,4,9,19] [48:7]
[49:6]
quantified [296:13]
quantitated [25:24]
quarreling [183:11]
quarterly [41:4] [93:24]
question [7:21,23] [8:13]
[20:9] [35:3] [42:15] [49:20]
[75:7] [91:3] [101:16,20]
[103:1] [117:15] [126:18]
[145:9] [163:17] [165:15,17]
[168:19,23] [169:5,6,8]
[172:7,9] [174:14] [175:1,5
,7] [178:4] [179:21,22]
[186:19] [193:18] [194:2]
[195:21] [199:12,21] [200:
12] [202:9] [204:13] [210:9]
[211:8] [214:7,9] [215:4]
[225:12] [226:8] [228:6,7]
[245:10] [248:24] [253:13]
[255:22] [259:5] [261:13]
[282:9] [285:5] [290:8]
[297:24] [300:12] [303:6]
[311:13] [316:2]
questioning [107:10]
questionnaire [19:17]
questionnaires [19:23]
questions [4:14] [7:9]
[8:7,12] [83:22] [101:2,7]
[104:21] [109:18] [111:3]
[121:23] [151:5] [177:8]
[199:20] [234:10] [319:15]
[323:7]
quick [134:10] [275:1]
quickly [102:3]
quite [18:19] [71:20] [83:19]
[146:10] [163:18] [240:19]
[255:10] [298:3] [319:1]
quotation [131:6] [133:2]
[140:20] [158:8] [160:23]
[208:19]
quotations [138:14] [139:10]
[140:19] [158:7,10] [244:17]
quote [139:1,7,8] [141:10,13]
[179:7]
quoted [138:15] [142:20,21]
[156:20] [197:19] [213:15]
[301:24] [302:3] [318:17]
quotes [130:20]
quoting [125:5]

___

R

r.ph [3:14]
raise [283:3]
rampant [295:19] [297:4]
ran [114:1]
range [93:15] [283:13]
[310:19,24] [312:1]
rarely [270:4]
rate [32:9] [33:15] [213:4]
rates [69:17] [92:14] [282:24]
[291:20]

rather [47:8] [64:3] [146:13]
[209:14,20] [210:5]
reach [160:8] [276:18]
reached [120:10] [243:8]
read [27:10] [58:8] [83:24]
[84:3,8,9,12] [100:20]
[159:16] [160:7] [163:16]
[175:6,10] [198:5,11,12,13]
[219:14,17] [227:13] [267:
11,24] [276:11,13,15]
[302:21] [303:19] [306:16]
[311:24] [321:3] [323:4]
[324:10]
reader [73:12]
reading [20:18] [105:11]
[126:9] [153:7] [159:13,18]
[160:12] [197:23] [198:4]
[211:18,19] [225:23]
ready [63:20] [66:16] [265:16]
real [68:16,17] [70:6] [200:1]
[213:6] [308:10]
realistic [308:13] [320:3]
reality [31:1] [185:23]
realization [30:3]
realized [102:3]
really [31:1] [37:1] [66:11]
[69:6] [70:10] [83:8] [91:20]
[118:1] [119:8,18] [127:16]
[209:19] [210:1] [213:3]
[227:10] [228:21] [238:10]
[255:21] [276:14] [279:17]
[290:17]
realm [196:9]
rear [91:22] [92:3]
rearend [92:3]
rear-end [92:3]
rearended [91:22]
rear-ended [91:22]
reason [35:13] [38:1] [51:16]
[113:18,22] [120:22] [137:
7] [145:19] [196:19] [207:21]
[225:18] [229:20] [242:12,21]
[252:24] [282:19] [284:22]
[292:23] [301:9] [321:5]
reasonable [160:11] [295:10]
reasons [66:7] [134:2]
[309:2]
rebate [151:13,14] [158:17]
[159:14,21] [163:13,24]
[164:11] [179:9,16] [189:20]
[221:14] [226:17] [246:16]
[247:18] [248:11] [250:14,15]
[252:3] [253:1,9,12,19]
[254:11] [255:2,24] [257:2
,6] [258:22] [259:22] [262:7
,19] [263:1,22] [264:19]
[269:2,5,15] [270:9,16,18,21]
[271:4,17] [272:23] [273:15
,16,19,23] [274:3,14,19]
[276:6,21] [279:21] [280:9
,14] [281:16,17] [282:4,10,17
,22] [283:7,21,23] [284:6]
[285:13,17] [286:1,9,13]
[287:7,12] [288:4] [290:24]
[291:24] [300:17,18,19]
[301:6] [306:20] [307:13]

[308:21,23] [309:4,10,19,21
,24] [310:12] [311:10,17,18
,22] [312:7,15] [313:1,10]
[314:18,21] [316:9,10]
[317:21] [319:2,13]
**rebates** [22:3,6] [36:1]
[50:4] [103:6] [151:11]
[159:5] [163:8] [165:5]
[179:14] [180:1] [244:24]
[245:4,15] [246:13,23]
[247:14,20,23] [248:14,20]
[249:3,7,12,17,20] [250:23]
[251:3,21] [252:6,7,9]
[253:3,6] [256:11,15,17]
[257:14] [259:6] [262:12]
[268:17,21,23,24] [269:8,10
,19,24] [270:6] [271:11,20]
[272:7,18] [273:8,10]
[274:10] [276:17] [277:1]
[279:2] [281:6,13] [282:6,15]
[284:1,2] [286:24] [287:18]
[288:22] [289:14] [290:11]
[291:6] [293:10] [301:16]
[307:8] [309:1] [312:1]
[313:24] [314:14] [315:16,17
,19] [316:21,22] [317:7,9]
[318:17,20]
**recall** [23:16] [40:12] [54:5]
[56:23] [61:9] [65:9,13,14,15]
[77:1] [78:1] [86:3] [96:1,4
,6] [108:2] [109:15] [121:7]
[124:4] [154:5] [162:2]
[168:14] [169:19,24] [173:
5] [176:4] [178:18] [194:2]
[207:16] [209:20] [210:7,11]
[212:14,18] [213:2] [216:14]
[220:21] [221:24] [224:3]
[229:10] [230:23] [231:6]
[232:4,9,24] [233:20]
[244:15] [256:1,2] [258:11]
[261:16] [274:12] [278:13]
[299:10] [302:1] [314:5]
**receipt** [291:6] [321:14]
**receive** [51:2] [237:15]
[257:2] [289:14] [290:11]
**received** [22:22,23] [24:9]
[61:19] [108:11] [110:3]
[265:6,11] [267:8] [269:6]
[274:15,18,20] [283:17]
[285:9,12] [286:8] [313:10]
**receiving** [31:9,13] [32:1]
[285:20] [286:1] [296:7]
**recent** [17:4,17] [146:6]
**recently** [12:22]
**recess** [85:3] [134:16]
[212:6] [275:12]
**recidivism** [33:15]
**recognize** [49:16] [71:5,7]
[113:3]
**recognized** [14:23] [31:9]
[34:5]
**recognizes** [234:3]
**recollection** [71:16] [114:8
,9] [216:11] [218:15]
**recommend** [100:5] [103:22]
[104:8]

**recommended** [102:4]
**record** [6:15,22] [8:2] [16:17]
[18:15] [73:9] [85:1,8]
[88:4] [100:15] [105:18,23]
[106:17] [111:9] [128:5]
[134:14] [135:8,20,22]
[136:1,4,23] [137:10]
[152:18] [175:10] [182:7,10
,14] [212:4,10] [214:8]
[218:11] [220:15] [234:14]
[259:16] [275:8,10,17]
[277:23,24] [281:19] [320:
10] [324:6]
**records** [59:2] [62:16]
[64:17] [69:9,12] [94:9,22]
[95:14]
**recruited** [76:1] [82:10]
**redo** [74:1]
**reduce** [279:21]
**reduced** [279:4]
**reduction** [64:7]
**reed** [1:14] [5:14]
**refer** [156:23]
**reference** [124:9,11] [137:1]
[157:5] [158:10] [161:3,5]
[241:23] [278:14] [279:7]
[280:19]
**referenced** [113:13] [114:4
,14] [125:10] [151:4,9]
[155:13] [158:7] [244:11]
[266:14] [267:14] [297:10]
**references** [114:18] [160:24]
**referrals** [29:18]
**referred** [14:1] [180:6]
**referring** [16:19] [105:20]
[128:8] [142:8] [159:9,11]
[168:7] [250:13] [293:20]
[297:19]
**refers** [124:22]
**refine** [241:13]
**refinement** [217:5]
**reflected** [184:7]
**reflects** [306:8]
**refresh** [71:16] [216:11]
**regard** [121:6]
**registered** [1:17]
**regular** [164:9,10] [191:6]
**regularly** [160:12] [164:18]
[180:15]
**reimbursed** [78:6] [230:19,24]
[250:17]
**reimbursement** [27:8]
[260:18,21] [261:23] [262:
1] [283:2]
**reimbursing** [95:19]
**reiterated** [119:14,23]
**relate** [143:23]
**related** [56:11] [109:10]
[151:19] [170:12] [223:14]
[227:15] [233:4]
**relates** [50:13] [53:20]
[72:16] [89:12,22] [91:5]
[104:22] [120:11] [174:12]
[178:13] [191:4] [194:16]
[199:7] [215:24] [216:6,7]
[228:18] [240:12] [241:13]

