# Expert Report

David J. Gibson, M.D.

Duramed Pharmaceuticals Inc. vs. Wyeth-Ayerst Laboratories, Inc., Civil Action No. C-1-00-735, In the United States District Court for the Southern District of Ohio



# Scope of Work and Qualifications

I was asked to prepare a report in order to provide an expert perspective on how the restrictions of formulary listings by major managed care organizations affect the prescribing behavior of physicians. Specifically, I will analyze the consequences of Cenestin being excluded from substantially all major managed care formularies from Cenestin's market introduction in 1999 to the present.

Duramed Pharmaceuticals, Inc. has retained me at a rate of $300 per hour for my time on this project. I have not testified in the past as an expert at trial or in deposition.

In preparing this report:

1. I reviewed the medical literature as to the effect formularies have had on the prescribing patterns of physicians in managed care.

2. I consulted with my peers in practice in multiple markets across the country.

3. I reviewed the weekly activity report summary from Cardinal Market Force, Duramed's subcontracted detailing company. These reports chronicled the responses from physicians to Cenestin as it was introduced in the market.

4. I selectively reviewed some of Wyeth's documents that dealt with the issue of formulary structure.

5. I drew upon over 30 years of experience in the clinical practice of medicine, Medical Group Practice Management, HMO development and management, consulting activities and PBM medical directorship.

My background is detailed in the attached curriculum vitae (see Attachment A). As an overview, I am a board certified internist with a subspecialty in Rheumatology. I have practiced medicine for over 30 years and have held position of chief executive officer (CEO) at 3 different health maintenance organizations (HMOs). I have been the CEO of an 800-physician multispecialty group practice (the UCLA Group Practice). I have been the Vice President of a major health insurance underwriter (Met-Life) with budget responsibility for over $1.2 billion per year in health care spending. I have served as the chief Medical Officer - insurance products for a major hospital corporation (Sutter Health). In addition, I have chaired the Pharmacy & Therapeutics Committee at a managed care organization (Omni) and at a pharmacy benefit manager (Pharmaceutical Care Network).

I presently have a consulting practice specializing in information technology and pharmaceutical distribution. I was the Medical Director for CASIO Corporation's vertical development group in San Jose. This unit specialized in personal data appliances (PDAs) in a local area network (LAN) wireless environment. Specifically, our group was tasked to facilitate the generation of prescriptions by physicians on a PDA in a wireless environment. Part of this assignment included the development of RxPhysician.com.

RxPhysician.com developed, with CASIO's technical assistance, a working wireless product used for prescribing which was installed in both the Santa Barbara Clinic in California and the Straub Clinic in Hawaii.

I have also worked on a retained basis with multiple software companies that have developed products for the medical environment. Some of these companies are: Software AG out of Germany; IKON Software development in Tucson AZ; STAR Information Technology Corporation, divine Software – a software development and integration company in Chicago.

My consulting practice has also involved the pharmaceutical distribution market. I have served as Longs Drug Stores chief medical consultant, strategic advisor to RxAmerica – a pharmaceutical benefits manager (PBM) joint owned by Longs and Albertsons, and now serve as the Medical Director for Pharmaceutical Care Network (PCN) – a PBM owned by the California Pharmaceutical Association.

I have listed the publications I have authored in the preceding ten years in **Attachment B**.

June 25, 2002<br>Page 4

# The Exclusion of Cenestin from Managed Care Organization Formularies and the Effect.

## Managed care's dominance of the health care market

**The pre-managed care market:**

Prior to the mid-1980's managed care played a marginal role in health care underwriting. Indemnity insurance covered most of the employer sponsored health insurance benefit market and managed care was not a factor in government entitlement programs at either the state or the federal level.

Physicians cared for their patients and prescribed pharmaceuticals based upon their experience and training. While physicians were "detailed" by most of the brand pharmaceutical manufacturing companies' sales forces, there were no physician-directed or health insurance company financial inducements to preferentially select a particular drug.

Patients took the physician's prescription to the pharmacy and the pharmacist dispensed the drug. Pharmacies stocked products based upon the prescribing patterns of the physicians in their immediate market. Pharmaceutical manufacturers played little role in influencing the inventory carried by dispensing pharmacies.

