- **(AHP 340336-41)** – The data updates the market information to the fall of 2002 and the spring of 2003 using a different source (Verispan's spring 2003 ET/HT Formulary Coverage Information) confirms the above findings.

Copied from AHP340336 - AHP340341.

  o **Total On Formulary** – "Total formulary coverage (considered 2nd tier or better) for Premarin decreased from 98% to 92% between the fall 2002 and Spring 2003 audit cycles while Prempro decreased from 99% to 90% during this same time period. FemHRT (52% to 69%) and Cenestin (20% to 37%) had the largest increases between the fall 2002 and spring 2003 audit cycles. Actively (17% to 30%) and Prefest (41% to 57%) also experienced large gains during this time period."[89]



### ET/HT Market
#### Total on formulary (on formulary/tier 2 or better)
#### Percentage of HMO Lives

|  | Activelia | Cenestin | Combi-patch | Estraca | FemHRT | Prefest | Premarin | PremPro | Vivelle-DOT |
|---|---|---|---|---|---|---|---|---|---|
| Fall 2002 | 17% | 20% | 27% | 14% | 52% | 41% | 98% | 99% | 77% |
| Spring 2003 | 30% | 37% | 32% | 28% | 69% | 57% | 92% | 90% | 65% |

Source: Verispan's Managed Care Formulary Drug Audit; Spring 2003; & AHP 339061

---

[89] AHP340338

David J. Gibson, M.D.

Page 62

o  **Total Coverage** – "Total Coverage for the Premarin Family remained consistent between the fall 2002 and spring 2003 audit cycles, at virtually 100% for both Premarin and PremPro.  Meanwhile, FemHRT increased from 93% to 100% between audit cycles while all remaining HT/ET products stayed relatively consistent in their total coverage of HMO members."[90]

Copied from AHP340339.



### ET/HT Market
Total Coverage
Percentage of HMO Lives

| | Ativella | Cenestin | Combi-patch | Estrace | FemHRT | Prefest | Premarin | PremPro | Vivelle-DOT |
|---|---|---|---|---|---|---|---|---|---|
| ■ Fall 2002 | 86% | 87% | 90% | 82% | 93% | 83% | 100% | 99% | 93% |
| ▣ Spring 2003 | 85% | 84% | 92% | 83% | 100% | 83% | 100% | 100% | 91% |

Source: AHP 340339

---

[90] AHP340339

David J. Gibson, M.D.

o  **Prior Authorization** -- "Overall, the Premarin Family continues to remain unaffected by HMOs' prior authorization requirements. Additionally, there seems to be a trend in the industry to make more ET/HT products available to the physician and patient. The majority of competing products in the HT/ET market, with the exception of Cenestin and Estrace, experienced a decrease in their prior authorization coverage during the spring 2003 audit cycle."[91]

Copied from AHP340339.



## ET/HT Market
### Prior Authorization
### Percentage of HMO Lives

| | Abrella | Cenestin | Combi-patch | Estrace | FemHRT | Prefest | Premarin | PremPro | Vivelle-DOT |
|---|---|---|---|---|---|---|---|---|---|
| Fall 2002 | 9% | 8% | 9% | 9% | 7% | 7% | 0% | 0% | 5% |
| Spring 2003 | 8% | 13% | 5% | 13% | 4% | 6% | 0% | 0% | 5% |

Source: AHP 340340

---

[91] AHP340339

David J. Gibson, M.D.

o **Covered at Third-Tier Co-Pay** – "The Premarin Family experienced an increase in the percentage of lives in third-tier coverage while the competitive HT/ET agents experienced mixed results. Premarin increased from 1% during the fall 2002 to 8% in the spring 2003 audit cycles while Prempro climbed from 0% to 9% during this time period. Meanwhile, FemHRT (28% to 20%) and Prefest (32% to 25%) benefited the most during this time period. Combipatch (44% to 52%) and Vivelle-DOT (11% to 23%), on the other hand, experienced the largest increase in the number of lives falling under third-tier coverage."[92]

Copied from AHP340340 - AHP340341.

## ET/HT Market
### Third Tier Coverage
### Percentage of HMO Lives



Source: AHP 340341

---

• **(WYE 187800)** – concerning Aetna's 2001 formulary, "Response was good and eye catching to the physicians to see formulary exclusion of the competitive product Cenestin...)"

Copied from WYE187800.

o "...competitive ERT/HRT products are hit and miss with coverage on the HMO's in Southern California, therefore use those only for patients who can't take a Premarin Family product."

o "Prescribing Premarin, Prempro and Premphase saves time for the office staff and save the patient money leading to less call backs and time spent switching patients."

o Premarin, Prempro and Premphase have a $15.00 co-pay versus Cenestin...which cost the patient a $30.00 co-pay."

o "Lower co-pays for Premarin Family means patients save $15.00 than using a formulary excluded product."

---

[92] AHP 340340

**David J. Gibson, M.D.**

- **(WYE 187691)** – "Wyeth and Ayerst reps should be equipped to discuss benefits of formulary products: fewer phone call backs to provider from pharmacy for switches, lower co-pay to patient (there is a $15 difference between formulary and non-formulary brands."
  - o "Reinforce Premarin Family formulary position on other national and local plans and the non-formulary status of …Cenestin…."
  - o "Please make this *'pull through program'* a priority when working with Aetna and field reps during the next few months."

*[Copied from WYE187691.]*

- **(WYE 190646)** – "Although none of the non-formulary products has achieved a large market share, we all know that every Rx they gain is taken from Premarin."
  - o "Patients will save money when Premarin products are used. The usual co-pay for our products is $20 while the usual co-pay for the competitors is $35. This amounts to a savings of $180 per year for Premarin ($15 x 12 months) and $195 per year for Prempro or Premphase ($15 x 13 cycles). These co-pays could vary but are correct for the majority of Aetna patients."
  - o "Providers will avoid calls from patients and pharmacists to switch to a lower co-pay product if they Rx Premarin family."

*[Copied from WYE190646.]*

## Wyeth's use of its market power as an offensive weapon against Cenestin.

Wyeth entered into extensive rebate contracts with every major PBM and MCO to gain formulary position for their Premarin Family of products, most often at the exclusion of their conjugated estrogen competitor, Cenestin.

Wyeth viewed Cenestin as a challenge to their monopolistic position for conjugated estrogen products. One of Wyeth's strategies was called the "Premarin Preemptive Plan". Webster's dictionary definition of "preempt" is *"to seize upon to the exclusion of others"*. Wyeth used previously implemented marketing tactics to seize upon the conjugated estrogen category at the exclusion of Cenestin and thereby continue the company's singular position in the conjugated estrogen ET/HT market.

*[Copied from Bystrom's report at 22.]*

Wyeth's plan was to protect Premarin's market share and effectively exclude Cenestin from appearing on the formularies of the largest PBMs/HMOs that control the majority of health plan members in the U.S.

