7/18/2002 Bystrom, Dale (final)

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
 2                 WESTERN DIVISION AT CINCINNATI

 3
      DURAMED PHARMACEUTICALS, INC.,   )
 4                                     )
                                       )
 5            Plaintiff               )
      vs.                              )    CIVIL ACTION
 6                                     )    NO. C-1-00-735
      WYETH-AYERST LABORATORIES, INC., )
 7                                     )
                                       )
 8                                     )
              Defendant               )
 9
      *************************************
10        ORAL AND VIDEOTAPED DEPOSITION OF
                    DALE BYSTROM
11               HIGHLY CONFIDENTIAL
                    JULY 18, 2002
12    *************************************
13         Oral deposition of DALE BYSTROM, produced as
      a witness at the instance of the Defendant and duly
14    sworn, was taken in the above-styled and numbered
      cause on the 18th of July, 2002, from 10:01 a.m. to
15    4:37 p.m., before Susan T. Baker, RDR, Certified
      Shorthand Reporter and Notary Public in Harris County,
16    for the State of Texas, reported by machine
      stenography, at the offices of Susman Godfrey, LLP,
17    1000 Louisiana, Suite 5100, Houston, Texas, pursuant
      to the Federal Rules of Civil Procedure, Notice and
18    the agreement of counsel that:
19              The original signature page of this
      deposition shall be forwarded to the attorney for
20    Plaintiff, who shall obtain the signature of the
      witness before any notary public within 30 days prior
21    to returning same to the court reporter for
      appropriate filing.  Failing that, a copy of this
22    deposition can be used at the time of trial with the
      same validity as if it were the original.
23
24
25
```

---

7/18/2002 Bystrom, Dale (final)

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFF:
 3         Carolyn P. Courville
           Susman Godfrey, LLP
 4         1000 Louisiana Street, Suite 5100
           Houston, TX  77002-5096
 5         713-653-7859
 6
 7    FOR THE DEFENDANT:
 8         David Eggert
           Christy C. Wiegand
 9         Arnold & Porter
           555 Twelfth Street, NW
10         Washington, D.C.  20004-1206
           202-942-6543
11
12    ALSO PRESENT:
13         Samantha Scott, intern,
           Susman Godfrey LLP
14
      VIDEOGRAPHER:
15         Scott Michael
           Steve Michael
16
17
18
19
20
21
22
23
24
25
```

---

```
 1    ----------------------INDEX----------------------
 2                                                    Page
      DALE BYSTROM
 3    Examination by MR. EGGERT                        5
 4    Witness Corrections and Signature              221
      Reporter's Certificate                         223
 5
                  *    *    *    *
 6
                    EXHIBIT INDEX
 7
      EXHIBIT NO. 120                                 210
 8    Viking-Managed Care Update (Cenestin)
      DUR010733-746
 9
      EXHIBIT NO. 301                                 152
10    e-mail, Carter to casey@solvay,
      DUR010960-966
11
      (BYSTROM) EXHIBIT NO. 848                         9
12    Expert Report of Dale Bystrom, R.Ph.
13    (BYSTROM) EXHIBIT NO. 849                        77
      "Drug Cost Management Report," 6/02
14
      (BYSTROM) EXHIBIT NO. 850                        80
15    Lois Rulli competitive information
      operation WYE 049839-40
16
      (BYSTROM) EXHIBIT NO. 851                       115
17    "Principles of a Sound Drug Formulary System,"
      10/00
18
      (BYSTROM) EXHIBIT NO. 852                       115
19    e-mails Neeley to Carter, DUR010670-10682
      (BYSTROM) EXHIBIT NO. 853                       123
20    RxAmerica Drug Formulary 2000
21
      (BYSTROM) EXHIBIT NO. 854                       136
22    "Premarin Tabs Pricing and Contracting
      Strategy as of April 2001," WYE 088156-159
23
      (BYSTROM) EXHIBIT NO. 855                       158
24    ltr, 6/28/02, Courville to various,
      encl. Plaintiff's Supplemental Responses to
25    Interrogatories
```

---

7/18/2002 Bystrom, Dale (final)

```
 1              EXHIBIT INDEX (cont'd)
 2    (BYSTROM) EXHIBIT NO. 856                       166
      McElroy to Jana, WYE 153066-072
 3
      (BYSTROM) EXHIBIT NO. 857                       170
 4    e-mail, Solomon to Duroche WYE 117994-118056
 5    (BYSTROM) EXHIBIT NO. 858                       191
      PCS Pharmacy and Therapeutics Committee Meeting
 6    Minutes, 9/15/99
 7    (BYSTROM) EXHIBIT NO. 859                       211
      RxAmerica Preferred Formulary Alternatives
 8
      (BYSTROM) EXHIBIT NO. 860                       214
 9    e-mails Messina to Carter 11/10/00
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    THE VIDEOGRAPHER:  Date is July 18th,
2  2002.  We are on the record at 10:01.
3    DALE BYSTROM,
4  having been first duly sworn, testified as follows:
5    EXAMINATION
6    Q.  (BY MR. EGGERT)  Sir, could you please state
7  your name for the record?
8    A.  My name is Dale Bystrom.
9    Q.  Mr. Bystrom, my name is David Eggert.  I'm
10  an attorney with Arnold & Porter in Washington, D.C.,
11  and I represent the -- and I need to put on my
12  microphone.  And I represent the Defendant in this
13  case, Wyeth-Ayerst Pharmaceuticals.  We will be taking
14  your deposition today.
15    I take it you've not had your deposition
16  taken before?
17    A.  Not as an expert witness.  I have been
18  deposed before, however.
19    Q.  What's the context in which you've been
20  deposed previously?
21    A.  I was deposed in an arbitration case between
22  a retail pharmacy and a PBM, and I was an employee of
23  the pharmacy at that time; and I was also deposed many
24  years ago as an employee during a case between myself
25  and a previous employer.

1    arbitration.
2    Q.  And was that the end of the matter --
3    A.  Yes.
4    Q.  -- or did it proceed?
5    A.  No, it did not.
6    Q.  One thing one thing I should say is that
7  I'll be asking questions today during the course of
8  the deposition.  If at any time you don't understand a
9  question, please feel free to ask me to clarify.  From
10  time to time, your attorney -- are you represented
11  here by counsel today?
12    A.  I am not.
13    Q.  Okay.  Well, from time to time today, Miss
14  Courville, who is representing I guess just Duramed
15  but not the witness in the context of this?
16    MS. COURVILLE:  Well, he is an expert
17  that's been retained by Duramed, so that is my
18  relationship with Mr. Bystrom.
19    MR. EGGERT:  Right.  Are you
20  representing the witness today?
21    MS. COURVILLE:  Personally?  Yes.
22    MR. EGGERT:  Yes?
23    MS. COURVILLE:  Yes.
24    MR. EGGERT:  Okay.
25    Q.  (BY MR. EGGERT)  Okay. From time to time,

1    Q.  In connection with the arbitration
2  concerning a pharmacy and a PBM, was the pharmacy Long
3  Drug Stores?
4    A.  Yes.
5    Q.  And what was the nature of the dispute with
6  the PBM in that case?
7    A.  The nature of the dispute was over
8  reimbursement for claims that had been submitted.
9    Q.  And who was it who was claiming
10  reimbursement?
11    A.  There was a dispute over the amount of
12  reimbursement that should have been submitted.  The
13  PBM was suing Longs Drug Stores for additional payment
14  that they felt was due them.
15    Q.  I see.  It felt that Long Drug Store had
16  submitted reimbursements that were higher than were
17  authorized under its arrangement with the --
18    A.  No, that's no correct.  They had interpreted
19  the reimbursement agreement differently than Longs
20  Drug Stores had interpreted the reimbursement
21  agreement.
22    Q.  And who was the PBM involved in that case?
23    A.  MedImpact.
24    Q.  And how was that case resolved?
25    A.  Longs was victorious 100 percent in the

1  Miss Courville might object to a question; and if she
2  objects, you can still and should still answer the
3  question unless she directs you not to answer by way
4  of an instruction.
5    If you need a break at any time or want a
6  drink or something, just let us know and we'll try to
7  accommodate you as soon as we can; and if there's any
8  other questions that come up, just let us know.
9    A.  Okay.
10    Q.  And what was the nature of your testimony in
11  the arbitration against MedImpact?
12    A.  The nature -- I was deposed, and the nature
13  of my testimony, they deposed me to explain my role at
14  Longs and my role at the PBM owned by Longs Drug
15  Stores.
16    Q.  And what was your role at Longs and at the
17  PBM owned by Longs Drug Stores at that time?
18    A.  At that time, I was the vice-president of
19  managed care for Longs Drug Stores and the co-general
20  manager of RxAmerica, and the vice-president of
21  managed care services for Integrated Health Concepts
22  at Longs Drug Stores.
23    Q.  And was RxAmerica the PBM that was owned by
24  Longs Drug Stores?
25    A.  Yes, Longs owned 50 percent of it at that

1    time.

2        Q.   And -- was it Integrated Health Concepts --
3    was that also a PBM?

4        A.   It was.  The span of the complaint by
5    MedImpact was over a time period during which Longs
6    owned and operated Integrated Health Concepts, which
7    was later merged into RxAmerica.  Longs became half
8    owner of RxAmerica, and the complaint by MedImpact
9    spanned that entire period.  So I was in those three
10   positions during that time frame.

11       Q.   I see.  Let's see.  If I could, I'd like to
12   mark as -- oh, boy.  Exhibit --

13           MS. COURVILLE:  Oh, that's a tricky
14   one.  Should we go off the record and find out?

15           MR. EGGERT:  Want to go off the record
16   for a minute and find out?

17           MS. COURVILLE:  Yes, let's go off the
18   record for a second.

19           THE VIDEOGRAPHER:  We're off the record
20   at 10:07.

21       (Short break 10:07 to 10:11 a.m.)

22           THE VIDEOGRAPHER:  We are back on the
23   record at 10:11.

24   (Bystrom Exhibit No. 848 marked for identification.)

25       Q.   (BY MR. EGGERT)  Sir, I'd like to show you a

1    document that has been marked as Exhibit 848 in this
2    case, and it's captioned the expert report of Dale
3    Bystrom, R.Ph.  Have you seen this document before?

4        A.   Yes, I have.

5        Q.   And if you turn to page 36 of the document,
6    it's towards the end, is that your signature that
7    appears there dated June 30th, 2002?

8        A.   Yes, it is.

9        Q.   And you have reviewed this document and
10   consider it to be accurate, to the best of your
11   knowledge and belief?

12       A.   Yes.

13       Q.   If I could refer you to attachment A to the
14   document, is this a copy of your CV or curriculum
15   vitae?

16       A.   It is, yes.

17       Q.   And you currently live in Modesto,
18   California; is that correct?

19       A.   That's correct.

20       Q.   Have you always lived in California?

21       A.   No.

22       Q.   During what period of time did you not live
23   in California?

24       A.   19 -- well, let's see.  1988 through 1989.

25       Q.   And other than that one-year period or one-

1    to two-year period from 1988 to '89 -- I take it
2    perhaps you were in Illinois during that time?

3        A.   Yes.

4        Q.   Have you lived in California the rest of
5    your life?

6        A.   I have, yes.

7        Q.   Okay.  I take it your title, your current
8    title is Director of Business Alliances for Longs Drug
9    Stores; that's correct?

10       A.   That's correct.

11       Q.   And also vice-president of PBM Services for
12   Nex2, Inc.?

13       A.   That has recently changed.  Nex2, Inc.,
14   has -- as of yesterday, has been acquired by a company
15   called NGenics (phonetic).

16       Q.   What is -- or what was Nex2, Inc.?

17       A.   Nex2, Inc. was a start-up technology company
18   that obtained and provided personal prescription
19   history to the life insurance industry for the purpose
20   of underwriting.

21       Q.   And how did Nex2 obtain personal
22   prescription history to provide it to the insurance
23   industry?

24       A.   I worked for Nex2 as their vice-president of
25   PBM services and established contracts and a network

1    of PBMs from which the prescription histories were
2    harvested.

3        Q.   So it was your job to contract with PBMs in
4    order to harvest prescription histories for patients;
5    is that correct?

6        A.   That's correct, yes.

7        Q.   And would you acquire them from PBMs, is
8    that what you would do, pay them money, and then they
9    would give you the information?

10       A.   No, what we did was to set up technology at
11   the PBM sites that would allow direct queries from the
12   insurance underwriters to the PBMs to harvest and
13   obtain that information.

14       Q.   I see.  So there would be a direct link
15   between the insurers and the PBMs?

16       A.   More indirect, I suppose.  The insurance
17   inquiry came to Nex2 and then was distributed out to
18   our PBM network.  The responses and prescription
19   profiles were then brought back to Nex2 and
20   transmitted back to the requestor.

21       Q.   Were there privacy concerns associated with
22   this enterprise?

23       A.   Absolutely, yes.

24       Q.   But was there a requirement that the patient
25   or the person applying for insurance had to consent to

1  this process before it would be undergone?

2      A.  Yes.

3      Q.  And were you an owner of Nex2?

4      A.  I was a shareholder.

5      Q.  Okay.  Was -- was Nex2 connected in any way

6  to Longs Drug Stores?

7      A.  No.

8      Q.  Okay.  So you held two different positions

9  simultaneously, one for Longs Drug Stores and one for

10  another entity?

11     A.  That's correct.

12     Q.  Are you working part time for Longs Drug

13  Stores during that time?

14     A.  Yes.

15     Q.  How long have you been working part time for

16  Longs Drug Stores?

17     A.  Approximately two years, two and a half.

18     Q.  And how did you split your time during that

19  time period?

20     A.  Roughly fifty-fifty.

21     Q.  Now, what is Longs Drug Stores?

22     A.  Longs Drug Stores is a publicly held

23  corporation of 430-plus chain pharmacies operating in

24  the western United States, California, Hawaii, Oregon,

25  Washington, Nevada and Colorado.

1      Q.  Are most of the stores in California?

2      A.  The largest percentage of the stores are in

3  California, correct.

4      Q.  And Longs Drug Stores operates as a

5  pharmacy?

6      A.  It operates as a retail pharmacy chain,

7  correct.

8      Q.  What were your duties as the director of

9  business alliances of Longs Drug Stores?

10     A.  Director of business alliances, I worked

11  with clients and health plans with which Longs had

12  involvement to develop Internet alliances and business

13  projects that allowed Longs to build their market

14  share of the health plan membership and their pharmacy

15  services, so basically created Internet alliances and

16  in-store marketing programs directly to the clients

17  through the alliances that were created.

18     Q.  Who were the clients that you're speaking

19  of?

20     A.  Clients would be entities like Sharp Health

21  Plan in San Diego; US Script, which was a PBM in

22  Fresno; a number of other PBMs and health plans.  We

23  were just beginning this process.

24     Q.  And the idea was to -- was to increase the

25  number of PBMs that Longs Drug Stores dealt with; is

1  that accurate?

2      A.  That's not accurate.  The idea was to create

3  additional business links between existing partners

4  that Longs already dealt with to encourage their

5  patients to use more of Longs services, specifically

6  pharmacy services that were offered through our

7  Internet that I developed for Longs through our

8  website, and to encourage their members to go to our

9  website and use our services for ordering their

10  prescriptions.

11     Q.  So Longs had a mail order enterprise that

12  one could access through the Internet; is that

13  correct?

14     A.  Longs had -- one of their pharmacies located

15  in Dublin, California, would have the capability of

16  mailing prescriptions to individuals.  Individuals

17  could also place their prescription orders through our

18  website and have that order directed to the store of

19  their choice of Longs to go pick it up.  So they had

20  two avenues with which to obtain their services.

21     Q.  If products were mailed, were they -- were

22  they cheaper than if you bought them directly from the

23  pharmacy?

24     A.  All of Longs programs through the Internet

25  were retail programs.  They were not mail service

1  benefits.

2      Q.  We're okay?

3          (Alarm is heard.)

4          MR. EGGERT:  We are having a fire

5  drill, but we don't have to participate.  Well, we may

6  have to break.  Let's go off the record while the --

7          THE VIDEOGRAPHER:  We're off the record

8  at 10:19.

9          (Short break 10:19 to 19:21 a.m.  Steve

10  Michael replaced Scott Michael as the videographer for

11  the remainder of the deposition.)

12         THE VIDEOGRAPHER:  We're back on the

13  record at 10:21 a.m.

14     Q.  (BY MR. EGGERT)  Sir, let's see.  We're back

15  on the record.  In the course of your duties as

16  director of business alliances, did you have -- did

17  you have any responsibility with respect to RxAmerica?

18     A.  I was on the operating committee for

19  RxAmerica.

20     Q.  What is the operating committee for

21  RxAmerica?

22     A.  The operating committee was an oversight

23  board very much like a board of directors.

24     Q.  And so what sort of issues would the

25  oversight board deal with?

1      A.   We dealt with issues such as strategic
2  planning, quarterly review, major performance issues,
3  things like that.
4      Q.   Would you have dealt with managed care
5  contracting issues?
6      A.   Not as a member of the operating committee.
7      Q.   All right.  At any time -- at any time after
8  you left the position of general manager of RxAmerica
9  in 1999, were you involved in those type of
10 contracting issues?
11     A.   Not directly, no.
12     Q.   Let's see, between 1997 and 1999, you served
13 as the general manager for RxAmerica; is that correct?
14     A.   Yes.
15     Q.   And RxAmerica was at that time owned by Long
16 Drug Stores; is that correct?
17     A.   Longs Drug Stores, and it started out
18 American Drug Stores, and then they were acquired by
19 Albertson's.
20     Q.   And during the entirety of that time, you
21 were working with RxAmerica?
22     A.   Yes.
23     Q.   What were your duties as the general manager
24 of RxAmerica?
25     A.   My duties were to generally oversee the

1  operations of the PBM and represent Longs' interest
2  and presence at the PBM location.
3      Q.   Was being general manager kind of like being
4  president, is that a similar title?
5      A.   That was the highest position at the
6  operation, correct.
7      Q.   So if they ask who runs RxAmerica, it would
8  have been yourself?
9      A.   Correct.
10     Q.   Were you involved in managed care
11 contracting decisions at that time?
12     A.   I was involved in an oversight capacity and
13 aware of what was going on in that area.
14     Q.   What is a PBM?
15     A.   PBM is an acronym for Pharmacy Benefit
16 Management.  It's a unique entity that is formed to
17 manage the administration of pharmacy benefits between
18 the provider of the benefits, the pharmacy, and the
19 payor of the benefits, be it a health plan or an
20 employer group, municipality or governmental
21 organization.  They're an intermediary that provides
22 administrative as well as clinical services to
23 administer the pharmacy benefits for the payor.
24     Q.   What sort of administrative services would a
25 PBM provide?

1      A.   It would provide a number of services, such
2  as management of health plan member eligibility.  They
3  provide pharmacy network services, providing networks
4  to pharmacies for the client for the members to access
5  prescription services.  The administrative services
6  may cover mail service operations; reporting back to
7  the client, both financial as well as utilization
8  reporting; development of formularies; administration
9  of rebate financials.
10          And then in addition to the administrative
11 functions, there's a number of clinical functions that
12 may be performed as well, such as compliance programs,
13 refill reminders, disease management programs, drug
14 utilization review programs, to assure that the
15 pharmaceutical therapy was being appropriately
16 distributed and utilized and reported back to the
17 providers and the payors.
18     Q.   So in that way to provide a check on the
19 physicians to make sure that they were appropriately
20 prescribing medications?
21     A.   They call it profiling; yes, to report on
22 the prescribing habits of the physicians.
23     Q.   Let's see.  Do you consider PBMs to be
24 interfering in the practice of medicine?
25     A.   No, I think PBMs probably are additive to

1  that practice.
2      Q.   In what way?
3      A.   Well, in the development of formularies to
4  help determine appropriate and cost-effective
5  prescribing choices; in drug utilization review
6  programs, to assure that there's not duplicate therapy
7  or fraudulent therapy; in the area of administering
8  drug supplies, to make sure there's not
9  overutilization or underutilization.
10          So I think there's a number of checks they
11 do for safety as well as cost-effective pharmacy
12 therapy administration.
13     Q.   Why would it be necessary for PBMs to set up
14 formularies to ensure appropriate and cost-effective
15 drug administration?  Why can't we count on physicians
16 to do that?
17     A.   The physicians don't have a broad-based
18 knowledge of all the pharmaceutical products that are
19 available, nor do they enter into relationships to
20 develop formularies with the drug manufacturers today.
21     Q.   Now, while you were general manager, did you
22 have other people reporting to you who were
23 responsible for managed care contracting?
24     A.   Yes, uh-huh.
25     Q.   And who was that?

1     A.     Our managed care contracting was done by a
2  gentleman named Joe LaPine.
3     Q.     And you considered him to be competent at
4  his job?
5     A.     Yes.
6     Q.     And did you also have a -- what's known as a
7  P & T committee while you were at RxAmerica?
8     A.     We did.  We have a pharmacy therapeutics
9  committee that was comprised of physicians in the --
10  in the area.
11     Q.     What was the role of the P & T committee?
12     A.     The role of the P & T committee was to
13  review formulary selection, formulary choices, and to
14  approve formulary drugs to be placed on formulary.
15     Q.     Would they engage in clinical reviews of the
16  drugs?
17     A.     Yes, they would.
18     Q.     Was that an important role that they
19  performed?
20     A.     That was their major role as -- on the P & T
21  committee.
22     Q.     Let's see.  Prior to the time that you were
23  the general manager at RxAmerica, you were the
24  vice-president of managed care services at a PBM known
25  as Integrated Health Concepts; is that correct?

1     A.     That's correct.
2     Q.     And that was between 1995 and 1997?
3     A.     Yes.
4     Q.     And was Integrated Health Concepts a PBM
5  that was a subsidiary of Longs Drug Stores that was
6  later folded into RxAmerica?
7     A.     Yes, it was later merged into RxAmerica.
8     Q.     What were your duties as the vice-president
9  of managed care services at Integrated Health
10  Concepts?
11     A.     I developed -- created Integrated Health
12  Concepts for Longs Drug Stores and was responsible for
13  its oversight as the highest-ranking person within the
14  organization.
15     Q.     Was -- was the development of Integrated
16  Health Concepts as a PBM owned by Longs Drug Stores
17  your idea?
18     A.     Basically my idea, yes.
19     Q.     Why was it that you considered it to be a
20  wise thing to do for Longs Drug Stores to develop its
21  own PBM subsidiary?
22     A.     Prior to my role in developing Integrated
23  Health Concepts, I was responsible for Longs
24  third-party administration and contracting in the
25  managed-care industry.  We had a number of groups,

1  employer groups, municipalities, contact Longs,
2  contact me, to see if Longs was capable of providing a
3  prescription benefit for them; and because of those
4  type of requests, it made sense to me that we wanted
5  to have a more formalized process to do that.  And it
6  also made sense that we may be able to improve Longs'
7  market share by being the PBM for clients in our
8  market area.
9     Q.     How would it be that you would improve
10  Longs' market share, I take it vis-a-vis other retail
11  pharmacies, by being the PBM for health plans in your
12  area?
13     A.     By having Longs be the selected, preferred
14  or one of the few pharmacy chains in the network that
15  we offered to clients to utilize.
16     Q.     So as a PBM, Integrated Health Concepts
17  would select certain pharmacies as being preferred
18  pharmacies?
19     A.     We would develop pharmacy networks at the
20  request of the client that would be anywhere from some
21  to all pharmacies, depending upon what the client's
22  needs were.
23     Q.     In what circumstances would you develop
24  preferred pharmacies and what would that mean?
25     A.     Well, one example would be we were requested

1  to put together a pharmacy benefit program for Gallo
2  health plans, which is Gallo Winery of -- they are
3  located in Modesto, California; and it was their
4  request that only pharmacy providers that purchase
5  their -- purchase and sell their products would be
6  included in their pharmacy network.  That's one
7  example of a restricted program.
8     Q.     And Longs Drug Stores sold Gallo products?
9     A.     Yes.
10     Q.     Are there other examples as well that you
11  recall, or was that the only one?
12     A.     There -- we had a pharmacy network we
13  developed for Omni Health Plan to manage their
14  Medicaid program, and that was comprised of Longs Drug
15  Stores plus independent pharmacies in the Omni area.
16  Not -- did not have other chain pharmacies involved in
17  the network.  That was another example.
18     Q.     And is that because Longs Drug Stores agreed
19  to give lower prices with respect to those products?
20     A.     It was to enable Longs to have better
21  control over the pharmacy services delivered; that was
22  a reflection on the pricing of those services for the
23  client.
24     Q.     Were you responsible for managed care
25  contracting during the time that you were

1    vice-president of managed care services at Integrated
2    Health Concepts?
3         A.   Could you repeat that question?
4         Q.   Were you responsible -- were you responsible
5    for contracts entered into between Integrated Health
6    Concepts and pharmaceutical manufacturers at the time
7    that you were the vice-president of managed care
8    services at that organization?
9         A.   Yes.
10        Q.   And would you personally negotiate those
11   agreements with pharmaceutical manufacturers?
12        A.   Yes.
13        Q.   And was it common in connection with those
14   agreements that Integrated Health Concepts would
15   arrange to receive a rebate from a pharmaceutical
16   manufacturer in connection with its agreements with
17   the manufacturer?
18        A.   Let me make sure that I'm not confusing you
19   with my answer.  We had relationships with
20   manufacturers for clinical service programs that I
21   negotiated directly with the manufacturers.  We also
22   had contracts for formulary rebates which we obtained
23   from another PBM, using their formulary and their
24   contracting process.
25        Q.   What -- what PBM did you obtain the rebate

1    contracts from?
2         A.   We utilized PBM in Sacramento called PCN,
3    Pharmaceutical Care Network.
4         Q.   So the effect of this using theirs was that
5    PCN would be negotiating rebates with manufacturers on
6    behalf of Integrated Health Concepts?
7         A.   Well, it goes a step beyond that.  PCN was
8    utilizing the formulary of Integrated Pharmaceutical
9    Services owned by Foundation Health Plan.  They were
10   the contracting entity direct with the manufacturers.
11        Q.   So in essence, is it accurate, then, that
12   Integrated Health Concepts utilized the formularies
13   and the rebate systems that IPS had established with
14   pharmaceutical manufacturers?
15        A.   Through PCN, correct.
16        Q.   And that was true from 1995 to 1997; that's
17   correct?
18        A.   Yes.
19        Q.   As of 1997, did RxAmerica then begin to
20   negotiate agreements directly with manufacturers
21   itself?
22        A.   When the two entities were merged, the
23   health -- the contracts that were -- the client
24   contracts that were owned by Integrated Health
25   Concepts were assigned over to RxAmerica and fell

1    within their process and their formularies and their
2    rebate administration.
3         Q.   Between 1991 and 1995, you were the director
4    of managed care pharmacy services for Longs Drugs,
5    right?
6         A.   That's correct.
7         Q.   What were your duties as director of managed
8    care pharmacy services?
9         A.   I was in charge of negotiating all of the
10   pharmacy network contracts between Longs Drug Stores
11   and the PBMs and HMOs and anybody else who contracted
12   for pharmacy services with Longs.
13        Q.   Did you have any dealings with
14   pharmaceutical manufacturers in that regard?
15        A.   I was involved with dealings with
16   pharmaceutical manufacturers, yes.
17        Q.   In what sense?
18        A.   We had a -- a drug buyer that met and
19   interfaced regularly with the pharmaceutical
20   manufacturers.  When they had programs to offer that
21   impacted delivery of pharmacy services, then I was
22   involved in those discussions as well.
23        Q.   Did Longs Drug Stores often purchase --
24   purchase drugs directly from pharmaceutical
25   manufacturers?

1         A.   Yes.
2         Q.   And sometimes from --
3         A.   Wholesale.
4         Q.   -- distributors, wholesalers?
5         A.   Uh-huh.
6         Q.   Do you know how they purchased Premarin?
7         A.   I don't specifically recall.  Probably both
8    ways.
9         Q.   Have you had any conversations with
10   individuals from Longs Drug Stores about the
11   possibility that in connection with this lawsuit,
12   Longs Drug Stores might -- might attempt to secure
13   payments from Wyeth Pharmaceuticals based on an
14   allegation that the prices that Longs Drug Stores has
15   paid for Premarin have been higher than they should
16   have been?
17        A.   No.
18        Q.   But I take it that the majority of your
19   duties as director of managed care pharmacy services
20   were dealing with -- was it with managed care
21   organizations?
22        A.   That's a good term for it.  Managed care
23   organizations can be a blanket term for PBMs and HMOs
24   and health plans and employer groups, and I interfaced
25   with that entire industry that had relationships with

1   Longs Drug Stores.

2       Q.   And much of what you did was to negotiate

3   the reimbursement rates at which the managed care

4   organizations, which I'll call MCOs, would reimburse

5   Longs Drug Stores in connection with the sales of

6   pharmaceuticals out of Longs Drug Stores?

7       A.   That was a big piece of my job, together

8   with monitoring the performance and regular review

9   with those payors.

10      Q.   Let's see.  Prior to 1991, you were the

11  vice-president of marketing at an organization known

12  as American Drug Stores in Oakbrook, Illinois.  What

13  were your duties there with American Drug Stores?

14      A.   American Drug Stores, when I came on board

15  with them, was known as American Stores.  They were a

16  national pharmacy chain and drug -- drug/supermarket

17  combo operation.  It was their intent to divide the

18  company into an eastern and western division and have

19  a western drug chain separate from the eastern --

20  eastern drug chain; and I was hired to put together

21  the merchandising and marketing programs for the newly

22  developed western drug chain.

23      Q.   And did that end up happening; did they

24  develop a western drug chain?

25      A.   They did not.

1       Q.   Is that why you left them in 1990?

2       A.   Yes.

3       Q.   It didn't pan out?

4       A.   Correct.

5       Q.   But during that period of time, you worked

6   with them not in the western United States, but in

7   Oakbrook, Illinois?

8       A.   The corporate office was located in

9   Oakbrook, yes.

10      Q.   Did you maintain your residence in

11  California during that time?

12      A.   I did the first year.  The second year, I

13  moved to Oakbrook -- to Illinois.

14      Q.   In connection with your duties at American

15  Drug Stores, did you have dealings with managed care?

16      A.   I did not.

17      Q.   And then prior to your departure to work for

18  American Drug Stores -- incidentally, is American Drug

19  Stores connected in any way to RxAmerica?

20      A.   American Drug Stores initially developed

21  RxAmerica.

22      Q.   So was your connection with American Drug

23  Stores important in some way to the ultimate merger

24  between Integrated Health Concepts and RxAmerica?

25      A.   It was in the fact that I knew the

1   organization and the people involved and did the

2   negotiation for Longs in putting that merger together.

3       Q.   And why did you consider it to be to Longs'

4   advantage to facilitate a merger with RxAmerica rather

5   than to just continue along with Integrated Health

6   Concepts as a freestanding PBM?

7       A.   Longs Drug Stores' market penetration in

8   California is primarily northern California, from

9   Bakersfield north.  The stores that American Drug

10  Stores owned in California, the Savon stores, were

11  primarily southern California.  It was the feeling of

12  both Longs and American Drug Stores that as opposed to

13  one chain buying the other, which was an expensive

14  proposition, they might be able to achieve economies

15  of scale by having a mutually owned PBM that could

16  offer that chain network to providers in California.

17      Q.   So it was largely a California-driven

18  merger?

19      A.   It was driven by events that were occurring

20  in California and also consolidation events that were

21  occurring within the industry, the PBM industry.

22      Q.   Would it be fair to say that California is

23  a -- leading or cutting edge state in connection

24  with managed care in the PBM industry?

25      A.   Yes.

1       Q.   And is the prevalence of managed care

2   greater in California than in other areas across the

3   country?

4       A.   Generally speaking, I believe it is.

5       Q.   Let's see.  Prior to your departure, you

6   worked as the general merchandise manager for Longs

7   Drug Stores in Walnut Creek, California.  What were

8   your duties between 1986 and 1988 in that position?

9       A.   Walnut Creek, California, is where Longs'

10  corporate office is located, and my functions in that

11  capacity were to oversee the merchandise acquisition

12  and advertising for -- the general merchandise

13  acquisition and promotion for Longs Drug Stores.

14      Q.   Would that have involved acquisition of

15  pharmaceutical products?

16      A.   Not legend drug products.  Over-the-counter

17  products, but not legend -- not prescription, legend

18  drug products.

19      Q.   A legend drug product is the same as a

20  prescription drug product?

21      A.   Yes.

22      Q.   Between 1980 and '86, you were a store

23  manager.  Was that a store manager for one particular

24  Longs drug pharmacy?

25      A.   Yes.

1    Q.   And that was located in Modesto, California?

2    A.   Yes.

3    Q.   What were your duties as a store manager?

4    A.   My duties were to oversee the entire store,

5  hire personnel, do the advertising and basically run

6  the store.

7    Q.   Did you have responsibilities related to the

8  acquisition of pharmaceuticals or was that handled by

9  Longs' central offices?

10    A.   Both.  The Longs stores have the autonomy to

11  buy directly from -- at store level as well as buy

12  through the Longs central distribution facility.  So

13  there was some of both taking place.

14    Q.   Did you have any dealings with Wyeth-Ayerst

15  in connection with your duties as a store manager?

16    A.   I don't think so.  I don't recall having

17  direct -- direct relationships with Wyeth-Ayerst as a

18  store manager.

19    Q.   I see.  Prior to being a store manager, you

20  were a pharmacy manager -- it was at a Longs Drug

21  Store in Carmel, California, correct?

22    A.   Correct.

23    Q.   What were your duties as a pharmacy manager?

24    A.   I was in charge of running the pharmacy for

25  Longs at the Carmel operation and overseeing the

1  pharmacy staff in that store.

2    Q.   Were you acting as a pharmacist?

3    A.   Yes.

4    Q.   And how big was your staff?

5    A.   Had two staff pharmacists and I believe we

6  had three ancillary non-pharmacy personnel in addition

7  to the staff pharmacists.

8    Q.   Now at the time that you were a pharmacy

9  manager between 1970 and 1979, managed care was not a

10  major force yet; is that correct?

11    A.   That's correct.

12    Q.   Were there such things as PBMs at that time?

13    A.   Yes, there were.

14    Q.   Who were the PBMs that you dealt with?

15    A.   The ones that come to mind that we dealt

16  with, Paid Prescriptions, who is now Medco, PCS.

17  Those are the two major PBMs that were there.  There's

18  probably others; I just don't recall who they were at

19  that early time in the industry.

20    Q.   And then from 1968 to '69, you were a staff

21  pharmacist.  What were your duties as a staff

22  pharmacist?

23    A.   Just to fill prescriptions and professional

24  responsibility behind the counter.

25    Q.   The type of computerized system linking up

1  with PBMs that you describe in your report was not in

2  existence at that time, was it?

3    A.   Longs I believe got into computerizing their

4  pharmacies in the early '80's.

5    Q.   So about 15 years or so after you had served

6  as a staff pharmacist?

7    A.   Correct.

8    Q.   Let's see.  You graduated from the

9  University of the Pacific School of Pharmacy in 1968,

10  correct?

11    A.   Yes.

12    Q.   Is that an undergraduate degree?

13    A.   It's a Bachelor of Science in Pharmacy

14  degree.

15    Q.   Okay.  Have you obtained any other degrees

16  other than your B.S. degree in pharmacy?

17    A.   I have not.

18    Q.   Okay.  Did you go to a -- is the University

19  of the Pacific School of Pharmacy, is it devoted

20  entirely to pharmacy?

21    A.   It is, yes.

22    Q.   How many years of study does one have to

23  take or did you have to take to get a B.S. degree in

24  pharmacy?

25    A.   Mine was a five-year program.

1    Q.   And that would have been five years after

2  graduation --

3    A.   After high school, yes.

4    Q.   -- high school?

5    A.   Yes, uh-huh.

6    Q.   Is that also like a liberal arts type of

7  school or is it just devoted exclusively to learning

8  about pharmacy?

9    A.   No, they've got several schools of --

10  they've got liberal arts and a couple of other schools

11  on that campus.  After I graduated, they developed a

12  separate campus for the pharmacy school adjacent to

13  the University of the Pacific.

14    Q.   Where was the School of Pharmacy located?

15    A.   It was located in the science wing, science

16  building on campus.

17    Q.   And what city is that located?

18    A.   Stockton, California.

19    Q.   Let's see.  Have you ever -- you also I

20  guess engaged in the Kellogg Executive Programs at

21  Northwestern University?

22    A.   I attended two of those, yes.

23    Q.   What are those?

24    A.   Those are business development programs

25  focused in managed care negotiations and negotiations

1    in general.

2         Q.    So that was specialized training in how to

3    negotiate in the managed care context?

4         A.    In the -- in the managed care environment,

5    yes.

6         Q.    And did you attain any degrees or --

7         A.    A certificate.

8         Q.    Certificate?

9         A.    Certificate of attendance.

10        Q.    Have you obtained any degrees -- maybe I

11   already asked you this, but any degrees at all other

12   than your B.S. degree in pharmacy?

13        A.    I have not.

14        Q.    Do you have any training in economics?

15        A.    Just the economics class I took in college.

16        Q.    How about -- let's see.  You've never worked

17   for a pharmaceutical manufacturer, have you?

18        A.    Correct.

19        Q.    And do you have training in -- in marketing?

20        A.    Hands-on training.

21        Q.    Any educational training in the area of

22   marketing?

23        A.    No formalized training.

24        Q.    Let's see.  I notice under your professional

25   activities, you're a member of a number of

1    organizations.  What is the American Managed Care

2    Pharmacy Association?

3         A.    American Managed Care Pharmacy Association

4    is an association of pharmacists involved in managed

5    care.  It also has PBMs and mail service organizations

6    involved with it.

7         Q.    Are manufacturers also involved?

8         A.    I don't know the answer to that, if their

9    membership -- if they have membership or not.

10        Q.    Have you ever held any offices in the

11   American Managed Care Pharmacy Association?

12        A.    No.

13        Q.    Have you ever held any offices in any of the

14   professional organizations listed on your CV?

15        A.    No.

16        Q.    Do you have any publications in the area of

17   pharmaceutical science?

18        A.    No, I don't.

19        Q.    Any publications at all?

20        A.    No.

21        Q.    In anything?

22        A.    No.

23        Q.    And have you ever conducted any peer-

24   reviewed work in the areas of pharmaceutical science?

25        A.    I was involved in the State of California

1    Medicaid Peer Review Committee back when I was in the

2    pharmacy area of my career.

3         Q.    And were you reviewing other persons' work

4    or was your work being reviewed?

5         A.    Other persons' work.

6         Q.    You list on page 2 of your resume industry

7    advisory panel participation.  What does that mean?

8    What is industry panel participation?

9         A.    There was several health plans that had

10   pharmacy advisory panels that they would meet on a

11   quarterly basis to discuss the pharmacy component of

12   their health care plan and how it relates to retail

13   pharmacy on an advisory basis.  We usually met

14   quarterly.

15        Q.    And you would meet and then advise persons

16   associated with the organization?

17        A.    We would provide them input as to their --

18   how their program was working; or if they had new

19   initiatives they wanted to develop, they would use our

20   committee to develop those -- get input to develop

21   those initiatives.

22        Q.    And you worked for various drug companies in

23   that regard, Parke-Davis, Warner Lambert, Merck and

24   Lilly, right?

25        A.    Right.

1         Q.    As well as Astra.

2               In connection with that, did you ever

3    consult with any managed care organization concerning

4    the use of market-share incentive rebate agreements or

5    exclusivity arrangements in the managed care arena?

6         A.    Not that I can recall.

7         Q.    That issue never came up, as far as you

8    know?

9         A.    No.

10        Q.    What sort of things did you consult with

11   with the drug company?

12        A.    On their advisory committees?

13        Q.    Yes.

14        A.    Provided input, again, representing the

15   pharmacy industry, for some of their new initiatives,

16   concepts, drugs they were bringing to market, how they

17   should bring them to market, and just provide feedback

18   and expert opinion on how their performance could best

19   be applied in the retail pharmacy industry.

20        Q.    And did you consult with the pharmaceutical

21   manufacturers in any capacity other than in connection

22   with the industry advisory panel?

23        A.    No.

24        Q.    What sort of consulting work did you do at

25   Harvard Pilgrim of Boston, Massachusetts?

1      A.    Harvard Pilgrim, I did consulting work with
2   them in my capacity as vice-president of PBM networks
3   when I worked -- was working with Nex2; and it had to
4   do with obtaining prescription profile history for
5   research that they were interested in.
6      Q.    Let's see.  Now, you've never previously
7   been certified as an expert witness in any case, have
8   you?
9      A.    That's right.
10     Q.    What is it you would consider to be your
11  area of expertise?
12     A.    Retail pharmacy and PBM industry.
13     Q.    Retail pharmacy and the PBM industry?
14     A.    Correct.
15     Q.    And that's based on your hands-on experience
16  in that area?
17     A.    Yes.
18     Q.    Your experience in that area has occurred
19  primarily in the state of California; is that correct?
20     A.    In the retail pharmacy area or the PBM
21  area?  Which one are you referring to?
22     Q.    Let's take them separately.  In the retail
23  pharmacy area, has your experience been primarily in
24  the state of California?
25     A.    As a pharmacist, it has been.  As the

1   vice-president of managed care services, it spanned
2   all six states in which Longs operated.
3      Q.    So those six western states that you
4   mentioned earlier?
5      A.    Yes.
6      Q.    And how about in the managed care arena?
7      A.    It was national, the managed care arena.  We
8   were located in Salt Lake City, Utah, but our
9   contracts were national in scope.
10     Q.    So RxAmerica had contacts across the
11  country?
12     A.    Yes.
13     Q.    Let's see.  If I could ask you to turn to
14  your report.  Incidentally, did you -- did you write
15  the first draft of this report?
16     A.    Yes.
17     Q.    And did anyone assist you in writing the
18  report?
19     A.    No.
20     Q.    So you didn't have any other assistance or
21  other persons working with you.  Did you type it
22  yourself?
23     A.    Yes.
24     Q.    Without -- without disclosing any
25  conversations with counsel, did you have input from

1   counsel for Duramed in connection with preparation of
2   the report?
3      A.    Yes.
4      Q.    Did you have any communications with anybody
5   from Duramed about the report or in preparation of
6   your writing of the report?
7      A.    No.
8      Q.    So you've never talked to anybody from
9   Duramed?
10     A.    In preparation of this report, that's
11  correct.
12     Q.    Have you talked with anyone from Duramed in
13  any other context?
14     A.    Not that I recall.
15     Q.    How about with Viking Health Care?  Are you
16  familiar with an organization known as Viking Health
17  Care?
18     A.    Vaguely familiar with them.
19     Q.    Do you consider them to be competent managed
20  care specialists?
21     A.    I'm not qualified to comment on that.  I'm
22  not that knowledgeable about them.
23     Q.    You've never had any direct dealings with
24  them?
25     A.    Correct.

1      Q.    Did you have any communications with anybody
2   from Viking before rendering the opinions in your
3   report?
4      A.    No.
5      Q.    How about anyone from Solvay
6   Pharmaceuticals?
7      A.    No.
8      Q.    Did you actually -- did you interview
9   anybody or talk to anybody before reaching the views
10  in this report?
11     A.    No.
12     Q.    Did you reach your views, then, entirely
13  upon reading certain documents?
14     A.    Upon -- based upon my industry experience
15  and reading documents, correct.
16     Q.    What documents did you review?
17     A.    I reviewed a number of documents that were
18  provided by Duramed through Susman, a number of which
19  are referenced in the report; and I reviewed a number
20  of industry documents which are also referenced in the
21  report.
22     Q.    Did you review any depositions?
23     A.    There were a couple of depositions I looked
24  through.
25     Q.    Whose depositions were those?

1    A.  You know, I'm not sure I recall.  I've read

2  so many documents and seen so many names now.  Carter,

3  I think was one.  Was there a Marty Carter?  Might

4  have been one, and a Finneran, Finneran?

5    Q.  Bill Finneran?

6    A.  Bill Finneran, that sounds like a familiar

7  name.

8    Q.  Do you remember who they worked for?

9    A.  Not specifically, no.

10    Q.  Did they work for Wyeth?

11    A.  I believe they -- I believe they worked for

12  Duramed.

13    Q.  And was there anything that you read in

14  those depositions that informed the opinions that you

15  reached in your report?

16    A.  No, they didn't inform my opinions or create

17  my opinions based on those depositions that I read.

18    Q.  Was there anything in those depositions that

19  supported your opinions?

20    A.  They were consistent with my opinions,

21  yeah.

22    Q.  Do you remember what in particular about

23  Mr. Carter's deposition was consistent with the

24  opinions rendered in your report?

25    A.  No, I don't.

1    Q.  Do you remember anything in particular in

2  Mr. Finneran's deposition that was consistent with any

3  of the views expressed in your report?

4    A.  No, I don't recall specifically.

5    Q.  Okay.  If I could, I'd like to walk through

6  a little bit of the report.

7       Before I do that, though, how many hours

8  have you -- did you work on this case prior to the

9  preparation or in connection with the preparation of

10  your report?

11    A.  Let me try and recollect.  I don't have an

12  exact tally of the hours.  Probably somewhere between

13  fifty and a hundred hours.  That's just as best as I

14  can recall.

15    Q.  And you're being compensated at a rate of

16  $300 an hour?

17    A.  Correct.

18    Q.  So have you been paid something in the

19  neighborhood of say $15 to $30,000 by Mr. Sussman's law

20  firm?

21    A.  That would be correct.

22    Q.  How much are you being paid for your

23  testimony here today?

24    A.  300 -- the rate of $300 per hour.

25    Q.  Still 300 an hour?  Is that your normal

1  consulting rate?

2    A.  For being an expert witness, it is.

3    Q.  You indicate, for example, that you've

4  consulted for several different companies nationally

5  within the health care industry, also.  Is $300 your

6  consulting rate in that connection?

7    A.  I have had different rates with different

8  companies.

9    Q.  Have you ever commanded a rate as high as

10  $300 per hour before in connection with anything

11  you've ever done?

12    A.  I believe I have before, yes, with a company

13  that I worked with, Nex2, when I initially started

14  with them.

15    Q.  Anyone else?

16    A.  Not that comes to mind.

17    Q.  Let's see.  If you can turn to page 5 of

18  your report, under III A, pharmaceutical distribution

19  system, I'm interested in the last paragraph of that

20  section.  It indicates that in the last sentence, PBMs

21  act as aggregators of pharmaceutical providers and

22  patients, providing an efficient delivery system for

23  pharmaceutical products and services.  What do you

24  mean by that sentence?

25    A.  PBMs enter into contracts with payors, be it

1  health plans, employer groups or whomever needs to

2  have pharmacy services delivered to a population group

3  of members.  And by doing such, they provide

4  aggregated numbers of members to make available to the

5  pharmacy providers when they enter into contracts with

6  the pharmacies so that they provide an efficient

7  delivery system for those members, directing them to

8  those pharmacies and adjudicating their prescription

9  claims through the claims processing services.

10    Q.  So in that sense, you think that PBMs are

11  good for consumers and good for holding down the costs

12  of health care?

13    A.  I think PBMs are a valuable function in the

14  industry as an intermediary between the payor and the

15  provider of services and provide a safeguard for

16  patients receiving pharmaceutical care.

17    Q.  In what way do they provide a safeguard for

18  patients receiving pharmacy care?

19    A.  Well, within their pharmaceutical claims

20  processing system, they have a -- what are called drug

21  utilization edits built in which will review the drugs

22  for a number of conditions, such as, is it the

23  appropriate drug for an individual of that particular

24  age; is the individual taking another drug

25  concurrently that might conflict; is the dosage

1  appropriate, is it too high, is it too low.  There's a
2  number of safety edits that the PBM will perform
3  called drug utilization reviews as well as -- those
4  are done concurrently.
5       They also have a retrospective drug
6  utilization review to work with the payors and the
7  physicians to ensure that the pharmaceutical therapy
8  is appropriate for their particular disease state and
9  it's being delivered appropriately.  So in that sense,
10  I think they add to the care of the individual.
11       Q.   And provide a check on what physicians are
12  doing in prescribing the drugs?
13       A.   They also do the physician profiling and
14  reviewing of their prescribing, yes.
15       Q.   A little bit further down, under the section
16  "payment cycle for pharmaceuticals," you indicate
17  that pharmacy patients can be divided into two
18  categories, cash patients and third-party patients.  I
19  take it cash patients are persons who are not insured;
20  is that correct?
21       A.   That's generally correct.  They pay cash for
22  their prescriptions.
23       Q.   What percentage of the pharmaceutical
24  marketplace is accounted for by cash payment -- cash
25  patients as opposed to third-party patients?

1       A.   Well, in the industry today, the cash
2  patient percentage of the pharmacy benefit receipts
3  are getting less and less.  They're in the 10 percent
4  range now for the majority of the pharmacy providers.
5       Q.   Where were they say in 1999?
6       A.   1999, they were -- depending upon which --
7  which group you -- which pharmacy group you are
8  measuring, they could have been as low as 70 percent.
9  Somewhere between 70 and 85 percent.
10       Q.   70 and 85 percent would have been
11  third-party --
12       A.   Correct.
13       Q.   -- patients?
14       A.   Yes.
15       Q.   And so between 15 and 30 percent would have
16  been cash patients?
17       A.   Correct.
18       Q.   And I take it that formulary decisions by
19  managed care would not have significant impact on the
20  availability of products to cash patients; is that
21  correct?
22       A.   Don't think that's entirely correct.  It's
23  been my experience that physicians usually stay within
24  a pretty narrow range of drugs that they offer their
25  patients; and if the bulk of their prescribing

1  involves patients that are covered by managed care,
2  that small group of drugs are going to be drugs that
3  are on formularies of managed care, and it's very
4  likely they will use those same drugs for all their
5  patients, whether they're cash or third-party.
6       Q.   What's the basis for your experience in that
7  regard?
8       A.   Just in talking with physicians and also
9  monitoring the prescription profiles within Longs Drug
10  Stores, which includes cash as well as third-party.
11  There doesn't seem to be a huge difference in their
12  utilization patterns.
13       Q.   Of course that would be consistent with the
14  possibility that their utilization patterns aren't
15  really affected very much by the formularies in the
16  first instance, right?
17       A.   I wouldn't say that.
18       Q.   It would be consistent with that, wouldn't
19  it?
20       A.   That could be consistent with it, yeah.
21       Q.   And who are the physicians that you've ever
22  spoken to that have indicated to you that they -- that
23  they prescribed the same drugs for patients that are
24  on formularies and those that don't have formularies?
25       A.   I've done a fair amount of work with

1  Dr. David Gibson in developing electronic prescribing
2  technology devices; and in that capacity, we spent
3  time interviewing and talking with physicians in
4  several medical groups in the California marketplace.
5       Q.   And when did that occur?
6       A.   That occurred between 1999 and probably
7  2001.  Somewhere in that time frame.
8       Q.   And that was, once again, in connection with
9  the California marketplace, right?
10       A.   California and Hawaii.
11       Q.   And you're -- you're aware that Mr. -- or
12  Dr. Gibson has been named as an expert in this case as
13  well?
14       A.   I am.
15       Q.   Are you the one that provided Mr. Susman's
16  firm Mr. Gibson's name?
17       A.   It was the other way around; he provided
18  them my name.
19       Q.   So they got to him first and then they got
20  to you; is that right?
21       A.   Yes.
22       Q.   When you say you and Dr. Gibson talked to a
23  number of physicians during the course of -- what was
24  it you were doing between 1999 and 2001, again?  I'm
25  sorry.

1    A.   I was assisting Dr. Gibson in his
2    development of electronic prescribing technology and
3    pilot programs to demonstrate its value and
4    usefulness.
5    Q.   And this would be -- for example, a
6    physician in his or her office would simply put a
7    prescription on line rather than give a slip to a
8    patient to take to a pharmacy; is that what you mean
9    by "electronic prescribing"?
10   A.   It was the development of the hand-held
11   wireless electronic prescribing device much like a PDA
12   in size, through which a doctor could order a
13   prescription and submit it to a pharmacy in a wireless
14   environment.
15   Q.   And in that connection, the two of you
16   talked to a number of physicians?
17   A.   Yes, physicians and physician groups.
18   Q.   And did you specifically raise with those
19   physicians the issue of whether they prescribed the
20   same sort of drugs to cash patients as to insured
21   patients?
22   A.   What we talked about with those physicians
23   was the way that they made selections for their drugs
24   and how they wanted their drugs listed on the
25   prescribing device so they would be drugs they're used

1    to using for all of their patients, which would keep
2    them on formulary as well as allow them to prescribe
3    it to all their patients.
4    Q.   And did you -- you and Dr. Gibson produce
5    any documents or reports in that regard?
6    A.   No.
7    Q.   So it's all in your heads?
8    A.   I have not produced any reports in that
9    regard.
10   Q.   Do you know if Dr. Gibson did?
11   A.   Don't know if he did or not.
12   Q.   He never wrote anything that he gave to you?
13   A.   I don't recall seeing anything that he's
14   written on that subject.
15   Q.   And what did you find about the factors that
16   doctors look at when they prescribe drugs in
17   connection with that work?
18   A.   Their -- one of their high concerns is
19   whether or not the drug is on formulary for the health
20   plan that the member is enrolled in so they won't have
21   any difficulty getting it prescribed.
22        What we learned was that a significant
23   amount of the phone calls that are received by the
24   physicians are due to pharmaceutical issues arriving
25   from the prescribing of non-formulary drugs.  So they

1    felt that that type of technology could reduce time
2    spent on those activities by assuring that they were
3    formulary drugs that they were prescribing.
4    Q.   And did you ever implement this electronic
5    prescription technology?
6    A.   We had implemented two pilot programs, one
7    in Santa Barbara, California, and one in Oahu, Hawaii.
8    Q.   And did the pilot programs allow that type
9    of on-line adjudication as to whether or not the
10   claims would be covered by the patient's managed care
11   plan?
12   A.   It did, yes.
13   Q.   And did that result in any change in the
14   prescribing patterns of the physicians in question?
15   A.   It was hard to tell.  The pilots didn't run
16   that long.
17   Q.   Would there be data relating to those
18   pilots?
19   A.   There probably is data relating to those
20   pilots.  I don't have such data, however.
21   Q.   Does Longs Drug Stores -- would Longs Drug
22   Stores have that data?
23   A.   No.
24   Q.   Who would have the data?
25   A.   If anyone would have the data, Dr. Gibson

1    would be the primary holder.  It was his company that
2    was developing the technology.
3    Q.   What was the name of his company at the
4    time?
5    A.   Rx Physician.com.
6    Q.   Let's see.  You say in your next paragraph
7    here that the payment cycle for pharmaceuticals begins
8    at the pharmacy with the patient and/or patient's
9    health plan paying the pharmacy their usual and
10   customary retail price or a negotiated contract price
11   for their prescription.  I take it -- would a cash
12   patient pay what you call the usual and customary
13   retail price?
14   A.   Yes.
15   Q.   And what you mean by "the usual and
16   customary retail price," then, is the price that the
17   pharmacy charges for the product for someone that just
18   walks in off the street and wants to buy it?
19   A.   Correct.
20   Q.   And then -- but that's not the price that
21   managed care entities pay, generally; is that correct?
22   A.   They may pay that price.
23   Q.   But they often -- in fact, almost always,
24   negotiate special -- special prices, special
25   negotiated prices, right?

1    A.    Prices that managed care negotiates with
2  retail pharmacy providers has normally several levels
3  involved in it.  It's usually a negotiated discount
4  off the cost of the medication plus a dispensing fee
5  or a maximum allowable cost, called MAC, or usual and
6  customary, and it defaults to whichever is less of
7  those three.  So in some cases, it's possible that a
8  managed care patient would pay usual and retail, usual
9  and customary retail.
10    Q.    It's fairly rare, though, isn't it, that the
11  usual and customary retail price would actually be
12  less than the negotiated price that the managed care
13  entity has negotiated with the pharmacy?
14    A.    It's not rare when it pertains to generic
15  drugs because of their low cost.
16    Q.    With respect to branded products, it would
17  be more rare?
18    A.    That's correct.
19    Q.    And you indicated that I guess the prices
20  negotiated with managed care entities are based on a
21  percentage off of the -- or percentage of the price of
22  the drug; that's not really accurate, is it?  Isn't it
23  generally a percentage off of what's known as AWP?
24    A.    That's the price, the pharmacy AWP price is
25  the one I was referring to.

1    Q.    Right.  AWP --
2    A.    Average wholesale price.
3    Q.    AWP is not actually the price that the
4  pharmacy pays, is it?
5    A.    Correct.
6    Q.    Like when Longs buys products, it doesn't
7  pay what's known as the AWP price, generally?
8    A.    Correct.
9    Q.    But it's a --
10    A.    It's an industry benchmark, yeah, it's a
11  benchmark in the industry.
12    Q.    And what is the maximum allowable cost; how
13  do you compute that?
14    A.    Maximum allowable cost is primarily for
15  generic medications.  And the reason they have that is
16  because generic medications can be manufactured and/or
17  distributed by a number of different entities that
18  produce the same generic drug and they can apply their
19  own pricing to it.  So in order to have some
20  uniformity of pricing for the health plan, they have
21  developed what's called maximum allowable cost lists
22  for generic pharmaceuticals, and those lists are
23  applied in the pricing logic.
24    Q.    Would maximum allowable cost then not
25  generally apply to a product like Premarin or

1  Cenestin?
2    A.    Correct.
3    Q.    So primarily, we're dealing with either the
4  negotiated price with the MCO or the usual and
5  customary price?
6    A.    When you're referring to branded drugs?
7    Q.    Yes.
8    A.    Yes.
9    Q.    Although in that case, in the vast majority
10  of cases, it's the negotiated price with the MCO that
11  will be lower and thus be applicable, right?
12    A.    Yes.  Usually that's true.
13    Q.    Now.  Bear with me.  I'm going to have a
14  little hypothetical question here; and if you need to
15  jot down a note or something, feel free.  But -- so it
16  might be a little bit elaborate in the way that I set
17  it up.
18          But assume with me for a moment that there's
19  a consumer who has a plan that has a three-tier
20  co-pay.  You know what I mean by a three-tier co-pay?
21    A.    Yes.
22    Q.    And assume that with respect to that plan,
23  Premarin is on the second tier, the branded -- the
24  branded tier, branded formulary tier.
25    A.    Okay.

1    Q.    And that Cenestin is on the third tier of
2  that co-pay.
3    A.    Okay.
4    Q.    Assume that the branded co-pay is, say, $20,
5  the second tier co-pay and the third tier co-pay is
6  $35.
7          If the patient goes into a pharmacy, and
8  that pharmacy has a negotiated price with -- this is a
9  patient that wants to get say Cenestin.  If the
10  patient wants to get Cenestin, it's on third tier, he
11  goes into the pharmacy -- I'm trying to figure out
12  what price that patient -- that she would actually
13  pay.
14          Would she pay the AWP minus "x" percent
15  price that has been negotiated between the pharmacy
16  and that -- and her managed care plan, or would she
17  pay instead the usual and customary price that that
18  pharmacy has for Cenestin, or would she pay the $35
19  co-pay?
20          And assume with me for a moment -- I know;
21  I told you it would be a little bit complex -- that
22  the AWP for Cenestin is let's say $25.  And if you
23  compute the AWP -- let's suppose that the negotiated
24  price is with the -- with the MCO is AWP minus 10
25  percent plus say a $2 handling fee.  So $25 minus 10

1    percent would be $22.50, plus a $2 handling fee would
2    be $24.50, would be the negotiated price.
3         Assume that the usual and customary price
4    for someone that walks in off the street at that
5    pharmacy is $27, that they would mark it up a little
6    bit over AWP, and then the co-pay -- the third-tier
7    co-pay is $35.
8         So she goes into the store.  Does she pay
9    $24.50 for Cenestin, does she pay $27 or does she pay
10   $35?
11        A.    That's a -- depends on a couple of things.
12   Each pharmacy chain -- and I'm going to talk about the
13   chains, because they fill 70 percent of all retail
14   prescriptions, and that's where my background is.
15             Each pharmacy chain negotiates individually
16   with the payor for their contract to be in the
17   network.  Terms of reimbursement is a critical part
18   of that negotiation.  It's possible that a pharmacy
19   chain would negotiate reimbursement in a manner by
20   which the patient would always pay their co-pay
21   regardless of usual and customary, regardless of
22   negotiated rate.  That's one scenario in which your
23   patient would pay $35.
24        Q.    Even if the product cost $5 in the usual and
25   customary?

1         A.    That's correct.  In that case, they could
2    opt out and either pay usual and customary and not buy
3    it on the plan; and what some pharmacy chains have
4    done is to have two usual and customaries, and --
5         Q.    Why would they have two usual and
6    customaries?
7         A.    They would have a usual and customary for
8    managed care patients that would be no less than the
9    managed care co-payment.  It's also possible that a
10   pharmacy chain might negotiate with the managed care
11   entity to have payment be the lesser of the patient
12   co-pay or the usual and customary price, in which case
13   they would pay the usual and customary price.
14             So there's not one blanket rule that would
15   apply across the industry on that.  It depends on how
16   the chain has negotiated their reimbursement with the
17   managed care organization.
18        Q.    And it's also possible that a managed care
19   entity would negotiate with the pharmacy so that
20   the -- that the customer, the consumer, would get the
21   benefit of the negotiated price?
22        A.    That's absolutely correct.  That could occur
23   as well.
24        Q.    How did that most often occur in the context
25   of RxAmerica?

1         A.    In the context of RxAmerica, we most often
2    required the co-pay or the usual and customary
3    amount.
4         Q.    Either the co-pay or the -- so that, for
5    example, if -- but when a consumer went in, say, and
6    was faced with say a $35 co-pay for a third-tier
7    co-pay, and in this case, the shelf price of the
8    product say was $27 for someone that just walked off
9    the street --
10        A.    Uh-huh.
11        Q.    -- she could simply buy it not on the health
12   plan, but just buy it out of her pocket for $27?
13        A.    Let me make sure I understand which case
14   we're talking about.  In the case of RxAmerica, the
15   patient would be charged the pharmacy's usual and
16   customary rate of $27 when she bought it on the health
17   plan or if she bought it off the health plan as a
18   usual and customary patient.
19        Q.    She would pay $27 either way?
20        A.    In that scenario, yes.
21        Q.    So what RxAmerica would do would be the
22   lesser of usual and customary or the co-pay, is how
23   much she would pay?
24        A.    Correct, correct.
25        Q.    And are you familiar with other managed care

1    plans that actually enabled the consumer to get the
2    benefit of the negotiated price that the MCO had
3    negotiated with the pharmacy?
4         A.    It's my opinion that most payors will
5    negotiate with pharmacy providers in a way that
6    will -- they have what's called a -- I believe they
7    call it a zero co-pay logic, and what that means is
8    that the patient will pay either their co-pay or the
9    usual and customary price, but the price will never
10   default below those two, to a calculated price.
11        Q.    And why would the MCO take that position
12   rather than trying to stand up for the woman who's
13   purchasing the drugs in this case to get her a lower
14   price that would be consistent with the negotiated
15   price?
16        A.    The pharmacies are -- over the past ten to
17   fifteen years, managed care negotiations have
18   continued to drive profit margins in pharmacies lower
19   and lower.  Consequently, pharmacies will hold onto
20   whatever piece of profit they can.  And that's a
21   significant chunk of profit that they would be giving
22   up if they were to accept less than that, less than
23   their usual and customary rate.
24        Q.    And it's not one that's quite so valuable to
25   the PBM since the money is coming out of the

1    customer's pocket and not the PBM's pocket, right?

2        A.   It's a price that's totally invisible to the

3    customer, so that's correct.

4        Q.   It's invisible to the customer only to the

5    extent that the customer doesn't know that she is

6    getting the negotiated price that her managed care

7    organization negotiated with the pharmacy, right?

8        A.   Correct.

9        Q.   Let's see.  If you can turn to page 6 of

10   your report, you're talking about rebates that a drug

11   manufacturer pays back to a PBM.  In your experience,

12   it's quite frequent, is it not, for manufacturers to

13   pay a percentage of rebate back to PBMs for specific

14   drugs dispensed to their members on the PBM's

15   formulary?

16       A.   That's correct.

17       Q.   And most commonly in the industry, the PBM

18   will share some or all of that rebate with its client

19   health care plans, right?

20       A.   That would be correct.

21       Q.   And to that extent, then, these rebates --

22       A.   Let me -- let me just qualify that to say

23   that situations do exist where those rebates are not

24   shared back to the payor as well; but as you stated,

25   most commonly there is some sharing that goes on.

1        Q.   And when rebates are extended down to the

2    client plans, in that sense, they lower the cost of

3    providing health care by those plans, right?

4        A.   That's true in some of the cases.  That's

5    not always true in all of the cases.  And the

6    mechanics of the rebate distribution back to the

7    client usually is a protracted time process.  It takes

8    anywhere from 60 to 90 to 120 to 180 days to get all

9    of those dollars back for the quarter in which the

10   activity occurred, which makes it difficult for some

11   plans to budget accurately against that.  And some

12   plans simply take that money in and don't apply it

13   against their pharmaceutical care budget for that

14   reason.  Some plans do, in fact, budget against that

15   in their negotiations and account for a credit of some

16   type for a rebate when they're negotiating.

17       Q.   And even if it's delayed, they do eventually

18   get the money, right?

19       A.   Eventually, they'll get whatever is due to

20   them.  Let -- lowering the cost of health care is the

21   intent of the formulary, one of the intents of the

22   formulary, to provide cost-effective health care.

23   There are situations, however, that I have seen where

24   formularies are created to drive rebates rather than

25   to drive low net -- low net costs of products; and in

1    that situation, a formulary could actually be listing

2    preferred drugs that are higher cost in order to

3    receive a higher rebate for their client, in which

4    case the health care ends up being higher cost health

5    care.  So I've seen that done as well.

6        Q.   Now, why would that be advantageous to the

7    client?  The client ends up paying more for the drugs,

8    but gets a higher rebate?  Why would that be

9    advantageous to the client?

10       A.   Depends upon how the client is being

11   reviewed and incentivized for their budgeting and how

12   they deal with the rebate.  It certainly would be

13   advantageous to the PBM involved because they would

14   receive a higher rebate.

15       Q.   To the extent that they weren't passing it

16   through to the client?

17       A.   Whatever percentage they were keeping would

18   be higher as a dollar figure even if they were passing

19   the remainder through, that's correct.

20       Q.   All right.  So to a certain extent, you're

21   saying there's a conflict of interest, then, between

22   the clients and the PBM's on this issue?

23       A.   That might exist in some case, that's

24   correct.

25       Q.   Did RxAmerica do that frequently, did they

1    charge higher rebates so their clients would pay

2    higher amounts of money?

3        A.   RxAmerica doesn't charge rebates, number

4    one; RxAmerica's formulary was developed and based on

5    the lowest AWP approach regardless of rebates, and

6    then whatever rebates were applied were applied after

7    that.

8        Q.   But they kept rebates; they kept a portion

9    of the rebates, correct?

10       A.   That's correct, yes.

11       Q.   And did they try to jigger their contracts

12   with pharmaceutical manufacturers to get big rebates

13   at the expense of their client plans so their client

14   plans would pay more for drugs?

15       A.   No, I -- what I just explained was, their

16   formulary was driven by low AWP-price drugs.  So the

17   rebates were applied on those drugs rather than

18   selecting the highest-cost drugs as your preferred

19   items in each category.

20       Q.   Now, would you say that the PBM industry is

21   competitive?

22       A.   It is, yes.

23       Q.   And PBMs compete with one another for the

24   business of client plans, right?

25       A.   Correct.

1    Q.    And to the extent that a PBM is screwing

2  over a client plan by trying to get big rebates for

3  itself at the expense of its client, that would, if

4  discovered --

5            (Reporter asks for repeat.)

6    Q.    -- that would redound to its detriment in

7  connection with competition with other PBMs for that

8  client's business?

9    A.    That was a question I -- you kind of lost me

10  on that one as well.  But let me answer what I think

11  I heard.

12          It's possible that a client would be more

13  interested in receiving high rebate payments or even

14  up-front payment guarantees based on future rebates to

15  enter into a contract with an entity that makes that

16  offering as opposed to entering into a contract that

17  had lower acquisition costs from day one as opposed to

18  receiving the generous up-front rebate guarantee from

19  a PBM.  I've seen that happen.

20    Q.    All right.  The rebate guarantees, they're

21  not generally guaranteed, are they; they're based upon

22  the performance of the drug and the -- and the managed

23  care plan's sales, right?

24    A.    It's not uncommon to guarantee a rebate back

25  in terms of a flat dollar amount per claim.  I've seen

1  that done in the industry as well.

2    Q.    Is it part of the contentions of this case

3  that Wyeth has done that?

4    A.    I didn't comment on that in this particular

5  case.

6    Q.    So you have no opinion on that?

7    A.    That's correct.

8            Let me make one more comment regarding

9  that.

10    Q.    Yes.

11    A.    This case involves Wyeth working with the

12  PBMs.  The situation that we just referred to was the

13  PBMs working with the payors in their negotiations

14  together.

15    Q.    Right.  In terms of passing through the

16  rebates that the manufacturers have provided --

17    A.    Correct.

18    Q.    -- to the PBM?

19    A.    Correct.

20    Q.    PBMs are also compensated in part through

21  the use of administration fees, right?

22    A.    That's correct.

23    Q.    Is there anything wrong with that, in your

24  view?

25    A.    It's common in the industry.

1    Q.    RxAmerica took administration fees, right?

2    A.    Correct.  There's costs involved to the PBM

3  to administer the rebate mechanics, so it's not

4  unusual to have a service fee or administration fee

5  involved there.

6    Q.    Would you agree that one way that the PBMs

7  compete against one another is in the extent to which

8  they pass on manufacturer rebates to their client

9  plans?

10    A.    I think that's probably -- that could be

11  true to an extent.  In the negotiation process, the

12  process can occur either as a low-cost program due to

13  controls on drug utilization that results in

14  lower-cost drugs being prescribed and lower cost to

15  the health plan as a result of that.  That's one way

16  to lower a client's cost.

17          Another way is to obtain large rebates and

18  apply those rebates back to the client, is another way

19  to lower costs.  So there's different ways of

20  presenting an offer in response to a request for a

21  proposal from a client.

22    Q.    But one of those ways would be to pass

23  through large amounts of rebates down to the client?

24    A.    Correct.

25    Q.    If you turn to page 7.  Let's see.  You say

1  at the point of service in a retail pharmacy, when a

2  patient receives their prescription, they pay 100

3  percent of their prescription cost if they are a cash

4  patient, or if they are a third-party patient, they

5  pay a portion of their prescription cost, the

6  co-payment, with the remainder of the cost billed to

7  the health plan that subsequently pays the pharmacy.

8  That sets forth the usual scenario, right?

9    A.    Yes.

10    Q.    Although as we did discuss earlier, the --

11  if, in fact, the usual and customary charge is lower

12  than the co-payment, then the patient would pay only

13  the usual and customary in most cases, right?

14    A.    Correct.

15    Q.    And in that case, there would be no -- no

16  compensation that would flow from the PBM to the

17  pharmacy, right?

18    A.    There would be a zero billed receivable on

19  the program.

20    Q.    Okay.

21    A.    Could we take about five minutes?

22    Q.    Sure.  We've been going for a while.  I was

23  going to suggest the same thing myself.

24    A.    Thank you.

25          THE VIDEOGRAPHER:  We're off the record

1    at 11:36.

2            (Short break 11:36 to 11:45 a.m.)

3            THE VIDEOGRAPHER:  We're back on the

4    record at 11:45.

5        Q.  (BY MR. EGGERT)  Sir, if I could direct your

6    attention to page 8 of your report in the third

7    paragraph under -- under Roman IV, the last sentence

8    there states that clinical services range from

9    formulary management to sophisticated disease

10   management programs.  What exactly is formulary

11   management?

12       A.  Formulary management would involve review of

13   formulary compliance.  For example, let me just share

14   with you what happens in the PBM retail setting.  PBMs

15   such as Medco, Express Scripts, AdvancePCS, most all

16   of the major PBMs, as well as several of the major

17   health plans that perform their own PBM functions,

18   regularly review with their pharmacy providers,

19   usually on a quarterly basis, their compliance in

20   generic fill rate, how high their generic substitution

21   rate is: for example, out of 1,000 prescriptions

22   filled, were you filling 500 of them generically; were

23   you maximizing the opportunity to use a generic

24   whenever possible.  That's important to the health

25   plan.  They monitor and they measure that.

---

1            And there's often times financial incentives

2    or disincentives tied to generic fill-rate percentage

3    by the PBM or the pharmacy provider.  Likewise, they

4    also monitor the degree of formulary compliance that a

5    pharmacy provider dispenses.  And some pharmacy

6    contracts with payors have credentialing requirements,

7    some of which are generic fill-rate targets and

8    formulary compliance targets.

9            So that's what the formulary management

10   process consists of in the PBM perspective; and like I

11   mentioned, there's often time financial incentives or

12   disincentives tied to formulary compliance for a

13   retail pharmacy in their contract and/or generic fill

14   rate.

15       Q.  Now, what's the basis for your knowledge of

16   what a PBM like Medco or AdvancePCS or Express Scripts

17   does in this regard?  I take it you worked for

18   RxAmerica, right?

19       A.  My knowledge with them doing that is based

20   on my negotiating those contracts with them for Longs

21   Drug Stores.

22       Q.  I see.  So this was based on -- at least

23   this is the way that they dealt with these things in

24   connection with their negotiations with Longs Drug

25   Stores?

---

1        A.  Correct.  And other chains.

2        Q.  Do you know how they dealt with other

3    chains?

4        A.  In exactly the same fashion, because they

5    would benchmark chains against each other for

6    performance and use that as a demonstration of what

7    could be done.

8        Q.  So that's how --

9            (Reporter asks for repeat.)

10       Q.  So that's how they would deal with the chain

11   drug stores, to your knowledge?

12       A.  Correct.  Yes.

13       Q.  We have to talk separately or else we

14   confuse the reporter.

15           Let's see.  Two paragraphs down, you state

16   that PBM services revolve around the drug benefit

17   designed by the client.  The benefit design determines

18   the therapeutic categories of drugs that are covered

19   including whether cosmetic, life-style and

20   over-the-counter drugs are reimbursed, and the extent

21   to which generics and formulary drugs are mandated.

22   Who is it that determines the benefit design?

23       A.  That's normally done in a collaborative

24   fashion between the PBM and the client.  The client,

25   depending upon their level of sophistication, may have

---

1    specific components they want in their drug benefit,

2    or they may simply ask the PBM to bring them a drug

3    benefit design that's common to others in the

4    industry.

5        Q.  So many MCOs design their own benefit

6    design; is that right?

7        A.  Some of the larger payors design their own

8    drug benefit design, correct.  It's not uncommon for

9    larger payors, like Blue Shield of California, to

10   assume many of the PBM functions and contract out for

11   some of the administrative functions to the service

12   what they've assumed internally.  So they may contract

13   out for claims processing, but negotiate their own

14   pharmacy networks and develop their own plan design.

15           A smaller client doesn't have the

16   sophistication to do that; he usually relies on the

17   PBM for assistance in that area.

18       Q.  Right.  Do you know of any circumstances in

19   which it's Wyeth that's devised the benefit design?

20       A.  I'm not familiar with any.

21       Q.  Let's see.  Further on down, the last

22   paragraph on this page, you say that PBMs also rely on

23   their aggregated population groups for leverage when

24   negotiating with drug manufacturers for rebates for

25   their managed care organization or MCO clients.

7/18/2002  Bystrom, Dale (final)

1        These large population groups give the PBMs
2   the ability to influence market share of
3   pharmaceutical products through their formulary
4   process and pharmacy benefit plan design features.
5   And then you add in the last sentence of that
6   paragraph that the rebates that pharmaceutical
7   manufacturers pay to PBMs are often tied to the market
8   share of their pharmaceutical products.
9        Are you familiar with the phrase
10  "market-share incentive rebates"?
11       A.   Yes, I've heard that phrase.
12       Q.   What do you understand by a market-share
13  incentive rebate?
14       A.   Market-share incentive rebates, to my
15  understanding, are provided in an incremental fashion
16  if a particular drug market share that a client is
17  contracted for achieves certain percentage plateaus of
18  growth relative to the market share in general.
19       Q.   And are market-share incentive rebate
20  contracts common in the industry?
21       A.   I would say they are, yes.
22       Q.   If I could, I'd like to show you a document
23  that I'll mark as Exhibit 849.
24       (Exhibit No. 849 marked for identification.)
25       Q.   By the way, are you familiar with the Drug

7/18/2002  Bystrom, Dale (final)

1   or -- I think he has it listed at the end of his
2   article here.  PharMedQuest, that's what it is.
3        Q.   If you could look to the second page of his
4   article, and the second paragraph under the bullet
5   point "market-share or tiered rebates" states that
6   drugs that compete in a crowded marketplace typically
7   choose the MSR, meaning the market-share rebate, when
8   negotiating with PBMs.  Is that -- is that conclusion
9   of Mr. Nee's consistent with your own experience?
10       A.   As I mentioned, I think the market-share
11  rebates have been common in the industry, so that
12  would be consistent.
13       Q.   In fact, can you name a single manufacturer
14  of a significant pharmaceutical product that does not
15  offer market-share incentive rebates?
16       A.   Not as I sit here, I can't recall one way or
17  the other.
18       Q.   But you can't name one that you know doesn't
19  offer them?
20       A.   That's correct.
21       Q.   And what would be the likely result to a
22  manufacturer if it refused to offer market-share
23  incentive rebates to managed care?
24       A.   That would be speculation on my part; if
25  that's what you want me to do, I would speculate that

7/18/2002  Bystrom, Dale (final)

1   Cost Management Report?
2        A.   I think I may have seen that in my
3   activities.
4        Q.   But that's not something that you regularly
5   subscribe to or see in the course of your duties?
6        A.   Not regularly, no.
7        Q.   And let me show you a copy of the Drug Cost
8   Management Report dated June of 2002, and ask you,
9   have you ever seen this document before, to your
10  knowledge?
11       A.   (Witness reading.)  Who wrote the article?
12  Susan -- she's with --
13       MS. COURVILLE:  Sorry, are you looking
14  at a particular article in this?
15       MR. EGGERT:  The first article in here
16  is "Uncovering the Mysteries Behind Rebates."
17       A.   Susan works for AIS, I believe.
18       MS. COURVILLE:  I think this is the
19  article he's talking about.
20       A.   Oh, Chris Nee?  Yeah, seems to me I just
21  read an article by Chris Nee.  I know Chris very well
22  and have worked with his company.  So this may be the
23  article you're referring to.
24       Q.   (BY MR. EGGERT)  What is Mr. Nee's company?
25       A.   I was going to say Pharmaquest or Pharmedics

7/18/2002  Bystrom, Dale (final)

1   they would have to negotiate some other type of rebate
2   in order to receive favorable formulary position.
3        (Exhibit No. 850 marked for identification.)
4        Q.   If I could, I'd like to direct your
5   attention to a document which I'll mark as Exhibit
6   850.  Are you familiar with a Chris Monovich?
7        A.   He's a national account manager for Wyeth;
8   is that correct?
9        Q.   He may have been a national account manager
10  for Chris Monovich -- for RxAmerica, I don't know.
11       A.   I don't recall the name.
12       Q.   If you look down at this memo under the
13  phrase "Premarin family"?
14       A.   Uh-huh.
15       Q.   Indicating a meeting with Joe LaPine, by the
16  way, the director of provider relations, and we spoke
17  about him earlier, I think, and also Jerry Miller,
18  director of clinical services.  Do you know a
19  Dr. Jerry Miller?
20       A.   I do.
21       Q.   What was Mr. Miller's role at RxAmerica?
22       A.   When he was at RxAmerica, his role was
23  director of clinical pharmacy services.
24       Q.   And was he involved in the P & T committee
25  in that capacity?

1    A.   I think he was occasionally involved in the

2    P & T committee, that's correct.

3    Q.   What was the duties of the director of

4    clinical services?

5    A.   The director of clinical services was

6    responsible for reviewing clinical pharmacy activity

7    and patient profiling, disease management programs,

8    drug utilization review programs with our clients.

9    Q.   If you look under "Premarin family" here --

10   A.   Uh-huh.

11   Q.   -- it says the new competitors, Cenestin,

12   FemHRT 1/5 and Prefest were all brought into the

13   overall category discussion.  This is Joe LaPine's way

14   of reminding Wyeth-Ayerst not to take the Premarin

15   Family category for granted, and that we must continue

16   to provide rebates competitive with current

17   offerings.  Then he noted that generic estradiol can

18   be purchased for much less than their Premarin net

19   price, and adding that if Wyeth-Ayerst does not

20   continue to provide rebates, Joe LaPine stated that we

21   will lose our gains in this category.

22        Mr. LaPine was working for you at the time;

23   is that correct?

24   A.   November 10 of '99, that's probably correct.

25   Q.   And he indicated to Wyeth that if they did

---

1    not continue to provide rebates, that Wyeth would lose

2    its gains in the ERT category, right?  Did he ever

3    have any discussions with you about that?

4    A.   I don't recall having such discussions with

5    Joe about that.

6    Q.   Did you recall having any discussions with

7    Mr. LaPine at all about Premarin or Cenestin?

8    A.   I don't recall that.

9    Q.   Do you have any reason to disagree with the

10   statement reported by Mr. LaPine that if Wyeth-Ayerst

11   did not continue provide rebates, that it would lose

12   its gains in that category at RxAmerica?

13   A.   To the best of my understanding, Wyeth's

14   contract required Premarin to be the sole conjugated

15   estrogen on their formulary in exchange for rebates;

16   and if those rebates went away, obviously other

17   competing products could be added, which could have

18   been a threat to Wyeth's market share of Premarin in

19   that category.  That's how I would interpret it.

20   Q.   In your next paragraph here, you indicate

21   that some larger PBMs rent their formularies to

22   smaller PBMs?

23   A.   Where are you on the report, please?

24   Q.   This is on page 9, the first full paragraph

25   on page 9, the --

---

1    A.   Okay.

2    Q.   -- second sentence there.

3    A.   Got you.

4    Q.   You indicate that some larger PBMs rent

5    their formularies to smaller PBMs and then pass the

6    rebates that are paid by manufacturers to the smaller

7    PBM's clients' members.  To the extent that that

8    occurs, are those numbers reflected in the covered

9    lives that you -- that you mention further down on the

10   page for various PBMs?

11   A.   I don't believe that in these covered lives

12   they are counting formulary-only lives.  It's

13   possible, but I don't believe it is.

14   Q.   What do you mean by "formulary-only lives"?

15   A.   Well, in the case that I mentioned to you

16   earlier where Integrated Health Concepts utilized the

17   formulary that PCN provided, in that case, PCN would

18   count the million covered lives of Integrated Health

19   Concepts as part of their formulary lives.  And

20   further up the chain, Integrated Pharmaceutical

21   Concepts, owned by Foundation Health Plan, would count

22   the PCN formulary lives as their formulary lives.

23   That's what I mean by "formulary lives," where

24   they're -- the only function they are providing is

25   formulary rebate services on those prescription

---

1    claims.

2    Q.   And you don't know one way or another

3    whether the covered lives listed in your chart include

4    these formulary lives?

5    A.   It's my belief that they do not.  I

6    negotiate directly with these PBMs in building

7    networks for Integrated -- for Nex2, and part of that

8    negotiation and part of Nex2's remuneration to the

9    PBMs is based on what they call their covered lives.

10   "Covered lives" refers to lives that are covered by a

11   pharmacy benefit that the PBM offers.

12   Q.   And not one that's simply rented?

13   A.   It should not include formulary-only lives,

14   correct.  Because there's no covered benefit involved

15   in administering programs for those patients.

16   Q.   Do you have any estimates for the number of

17   rented lives, I guess, that are -- that are out there

18   for the various PBMs?

19   A.   I do not.

20   Q.   So you've not really factored that into your

21   analysis or your opinion?

22   A.   I have no knowledge of that.  I've not used

23   it for anything.

24   Q.   Under the paragraph "PBM market

25   consolidation," the last sentence -- the last two

1    sentences talk about how the total number of reported
2    covered lives by PBMs, 400 million, significantly
3    exceeds the total population of the U.S. primarily
4    because of double counting. For example, a state
5    government with 3 million members may contract with
6    one PBM for retail services and another PBM to provide
7    mail service. In this case, both PBMs would count the
8    same 3 million members; and that's right?
9        A.    Yes.
10       Q.    Is that the primary source of the double
11   counting, that you would have different PBMs covering
12   the same people with different aspects of their
13   coverage?
14       A.    That's one major source. The other major
15   source comes from the fact that many of the working
16   households today have both spouses or both family
17   members working, and they normally work for different
18   companies, and it's quite often those companies will
19   have health plans administered by different PBMs.
20   Most often, the family's health plan and prescription
21   benefit will cover not only that member but the
22   member's dependents. They may have three or four
23   children, so that total family might be six people.
24   In that case, each of those PBMs is going to count all
25   six of those people because they cover the primary as

1    well as the dependent of the primary family.
2        Q.    And the family itself might have overlapping
3    or duplicative coverage?
4        A.    Yes. They would be found on the eligibility
5    rolls of both PBMs.
6        Q.    Now in circumstances where you have this
7    kind of overlapping coverage or in the example that
8    you cite in the text of the state government that has
9    lives covered with respect to certain aspects of
10   coverage by one PBM and other aspects of coverage by
11   another PBM, it's true, isn't it, that if a particular
12   drug is reimbursed by just one of those PBMs, the
13   persons covered can get the drug, right, if they go
14   through the right channel?
15       A.    If a person is eligible on a PBM's benefit
16   to receive a drug, whether it's their health plan or
17   their spouse's health plan, they would be able to
18   receive it either way.
19       Q.    And in the government -- the state
20   government example, if the PBM dealing with retail
21   services, for example, didn't cover a particular drug,
22   but the PBM with the mail service did, then the
23   consumer could get the drug if they sent away for a
24   mail order prescription, right?
25       A.    As you've stated it, that would be correct.

1        Q.    Now you've listed a number of the larger
2    PBMs here with estimates of their covered lives.
3    What's the source for the numbers that you -- that you
4    have in this document?
5        A.    The numbers in the document reflect the
6    numbers that I've obtained directly from the PBMs in
7    my negotiations with them for network participation
8    with Nex2. And some of them reflect the most recent
9    industry reports as well, but some of them are -- some
10   of the industry reports lag behind where the PBMs
11   actually are in their evolution of taking on more
12   lives.
13       Q.    So have you received documents or do you
14   have notes of conversations with individuals from
15   these PBMs setting forth these covered lives?
16       A.    In the PBM network materials that I gathered
17   and put together for Nex2, I have PBMs with covered
18   lives listed.
19       Q.    I don't believe those PBM -- those network
20   materials have been provided to us as part of the
21   materials that Mr. Bystrom relied upon, and we'd
22   request those.
23       A.    This particular chart came out of a Price
24   Waterhouse report that was provided as part of the
25   backup.

1        Q.    So this chart came from a Price Waterhouse
2    report?
3        A.    The chart did, yes. A couple of the
4    numbers, I trued up, based on my knowledge of what the
5    enrollment actually is.
6        Q.    But in reaching your opinions, you also
7    relied upon the numbers that you've discussed with
8    PBMs in the context of your work with -- what is the
9    name of the organization?
10       A.    Nex2.
11       Q.    Nex2?
12       A.    Yes, I relied upon those discussions.
13       Q.    Let's see. If I could ask you to take a
14   look once again at -- let's see, Exhibit 849, and if
15   you go about -- I think it's on page 6. There's a
16   listing of top PBMs by total covered lives. And the
17   numbers are a little bit different than those provided
18   in your report. I noticed that there were some PBMs
19   that were listed here that actually weren't even
20   listed in your report. Are you familiar with Argus
21   Health Systems?
22       A.    I am. They are located in Kansas City,
23   Kansas.
24       Q.    And they're listed here on this exhibit, at
25   least, as having 24 million covered lives. Is there

```
1    some reason they were not listed in your report?
2        A.   Yeah, Argus Health System is a little
3    unique.  They don't classify themselves as a PBM
4    because they don't perform all the PBM services such
5    as pharmacy network management, rebate negotiations,
6    formulary development.  They are more of a claims
7    processor.  Probably one of the best in the industry.
8    They're moving towards developing a pharmacy network.
9    They called me to ask if I would come to work for them
10   and develop a pharmacy network because they want to be
11   included as a full-service PBM.  That's why they're
12   not on this report.
13           And this report was not intended to be
14   inclusive.  It was intended to be exemplary.
15       Q.   And further down, are you familiar with
16   PharmaCare Management Services?
17       A.   Yeah, they're located in Woonsocket, Rhode
18   Island.
19       Q.   Are they connected with a drug store in any
20   way?
21       A.   They're owned by CVS.
22       Q.   CVS.  They're ace listed as having 12
23   million covered lives.  And they're a PBM, as far as
24   you know?
25       A.   They are.
```

```
1        Q.   How about Anthem Prescription, further down,
2    4 and a half million lives.  Are you familiar with
3    them?
4        A.   I am, yes.
5        Q.   And then RxAmerica is listed here at 4.7
6    million lives; is that an approximately correct figure
7    for the number of covered lives at RxAmerica?
8        A.   Yeah, order of magnitude, it would be
9    correct.
10       Q.   By the way, are you aware that Argus now
11   does have a formulary?
12       A.   That would be new news to me.  I knew they
13   are moving in that direction, but I don't contract
14   directly with them in my responsibilities for Nex2,
15   so...
16       Q.   Okay.  On your report here, you listed I
17   guess the tier 1 or the major PBMs as AdvancePCS,
18   Merck-Medco, Express Scripts and Caremark.  Why was it
19   that you didn't also list WellPoint, which actually
20   has more covered lives than Caremark?
21       A.   The industry -- a couple of reasons.  Number
22   one, WellPoint has just achieved that number of lives
23   within this year.  Prior to 2002, their number of
24   lives was under -- under 30 million, in the lower 20s,
25   and the industry in general has considered these four
```

```
1    as the top PBMs.  They usually -- they usually
2    consider -- when you talk about the big PBMs, what
3    they usually talk about is Advance, Merck-Medco and
4    Express.  They have been the industry leaders in PBMs
5    for the last decade.
6        Q.   Okay.  So even though WellPoint has -- has
7    more lives and has had more lives than Caremark, it
8    hasn't been considered one of the top four; Caremark
9    is considered --
10       A.   Not until recently.  Caremark has always
11   been one of the top 4.
12       Q.   Okay.  And then on the next page, you say
13   the four largest PBMs each manage greater than 20
14   million covered lives.  In fact, it would be accurate,
15   then, to say that the top five largest PBMs each
16   manage more than 20 million lives, right?
17       A.   You could probably add others in there as
18   well.
19       Q.   What are the others that you would add?
20       A.   Depending upon how you're going to define a
21   PBM, you may be able to add Argus Health Systems in
22   there; MedImpact, you could add them in there.
23       Q.   Okay.  I think that the videographer needs
24   to take a brief break to change a tape.
25           THE VIDEOGRAPHER:  We're off the record
```

```
1    at 12:11.
2            (Short break 12:11 to 12:12 p.m.)
3            THE VIDEOGRAPHER:  We're back on the
4    record at 12:12.
5        Q.   (BY MR. EGGERT)  Sir, I'd also like to ask
6    you about a couple of discrepancies between the
7    numbers cited in your report and the numbers in the
8    drug cost management report.
9            With respect to New Eckerd Health Services,
10   you list covered lives at 5 million.  And this report
11   lists as the Eckerd Health Services covered lives at
12   16 million.  Do you have any explanation as to why you
13   might have those discrepancies?
14       A.   The information that I get from Eckerd
15   Health Care Services in terms of the contracts we're
16   negotiating with Nex2 is they have about 5 million
17   lives.  They have other lives they count for other
18   things, and some, they do mail service only with.  But
19   they don't count those in their -- in the covered
20   lives that I deal with with them.
21       Q.   But they might have more lives than -- that
22   they deal with on a mail-order basis?
23       A.   Mail-order-only basis.  That's entirely
24   possible.  They run a large mail order business out of
25   Pennsylvania.
```

1    Q.    Pennsylvania.  I grew up in Florida; I
2    always think of Eckerd as being Florida based, but
3    they're all over the country I guess, huh?
4    A.    (Nodding.)  They acquired Thrift; that's
5    where their mail service was.
6    Q.    Let's see.  Another one -- let's see.  Aetna
7    is listed on your chart as being at 5 million.  And
8    then there's an entity known as Aetna USA Health Care
9    Pharmacy Management which is listed at 11.1 million
10   here.  Do you have any explanation as to why we might
11   have that disparity?
12   A.    I do.  Aetna, to my understanding, has a
13   number of their clients that are actually processed
14   through Express Scripts, about half of them, roughly.
15   That's why I just list Aetna for those lives that are
16   actually processed by Aetna.
17   Q.    So there might be some double counting on
18   this list here between the 50 million Express Scripts
19   lives and the 11 million Aetna lives, for example?
20   A.    That's possible, yes.
21   Q.    Do you know with respect to the Aetna lives
22   that Aetna processes through Express Scripts whether
23   they use Aetna-derived formularies and benefit designs
24   or whether they use Express Scripts benefit designs?
25   A.    I don't know the answer to that.

1    Q.    Okay.  If you could look at page 11 of the
2    report, and in the middle of that page in bold, you
3    list three different kinds of drug formularies, an
4    open formulary, an incentivized formulary and a closed
5    formulary.
6          Could you explain to me what an open
7    formulary is?
8    A.    Yes.  As I stated in my report, an open
9    formulary is a listing of drugs that has no actual
10   incentives tied to any particular drug within a
11   therapeutic category such that they can prescribe any
12   drug that's available without any disincentives
13   financially.
14   Q.    Right.  I was a little bit confused by the
15   last sentence under "open formulary" in your report,
16   which stated that some open formularies may contain
17   patient incentives such as differential co-payments.
18   Is that a mistake?  Because in that sense, would that
19   kind of open formulary be any different than an
20   incentivized formulary?
21   A.    It's really a matter -- it's almost like a
22   gradient.  There may be -- there may be some
23   incentives within an open formulary and still
24   considered open whereas an incentivized formulary has
25   very definite incentives on the preferred drugs within

1    the formulary, and co-pay differentials, as well as
2    incentives for the pharmacist and the physicians.
3    Q.    Well, are you suggesting that if the co-pay
4    differential is small, that it might still be an open
5    formulary; but if the co-pay differential is great,
6    then it's an incentivized formulary?
7    A.    The manufacturer could consider it that way,
8    depending upon how strongly the incentivized -- the
9    incentive will drive utilization to the selected
10   products.
11   Q.    And I take it that if the spread or the
12   differential between the co-pays differs among
13   different benefit designs, that the -- the effect of
14   being able to I guess encourage drug usage from one
15   drug to another might vary; is that correct?
16   A.    That's correct, yes.
17   Q.    Let's see.  And then what is an incentivized
18   formulary?
19   A.    Incentivized formulary has incentives
20   involved for either the patient in terms of a higher
21   co-payment or a third tier co-pay or the pharmacist in
22   terms of on-line edits and messaging or the physician
23   in terms of physician reporting and profiling, and
24   possible even incentives by the payor for the
25   physician to prescribe preferred products within that

1    formulary.
2    Q.    And then a closed formulary, that's one
3    where non-formulary products are not covered at all?
4    A.    Correct.
5    Q.    Now, you'd agree, would you not, that the --
6    that the effect of not being on a particular plan's
7    formulary, that the impact of that is -- is different
8    depending upon what sort of formulary we're talking
9    about; is that right?
10   A.    The positioning on the formulary could be
11   different depending on which formulary we were talking
12   about.
13   Q.    Well, take a manufacturer whose product is
14   not even on the formulary.  So he's not on the
15   formulary at all.
16   A.    Uh-huh.
17   Q.    Would the impact of that exclusion from the
18   formulary be different depending upon whether the
19   formulary in question was an open formulary, an
20   incentivized formulary or a closed formulary?
21   A.    It would be, correct.
22   Q.    In that the manufacturer would be better off
23   if it was an open formulary; is that correct, and
24   worse off if it was a closed formulary?
25   A.    Depending upon whether the drug were listed

1  or not, that's correct.

2      Q.  Now, if we flip back to page 9, let's see.

3  Do you have an understanding as to the percentage of

4  the covered lives under, say, the AdvancePCS, the 85

5  million covered lives, what percentage of those are

6  subject to open formularies as opposed to incentivized

7  formularies as opposed to closed formularies?

8      A.  I have a -- I have an opinion.  I don't have

9  definite -- any records to back it up.

10     Q.  What's the basis of your opinion?

11     A.  The basis of my opinion would be what I see

12 happening in the industry in general.

13     Q.  Well, let's -- let's talk about 1999, first

14 of all, at the time that Cenestin was introduced into

15 the marketplace.  You're familiar that '99 was the

16 year of the launch.  In 1999, do you have a sense as

17 to what the relative open, incentivized and closed

18 lives were for the AdvancePCS formulary?

19     A.  I don't have a real sense for that, no.

20     Q.  And you've not considered that in reaching

21 your opinions in this case?

22     A.  I've not considered what type of formulary

23 structure AdvancePCS had in 1999.

24     Q.  Have you considered what sort of formulary

25 structure any of the PBMs listed on page 9 had as of

---

1  1999 in reaching your opinions in this case?

2      A.  I know that in 1999, the third-tier

3  formulary design was just beginning to emerge, so the

4  move to open formularies was more prevalent after

5  1999, towards 2000 and 2001.  Formularies back in 1999

6  were more restrictive than they are today.

7      Q.  And would that also be true, in your

8  opinion, in 2000?

9      A.  Well, as I say, they are more restrictive.

10 It's my opinion that formularies were more restrictive

11 in 2000 than they are today because of the development

12 of a third-tier program, third-tier co-pay program and

13 the tendency to want to make access more available to

14 pharmaceutical products for plan members.

15     Q.  Is the three-tier program, in your mind, the

16 same as what you'd call an incentivized formulary?

17     A.  It is -- the three-tier would be the

18 incentive for the patient, correct.

19     Q.  So when you refer to a three-tier formulary,

20 you're referring to a type of incentivized formulary,

21 correct?

22     A.  Correct.

23     Q.  And you believe that the emergence of

24 three-tier formularies has led to less restrictions on

25 what kind of drugs consumers can get; is that correct?

---

1      A.  That's the intent of the three-tier

2  formulary, and it depends a lot upon the differential

3  between the payment of the second and third tier.

4      Q.  And that varies from plan to plan?

5      A.  It could vary from plan to plan.

6      Q.  In reaching your opinions, did you consider

7  at any time between 1999 and 2002 what the

8  differential and the co-pays were with respect to any

9  of the PBMs listed on page 9?

10     A.  No.

11     Q.  Might that be relevant to the impact of the

12 conduct alleged in the complaint?

13     A.  I'm not sure how that would be relevant to

14 the -- to the alleged complaint.  The complaint dealt

15 with -- with sole-source contracting, which in effect

16 would prevent a Cenestin product from getting on many

17 of the formularies at all.

18     Q.  Is it your understanding that if Cenestin

19 was not on an open formulary, not listed on the

20 formulary, that it would not be reimbursed by the

21 formulary?

22     A.  No, in an open formulary, as long as a

23 therapeutic category is covered under the members'

24 benefit, the drug products in that category would get

25 reimbursed.

---

1      Q.  And is it your understanding that if

2  Cenestin were not on a formulary, that it would not be

3  eligible for a third-tier co-payment?

4      A.  No, that's not my understanding.

5      Q.  So I guess I don't quite understand your

6  point.  Why is it that the fact that they were

7  excluded from the formulary means that the co-pay

8  differentials are not relevant?  I would think that

9  that is what makes them relevant.

10     A.  The co-pay differentials would be relevant

11 to Cenestin being prescribed and the member obtaining

12 a prescription.  If it's significant between the tier

13 2 and the tier 3 co-payment amount, it would have an

14 impact on Cenestin being dispensed.

15     Q.  In terms of the percentage of the various

16 plans that were open and closed, why don't we take a

17 quick look at -- let's see -- a document that's been

18 marked as -- it's previously been marked as Exhibit

19 301.  This was a document that's been produced in this

20 case by Duramed.  You're familiar with Duramed, are

21 you not?

22     A.  Uh-huh.  Yes.

23     Q.  And have you reviewed this document in the

24 course of your work on this case?  Is that one of the

25 documents provided to you by counsel?

7/18/2002 Bystrom, Dale (final)

1     A.  It's possible.  I've looked at a number of
2  documents.
3     Q.  Did you consider this document in reaching
4  the opinions in your report?
5     A.  I may not have.  I don't recall this
6  specific document, but I may have read it.
7     Q.  If I could direct your attention to the last
8  page of the document entitled "PBMs formulary
9  breakdown."  And incidentally, this document is dated
10  November 30th of 2000.
11     And it lists AdvancePCS and purports to list
12  the percentage of lives covered by the open benefit,
13  the three-tier benefit and the closed benefit for
14  AdvancePCS.  And do you see that, 75 percent open?
15     A.  Uh-huh.
16     Q.  Do you have any reason to dispute that
17  estimate by Duramed that 75 percent of the lives
18  covered by AdvancePCS were subject to open
19  formularies?
20     A.  No.
21          MS. COURVILLE:  Objection.  We don't
22  really know how they're defining "open formularies" in
23  this document, so the definition, as you know, might
24  differ from what Mr. Bystrom has given us as his
25  definition.

7/18/2002 Bystrom, Dale (final)

1     Q.  (BY MR. EGGERT)  Right.  You said you read
2  Mr. Finneran's deposition, right?
3     A.  I read parts of it.
4     Q.  Right.  Did you read the portion of
5  Mr. Finneran's deposition in which he explained what
6  "open," "three-tier" and "closed" meant on this
7  chart?
8     A.  I may have.  I don't recall exactly what his
9  definitions were.
10     Q.  Okay.  Well, let's assume for a moment that
11  "open" here means that they're covered at the same
12  co-pay, and the "three-tier" means that they are not
13  covered at the same co-pay, but that there is a higher
14  co-pay for Cenestin than Premarin, and "closed" means
15  that Cenestin is not covered at all.
16     Given that, let's take a look at Caremark.
17  Once again, 75 percent of the lives are listed as
18  open.  Do you have any reason to dispute that figure?
19     A.  I have no reason to dispute that.
20     Q.  You didn't consider that 75 percent of the
21  lives at AdvancePCS and at Caremark were open in
22  reaching your opinions, did you?
23     A.  I didn't consider this in reaching my
24  opinions, correct.
25     Q.  And did you consider the fact that in this

7/18/2002 Bystrom, Dale (final)

1  group of -- how many is it, one, two, three, four,
2  five, six, seven, eight, nine, ten, eleven, twelve --
3  thirteen PBMs, accounting for 130 -- 140 -- 222
4  million lives, I'm sorry, that 62 percent of the lives
5  covered were open, according to Duramed's
6  calculations?
7     A.  Was your question I didn't consider it; was
8  that what your question was?
9     Q.  Right, you didn't consider that in reaching
10  your opinions?
11     A.  Correct.
12     Q.  Would this be at all relevant, in your view,
13  to any of the opinions reached in your report?
14     A.  My opinions would probably stay the same.  I
15  still believe that if a drug is not listed on
16  formulary, the doctor is not going to be prescribing
17  it, because they're used to prescribing drugs that are
18  on formulary because it makes their life easier.
19     Q.  Did you consider, in reaching your opinions,
20  the fact that on those occasions when Cenestin got on
21  formularies, that their market share with respect to
22  those plans was no greater than it was with respect to
23  those plans where they were not on formulary?
24     Were you aware of that?
25     A.  I don't recall seeing that.  I may have

7/18/2002 Bystrom, Dale (final)

1  reviewed that, but don't recall it.
2     Q.  Did you consider that in reaching your
3  opinions?
4     A.  No.
5     Q.  Might that be relevant to the opinions you
6  reached in the case?
7     A.  Over what time period did that cover?  Do
8  you know?
9     Q.  I think it covered all periods of time in
10  the complaint.  But the facts will be the facts on
11  it.
12     A.  Yeah.  It may or may not be relevant.  I
13  didn't consider it in my report.
14     Q.  Let me see.  Let's go back to your report,
15  page 10.
16     Incidentally, by the way, you also didn't
17  consider whether the percentage of particular managed
18  care organizations were open or closed in the course
19  of reaching the opinions in your report, did you,
20  other than PBMs?
21     A.  My report focused mainly on PBMs, but I am
22  aware that managed care organizations have both open
23  and closed lives.
24     Q.  Are you aware of the relative percentages
25  between open and closed in the managed care field?

1    A.    Not specifically.

2    Q.    So you didn't consider that in reaching the

3    conclusions in your report?

4    A.    Correct.

5    Q.    Under C, the last paragraph, you indicate

6    that PBMs offer formulary services to their clients as

7    a cost containment tool.  How is it that a formulary's

8    services are a cost containment tool?

9    A.    They offer formulary services.  For example,

10    RxAmerica provides their formulary which is driven by

11    low WAP -- low AWP costs as tool to keep prescribers

12    on a list of drugs that have low AWPs so their health

13    plan costs are low.

14    Q.    And your testimony is that RxAmerica looks

15    only to AWPs in determining what the costs of the drug

16    is for purposes of formulary inclusion, doesn't look

17    to the total cost of the drug which includes the AWPs

18    and the rebates that might be offered in connection

19    with it?

20    A.    The primary decision is made based on the

21    AWP, and secondarily, the rebates would flow.

22    Q.    So rebates are also considered?

23    A.    Rebates are -- are part of the financials,

24    but they're not the driving reason for drug selection

25    on the formulary.  Its formulary is designed as a

1    low-AWP formulary.

2    Q.    And does RxAmerica differ from other PBMs in

3    that respect?

4    A.    To my knowledge, Medco, for example, has a

5    prevalence of Merck products on their formulary;

6    they're not always the least expensive AWP.

7    Q.    Because Medco has been associated with Merck

8    and owned by Merck, historically; is that correct?

9    A.    That would be my assumption, yes.

10    Q.    In the same way that RxAmerica had a

11    preference for Longs Pharmacies as opposed to other

12    pharmacies?

13    A.    When they could.

14    Q.    Let's see.  If I could turn to 5 --

15    MR. EGGERT:  Are you going to be

16    breaking anytime soon?

17    MR. EGGERT:  Yeah, I guess we want to

18    break for lunch pretty soon, won't we?

19    MS. COURVILLE:  I would.

20    MR. EGGERT:  Just a couple minutes.

21    MS. COURVILLE:  Okay.

22    Q.    (BY MR. EGGERT)  Let me show you a document

23    which has been marked as Exhibit 800 --

24    MS. WIEGAND:  51, it should be.

25    Q.    (BY MR. EGGERT)  And 51.  Entitled

1    "Principles of a Sound Formulary System."  Are you

2    familiar with this document?

3    A.    This is produced by AMCP?

4    Q.    I believe that to be the case.

5    A.    Looks familiar.

6    Q.    And --

7    A.    Yes.

8    Q.    And if I could direct your attention to the

9    second page of the document under "drug formulary

10    system," would you agree that it's a purpose of a drug

11    formulary system for a PBM to --

12    A.    I'm still not following where you are here.

13    Q.    Oh, I'm sorry.

14    A.    Page 2?

15    Q.    Yeah, do I have the same document as you?

16    Oh, it's actually the second page of the document, but

17    page 1 of the article, I'm sorry.  Under "drug

18    formulary system."  Would you agree that it's a

19    purpose of a drug formulary system to, at the end of

20    that sentence, "identify drug products and therapies

21    that are the most medically appropriate and cost

22    effective to best service the health interests of the

23    given patient population"?

24    A.    I would say in general, that's a correct

25    statement.

1    Q.    And that one component of that is to analyze

2    drugs for their comparative therapeutic and clinical

3    attributes, right?

4    A.    That's correct.

5    Q.    Now, have you ever examined the relative

6    clinical or therapeutic attributes of Premarin and

7    Cenestin?

8    A.    I have not.

9    Q.    And did you engage in any such analysis in

10    reaching any of the conclusions in your report?

11    A.    No.  I wasn't asked to do that.

12    Q.    As a pharmacist, do you consider yourself

13    capable to engage in a clinical -- or a comparison of

14    Cenestin and Premarin?

15    A.    If I had the information available to me.

16    I have not practiced clinical pharmacy behind the

17    counter for a number of years, so I would need to

18    review in order to do that.

19    Q.    If you turn to the next page, page 2, the

20    real page 2 this time, would you agree that clinical

21    decisions on formulary inclusion should involve

22    assessing peer-reviewed medical literature?

23    A.    Yes, I would in general agree with that.

24    Q.    That they should involve assessing

25    randomized clinical trials?

1    A.    That would be part of the clinical

2  information review.

3    Q.    Would you agree that drug comparison studies

4  are the best sort of trials to have, ones that show

5  head-to-head comparison to existing drugs?

6    A.    I wouldn't disagree with that.

7    Q.    How about pharmacoeconomic studies, what are

8  those?

9    A.    Pharmacoeconomics studies?

10    Q.    Yes.

11    A.    Studies that determine the actual cost of

12  therapy, taking in all factors, in addition to drug

13  costs, costs of -- per-member, per-year cost of

14  pharmaceutical care, together with their health care

15  costs and what the overall impact is.

16    Q.    And would you agree that those should be

17  taken into account in formulary decisions?

18    A.    I wouldn't disagree with that.

19    Q.    What is outcomes research data?

20    A.    Outcomes research data has to do with

21  longer-term studies to determine the actual outcome of

22  the pharmaceutical therapy: did it, in fact, produce

23  the results it wanted and did it have a positive or

24  negative effect on the overall health care.

25    Q.    And you'd agree that that should be

1  considered on the issue of formulary inclusion?

2    A.    I wouldn't disagree with that one, either.

3    Q.    You'd also agree, would you not, that --

4  further down on the page, that economic considerations

5  should be secondary to decisions about the safety,

6  efficacy and therapeutic need for particular drugs?

7    A.    Yes.

8    Q.    And if you turn to the next page, page 3,

9  the discussion of the Pharmacy and Therapeutics

10  committee, would you agree with the discussion here of

11  the goals and objectives of a Pharmacy and

12  Therapeutics committee that first they would objective

13  appraise, evaluate and select drugs for the formulary?

14    A.    Yeah, I would -- I would agree in principle

15  with all of the recommendations put forth by the AMCP.

16    Q.    Okay.  Have you participated in the

17  development of the AMCP standards?

18    A.    I have not.

19    Q.    But as a member of that organization, you

20  accept those standards?

21    A.    Correct.

22    Q.    Let's see.  If you could turn to page 4, do

23  you see that also the AMCP indicates that the

24  formulary system -- this is towards the bottom --

25  should enable individual patient needs to be met with

1  non-formulary drug products when demonstrated to be

2  clinically justified by the physician or other

3  prescriber?

4    A.    That's correct.  What they're referring to

5  there, in my opinion, is an effective prior -- that

6  prior authorization process, which would allow

7  virtually any non-formulary drug to be included in a

8  member's prescription drug coverage if the physician

9  has petitioned an appeal and received approval by the

10  either clinical review board or by the health plan to

11  provide that coverage.  But there needs to be a system

12  in place to accommodate that.

13    Q.    Right.  Are you aware in this case that --

14  actually for those cases where Cenestin was not on

15  formulary, that Duramed's marketing partner, Solvay

16  Pharmaceuticals, urged Duramed to develop formulary

17  packets that would encourage physicians to submit

18  prior authorization requests for the drug?

19    A.    I'm not aware of it.  It doesn't surprise

20  me.

21    Q.    And would it surprise you if you found that

22  Duramed decided that they wouldn't bother?

23    A.    That the physicians wouldn't bother?

24    Q.    That Duramed wouldn't bother to try to put

25  together prior authorization packets for physicians.

1    A.    Doesn't surprise me, because I don't think

2  the physicians would be using them, either.  It's a

3  lot of extra work they have to do.

4    Q.    So in your experience, physicians never

5  submit prior authorizations?

6    A.    No, in my experience, the prior

7  authorization process can be quite cumbersome and time

8  consuming for a physician, so they -- if possible,

9  they would avoid that.

10    Q.    The extent of cumbersomeness might vary from

11  plan to plan depending upon what particular

12  requirements a plan might put for a prior

13  authorization, right?

14    A.    Correct.  And it may vary by drug as well.

15    Q.    Let's see.  The second -- the second bullet

16  point under here indicates that the formulary system

17  should institute an efficient process for the timely

18  procurement of non-formulary drug products and impose

19  minimal administrative burdens.  Do you think that's

20  also talking about the prior authorizations?

21    A.    It may be.  It would be an ideal situation.

22    Q.    And that's the goal set forth by the -- by

23  this organization --

24    A.    AMCP.

25    Q.    -- AMCP.

1    And to provide access to a formal appeal
2    process if a request for a non-formulary drug is
3    denied?
4    A.    Correct.
5    Q.    Does RxAmerica allow for that type of
6    appeal?
7    A.    Yes.
8    Q.    To your knowledge, do most PBMs allow for
9    that type of appeal?
10    A.    As far as I know, that exists within the
11    industry with most PBMs and health plans.
12    Q.    And also, the final bullet point, that the
13    formulary system should include policies that state
14    that practitioners should not be penalized for
15    prescribing non-formulary drug products that are
16    medically necessary.  Are you familiar with that?
17    A.    I think that's an excellent policy.
18    Q.    And that's the policy that's set forth by
19    the AMCP?
20    A.    Recommended by AMCP.
21    Q.    Does RxAmerica abide by that policy?
22    A.    RxAmerica does not deal directly with the
23    physicians from a remuneration perspective --
24    (Sotto voce discussion with court reporter.)
25    A.    RxAmerica does not deal directly with

1    remuneration for physicians.  That would be between
2    the physician and the health plan as far as
3    non-formulary prescribing would go.
4    MR. EGGERT:  If you want to take a
5    brief break -- a break for lunch, maybe we could do
6    that now.
7    MS. COURVILLE:  Okay.  Go off the
8    record.
9    THE VIDEOGRAPHER:  We're off the record
10    at 12:41.
11    (Lunch break 12:41 to 1:34 p.m.)
12    THE VIDEOGRAPHER:  We're back on the
13    record at 1:34.
14    (Sotto voce discussion, defense table.)
15    MR. EGGERT:  We're back on?
16    Q.    (BY MR. EGGERT)  Welcome back, sir.  Are you
17    familiar with the formulary status that Cenestin had
18    on the plan at RxAmerica while you were there?
19    A.    Not -- no, I'm not intimately familiar.  I
20    believe that -- well, I'm not, no.
21    Q.    Did RxAmerica have a contract with Wyeth
22    that precluded it from putting Cenestin on formulary,
23    to your knowledge?
24    A.    That's my understanding, yes.
25    Q.    And would you have approved that contract?

1    A.    I probably would, if Joe made that decision
2    to do that.
3    Q.    Do you think there was anything wrong with
4    RxAmerica entering into that type of arrangement with
5    Wyeth?  Did they commit some violation of law, in your
6    view?
7    A.    No.  That's perfectly legal to do that.
8    Q.    Why?  Is that commonly done in the industry?
9    A.    I don't think it's commonly done, but with
10    the predominant market share that Wyeth had with
11    Premarin, it seemed to fit for that particular
12    circumstance.
13    Q.    And have you -- have you -- are you aware of
14    other similar exclusive arrangements with respect to
15    other manufacturers that had a large market share?
16    A.    No, I'm not.
17    Q.    But you haven't looked into that?
18    A.    In my experience, I'm not familiar with
19    that.
20    (Exhibit No. 852 marked for identification.)
21    Q.    If I could, I'd like to show you a document
22    which has been marked as Exhibit 852, and this is a
23    document which was produced in the course of this
24    litigation by Duramed.  It's an electronic mail
25    message from John Neeley, who's with Viking.  Are you

1    familiar with Mr. Neeley?
2    A.    No.
3    Q.    To Mr. Marty Carter, who was the head of
4    managed care at Duramed.  I believe he's one of the
5    individuals whose deposition you said you reviewed.
6    A.    Saw the deposition, uh-huh.
7    Q.    If you can turn to -- let's see.  The one,
8    two, three, four -- I think it's the sixth page of
9    that exhibit, Duramed 010675 on the bottom, there's a
10    discussion of RxAmerica, recording a discussion that
11    someone from Viking had, I think Mr. Neeley had, with
12    Mr. Joe -- was it LaPine --
13    A.    LaPine.
14    Q.    -- to go over the Cenestin presentation.  He
15    indicated that Joe indicated that the clinical team
16    reviewed Cenestin and decided not to add the product
17    to their formulary.  "From the feedback I received,
18    they felt there were not enough participants in the
19    study.  The bottom line is, they want to take a
20    wait-and-see attitude and get some experience on the
21    product before they add it to the formulary."
22    Would that be consistent with your
23    experience that if a new product came into the market
24    and didn't have a lot of participants in the study
25    supporting it, that RxAmerica might take a

7/18/2002  Bystrom, Dale (final)

1  wait-and-see attitude?

2      A.  It was not unusual to take a wait-and-see

3  attitude with new products entering the market till

4  the clinical team had a chance to evaluate and present

5  to the P & T committee.

6      Q.  And you have no reason to disagree with the

7  fact that -- with the statements suggested here that

8  the reason that Cenestin was not added to the

9  formulary was that the clinical review team reviewed

10  it and decided not to add it because they felt there

11  were not enough participants in the study?

12      A.  Looks to me like that's one of the reasons.

13  They also wanted to take a wait-and-see attitude to

14  get some experience on the product.

15      Q.  What -- why would -- why would a PBM want to

16  take a wait-and-see attitude to look and see about

17  experience on the product?  What would they be waiting

18  to see?

19      A.  They may be waiting to see if the -- if

20  there is an adoption rate by the plans or the

21  physicians requesting it.

22      Q.  In other words, to see if the product is

23  able to generate demand -- physician demand and

24  consumer demand in the marketplace?

25      A.  That may be one piece.  They also may want

7/18/2002  Bystrom, Dale (final)

1  to see and wait -- just wait and see how their current

2  contract is behaving to the introduction of a new

3  product as well.

4      Q.  Might they also want to wait and see if

5  there were adverse reactions in the marketplace to the

6  drug?

7      A.  That's certainly possible.

8      Q.  And do you know whether Cenestin was ever

9  able to generate sufficient physician demand in the

10  marketplace that might have warranted its placement on

11  the formulary?

12      A.  Don't know that.

13      Q.  What sort of demand would ordinarily be a

14  prerequisite for formulary inclusion?

15      A.  I'm not sure I could quote you on that,

16  either.

17      Q.  That wasn't your area of --

18      A.  That was not my area of expertise.

19      Q.  You would defer to Mr. LaPine on issues of

20  that sort?

21      A.  Mr. LaPine and Mr. Miller and the P & T

22  committee.  That was up to them to make those

23  decisions.

24      Q.  You did not use to interfere with or

25  intervene in their decisions concerning what should be

7/18/2002  Bystrom, Dale (final)

1  placed on the formulary?

2      A.  Correct.

3      Q.  If you could look briefly at page 15 towards

4  the bottom, under 4 -- the sentence -- the paragraph

5  that starts, "In almost all cases, a PBM's P & T

6  committee approval is necessary for changes to occur

7  in their formulary."  Then you add "P & T committees

8  rarely drive these formulary change decisions,

9  instead, they bless decisions made by the PBM's

10  decision makers."  I take it that wasn't true, you

11  say, in the case of RxAmerica; they weren't simply

12  blessing decisions that you made as to what should be

13  placed on the formulary?

14      A.  I didn't make those decisions personally

15  myself.

16      Q.  But you were the chief decision-maker of the

17  PBM, were you not; you were the head of the

18  organization?

19      A.  Correct.

20      Q.  Why did you state here that "P & T

21  committees rarely drive formulary change decisions but

22  merely bless decisions made by the PBM's decision-

23  makers"?  Is that a true statement, to your knowledge?

24      A.  I think it is.  The P & T committees accept

25  recommendations from clinical pharmacists and also

7/18/2002  Bystrom, Dale (final)

1  from the -- Joe LaPine on making additions or changes

2  in the formulary.  And they would generally bless

3  those decisions or approve them as long as they're not

4  bad practice in terms of pharmaceutical therapy.

5      Q.  Well, the P & T committee would first make

6  the decision as to whether or not the product was

7  clinically and therapeutically adequate, right?

8      A.  Correct.

9      Q.  And they weren't going to change their mind

10  on that view simply because some decision maker at the

11  PBM wanted to place the product on formulary, I take

12  it?

13      A.  Depending upon how much clinical evidence

14  there was that the particular product may or may not

15  be appropriate for use based on the studies they've

16  seen.  If it was neutral, in their mind, they would

17  most likely bless the decision made by the PBM

18  decision makers.

19      Q.  But in a case where they felt that the

20  product hadn't had enough participants in the study

21  and hadn't clinically shown itself, then they wouldn't

22  approve it; is that -- would that be accurate?

23      A.  If they felt there were evidence indicating

24  it was clinically inadequate or not a good clinical

25  decision to have it on formulary, it would be

1    difficult for them to bless that decision to add it.

2        Q.    Are you aware that in the initial study that

3    Cenestin conducted to obtain FDA approval, that 77

4    percent of the participants had to be titrated upward

5    to a 1.25-milligram dose as opposed to the standard

6    .625-milligram dose in order to obtain relief?

7        A.    Not totally familiar with that, no.

8        Q.    Would something of that sort have been

9    relevant, do you think, to a P & T committee in

10   determining whether or not to give Cenestin formulary

11   status?

12       A.    Might be.  The P & T committee uses clinical

13   data to make their decisions; could be it would be, it

14   might or might not be.

15       Q.    Are you aware of the dosage levels of

16   Cenestin that were approved by the FDA when Cenestin

17   came into the marketplace?

18       A.    To the best of my understanding, initially

19   when it entered the marketplace, I think they came out

20   with the one-dosage form.

21       Q.    And is Premarin available in a much larger

22   number of dosage forms?

23       A.    Yes.

24       Q.    Could the limited dosage forms available for

25   a product impact its inclusion on formulary?

1        A.    Possibly.

2        Q.    Are you available -- are you aware of the

3    indications for which Cenestin was approved by the

4    FDA?

5        A.    It's my under -- I'm not a clinical

6    pharmacist, and just based on my review of the

7    documents in this case, it appears to me that it was

8    approved for use in menopausal symptoms.

9        Q.    Vasomotor symptoms?

10       A.    Yes.

11       Q.    Was it approved for prevention of

12   osteoporosis?

13       A.    I don't know that it was.

14       Q.    To your knowledge, is Premarin approved for

15   the prevention of osteoporosis?

16       A.    I believe it was.  Uh-huh.

17       Q.    And is Premarin approved for other

18   indications as well that Cenestin is not approved for?

19       A.    Seems to me in the review of the documents,

20   there were conditions -- there were indications that

21   Premarin had that Cenestin did not.

22       Q.    But you're not aware of that, independent of

23   your review of the documents produced in this case?

24       A.    No, I'm not.

25       Q.    Let me see.  If I could, I'd like to show

1    you -- do you have 9?  A document that we will mark as

2    our next exhibit number, which will be 853.  And this

3    is a copy of the RxAmerica drug formulary in the year

4    2000.

5        (Exhibit No. 853 marked for identification.)

6        Q.    Have you ever seen this document before?

7        A.    I may have.  I don't recall specifically.

8    I've seen different forms of the RxAmerica drug

9    formulary; whether I've seen the 2000 edition or the

10   2001 or which edition, I don't know.

11       Q.    If you look at the first actual page of the

12   document, not the cover page, but the next page, the

13   one that's denominated WYE 160468, the second full

14   paragraph there towards the middle, it states, "In

15   addition to clinical considerations, the advisory

16   panel evaluates the cost of treatment of

17   therapeutically equivalent drugs and bioequivalency

18   data provided by the FDA.  With primary consideration

19   to provide a safe, effective and comprehensive

20   formulary, the advisory panel evaluated all

21   therapeutic categories and has selected the most cost

22   effective agents in each class."

23       At the time that RxAmerica made that

24   statement in connection with its formulary, to the

25   best of your knowledge, was that an accurate

1    statement?

2        A.    To the best of my knowledge, it would have

3    been accurate.

4        Q.    And RxAmerica had made the decision to have

5    Premarin on its formulary and not Cenestin with

6    respect to the therapeutic category of estrogen

7    replacement products, right?

8        A.    That's my understanding.

9        Q.    Let's see if you can turn a couple of pages

10   over to the page which is denominated 160470.  Under

11   "function and scope," talking about the pharmacy and

12   therapeutics advisory panel -- is that the same as the

13   P & T committee, incidentally?

14       A.    Yes.

15       Q.    Under item number 2, it's one of their

16   charges to maintain the RxAmerica drug formulary and

17   to provide procedures for constant evaluation and

18   modification of the formulary based upon an objective

19   analysis of the safety, efficacy and cost

20   effectiveness of each medication.  That accurately set

21   forth one of their charges, did it not?

22       A.    Yes, it did.

23       Q.    And do you have any reason to believe that

24   they did not adequately fulfill that charge in

25   connection with their decision regarding Cenestin and

1    Premarin?

2        A.    The guidelines would apply to that decision

3    as well as others.

4        Q.    And you never -- you never suggested that

5    they failed to comply by those guidelines in

6    connection with their decision regarding Cenestin?

7        A.    That's correct.

8        Q.    Okay.  If you can turn to page 160478,

9    that's like the middle of the document, that's where

10   they're actually talking about estrogens.  I think

11   it's page 18 in the small print on the bottom.

12            It lists various estrogens which I take it

13   were covered by the -- by the formulary, right?

14       A.    Correct.

15       Q.    And estradiol was one such -- estradiol,

16   with the Estrace being the brand name, was one such

17   estrogen, right?

18       A.    Correct.

19       Q.    And I take it that nothing that Wyeth did

20   prevented RxAmerica from putting estradiol or Estrace

21   on the formulary?

22       A.    Evidently not.

23       Q.    And then estrogens conjugated, Premarin, has

24   a one dollar sign by it.  What does one dollar sign

25   mean?

1        A.    Dollar signs are a relative ranking of cost

2    of therapy of the drugs that are listed such that a

3    one dollar sign would be a more cost effective choice

4    than perhaps a two dollar sign would be.

5        Q.    So Premarin, in the view of RxAmerica, was

6    more cost effective than Vivelle, Estraderm and

7    Estring, which were other estrogens available on the

8    formulary; is that right?

9        A.    Evidently at that point in time, that's

10   correct.

11       Q.    Anything here that would suggest that

12   Premarin was overpriced?

13       A.    No.

14       Q.    Okay.  I don't have any further questions on

15   that document.

16            If I could direct your attention to page 13

17   of your report.  Under subcategory G, you indicate

18   that PBM contracting with pharmaceutical manufacturers

19   most often involves negotiations between the two

20   parties to determine positioning of manufacturers'

21   drug products on the PBM's formulary.  I take it,

22   then, that it's common for manufacturers and PBMs to

23   have negotiations concerning where on the formulary

24   the manufacturer's products will be listed?

25       A.    That's part of the negotiation process, yes.

1        Q.    Is there anything wrong with that?

2        A.    No, that's pretty standard in the industry.

3        Q.    In fact, if PBMs weren't able to do that --

4    that's what PBMs do, right; that's the whole idea of a

5    PBM is to try to set up formularies and to make

6    judgments as between drugs as to which are more

7    effective and which are more cost effective,  right?

8        A.    That's correct.

9        Q.    And the goal of that ultimately is to

10   deliver lower-cost health care to the consumer; is

11   that correct?

12       A.    Pharmaceutically effective and lower health

13   care costs.  That's the goal.

14       Q.    Down towards the bottom of the page, it

15   indicates that in creating a drug formulary, the issue

16   of rebates becomes paramount to the PBM when

17   determining formulary positioning between drugs in the

18   same therapeutic class.  Is that generally true across

19   PBMs, to your knowledge?

20       A.    To my knowledge, that is, yes.

21       Q.    And in particular, PBMs are more likely to

22   give favorable formulary position to drugs that

23   have -- that give them greater amount of rebates?

24       A.    If everything else is pretty much equal

25   between the two drugs, that would favor the one with

1    the higher rebate.

2        Q.    And that's standard across the industry,

3    isn't it?

4        A.    To my knowledge, it is.

5        Q.    Do you -- in this case, do you have an

6    opinion that there was something wrong with Wyeth's

7    use of market-share incentive rebates separate and

8    apart from any provision in its rebate agreements that

9    precluded -- that required that Premarin be the sole

10   and exclusive conjugated estrogen on the formulary?

11       A.    Probably not.  Their behavior as far as

12   negotiating market-share agreements and getting

13   products listed on formularies, the parts we've

14   discussed probably fall within the normal activity of

15   the industry.

16       Q.    But what you're more concerned with is that

17   provision in some of the contracts with PBMs that

18   required that Premarin would be the sole and exclusive

19   conjugated estrogen listed on the formulary; is that

20   right?

21       A.    That's -- that's kind of unusual, correct,

22   in my estimation.

23            THE VIDEOGRAPHER:  Mr. Bystrom, could

24   you move your microphone up a little bit?  It's

25   knocking against the table.  Thank you.

7/18/2002 Bystrom, Dale (final)

1    Q.   (BY MR. EGGERT)  So you're not familiar with
2    other exclusivity arrangements that other
3    manufacturers have negotiated with PBMs?
4    A.   Not -- not very familiar with a lot of those
5    type of contracts in the industry.
6    Q.   How about in the area of insulin, insulin
7    medications?
8    A.   I think Lilly had some exclusive
9    arrangements for quite some time until competitive
10   products came out.
11   Q.   And isn't it common for manufacturers to
12   give PBMs greater rebates if they have either an
13   exclusive status on the formulary with respect to a
14   therapeutic category or if they are one of only a
15   small number of drugs?
16   A.   That would be correct.
17   Q.   And in fact, a number of PBMs actually send
18   out bid grids that require manufacturers, in bidding,
19   to fill out different percentage rebates premised on
20   the level of exclusivity that would be provided on the
21   particular formulary; is that right?
22   A.   That might be one of the factors on the bid
23   process.
24   Q.   RxAmerica doesn't engage in that time of
25   bidding process, to your knowledge, or --

4/1/2005 2:53 PM                                    129

7/18/2002 Bystrom, Dale (final)

1    A.   Not to my knowledge, no.
2    Q.   But are you aware of some of the PBMs that
3    do?
4    A.   After reviewing the documents that were
5    given to me, it appears that some of the PBMs do
6    that.
7    Q.   You weren't aware of that before you
8    reviewed some of the documents that were produced in
9    this case?
10   A.   I was aware that PBMs submit requests for
11   proposals for formularies, but I was not aware of what
12   you call the bid grid process and the type of process
13   that was used by some of the other PBMs.
14   Q.   Express Scripts would be an example,
15   wouldn't it?
16   A.   Yes, uh-huh.
17   Q.   If you look on page 14 of your report, let's
18   see.  The third paragraph.  The one that starts, "As
19   the PBM industry competes aggressively for new
20   clients, the PBM profits derived from their
21   administration fees has diminished and their
22   manufacturer rebates with their associated
23   administration fees have become a more significant
24   component of the PBM's totality profitability."
25        First of all, is there any difference

4/1/2005 2:53 PM                                    130

7/18/2002 Bystrom, Dale (final)

1    between administration fees and administration fees
2    that are associated with manufacturer rebates?
3    I found this sentence a bit confusing.
4    A.   They're for different purposes, yes.
5    Administration fees that I refer to in the beginning
6    of that statement refer to claims processing fees,
7    fees for maintaining eligibility, fees for providing
8    services to the payor.
9    Q.   And is that generally the 2 or 3 percent
10   administrative fee that a PBM would negotiate with an
11   MCO?
12   A.   Yeah, generally it will be 30, 40, 50 cents,
13   a dollar in the old days.  That was what's called the
14   admin fee that they would negotiate with the payor for
15   payment of their services.
16   Q.   Okay.  And then there's a different kind of
17   administration fee?
18   A.   Well, the administration fee or service fees
19   that are associated with rebates have to do with the
20   activities involved in administering the rebates and
21   the submission for payments back to the -- to the drug
22   manufacturer.
23   Q.   But is there a separate administration fee
24   charged for that in the contracts or are you just
25   referring to --

4/1/2005 2:53 PM                                    131

7/18/2002 Bystrom, Dale (final)

1    A.   No, no, no overall -- overall profitability
2    of the PBM is derived from administration fees from
3    their client as well as administration fees they
4    receive from the drug manufacturer in managing their
5    rebates.  There's several fees involved in
6    profitability.
7    Q.   I see.  So here, you're talking about the
8    administration fee which is received from the
9    manufacturer.  Those are the ones that are associated
10   with the rebates?
11   A.   Those are the ones associated with the
12   rebates, correct.
13   Q.   And those are the -- that's the 2 or 3
14   percent that a manufacturer might pay to a PBM in
15   addition to whatever the percentage rebate is?
16   A.   That's correct.
17   Q.   And the administration fee is something that
18   the PBM will not generally or ever pass down to its
19   clients, whereas the rebate itself might get passed
20   down, in whole or in part, to the client plans,
21   correct?
22   A.   Correct.
23   Q.   When you state that for some PBM brand drug
24   manufacturers, rebates and associated fees account for
25   over 50 percent of their total gross margin dollars,

4/1/2005 2:53 PM                                    132

1  can you break that down for me as to what portion of

2  that is the rebates and what part is the associated

3  fees?

4      A.   Probably really can't, because from my

5  experience, they're lumped into rebates in general as

6  a line on the P & L.

7      Q.   What's the basis --

8      A.   So the -- if the rebates are in the area of

9  5 to 10 percent and the admin fees are 2 to 3 percent,

10  they may be close to the same, because a portion of

11  the rebate actually goes back to the -- to the

12  client.  But that would be speculation on my part as

13  to the exact amount and breakdown.

14      Q.   I mean, it's true, isn't it, that in -- in

15  recent years, a greater and greater number of the

16  plans are demanding that a larger and larger

17  percentage of the rebates be passed down to them;

18  isn't that true?

19      A.   It's correct that the clients are becoming

20  more aware of the rebates and what they should be

21  asking for.

22      Q.   Right.  In the early days of the PBM

23  industry, clients might have been ignorant and they

24  didn't know that the PBMs were pocketing large amounts

25  of rebates, but clients now are aware of that fact and

1  they demand their share of the rebates, right?

2      A.   I think as the cost of health care goes up,

3  everybody is looking for where they can find more

4  profit opportunities.

5      Q.   The next paragraph, you talk about Medicaid

6  best-price rebates.  Could you explain to me how that

7  works?

8      A.   Yes.  The Medicaid -- governmental

9  prescription drug program for Medicaid recipients

10  requires drug manufacturers to pay rebates to be

11  listed on their formulary as well, and they have a --

12  they have a threshold that's listed as 15.1 percent,

13  and they call that the best-practices threshold; and

14  if a manufacturer gives a rebate to a private entity

15  that exceeds the best-practice threshold that the

16  government has established, then they would also be

17  required to give that same amount to the government so

18  that the government is not disadvantaged in the

19  formulary rebates.

20      Q.   Why do you include that in your report; why

21  is that relevant to your analysis?

22      A.   Just educating the reader of the report that

23  rebates usually fall within a certain range --

24      Q.   So --

25      A.   -- and they have a ceiling that is

1  artificially imposed by the best-practices rebate to

2  Medicaid.

3      Q.   So your suggestion is that the rules related

4  to Medicaid best prices act as a sort of ceiling and

5  discourage manufacturers from rebating more than 15

6  percent?

7      A.   Correct.

8      Q.   Kind of -- yeah, a most favored nations

9  clause, kind of, for the government?

10      A.   Correct.

11      Q.   You're aware, are you not, that both Wyeth

12  and Duramed offer rebates to entities above the 15

13  percent level?

14      A.   That could be possible.

15      Q.   And if that's true, does this analysis

16  really pertain to Cenestin and Premarin?  Is it

17  particularly pertinent to the analysis of those two

18  drugs?

19      A.   It's pertinent to the PBM industry and the

20  way manufacturer rebates are negotiated.

21      Q.   So would you be surprised if Wyeth offers

22  rebates to some PBMs or MCOs in excess of 15 percent?

23      A.   Probably not.

24      Q.   And would you be surprised if Cenestin

25  offered rebates to MCOs and PBMs in excess of 15

1  percent?

2      A.   I would not be.

3      Q.   In fact, if I could show you a document

4  marked as Exhibit 854 --

5      (Exhibit No. 854 marked for identification.)

6      Q.   -- and direct your attention to the second

7  page.  This is a document produced by Wyeth in this

8  litigation under "government strategy, Medicaid,"

9  towards the bottom there, listing the discounts

10  offered to Medicaid, it ranges from 63 to 66 percent.

11  That's a fairly substantial rebate, isn't it?

12      A.   Yes, it is.

13      Q.   And that shows that Wyeth is competing

14  vigorously in offering significant rebates with

15  respect to the Medicaid business, does it not?

16      A.   It demonstrates that they're offering

17  significant rebates to the Medicaid system.

18      Q.   And that's just an expression of low prices

19  and good price competition, isn't it?

20      A.   You could interpret it that way.

21      Q.   Do you have any other way to interpret it,

22  based on your opinions in this case?

23      A.   The only other way I could interpret it

24  would be if they were -- and I don't -- I'm not sure

25  they can do it with Medicaid, but if they were trying

1  to buy exclusive positioning or excluding others from
2  being able to compete in that same area.
3      Q.  But you're not aware that Medicaid offers
4  exclusive positioning, are you?
5      A.  I'm not aware of that, no.
6      Q.  And certainly, that's not one of the
7  opinions that you've expressed in your report?
8      A.  I have not.
9      Q.  I'd like to direct your attention to page 19
10  of your report.  Starting with page -- yeah, page 19.
11  On pages 18 and 19, you're talking about NDC blocks.
12  Would NDC blocks be an item that is used in connection
13  with what you called incentivized -- incentivized
14  formularies or closed formularies?
15      A.  NDC blocks would appear in closed
16  formularies.
17      Q.  In closed formularies.  Would they appear in
18  any other type of formulary?
19      A.  They would appear -- in formularies?
20  Offhand, I can't think of instances where they would.
21      Q.  Okay.  Other than closed.  Have you done any
22  analysis to determine how often, if at all, NDC blocks
23  were used against Cenestin?
24      A.  I have not.
25      Q.  So you don't really have a view as to

1  whether NDC blocks were ever used against Cenestin in
2  the marketplace?
3      A.  I've not done any analysis in that area.
4      Q.  And your opinion in this case is not based
5  in any way on the use of NDC blocks against Cenestin?
6      A.  It's based on the negotiations to have NDC
7  blocks put in place against Cenestin.
8      Q.  But do you know if any of those negotiations
9  were successful?
10      A.  I don't know.
11      Q.  If they weren't successful -- if they were
12  not successful, what impact would they have had on
13  Cenestin?
14      A.  If they were not successful, the NDC block
15  wouldn't have occurred on Cenestin.
16      Q.  And there would have been no impact on
17  Cenestin, right?
18      A.  From an NDC block, correct.
19      Q.  And you don't know one way or the other as
20  to whether they ever occurred, right?
21      A.  That's correct.
22      Q.  How about soft edits?  Do you know -- do you
23  know what sort of soft edits, if any, were used with
24  respect to Cenestin?
25      A.  The -- PCS had a program called the

1  Preferred Drug Program, in which the pharmacist was
2  incentivized to change a drug from a non-preferred to
3  a preferred drug if a non-preferred drug was
4  adjudicated across in their program.  So there were
5  edit messages put in place to instruct the pharmacist
6  to call the doctor and make a decision to change the
7  drug from a non -- that wasn't preferred -- it was
8  performance -- they called it performance drug plan.
9      Q.  Right.  And in fact, the number of drug
10  products listed on the performance drug list was much
11  smaller than the number of products listed on the PCS
12  formulary, right?
13      A.  It was a subset within the formulary.
14      Q.  Right.  So that even if a product was on the
15  formulary, if it wasn't on the PDL list, it could
16  still be subject to those soft edits, right?
17      A.  Soft edit does not stop a prescription from
18  being adjudicated and filled, that's correct.  It's a
19  advisory message.
20      Q.  It's an advisory message and thus doesn't
21  stop the prescription from being filled; in addition,
22  even if Cenestin had been on the formulary, if it
23  weren't on the PDL, it could have still been subject
24  to those soft edits, right?
25      A.  That's correct.

1      Q.  Do you have any reason to know that in 1999,
2  Cenestin would have been placed on the PDL at PCS
3  absent any of Wyeth's alleged contact?
4      A.  I have no knowledge of that.
5      Q.  How about prior authorizations?  -- Oh,
6  incidentally, do you know of any measures of the
7  efficacy of soft edits in actually switching --
8  switching drug utilization from one drug to another?
9      A.  I've not seen any outcome studies from
10  that.
11      Q.  On prior authorizations, have you done any
12  analysis to determine the extent to which prior
13  authorizations were required with respect to Cenestin?
14      A.  I've not done any analysis of that, no.
15      Q.  Does -- does your opinion rest in any way on
16  the extent to which prior authorizations were required
17  for Cenestin?
18      A.  No, my opinion rests on the negotiations
19  which involved negotiating for prior authorizations to
20  be placed on Cenestin, not on the result of the
21  negotiation.
22      Q.  So your opinion rests on merely, what, Wyeth
23  discussing with PBMs the possibility that prior
24  authorizations might be put into place against
25  Premarin even if they never were put into place?

7/18/2002 Bystrom, Dale (final)

1      A.   That's correct.  It's based on the behavior
2  of Wyeth asking for and requesting those prior
3  authorizations and/or hard edits be placed on
4  Cenestin.
5      Q.   To the extent that Wyeth was unsuccessful in
6  obtaining any prior authorizations, what impact would
7  that have had on Cenestin in the marketplace?
8      A.   If they were unsuccessful, they would have
9  no impact because they wouldn't have been put in
10  place.
11      Q.   And which particular entities did Wyeth have
12  discussions with concerning prior authorizations?
13      A.   To the best of my memory, and there's a
14  couple cases cited in here, they had discussions with
15  Health Net and IPS and Aetna, I believe, for placing
16  hard edits as well as NDC blocks -- NDC blocks as well
17  as prior authorizations.  There may have been others,
18  but those are the ones I recall as I sit here.
19      Q.   Is an NDC block the same as a hard edit to
20  you?
21      A.   That would be the same as a hard edit, yes.
22  Stops the prescription-filling process.
23      Q.   Anyone else that you remember?
24      A.   Not as I recall sitting here this
25  afternoon.

4/1/2005 2:53 PM                                          141

7/18/2002 Bystrom, Dale (final)

1      Q.   And you don't know what ultimately came of
2  any of those discussions?
3      A.   That's correct.
4      Q.   Did you inquire --
5      A.   Although I believe -- I believe in the
6  information I saw on Health Net, Alan Jacobs indicated
7  that the NDC blocks were in place.
8      Q.   With Health Net?
9      A.   Yeah.
10      Q.   And who's Alan Jacobs?
11      A.   He was the director of pharmacy for Health
12  Net at that time.
13      Q.   If I could refer you to page 20, it
14  indicates under section D -- by the way, before I even
15  do that, the last sentence here, the top sentence on
16  the page says, "a step therapy protocol may require a
17  physician to prescribe older and less expensive drugs
18  in a therapeutic class before prescribing newer and
19  more expensive equivalents."
20      What did you mean by including that in your
21  report?
22      A.   I included that under "prior authorization"
23  to indicate that the prior authorizations may be quite
24  cumbersome for a physician if it requires him to go
25  through a step therapy protocol process where he has

4/1/2005 2:53 PM                                          142

7/18/2002 Bystrom, Dale (final)

1  to have -- demonstrate failed therapy with drug A
2  before he can prescribe the non-formulary drug B.
3      Q.   Was that relevant to Cenestin and Premarin?
4      A.   It's relevant to prior authorizations.
5      Q.   Do you know if any entity ever entered into
6  a prior authorization requirement that would have
7  required physicians to show that the patient had --
8  was not successfully treated with Premarin before
9  Cenestin could be made available?
10      A.   I don't know that.
11      Q.   Did you ever see any negotiations even
12  concerning that matter?
13      A.   I saw negotiations where prior
14  authorizations were discussed and requested.  Whether
15  they were successful or not, I can't tell you.
16      Q.   And to your knowledge, those discussions
17  didn't involve step therapy, did they?
18      A.   I'm unaware whether they involved step
19  therapy or not.
20      Q.   Let's see.  Under subsection D, you indicate
21  pharmacy retailers have minimal control over which
22  drug product is dispensed and minimal impact on
23  influencing the market share of a given drug product
24  because up to 90 percent of drug product selection is
25  directed by formularies or preferred drug lists of PBM

4/1/2005 2:53 PM                                          143

7/18/2002 Bystrom, Dale (final)

1  clients.
2      Is that in accord with your understanding of
3  the pharmaceutical industry?
4      A.   In general, that is, yes.  The pharmacy
5  retailers are generally subject to their contracts,
6  which require formulary compliance of their
7  dispensing.
8      Q.   So there's not a whole lot that a pharmacy
9  can do to affect the demand of a drug?
10      A.   They can do therapeutic interventions with a
11  physician, for example, like the PCS, PDL program
12  where they can call and recommend another drug be
13  replaced -- be switched for the drug that was
14  dispensed.  They can do that.
15      Q.   And that's a program they're doing in
16  conjunction with a PBM, right?
17      A.   Correct.
18      Q.   How about just on their own, without --
19      A.   Some pharmacy retailers in instances where
20  substitutable products are available without
21  contacting the physician, will favor one product over
22  another.
23      Q.   Referring to generic substitutable products?
24      A.   No, even multi-source brands where you have
25  two products that are -- can be readily

4/1/2005 2:53 PM                                          144

1 substitutable. They may have flags in their system to
2 indicate to the pharmacist to use preferred drug A
3 over B in that situation. So they can influence
4 market share to some extent.
5       Q.   Is that permitted in California; can a
6 pharmacy substitute one branded product for another?
7       A.   If it -- if they're AB rated and they're the
8 same therapeutically and bioequivalent products, they
9 can do that.
10      Q.   So they have to be generic substitutes and
11 be AB rated in order to --
12      A.   They have to be substitutable. They're not
13 generics, but they're substitutable products.
14      Q.   To your knowledge, is Cenestin AB rated with
15 Premarin?
16      A.   Not to my knowledge.
17      Q.   So it's not substitutable in that way?
18      A.   Not without contacting the physician.
19      Q.   Right, so a pharmacist can't do that sort of
20 substitution between Cenestin and Premarin?
21      A.   Correct.
22      Q.   Let's see. Do you have any reason to
23 believe that pharmacies actually did -- did anything
24 that appreciably affected the market share of Cenestin
25 vis-a-vis Premarin?

1       A.   Not that I'm aware of.
2       Q.   How about Long Drug Store, did they do
3 anything to affect the market share of Premarin versus
4 Cenestin?
5       A.   I'm unaware of anything that they have done
6 in that area.
7       Q.   Are you aware of whether or not Longs Drug
8 Store has a shared success agreement with -- or has
9 ever had a shared success agreement with Wyeth?
10      A.   I'm not aware of that.
11      Q.   How would you -- how would you summarize the
12 opinions that you plan to issue in this case? What
13 are your opinions that you reached?
14      A.   A couple of things: Number one, explanation
15 of the retail pharmacy market and the PBM market,
16 those are information that I can introduce at trial;
17 and opinions that Wyeth introduced a preemptive plan
18 to -- that was with an objective focused at keeping
19 their competitor from gaining market share; that they
20 entered into sole-source contracts with major PBMs and
21 HMOs with the intent of keeping Cenestin off the
22 market, and leveraged their financial rebates to keep
23 those contracts in place; and that Wyeth negotiated
24 with PBMs, requesting that specific NDC blocks and
25 hard edits or prior authorizations be placed against

1 their competitive product; and in one instance, they
2 even negotiated with at that time the largest PBM in
3 the market, Medco, not only did they negotiate market
4 share on their own product, they negotiated rebates
5 based on Medco reducing the market share of their
6 competitors' products.
7       Q.   Let me ask you about that: What's the
8 difference between negotiating rebates based on an
9 increase in the manufacturer's market share as opposed
10 to negotiating rebates based on a decline in the
11 competitors' market share? Doesn't it amount to the
12 same thing?
13      A.   You may have the -- you may end up at the
14 same point, but I think it gets to be predatory when
15 your activities and tactics are focused on negative
16 impact to your competition, specifically trying to
17 disadvantage them in the market as opposed to working
18 in a positive fashion with your own product.
19      Q.   Now, would it affect your view at all on
20 that contractual provision if you were to learn that,
21 in fact, that provision emanated from Medco and not
22 from Wyeth?
23      A.   It really wouldn't. I think the behavior
24 still exists.
25      Q.   But it would, it would impact -- you seem to

1 have a focus on your opinions on what Wyeth's intent
2 is. You want to opine about why -- its intent; is
3 that correct?
4       A.   I want to -- my opinion is based on what
5 Wyeth's strategy and plans were relative to their
6 formulary positioning with the PBM market.
7       Q.   And how do you know what Wyeth's strategy
8 and plans were?
9       A.   From their preemptive Premarin plan and from
10 the documents that I've reviewed in the case having to
11 do with their negotiations with the PBMs.
12      Q.   Other than reviewing the documents in the
13 case, do you have any other basis for opining as to
14 what Wyeth's intent was with respect to its preemptive
15 plan, that you call it?
16      A.   It's based on what I've reviewed in the
17 documents in the case.
18           MS. COURVILLE: Objection, it's not
19 what he calls it; it's the name of the document, "The
20 Preemptive Plan."
21      Q.   (BY MR. EGGERT) Are there any other
22 opinions that you expect to render other than those?
23      A.   Any other opinions would be basically
24 supporting those positions that Wyeth entered into
25 contracts to keep Cenestin off formulary with PBM --

1  major PBMs and HMOs, and that they used their rebates
2  to leverage that activity.  And I also feel that in
3  instances I reviewed, that Wyeth was bundling their
4  rebates in such a way -- and that bundling rebates is
5  not uncommon in the industry -- but they were offering
6  rebates on multiple products and multiple product
7  families; and whenever -- on the documents I reviewed,
8  it appeared that whenever a PBM wanted to consider
9  placing Cenestin on their formulary, Wyeth made it
10  evident that all of their rebates could go away if
11  they were to place a product in that one category.
12      Q.   Did Wyeth ever do that to anyone?
13      A.   Didn't appear that they needed to.
14      Q.   If Wyeth had done that; I mean, let's
15  suppose that someone had called the bluff, so to
16  speak, wouldn't Wyeth be shooting itself in its own
17  foot by removing its rebates with respect to other
18  products?  What would happen to Wyeth's sales of those
19  other products?
20      A.   I don't know.  It didn't happen, so I can't
21  speculate on that.
22      Q.   Take the example of oral contraceptives.
23  Does Wyeth have a dominant share in the marketplace
24  for oral contraceptives?
25      A.   Not to my knowledge.

1      Q.   So if Wyeth were to no longer provide
2  rebates to oral contraceptives in managed care plans,
3  would it not be predictable that Wyeth's share of the
4  oral contraceptive market would plunge?
5      A.   Could be.
6      Q.   And that would hurt Wyeth's sales, wouldn't
7  it?
8      A.   In that category, it would.
9      Q.   And you say that bundling rebates is not
10  uncommon in the industry?
11      A.   It's not uncommon for one manufacturer to
12  offer rebates on multiple products and offer them as a
13  bundle to a PBM.
14      Q.   What are some other manufacturers that
15  engage in that kind of bundling activity?
16      A.   Without naming specific products, I believe
17  Schering has done that, and I believe Parke-Davis has
18  done that.  And I suspect that others have done that
19  as well.
20      Q.   And are you aware that Wyeth actually
21  bundles rebates far much less frequently now than it
22  did say three or four years ago?
23      A.   I'm not aware of that.
24      Q.   Do you have any opinions with respect to the
25  shared-success program that you intend to render in

1  this case?
2      A.   The only opinion that I would render in the
3  shared-success program was based on the documents I
4  reviewed.  It was Wyeth's intent to go out and
5  renegotiate those to secure their position with retail
6  pharmacies to make -- to prevent Cenestin from
7  entering into any kind of relationships with retail
8  pharmacies in a similar fashion.
9      Q.   And do you have any idea as to how many
10  shared-success agreements, if any, they actually
11  renegotiated?
12      A.   I do not, no.
13          MR. EGGERT:  Can we take a break for
14  just a couple minutes?
15          MS. COURVILLE:  Absolutely.
16          THE VIDEOGRAPHER:  We're off the record
17  at 2:23.
18          (Short break 2:23 to 2:34 p.m.)
19          THE VIDEOGRAPHER:  We're back on the
20  record at 2:34.
21      Q.   (BY MR. EGGERT)  Sir, if I could direct you
22  to page 11 of your report, about three quarters of the
23  way down underneath the bold and italicized paragraph
24  there, you say that evidence of the prevalence of
25  different formulary types is mixed, and then you

1  indicate that about three fourths of HMOs have
2  preferred or closed formularies, 45 percent preferred
3  or partially closed and 27 percent closed; and then
4  you cite an article in Novartis 1999 or a study from
5  Novartis of 1999?
6      A.   Uh-huh, uh-huh.
7      Q.   Should you have said "had as of 1999"; are
8  those figures accurate as of the present time?
9      A.   This was as of 1999.
10      Q.   Okay.  And then even as of 1999, if I could
11  direct your attention to what's previously been marked
12  as Exhibit 301 -- let's see where that was.
13          Okay.  If you can look -- we already looked
14  at the last page of that document which dealt with
15  PBMs.  If you turn two more pages towards the front
16  from the back, there's an HMO formulary breakdown that
17  was computed by Duramed -- by the way, stepping back
18  for a moment, in your experience, isn't it possible
19  that even if a particular MCO has plans that are
20  classified in general as open or incentive-based or
21  closed, that with respect to particular drug products,
22  it can make exceptions and allow that drug product to
23  be made available at the same co-pay to its members
24  even if it would not normally qualify under its plans?
25      A.   They have the mechanics to do that, correct.

1    Q.   In the course of reaching your opinions in
2  this case, did you examine the extent to which that
3  actually occurred in the marketplace with respect to
4  Cenestin?
5    A.   I did not.
6    Q.   Well, let me represent that the formulary
7  breakdown here is meant to incorporate that the way
8  Premarin -- the way that Cenestin was actually treated
9  on plans of HMOs and PBMs; and if you look at this
10 page under HMOs' formulary breakdown, it expresses the
11 view that in cumulative, that a number of HMOs -- and
12 they go on for pages and pages before, there's
13 probably over a hundred of them -- cumulatively
14 accounting for 113 million lives, that of those, 65
15 percent of those lives were open, meaning that they
16 were at the same co-pay level; 11 percent were at the
17 3-tier level; and 24 percent were closed.
18      Those numbers are actually somewhat lower
19 with respect to the incentivized and closed than the
20 numbers as revealed in the Novartis article, are they
21 not?
22   A.   They appear to be, correct.
23   Q.   If, in fact, you had been looking at these
24 numbers as opposed to the Novartis numbers, might that
25 have impacted in some way your opinions as expressed

1  in your report?
2    A.   Probably not.
3    Q.   Why is that?
4    A.   My opinions are based on what I saw as their
5  behavior and their plan and their objective to
6  disadvantage their competitor in the marketplace.
7    Q.   So your opinions are really based more upon
8  what you saw as Wyeth's objective and not in terms
9  Wyeth's actual effect on the marketplace; is that
10 fair?
11   A.   That's fair.  It's not based on the
12 outcome.
13   Q.   What is it, in your opinion, if anything,
14 that would qualify you as opposed to other people to
15 express an opinion as to what Wyeth's intent was,
16 other than the fact that you've reviewed some of the
17 underlying documents in the case?
18   A.   What would qualify me to comment on their
19 intent?  Was that your question?
20   Q.   To opine on what their intent was, yes.
21   A.   Well, I think my years in the industry, in
22 the pharmacy and PBM industry; and then being able to
23 read their preemptive plan, which had their main
24 objectives stating to reduce or keep their -- their
25 competitors' market share at an absolute minimum,

1  that's where I would derive that ability to come forth
2  with that opinion.
3    Q.   Right.  Well, for example, could Miss
4  Courville read the preemptive plan as well as you and
5  come to a conclusion about what their intent might
6  have been?
7    A.   I think anybody reading that document could
8  understand what their objective was.
9    Q.   So what -- is there something that qualifies
10 you to be more able to discern their objective than
11 anyone else?
12   A.   I think my years in the industry qualify me
13 to understand how the industry works and get a feel
14 for how their objective might differ from other
15 companies in formulating their business strategies and
16 business plans.
17   Q.   Anything else?
18   A.   That's all that comes to mind.  Let me just
19 add one other thing.  I have had a lot of experience
20 in dealing with pharmaceutical manufacturers and on
21 their advisory committees and listening to their
22 plans, so I think that also helps to qualify me to
23 come up with an opinion on what I saw here.
24   Q.   And in the course of your advisory -- have
25 you found a lot of manufacturers that you think were

1  engaged in exclusive type of plans and preemptive
2  plans?
3    A.   I don't recall any of the manufacturers that
4  I dealt with that were developing plans with the
5  objective of disadvantaging their competition.
6    Q.   So in the course of dealing with
7  pharmaceutical manufacturers, you didn't develop any
8  special expertise, then, in the area of manufacturers
9  that are trying to disadvantage their competition?
10   A.   I didn't develop any expertise in that area,
11 no.  The...
12   Q.   Now, I take it you -- you don't have an
13 opinion to express as to whether, in the absence of
14 Wyeth's alleged conduct here, that Cenestin would have
15 obtained access to PBM formularies?
16   A.   That's correct.
17   Q.   And you'd agree, would you not, that there
18 are a number of different reasons other than Wyeth's
19 contracts that might have accounted for Cenestin's
20 inability to get on certain formularies?
21   A.   There could be other reasons.
22   Q.   Have you -- have you considered the fact
23 that Cenestin actually is on a number of formularies
24 in reaching your opinion?
25   A.   I'm aware that it is on some formularies.

1    Q.   What formularies are you aware of that it's

2  on?

3    A.   It's now on the AdvancePCS formulary,

4  although it wasn't during the time this was going on.

5    Q.   And that's about 85 million lives?

6    A.   It is today.  Yes.  Uh-huh.

7    Q.   Right.  It was fewer in the earlier periods,

8  right?

9    A.   (Nodding.)  I can't specifically cite

10  others, but I know in reading documents such as this,

11  they indicated that they did have formulary position

12  with some smaller plans.

13    Q.   Do you consider WellPoint to be a small

14  plan?

15    A.   At that time, WellPoint was probably between

16  15 to 20 million members; they would be a relatively

17  significant player.

18    Q.   And now they're up around 30 million, right?

19    A.   I think they're over 30 million, yeah.

20    Q.   And Argus, you consider that to be a

21  significantly sized plan?

22    A.   They are today.  I'm not sure where they

23  were in 1999 and 2000.

24    Q.   Let me show you a document which I'll mark

25  as 855?  855.

1       (Exhibit No. 855 marked for identification.)

2    Q.   This is a copy of a letter that Miss

3  Courville kindly sent to a number of us.  It attaches

4  some interrogatory responses, they're called, in this

5  case.

6       Have you ever seen this document?

7    A.   I'm not sure if I've reviewed this document

8  or not.  It's certainly possible, but I don't

9  specifically recall it as I sit here.

10    Q.   It lists a number of formularies that

11  Cenestin is on, including a number of Blue Cross plans

12  up here at the top, a number of Humana plans.  Is

13  Humana a significant player in the market?

14    A.   Fairly much so.

15    Q.   Eckerd Drug Company, which we've seen --

16  they list here as 4 and a half million lives; we've

17  seen it listed somewhere as high as 16 million, right?

18    A.   Correct.

19    Q.   PharmaCare, CVS, is on here listed as 4

20  million; I think we've seen that as high as 12 million

21  on another document, right?

22    A.   Yes, uh-huh.

23    Q.   Have you heard of Keystone Mercy Health

24  Plan?  It's a Blue Cross plan.

25    A.   I'm not familiar with Keystone.

1    Q.   Prime Therapeutics; are you familiar with

2  that plan?

3    A.   They're a PBM.  I am familiar with them.

4    Q.   Are they located in California?

5    A.   They are located in Minneapolis.

6    Q.   Minneapolis.

7       MS. COURVILLE:  By the way, Dave, I've

8  just found out that Prime Therapeutics should be

9  removed from that list, and we will be serving

10  corrected interrogatory answers.

11       MR. EGGERT:  Yet again.

12       MS. COURVILLE:  Sorry.  As I get it.

13    Q.   (BY MR. EGGERT)  Let's see.  Express Scripts

14  is listed here with respect to the expanded formulary

15  bid grid.  Are you aware that they -- that Cenestin

16  was on the expanded formulary for Express Scripts?

17    A.   I was unaware of that.

18    Q.   Anthem, are you familiar with that plan?

19    A.   They're a PBM, I'm familiar with them.

20    Q.   Are they, you know, a fairly significant

21  comparable, say, to RxAmerica?

22    A.   In that same tier.

23    Q.   But I take it it wasn't relevant to you in

24  the course of your analysis that, in fact, Cenestin

25  had obtained access to a number of -- number of

1  formularies?

2    A.   I based my opinion on the documents in the

3  preemptive plan that I read, and also the documents

4  that involved interactions between Wyeth and various

5  PBMs in the industry.

6       MS. COURVILLE:  And objection, that

7  list is as of today, July 2002.  Many of the plans

8  that you've mentioned, only recently did Cenestin get

9  on the formulary.  So I'm not really sure what the

10  relevance of your question is.

11       MR. EGGERT:  I take it you're seeking

12  injunctive relief in the case.

13       MS. COURVILLE:  Well, but you've asked

14  him about a plan that was 1999 and you're asking him

15  about formulary positions that we achieved yesterday,

16  so...

17    Q.   (BY MR. EGGERT)  You indicate in your report

18  that -- I think you say at one point that formulary

19  status is the holy grail, and that it's the most

20  important factor in marketing a product; is that your

21  opinion?

22    A.   That's my opinion, based on what I've seen

23  in the industry and conversations with drug

24  manufacturers and the fact that if you can't get

25  position on a formulary, you don't have much chance of

1    achieving market penetration.

2        Q.    Are you aware of products like Celebrex and

3    Vioxx that have actually done quite well in the market

4    without achieving appreciable formulary penetration?

5        A.    There may be products that have done quite

6    well without achieving formulary penetration that are

7    unique in the industry in terms of their drug classes

8    that don't have relatively good formulary

9    alternatives.

10       Q.    And are Celebrex and Vioxx among those?

11       A.    They're the brand-new category of Cox

12   inhibitors that are unique to the industry.  I think

13   they call them Cox-2 inhibitors.

14       Q.    Uh-huh.  And do you think that formulary

15   status is more important than the clinical efficacy of

16   a drug in order for it to achieve success in the

17   marketplace?

18       A.    Well, I think they have to have both.  I

19   think they have to be clinically effective in order to

20   gain formulary status.  And they need to be on

21   formulary in order to be widely prescribed.

22       Q.    And how about the way that the product is

23   detailed to physicians; is that important to its

24   success?

25       A.    All of those factors contribute to the

1    success of a product.

2        Q.    Or the failure of a product, right?

3        A.    Correct.

4        Q.    Can you really disaggregate one and say that

5    it's more important than the others?

6        A.    Well, I would -- mentioned in my report I

7    think the most important one is the fact that the drug

8    achieves formulary status so the physicians can

9    prescribe it.  It has to do the other, it has to be

10   clinically effective and safe and cost effective in

11   order to be placed on formulary.

12       Q.    Right.  But there's lots and lots of

13   products that are placed on formulary that don't have

14   very many sales, right?

15       A.    There may be, depending upon market demand

16   and the therapeutic category they're in.

17       Q.    And certainly you'd agree that formulary

18   positioning is no guarantee of successful product

19   sales?

20       A.    Yes.

21       Q.    Let's see, now.  You'd agree that the

22   primary demand generators in the pharmaceutical market

23   are physicians who prescribe the product; is that

24   correct?

25       A.    Physicians and patients themselves.  They're

1    becoming more and more educated on -- thanks to

2    direct-to-consumer advertising on products -- and

3    often drive product demand as well as the physician.

4        Q.    And you'd agree, would you not, that thus,

5    manufacturers are incentivized to devote marketing

6    resources to try to encourage physician prescriptions,

7    right?

8        A.    Correct.

9        Q.    And one way that they do that is through

10   detailing, correct?

11       A.    That's correct.

12       Q.    And PBMs attempt to market themselves as

13   able to affect physician prescriptions in some way

14   through their formulary decisions, right?

15       A.    Through their formulary decisions and their

16   physician profiling and their drug utilization review

17   process.

18       Q.    Are you aware of any studies that would --

19   that would indicate that PBMs, using their formulary

20   processes, are as effective as physician detailing in

21   actually impacting physician prescriptions?

22       A.    I've not reviewed studies to that effect.

23       Q.    Well, as a representative of a PBM, when

24   you're trying to sell your services or trying to

25   encourage manufacturers to give -- to give you rebates

1    in order to give formulary positions, do you try to --

2    do you try to convince the manufacturer that you're

3    able to move market share?

4        A.    Manufacturers are already aware that the

5    formulary itself is a tool that will allow them to

6    achieve market share.  Or that would prevent them from

7    achieving market share if they can't get on it.

8        Q.    But the extent to which that's the case has

9    not been indicated in empirical studies?

10       A.    I've not seen empirical studies on that.

11       Q.    Now, is it your view that a PBM or an MCO

12   just can't get by without -- without getting rebates

13   from Premarin and Wyeth?

14       A.    As I mentioned in my report, rebates are

15   very important -- important profit component to the

16   PBMs today; and I'm sure they would still exist in the

17   community if they didn't receive rebates from Wyeth,

18   but it would be a significant negative impact on their

19   profitability.

20       Q.    Well, if PBMs actually have the ability to

21   move market share, why wouldn't they simply move

22   market share away from Wyeth products if they weren't

23   getting rebates from Wyeth?

24       A.    Well, it could be an effect that formulary

25   positioning would change if rebates disappeared for

1  Wyeth products, and which may have an impact then on
2  the Wyeth product market share.
3      Q.   And that would be the PBM's prerogative.
4  For example, if a particular PBM wanted to remove
5  Premarin from its formulary and replace it with
6  Cenestin, it could do so and try to push Cenestin
7  shares, right?
8      A.   They have the -- they would have the ability
9  to do that, yeah.
10     Q.   And you're aware that some plans in the past
11 have removed Premarin, are you not, and have tried to
12 push other estrogen products?
13     A.   Seems to me there was a -- in one of the
14 documents that I read, one of the HMOs, Rocky Mountain
15 HMO, actually put Cenestin on the formulary, and Wyeth
16 discontinued their rebates.  I'm not sure whether they
17 took Premarin off formulary or not.  But that would be
18 one instance that I specifically am aware of where the
19 rebates went away because Cenestin was put on
20 formulary.
21          THE VIDEOGRAPHER:  Sir, I think your
22 microphone got tugged off or something.
23          MR. EGGERT:  No, I had it in my lap
24 here.
25     Q.   (BY MR. EGGERT)  If I could, I'd like to

1  show you a document which we'll mark as Exhibit 856.
2          (Exhibit No. 856 marked for identification.)
3      Q.   (BY MR. EGGERT)  Are you familiar with an
4  individual by the name of Bill McElroy?
5      A.   I don't recall that right offhand.  Bill
6  McElroy.  I don't recall Bill McElroy.
7      Q.   Do you recall receiving this document, not
8  the first page, but the remainder of the document in
9  or about January 26th of 1994?
10     A.   I believe I wrote the document.
11     Q.   Okay.  So this would be a document that you
12 authored, from the -- from the style of it?
13     A.   Uh-huh.
14     Q.   And this would be something that you wrote
15 to all California stores?
16     A.   In my capacity with Longs Drug Stores,
17 correct.
18     Q.   Right.  At that time, were you with their
19 managed care organization, managed care --
20     A.   In 1994, I was their director of managed
21 care services.  We did not have a PBM until 1995.
22     Q.   Right.  So you were the person that
23 interfaced with MCOs and PBMs?
24     A.   Correct.
25     Q.   And you indicate here under item number 2

1  here, that the following drugs are no longer
2  covered -- and this is with respect to Prescription
3  Solutions and PacifiCare -- the following drugs are no
4  longer covered unless medically indicated and prior
5  authorized by Prescription Solutions, and one of those
6  is Premarin, and the suggested covered drug to
7  substitute is Ortho-Est and Menest.  Do you recall
8  receiving that information from Prescription
9  Solutions in 1994?
10     A.   This information came from Prescription
11 Solutions; and according to the memo -- I don't recall
12 a specific instance of writing it, but I obviously
13 did.  According to the memo, it applies just to their
14 retirees and Secure Horizons senior members, not their
15 entire book of business.
16     Q.   And what portion of PacifiCare's business is
17 the Secure Horizons, dash, individual contracts?
18     A.   I can't give you the exact number, but it's
19 a -- it's a smaller portion than their commercial HMO
20 population is.
21     Q.   And do you have any reason to know why it
22 was that they chose to remove Premarin from -- to make
23 it a non-covered drug?
24          MS. COURVILLE:  Are you asking him why
25 Prescription Solutions made that choice?

1      A.   I don't know why they made the choice.  They
2  simply gave me the changes to their plan to
3  communicate to our stores.
4      Q.   (BY MR. EGGERT)  And you just communicated?
5      A.   Yes.
6      Q.   You never had discussions with Prescription
7  Solutions as to why they chose to do this?
8      A.   No.
9      Q.   But this was an example where one PBM
10 removed Premarin from -- or at least a portion of its
11 formularies, I take it?
12     A.   That's what it appears to be.
13     Q.   And of course, the --
14     A.   They didn't -- looks like they -- they
15 assigned it to a prior auth category,
16          (Reporter asks for repeat.)
17     A.   A prior authorization category.  Changes to
18 the... (Witness reading.)
19          I can give you an assumption, but I can't
20 tell you why they did it.  What they're doing is
21 moving Premarin from an open position to require a
22 prior auth in order to be dispensed.
23     Q.   And then to your knowledge, does AdvancePCS
24 receive any rebates from Premarin at this time?
25     A.   Don't know the answer to that.

1    Q.   You indicate in your report that they no
2  longer have a contract with AdvancePCS -- between the
3  AdvancePCS and Wyeth, right?
4    A.   AdvancePCS, the best of my recollection,
5  documents I read, their contract expired toward the
6  end of 2001, and they added Cenestin to their
7  formulary oh, early in 2002, in the spring sometime.
8    Q.   You're aware that that standard clause in
9  contracts between managed care entities and
10  pharmaceutical manufacturers is to provide for
11  termination -- unilateral termination by either party
12  on 60 to 90 days' notice, generally?
13    A.   I'm aware that they have termination clauses
14  in the contracts, and it may be 60 to 90 days.  It may
15  be different time periods.
16    Q.   AdvancePCS didn't have to wait until the end
17  of 2001 to terminate its arrangement with Wyeth; they
18  could have terminated at any time, right?
19    A.   As long as their agreement allowed that type
20  of an out, yes.
21    Q.   Have you reviewed the AdvancePCS agreement?
22    A.   I don't specifically recall what the
23  termination language was in their contract.
24    Q.   Did you read it?
25    A.   I'm not sure if I remember reading that or

1  not.
2    Q.   Did you read any of the contracts between
3  Wyeth and any of the PBMs?
4    A.   I reviewed a number of the contracts, yeah,
5  probably a dozen to two dozen of the contracts.
6    Q.   Let me turn to that section of your report
7  where you go through a number of the Wyeth documents.
8  I think that's Roman number VI, is it, starting on
9  page 22.  Let's see.
10        If I could, I'd like to show you 14, a
11  document which -- which your counsel indicated is
12  entitled the "Premarin Preemptive Plan."
13        I'll mark that as Exhibit 857, although I
14  suspect it's been marked before.
15        (Exhibit No. 857 marked for identification.)
16    Q.   (BY MR. EGGERT)  There you go.
17        MS. COURVILLE:  Okay.  And I would just
18  bring your attention to the fact that this has
19  actually been identified with Mr. Schneider as a
20  draft, and another document was produced and was
21  represented by Wyeth to be the final Premarin
22  Preemptive Plan, and this is not that document.  Just
23  FYI.
24        MR. EGGERT:  Okay.
25    Q.   (BY MR. EGGERT)  Well, if you look at

1  paragraph number 2 of your -- here on page 22, this is
2  the document you relied on, in any event, in your
3  report, so I take it you are relying on the draft of
4  the preemptive plan rather than the final preemptive
5  plan; is that correct?
6    A.   I was relying on the document number that's
7  indicated here.
8        MS. COURVILLE:  That's okay.
9    A.   The same one.
10    Q.   (BY MR. EGGERT)  Right.  Did you ever review
11  the actual plan, or is this the one you reviewed?
12    A.   I may have reviewed them both.  This is the
13  one that --
14    Q.   This is the only one you remember?
15    A.   This is the one I recall.
16        MR. EGGERT:  Okay.  I thank you for
17  that clarification, Miss Courville.
18    Q.   (BY MR. EGGERT)  At least insofar as this
19  draft is concerned -- by the way, you don't know what
20  differences, if any, exist between the draft and the
21  final product, I take it?
22    A.   I do not, as I sit here.
23    Q.   If we turn to page 117999 -- let's see.  It
24  listed a number of items.  The first one was "distance
25  Cenestin from Premarin."

1        Actually, you deleted some of the things
2  here when you quoted it, right?  It should say
3  "distance Cenestin from Premarin, not AB rated, not
4  therapeutically equivalent, not indicated for
5  osteoporosis" you took those parts out, right?
6    A.   I did not list those on my report, correct.
7    Q.   Right.  Why didn't you list those parts?
8    A.   They were not relevant to my opinion.
9    Q.   They weren't helpful to the point you were
10  trying to make right?
11    A.   Right.  Prem -- Cenestin was not being
12  treated as a generic product, and that's what those
13  two points refer to.
14    Q.   Right.  But did you understand the notion of
15  this as -- the very first item in the strategy was to
16  try to convince physicians, consumers and others that
17  Cenestin was not the same as Premarin, to distance it
18  from Premarin, to point out to those entities that it
19  was not an AB-rated or substitutable product; that it
20  was not therapeutically equivalent, that like
21  Premarin -- unlike Premarin, it wasn't indicated for
22  osteoporosis?
23    A.   I'm aware they had the communication plan in
24  place.
25    Q.   Right.  And in fact, the largest bulk of

1   this document deals with that, right?  Deals with how
2   to engage in that plan and that educational program to
3   show to the -- to show to the marketplace that
4   Premarin was different than Cenestin?
5       A.   It has a lot of -- a lot of tools and
6   information in the document itself.
7       Q.   Okay.  And then -- and then the part that
8   you did quote in full, one of them was "limit
9   distribution, modify shared success."  We already
10  talked about that, and you said you don't know the
11  extent to which they were successful in modifying
12  shared success, right?
13      A.   Yes.
14      Q.   The next point, "limit contracting
15  opportunities, quantify value of Wyeth contracts."
16  I take it did you read Mr. Schneider's deposition when
17  he was explaining what this document meant?
18      A.   I read through parts of his deposition.  I
19  don't recall exactly his description of how this was
20  to be interpreted by the folks at Wyeth.
21      Q.   You didn't mention that one before; I think
22  the only depositions you mentioned were Mr. Finneran
23  and Mr. Carter.  Now you recall reading portions of
24  Mr. Schneider's deposition as well?
25      A.   I'm not sure whether I read Mr. Schneider's

1   or -- I know I read Marty Carter's and I read one
2   other one.  Might have been Finneran or it might have
3   been Schneider, the names are --
4       Q.   Did you read the deposition of anyone who
5   was an employee of Wyeth; I think you indicated
6   earlier you had not?
7       A.   No, those are the only ones I've looked at.
8       Q.   Okay.  And those were employees of Duramed
9   or Viking?
10      A.   Yes.
11      Q.   In reaching an opinion as to what the
12  Wyeth's intent was with respect to this draft
13  preemption plan, might it not have been relevant to
14  look at the deposition testimony of the people at
15  Wyeth that were involved in the development of the
16  plan?
17      A.   It would have been information, though I'm
18  not sure it would have changed my opinion on what I
19  saw and the way I felt Wyeth was implementing their
20  strategy in the marketplace, based on the documents
21  that support what their strategies were.
22      Q.   Right.  We don't know whether it would
23  change your opinion because you didn't read the
24  depositions, right?
25      A.   Correct.

1       Q.   Do you have an opinion as to what it means
2   when it says "quantify value of Wyeth's contracts"?
3       A.   My opinion on reading that and looking at
4   the tools they developed to take out to the market to
5   measure the impact of their rebates to each plan to me
6   indicates that they're quantifying the value of the
7   Wyeth contracts to their clients where they have
8   rebate structures in place.
9       Q.   And "enforce preferred brand status."  Do
10  you have a view as to what that means?
11      A.   In my opinion, means that in the contracts I
12  reviewed, that Premarin was the sole conjugated
13  estrogen, and that was a requirement of the contracts;
14  and it's my understanding that their strategy was to
15  go out and make sure that that was being enforced.
16      Q.   Well, there are some contracts out there,
17  there are there not, where it requires that Premarin be
18  listed as a preferred brand, right?
19      A.   Correct, correct.
20      Q.   And it may or may not be the only preferred
21  brand on the formulary, but could be one of a number
22  of brands designated as preferred on the formulary for
23  the ERT category?
24      A.   Correct.
25      Q.   So this could be referring to that, right --

1       A.   Could be.
2       Q.   -- preferred brand status.
3       A.   Could be.
4       Q.   It doesn't say anything about exclusive sole
5   and exclusive conjugated estrogen, does it?
6       A.   Not in that line, it doesn't, no.
7       Q.   Is there anything in this entire draft
8   preemptive plan that says anything about sole and
9   exclusive conjugated estrogen?
10      A.   I'm not sure those words appear in here.
11      Q.   Well, do you get any closer than "preferred
12  brand status"?  Is that as close as you get?
13      A.   I probably have to review the document again
14  to answer that question, but...
15      Q.   Again, I gather this document is the core of
16  your opinion, though, related to Wyeth's intent,
17  right, that's the one you referred to?
18      A.   This document together with the documents
19  that describe the interactions between Wyeth and the
20  PBMs that are listed in the report.
21      Q.   Actually, let's take a look at page 118000.
22  Talking about the Cenestin profile.  Indicated that at
23  that time, apparently Wyeth thought that there would
24  be a probable 30 to 40 percent cost savings associated
25  with Cenestin?  Are you aware that, in fact, Cenestin

7/18/2002 Bystrom, Dale (final)

1    came on the marketplace priced essentially at parity

2    with Premarin?

3        A.   I'm aware there was a very small difference

4    between the two.

5        Q.   Is it possible that a product would have

6    been in perhaps a less -- less of a threat to Premarin

7    if it was priced at the same price as Premarin as

8    opposed to at a 30 to 40 percent discount?

9        A.   That's certainly possible.

10           Are you referring to AWP price or direct

11   catalog price or net price after rebates?

12       Q.   You know, perhaps if you'd looked at the

13   deposition testimony, they would have explained that,

14   but I can't explain it as I'm sitting here.  What

15   price would be most relevant to you?

16       A.   Well, if they're talking about cost savings,

17   the PBM would want to factor in not only the product

18   price, but whatever the net effect would be, together

19   with the rebates.

20       Q.   So you'd have to take into account the

21   rebates as well?

22       A.   Yeah.  My guess is that they're talking here

23   about direct catalog price.  That's the way I would

24   interpret that.

25       Q.   Okay.

4/1/2005 2:53 PM                                          177

7/18/2002 Bystrom, Dale (final)

1            THE VIDEOGRAPHER:  I have five minutes

2    left on the tape.

3        Q.   (BY MR. EGGERT)  Okay.  Let's see.  If you

4    turn over a few pages, 118002.  Kind of a contrast of

5    Premarin and Cenestin, and this is -- once again fits

6    into the category of distancing Cenestin from

7    Premarin.  And would you agree with that?

8        A.   I would, yes.

9        Q.   And talks about how Premarin has been the

10   subject of over 3,000 studies; Cenestin has been the

11   subject of one study.  Premarin had over 10 million

12   users; Cenestin had been tested on 120 patients.

13   Premarin had been out for 56 years; Cenestin for 6

14   months, et cetera, et cetera.  But nothing in there is

15   talking about sole and exclusive conjugated estrogens

16   on formularies, right?

17       A.   Nothing in here, correct.

18       Q.   Okay.  Let's see.  The next page, talking

19   about nicheing Cenestin.  Basically that's yet

20   another -- that's a distancing Cenestin from Premarin

21   point again?  Cenestin is not bioequivalent to

22   Premarin, do you agree?

23       A.   I would agree.

24       Q.   Okay.  Just flipping through the pages here,

25   I don't see anything on sole and exclusive conjugated

4/1/2005 2:53 PM                                          178

7/18/2002 Bystrom, Dale (final)

1    estrogens.  If you see something, let me know.

2            Page 118007, I think this is more distancing

3    Cenestin from Premarin.  Says "no other estrogen is

4    therapeutically equivalent to Premarin; there is no

5    generic equivalent to Premarin."  You'd agree that's

6    distancing Cenestin from Premarin?

7        A.   I would, yes.

8        Q.   The next page, the same thing, right?

9    118008?

10       A.   Yes, uh-huh.

11       Q.   And then the promotion/education plan, do

12   you take that to have anything to do with limiting

13   contracting opportunities or is that still distancing

14   Cenestin from Premarin?

15       A.   That doesn't appear to me to have anything

16   to do with contracting activities.

17       Q.   Okay.  If it deals with education, it's

18   probably trying to tell people about the differences

19   between Cenestin and Premarin, right?

20       A.   I would imagine it is.

21       Q.   Then there's something called a Pharmacy

22   Attack Pack.  Did you consider that at all in reaching

23   your opinions, the Pharmacy Attack Pack?

24       A.   I didn't factor that into my opinion on the

25   relationship between Wyeth and the PBMs in the

4/1/2005 2:53 PM                                          179

7/18/2002 Bystrom, Dale (final)

1    contracting process.

2        Q.   Okay.  And once again, this seems to be

3    pushing the principle that all estrogens are not the

4    same and distancing Cenestin from Premarin, right?

5        A.   Correct.

6        Q.   Let's see.  I think if we get to the back of

7    the document, we'll find something about the

8    contracts.  Here they're mentioning MCOs, at least on

9    this page, 118023, an MCO tactical overview.

10           (Reporter asks for repeat.)

11       Q.   118023.

12           Did you rely upon this page in coming to

13   your conclusions concerning Wyeth's intent in the sole

14   and exclusive conjugated estrogen language?

15       A.   No, I don't recall using this specific

16   page.

17       Q.   Okay.  There's some discussion of shared

18   success here.  Starting at 118027.  But did you see

19   anything inappropriate about these things related to

20   shared success, that it reflected some sort of a

21   malicious intent?

22       A.   No, I did not.

23           THE VIDEOGRAPHER:  I need to change

24   tapes.

25           MR. EGGERT:  Oh, sorry.

4/1/2005 2:53 PM                                          180

1    THE VIDEOGRAPHER:  That's okay.

2    MR. EGGERT:  Change the tape.  You did

3  give me a warning.

4    THE VIDEOGRAPHER:  We're off the record

5  at 3:14.

6    (Short break 3:14 to 3:16 p.m.)

7    THE VIDEOGRAPHER:  We're back on the

8  record at 3:16.

9    Q.  (BY MR. EGGERT)  Okay.  I'm still leafing

10  through.  I notice on page 118032, it mentions once

11  again to quantify the value of the Wyeth contract?

12    A.  Correct.

13    Q.  That's the same language that we had up

14  above, right?

15    A.  Correct.

16    Q.  But it says that is ongoing.  It also

17  mentions to sell the science of Premarin and to assess

18  each national account.

19    Actually, if you look at page 118033 under

20  "Premarin Defense Strategy," and it lists a number of

21  PBMs and HMOs listed as -- what do you understand by

22  the low, medium and high risk there?

23    A.  Those were -- it was my understanding those

24  were PBMs that there was potential risk of losing the

25  formulary status or having them put on another

---

1  formulary product.

2    Q.  And I take it, then, with respect to these

3  formularies on the top here which seem to cumulatively

4  account for something like 700 million or more in

5  sales, it was perceived it was a low risk, right?

6    A.  Correct.

7    Q.  And the only ones with the high risk were

8  Provantage and Humana, right?

9    A.  Correct.

10    Q.  And Humana actually signed a formulary

11  agreement ultimately with Duramed, right?

12    A.  Correct.

13    MS. COURVILLE:  Objection, evidences

14  facts not in evidence.

15    Q.  (BY MR. EGGERT)  Did Provantage also place

16  Cenestin on the formulary, do you know?

17    A.  I don't recall whether they did or not.

18    Q.  Okay.  There's a number of pages on selling

19  the science of Premarin.  But once again, that's the

20  message of distancing Cenestin from Premarin, right?

21    A.  Correct.

22    Q.  Here on page 118037, we get some elaboration

23  on quantifying the value of the Wyeth contract.

24  Talking about PacifiCare here.  Doesn't mention "sole

25  and exclusive conjugated estrogen" language, does it?

---

1    A.  That language is not on here, no, these are

2  the tools that, to my understanding, were distributed

3  to all of the national account managers to take out to

4  their accounts to demonstrate the financial value of

5  their current sole-source contracts with Wyeth and to

6  be used as a -- a lever to prevent them from getting

7  Cenestin on their formularies.

8    Q.  Was it a lever to prevent them from getting

9  Cenestin on their formularies or to -- or to tell them

10  what would happen with respect to their rebates as

11  particular percentage shares of their sales were

12  attributable to Cenestin rather than Premarin?

13    A.  That's the method by which they demonstrated

14  the loss would occur, and the -- if they were to

15  violate their sole-source contract, they would lose

16  those dollars by allowing Cenestin to be put on

17  formulary.  I think in one of my exhibits, it even

18  indicates that in their discussions with Express

19  Scripts who, in part of their process, went as far as

20  to select Cenestin to be on formulary and was reminded

21  after the fact that they had a sole-source contract,

22  and I think the number was $40 million of annual

23  rebates were going to be at risk if they didn't keep

24  Cenestin off formulary.

25    Q.  But then they did put Cenestin on their

---

1  expanded formulary, right, as we saw in the

2  interrogatory response?

3    A.  At a later point in time.

4    Q.  Do you know when that occurred?

5    A.  I do not.

6    Q.  Okay.  Now, is it your understanding that

7  Wyeth sales representatives actually went out to each

8  PBM and gave them documents of this sort?

9    A.  I know they did it with a couple of the

10  PBMs.  I don't have evidence that they actually

11  reached all PBMs, but I know according to the internal

12  Wyeth documents that it was distributed to all

13  national sales managers to take out and use with their

14  PBMs.

15    Q.  But you don't know whether they actually --

16    A.  I don't know the outcome of the process.

17    Q.  Is this kind of a standard analysis that

18  PBMs would undergo normally in determining whether or

19  not to place drugs on formulary, they would look at

20  effect on -- the total effect on their rebates of

21  shifting percentage sales to a competing product, and

22  they'd look at the competing product's prices and its

23  rebates and compare them to the prices and rebates of

24  the other product and see how it all balanced out?

25    A.  Yeah, an analysis of the total drug cost and

1    the potential rebates would be part of the process a

2    PBM would go through when they make a decision to put

3    a product on formulary.

4         Q.   And in fact, would the analysis that the PBM

5    would go through, would it actually be a fair amount

6    more sophisticated than the analysis set forth in

7    these documents?

8         A.   It may be similar to this.

9         Q.   Did you engage in that type process when you

10   were at RxAmerica?

11        A.   I think I sat in on a couple of reviews, but

12   I don't recall having any accounts where we -- any

13   pharmaceutical manufacturers where we had multiple

14   products and would lose all rebates or threaten to

15   lose all rebates if one of the products had a

16   competitive product on our formulary.

17        Q.   And is that pretty much it?  Talks about

18   state government affairs -- once again, on page

19   118049, seems like this is once again distancing

20   Cenestin from Premarin, talking about blast faxes and

21   scientific briefings, physician papers?

22        A.   Uh-huh.

23        Q.   The next page, press release "new synthetic

24   estrogen product not equivalent to Premarin."  It's

25   not your opinion that anything that Wyeth did in that

1    regard was exclusionary, I take it?

2         A.   In their communication and media

3    relations --

4         Q.   Right.

5         A.   -- is that what you're asking about?

6         Q.   Right.

7         A.   No.  I didn't see them specifically

8    disadvantaging their competitor in those efforts.

9         Q.   How about in DTC advertising?  What's DTC

10   advertising?

11        A.   Direct-to-consumer advertising.

12        Q.   That's mentioned on 118052.  Does that form

13   part of your opinion, are you --

14        A.   No, that's not included in my opinion.

15        Q.   Okay.  And then the last page, "Key

16   Messages."  "Not AB rated, not bioequivalent, not a

17   pharmaceutical equivalent, not therapeutically

18   equivalent, no osteoporosis indication, lacks

19   long-term safety and efficacy data, offers just one

20   dose, simply another limited option."  It doesn't say

21   anything about sole and conjugated estrogens, right?

22        A.   Correct.

23        Q.   Okay.  Now, you mentioned, I guess, a number

24   of things in paragraph 4, I think you're talking about

25   AdvancePCS; is that right?

1         A.   What page are you on?

2         Q.   That's page 23 of your report.  And

3    paragraph 4 is essentially devoted to AdvancePCS and

4    its predecessors, I may call them?

5         A.   Correct.

6         Q.   And there were a number of predecessors

7    because there's been a lot of mergers and

8    consolidations in the PBM industry, correct?

9         A.   That's correct.

10        Q.   And PBMs have been getting bigger and

11   bigger; isn't that true?

12        A.   Yes, they have.

13        Q.   And more and more powerful?

14        A.   In what sense?

15        Q.   As they aggregate more and more members?

16        A.   Oh, correct.

17        Q.   They have more power to negotiate both with

18   pharmacies and with pharmaceutical manufacturers,

19   right?

20        A.   Correct.

21        Q.   And they use that to try to get low prices

22   from pharmacies and big rebates from manufacturers,

23   essentially, right?

24        A.   Correct.

25        Q.   And let's see.  In paragraph A, you mention

1    a February 19th, 1999, document to Advance Paradigm.

2    And you talk about how Wyeth is saying that

3    protection -- their position is protected with Advance

4    Paradigm.  And then you indicate that -- it says Karl

5    wants to identify partnering strategies and tactics on

6    how we can together with API -- and that would be

7    Advance Paradigm, right?

8         A.   Uh-huh.

9         Q.   -- blunt the launch of Cenestin.  Do you

10   know whether Advance Paradigm ever did anything to

11   work with Wyeth to blunt the launch of Cenestin?

12        A.   I'm not aware of the outcome of that

13   information conversation.

14        Q.   Are you aware of -- are you aware of

15   anything called an access agreement?  Is that a phrase

16   that you're familiar with?

17        A.   I'm familiar with access agreements or

18   access rebates.

19        Q.   What are access rebates?

20        A.   Rebates that are generally rebates that are

21   paid for allowing a product to be placed on formulary,

22   regardless of their market share.

23        Q.   Actually, let me -- do you have the Drug

24   Cost Management Review?  If you'd look on the second

25   page, I think Mr. Nee has a discussion of access

7/18/2002 Bystrom, Dale (final)

1  rebates.  It's a little bit different than what you've
2  said.
3         Says the access rebate structure is similar
4  to the flat rebate in that the percentage of the
5  rebate is constant.  Manufacturer's goal in using this
6  type of rebate might be to gain a foothold in a PBM's
7  formulary or just to prevent being blocked by the PBM?
8     A.    That's correct.  It's a rebate paid to
9  obtain position on the formulary and access to the
10 membership.
11    Q.    Are you aware that Duramed actually
12 negotiated an access agreement with Advance Paradigm
13 by which Advance Paradigm agreed that it would not
14 intervene against Cenestin; and that although the
15 product would not be on formulary, it would be
16 available to consumers at the same co-pay as Premarin?
17    A.    I'm not --
18          MS. COURVILLE:  Objection.  There's a
19 date discrepancy that we need to resolve if you're
20 going to ask him questions like that.
21    Q.    (BY MR. EGGERT)  Are you aware of such an
22 agreement negotiated?
23    A.    I'm not aware of that, but to me, it
24 wouldn't change things a whole lot.  If they're not on
25 formulary, they're still going to be viewed as a

7/18/2002 Bystrom, Dale (final)

1  non-formulary product in the eyes of the physicians
2  when they make their prescribing choices.
3     Q.    Are you aware that Cenestin was actually
4  listed in the AdvancePCS formulary?
5     A.    As of when?
6     Q.    As of I think 2000.  Not listed as a
7  formulary product, but listed in the formulary.
8     A.    Was it listed as a non -- I'm not aware of
9  how it was listed in that particular formulary.  I'm
10 aware that they were listed in the formulary after
11 2001.
12    Q.    As a formulary product, right?
13    A.    Correct.
14    Q.    If they were actually listed in the
15 formulary as early as 2000 or 2001, might that affect
16 your analysis?
17    A.    Depending on how they were listed.
18    Q.    Now, do you have any understanding as to why
19 it was that Cenestin was not placed on AdvancePCS's
20 formulary -- or PCS's formulary -- I guess at that
21 time, it was PCS, back in 1999?
22    A.    It's my understanding that -- that Wyeth had
23 a sole-source contract with -- are you talking Advance
24 or PCS?
25    Q.    Talking PCS right now.

7/18/2002 Bystrom, Dale (final)

1     A.    They had a contract with PCS that prevented
2  them from putting Cenestin on formulary or adding
3  another conjugated estrogen to formulary.
4     Q.    Could Cenestin have obtained placement on
5  the formulary if they just obtained a placement as --
6  identified as just an estrogen and not as a conjugated
7  estrogen?
8     A.    I don't know the answer to that.
9     Q.    You've not explored that in reaching your
10 opinions?
11    A.    Correct.
12    Q.    And let me show you a document which I'll
13 mark as Exhibit 858, and this is a document produced
14 by PCS HealthSystems.
15    (Exhibit No. 858 marked for identification.)
16    Q.    You know, I should say that the entirety of
17 this deposition transcript in the interim period
18 should be designated as highly confidential because
19 we're using various parties' documents, including here
20 PCS's.  And I suspect that most of it will probably
21 remain confidential.
22          Is this a document that you've seen before?
23    A.    It is not.
24    Q.    These purport to be the minutes of a
25 pharmacy and therapeutics committee meeting dated

7/18/2002 Bystrom, Dale (final)

1  September 15th of 1999, and I think portions that did
2  not relate to Cenestin were redacted by PCS from the
3  production.  But if you look under item number 2 on
4  page 2 of the document, it indicates that, "Cenestin
5  is indicated in the treatment of moderate to severe
6  vasomotor symptoms associated with menopause.
7  Cenestin contains 9 synthetic estrogenic substances
8  derived from soybeans and yams.  In a 12-week clinical
9  study, Cenestin demonstrated daily, 77 percent were on
10 1.25-milligram daily by week 12," et cetera, et
11 cetera.
12          They mention that there is no discount on
13 the product.  They say that despite its derivation
14 from natural sources, the committee member thought
15 there were enough other options for hormonal
16 replacement that Cenestin would not be necessary.
17          The ob/gyn committee member was unsure what
18 benefits Cenestin had over Premarin.  And further
19 down, the member also stated that although there are
20 no comparison studies, it may be that twice as much
21 Cenestin versus Premarin may be required to relieve
22 vasomotor symptoms.  At a 1.25-milligram comparative
23 dose, Cenestin is 40 percent more expensive than
24 Premarin.  The committee voted not to add Cenestin to
25 formulary.

1    So does this analysis from PCS indicate that
2 Wyeth's "sole and conjugated exclusive estrogen"
3 language had anything to do at all with the decision
4 not to place Cenestin on PCS's formulary?
5    A.  Not this document.
6    Q.  Do you know of any document that suggests
7 that -- that the "sole and exclusive" language was the
8 reason that PCS didn't place Cenestin on the
9 formulary?
10    A.  It's my understanding that the -- the
11 agreement that Wyeth had with PCS also indicated that
12 Premarin would be the sole conjugated estrogen on
13 formulary with their plan.
14    Q.  But even if it had indicated otherwise,
15 according to this document, the Cenestin wouldn't have
16 been on the formulary, right?
17    A.  This also supports Cenestin's non-formulary
18 position.
19    Q.  All right.  Let me show you the document
20 that we've already marked as Exhibit 852.  Is that
21 it?
22         MS. WIEGAND:  Yeah.
23         MR. EGGERT:  Is this the actual
24 original?  I guess this is.  Here's a copy.  852.
25 That was the -- the memo from Mr. Neeley to Mr. Carter

1 attaching various things.  The one that had talked
2 about how RxAmerica hadn't put it on formulary.
3    Q.  (BY MR. EGGERT)  If you look at the first
4 item there under PCS Health Systems on page 10671, it
5 indicates that for the year 2000, PCS has decided to
6 table the discussion and review of Cenestin for
7 inclusion into their performance drug program.  This
8 decision was due to the unavailability of the
9 1.25-milligram strength, which comprises nearly 25
10 percent of their Premarin utilization.
11    So there's nothing in there that suggests
12 that the decision even as of 2000 had anything to do
13 with the "sole and the exclusive conjugated estrogen"
14 language, but it was focusing more on the lack of
15 availability of the 1.25-milligram strength?
16    A.  (Witness reading.)  What was your question,
17 again?  I'm sorry, I finished reading the rest of the
18 document here.
19    Q.  Right.  Once again, there's no suggestion
20 here that the reason that PCS did not place Cenestin
21 on the formulary was because of the contractual
22 language with Wyeth, but instead, it focuses on the
23 lack of the 1.25-milligram strength, correct?
24    A.  That's what this particular document
25 indicates.

1    Q.  And this particular document also indicates
2 that notwithstanding the fact that Cenestin was not on
3 the formulary, that it would be available at the same
4 co-pay as products accepted for inclusion on the
5 formulary, such as Premarin, with respect to 90
6 percent of PCS's book of business, or over 45 million
7 lives, right?
8    A.  That's what it says, uh-huh.
9    Q.  So with respect to those 45 million lives,
10 they could still get Cenestin by paying the same
11 co-pay as Premarin, right?
12    A.  That's what it indicates.
13    Q.  And in fact, in the last paragraph, it
14 indicates that Viking, the managed-care experts hired
15 by Duramed, actually continued to recommend a strategy
16 without an agreement because it provided extensive
17 Cenestin coverage with no rebate liability.  What do
18 you understand by that statement?
19    A.  Oh, just what it says, it allows some access
20 without Cenestin having to pay a lot -- pay rebates.
21 It also indicates up in the prior paragraph, just
22 about the last sentence, that pharmacists will receive
23 an on-line message indicating the status of Cenestin
24 as a non-formulary product.  They are told not to
25 intervene.

1    Well, so they're still sending out an
2 on-line message indicating it's non-formulary.
3    Q.  But they're told not to intervene and
4 they're told to dispense Cenestin as written, is what
5 it says, right; that what's it says?
6    A.  Yes.  It doesn't indicate that's part of the
7 on-line process.  The on-line process is pretty brief
8 messaging.  I don't know how they get all of that on
9 there.
10    Q.  How can you read that sentence as anything
11 else other than that?  "Pharmacists receive an on-line
12 message indicating the status of Cenestin is a
13 non-formulary product, but are told not to intervene,
14 and dispense Cenestin as written."  Do you think they
15 give the pharmacists a telephone call; is that what
16 that means?
17    A.  No, it could mean they communicate
18 corporately that although that message is coming
19 across, let your pharmacists know that they can still
20 dispense as written.  Could be interpreted different
21 ways, is what I'm saying.
22    Q.  You don't know one way or the other?
23    A.  I don't.  But it does indicate that the
24 on-line message indicating Cenestin is non-formulary
25 is quite clear.

1    Q.   Let's look down at Aetna/US HealthCare right
2  below.  It indicates that Cenestin would not be
3  included on the 2000 drug formulary exclusion list, so
4  it wouldn't be actively intervened against; and also
5  indicated that for the majority of Aetna plans,
6  Cenestin will be covered and reimbursed at a standard
7  co-pay level and not actively intervened against.
8      So that was another plan where Cenestin
9  would be available at the standard co-pay, right?
10    A.   Correct, but not included in the formulary.
11    Q.   All right.  And in United Health Care on the
12  next page, which is connected I think with -- with
13  that --
14          MS. COURVILLE:  Dave, is there a
15  question in here somewhere?
16          MR. EGGERT:  Yes.
17    Q.   (BY MR. EGGERT)  The next page, it says, "At
18  this time, Cenestin is considered non-formulary"?
19    A.   What page are you on?  I'm sorry.
20    Q.   The next page, 10672.
21    A.   Okay.
22    Q.   "Cenestin is considered non-formulary,
23  however, is being reimbursed in the majority of their
24  plans at the $13 co-pay level."  Reading this, is it
25  your understanding that this was -- even with respect

1  to what were normally three-tier plans, Cenestin was
2  available at the standard co-pay level?
3    A.   That's what this indicates.
4    Q.   And you didn't take that into account in
5  connection with reaching your opinions in your report,
6  right?
7    A.   No, what I would take into account, that
8  it's still considered a non-formulary product.
9    Q.   Why is it that being on the formulary is
10  considered the holy grail?
11    A.   Being on formulary indicates to the
12  physicians that it's okay to dispense it.  And they
13  can include it in their products, their 20 or 30 drugs
14  they formally prescribe as products they know are not
15  going to be stopped because they're non-formulary.  So
16  formulary positioning is very important in the
17  industry for the manufacturers as well as for the
18  physicians.
19    Q.   Do you think that most physicians actually
20  even examine the formularies that are sent to them by
21  PBMs?
22    A.   I think physicians learn -- I think some of
23  them do.  I also think that physicians learn by
24  exception that when they get a few phone calls on a
25  product, they know that that's not a product on

1  formulary for most of their plans.
2    Q.   But they won't be getting a phone call if
3  it's being reimbursed at the same co-pay level as
4  Premarin, will they?
5    A.   With this particular plan, they won't, but
6  they may be getting it with their other plans that do
7  not have a similar co-pay if that, in fact, is the
8  case.
9          MS. COURVILLE:  I'm going to object to
10  this entire line of questioning to the extent it's
11  irrelevant to any of the opinions that this expert
12  will offer.
13          MR. EGGERT:  That might be true,
14  because he appears to have no opinion on the actual
15  effect of anything that Wyeth did.
16          MS. COURVILLE:  He's told you what his
17  opinions are.
18          MR. EGGERT:  Yes.  He has.
19    Q.   (BY MR. EGGERT)  Let's see if I could direct
20  your attention to page 24, subsection f.  What you
21  said in subsection f there appears to be identical to
22  the language in the document that you've cited in
23  subsection d, which is the immediate top of that
24  page.
25      Was there a reason that you found it

1  necessary to cite the exact same language regarding
2  the exact same situation twice within two paragraphs
3  in your report or was that just a mistake?
4    A.   It may have just been redundant.
5    Q.   Okay.  If you go to number h on page 25,
6  we're talking about Alan -- I think you spoke with
7  Alan at Health Net earlier?
8    A.   Alan Jacobs, correct.
9    Q.   And he was the one you thought had said that
10  there actually -- that there was some actual activity
11  going on against Cenestin, right?
12      Let's see.  And he says here, "Alan is aware
13  of the exclusionary language in our contract, and
14  given the limited indications for the Cenestin
15  product, did not see a role for it on formulary."
16      So that statement is consistent with -- with
17  Alan not seeing a place for it on the formulary
18  because of the limited indications that the Cenestin
19  product had, right?
20    A.   That's according to the language of the
21  Wyeth person that was reporting on that memo.
22    Q.   Right.
23    A.   Also indicates that they'll continue the NDC
24  blocks and keep Cenestin from being made available.
25    Q.   At least that's a prediction that this Wyeth

1  person said?

2      A.  Correct.  It will be blocked; and Alan

3  indicated that it would stay blocked and not

4  available, which to me indicates that there was an NDC

5  block in place.

6      Q.  Is Health Net a highly -- is it a closed

7  plan?

8      A.  It's not a staff model plan like a Kaiser

9  (phonetic).  They have an HMO program and they have

10  more open plans as well.

11      Q.  Are they -- where are they located?

12      A.  Health Net is located in Woodland Hills,

13  California.

14      Q.  Let's see.  Down to subsection j here,

15  quoting from another internal Wyeth memo -- by the

16  way, do you have any idea who the persons were who

17  were writing these memos?

18      A.  No, I do not.  They were Wyeth employees.

19      Q.  Would it make any difference to your opinion

20  as to what sort of employees they were, whether they

21  were, you know, lowest-level rung employees or whether

22  they were the upper-echelon employees?

23      A.  Wouldn't make a big difference.  To me, they

24  still represent Wyeth in their activities out in the

25  marketplace when they're interfacing with the major

1  health plans and PBMs.

2      Q.  And you'd have the same view with respect to

3  RxAmerica, that whatever some small employee does has

4  as much impact or as much relevance as something that

5  you did as the manager and the CEO of the

6  organization?

7      A.  Could very well be, correct.

8      Q.  Now, at the end of that subparagraph, it

9  states "Until a specific plan requests the product or

10  a P & T review occurs, the product will be

11  non-formulary and listed as 'NDC not covered.'"  Is

12  there anything unusual about that?

13      A.  No, that's not unusual.

14      Q.  And do you know whether a specific plan at

15  IPS ever requested the product?

16      A.  I have no knowledge of that.

17      Q.  And do you know whether a P & T review

18  occurred?

19      A.  I'm not familiar with that, either.

20      Q.  Let's see.  If you turn over to page 26,

21  paragraph n, it states, "if we can adjust the baseline

22  on a quarterly basis, we will have an incentive for

23  IPS and the plans to NDC block Cenestin and, where

24  necessary, place the product in highest co-pay

25  category."  This is a Wyeth employee suggesting that

1  they might adjust the baseline in order to incentivize

2  IPS to block Cenestin; is that correct?

3      A.  Correct.

4      Q.  Do you know whether Wyeth ever adjusted the

5  baseline?

6      A.  I'm not aware of the outcome.

7      Q.  And you don't know whether or not there was

8  any NDC blocks of Cenestin and IPS?

9      A.  Correct.

10      Q.  And let's see under p, also, you have in

11  brackets, "Wyeth was able to exclude Cenestin from

12  Advance's formulary until its contract expired in

13  December of 2001.  Cenestin was subsequently added to

14  Advance PCS's formulary in February 4th, 2002,"

15  correct?

16      A.  Right.

17      Q.  But you don't know of any reason Advance PCS

18  couldn't have terminated that agreement at any time,

19  right?

20      A.  Correct.

21      Q.  Now, I guess paragraph 5, you talk about

22  Medco, right, the second largest PBM in the country?

23      A.  Yes.

24      Q.  And is it your understanding that Medco had

25  an agreement with Wyeth that required Premarin to be

1  the sole and exclusive conjugated estrogen on the

2  formulary?

3      A.  That's my understanding.

4      Q.  If, in fact, your understanding in that

5  regard is incorrect and they could have changed and

6  added other products to the formulary, would that

7  affect your opinion?

8      A.  I'd have to know more about exactly what it

9  was you were talking about.

10      Q.  But you'd want to consider that, I take it?

11      A.  I would be open to reviewing that

12  information.

13      Q.  And then I guess under subparagraph c, this

14  is the language I think that you -- that you talked

15  about --

16      A.  Are we on page 27?

17      Q.  Page 27, yes.  In which the amount of the

18  rebate is proportional to the extent to which the

19  market share of -- you have Cenestin, and then four

20  dots, "is below the national market share of such

21  products for such contract quarter"?  In fact, there

22  are a number of other products listed after

23  Cenestin --

24      A.  Absolutely there were other competitive

25  products they were targeting.

1      (Court reporter asks for repeat; discussion
2  held off the record.)
3          MR. EGGERT:  You want to read back the
4  question so he can answer?
5          (Question read.)
6          MS. COURVILLE:  And then you said it's
7  true that there were other products.
8      Q.  (BY MR. EGGERT)  It's true that there were
9  other products listed where the three -- the four dots
10 are in addition to Cenestin, right?
11     A.  That's correct.
12     Q.  But you took those out in putting them into
13 this document?
14     A.  I did, yes.
15     Q.  And it would have been the cumulative market
16 share of Cenestin and those other products that would
17 have triggered the percentage rebates under this
18 contract language?
19     A.  It was my understanding that it was the
20 market share of Cenestin or each of the other
21 products.
22     Q.  Well, then what would be the rebate?  Would
23 the rebate be determined by the market share of
24 Cenestin or the market share of the other products?
25 There's only one rebate, right?

1      A.  It may be -- it may be lumped together.  The
2  math that followed this was slightly difficult to
3  understand what they're trying to achieve in the fact
4  that they were targeting a program to pay Medco for
5  reducing the market share of their competitive
6  products, which also included Cenestin.
7      Q.  And once again, you don't -- you don't know
8  whether that language originated with Medco or with
9  Wyeth, I take it?
10     A.  I do not know where it originated.  It was
11 in the Wyeth memo.
12     Q.  You mean it was in the document here, the
13 amendment to the agreement?
14     A.  Correct.  Yes.
15     Q.  Which both parties signed.
16         MR. EGGERT:  Why don't we take a break
17 for just a few minutes, and I'll go over this stuff?
18 Might not have all that much longer.
19         MR. COURVILLE:  Okay.
20         THE VIDEOGRAPHER:  We're off the record
21 at 3:50.
22         (Short break 3:50 to 4:17 p.m.)
23         THE VIDEOGRAPHER:  We're back on the
24 record at 4:17.
25     Q.  (BY MR. EGGERT)  Sir, if I could direct your

1  attention to paragraph 32 -- page 32, paragraph 10 of
2  your expert report, and you indicate that in some
3  instances where Wyeth felt Premarin's exclusive
4  formulary position was at risk with a PBM HMO client,
5  Wyeth revised their agreement to increase the rebate
6  dollars paid to the client and lowered the market
7  share performance requirement for their client to
8  achieve the increased rebate amounts.
9          Is your point here that Wyeth essentially
10 gave the PBMs or the HMOs a better deal and greater
11 rebates than they previously had in order to maintain
12 its status with that account?
13     A.  That's my opinion, yes.
14     Q.  And thus, that the -- the presence of
15 Cenestin and the potentiality of their contracting
16 with Cenestin led to greater rebates for the MCOs and
17 the PBMs, right?
18     A.  To protect their rebate -- to protect their
19 formulary position, they enhanced their rebates to the
20 MCOs, correct.
21     Q.  Is it your experience generally in the
22 pharmaceutical industry that pharmaceutical
23 manufacturers compete with one another in offering
24 greater rebates in order to enhance their formulary
25 position vis-a-vis their competitors?

1      A.  That occurs from time to time.
2      Q.  And is this an example of that?
3      A.  Well, they really had no competitor in this
4  case because the competitor had never made it to
5  formulary positioning.  They already owned the
6  formulary position as Premarin.
7      Q.  But the presence of the competitor out
8  there, as you say, caused them to -- competitor
9  waiting in the wings, so to speak, caused them to
10 offer greater rebates to the MCO and the PBM, right?
11     A.  They wanted to -- yes, that's correct.  They
12 wanted to protect their position with the PBMs.
13     Q.  And further on, I guess down here with respect to
14 Aetna, indicate that Aetna had received -- this is
15 paragraph C, Aetna received rebates for Premarin of 3
16 percent.  And Charles proposed if Aetna agrees to
17 include additional language regarding blocking of
18 Cenestin, then Wyeth should in turn reinstate the 3
19 percent Premarin rebates.  So in essence, they were
20 getting a 3 percent rebate; is that right?
21     A.  The way I read that was that the -- back in
22 1997, they were at that 3 percent level, and with the
23 signing of the contract subsequent to that, they took
24 those rebates away.  And Wyeth was proposing
25 internally that if Aetna would agree to do certain

1  things to block Cenestin, they would, in turn -- Wyeth
2  would in turn reinstate those 3 percent rebates that
3  they used to receive.
4      Q.   And did that happen?
5      A.   I can -- I can only assume it did.  I don't
6  have the outcome of that conversation.
7      Q.   And in fact, in subparagraph d, it talks
8  about how the dollar increase with the new amendment
9  would come to $800,000 for quarterly rebates; is that
10 right?
11     A.   That's correct.
12     Q.   So that was $800,000 in additional rebates
13 that Aetna was getting because of the presence of
14 Cenestin in the marketplace, right?
15     A.   That was an increase of rebate dollars they
16 received, correct, because of the renegotiation.
17     Q.   Let's turn to page 33, subparagraph f,
18 there's a discussion about Caremark here.  What's your
19 understanding about -- what was the situation with
20 Caremark?
21     A.   My understanding was based on this, Wyeth --
22 on this information from Duramed, that Caremark had a
23 lucrative contract with Wyeth for Premarin.
24     Q.   Your understanding, had they had that
25 lucrative contract for a long time?  Had it preceded

1  the entry of Cenestin into the marketplace?
2      A.   I interpreted this to mean that based on
3  Wyeth's last proposal, it appears that they will go
4  with the Premarin and that that contract would net
5  them over a million dollars in gross profits annually
6  based on the proposal that Wyeth gave them.
7      Q.   And was Cenestin trying to get on Caremark's
8  formulary at the same time here?
9      A.   I can only assume it was.
10     Q.   Do you know anything about Caremark's
11 situation other than what you've read in this document
12 that you reference in subparagraph f?
13     A.   I do not.
14     Q.   If I could direct your attention to document
15 previously marked as Defendant's Exhibit 120.  It --
16 has one already.  Is there another copy of it?
17          MS. WIEGAND:  Yes.
18          MS. COURVILLE:  Thanks.
19     Q.   (BY MR. EGGERT)  This is a Viking managed
20 care update which Miss Courville has seen numerous
21 occasions, and if I could direct your attention to
22 page 736 and 737 and the discussion of Caremark, it's
23 towards the bottom of 736, said that "Dan said that
24 the contract would net Caremark more than a million
25 dollars in profits annually.  He felt there still

1  might be an opportunity for Cenestin with Caremark.
2  However, with the sole and exclusive clause in the
3  contract, I don't share this view."  So apparently the
4  author of this document was disagreeing with the
5  person who he'd be dealing with at Caremark about that
6  issue.
7          "I would not pursue a position on their PBM
8  side without access to the mail, since there are
9  virtually no controls or benefits of contracting for
10 their PBM business.  Therefore, I would NOT recommend
11 contracting with Caremark, even if we have that
12 option, (which is questionable)."
13          So here, at least, Viking is recommending
14 that they not even contract with Caremark, right?
15     A.   That's what the memo indicates.
16     Q.   All right.  Let me see.  If I could, I'd
17 like to show you this document, which I'll mark as
18 859, and probably because of my obvious technological
19 limitations, when I printed this off the Internet,
20 some of the spacing was a little bit spasmodic.
21     (Exhibit No. 850 marked for identification.)
22     Q.   But I printed this off RxAmerica's website
23 yesterday.  And it talks about the preferred formulary
24 list.  Are you aware of a preferred formulary list
25 of -- that RxAmerica has?

1      A.   Yes, I am.
2      Q.   What is the purpose of the preferred
3  formulary alternative list?
4      A.   The preferred formulary alternative list is
5  a -- in those cases where there are open formularies,
6  drugs that fall within the preferred status provide a
7  higher rebate as opposed to the non-preferred drugs.
8      Q.   So the way that one determines whether you
9  get on the preferred is whether they offer a higher
10 rebate; that's not linked to their AWPs, I take it?
11     A.   Lower cost overall, which often has higher
12 rebates involved with that.
13     Q.   And in the estrogen category, it appears
14 that the preferred alternatives at RxAmerica are
15 Estraderm and Vivelle; is that correct?  That comes up
16 with respect to the substitutes for the non-preferred
17 drugs of Climara and VivelleDOT?
18     A.   That's what this indicates, yes.
19     Q.   So to your knowledge, is Premarin a
20 preferred alternative?
21     A.   Not according to this list.
22     Q.   And Cenestin is not listed as a
23 non-preferred drug?
24     A.   Is this the only page?
25     Q.   Yeah, the only page I found, yes.  And it

7/18/2002  Bystrom, Dale (final)

1     appears to go A through Z, so seems fairly complete.
2             Do you have continuing responsibilities with
3     respect to RxAmerica or are you still on that planning
4     board or oversight board?
5         A.   The -- I am no longer on the operating
6     committee and have no further activities with
7     RxAmerica.
8         Q.   But they're still affiliated with Longs?
9         A.   They're owned 100 percent by Longs now.
10             It appears from the heading that this
11     doesn't include all of their therapeutic categories.
12     It says "for several therapeutic categories."
13        Q.   Do you understand --
14        A.   As you can see from the "preferred
15     alternative" listing, whenever possible, they do
16     indicate that a generic drug be used, and this is a
17     low-cost alternative recommendation.
18        Q.   Are Estraderm and Vivelle generics?
19        A.   I don't know whether they're generics or
20     not; they're not indicated as such on the list.
21        Q.   Right.  The generics are listed with an
22     asterisk, and they don't have an asterisk by them,
23     right?
24        A.   Right, they have generic equivalents on
25     formulary.

4/1/2005  2:53 PM                                           213

7/18/2002  Bystrom, Dale (final)

1         Q.   Okay.  Put that aside.
2             (Sotto voce discussion, Defense table.)
3             MR. EGGERT:  Let me mark this as
4     Exhibit -- am I on 860 now?
5             (Exhibit No. 860 marked for identification.)
6         Q.   (BY MR. EGGERT)  This is an e-mail from
7     David Messina of Duramed to Marty Carter, stating that
8     Joe LaPine is no longer involved in contracting.  And
9     now he's dealing with someone named -- is it Doug
10     Burgoyne, perhaps?
11        A.   Doug Burgoyne is a clinical pharmacist,
12     uh-huh.
13        Q.   And he indicates in November of 2000 that
14     their formulary is closed.  Is that correct, by the
15     way, is RxAmerica -- does it have a closed formulary?
16        A.   I think what this probably refers to is
17     that -- and I don't recall the specific date, but
18     somewhere in -- in between 2000, 2001, RxAmerica
19     changed their formulary process from negotiating
20     directly and internally to using a formulary that was
21     developed by WellPoint and using their formulary and
22     rebate services, and that -- that may be why it
23     indicates that Joe is no longer involved in
24     contracting.
25        Q.   So if Cenestin is now on Wellpoint's

4/1/2005  2:53 PM                                           214

7/18/2002  Bystrom, Dale (final)

1     formulary, it should also be on RxAmerica's formulary?
2         A.   It may be.  It doesn't have to line up drug
3     by drug.  They tried to do the best in aligning them
4     when they went to WellPoint's formulary.
5         Q.   Because I don't believe that currently
6     Cenestin is listed on RxAmerica's formulary, but it is
7     listed on Wellpoint's.
8         A.   It may not be on RxAmerica's formulary.
9     Just because they rent the formulary service doesn't
10     mean it's going to match drug by drug.
11        Q.   And it appears that Mr. Burgoyne is
12     indicating to Mr. Messina that there has to be a
13     demand, and there is just no market share now.  Is it
14     uncommon for PBMs to demand that there be some demand
15     or market share for a drug before they place it on
16     formulary?
17        A.   Not uncommon, no.
18        Q.   What would be the logic of that?
19        A.   The PBM would want to know that there's --
20     that the physicians are going to be wanting to utilize
21     the products or the members are going to demand them
22     or somebody wants it out in the marketplace.
23        Q.   It's frequently the case, then, that a
24     product is able to generate some demand for itself in
25     the marketplace without first being on formulary and

4/1/2005  2:53 PM                                           215

7/18/2002  Bystrom, Dale (final)

1     thus to encourage the PBMs to place it on formulary,
2     right?
3         A.   That happens sometimes.
4         Q.   Do you -- do you anticipate doing any other
5     additional work to prepare your work or your opinion
6     in this case or are you finished?
7         A.   I may do additional work depending upon what
8     Duramed would like me to do as the -- as we progress
9     to trial.
10        Q.   But at this time, you have no specific plans
11     of -- specific projects or other things that you are
12     planning to do?
13        A.   That's correct.
14             MS. COURVILLE:  You mean in terms of
15     his report that -- any -- you asking him about a
16     supplement report or --
17        Q.   (BY MR. EGGERT)  You're not planning on
18     doing a supplement report, are you?
19        A.   As I sit here today, I have no plans for
20     additional reports unless I'm requested to do that.
21        Q.   And even apart from a supplemental report,
22     you don't have any plans to do additional research or
23     to look at different documents or things of that sort
24     to bolster the opinions that you've expressed in your
25     report to date?

4/1/2005  2:53 PM                                           216

1    A.   Not as I sit here today, no.

2    Q.   Do you have any understanding with Duramed

3  or with counsel as to a cap as to the amount of hours

4  that you can spend on the case?

5    A.   No.

6    Q.   And do you intend to appear in Cincinnati to

7  testify in this case early next year?

8    A.   If I'm asked to do so, that would be my

9  intent.

10        MR. EGGERT:  Take just a second here

11  just to make sure I'm not missing anything.

12        MS. COURVILLE:  Go off the record.

13        THE VIDEOGRAPHER:  We're off the

14  record.

15        (Brief break at 4:33 p.m.)

16        THE VIDEOGRAPHER:  We're back on the

17  record at 4:33.

18    Q.   (BY MR. EGGERT)  Sir, I appreciate your

19  time -- just a couple more questions.  Have you

20  reviewed the reports of the other experts that Duramed

21  has retained in this action?

22    A.   I have reviewed a report from Dave Gibson, a

23  report from Steve Schondelmeyer, a report from a

24  pharmacoeconomist.

25        MS. COURVILLE:  Dr. Leitzinger?

1    A.   Dr. Leitzinger.  I've seen their reports.

2    Q.   (BY MR. EGGERT)  And do you have any views

3  on the accuracy of the information contained in their

4  reports?

5    A.   I have nothing to comment on their reports.

6    Q.   Do you rely in any way on their reports in

7  reaching your own conclusions?

8    A.   I did not.

9    Q.   Did you and Mr. Gibson discuss your

10  reports -- or Dr. Gibson discuss your reports with

11  each other before they were submitted?

12    A.   We knew that we were both working on reports

13  and that his was focused on the physician area and

14  mine was focused on pharmacy and PBM.

15    Q.   Did you have conversations with Dr. Gibson

16  about the substance of your report?

17    A.   Not necessarily, no.

18    Q.   What sort of conversations did you have with

19  Dr. Gibson about your report?

20    A.   We talked about the fact that originally, he

21  was the first person contacted by Duramed through

22  Susman to create a report that was inclusive of

23  pharmacy and PBM information; and then he quickly

24  realized that that's not where his expertise was, and

25  recommended they contact me for that.  So then I told

1  him that I would be working in that area, and those

2  are the expert opinions I would render based on things

3  in those two areas, and his would be focused on

4  physicians and the physician-prescribing activities.

5    Q.   Did you agree to take on this job as a favor

6  to Dr. Gibson?

7    A.   No.

8    Q.   And did -- have you had any conversations

9  with Schondelburg?

10    A.   Schondelmeyer.  I have not, no.

11    Q.   Lightheiser?

12    A.   No.

13    Q.   All these names, very confusing for me.

14  You've not had any conversations with a Mr. Ostberg,

15  have you?

16    A.   No.

17    Q.   Have you looked at the Ostberg report, just

18  a survey of physicians?

19    A.   (Shaking head.)

20    Q.   No?

21    A.   Let me rephrase that.  I looked at a survey

22  that was done, a telephonic survey that was done with

23  physicians.  I don't know if that's the one you're

24  referring to or not.

25    Q.   Are you relying upon that survey at all in

1  connection with your opinions in this case?

2    A.   No.

3    Q.   Okay.  Well, I don't have any further

4  questions for you at this time, sir.

5    A.   Okay.

6        MR. EGGERT:  It's been a pleasure.

7  Thank you very much.  And subject to -- I think there

8  were two documents that I mentioned that we'd like to

9  receive; and subject to any further questions that I

10  might have based on those documents, which I think is

11  doubtful, I'm completed, and I take it there's no --

12        MS. COURVILLE:  No questions at this

13  time.

14        THE VIDEOGRAPHER:  We're off the record

15  at 4:36.

16        (Record closed 4:36 p.m.)

17

18

19

20

21

22

```
1                CHANGES AND SIGNATURE

2    PAGE/LINE      CHANGE        REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____
```

```
1    THE STATE OF TEXAS :
     COUNTY OF  HARRIS :
2
3         I, SUSAN T. BAKER, a Certified Shorthand
     Reporter and Notary Public in and for the State of
     Texas, do hereby certify that the facts as stated by
4    me in the caption hereto are true; that the above and
     foregoing answers of the witness, DALE BYSTROM, to the
5    interrogatories as indicated were made before me by
     the said witness after being first duly sworn to
6    testify the truth, and same were reduced to
     typewriting under my direction; that the above and
7    foregoing deposition as set forth in typewriting is a
     full, true, and correct transcript of the proceedings
8    had at the time of taking of said deposition.
9         I further certify that I am not, in any
     capacity, a regular employee of the party in whose
10   behalf this deposition is taken, nor in the regular
     employ of his attorney; and I certify that I am not
11   interested in the cause, nor of kin or counsel to
     either of the parties.
12
          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
13   this, the 23rd day of July, 2002.
14
15   _____
          SUSAN T. BAKER, CSR, RDR
16        Notary Public in and for
          Harris County, T E X A S
17
     My Commission Expires:  11/26/03
18   Certification No.:  1561
     Expiration Date:  1/7/06
19
20
     Team Litigation Company
21   3605 Katy Freeway, Suite 100
     Houston, Texas  77007
22   713-802-9100
```

```
1         I, DALE BYSTROM, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.
3
     _____
4              DALE BYSTROM
5
6
     THE STATE OF _____)
7
     COUNTY OF _____)
8
          Before me, _____, on this day
9    personally appeared DALE BYSTROM, known to me (or
     proved to me under oath or through_____)
10   (description of identity card or other document) to be
     the person whose name is subscribed to the foregoing
11   instrument and acknowledge to me that they executed
     the same for the purposes and consideration therein
12   expressed.
13        Given under my hand and seal of office this
     _____ day of _____, ____.
14
15   _____
          Notary Public in and for
16        The State of _____
17   My Commission Expires: _____
18
19
20
21
22
```

7/18/2002  Bystrom, Dale (final)

**$**

**$13** [197:24]
**$15** [46:19]
**$2** [60:25] [61:1]
**$20** [60:4]
**$22.50** [61:1]
**$24.50** [61:2,9]
**$25** [60:22,25]
**$27** [61:5,9] [63:8,12,16,19]
**$30,000** [46:19]
**$300** [46:16,24] [47:5,10]
**$35** [60:6,18] [61:7,10,23] [63:6]
**$40** [183:22]
**$5** [61:24]
**$800,000** [209:9,12]

**.**

**.625** [121:6]
**.625milligram** [121:6]
**.625-milligram** [121:6]

**0**

**00** [1:6]
**010675** [116:9]
**049839** [3:]
**04983940** [3:]
**049839-40** [3:]
**088156** [3:]
**088156159** [3:]
**088156-159** [3:]

**1**

**1** [1:6] [90:17] [107:17]
**1,000** [73:21]
**1.25** [121:5] [192:10,22] [194:9,15,23]
**1.25milligram** [121:5] [192:10,22] [194:9,15,23]
**1.25-milligram** [121:5] [192:10,22] [194:9,15,23]
**1/5** [81:12]
**1/7/06** [:]
**1:34** [114:11,13]
**10** [50:3] [60:24,25] [81:24] [104:15] [133:9] [178:11] [207:1]
**10/00** [3:]
**10:01** [1:] [5:2]
**10:07** [9:20,21]
**10:11** [9:21,23]
**10:19** [16:8,9]
**10:21** [16:13]
**100** [6:25] [72:2] [213:9] [:21]
**1000** [1:17] [2:4]

**10671** [194:4]
**10672** [197:20]
**11** [93:19] [94:1] [151:22] [153:16]
**11.1** [93:9]
**11/10/00** [4:9]
**11/26/03** [:]
**11:36** [73:1,2]
**11:45** [73:2,4]
**113** [153:14]
**115** [3:]
**117994** [4:4]
**117994118056** [4:4]
**117994-118056** [4:4]
**117999** [171:23]
**118000** [176:21]
**118002** [178:4]
**118007** [179:2]
**118008** [179:9]
**118023** [180:9,11]
**118027** [180:18]
**118032** [181:10]
**118033** [181:19]
**118037** [182:22]
**118049** [185:19]
**118052** [186:12]
**12** [89:22] [158:20] [192:8,10]
**12:11** [92:1,2]
**12:12** [92:2,4]
**12:41** [114:10,11]
**120** [3:] [66:8] [178:12] [210:15]
**123** [3:20]
**12week** [192:8]
**12-week** [192:8]
**13** [126:16]
**130** [103:3]
**136** [3:]
**14** [130:17] [170:10]
**140** [103:3]
**15** [35:5] [50:15] [119:3] [135:5,12,22,25] [157:16]
**15.1** [134:12]
**152** [3:]
**153066** [4:]
**153066072** [4:]
**153066-072** [4:]
**1561** [:18]
**158** [3:]
**15th** [192:1]
**16** [92:12] [158:17]
**160468** [123:13]
**160470** [124:10]
**160478** [125:8]
**166** [4:2]
**170** [4:]
**18** [1:] [125:11] [137:11]
**180** [66:8]
**18th** [1:] [5:1]
**19** [10:24] [137:9,10,11]
**19:21** [16:9]

**191** [4:5]
**1968** [34:20] [35:9]
**1970** [34:9]
**1979** [34:9]
**1980** [32:22]
**1986** [32:8]
**1988** [10:24] [11:1] [32:8]
**1989** [10:24]
**1990** [30:1]
**1991** [27:3] [29:10]
**1994** [166:9,20] [167:9]
**1995** [22:2] [26:16] [27:3] [166:21]
**1997** [17:12] [22:2] [26:16,19] [208:22]
**1999** [17:9,12] [50:5,6] [52:6 ,24] [97:13,16,23] [98:1,2,5] [99:7] [140:1] [152:4,5,7,9,10] [157:23] [160:14] [188:1] [190:21] [192:1]
**19th** [188:1]

**2**

**2** [39:6] [100:13] [107:14] [108:19,20] [124:15] [131:9] [132:13] [133:9] [166:25] [171:1] [192:3,4]
**2:23** [151:17,18]
**2:34** [151:18,20]
**20** [91:13,16] [142:13] [157:16] [198:13]
**2000** [3:] [98:5,8,11] [101:10] [123:4,9] [157:23] [190:6,15] [194:5,12] [197:3] [214:13,18]
**20004** [2:10]
**200041206** [2:10]
**20004-1206** [2:10]
**2001** [3:] [52:7,24] [98:5] [123:10] [169:6,17] [190:11 ,15] [203:13] [214:18]
**2002** [1:] [5:2] [10:7] [78:8] [90:23] [99:7] [160:7] [169:7] [203:14] [:13]
**202** [2:]
**2029426543** [2:]
**202-942-6543** [2:]
**20s** [90:24]
**210** [3:]
**211** [4:7]
**214** [4:]
**22** [170:9] [171:1]
**221** [3:4]
**222** [103:3]
**223** [3:]
**23** [187:2]
**23rd** [:13]
**24** [88:25] [153:17] [199:20]
**25** [194:9] [200:5]
**26** [202:20]
**26th** [166:9]

**27** [152:3] [204:16,17]

**3**

**3** [85:5,8] [100:13] [110:8] [131:9] [132:13] [133:9] [153:17] [208:15,18,20,22] [209:2]
**3,000** [178:10]
**3:14** [181:5,6]
**3:16** [181:6,8]
**3:50** [206:21,22]
**30** [1:] [50:15] [90:24] [131:12] [157:18,19] [176:24] [177:8] [198:13]
**300** [46:24,25]
**301** [3:] [100:19] [152:12]
**30th** [10:7] [101:10]
**32** [207:1]
**33** [209:17]
**36** [10:5]
**3605** [:21]
**3tier** [153:17]
**3-tier** [153:17]

**4**

**4** [90:2] [91:11] [110:22] [119:4] [158:16,19] [186:24] [187:3]
**4.7** [90:5]
**4:17** [206:22,24]
**4:33** [217:15,17]
**4:36** [220:15,16]
**4:37** [1:15]
**40** [131:12] [176:24] [177:8] [192:23]
**400** [85:2]
**430** [13:23]
**430plus** [13:23]
**430-plus** [13:23]
**45** [152:2] [195:6,9]
**4th** [203:14]

**5**

**5** [3:3] [47:17] [92:10,16] [93:7] [106:14] [133:9] [203:21]
**50** [8:25] [93:18] [131:12] [132:25]
**500** [73:22]
**51** [106:24,25]
**5100** [1:17] [2:4]
**555** [2:]
**56** [178:13]

**6**

**6** [65:9] [88:15] [178:13]
**6/02** [3:]

7/18/2002  Bystrom, Dale (final)

**6/28/02** [3:24]
**60** [66:8] [169:12,14]
**62** [103:4]
**63** [136:10]
**65** [153:14]
**653** [2:5]
**66** [136:10]
**69** [34:20]

**7**

**7** [71:25]
**70** [50:8,9,10] [61:13]
**700** [182:4]
**713** [2:5] [:22]
**7136537859** [2:5]
**713-653-7859** [2:5]
**7138029100** [:22]
**713-802-9100** [:22]
**736** [210:22,23]
**737** [210:22]
**75** [101:14,17] [102:17,20]
**77** [3:13] [121:3] [192:9]
**77002** [2:]
**770025096** [2:]
**77002-5096** [2:]
**77007** [:]

**8**

**8** [73:6]
**80** [3:]
**800** [106:23]
**802** [:22]
**80s** [35:4]
**848** [3:] [9:24] [10:1]
**849** [3:13] [77:23,24] [88:14]
**85** [50:9,10] [97:4] [157:5]
**850** [3:] [80:3,6] [211:21]
**851** [3:]
**852** [3:] [115:20,22] [193:20,24]
**853** [3:20] [123:2,5]
**854** [3:] [136:4,5]
**855** [3:] [157:25] [158:1]
**856** [4:2] [166:1,2]
**857** [4:] [170:13,15]
**858** [4:5] [191:13,15]
**859** [4:7] [211:18]
**86** [32:22]
**860** [4:] [214:4,5]
**89** [11:1]

**9**

**9** [3:] [82:24,25] [97:2,25]
[99:9] [123:1] [192:7]
**9/15/99** [4:6]
**90** [66:8] [143:24] [169:12,14]
[195:5]
**942** [2:]
**99** [81:24] [97:15]

**A**

**a.m** [1:] [9:21] [16:9,13]
[73:2]
**ab** [145:7,11,14] [172:3,19]
[186:16]
**abide** [113:21]
**ability** [77:2] [155:1] [164:20]
[165:8]
**able** [23:6] [31:14] [86:17]
[91:21] [95:14] [117:23]
[118:9] [127:3] [137:2]
[154:22] [155:10] [163:13]
[164:3] [203:11] [215:24]
**above** [1:14] [135:12] [181:14]
[222:2] [:4,]
**abovestyled** [1:14]
**above-styled** [1:14]
**abrated** [172:19]
**ab-rated** [172:19]
**absence** [156:13]
**absent** [140:3]
**absolute** [154:25]
**absolutely** [12:23] [62:22]
[151:15] [204:24]
**accept** [64:22] [110:20]
[119:24]
**accepted** [195:4]
**access** [15:12] [19:4] [98:13]
[113:1] [156:15] [159:25]
[188:15,17,18,19,25] [189:3
,9,12] [195:19] [211:8]
**accommodate** [8:7] [111:12]
**accord** [144:2]
**according** [103:5] [167:11,13]
[184:11] [193:15] [200:20]
[212:21]
**account** [66:15] [80:7,9]
[109:17] [132:24] [177:20]
[181:18] [182:4] [183:3]
[198:4,7] [207:12]
**accounted** [49:24] [156:19]
**accounting** [103:3] [153:14]
**accounts** [183:4] [185:12]
**accuracy** [218:3]
**accurate** [10:10] [15:1,2]
[26:11] [57:22] [91:14]
[120:22] [123:25] [124:3]
[152:8]
**accurately** [66:11] [124:20]
**ace** [89:22]
**achieve** [31:14] [161:16]
[164:6] [206:3] [207:8]
**achieved** [90:22] [160:15]
**achieves** [77:17] [162:8]
**achieving** [161:1,4,6] [164:7]
**acknowledge** [222:11]
**acquire** [12:7]
**acquired** [11:14] [17:18]
[93:4]

**acquisition** [32:11,13,14]
[33:8] [69:17]
**acronym** [18:15]
**across** [32:2] [42:10] [62:15]
[127:18] [128:2] [139:4]
[196:19]
**act** [47:21] [135:4]
**acting** [34:2]
**action** [1:] [217:21]
**actively** [197:4,7]
**activities** [37:25] [55:2]
[78:3] [131:20] [147:15]
[179:16] [201:24] [213:6]
[219:4]
**activity** [66:10] [81:6] [128:14]
[149:2] [150:15] [200:10]
**actual** [94:9] [109:11,21]
[123:11] [154:9] [171:11]
[193:23] [199:14] [200:10]
**actually** [44:8] [57:11] [58:3]
[60:12] [64:1] [67:1] [87:11]
[88:5,19] [90:19] [93:13,16]
[107:16] [111:14] [125:10]
[129:17] [133:11] [140:7]
[145:23] [150:20] [151:10]
[153:3,8,18] [156:23] [161:3]
[163:21] [164:20] [165:15]
[170:19] [172:1] [176:21]
[181:19] [182:10] [184:7,10
,15] [185:5] [188:23] [189:11]
[190:3,14] [195:15] [198:19]
[200:10]
**add** [49:10] [77:5] [91:17,19,21
,22] [116:16,21] [117:10]
[119:7] [121:1] [155:19]
[192:24]
**added** [82:17] [117:8] [169:6]
[203:13] [204:6]
**adding** [81:19] [191:2]
**addition** [19:10] [34:6]
[109:12] [123:15] [132:15]
[139:21] [205:10]
**additional** [6:13] [15:3]
[208:17] [209:12] [216:5,7,20
,22]
**additions** [120:1]
**additive** [19:25]
**adequate** [120:7]
**adequately** [124:24]
**adjacent** [36:12]
**adjudicated** [139:4,18]
**adjudicating** [48:8]
**adjudication** [55:9]
**adjust** [202:21] [203:1]
**adjusted** [203:4]
**admin** [131:14] [133:9]
**administer** [18:23] [71:3]
**administered** [85:19]
**administering** [20:7] [84:15]
[131:20]
**administration** [18:17]

[19:8] [20:12,15] [22:24]
[27:2] [70:21] [71:1,4]
[130:21,23] [131:1,5,17,18,23]
[132:2,3,8,17]
**administrative** [18:22,24]
[19:5,10] [76:11] [112:19]
[131:10]
**adoption** [117:20]
**advance** [91:3] [188:1,3,7,10]
[189:12,13] [190:23] [203:14
,17]
**advancepcs** [73:15] [74:16]
[90:17] [97:4,18,23] [101:11
,14,18] [102:21] [157:3]
[168:23] [169:2,3,4,16,21]
[186:25] [187:3] [190:4]
**advancepcss** [190:19]
**advances** [203:12]
**advantage** [31:4]
**advantageous** [67:6,9,13]
**adverse** [118:5]
**advertising** [32:12] [33:5]
[163:2] [186:9,10,11]
**advise** [39:15]
**advisory** [39:7,10,13] [40:12
,22] [123:15,20] [124:12]
[139:19,20] [155:21,24]
**aetna** [93:6,8,12,15,16,19,21
,22,23] [141:15] [197:5]
[208:14,15,16,25] [209:13]
**aetna/us** [197:1]
**aetnaderived** [93:23]
**aetna-derived** [93:23]
**affairs** [185:18]
**affect** [144:9] [146:3] [147:19]
[163:13] [190:15] [204:7]
**affected** [51:15] [145:24]
**affiliated** [213:8]
**affix** [222:]
**afternoon** [141:25]
**again** [40:14] [52:8,24]
[88:14] [102:17] [159:11]
[176:13,15] [178:5,21]
[180:2] [181:11] [182:19]
[185:18,19] [194:17,19]
[206:7]
**against** [8:11] [66:11,13,14]
[71:7] [75:5] [128:25] [137:23]
[138:1,5,7] [140:24] [146:25]
[189:14] [197:4,7] [200:11]
**age** [48:24]
**agents** [123:22]
**aggregate** [187:15]
**aggregated** [48:4] [76:23]
**aggregators** [47:21]
**aggressively** [130:19]
**ago** [5:24] [150:22]
**agree** [71:6] [96:5] [107:10,18]
[108:20,23] [109:3,16,25]
[110:3,10,14] [156:17]
[162:17,21] [163:4] [178:7,22

7/18/2002  Bystrom, Dale (final)

,23] [179:5] [208:25] [219:5]
**agreed** [24:18] [189:13]
**agreement** [1:18] [6:19,21]
[146:8,9] [169:19,21] [182:11]
[188:15] [189:12,22] [193:11]
[195:16] [203:18,25] [206:13]
[207:5]
**agreements** [25:11,14,16]
[26:20] [40:4] [128:8,12]
[151:10] [188:17]
**agrees** [208:16]
**ais** [78:17]
**alan** [142:6,10] [200:6,7,8,12
,17] [201:2]
**alarm** [16:3]
**albertsons** [17:19]
**aligning** [215:3]
**allegation** [28:14]
**alleged** [99:12,14] [140:3]
[156:14]
**alliances** [11:8] [14:9,10,12
,15,17] [16:16]
**allow** [12:11] [54:2] [55:8]
[111:6] [113:5,8] [152:22]
[164:5]
**allowable** [57:5] [58:12,14,21
,24]
**allowed** [14:13] [169:19]
**allowing** [183:16] [188:21]
**allows** [195:19]
**almost** [56:23] [94:21]
[119:5]
**along** [31:5]
**already** [15:4] [37:11] [152:13]
[164:4] [173:9] [193:20]
[208:5] [210:16]
**alternative** [212:3,4,20]
[213:15,17]
**alternatives** [4:] [161:9]
[212:14]
**although** [59:9] [72:10]
[142:5] [157:4] [170:13]
[189:14] [192:19] [196:18]
**always** [10:20] [56:23]
[61:20] [66:5] [91:10] [93:2]
[106:6]
**am** [7:12] [52:14] [88:22]
[90:4] [104:21] [159:3]
[165:18] [212:1] [213:5]
[214:4] [:9,]
**amcp** [107:3] [110:15,17,23]
[112:24,25] [113:19,20]
**amendment** [206:13] [209:
8]
**american** [17:18] [29:12,13
,14,15] [30:14,18,20,22]
[31:9,12] [38:1,3,11]
**among** [95:12] [161:10]
**amount** [6:11] [51:25] [54:23]
[63:3] [69:25] [100:13]
[127:23] [133:13] [134:17]

**amounts** [68:2] [71:23]
[133:24] [207:8]
**analysis** [84:21] [108:9]
[124:19] [134:21] [135:15,17]
[137:22] [138:3] [140:12,14]
[159:24] [184:17,25] [185:4
,6] [190:16] [193:1]
**analyze** [108:1]
**ancillary** [34:6]
**and/or** [56:8] [58:16] [74:13]
[141:3]
**annual** [183:22]
**annually** [210:5,25]
**answer** [8:2,3] [25:19]
[38:8] [69:10] [93:25] [168:25]
[176:14] [191:8] [205:4]
**answers** [159:10] [:]
**anthem** [90:1] [159:18]
**anticipate** [216:4]
**anybody** [27:11] [43:4,8]
[44:1,9] [155:7]
**anyone** [42:17] [43:12]
[44:5] [47:15] [55:25] [141:23]
[149:12] [155:11] [174:4]
**anything** [38:21] [45:13,18]
[46:1] [47:10] [54:12,13]
[70:23] [84:23] [115:3]
[126:11] [127:1] [145:23]
[146:3,5] [154:13] [155:17]
[176:4,7,8] [178:25] [179:12
,15] [180:19] [185:25] [186:21]
[188:10,15] [193:3] [194:12]
[196:10] [199:15] [202:12]
[210:10] [217:11]
**anytime** [106:16]
**anywhere** [23:20] [66:8]
**apart** [128:8] [216:21]
**api** [188:6]
**apparently** [176:23] [211:3]
**appeal** [111:9] [113:1,6,9]
**appear** [137:15,17,19]
[149:13] [153:22] [176:10]
[179:15] [217:6]
**appeared** [149:8] [222:9]
**appears** [10:7] [122:7]
[130:5] [168:12] [199:14,21]
[210:3] [212:13] [213:1,10]
[215:11]
**applicable** [59:11]
**applied** [40:19] [58:23]
[68:6,17]
**applies** [167:13]
**apply** [58:18,25] [62:15]
[66:12] [71:18] [125:2]
**applying** [12:25]
**appraise** [110:13]
**appreciable** [161:4]
**appreciably** [145:24]
**appreciate** [217:18]

**approach** [68:5]
**appropriate** [1:] [20:4,14]
[48:23] [49:1,8] [107:21]
[120:15]
**appropriately** [19:15,19]
[49:9]
**approval** [111:9] [119:6]
[121:3]
**approve** [21:14] [120:3,22]
**approved** [114:25] [121:16]
[122:3,8,11,14,17,18]
**approximately** [13:17]
[90:6]
**april** [3:]
**arbitration** [5:21] [6:1]
[7:1] [8:11]
**area** [18:13] [20:7] [21:10]
[23:8,12] [24:15] [37:21]
[38:16] [39:2] [41:11,16,18,20
,21,23] [76:17] [118:17,18]
[129:6] [133:8] [137:2]
[138:3] [146:6] [156:8,10]
[218:13] [219:1]
**areas** [32:2] [38:24] [219:3]
**arena** [40:5] [42:6,7]
**arent** [51:14]
**argus** [88:20] [89:2] [90:10]
[91:21] [157:20]
**arnold** [2:9] [5:10]
**around** [52:17] [75:16]
[157:18]
**arrange** [25:15]
**arrangement** [6:17] [115:4]
[169:17]
**arrangements** [40:5] [115:
14] [129:2,9]
**arriving** [54:24]
**article** [78:11,14,15,19,21,23]
[79:2,4] [107:17] [152:4]
[153:20]
**artificially** [135:1]
**arts** [36:6,10]
**aside** [214:1]
**ask** [7:9] [18:7] [42:13]
[76:2] [78:8] [88:13] [89:9]
[92:5] [147:7] [189:20]
**asked** [37:11] [108:11]
[160:13] [217:8]
**asking** [7:7] [133:21] [141:2]
[160:14] [167:24] [186:5]
[216:15]
**asks** [69:5] [75:9] [168:16]
[180:10] [205:1]
**aspects** [85:12] [86:9,10]
**assess** [181:17]
**assessing** [108:22,24]
**assigned** [26:25] [168:15]
**assist** [42:17]
**assistance** [42:20] [76:17]
**assisting** [53:1]
**associated** [12:21] [39:16]

[106:7] [130:22] [131:2,19]
[132:9,11,24] [133:2] [176:24]
[192:6]
**association** [38:2,3,4,11]
**assume** [59:18,22] [60:4,20]
[61:3] [76:10] [102:10]
[209:5] [210:9]
**assumed** [76:12]
**assumption** [106:9] [168:19]
**assure** [19:14] [20:6]
**assuring** [55:2]
**asterisk** [213:22]
**astra** [40:1]
**attaches** [158:3]
**attaching** [194:1]
**attachment** [10:13]
**attack** [179:22,23]
**attain** [37:6]
**attempt** [28:12] [163:12]
**attendance** [37:9]
**attended** [36:22]
**attention** [73:6] [80:5] [101:
7] [107:8] [126:16] [136:6]
[137:9] [152:11] [170:18]
[199:20] [207:1] [210:14,21]
**attitude** [116:20] [117:1,3,13
,16]
**attorney** [1:] [5:10] [7:10]
[:]
**attributable** [183:12]
**attributes** [108:3,6]
**auth** [168:15,22]
**author** [211:4]
**authored** [166:12]
**authorization** [111:6,18,25]
[112:7,13] [142:22] [143:6]
[168:17]
**authorizations** [112:5,20]
[140:5,11,13,16,19,24]
[141:3,6,12,17] [142:23]
[143:4,14] [146:25]
**authorized** [6:17] [167:5]
**autonomy** [33:10]
**availability** [50:20] [194:15]
**available** [20:19] [48:4]
[94:12] [98:13] [108:15]
[121:21,24] [122:2] [126:7]
[143:9] [144:20] [152:23]
[189:16] [195:3] [197:9]
[198:2] [200:24] [201:4]
**avenues** [15:20]
**average** [58:2]
**avoid** [112:9]
**aware** [18:13] [52:11] [90:10]
[103:24] [104:22,24] [111:13
,19] [115:13] [121:2,15]
[122:2,22] [130:2,7,10,11]
[133:20,25] [135:11] [137:3
,5] [146:1,7,10] [150:20,23]
[156:25] [157:1] [159:15]
[161:2] [163:18] [164:4]

**7/18/2002  Bystrom, Dale (final)**

[165:10,18] [169:8,13] [172:
   23] [176:25] [177:3] [188:12
   ,14] [189:11,21,23] [190:3,8
   ,10] [200:12] [203:6] [211:24]
**away** [82:16] [86:23] [149:10]
   [164:22] [165:19] [208:24]
**awp** [57:23,24] [58:1,3,7]
   [60:14,22,23,24] [61:6]
   [68:5,16] [105:11,21] [106:6]
   [177:10]
**awpprice** [68:16]
**awp-price** [68:16]
**awps** [105:12,15,17] [212:10]

B

**b.s** [35:16,23] [37:12]
**bachelor** [35:13]
**back** [9:22] [12:19,20] [16:12
   ,14] [19:6,16] [39:1] [65:11,13
   ,24] [66:6,9] [69:24] [71:18]
   [73:3] [92:3] [97:2,9] [98:5]
   [104:14] [114:12,15,16]
   [131:21] [133:11] [151:19]
   [152:16,17] [180:6] [181:7]
   [190:21] [205:3] [206:23]
   [208:21] [217:16]
**background** [61:14]
**backup** [87:25]
**bad** [120:4]
**baker** [1:15] [:]
**bakersfield** [31:9]
**balanced** [184:24]
**barbara** [55:7]
**based** [28:13] [41:15] [44:14]
   [45:17] [57:20] [68:4] [69:14
   ,21] [74:19,22] [84:9] [88:4]
   [93:2] [105:20] [120:15]
   [122:6] [124:18] [136:22]
   [138:4,6] [141:1] [147:5,8,10]
   [148:4,16] [151:3] [154:4,7,11]
   [160:2,22] [174:20] [209:21]
   [210:2,6] [219:2] [220:10]
**baseline** [202:21] [203:1,5]
**basically** [14:15] [22:18]
   [33:5] [148:23] [178:19]
**basis** [39:11,13] [51:6]
   [73:19] [74:15] [92:22,23]
   [97:10,11] [133:7] [148:13]
   [202:22]
**bear** [59:13]
**became** [9:7]
**become** [130:23]
**becomes** [127:16]
**becoming** [133:19] [163:1]
**begin** [26:19]
**beginning** [14:23] [98:3]
   [131:5]
**begins** [56:7]
**behalf** [26:6] [:10]
**behaving** [118:2]

**behavior** [128:11] [141:1]
   [147:23] [154:5]
**behind** [34:24] [78:16]
   [87:10] [108:16]
**belief** [10:11] [84:5]
**believe** [13:4] [34:5] [35:3]
   [45:11] [47:12] [64:6] [78:17]
   [83:11,13] [87:19] [98:23]
   [103:15] [107:4] [114:20]
   [116:4] [122:16] [124:23]
   [141:15] [142:5] [145:23]
   [150:16,17] [166:10] [215:5]
**below** [64:10] [197:2] [204:20]
**benchmark** [58:10,11]
   [75:5]
**benefit** [18:15] [23:3] [24:1]
   [50:2] [62:21] [64:2] [75:16,17
   ,22] [76:1,3,5,8,19] [77:4]
   [84:11,14] [85:21] [86:15]
   [93:23,24] [95:13] [99:24]
   [101:12,13]
**benefits** [16:1] [18:17,18,19
   ,23] [192:18] [211:9]
**best** [10:10] [40:18] [46:13]
   [82:13] [89:7] [107:22]
   [109:4] [121:18] [123:25]
   [124:2] [134:6,13,15] [135:1
   ,4] [141:13] [169:4] [215:3]
**bestpractice** [134:15]
**best-practice** [134:15]
**bestpractices** [134:13]
   [135:1]
**best-practices** [134:13]
   [135:1]
**bestprice** [134:6]
**best-price** [134:6]
**better** [24:20] [96:22] [207:10]
**beyond** [26:7]
**bid** [129:18,22] [130:12]
   [159:15]
**bidding** [129:18,25]
**big** [29:7] [34:4] [68:12]
   [69:2] [91:2] [187:22] [201:23]
**bigger** [187:10,11]
**bill** [45:5,6] [166:4,5,6]
**billed** [72:6,18]
**bioequivalency** [123:17]
**bioequivalent** [145:8]
   [178:21] [186:16]
**bit** [46:6] [49:15] [59:16]
   [60:21] [61:6] [88:17] [94:14]
   [128:24] [131:3] [189:1]
   [211:20]
**blanket** [28:23] [62:14]
**blast** [185:20]
**bless** [119:9,22] [120:2,17]
   [121:1]
**blessing** [119:12]
**block** [138:14,18] [141:19]
   [201:5] [202:23] [203:2]
   [209:1]

**blocked** [189:7] [201:2,3]
**blocking** [208:17]
**blocks** [137:11,12,15,22]
   [138:1,5,7] [141:16] [142:7]
   [146:24] [200:24] [203:8]
**blue** [76:9] [158:11,24]
**bluff** [149:15]
**blunt** [188:9,11]
**board** [16:23,25] [29:14]
   [111:10] [213:4]
**bold** [94:2] [151:23]
**bolster** [216:24]
**book** [167:15] [195:6]
**boston** [40:25]
**bother** [111:22,23,24]
**bottom** [110:24] [116:9,19]
   [119:4] [125:11] [127:14]
   [136:9] [210:23]
**bought** [15:22] [63:16,17]
**boy** [9:12]
**brackets** [203:11]
**brand** [125:16] [132:23]
   [161:11] [175:9,18,21]
   [176:2,12]
**branded** [57:16] [59:6,23,24]
   [60:4] [145:6]
**brandnew** [161:11]
**brand-new** [161:11]
**brands** [144:24] [175:22]
**break** [8:5] [9:21] [16:6,9]
   [73:2] [91:24] [92:2] [106:18]
   [114:5,11] [133:1] [151:13,18]
   [181:6] [206:16,22] [217:15]
**breakdown** [101:9] [133:13]
   [152:16] [153:7,10]
**breaking** [106:16]
**brief** [91:24] [114:5] [196:7]
   [217:15]
**briefings** [185:21]
**briefly** [119:3]
**bring** [40:17] [76:2] [170:18]
**bringing** [40:16]
**broad** [20:17]
**broadbased** [20:17]
**broad-based** [20:17]
**brought** [12:19] [81:12]
**budget** [66:11,13,14]
**budgeting** [67:11]
**build** [14:13]
**building** [36:16] [84:6]
**built** [48:21]
**bulk** [50:25] [172:25]
**bullet** [79:4] [112:15] [113:12]
**bundle** [150:13]
**bundles** [150:21]
**bundling** [149:3,4] [150:9,15]
**burdens** [112:19]
**burgoyne** [214:10,11]
   [215:11]
**business** [11:8] [14:9,10,12]
   [15:3] [16:16] [36:24] [68:24]

[69:8] [92:24] [136:15] [155:
   15,16] [167:15,16] [195:6]
   [211:10]
**buy** [33:11] [56:18] [62:2]
   [63:11,12] [137:1]
**buyer** [27:18]
**buying** [31:13]
**buys** [58:6]
**bystrom** [1:13] [3:2,,12,13,,
   ,,20,,] [4:2,,5,7,] [5:3,8,9]
   [7:18] [9:24] [10:3] [87:21]
   [101:24] [128:23] [222:1,4,9]
   [:]

C

**c100735** [1:6]
**c-1-00-735** [1:6]
**calculated** [64:10]
**calculations** [103:6]
**california** [10:18,20,23]
   [11:4] [13:24] [14:1,3]
   [15:15] [24:3] [30:11] [31:8,10
   ,11,16,17,20,22] [32:2,7,9]
   [33:1,21] [36:18] [38:25]
   [41:19,24] [52:4,9,10]
   [55:7] [76:9] [145:5] [159:4]
   [166:15] [201:13]
**californiadriven** [31:17]
**california-driven** [31:17]
**call** [19:21] [29:4] [56:12]
   [64:7] [84:9] [98:16] [130:12]
   [134:13] [139:6] [144:12]
   [148:15] [161:13] [187:4]
   [196:15] [199:2]
**called** [11:15] [26:2] [48:20]
   [49:3] [57:5] [58:21] [64:6]
   [89:9] [131:13] [137:13]
   [138:25] [139:8] [149:15]
   [158:4] [179:21] [188:15]
**calls** [54:23] [148:19] [198:24]
**campus** [36:11,12,16]
**cant** [20:15] [79:16,18]
   [133:4] [137:20] [143:15]
   [145:19] [149:20] [157:9]
   [160:24] [164:7,12] [167:18]
   [168:19] [177:14]
**cap** [217:3]
**capability** [15:15]
**capable** [23:2] [108:13]
**capacity** [18:12] [32:11]
   [40:21] [41:2] [52:2] [80:25]
   [166:16] [:]
**caption** [:4]
**captioned** [10:2]
**card** [222:10]
**care** [3:8] [8:19,21] [17:4]
   [18:10] [20:23] [21:1,24]
   [22:9] [24:24] [25:1,7]
   [26:3] [27:4,8] [28:19,20,22]
   [29:3] [30:15] [31:24] [32:1]

7/18/2002  Bystrom, Dale (final)

[34:9] [36:25] [37:3,4] [38:1,3
,5,11] [39:12] [40:3,5] [42:1,6
,7] [43:15,17,20] [47:5]
[48:12,16,18] [49:10] [50:19]
[51:1,3] [55:10] [56:21]
[57:1,8,12,20] [60:16]
[62:8,9,10,17,18] [63:25]
[64:17] [65:6,19] [66:3,13,20
,22] [67:4,5] [69:23] [76:25]
[79:23] [92:15] [93:8] [104:18
,22,25] [109:14,24] [116:4]
[127:10,13] [134:2] [150:2]
[166:19,21] [169:9] [197:11]
[210:20]
**career** [39:2]
**caremark** [90:18,20] [91:7,8
,10] [102:16,21] [209:18,20,22]
[210:22,24] [211:1,5,11,14]
**caremarks** [210:7,10]
**carmel** [33:21,25]
**carolyn** [2:3]
**carter** [3:10,19] [4:9] [45:2,3]
[116:3] [173:23] [193:25]
[214:7]
**carters** [45:23] [174:1]
**case** [5:13,21,24] [6:6,22,24]
[10:2] [41:7] [46:8] [52:12]
[59:9] [62:1,12] [63:7,13,14]
[64:13] [67:4,23] [70:2,5,11]
[72:15] [83:15,17] [85:7,24]
[97:21] [98:1] [100:20,24]
[104:6] [107:4] [111:13]
[119:11] [120:19] [122:7,23]
[128:5] [130:9] [136:22]
[138:4] [146:12] [148:10,13
,17] [151:1] [153:2] [154:17]
[158:5] [160:12] [164:8]
[199:8] [208:4] [215:23]
[216:6] [217:4,7] [220:1]
**cases** [57:7] [59:10] [66:4,5]
[72:13] [111:14] [119:5]
[121:14] [212:5]
**casey@solvay** [3:10]
**cash** [49:18,19,21,24] [50:1,16
,20] [51:5,10] [53:20] [56:11]
[72:3]
**catalog** [177:11,23]
**categories** [49:18] [75:18]
[123:21] [213:11,12]
**category** [68:19] [81:13,15,21]
[82:2,12,19] [94:11] [99:23,24]
[124:6] [129:14] [149:11]
[150:8] [161:11] [162:16]
[168:15,17] [175:23] [178:6]
[202:25] [212:13]
**cause** [1:] [:11]
**caused** [208:8,9]
**ceiling** [134:25] [135:4]
**celebrex** [161:2,10]
**cenestin** [3:8] [59:1] [60:1,9
,10,18,22] [61:9] [81:11]

[82:7] [97:14] [99:16,18]
[100:2,11,14] [102:14,15]
[103:20] [108:7,14] [111:14]
[114:17,22] [116:14,16]
[117:8] [118:8] [121:3,10,16]
[122:3,18,21] [124:5,25]
[125:6] [135:16,24] [137:23]
[138:1,5,7,13,15,17,24]
[139:22] [140:2,13,17,20]
[141:4,7] [143:3,9] [145:14,20
,24] [146:4,21] [148:25]
[149:9] [151:6] [153:4,8]
[156:14,23] [158:11] [159:15
,24] [160:8] [165:6,15,19]
[169:6] [171:25] [172:3,11,17]
[173:4] [176:22,25] [178:5,6
,10,12,13,19,20,21] [179:3,6
,14,19] [180:4] [182:16,20]
[183:7,9,12,16,20,24,25]
[185:20] [188:9,11] [189:14]
[190:3,19] [191:2,4] [192:2,4
,7,9,16,18,21,23,24] [193:4,8
,15] [194:6,20] [195:2,10,17
,20,23] [196:4,12,14,24]
[197:2,6,8,18,22] [198:1]
[200:11,14,18,24] [202:23]
[203:2,8,11,13] [204:19,23]
[205:10,16,20,24] [206:6]
[207:15,16] [208:18] [209:1
,14] [210:1,7] [211:1] [212:22]
[214:25] [215:6]
**cenestins** [156:19] [193:17]
**central** [33:9,12]
**cents** [131:12]
**ceo** [202:5]
**certain** [23:17] [44:13]
[67:20] [77:17] [86:9] [134:23]
[156:20] [208:25]
**certainly** [67:12] [118:7]
[137:6] [158:8] [162:17]
[177:9]
**certificate** [3:] [37:7,8,9]
**certification** [:18]
**certified** [1:15] [41:7] [:]
**certify** [:9,]
**cetera** [178:14] [192:10,11]
**chain** [13:23] [14:6] [24:16]
[29:16,19,20,22,24] [31:13,16]
[61:12,15,19] [62:10,16]
[75:10] [83:20]
**chains** [23:14] [61:13] [62:3]
[75:1,3,5]
**chance** [117:4] [160:25]
**change** [55:13] [91:24]
[119:8,21] [120:9] [139:2,6]
[164:25] [174:23] [180:23]
[181:2] [189:24] [221:2]
**changed** [11:13] [174:18]
[204:5] [214:19]
**changes** [119:6] [120:1]
[168:2,17] [221:1]

**channel** [86:14]
**charge** [27:9] [33:24] [68:1,3]
[72:11] [124:24]
**charged** [63:15] [131:24]
**charges** [56:17] [124:16,21]
**charles** [208:16]
**chart** [84:3] [87:23] [88:1,3]
[93:7] [102:7]
**cheaper** [15:22]
**check** [19:18] [49:11]
**checks** [20:10]
**chief** [119:16]
**children** [85:23]
**choice** [15:19] [126:3] [167:
25] [168:1]
**choices** [20:5] [21:13] [190:
2]
**choose** [79:7]
**chose** [167:22] [168:7]
**chris** [78:20,21] [80:6,10]
**christy** [2:]
**chunk** [64:21]
**cincinnati** [1:2] [217:6]
**circumstance** [115:12]
**circumstances** [23:23]
[76:18] [86:6]
**cite** [86:8] [152:4] [157:9]
[200:1]
**cited** [92:7] [141:14] [199:22]
**city** [36:17] [42:8] [88:22]
**civil** [1:]
**claim** [69:25]
**claiming** [6:9]
**claims** [6:8] [48:9,19] [55:10]
[76:13] [84:1] [89:6] [131:6]
**clarification** [171:17]
**clarify** [7:9]
**class** [37:15] [123:22] [127:18]
[142:18]
**classes** [161:7]
**classified** [152:20]
**classify** [89:3]
**clause** [135:9] [169:8] [211:
2]
**clauses** [169:13]
**clear** [196:25]
**client** [19:4,7] [23:20] [24:23]
[26:23] [65:18] [66:2,7]
[67:3,7,9,10,16] [68:13,24]
[69:2,3,12] [71:8,18,21,23]
[75:17,24] [76:15] [77:16]
[132:3,20] [133:12] [207:4,6
,7]
**clients** [14:11,16,18,20]
[23:7,15,21] [67:22] [68:1]
[69:8] [71:16] [76:25] [81:8]
[83:7] [93:13] [105:6] [130:20]
[132:19] [133:19,23,25]
[144:1] [175:7]
**climara** [212:17]
**clinical** [18:22] [19:11] [21:15]

[25:20] [73:8] [80:18,23]
[81:4,5,6] [108:2,6,13,16,20
,25] [109:1] [111:10] [116:15]
[117:4,9] [119:25] [120:13,24]
[121:12] [122:5] [123:15]
[161:15] [192:8] [214:11]
**clinically** [111:2] [120:7,21,24]
[161:19] [162:10]
**close** [133:10] [176:12]
**closed** [94:4] [96:2,20,24]
[97:7,17] [100:16] [101:13]
[102:6,14] [104:18,23,25]
[137:14,15,17,21] [152:2,3,21]
[153:17,19] [201:6] [214:14
,15] [220:16]
**closer** [176:11]
**co** [8:19] [59:20] [60:2,4,5,19]
[61:6,7,20] [62:9,12] [63:2,4
,6,7,22] [64:7,8] [72:6,12]
[94:17] [95:1,3,5,12,21]
[98:12] [99:8] [100:3,7,10,13]
[102:12,13,14] [152:23]
[153:16] [189:16] [195:4,11]
[197:7,9,24] [198:2] [199:3,7]
[202:24]
**cogeneral** [8:19]
**co-general** [8:19]
**collaborative** [75:23]
**college** [37:15]
**colorado** [13:25]
**combo** [29:17]
**coming** [64:25] [180:12]
[196:18]
**commanded** [47:9]
**comment** [43:21] [70:4,8]
[154:18] [218:5]
**commercial** [167:19]
**commission** [222:17]
[:]
**commit** [115:5]
**committee** [4:] [16:18,20,22]
[17:6] [21:7,9,11,12,21]
[39:1,20] [80:24] [81:2]
[110:10,12] [117:5] [118:22]
[119:6] [120:5] [121:9,12]
[124:13] [191:25] [192:14,17
,24] [213:6]
**committees** [40:12] [119:7
,21,24] [155:21]
**common** [25:13] [70:25]
[76:3] [77:20] [79:11] [126:22]
[129:11]
**commonly** [65:17,25] [115:
8,9]
**communicate** [168:3]
[196:17]
**communicated** [168:4]
**communication** [172:23]
[186:2]
**communications** [43:4]
[44:1]

**7/18/2002  Bystrom, Dale (final)**

**community** [164:17]
**companies** [39:22] [47:4,8] [85:18] [155:15]
**company** [11:14,17] [29:18] [40:11] [47:12] [56:1,3] [78:22,24] [158:15] [:]
**comparable** [159:21]
**comparative** [108:2] [192:22]
**compare** [184:23]
**comparison** [108:13] [109: 3,5] [192:20]
**compensated** [46:15] [70:20]
**compensation** [72:16]
**compete** [68:23] [71:7] [79:6] [137:2] [207:23]
**competent** [21:3] [43:19]
**competes** [130:19]
**competing** [82:17] [136:13] [184:21,22]
**competition** [69:7] [136:19] [147:16] [156:5,9]
**competitive** [3:15] [68:21] [81:16] [129:9] [147:1] [185:16] [204:24] [206:5]
**competitor** [146:19] [154:6] [186:8] [208:3,4,7,8]
**competitors** [81:11] [147:6 ,11] [154:25] [207:25]
**complaint** [9:4,8] [99:12,14] [104:10]
**complete** [213:1]
**completed** [220:11]
**complex** [60:21]
**compliance** [19:12] [73:13,19] [74:4,8,12] [144:6]
**comply** [125:5]
**component** [39:11] [108:1] [130:24] [164:15]
**components** [76:1]
**comprehensive** [123:19]
**comprised** [21:9] [24:14]
**comprises** [194:9]
**compute** [58:13] [60:23]
**computed** [152:17]
**computerized** [34:25]
**computerizing** [35:3]
**concepts** [8:21] [9:2,6] [21:25] [22:4,10,12,16,23] [23:16] [25:2,6,14] [26:6,12 ,25] [30:24] [31:6] [40:16] [83:16,19,21]
**concerned** [128:16] [171:19]
**concerning** [6:2] [40:3] [118:25] [126:23] [141:12] [143:12] [180:13]
**concerns** [12:21] [54:18]
**conclusion** [79:8] [155:5]
**conclusions** [105:3] [108:10] [180:13] [218:7]
**concurrently** [48:25] [49:4]

**conditions** [48:22] [122:20]
**conduct** [99:12] [156:14]
**conducted** [38:23] [121:3]
**confidential** [1:11] [191:18,21]
**conflict** [48:25] [67:21]
**confuse** [75:14]
**confused** [94:14]
**confusing** [25:18] [131:3] [219:13]
**conjugated** [82:14] [125:23] [128:10,19] [175:12] [176:5 ,9] [178:15,25] [180:14] [182:25] [186:21] [191:3,6] [193:2,12] [194:13] [204:1]
**conjunction** [144:16]
**connected** [13:5] [30:19] [89:19] [197:12]
**connection** [6:1] [25:13,16] [28:11] [29:5] [30:14,22] [31:23] [33:15] [40:2,21] [43:1] [46:9] [47:6,10] [52:8] [53:15] [54:17] [69:7] [74:24] [105:18] [123:24] [124:25] [125:6] [137:12] [198:5] [220:1]
**consent** [12:25]
**consequently** [64:19]
**consider** [10:10] [19:23] [31:3] [41:10] [43:19] [91:2] [95:7] [99:6] [101:3] [102:20 ,23,25] [103:7,9,19] [104:2,13 ,17] [105:2] [108:12] [149:8] [157:13,20] [179:22] [204:10]
**consideration** [123:18] [222:]
**considerations** [110:4] [123:15]
**considered** [21:3] [22:19] [90:25] [91:8,9] [94:24] [97:20,22,24] [105:22] [110:1] [156:22] [197:18,22] [198:8,10]
**consistent** [45:20,23] [46:2] [51:13,18,20] [64:14] [79:9,12] [116:22] [200:16]
**consists** [74:10]
**consolidation** [31:20] [84:25]
**consolidations** [187:8]
**constant** [124:17] [189:5]
**consult** [40:3,10,20]
**consulted** [47:4]
**consulting** [40:24] [41:1] [47:1,6]
**consumer** [59:19] [62:20] [63:5] [64:1] [86:23] [117:24] [127:10]
**consumers** [48:11] [98:25] [172:16] [189:16]
**consuming** [112:8]
**contact** [23:1,2] [140:3]

[218:25]
**contacted** [218:21]
**contacting** [144:21] [145:18]
**contacts** [42:10]
**contain** [94:16]
**contained** [218:3]
**containment** [105:7,8]
**contains** [192:7]
**contd** [4:1]
**contentions** [70:2]
**context** [5:19] [7:15] [37:3] [43:13] [62:24] [63:1] [88:8]
**continue** [31:5] [81:15,20] [82:1,11] [200:23]
**continued** [64:18] [195:15]
**continuing** [213:2]
**contraceptive** [150:4]
**contraceptives** [149:22,24] [150:2]
**contract** [12:3] [56:10] [61:16] [69:15,16] [74:13] [76:10,12] [82:14] [85:5] [90:13] [114:21,25] [118:2] [169:2,5,23] [181:11] [182:23] [183:15,21] [190:23] [191:1] [200:13] [203:12] [204:21] [205:18] [208:23] [209:23,25] [210:4,24] [211:3,14]
**contracted** [27:11] [77:17]
**contracting** [3:22] [17:5,10] [18:11] [20:23] [21:1] [22:24] [24:25] [25:24] [26:10] [99:15] [126:18] [173:14] [179:13,16] [180:1] [207:15] [211:9,11] [214:8,24]
**contracts** [11:25] [25:5,22] [26:1,23,24] [27:10] [42:9] [47:25] [48:5] [68:11] [74:6,20] [77:20] [92:15] [128:17] [129:5] [131:24] [144:5] [146:20,23] [148:25] [156:19] [167:17] [169:9,14] [170:2,4 ,5] [173:15] [175:2,7,11,13,16] [180:8] [183:5]
**contractual** [147:20] [194:21]
**contrast** [178:4]
**contribute** [161:25]
**control** [24:21] [143:21]
**controls** [71:13] [211:9]
**conversation** [188:13] [209:6]
**conversations** [28:9] [42:25] [87:14] [160:23] [218:15,18] [219:8,14]
**convince** [164:2] [172:16]
**copay** [59:20] [60:2,4,5,19] [61:6,7,20] [62:12] [63:2,4,6 ,7,22] [64:7,8] [95:1,3,5,21] [98:12] [100:7,10] [102:12,13 ,14] [152:23] [153:16] [189:16] [195:4,11] [197:7,9,24]

[198:2] [199:3,7] [202:24]
**co-pay** [59:20] [60:2,4,5,19] [61:6,7,20] [62:12] [63:2,4,6 ,7,22] [64:7,8] [95:1,3,5,21] [98:12] [100:7,10] [102:12,13 ,14] [152:23] [153:16] [189:16] [195:4,11] [197:7,9,24] [198:2] [199:3,7] [202:24]
**copayment** [62:9] [72:6,12] [95:21] [100:3,13]
**co-payment** [62:9] [72:6,12] [95:21] [100:3,13]
**copayments** [94:17]
**co-payments** [94:17]
**copays** [95:12] [99:8]
**co-pays** [95:12] [99:8]
**copy** [1:] [10:14] [78:7] [123:3] [158:2] [193:24] [210:16]
**core** [176:15]
**corporate** [30:8] [32:10]
**corporately** [196:18]
**corporation** [13:23]
**correct** [6:18] [10:18,19] [11:9,10] [12:5,6] [13:11] [14:3,7] [15:13] [17:13,16] [18:6,9] [21:25] [22:1] [26:15,17] [27:6] [30:4] [33:21,22] [34:10,11] [35:7,10] [37:18] [41:14,19] [43:11,25] [44:15] [46:17,21] [49:20,21] [50:12,17,21,22] [56:19,21] [57:18] [58:5,8] [59:2] [62:1,22] [63:24] [65:3,8,16 ,20] [67:19,24] [68:9,10,25] [70:7,17,19,22] [71:2,24] [72:14] [75:1,12] [76:8] [79:20] [80:8] [81:2,23,24] [84:14] [86:25] [90:6,9] [95:15,16] [96:4,21,23] [97:1] [98:18,21,22,25] [102:24] [103:11] [105:4] [106:8] [107:24] [108:4] [110:21] [111:4] [112:14] [113:4] [119:2,19] [120:8] [125:7,14,18] [126:10] [127:8,11] [128:21] [129:16] [132:12,16,21,22] [133:19] [135:7,10] [138:18,21] [139:18,25] [141:1] [142:3] [144:17] [145:21] [148:3] [152:25] [153:22] [156:16] [158:18] [162:3,24] [163:8,10 ,11] [166:17,24] [171:5] [172:6] [174:25] [175:19,24] [178:17] [180:5] [181:12,15] [182:6,9,12,21] [186:22] [187:5,8,9,16,20,24] [189:8] [190:13] [191:11] [194:23] [197:10] [200:8] [201:2] [202:7] [203:2,3,9,15,20]

7/18/2002  Bystrom, Dale (final)

[205:11] [206:14] [207:20]
[208:11] [209:11,16] [212:15]
[214:14] [216:13] [222:2]
[:]
**corrected** [159:10]
**corrections** [3:4]
**cosmetic** [75:19]
**cost** [3:] [20:4,11,14] [57:4,5
,15] [58:12,14,21,24] [61:24]
[66:2,20,22] [67:2,4] [71:14
,16] [72:3,5,6] [78:1,7]
[92:8] [105:7,8,17] [107:21]
[109:11,13] [123:16,21]
[124:19] [126:1,3,6] [127:7]
[134:2] [162:10] [176:24]
[177:16] [184:25] [188:24]
[212:11]
**costeffective** [20:4,11,14]
[66:22]
**cost-effective** [20:4,11,14]
[66:22]
**costs** [48:11] [66:25] [69:17]
[71:2,19] [105:11,13,15]
[109:13,15] [127:13]
**couldnt** [203:18]
**counsel** [1:18] [7:11] [42:25]
[43:1] [100:25] [170:11]
[217:3] [:11]
**count** [20:15] [83:18,21]
[85:7,24] [92:17,19]
**counter** [34:24] [108:17]
**counting** [83:12] [85:4,11]
[93:17]
**country** [32:3] [42:11] [93:3]
[203:22]
**county** [1:] [222:] [:]
**couple** [36:10] [44:23] [61:11]
[88:3] [90:21] [92:6] [106:20]
[124:9] [141:14] [146:14]
[151:14] [184:9] [185:11]
[217:19]
**course** [7:7] [16:15] [51:13]
[52:23] [78:5] [100:24]
[104:18] [115:23] [153:1]
[155:24] [156:6] [159:24]
[168:13]
**court** [1:1,21] [113:24]
[205:1]
**courville** [2:3] [3:24] [7:14,16
,21,23] [8:1] [9:13,17] [78:13
,18] [101:21] [106:19,21]
[114:7] [148:18] [151:15]
[155:4] [158:3] [159:7,12]
[160:6,13] [167:24] [170:17]
[171:8,17] [182:13] [189:18]
[197:14] [199:9,16] [205:6]
[206:19] [210:18,20] [216:14]
[217:12,25] [220:12]
**cover** [19:6] [85:21,25]
[86:21] [104:7] [123:12]
**coverage** [85:13] [86:3,7,10]

[111:8,11] [195:17]
**covered** [51:1] [55:10]
[75:18] [83:8,11,18] [84:3,9
,10,14] [85:2] [86:9,13]
[87:2,15,17] [88:16,25]
[89:23] [90:7,20] [91:14]
[92:10,11,19] [96:3] [97:4,5]
[99:23] [101:12,18] [102:11
,13,15] [103:5] [104:9]
[125:13] [167:2,4,6] [197:6]
[202:11]
**covering** [85:11]
**cox** [161:11,13]
**cox2** [161:13]
**cox-2** [161:13]
**create** [15:2] [45:16] [218:22]
**created** [14:15,17] [22:11]
[66:24]
**creating** [127:15]
**credentialing** [74:6]
**credit** [66:15]
**creek** [32:7,9]
**critical** [158:11,24]
**cross** [158:11,24]
**crowded** [79:6]
**csr** [:]
**cumbersome** [112:7]
[142:24]
**cumbersomeness** [112:10]
**cumulative** [153:11] [205:15]
**cumulatively** [153:13]
[182:3]
**current** [11:7] [81:16] [118:1]
[183:5]
**currently** [10:17] [215:5]
**curriculum** [10:14]
**customaries** [62:4,6]
**customary** [56:10,12,16]
[57:6,9,11] [59:5] [60:17]
[61:3,21,25] [62:2,7,12,13]
[63:2,16,18,22] [64:9,23]
[72:11,13]
**customer** [62:20] [65:3,4,5]
**customers** [65:1]
**cutting** [31:23]
**cv** [10:14] [38:14]
**cvs** [89:21,22] [158:19]
**cycle** [49:16] [56:7]

---

D

---

**d.c** [2:10] [5:10]
**daily** [192:9,10]
**dale** [1:13] [3:2,12] [5:3,8]
[10:2] [222:1,4,9] [:]
**dan** [210:23]
**dash** [167:17]
**data** [55:17,19,20,22,24,25]
[109:19,20] [121:13] [123:18]
[186:19]
**date** [5:1] [189:19] [214:17]

[216:25] [:]
**dated** [10:7] [78:8] [101:9]
[191:25]
**dave** [159:7] [197:14] [217:22]
**david** [2:8] [5:9] [52:1] [214:7]
**day** [69:17] [222:] [:13]
**days** [1:] [66:8] [131:13]
[133:22] [169:12,14]
**deal** [16:25] [67:12] [75:10]
[92:20,22] [113:22,25]
[207:10]
**dealing** [28:20] [59:3] [86:20]
[155:20] [156:6] [211:5]
[214:9]
**dealings** [27:13,15] [30:15]
[33:14] [43:23]
**deals** [173:1] [179:17]
**dealt** [14:25] [15:4] [17:1,4]
[34:14,15] [74:23] [75:2]
[99:14] [152:14] [156:4]
**decade** [91:5]
**december** [203:13]
**decided** [111:22] [116:16]
[117:10] [194:5]
**decision** [105:20] [115:1]
[119:10,16,22] [120:6,10,17
,18,25] [121:1] [124:4,25]
[125:2,6] [139:6] [185:2]
[193:3] [194:8,12]
**decisionmaker** [119:16]
**decision-maker** [119:16]
**decisions** [18:11] [50:18]
[108:21] [109:17] [110:5]
[118:23,25] [119:8,9,12,14,21
,22] [120:3] [121:13] [163:14
,15]
**decline** [147:10]
**default** [64:10]
**defaults** [57:6]
**defendant** [1:] [2:7] [5:12]
**defendants** [210:15]
**defense** [114:14] [181:20]
[214:2]
**defer** [118:19]
**define** [91:20]
**defining** [101:22]
**definite** [94:25] [97:9]
**definition** [101:23,25]
**definitions** [102:9]
**degree** [35:12,14,16,23]
[37:12] [74:4]
**degrees** [35:15] [37:6,10,11]
**delayed** [66:17]
**deleted** [172:1]
**deliver** [127:10]
**delivered** [24:21] [48:2]
[49:9]
**delivery** [27:21] [47:22]
[48:7]
**demand** [117:23,24] [118:9
,13] [134:1] [144:9] [162:15,22]

[163:3] [215:13,14,21,24]
**demanding** [133:16]
**demonstrate** [53:3] [143:1]
[183:4]
**demonstrated** [111:1]
[183:13] [192:9]
**demonstrates** [136:16]
**demonstration** [75:6]
**denied** [113:3]
**denominated** [123:13]
[124:10]
**departure** [30:17] [32:5]
**dependent** [86:1]
**dependents** [85:22]
**depending** [23:21] [50:6]
[75:25] [91:20] [95:8] [96:8,11
,18,25] [112:11] [120:13]
[162:15] [190:17] [216:7]
**depends** [61:11] [62:15]
[67:10] [99:2]
**deposed** [5:18,20,21,23]
[8:12,13]
**deposition** [1:10,13,,22]
[5:14,15] [7:8] [16:11]
[45:23] [46:2] [102:2,5]
[116:5,6] [173:16,18,24]
[174:4,14] [177:13] [191:17]
[222:] [:7,8,10]
**depositions** [44:22,23,25]
[45:14,17,18] [173:22]
[174:24]
**derivation** [192:13]
**derive** [155:1]
**derived** [130:20] [132:2]
[192:8]
**describe** [35:1] [176:19]
**description** [173:19] [222:10]
**design** [75:17,22] [76:3,5,6,7
,8,14,19] [77:4] [98:3]
**designated** [175:22] [191:18]
**designed** [75:17] [105:25]
**designs** [93:23,24] [95:13]
**despite** [192:13]
**detailed** [161:23]
**detailing** [163:10,20]
**determine** [20:4] [109:11,21]
[126:20] [137:22] [140:12]
**determined** [205:23]
**determines** [75:17,22]
[212:8]
**determining** [105:15]
[121:10] [127:17] [184:18]
**detriment** [69:6]
**develop** [14:12] [20:20]
[22:20] [23:19,23] [29:24]
[39:19,20] [76:14] [89:10]
[111:16] [156:7,10]
**developed** [15:7] [22:11]
[24:13] [29:22] [30:20]
[36:11] [58:21] [68:4] [175:4]
[214:21]

**7/18/2002  Bystrom, Dale (final)**

developing [22:22] [52:1] [56:2] [89:8] [156:4]

development [19:8] [20:3] [22:15] [36:24] [53:2,10] [89:6] [98:11] [110:17] [174:15]

device [53:11,25]

devices [52:2]

devised [76:19]

devote [163:5]

devoted [35:19] [36:7] [187:3]

didnt [30:3] [42:20] [45:16] [55:15] [70:4] [86:21] [90:19] [102:20,23] [103:7,9] [104:13 ,16] [105:2] [116:24] [119:14] [133:24] [143:17] [149:13,20] [156:7,10] [164:17] [168:14] [169:16] [172:7] [173:21] [174:23] [179:24] [183:23] [186:7] [193:8] [198:4]

diego [14:21]

differ [101:24] [106:2] [155:14]

difference [51:11] [130:25] [147:8] [177:3] [201:19,23]

differences [171:20] [179:18]

different [13:8] [47:4,7] [58:17] [71:19] [85:11,12,17 ,19] [88:17] [94:3,19] [95:13] [96:7,11,18] [123:8] [129:19] [131:4,16] [151:25] [156:18] [169:15] [173:4] [189:1] [196:20] [216:23]

differential [94:17] [95:4,5,12] [99:2,8]

differentials [95:1] [100:8,10]

differently [6:19]

differs [95:12]

difficult [66:10] [121:1] [206:2]

difficulty [54:21]

diminished [130:21]

direct [12:11,14] [26:10] [33:17] [43:23] [73:5] [80:4] [101:7] [107:8] [126:16] [136:6] [137:9] [151:21] [152:11] [163:2] [177:10,23] [186:11] [199:19] [206:25] [210:14,21]

directed [15:18] [143:25]

directing [48:7]

direction [90:13] [:]

directly [14:16] [15:22] [17:11] [25:21] [26:20] [27:24] [33:11] [84:6] [87:6] [90:14] [113:22,25] [214:20]

director [11:8] [14:8,10] [16:16] [27:3,7] [28:19] [80:16,18,23] [81:3,5] [142:11] [166:20]

directors [16:23]

directs [8:3]

directtoconsumer [163:2] [186:11]

direct-to-consumer [163: 2] [186:11]

disadvantage [147:17] [154:6] [156:9]

disadvantaged [134:18]

disadvantaging [156:5] [186:8]

disaggregate [162:4]

disagree [82:9] [109:6,18] [110:2] [117:6]

disagreeing [211:4]

disappeared [164:25]

discern [155:10]

disclosing [42:24]

discontinued [165:16]

discount [57:3] [177:8] [192:12]

discounts [136:9]

discourage [135:5]

discovered [69:4]

discrepancies [92:6,13]

discrepancy [189:19]

discuss [39:11] [72:10] [218:9,10]

discussed [88:7] [128:14] [143:14]

discussing [140:23]

discussion [81:13] [110:9,10] [113:24] [114:14] [116:10] [180:17] [188:25] [194:6] [205:1] [209:18] [210:22] [214:2]

discussions [27:22] [82:3,4 ,6] [88:12] [141:12,14] [142:2] [143:16] [168:6] [183:18]

disease [19:13] [49:8] [73:9] [81:7]

disincentives [74:2,12] [94:12]

disparity [93:11]

dispense [196:4,14,20] [198:12]

dispensed [65:14] [100:14] [143:22] [144:14] [168:22]

dispenses [74:5]

dispensing [57:4] [144:7]

dispute [6:5,7,11] [101:16] [102:18,19]

distance [171:24] [172:3,17]

distancing [178:6,20] [179: 2,6,13] [180:4] [182:20] [185:19]

distributed [12:17] [19:16] [58:17] [183:2] [184:12]

distribution [33:12] [47:18] [66:6] [173:9]

distributors [28:4]

district [1:1,]

divide [29:17]

divided [49:17]

division [1:2] [29:18]

doctor [53:12] [103:16] [139:6]

doctors [54:16]

document [10:1,3,5,9,14] [77:22] [78:9] [80:5] [87:4,5] [100:17,19,23] [101:3,6,8,9 ,23] [106:22] [107:2,9,15,16] [115:21,23] [123:1,6,12] [125:9] [126:15] [136:3,7] [148:19] [152:14] [155:7] [157:24] [158:6,7,21] [166:1 ,7,8,10,11] [170:11,20,22] [171:2,6] [173:1,6,17] [176:13,15,18] [180:7] [188:1] [191:12,13,22] [192:4] [193:5,6,15,19] [194:18,24] [195:1] [199:22] [205:13] [206:12] [210:11,14] [211:4,17] [222:10]

documents [44:13,15,16,17 ,20] [45:2] [54:5] [87:13] [100:25] [101:2] [122:7,19,23] [130:4,8] [148:10,12,17] [149:7] [151:3] [154:17] [157:10] [160:2,3] [165:14] [169:5] [170:7] [174:20] [176:18] [184:8,12] [185:7] [191:19] [216:23] [220:8,10]

doesnt [51:11] [58:6] [65:5] [68:3] [76:15] [79:18] [105:16] [111:19] [112:1] [129:24] [139:20] [147:11] [176:4,6] [179:15] [182:24] [186:20] [196:6] [213:11] [215:2,9]

doing [48:3] [49:12] [52:24] [74:19] [144:15] [168:20] [216:4,18]

dollar [67:18] [69:25] [125:24] [126:1,3,4] [131:13] [209:8]

dollars [66:9] [132:25] [183:16] [207:6] [209:15] [210:5,25]

dominant [149:23]

done [21:1] [47:11] [49:4] [51:25] [62:4] [67:5] [70:1,3] [75:7,23] [115:8,9] [137:21] [138:3] [140:11,14] [146:5] [149:14] [150:17,18] [161:3 ,5] [219:22]

dont [7:8] [16:5] [20:17] [28:7] [33:16] [34:18] [38:6,18] [45:25] [46:4,11] [50:22] [51:24] [54:11,13] [55:20] [66:12] [80:10,11] [82:4,8] [83:11,13] [84:2] [87:19] [89:3,4] [90:13] [92:19]

[93:25] [97:8,19] [100:5,16] [101:5,21] [102:8] [103:25] [104:1] [112:1] [115:9] [118:12] [122:13] [123:7,10] [126:14] [136:24] [137:25] [138:10,19] [142:1] [143:10] [149:20] [156:3,12] [158:8] [160:25] [161:8] [162:13] [166:5,6] [167:11] [168:1,25] [169:22] [171:19] [173:10,19] [174:22] [178:25] [180:15] [182:17] [184:10,15,16] [185:12] [191:8] [196:8,22,23] [203:7,17] [206:7,16] [209:5] [211:3] [213:19,22] [214:17] [215:5] [216:22] [219:23] [220:3]

dosage [48:25] [121:15,22,24]

dose [121:5,6] [186:20] [192:23]

dots [204:20] [205:9]

double [85:4,10] [93:17]

doubtful [220:11]

doug [214:9,11]

down [48:11] [49:15] [59:15] [66:1] [71:23] [75:15] [76:21] [80:12] [83:9] [89:15] [90:1] [110:4] [127:14] [132:18,20] [133:1,17] [151:23] [192:19] [197:1] [201:14] [208:13] [213:14]

dozen [170:5]

dr [52:1,12,22] [53:1] [54:4,10] [55:25] [80:19] [217:25] [218:1,10,15,19] [219:6]

draft [42:15] [170:20] [171:3 ,19,20] [174:12] [176:7]

drill [16:5]

drink [8:6]

drive [64:18] [66:24,25] [95:9] [119:8,21] [163:3]

driven [31:19] [68:16] [105:10]

driving [105:24]

drug [3:17,] [6:3,13,15,20] [8:14,17,19,22,24] [11:8] [13:6,9,12,16,21,22] [14:4,9 ,25] [17:16,17,18] [19:13] [20:5,8,15,20] [22:5,12,16,20] [24:8,14,18] [27:10,18,23] [28:10,12,14] [29:1,5,6,12,13 ,14,16,19,20,22,24] [30:15,18 ,20,22] [31:7,9,12] [32:7,13,16 ,18,19,20,24] [33:20] [39:22] [40:11] [48:20,23,24] [49:3,5] [51:9] [54:19] [55:21] [57:22] [58:18] [65:10] [69:22] [71:13] [74:21,24] [75:11,16] [76:1,2,8,24] [77:16,25] [78:7] [81:8] [86:12,13,16,21 ,23] [89:19] [92:8] [94:3,12] [95:14,15] [96:25] [99:24]

**7/18/2002  Bystrom, Dale (final)**

[103:15] [105:15,17,24]
[107:9,10,17,19,20] [109:3,12]
[111:1,7,8,18] [112:14,18]
[113:2,15] [118:6] [123:3,8]
[124:16] [126:21] [127:15]
[131:21] [132:4,23] [134:9,10]
[139:1,2,3,7,8,9,10] [140:8]
[143:1,2,22,23,24,25]
[144:9,12,13] [145:2] [146:2
,7] [152:21,22] [158:15]
[160:23] [161:7,16] [162:7]
[163:16] [166:16] [167:6,23]
[184:25] [188:23] [194:7]
[197:3] [212:23] [213:16]
[215:2,3,10,15]
**drug/supermarket** [29:16]
**drugs** [21:14,16] [27:4,24]
[40:16] [48:21] [49:12]
[50:24] [51:2,4,23] [53:20,23
,24,25] [54:16,25] [55:3]
[57:15] [59:6] [64:13] [65:14]
[67:2,7] [68:14,16,17,18]
[71:14] [75:18,20,21] [79:6]
[94:9,10,25] [98:25] [103:17]
[105:12] [108:2] [109:5]
[110:6,13] [123:17] [126:2]
[127:6,17,22,25] [129:15]
[135:18] [142:17] [167:1,3]
[184:19] [198:13] [212:6,7,17]
**dtc** [186:9]
**dublin** [15:15]
**due** [6:14] [54:24] [66:19]
[71:12] [194:8]
**duly** [1:] [5:4] [:]
**duplicate** [20:6]
**duplicative** [86:3]
**dur010670** [3:19]
**dur01067010682** [3:19]
**dur010670-10682** [3:19]
**dur010733** [3:]
**dur010733746** [3:]
**dur010733-746** [3:]
**dur010960** [3:]
**dur010960966** [3:]
**dur010960-966** [3:]
**duramed** [1:] [7:14,17]
[43:1,5,9,12] [44:18] [45:12]
[100:20] [101:17] [111:16,22
,24] [115:24] [116:4,9]
[135:12] [152:17] [174:8]
[182:11] [189:11] [195:15]
[209:22] [214:7] [216:8]
[217:2,20] [218:21]
**durameds** [103:5] [111:15]
**during** [5:24] [7:7] [9:5,10]
[10:22] [11:2] [13:13,18]
[17:20] [24:25] [30:5,11]
[52:23] [157:4]
**duroche** [4:4]
**duties** [14:8] [16:15] [17:23,25]
[22:8] [27:7] [28:19] [29:13]

[30:14] [32:8] [33:3,4,15,23]
[34:21] [78:5] [81:3]

---

E

**earlier** [42:4] [72:10] [80:17]
[83:16] [157:7] [174:6]
[200:7]
**early** [34:19] [35:4] [133:22]
[169:7] [190:15] [217:7]
**easier** [103:18]
**eastern** [29:18,19,20]
**eckerd** [92:9,11,14] [93:2]
[158:15]
**economic** [110:4]
**economics** [37:14,15]
**economies** [31:14]
**edge** [31:23]
**edit** [139:5,17] [141:19,21]
**edition** [123:9,10]
**edits** [48:21] [49:2] [95:22]
[138:22,23] [139:16,24]
[140:7] [141:3,16] [146:25]
**educated** [163:1]
**educating** [134:22]
**education** [179:17]
**educational** [37:21] [173:2]
**effect** [26:4] [95:13] [96:6]
[99:15] [109:24] [154:9]
[163:22] [164:24] [177:18]
[184:20] [199:15]
**effective** [107:22] [111:5]
[123:19,22] [126:3,6] [127:7
,12] [161:19] [162:10] [163:20]
**effectiveness** [124:20]
**efficacy** [110:6] [124:19]
[140:7] [161:15] [186:19]
**efficient** [47:22] [48:6]
[112:17]
**efforts** [186:8]
**eggert** [2:8] [3:3] [5:6,9]
[7:19,22,24,25] [9:15,25]
[16:4,14] [73:5] [78:15,24]
[92:5] [102:1] [106:15,17,20
,22,25] [114:4,15,16] [129:1]
[148:21] [151:13,21] [159:11
,13] [160:11,17] [165:23,25]
[166:3] [168:4] [170:16,24,25]
[171:10,16,18] [178:3]
[180:25] [181:2,9] [182:15]
[189:21] [193:23] [194:3]
[197:16,17] [199:13,18,19]
[205:3,8] [206:16,25] [210:19]
[214:3,6] [216:17] [217:10,18]
[218:2] [220:6]
**eight** [103:2]
**either** [59:3] [62:2] [63:4,19]
[64:8] [71:12] [86:18] [95:20]
[110:2] [111:10] [112:2]
[118:16] [129:12] [169:11]
[202:19] [:]

**elaborate** [59:16]
**elaboration** [182:22]
**electronic** [52:1] [53:2,9,11]
[55:4] [115:24]
**eleven** [103:2]
**eligibility** [19:2] [86:4] [131:
7]
**eligible** [86:15] [100:3]
**else** [27:11] [47:15] [75:13]
[127:24] [141:23] [155:11,17]
[196:11]
**email** [3:10] [4:4] [214:6]
**e-mail** [3:10] [4:4] [214:6]
**emails** [3:19] [4:9]
**e-mails** [3:19] [4:9]
**emanated** [147:21]
**emerge** [98:3]
**emergence** [98:23]
**empirical** [164:9,10]
**employ** [:]
**employee** [5:22,24] [174:5]
[202:3,25] [:]
**employees** [174:8] [201:18
,20,21,22]
**employer** [5:25] [18:20]
[23:1] [28:24] [48:1]
**enable** [24:20] [110:25]
**enabled** [64:1]
**encl** [3:]
**encourage** [15:4,8] [95:14]
[111:17] [163:6,25] [216:1]
**end** [7:2] [10:6] [29:23]
[79:1] [107:19] [147:13]
[169:6,16] [202:8]
**ends** [67:4,7]
**enforce** [175:9]
**enforced** [175:15]
**engage** [21:15] [108:9,13]
[129:24] [150:15] [173:2]
[185:9]
**engaged** [36:20] [156:1]
**enhance** [207:24]
**enhanced** [207:19]
**enough** [116:18] [117:11]
[120:20] [192:15]
**enrolled** [54:20]
**enrollment** [88:5]
**ensure** [20:14] [49:7]
**enter** [20:19] [47:25] [48:5]
[69:15]
**entered** [25:5] [121:19]
[143:5] [146:20] [148:24]
**entering** [69:16] [115:4]
[117:3] [151:7]
**enterprise** [12:22] [15:11]
**entire** [9:9] [28:25] [33:4]
[167:15] [176:7] [199:10]
**entirely** [35:20] [44:12]
[50:22] [92:23]
**entirety** [17:20] [191:16]
**entities** [14:20] [26:22]

[56:21] [57:20] [58:17] [135:
12] [141:11] [169:9] [172:18]
**entitled** [101:8] [106:25]
[170:12]
**entity** [13:10] [18:16] [26:10]
[57:13] [62:11,19] [69:15]
[93:8] [134:14] [143:5]
**entry** [210:1]
**environment** [37:4] [53:14]
**equal** [127:24]
**equivalent** [123:17] [172:4,20]
[179:4,5] [185:24] [186:17,18]
**equivalents** [142:19] [213:24]
**ert** [82:2] [175:23]
**essence** [26:11] [208:19]
**essentially** [177:1] [187:3,23]
[207:9]
**established** [11:25] [26:13]
[134:16]
**estimate** [101:17]
**estimates** [84:16] [87:2]
**estimation** [128:22]
**estrace** [125:16,20]
**estraderm** [126:6] [212:15]
[213:18]
**estradiol** [81:17] [125:15,20]
[213:18]
**estring** [126:7]
**estrogen** [82:15] [124:6]
[125:17] [128:10,19] [165:12]
[175:13] [176:5,9] [179:3]
[180:14] [182:25] [185:24]
[191:3,6,7] [193:2,12]
[194:13] [204:1] [212:13]
**estrogenic** [192:7]
**estrogens** [125:10,12,23]
[126:7] [178:15] [179:1]
[180:3] [186:21]
**et** [178:14] [192:10]
**evaluate** [110:13] [117:4]
**evaluated** [123:20]
**evaluates** [123:16]
**evaluation** [124:17]
**even** [61:24] [66:17] [67:18]
[69:13] [88:19] [91:6] [95:24]
[96:14] [139:14,22] [140:25]
[142:14] [143:11] [144:24]
[147:2] [152:10,19,24]
[183:17] [193:14] [194:12]
[197:25] [198:20] [211:11,14]
[216:21]
**event** [171:2]
**events** [31:19,20]
**eventually** [66:17,19]
**ever** [36:19] [38:10,13,23]
[40:2] [47:9,11] [51:21]
[55:4] [78:9] [82:2] [108:5]
[118:8] [123:6] [132:18]
[138:1,20] [143:5,11] [146:9]
[149:12] [158:6] [171:10]
[188:10] [202:15] [203:4]
**everybody** [134:3]

**7/18/2002  Bystrom, Dale (final)**

everything [127:24]
evidence [120:13,23] [151:24] [182:14] [184:10]
evidences [182:13]
evident [149:10]
evidently [125:22] [126:9]
evolution [87:11]
exact [46:12] [133:13] [167:18] [200:1,2]
exactly [73:10] [75:4] [102:8] [173:19] [204:8]
examination [3:3] [5:5]
examine [153:2] [198:20]
examined [108:5]
example [23:25] [24:7,17] [47:3] [53:5] [63:5] [73:13,21] [85:4] [86:7,20,21] [93:19] [105:9] [106:4] [130:14] [144:11] [149:22] [155:3] [165:4] [168:9] [208:2]
examples [24:10]
exceeds [85:3] [134:15]
excellent [113:17]
except [222:2]
exception [198:24]
exceptions [152:22]
excess [135:22,25]
exchange [82:15]
exclude [203:11]
excluded [100:7]
excluding [137:1]
exclusion [96:17] [197:3]
exclusionary [186:1] [200:13]
exclusive [115:14] [128:10,18] [129:8,13] [137:1,4] [156:1] [176:4,5,9] [178:15,25] [180:14] [182:25] [193:2,7] [194:13] [204:1] [207:3] [211:2]
exclusively [36:7]
exclusivity [40:5] [129:2,20]
executed [222:11]
executive [36:20]
exemplary [89:14]
exhibit [3:13,,,,20,,] [4:1,2,,5 ,7,] [9:12,24] [10:1] [77:23,24] [80:3,5] [88:14,24] [100:18] [106:23] [115:20,22] [116:9] [123:2,5] [136:4,5] [152:12] [158:1] [166:1,2] [170:13,15] [191:13,15] [193:20] [210:15] [211:21] [214:4,5]
exhibits [183:17]
exist [65:23] [67:23] [164:16] [171:20]
existence [35:2]
existing [15:3] [109:5]
exists [113:10] [147:24]
expanded [159:14,16] [184:1]
expect [148:22]

expense [68:13] [69:3]
expensive [31:13] [106:6] [142:17,19] [192:23]
experience [41:15,18,23] [44:14] [50:23] [51:6] [65:11] [79:9] [112:4,6] [115:18] [116:20,23] [117:14,17] [133:5] [152:18] [155:19] [207:21]
expert [3:12] [5:17] [7:16] [10:2] [40:18] [41:7] [47:2] [52:12] [199:11] [207:2] [219:2]
expertise [41:11] [118:18] [156:8,10] [218:24]
experts [195:14] [217:20]
expiration [:]
expired [169:5] [203:12]
expires [222:17] [:]
explain [8:13] [94:6] [134:6] [177:14]
explained [68:15] [102:5] [177:13]
explaining [173:17]
explanation [92:12] [93:10] [146:14]
explored [191:9]
express [73:15] [74:16] [90:18] [91:4] [93:14,18,22,24] [130:14] [154:15] [156:13] [159:13,16] [183:18]
expressed [46:3] [137:7] [153:25] [216:24] [222:12]
expresses [153:10]
expression [136:18]
extended [66:1]
extensive [195:16]
extent [65:5,21] [67:15,20] [69:1] [71:7,11] [75:20] [83:7] [112:10] [140:12,16] [141:5] [145:4] [153:2] [164:8] [173:11] [199:10] [204:18]
extra [112:3]
eyes [190:1]

F

faced [63:6]
facilitate [31:4]
facility [33:12]
fact [30:25] [56:23] [66:14] [72:11] [79:13] [85:15] [91:14] [100:6] [102:25] [103:20] [109:22] [117:7] [127:3] [129:17] [133:25] [136:3] [139:9] [147:21] [153:23] [154:16] [156:22] [159:24] [160:24] [162:7] [170:18] [172:25] [176:25] [183:21] [185:4] [195:2,13]

[199:7] [204:4,21] [206:3] [209:7] [218:20]
factor [160:20] [177:17] [179:24]
factored [84:20]
factors [54:15] [109:12] [129:22] [161:25]
facts [104:10] [182:14] [:]
failed [125:5] [143:1]
failing [1:]
failure [162:2]
fair [31:22] [51:25] [154:10,11] [185:5]
fairly [57:10] [136:11] [158:14] [159:20] [213:1]
fall [128:14] [134:23] [212:6]
familiar [43:16,18] [45:6] [63:25] [76:20] [77:9,25] [80:6] [88:20] [89:15] [90:2] [97:15] [100:20] [107:2,5] [113:16] [114:17,19] [115:18] [116:1] [121:7] [129:1,4] [158:25] [159:1,3,18,19] [166:3] [188:16,17] [202:19]
families [149:7]
family [80:13] [81:9,15] [85:16,23] [86:1,2]
familys [85:20]
far [40:7] [89:23] [113:10] [114:2] [128:11] [150:21] [183:19]
fashion [75:4,24] [77:15] [147:18] [151:8]
favor [127:25] [144:21] [219:5]
favorable [80:2] [127:22]
favored [135:8]
faxes [135:20]
fda [121:3,16] [122:4] [123:18]
features [77:4]
february [188:1] [203:14]
federal [1:]
fee [57:4] [60:25] [61:1] [71:4] [131:10,14,17,18,23] [132:8,17]
feedback [40:17] [116:17]
feel [7:9] [59:15] [149:2] [155:13]
feeling [31:11]
fees [70:21] [71:1] [130:21,23] [131:1,5,6,7,18] [132:2,3,5,24] [133:3,9]
fell [26:25]
felt [6:14,15] [55:1] [116:18] [117:10] [120:19,23] [174:19] [207:3] [210:25]
femhrt [81:12]
few [23:14] [178:4] [198:24] [206:17]
fewer [157:7]

field [104:25]
fifteen [64:17]
fifty [13:20] [46:13]
fiftyfifty [13:20]
fifty-fifty [13:20]
figure [60:11] [67:18] [90:6] [102:18]
figures [152:8]
filing [1:]
fill [34:23] [61:13] [73:20] [74:2,7,13] [129:19]
filled [73:22] [139:18,21]
filling [73:22]
fillrate [74:2,7]
fill-rate [74:2,7]
final [113:12] [170:21] [171:4 ,21]
financial [19:7] [74:1,11] [146:22] [183:4]
financially [94:13]
financials [19:9] [105:23]
find [9:14,16] [54:15] [134:3] [180:7]
finished [194:17] [216:6]
finneran [45:4,5,6] [173:22] [174:2]
finnerans [46:2] [102:2,5]
fire [16:4]
firm [46:20] [52:16]
first [5:4] [30:12] [42:15] [51:16] [52:19] [78:15] [82:24] [97:13] [110:12] [120:5] [123:11] [130:25] [166:8] [171:24] [172:15] [194:3] [215:25] [218:21] [:]
fit [115:11]
fits [178:5]
five [35:25] [36:1] [72:21] [91:15] [103:2] [178:1]
fiveyear [35:25]
five-year [35:25]
flags [145:1]
flat [69:25] [189:4]
flip [97:2]
flipping [178:24]
florida [93:1,2]
flow [72:16] [105:21]
focus [148:1]
focused [36:25] [104:21] [146:18] [147:15] [218:13,14] [219:3]
focuses [194:22]
focusing [194:14]
folded [22:6]
folks [173:20]
followed [206:2]
following [107:12] [167:1,3]
follows [5:4]
foot [149:17]
foothold [189:6]

**7/18/2002  Bystrom, Dale (final)**

force [34:10]
foregoing [222:1,] [:7]
form [121:20] [186:12]
formal [113:1]
formalized [23:5] [37:23]
formally [198:14]
formed [18:16]
forms [121:22,24] [123:8]
formularies [19:8] [20:3,14
  ,20] [26:12] [27:1] [51:3,15,24]
  [66:24] [82:21] [83:5] [93:23]
  [94:3,16] [97:6,7] [98:4,5,10
  ,24] [99:17] [101:19,22]
  [103:21] [127:5] [128:13]
  [130:11] [137:14,16,17,19]
  [143:25] [152:2] [156:15,20
  ,23,25] [157:1] [158:10]
  [160:1] [168:11] [178:16]
  [182:3] [183:7,9] [198:20]
  [212:5]
formulary [3:17,] [4:] [21:13
  ,14] [25:22,23] [26:8] [50:18]
  [54:2,19] [55:3] [59:24]
  [65:15] [66:21,22] [67:1]
  [68:4,16] [73:9,10,12,13]
  [74:4,8,9,12] [75:21] [77:3]
  [80:2] [82:15] [83:12,14,17,19
  ,22,23,25] [84:4,13] [89:6]
  [90:11] [94:4,5,7,9,15,19,20
  ,23,24] [95:1,5,6,18,19]
  [96:1,2,7,8,10,11,14,15,18,19
  ,20,23,24] [97:18,22,24]
  [98:3,16,19,20] [99:2,19,20
  ,21,22] [100:2,7] [101:8]
  [103:16,18,23] [105:6,9,10,16
  ,25] [106:1,5] [107:1,9,11,18
  ,19] [108:21] [109:17] [110:1
  ,13,24] [111:15,16] [112:16]
  [113:13] [114:17,22] [116:17
  ,21] [117:9] [118:11,14]
  [119:1,7,8,13,21] [120:2,11
  ,25] [121:10,25] [123:3,9,20
  ,24] [124:5,16,18] [125:13,21]
  [126:8,21,23] [127:15,17,22]
  [128:10,19] [129:13,21]
  [134:11,19] [137:18] [139:12
  ,13,15,22] [144:6] [148:6,25]
  [149:9] [151:25] [152:16]
  [153:6,10] [157:3,11] [159:14
  ,16] [160:9,15,18,25] [161:4
  ,6,8,14,20,21] [162:8,11,13,17]
  [163:14,15,19] [164:1,5,24]
  [165:5,15,17,20] [169:7]
  [175:21,22] [181:25] [182:1
  ,10,16] [183:17,20,24]
  [184:1,19] [185:3,16] [188:21]
  [189:7,9,15,25] [190:4,7,9,10
  ,12,15,20] [191:2,3,5] [192:25]
  [193:4,9,13,16] [194:2,21]
  [195:3,5] [197:3,10] [198:9,11
  ,16] [199:1] [200:15,17]

[203:12,14] [204:2,6] [207:4
  ,19,24] [208:5,6] [210:8]
  [211:23,24] [212:3,4] [213:25]
  [214:14,15,19,20,21] [215:1
  ,4,6,8,9,16,25] [216:1]
formularyonly [83:12,14]
  [84:13]
formulary-only [83:12,14]
  [84:13]
formularys [105:7]
formulating [155:15]
forth [72:8] [87:15] [110:15]
  [112:22] [113:18] [124:21]
  [155:1] [185:6] [:7]
forwarded [1:]
found [86:4] [111:21] [131:3]
  [155:25] [159:8] [199:25]
  [212:25]
foundation [26:9] [83:21]
four [85:22] [90:25] [91:8,13]
  [103:1] [116:8] [150:22]
  [204:19] [205:9]
fourths [152:1]
frame [9:10] [52:7]
fraudulent [20:7]
free [7:9] [59:15]
freestanding [31:6]
freeway [:21]
frequent [65:12]
frequently [67:25] [150:21]
  [215:23]
fresno [14:22]
front [152:15]
fulfill [124:24]
full [82:24] [89:11] [123:13]
  [173:8] [:]
fullservice [89:11]
full-service [89:11]
function [48:13] [83:24]
  [124:11]
functions [19:11] [32:10]
  [73:17] [76:10,11]
further [49:15] [76:21]
  [83:9,20] [89:15] [90:1]
  [110:4] [126:14] [192:18]
  [208:13] [213:6] [220:3,9]
  [:9]
future [69:14]
fyi [170:23]

_____

G

_____

gain [161:20] [189:6]
gaining [146:19]
gains [81:21] [82:2,12]
gallo [24:1,2,8]
gather [176:15]
gathered [87:16]
gave [54:12] [168:2] [184:8]
  [207:10] [210:6]
general [17:8,13,23] [18:3]

[20:21] [21:23] [32:6,12]
  [37:1] [77:18] [90:25] [97:12]
  [107:24] [108:23] [133:5]
  [144:4] [152:20]
generally [17:25] [32:4]
  [49:21] [56:21] [57:23]
  [58:7,25] [69:21] [120:2]
  [127:18] [131:9,12] [132:18]
  [144:5] [169:12] [188:20]
  [207:21]
generate [117:23] [118:9]
  [215:24]
generators [162:22]
generic [57:14] [58:15,16,18
  ,22] [73:20,23] [74:2,7,13]
  [81:17] [144:23] [145:10]
  [172:12] [179:5] [213:16,24]
generically [73:22]
generics [75:21] [145:13]
  [213:18,19,21]
generous [69:18]
gentleman [21:2]
gets [67:8] [147:14]
getting [50:3] [54:21] [65:6]
  [99:16] [128:12] [164:12,23]
  [183:6,8] [187:10] [199:2,6]
  [208:20] [209:13]
gibson [52:1,12,22] [53:1]
  [54:4,10] [55:25] [217:22]
  [218:9,10,15,19] [219:6]
gibsons [52:16]
give [12:9] [24:19] [53:7]
  [77:1] [121:10] [127:22,23]
  [129:12] [134:17] [163:25]
  [164:1] [167:18] [168:19]
  [181:3] [196:15]
given [101:24] [102:16]
  [107:23] [130:5] [143:23]
  [200:14] [222:13] [:]
gives [134:14]
giving [64:21]
go [9:14,15,17] [15:8,19]
  [16:6] [35:18] [86:13] [88:15]
  [104:14] [114:3,7] [116:14]
  [142:24] [149:10] [151:4]
  [153:12] [170:7,16] [175:15]
  [185:2,5] [200:5] [206:17]
  [210:3] [213:1] [217:12]
goal [112:22] [127:9,13]
  [189:5]
goals [110:11]
godfrey [1:] [2:13]
goes [26:7] [60:7,11] [61:8]
  [65:25] [133:11] [134:2]
going [18:13] [51:2] [59:13]
  [61:12] [72:22,23] [78:25]
  [85:24] [91:20] [103:16]
  [106:15] [120:9] [157:4]
  [183:23] [189:20,25] [198:15]
  [199:9] [200:11] [215:10,20
  ,21]

good [28:22] [48:11] [120:24]
  [136:19] [161:8]
government [85:5] [86:8,19
  ,20] [134:16,17,18] [135:9]
  [136:8] [185:18]
governmental [18:20]
  [134:8]
gradient [94:22]
graduated [35:8] [36:11]
graduation [36:2]
grail [160:19] [198:10]
granted [81:15]
great [95:5]
greater [32:2] [91:13] [103:22]
  [127:23] [129:12] [133:15]
  [207:10,16,24] [208:10]
grew [93:1]
grid [130:12] [159:15]
grids [129:18]
gross [132:25] [210:5]
group [18:20] [48:2] [50:7]
  [51:2] [103:1]
groups [22:25] [23:1] [28:24]
  [48:1] [52:4] [53:17] [76:23]
  [77:1]
growth [77:18]
guarantee [69:18,24] [162:18]
guaranteed [69:21]
guarantees [69:14,20]
guess [7:14] [36:20] [57:19]
  [84:17] [90:17] [93:3] [95:14]
  [100:5] [106:17] [177:22]
  [186:23] [190:20] [193:24]
  [203:21] [204:13] [208:13]
guidelines [125:2,5]

_____

H

_____

habits [19:22]
hadnt [120:20,21] [194:2]
half [9:7] [13:17] [90:2]
  [93:14] [158:16]
hand [53:10] [222:13] [:]
handheld [53:10]
hand-held [53:10]
handled [33:8]
handling [60:25] [61:1]
hands [37:20] [41:15]
handson [37:20] [41:15]
hands-on [37:20] [41:15]
happen [69:19] [149:18,20]
  [183:10] [209:4]
happening [29:23] [97:12]
happens [73:14] [216:3]
hard [55:15] [141:3,16,19,21]
  [146:25]
harris [1:] [:]
harvard [40:25] [41:1]
harvest [12:4,12]
harvested [12:2]
hasnt [91:8]

**7/18/2002  Bystrom, Dale (final)**

**havent** [115:17]
**having** [5:4] [16:4] [23:13]
 [31:15] [33:16] [82:4,6]
 [88:25] [89:22] [148:10]
 [181:25] [185:12] [195:20]
**hawaii** [13:24] [52:10] [55:7]
**head** [109:5] [116:3] [119:17]
 [219:19]
**heading** [213:10]
**heads** [54:7]
**headtohead** [109:5]
**head-to-head** [109:5]
**health** [8:21] [9:2,6] [14:11,14
 ,20,22] [18:19] [19:2] [21:25]
 [22:4,9,11,16,23] [23:11,16]
 [24:2,13] [25:2,5,14] [26:6,9
 ,12,23,24] [28:24] [30:24]
 [31:5] [39:9,12] [43:15,16]
 [47:5] [48:1,12] [54:19]
 [56:9] [58:20] [63:11,16,17]
 [65:19] [66:3,20,22] [67:4]
 [71:15] [72:7] [73:17,24]
 [83:16,18,21] [85:19,20]
 [86:16,17] [88:21] [89:2]
 [91:21] [92:9,11,15] [93:8]
 [105:12] [107:22] [109:14,24]
 [111:10] [113:11] [114:2]
 [127:10,12] [134:2] [141:15]
 [142:6,8,11] [158:23] [194:4]
 [197:11] [200:7] [201:6,12]
 [202:1]
**healthcare** [197:1]
**healthsystems** [191:14]
**heard** [16:3] [69:11] [77:11]
 [158:23]
**hed** [211:5]
**held** [13:8,22] [38:10,13]
 [205:2]
**help** [20:4]
**helpful** [172:9]
**helps** [155:22]
**hereby** [222:] [:]
**heres** [193:24]
**hereto** [:4]
**hes** [54:13] [78:19] [80:7]
 [96:14] [116:4] [199:16]
 [214:9]
**high** [36:3,4] [47:9] [49:1]
 [54:18] [69:13] [73:20]
 [158:17,20] [181:22] [182:7]
**higher** [6:16] [28:15] [67:2,3
 ,4,8,14,18] [68:1,2] [95:20]
 [102:13] [128:1] [212:7,9,11]
**highest** [18:5] [22:13] [68:18]
 [202:24]
**highestcost** [68:18]
**highestranking** [22:13]
**highest-cost** [68:18]
**highest-ranking** [22:13]
**highly** [1:11] [191:18] [201:6]
**hills** [201:12]

**hire** [33:5]
**hired** [29:20] [195:14]
**historically** [106:8]
**histories** [12:1,4]
**history** [11:19,22] [41:4]
**hmo** [152:16] [165:15] [167:
 19] [201:9] [207:4]
**hmos** [27:11] [28:23] [146:21]
 [149:1] [152:1] [153:9,10,11]
 [165:14] [181:21] [207:10]
**hold** [64:19]
**holder** [56:1]
**holding** [48:11]
**holy** [160:19] [198:10]
**horizons** [147:14,17]
**hormonal** [192:15]
**hour** [46:16,24,25] [47:10]
**hours** [46:7,12,13] [217:3]
**households** [85:16]
**houston** [1:17] [2:] [:]
**however** [5:18] [55:20]
 [66:23] [197:23] [211:2]
**huge** [51:11]
**huh** [93:3]
**humana** [158:12,13] [182:8,10]
**hundred** [46:13] [153:13]
**hurt** [150:6]
**hypothetical** [59:14]

---

**I**

**id** [9:11,25] [46:5] [77:22]
 [80:4] [92:5] [115:21] [122:25]
 [137:9] [165:25] [170:10]
 [204:8] [211:16]
**idea** [14:24] [15:2] [22:17,18]
 [127:4] [151:9] [201:16]
**ideal** [112:21]
**identical** [199:21]
**identification** [9:24] [77:24]
 [80:3] [115:20] [123:5]
 [136:5] [158:1] [166:2]
 [170:15] [191:15] [211:21]
 [214:5]
**identified** [170:19] [191:6]
**identify** [107:20] [188:5]
**identity** [222:10]
**ignorant** [133:23]
**iii** [47:18]
**ill** [7:7] [29:4] [77:23] [80:5]
 [157:24] [170:13] [191:12]
 [206:17] [211:17]
**illinois** [11:2] [29:12] [30:7,13]
**im** [5:9] [25:18] [43:21]
 [45:1] [47:19] [52:24] [59:13]
 [60:11] [61:12] [76:20]
 [99:13] [103:4] [107:12,13,17]
 [111:19] [114:19,20] [115:16
 ,18] [118:15] [122:5,24]
 [136:24] [137:5] [143:18]
 [146:1,5,10] [150:23] [156:25]

[157:22] [158:7,25] [159:19]
 [160:9] [164:16] [165:16]
 [169:13,25] [172:23] [173:25]
 [174:17] [176:10] [177:3,14]
 [181:9] [188:12,17] [189:17
 ,23] [190:8,9] [194:17]
 [196:21] [197:19] [199:9]
 [202:19] [203:6] [216:20]
 [217:8,11] [220:11]
**imagine** [179:20]
**immediate** [199:23]
**impact** [50:19] [96:7,17]
 [99:11] [100:14] [109:15]
 [121:25] [138:12,16] [141:6
 ,9] [143:22] [147:16,25]
 [164:18] [165:1] [175:5]
 [202:4]
**impacted** [27:21] [153:25]
**impacting** [163:21]
**implement** [55:4]
**implemented** [55:6]
**implementing** [174:19]
**important** [21:18] [30:23]
 [73:24] [160:20] [161:15,23]
 [162:5,7] [164:15] [198:16]
**impose** [112:18]
**imposed** [135:1]
**improve** [23:6,9]
**inability** [156:20]
**inadequate** [120:24]
**inappropriate** [180:19]
**inc** [1:] [11:12,13,16,17]
**incentive** [40:4] [77:10,13,14
 ,19] [79:15,23] [95:9] [98:18]
 [128:7] [152:20] [202:22]
**incentivebased** [152:20]
**incentive-based** [152:20]
**incentives** [74:1,11] [94:10
 ,17,23,25] [95:2,19,24]
**incentivize** [203:1]
**incentivized** [67:11] [94:4,20
 ,24] [95:6,8,17,19] [96:20]
 [97:6,17] [98:16,20] [137:13]
 [139:2] [153:19] [163:5]
**incidentally** [30:18] [42:14]
 [101:9] [104:16] [124:13]
 [140:6]
**include** [84:3,13] [113:13]
 [134:20] [198:13] [208:17]
 [213:11]
**included** [24:6] [89:11]
 [111:7] [142:22] [186:14]
 [197:3,10] [206:6]
**includes** [51:10] [105:17]
**including** [75:19] [142:20]
 [158:11] [191:19]
**inclusion** [105:16] [108:21]
 [110:1] [118:14] [121:25]
 [194:7] [195:4]
**inclusive** [89:14] [218:22]
**incorporate** [153:7]

**incorrect** [204:5]
**increase** [14:24] [147:9]
 [207:5] [209:8,15]
**increased** [207:8]
**incremental** [77:15]
**independent** [24:15] [122:22]
**index** [3:1,] [4:1]
**indicate** [47:3] [49:16] [82:20]
 [83:4] [105:5] [126:17]
 [142:23] [143:20] [145:2]
 [152:1] [160:17] [163:19]
 [166:25] [169:1] [188:4]
 [193:1] [196:6,23] [207:2]
 [208:14] [213:16]
**indicated** [51:22] [57:19]
 [81:25] [116:15] [142:6]
 [157:11] [164:9] [167:4]
 [170:11] [171:7] [172:4,21]
 [174:5] [176:22] [192:5]
 [193:11,14] [197:5] [201:3]
 [213:20] [:5]
**indicates** [47:20] [110:23]
 [112:16] [127:15] [142:14]
 [175:6] [183:18] [192:4]
 [194:5,25] [195:1,12,14,21]
 [197:2] [198:3,11] [200:23]
 [201:4] [211:15] [212:18]
 [214:13,23]
**indicating** [80:15] [120:23]
 [195:23] [196:2,12,24]
 [215:12]
**indication** [186:18]
**indications** [122:3,18,20]
 [200:14,16]
**indirect** [12:16]
**individual** [48:23,24] [49:10]
 [110:25] [166:4] [167:17]
**individually** [61:15]
**individuals** [15:16] [28:10]
 [87:14] [116:5]
**industry** [11:19,23] [22:25]
 [28:25] [31:21,24] [34:19]
 [39:6,8] [40:15,19,22]
 [41:12,13] [44:14,20] [47:5]
 [48:14] [50:1] [58:10,11]
 [62:15] [65:17] [68:20]
 [70:1,25] [76:4] [77:20]
 [79:11] [87:9,10] [89:7]
 [90:21,25] [91:4] [97:12]
 [113:11] [115:8] [127:2]
 [128:2,15] [129:5] [130:19]
 [133:23] [135:19] [144:3]
 [149:5] [150:10] [154:21,22]
 [155:12,13] [160:5,23]
 [161:7,12] [187:8] [198:17]
 [207:22]
**influence** [77:2] [145:3]
**influencing** [143:23]
**inform** [45:16]
**information** [3:15] [12:9,13]
 [92:14] [108:15] [109:2]

**7/18/2002 Bystrom, Dale (final)**

[142:6] [146:16] [167:8,10]
  [173:6] [174:17] [188:13]
  [204:12] [209:22] [218:3,23]
**informed** [45:14]
**inhibitors** [161:12,13]
**initial** [121:2]
**initially** [30:20] [47:13]
  [121:18]
**initiatives** [39:19,21] [40:15]
**injunctive** [160:12]
**input** [39:17,20] [40:14]
  [42:25]
**inquire** [142:4]
**inquiry** [12:17]
**insofar** [171:18]
**instance** [1:] [51:16] [147:1]
  [165:18] [167:12]
**instances** [137:20] [144:19]
  [149:3] [207:3]
**instead** [60:17] [119:9]
  [194:22]
**institute** [112:17]
**instore** [14:16]
**in-store** [14:16]
**instruct** [139:5]
**instruction** [8:4]
**instrument** [222:11]
**insulin** [129:6]
**insurance** [11:19,22] [12:12
  ,16,25]
**insured** [49:19] [53:20]
**insurers** [12:15]
**integrated** [8:21] [9:2,6]
  [21:25] [22:4,9,11,15,22]
  [23:16] [25:1,5,14] [26:6,8,12
  ,24] [30:24] [31:5] [83:16,18
  ,20] [84:7]
**intend** [150:25] [217:6]
**intended** [89:13,14]
**intent** [29:17] [66:21] [99:1]
  [146:21] [148:1,2,14] [151:4]
  [154:15,19,20] [155:5]
  [174:12] [176:16] [180:13,21]
  [217:9]
**intents** [66:21]
**interactions** [160:4] [176:19]
**interest** [18:1] [67:21]
**interested** [41:5] [47:19]
  [69:13] [:11]
**interests** [107:22]
**interfaced** [27:19] [28:24]
  [166:23]
**interfacing** [201:25]
**interfere** [118:24]
**interfering** [19:24]
**interim** [191:17]
**intermediary** [18:21] [48:14]
**intern** [2:]
**internal** [184:11] [201:15]
**internally** [76:12] [208:25]
  [214:20]

**internet** [14:12,15] [15:7,12
  ,24] [211:19]
**interpret** [82:19] [136:20,21
  ,23] [177:24]
**interpreted** [6:18,20] [173:
  20] [196:20] [210:2]
**interrogatories** [3:25]
  [:5]
**interrogatory** [158:4] [159:
  10] [184:2]
**intervene** [118:25] [189:14]
  [195:25] [196:3,13]
**intervened** [197:4,7]
**interventions** [144:10]
**interview** [44:8]
**interviewing** [52:3]
**intimately** [114:19]
**introduce** [146:16]
**introduced** [97:14] [146:17]
**introduction** [118:2]
**invisible** [65:2,4]
**involve** [73:12] [108:21,24]
  [143:17]
**involved** [6:22] [17:9] [18:10
  ,12] [24:16] [27:15,22]
  [31:1] [32:14] [38:4,6,7,25]
  [57:3] [67:13] [71:2,5]
  [80:24] [81:1] [84:14] [95:20]
  [131:20] [132:5] [140:19]
  [143:18] [160:4] [174:15]
  [212:12] [214:8,23]
**involvement** [14:12]
**involves** [51:1] [70:11]
  [126:19]
**ips** [26:13] [141:15] [202:15,23]
  [203:2,8]
**irrelevant** [199:11]
**island** [89:18]
**isnt** [57:10,22] [86:11] [128:
  3] [129:11] [133:14,18]
  [136:11,19] [152:18] [187:11]
**issue** [40:7] [53:19] [67:22]
  [110:1] [127:15] [146:12]
  [211:6]
**issues** [16:24] [17:1,2,5,10]
  [54:24] [118:19]
**italicized** [151:23]
**item** [124:15] [137:12] [166:
  25] [172:15] [192:3] [194:4]
**items** [68:19] [171:24]
**itself** [26:21] [69:3] [86:2]
  [120:21] [132:19] [149:16]
  [164:5] [173:6] [215:24]
**iv** [73:7]
**ive** [45:1] [51:25] [67:5]
  [69:19,25] [77:11] [84:22]
  [87:6] [97:22] [101:1] [123:8
  ,9] [138:3] [140:9,14] [148:10
  ,16] [158:7] [159:7] [160:22]
  [163:22] [164:10] [174:7]
  [218:1]

[219:23]
J

**jacobs** [142:6,10] [200:8]
**jana** [4:]
**january** [166:9]
**jerry** [80:17,19]
**jigger** [68:11]
**job** [12:3] [21:4] [29:7] [219:5]
**joe** [21:2] [80:15] [81:13,20]
  [82:5] [115:1] [116:12,15]
  [120:1] [214:8,23]
**john** [115:25]
**jot** [59:15]
**judgments** [127:6]
**july** [1:] [5:1] [160:7] [:13]
**june** [10:7] [78:8]
**justified** [111:2]

K

**kaiser** [201:8]
**kansas** [88:22,23]
**karl** [188:4]
**katy** [:21]
**keep** [54:1] [105:11] [146:22]
  [148:25] [154:24] [183:23]
  [200:24]
**keeping** [67:17] [146:18,21]
**kellogg** [36:20]
**kept** [68:8]
**key** [186:15]
**keystone** [158:23,25]
**kin** [:11]
**kind** [18:3] [69:9] [86:7]
  [94:19] [98:25] [128:21]
  [131:16] [135:8,9] [150:15]
  [151:7] [178:4] [184:17]
**kindly** [158:3]
**kinds** [94:3]
**knew** [30:25] [90:12] [218:12]
**knocking** [128:25]
**know** [8:6,8] [28:6] [38:8]
  [40:8] [45:1] [54:10,11]
  [59:20] [60:20] [65:5] [75:2]
  [76:18] [78:21] [79:18]
  [80:10,18] [84:2] [89:24]
  [93:21,25] [98:2] [101:22,23]
  [104:8] [113:10] [118:8,12]
  [122:13] [123:10] [133:24]
  [138:8,10,19,22,23] [140:1,6]
  [142:1] [143:5,10] [148:7]
  [149:20] [157:10] [159:20]
  [167:21] [168:1,25] [171:19]
  [173:10] [174:1,22] [177:12]
  [179:1] [182:16] [184:4,9,11
  ,15,16] [188:10] [191:8,16]
  [193:6] [196:8,19,22] [198:14
  ,25] [201:21] [202:14,17]
  [203:4,7,17] [204:8] [206:7,10]
  [210:10] [213:19] [215:19]

[219:23]
**knowledge** [10:11] [20:18]
  [74:15,19] [75:11] [78:10]
  [84:22] [88:4] [106:4] [113:8]
  [114:23] [119:23] [122:14]
  [123:25] [124:2] [127:19,20]
  [128:4] [129:25] [130:1]
  [140:4] [143:16] [145:14,16]
  [149:25] [168:23] [202:16]
  [212:19]
**knowledgeable** [43:22]
**known** [21:6,24] [29:11,15]
  [43:16] [57:23] [58:7] [93:8]
  [222:9]

L

**laboratories** [1:]
**lack** [194:14,23]
**lacks** [186:18]
**lag** [87:10]
**lake** [42:8]
**lambert** [39:23]
**language** [169:23] [180:14]
  [181:13] [182:25] [183:1]
  [193:3,7] [194:14,22] [199:22]
  [200:1,13,20] [204:14]
  [205:18] [206:8] [208:17]
**lap** [165:23]
**lapine** [21:2] [80:15] [81:20,22]
  [82:7,10] [116:12,13] [118:19
  ,21] [120:1] [214:8]
**lapines** [81:13]
**large** [71:17,23] [77:1] [92:24]
  [115:15] [133:24]
**largely** [31:17]
**larger** [76:7,9] [82:21] [83:4]
  [87:1] [121:21] [133:16]
**largest** [14:2] [91:13,15]
  [147:2] [172:25] [203:22]
**last** [47:19,20] [73:7] [76:21]
  [77:5] [84:25] [91:5] [94:15]
  [101:7] [105:5] [142:15]
  [152:14] [186:15] [195:13,22]
  [210:3]
**later** [9:7] [22:6,7] [184:3]
**launch** [97:16] [188:9,11]
**law** [46:19] [115:5]
**lawsuit** [28:11]
**leaders** [91:4]
**leading** [31:23]
**leafing** [181:9]
**learn** [147:20] [198:22,23]
**learned** [54:22]
**learning** [36:7]
**least** [74:22] [88:25] [106:6]
  [168:10] [171:18] [180:8]
  [200:25] [211:13]
**led** [98:24] [207:16]
**left** [17:8] [30:1] [178:2]
**legal** [115:7]

**7/18/2002  Bystrom, Dale (final)**

**legend** [32:16,17,19]
**leitzinger** [217:25] [218:1]
**less** [50:3] [57:6,12] [62:8]
[64:22] [81:18] [98:24]
[142:17] [150:21] [177:6]
**lesser** [62:11] [63:22]
**let** [8:6,8] [25:18] [46:11]
[63:13] [65:22] [66:20]
[69:10] [70:8] [73:13] [78:7]
[104:14] [106:22] [122:25]
[147:7] [153:6] [155:18]
[157:24] [170:6] [179:1]
[188:23] [191:12] [193:19]
[196:19] [211:16] [214:3]
[219:21]
**lets** [9:11,17] [10:24] [16:6,14]
[17:12] [19:23] [21:22]
[29:10] [32:5] [35:8] [36:19]
[37:16,24] [41:6,22] [42:13]
[47:17] [56:6] [60:22,23]
[65:9] [71:25] [75:15] [76:21]
[88:13,14] [93:6] [95:17]
[97:2,13] [100:17] [102:10,16]
[104:14] [106:14] [110:22]
[112:15] [116:7] [124:9]
[130:17] [143:20] [145:22]
[149:14] [152:12] [159:13]
[162:21] [170:9] [171:23]
[176:21] [178:3,18] [180:6]
[187:25] [197:1] [199:19]
[200:12] [201:14] [202:20]
[203:10] [209:17]
**letter** [158:2]
**level** [33:11] [75:25] [129:20]
[135:13] [153:16,17] [197:7
,24] [198:2] [199:3] [208:22]
**levels** [57:2] [121:15]
**lever** [183:6,8]
**leverage** [76:23] [149:2]
**leveraged** [146:22]
**liability** [195:17]
**liberal** [36:6,10]
**life** [11:5,19] [75:19] [103:18]
**lifestyle** [75:19]
**life-style** [75:19]
**lightheiser** [219:11]
**likely** [51:4] [79:21] [120:17]
[127:21]
**likewise** [74:3]
**lilly** [39:24] [129:8]
**limit** [173:8,14]
**limitations** [211:19]
**limited** [121:24] [186:20]
[200:14,18]
**limiting** [179:12]
**line** [53:7] [116:19] [133:6]
[176:6] [199:10] [215:2]
**link** [12:14]
**linked** [212:10]
**linking** [34:25]
**links** [15:3]

**list** [39:6] [90:19] [92:10]
[93:15,18] [94:3] [101:11]
[105:12] [139:10,15] [158:16]
[159:9] [160:7] [172:6,7]
[197:3] [211:24] [212:3,4,21]
[213:20]
**listed** [38:14] [53:24] [79:1]
[84:3] [87:1,18] [88:19,20,24]
[89:1,22] [90:5,16] [93:7,9]
[96:25] [97:25] [99:9,19]
[102:17] [103:15] [126:2,24]
[128:13,19] [134:11,12]
[139:10,11] [158:17,19]
[159:14] [171:24] [175:18]
[176:20] [181:21] [190:4,6,7
,8,9,10,14,17] [202:11]
[204:22] [205:9] [212:22]
[213:21] [215:6,7]
**listening** [155:21]
**listing** [67:1] [88:16] [94:9]
[136:9] [213:15]
**lists** [58:21,22] [92:11]
[101:11] [125:12] [143:25]
[158:10] [181:20]
**literature** [108:22]
**litigation** [115:24] [136:8]
[:]
**little** [46:6] [49:15] [59:14,16]
[60:21] [61:5] [88:17] [89:2]
[94:14] [128:24] [189:1]
[211:20]
**live** [10:17,22]
**lived** [10:20] [11:4]
**lives** [83:9,11,12,14,18,19,22
,23] [84:3,4,9,10,13,17]
[85:2] [86:9] [87:2,12,15,18]
[88:16,25] [89:23] [90:2,6,7
,20,22,24] [91:7,14,16]
[92:10,11,17,20,21] [93:15,19
,21] [97:4,5,18] [101:12,17]
[102:17,21] [103:4] [104:23]
[153:14,15] [157:5] [158:16]
[195:7,9]
**llp** [1:] [2:13]
**located** [15:14] [24:3] [30:8]
[32:10] [33:1] [36:14,15,17]
[42:8] [88:22] [89:17] [159:4
,5] [201:11,12]
**location** [18:2]
**logic** [58:23] [64:7] [215:18]
**lois** [3:15]
**long** [6:2,15] [13:15] [17:15]
[55:16] [99:22] [120:3]
[146:2] [169:19] [186:19]
[209:25]
**longer** [109:21] [150:1]
[167:1,4] [169:2] [206:18]
[213:5] [214:8,23]
**longerterm** [109:21]
**longer-term** [109:21]
**longs** [6:13,19,25] [8:14,16,17

,19,22,24,25] [9:5,7] [11:8]
[13:6,9,12,16,21,22] [14:4,9
,11,13,25] [15:4,5,7,11,14,19
,24] [17:17] [18:1] [22:5,12,16
,20,23] [23:1,2,6,10,13]
[24:8,14,18,20] [27:4,10,12
,23] [28:10,12,14] [29:1,5,6]
[31:2,3,7,12] [32:6,9,13,24]
[33:9,10,12,20,25] [35:3]
[42:2] [51:9] [55:21] [58:6]
[74:20,24] [106:11] [146:7]
[166:16] [213:8,9]
**longterm** [186:19]
**long-term** [186:19]
**look** [54:16] [79:3] [80:12]
[81:9] [88:14] [94:1] [100:17]
[102:16] [105:16] [117:16]
[119:3] [123:11] [130:17]
[152:13] [153:9] [170:25]
[174:14] [176:21] [181:19]
[184:19,22] [188:24] [192:3]
[194:3] [197:1] [216:23]
**looked** [44:23] [101:1]
[115:17] [152:13] [174:7]
[177:12] [219:17,21]
**looking** [78:13] [134:3]
[153:23] [175:3]
**looks** [105:14] [107:5] [117:
12] [168:14]
**lose** [81:21] [82:1,11] [183:15]
[185:14,15]
**losing** [181:24]
**loss** [183:14]
**lost** [69:9]
**lot** [99:2] [112:3] [116:24]
[129:4] [144:8] [155:19,25]
[173:5] [187:7] [189:24]
[195:20]
**lots** [162:12]
**louisiana** [1:17] [2:4]
**low** [49:1] [50:8] [57:15]
[66:25] [68:16] [71:12]
[105:11,12,13] [106:1]
[136:18] [181:22] [182:5]
[187:21] [213:17]
**lowawp** [106:1]
**low-awp** [106:1]
**lowcost** [71:12] [213:17]
**low-cost** [71:12] [213:17]
**lower** [24:19] [59:11] [64:13
,18,19] [66:2] [69:17] [71:14
,16,19] [72:11] [90:24]
[127:10,12] [153:18] [212:11]
**lowercost** [71:14] [127:10]
**lower-cost** [71:14] [127:10]
**lowered** [207:6]
**lowering** [66:20]
**lowest** [68:5] [201:21]
**lowestlevel** [201:21]
**lowest-level** [201:21]
**ltr** [3:24]

**lucrative** [209:23,25]
**lumped** [133:5] [206:1]
**lunch** [106:18] [114:5,11]

M

**mac** [57:5]
**machine** [1:16]
**magnitude** [90:8]
**mail** [15:11,25] [19:6] [38:5]
[85:7] [86:22,24] [92:18,22,23
,24] [93:5] [115:24] [211:8]
**mailed** [15:21]
**mailing** [15:16]
**mailorder** [92:22]
**mail-order** [92:22]
**mailorderonly** [92:23]
**mail-order-only** [92:23]
**main** [154:23]
**mainly** [104:21]
**maintain** [30:10] [124:16]
[207:11]
**maintaining** [131:7]
**major** [17:2] [21:20] [34:10,17]
[73:16] [85:14] [90:17]
[146:20] [149:1] [201:25]
**majority** [28:18] [50:4]
[59:9] [197:5,23]
**maker** [120:10]
**makers** [119:10,23] [120:18]
**making** [120:1]
**malicious** [180:21]
**manage** [18:17] [24:13]
[91:13,16]
**managed** [8:19,21] [17:4]
[18:10] [20:23] [21:1,24]
[22:9,25] [24:24] [25:1,7]
[27:4,7] [28:19,20,22]
[29:3] [30:15] [31:24] [32:1]
[34:9] [36:25] [37:3,4]
[38:1,3,4,11] [40:3,5] [42:1,6
,7] [43:19] [50:19] [51:1,3]
[55:10] [56:21] [57:1,8,12,20]
[60:16] [62:8,9,10,17,18]
[63:25] [64:17] [65:6] [69:22]
[76:25] [79:23] [104:17,22,25]
[116:4] [150:2] [166:19,20]
[169:9] [195:14] [210:19]
**managedcare** [22:25]
[195:14]
**managed-care** [22:25]
[195:14]
**management** [3:] [18:16]
[19:2,13] [73:9,10,11,12]
[74:9] [78:1,8] [81:7] [89:5,16]
[92:8] [93:9] [188:24]
**manager** [8:20] [17:8,13,23]
[18:3] [20:21] [21:23] [32:6,23]
[33:3,15,18,19,20,23]
[34:9] [80:7,9] [202:5]
**managers** [183:3] [184:13]

7/18/2002  Bystrom, Dale (final)

managing [132:4]
mandated [75:21]
manner [61:19]
manufactured [58:16]
manufacturer [25:16,17]
  [37:17] [65:11] [71:8] [79:13
  ,22] [95:7] [96:13,22] [130:22]
  [131:2,22] [132:4,9,14]
  [134:14] [135:20] [150:11]
  [164:2]
manufacturers [20:20]
  [25:6,11,20,21] [26:5,10,14
  ,20] [27:14,16,20,25] [38:7]
  [40:21] [65:12] [68:12]
  [70:16] [76:24] [77:7] [83:6]
  [115:15] [126:18,20,22,24]
  [129:3,11,18] [132:24]
  [134:10] [135:5] [147:9]
  [150:14] [155:20,25] [156:3
  ,7,8] [160:24] [163:5,25]
  [164:4] [169:10] [185:13]
  [187:18,22] [189:5] [198:17]
  [207:23]
margin [132:25]
margins [64:18]
mark [9:12] [61:5] [77:23]
  [80:5] [123:1] [157:24]
  [166:1] [170:13] [191:13]
  [211:17] [214:3]
marked [9:24] [10:1] [77:24]
  [80:3] [100:18] [106:23]
  [115:20,22] [123:5] [136:4,5]
  [152:11] [158:1] [166:2]
  [170:14,15] [191:15] [193:20]
  [210:15] [211:21] [214:5]
market [14:13] [23:7,8,10]
  [31:7] [40:4,16,17] [77:2,7,10
  ,12,14,16,18,19] [79:5,7,10,15
  ,22] [82:18] [84:24] [103:21]
  [115:10,15] [116:23] [117:3]
  [128:7,12] [143:23] [145:4,24]
  [146:3,15,19,22] [147:3,5,9
  ,11,17] [148:6] [150:4]
  [154:25] [158:13] [161:1,3]
  [162:15,22] [163:12] [164:3
  ,6,7,21,22] [165:2] [175:4]
  [188:22] [204:19,20] [205:15
  ,20,23,24] [206:5] [207:6]
  [215:13,15]
marketing [14:16] [29:11,21]
  [37:19,22] [111:15] [160:20]
  [163:5]
marketplace [49:24] [52:4,9]
  [79:6] [97:15] [117:24]
  [118:5,10] [121:17,19]
  [138:2] [141:7] [149:23]
  [153:3] [154:6,9] [161:17]
  [173:3] [174:20] [177:1]
  [201:25] [209:14] [210:1]
  [215:22,25]
marketshare [40:4] [77:10

,12,14,19] [79:5,7,10,15,22]
  [128:7,12]
market-share [40:4] [77:10
  ,12,14,19] [79:5,7,10,15,22]
  [128:7,12]
marty [45:3] [116:3] [174:1]
  [214:7]
massachusetts [40:25]
match [215:10]
materials [87:16,20,21]
math [206:2]
matter [7:2] [94:21] [143:12]
maximizing [73:23]
maximum [57:5] [58:12,14,21
  ,24]
may [16:5] [19:6,12] [23:6]
  [56:22] [75:25] [76:2,12]
  [78:2,22] [80:9] [85:5,22]
  [91:21] [94:16,22] [101:5,6]
  [102:8] [103:25] [104:12]
  [112:14,21] [117:19,25]
  [120:14] [123:7] [133:10]
  [141:17] [142:16,23] [145:1]
  [147:13] [161:5] [162:15]
  [165:1] [169:14] [171:12]
  [175:20] [185:8] [187:4]
  [192:20,21] [199:6] [200:4]
  [206:1] [214:22] [215:2,8]
  [216:7]
maybe [37:10] [114:5]
mcelroy [4:] [166:4,6]
mco [59:4,10] [60:24] [64:2,11]
  [76:25] [131:11] [152:19]
  [164:11] [180:9] [208:10]
mcos [29:4] [76:5] [135:22,25]
  [166:23] [180:8] [207:16,20]
mean [23:24] [39:7] [47:24]
  [53:8] [56:15] [59:20] [83:14
  ,23] [125:25] [133:14] [142:20]
  [149:14] [196:17] [206:12]
  [210:2] [215:10] [216:14]
meaning [79:7] [153:15]
means [64:7] [100:7] [102:11
  ,12,14] [175:1,10,11] [196:16]
meant [102:6] [153:7] [173:17]
measure [73:25] [175:5]
measures [140:6]
measuring [50:8]
mechanics [66:6] [71:3]
  [152:25]
medco [34:16] [73:15]
  [74:16] [106:4,7] [147:3,5,21]
  [203:22,24] [206:4,8]
media [186:2]
medicaid [24:14] [39:1]
  [134:5,8,9] [135:2,4] [136:8
  ,10,15,17,25] [137:3]
medical [52:4] [108:22]
medically [107:21] [113:16]
  [167:4]
medication [57:4] [124:20]

medications [19:20] [58:15
  ,16] [129:7]
medicine [19:24]
medimpact [6:23] [8:11]
  [9:5,8] [91:22]
medium [181:22]
meet [39:10,15]
meeting [4:] [80:15] [191:25]
member [17:6] [19:2] [37:25]
  [54:20] [85:21] [100:11]
  [110:19] [192:14,17,19]
members [15:8] [19:4]
  [48:3,4,7] [65:14] [83:7]
  [85:5,8,17,22] [98:14]
  [99:23] [111:8] [152:23]
  [157:16] [167:14] [187:15]
  [215:21]
membership [14:14] [38:9]
  [189:10]
memo [80:12] [167:11,13]
  [193:25] [200:21] [201:15]
  [206:11] [211:15]
memory [141:13]
memos [201:17]
menest [167:7]
menopausal [122:8]
menopause [192:6]
mention [83:9] [173:21]
  [182:24] [187:25] [192:12]
mentioned [42:4] [74:11]
  [79:10] [83:15] [160:8]
  [162:6] [164:14] [173:22]
  [186:12,23] [220:8]
mentioning [180:8]
mentions [181:10,17]
merchandise [32:6,11,12]
merchandising [29:21]
merck [39:23] [90:18] [91:3]
  [106:5,7,8]
merckmedco [90:18]
  [91:3]
merck-medco [90:18]
  [91:3]
mercy [158:23]
merely [119:22] [140:22]
merged [9:7] [22:7] [26:22]
merger [30:23] [31:2,4,18]
mergers [187:7]
message [115:25] [139:19,20]
  [182:20] [195:23] [196:2,12
  ,18,24]
messages [139:5] [186:16]
messaging [95:22] [196:8]
messina [4:9] [214:7] [215:
  12]
met [27:18] [39:13] [110:25]
method [183:13]
michael [2:15,] [16:10]
microphone [5:12] [128:24]
  [165:22]
middle [94:2] [123:14]

[125:9]
miller [80:17,19] [118:21]
millers [80:21]
million [83:18] [85:2,5,8]
  [88:25] [89:23] [90:2,6,24]
  [91:14,16] [92:10,12,16]
  [93:7,9,18,19] [97:5] [103:4]
  [153:14] [157:5,16,18,19]
  [158:16,17,20] [178:11]
  [182:4] [183:22] [195:6,9]
  [210:5,24]
mind [34:15] [47:16] [98:15]
  [120:9,16] [155:18]
mine [35:25] [218:14]
minimal [112:19] [143:21,22]
minimum [154:25]
minneapolis [159:5,6]
minus [60:14,24,25]
minute [9:16]
minutes [4:6] [72:21] [106:20]
  [151:14] [178:1] [191:24]
  [206:17]
miss [7:13] [8:1] [155:3]
  [158:2] [171:17] [210:20]
missing [217:11]
mistake [94:18] [200:3]
mixed [151:25]
model [201:8]
moderate [192:5]
modesto [10:17] [24:3]
  [33:1]
modification [124:18]
modify [173:9]
modifying [173:11]
moment [59:18] [60:20]
  [102:10] [152:18]
money [12:8] [64:25] [66:12
  ,18] [68:2]
monitor [73:25] [74:4]
monitoring [29:8] [51:9]
monovich [80:6,10]
months [178:14]
mountain [165:14]
move [98:4] [128:24] [164:3
  ,21]
moved [30:13]
moving [89:8] [90:13] [168:21]
mr [3:3] [5:6,9] [7:18,19,22,24
  ,25] [9:15,25] [16:4,14]
  [45:23] [46:2,19] [52:11,15,16]
  [73:5] [78:15,24] [79:9]
  [80:21] [81:22] [82:7,10]
  [87:21] [92:5] [101:24]
  [102:1,2,5] [106:15,17,20,22
  ,25] [114:4,15,16] [116:1,3,11
  ,12] [118:19,21] [128:23]
  [129:1] [148:21] [151:13,21]
  [159:11,13] [160:11,17]
  [165:23,25] [166:3] [168:4]
  [170:16,19,24,25] [171:10,16
  ,18] [173:16,22,23,24,25]

**7/18/2002  Bystrom, Dale (final)**

[178:3] [180:25] [181:2,9] [182:15] [188:25] [189:21] [193:23,25] [194:3] [197:16,17] [199:13,18,19] [205:3,8] [206:16,19,25] [210:19] [214:3,6] [215:11,12] [216:17] [217:10,18] [218:2,9] [219:14] [220:6]

**ms** [7:16,21,23] [9:13,17] [78:13,18] [101:21] [106:19,21,24] [114:7] [148:18] [151:15] [159:7,12] [160:6,13] [167:24] [170:17] [171:8] [182:13] [189:18] [193:22] [197:14] [199:9,16] [205:6] [210:17,18] [216:14] [217:12,25] [220:12]

**msr** [79:7]

**multi** [144:24]

**multiple** [149:6] [150:12] [185:13]

**multisource** [144:24]

**multi-source** [144:24]

**municipalities** [23:1]

**municipality** [18:20]

**mutually** [31:15]

**myself** [5:24] [72:23] [119:15]

**mysteries** [78:16]

——————————————

**N**

**name** [5:7,8,9] [45:7] [52:16,18] [56:3] [79:13,18] [80:11] [88:9] [125:16] [148:19] [166:4] [222:]

**named** [21:2] [52:12] [214:9]

**names** [45:2] [174:3] [219:13]

**naming** [150:16]

**narrow** [50:24]

**national** [29:16] [42:7,9] [80:7,9] [181:18] [183:3] [184:13] [204:20]

**nationally** [47:4]

**nations** [135:8]

**natural** [192:14]

**nature** [6:5,7] [8:10,12]

**ndc** [137:11,12,15,22] [138:1,5,6,14,18] [141:16,19] [142:7] [146:24] [200:23] [201:4] [202:11,23] [203:8]

**nearly** [194:9]

**necessarily** [218:17]

**necessary** [20:13] [113:16] [119:6] [192:16] [200:1] [202:24]

**nee** [78:20,21] [188:25]

**need** [5:11] [8:5] [59:14] [108:17] [110:6] [161:20] [180:23] [189:19]

**needed** [149:13]

**needs** [23:22] [48:1] [91:23]

**neeley** [3:19] [115:25] [116:1,11] [193:25]

**nees** [78:24] [79:9]

**negative** [109:24] [147:15] [164:18]

**negotiate** [25:10] [26:20] [29:2] [37:3] [56:24] [61:19] [62:10,19] [64:5] [76:13] [80:1] [84:6] [131:10,14] [147:3] [187:17]

**negotiated** [25:21] [56:10,25] [57:3,12,13,20] [59:4,10] [60:8,15,23] [61:2,22] [62:16,21] [64:2,3,14] [65:6,7] [129:3] [135:20] [146:23] [147:2,4] [189:12,22]

**negotiates** [57:1] [61:15]

**negotiating** [26:5] [27:9] [66:16] [74:20] [76:24] [79:8] [92:16] [128:12] [140:19] [147:8,10] [214:19]

**negotiation** [31:2] [61:18] [71:11] [84:8] [126:25] [140:21]

**negotiations** [36:25] [64:17] [66:15] [70:13] [74:24] [87:7] [89:5] [126:19,23] [138:6,8] [140:18] [143:11,13] [148:11]

**neighborhood** [46:19]

**net** [66:25] [81:18] [141:15] [142:6,8,12] [177:11,18] [200:7] [201:6,12] [210:4,24]

**network** [11:25] [12:18] [19:3] [23:14] [24:6,7,12,17] [26:3] [27:10] [31:16] [61:17] [87:7,16,19] [89:5,8,10]

**networks** [19:3] [23:19] [41:2] [76:14] [84:7]

**neutral** [120:16]

**nevada** [13:25]

**new** [39:18] [40:15] [81:11] [90:12] [92:9] [116:23] [117:3] [118:2] [130:19] [185:23] [209:8]

**newer** [142:18]

**newly** [29:21]

**news** [90:12]

**nex2** [11:12,13,16,17,21,24] [12:17,19] [13:3,5] [41:3] [47:13] [84:7] [87:8,17] [88:10,11] [90:14] [92:16]

**nex2s** [84:8]

**next** [56:6] [82:20] [91:12] [108:19] [110:8] [123:2,12] [134:5] [173:14] [178:18] [179:8] [185:23] [197:12,17,20] [217:7]

**ngenics** [11:15]

**nicheing** [178:19]

**nine** [103:2]

**no** [1:6] [3:13,,,20,,] [4:2,,5,7,] [6:18] [7:5] [9:24] [10:21] [12:10] [13:7] [17:11] [19:25] [28:17] [36:9] [37:23] [38:12,15,18,20,22] [40:9,23] [42:19] [43:7] [44:4,7,11] [45:9,16,25] [46:4] [54:6] [55:23] [62:8] [68:15] [70:6] [72:15] [77:24] [78:6] [80:3] [84:14,22] [94:9] [97:19] [99:10,22] [100:4] [101:20] [102:19] [103:22] [104:4] [108:11] [112:6] [114:19,20] [115:7,16,20] [116:2] [117:6] [121:7] [122:24] [123:5] [126:13] [127:2] [130:1] [132:1] [136:5] [137:5] [138:16] [140:4,14,18] [141:9] [144:24] [150:1] [151:12] [156:11] [158:1] [162:18] [165:23] [166:2] [167:1,3] [168:8] [169:1] [170:15] [174:7] [176:6] [179:3,4] [180:15,22] [183:1] [186:7,14,18] [191:15] [192:12,20] [194:19] [195:17] [196:17] [198:7] [199:14] [201:18] [202:13,16] [208:3] [211:9,21] [213:5,6] [214:5,8,23] [215:13,17] [216:10,19] [217:1,5] [218:17] [219:7,10,12,16,20] [220:2,11,12] [:18]

**nodding** [93:4] [157:9]

**non** [34:6] [54:25] [96:3] [111:1,7] [112:18] [113:2,15] [114:3] [139:2,3,7] [143:2] [167:23] [190:1,8] [193:17] [195:24] [196:2,13,24] [197:18,22] [198:8,15] [202:11] [212:7,16,23]

**noncovered** [167:23]

**non-covered** [167:23]

**nonformulary** [54:25] [96:3] [111:1,7] [112:18] [113:2,15] [114:3] [143:2] [190:1] [193:17] [195:24] [196:2,13,24] [197:18,22] [198:8,15] [202:11]

**non-formulary** [54:25] [96:3] [111:1,7] [112:18] [113:2,15] [114:3] [143:2] [190:1] [193:17] [195:24] [196:2,13,24] [197:18,22] [198:8,15] [202:11]

**nonpharmacy** [34:6]

**non-pharmacy** [34:6]

**nonpreferred** [139:2,3] [212:7,16,23]

**non-preferred** [139:2,3]

[212:7,16,23]

**nor** [20:19] [:10,11]

**normal** [46:25] [128:14]

**normally** [57:2] [75:23] [85:17] [152:24] [184:18] [198:1]

**north** [31:9]

**northern** [31:8]

**northwestern** [36:21]

**notary** [1:] [222:] [:3,16]

**note** [59:15]

**noted** [81:17] [222:2]

**notes** [87:14]

**nothing** [125:19] [178:14,17] [194:11] [218:5]

**notice** [1:] [37:24] [169:12] [181:10]

**noticed** [88:18]

**notion** [172:14]

**notwithstanding** [195:2]

**novartis** [152:4,5] [153:20,24]

**november** [81:24] [101:10] [214:13]

**number** [14:22,25] [19:1,11] [20:10] [22:25] [37:25] [44:17,18,19] [48:22] [49:2] [52:23] [53:16] [58:17] [68:3] [84:16] [85:1] [87:1] [90:7,21,22,23] [93:13] [101:1] [108:17] [121:22] [123:2] [124:15] [129:15,17] [133:15] [139:9,11] [146:14] [153:11] [156:18,23] [158:3,10,11,12] [159:25] [166:25] [167:18] [170:4,7,8] [171:1,6,24] [175:21] [181:20] [182:18] [183:22] [186:23] [187:6] [192:3] [200:5] [204:22]

**numbered** [1:14]

**numbers** [48:4] [83:8] [87:3,5,6] [88:4,7,17] [92:7] [153:18,20,24]

**numerous** [210:20]

**nw** [2:]

——————————————

**O**

**oahu** [55:7]

**oakbrook** [29:12] [30:7,9,13]

**oath** [222:]

**ob/gyn** [192:17]

**object** [8:1] [199:9]

**objection** [101:21] [148:18] [160:6] [182:13] [189:18]

**objective** [110:12] [124:18] [146:18] [154:5,8] [155:8,10,14] [156:5]

**objectives** [110:11] [154:24]

**objects** [8:2]

**obtain** [1:20] [11:21] [12:13] [15:20] [25:25] [71:17]

**7/18/2002 Bystrom, Dale (final)**

[121:3,6] [189:9]
**obtained** [11:18] [25:22] [35:15] [37:10] [87:6] [156:15] [159:25] [191:4,5]
**obtaining** [41:4] [100:11] [141:6]
**obvious** [211:18]
**obviously** [82:16] [167:12]
**occasionally** [81:1]
**occasions** [103:20] [210:21]
**occur** [52:5] [62:22,24] [71:12] [119:6] [183:14]
**occurred** [41:18] [52:6] [66:10] [138:15,20] [153:3] [184:4] [202:18]
**occurring** [31:19,21]
**occurs** [83:8] [202:10] [208:1]
**off** [9:14,15,17,19] [16:6,7] [56:18] [57:4,21,23] [61:4] [63:8,17] [72:25] [91:25] [96:22,24] [114:7,9] [148:4] [148:25] [151:16] [165:17,22] [181:4] [183:24] [205:2] [206:20] [211:19,22] [217:12 ,13] [220:14]
**offer** [27:20] [31:16] [50:24] [71:20] [79:15,19,22] [105:6 ,9] [135:12] [150:12] [199:12] [208:10] [212:9]
**offered** [15:6] [23:15] [105:18] [135:25] [136:10]
**offering** [69:16] [136:14,16] [149:5] [207:23]
**offerings** [81:17]
**offers** [84:11] [135:21] [137:3] [186:19]
**offhand** [137:20] [166:5]
**office** [30:8] [32:10] [53:6] [222:13] [:]
**offices** [1:] [33:9] [38:10,13]
**often** [27:23] [56:23] [62:24] [63:1] [74:1,11] [77:7] [85:18,20] [126:19] [137:22] [163:3] [212:11]
**oh** [9:12,13] [78:20] [107:13,16] [140:5] [169:7] [180:25] [187:16] [195:19]
**ohio** [1:]
**okay** [7:13,24,25] [8:9] [11:7] [13:5,8] [16:2] [35:15 ,18] [46:5] [59:25] [60:3] [72:20] [83:1] [90:16] [91:6,12 ,23] [94:1] [102:10] [106:21] [110:16] [114:7] [125:8] [126:14] [131:16] [137:21] [152:10,13] [166:11] [170:17 ,24] [171:8,16] [173:7] [174:8] [177:25] [178:3,18,24] [179:17] [180:2,17] [181:1,9] [182:18] [184:6] [186:15,23]

[197:21] [198:12] [200:5] [206:19] [214:1] [220:3,5]
**old** [131:13]
**older** [142:17]
**omni** [24:13,15]
**once** [52:8] [88:14] [102:17] [178:5] [180:2] [181:10] [182:19] [185:18,19] [194:19] [206:7]
**one** [7:6] [9:14] [10:25] [13:9] [15:12,14] [23:14,25] [24:6,11] [31:13] [32:23] [35:22] [41:21] [45:3,4] [52:15] [54:18] [55:6,7] [57:25] [61:22] [62:14] [64:24] [66:21] [68:4,23] [69:10,17] [70:8] [71:6,7,15 ,22] [79:16,18] [84:2,12] [85:6,14] [86:10,12] [89:7] [90:22] [91:8,11] [93:6] [95:14] [96:2] [100:24] [103:1] [108:1] [110:2] [116:4,7] [117:12,25] [121:20] [123:13] [124:15,21] [125:15 ,16,24] [126:3] [127:25] [129:14,22] [130:18] [137:6] [138:19] [140:8] [144:21] [145:6] [146:14] [147:1] [149:11] [150:11] [155:19] [160:18] [162:4,7] [163:9] [165:13,14,18] [167:5] [168:9] [171:9,11,13,14,15,24] [173:8,21] [174:1,2] [175:21] [176:17] [178:11] [183:17] [185:15] [186:19] [194:1] [196:22] [200:9] [205:25] [207:23] [210:16] [212:8] [219:23]
**onedosage** [121:20]
**one-dosage** [121:20]
**ones** [34:15] [109:4] [132:9,11] [141:18] [174:7] [182:7]
**oneyear** [10:25]
**one-year** [10:25]
**ongoing** [181:16]
**online** [55:9] [95:22] [195:23] [196:2,7,11,24]
**on-line** [55:9] [95:22] [195:23] [196:2,7,11,24]
**onto** [64:19]
**open** [94:4,6,8,15,16,19,23,24] [95:4] [96:19,23] [97:6,17] [98:4] [99:19,22] [100:16] [101:12,14,18,22] [102:6,11 ,18,21] [103:5] [104:18,22,25] [152:20] [153:15] [168:21] [201:10] [204:11] [212:5]
**operated** [9:6] [42:2]
**operates** [14:4,6]
**operating** [13:23] [16:18,20 ,22] [17:6] [213:5]

**operation** [3:] [18:6] [29:17] [33:25]
**operations** [18:1] [19:6]
**opine** [148:2] [154:20]
**opining** [148:13]
**opinion** [40:18] [64:4] [70:6] [84:21] [97:8,10,11] [98:8,10] [111:5] [128:6] [138:4] [140:15,18,22] [148:4] [151:2] [154:13,15] [155:2,23] [156:13,24] [160:2,21,22] [172:8] [174:11,18,23] [175:1,3,11] [176:16] [179:24] [185:25] [186:13,14] [199:14] [201:19] [204:7] [207:13] [216:5]
**opinions** [44:2] [45:14,16,17 ,19,20,24] [88:6] [97:21] [98:1] [99:6] [101:4] [102:22 ,24] [103:10,13,14,19] [104:3,5,19] [136:22] [137:7] [146:12,13,17] [148:1,22,23] [150:24] [153:1,25] [154:4,7] [179:23] [191:10] [198:5] [199:11,17] [216:24] [219:2] [220:1]
**opportunities** [134:4] [173:15] [179:13]
**opportunity** [73:23] [211:1]
**opposed** [31:12] [49:25] [69:16,17] [97:6,7] [106:11] [121:5] [147:9,17] [153:24] [154:14] [177:8] [212:7]
**opt** [62:2]
**option** [186:20] [211:12]
**options** [192:15]
**oral** [1:10,13] [149:22,24] [150:2,4]
**order** [12:4] [15:11,18] [53:12] [58:19] [67:2] [80:2] [86:24] [90:8] [92:23,24] [108:18] [121:6] [145:11] [161:16,19,21] [162:11] [164:1] [168:22] [203:1] [207:11,24]
**ordering** [15:9]
**orders** [15:17]
**ordinarily** [118:13]
**oregon** [13:24]
**organization** [18:21] [22:14] [25:8] [29:11] [31:1] [39:16] [40:3] [43:16] [62:17] [65:7] [76:25] [88:9] [110:19] [112:23] [119:18] [166:19] [202:6]
**organizations** [28:21,23] [29:4] [38:1,5,14] [104:18,22]
**original** [1:19,] [193:24]
**originally** [218:20]
**originated** [206:8,10]
**ortho** [167:7]

**orthoest** [167:7]
**ortho-est** [167:7]
**ostberg** [219:14,17]
**osteoporosis** [122:12,15] [172:5,22] [186:18]
**otherwise** [193:14]
**outcome** [109:21] [140:9] [154:12] [184:16] [188:12] [203:6] [209:6]
**outcomes** [109:19,20]
**overall** [81:13] [109:15,24] [132:1] [212:11]
**overlapping** [86:2,7]
**overpriced** [126:12]
**oversee** [17:25] [32:11] [33:4]
**overseeing** [33:25]
**oversight** [16:22,25] [18:12] [22:13] [213:4]
**overthecounter** [32:16] [75:20]
**over-the-counter** [32:16] [75:20]
**overutilization** [20:9]
**overview** [180:9]
**own** [22:21] [58:19] [73:17] [76:5,7,13,14] [79:9] [144:18] [147:4,18] [149:16] [218:7]
**owned** [8:14,17,23,25] [9:6] [17:15] [22:16] [26:9,24] [31:10,15] [83:21] [89:21] [106:8] [208:5] [213:9]
**owner** [9:8] [13:3]

**P**

**p.m** [1:15] [92:2] [114:11] [151:18] [181:6] [206:22] [217:15] [220:16]
**pacific** [35:9,19] [36:13]
**pacificare** [167:3] [182:24]
**pacificares** [167:16]
**pack** [179:22,23]
**packets** [111:17,25]
**page** [1:19] [3:] [10:5] [39:6] [47:17] [65:9] [71:25] [73:6] [76:22] [79:3] [82:24,25] [83:10] [88:15] [91:12] [94:1,2] [97:2,25] [99:9] [101:8] [104:15] [107:9,14,16 ,17] [108:19,20] [110:4,8,22] [116:8] [119:3] [123:11,12] [124:10] [125:8,11] [126:16] [127:14] [130:17] [136:7] [137:9,10] [142:13,16] [151:22] [152:14] [153:10] [166:8] [170:9] [171:1,23] [176:21] [178:18] [179:2,8] [180:9,12,16] [181:10,19] [182:22] [185:18,23] [186:15] [187:1,2] [188:25] [192:4]

**7/18/2002 Bystrom, Dale (final)**

[194:4] [197:12,17,19,20]
[199:20,24] [200:5] [202:20]
[204:16,17] [207:1] [209:17]
[210:22] [212:24,25]
page/line [221:2]
pages [124:9] [137:11]
[152:15] [153:12] [178:4,24]
[182:18]
paid [28:15] [34:16] [46:18,22]
[83:6] [188:21] [189:8]
[207:6]
pan [30:3]
panel [39:7,8] [40:22] [123:16
,20] [124:12]
panels [39:10]
papers [185:21]
paradigm [188:1,4,7,10]
[189:12,13]
paragraph [47:19] [56:6]
[73:7] [76:22] [77:6] [79:4]
[82:20,24] [84:24] [105:5]
[119:4] [123:14] [130:18]
[134:5] [151:23] [171:1]
[186:24] [187:3,25] [195:13
,21] [202:21] [203:21] [207:1]
[208:15]
paragraphs [75:15] [200:2]
paramount [127:16]
parity [177:1]
parke [39:23] [150:17]
parkedavis [39:23] [150:17]
parke-davis [39:23] [150:17]
part [13:12,15] [61:17] [70:2
,20] [79:24] [83:19] [84:7,8]
[87:20,24] [105:23] [109:1]
[126:25] [132:20] [133:2,12]
[173:7] [183:19] [185:1]
[186:13] [196:6]
partially [152:3]
participants [116:18,24]
[117:11] [120:20] [121:4]
participate [16:5]
participated [110:16]
participation [39:7,8] [87:7]
particular [32:23] [45:22]
[46:1] [48:23] [49:8] [70:4]
[77:16] [78:14] [86:11,21]
[87:23] [94:10] [96:6] [104:17]
[110:6] [112:11] [115:11]
[120:14] [127:21] [129:21]
[141:11] [152:19,21] [165:4]
[183:11] [190:9] [194:24]
[195:1] [199:5]
particularly [135:17]
parties [126:20] [191:19]
[206:15] [:]
partner [111:15]
partnering [188:5]
partners [15:3]
parts [102:3] [128:13] [172:5
,7] [173:18]

party [169:11] [:]
pass [71:8,22] [83:5] [132:18]
passed [132:19] [133:17]
passing [67:15,18] [70:15]
past [64:16] [165:10]
patient [12:24] [50:2] [53:8]
[56:8,12] [57:8] [60:7,9,10,12]
[61:20,23] [62:11] [63:15,18]
[64:8] [72:2,4,12] [81:7]
[94:17] [95:20] [98:18]
[107:23] [110:25] [143:7]
patients [12:4] [15:5] [47:22]
[48:16,18] [49:17,18,19,25]
[50:13,16,20,25] [51:1,5,23]
[53:20,21] [54:1,3] [55:10]
[56:8] [62:8] [84:15] [162:25]
[178:12]
patterns [51:12,14] [55:14]
pay [12:8] [49:21] [56:12,21,22]
[57:8] [58:7] [60:13,14,17,18]
[61:8,9,20,23] [62:2,13]
[63:19,23] [64:8] [65:13]
[68:1,14] [72:2,5,12] [77:7]
[132:14] [134:10] [195:20]
[206:4]
paying [56:9] [67:7] [195:10]
payment [6:13] [49:16,24]
[56:7] [62:11] [69:14] [99:3]
[131:15]
payments [28:13] [69:13]
[131:21]
payor [18:19,23] [48:14]
[61:16] [65:24] [95:24]
[131:8,14]
payors [19:17] [29:9] [47:25]
[49:6] [64:4] [70:13] [74:6]
[76:7,9]
pays [58:4] [65:11] [72:7]
pbm [5:22] [6:2,6,13,22]
[8:14,17,23] [9:3] [11:11,25]
[12:11,18] [14:21] [18:1,2,14
,15,25] [21:24] [22:4,16,21]
[23:7,11,16] [25:23,25]
[26:2] [31:6,15,21,24]
[41:2,12,13,20] [49:2]
[64:25] [65:11,17] [67:13]
[68:20] [69:1,19] [70:18]
[71:2] [72:16] [73:14,17]
[74:3,10,16] [75:16,24]
[76:2,10,17] [84:11,24]
[85:6] [86:10,11,20,22]
[87:16,19] [89:3,4,11,23]
[91:21] [107:11] [117:15]
[119:17] [120:11,17] [126:18]
[127:5,16] [130:19,20]
[131:10] [132:2,14,18,23]
[133:22] [135:19] [143:25]
[144:16] [146:15] [147:2]
[148:6,25] [149:8] [150:13]
[154:22] [156:15] [159:3,19]
[163:23] [164:11] [165:4]

[166:21] [168:9] [177:17]
[184:8] [185:2,4] [187:8]
[189:7] [203:22] [207:4]
[208:10] [211:7,10] [215:19]
[218:14,23]
pbms [12:1,3,7,12,15]
[14:22,25] [19:23,25] [20:13]
[27:11] [28:23] [34:12,14,17]
[35:1] [38:5] [47:20,25]
[48:10,13] [65:1,13,14]
[67:22] [68:23] [69:7] [70:12
,13,20] [71:6] [73:14,16]
[76:22] [77:1,7] [79:8]
[82:21,22] [83:4,5,7,10]
[84:6,9,18] [85:2,7,11,19,24]
[86:5,12,15] [87:2,6,10,15,17]
[88:8,16,18] [90:17] [91:1,2
,4,13,15] [97:25] [99:9]
[101:8] [103:3] [104:20,21]
[105:6] [106:2] [113:8,11]
[119:5,9,22] [126:21,22]
[127:3,4,19,21] [128:17]
[129:3,12,17] [130:2,5,10,13
,24] [133:24] [135:22,25]
[140:23] [146:20,24] [148:11]
[149:1] [152:15] [153:9]
[160:5] [163:12,19] [164:16
,20] [165:3] [166:23] [170:3]
[176:20] [179:25] [181:21,24]
[184:10,11,14,18] [187:10]
[189:6] [198:21] [202:1]
[207:10,17] [208:12] [215:14]
[216:1]
pcn [26:2,5,7,15] [83:17,22]
pcs [4:] [34:16] [138:25]
[139:11] [140:2] [144:11]
[190:21,24,25] [191:1,14]
[192:2] [193:1,8,11] [194:4,5
,20] [203:17]
pcss [190:20] [191:20]
[193:4] [195:6] [203:14]
pda [53:11]
pdl [139:15,23] [140:2]
[144:11]
peer [38:23] [39:1] [108:22]
peerreviewed [108:22]
peer-reviewed [108:22]
penalized [113:14]
penetration [31:7] [161:1,4
,6]
pennsylvania [92:25] [93:1]
people [20:22] [31:1] [85:12
,23,25] [154:14] [174:14]
[179:18]
per [46:24] [47:10] [69:25]
[109:13]
perceived [182:5]
percent [6:25] [8:25] [50:3,8
,9,10,15] [60:14,25] [61:1,13]
[72:3] [101:14,17] [102:17,20]
[103:4] [121:4] [131:9]

[132:14,25] [133:9] [134:12]
[135:6,13,22] [136:1,10]
[143:24] [152:2,3] [153:15,16
,17] [176:24] [177:8] [192:9,23]
[194:10] [195:6] [208:16,19
,20,22] [209:2] [213:9]
percentage [14:2] [49:23]
[50:2] [57:21,23] [65:13]
[67:17] [74:2] [77:17] [97:3,5]
[100:15] [101:12] [104:17]
[129:19] [132:15] [133:17]
[183:11] [184:21] [189:4]
[205:17]
percentages [104:24]
perfectly [115:7]
perform [49:2] [73:17]
[89:4]
performance [17:2] [29:8]
[40:18] [69:22] [75:6] [139:8
,10] [194:7] [207:7]
performed [19:12] [21:19]
perhaps [11:2] [126:4]
[177:6,12] [214:10]
period [9:5,9] [10:22,25]
[11:1] [13:19] [30:5] [104:7]
[191:17]
periods [104:9] [157:7]
[169:15]
permember [109:13]
per-member [109:13]
permitted [145:5]
person [12:25] [22:13]
[86:15] [166:22] [200:21]
[201:1] [211:5] [218:21]
[222:]
personal [11:18,21]
personally [7:21] [25:10]
[119:14] [222:9]
personnel [33:5] [34:6]
persons [39:3,5,15] [42:21]
[49:19] [86:13] [201:16]
perspective [74:10] [113:23]
pertain [135:16]
pertains [57:14]
pertinent [135:17,19]
peryear [109:13]
per-year [109:13]
petitioned [111:9]
pharmacare [89:16] [158:19]
pharmaceutical [19:15]
[20:18] [25:6,11,15] [26:3,8
,14] [27:14,16,19,24] [32:15]
[37:17] [38:17,24] [40:20]
[47:18,21,23] [48:16,19]
[49:7,23] [54:24] [66:13]
[68:12] [77:3,6,8] [79:14]
[83:20] [98:14] [109:14,22]
[120:4] [126:18] [144:3]
[155:20] [156:7] [162:22]
[169:10] [185:13] [186:17]
[187:18] [207:22]

**7/18/2002  Bystrom, Dale (final)**

pharmaceutically [127:12]
pharmaceuticals [1:] [5:13]
[28:13] [29:6] [33:8] [44:6]
[49:16] [56:7] [58:22] [111:16]
pharmacies [13:23] [15:14]
[19:4] [23:11,17,18,21,24]
[24:15,16] [35:4] [48:6,8]
[64:16,18,19] [106:11,12]
[145:23] [151:6,8] [187:18,22]
pharmacist [34:2,21,22]
[35:6] [41:25] [95:2,21]
[108:12] [122:6] [139:1,5]
[145:2,19] [214:11]
pharmacists [34:5,7] [38:4]
[119:25] [195:22] [196:11,15
,19]
pharmacoeconomic [109:
7]
pharmacoeconomics
[109:9]
pharmacoeconomist
[217:24]
pharmacy [4:] [5:22,23]
[6:2] [14:5,6,14] [15:6,23]
[18:15,17,18,23] [19:3]
[20:11] [21:8] [23:14,19]
[24:1,4,6,12,21] [27:4,8,10,12
,21] [28:19] [29:16] [32:24]
[33:20,23,24] [34:1,8]
[35:9,13,16,19,20,24]
[36:8,12,14] [37:12] [38:2,3
,11] [39:2,10,11,13] [40:15,19]
[41:12,13,20,23] [48:2,5,18]
[49:17] [50:2,4,7] [53:8,13]
[56:8,9,17] [57:2,13,24]
[58:4] [60:7,8,11,15,18]
[61:5,12,15,18] [62:3,10,19]
[64:3,5] [65:7] [72:1,7,17]
[73:18] [74:3,5,13] [76:14]
[77:4] [80:23] [81:6] [84:11]
[89:5,8,10] [93:9] [108:16]
[110:9,11] [124:11] [142:11]
[143:21] [144:4,8,19] [145:6]
[146:15] [154:22] [179:21,23]
[191:25] [218:14,23]
pharmacys [63:15]
pharmaquest [78:25]
pharmedics [78:25]
pharmedquest [79:2]
phone [54:23] [198:24]
[199:2]
phonetic [11:15] [201:9]
phrase [77:9,11] [80:13]
[188:15]
physician [49:13] [53:6,17]
[95:22,23,25] [111:2,8]
[112:8] [114:2] [117:23]
[118:9] [142:17,24] [144:11
,21] [145:18] [163:3,6,13,16
,20,21] [185:21] [218:13]
[219:4]

physician.com [56:5]
physicianprescribing
[219:4]
physician-prescribing
[219:4]
physicians [19:19,22]
[20:15,17] [21:9] [49:7,11]
[50:23] [51:8,21] [52:3,23]
[53:16,17,19,22] [54:24]
[55:14] [95:2] [111:17,23,25]
[112:2,4] [113:23] [114:1]
[117:21] [143:7] [161:23]
[162:8,23,25] [172:16]
[190:1] [198:12,18,19,22,23]
[215:20] [219:4,18,23]
pick [15:19]
piece [29:7] [64:20] [117:25]
pilgrim [40:25] [41:1]
pilot [53:3] [55:6,8]
pilots [55:15,18,20]
place [15:17] [33:13] [111:12]
[120:11] [138:7] [139:5]
[140:24,25] [141:10] [142:7]
[146:23] [149:11] [172:24]
[175:8] [182:15] [184:19]
[193:4,8] [194:20] [200:17]
[201:5] [202:24] [215:15]
[216:1]
placed [21:14] [119:1,13]
[140:2,20] [141:3] [146:25]
[162:11,13] [188:21] [190:19]
placement [118:10] [191:4,5]
placing [141:15] [149:9]
plaintiff [1:5,20] [2:2]
plaintiffs [3:]
plan [14:14,21] [18:19]
[19:2] [24:13] [26:9] [39:12]
[54:20] [55:11] [56:9] [58:20]
[59:19,22] [60:16] [62:3]
[63:12,17] [69:2] [71:15]
[72:7] [73:25] [76:14] [77:4]
[83:21] [85:20] [86:16,17]
[98:14] [99:4,5] [105:13]
[111:10] [112:11,12] [114:2
,18] [139:8] [146:12,17]
[148:9,15,20] [154:5,23]
[155:4] [157:14,21] [158:24]
[159:2,18] [160:3,14] [168:2]
[170:12,22] [171:4,5,11]
[172:23] [173:2] [174:13,16]
[175:5] [176:8] [179:11]
[193:13] [197:8] [199:5]
[201:7,8] [202:9,14]
planning [17:2] [213:3]
[216:12,17]
plans [14:11,22] [23:11]
[24:2] [28:24] [39:9] [48:1]
[64:1] [65:19] [66:2,3,11,12
,14] [68:13,14,24] [69:23]
[71:9] [73:17] [85:19] [96:6]
[100:16] [103:22,23] [113:11]

[117:20] [132:20] [133:16]
[148:5,8] [150:2] [152:19,24]
[153:9] [155:16,22] [156:1,2
,4] [157:12] [158:11,12]
[160:7] [165:10] [197:5,24]
[198:1] [199:1,6] [201:10]
[202:1,23] [216:10,19,22]
plateaus [77:17]
player [157:17] [158:13]
please [5:6] [7:9] [82:23]
pleasure [220:6]
plunge [150:4]
plus [24:15] [57:4] [60:25]
[61:1]
pocket [63:12] [65:1]
pocketing [133:24]
point [72:1] [79:5] [100:6]
[112:16] [113:12] [126:9]
[147:14] [160:18] [172:9,18]
[173:14] [178:21] [184:3]
[207:9]
points [172:13]
policies [113:13]
policy [113:17,18,21]
population [42] [76:23]
[77:1] [85:3] [107:23] [167:20]
porter [2:9] [5:10]
portion [68:8] [72:5] [102:4]
[133:1,10] [167:16,19]
[168:10]
portions [173:23] [192:1]
position [17:8] [18:5] [32:8]
[64:11] [80:2] [127:22]
[151:5] [157:11] [160:25]
[168:21] [188:3] [189:9]
[193:18] [207:4,19,25]
[208:6,12] [211:7]
positioning [96:10] [126:20]
[127:17] [137:1,4] [148:6]
[162:18] [164:25] [198:16]
[208:5]
positions [9:10] [13:8]
[148:24] [160:15] [164:1]
positive [109:23] [147:18]
possibility [28:11] [51:14]
[140:23]
possible [57:7] [61:18]
[62:9,18] [69:12] [73:24]
[83:13] [92:24] [93:20]
[95:24] [101:1] [112:8]
[118:7] [135:14] [152:18]
[158:8] [177:5,9] [213:15]
possibly [122:1]
potential [181:24] [185:1]
potentiality [207:15]
power [187:17]
powerful [187:13]
practice [19:24] [20:1]
[120:4]
practiced [108:16]
practitioners [113:14]

preceded [209:25]
precluded [114:22] [128:9]
predatory [147:14]
predecessors [187:4,6]
predictable [150:3]
prediction [200:25]
predominant [115:10]
preemption [174:13]
preemptive [146:17] [148:9
,14,20] [154:23] [155:4]
[156:1] [160:3] [170:12,22]
[171:4] [176:8]
preference [106:11]
preferred [4:] [23:13,17,24]
[67:2] [68:18] [94:25] [95:25]
[139:1,3,7] [143:25] [145:2]
[152:2] [175:9,18,20,22]
[176:2,11] [211:23,24]
[212:2,4,6,9,14,20] [213:14]
prefest [81:12]
prem [172:11]
premarin [3:22] [28:6,15]
[58:25] [59:23] [80:13]
[81:9,14,18] [82:7,14,18]
[102:14] [108:6,14] [115:11]
[121:21] [122:14,17,21]
[124:5] [125:1,23] [126:5,12]
[128:9,18] [135:16] [140:25]
[143:3,8] [145:15,20,25]
[146:3] [148:9] [153:8]
[164:13] [165:5,11,17]
[167:6,22] [168:10,21,24]
[170:12,21] [171:25] [172:3
,17,18,21] [173:4] [175:12,17]
[177:2,6,7] [178:5,7,9,11,13
,20,22] [179:3,4,5,6,14,19]
[180:4] [181:17,20] [182:19
,20] [183:12] [185:20,24]
[189:16] [192:18,21,24]
[193:12] [194:10] [195:5,11]
[199:4] [203:25] [208:6,15,19]
[209:23] [210:4] [212:19]
premarins [207:3]
premised [129:19]
preparation [43:1,5,10]
[46:9]
prepare [216:5]
prerequisite [118:14]
prerogative [165:3]
prescribe [54:2,16] [94:11]
[95:25] [142:17] [143:2]
[162:9,23] [198:14]
prescribed [51:23] [53:19]
[54:21] [71:14] [100:11]
[161:21]
prescriber [111:3]
prescribers [105:11]
prescribing [19:20,22]
[20:5] [49:12,14] [50:25]
[52:1] [53:2,9,11,25] [54:25]
[55:3,14] [103:16,17] [113:15]

**7/18/2002  Bystrom, Dale (final)**

[114:3] [142:18] [190:2]
**prescription** [11:18,22]
[12:1,4,18] [15:17] [19:5]
[23:3] [32:17,20] [41:4]
[48:8] [51:9] [53:7,13]
[55:5] [56:11] [72:2,3,5]
[83:25] [85:20] [86:24]
[90:1] [100:12] [111:8]
[134:9] [139:17,21] [141:22]
[167:2,5,8,10,25] [168:6]
**prescriptionfilling** [141:22]
**prescription-filling** [141:22]
**prescriptions** [15:10,16]
[34:16,23] [49:22] [61:14]
[73:21] [163:6,13,21]
**presence** [18:2] [207:14]
[208:7] [209:13]
**present** [2:12] [117:4]
[152:8]
**presentation** [116:14]
**presenting** [71:20]
**president** [18:4]
**press** [185:23]
**pretty** [50:24] [106:18]
[127:2,24] [185:17] [196:7]
**prevalence** [32:1] [106:5]
[151:24]
**prevalent** [98:4]
**prevent** [99:16] [151:6]
[164:6] [183:6,8] [189:7]
**prevented** [125:20] [191:1]
**prevention** [122:11,15]
**previous** [5:25]
**previously** [5:20] [41:6]
[100:18] [152:11] [207:11]
[210:15]
**price** [56:10,13,16,20,22]
[57:11,12,21,24] [58:2,3,7]
[59:4,5,10] [60:8,12,15,17,24]
[61:2,3] [62:12,13,21]
[63:7] [64:2,9,10,14,15]
[65:2,6] [81:19] [87:23]
[88:1] [136:19] [177:7,10,11
,15,18,23]
**priced** [177:1,7]
**prices** [24:19] [28:14] [56:24
,25] [57:1,19] [135:4] [136:18]
[184:22,23] [187:21]
**pricing** [3:22] [24:22] [58:19
,20,23]
**primarily** [31:8,11] [41:19,23]
[58:14] [59:3] [85:3]
**primary** [56:1] [85:10,25]
[86:1] [105:20] [123:18]
[162:22]
**prime** [159:1,8]
**principle** [110:14] [180:3]
**principles** [3:17] [107:1]
**print** [125:11]
**printed** [211:19,22]
**prior** [1:] [21:22] [22:22]

[29:10] [30:17] [32:5] [33:19]
[46:8] [90:23] [111:5,6,18,25]
[112:5,6,12,20] [140:5,11,12
,16,19,23] [141:2,6,12,17]
[142:22,23] [143:4,6,13]
[146:25] [167:4] [168:15,17
,22] [195:21]
**privacy** [12:21]
**private** [134:14]
**probable** [176:24]
**probably** [19:25] [28:7]
[34:18] [46:12] [52:6] [55:19]
[71:10] [81:24] [89:7] [91:17]
[103:14] [115:1] [128:11,14]
[133:4] [135:23] [153:13]
[154:2] [157:15] [170:5]
[176:13] [179:18] [191:20]
[211:18] [214:16]
**procedure** [1:]
**procedures** [124:17]
**proceed** [7:4]
**proceedings** [:]
**process** [13:1] [14:23]
[23:5] [25:24] [27:1] [66:7]
[71:11,12] [74:10] [77:4]
[111:6] [112:7,17] [113:2]
[126:25] [129:23,25] [130:12]
[141:22] [142:25] [163:17]
[180:1] [183:19] [184:16]
[185:1,9] [196:7] [214:19]
**processed** [93:13,16]
**processes** [93:22] [163:20]
**processing** [48:9,20] [76:13]
[131:6]
**processor** [89:7]
**procurement** [112:18]
**produce** [54:4] [58:18]
[109:22]
**produced** [1:13] [54:8]
[100:19] [107:3] [115:23]
[122:23] [130:8] [136:7]
[170:20] [191:13]
**product** [32:19,20] [56:17]
[58:25] [61:24] [63:8] [79:14]
[96:13] [99:16] [116:16,21,23]
[117:14,17,22] [118:3]
[120:6,11,14,20] [121:25]
[139:14] [143:22,23,24]
[144:21] [145:6] [147:1,4,18]
[149:6,11] [152:22] [160:20]
[161:22] [162:1,2,18,23]
[163:3] [165:2] [171:21]
[172:12,19] [177:5,17]
[182:1] [184:21,24] [185:3,16
,24] [188:21] [189:15] [190:1
,7,12] [192:13] [195:24]
[196:13] [198:8,25] [200:15
,19] [202:9,10,15,24] [215:24]
**production** [192:3]
**products** [15:21] [20:18]
[24:5,8,19] [32:15,16,17,18]

[47:23] [50:20] [57:16] [58:6]
[66:25] [77:3,8] [82:17]
[95:10,25] [96:3] [98:14]
[99:24] [106:5] [107:20]
[111:1] [112:18] [113:15]
[117:3] [124:7] [126:21,24]
[128:13] [129:10] [139:10,11]
[144:20,23,25] [145:8,13]
[147:6] [149:6,18,19] [150:12
,16] [152:21] [161:2,5]
[162:13] [163:2] [164:22]
[165:1,12] [184:22] [185:14
,15] [195:4] [198:13,14]
[204:6,21,22,25] [205:7,9,16
,21,24] [206:6] [215:21]
**professional** [34:23] [37:24]
[38:14]
**profile** [41:4] [176:22]
**profiles** [12:19] [51:9]
**profiling** [19:21] [49:13]
[81:7] [95:23] [163:16]
**profit** [64:18,20,21] [134:4]
[164:15]
**profitability** [130:24] [132:1
,6] [164:19]
**profits** [130:20] [210:5,25]
**program** [24:1,14] [35:25]
[39:18] [71:12] [72:19]
[98:12,15] [134:9] [138:25]
[139:1,4] [144:11,15] [150:25]
[151:3] [173:2] [194:7]
[201:9] [206:4]
**programs** [14:16] [15:24,25]
[19:12,13,14] [20:6] [25:20]
[27:20] [29:21] [36:20,24]
[53:3] [55:6,8] [73:10]
[81:7,8] [84:15]
**progress** [216:8]
**projects** [14:13] [216:11]
**promotion** [32:13]
**promotion/education**
[179:1]
**proportional** [204:18]
**proposal** [71:21] [210:3,6]
**proposals** [130:11]
**proposed** [208:16]
**proposing** [208:24]
**proposition** [31:14]
**protect** [207:18] [208:12]
**protected** [188:3]
**protection** [188:3]
**protocol** [142:16,25]
**protracted** [66:7]
**provantage** [182:8,15]
**proved** [222:]
**provide** [11:22] [18:25]
[19:1,3,18] [39:17] [40:17]
[48:3,6,15,17] [49:11]
[66:22] [81:16,20] [82:1,11]
[85:6] [111:11] [113:1]
[123:19] [124:17] [150:1]

[169:10] [212:6]
**provided** [11:18] [40:14]
[44:18] [52:15,17] [70:16]
[77:15] [83:17] [87:20,24]
[88:17] [100:25] [123:18]
[129:20] [195:16]
**provider** [18:18] [48:15]
[74:3,5] [80:16]
**providers** [19:17] [24:4]
[31:16] [47:21] [48:5] [50:4]
[57:2] [64:5] [73:18]
**provides** [18:21] [105:10]
**providing** [19:3] [23:2]
[47:22] [66:3] [83:24] [131:7]
**provision** [128:8,17] [147:20
,21]
**public** [1:] [222:] [:3,16]
**publications** [38:16,19]
**publicly** [13:22]
**purchase** [24:4,5] [27:23,24]
**purchased** [28:6] [81:18]
**purchasing** [64:13]
**purport** [191:24]
**purports** [101:11]
**purpose** [11:19] [107:10,19]
[212:2]
**purposes** [105:16] [131:4]
[222:]
**pursuant** [1:17]
**pursue** [211:7]
**push** [165:6,12]
**pushing** [180:3]
**put** [5:11] [24:1] [29:20]
[53:6] [87:17] [110:15]
[111:24] [112:12] [138:7]
[139:5] [140:24,25] [141:9]
[165:15,19] [181:25] [183:16
,25] [185:2] [194:2] [214:1]
**putting** [31:2] [114:22]
[125:20] [191:2] [205:12]

---

**Q**

**qualified** [43:21]
**qualifies** [155:9]
**qualify** [65:22] [152:24]
[154:14,18] [155:12,22]
**quantify** [173:15] [175:2]
[181:11]
**quantifying** [175:6] [182:23]
**quarter** [66:9] [204:21]
**quarterly** [17:2] [39:11,14]
[73:19] [202:22] [209:9]
**quarters** [151:22]
**queries** [12:11]
**question** [7:9] [8:1,3] [25:3]
[55:14] [59:14] [69:9] [96:19]
[103:7,8] [154:19] [160:10]
[176:14] [194:16] [197:15]
[205:4,5]
**questionable** [211:12]

7/18/2002  Bystrom, Dale (final)

questioning [199:10]
questions [7:7] [8:8] [126:14]
[189:20] [217:19] [220:4,9,12]
quick [100:17]
quickly [218:23]
quite [64:24] [65:12] [85:18]
[100:5] [112:7] [129:9]
[142:23] [161:3,5] [196:25]
quote [118:15] [173:8]
quoted [172:2]
quoting [201:15]

R

r.ph [3:12] [10:3]
raise [53:18]
randomized [108:25]
range [50:4,24] [73:8] [134:23]
ranges [136:10]
ranking [126:1]
rare [57:10,14,17]
rarely [119:8,21]
rate [46:15,24] [47:1,6,9]
[61:22] [63:16] [64:23]
[73:20,21] [74:14] [117:20]
rated [145:7,11,14] [172:3]
[186:16]
rates [29:3] [47:7]
rather [31:4] [53:7] [64:12]
[66:24] [68:17] [171:4]
[183:12]
rdr [1:15] [:]
reach [44:12]
reached [45:15] [103:13]
[104:6] [146:13] [184:11]
reaching [44:9] [88:6] [97:20]
[98:1] [99:6] [101:3] [102:22
,23] [103:9,19] [104:2,19]
[105:2] [108:10] [153:1]
[156:24] [174:11] [179:22]
[191:9] [198:5] [218:7]
reactions [118:5]
read [45:1,13,17] [78:21]
[101:6] [102:1,3,4] [154:23]
[155:4] [160:3] [165:14]
[169:5,24] [170:2] [173:16,18
,25] [174:1,4,23] [196:10]
[205:3,5] [208:21] [210:11]
[222:1]
reader [134:22]
readily [144:25]
reading [44:13,15] [78:11]
[155:7] [157:10] [168:18]
[169:25] [173:23] [175:3]
[194:16,17] [197:24]
real [97:19] [108:20]
realized [218:24]
really [51:15] [57:22] [84:20]
[94:21] [101:22] [133:4]
[135:16] [137:25] [147:23]
[154:7] [160:9] [162:4]

[208:3]
reason [58:15] [66:14]
[82:9] [89:1] [101:16] [102:18
,19] [105:24] [117:6,8]
[124:23] [140:1] [145:22]
[167:21] [193:8] [194:20]
[199:25] [203:17] [221:2]
reasons [90:21] [117:12]
[156:18,21]
rebate [19:9] [25:15,25]
[26:13] [27:2] [40:4] [65:13,18]
[66:6,16] [67:3,8,12,14]
[69:13,18,20,24] [71:3]
[77:13,19] [79:7] [80:1]
[83:25] [89:5] [128:1,8]
[132:15,19] [133:11] [134:14]
[135:1] [136:11] [175:8]
[189:3,4,5,6,8] [195:17]
[204:18] [205:22,23,25]
[207:5,8,18] [208:20] [209:15]
[212:7,10] [214:22]
rebates [25:22] [26:5] [65:10
,21,23] [66:1,24] [68:1,3,5,6
,8,9,12,17] [69:2,14] [70:16]
[71:8,17,18,23] [76:24]
[77:6,10,14] [78:16] [79:5,11
,15,23] [81:16,20] [82:1,11,15
,16] [83:6] [105:18,21,22,23]
[127:16,23] [128:7] [129:12
,19] [130:22] [131:2,19,20]
[132:5,10,12,24] [133:2,5,8
,17,20,25] [134:1,6,10,19,23]
[135:12,20,22,25] [136:14,17]
[146:22] [147:4,8,10] [149:1
,4,6,10,17] [150:2,9,12,21]
[163:25] [164:12,14,17,23,25]
[165:16,19] [168:24] [175:5]
[177:11,19,21] [183:10,23]
[184:20,23] [185:1,14,15]
[187:22] [188:18,19,20]
[189:1] [195:20] [205:17]
[207:11,16,19,24] [208:10,15
,19,24] [209:2,9,12] [212:12]
rebating [135:5]
recall [24:11] [28:7] [33:16]
[34:18] [40:6] [43:14] [45:1]
[46:4,14] [54:13] [79:16]
[80:11] [82:4,6,8] [101:5]
[102:8] [103:25] [104:1]
[123:7] [141:18,24] [156:3]
[158:9] [166:5,6,7] [167:7,11]
[169:22] [171:15] [173:19,23]
[180:15] [182:17] [185:12]
[214:17]
receipts [50:2]
receivable [72:18]
receive [25:15] [67:3,14]
[80:2] [86:16,18] [132:4]
[164:17] [168:24] [195:22]
[196:11] [209:3] [220:9]
received [54:23] [87:13]

[111:9] [116:17] [132:8]
[208:14,15] [209:16]
receives [72:2]
receiving [48:16,18] [69:13
,18] [166:7] [167:8]
recent [87:8] [133:15]
recently [11:13] [91:10]
[160:8]
recipients [134:9]
recollect [46:11]
recollection [169:4]
recommend [144:12]
[195:15] [211:10]
recommendation [213:17]
recommendations [110:15]
[119:25]
recommended [113:20]
[218:25]
recommending [211:13]
record [5:2,7] [9:14,15,18,19
,23] [16:6,7,13,15] [72:25]
[73:4] [91:25] [92:4] [114:8,9
,13] [151:16,20] [181:4,8]
[205:2] [206:20,24] [217:12
,14,17] [220:14,16]
recording [116:10]
records [97:9]
redacted [192:2]
redound [69:6]
reduce [55:1] [154:24]
reduced [:6]
reducing [147:5] [206:5]
redundant [200:4]
refer [10:13] [98:19] [131:5,6]
[142:13] [172:13]
reference [210:12]
referenced [44:19,20]
referred [70:12] [176:17]
referring [41:21] [57:25]
[59:6] [78:23] [98:20] [111:4]
[131:25] [144:23] [175:25]
[177:10] [219:24]
refers [84:10] [214:16]
refill [19:13]
reflect [87:5,8]
reflected [83:8] [180:20]
reflection [24:22]
refused [79:22]
regard [27:14] [39:23] [51:7]
[54:5,9] [74:17] [186:1]
[204:5]
regarding [70:8] [124:25]
[125:6] [200:1] [208:17]
regardless [61:21] [68:5]
[188:22]
regular [29:8] [:10]
regularly [27:19] [73:18]
[78:4,6]
reimburse [29:4]
reimbursed [75:20] [86:12]
[99:20,25] [197:6,23] [199:3]

reimbursement [6:8,10,12
,19,20] [29:3] [61:17,19]
[62:16]
reimbursements [6:16]
reinstate [208:18] [209:2]
relate [192:2]
related [33:7] [135:3] [176:16]
[180:19]
relates [39:12]
relating [55:17,19]
relations [80:16] [186:3]
relationship [7:18] [179:25]
relationships [20:19] [25:19]
[28:25] [33:17] [151:7]
relative [77:18] [97:17]
[104:24] [108:5] [126:1]
[148:5]
relatively [157:16] [161:8]
release [185:23]
relevance [160:10] [202:4]
relevant [99:11,13] [100:8,9
,10] [103:12] [104:5,12]
[121:9] [134:21] [143:3,4]
[159:23] [172:8] [174:13]
[177:15]
relied [87:21] [88:7,12]
[171:2]
relief [121:6] [160:12]
relies [76:16]
relieve [192:21]
rely [76:22] [180:12] [218:6]
relying [171:3,6] [219:25]
remain [191:21]
remainder [16:11] [67:19]
[72:6] [166:8]
remember [45:8,22] [46:1]
[141:23] [169:25] [171:14]
reminded [183:20]
reminders [19:13]
reminding [81:14]
remove [165:4] [167:22]
removed [159:9] [165:11]
[168:10]
removing [149:17]
remuneration [84:8] [113:23]
[114:1]
render [148:22] [150:25]
[151:2] [219:2]
rendered [45:24]
rendering [44:2]
renegotiate [151:5]
renegotiated [151:11]
renegotiation [209:16]
rent [82:21] [83:4] [215:9]
rented [84:12,17]
repeat [25:3] [69:5] [75:9]
[168:16] [180:10] [205:1]
rephrase [219:21]
replace [165:5]
replaced [16:10] [144:13]
replacement [124:7] [192:16]

**7/18/2002  Bystrom, Dale (final)**

**report** [3:12,] [10:2] [19:21] [35:1] [42:14,15,18] [43:2,5,6,10] [44:3,10,19,21] [45:15,24] [46:3,6,10] [47:18] [65:10] [73:6] [78:1,8] [82:23] [87:24] [88:2,18,20] [89:1,12,13] [90:16] [92:7,8,10] [94:2,8,15] [101:4] [103:13] [104:13,14,19,21] [105:3] [108:10] [126:17] [130:17] [134:20,22] [137:7,10] [142:21] [151:22] [154:1] [160:17] [162:6] [164:14] [169:1] [170:6] [171:3] [172:6] [176:20] [187:2] [198:5] [200:3] [207:2] [216:15,16,18,21,25] [217:22,23] [218:16,19,22] [219:17]
**reported** [1:16] [19:16] [82:10] [85:1]
**reporter** [1:21] [69:5] [75:9,14] [113:24] [168:16] [180:10] [205:1] [:3]
**reporters** [3:]
**reporting** [19:6,8] [20:22] [95:23] [200:21]
**reports** [54:5,8] [87:9,10] [216:20] [217:20] [218:1,4,5,6,10,12]
**represent** [5:11,12] [18:1] [153:6] [201:24]
**representative** [163:23]
**representatives** [184:7]
**represented** [7:10] [170:21]
**representing** [7:14,20] [40:14]
**request** [23:20] [24:4] [71:20] [87:22] [113:2]
**requested** [23:25] [143:14] [202:15] [216:20]
**requesting** [117:21] [141:2] [146:24]
**requestor** [12:20]
**requests** [23:4] [111:18] [130:10] [202:9]
**require** [129:18] [142:16] [144:6] [168:21]
**required** [63:2] [82:14] [128:9,18] [134:17] [140:13,16] [143:7] [192:21] [203:25]
**requirement** [12:24] [143:6] [175:13] [207:7]
**requirements** [74:6] [112:12]
**requires** [134:10] [142:24] [175:17]
**research** [41:5] [109:19,20] [216:22]
**residence** [30:10]
**resolve** [189:19]
**resolved** [6:24]
**resources** [163:6]

**respect** [16:17] [24:19] [57:16] [59:22] [86:9] [92:9] [93:21] [99:8] [103:21,22] [106:3] [115:14] [124:6] [129:13] [136:15] [138:24] [140:13] [148:14] [149:17] [150:24] [152:21] [153:3,19] [159:14] [167:2] [174:12] [182:2] [183:10] [195:5,9] [197:25] [202:2] [208:13] [212:16] [213:3]
**response** [71:20] [184:2]
**responses** [3:] [12:18] [158:4]
**responsibilities** [33:7] [90:14] [213:2]
**responsibility** [16:17] [34:24]
**responsible** [20:23] [22:12,23] [24:24] [25:4] [81:6]
**rest** [11:4] [140:15] [194:17]
**restricted** [24:7]
**restrictions** [98:24]
**restrictive** [98:6,9,10]
**rests** [140:18,22]
**result** [55:13] [71:15] [79:21] [140:20]
**results** [71:13] [109:23]
**resume** [39:6]
**retail** [5:22] [14:6] [15:25] [23:10] [39:12] [40:19] [41:12,13,20,22] [56:10,13,16] [57:2,8,9,11] [61:13] [72:1] [73:14] [74:13] [85:6] [86:20] [146:15] [151:5,7]
**retailers** [143:21] [144:5,19]
**retained** [7:17] [217:21]
**retirees** [167:14]
**retrospective** [49:5]
**returning** [1:21]
**revealed** [153:20]
**review** [17:2] [19:14] [20:5] [21:13] [29:8] [39:1] [44:16,22] [48:21] [49:6] [73:12,18] [81:8] [108:18] [109:2] [111:10] [117:9] [122:6,19,23] [163:16] [171:10] [176:13] [188:24] [194:6] [202:10,17]
**reviewed** [10:9] [38:24] [39:4] [44:17,19] [67:11] [100:23] [104:1] [116:5,16] [117:9] [130:8] [148:10,16] [149:3,7] [151:4] [154:16] [158:7] [163:22] [169:21] [170:4] [171:11,12] [175:12] [217:20,22]
**reviewing** [39:3] [49:14] [81:6] [130:4] [148:12] [204:11]
**reviews** [21:15] [49:3] [185:11]

**revised** [207:5]
**revolve** [75:16]
**rhode** [89:17]
**right** [7:19] [17:7] [27:5] [39:24,25] [41:9] [51:16] [52:9,20] [56:25] [58:1] [59:11] [65:1,7,19] [66:3,18] [67:20] [68:24] [69:20,23] [70:15,21] [71:1] [72:8,13,17] [74:18] [76:6,18] [82:2] [85:8] [86:13,14,24] [91:16] [94:14] [96:9] [102:1,2,4] [103:9] [108:3] [111:13] [112:13] [120:7] [124:7] [125:13,17] [126:8] [127:4,7] [128:20] [129:21] [133:22] [134:1] [138:17,20] [139:9,12,14,16,24] [144:16] [145:19] [155:3] [157:7,8,18] [158:17,21] [162:2,12,14] [163:7,14] [165:7] [166:5,18,22] [169:3,18] [171:10] [172:2,5,7,10,11,14,25] [173:1,12] [174:22,24] [175:18,25] [176:17] [178:16] [179:8,19] [180:4] [181:14] [182:5,8,11,20] [184:1] [186:4,6,21,25] [187:19,23] [188:7] [190:12,25] [193:16,19] [194:19] [195:7,11] [196:5] [197:1,9,11] [198:6] [200:11,19,22] [203:16,19,22] [205:10,25] [207:17] [208:10,20] [209:10,14] [211:14,16] [213:21,23,24] [216:2]
**risk** [181:22,24] [182:5,7] [183:23] [207:4]
**rocky** [165:14]
**role** [8:13,14,16] [21:11,12,18,20] [22:22] [80:21,22] [200:15]
**rolls** [86:5]
**roman** [73:7] [170:8]
**roughly** [13:20] [93:14]
**rule** [62:14]
**rules** [1:] [135:3]
**rulli** [3:15]
**run** [33:5] [55:15] [92:24]
**rung** [201:21]
**running** [33:24]
**runs** [18:7]
**rx** [56:5]
**rxamerica** [3:] [4:] [8:20,23] [9:7,8] [16:17,19,21] [17:8,13,15,21,24] [18:7] [21:7,23] [22:6,7] [26:19,25] [30:19,21,24] [31:4] [42:10] [62:25] [63:1,14,21] [67:25] [68:3] [71:1] [74:18] [80:10,21,22] [82:12] [90:5,7] [105:10,14] [106:2,10] [113:5,21,22,25] [114:18,21] [115:4] [116:10

**,25]** [119:11] [123:3,8,23] [124:4,16] [125:20] [126:5] [129:24] [159:21] [185:10] [194:2] [202:3] [211:25] [212:14] [213:3,7] [214:15,18]
**rxamericas** [68:4] [211:22] [215:1,6,8]

S

**sacramento** [26:2]
**safe** [123:19] [162:10]
**safeguard** [48:15,17]
**safety** [20:11] [49:2] [110:5] [124:19] [186:19]
**sales** [29:5] [69:23] [149:18] [150:6] [162:14,19] [182:5] [183:11] [184:7,13,21]
**salt** [42:8]
**samantha** [2:]
**san** [14:21]
**santa** [55:7]
**sat** [185:11]
**savings** [176:24] [177:16]
**savon** [31:10]
**saw** [116:6] [142:6] [143:13] [154:4,8] [155:23] [174:19] [184:1]
**say** [7:6] [31:22] [46:19] [50:5] [51:17] [52:22] [56:6] [60:4,9,22,25] [63:5,6,8] [65:22] [68:20] [71:25] [76:22] [77:21] [78:25] [91:12,15] [97:4] [98:9] [107:24] [119:11] [150:9,22] [151:24] [159:21] [160:18] [162:4] [172:2] [176:4] [186:20] [191:16] [192:13] [208:8]
**saying** [67:21] [188:2] [196:21]
**says** [81:11] [142:16] [175:2] [176:8] [179:3] [181:16] [188:4] [189:3] [195:8,19] [196:5] [197:17] [200:12] [213:12]
**scale** [31:15]
**scenario** [61:22] [63:20] [72:8]
**schering** [150:17]
**schneider** [170:19] [174:3]
**schneiders** [173:16,24,25]
**schondelburg** [219:9]
**schondelmeyer** [217:23] [219:10]
**school** [35:9,19] [36:3,4,7,12,14]
**schools** [36:9,10]
**science** [35:13] [36:15] [38:17,24] [181:17] [182:19]
**scientific** [185:21]

**7/18/2002  Bystrom, Dale (final)**

**scope** [42:9] [124:11]
**scott** [2:15] [16:10]
**screwing** [69:1]
**script** [14:21]
**scripts** [73:15] [74:16]
  [90:18] [93:14,18,22,24]
  [130:14] [159:13,16] [183:19]
**seal** [222:13] [:]
**second** [9:18] [30:12] [59:23]
  [60:5] [79:3,4] [83:2] [99:3]
  [107:9,16] [112:15] [123:13]
  [136:6] [188:24] [203:22]
  [217:10]
**secondarily** [105:21]
**secondary** [110:5]
**section** [47:20] [49:15]
  [142:14] [170:6]
**secure** [28:12] [151:5]
  [167:14,17]
**seeing** [54:13] [103:25]
  [200:17]
**seeking** [160:11]
**seem** [51:11] [147:25]
  [182:3]
**seemed** [115:11]
**seems** [78:20] [122:19]
  [165:13] [180:2] [185:19]
  [213:1]
**seen** [10:3] [45:2] [66:23]
  [67:5] [69:19,25] [78:2,9]
  [120:16] [123:6,8,9] [140:9]
  [158:6,15,17,20] [160:22]
  [164:10] [191:22] [210:20]
  [218:1]
**select** [23:17] [110:13]
  [183:20]
**selected** [23:13] [95:9]
  [123:21]
**selecting** [68:18]
**selection** [21:13] [105:24]
  [143:24]
**selections** [53:23]
**sell** [24:5] [163:24] [181:17]
**selling** [182:18]
**send** [129:17]
**sending** [196:1]
**senior** [167:14]
**sense** [23:4,6] [27:17]
  [48:10] [49:9] [66:2] [94:18]
  [97:16,19] [187:14]
**sent** [86:23] [158:3] [198:20]
**sentence** [47:20,24] [73:7]
  [77:5] [83:2] [84:25] [94:15]
  [107:20] [119:4] [131:3]
  [142:15] [195:22] [196:10]
**sentences** [85:1]
**separate** [29:19] [36:12]
  [128:7] [131:23]
**separately** [41:22] [75:13]
**september** [192:1]
**served** [17:12] [35:5]

**service** [15:25] [19:6] [25:20]
  [38:5] [71:4] [72:1] [76:11]
  [85:7] [86:22] [92:18] [93:5]
  [107:22] [131:18] [215:9]
**services** [8:21] [11:11,25]
  [14:15] [15:5,6,9,20] [18:22
  ,24] [19:1,3,5] [21:24] [22:9]
  [24:21,22] [25:1,8] [26:9]
  [27:4,8,12,21] [28:19]
  [42:1] [47:23] [48:2,9,15]
  [73:8] [75:16] [80:18,23]
  [81:4,5] [83:25] [85:6]
  [86:21] [89:4,16] [92:9,11,15]
  [105:6,8,9] [131:8,15]
  [163:24] [166:21] [214:22]
**serving** [159:9]
**set** [12:10] [20:13] [59:16]
  [112:22] [113:18] [124:20]
  [127:5] [185:6] [:7]
**sets** [72:8]
**setting** [73:14] [87:15]
**seven** [103:2]
**several** [36:9] [39:9] [47:4]
  [52:4] [57:2] [73:16] [132:5]
  [213:12]
**severe** [192:5]
**shaking** [219:19]
**shall** [1:20]
**share** [14:14] [23:7,10]
  [65:18] [73:13] [77:2,8,16,18]
  [82:18] [103:21] [115:10,15]
  [134:1] [143:23] [145:4,24]
  [146:3,19] [147:4,5,9,11]
  [149:23] [150:3] [154:25]
  [164:3,6,7,21,22] [165:2]
  [188:22] [204:19,20] [205:16
  ,20,23,24] [206:5] [207:7]
  [211:3] [215:13,15]
**shared** [65:24] [146:8,9]
  [150:25] [151:3,10] [173:9,12]
  [180:17,20]
**sharedsuccess** [150:25]
  [151:3,10]
**shared-success** [150:25]
  [151:3,10]
**shareholder** [13:4]
**shares** [165:7] [183:11]
**sharing** [65:25]
**sharp** [14:20]
**shelf** [63:7]
**shes** [78:12]
**shield** [76:9]
**shifting** [184:21]
**shooting** [149:16]
**short** [9:21] [16:9] [73:2]
  [92:2] [151:18] [181:6]
  [206:22]
**shorthand** [1:] [:]
**show** [9:25] [77:22] [78:7]
  [106:22] [109:4] [115:21]
  [122:25] [136:3] [143:7]

[157:24] [166:1] [170:10]
  [173:3] [191:12] [193:19]
  [211:17]
**shown** [120:21]
**shows** [136:13]
**side** [211:8]
**sign** [125:24] [126:3,4]
**signature** [1:19,20] [3:4]
  [10:6] [221:1] [222:]
**signed** [182:10] [206:15]
**significant** [50:19] [54:22]
  [64:21] [79:14] [100:12]
  [130:23] [136:14,17] [157:17]
  [158:13] [159:20] [164:18]
**significantly** [85:2] [157:21]
**signing** [208:23]
**signs** [126:1]
**similar** [18:4] [115:14]
  [151:8] [185:8] [189:3]
  [199:7]
**simply** [53:6] [63:11] [66:12]
  [76:2] [84:12] [119:11]
  [120:10] [164:21] [168:2]
  [186:20]
**simultaneously** [13:9]
**single** [79:13]
**sir** [5:6] [9:25] [16:14] [73:5]
  [92:5] [114:16] [151:21]
  [165:21] [206:25] [217:18]
  [220:4]
**sit** [79:16] [141:18] [158:9]
  [171:22] [216:19] [217:1]
**sites** [12:11]
**sitting** [141:24] [177:14]
**situation** [67:1] [70:12]
  [112:21] [145:3] [200:2]
  [209:19] [210:11]
**situations** [65:23] [66:23]
**six** [42:2,3] [85:23,25] [103:2]
**sixth** [116:8]
**size** [53:12]
**sized** [157:21]
**slightly** [206:2]
**slip** [53:7]
**small** [51:2] [95:4] [125:11]
  [129:15] [157:13] [177:3]
  [202:3]
**smaller** [76:15] [82:22]
  [83:5,6] [139:11] [157:12]
  [167:19]
**soft** [138:22,23] [139:16,17,24]
  [140:7]
**sold** [24:8]
**sole** [82:14] [99:15] [128:9,18]
  [146:20] [175:12] [176:4,8]
  [178:15,25] [180:13] [182:24]
  [183:5,15,21] [186:21]
  [190:23] [193:2,7,12] [194:13]
  [204:1] [211:2]
**solesource** [99:15] [146:20]
  [183:5,15,21] [190:23]

**sole-source** [99:15] [146:20]
  [183:5,15,21] [190:23]
**solomon** [4:4]
**solutions** [167:3,5,9,11,25]
  [168:7]
**solvay** [44:5] [111:15]
**somebody** [215:22]
**someone** [56:17] [61:4]
  [63:8] [116:11] [149:15]
  [214:9]
**something** [8:6] [46:18]
  [59:15] [78:4] [121:8] [128:6]
  [132:17] [155:9] [165:22]
  [166:14] [179:1,21] [180:7]
  [182:4] [202:4]
**sometime** [169:7]
**sometimes** [28:2] [216:3]
**somewhat** [153:18]
**somewhere** [46:12] [50:9]
  [52:7] [158:17] [197:15]
  [214:18]
**soon** [8:7] [106:16,18]
**sophisticated** [73:9] [185:6]
**sophistication** [75:25]
  [76:16]
**sorry** [52:25] [78:13] [103:4]
  [107:13,17] [159:12] [180:25]
  [194:17] [197:19]
**sort** [16:24] [18:24] [40:10,24]
  [53:20] [96:8] [97:24] [109:4]
  [118:13,20] [121:8] [135:4]
  [138:23] [145:19] [180:20]
  [184:8] [201:20] [216:23]
  [218:18]
**sotto** [113:24] [114:14]
  [214:2]
**sound** [3:17] [107:1]
**sounds** [45:6]
**source** [85:10,14,15] [87:3]
**sources** [192:14]
**southern** [1:] [31:11]
**soybeans** [192:8]
**spacing** [211:20]
**span** [9:4]
**spanned** [9:9] [42:1]
**spasmodic** [211:20]
**speak** [149:16] [208:9]
**speaking** [14:18] [32:4]
**special** [56:24] [156:8]
**specialists** [43:20]
**specialized** [37:2]
**specific** [65:13] [76:1] [101:
  6] [146:24] [150:16] [167:12]
  [180:15] [202:9,14] [214:17]
  [216:10,11]
**specifically** [15:5] [28:7]
  [45:9] [46:4] [53:18] [105:1]
  [123:7] [147:16] [157:9]
  [158:9] [165:18] [169:22]
  [186:7]
**speculate** [79:25] [149:21]

**7/18/2002  Bystrom, Dale (final)**

speculation [79:24] [133:12]
spend [217:4]
spent [52:2] [55:2]
split [13:18]
spoke [80:16] [200:6]
spoken [51:22]
spouses [85:16] [86:17]
spread [95:11]
spring [169:7]
staff [34:1,4,5,7,20,21] [35:6] [201:8]
stand [64:12]
standard [121:5] [127:2] [128:2] [169:8] [184:17] [197:6,9] [198:2]
standards [110:17,20]
start [11:17]
started [17:17] [47:13]
starting [137:10] [170:8] [180:18]
starts [119:5] [130:18]
startup [11:17]
start-up [11:17]
state [1:16] [5:6] [31:23] [38:25] [41:19,24] [49:8] [75:15] [85:4] [86:8,19] [113:13] [119:20] [132:23] [185:18] [222:16] [:1,3]
stated [65:24] [81:20] [86:25] [94:8,16] [192:19] [:]
statement [82:10] [107:25] [119:23] [123:24] [124:1] [131:6] [195:18] [200:16]
statements [117:7]
states [1:1] [13:24] [30:6] [42:2,3] [73:8] [79:5] [123:14] [202:9,21]
stating [154:24] [214:7]
status [114:17] [121:11] [129:13] [160:19] [161:15,20] [162:8] [175:9] [176:2,12] [181:25] [195:23] [196:12] [207:12] [212:6]
stay [50:23] [103:14] [201:3]
stenography [1:]
step [26:7] [142:16,25] [143:17,18]
stepping [152:17]
steve [2:] [16:9] [217:23]
stockton [36:18]
stop [139:17,21]
stopped [198:15]
stops [141:22]
store [6:15] [15:18] [32:22,23] [33:3,4,6,11,15,18,19,21] [34:1] [61:8] [89:19] [146:2,8]
stores [6:3,13,20] [8:15,17,19 ,22,24] [11:9] [13:6,9,13,16,21 ,22] [14:1,2,4,9,25] [17:16,17 ,18] [22:5,12,16,20] [24:8,15 ,18] [27:10,23] [28:10,12,14]

[29:1,5,6,12,13,14,15] [30:15 ,18,19,20,23] [31:7,9,10,12] [32:7,13] [33:10] [51:10] [55:21,22] [74:21,25] [75:11] [166:15,16] [168:3]
strategic [17:1]
strategies [155:15] [174:21] [188:5]
strategy [3:] [136:8] [148:5,7] [172:15] [174:20] [175:14] [181:20] [195:15]
street [2:4,] [56:18] [61:4] [63:9]
strength [194:9,15,23]
strongly [95:8]
structure [97:23,25] [189:3]
structures [175:8]
studies [109:3,7,9,11,21] [120:15] [140:9] [163:18,22] [164:9,10] [178:10] [192:20]
study [35:22] [116:19,24] [117:11] [120:20] [121:2] [152:4] [178:11] [192:9]
stuff [206:17]
style [166:12]
subcategory [126:17]
subject [54:14] [97:6] [101:18] [139:16,23] [144:5] [178:10 ,11] [220:7,9]
submission [131:21]
submit [53:13] [111:17] [112:5] [130:10]
submitted [6:8,12,16] [218:11]
subparagraph [202:8] [204:13] [209:7,17] [210:12]
subscribe [78:5]
subscribed [222:]
subsection [143:20] [199:20 ,21,23] [201:14]
subsequent [208:23]
subsequently [72:7] [203:13]
subset [139:13]
subsidiary [22:5,21]
substance [218:16]
substances [192:7]
substantial [136:11]
substitutable [144:20,23] [145:1,12,13,17] [172:19]
substitute [145:6] [167:7]
substitutes [145:10] [212:16]
substitution [73:20] [145:20]
success [146:8,9] [161:16,24] [162:1] [173:9,12] [180:18,20]
successful [138:9,11,12,14] [143:15] [162:18] [173:11]
successfully [143:8]
sufficient [118:9]
suggest [72:23] [126:11]
suggested [117:7] [125:4] [167:6]

suggesting [95:3] [202:25]
suggestion [135:3] [194:19]
suggests [193:6] [194:11]
suing [6:13]
suite [1:17] [2:4] [:21]
summarize [146:11]
supplement [216:16,18]
supplemental [3:] [216:21]
supplies [20:8]
support [174:21]
supported [45:19]
supporting [116:25] [148:24]
supports [193:17]
suppose [12:16] [60:23] [149:15]
sure [19:19] [20:8] [25:18] [45:1] [63:13] [72:22] [99:13] [118:15] [136:24] [157:22] [158:7] [160:9] [164:16] [165:16] [169:25] [173:25] [174:18] [175:15] [176:10] [217:11]
surprise [111:19,21] [112:1]
surprised [135:21,24]
survey [219:18,21,22,25]
susan [1:15] [78:12,17] [:]
susman [1:] [2:13] [44:18] [218:22]
susmans [46:19] [52:15]
suspect [150:18] [170:14] [191:20]
switched [144:13]
switching [140:7,8]
sworn [1:14] [5:4] [:]
symptoms [122:8,9] [192:6 ,22]
synthetic [185:23] [192:7]
system [3:17] [34:25] [47:19 ,22] [48:7,20] [89:2] [107:1,10 ,11,18,19] [110:24] [111:11] [112:16] [113:13] [136:17] [145:1]
systems [26:13] [88:21] [91:21] [194:4]

---

**T**

---

table [114:14] [128:25] [194:6] [214:2]
tabs [3:22]
tactical [180:9]
tactics [147:15] [188:5]
taken [1:14] [5:16] [109:17] [:10]
taking [5:13] [33:13] [48:24] [87:11] [109:12] [:8]
talk [44:9] [61:12] [75:13] [85:1] [91:2,3] [97:13] [134:5] [188:2] [203:21]
talked [43:8,12] [52:22]

[53:16,22] [173:10] [194:1] [204:14] [218:20]
talking [51:8] [52:3] [63:14] [65:10] [78:19] [96:8,11] [112:20] [124:11] [125:10] [132:7] [137:11] [176:22] [177:16,22] [178:15,18] [182:24] [185:20] [186:24] [190:23,25] [200:6] [204:9]
talks [178:9] [185:17] [209:7] [211:23]
tally [46:12]
tape [91:24] [178:2] [181:2]
tapes [180:24]
targeting [204:25] [206:4]
targets [74:7,8]
team [116:15] [117:4,9] [:]
technological [211:18]
technology [11:17] [12:10] [52:2] [53:2] [55:1,5] [56:2]
telephone [196:15]
telephonic [219:22]
tell [55:15] [143:15] [168:20] [179:18] [183:9]
ten [64:16] [103:2]
tendency [98:13]
term [28:22,23]
terminate [169:17]
terminated [169:18] [203:18]
termination [169:11,13,23]
terms [61:17] [69:25] [70:15] [92:15] [95:20,22,23] [100:15] [120:4] [154:8] [161:7] [216:14]
tested [178:12]
testified [5:4]
testify [217:7] [:6]
testimony [8:10,13] [46:23] [105:14] [174:14] [177:13]
texas [1:16,17] [:1,,]
text [86:8]
thank [72:24] [128:25] [171: 16] [220:7]
thanks [163:1] [210:18]
thats [6:18] [7:17] [9:13] [10:19] [11:9,10] [12:6] [13:11] [15:2] [22:1] [24:6] [26:16] [27:6] [28:22] [34:11] [41:9,15] [43:10] [46:13] [49:21] [50:22] [56:20] [57:18,22,24] [59:12] [61:11 ,14,22] [62:1,22] [64:20,24] [65:2,3,16] [66:4] [67:19,23] [68:10] [70:7,22] [71:10,15] [73:24] [74:9] [75:8,10,23] [76:3,19] [78:4] [79:2,20,25] [81:2,24] [82:19] [83:23] [84:12] [85:8,14] [89:11] [92:23] [93:4,15,20] [94:12] [95:16] [96:2] [97:1] [99:1]

**7/18/2002  Bystrom, Dale (final)**

[100:4,17,19] [107:24] [108:
4] [111:4] [112:19,22] [113:17
,18] [114:24] [115:7] [117:12]
[118:7] [123:13] [124:8]
[125:7,9] [126:9,25] [127:2,4
,8,13] [128:2,21] [132:13,16]
[134:12] [135:15] [136:11,18]
[137:6] [138:21] [139:18,25]
[141:1] [142:3] [144:15]
[154:11] [155:1,18] [156:16]
[157:5] [160:22] [163:11]
[164:8] [168:12] [170:8]
[171:6,8] [172:12] [176:17]
[177:9,23] [178:19,20]
[179:5] [181:1,13] [182:19]
[183:13] [186:12,14] [187:2
,9] [189:8] [194:24] [195:8,12]
[196:6] [198:3,25] [200:20,25]
[202:13] [204:3] [205:11]
[207:13] [208:11] [209:11]
[211:15] [212:10,18] [216:13]
[218:24] [219:23]

**theirs** [26:4]

**themselves** [89:3] [162:25]
[163:12]

**therapeutic** [75:18] [94:11]
[99:23] [108:2,6] [110:6]
[123:21] [124:6] [127:18]
[129:14] [142:18] [144:10]
[162:16] [213:11,12]

**therapeutically** [120:7]
[123:17] [145:8] [172:4,20]
[179:4] [186:17]

**therapeutics** [4:] [21:8]
[110:9,12] [124:12] [159:1,8]
[191:25]

**therapies** [107:20]

**therapy** [19:15] [20:6,7,12]
[49:7] [109:12,22] [120:4]
[126:2] [142:16,25] [143:1,17
,19]

**therefore** [211:10]

**therein** [222:]

**theres** [8:7] [19:11] [20:6,8,10]
[34:17] [49:1] [59:18] [62:14]
[67:21] [71:2,19] [74:1,11]
[84:14] [88:15] [93:8] [116:9]
[131:16] [132:5] [141:13]
[144:8] [152:16] [153:12]
[162:12] [179:21] [180:17]
[182:18] [187:7] [189:18]
[194:11,19] [205:25] [209:18]
[215:19] [220:11]

**theyd** [184:22]

**theyll** [66:19] [200:23]

**theyre** [18:21] [50:3] [51:5]
[53:25] [66:16] [69:20,21]
[83:24] [88:24] [89:8,11,17,21
,22,23] [93:3] [101:22]
[102:11] [103:17] [105:24]
[106:6] [111:4] [120:3]

[125:10] [131:4] [133:5]
[136:16] [144:15] [145:7,12
,13] [157:18,19] [158:4]
[159:3,19] [161:11] [162:16
,25] [168:20] [175:6] [177:16
,22] [180:8] [189:24,25]
[196:1,3,4] [198:15] [201:25]
[206:3] [213:8,9,19,20]

**theyve** [36:9,10] [76:12]
[120:15]

**thing** [7:6] [22:20] [72:23]
[147:12] [155:19] [179:8]

**things** [17:3] [34:12] [40:10]
[61:11] [74:23] [92:18]
[146:14] [172:1] [180:19]
[186:24] [189:24] [194:1]
[209:1] [216:11,23] [219:2]

**think** [19:25] [20:10] [33:16]
[45:3] [48:10,13] [49:10]
[50:22] [69:10] [71:10]
[78:2,18] [79:1,10] [80:17]
[81:1] [88:15] [91:23] [93:2]
[100:8] [104:9] [112:1,19]
[113:17] [115:3,9] [116:8,11]
[119:24] [121:9,19] [125:10]
[129:8] [134:2] [137:20]
[147:14,23] [154:21] [155:7
,12,22,25] [157:19] [158:20]
[160:18] [161:12,14,18,19]
[162:7] [165:21] [170:8]
[173:21] [174:5] [179:2]
[180:6] [183:17,22] [185:11]
[186:24] [188:25] [190:6]
[192:1] [196:14] [197:12]
[198:19,22,23] [200:6]
[204:14] [214:16] [220:7,10]

**third** [22:24] [49:18,25]
[50:11] [51:5,10] [60:1,5,10]
[61:6] [63:6] [72:4] [73:6]
[95:21] [98:2,12] [99:3]
[100:3] [130:18]

**thirdparty** [22:24] [49:18,25]
[50:11] [51:5,10] [72:4]

**third-party** [22:24] [49:18,25]
[50:11] [51:5,10] [72:4]

**thirdtier** [61:6] [63:6] [98:2,12]
[100:3]

**third-tier** [61:6] [63:6] [98:2
,12] [100:3]

**thirteen** [103:3]

**though** [46:7] [57:10] [91:6]
[174:17] [176:16]

**thought** [176:23] [192:14]
[200:9]

**threat** [82:18] [177:6]

**threaten** [185:14]

**three** [9:9] [34:6] [57:7
[59:19,20] [85:22] [94:3]
[98:15,17,19,24] [99:1]
[101:13] [102:6,12] [103:1]
[116:8] [150:22] [151:22]

[152:1] [198:1] [205:9]

**threetier** [59:19,20] [98:15,17
,19,24] [99:1] [101:13]
[102:6,12] [198:1]

**three-tier** [59:19,20] [98:15
,17,19,24] [99:1] [101:13]
[102:6,12] [198:1]

**threshold** [134:12,13,15]

**thrift** [93:4]

**thus** [59:11] [139:20] [163:4]
[207:14] [216:1]

**tied** [74:2,12] [77:7] [94:10]

**tier** [59:23,24] [60:1,5,10]
[90:17] [95:21] [99:3] [100:12
,13] [159:22]

**tiered** [79:5]

**till** [117:3]

**time** [1:22] [5:23] [7:8,10,13
,25] [8:5,17,18] [9:1,5,10]
[10:22] [11:2] [13:12,13,15,18
,19] [17:7,15,20] [18:11]
[21:22] [24:25] [25:6] [30:5,11]
[34:8,12,19] [35:2] [52:3,7]
[55:1] [56:4] [66:7] [74:11]
[81:22] [97:14] [99:7] [104:7
,9] [108:20] [112:7] [123:23]
[126:9] [129:9,24] [142:12]
[147:2] [152:8] [157:4,15]
[166:18] [168:24] [169:15,18]
[176:23] [184:3] [190:21]
[197:18] [203:18] [208:1]
[209:25] [210:8] [216:10]
[217:19] [220:4,13] [:8]

**timely** [112:17]

**times** [74:1]

**title** [11:7,8] [18:4]

**titrated** [121:4]

**today** [5:14] [7:7,11,13,20]
[20:20] [46:23] [50:1] [85:16]
[98:6,11] [157:6,22] [160:7]
[164:16] [216:19] [217:1]

**together** [24:1] [29:7,20]
[31:2] [70:14] [87:17] [109:14]
[111:25] [176:18] [177:18]
[188:6] [206:1]

**told** [60:21] [195:24] [196:3,4
,13] [199:16] [218:25]

**took** [37:15] [71:1] [165:17]
[172:5] [205:12] [208:23]

**tool** [105:7,8,11] [164:5]

**tools** [173:5] [175:4] [183:2]

**top** [88:16] [91:1,8,11,15]
[142:15] [158:12] [182:3]
[199:23]

**total** [85:1,3,23] [88:16]
[105:17] [132:25] [184:20,25]

**totality** [130:24]

**totally** [65:2] [121:7]

**toward** [169:5]

**towards** [10:6] [89:8] [98:5]
[110:24] [119:3] [123:14]

[127:14] [136:9] [152:15]
[210:23]

**training** [37:2,14,19,20,21,23]

**transcript** [191:17] [:]

**transmitted** [12:20]

**treated** [143:8] [153:8]
[172:12]

**treatment** [123:16] [192:5]

**trial** [1:22] [146:16] [216:9]

**trials** [108:25] [109:4]

**tricky** [9:13]

**tried** [165:11] [215:3]

**triggered** [205:17]

**true** [26:16] [59:12] [66:4,5]
[71:11] [86:11] [98:7] [119:10
,23] [127:18] [133:14,18]
[135:15] [187:11] [199:13]
[205:7,8] [222:2] [:4,]

**trued** [88:4]

**truth** [:6]

**try** [8:6] [46:11] [68:11]
[111:24] [127:5] [163:6]
[164:1,2] [165:6] [172:16]
[187:21]

**trying** [60:11] [64:12] [69:2]
[136:25] [147:16] [156:9]
[163:24] [172:10] [179:18]
[206:3] [210:7]

**tugged** [165:22]

**turn** [10:5] [42:13] [47:17]
[65:9] [71:25] [106:14]
[108:19] [110:8,22] [116:7]
[124:9] [125:8] [152:15]
[170:6] [171:23] [178:4]
[202:20] [208:18] [209:1,2,17]

**twelfth** [2:]

**twelve** [103:2]

**twice** [192:20] [200:2]

**twoyear** [11:1]

**two-year** [11:1]

**tx** [2:]

**type** [17:9] [23:4] [34:25]
[36:6] [42:21] [55:1,8]
[66:16] [80:1] [97:22] [98:20]
[113:5,9] [115:4] [129:5]
[130:12] [137:18] [156:1]
[169:19] [185:9] [189:6]

**types** [151:25]

**typewriting** [:7]

**typically** [79:6]

---

**U**

---

**u.s** [85:3]

**uh** [20:24] [28:5] [36:5]
[63:10] [80:14] [81:10]
[96:16] [100:22] [101:15]
[116:6] [122:16] [130:16]
[152:6] [157:6] [158:22]
[161:14] [166:13] [179:10]
[185:22] [188:8] [195:8]

**7/18/2002 Bystrom, Dale (final)**

[214:12]
uhhuh [20:24] [28:5] [36:5]
[63:10] [80:14] [81:10]
[96:16] [100:22] [101:15]
[116:6] [122:16] [130:16]
[152:6] [157:6] [158:22]
[161:14] [166:13] [179:10]
[185:22] [188:8] [195:8]
[214:12]
uh-huh [20:24] [28:5] [36:5]
[63:10] [80:14] [81:10]
[96:16] [100:22] [101:15]
[116:6] [122:16] [130:16]
[152:6] [157:6] [158:22]
[161:14] [166:13] [179:10]
[185:22] [188:8] [195:8]
[214:12]
ultimate [30:23]
ultimately [127:9] [142:1]
[182:11]
unavailability [194:8]
unaware [143:18] [146:5]
[159:17]
uncommon [69:24] [76:8]
[149:5] [150:10,11] [215:14
,17]
uncovering [78:16]
undergo [184:18]
undergone [13:1]
undergraduate [35:12]
underlying [154:17]
underneath [151:23]
understand [7:8] [63:13]
[77:12] [100:5] [155:8,13]
[172:14] [181:21] [195:18]
[206:3] [213:13]
understanding [77:15]
[82:13] [93:12] [97:3] [99:18]
[100:1,4] [114:24] [121:18]
[124:8] [144:2] [175:14]
[181:23] [183:2] [184:6]
[190:18,22] [193:10] [197:25]
[203:24] [204:3,4] [205:19]
[209:19,21,24] [217:2]
underutilization [20:9]
underwriters [12:12]
underwriting [11:20]
uniformity [58:20]
unilateral [169:11]
unique [18:16] [89:3] [161:7
,12]
united [1:1] [13:24] [30:6]
[197:11]
university [35:9,18] [36:13,21]
unless [8:3] [167:4] [216:20]
unlike [172:21]
unsuccessful [141:5,8]
unsure [192:17]
until [91:10] [129:9] [166:21]
[169:16] [202:9] [203:12]
unusual [71:4] [117:2]

[128:21] [202:12,13]
update [3:8] [210:20]
upfront [69:14,18]
up-front [69:14,18]
upon [23:21] [44:13,14]
[50:6] [67:10] [69:21] [75:25]
[87:21] [88:7,12] [91:20]
[95:8] [96:8,18,25] [99:2]
[112:11] [120:13] [124:18]
[154:7] [162:15] [180:12]
[216:7] [219:25]
upper [201:22]
upperechelon [201:22]
upper-echelon [201:22]
upward [121:4]
urged [111:16]
us [8:6,8] [14:21] [87:20]
[101:24] [158:3]
usa [93:8]
usage [95:14]
use [15:5,9] [39:19] [40:4]
[51:4] [70:21] [73:23] [75:6]
[93:23,24] [118:24] [120:15]
[122:8] [128:7] [138:5]
[145:2] [184:13] [187:21]
used [1:22] [53:25] [84:22]
[103:17] [130:13] [137:12,23]
[138:1,23] [149:1] [183:6]
[209:3] [213:16]
usefulness [53:4]
users [178:12]
uses [121:12]
using [25:23] [26:4] [54:1]
[112:2] [163:19] [180:15]
[189:5] [191:19] [214:20,21]
usual [56:9,12,15] [57:5,8,11]
[59:4] [60:17] [61:3,21,24]
[62:2,4,5,7,12,13] [63:2,15,18
,22] [64:9,23] [72:8,11,13]
usually [39:13] [50:23]
[57:3] [59:12] [66:7] [73:19]
[76:16] [91:1,3] [134:23]
utah [42:8]
utilization [19:7,14] [20:5]
[48:21] [49:3,6] [51:12,14]
[71:13] [81:8] [95:9] [140:8]
[163:16] [194:10]
utilize [23:15] [215:20]
utilized [19:16] [26:2,12]
[83:16]
utilizing [26:8]

_____

V

vaguely [43:18]
validity [1:]
valuable [48:13] [64:24]
value [53:3] [73:15] [175:2,6]
[181:11] [182:23] [183:4]
varies [99:4]
various [3:24] [39:22] [83:10]

[84:18] [100:15] [125:12]
[160:4] [191:19] [194:1]
vary [95:15] [99:5] [112:10,14]
vasomotor [122:9] [192:6,22]
vast [59:9]
versus [146:3] [192:21]
vi [170:8]
vice [8:18,20] [11:11,24]
[21:24] [22:8] [25:1,7]
[29:11] [41:2] [42:1]
vicepresident [8:18,20]
[11:11,24] [21:24] [22:8]
[25:1,7] [29:11] [41:2]
[42:1]
vice-president [8:18,20]
[11:11,24] [21:24] [22:8]
[25:1,7] [29:11] [41:2]
[42:1]
victorious [6:25]
videographer [2:] [5:1]
[9:19,22] [16:7,10,12]
[72:25] [73:3] [91:23,25]
[92:3] [114:9,12] [128:23]
[151:16,19] [165:21] [178:1]
[180:23] [181:1,4,7] [206:20
,23] [217:13,16] [220:14]
videotaped [1:10]
view [70:24] [103:12] [115:6]
[120:10] [126:5] [137:25]
[147:19] [153:11] [164:11]
[175:10] [202:2] [211:3]
viewed [189:25]
views [44:9,12] [46:3] [218:
2]
vigorously [136:14]
viking [3:8] [43:15,16] [44:2]
[115:25] [116:11] [174:9]
[195:14] [210:19] [211:13]
vikingmanaged [3:8]
viking-managed [3:8]
violate [183:15]
violation [115:5]
vioxx [161:3,10]
virtually [111:7] [211:9]
vis [23:10] [145:25] [207:25]
visavis [23:10] [145:25]
[207:25]
vis-a-vis [23:10] [145:25]
[207:25]
vitae [10:15]
vivelle [126:6] [212:15]
[213:18]
vivelledot [212:17]
voce [113:24] [114:14]
[214:2]
voted [192:24]
vs [1:]

_____

W

wait [116:20] [117:1,2,13,16]

[118:1,4] [169:16]
waitand [117:2]
wait-and [117:2]
waitandsee [116:20] [117:1
,13,16]
wait-and-see [116:20]
[117:1,13,16]
waiting [117:17,19] [208:9]
walk [46:5]
walked [63:8]
walks [56:18] [61:4]
walnut [32:7,9]
want [8:5] [9:15] [76:1]
[79:25] [89:10] [98:13]
[106:17] [114:4] [116:19]
[117:15,25] [118:4] [148:2,4]
[177:17] [204:10] [205:3]
[215:19]
wanted [23:4] [39:19] [53:24]
[109:23] [117:13] [120:11]
[149:8] [165:4] [208:11,12]
wanting [215:20]
wants [56:18] [60:9,10]
[188:5] [215:22]
wap [105:11]
warner [39:23]
warning [181:3]
warranted [118:10]
washington [2:10] [5:10]
[13:25]
wasnt [108:11] [118:17]
[119:10] [139:7,15] [157:4]
[159:23] [172:21]
waterhouse [87:24] [88:1]
ways [28:8] [71:19,22]
[196:21]
website [15:8,9,18] [211:22]
wed [87:21] [220:8]
week [192:10]
welcome [114:16]
well [7:13,16] [8:6] [10:24]
[16:5] [18:22] [19:7,12]
[20:3,11] [23:25] [24:10]
[26:7] [27:22] [33:11] [40:1]
[48:19] [49:3] [50:1] [51:10]
[52:13] [54:2] [62:23] [65:24]
[67:5] [69:10] [70:1] [73:16]
[78:21] [83:15] [86:1] [87:9]
[91:18] [95:1,3] [96:13]
[97:13] [98:9] [102:10]
[112:14] [114:20] [118:3]
[120:5] [122:18] [125:3]
[131:18] [132:3] [134:11]
[141:16] [150:19] [153:6]
[154:21] [155:3,4] [160:13]
[161:3,6,18] [162:6] [163:3,23]
[164:20,24] [166:1] [170:25]
[173:24] [175:16] [176:11]
[177:16,21] [180:7] [196:1]
[198:17] [201:10] [202:7]
[205:22] [208:3] [220:3]

**7/18/2002  Bystrom, Dale (final)**

**wellpoint** [90:19,22] [91:6] [157:13,15] [214:21]

**wellpoints** [214:25] [215:4,7]

**went** [63:5] [82:16] [165:19] [183:19] [184:7] [215:4]

**werent** [67:15] [88:19] [119:11] [120:9] [127:3] [130:7] [138:11] [139:23] [164:22] [172:9]

**western** [1:2] [13:24] [29:18 ,19,22,24] [30:6] [42:3]

**weve** [72:22] [128:13] [158: 15,16,20] [193:20]

**whatever** [64:20] [66:19] [67:17] [68:6] [132:15] [177:18] [202:3]

**whats** [5:19] [21:6] [51:6] [57:23] [58:7,21] [64:6] [74:15] [87:3] [97:10] [131:13] [133:7] [147:7] [152:11] [186:9] [196:5] [209:18]

**whenever** [73:24] [149:7,8] [213:15]

**whereas** [94:24] [132:19]

**whether** [51:5] [53:19] [54:19] [55:9] [75:19] [84:3] [86:16] [93:22,24] [96:18,25] [104:17] [118:8] [120:6] [121:10] [123:9] [138:1,20] [143:14,18] [146:7] [156:13] [165:16] [173:25] [174:22] [182:17] [184:15,18] [188:10] [201:20,21] [202:14,17] [203:4,7] [206:8] [212:8,9] [213:19]

**whichever** [57:6]

**whole** [127:4] [132:20] [144:8] [189:24]

**wholesale** [28:3] [58:2]

**wholesalers** [28:4]

**whomever** [48:1]

**whos** [64:12] [115:25] [142: 10]

**whose** [44:25] [96:13] [116:5] [222:] [:]

**why** [20:13,15] [22:19] [30:1] [31:3] [62:5] [64:11] [67:6,8] [89:11] [90:18] [92:12] [93:10,15] [100:6,16] [115:8] [117:15] [119:20] [134:20] [148:2] [154:3] [164:21] [167:21,24] [168:1 ,7,20] [172:7] [190:18] [198:9] [206:16] [214:22]

**widely** [161:21]

**wiegand** [2:] [106:24] [193:22] [210:17]

**will** [5:13] [48:21] [49:2] [51:4] [59:11] [64:4,6,8,9,19] [65:18] [81:21] [85:18,21] [95:9] [104:10] [123:1,2]

[126:24] [131:12] [132:18] [144:21] [159:9] [164:5] [191:20] [195:22] [197:6] [199:4,12] [201:2] [202:10,22] [210:3]

**winery** [24:2]

**wing** [36:15]

**wings** [208:9]

**wireless** [53:11,13]

**wise** [22:20]

**within** [1:] [22:13] [27:1] [31:21] [47:5] [48:19] [50:23] [51:9] [90:23] [94:10,23,25] [95:25] [113:10] [128:14] [134:23] [139:13] [200:2] [212:6]

**without** [42:24] [94:12] [144:18,20] [145:18] [150:16] [161:4,6] [164:12] [195:16,20] [211:8] [215:25]

**witness** [1:] [3:4] [5:17] [7:15,20] [41:7] [47:2] [78:11] [168:18] [194:16] [:]

**woman** [64:12]

**wont** [54:20] [106:18] [199:2 ,5]

**woodland** [201:12]

**woonsocket** [89:17]

**words** [117:22] [176:10]

**work** [30:17] [38:24] [39:3,4 ,5] [40:24] [41:1] [45:10] [46:8] [49:6] [51:25] [54:17] [85:17] [88:8] [89:9] [100:24] [112:3] [188:11] [216:5,7]

**worked** [11:24] [14:10] [30:5] [32:6] [37:16] [39:22] [41:3] [45:8,11] [47:13] [74:17] [78:22]

**working** [13:12,15] [17:21] [39:18] [41:3] [42:21] [70:11 ,13] [81:22] [85:15,17] [147:17] [218:12] [219:1]

**works** [78:17] [134:7] [155: 13]

**worse** [96:24]

**wouldnt** [51:17,18] [109:6,18] [110:2] [111:22,23,24] [120:21] [130:15] [138:15] [141:9] [147:23] [149:16] [150:6] [164:21] [189:24] [193:15] [197:4] [201:23]

**write** [42:14]

**writing** [42:17] [43:6] [167:12] [201:17]

**written** [54:14] [196:4,14,20]

**wrong** [70:23] [115:3] [127: 1] [128:6]

**wrote** [54:12] [78:11] [166:10 ,14]

**wye** [3:] [4:4] [123:13]

**wyeth** [1:] [5:13] [28:13] [33:14,17] [45:10] [70:3,11] [76:19] [80:7] [81:14,19,25] [82:1,10] [114:21] [115:5,10] [125:19] [135:11,21] [136:7 ,13] [140:22] [141:2,5,11] [146:9,17,23] [147:22] [148:24] [149:3,9,12,14,16,23] [150:1,20] [160:4] [164:13,17 ,22,23] [165:1,2,15] [169:3,17] [170:3,7,21] [173:15,20] [174:5,15,19] [175:7] [176:19 ,23] [179:25] [181:11] [182:23] [183:5] [184:7,12] [185:25] [188:2,11] [190:22] [193:11] [194:22] [199:15] [200:21,25] [201:15,18,24] [202:25] [203:4,11,25] [206:9,11] [207:3,5,9] [208:18,24] [209:1,21,23] [210:6]

**wyethayerst** [1:] [5:13] [33:14,17] [81:14,19] [82:10]

**wyeth-ayerst** [1:] [5:13] [33:14,17] [81:14,19] [82:10]

**wyeths** [82:13,18] [128:6] [140:3] [148:1,5,7,14] [149:18] [150:3,6] [151:4] [154:8,9,15] [156:14,18] [174:12] [175:2] [176:16] [180:13] [193:2] [210:3]

———————————

**Y**

**yams** [192:8]

**yeah** [45:21] [51:20] [58:10] [78:20] [89:2,17] [90:8] [104:12] [106:17] [107:15] [110:14] [131:12] [135:8] [137:10] [142:9] [157:19] [165:9] [170:4] [177:22] [184:25] [193:22] [212:25]

**year** [30:12] [90:23] [97:16] [123:3] [194:5] [217:7]

**years** [5:24] [13:17] [35:5,22] [36:1] [64:17] [108:17] [133:15] [150:22] [154:21] [155:12] [178:13]

**yes** [6:4] [7:3,21,22,23] [8:25] [9:17] [10:4,8,12,16] [11:3,6] [12:6,23] [13:2,14] [17:14,22] [19:21] [20:24] [21:5,17] [22:3,7,18] [24:9] [25:9,12] [26:18] [27:16] [28:1] [30:2,9] [31:25] [32:21,25] [33:2] [34:3,13] [35:11,21] [36:3,5,22] [37:5] [40:13] [41:17] [42:5,12 ,16,23] [43:3] [47:12] [49:14] [50:14] [52:21] [53:17] [55:12] [56:14] [57:9,8,12,21] [63:20] [68:10,22] [70:10]

[72:9] [75:12] [77:11,21] [85:9] [86:4] [88:3,12] [90:4] [93:20] [94:8] [95:16] [100:22] [106:9] [107:7] [108:23] [109:10] [110:7] [113:7] [114:24] [121:23] [122:10] [124:14,22] [126:25] [127:20] [130:16] [131:4] [134:8] [136:12] [141:21] [144:4] [154:20] [157:6] [158:22] [162:20] [168:5] [169:20] [173:13] [174:10] [178:8] [179:7,10] [187:12] [196:6] [197:16] [199:18] [203:23] [204:17] [205:14] [206:14] [207:13] [208:11] [210:17] [212:1,18,25]

**yesterday** [11:14] [160:15] [211:23]

**yet** [34:10] [159:11] [178:19]

**youd** [96:5] [98:16] [109:25] [110:3] [156:17] [162:17,21] [163:4] [177:12,20] [179:5] [188:24] [202:2] [204:10]

**youre** [14:18] [37:25] [46:15] [52:11] [59:6] [65:10] [67:20] [78:23] [91:20] [97:15] [98:20] [100:20] [122:22] [128:16] [129:1] [132:7] [135:11] [137:3,11] [160:11 ,14] [163:24] [164:2] [165:10] [169:8] [186:5,24] [188:16] [189:19] [216:17] [219:23]

**yourself** [18:8] [42:22] [108:12]

**youve** [5:15,19] [37:16] [41:6] [43:8,23] [47:3,11] [51:21] [84:20] [86:25] [87:1] [88:7] [97:20] [137:7] [154:16] [160:8,13] [189:11] [191:9,22] [199:22] [210:11] [216:24] [219:14]

———————————

**Z**

———————————

**zero** [64:7] [72:18]