[242:7] [279:18] [283:5]
[293:9] [311:7] [312:11]
**relating** [16:18] [121:11]
[125:15] [196:20] [310:20]
**relation** [166:23] [318:24]
[319:1]
**relationship** [294:15,17]
[314:10]
**relationships** [167:3,4]
[189:24] [190:1] [191:2]
[295:17] [296:5]
**relevant** [73:20,24] [237:9]
[272:12,14]
**reliable** [154:2] [279:14,16]
**rely** [151:9] [195:14]
**relying** [193:14] [195:15,19]
[253:17]
**remember** [69:18] [100:20]
[140:13] [159:1] [164:16]
[165:14] [232:20]
**remit** [260:17] [261:22]
**remove** [142:4]
**removed** [141:15,22]
**render** [133:13,17] [151:13]
[226:1] [319:5]
**rendered** [102:7]
**repeat** [56:2] [59:17] [83:23]
[126:13] [248:24]
**rephrase** [8:13] [247:5]
**replace** [54:17] [76:1]
**replacement** [171:15]
[174:5,7] [311:4] [312:8]
**report** [3:7,10,14] [7:9,14,18]
[8:16] [9:5,17,18] [27:15]
[28:2,6] [34:20] [51:6,7,12]
[55:6] [57:2,7] [63:14]
[65:23] [71:9] [72:6,17]
[73:2,11,17] [74:2,5] [75:4]
[85:12] [92:8] [93:24]
[94:3] [98:6,7,10,11,22,24]
[99:3,12,20,22] [100:6]
[101:18,22] [102:1] [105:4
,7] [106:2,6] [108:6,8,9]
[109:23] [110:4,10] [111:13
,14,17] [112:13] [113:15,20]
[114:1] [115:8,12,16,20,24]
[116:4,9] [119:5] [120:2,13
,16,20,23] [121:16,20,24]
[122:4,17,20,23] [123:9,12
,17] [124:19] [125:4,7,18,19]
[126:1,2,4,19,23] [127:16,17
,23] [128:7,10,12,14,17,18
,23] [129:4,9,11,14,16,17,18
,19,21] [130:2,7,11,13]
[132:5,11,19,23] [133:21]
[134:1,7] [135:11] [137:2,4
,16,21] [138:8] [139:15]
[140:1,2,13,21] [141:1,16]
[143:22] [144:5,7,9,15,18]
[147:9,14] [148:9] [149:24]
[150:16,19,24] [151:3,11,17
,19] [154:4,16] [157:11,20,22]
[158:1,3,7,14,24] [161:4,5]
[162:1] [177:24] [192:17,22]
[193:1,2] [194:18] [195:5]
[197:20,24] [198:8] [223:2]

[224:1] [235:16] [242:22]
[243:24] [244:1,14] [245:14
,22] [246:12] [268:14]
[276:19] [278:20] [279:1,8]
[285:19] [286:12] [288:16]
[297:13] [303:5] [315:11]
**reported** [25:5]
**reporter** [1:18] [6:7,14]
[8:1] [27:22] [324:21]
**reports** [101:10,13] [113:2,4]
[161:11] [286:12]
**represent** [5:21] [16:16]
[134:1] [147:2] [266:12]
[288:23]
**represented** [241:16] [266:
22]
**representing** [2:6,11,16]
[118:8]
**represents** [308:16]
**reproduction** [324:19]
**reproductive** [242:17]
**request** [4:8] [47:16] [264:24]
[265:2,5]
**requested** [108:7] [175:9]
[324:8]
**require** [53:1,4]
**requirements** [143:12]
**reread** [8:3]
**research** [41:23] [92:9,23]
[145:15] [157:24] [184:24]
**reside** [6:24]
**resource** [111:19,24]
**resources** [220:17]
**respect** [174:21]
**respond** [7:22] [8:7] [240:21]
[291:10]
**response** [97:8] [259:18]
**responsibilities** [72:15]
**responsibility** [10:3] [36:21]
[46:3] [76:15] [97:19]
[119:14,15] [165:3,4]
**responsible** [76:12] [119:19
,22] [238:20]
**responsive** [194:7]
**rest** [130:9] [197:18] [272:15]
**restate** [163:19] [174:14]
[307:4]
**restrictions** [98:12]
**restrictive** [38:14]
**result** [65:17] [99:13] [111:
18,23] [186:14] [307:24]
**resulted** [64:6] [70:11]
**resulting** [54:13]
**results** [33:8]
**resume** [28:17] [51:8] [55:6]
[71:21] [72:5,17] [73:16]
[74:8] [78:23] [85:11]
[183:17] [231:15]
**retail** [103:18] [124:23]
[130:8] [148:15] [179:9]
[212:20] [213:4,7] [214:18]
[215:8,15,16] [216:20]
[217:9,12,22,23] [218:20]
[219:13] [222:5,17,20]
[235:21]
**retailer** [179:20] [201:11]

[203:23]

retailers [97:4] [117:9] [179:12,16] [180:1]
retain [104:13] [193:9]
retained [93:16,20] [95:23] [117:4,10,17] [260:22] [262:2]
retention [101:8] [104:22]
retired [91:23]
return [305:23] [321:12]
returning [307:7]
returns [317:21]
reuptake [309:7]
revenue [253:17] [281:1,6,9 ,11,13,18,19] [283:16,18,22 ,23] [287:24] [289:19] [290:3] [301:13] [302:10,17] [303:12] [308:11] [312:10] [314:19]
revenues [282:4] [285:8,12] [286:7] [303:3,20,21] [305:19]
review [108:10] [109:11,13] [111:15,24] [112:22] [115: 14] [119:21] [121:8] [173:4 ,13,19] [196:22] [198:18] [227:24] [275:23] [276:1,17] [285:6,11]
reviewed [89:5] [90:1,11,16 ,24] [100:18] [105:3,7,22] [106:5] [107:2,5] [112:14] [114:4] [119:5,7] [121:14] [137:6] [173:3,5,6,10,11,23] [194:12] [232:7] [268:9] [275:19] [276:3] [318:11]
reviewing [111:2]
rewarding [227:21]
rheumatologist [43:20] [44:1,2]
right [12:12,17,20] [14:17] [15:8] [16:1,12] [19:8] [20:22] [21:18] [27:1,12,23] [35:10] [40:21] [44:6,24] [45:6] [46:13,19] [48:20] [54:23] [55:20] [57:13,21] [63:11] [64:8,12] [68:13] [79:2,13,17,20] [80:3,18] [81:5] [82:16] [84:13] [86:7] [89:9,19] [91:8] [92:16,20] [95:20] [97:6] [98:9,19,21] [100:21] [102:24] [104:7] [106:13] [108:14] [110:5] [111:9,22] [112:20] [113:14] [114:3] [115:4] [117:7] [120:18] [121:3] [123:12,14] [128:15] [129:13,21] [130:1,4,5,23,24] [131:18] [132:15] [133:24] [138:10] [139:14] [141:8,13 ,18] [144:21] [145:17] [146:11] [148:6] [149:22] [153:23] [154:14] [155:10,14 ,15] [156:7,13] [157:8,16] [158:4,11] [161:4,7,9] [164:5] [166:11,18] [167:12 ,13,24] [168:6,22] [169:7,17]

[171:14,22] [172:12,22] [173:19,22] [176:5,21] [177:1] [178:3] [179:21] [180:19] [181:10] [183:10,11 ,21] [184:9,14] [185:8] [186:16,21] [189:3,16] [190:3,6,15] [191:19] [192:17] [196:13] [197:9] [198:10,14] [199:4] [200:1 ,14] [204:12,19] [205:1] [209:2,5] [212:24] [214:19] [215:6] [216:15,23] [217:12 ,24] [219:17] [221:2] [222:7 ,13,16] [223:5] [229:4,15] [230:3,10] [231:1,7,16] [232:6] [235:5] [239:19] [240:5,11] [242:1] [244:11 ,14] [245:18] [246:14,18] [247:1,3] [248:4,7,19] [249:9] [250:8] [251:5,20] [254:13,16] [255:3,12,19] [256:4] [259:4] [260:24] [262:4,5] [264:1,8,9,11,12 ,17,20] [266:21] [268:14,15] [270:23] [271:21] [273:4,11 ,13] [276:16] [278:8,19] [279:7,13] [284:10,11,19] [286:6] [289:2,20] [290:4] [291:5,13] [292:18] [293:4 ,6,10] [296:13,18] [297:1,7] [300:11,21] [302:5] [303:2 ,20,22] [304:19] [305:10] [306:5] [312:20] [313:22] [315:6] [316:18] [317:9,22] [318:12,13] [319:7,8]
righthand [222:7]
right-hand [222:7]
ring [177:18] [178:1]
rise [198:7]
rises [236:20]
risk [19:18,19,24] [24:3] [35:1] [240:17]
rite [2:16] [6:1] [26:18,23] [97:4] [117:13,18,23] [118:9]
role [82:5] [100:2] [226:20] [233:3] [244:8] [278:5]
room [33:16] [43:16] [44:4] [54:12] [122:10]
rose [69:6]
roseman [2:]
rough [11:13] [44:14]
roughly [28:16] [41:3] [44:11] [51:21] [68:17,19] [76:8] [94:23] [96:11] [147:1] [282:21]
round [60:6,7] [92:19] [108:18]
routinely [122:13,14] [166: 10]
rules [7:19] [27:8] [198:15] [199:1] [281:23]
run [26:6,8] [47:12] [69:8] [93:5] [153:6] [307:22]
runners [13:5]
running [44:16] [138:9]

russian [23:23]
rxamerica [103:15]
rxphysician [55:7,9,12,14,24] [56:10,11] [58:13]
rxphysician.com [62:22] [68:5]

———————

S

———————

sacramento [7:1,6] [43:12] [45:17] [60:5,10] [61:8] [84:10] [88:9] [96:5,15] [233:2] [234:11]
safe [17:23] [18:9,10] [267: 23]
sagapi [275:22]
sales [130:8]
samaritan [75:1] [80:13] [82:24]
sample [266:17]
san [23:18,23] [76:24]
santa [56:16] [57:24] [59:23] [60:1,7] [61:1,11,17] [64:19] [65:18] [67:24] [68:1] [70:1,3]
saved [286:14]
saving [308:14,15]
savings [260:18,21] [261:23] [262:1]
saw [8:4] [106:12] [123:1] [137:5] [219:22] [268:6]
say [15:10] [17:16] [22:15] [28:15] [30:15] [35:5] [38:4] [41:11] [42:4] [44:11 ,13] [50:18] [52:6] [60:3] [61:15] [63:21] [66:4] [67:4] [73:14] [83:1] [90:23] [94:22,23] [95:3,9,15] [97:7] [103:2,24] [104:8,14] [106:7] [107:14] [114:13] [119:12,16] [121:6] [125:4 ,12,15] [127:3,13] [128:19,23] [129:8,22] [139:19] [140:10 ,16] [141:2] [152:5] [155:14] [167:11] [168:4] [169:17] [170:19,22] [199:16] [200: 16] [201:1,12] [206:19] [209:10,14] [217:14,19,20] [218:1] [233:4] [234:5,24] [239:13] [242:17] [245:23] [246:13,15,22] [254:7] [255:11] [262:14] [267:23] [272:6] [282:2] [287:3,6] [294:7] [295:24] [297:2] [298:9] [304:13,24] [305:3] [310:3] [312:16] [315:10] [316:15] [318:2,21]
saying [29:11] [39:17] [114:19] [122:21,22] [156: 14] [171:10] [172:13,14] [183:13] [187:10] [197:6] [209:19] [215:20] [216:3] [234:18] [254:14] [256:21] [272:22] [282:14] [284:5] [288:9] [294:12] [304:21] [306:14] [307:5] [313:18]