Frequently, pharmacists and physicians would confer concerning the most appropriate drug to administer to the patient. The patient then paid for the medication out of his or her own pocket.

**The managed care dominated market:**

Starting in the later half of the 80's, managed care evolved into the dominant form of underwriting in both group health coverage and much of the state and federal entitlement markets. In 1976 there were six million people enrolled in HMOs. By 1995 that number had reached 58.2 million.[1] In 1960 public and private expenditures on health care amounted to $26.8 billion; by 1994 this amount had grown to $949.4 billion. Spending for pharmaceuticals accounted for 8.2% of this total.[2]

---

[1] Medical Interface's Facts & Figures, Bronxville, New York, Medicom International 1996.
[2] Medical Interface's Facts & Figures, Bronxville, New York, Medicom International 1996.

This rapid inflation in medical spending, relative to the general consumer inflation rate, caused a paradigm shift in healthcare insurance from fee-for-service reimbursement to a managed care dominated market.

This transition introduced a third party whose financial performance was dependent upon confining the decision-making parameters for both physicians and pharmacists. Neither the prescriber nor the dispenser of medications worked solely for the patient any longer. They also answered to MCOs with management structures that became more complex and distant each year.

# Prescribing Medications in the Managed Care Environment

Over the past two decades, the business environment in healthcare has been transformed into a complex and, for the physician, incomprehensible third party payor system. Insurance intermediaries have launched complex managed care products, including a wide variety of pharmacy benefits structures, into the market. These intermediaries then turn to the physician and expect him/her to manage these benefits in the ambulatory environment without any information system infrastructure to accomplish this assignment.

## How the pharmacy benefit is structured

The National Drug Code Directory[3] lists fourteen major drug classes with each containing multiple subclasses. Over fifty-one thousand drug products are listed in this classification system.[4] Between 1975 and 1999, 548 new chemical entities were approved by the FDA as prescription drugs.[5,6]

Formularies are organized by the classes and subclasses described in the National Drug Code Directory. Each formulary must provide at least one medication for each of these classifications. Any of these "favored" drugs is subject to change based upon the PBM's contractual relationships with the various manufacturers. In fact, any printed formulary that is distributed to physician offices by an insurance company is often out dated the month it is delivered. The "favored" drugs are generally different for each PBM and often for each client the PBM serves.

---

[3] The NDC System was originally established as an essential part of an out-of-hospital drug reimbursement program under Medicare. The NDC serves as a universal product identifier for human drugs. The current edition of the National Drug Code Directory is limited to prescription drugs and a few selected OTC products
[4] The major drug class is a general therapeutic or pharmacological classification scheme for drug products reported to the FDA under the provisions of the Drug Listing Act. The classification scheme used was based on the AMA DRUG EVALUATIONS SUBSCRIPTION and generally follows the organization of material in that publication. The drug class for each product was determined by the labeled indication.
[5] Safety of Newly Approved Drugs: Implications for Prescribing; Robert J. Temple, MD; Martin H. Himmel, MD, MPH; JAMA / volume:287 (page: 2273);May 1, 2002
[6] Timing of New Black Box Warnings and Withdrawals for Prescription Medications; Karen E. Lasser, MD, MPH; Paul D. Allen, MD, MPH; Steffie J. Woolhandler, MD, MPH; David U. Himmelstein, MD; Sidney M. Wolfe, MD; David H. Bor, MD; JAMA / volume:287 (page: 2215); May 1, 2002

From the physician's perspective, formularies represent an incomprehensible listing of drugs that are "favored" by the underwriter of the pharmacy benefit. From the physician's perspective, formularies are not intuitive. That means that different drugs are "favored" not based on data in the peer-reviewed literature but based on business considerations.

A recent study shows that physicians generally deal with more than six different drug formularies daily.[7,8] Each formulary has different excluded drugs and different "favored" drug. The practicing physician cannot know the "favored" drug along with the co-payment structures for thousands of different major and minor drug classes.

Even if the physician tried to master this formulary information, the individual formularies change monthly. Thus, if an insurance company's formulary is even available, the information is contained in an outdated paper based data repositories in the physician's office. The bottom line – few physicians have the time or the resources to remain current as to which drugs are on each of the formularies. Thus, physicians tend to prescribe from a limited list of drugs. These drugs are known to be present on the major insurance company formularies with which the physician interfaces on a daily basis.