### Wyeth Rebate requirements and tactics

Well in advance of the launch of Cenestin, Wyeth had developed a variety of types of pricing structures for use in contract generation. These structures supplemented by others described below, constituted the arsenal of contractual weapons subsequently used by Wyeth against Cenestin. The pricing structures were published by Wyeth in a document titled "Contracting Resource Manual" that was published in October 1995.[93]

---

[93] WYE079940-080095

David J. Gibson, M.D.

Specifically, Section 5 – Proposal Development; Sub-section 5.3 – Types of Pricing Structures[94] detailed Wyeth's rebate structures that were to be used within all subsequent Reimbursement Agreements with PBMs and MCOs.

Wyeth demonstrated its sophistication in understanding and exploiting the managed care rebate contract environment. The following summarizes the tactics Wyeth incorporated into their rebate negotiating strategy when dealing with MCOs and PBMs.

## Wyeth Reimbursement Agreement
## (Rebate Requirements / Tactics)

The following are examples and not intended to be an exhaustive list of all Wyeth's contracting tactic documents.

1   **Premarin was required to be the exclusive or sole conjugated estrogen or preferred estrogen on formulary**

   WYE 004316 –MedImpact Reimbursement Agreement (4-1-96)
   - o   Exhibit C, II, A, 1. "Premarin will be listed in the Formulary and Plan Formulary as the exclusive conjugated Estrogen and the preferred estrogen replacement therapy."

   WYE134739 – MedImpact amended agreement (11-14-00)
   - o   2.1.3 – "Premarin shall be listed as the sole conjugated estrogen on the Formulary and Plan Formulary."

   WYE124582 – National Prescription Administrators (NPA) Reimbursement Agreement 8-30-00.
   - o   2.1.2 – (Formulary Requirements) "Premarin being listed as the sole conjugated estrogen on the Formulary and Plan Formulary."

   WYE010257 – Caremark Reimbursement Agreement 3-23-00
   - o   2.1.3 "Products included in the Premarin Family[95] shall be the sole conjugated estrogen product on the Formulary."

2   **All products within a Wyeth "product grouping" must be preferentially listed for any of the group products to be eligible for a rebate**

   WYE010257 – Caremark Reimbursement Agreement 3-23-00
   - o   2.1.1 "In order for any product to be eligible for Rebates, all Products must be included in the Formulary and Plan Formulary."

3   **A minimum number of Wyeth's product groupings must appear on formulary to qualify for any rebates**

---

[94] WYE 079996-080000
[95] The "Premarin Family" defined in Schedule A WYE010262

**David J. Gibson, M.D.**

**WYE124016** – Integrated Pharmaceutical Services, Inc. Reimbursement Agreement (7-14-97)
- o II.B "IPS and Type 1 Plans and Type 2 Plans accepting and listing on Core Formulary and Plan Formulary with no prescribing or dispensing restrictions a minimum of seven (7) of the Product Groups listed below according to the criteria listed and Type 3 Plans accepting and listing on the Plan Formulary with no prescribing or dispensing restrictions a minimum of five (5) of the Product Groups listed below according to the criteria listed,.....)

**4   Increased rebates are tied to Wyeth products market share increases**

**WYE124581-82** – NPA Reimbursement Agreement (10-16-00)
- o Sec 1.16 (standard in most agreements) Relative Market Share Change – formula defined.

**WYE124594** – Schedule B: defines rebate by formula

**5   Rebates are tied to Cenestin market share decreases**

**WYE012690-91** - Merck-Medco Managed Care Amendment to the 01-01-00 agreement dated 08-16-00.
- o "The following shall be added to the end of Part A, Section III: L. Wyeth-Ayerst shall pay an additional Premarin/Prempro/Premphase Market Share Rebate to Medco each Contract Quarter in an amount equal to 0.75% of the Medco mail service volume of Premarin/Prempro/Premphase for each contract Quarter for each 10% or portion thereof that the Medco Mail Service Market Share of Cenestin....is below the National Market Share of such Products..."

**6   Available rebate percentages increase as additional Wyeth products are included on formulary – incentive rebates**

**WYE010345** – Advance Paradigm Clinical Services, Inc. Reimbursement Agreement 05-07-97
- o Schedule C1 All oral estrogens and estrogen/progestin combination (Premarin/Prempro/Premphase)

**WYE010346** – Schedule C2 Product Performance Rebates defined by performance above baseline.

**WYE124019** – IPS Reimbursement Agreement, 07-14-97
- o "Type 2 Plans or Type 3 Plans/Groups of Plans that elect collectively to accept seven (7) or more of five (5) or more...."

**WYE009111** – Aetna Health Management Reimbursement Agreement, 07-17-97
- o II, A, 1 – Product Groups: HRT Products, "Premarin, Prempro and Premphase must be listed on the Voluntary Formulary and the Select Formulary as the sole conjugated estrogen-containing products, and a preferred hormone replacement product."

**WYE009115** –
- o Sec III, graph on group incentives

**7   NDC blocks, to lock out competitors' products from the formulary, may be required**

David J. Gibson, M.D.

WYE023418 – Wellpoint Pharmacy Management, Reimbursement
Agreement Amendment to the contract; 09-29-00.
  o  Point 4: Exhibit C. Section II.B.1.

8    **Additional monies paid as "Admin. Fees" and/or "Service Fees" by
     Wyeth to client for client services rendered to Wyeth**

WYE124584 – NPA Reimbursement Agreement (10-16-00)"service fee"
  o  Sec 3.5, "Wyeth-Ayerst shall pay a 2% *Service Fee* on the Net
     Sales..."
  o  3.51-.58, "PBMs providing services to Wyeth-Ayerst that will include,
     but not necessarily be limited to the following:"
WYE010956 – "Products specifically excluded from Rebates and
Administrative fees" (see Exhibit D below[96]).
WYE010967 – administration fee described in Exhibit D

9    **Specific formulary promotional efforts are required of some clients**

WYE006084 – Medco Pharmaceutical Supply Agreement, 10-01-95
  o  6.1.1 "...Physicians representing a minimum of ninety (90%) percent
     of prescriptions written for competing branded oral estrogens
     dispensed at retail..."

10   **Wyeth may apply formulary promotional efforts to some client
     physicians and pharmacies**

WYE124016 – IPS Reimbursement Agreement, 07-01-97.
  o  II.B.1.HRT Products

11   **Pharmacies must dispense as written, without changing to a competing
     product**

WYE124017 –
  o  II.C "...No Pharmacy initiated program involving product
     interchange..."

12   **Wyeth leveraging their position threatening loss of rebates if competing
     products are put on formulary**

WYE157987 - 990 – Rocky Mountain HMO letters
WYE117064 – 1. Key Issue, "...Express Scripts accepted Cenestin as part
of their Bid Grid. Upon our objection, they notified Duramed that they would
NOT accept a contract on the product."