[317:13,22,23] [318:14]
says [16:23] [17:16] [22:18] [74:5] [76:2,3] [78:23] [124:20] [125:12] [130:3,7] [131:11] [132:7,16] [141:5] [142:12] [143:11] [150:3] [153:10] [155:18] [157:9,11] [158:15] [159:12] [216:24] [217:20] [218:1,22] [222:17] [237:21] [244:5] [259:20] [260:16] [266:14,15] [301: 4] [307:7]
scenes [120:8]
scheduled [96:14]
schedules [243:5]
schondelmeyer [123:24] [131:1,16] [149:3,13,20] [150:8] [237:19]
schondelmeyers [123:20] [150:5]
school [34:16] [49:10] [53:9] [294:9]
science [59:21]
scientific [45:21]
scope [99:19]
score [24:4] [49:10]
scored [19:17]
scores [19:20]
scott [157:5]
scout [265:15]
scratch [75:22]
screened [19:1]
script [70:8] [203:14] [218: 20] [220:2]
scripts [66:13,17,20,22] [67:3,16] [68:18] [188:12] [190:12] [275:24] [276:2] [280:12] [283:16,17] [284: 12] [285:7,16,24] [286:8] [289:9] [293:2] [294:21] [300:16] [302:4]
scriptses [291:17]
scull [164:15] [167:10] [168:12,15,22,24] [169:14] [170:12] [172:11] [178:17] [179:2] [180:8] [197:4] [211:1,4] [213:3,20] [214:10] [251:15]
se [109:4]
seal [47:6]
search [278:15]
second [8:6] [9:19] [10:16] [27:12] [34:12] [60:3,7] [76:14] [81:15] [98:9] [110:7] [132:2,3,6] [135:20] [138:5] [140:24] [151:15] [156:2] [159:5] [167:10] [171:23] [172:5] [173:15] [174:7,9,17,21] [175:17] [176:1,4,8] [177:3] [181:24] [192:14] [195:12] [201:9] [213:7,9] [214:3,14,17] [216:8] [222:16] [229:12] [230:6,8,24] [239:10] [248:10,15] [250:16] [252: 14] [260:16] [266:18] [269:

18] [281:5] [302:2,6]
**secondtier** [213:7,9] [252:14]
**second-tier** [213:7,9] [252:14]
**section** [124:18,22] [125:13,15] [151:7]
**sections** [126:11,19]
**sector** [228:22]
**seeing** [166:13] [167:21] [218:10] [285:23]
**seek** [253:24] [255:4,15]
**seeking** [253:11]
**seem** [126:7]
**seemed** [209:18]
**seems** [266:3]
**seen** [16:13] [37:17] [90:12] [110:14] [124:17] [136:23] [218:13] [219:8] [221:22] [222:1,2] [257:4,16] [258:4] [261:14] [297:9,12] [305:9] [307:6]
**seepage** [213:17]
**segal** [2:]
**segments** [126:1] [146:3]
**select** [73:5] [110:6]
**selected** [99:11] [110:8] [111:14]
**selecting** [108:15]
**self** [29:22] [221:8] [240:24] [241:18] [242:9,12,18] [243:21] [246:6] [292:16]
**selffund** [242:9]
**self-fund** [242:9]
**selffunded** [29:22] [240:24] [241:18]
**self-funded** [29:22] [240:24] [241:18]
**selffundeds** [292:16]
**self-fundeds** [292:16]
**selfpay** [243:21] [246:6]
**self-pay** [243:21] [246:6]
**sell** [63:2]
**selling** [317:2]
**sells** [55:20] [313:4]
**send** [38:8] [39:13] [114:6]
**sending** [271:2]
**senior** [316:17]
**sense** [148:5] [283:21] [311:19]
**sent** [37:13] [38:17] [39:5,7] [40:4] [107:24] [108:9] [112:23] [113:1,3] [266:7] [274:9]
**sentence** [72:8,10] [75:12] [130:9] [138:5] [217:19] [222:16] [260:16] [314:24]
**separate** [187:20] [197:12] [200:3] [269:2]
**september** [302:16]
**series** [20:4] [31:20] [101:1,7] [106:8] [108:20] [109:18] [113:6] [136:22]
**serious** [28:10] [87:9]
**serotonin** [309:7]
**serve** [41:22] [73:20] [82:12,17,20,23] [86:23] [87:2]

[88:18]
**served** [23:22] [76:12] [82:13] [100:1] [103:8] [104:10] [223:13] [259:18] [265:3,4]
**server** [61:4] [68:7,8,10]
**service** [47:20] [76:4] [78:5] [91:9] [162:6] [204:2] [243:5,6] [281:2]
**services** [1:22] [5:16] [10:15] [16:6] [78:14] [239:9] [242:17] [258:10] [289:17] [291:15,18] [301:14] [307:10] [308:11]
**servicing** [281:10,12]
**serving** [239:8] [240:3]
**session** [135:2]
**set** [134:6] [138:8] [151:5] [278:2] [290:20] [309:1]
**sets** [32:7] [50:24]
**setting** [56:14] [79:7] [183:1,4] [184:7]
**settings** [65:2]
**settle** [91:24]
**seven** [7:7] [15:10] [41:15] [42:2] [90:24]
**several** [19:6] [34:9,13] [106:13] [107:20] [108:24] [160:22] [202:8] [211:2] [215:9] [228:15]
**shape** [186:15]
**share** [99:6] [163:8] [250:4,18,23] [251:22] [253:1] [270:3] [271:13]
**shareholders** [11:11] [305:23,24]
**sharing** [33:19] [117:24]
**sheet** [321:6,8,10,13] [323:9]
**shell** [11:14]
**shes** [259:23]
**shield** [275:20] [314:6,13,19,22] [315:1,16] [316:21] [317:1]
**shirt** [67:1]
**shop** [79:7]
**short** [21:17] [50:16] [85:3] [175:12] [212:6] [275:12]
**shorthand** [324:21]
**shouldnt** [277:14]
**show** [11:22] [16:12] [63:20] [88:3] [100:13] [136:20] [214:22] [217:17] [218:8] [228:5] [238:1] [259:14] [269:3]
**showed** [228:2] [280:23]
**showing** [176:1] [302:16]
**sick** [30:13,16] [31:4,18]
**side** [100:7] [102:17] [187:3] [198:16] [199:7,23] [200:1] [211:16] [239:3]
**sierra** [88:9]
**sign** [84:11] [321:7] [324:10]
**signature** [37:9] [39:9,10] [40:6]
**signed** [25:17] [84:13,16]

**significant** [213:12] [214:1] [264:17]
**signing** [321:9]
**similar** [18:11] [58:15] [60:1] [64:9] [65:17] [70:4] [83:19] [139:20] [185:19]
**similartype** [64:9]
**similar-type** [64:9]
**simply** [123:16] [125:18] [137:19] [140:1] [158:5] [229:4] [248:21] [251:5,21] [252:7] [318:1]
**single** [39:11] [178:7] [187:2] [260:7]
**siphoned** [26:5]
**sir** [6:16,21] [7:8,15] [11:23] [12:9,18] [13:10,23] [14:18] [16:14] [20:14] [26:1] [28:14] [34:18] [38:8] [52:5,15] [65:20] [73:16] [75:8] [88:4] [91:13] [92:20] [98:4,6] [101:4] [103:21] [105:23] [112:1,6] [113:21] [115:6] [116:13] [121:24] [122:19] [123:6] [124:21] [128:12] [133:11] [137:4] [142:5,10] [143:17] [144:14] [145:19] [147:12] [152:19] [155:11,16] [157:20] [158:24] [160:17] [161:12,22] [162:18] [163:10,14,23] [167:18] [168:19] [174:15] [175:5,21] [176:7,18] [177:12] [178:16] [179:4] [180:3,19,22] [183:23] [191:22] [193:22] [195:9] [197:17] [206:2] [208:22] [212:12] [214:22,24] [216:12] [217:16] [218:8] [219:2] [220:13,19] [222:11] [223:7] [227:2] [228:12] [237:8] [249:2] [250:22] [251:12] [256:16] [260:1,10] [261:11] [262:5] [267:10] [269:17] [272:10] [274:1] [276:9] [277:23] [282:3] [283:19] [288:18] [297:24] [301:20] [302:3] [307:16,23] [309:12] [312:14]
**sisters** [74:13,17] [75:16] [76:4,14,18] [77:6,14,15] [78:10] [79:8,14,21] [81:20,23,24] [82:1,17]
**sit** [46:10]
**site** [38:22]
**sits** [273:22]
**sitting** [95:17] [213:10] [257:1] [305:12]
**situation** [72:18] [116:7] [178:6] [200:7] [203:13] [239:18] [274:20,21]
**situations** [26:17] [240:13] [241:17]
**six** [42:8] [43:4] [63:12] [82:22] [83:1] [90:24] [231:6] [232:2]