## The prescribing process

Managing the dispensing and use of pharmaceuticals represents a major time commitment for physicians in practice. A typical primary care doctor writes as many as 30 prescriptions or more daily and handles an equal number of prescription renewals.[9]

Within managed care, the prescribing process can best be described as pain avoidance for most practicing physicians. The average primary care physician spends 40 minutes a day on managed care (mostly around referral and prescription issues).[10]

Both formulary compliance calls and renewals, usually triggered by a call from the pharmacist, are particularly time consuming. Sixty-one percent of doctors who were questioned said insurance plans (MCOs/PBMs) denied coverage for a prescription drug for one of their patients on a weekly basis.[11] Studies of doctors' offices[12] found that nurses on average spend 80 percent of their time handling prescriptions. For doctors, the average is 30 minutes or more per day.[13]

More than half of the clinical calls to doctors concern pharmacy issues centering upon refills and formulary issues.[14] To handle a pharmacy call, the physician's staff must pull the

---

[7] *Minnesota Medicine*, January 2001/Vol 84.
[8] *Minnesota Medicine*, January 2001/Vol 84.
[9] Proprietary data (various dot.coms, RxPhysician.com, IMS & various PBMs).
[10] *The Western Journal of Medicine;* March, 2001.
[11] Studies of doctors' offices by Merck-Medco, 1998
[12] Studies of doctors' offices by Merck-Medco, 1998
[13] *Hospitals & Health Networks*, Michael Menduno, July 1999.
[14] *Hospitals & Health Networks*, Michael Menduno, July 1999.

patient's chart. On average, every chart in a doctor's office is pulled 6.5 times each year. Each chart pull generates 3 hours of overhead and costs $5 to $7 per hour.[15]

Traditionally, PBMs have used mailings, faxes and phone calls to contact doctors. Merck-Medco Managed Care made about 2 million phone calls to doctors' offices last year in the course of managing 322 million prescriptions, according to the company.

Prescribing a non-"favored" drug will produce significant discomfort for a practicing physician. He/she will often receive a phone call from the dispensing pharmacist usually informing him/her that his/her impatient patient is standing at the counter and the medication the physician prescribed is not covered. To get the patient the non-covered drug he/she prescribed, the physician must fill out a "prior-authorization" form and send it to the PBM processing the pharmaceutical claim.

Because each PBM or MCO has a different form, most physicians do not have the right form in their office. Getting the form requires calling the PBM and having them fax the form to the physician's office. Unless the form is fully and accurately filled out, the claim is denied. Given the above, over 93% of practicing physicians indicate that it is either difficult or extremely difficult to obtain coverage for a non-formulary drug for their patients.[16] As a result, most physicians are exasperated by the time they are required to dedicate to PA paperwork. Physician are reporting that they now routinely fill out up to 10 PA forms a day.[17,18]

Community pharmacists, who are on the receiving end of this transaction, complain about the administrative burden of PA programs as well. On average, a supermarket chain pharmacy spends 2.15 minutes and an independent pharmacy spent 2.97 minutes just on rejection resolution for each prescription that required a PA.[19]

In addition to all of the above difficulty, if physicians consistently prescribe off formulary, they are classified as poor performers in the "Physician Prescribing Profile" kept by the PBM. When a physician is identified as "non-compliant", he/she is targeted for educational visits by the PBM or de-listing (loss of contract) by the MCO. For example, PCS Health Systems employs 130 clinical specialists, 100 of them hired during 1998, to visit physicians nationwide.[20]

All of the above equates to pain for the physician. Since no human being can keep up with all the variables that go into formulary maintenance described above, the physician tends

---

[15] *Hospitals & Health Networks*, Michael Menduno, July 1999.
[16] *Minnesota Medicine*, January 2001/Vol 84.
[17] Robb N. Some suffer adjustment pains as Blue Cross changes drug-benefit program on East Coast. Can Med Assoc J 1995; 153(3): 339-41.
[18] Health Edition Newsletter. Merck Frosst Canada Inc., September 22, 2000; 4(37): 1.
[19] Herrier RN, Spencer JR, Davis CD. Case study using descriptive analysis to estimate hidden costs in processing third party prescriptions. J Am Pharm Assoc 2000; 40(5): 658-65
[20] Dealing with PBMs - The problem of rising prescription drug costs won't be abating any time soon. And PBMs won't be backing off -- whether doctors like it or not; Carolyn Hirschman, *AMNews*; June 28, 1999.