**Wyeth viewed Cenestin as a "significant challenge" to their women's
health care single source and exclusive franchise**

- Wyeth document #WYE118176, an internal Wyeth memo, dated March 26, 1999
  states:

---
[96] WYE010967

David J. Gibson, M.D.

- "The approval of Cenestin is a *significant challenge* to our women's health care franchise..."
- "...we must reinforce those managed care contractual arrangements that identify Premarin as the exclusive conjugated estrogen on formulary."
- "I ask that you communicate any account issues or challenges related to Cenestin immediately. Executive management has requested regular updates from all field personnel."

## Wyeth developed a sophisticated offensive marketing strategy known as the "Premarin Preemptive Plan"[97] to attack Cenestin as it was introduced into the market.

The "Premarin Preemptive Plan" was sophisticated marketing strategies presented in 1999 to target and inhibit Cenestin's market entrance. The overall goal of the plan was to hold Cenestin to less than 2% TRx share in 1999 (approximately $20 million).[98]

The plan asserted that a number of clinically relevant attributes made Premarin superior to any other conjugated estrogen on the market, including Cenestin.

- The plan called for selling the "science of Premarin."[99]
- A format for developing a detailed "Cost Analysis" for each MCO and PBM was developed.[100] This analysis demonstrated both the value of the Wyeth rebate package and the downside risk of losing the rebates if Cenestin were permitted onto the Formulary.
- The plan called for a "Medical Affairs Response Team"[101] consisting of physician speakers with regional and national reputations; and a "Clinical Consultant Bureau"[102] that consisted of Pharm.D. speakers from academic backgrounds that would be available to address physician meetings and present the above messages ("science of Premarin") to professional audiences.
- In addition the plan called for "blast faxing" press releases & short Q & As to external spokesperson advocates.[103]
- The plan called for the cultivation of alliances with key medical and pharmaceutical professional and trade associations along with patient advocacy groups.[104]
- Full page ads were to be placed in various national publications (*USA Today, the Washington Post*) to articulate the above message.[105]

---

[97] WYE132250 - 132311
[98] WYE132253
[99] WYE132290-91
[100] WYE132293
[101] WYE132273
[102] WYE132275
[103] WYE132305
[104] WYE132303
[105] WYE132307

Page 70

- There was an integrated time line published that coordinated the components of the plan leading up to and following the anticipated market entrance of Cenestin in April of 1999.[106]

## Negotiated and enforced market share agreements to protect its single source status

Wyeth's existing rebate contracts with the largest PBMs/MCOs required that Premarin be either the *sole* conjugated estrogen on their formularies or the preferred drug in the oral estrogen category. Wyeth considered it a breach of their rebate contract by the PBMs/MCOs if they were to allow Cenestin on their formularies or allowed it to be classified as anything but non-preferred. Such a breach could lead to the loss of *all* rebates for *all* Wyeth products. Wyeth enforced their contracts to prevent Cenestin from appearing on the formularies where it enjoyed a sole conjugated estrogen status.

Copied from Bystrom's report at 27.

- Wyeth document #WYE118139, an attachment to an internal Wyeth memo, dated March 9, 1999 illustrates Wyeth's dominant formulary position with PBMs & HMOs:

  - Wyeth had either an exclusive or a preferred formulary status with all the large underwriters and PBMs in the market with the single exception of Humana (Caremark is classified as N/A).

Copied from WYE118139.

| Account | # Lives (Members) | W-A Contract Status |
|---|---|---|
| **Low Control** | | |
| Caremark | 8.4 | N/A |
| Express Scripts/Value Rx | 21.7 | A |
| MEDCO | 52.0 | A/B |
| MedImpact | 3.4 | A/B |
| NPA | 7.5 | A |
| PCS | 56.0 | B |
| ProVantage | 3.8 | A/B |
| Prime Therapeutics | 5.0 | B |
| **Subtotal:** | **157.8** | |
| **Medium Control** | | |
| Aetna (w/Prudential) | 13.4 | A/B |
| API | 12.5 | A/B |
| Coventry | 1.5 | B |
| DPS | 20.2 | B |
| Humana | 6.2 | C |
| Wellpoint | 8.6 | A/B |
| **Subtotal:** | **62.4** | |
| **High Control** | | |
| CIGNA | 6.4 | B |

---

[106] "Cenestin Plan Implementation"; WYE132279

David J. Gibson, M.D.

| Foundation (IPS) | 15.5 | A |
| Kaiser | 8.1 | B |
| Pacificare | 4.5 | A |
| **Subtotal:** | **34.5** | |
| **TOTAL** | **254.7** | |

Source: #WYE118139

* A = Exclusive Conjugated Estrogen
B = Preferred Oral Estrogen
C = Non-preferred Status

Copied from WYE118139.

## Wyeth enforced the terms of their contracts

- Wyeth document WYE117064 Sec. 1, an internal Wyeth memo regarding Wyeth's formulary relationship with Express Scripts, ValueRx/DPS dated Nov. 4, 1999, states:

  - "Express Scripts accepted Cenestin as part of their Bid Grid.. Upon our objection, they notified Duramed that they would NOT accept a contract on the product."

- Wyeth document WYE025546, an internal Wyeth memo, dated Nov. 9, 1999, states:

  - "A signed agreement with Duramed, which had added Cenestin to the Express Scripts formulary, was reversed by quick, concerted action between national account sales and CD&A. *To date, no known managed care accounts have Cenestin on formulary*.

- Wyeth document WYE051073  Wyeth's "Managed Care National Accounts Action Steps", instructs Wyeth employees:

  - "-Continue to position Premarin Family as preferred ERT/HRT agents at each National Account

  - Ongoing evaluation of each National Account relative to performance and rebates

  - *"Enforce terms of contract"*

Copied from Bystrom's report at 28.

## Wyeth threatened MCOs with loss of their rebate income

Wyeth communicated to their clients that a breach of their rebate contract would result in Wyeth not paying rebates on Premarin and /or all Wyeth products.

- WYE023598-600, an internal memorandum from Sally Miller detailing the contents of a meeting with Jim Hill at ExpressScripts:  "First on the list was Premarin. He (Hill) started out by saying that they had a small but persistent group of clients who were insisting on having Cenestin available and he "needed" to renegotiate the contract.  I replied that under no circumstances would we agree to do this and reminded him that they (ExpressScripts) are receiving over $40 million in rebates per year that would be at risk..."

- Wyeth document WYE157990, an October 6, 1999 letter from Wyeth-Ayerst to Rocky Mountain HMO states:

Copied from Bystrom's report at 29.

David J. Gibson, M.D.