**size** [240:22]
**skeptical** [301:9] [313:20] [317:18]
**slide** [123:20] [149:6] [155:6,18] [236:14,15] [278:21] [282:2]
**slides** [151:4] [154:17] [278:2]
**slip** [229:20]
**slow** [142:16]
**small** [31:3,17] [264:9] [319:1]
**smaller** [317:7]
**smears** [32:14]
**smell** [317:22]
**smith** [1:14] [5:14]
**society** [88:10]
**soft** [51:3] [124:10] [127:19]
**software** [19:11] [63:4]
**sold** [22:18]
**sole** [178:22] [180:24] [196:2]
**solid** [95:1]
**solvay** [115:19]
**somebody** [48:21] [57:21] [148:5] [159:18] [165:7] [173:24] [177:12,23] [183:23] [188:10] [190:9] [208:23] [216:21] [217:5,6] [237:1] [299:5] [300:6] [317:8]
**somehow** [288:5]
**someone** [58:2] [301:4]
**something** [9:8] [13:12] [17:23] [23:17] [27:14] [35:6] [38:16] [56:3] [66:21] [100:18] [113:9,11] [119:16] [136:13] [142:22] [144:17] [164:1] [198:19] [199:19] [228:2] [262:10] [294:10] [301:16] [304:11]
**somethings** [138:23]
**somewhat** [20:17]
**somewhere** [26:7] [273:7] [283:13] [304:15] [310:19] [311:2] [312:5]
**sophisticated** [254:24]
**sorry** [15:13] [26:15] [28:3] [36:4,9,13] [42:1] [64:16] [65:10] [71:6] [74:17] [81:9] [100:14] [101:4] [106:16] [112:7,16] [114:10] [115:3] [140:4] [152:3] [155:3] [163:16] [174:14] [208:14] [215:1,3] [216:7] [244:2] [245:10] [277:17,21] [299:6,22] [314:6]
**sort** [59:20] [61:12] [101:20] [235:3] [243:19] [281:3] [310:24]
**sorts** [32:11] [47:18] [271:1]
**sought** [137:8] [253:2,5]
**sounds** [30:24] [84:22]
**source** [25:1] [58:1] [139:17] [144:15] [145:8] [146:16] [147:14] [148:23] [149:2,4] [150:2] [152:21] [153:15,20] [154:2,9,10,12,18] [155:6]

[157:1] [158:8] [178:7]
[198:16] [279:14] [280:17]
[302:14]
**sources** [22:13] [139:20]
[140:2] [144:1,4,6] [146:24]
[147:10] [149:16] [151:10]
[156:19] [157:21] [160:18]
[197:19] [211:18] [213:16]
[240:6] [251:19]
**sourcing** [244:18]
**southern** [1:2] [5:9] [53:7,12]
[146:7,14] [207:4]
**space** [321:5]
**speak** [116:6] [121:1]
**speaking** [26:24] [68:3]
[69:1] [211:9] [262:6]
[263:20]
**speaks** [218:7] [272:2]
**special** [10:18,22] [47:16]
[215:5,6]
**specialists** [65:6] [221:6]
**specializes** [9:20] [28:8]
[29:12]
**specialties** [232:22]
**specialty** [52:10] [54:9]
**specialtybased** [52:10]
**specialty-based** [52:10]
**specific** [111:22] [234:19]
[246:16]
**specifically** [98:15]
**spector** [2:]
**speculate** [104:2]
**speculating** [176:21]
**spend** [25:11] [28:13,15]
[61:17] [84:6] [94:10,16]
**spending** [51:24] [52:3]
[92:22,23] [142:16] [279:4
,22] [311:3]
**spent** [24:6] [25:13] [55:24]
[61:16,18,22] [94:20,23]
[310:15,22] [311:7]
**sphere** [14:9]
**split** [122:24] [258:2] [259:22]
[291:11]
**spoke** [265:14]
**spoken** [116:2]
**sponsored** [242:24]
**sponsors** [277:2]
**spot** [14:24]
**spread** [65:4]
**spreadsheet** [94:18]
**square** [2:14]
**ssis** [173:5]
**stack** [27:23] [105:2]
**staff** [36:20] [37:10,11]
[41:18] [42:13,23] [45:19]
[76:1] [82:10] [233:22]
[235:2,12] [298:15]
**staffed** [82:10]
**staffs** [36:24] [37:2] [233:3]
**stand** [81:17] [133:6]
**standard** [50:11,14] [150:20]
[308:4]
**standards** [31:10] [33:12]
[48:16,24] [49:20]
**stands** [32:6] [81:18]

**start** [11:8] [25:8] [88:21]
[108:19] [138:2] [168:22]
[243:8]
**started** [9:19] [13:13] [14:20]
[20:11] [42:17] [51:21]
[77:17] [103:12,13] [162:16]
[295:9]
**starting** [138:5] [302:8]
[317:12]
**starts** [141:19] [222:9]
[260:13]
**startup** [29:5,7,9] [75:24]
**state** [5:20] [6:21] [9:18]
[11:14] [27:16] [28:6,17]
[51:8] [71:21,23] [80:11]
[81:11] [98:10,22] [99:2]
[200:5] [235:18] [242:15,22]
[288:24] [321:5]
**stated** [307:20] [317:21]
**statement** [102:15,18]
[128:13] [134:1] [142:19]
[160:13] [282:1] [319:24]
**statements** [6:14] [24:7]
[223:1] [301:21] [304:11,16]
[306:12]
**states** [1:1,19] [5:9] [76:22]
[77:13] [97:2]
**static** [252:2]
**stating** [115:2]
**status** [47:10] [185:23]
**stay** [154:21]
**stayed** [43:1]
**stays** [314:19]
**steering** [297:20]
**step** [28:3] [181:14]
**stepped** [8:4]
**stepping** [142:15]
**steps** [24:21]
**steve** [232:16]
**stock** [42:20] [306:3,4,21]
**stockton** [233:2]
**stool** [78:16] [79:10,16]
**stop** [289:2]
**store** [69:9]
**straight** [301:3]
**strategies** [142:17]
**strategy** [99:9,14] [227:19]
[234:6] [253:19]
**straub** [56:17] [57:24]
[60:2,6] [61:2] [64:8,14,19
,20] [65:18,22] [67:19]
[69:2]
**strawn** [2:]
**street** [1:15] [2:4] [22:5]
[27:3] [159:16,19] [203:21]
[207:13,17,18] [211:20]
[216:21]
**stretched** [76:24]
**strike** [168:23] [199:11]
[226:22] [227:1] [228:9]
[229:13]
**strokes** [32:23]
**strong** [233:17]
**structure** [34:1,3] [155:10]
[156:5] [158:17] [230:20]
[252:17,19] [253:20] [263:

2] [269:2] [272:23] [273:15,16]
[276:22] [300:2] [311:22]
**structured** [287:1]
**structures** [80:24] [121:17]
[145:6] [155:7] [159:14,21]
[273:20] [285:17] [286:13]
**studies** [33:7] [58:16] [59:4]
[121:12] [148:9] [297:3]
**study** [33:9] [42:17] [56:15,17
,20] [57:23] [58:12] [59:21,22]
[61:8] [144:18] [157:24]
[191:22] [227:10] [288:11]
[296:16,17] [313:5]
**stuff** [148:17] [200:21]
**subcontracting** [34:4]
**subject** [22:9] [108:19]
[109:1] [278:3] [321:9]
**subjects** [50:2] [89:10]
**submission** [13:6]
**submit** [243:6]
**submitted** [101:11]
**submitting** [13:5]
**subpoena** [259:18] [265:1]
**subscribed** [323:15]
**subspecialties** [43:23]
**substance** [7:17] [8:15]
[84:15] [101:17] [323:8]
**substantial** [273:23] [308:10
,17]
**substantially** [98:16] [99:15]
**success** [184:14]
**successful** [99:8] [185:15]
[270:24]
**successfully** [21:11] [99:14]
**sudden** [33:16]
**sue** [258:8]
**suggested** [99:24]
**suit** [96:21] [116:12]
**suite** [2:4]
**suits** [160:1]
**sum** [109:24] [111:5]
**summated** [246:9] [269:22]
**sums** [111:21]
**sunday** [118:14,15] [265:17]
**supervision** [324:21]
**supplement** [83:17]
**supplied** [196:12]
**supplier** [22:19]
**supplies** [21:3] [24:9,20]
[25:3]
**supply** [22:22] [23:17]
[24:15] [156:3]
**supplying** [34:12]
**support** [4:1] [41:23] [63:4]
[248:6]
**supportive** [150:18]
**suppose** [58:4] [120:21]
[244:16]
**supposed** [200:20]
**sure** [8:6] [9:10] [29:7]
[38:15] [40:9,13] [51:4]
[54:8] [56:3,5] [57:5] [84:5
,20] [106:11] [110:1] [114:11]
[117:6] [119:24] [136:6]
[155:4] [157:15] [159:10]
[161:14] [167:5] [194:19]

[197:1] [203:11] [212:1]
[214:2] [219:9] [224:20]
[240:19] [249:9] [250:5]
[275:3] [292:22] [294:20]
[320:6]
**surprise** [254:23] [255:3,13]
[314:20] [315:4]
**surprised** [39:8] [256:3,14,20
,21] [314:15,16]
**surveys** [68:15]
**survive** [301:11]
**survived** [129:11]
**susman** [100:1,4,5] [102:1]
[103:8] [107:24]
**susmans** [122:11]
**suspicious** [298:3]
**swear** [6:7]
**sworn** [6:11] [323:15] [324:
5]
**system** [22:12,13] [25:8]
[29:21] [56:13] [60:18]
[63:6] [65:16] [67:16]
[68:20] [69:8] [76:10,20]
[77:4,8] [80:1] [87:14]
[97:1,20] [125:16] [129:23]
[130:4] [131:10] [151:18]
[207:20] [236:16] [237:1,7
,10,13]
**systems** [47:17] [48:8]
[70:6,9] [75:20] [76:3]
[78:19] [79:1] [81:3] [97:23
,24] [99:7] [103:19]
**systemwide** [80:2]