June 25, 2002
Page 8

to identify the drugs he commonly prescribes (generally 20 to 40 medications)[21] based on whether they are included in the major contracts they service.

## Physicians and the Prescribing Process[22,23]

A comprehensive evaluation of the physician's view of the prescribing process was performed by California Health Decisions with their publishing the results of their research in June of 2001.[24] Attachment C lists the project partners involved in this research project.

The report examined a series of issues including physicians experiences when prescribing medications. The following information, extracted from this report, deals with this issue.

### Formulary issues pose concerns for the majority of physicians surveyed.

The specific concerns cited include obtaining approvals for formulary exceptions, named as a "major problem" by nearly 68 percent of those surveyed. In addition, access to formularies for specific health plans is named a "major problem" by nearly two-thirds of physicians surveyed. More than one-third of physicians named "formulary restrictions" as the greatest source of frustration when asked to describe, in their own words, barriers or problems they experience with respect to prescription medications.

In an open-ended portion of the interview, physicians were asked how the formulary process could be improved. Several expressed the wish that formularies could be broadened to include more medications. "The formularies need to be opened up quite a bit to give more leeway to the physician," was one comment.

In addition, providers would like to have readier access to health plans when formulary questions arise. "Waiting time for approval" was cited as frustrating, as was inability to reach the plan in a timely manner. As one physician put it simply, "Please answer the phone." Another physician would like to "speak directly to the doctor who is making the decisions" when coverage for a particular medication is at issue.

---

[21] Proprietary data (dot.coms, RxPhysician.com, IMS & various PBMs).
[22] California Health Decisions' (CHD's) Healthcare 101 project. The purpose of the report is to describe survey research conducted with 81 California primary care physicians. The analysis examines their views on prescription medication issues and identifies differences and similarities among physician and consumer opinions.
[23] The Seattle-based firm Endresen Research was commissioned by CHD to participate in designing the survey and to carry it out. A total of 1,154 primary care physicians received a letter from CHD explaining the research and inviting them to participate in an 18-minute phone survey. A total of 81 physicians completed the survey (7 percent response rate). The survey sample included physicians from northern and southern California who contract with PacifiCare, Blue Shield, and HealthNet, as well as those employed by Kaiser Permanente.
[24] California Health Decisions (CHD) is a non-profit organization dedicated to involving the public in policies and practices decisions that affect their healthcare. CHD, which is affiliated, with American Health Decisions, was founded in 1985.

June 25, 2002<br>
Page 9

Finally, several physicians remarked that keeping up with multiple formularies is burdensome, and suggested that standardization among plans, regions, or medical groups would smooth the process. "It takes too much time to go through individual listings from separate companies," noted one provider.

Online access to formularies was also suggested as a means of determining, quickly, whether a patient's health plan covered a particular medication.

## The Effect of Formulary Exclusion on Cenestin

Cenestin was systematically excluded from virtually all managed care formularies as a direct result of "The PREMARIN® Preemptive Plan." This Plans was designed and implemented by Wyeth. The importance of formulary inclusion and positioning is well documented within the papers produced in this case. I cite the following as examples:

- (CM:00528) – "Dr. Ellerman, who sits on the formulary Board for Oxford Health Plan, stopped Rxing Cenestin because it was denied by his formulary...Prescriptions for Cenestin are now being denied by formularies in NJ and NY."
- (CM:0264) – Dr. Minton had had "24 prescriptions rejected at the pharmacy level." This produced significant disruptions in his office operations. The physicians providing care under contract to American Airlines in Dallas were likewise "having their Cenestin prescriptions rejected as well."
- (CM:0264) – the following health plans in Dallas were not approving any scripts for Cenestin: Harris Methodist-regional; Prudential-national and regional; Pacificare – regional and national; Kelsey-Seibold-regional; Scott and White – regional; Wal-Mart – national.
- (CM:00511) – "Cenestin is only on 2 formularies in all of Southern California. The physicians indicate that they will not write Rx for Cenestin until these formulary issues are resolved."
- (CM:00498) – physicians were willing to prescribe Cenestin but "refused to take the time to write a letter to the plan administrator for prior approval" of an off formulary or non-preferred drug.
- (CM:00513) – "HMOs (Independent Health) continue to reject scripts written for Cenestin, even when the doctor fills out a prior authorization. Physicians are therefore reluctant to write any more scripts for Cenestin."
- (CM:00525) – "...physicians describe how FL Managed care plans are rejecting Cenestin Rx's. (The physicians) are frustrated."
- (CM:00523) – "...two physicians wrote scripts for Cenestin. However, due to formulary constraints, the scripts were filled by Premarin."
- (CM:00501) – "once a physician's Rx is rejected at the drug store, that physician is VERY reluctant to Rx (Cenestin) again."

- (CM:00519) – Dr. Montsemat has been receiving phone calls from pharmacies asking if they can switch Cenestin to Premarin. The reason they say is because the insurance is rejecting the claim."
- (CM:00505) – "...a large OB/GYN office will only Rx when the rep. produces a list of guaranteed approved formularies."
- (CM:00497) – "I am not going to write Cenestin till it's on the formulary."
- (CM:00503) – "90% of my patients are on formularies and I won't prescribe it unless its on the formularies."
- (CM:00504) – "(Health Net) will not pay – come back when you are on the formulary"
- (CM:00509) – "Doctors continue to be frustrated by writing Rx's for Cenestin only to have them rejected and redirected to another brand because of lack of formulary approval...It is not the product (Cenestin) the doc's are concerned with, it's the formulary status. They do not want to deal with the calls from pharmacists and additional paper work.
- (CM:00510) – "Time and again, doctors Rx Cenestin only to have it rejected. It won't be too long before they won't write it period."

Wyeth Managed Care's documents indicate that formulary inclusion and positioning for its products was of importance to the company. The following represent a few examples:

- (WYE 187812) When discussing "availability" of competitive products on a three tier plan.
    o All products are available, however
    o Third tier is non-formulary (though) the patient can (get the drug) by paying more out of pocket for it.
    o What that means is when a physician prescribes the non-formulary product; the patient has higher out-of-pocket costs when they can get a Premarin Family product for percentage the cost.
    o Remind physicians and office staff that seniors pay more out of their pocket for non-formulary products.
    o ...(by saving the patient money, the physicians office will) experience less callbacks and time spent switching patients.

- (WYE 187692) – Order Aetna's 2002 Formulary stating formulary position of Premarin Family vs. excluded status of Cenestin..."
- (WYE 187800) – concerning Aetna's 2001 formulary, "Response was good and eye catching to the physicians to see formulary exclusion of the competitive products Cenestin...)"
    o "...competitive ERT/HRT products are hit and miss with coverage on the HMO's in Southern California, therefore use those only for patients who can't take a Premarin Family product."

- o "Prescribing Premarin, Prempra and Premphase saves time for the office staff and save the patient money leading to less call backs and time spent switching patients."
- o Premarin, Prempro and Premphase have a $15.00 co-pay versus Cenestin...which cost the patient a $30.00 co-pay."
- o "Lower co-pays for Premarin Family means patients save $15.00 than using a formulary excluded product."

- (WYE 187691) – "Wyeth and Ayerst reps should be equipped to discuss benefits of formulary products: fewer phone call backs to provider from pharmacy for switches, lower co-pay to patient (there is a $15 difference between formulary and non-formulary brands."
    - o "Reinforce Premarin Family formulary position on other national and local plans and the non-formulary status of ... Cenestin...."
    - o "Please make this 'pull through program' a priority when working with Aetna and field reps during the next few months."