- "According to the terms of the MedImpact Agreement, should Rocky Mountain HMO add Cenestin™ to its formulary or take any action against our oral contraceptives, we will exercise the thirty (30) day no cause termination option in the agreement, and inform MedImpact that Rocky Mountain HMO is no longer eligible to participate in the MedImpact/Wyeth-Ayerst Reimbursement Agreement."

Copied from Bystrom's report at 29.

- Wyeth document WYE157987-988, An Dec. 14th, 1999 letter from Rocky Mountain Health Maintenance Organization to Wyeth-Ayerst states:

  - "RMHMO is seriously concerned about the statements made in your letter regarding Wyeth-Ayerst exercising a 30-day no cause termination option if RMHMO adds Cenestin™ to its formulary or takes 'other action' against Wyeth-Ayerst oral contraceptives. We are all well aware of the large market share Wyeth-Ayerst has with its Premarin Family in that category of pharmaceuticals. We seriously question the appropriateness and legality of Wyeth's attempt to use such market share to influence RMHMO's decisions with regard to its formulary for other pharmaceutical products."

## Wyeth used their market position to negotiate exclusive contracts

Wyeth's rebate contracts provided significant rebate dollars for the PBMs/HMOs if they protected Premarin's market share from competition like Cenestin. Wyeth leveraged their exclusive contracts and rebate dollars with the PBMs/HMOs to keep Cenestin off their formularies.

Copied from Bystrom's report at 23.

- Wyeth document WYE118068, an internal Wyeth memo about a phone call with Advance Paradigm, dated Feb. 19, 1999 states:

  - "Our position is protected with API (Advance Paradigm, Inc.) as far as our contractual language regarding Premarin. It reads as follows: 'Premarin, Prempro and Premphase ("Premarin Products") must be listed on the Formulary and Plan Formulary as the sole conjugated estrogen-containing products."

- Wyeth document WYE118069, an internal Wyeth memo with the subject heading of "Likelihood of Cenestin added to Plan Formularies", dated Feb. 24, 1999 states:

  - "Charles-Per your voicemail as far as determining the estimate of plans that will add Cenestin to formularies, the decision will be solely dictated by how Duramed's product will be classified."

  - "If the product is classified as a conjugated estrogen we are protected by contractual language for API (Advance Paradigm, Inc.) and NPA (National Prescription Administrators) therefore the percentage will be 0% for both."

- Wyeth document WYE117253, an internal Wyeth memo about a meeting between Wyeth and Medco, dated May 10, 1999 states:

  - "The purpose of this meeting was to evaluate current programs and to discuss tentative plans for moving forward. Each party came to the meeting with their list of needs. Objectives I established for this meeting included; (1) *Gain commitment to make Cenestin "non-formulary drug"* as per contract Premarin is the "exclusive conjugated estrogen on formulary and the preferred oral estrogen therapy."

Copied from Bystrom's report at 27.

David J. Gibson, M.D.

Page 73

- "After reviewing our contractual arrangement for Premarin, Art agreed that Premarin is the sole conjugated estrogen per terms of the contract. Art will talk with Glen Taylor to determine if "prior authorization" can be put in place for Cenestin."

  Copied from Bystrom's report at 27.

- Wyeth document WYE118196, a memo from Wyeth to Wellpoint dated April 6, 1999 conveying Wyeth's Cenestin Impact Model to WellPoint, as well as reminding WellPoint of their exclusive agreement for Premarin:

  Copied from Bystrom's report at 30.

  - "For your consideration, our contract dated October 1, 1996, includes language which pertains to this issue. Page 10, Section HB I states 'Premarin, Prempro and Premphase must be listed on the Formulary and Plan Formulary as the sole conjugated estrogen-containing products...."

## Wyeth worked with PBMs / MCOs to exclude Cenestin from their formularies

- Wyeth document WYE118068, an internal Wyeth memo about a phone call with Advance Paradigm, dated Feb. 19, 1999 states:

  Copied from Bystrom's report at 23.

  - "Karl wants to identify partnering strategies and tactics on how we can together with API blunt the launch of Cenestin. He spoke of mailings, programs etc. that API would be willing to work with W-A to target the current Premarin users as well as target new Rx's."

- Wyeth document WYE118389, an internal Wyeth document referencing discussions with IPS, dated April 11, 1999, states:

  Copied from Bystrom's report at 24.

  - "I will be meeting with the account on 4/19 and will discuss the status of 4Q98 rebates as well as the contractual language which prohibits any other conjugated estrogen from formulary status.

  - I have spoken to Gina Warren, Pharm D., at IPS, who is preparing a monograph on Cenestin and she is aware of the contractual prohibition.

  - I have asked all other AAMs to meet with their FHS contacts and reinforce the contractual language with the (client)

  - I am confident, IPS and FHS will comply with the contract and Cenestin will remain non-formulary. Adjustments on rebates would be an additional enhancement to their contractual compliance."

- Wyeth document WYE117146, an internal Wyeth memo regarding Foundation Health Plan, dated May 4, 1999, states:" Key Issues:

  Copied from Bystrom's report at 25.

  - "'Value' of Premarin contract in face of Cenestin and decreasing market share in key accounts."

  - "Contracting language prohibiting any other conjugated estrogen needs to be communicated to all plans."

David J. Gibson, M.D.

## The Managed Care Cost Analysis

Wyeth devised a strategy whereby they could either reward or punish an MCO if it did or did not permit Cenestin to have access to the MCO's formulary.[107]

The Cenestin Impact Model clearly illustrated to the PBMs/HMOs the loss of Wyeth rebate dollars that would occur if they placed Cenestin on their formularies with a resulting loss of market share for Premarin. Not only did Wyeth demonstrate loss of rebate dollars for their Premarin product, the Cenestin Impact Model communicated a potential total loss of rebate dollars for all Wyeth products, which would result from allowing Cenestin on their formularies.

*Copied from Bystrom's report at 30.*

- Wyeth document WYE118080-8105, an internal Wyeth memo dated March 8, 1999 illustrated the fact that the Cenestin Impact Model went out to all of Wyeth's National Account Managers:

  "The attached Excel files include directions for use, key assumptions, summary, and detail sheets pertaining to all national accounts. Please be advised that each National Account Manager has been mailed a similar account specific file."

Demonstrating the Managed Care Cost Analysis required constructing an existing market snapshot. This demonstration combined market share penetration for Wyeth products and quantifying the rebates that were being paid to the MCO prior to the market introduction of Cenestin.

The following example of a Managed Care Cost Analysis uses the Pacificare account.[108] Pacificare had 4.5 million members at the time of this analysis. As one of Wyeth-Ayerst major national accounts, Pacificare received $3.8 million in rebates from the Premarin family of drugs and $3.3 million in rebates from all other Wyeth-Ayerst products.