—————————————

**T**

—————————————

**table** [121:19] [256:22]
**taft** [29:24] [35:14] [80:24]
[143:8] [238:8,14] [239:17]
[241:1] [242:13] [262:9]
**t-a-f-t** [29:24]
**tafthartley** [29:24] [143:8]
[238:8] [241:1] [242:13]
**taft-hartley** [29:24] [143:8]
[238:8] [241:1] [242:13]
**tafthartleytype** [80:24]
[239:17]
**taft-hartley-type** [80:24]
[239:17]
**tainted** [296:9]
**taken** [1:13] [5:13] [8:23]
[20:15] [38:21] [63:18]
[85:4] [100:16] [123:7]
[124:1] [134:17] [141:21]
[144:4,17] [158:5] [160:17
,19] [212:7] [275:13]
**taking** [19:24] [37:20] [39:22]
[125:5] [143:19] [240:16]
**talk** [8:16] [12:21] [38:15]
[51:3] [58:4] [64:10] [79:5]
[119:2,18] [120:12] [162:18]
[187:13] [227:5] [228:24]
[246:20] [251:9] [297:3,13]
[313:9]
**talked** [44:10] [96:16] [101:
23] [119:6] [121:16] [206:24]

[207:7] [210:12,15,16]
[226:19] [228:14] [247:9]
[265:12] [292:3,5] [293:1,2]
**talking** [15:2] [17:23] [25:12]
[26:14] [56:1] [58:17]
[71:22] [123:21] [128:21]
[171:5] [183:4,6,18] [192:18]
[213:19] [214:12,13] [217:
1] [226:3] [228:17] [237:17]
[240:5] [246:13] [248:8]
[253:14] [263:9,15] [264:5]
[273:2,3] [295:18] [305:18
,20] [306:2]
**talks** [17:3] [20:6]
**tallahassee** [74:15,16,21,22]
[80:5,7] [82:21]
**tandem** [81:16] [319:13]
**tangential** [224:18] [225:15]
**tangentially** [193:17]
**tape** [84:24] [85:7] [182:4,6
,13] [275:9,16]
**target** [31:15]
**targets** [251:22]
**taught** [92:18] [223:17]
**team** [122:10]
**teamster** [262:14,15]
**teamsters** [238:18] [239:17]
[240:8,9] [292:2]
**technically** [83:15]
**techniques** [29:16] [143:11]
**technology** [17:19,22]
[59:12] [60:17,20] [62:8,20]
[63:4,18] [66:15]
**tell** [29:10] [46:19] [56:9]
[60:8] [67:23] [76:17]
[77:5] [96:7,18] [155:3]
[169:7,22] [170:8,21]
[174:6] [175:2] [177:15]
[189:23] [190:10] [194:17]
[209:4] [210:6] [211:4]
[212:17] [257:23] [292:8]
[303:4] [308:3]
**telling** [108:5] [136:8] [166:
7] [167:14] [177:7] [193:20]
[209:4,7] [301:14] [307:11]
[308:8] [318:5]
**template** [257:24] [258:16]
**tend** [309:4]
**tends** [66:8]
**term** [18:12] [83:16] [106:9]
[249:13]
**termination** [35:6]
**terms** [65:23] [70:4] [77:6]
[92:5] [163:3] [166:14,15]
[170:9] [174:20] [188:17]
[192:8,13] [195:24] [198:15]
[199:23] [219:22] [220:24]
[221:13] [225:16] [236:9]
[253:23] [254:21] [273:10]
[290:8] [293:8] [296:8]
[300:16,17,18,21] [305:19]
[309:20] [311:6]
**test** [33:10] [49:10] [57:22]
[58:2] [198:20]
**testified** [6:12] [128:16]
[180:5] [212:19] [269:7,9]

[270:1] [271:19] [311:16]
[313:14] [318:1,10,18,19]
**testify** [105:4] [182:20]
[183:14,23] [185:17,20]
[196:1] [319:11]
**testifying** [119:11] [182:23]
[216:19] [286:17]
**testimony** [3:2] [92:10,22]
[119:11,13] [128:11] [170:
13] [209:18] [212:15] [215:
22] [273:6,7] [276:17]
[306:16] [307:2] [314:1]
[324:6]
**texas** [76:9,23] [77:2]
**text** [122:13,14] [123:4,5,24]
[124:18] [156:20] [160:20]
**thank** [7:12] [71:18]
**thanks** [200:23] [210:2,3]
[212:2]
**thats** [10:2] [12:2,9,16]
[13:12] [15:5,6,7,24] [18:2
,9] [19:11] [23:8] [27:10]
[28:1] [30:9,22] [32:5,21]
[34:5] [38:11,19] [39:15]
[40:22] [42:15] [47:3]
[48:19] [51:6] [55:13,22,23]
[66:10] [68:20] [71:11,13]
[72:17,18] [74:6] [77:4]
[79:2] [89:5] [92:11] [94:6,24]
[95:6] [102:3] [105:24]
[107:12] [108:5] [110:19,22]
[112:8] [124:1,13,23]
[125:10] [129:4] [131:1,24]
[132:22] [140:23,24] [141:
1,20] [142:5,6,19,21] [144:
12] [146:2] [147:13] [148:19]
[149:14] [150:5] [151:22]
[153:15] [156:5,18] [159:6]
[162:11] [167:11] [172:7,11]
[175:1] [176:24] [186:19]
[187:4,5] [191:15] [201:15]
[204:5] [205:2,16] [207:4]
[209:24] [211:21] [219:9,10]
[226:8] [227:7] [233:8]
[234:24] [236:18] [237:3,18
,20] [239:17] [240:2,10,16]
[242:8] [243:3] [245:14]
[250:10] [252:15] [263:24]
[264:7,9] [265:9,19] [266:17]
[267:7] [268:20,24] [269:4]
[270:8] [272:4] [279:15]
[284:7,8,23] [287:17]
[288:6,9] [289:22] [291:4,8]
[293:15] [296:11] [299:1,3]
[300:22] [301:3] [302:11,12
,19,21,23] [303:1] [306:24]
[307:3] [308:17] [309:11]
[310:8] [314:2,8] [315:14]
[316:18] [317:19] [318:5,7
,17]
**theft** [25:3,8]
**themselves** [57:22] [165:23]
[233:19] [308:16]
**therapeutic** [171:6,10]
[172:15,16,19,24] [174:3]
[178:19] [180:22] [181:1]

[186:13] [187:3] [191:12,24]
[196:3] [308:22,24] [309:13
,16]
**therapeutics** [36:23] [71:24]
**therapy** [31:14] [33:12]
[52:19,20] [54:15,19]
[171:16] [174:5,13] [311:4]
**theres** [20:4] [30:5] [34:22]
[37:15] [41:15] [42:7]
[43:24] [48:15] [49:17]
[55:13] [60:21,22] [98:7]
[102:13] [109:3] [114:17,19]
[121:4] [124:8,9,22] [132:22]
[136:8] [151:15] [177:6]
[184:12,20] [187:2] [195:2
,3] [198:1,16,19] [203:21]
[205:10] [208:22] [221:21]
[222:4] [229:14] [233:6]
[237:22] [238:24] [241:8]
[245:23] [248:20] [259:7]
[266:23] [268:23] [269:1]
[272:16,18,22] [284:5]
[294:16] [295:11] [316:12]
[317:24]
**thereto** [71:14]
**theyd** [39:9] [63:6] [90:21]
[188:15] [199:10] [202:19]
[204:6,8] [228:6]
**theyll** [205:15] [291:22]
**theyre** [32:1] [33:14] [39:20]
[41:21] [46:14] [90:20]
[117:9] [172:13] [179:8]
[182:1] [188:13,14] [190:10]
[205:22] [219:9,10] [221:5]
[237:14,15] [238:17] [239:
22] [240:9] [282:8] [287:15]
[292:13] [294:20] [295:4,8]
[300:13,14] [301:12,13,15]
[304:11,18,22] [305:14]
[306:19,22] [307:24] [308:
3,14,15,19] [315:24] [316:3
,16] [318:15]
**theyve** [31:21] [166:2]
[206:17] [211:13] [314:9]
**thing** [39:18] [66:4] [80:4,15]
[99:24] [107:15] [110:16]
[126:8] [135:18] [167:2]
[169:12] [179:1] [184:4]
[189:13] [213:1,6] [214:11]
[253:16] [255:8] [281:4]
[301:7]
**things** [9:7] [12:21] [23:3]
[24:15] [25:20] [47:14,18]
[48:2,21] [50:6] [51:3]
[55:21] [68:15] [73:5]
[84:5] [90:14] [102:7]
[103:17] [112:14] [120:12]
[136:11,19] [150:17] [166:
7] [185:3] [202:8] [221:15]
[230:19] [242:4] [268:6]
[283:24] [284:4] [285:3,14]
**think** [7:23] [8:23] [15:10]
[42:15] [43:20] [50:20]
[56:21] [58:14] [65:11]
[66:24] [67:7] [68:13]
[73:19,24] [77:19] [84:4]

[91:10] [106:3] [109:21]
[110:22] [111:1,6,8,21]
[113:22] [119:7] [120:24]
[121:7,10,14,18] [123:14]
[135:16] [139:24] [150:17]
[154:1,5] [155:13] [156:11
,18] [157:17] [160:11]
[176:22] [180:10] [181:13]
[184:10] [185:21] [187:24]
[197:10] [203:7] [204:6]
[211:17] [221:16] [224:18,23]
[225:11] [226:11] [228:5,16
,20] [231:12,15,19] [234:24]
[251:24] [252:1] [253:18]
[255:17] [260:4] [261:7]
[268:2,3] [273:12] [277:15]
[279:13,15,18] [281:22]
[282:8,9] [288:2,6,9] [289:
15] [290:18] [292:11] [295:
10,11,15] [296:3,6,11]
[298:4,13,18,21] [299:2]
[301:18] [302:11] [303:2]
[304:6] [307:12,22] [312:18]
[313:16] [314:2] [315:8]
**thinking** [30:20] [110:9]
[311:20]
**third** [3:17] [17:3] [38:13,23]
[44:13,14] [106:1] [110:16]
[156:16,22] [167:12] [172:
6] [174:10] [192:14] [195:12]
[199:10,15,16,19] [201:8,19
,21] [203:15,16] [204:17]
[205:2] [213:5,8] [214:3,15
,17] [219:6] [239:10] [241:6
,18] [246:1,3,8] [248:10,15]
[252:18] [286:15] [288:23]
**thirdparty** [3:17] [239:10]
[286:15]
**third-party** [3:17] [239:10]
[286:15]
**thirds** [241:2,4,16]
**thirdtier** [156:16,22] [199:19]
[201:19] [205:2] [214:15]
[219:6]
**third-tier** [156:16,22] [199:
19] [201:19] [205:2] [214:15]
[219:6]
**thirty** [321:14]
**though** [7:22] [136:12]
[173:23] [183:23] [190:8]
[194:8] [205:19] [252:1]
[286:23] [306:16] [316:8]
**thought** [42:1] [138:18]
[265:8] [277:20]
**thousand** [31:23] [302:19]
**thousands** [39:6,7]
**three** [39:7] [44:12] [65:1]
[74:6,10,11] [78:16] [79:10]
[83:5] [94:24] [161:23]
[162:7] [180:16,20] [186:10]
[189:7,10,13] [215:14,21]
[216:4,10] [217:10,24]
[218:1] [231:8] [232:3,4]
[246:21] [252:16] [279:2]
[280:5,20]
**threelegged** [78:16] [79:10]