- (WYE 190646) – "Although none of the non-formulary products has achieved a large market share, we all know that every Rx they gain is taken from Premarin."
    - o "Patients will save money when Premarin products are used. The usual co-pay for our products is $20 while the usual co-pay for the competitors is $35. This amounts to a savings of $180 per year for Premarin ($15 x 12 months) and $195 per year for Prempro or Premphase ($15 x 13 cycles). These co-pays could vary but are correct for the majority of Aetna patients."
    - o **"Providers will avoid calls from patients and pharmacists to switch to a lower co-pay product if they Rx Premarin family."**
    - o "Premarin family is available on all formularies so why would any provider choose to use anything else?"

## Conclusion

Based upon all of the above, it is my opinion that lack of inclusion on the major formularies, and the "non-favored" positioning on some, significantly reduced the number of Cenestin prescriptions generated during and after the drug's market introduction. The above documented experiences by early adapting physicians demonstrated a chain of disruptive events within their practice. The result, few physicians would make the effort to get an off formulary Cenestin or a non-preferred Cenestin for their patient even if they felt that Cenestin was a more efficacious and therefore indicated for the patient's clinical condition.

## Signature Page

_David J. Gibson_ ns
_____
David J. Gibson, M.D.

6·25·02
_____
Date

# Attachment A: Curriculum Vitae
# David J. Gibson, M.D.

## Experience

### Pharmaceutical Care Network (PCN)
*Medical Director*
2002 – Present

Based in Sacramento, California, PCN is a full service pharmacy benefit management and healthcare information management company providing services to Medicaid Managed Care Plans, self-funded employer groups, Health & Welfare Trust Funds, Third Party Administrators, HMOs and other Managed Care Organizations. MedIntelligence, the clinical offering from PCN, provides healthcare information management services to the health care industry, and focuses on improving outcomes - both clinical and financial. As the Medical Director for PCN, I chair the Pharmacy and Therapeutics Committee for the company.

### CASIO Manufacturing Corporation
*Chief Medical Officer* – Vertical Market Research and Development
1999-2001

Provided technical assistance to the Research and Development Group, which is based in San Jose California. Primary area of interest involved business-to-business (B-2-B) applicability of CASIO's hand-held technology with wireless linkage to the Internet.

### Longs Drug Stores and RxAmerica
*Chief Medical Consultant* – 1999 - 2001

Provide consulting services to Longs Drug Stores. Longs operates 460 stores and is the largest drug store chains in Hawaii. With 400 clients and 3.1 million lives represented, RxAmerica is a leading provider of Pharmacy Benefits Management (PBM) Services. My responsibility is to provide consultative services to both organizations. I have focused my attention on the development of a stronger professional relationship between the dispensing pharmacist and the prescribing physician. Specifically, I have developed a series of B-2-B tools to facilitate the strengthening of the professional relationship using the Internet as the method of communication.

### The Pacific Development Group
*President* – 1998 - Present

Founded a consulting group that consists of health care executives with extensive experience in developing and managing physician organizations. The group is recognized for its intimate knowledge of healthcare markets throughout the United States. In addition, the group is known nationally for its experienced leadership of pharmacy networks. PDG's focus is the development and deployment of physician connectivity modalities throughout the West Coast, Hawaii as well as other markets. Furthermore, PDG will exploit the business opportunities that result from a long-term relationship with the prescribing physician or medical group using these evolving information technologies.

### RxPhysician.com
President -- Jan 1998 - Present

Founded a medical information integration company specializing in pharmacy ordering systems. The Company utilizes innovative hand-held wireless technology to permit the prescribing physician to have full access to computer databases from the mobile pocket in his lab jacket. The Company has deployed its systems at the Santa Barbara Medical Foundation in Santa Barbara, CA and at the Straub Clinic and Hospital in Honolulu, HI.

### Omni HealthCare
*Vice President, Medical Affairs & Chief Medical Officer – Insurance Products, the Sutter System*
*May 1996 – Jan 1998*

Responsible for medical and pharmaceutical benefit related policy and operational issues. Omni HealthCare was a 175,798 member, California based, for profit health plan, which is owned by the *Sutter*/CHS Health System. Omni's annual revenue stood at over $157 million. The provider network consisted of 1,000 primary care physicians, 2,400 specialists, and 50 hospitals. At the VP, Medical Affairs I also chaired the Pharmacy & Therapeutics Committee for the health plan.