### Pacificare Market Cost Analysis[109]

*Copied from WYE117988 - WYE117989.*

| | Market Share | | Annualized | | |
| | National | Account | AWP Gross Sales | Rebates | AWP Net Sales |
|---|---|---|---|---|---|
| Premarin Total | 74.4% | 77.8% | $ 28,550,325 | $ 3,839,390 | $ 24,710,935 |
| Tabs | 54.5% | 62.1% | $ 21,114,020 | $ 2,824,570 | $ 18,289,450 |
| Prempro/Phase[1] | 19.9% | 15.6% | $ 7,436,305 | $ 1,014,820 | $ 6,421,485 |
| OCs | 23.3% | 21.2% | $ 6,348,650 | $ 2,654,676 | $ 3,693,974 |
| Effexor[2] | 7.1% | 6.4% | $ 4,087,478 | $ 326,883 | $ 3,760,594 |
| All other Products | | | $ 2,138,190 | $ 300,664 | $ 1,837,526 |
| | | | $ 41,124,643 | $ 7,121,613 | $ 34,003,029 |

[1]: PREMPRO therapy consists of a single tablet containing 0.625mg of the conjugated estrogens found in Premarin™ tablets and 2.5 mg or 5 mg of medroxyprogesterone acetate (MPA) for oral administration.

[2]: A structurally novel antidepressant for oral administration. It is chemically unrelated to tricyclic, tetracyclic, or other available antidepressant agents

---

[107] WYE117988, WYE117989
[108] It should be noted that while this example summarizes a set of hypothetical scenarios for Pacificare, similar financial projections were prepared for each of Wyeth's MCO and PBM accounts.
[109] WYE118080-118105

David J. Gibson, M.D.

Wyeth-Ayerst account reps would then demonstrate what would occur if Cenestin were permitted, through formulary inclusion and tiered structure placement, to erode Premarin's market share position. The following table assumes a 5% shift in Premarin's existing conjugated market share to Cenestin. Such a change would require an 8% shift of 0.625 mg tablet business.

**Assumes a 5% shift in Pacificare's Premarin market share.**

| | Market Share | | Annualized | | |
| | National | Account | AWP Gross Sales | Rebates | AWP Net Sales |
|---|---|---|---|---|---|
| Premarin Total | 74.4% | 74.6% | $ 27,494,624 | $ - | $ 27,494,624 |
| *Tabs* | 54.5% | 59.0% | $ 20,058,319 | $ - | $ 20,058,319 |
| *Prempro/Phase* | 19.9% | 15.6% | $ 7,436,305 | $ - | $ 7,436,305 |
| Cenestin** | 0.0% | 3.1% | $ 950,131 | $ - | $ 950,131 |
| OCs | 23.3% | 21.2% | $ 6,348,650 | $ 2,654,676 | $ 3,693,974 |
| Effexor | 7.1% | 6.4% | $ 4,087,478 | $ 326,883 | $ 3,760,594 |
| All other Products | | | $ 2,138,190 | $ 300,664 | $ 1,837,526 |
| | | | $ 41,019,073 | $ 3,282,223 | $ 37,736,849 |

| | Cost/(Savings) @ AWP | Gain/(loss) in rebates | Cost/(savings) Net to Acct. @ AWP |
|---|---|---|---|
| | $ (105,570) | $(3,839,390) | $ 3,733,820 |

** Model assumes no rebate and no discount off AWP for acquisition

Copied from WYE117988 - WYE117989.

There are several messages that Wyeth sought to communicate to the pharmacy director at Pacificare within this demonstration. These include:

1. Based upon Wyeth's projected AWP for Cenestin, overall cost savings to Pacificare by moving 5% of the conjugated market to the less expensive Cenestin would generate only $105,570 in AWP savings.

2. On the other hand, should Premarin's market share deteriorate, even by 5%, the entire rebate for the Premarin family of drugs will go away – this represents a loss to Pacificare of $3,839,390 annually.

3. The discounts from AWP for acquisition costs will no longer apply. Thus increasing acquisition costs by $3,733,820.[110]

To leave no doubt in the mind of the pharmacy director at Pacificare, Wyeth's field representatives presented the director with the consequences of Premarin experiencing a 5% shift in conjugated market share to Cenestin AND cancellation of Wyeth's contract.

---

[110] The model should have raised questions in the pharmacy director's mind in that the model assumes no rebates or discount off AWP for acquisition of Cenestin.

David J. Gibson, M.D.

Page 76

**Assumes a 5% shift in Pacificare's Premarin market share AND cancellation of the entire Wyeth rebate and AWP discounted acquisition contract.**

Copied from WYE117988 - WYE117989.

| | Market Share | | Annualized | | |
|---|---|---|---|---|---|
| | National | Account | AWP Gross Sales | Rebates | AWP Net Sales |
| Premarin Total | 74.4% | 74.6% | $ 27,494,624 | $ - | $ 27,494,624 |
| *Tabs* | 54.5% | 59.0% | $ 20,058,319 | $ - | $ 20,058,319 |
| *Prempro/Phase* | 19.9% | 15.6% | $ 7,436,305 | $ - | $ 7,436,305 |
| Cenestin* | 0.0% | 3.1% | $ 950,131 | $ - | $ 950,131 |
| OCs** | 23.3% | 21.2% | $ 6,348,650 | $ - | $ 6,348,650 |
| Effexor** | 7.1% | 6.4% | $ 4,087,478 | $ - | $ 4,087,478 |
| All other Products** | | | $ 2,138,190 | $ - | $ 2,138,190 |
| TOTALS | | | $ 41,019,073 | $ - | $ 41,019,073 |
| | | | Cost/(Savings) @ AWP | Gain/(loss) in rebates | Cost/(savings) Net to Acct. @ AWP |
| | | | $ (105,570) | $(7,121,613) | $ 7,016,044 |

\* Model assumes no rebate and no discount off AWP for acquisition
\*\* Assumes loss of AWP% discount on product acquisition

The following set of tables illustrates the fact that with further deterioration in Premarin's market share, the consequences to Pacificare will become even more catastrophic. This model assumes that there will be a 63% shift in conjugated market share to Cenestin within the Pacificare account. This will require a Premarin loss of 100% of the 0.625 mg dosage market.