**three-legged** [78:16] [79:10]
**threshold** [271:17]
**throughout** [25:7] [64:21] [122:8] [139:14]
**throwing** [301:10]
**thrown** [318:3]
**thus** [34:8]
**tied** [165:19] [167:3] [251:4]
**tier** [38:13,23] [156:1,2] [172:1,5] [174:7,9,10,17,21] [175:17] [176:1,4,9] [177:3] [192:14] [195:12] [199:10,15 ,16] [201:8,21] [203:15,16] [213:5,8] [214:5,17] [229:12 ,21] [230:6,8,12,17,24] [248:11,16] [252:17,18] [309:3] [310:16] [311:2]
**tiered** [155:7,9,18] [156:5]
**tiers** [143:24] [172:6] [252:20] [270:19]
**tiles** [152:8]
**till** [166:9] [190:17] [251:8]
**tim** [153:11]
**time** [5:12] [9:7] [11:4] [25:11] [28:13,16] [36:11,17] [40:18] [44:8,11] [50:16] [51:23] [52:1,2,6] [53:15] [55:5] [56:1] [58:22] [59:19] [61:16,17,18,19,21] [62:15] [63:18,20] [68:16] [69:11,21] [70:5,7] [71:14,17] [76:6] [78:10] [84:8,9,18,24] [85:7] [92:9,22] [94:9,12,16 ,20] [102:11,18] [103:8] [104:6] [106:20] [121:11] [134:14] [135:8,22] [136:17] [142:15,21] [155:11] [161: 24] [162:3,16,21] [163:22] [164:6] [167:19] [168:24] [176:6] [182:6,13] [198:5,7] [212:4,10] [218:10] [227:9 ,11] [230:21] [232:1] [235:1 ,9] [243:6] [268:19] [269:11] [270:7] [272:9] [275:8,10,16] [280:24] [307:9] [313:20] [320:4,9]
**times** [84:11] [89:6] [95:21] [113:1] [116:15] [160:22] [208:17] [220:20] [231:24] [238:13]
**timetested** [142:15]
**time-tested** [142:15]
**tissue** [89:18]
**title** [48:5]
**today** [7:19] [8:5] [12:18] [29:14] [38:15] [52:4] [57:11] [95:17] [98:3] [108:5] [118:5,9] [119:7] [121:5] [134:11] [192:23] [193:16] [214:23] [226:15] [252:4,6] [257:1] [265:9] [272:10] [305:13] [307:6] [313:20]
**todays** [5:11] [320:8]
**together** [96:15] [106:1,2] [125:1] [145:20] [150:16]

[165:21] [166:9] [177:21]
**token** [160:8]
**told** [23:13] [91:10] [102:5] [162:22] [163:23] [167:7,9] [168:13,14,17,21,24] [169:13,14,24] [170:12,16] [178:18] [180:21] [181:8] [206:17,24] [208:11,23] [211:14] [214:13] [216:12] [254:10] [258:1,12] [265:10] [308:9]
**took** [76:15] [130:24] [131:15] [132:10] [157:21] [227:9]
**top** [9:18] [98:19] [106:23] [129:22] [130:3] [204:2] [222:9] [237:21] [241:22] [271:10] [294:3] [296:5] [304:3] [310:11]
**topics** [90:13]
**toptier** [294:3] [296:5] [310:11]
**top-tier** [294:3] [296:5] [310:11]
**total** [31:21] [39:5] [246:7] [270:8] [274:16,17] [302:9] [305:20] [311:3] [312:10,22]
**totality** [273:14]
**totally** [309:2]
**touches** [138:6] [142:13]
**touchy** [70:6]
**towards** [36:5] [100:22] [122:24] [135:12] [250:18]
**tpa** [239:21,22] [240:2]
**tpas** [239:11]
**trade** [122:13,14] [153:22] [280:22]
**traded** [66:23] [306:1]
**tradition** [42:16]
**traditional** [243:1]
**transaction** [207:15]
**transactions** [26:4,9] [68:6] [287:24]
**transcript** [3:12] [272:1,2] [321:15,16] [324:11,18]
**transcription** [323:6]
**transmittal** [113:7]
**transparent** [257:12]
**transportation** [22:16]
**treat** [31:10] [287:20]
**treated** [287:15,17]
**treats** [287:12]
**trend** [234:4] [242:12]
**trial** [120:19]
**tried** [25:19] [74:8]
**trip** [265:15]
**trouble** [167:13] [313:19]
**true** [67:23] [69:11] [102:15] [160:15] [227:2] [291:5] [317:19] [324:5]
**truly** [316:11]
**trust** [143:7,8]
**trusts** [29:22,23,24] [30:1] [34:15] [146:5] [238:14] [241:8,10] [242:13]
**truth** [238:5]
**try** [8:5,13] [9:5] [14:5]

[29:16] [30:15,18] [49:21] [50:15] [119:23] [134:10] [136:10] [160:23] [177:15] [200:22] [217:13] [289:10]
**trying** [9:5] [39:1,23] [50:12 ,23] [53:20] [56:5,10,12] [79:4] [181:11] [183:22] [195:8] [209:17] [214:20] [230:10] [258:14] [264:4] [291:9]
**turn** [16:21] [50:15] [70:12] [94:18] [100:21] [123:10] [130:1] [137:16] [155:1] [215:1] [235:17] [243:24] [245:15] [260:1]
**turned** [113:20] [129:4,5] [133:22]
**turning** [261:17]
**turns** [17:2]
**tweak** [234:22]
**twice** [39:4]
**twothirds** [241:5]
**two-thirds** [241:5]
**twothirdsonethird** [241:2,4]
**two-thirds-one-third** [241: 2,4]
**twotier** [229:8,10,15] [230: 21]
**two-tier** [229:8,10,15] [230:21]
**tying** [165:20]
**type** [27:4] [34:7,20] [58:15] [81:15] [90:19] [135:18] [147:15] [186:8] [190:15] [201:24] [253:10] [254:11] [256:5] [257:2] [270:24]
**types** [25:20] [38:13] [81:1,10] [89:24] [90:15] [221:14] [269:5]
**typical** [258:16] [290:6]
**typically** [34:16] [50:6] [54:10] [186:9,10] [191:10]
**typing** [89:18]
**typo** [266:23]

U

**uc** [43:13]
**uh** [8:8] [13:2] [141:6] [144: 13] [193:5] [221:11] [237:24] [244:7] [260:14]
**uhhuh** [8:8] [13:2] [141:6] [144:13] [193:5] [221:11] [237:24] [244:7] [260:14]
**uh-huh** [8:8] [13:2] [141:6] [144:13] [193:5] [221:11] [237:24] [244:7] [260:14]
**ultimate** [240:9]
**ultimately** [75:24] [80:11] [103:14]
**umbrella** [34:4]
**unclear** [8:12]
**uncommon** [167:3] [169:18 ,20] [170:23] [234:4]
**underlying** [191:2]
**underneath** [218:21]

**understand** [8:10] [19:9] [23:10] [42:7] [56:3] [57:6] [68:13] [79:4] [102:24] [115:1] [117:23] [146:4] [148:4] [150:15] [159:19] [167:5] [183:10,17] [195:9] [197:2] [209:13] [216:2] [226:20] [227:5,10] [228:3 ,6] [230:11] [258:14] [264:15] [280:7] [282:14] [286:20] [287:11]
**understanding** [40:1] [56:6] [67:5] [97:13,16] [117:19] [145:6] [147:23] [148:10] [152:6] [156:19] [165:2] [168:18] [169:11] [174:11] [202:7] [211:5,6] [219:3] [236:10] [245:8,13] [251:2] [252:8] [253:19] [256:24] [258:15,21] [287: 7] [289:4]
**understood** [42:11] [114:11] [119:10] [214:22] [227:9,12 ,14,17,18]
**undertaken** [9:16] [21:11] [192:2] [255:20]
**underwriter** [78:13] [239:15 ,24]
**undisputed** [273:7]
**undue** [17:7,8]
**unfairly** [158:16] [159:20]
**uninsured** [243:21]
**union** [34:13] [238:8] [239: 17] [240:9] [262:14,19] [263:24] [292:2]
**unions** [29:23] [34:14] [35:15] [262:15]
**unique** [127:16] [229:21] [230:9] [264:10]
**unit** [10:14] [310:8,11]
**united** [1:1,18] [5:8] [14:21] [15:4,20,22] [16:18] [18:6] [25:18] [76:22] [77:12] [97:2]
**units** [302:17] [310:13,15]
**universe** [106:5]
**university** [53:7,12] [150:4]
**unless** [9:7] [60:13] [119:17] [205:20] [230:9] [324:20]
**unusual** [169:12] [172:21] [207:5] [210:20]
**upni** [14:21] [19:7] [93:12]
**upon** [110:10] [151:9] [167: 15] [168:17,21] [180:13] [193:14] [195:14,15] [213: 17] [248:14] [319:23]
**upper** [282:21,22]
**uptake** [185:5]
**us** [11:6] [29:10] [30:23] [44:22] [55:22] [56:9] [62:8] [70:21] [79:17] [80:9] [108:5] [109:5] [112:23] [122:23] [181:8] [193:21] [209:4] [227:8,9]