### Medical Technology Transfer Corporation
President - 1994-1996

I started the company and sold a major equity position. The Medical Technology Transfer Corporation (MTT Corp) is an investment and management company. It develops advanced imaging centers throughout the world and tele-communicates the digital data via satellite and fiber optic landlines back to the faculty practice at leading academic medical centers in the United States. MTT Corp leads a consortium of companies including Semen's Medical Systems, Harris Corporation and UCLA in its imaging center development activity. Current projects include a facility in Melbourne, Florida; Buenos Aires, Argentina; Santiago, Chile and Costa Rica.

### UCLA Medical Group Practice
*Chief Executive Officer, 1993-1994*

The UCLA Medical Group Practice is the second largest group practice in the United States encompassing over 800 physicians. The group consisted of the full and part time faculty members in the UCLA School of Medicine.

### Metropolitan Life Insurance Company (MetLife)
*Vice President for Medical Affairs & CMO - Florida, 1991-1993*

Supervised medical benefits administration for over 935,000 insures. The total dollars managed exceeded $1.12 billion annually and represented 14 percent of MetLife's total managed indemnity and 7 percent of its total HMO book of business. The Florida network for MetLife consisted of thirty-eight hundred physicians and twenty-three hospitals.

### Avanti Health Systems
*President and Chief Executive Officer, 1984 - 1991*

Avanti Health Systems was a development and management firm. Projects developed were national in scope with locations in Texas, Florida, Colorado, California, Connecticut and other states. When operational, the independent managed care companies that were developed grossed over $150 million in 1987. Their gross revenues in 1988 exceeded $250 million. Most of these managed care companies have been acquired by national insurance companies during the early 1990s.

### Santa Barbara Medical Foundation Clinic
*Partner, 1977 - 1984*

Clinical practice of Rheumatology within the department of medicine. Academic appointments at both UCLA and the University of Southern California (U.S.C.). Served as President of the Santa Barbara Society of Internal Medicine.

# Education

### Asbury College
*B.A., Liberal Arts, 1967*

University of Kentucky
M.D., 1971

University of Indiana
*Internship and Residency in Internal Medicine, 1973*

Harvard University
*Research Fellow - Rheumatology, 1975*

## Academic Appointments

Harvard University
*National Institutes of Health Research Fellow*
*Clinical Proctor, Internal Medicine*

Louisiana State University School of Medicine (LSU)
*Clinical Associate Professor of Medicine - Rheumatology*

University of California Los Angeles School of Medicine
*Clinical Associate Professor of Medicine - Rheumatology*

University of Southern California School of Medicine
*Clinical Associate Professor of Medicine - Rheumatology*

University of Texas Medical School - Houston
*Clinical Associate Professor of Medicine - Rheumatology*

## Licensure

California # G33504

## Certification

National Board of Medical Examiners #118712
The American Board of Internal Medicine #47482

# Attachment B: Articles Written During the Last 10 Years by

## David J. Gibson, M.D.

1. A Doctor Shortage? Fine! By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001 Edition; May / June Volume 52 / Number 3.

2. My Experience with Health Care Inflation in the ER By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001 Edition; January / February; Volume 53 / Number 1.

3. Morphing of Health Care By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001 Edition; March / April; Volume 53 / Number 2.

4. What Comes After Managed Care? By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001; March / April; Volume 51 / Number 2.

5. Your Practice - 2005 A.D. By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001; May / June; Volume 52 / Number 3.

6. Spending More on Drugs By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001; September / October; Volume 52 / Number 5.

7. Our Pursuit of Mediocrity By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2001; November / December; Volume 52 / Number 6.

8. MOVIE REVIEW: "John Q" is Worth Seeing By David J. Gibson, MD; Sierra Sacramento Valley Medicine, 2002; March / April; Volume 53 / Number 2.

9. Corporate Practice; By David J. Gibson, M.D.; Health Plan USA Network; 4/2001.

10. Other Views: What's behind those rising health-care costs? By David J. Gibson -- Special to The Bee; Opinion/Editorial, Dec. 18 Metro Section, Page B7,

11. Health care competition; By David J. Gibson, MD; Sacramento Bee; *Sunday, February 10, 2002.*

12. Price comparison for goods and services within the Sacramento Market; By David J. Gibson, M.D.; Health Plan USA Network.