**Assumes a 63% shift in conjugated market share to Cenestin and cancellation of the Wyeth-Ayerst AWP discounted acquisition contract.**

Copied from WYE117988 - WYE117989.

| | Market Share | | Annualized | | |
|---|---|---|---|---|---|
| | National | Account | AWP Gross Sales | Rebates | AWP Net Sales |
| Premarin Total | 74.4% | 38.6% | $ 15,248,492 | $ - | $ 15,248,492 |
| *Tabs* | 54.5% | 23.0% | $ 7,812,187 | $ - | $ 7,812,187 |
| *Prempro/Phase* | 19.9% | 15.6% | $ 7,436,305 | $ - | $ 7,436,305 |
| Cenestin** | 0.0% | 39.1% | $ 11,971,649 | $ - | $ 11,971,649 |
| OCs | 23.3% | 21.2% | $ 6,348,650 | $ 2,654,676 | $ 3,693,974 |
| Effexor | 7.1% | 6.4% | $ 4,087,478 | $ 326,883 | $ 3,760,594 |
| All other Products | | | $ 2,138,190 | $ 300,664 | $ 1,837,526 |
| | | | $ 39,794,459 | $ 3,282,223 | $ 36,512,235 |
| | | | Cost/(Savings) @ AWP | Gain/(loss) in rebates | Cost/(savings) Net to Acct. @ AWP |
| | | | $(1,330,184) | $(3,839,390) | $ 2,509,206 |

David J. Gibson, M.D.

Page 77

## Wyeth enhanced their contract terms with certain accounts to protect their existing exclusive formulary position

In some instances, where Wyeth felt Premarin's exclusive formulary position was at risk with a PBM/HMO client, Wyeth revised their agreement to increase the rebate dollars paid to the client and lowered the market share performance requirement for their client to achieve the increased rebate amounts and paid retroactive rebates.

Copied from Bystrom's report at 32.

- Wyeth document WYE118320, an internal Wyeth memo dated February 24, 1999, indicates:
  - "At our Fast Start meeting in Dallas Bob Repella stated the importance of us being able to amend our national account contracts so our clients' Premarin performance parameters would be adjusted according to changes in the National Premarin performance. We had discussed trying to make this offer not appear as a defense strategy to the market entry of Cenestin – which will require that we do something quickly"

- Wyeth document WYE154418, an internal Wyeth memo discussing rebate strategy for IPS, indicates:
  - "If we can adjust the Baseline on a quarterly basis we will have an incentive for IPS and the plans to NDC block Cenestin and where necessary place the product in the highest co-pay category…"

Copied from Bystrom's report at 25.

- Wyeth document WYE117191, an internal Wyeth memo dated February 28, 1999, indicates "February Highlights":
  - "Review Premarin baseline level for Key FHS plans and determine best strategy for preserving value"
- Wyeth document WYE118389, an internal Wyeth memo dated April 11, 1999, regarding IPS rebates, indicates:
  - "Adjustments on rebates would be an additional enhancement to their contractual compliance"

Copied from Bystrom's report at 26.

- Wyeth documents WYE000036 & WYE000037, an internal Wyeth memo with "Pricing Committee Meeting notes of Oct. 27, 1998" regarding Aetna/US Healthcare indicates:
  - "Reestablish the Premarin Family rebates schedule, which was applicable in 1997 with some revision…"
  - "In turn for the concessions Aetna would:
  - Assure that the Premarin Family products are the sole multi-estrogen component EHT/HRT products listed in the formulary."
- Wyeth document WYE032576, an internal Wyeth memo undated, states:
  - "Charles explained to the Pricing Committee in 1997 Aetna received rebates for Premarin @ 3%. With the signing of the new contract, Wyeth-Ayerst took those rebates away. Charles proposed if Aetna agrees to include additional language regarding blockage of Cenestin, then Wyeth should in turn reinstate the 3%

Copied from Bystrom's report at 32.

David J. Gibson, M.D.

Premarin rebates. The addition of this language should/could help/maintain our current market share. This was approved by the Pricing Committee."

Copied from Bystrom's report at 32.

- Wyeth document WYE032575, an internal Wyeth memo dated July 1, 1999, states:

  - "We just had a meeting with regards to Aetna's fourth quarter 1998 payment. The dollar increase with the new amendment comes in around $800,000."

- Duramed document DUR010786, a Viking Managed Care Update submitted 11/99, states:

Copied from Bystrom's report at 33.

  - "I did speak with Dan concerning Caremark's decision regarding Cenestin and/or Premarin before he left 11/12/99. Based on Wyeth's last proposal it appears that they will go with Premarin. Dan said that the contract would net Caremark more than $1,000,000 in profits annually."

- Wyeth document WYE049692, an internal Wyeth memo dated April 13, 1999, indicates about ProVantage:

  - "The ProVantage Reimbursement Agreement Amendment has been signed and forwarded to Lois Rulli. The effect of the amendment is to roll back the Premarin, Prempro and Premphase baseline rebate level to what it was at the beginning of the contract. It is effective as of 3Q98. Please ask Lois for a copy of the amendment and then you can process the submission you have in house – they should earn Premarin rebates as a result of the amendment."

## The effect formulary exclusion of Cenestin had on physicians

The importance of formulary inclusion and positioning is well documented within the papers filed in this case. I cite the following as examples:

- **(CM:00513)** – "HMOs (Independent Health) continue to reject scripts written for Cenestin, even when the doctor fills out a prior authorization. Physicians are therefore reluctant to write any more scripts for Cenestin."

- **(CM:00525)** – "...physicians describe how FL Managed care plans are rejecting Cenestin Rx's. (The physicians) are frustrated."

- **(CM:00523)** – "...two physicians wrote scripts for Cenestin. However, due to formulary constraints, the scripts were filled by Premarin."

- **(CM:02691)** – "Dr. Morris Elstein in Virginia Beach indicated to me that he likes Prometrium (progesterone, USP) very much and would like to write Cenestin. However, he says that CIGNA does not have Cenestin on their formulary, therefore it is too expensive for many of his patients who are military, who can get Premarin at the base for next to nothing."

- **(CM:00501)** – "once a physician's Rx is rejected at the drug store, that physician is VERY reluctant to Rx (Cenestin) again."

- **(CM:00519)** – Dr. Montsemat has been receiving phone calls from pharmacies asking if they can switch Cenestin to Premarin. The reason they say is because the insurance is rejecting the claim."

- **(CM:00505)** – "...a large OB/GYN office will only Rx when the rep produces a list of guaranteed approved formularies."

David J. Gibson, M.D.

- **(CM:00497)** – "I am not going to write Cenestin till it's on the formulary."

- **(CM:00503)** – "90% of my patients are on formularies and I won't prescribe it unless it's on the formularies."

- **(CM:00509)** – "Doctors continue to be frustrated by writing Rx's for Cenestin only to have them rejected and redirected to another brand because of lack of formulary approval...It is not the product (Cenestin) the doc's are concerned with, it's the formulary status. They do not want to deal with the calls from pharmacists and additional paper work.

- **(CM:00510)** – "Time and again, doctors Rx Cenestin only to have it rejected. It won't be too long before they won't write it period."

- **(CM: 02640)** – "Dr. Minton (Fort Worth, TX) had had 24 prescriptions rejected at the pharmacy level. His nurse was quite frustrated naturally..."

**David J. Gibson, M.D.**

Page 80

# Signature Page

_David J. Gill_
_____
David J. Gibson, M.D.