[254:10] [266:7] [284:17]
[307:6] [311:6] [319:14]
**usage** [68:22] [69:1]
**usc** [52:17] [53:6,10,15]
**use** [32:9] [35:12] [48:2]
[59:13] [62:8] [63:7] [67:8,13]
[69:5,11,24] [140:16]
[142:4,22] [144:10] [152:2]
[157:5] [160:22] [162:4]
[174:20] [225:16] [234:22]
[252:6,9] [263:2,6,7] [270:
23] [277:18] [279:17] [294:
19]
**used** [9:1] [18:17,19] [29:16]
[69:5,20] [73:7] [109:23]
[124:19,21] [125:13] [127:
5,10] [139:20] [140:5,8]
[143:14,18] [144:6] [149:7
,16,17] [153:4] [239:18]
[240:8] [251:3] [267:15]
[310:7] [321:17]
**useful** [280:1,4]
**user** [237:14]
**using** [23:2] [60:16] [61:5,23]
[63:18] [70:5] [99:5] [227:19]
[233:11] [239:16] [271:14]
**usual** [206:18] [215:12,15,16]
[216:9] [217:12,22] [222:4
,13,17,19,21]
**usually** [24:14] [27:7] [34:11]
[93:16] [94:15] [95:5]
[140:5] [212:14] [215:10]
[257:14] [258:3] [310:16,20]
**utilization** [69:16]

V

**valley** [88:10]
**valuation** [306:4]
**value** [246:10]
**values** [158:1]
**variables** [248:17]
**varied** [69:3]
**varies** [241:6]
**variety** [171:17]
**various** [13:3] [47:22] [49:4]
[77:14] [147:10] [196:15,16]
[208:17] [227:20] [232:22,23]
[238:6,7] [289:8]
**vast** [17:9] [262:8] [271:15]
[296:2]
**vendor** [22:15,18,21] [24:4
,6]
**vendors** [124:23]
**verbally** [8:7]
**verbiage** [112:4] [122:3]
[128:22] [129:10] [159:12]
**verified** [147:9]
**verify** [145:14]
**versus** [5:8] [8:19] [69:20]
[71:10] [92:22] [155:23]
[206:3] [213:4] [214:3]
[229:19] [240:14] [248:10]
[258:18] [274:3] [286:9]
[301:4] [303:10] [312:16]
[313:3]

**viagra** [55:20]
**vice** [70:14]
**victor** [43:11]
**videographer** [2:] [5:5,14]
[6:6] [84:23] [85:6] [133:6,8]
[134:13] [135:7,21] [136:3]
[182:5,12] [212:3,9] [234:16]
[275:7,15] [320:7]
**videotape** [1:12] [5:6]
**view** [153:24] [219:22]
[221:13] [225:4,10,13]
[226:16] [227:14] [228:8,21]
[273:5] [293:11,12,16]
[294:1] [295:5,12,19]
[296:1,19] [297:23]
**viewed** [305:17]
**viking** [115:11] [219:15]
**virtual** [45:15]
**virtually** [39:17]
**visit** [21:8] [116:11] [166:8]
**visited** [24:7] [65:15] [84:10]
[96:16] [116:14] [164:14,15]
[207:2] [208:16] [210:21,24]
[211:2] [292:24]
**visits** [33:15]
**vista** [7:3]
**voice** [233:18] [234:21]
**volume** [310:6]
**vp** [71:23]
**vs** [1:]

W

**wacker** [2:9]
**wait** [47:14]
**waits** [48:21]
**walk** [203:20] [260:4]
**walked** [96:15] [199:14]
**walks** [204:22]
**wall** [159:16,18] [207:13,17
,18] [211:19]
**walls** [264:3,4]
**walter** [207:3] [210:16]
**want** [7:8] [8:16] [18:15]
[27:18] [39:16,24] [49:5,15]
[56:2,3] [58:7] [59:16,17]
[60:14] [85:10] [104:21]
[134:10] [146:12] [150:14]
[154:21] [162:18] [167:11]
[170:14] [175:3,4] [197:1]
[205:20] [209:4,6] [221:8]
[233:9] [234:8] [276:16]
[288:3] [292:10] [317:6]
[319:23]
**wanted** [57:21] [59:2] [73:15]
[102:19] [104:15] [107:11]
[109:18] [110:6] [111:12]
[119:18] [140:16] [141:2]
[227:23] [243:4] [252:16]
[268:16] [276:21]
**ward** [2:8] [6:4] [106:18,19]
[266:12,21]
**warehouse** [30:12] [191:21]
**washington** [206:15]
**wasnt** [57:4] [59:11] [60:11]
[63:2,20] [103:11] [119:18

,22] [158:20] [166:20] [168:
9] [179:21] [195:20] [226:9]
[230:23,24] [233:16] [252:
12] [313:7] [319:5]
**water** [275:5]
**ways** [83:19] [150:23]
[229:14]
**web** [12:1] [16:18] [37:4]
[149:9,10] [150:17] [152:20]
[220:18]
**webmd** [58:22,24]
**website** [55:13]
**websites** [45:18]
**weekend** [226:14,18]
**weekly** [137:14,15] [138:12]
**weeks** [63:12] [67:19]
[94:19,24] [102:8] [193:3]
**weight** [55:20]
**well** [8:1,9] [23:5,9] [24:14]
[27:7,23] [30:21] [33:17]
[34:5] [38:15,20] [44:1]
[50:22] [51:3] [57:4] [58:20]
[62:9,14] [67:12] [68:6]
[73:16] [83:12] [84:6]
[87:12] [93:12,21] [95:20]
[103:12] [104:19] [105:6]
[109:21] [116:14] [117:5]
[120:1,24] [126:10] [129:13
,20] [131:2,20,22] [140:12,22]
[158:24] [159:2] [160:19]
[169:7] [177:7] [179:11]
[181:4] [184:3] [185:16]
[186:2] [187:13] [193:21]
[195:22] [196:10] [198:1,14
,22] [203:8] [205:14] [208:21]
[209:24] [213:15] [216:15]
[220:18] [221:5] [225:9]
[226:22] [228:4,9,16]
[234:8,9,10] [236:18]
[244:16] [245:11] [246:5]
[247:9,10] [255:7] [259:24]
[263:5] [264:13] [265:14]
[266:23] [268:4,13] [269:8]
[271:22] [272:18,22] [273:
17] [276:10] [283:1,20]
[284:24] [289:24] [294:2,13]
[296:1] [298:1] [302:6]
[314:8] [318:5]
**went** [21:2] [24:7,22] [37:4]
[40:9] [62:21] [67:10,16]
[68:6] [108:23] [119:4]
[120:7] [121:18] [137:7]
[161:11] [202:15] [231:11]
**werent** [91:20] [99:23]
[195:13] [254:22] [268:4,7]
[276:24] [277:4]
**west** [2:9]
**western** [1:3]
**weve** [7:10] [8:23] [14:19]
[29:16] [34:8] [41:2,9,11]
[63:17] [72:5] [111:11]
[147:17] [160:21] [166:13]
[180:17] [185:19] [190:17]
[197:3] [226:15,18] [228:15
,16,18] [245:7] [247:9]
[267:7] [307:6]

**whatever** [38:1] [49:13]
[108:2] [110:9] [215:13]
[216:9] [231:13] [243:9]
[265:3] [308:15]
**whats** [7:2] [16:12] [27:5]
[50:11] [52:14,20] [53:23,24]
[74:20] [94:13] [95:8]
[100:13] [106:8,23] [149:1]
[154:12] [159:6] [161:18]
[165:2] [190:21] [206:1]
[214:12] [220:13] [269:18]
[290:17] [299:11,13] [300:
21] [301:23] [304:19,21]
[305:21,22] [318:8]
**whatsoever** [223:14]
**wheelchairs** [24:16]
**wherein** [78:17] [294:15]
[317:18]
**whereupon** [5:2] [11:18]
[16:8] [70:24] [85:3] [87:23]
[100:9] [105:14] [128:1]
[134:16] [135:4,24] [152:13]
[175:9] [182:9] [212:6]
[218:3] [220:9] [234:13]
[259:10] [275:12] [277:8]
[320:12]
**whether** [22:20,23] [32:2,12
,20] [39:2] [40:3] [45:23]
[62:10] [67:2] [69:19]
[70:2] [73:20] [75:7] [136:6]
[140:7] [143:18] [144:22]
[145:10,21] [150:21] [153:
14] [156:15,21] [170:9]
[171:3] [172:22] [173:9,22]
[174:1] [175:15] [178:6,21]
[180:5] [181:3,9] [182:17,18]
[184:17,20] [185:11,14]
[187:2,16] [188:4,11,13,21]
[189:5,9,18,19] [191:5,10]
[192:8,13] [193:23] [194:3
,4,5,11] [195:10] [198:19]
[199:10,17] [203:3] [216:4]
[219:23,24] [220:2] [225:8]
[226:3,4] [229:11] [230:15]
[232:6] [242:1] [248:14,19]
[249:3] [250:22,23] [251:5]
[252:21] [253:2,5,11]
[255:14,23] [256:20] [257:
1,5] [262:9] [274:2] [280:7,10
,12] [283:6] [285:23] [286:3]
[288:11] [289:8] [290:9]
[295:9] [308:2] [311:10]
[313:8] [316:20] [317:6]
**whichever** [204:15]
**whipping** [271:2]
**whoever** [262:19]
**whole** [29:20] [40:10] [69:4]
[109:18] [172:19] [189:16]
[204:4] [208:15] [269:2]
[309:1]
**wholesale** [125:6] [137:20]
[203:24] [235:20]
**wholesaler** [22:20] [24:11,21]
[147:3]
**wholesalers** [97:3] [117:9]
[130:7]