## David J. Gibson

Digitally signed by David J. Gibson
DN: CN = David J. Gibson, C = US
Reason: I am the author of this
document
Date::2004.04.22 09:01:17 -07'00'

April 22, 2004
_____
Date

David J. Gibson, M.D.

# Attachment A: Curriculum Vitae

## David J. Gibson, M.D.

4830 Oak Vista Drive
Carmichael, CA 95608
916.359.4268 voice
916.359.4267 fax
davidjgibson@msn.com

## Experience

### The Fraud Prevention Institute (FPI)
*Chief Executive Officer*
2003 - Present

The Fraud Prevention Institute (FPI) is a California based non-profit organization. FPI is a business league whose purpose is to promote the common business interests of health care providers by preventing, detecting and eradicating fraud in the health care industry. To accomplish this mission, FPI conducts active programs of research, education, consulting, and network management. All of these activities are aimed at elevating ethical standards of health care providers and eliminating fraud in the industry.

FPI's technology was developed by a joint task force consisting of the Federal Bureau of Investigation and the MediCal Fraud Prevention Bureau. This task force has investigated more than 500 Medi-Cal providers over the last few years. These investigations produced a 100% conviction rate. The task force charged 314 individuals with $200,000,000 fraud. To this date, 195 have been convicted with $72,000,000 restitution recovered. The senior agents, both state and FBI have joined FPI on a full time basis and make up the operational core of the organization.

### Illumination Medical Inc.
*Partner & Chief Operating Officer*
2003 - Present

Illumination Medical is a unique, specialty consulting organization. Large managed care underwriting companies tend to focus their resources upon their fully insured products that are defined by state insurance law. Furthermore they tend to bring this orientation to their administrative services only (ASO) contracts. This is certainly the case for organizations like Blue Cross across the country.

ERISA and Taft-Hartley Trusts need consulting support that focuses upon the Trust's unique position within the market and leverages the Trust's advantages under Federal Law. Illumination Medical, Inc. targets its services to serve mid sized self funded trusts including ERISA and Taft-Hartley trusts.

Illumination Medical's core competency centers upon evolving problems faced by *all* health plans. Actuarial support, administrator and PBM auditing, and traditional claims

David J. Gibson, M.D.

based benefit design activities are all still important but no longer fully meet the evolving needs of health plans in today's market. It is now incumbent upon health plan administrators to manage proactively using current data rather than reactively using past experience.

## Pharmaceutical Care Network (PCN)
*Medical Director*
2002 – Present

Based in Sacramento, California, PCN is a full service pharmacy benefit management and healthcare information management company providing services to Medicaid Managed Care Plans, self-funded employer groups, Health & Welfare Trust Funds, Third Party Administrators, HMOs and other Managed Care Organizations. MedIntelligence, the clinical offering from PCN, provides healthcare information management services to the health care industry, and focuses on improving outcomes - both clinical and financial. PCN's mission is to maximize the value of health care by managing pharmaceutical information, programs and services for its customers. I serve as the Chairman of the Pharmacy and Therapeutics Committee for PCN and have responsibility for developing the company's formulary. I also serve as the Chairman of the Quality Assurance activities for PCN functioning as a delegated manager for a number of NCQA qualified MCOs.

## The Pacific Development Group
*President*
2000 - Present

Founded a consulting group that consists of health care executives with extensive experience in developing and managing physician organizations. The group is recognized for its intimate knowledge of healthcare markets throughout the United States. In addition, the group is known nationally for its experienced leadership of pharmacy networks. PDG's focus is the development and deployment of physician connectivity modalities throughout the West Coast, Hawaii as well as other markets. Furthermore, PDG will exploit the business opportunities that result from a long-term relationship with the prescribing physician or medical group using these evolving information technologies.

## RxPhysician.com
*Chief Executive Officer*
1998 - 2001

Founded a medical information integration company specializing in pharmacy ordering systems. The Company utilizes innovative hand-held wireless technology to permit the prescribing physician to have full access to computer databases from the mobile pocket in his lab jacket. The Company has deployed its systems at the Santa Barbara Medical Foundation in Santa Barbara, CA and at the Straub Clinic and Hospital in Honolulu, HI.

David J. Gibson, M.D.

## CASIO Manufacturing Corporation
*Chief Medical Officer –* American Research and Development
1999-2001

Provided technical assistance to the Research and Development Group, which is
based in San Jose California.  Primary area of interest involved business-to-business
(B-2-B) applicability of CASIO's hand-held technology with wireless linkage to the
Internet.

## Longs Drug Stores and RxAmerica
*Chief Medical Consultant*
1998 - 2001

Provided consulting services to Longs Drug Stores, with sales averaging over $8.7
million per store, Longs operates 460 stores and is the largest drug store chain in
Hawaii.  With 400 clients and 3.1 million lives represented, RxAmerica is a leading
provider of Pharmacy Benefits Management (PBM) Services.  My responsibility was to
provide consultative services to both organizations.  I focused my attention on the
development of a stronger professional relationship between the dispensing
pharmacist and the prescribing physician.  Specifically, I developed a series of B-2-B
tools to facilitate the strengthening of the professional relationship using the Internet
as the method of communication.

## Omni HealthCare
*Vice President, Medical Affairs & Chief Medical Officer – Insurance Products, the
Sutter System*
1996 – 1998

Responsible for medical related policy and operational issues.  Omni HealthCare was
a 175,798 member, California based, for profit health plan, owned by the *Sutter*/CHS
Health System.  Omni's annual revenue stood at over $157 million.  The provider
network consisted of 1,000 primary care physicians, 2,400 specialists, and 50
hospitals.

## Medical Technology Transfer Corporation
*President*
1994 -1996

I started the company and sold a major equity position.  The Medical Technology Transfer
Corporation (MTT Corp) is an investment and management company.  It develops
advanced imaging centers throughout the world and tele-communicates the digital data
via satellite and fiber optic landlines back to the faculty practice at leading academic
medical centers in the United States. MTT Corp leads a consortium of companies
including Semen's Medical Systems, Harris Corporation and UCLA in its imaging center
development activity.  Projects included a facility in Melbourne, Florida; Buenos Aires,
Argentina; Santiago, Chile and Costa Rica.

**David J. Gibson, M.D.**

### UCLA Medical Group Practice
*Chief Executive Officer*
1993-1994

The UCLA Medical Group Practice is the second largest group practice in the United States encompassing over 800 physicians. The group consisted of the full and part time faculty members in the UCLA School of Medicine.

### Metropolitan Life Insurance Company (MetLife)
*Vice President for Medical Affairs & CMO - Florida*
1991-1993

Supervised medical benefits administration for over 935,000 insured. The total dollars managed exceeded $1.12 billion annually and represented 14 percent of MetLife's total managed indemnity and 7 percent of its total HMO book of business. The Florida network for MetLife consisted of thirty-eight hundred physicians and twenty-three hospitals.