**whom** [5:20] [194:18] [207: 9]

**whos** [28:23] [30:13,16] [43:12] [148:5] [164:17] [165:7] [173:24] [236:21] [317:23]

**whose** [76:10] [177:23] [178:17]

**why** [18:14] [37:12] [42:11,13] [45:12] [54:6] [68:14] [72:9,10] [92:13,21] [95:6] [99:19] [103:21] [104:2,14] [112:14] [113:18,23] [120: 22] [125:12,15] [127:3,9,22] [138:13,14] [193:1] [207:21] [224:10] [226:11] [237:12] [242:12] [254:21] [262:24] [272:24] [279:10] [285:22] [286:6] [290:18]

**wide** [60:15]

**widearea** [60:15]

**wide-area** [60:15]

**will** [6:7] [7:24] [22:14,17,19 ,21] [27:19] [30:6,16] [32:19] [45:19,20] [46:5,10] [53:3] [78:1] [79:18] [84:5] [98:15] [99:12] [105:1] [109:3] [113:12] [154:15,16] [174: 6] [175:2] [184:13] [185:14] [195:4] [200:6] [240:20] [242:9] [260:13,17,22] [261:22] [262:1] [270:21] [301:4] [303:4] [308:3] [309:10] [321:11]

**winston** [2:]

**wireless** [61:3,5]

**wise** [1:17] [6:7] [324:]

**withholding** [209:21]

**within** [9:21] [10:1,16] [18:22] [23:21] [29:14] [31:3,6,14] [32:15,17] [33:24] [34:3,5] [46:9] [47:7,9] [48:5] [49:6,23] [50:18] [61:4,5] [62:11] [73:13] [77:8] [97:1] [99:6] [103:19] [104:4] [110:20] [113:12] [142:24] [143:3] [147:21,22] [148:1] [151:10] [152:8] [154:12] [171:10,13] [172:16,19,23] [174:3,13] [177:2] [178:19,23] [180:22] [181:1,2] [182:1,22] [184:1 ,7] [186:13] [187:2,5] [190: 18] [191:11,23] [193:12] [194:6] [196:2] [198:24] [205:21] [207:20] [223:23] [224:2] [228:23] [232:23] [236:19] [241:19] [242:15,18] [243:14] [257:13] [271:12] [284:3] [286:17] [298:17] [309:4] [314:13,19] [321:14]

**without** [17:8] [133:2] [140:18,19,20] [158:7] [185:18] [231:2] [241:23] [287:7]

**witness** [4:2] [6:8,16] [9:4]

[15:12,14,17] [84:22] [91:10] [97:11] [107:14] [116:6,11] [127:13] [209:24] [216:23] [270:1] [275:1,4] [318:10] [319:24] [321:1] [324:4,6,9]

**witnesses** [116:19] [306:17]

**women** [32:13]

**womens** [310:20,23] [311:3 ,9]

**wondering** [72:9] [185:9] [312:13]

**wont** [60:13,23] [185:14] [186:18] [205:19] [234:10] [247:18]

**word** [77:16] [122:2] [141:20 ,21] [158:20] [174:20] [205:1] [266:15] [314:24]

**words** [106:22] [128:22,24] [234:22] [242:3,5] [268:21] [271:12] [287:13] [288:3] [308:5] [311:11]

**work** [8:9] [11:1] [13:16] [21:19] [30:10] [35:16] [43:17] [45:18] [57:20] [58:24] [59:14] [60:4,21,24] [70:9] [86:4] [95:4,24] [104:5] [122:20] [126:12] [133:10,15,21] [134:4] [187:20] [195:15] [198:15] [199:22] [200:1] [211:15] [250:9] [264:8,11]

**worked** [29:20] [59:12] [61:14,15] [62:16] [92:4] [103:6,17,18] [122:8] [124:24] [126:16,20] [136: 16] [147:20] [199:9] [212:14] [223:12] [229:17]

**working** [9:23] [10:19] [11:6] [14:22] [35:6] [52:16] [53:6] [61:13] [92:5] [96:13] [97:10] [101:13] [102:5] [117:22] [135:12] [143:6,8] [146:3] [233:11] [292:14]

**works** [11:3] [14:13] [25:1] [61:21] [93:18] [97:21] [145:24] [147:4] [151:19] [152:11] [199:24] [202:7] [216:8] [219:10] [225:7,24] [226:16,20] [228:21] [243: 23]

**world** [149:7] [200:1] [280:6] [292:6]

**wouldnt** [35:15] [58:8] [73:14] [84:16] [110:23] [125:23] [188:6,17,20] [202:16,17,21] [225:17] [256:21] [274:20] [276:16] [314:14] [315:18]

**wound** [109:22]

**write** [70:8] [73:1] [108:23] [109:8] [128:18,24] [200:16 ,20]

**writes** [137:12]

**writing** [68:18,19] [109:23] [139:20,22] [200:22]

**written** [49:20] [121:21]

[123:4,5] [138:23] [149:11] [199:1] [223:20,22] [225:14] [226:4]

**wrong** [35:10] [209:22] [268:3]

**wrote** [87:8] [121:24] [128:12 ,16,24] [129:4,5,9] [130:9,12] [158:24] [224:4] [252:23]

**wye117064** [106:12]

**wyeth** [1:] [2:11] [5:8] [6:3,5] [8:19] [71:10] [96:22] [99:4,13] [109:17] [112:3] [116:3] [157:9] [196:12] [234:2] [248:7] [249:3,7] [252:22] [253:15] [269:6] [273:1,2] [274:2,15,18] [283:7,17] [284:12] [285:9 ,12,16,21] [286:8] [287:7] [302:15] [313:3,11]

**wyethayerst** [1:] [2:11]

**wyeth-ayerst** [1:] [2:11]

**wyeths** [110:17] [157:6] [227:14] [248:6,13] [250:11] [253:8] [283:5]

—————

Y

—————

**year** [10:20] [13:15] [17:15] [31:24] [41:3] [44:7] [82:19] [96:2] [157:5] [158:1] [167:19] [258:7] [281:1] [300:3] [302:1,15]

**yearly** [316:11]

**years** [7:7] [10:1,23] [13:13] [52:12] [70:20] [78:2] [87:7] [89:7] [103:15,17] [143:14] [156:7] [161:23] [162:7] [164:7] [169:12] [231:9,18] [242:11] [252:4 ,10,12] [280:20] [281:8]

**yes** [13:11] [17:11] [25:23] [26:1] [39:10] [40:2,24] [41:7] [52:5,15] [55:4] [63:24] [64:2] [65:20] [66:8] [70:6] [71:8,18] [75:8] [80:6] [83:10] [87:14] [91:13] [95:7] [96:4] [98:6,20] [99:18] [101:4] [106:11] [107:17] [108:7] [111:6,21] [112:9] [113:9,21] [114:16 ,21] [116:5,13] [123:13,22] [126:22] [132:9] [134:3,12] [137:4] [138:2,22] [141:12] [142:10] [148:13] [157:23] [159:6] [162:5,11] [163:19] [167:18] [168:2,20] [171:7] [172:17] [173:8] [177:10] [179:14] [180:18] [183:20] [184:15] [192:3] [193:10] [197:17] [200:4,13] [201:3] [203:6] [205:6,8] [210:10,18] [212:23] [221:17] [222:11,15] [223:7] [224:15] [226:9] [231:22] [233:13] [234:24] [241:20] [247:16,19] [248: 2,3,18] [249:6] [250:7]

[251:1,16] [254:2,15,16,23] [256:18] [257:22] [260:10,20] [261:11,21] [262:11] [264: 3,6,16,21] [267:19] [269:17] [270:10] [272:11] [276:9] [278:1,22,23] [282:14] [283:19] [285:2] [288:18,20] [289:6,12] [293:5] [294:22] [295:1,21] [309:15] [311:22] [314:8] [315:2] [317:16]

**yesterday** [118:12,21] [265:16]

**yet** [11:15] [16:6] [20:1] [29:8] [194:9] [202:24]

**youall** [315:20]

**you-all** [315:20]

**youd** [54:24] [91:14,15] [150:21] [184:12] [248:10] [286:18] [302:21]

**youll** [28:2] [75:10,11] [86:2] [143:21,22] [154:13] [260:12]

**youre** [12:23] [13:10] [15:2] [20:23] [23:1,2] [25:7,12] [26:14] [27:6] [28:18] [40:3] [42:5,8] [49:5] [50:12] [53:6] [58:11] [69:7,8,9] [80:15,20] [81:1] [82:3] [90:3] [92:9,22,23] [95:17] [108:4] [116:10] [122:21] [123:21] [125:5] [128:7] [132:4] [140:12] [142:8] [150:15,16] [156:14] [157: 4] [175:24] [176:21] [181:21] [183:4,6,13,16] [185:21] [187:10] [189:22] [190:7,8 ,11,12,13,14] [192:18] [193:20] [197:6] [200:12] [203:12] [209:4] [213:11] [218:10] [224:11] [234:18] [236:13,14] [240:19] [249: 1] [250:13] [252:15,16] [254:4,10] [256:8] [263:3,6] [272:9] [284:5,24] [285:3] [288:2,9] [293:19] [294:12] [295:18] [301:10,14] [306: 6,14] [307:12] [313:19] [317:23] [318:14] [319:19]

**yourself** [20:14] [46:1] [145:20] [171:2] [180:5] [183:22] [187:11] [225:10,13]

**yourselves** [5:20]

**youve** [7:9] [8:17] [9:16] [27:13] [34:19] [35:17] [41:6,8] [43:7] [51:8] [54:1] [63:18] [71:14] [72:5,7] [75:4] [89:10] [93:2] [99:2] [111:5,6,8] [114:23] [129:22] [130:6,7,8] [133:12,17] [141:8,9,15] [142:20] [145:11] [145:17,18] [148: 8] [151:4] [160:17,22] [173:7,10] [178:20] [180:7 ,20] [181:8] [186:19] [187:20] [191:3] [192:2] [197:6] [202:8] [206:24] [209:3]

**5/18/2004  Gibson, David**

[213:15] [223:12,17] [244:5
,23] [261:14] [264:2] [267:4
,17] [272:19] [273:22]
 [285:18] [290:24] [311:5,8]
 [315:15] [318:3] [319:14]

---

Z

---

**zero** [271:13]
**zeroing** [201:23] [203:2]