### Avanti Health Systems
*President and Chief Executive Officer*
1984 - 1991

Avanti Health Systems was a development and management firm. Projects developed were national in scope with locations in Texas, Florida, Colorado, California, Connecticut and other states. When operational, the independent managed care companies developed grossed over $150 million in 1987. Their gross revenues in 1988 exceeded $250 million. Most of these managed care companies have been acquired by national insurance companies during the early 1990s.

### Santa Barbara Medical Foundation Clinic
*Partner*
1977 - 1984

Clinical practice of Rheumatology within the Department of Medicine. Academic appointments at both UCLA and the University of Southern California (U.S.C.). I also served as President of the Santa Barbara Society of Internal Medicine.

## Education

### Asbury College
*B.A., Liberal Arts, 1967*

### University of Kentucky
M.D., 1971

### University of Indiana
*Internship and Residency in Internal Medicine, 1973*

### Harvard University
*Research Fellow - Rheumatology, 1975*

**David J. Gibson, M.D.**

## Academic Appointments

**Harvard University**
*National Institutes of Health Research Fellow*
*Clinical Proctor, Internal Medicine*

**Louisiana State University School of Medicine (LSU)**
*Clinical Associate Professor of Medicine - Rheumatology*

**University of California Los Angeles School of Medicine**
*Clinical Associate Professor of Medicine - Rheumatology*

**University of Southern California School of Medicine**
*Clinical Associate Professor of Medicine - Rheumatology*

**University of Texas Medical School - Houston**
*Clinical Associate Professor of Medicine - Rheumatology*

## Licensure

California # G33504

## Certification

National Board of Medical Examiners #118712
The American Board of Internal Medicine #47482

## Personal Data

- Associate editor of *SSVMedicine*, the official publication of the Sierra Sacramento Valley Medical Society (SSVMS) - http://www.ssvms.org/magazine.asp

- Member of the Medical Practices Committee for the California Medical Association (CMA).

**David J. Gibson, M.D.**

# Attachment B: Bibliography

**Articles written during the last 10 Years by
David J. Gibson, M.D.**

David J. Gibson, M.D.

## Bibliography: *SSV Medicine*

The Sierra Sacramento Valley Medical Society

David J. Gibson, MD



All articles are hyperlinked to:
http://www.ssvms.org/index.asp

SSVMS: Sierra Sacramento Valley Medicine - Vol. 52 / No. 5 - Sep / Oct 2001
*Spending More on Drugs*, by David J. Gibson, MD - The United States should - and inevitably will - be paying at least twice as much for drugs. The bad news is the likely source of those dollars.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 52 / No. 6 - Nov / Dec 2001
*Our Pursuit of Mediocrity*, by David J. Gibson, MD - Why does California want a Third World health care system?

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 1 - Jan / Feb 2002
*My Experience with Health Care Inflation in the ER*, by David J. Gibson, MD - Physicians need to do something about the high cost of ambulatory care in the hospital setting - because they'll be blamed for the mess in any event.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 2 - Mar / Apr 2002
*"John Q" Is Worth Seeing*, by David J. Gibson, MD - Denzel Washington's new movie, "John Q," is worth watching. It will likely become part of the public discourse on where we go with health care in the future.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 2 - Mar / Apr 2002
*Morphing of Health Care*, by David J. Gibson, MD - Financing of health care in the United States is now entering a period of rapid change. For the past 15 years, managed care has been the predominant product that employers have selected to manage the group health benefit for their employees.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 52 / No. 3 - May / Jun 2001
*A Doctor Shortage? Fine!*, by David J. Gibson, MD - Health care professionals are behaving rationally. They are entering other fields or selecting less hostile markets.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 52 / No. 2 - Mar / Apr 2001
*What Comes After Managed Care?*, by David J. Gibson, MD - Health care in California is broken and managed care, as a cost-containment mechanism, is dead. Employers will abandon this increasingly unpopular approach.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 51 / No. 1 - Jan / Feb 2000
*Corporate Practice*, by David J. Gibson, MD - The long-standing bar on the corporate practice of medicine in California is being skirted in the struggle to control the structuring of health care.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 52 / No. 3 - May / Jun 2001
*Your Practice - 2005 A.D.*, by David J. Gibson, MD - In the last issue, the author contended

David J. Gibson, M.D.

managed care is dying and that employers will turn to a new way of financing health care coverage for workers. That means big changes for practicing physicians.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 4 - Jul / Aug 2002
*Plop, Plop, Fizz, Fizz*, by David J. Gibson, MD - The author's family just joined Kaiser — and, as that old jingle goes, "Oh, what a relief it is!"

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 5 - Sep / Oct 2002
*Thinking About Retiring? — Think Again*, by David J. Gibson, MD - If you're thinking about retiring, don't forget to factor in the escalating costs of health care coverage. Then you can start worrying about long term care.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 53 / No. 6 - Nov / Dec 2002
*Bad Times for Physicians*, by David J. Gibson, MD - Physicians in private practice will soon begin to experience a precipitous drop in office cash flow...

SSVMS: Sierra Sacramento Valley Medicine - Vol. 54 / No. 1 - Jan / Feb 2003
*The Diminishing Pharmacy Benefit*, by David J. Gibson, MD - Consumers can look forward to deductibles, generic drugs and on-line Canadian purchases.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 54 / No. 4 - Jul / Aug 2003
*"Single-Payer" Simply Won't Work in California*, by David J. Gibson, MD - An increased state tax liability for expanded California entitlements would impoverish our children and their families.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 54 / No. 5 - Sep 2003; **Medicine's Feminization —and its Implications** By David J. Gibson, MD.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 54 / No. 6 - Nov / Dec 2003
*CMA: Part of the Problem*, by David J. Gibson, MD - The requisite for a professional is the willingness to place the calling above self-interest.

SSVMS: Sierra Sacramento Valley Medicine - Vol. 55 / No. 1 - Jan / Feb 2004
*Fraud in Health Care*, by David J. Gibson, MD - Despite the myth of abused doctors, fraud is a serious problem that we must address.

David J. Gibson, M.D.

Bibliography: *Organized Labor*



David J. Gibson, MD



Article references are linked to:  http://www.sfbctc.org/

**The Feminization of Medicine and its Implications** by David Gibson, M.D.

**Workers Compensation is Under Utilized** by David J. Gibson, MD

**An M.D. Offers Alternatives to Labor's Health Care Dilemma** by David J. Gibson, MD

**Fraud in Health Care** by David J. Gibson, MD

**Three Articles on Health** by Doug Perry and David J. Gibson, MD

**Why are Prescription Drugs Cheaper in Canada?** by David Gibson, M.D.

**Why Does Health Care Cost so Much?** by David Gibson, M.D.

**David J. Gibson, M.D.**