0326

1       VOLUME II

2       IN THE UNITED STATES DISTRICT COURT

3       FOR THE SOUTHERN DISTRICT OF OHIO

4       WESTERN DIVISION

5               * * *

6   J.B.D.L. CORP. d/b/a        :  CIVIL ACTION
    BECKETT APOTHECARY, et al.  :

7                               :
                vs.             :

8                               :

    WYETH-AYERST LABORATORIES,  :

9   INC., et al.                :  NO. C-1-01-704.

10              * * *

11      MAY 19, 2004

12              * * *

13          Continued videotape deposition of DAVID

14  J. GIBSON, M.D., taken pursuant to notice, was held

15  at the law offices of REED SMITH LLP, 2500 One

16  Liberty Place, 1650 Market Street, Philadelphia,

17  Pennsylvania 19103-7301, beginning at 9:08 a.m.,

18  before McKinley Wise, a Registered Professional

19  Reporter and an approved Reporter of the United

20  States District Court.

21              * * *

22      ESQUIRE DEPOSITION SERVICES
        1880 John F. Kennedy Boulevard

23          15th Floor
        Philadelphia, Pennsylvania 19103

24      (215)  988-9191

---

1       A P P E A R A N C E S :

2

3

        JAY S. COHEN, ESQUIRE

4       SPECTOR, ROSEMAN & KODROFF, P.C.
        1818 Market Street, Suite 2500

5       Philadelphia, Pennsylvania  19103
        (215-496-0300)

6

        -- Representing Direct Purchaser Plaintiffs

7

8       W. GORDON DOBIE, ESQUIRE
        BROOKE B. WARD, ESQUIRE

9       WINSTON & STRAWN LLP
        35 West Wacker Drive

10      Chicago, Illinois  60601
        (312-558-5691)

11

        -- Representing Wyeth-Ayerst Laboratories,

12      Inc.

13  A L S O  P R E S E N T :

14      MICHAEL PANICHELLI, Videographer

15              * * *

16

17

18

19

20

21

22

23

24

---

1           I N D E X

2   Testimony of DAVID J. GIBSON, M.D.

3   By Mr. Dobie                                    331

4

5               * * *

6

7           GIBSON EXHIBITS

8   NO.         DESCRIPTION                         PAGE

9   15  Document entitled "Navigating the Pharmacy

10      Benefits Marketplace"                       349

11  16  E-mail to Casey from Carter                 361

12  17  Memmo to Arington from Carter               366

13  18  E-mail to Carter from Neeley                371

14  19  Diagnostic review of Premarin family        419

15  20  Presentation                                423

16  21  Preferred drug list                         429

17  22  Medicaid formulary                          429

18  23  Article                                     484

19  24  Amendment                                   493

20  25  Pricing and contracting strategy            502

21  26  Subpoena                                     515

22

23              * * *

24

---

1           DEPOSITION SUPPORT INDEX

2   Direction to Witness Not to Answer

3   Page   Line   Page   Line

4

5   (None)

6

7

8   Request for Production of Documents

9   Page   Line   Page   Line

10

11  (None)

12

13

14  Questions Marked

15  Page   Line   Page   Line

16

17  (None)

18

19              * * *

20

21

22

23

24

5/19/2004 Gibson, David

**Page 330**

```
 1                    * * *
 2           THE VIDEOGRAPHER:  Good morning.
 3   Here begins Day No. 2, Videotape No. 1 in
 4   the deposition of David Gibson in the matter
 5   of J.B.D.L. versus Wyeth in the United
 6   States District Court, Southern District of
 7   Ohio.
 8           Today's date is May 19th, 2004, and
 9   the time is 9:08 a.m.  Deposition is being
10   held at One Liberty Place, Philadelphia,
11   Pennsylvania, the law offices of Reed Smith.
12           The videographer is Michael
13   Panichelli, here on behalf of Esquire
14   Deposition Services located at 1880 JFK
15   Boulevard, Philadelphia, Pennsylvania.
16           All counsel will be noted on the
17   stenographic record.
18           The court reporter is Mac Wise, and
19   he'll now swear in the witness.
20           MR. DOBIE:  Dr. Gibson, you
21   understand you're still under oath?
22           DR. GIBSON:  I do.
23           MR. DOBIE:  All right.  Why don't we
24   just get started then, Mac, if that's okay
```

**Page 331**

```
 1   with you.
 2           THE COURT REPORTER:  I'm fine.
 3           MR. DOBIE:  All right?
 4                    * * *
 5           DAVID J. GIBSON, M.D., resumed.
 6                    * * *
 7   BY MR. DOBIE:
 8       Q.    Let me just follow up, Dr. Gibson,
 9   on some -- some things that you said yesterday.
10           A few times yesterday you mentioned
11   that, quote, we haven't received certain documents
12   and data.  Now, you do understand that counsel for
13   the plaintiffs in this case have all the
14   documents?
15       A.    I'm not aware of what they have or
16   not.  I -- if you say that's the case, that --
17   I -- that's I'm sure true.  I don't --
18       Q.    You have no reason to dispute that?
19       A.    I have no reason to dispute it.
20       Q.    All right.  And so when you say "we
21   haven't received," you're saying that you haven't
22   received certain documents from your counsel, Mr.
23   Cohen, and the other lawyers that are working on
24   this case; correct?
```

**Page 332**

```
 1       A.    Correct.
 2       Q.    Now, another followup thing I wanted
 3   to ask you about it.
 4           At PCN, sir, is it true that the
 5   health plans that contract with PCN have -- are
 6   provided with documents that -- that indicate the
 7   amount of money that they spend on pharmaceutical
 8   benefits every year?
 9       A.    Yes.
10       Q.    And do you also provide -- does PCN
11   also provide to health plans information
12   concerning the amount of money that PCN is
13   charging in administrative fees in the year?
14       A.    Yes.
15       Q.    And so aren't these health plans in
16   a position then to compare PBMs in terms of cost
17   and the cost of pharmacy benefit?
18           MR. COHEN:  Object to the form.
19       A.    That is an interesting question.
20   It -- you can't get from the start of the question
21   to the end with a yes answer.  Speaking from the
22   industry perspective, which PCN is part of, a
23   client can calculate what their pharmacy benefit
24   costs.  A client can calculate what the rebate
```

**Page 333**

```
 1   amounts that came back to them were.  And they can
 2   calculate what the administrative fees are.
 3           What they will have difficulty doing
 4   is calculating if a drug was substituted or
 5   encouraged to reward a rebate structure.  In other
 6   words, a more expensive drug would be encouraged
 7   for use because it profited the PBM on their
 8   rebate contracts.
 9   BY MR. DOBIE:
10       Q.    All right.  But if they have the
11   amount of -- if they're provided -- the example
12   that you're familiar with, PCN, if they're
13   employed with the total pharmacy benefit costs
14   that the plan is incurring in any given year for,
15   let's say, the teamsters union, that's the plan,
16   and they're told, Here's the pharmacy benefit cost
17   that we spent last year, they know the
18   administrative cost that's being charged by PCN,
19   they know the amount of rebates that they have
20   received back, they're in a position to then go to
21   other PBMs and compare what the other PBM may be
22   able to offer them in terms of rebates, in terms
23   of administrative cost; correct?
24       A.    Correct.
```

1    MR. COHEN:  Object to the form.

2    BY MR. DOBIE:

3    Q.    And -- and they're also in a

4    position to evaluate whether or not they would

5    prefer to take a larger up-front payment from the

6    PBM versus whether to simply true-up at the end of

7    the year; correct?

8    MR. COHEN:  Object to the form.

9    A.    This is a complex issue.  The short

10   answer is yes.

11   BY MR. DOBIE:

12   Q.    All right.  And you say that PBMs

13   sometimes push higher price products, but then

14   again at the end of the year the plan would see to

15   the extent that their pharmaceutical costs had

16   gone up; isn't that also true?

17   A.    They would know their pharmaceutical

18   costs went up.  They wouldn't know the percentage

19   of the increase based on certain selective

20   substitutions.

21   Q.    You do provide them, I assume, cost

22   per therapeutic class, don't you?

23   A.    You -- you provide them with -- you

24   provide them with the amount that the contract

---

1    called for paying for a given drug.

2    Q.    So -- so that the plan at the end of

3    a year has from PCN not only here's the total

4    amount of spend, but they know how much they spent

5    on particular products; right?

6    A.    They do.

7    Q.    Another question I wanted to follow

8    up on at PCN.  You talked about P&T committee

9    minutes for Omni.  Are there P&T committee minutes

10   for PCN?

11   A.    Yes.

12   Q.    And who keeps the P&T committee

13   minutes?

14   A.    It would --

15   MR. COHEN:  You mean who -- who is

16   the custodian or who actually writes the

17   minutes?

18   BY MR. DOBIE:

19   Q.    Let's start with who writes them.

20   A.    I believe the -- we've had some

21   changeover in staff.  So I believe the person who

22   writes them is a person by the name of Cathy

23   Maskita, who is one of the consulting pharmacists

24   at PCN.

---

1    Q.    And do you receive and approve the

2    minutes before they're -- let me back up.

3    What's -- what's the process for

4    keeping minutes?

5    A.    The minutes are kept during the P&T

6    committee and then they are distributed at the

7    next meeting for approval.

8    Q.    And so the P&T committee minutes

9    that -- that exist for PCN are all minutes that

10   have been approved by you?

11   A.    By me and the committee, correct.

12   Q.    And one final followup from

13   yesterday on FPI.

14   You mentioned Mr. Cates.  Does he

15   hold any position with -- with FPI?

16   A.    He currently is chairman of the

17   board.

18   Q.    He is the chairman of the board of

19   FPI?

20   A.    Correct.

21   Q.    And what is -- do you have a -- do

22   you have a position on the board of directors at

23   FPI?

24   A.    I am the chief executive officer of

---

1    FPI.

2    Q.    So the answer is no, you don't have

3    a position --

4    A.    I have --

5    q.    -- on the board?

6    A.    I have a position on the board and

7    I'm chief executive officer.

8    Q.    Who are the other board members of

9    FPI?

10   A.    Ed O'Donnell, the FPI -- the FBI

11   agent -- or former FBI agent that I referenced;

12   Carlo Michelotti, who is the CEO of the California

13   Pharmacists Association.  And there are two other

14   individuals from California state government.  I

15   will give you the names if you'd like.  I don't

16   have those on the top of my head.

17   Q.    And are any of these individuals

18   paid in connection with their position on the

19   board?

20   A.    No.

21   Q.    In addition to you serving as CEO,

22   does the company have any other officers?

23   A.    No.

24   Q.    Does the company have any other

1 employees?

2    A.    No.

3    Q.    Does the company have any revenues?

4    A.    Yes.

5    Q.    And is that in connection with the

6 contract with United Pharmacists Network?

7    A.    Correct.

8    Q.    And what were the revenues last year

9 for FPI?

10    A.    Zero last year.  This year, we have

11 a contract that is an annual of around 30,000

12 paid quarterly.

13    Q.    And the --

14    A.    So our first quarter payment is one-

15 fourth of that.

16    Q.    The revenues that you mentioned

17 before from -- from FPI -- you said it's a

18 nonprofit corporation -- would those moneys be

19 distributed in some ways to any shareholders or is

20 it simply to go to the expenses, which I assume --

21    A.    Correct.

22    Q.    -- would be your salary?

23    A.    Well, at some point, I may take a

24 salary, but the intent is to eventually have a

---

1    flags that there could be fraudulent activity

2 occurring within that vendor's business practices,

3 then the fees go up for that vendor to monitor

4 their activities, and it could go as far as our

5 having an investigator involved on a daily basis

6 with them.

7    Q.    I want to change topics and kind of

8 move on away from yesterday and cover some new

9 things and talk about pharmacy benefit managers.

10    In a portion of your report which is

11 on Page 22, you have a heading here that says

12 "PBMs" -- "PBM failure to perform as a fiduciary

13 for the client."

14    Do you remember preparing that?

15    A.    I do.

16    Q.    And what do you mean that PBMs have

17 failed to perform as a fiduciary for the client?

18    A.    I'll answer that, and let me put the

19 context.  This is a hot topic within the industry

20 right now.  There's been an effort over the past

21 several years for the industry to have PBMs

22 classify themselves as being in a fiduciary

23 relationship and they have consistently declined

24 to do so.

---

1 staff that is paid that will do the operational

2 activities of the -- of the institute.  The

3 overall intent is to tell the public that fighting

4 fraud and health care is the purview of the

5 providers, not the buyers.  So that fees charged

6 to pay for operational costs would come from those

7 vendors doing business in health care, not the

8 people who come into health care to purchase.

9    Q.    And the vendors being in this

10 instance doctors, pharmacists?

11    A.    It would be hospitals, doctors,

12 pharmacists, pharmacies, durable goods companies.

13    Q.    And you want to charge them in

14 essence for placing the group that's the provider

15 as opposed to charging the patient?

16    A.    We will -- the business model calls

17 for charging them an annual fee that is fairly

18 small.

19    Q.    "Them" being?

20    A.    The vendors that -- we just went

21 through the list.  Charging them a fairly small

22 annual fee to be a member of the panel.  The fee

23 will be about $300 each year.  If we find evidence

24 or if we find indicators that -- that raise red

---

1    A fiduciary relationship takes the

2 interest of the client as primary and the entity,

3 in this case a PBM, would -- would conduct its

4 business in all instances to benefit the client

5 first.  By not being in a fiduciary position, the

6 PBM is selling services and products to its client

7 on a competitive basis against other PBMs, but not

8 necessarily keeping the client's best interest in

9 mind as they run their operating organization.

10    Q.    So is it your view that -- that PBMs

11 should act as fiduciaries to the client?

12    A.    I think that PBMs -- yes.  The short

13 answer is they should do that.  If they don't, the

14 backup position is they need to be completely

15 transparent --

16    Q.    And -- and when you say that --

17    A.    -- in a business model.

18    Q.    When you say that they should, are

19 you saying that it's your understanding that --

20 that PBMs, in fact, are somehow required to act as

21 fiduciaries?

22    A.    Not by law, no.

23    Q.    In practice, is -- it's your view

24 that they should act as fiduciaries for clients?

1    A.    I think it would be -- I think it
2   would be a more trustworthy business environment
3   if they did.
4    Q.    Is that the -- is that the standard
5   in the industry currently that PBMs act as
6   fiduciaries for their clients?
7    A.    It's the standard in the industry
8   that they do not.
9    Q.    Does PCN act as a fiduciary for
10  their clients?
11   A.    PCN is not a fiduciary for the
12  client.
13   Q.    In fact, PBMs and the client, if
14  it's a teamster plan, are basically across from
15  each other at the table rather than sitting on the
16  same side, aren't they?
17   A.    They're two businesses doing
18  business with each other through a contractual
19  bridge.
20   Q.    And they are not -- PBMs are not
21  fiduciaries?
22   A.    Correct.  And that -- that was the
23  reason for this heading.  That's the context for
24  this.

1    Q.    But it's -- just so I understand
2   this, it's your view that the rule should be that
3   PBMs should act as fuduciaries for, to use your
4   example yesterday, the teamsters union plan?
5    A.    Yes.  And the reason is this is such
6   a convoluted business.  There's so many nooks and
7   crannies to hide money in that's easy to take
8   advantage of the client.
9    Q.    All right.  And -- and have you
10  expressed your view to the management of PCN that
11  it should act as a fuduciary for all of its
12  clients?
13   A.    I've consistently taken that
14  position with PCN and throughout the industry.
15   Q.    And -- and what's been the reaction
16  by your employer to your -- your view that PCN
17  should act as a fiduciary?
18   A.    I think PCN's position is that they
19  don't -- they -- they have the most transparent
20  business model -- or business -- they are the most
21  transparent of any P -- of the PBMs in the
22  industry or among the most transparent and they
23  don't have all of the other places to hide money,
24  particularly in the mail order.

1    Q.    Is it your view that the PBMs should
2   disclose their -- let's say the profits they make
3   on -- on contracts to health plans?
4    A.    It is my opinion that they should do
5   one of two things.  They either should bind
6   themselves to their clients as fiduciaries or they
7   should be completely transparent.
8    Q.    And by being completely transparent,
9   what do you mean?
10   A.    That is they disclose all their
11  sources of revenues and they disclose all their --
12  all their sources of expenses to their clients.
13   Q.    And by all sources of revenues, you
14  would have PBMs disclose all the rebate dollars
15  that they receive from the manufacturers and all
16  other revenue sources to each of its client in
17  connection with -- with --
18   A.    For their account.
19   Q.    For their account.  And is that
20  opinion of yours -- is that -- is that a basis for
21  your conclusions in this case?  You have this in
22  your report.  I assume it is.
23   A.    I would -- I would say that it's
24  part of my structure of my opinions.

1    Q.    All right.  But by the same token,
2   you'd agree that that isn't the rule today, that
3   there is no PBM that takes the view that they
4   should either bind itself as a fiduciary or be
5   completely transparent and disclose all sources of
6   revenues to its plan members?
7       MR. COHEN:  Object to the word
8    "rule."
9    A.    There's a very great effort in the
10  industry now to proclaim to the clients that
11  they're transparent.
12  BY MR. DOBIE:
13   Q.    But in terms of the practice that's
14  followed by the PBMs, including PCN -- let's start
15  with the first -- the first example.
16      Are you aware of any PBM that
17  accepts your view that they should -- that they
18  should be a fiduciary for the client plans?
19      MR. COHEN:  Object to the form.
20   A.    No.
21  BY MR. DOBIE:
22   Q.    All right.  And are you aware of any
23  plan that -- or any PBM that currently is
24  completely transparent and discloses all sources

1 of revenues to each client plan?
2    A.    I know that almost every top-tier
3 PBM in the industry is now telling their clients
4 that they are transparent.
5    Q.    And how do you know that, sir?
6    A.    Because I've been at the meetings
7 where they say that.
8    Q.    All right.  And if that's -- so
9 currently then PBMs are, in fact, disclosing to
10 the client plans all of the information concerning
11 their sources of revenue for each and every one of
12 their contracts; right?
13        MR. COHEN:  Object to the form.
14    That's not his testimony.
15    A.    That's not what I'm saying.  I'm
16 saying that's what they are telling their clients
17 they're doing.  I'm not -- I'm not testifying to
18 the fact that they're doing that.
19 BY MR. DOBIE:
20    Q.    Okay.  Well, if -- would you agree
21 with me that if they're telling their clients that
22 they're doing that and then the client goes in and
23 negotiates a contract with a PBM and the -- and
24 the PBM in turn doesn't do what they said that

1 they would do, that the -- that the client plan
2 might decide to do business with someone else?
3        MR. COHEN:  Object to the form.
4    A.    I would agree with that, yes.
5 BY MR. DOBIE:
6    Q.    Okay.  You also use in -- in your
7 report the term "monopoly" on various occasions.
8        How do you define a monopoly?  Are
9 you a -- do you hold yourself out as a legal
10 expert?
11    A.    No, I don't.
12    Q.    Okay.  So how do you use and why do
13 you use the term "monopoly" in your report?
14    A.    I use the term "monopoly" in the
15 context of a company dominating a class of drugs
16 and being able to impose its will on the market in
17 a noncompetitive fashion.
18    Q.    Do you have any other definition of
19 "monopoly" as you use it?
20    A.    I think a nuance of it would be that
21 if you're competing in -- if you have competitors
22 in a market, they generally compete for business
23 based on add-ons or benefits to the customer.  A
24 monopolist can put in place damage to a customer

1 if they don't do what the monopolist wants.  So
2 that's perhaps a nuance to what -- to the
3 definition.  I'm not sure.
4    Q.    Is that because of a concentration
5 of market share?
6    A.    Correct.
7    Q.    And do you have any understanding of
8 when it is and when it is not appropriate to be a
9 monopolist?
10    A.    I have a general knowledge --
11    Q.    All right.  Tell --
12    A.    -- but I'm not a legal expert, no.
13    Q.    Are you applying your definition of
14 "monopoly" in connection with the report that
15 you've --
16    A.    Yes --
17    Q.    -- issued?
18    A.    -- that's -- what I just mentioned
19 to you is how I use that term.
20    Q.    And it's your intention to -- to
21 express to the jury this view of monopoly that
22 you've just explained?
23    A.    Correct.
24        MR. COHEN:  Object to the form.

1 BY MR. DOBIE:
2    Q.    Do you have any other definition
3 or -- or view of what a monopoly is other than
4 what you've told us so far?
5    A.    I can't think of it now.  I suppose
6 in conversation if something comes up, I will add
7 to it and -- but as of now I've tried to give you
8 in a responsive way what I generally view as a
9 monopoly.
10            * * *
11        (Whereupon, Gibson Exhibit 15 was
12    marked for identification.)
13            * * *
14 BY MR. DOBIE:
15    Q.    Okay.  For the record, Exhibit 15 is
16 a copy of another document prepared for the
17 California Health Care Foundation from Mercer
18 Human Resources Consulting.  Sir, have you seen
19 this document before?
20    A.    Okay.  The Exhibit 12 was the same
21 date but it was a different title.  So this is a
22 different --
23    Q.    Different report?
24    A.    Let's see.  I get daily updates from

5/19/2004 Gibson, David

1  the California Health Care Foundation on all of
2  their publications and their newsletter.
3          MR. DOBIE:  Let's go off the record
4  for a second.
5          THE VIDEOGRAPHER:  Going off the
6  record.  The time is 9:31 a.m.
7              * * *
8          (Whereupon, a discussion was held
9  off the record.)
10             * * *
11         THE VIDEOGRAPHER:  We're back on the
12  record.  The time is 9:31 a.m.
13 BY MR. DOBIE:
14     Q.    Let me ask you to draw your
15  attention to Page 22 of Exhibit 15.
16     A.    Okay.
17     Q.    Okay.  There's a statement on Page
18  22 as a description of wholesalers in the industry
19  and it notes that the top five wholesalers of
20  pharmaceuticals now account for approximately 90
21  percent of the entire wholesale drug market."
22         Were you aware of that, sir?
23     A.    Yes.
24     Q.    So are you aware that these five

5/19/2004 Gibson, David

1  large wholesalers are very big companies?
2      A.    Yes.
3      Q.    And very sophisticated companies?
4      A.    Yes.
5      Q.    And -- and would you say that these
6  companies have significant power in the
7  marketplace as it relates to pharmaceuticals
8  and -- and what they pay for pharmaceuticals?
9          MR. COHEN:  Object to the form.
10     A.    I don't -- I don't think that
11  there's any particular selective power that any of
12  them have.
13 BY MR. DOBIE:
14     Q.    Is there -- do you have ever have
15  any concerns or have you ever had any concerns
16  that these five wholesalers have a concentration
17  of the -- of the market for the purchase of
18  pharmaceutical products?
19     A.    I have a concern any time any
20  segment of the market concentrates, but it's the
21  nature of markets to do that.
22     Q.    All right.  And have you had any
23  discussions with anyone about this large
24  concentration of market share as it relates to the

5/19/2004 Gibson, David

1  wholesalers for pharmaceutical products?
2      A.    Not that I recall other than perhaps
3  chitchat with people, but no.
4      Q.    In your report, you don't discuss
5  the fact that these top five wholesalers now
6  account for 90 percent of the wholesale drug
7  market, do you?
8      A.    I don't believe I do.
9      Q.    And why not?
10     A.    Because I didn't view it as being a
11  major issue.
12     Q.    All right.  Let me ask you to turn
13  your attention to Page -- Page 18.  Page 18 and
14  then if you look over on Page 19 have a picture in
15  essence of how the pharmaceutical money flows if
16  an employer plan either decides to keep the
17  pharmacy benefit carved in -- in other words,
18  they're going to pay for that -- and Page 19 has
19  the flow of pharmaceutical money when the PBM
20  benefit is carved out.  Look at that.
21     A.    Okay.
22     Q.    And is there -- is there anything in
23  this chart that appears inaccurate to you, either
24  the chart on Page 18 or Page 19?

5/19/2004 Gibson, David

1      A.    Okay.  If you'll give me a minute --
2      Q.    Yes, sir.
3      A.    -- I'll look at these and then
4  answer your question.
5          Okay.  I've finished looking at the
6  chart on 18, and that looks pretty much the way
7  the industry is structured for a carve-in and
8  consistent with the chart that I gave you in my
9  report --
10     Q.    Yes, sir.
11     A.    -- at the top.  And on Page 19 -- on
12  Page 19, you have the same -- basically the same
13  structure except you remove the left-hand side
14  where we have the medical administrator that had
15  the PBM under contract.  So yes, I -- the short
16  answer is yes.
17     Q.    These -- these appear accurate?
18     A.    Yes.
19     Q.    Okay.  Now, on your report -- in
20  your report, I'm sorry, on Page 17, you state that
21  there are approximately a hundred PBMs in the U.S.
22  but that the top four companies dominate the
23  industry.  And you don't have --
24     A.    I'm sorry.  What page are we on now?

5/19/2004 Gibson, David
5/19/2004 Gibson, David

1  Q.    Page 17.

2  A.    Okay.

3  Q.    You note in the -- under "The PBM

4  role in the distribution process," second

5  paragraph --

6  A.    Okay.

7  Q.    -- last sentence, you say there are

8  approximately a hundred PBMs in the U.S., but the

9  top four dominate the industry.  There's no cite

10 there.  Do you know where you got that

11 information?

12 A.    I believe it came from the same

13 sources that I had cited earlier wherein -- let's

14 see.  It wasn't earlier.  It was -- it was on Page

15 24 I cite the number of lives covered by company

16 and indicate that there's a first tier which are

17 companies that cover over 20 million lives.

18 Q.    Where did you get the information

19 that there's, I'm sorry, approximately a hundred

20 PBMs in the U.S.?

21 A.    I don't recall exactly where I got

22 that.  It could have been from here, but I'm not

23 sure.

24 Q.    But again, is this data that you

---

1  is becoming much more common in the industry.  So

2  that states now are carving up the pharmacy

3  benefit and using specialty subcontractors like

4  Argus and then renting -- renting networks for the

5  pharmaceutical retailers and setting their own

6  contracts with the mail orders.

7  So the delta, or the difference,

8  between the figure on Page 25 and the figure on

9  Page -- 18, was it?

10 Q.    17.

11 A.    17.  There's -- that's part of that

12 gray area as to how you define what is or isn't a

13 PBM.  So I could -- I think with a little work I

14 could give you the -- to square the circle on

15 those two numbers.

16 Q.    But have you squared the circle?

17 Have you looked at this to figure out which --

18 which of the -- let me finish the question --

19 which of the -- which of the two numbers is right,

20 whether it's 50 or a hundred PBMs?

21 A.    The right number for the graph on

22 Page 25 and on 24 is the 50.  The right number on

23 the hundred I believe is also correct, but I don't

24 have that research for you.

5/19/2004 Gibson, David
5/19/2004 Gibson, David

1  have not verified in any way?

2  A.    It's data that I've picked up

3  through my reading of research, but I didn't

4  happen to footnote that particular point.

5  Q.    All right.  The reason I ask, sir,

6  is if you turn to Page 25--

7  A.    Of my report?

8  Q.    Yes, sir.

9  A.    Okay.

10 Q.    Now, here you say that there are 50

11 companies classified as PBMs.  You see that?

12 A.    Uh-huh.

13 Q.    Which one is it?  Are there 50 PBMs

14 or are there a hundred?

15 A.    Let's see.  I'd have to pull my data

16 to give you the correct answer on that.  It could

17 be both.  And let me explain.

18 The 50 PBMs would be those that are

19 clearly classified as PBMs.  There are a number of

20 carve -- again, the word "carveout" comes out.

21 There's a number of carveout PBM-like entities

22 that will use companies like Argus in Kansas City

23 to administer the benefit and they will do their

24 direct contracting.  This, interestingly enough,

---

1  Q.    All right.  And -- and you think

2  that -- that the other 50 PBMs are in essence

3  claims administrators?

4  A.    No.  Well --

5  Q.    Like Argus?

6  A.    I think that they are PBM

7  arrangements where the client plays a much more

8  prominent role.  For -- a clear example of that

9  would be the Blue Cross -- Blue Shield of

10 California product that we discussed yesterday

11 wherein they subcontract with Argus and inhouse

12 they administer their own rebates and they manage

13 their own networks.

14 Q.    Okay.  And so if -- if we go to the

15 data on the hundred, it's your testimony that --

16 that what we're going to see is that those are

17 what the other 50 PBMs are and --

18 A.    That would be my -- that would be

19 what I would think is in there.

20 Q.    All right.  Do you know?

21 A.    I don't.

22 Q.    In your -- let me ask you kind of

23 generally.  If we step back for a moment, in your

24 experience, isn't it possible that even if a

5/19/2004 Gibson, David

1 particular PBM has a plan that is classified as
2 general -- generally speaking as open or
3 incentive-based or closed, that with respect to
4 particular drug products, it can make an exception
5 and allow a drug product to be made available at
6 the same copay to its members even if that would
7 not normally qualify under its plan?
8         MR. COHEN:  Object to the form.
9     A.    You can ask the most complex
10 questions.
11        I think what I'm hearing, and tell
12 me if I'm responding to the wrong question, are
13 you telling me -- asking me whether or not a
14 benefit plan adminstered by a PBM can make a drug
15 available on any given tier irrespective of its
16 formulary status?  Am I -- is that the question?
17 BY MR. DOBIE:
18    Q.    Yes, why don't you answer that.
19    A.    Okay.  The answer is yes, you can
20 override anything within the formulary structure
21 with a prior authorization.
22    Q.    Okay.  In connection with prior
23 authorization, are you familiar, though, sir, with
24 situations where PBMs without a prior

---

5/19/2004  Gibson, David

1 say, I wouldn't necessarily be surprised.
2    Q.    In the course of reaching your
3 opinions in this case, did you examine the extent
4 to which that actually occurred in the marketplace
5 with respect to Cenestin?
6    A.    No, I did not.
7    Q.    In your last deposition, you were
8 shown some data that had to do with the extent to
9 which various plans were, in fact, reimbursing
10 Cenestin and -- through basically an open
11 formulary system the same as in a -- as in a
12 branded -- strike that.
13        Have you, sir, made any
14 investigation in -- in terms of to what extent
15 Cenestin was reimbursed exactly the same way as
16 Premarin in the -- by PBMs and HMOs?
17        MR. COHEN:  Object to the form.
18    A.    Other than researching the Wyeth's
19 internal documents that were part of my report and
20 footnoted, no.
21 BY MR. DOBIE:
22    Q.    Here's what I'm -- okay.  And so if
23 we look at --
24            * * *

---

5/19/2004  Gibson, David

1 authorization have made any -- strike that.
2        Are you aware of whether or not a
3 PBM can simply make the decision that regardless
4 of whether the product is listed as a -- whether
5 or not the plan is designed as an open plan, a
6 closed, or a three-tier, it can actually decide to
7 reimburse a particular product as -- and treat it
8 at the same copay as any product that, let's say,
9 is on formulary without prior authorization?
10    A.    I don't know of instances for that,
11 but I wouldn't be surprised.  Let me just say they
12 have to be very careful here, because if they --
13 if they -- if they do not administer the plan
14 uniformly across the beneficiary pool, they will
15 be in violation of federal law.
16    Q.    All right.  Let's -- let's assume
17 that they do uniformly administer the plan across
18 the benefit pool such that a particular product
19 is, in fact, reimbursed at the -- a branded
20 product is reimbursed at -- in the -- like any
21 other branded product, irrespective of it being on
22 formulary or not, are you familiar with that
23 happening in the -- in the industry?
24    A.    I'm not familiar, but I -- like you

---

5/19/2004  Gibson, David

1        (Whereupon, Gibson Exhibit 16 was
2        marked for identification.)
3            * * *
4 BY MR. DOBIE:
5    Q.    Let me show you what's been marked
6 as Exhibit 16.  For the record, Exhibit 16 is a
7 copy of a document produced by Duramed in this
8 case that has a listing of HMO formulary
9 breakdown, PBM formulary breakdown, and the number
10 of lives broken down at a percent open, percent
11 three tier, percent closed.
12        In turning to the very last page of
13 Exhibit 16, sir, it shows that 62 percent of PBM
14 lives as it relates to Cenestin fall within an
15 open formulary system.  You see that?
16    A.    I see that.
17    Q.    Have you made any investigation to
18 determine whether that, in fact, is -- is
19 accurate?
20    A.    Yes.
21    Q.    Okay.  And what investigation have
22 you made?
23    A.    I did a -- give me a minute here and
24 I'll -- on Page 70 of my report and 71, you will

1   see a breakout of most of the same companies that
2   are listed on this chart as to the number of lives
3   involved and Wyeth's contractual status either as
4   an exclusive conjugated estrogen or as a preferred
5   product, which is almost universal across the
6   board.
7        Q.    Okay.
8        A.    So I think that's -- that would be
9   my research.
10       Q.    All right.  Did you do anything
11  else?
12       A.    I looked at a number of documents
13  which you've seen --
14       Q.    The Wyeth documents?
15       A.    -- but they -- Wyeth and others.
16  This was the most on point on the -- on the issues
17  that I was raising and discussing in my report.
18       Q.    Okay.  So -- so what you have here
19  on Page 70 running over to 71 is a breakdown of
20  the Wyeth contract and whether they have a sole
21  conjugated estrogen-language contract, a preferred
22  oral estrogen contract, this is what you're
23  relying upon --
24       A.    I am.

1        Q.    -- principally?
2        A.    Well, that's -- that's one of the
3   major things, yes.
4        Q.    Okay.  What I'm -- what I'm
5   suggesting to you is something different, okay,
6   and it's this:  Regardless of whether or not any
7   of these particular plans, let's say PCS, had an
8   agreement that Wyeth would be a -- in this
9   instance, a preferred oral estrogen, you
10  understand that PCS, if it has an open plan, could
11  still reimburse Cenestin at the same copay level
12  as Premarin; correct?
13            MR. COHEN:  Object to the form.
14       Lack of foundation.
15       A.    I would disagree with that.
16  BY MR. DOBIE:
17       Q.    Okay.  Did you read Mr. Finneran's
18  deposition or Mr. Carter's deposition in this
19  case, the individuals that were involved with
20  preparing Exhibit 16?
21       A.    No.
22       Q.    Do you know what effort they made to
23  examine the -- and put together Exhibit 16 so that
24  it would break down the amount of lives that were,

1   in fact, open for Cenestin?
2        A.    I didn't read the deposition and I
3   don't know the methodology.  The key here is
4   definitions.  What does "open" mean?
5        Q.    Okay.  And if Mr. Finneran testified
6   that by -- by preparing this document, they
7   intended to mean reimburse at the same copay with
8   no prior authorization, don't you think that this
9   would be relevant, having an understanding of
10  what -- of whether or not that is, in fact, the
11  case in reaching your conclusions?
12            MR. COHEN:  Object to the form.
13       A.    I'd be highly skeptical of that
14  interpretation of this report.
15  BY MR. DOBIE:
16       Q.    Okay.  Have you done any
17  investigation to get behind this and figure out
18  whether or not that, in fact, is what the
19  situation was at -- at these companies as it
20  relates to Cenestin?
21       A.    I think Wyeth's own internal
22  documents that I've put into my report rebut this
23  rather effectively.
24       Q.    Don't you think that Duramed would

1   be the company that would be in the best position
2   to know what its formulary status was for its own
3   product?
4             MR. COHEN:  Object to the form.
5        A.    What this report says is they are
6   reporting their lives -- their -- they having
7   access to their lives in an open status.  That
8   does not say that it's preferred or not
9   positioning on the market.  It doesn't say
10  anything about what copayment structures are.
11  BY MR. DOBIE:
12       Q.    Okay.  But again, if the testimony
13  of the witnesses is undisputed and they've
14  admitted that by preparing this document they
15  meant the same copayment, that's what they mean by
16  "open," with no prior authorization involved, how
17  have you -- how have you incorporated this into
18  reaching your conclusions, if at all?
19            MR. COHEN:  Object to the form.
20       A.    I read many things that I'm -- if
21  I'm skeptical or don't agree with it would not
22  include it.  I did not read the deposition and I
23  would be highly surprised if they say that their
24  drug, in light of what you have here on my Page 70

1  and 71, are on an equal financial positioning with
2  Premarin in all of these companies.
3  BY MR. DOBIE:
4      Q.    All right.  I understand you'd be
5  surprised, but if, in fact, that is what the facts
6  demonstrate, does that change your opinion at all?
7          MR. COHEN:  Object to the form.
8      A.    I would just have to look at it to
9  give you an answer on that.  I'm not prepared to
10  take your hypothetical and tell me that I would --
11  and answer that I would change my opinion.
12  BY MR. DOBIE:
13      Q.    All right.  You haven't looked at
14  Exhibit 16 before, have you?
15      A.    Have I looked at it?
16      Q.    Have you looked at Exhibit 16 as
17  part of the preparation of your report?
18      A.    No.
19              * * *
20          (Whereupon, Gibson Exhibit 17 was
21       marked for identification.)
22              * * *
23  BY MR. DOBIE:
24      Q.    Let me show you another document.

1  Let me show you what's been marked as Exhibit 17.
2          For the record, Exhibit 17 is a copy
3  of a managed care overview 2001 business plan
4  dated October 27, 2000, cover memo from Mr. Marty
5  Carter to Jeff Arington.
6          Sir, do you know who Marty Carter
7  is?
8      A.    No, I don't.
9      Q.    Do you know who Jeff Arington is?
10      A.    No.
11      Q.    Okay.
12      A.    Well, it's listed here who Marty
13  Carter is at the bottom of the page, but I --
14  personally I didn't know until I read this.
15      Q.    Have you ever seen this document
16  before?
17      A.    I don't recall having seen it.
18      Q.    All right.  This is -- as it
19  indicates here, Marty Carter is the executive
20  director of managed care at Duramed
21  Pharmaceuticals.  Jeff Arington was the president
22  of Duramed Pharmaceuticals.  And if -- if you turn
23  to the second page of Exhibit 16, it notes in the
24  very first bullet point, "Cenestin continues to

1  have access to a minimum of 75 percent of the
2  managed care lives."  Do you see that?
3      A.    I do.
4      Q.    And again, did you in any way
5  incorporate this into your report or the
6  conclusions that you've reached?
7      A.    It -- having access to the lives on
8  the third tier is for the -- for the most part
9  irrelevant.
10      Q.    All right.  And is that because in
11  your view the -- well, let me -- let's back up.
12          Do you know whether or not this is
13  access on the third tier or if this is access not
14  on the third tier?
15      A.    I know based on the table that I
16  cited from Wyeth that it is -- it is likely that
17  all of this is third-tier access.
18      Q.    Okay.  If you look at Exhibit 15,
19  sir, which is also a memo from Mr. Carter,
20  executive --
21      A.    15?
22      Q.    Yes, sir.  I'm sorry, 16.  The
23  executive director of managed care for -- for
24  Duramed?

1      A.    Uh-huh.
2      Q.    It doesn't say 75 percent is third
3  tier.  He says 62 percent is open.  30 percent is
4  three tier.  Do you see that?  So this is November
5  of 2000.
6      A.    All right.  You're referring to Page
7  1 through Page --
8      Q.    I'm referring to the last page of
9  Exhibit 16, the same page --
10      A.    The last page?  Okay.
11      Q.    Yes, sir.  And on the PBM side, he's
12  got 62 percent open, 30 percent third tier.  Do
13  you see that?
14      A.    I see that.
15      Q.    Okay.  So in light of that, do you
16  think it's reasonable to assume that Mr. Carter is
17  referring to 75 percent of the managed care lives
18  having access to as being third tier?
19          MR. COHEN:  Object to the form.
20      A.    I'm -- I'm not sure from this chart
21  how he is defining that.  He lists that Cenestin
22  was available in only 8 percent of the closed
23  lives.
24  BY MR. DOBIE:

1    Q.     Right.

2    A.     He indicates that on the third tier

3    they were available for 30 percent.

4    Q.     Correct.

5    A.     I don't know exactly what the

6    definition of "open lives" here on this chart is.

7    Q.     62 percent.

8    A.     I know what the numbers are listed.

9    Q.     All right.  But go back to my

10   question.

11   A.     It would be helpful if he had a

12   footnote.

13   Q.     My question was, why do you believe

14   in light of Exhibit 16 that by him stating in the

15   business plan for Cenestin 2001 that Cenestin

16   continues to have an access to a minimum of 75

17   percent of managed care lives and Mr. Carter was

18   referring to third tier when his own document from

19   the same time period says 30 percent third tier

20   and 62 percent open lives within the PBM formulary

21   system?

22           MR. COHEN:  Object to the form.

23   A.     I can't square the circle on that.

24   BY MR. DOBIE:

1    Q.     And again, you haven't -- you

2    haven't considered Exhibit 16 in reaching your

3    conclusions here?

4    A.     Correct.

5                    * * *

6           (Whereupon, Gibson Exhibit 18 was

7           marked for identification.)

8                    * * *

9    BY MR. DOBIE:

10   Q.     Let me show you -- sir, I've handed

11   you Exhibit 17.  Have you ever seen this document

12   before?

13          MR. COHEN:  Did you say 18?

14          MR. DOBIE:  Oh, 18.

15   A.     Not that I recall.

16   BY MR. DOBIE:

17   Q.     Okay.  This -- this is a document

18   that again comes from Duramed and it's from John

19   Neeley, who is -- who is one of the managed care

20   people hired by Duramed that work for -- for

21   Viking for the executive director of managed care

22   for Duramed, Marty Carter.

23          Sir, you note in your report that

24   there are four significant PBMs; right?

1    A.     Correct.

2    Q.     And the four PBMs are AdvancePCS,

3    Merck-Medco, Express Scripts and Caremark; right?

4    A.     Correct.

5    Q.     And in the prior documents we were

6    looking at, in particular Exhibit 16, this chart

7    shows that AdvancePCS, 75 percent of lives were

8    open; at Caremark, 75 percent of the lives were in

9    open, 25 percent third tier, no closed formulary;

10   Express Scripts, 40 percent open, 50 percent in

11   the third tier, 10 percent closed; and in Merck-

12   Medco, 50 percent open, 30 -- 35 percent in the

13   third tier, and 15 percent in a closed formulary.

14   Do you see that?

15   A.     I do.

16   Q.     And -- and again, the conclusions

17   that you reached in the -- in your report are that

18   contrary to this document and the statement that

19   75 percent -- I'm sorry.  Strike that.

20          The conclusions that you reached in

21   the report are basically that that's not true,

22   right, that 75 percent -- or that these -- at

23   least at these big PBMs the Cenestin was in the

24   third tier in the majority of instances or in --

1    disadvantaged by being in basically a closed

2    formulary; right?

3    A.     No, that's not what I'm saying.

4    What I'm saying is I don't know the definition of

5    "open lives" here.  That it -- in general, it's

6    irrelevant if -- there is access to a drug if it

7    is not on the preferred list; that once you fall

8    off the preferred list, and the documents I cite

9    within Wyeth attest to this, that the penalties

10   are enormous.  The patients and physicians do not

11   know that they have access to the drug because

12   it's not published on any formulary and all of the

13   inhibitors, both hard edits, soft edits, and

14   copayment structures, which are accepted

15   throughout the industry as being very effective in

16   moving market share, can be arraigned against a

17   product that is some -- that is listed here as an

18   open product.

19   Q.     Okay.  Well, we'll come back and

20   talk about each of those and the extent to which

21   they were, in fact, applied against Cenestin.  All

22   right.

23          But what I'm saying is, sir, as it

24   relates to -- to this, okay, to these -- these

1  documents that we're looking at, it's true, is it
2  not, that you've have decided in your report to
3  use Wyeth documents principally for an
4  understanding as to whether or not the situation
5  with Cenestin was that it was disadvantaged as
6  opposed to looking at Duramed's documents with its
7  understanding of the marketplace?
8      A.    That would be correct.
9      Q.    Okay.  And did you know, for
10  example, looking at Exhibit 18, that -- go to the
11  second page and look at --
12     A.    The second page of the document?
13     Q.    You're on the second page right
14  there, yes, sir, Bates No. DUR10671.
15          Were you aware, for example, that at
16  PCS Health Systems Duramed learned that Cenestin
17  will be available at the same copay level as
18  products accepted for inclusion in the 2000
19  formulary plan programs in at least 90 percent of
20  their book of business or over 45 million lives?
21          MR. COHEN:  So you're -- you're --
22      Gordon, you're asking him whether he learned
23      what -- what this document says?
24          THE WITNESS:  Was he aware of that.

1          MR. COHEN:  What the document says.
2          MR. DOBIE:  Yes, sir.
3      A.    I don't recall that I was --
4  BY MR. DOBIE:
5      Q.    Okay.
6      A.    -- when I prepared my report.
7      Q.    And -- and were you aware that it
8  was -- looking at the last sentence under "PCS
9  Health System," were you aware that it was Viking
10  Health Care's proposal that Duramed continue to
11  recommend -- I'm sorry.  Let me back up.
12          Were you aware that Viking
13  recommended that with this coverage for Cenestin
14  in the vast majority of PCA plans without an
15  agreement that it's likely that Viking Health Care
16  Solutions will continue to recommend to Duramed
17  the strategy in the future as it provides
18  extensive Cenestin coverage with no rebate
19  liability?  Did you know that that was their
20  strategy?
21      A.    Let me just review that paragraph
22  again.
23      Q.    Yes, sir.
24      A.    All right.  I'm reading a paragraph

1  in a document that I have not seen before, so let
2  me tell you how I'm interpreting the paragraph.
3      Q.    I'm just asking whether you were
4  aware of what's stated here in this paragraph.
5      A.    I was not.
6      Q.    All right.  And do you know whether
7  or not Viking, which was the group that was
8  advising Cenestin and meeting with managed care
9  executives from Medco, Express Scripts and others,
10  was actually just trying to have Cenestin approved
11  at the same copay level without having put --
12  being put on formulary?
13     A.    It looks as though that's what they
14  were trying to do.
15     Q.    All right.  And have you looked at
16  Aetna?  The very next item there.
17     A.    Uh-huh.
18     Q.    It states there that -- in the
19  second paragraph that Viking's recommendation by
20  Aetna in regards to Cenestin is to continue to
21  work with physicians to generate demand, keep a
22  low profile on the contracting side, and allow the
23  prescriptions to be filled at the same copay level
24  as formulary products.

1          Were you aware that that was the
2  situation at Aetna, sir, for Cenestin?
3      A.    No.
4      Q.    If you look at the next item under
5  "United Healthcare."
6          THE VIDEOGRAPHER:  Stand by.
7              *  *  *
8          (Wherefore, a discussion was held
9      off the record.)
10             *  *  *
11         THE VIDEOGRAPHER:  Proceed.
12  BY MR. DOBIE:
13     Q.    Under "United Healthcare," sir, on
14  the next page, the third page of the exhibit,
15  DUR10672, the first full paragraph on that page
16  notes that "At this time, Cenestin is considered
17  nonformulary, however is being reimbursed in the
18  majority of their plans at the $13 copay level."
19         Were you aware that that was the
20  situation at United Healthcare?
21     A.    No, I wasn't.
22     Q.    Let's look at Caremark, which is one
23  of the other big PBMs that you identified.  It's
24  the next page, DUR --

1     A.     Did we skip Express Scripts that
2  was --
3     Q.     We'll come back to Express Scripts.
4         At Caremark, did you -- were you
5  aware that it was Viking -- were you aware first
6  that at Caremark most prescriptions would
7  continue -- most prescriptions for Cenestin would
8  continue to go through with the normal copay for a
9  branded product?
10        MR. COHEN:  Object to the form.
11    A.     This paragraph pretty much sums up
12 why I think most of this is not on point.  And it
13 states at the top of the paragraph that Caremark
14 was unable to contract and place Cenestin on the
15 formulary because of the contractual restrictions
16 by Wyeth.  This would be an end-run arrangement
17 that Caremark would have made with Cenestin to
18 give broader access.  That's how I'm reading this.
19 BY MR. DOBIE:
20    Q.     Sir, do you understand the role of
21 an expert in litigation?
22    A.     I think so.
23    Q.     Do you -- do you think it's your
24 role to be an advocate or are you supposed to

1  objectively provide the jury with your opinions?
2     A.     I'm -- what I'm trying to do is give
3  you a background for how I arrived at my opinions
4  and how I would interpret this.
5     Q.     Okay.  Is there -- sir, aren't you
6  being an advocate?  Is there anywhere in this
7  paragraph on Caremark that there says one word
8  about whether they have a contractual restriction
9  with Wyeth?
10        MR. COHEN:  Object to the form.
11 BY MR. DOBIE:
12    Q.     Yes or no.
13    A.     It does not say --
14    Q.     Okay.
15    A.     -- the word "contract."
16    Q.     And when you answer my questions,
17 you created that; correct?
18    A.     I interpreted Wyeth's proposal --
19    Q.     Okay.  Do you --
20    A.     -- as meaning that.
21    Q.     And do you know whether or not
22 Caremark even had a contract with Wyeth prior to
23 this time period?
24    A.     I don't know in the instance of

1  Caremark.  I do know what Wyeth's contracts look
2  like.
3     Q.     Okay.  And so what you are doing
4  here in testifying is you're being an advocate and
5  you're actually creating language in a document
6  that doesn't exist; isn't that right?
7         MR. COHEN:  Object to the form.
8         Argumentative.
9     A.     I substituted the word "contract"
10 for "proposal."
11 BY MR. DOBIE:
12    Q.     Okay.  And you also substituted the
13 idea that Wyeth had a restrictive contract with
14 Caremark at that time, even though it's not in the
15 paragraph; correct?
16    A.     Even though it's not in the
17 paragraph, with the prior knowledge of how Wyeth
18 contracted.
19    Q.     Okay.  And you substituted that
20 without even knowing whether or not Caremark, in
21 fact, had a contract; correct?
22    A.     Wrong.  I know that there was a
23 contract.
24    Q.     Look at your --

1     A.     Again, it's on Page 70.
2     Q.     Okay.  And look at your chart, sir.
3  What does it say in terms of contract status for
4  Caremark?
5         MR. COHEN:  Where are you, Gordon?
6  BY MR. DOBIE:
7     Q.     On your report -- now you're looking
8  at your report; right?
9     A.     Correct.
10    Q.     Okay.  And in your report for
11 contract status, what does it say about Caremark?
12    A.     "Not applicable."
13    Q.     Okay.  And so knowing that, knowing
14 that Caremark didn't have a contract with Wyeth,
15 you are now creating and adding language to a
16 document in order to be an advocate for your
17 clients; isn't that right?
18        MR. COHEN:  Object to the form.
19    A.     I'm -- I'm interpreting a document
20 you're giving me for the first time based on my
21 knowledge of what the contracts are.
22 BY MR. DOBIE:
23    Q.     Okay.  Your knowledge and your
24 report is that they didn't have a contract with

1    Caremark and yet you answer the question by
2    assuming that there was; correct?
3            MR. COHEN:  Object to the form.
4        A.    Correct.
5    BY MR. DOBIE:
6        Q.    Okay.  All right.  Can you be an
7    objective expert here today, sir?
8            MR. COHEN:  Object to the form.
9        A.    I am and I can be.
10   BY MR. DOBIE:
11       Q.    Okay.  Can you answer my questions
12   as opposed -- as opposed to creating language in
13   documents that doesn't exist?
14           MR. COHEN:  Object to the form.
15       A.    I'd be happy to.
16   BY MR. DOBIE:
17       Q.    Okay.  Let's try that.
18           Have you -- have you ever acted as
19   an expert before in any case, sir?
20       A.    You and I both were involved in my
21   prior experience as an expert.
22       Q.    Has any judge ever certified you as
23   an expert in any case?
24       A.    I don't know whether that occurred

1    within the Duramed case or not.
2        Q.    Do you have an understanding of what
3    the rules are for an expert witness?
4        A.    Generally, yes.
5        Q.    Okay.  And what's your understanding
6    of the role of an expert?
7        A.    That I am to give -- that I am to
8    review a case and to give an opinion based on my
9    experience in the industry as to what occurred and
10   how it occurred.
11       Q.    Okay.  Do you understand you have to
12   be objective, sir?
13       A.    Yes.
14       Q.    Do you understand you're not
15   supposed to be an advocate?
16       A.    Yes.
17       Q.    Okay.  Let's go back to Caremark.
18           With Caremark, sir, looking at
19   Exhibit 18, it states that with the exception of
20   the mail-order segment that the fact that Premarin
21   was on formulary will have minimal impact on
22   Cenestin prescriptions.  Most prescriptions would
23   continue to go through with the normal copay.  Do
24   you see that?

1        A.    I see that.
2        Q.    Okay.  And were you aware that at
3    Caremark most Cenestin scripts would continue to
4    go through with the normal copay?
5            MR. COHEN:  Are you asking him is he
6            aware of what this document states or
7            separate and apart from this document?
8            MR. DOBIE:  Was he aware of that at
9            the time that he prepared his report.
10           THE WITNESS:  No.
11   BY MR. DOBIE:
12       Q.    Do you have any reason to know that
13   that's not true?
14       A.    No.
15       Q.    And where it says here that -- were
16   you aware of the next sentence under "Caremark,"
17   that "While there is not clearly an opportunity to
18   contract for formulary inclusion, there is an
19   opportunity to contract for access.  However, I
20   see little upside in doing so.  Basically we would
21   be paying for prescriptions that will be going
22   through the system anyway."  Do you see that?
23       A.    Yes.
24       Q.    Okay.  And do you have any -- did

1    you have any understanding of that at the time
2    that you wrote your report?
3        A.    No.
4        Q.    And -- and sir, don't you think it's
5    relevant to your report if -- so far we've covered
6    the three biggest PBMs -- if, in fact, it was true
7    that Cenestin prescriptions were going through
8    with the same copay as Premarin?
9        A.    I think it's relevant.
10       Q.    Okay.  And how is it relevant?
11       A.    It would mean that a -- that at the
12   point of dispensing it would not generate a
13   callback.
14       Q.    All right.
15       A.    Or a problem for the patient as far
16   as what they were paying out of pocket.
17       Q.    All right.  And to that -- to the
18   extent that this is true, that Cenestin
19   prescriptions went through at the same copay level
20   without a prior authorization, without an NDC
21   block or anything like that, would that impact in
22   your expert opinion the extent to which Cenestin
23   was, in fact, disadvantaged in the marketplace?
24       A.    It would be a factor.

**Page 386**

1    Q.    All right.  And have you
2    investigated whether, in fact, this is true, that
3    there -- that Cenestin prescriptions were
4    reimbursed at the same copay level as Premarin, as
5    indicated in Duramed's documents?
6    A.    The --
7         MR. COHEN:  With respect to
8    Caremark?
9         MR. DOBIE:  At all.
10   A.    At all?
11   BY MR. DOBIE:
12   Q.    Yes, sir.
13   A.    The research which is cited in my
14   report starting on Page 78 and going to 79 are
15   some representative examples that I pulled out of
16   the documents that do not indicate that patients
17   arriving at the pharmacy to get a prescription
18   were not being disadvantaged.
19   Q.    Okay.  And those are 12 examples;
20   correct?
21   A.    Correct.
22   Q.    And have you examined anything
23   beyond this broader -- these 12 examples to see
24   whether or not it is the case that Cenestin was,

**Page 388**

1    Q.    Okay.
2    A.    -- correct.
3    Q.    So as it relates to these 12, we
4    don't know whether or not Wyeth had any contract
5    with any of the health plans that are indicated
6    here; correct?
7    A.    No, that's not correct.  Go back to
8    Page 70.  You made the point about Caremark, which
9    is the only company listed here that does -- does
10   not indicate what its contractual status is.  The
11   rest are all active accounts.
12   Q.    You're not answering my question,
13   sir.  I'm asking about your 12 examples.
14        As it relates to those 12 examples
15   where people had script turned away for Cenestin,
16   you don't know whether or not any of these -- any
17   of these individuals who had the Cenestin script
18   turned away was -- had a script turned away
19   because of a Wyeth contract; correct?
20   A.    The performance of the dispensing
21   pharmacist flows directly from the underlying
22   contracts.  I can infer it but I don't know it.
23   Q.    Okay.  But just take an example
24   here.  Your second one.  "Physicians describe how

**Page 387**

1    in fact -- strike that.
2         Beyond these 12 examples, do you
3    know whether or not Cenestin was reimbursed at the
4    same copay level as Premarin, as indicated in
5    Duramed's documents?
6         MR. COHEN:  For -- for all plans?
7         MR. DOBIE:  Along the lines of
8    what's indicated in Exhibit 16, 17, and 18.
9    A.    I pulled and cited these cases.  I
10   read a number of them.  In -- in the interest of
11   not having this thing run any longer than it did,
12   I didn't include every document that I read.  But
13   you have a list of what I reviewed, and these were
14   the more interesting examples of where patients
15   were disadvantaged when Cenestin was prescribed.
16   BY MR. DOBIE:
17   Q.    Okay.  And of these 12, for example,
18   you don't know whether -- whether Wyeth had an
19   exclusive contract with respect to any of these
20   12, do you?
21   A.    I have indicated in my report the
22   examples of exclusive contracts that they had, but
23   I'm not certain that they matched up with each of
24   these --

**Page 389**

1    Florida managed care plans are rejecting Cenestin
2    prescriptions.  The physicians are frustrated."
3    Do you see that?
4    A.    I do.
5    Q.    You don't know whether or not the
6    plan had previously reviewed and rejected Cenestin
7    because of, let's say, its limited indications,
8    because it had just gone on the market, because it
9    only was available in one size, .625, at the time
10   of launch?  Those are all reasons why a health
11   plan could have rejected Cenestin for formulary
12   inclusion irrespective of they had a Wyeth
13   contract; right?
14   A.    I see your point.  Correct.
15   Q.    Okay.  I mean, for example, these
16   plans, they could have had contracts with Solvey
17   to make estradiol their -- their exclusive
18   product; correct?
19   A.    Correct.
20   Q.    Now, you mentioned -- you mentioned
21   Express Scripts as another example.  Express
22   Scripts --
23   A.    Are we on Exhibit 18?
24   Q.    Yes, sir.

5/19/2004 Gibson, David

1    A.    Okay.

2    Q.    Were you aware that -- that Express

3    was -- Express Scripts reviewed and placed

4    Cenestin on formulary at 2001?

5         MR. COHEN:  Object to the form.

6    A.    Yes.

7    BY MR. DOBIE:

8    Q.    All right.  And do you know it's on

9    the formulary in '02?

10   A.    Yes.

11   Q.    And '03 and '04?

12   A.    I am.

13   Q.    Have you made any investigation to

14   see whether or not Cenestin has done better at

15   Express Scripts since it went on formulary?

16   A.    I investigated the market

17   performance of Aetna.

18   Q.    Okay.  Have you made an examination

19   of the market performance of Express Scripts?

20   A.    I don't recall that I included it in

21   my report.  I may have read about it.

22   Q.    And -- and do you have any

23   recollection of how it did?

24   A.    It's my recollection that their --

4/1/2005 2:25 PM                                        390

---

1    present.

2    Q.    Okay.  And -- and do you know

3    whether or not, for example, Cenestin is on

4    formulary now at Medco?

5    A.    I don't know.  I wouldn't be

6    surprised that it is.

7    Q.    Do you know whether or not it's on

8    formulary at Humana?

9    A.    And again, I would expect that it

10   would be, at least third tier.

11   Q.    Do you know whether --

12   A.    I don't know if it's the second

13   tier.

14   Q.    Do you know whether it's been on

15   formulary in the second tier since 2000?

16   A.    I don't --

17        MR. COHEN:  At a particular -- at

18   Humana, you're saying?

19        MR. DOBIE:  Humana.

20   A.    I don't know.

21   BY MR. DOBIE:

22   Q.    Have you made any investigation in

23   terms of whether or not Cenestin has done any

24   better at any plan where it's on formulary

4/1/2005 2:25 PM                                        392

---

5/19/2004 Gibson, David

1    their performance -- Cenestin's performance

2    improved.

3    Q.    Do you know whether it -- it does

4    better than its national market share at Express

5    Scripts; in other words, where it's on formulary?

6    A.    I don't know that.

7    Q.    Okay.  Do you know -- have you made

8    any examination of -- let me back up.

9         Do you know where else Cenestin is

10   on formulary?

11   A.    On formulary as defined by which

12   position on formulary?

13   Q.    As -- as the preferred product.

14   A.    As the preferred product?

15   Q.    Yes, sir.

16   A.    And in what year?

17   Q.    In any year.  You mentioned the

18   Aetna example.  Have you made any other

19   examination in terms of how Cenestin has done

20   after going on formulary at any plan?

21   A.    It is my general view and review

22   that Cenestin has been gaining access, as have

23   other estrogen products, to the second tier in a

24   more advantageous way since 2001, 2002 to the

4/1/2005 2:25 PM                                        391

---

1    compared to its national market share other than

2    at Aetna?

3    A.    Aetna is where I focused my

4    attention.  The reason I was focusing as I did is

5    the majority of these -- what this case is

6    bracketed by is a time frame in the past, not the

7    present.  So my access to what their formularies

8    were in 1999, for instance, I didn't have that

9    data or I didn't -- I didn't obtain that data.

10   Q.    Okay.  You didn't ask your counsel

11   for that data; correct?

12   A.    No.

13   Q.    But you're not saying that your

14   counsel didn't have that data; right?  You just

15   weren't interested in reviewing it?

16   A.    I'm unaware of what my counsel has.

17   I know that what my counsel -- what -- what Mr.

18   Cohen has provided to me on my request.

19   Q.    On Page --

20        THE WITNESS:  Wonder if we could

21   take a break.

22        MR. COHEN:  Gordon, can we take a

23   break?

24        MR. DOBIE:  Sure.

4/1/2005 2:25 PM                                        393

5/19/2004 Gibson, David

5/19/2004 Gibson, David

1    THE VIDEOGRAPHER:  Going off the
2  record.  The time is 10:25 a.m.
3              * * *
4          (Whereupon, a short recess was
5  taken.)
6              * * *
7    THE VIDEOGRAPHER:  We're back on the
8  record.  The time is 10:35 a.m.
9  BY MR. DOBIE:
10   Q.    Dr. Gibson, I want to ask you about
11 a statement on Page 14 of your report.  You
12 state -- you can find it there, but you'll
13 probably recall -- "PBMs may or may not pass on
14 some of the manufacturer's rebate received by" --
15 "received to their client, but generally do not
16 pass on administrative fees received from
17 manufacturers."  Correct?
18   A.    Correct.
19   Q.    Okay.  And we were talking about the
20 pass on the rebates yesterday and I think you
21 mentioned that you weren't aware of any
22 authoritative sources -- we ventured your history
23 now from PCN, but you weren't aware of any
24 authoritative sources that indicated the amount of

---

1  BY MR. DOBIE:
2    Q.    Do you believe that -- that PBMs
3  pass on rebates at between 70 and 90 percent on
4  average?
5    A.    I will tell you that the percent of
6  rebate passed through to the customer is higher
7  today in 2004 than it was in 1999.  The reason for
8  that is that more of the PBM's revenue is now
9  being derived from their mail order than from
10 their rebate.  In other words, they're not as
11 reliant upon the rebate dollar for their profit.
12   Q.    How about in 2000; do you believe
13 that PBMs passed on rebate dollars at between 70
14 and 90 percent on average to their health plans?
15   A.    70 percent I would think would be
16 within a range that wouldn't be surprising.  90 in
17 the year 2000 I would find -- I would -- I would
18 bet would be unusual.
19   Q.    Okay.  And so we know at PCN you do
20 that with your MediCal formularies, but -- but you
21 think otherwise that would be true at the high end
22 of the range?
23   A.    I would.
24   Q.    And do you think the low end of the

---

5/19/2004 Gibson, David

1  pass on the rebates that usually occurs; right?
2    A.    The only thing that I -- the only
3  thing that I've seen that would reflect
4  contractual relationships within companies would
5  be the document you showed me yesterday with
6  Merck-Medco.
7    Q.    Okay.  I'm talking about not the
8  rebates from -- from manufacturers to the PBMs.
9  I'm talking about the pass on the rebates from
10 PBMs to health plans.
11   A.    Yes.  I quote in my -- in my report
12 industry sources and -- and knowledge of what the
13 range for rebates are between the manufacturer and
14 the PBM, but I don't have a handle on the
15 percentage passed back to the customer, and one of
16 the reasons that that's a hard number to give you
17 is it's quite a moving target.
18   Q.    Are there -- do you believe that the
19 rebates that may be passed on by manufacturers at
20 up to 70 to 90 percent on average?
21        MR. COHEN:  You said "by
22   manufacturers."
23        MR. DOBIE:  I'm sorry.  Let me
24   restate the question.

---

5/19/2004 Gibson, David

1  range would be about 70 percent?
2    A.    In what year?
3    Q.    2000.
4    A.    In 2000.  I think the low -- and
5  again, what clients?  The different -- this is a
6  negotiated arrangement client by client.  So if
7  you have a fairly unsophisticated client as
8  opposed to a sophisticated client -- we can go
9  through all how that is differentiated -- the
10 unsophisticated client would likely get less than
11 a sophisticated client.
12   Q.    Okay.  Do you have any sense of what
13 the range was, though, in 2000?  Would it be
14 between 70 and 90 percent?  You think that's a
15 fair range?
16   A.    I would not be surprised that that
17 would be the number.
18   Q.    Okay.  And, in fact, one of the
19 documents we were just looking at, Exhibit 15 --
20 let me show you that.  If you turn to Page 6, in
21 the second column right before "Health Plans," the
22 word "Health Plans," that heading, there's a
23 sentence that notes that "The U.S. Department of
24 Health and Human Servicess estimate that PBMs

1  receive direct rebates from manufacturers ranging
2  from 2 to 35 percent of brand name drug sales
3  prices and pass on about 70 to 90 percent of those
4  direct rebates to insurers or self-insured
5  employers." Do you see that?
6      A.    I do.
7      Q.    And then the citation is there -- I
8  can see you thumbing to that -- that's actually a
9  report to the president, prescription drug
10 coverage spending, utilization, and prices from
11 April of 2000; right?
12     A.    Correct.
13     Q.    And that's actually a document that
14 you yourself have cited; correct?
15     A.    Correct.
16     Q.    And -- and so in light of that, sir,
17 would you -- you don't have any reason to quarrel
18 with the fact that -- the best -- the best
19 estimate that was out there at least in the year
20 2000 of the amount of rebates being passed on is
21 from 70 to 90 percent?
22     A.    Yes, I'd accept that.
23     Q.    And would you also agree that since
24 2000 the amount of rebates being passed on may

1  have gone up?
2      A.    They may have.  And I would also add
3  that before that they were probably less.
4      Q.    Okay.  Let's talk about drug
5  formularies, to switch topics for a moment.
6           On Page 31 of your report, the very
7  top of the page, you talk about how "P&T
8  committees generally focus upon the scientific
9  data available concerning new drugs as they become
10 available in the market.  They're evaluated as
11 being unique, similar to other already available
12 products within a class of drugs or occasionally
13 classified as unacceptable based upon risk-benefit
14 calculations.  The price of the drug and any
15 rebate negotiations are generally not available to
16 the committee."
17          Is that your experience with -- with
18 PCN and Omni?
19     A.    It is.
20     Q.    And is that also your experience or
21 understanding of how the industry generally works?
22     A.    Generally, yes.
23     Q.    And here's where I'm confused.  You
24 have -- other places in your report, you note

1  that -- that pharmaceutical products are sometimes
2  not evaluated on the relative scientific merit.
3  All right.  And I'm just trying to sort of square
4  the two statements.
5      A.    Sure.
6      Q.    Can you explain that for us?
7      A.    I will.  When the PBM committee --
8  or P&T committee -- we have too many acronyms
9  here.  When the P&T committee looks at drugs, as I
10 stated in the report, it evaluates them at the end
11 as being one of three categories.  Either this is
12 a unique drug that there's nothing else like it
13 and it works and it should be strongly considered
14 to be on the formulary.  The second category would
15 be similar to what is currently available.  And in
16 general, we look favorably on similar products
17 because it broadens the drugs available on any
18 given tier and it improves the likelihood for
19 rebate contracts for positioning on the formulary.
20 And we covered this yesterday on multiple drugs in
21 class.  And the third would be a drug that is --
22 it has just a very high toxicity, a lot of black
23 box warnings, which is warnings by the FDA that
24 this drug has a high likelihood of producing some

1  complication like liver or renal toxicity.
2           And it is -- if you look at overall
3  decision making for the committee, almost all of
4  the drugs fall into the category of similar.
5  There's very few drugs that come out.
6  Occasionally they come out as being unique and
7  there are few drugs that make it through the FDA
8  process that are just -- that lack merit, that
9  have minimal benefits and huge risks for use.
10          So once the committee makes the
11 decision and puts the drug into whichever
12 category, it then becomes a matter for the folks
13 that negotiate contracts to determine positioning
14 for the products and it becomes the purview of the
15 clients themselves and their consultants to design
16 the benefit plan.  They may elect to put a drug on
17 a second tier that is not within the standard
18 formulary for the PBM and they -- they will
19 generally have a great deal of say as to what the
20 copayment amounts are.
21     Q.    So individual plans can elect to put
22 their own things on formulary, have their own
23 custom formularies, and also customize their
24 copays?

1     A.     Correct.  Most of them don't, but
2 some do.
3     Q.     And -- and would you agree that --
4 that generally speaking that formulary inclusion
5 should -- that the evaluation of the product
6 should include assessing peer-reviewed medical
7 literature?
8     A.     Absolutely.  Let me tell you what --
9 just to expand on that for a second.
10           The really important studies that we
11 constantly ask for and rarely get are head-to-head
12 competitive studies.  In general, what we get are
13 the placebo-controlled studies that were used to
14 get the drug licensed by the FDA.  The head-to-
15 head studies would tell you in a live clinical
16 blinded environment what was the clinical
17 effectiveness of Drug A, which could be a
18 serotonin reuptake inhibitor for depression,
19 versus Drug B.  The second type of study that we
20 don't get and constantly ask for are economic
21 model studies.  This is particularly relevant in
22 the case of these new expensive drugs.  Your
23 client's Enbrel would be an example in the
24 treatment of rheumatoid arthritis.

1           The industry in general is asking
2 and demanding that these expensive drugs come into
3 the market with models showing how they affect
4 overall spending.  In other words, if you use this
5 new drug, will it reduce complications?  Will it
6 reduce subsequent hospitalizations?  Will it
7 reduce visits to the doctor?  Will it reduce tests
8 that are needed?  And what is the projected
9 financial performance for adding this to your
10 formulary?  We get those occasionally, but it's
11 rare, but that's -- that's something we ask for a
12 lot.
13     Q.     Okay.  Let me follow up on the two
14 things that you just said.
15           First, you do agree that it is
16 helpful and that a P&T committee should, in fact,
17 assess peer-reviewed literature; right?
18     A.     Correct.
19     Q.     And then on the head-to-head
20 studies, let me ask you this:  Did Cenestin
21 prepare any head-to-head study that you've seen at
22 the time that it launched this product?
23     A.     No.
24     Q.     All right.  Do you think it would

1 have been helpful for Duramed to have prepared a
2 head-to-head study when it went to the marketplace
3 with Cenestin in terms of calling on managed care?
4     A.     I think in this particular instance
5 it's -- most committees wouldn't have looked for
6 that.
7     Q.     Do you know whether or not any
8 committees did, in fact, look for it?
9     A.     No.
10     Q.     Do you know whether or not after
11 launch Cenestin ever did a head-to-head study?
12     A.     No.
13     Q.     On the economic model that you
14 mentioned, you said it is in your view helpful for
15 a P&T committee to have information about the
16 implications, the financial and economic
17 implications of adding a product to formulary;
18 correct?
19     A.     Correct.
20     Q.     And do you know whether or not
21 Duramed offered such an economic study or a
22 financial study like this to various PBMs when
23 they -- when they called on them?
24     A.     The short answer is no, I don't

1 know.  The slight expansion of that is we're
2 looking at a moving picture here.
3           Back in 1999, when Cenestin was
4 coming on the market, that was not commonly
5 requested, and in general even today, in 2004,
6 products in the price range of Cenestin and
7 Premarin, economic models don't really come up.
8 It's in these new biologic agents, the injectables
9 like anti-TNF agents, that you find the need for
10 these economic models.
11     Q.     Okay.  And it's -- just so I'm
12 clear, in contrast to Duramed not offering an
13 economic model, you're aware that Wyeth did, in
14 fact, at least arm its sales force with the
15 economic implications of either remaining with
16 Premarin as opposed to going with Cenestin;
17 correct?
18     A.     I am.  And I cite it in my report.
19     Q.     Yes, sir.  And then on other things
20 that a P&T committee should --
21     A.     Could I stop you just a second?
22     Q.     Yes, sir.
23     A.     That's not the kind of economic
24 models that we're talking about.  They're the same

1  word but they're not the same thing.
2          The economic models that -- that
3  Wyeth developed showed the consequences of adding
4  Cenestin and what the loss of rebate dollars would
5  be.  That's not what -- that's not the economic
6  models that P&T committees are interested in.
7  They want to know if you use Drug A, will it
8  reduce the incidence of hospitalization per
9  population of some number, say a thousand lives.
10     Q.     Well, do you know -- isn't it, in
11  fact, the case, sir, that Wyeth does have such --
12  such data that indicates the efficacy of its
13  product and -- and the extent to which use of
14  Premarin, the extent of hospital stays -- hospital
15  stays does, in fact, successfully treat or not
16  treat the symptoms for which it's prescribed?
17     A.     What year are we talking about?
18     Q.     In '99 or 2000.
19     A.     In '99 or 2000, the report -- the
20  studies that they were presenting for their
21  product were observational studies.
22     Q.     Okay.
23     A.     They were pre-Women's Health
24  Initiative studies.

1     Q.     But -- but they had such studies and
2  Duramed did not; correct?
3     A.     Correct.  These were observational
4  studies that had occurred over a decade of use.
5     Q.     And in addition --
6     A.     And most of them were proved to be
7  wrong.
8     Q.     Right.  So that 3,000 -- are you
9  aware that there's 3,000 clinical studies on
10  Premarin?
11     A.     Yes.
12     Q.     And is it your view that most of
13  them have been proven to be wrong?
14     A.     If you look at the Premarin
15  preemptive plan and the selling of science that
16  they did which was based on those studies that
17  were attributing reduction in the incidence of
18  stroke, reduction in the incidence of heart
19  disease, reduction in the incidence of
20  cholelithiasis and gallbladder disease, and on and
21  on, all of that was shown to be inaccurate in the
22  definitive double blind studies that were done
23  within the -- within the Women's Health Initiative
24  and HERS I and II.

1     Q.     Right.  I understand that those --
2  that those indications for the product turned out
3  not to be consistent with the WHI.  My question
4  was a different one.
5          Is it your view, sir, that the 3,000
6  studies that are out there are all wrong now in
7  light of WHI?
8     A.     I think they've been updated.
9     Q.     Have you done an analyis of any of
10  those 3,000 studies?
11     A.     I've -- I've read some of the
12  studies.  I don't know how you would use the term
13  "analysis."  But I've read the studies and I've
14  read the Women's Health Initiative.
15     Q.     Which studies have you read?
16     A.     I don't recall.
17     Q.     When did you read them?
18     A.     I read them around the time that the
19  WHI came out.  So that would have been around
20  what?  2002?
21     Q.     Would you agree that a P&T committee
22  should assess randomized clinical trials?
23     A.     Yes.
24     Q.     And assess outcome data,

1  pharmoeconomic studies?
2     A.     In the context as I've testified to
3  this point, yes.
4     Q.     And would you agree that economic
5  considerations should be secondary to the decision
6  about the safety, efficacy, and therapeutic need
7  for the drug?
8     A.     In general, yes.
9     Q.     And would you agree that legitimate
10  reasons to exclude a drug from formulary could
11  include the fact that the P&T committee views that
12  the study that has been done on the product is
13  not -- is not a particularly strong study?
14     A.     Usually there's not just a study
15  that a committee looks at.  Generally there's --
16  there's a multitude of studies.  Most of them
17  relate to the studies that were performed in the
18  process of gaining FDA approval.
19          That's a point that I probably
20  should make here.  In general, the P&T committee
21  is looking at drugs as they come into the market.
22  They're not looking in a systematic way at all the
23  drugs that are in the market already.  So unless a
24  drug that's on the market that has previously been

5/19/2004  Gibson, David

1  assigned to one of the categories has something
2  arise about it that -- for instance, again with
3  your client and diet medications, when it becomes
4  apparent that a very serious complication like
5  pulmonary fibrosis is arising, that would trigger
6  a reevaluation of a drug and likely withdrawal
7  from the formulary.  But in general, we're not
8  looking back at drugs that are already there.
9       Q.   Okay.  Let's go back to the question
10  I asked you.
11       A.   Okay.
12       Q.   Okay.  Is it legitimate for a P&T
13  committee to exclude a drug from -- from a
14  formulary because there is a weak study in their
15  view?
16       A.   Again, not usually one study will
17  affect it.  If there's a preponderance of evidence
18  that this is a weak drug based on the literature,
19  it would be relevant.  However, it has been my
20  experience and the experience of peers that I've
21  visited with that it's -- it would be exceedingly
22  rare for a drug to make it through the FDA process
23  that looks like that.
24       Q.   So it's very rare to have a drug

---

5/19/2004  Gibson, David

1  approval with just one study?
2       A.   Yes.
3       Q.   Okay.
4       A.   By the -- by the FDA.
5       Q.   Right.  Would you agree that it's
6  rare for a drug to be approved by a P&T committee
7  if there's only one study that is -- that is
8  supporting it?
9       A.   Again, it depends on the drug.
10  If -- if we're talking about a drug that in
11  essence is similar to something that's else on the
12  market -- I assume we're talking about Cenestin
13  here.  I may not be.
14            Cenestin was viewed by the medical
15  community essentially as a generic to Premarin.
16  It did not meet the strict criteria of a generic
17  because it lacked some of the 17 herbs and spices
18  that went into Premarin.  But in general, the use
19  of a conjugated estrogen or estrogen replacement
20  therapy in the market had been well established
21  when Cenestin came on the market.
22       Q.   And sir, when you say that -- that
23  the medical community viewed Cenestin as the
24  equivalent of Premarin, what's the basis for that

---

5/19/2004  Gibson, David

1  statement, sir?
2       A.   It was the way the drug -- drug was
3  marketed.  It was the way the drug was -- and
4  again, I'm stretching this analogy to generic.
5            The bigger point I was making is
6  that the whole area of hormone replacement therapy
7  was well established in medicine.  It wasn't like
8  we were bringing a new drug here that had never
9  been used.  The issue was is -- was there
10  something about Cenestin itself that was
11  dangerous, and the level of -- the level of proof
12  would be lower in that instance than it would,
13  say, for a new antibiotic that had never been used
14  for, say, a fourth-generation cephalosporin.
15  That -- that would get a lot more attention if
16  there were no other fourth-generation
17  cephalosporins on the market.
18       Q.   Okay.  So if I understand correctly,
19  if you just answer my question, is it your -- what
20  is the -- strike that.
21            What is the basis for your
22  conclusion that the, quote, medical community
23  viewed Cenestin and Premarin and the other
24  estrogen drugs, I think you're saying, as all

---

5/19/2004  Gibson, David

1  equivalent during the '99-2000 time period?
2       A.   I'm not saying all of the drugs.
3  I'm saying that in the 1999 period the use of
4  conjugated estrogens was well established in the
5  marketplace and that the physicians in general
6  viewed Cenestin as another conjugated estrogen.
7       Q.   When you say "physicians in
8  general," do you think you can speak for all
9  physicians, sir?
10       A.   I can -- going back to yesterday and
11  the issue did I, for instance, do a survey of
12  physicians and -- no.  I will tell you based on my
13  experience working with physicians that that was
14  the general impression.
15       Q.   All right.  And what physicians are
16  you -- are you referring to that you spoke with
17  that gave you the impression that Cenestin and
18  Premarin were equivalent products?
19       A.   This -- this would go back to
20  1999 --
21       Q.   Yes, sir.
22       A.   -- which is some time ago, and it
23  would involve conversations in the hallways or in
24  the hospitals with doctors that I came in touch

1  with as we chitchatted about events in medicine.

2      Q.    And so in 1999 and in 2000, you were

3  working as -- working out your -- your computer

4  device for RxPhysician and you were a -- anything

5  else that you were doing during that time period?

6      A.    I was at that time doing several

7  things.  I was involved in RxPhysician.  I was

8  involved working with Longs Drugstores as a

9  consultant.  And my major area of involvement was

10  working with doctors to enhance the professional

11  relationship between the retail pharmacy and the

12  prescribing physicians.  And I was working with

13  Casio Manufacturing to bounce their ideas for

14  design of -- of their hardware to the needs of the

15  practicing physician.  So all of those activities

16  would have put me into daily contact with

17  physicians across the country.

18      Q.    Okay.  And there's hundreds and

19  hundreds of drugs in the United States, correct,

20  that are on the market?

21      A.    Yes.

22      Q.    Okay.  And is it your testimony,

23  sir, that you talked with all of these doctors

24  about an inexpensive product like Cenestin?

---

1      Q.    Give me your best estimate.

2      A.    I'd say I probably visited with 25

3  to 50 physicians on it.

4      Q.    Okay.  And do you think from your

5  visit to 25 -- your visits with 25 to 50

6  physicians -- I assume these were conversations

7  principally in California.

8      A.    Principally.

9      Q.    -- that you --

10      A.    And Hawaii.

11      Q.    -- that you can now state that the

12  medical community viewed Cenestin and Premarin as

13  equivalent products?

14      A.    That's not really the direction that

15  I understand we're talking.  You -- you were

16  asking me as a member of a P&T committee what --

17  whether or not one study would be appropriate or

18  not for considering a drug, and I was telling you

19  that it was unique in this case and I was

20  buttressing it with that comment.  I'm not making

21  the statement that I have done a market survey of

22  physician attitudes as to whether it was a generic

23  drug or not.

24      Q.    You haven't done that; correct?

---

1      A.    No.

2      Q.    How -- how many did you talk with

3  about Cenestin and Premarin, sir?

4      A.    I'm saying that it came up in

5  conversations that there was a new conjugated

6  estrogen coming on the market and that it was

7  generally viewed as being similar to Premarin.

8      Q.    Okay.  And -- and I assume that

9  those conversations would have been with OB-GYNs

10  or primary care physicians; right?

11      A.    Generally, yes.

12      Q.    All right.

13      A.    I talked to lots of physicians

14  beyond that, but yes, it will have been --

15      Q.    You would have been talking to brain

16  surgeons about Cenestin coming on the market?

17      A.    No, no, no.  It would have been --

18  it would have been relevant conversations to their

19  practices.

20      Q.    Okay.  And how many of these

21  conversations did you have with physicians that

22  involved Cenestin or Premarin?

23      A.    I would have to just give you an

24  estimate.

---

1      A.    No.

2      Q.    All right.  And are you trying to

3  say that the medical community in general viewed

4  Cenestin and Premarin as equivalent products in

5  1999?

6      A.    What I'm -- what I'm saying is that

7  if I were on a P&T committee that was active at

8  that time and I was presented with a drug like

9  Cenestin, I would not necessarily ask for the same

10  number of studies that I would for another drug

11  that was unique or new in class.

12      Q.    Let's try my question one more time.

13          Are you saying that you speak for

14  the medical community and that in '99 and 2000 the

15  medical community in the United States viewed

16  Premarin and Cenestin as equivalent products?

17      A.    I do not speak for the medical

18  community and I am not attesting that that was the

19  attitude of the medical community in those time

20  periods.

21      Q.    All right.  In fact, the FDA took

22  the position that they were very different

23  products, didn't they?

24          MR. COHEN:  Object to the form.

5/19/2004 Gibson, David

1    A.    They took the position that they
2  were not alike enough to be -- so that Cenestin
3  could be a generic product.
4  BY MR. DOBIE:
5    Q.    All right.  And they also took the
6  position that they weren't going to approve it for
7  all of the same indications that Premarin had;
8  correct?
9    A.    Correct.
10    Q.    And have you seen any studies in
11  terms of whether physicians, in fact, view other
12  estrogen products as being equivalent to Premarin?
13    A.    I don't recall that I have.  I can
14  tell you why -- why physicians were interested in
15  this.  We haven't discussed it.  If you want.
16    Q.    Sir, I'm happy to come to Sacramento
17  and do your deposition there too.
18    A.    I'm just offering.
19    Q.    Okay.
20    A.    That's why I --
21    Q.    What I want you to do is answer my
22  questions.
23    A.    I'm happy to do that.
24    MR. DOBIE:  Why don't we mark this

1  done in this case; correct?
2    A.    All right.  Now, this -- this is a
3  graph -- you're talking about the graph?
4    Q.    I'm talking about, yes, the graph,
5  sir.
6    A.    Okay.  So the graph is attributes of
7  Premarin --
8    Q.    Right.
9    A.    -- among OB-GYN and PCP physicians.
10    Q.    Yes.  And you have not undertaken
11  any type of study like this; correct?
12    A.    No.
13    Q.    And as indicated in this study of
14  physician perceptions of Premarin, that only 26
15  percent of physicians believe that estrogens are
16  the same and can be used interchangeably; correct?
17    A.    That's what this shows, correct.
18    Q.    Do you have any -- any reason to
19  disagree with that?  You haven't undertaken any of
20  your own research; right?
21    A.    No.
22    Q.    Is it your view, sir, that Cenestin
23  and Premarin have similar clinical results?
24    A.    Yes.

5/19/2004 Gibson, David

1  as the next exhibit.
2              * * *
3    (Whereupon, Gibson Exhibit 19 was
4    marked for identification.)
5              * * *
6  BY MR. DOBIE:
7    Q.    I hand you what's been marked as
8  Exhibit 19.  Sir, let me draw your attention to
9  Exhibit 19 and ask you if you've ever seen this
10  document before.  It's a document that has market
11  research concerning the Premarin family of
12  products.
13    A.    I don't recall having seen it.  I
14  might have seen it during the Duramed case and not
15  quoted it, but I don't -- I don't recall it.
16    Q.    Were you aware that the physicians
17  were surveyed concerning their attitude towards
18  Premarin?
19    A.    I'm -- I'm not surprised they were,
20  but I didn't recall that.
21    Q.    All right.  And if you turn to page
22  131728, this is a document that describes a
23  physician survey that was undertaken, and -- and
24  that's the type of survey, sir, that you have not

5/19/2004 Gibson, David

1    Q.    Okay.  And what's the basis for you
2  to provide an expert opinion that Cenestin and
3  Premarin have similar clinical results?
4    A.    Well --
5    MR. COHEN:  Object to the form to
6    the extent that you're asking him whether
7    he's presenting an expert opinion on that
8    topic.
9  BY MR. DOBIE:
10    Q.    Are you, sir?
11    A.    No.
12    Q.    Okay.  Can you cite to any treatment
13  protocols, any usage guidelines, or other clinical
14  information that advocates the use of Cenestin
15  over Premarin?
16    A.    Most of what I'm aware of is that
17  the class of drugs as -- as conjugated estrogens
18  have effects and that there's not differential
19  effects.
20    Q.    And what studies are you
21  referring --
22    A.    These are primarily based on --
23    Q.    Can I finish the question, please?
24    What studies are you referring to

1 that says it's conjugated estrogens as opposed to
2 Premarin?
3     A.    Well, that's a good point.  The
4 issue that I'm relying on most heavily is HERS I,
5 II, and the overall Women's Health Initiative.
6     Q.    Okay.  All of the research -- let
7 me -- let me back up.
8         Are you aware of any research that
9 relates to Cenestin beyond the initial 125-person
10 study that was submitted to the FDA?
11     A.    That's the one I'm familiar with.
12     Q.    Okay.  Are you aware of any others?
13     A.    No.
14     Q.    And are you aware that in that study
15 two-thirds of women had to take two tablets in
16 order to obtain relief from vasomotor symptoms?
17         MR. COHEN:  Object to the form.
18     A.    I'd have to review the study, but
19 I'm not surprised.  I have read it, but I'm not --
20 I don't have it with me now.
21         THE VIDEOGRAPHER:  This is the end
22     of Videotape No. 1.  The time is 11:12 a.m.
23     We're now off the record.
24                 * * *

---

1 BY MR. DOBIE:
2     Q.    This is a document that you cited
3 in -- in your report; correct?
4     A.    Correct.
5     Q.    And looking at Page 29, at the top
6 it notes that -- "What is the Role of PBMs in the
7 RX Decision-Making Process" and it states, first
8 bullet point, "Prescription decision-making
9 process is still driven by physician and patient."
10 Do you see that?
11     A.    I do.
12     Q.    Is this consistent with -- with your
13 view?
14     A.    No.  That is a -- that is a worthy
15 goal, but I think that the industry as it's now
16 structured has sidelined the deliberative process
17 for physicians and pharmacists.
18     Q.    Right.  So you don't -- you don't
19 agree that this is -- this is a correct statement,
20 even though it's in a document that you yourself
21 cited in your report?
22     A.    I think there is many qualifiers to
23     that -- that statement that you've identified.
24     It's correct in that a prescription cannot be

---

1         (Whereupon, a discussion was held
2     off the record.)
3                 * * *
4         THE VIDEOGRAPHER:  This is the
5     beginning of Videotape No. 2.  The time is
6     11:14 a.m.  We're back on the record.
7 BY MR. DOBIE:
8     Q.    Sir, just to follow up on that,
9 you're not contending that conjugated estrogens is
10 its own unique therapeutic class, are you?
11     A.    No.
12     Q.    The selection of drugs to a
13 formulary, sir, would you agree that it's --
14 although there are rebates that are -- that can be
15 factored into the equation, in the first instance,
16 the most important -- the most important issue is
17 still the clinical effectiveness of the product?
18     A.    And its safety.
19     Q.    And so, for example -- this is a
20 document, sir, marked as Exhibit 20.
21                 * * *
22         (Whereupon, Gibson Exhibit 20 was
23     marked for identification.)
24                 * * *

---

1 filled without -- a drug cannot -- a prescription
2 drug cannot be obtained without a physician
3 writing a prescription.  So if -- if you define it
4 in that narrow sense, that's a correct sentence.
5 If you -- if you, in viewing that sentence, do not
6 factor in all of the factors that go into
7 influencing the decision, then it's wrong.
8     Q.    All right.  Is it your view, sir,
9 that -- that the patient desire for a particular
10 product or physician desire to prescribe a
11 particular product is less important than other
12 factors?
13     A.    It's important.  It's -- there is
14 just significant inhibitors that prevent that from
15 being a reality.
16     Q.    And -- and the inhibitors you're
17 talking about I assume are formularies?
18     A.    The report deals with a whole host
19 of factors, including formulary, positioning on
20 the formulary, and enforcement procedures that are
21 in the market to drive utilization in conformance
22 with the formulary.
23     Q.    Okay.  Would you agree that in many
24 instances formulary status doesn't necessarily

1  have a major impact on physician prescribing

2  patterns?

3         MR. COHEN:  Object to the form.

4         A.    I think formulary position for the

5  major contractors has a significant influence.  So

6  I would disagree with that with those

7  modifications.

8  BY MR. DOBIE:

9         Q.    Isn't it true, sir, that customers

10 will develop their own formulary and that

11 customers developing their own formulary within

12 these major PBMs that you're speaking of, that in

13 turn can be what, in fact, influences patient

14 demand?

15        A.    It can.  And I quoted sources from

16 Wyeth's own documents that support that as well.

17        Q.    Right.  And -- and that would have

18 been another avenue for Cenestin in the

19 marketplace; right?  They could have gone to

20 individual plans and tried to have their drug put

21 on particular plan formularies; correct?

22        A.    They could.  Again, you have to look

23 at the time frames.  Back in 1999 -- from 1999 to

24 2004, this market evolved.  The attention paid by

---

1  involved in bringing a client aboard with a PBM.

2  They can look at the formulary structure and they

3  can look at and design the copayment structures

4  and then the PBM administers the benefit based on

5  those understanding -- those agreements.

6         Q.    Now, sir, you've been involved in

7  litigation between Cenestin and Premarin and

8  everything going all the way back to 2001;

9  correct?

10        A.    I was involved in one instance, yes.

11        Q.    And you've been the head of the P&T

12 committee at PCN since 2002, although I understand

13 your first meetings weren't until 2003; correct?

14        A.    Correct.

15        Q.    And at any time between 2002 and the

16 present, has PCN ever considered adding Cenestin

17 to formulary?

18        A.    Not that I'm aware of.

19               Let me back up.  I do not know

20 how -- I know that Cenestin was probably

21 classified as an also-ran drug in the -- in the

22 category of the three categories that I mentioned,

23 in that it's now available but not in a preferred

24 position.  So knowing the -- knowing the

---

1  the marketing side of the pharma houses has been

2  more and more concentrated on the consultants and

3  the independent trust funds.

4         Q.    All right.  And so to answer my

5  question, in addition to trying to market to PBMs,

6  Duramed could have -- as you indicated Wyeth is

7  now doing, could have called on particular plans

8  and had the plan put Cenestin on that particular

9  plan's formulary; correct?

10        A.    Yes.

11        Q.    And do you know whether this was the

12 case in 2001?

13        A.    Do I -- the question is do I know

14 that -- that Duramed --

15        Q.    Do you know whether that option was

16 available to Duramed in, say, '99, 2000, 2001 or

17 is it your view that you can only do that in 2004?

18        A.    No, no.  If that's your

19 understanding of what I said, that's inaccurate.

20               I -- what I -- what I said was that

21 any time an underwriter had a pharmacy benefit and

22 they had their own consultants or their own P&T

23 committee, they had the option of modifying the

24 formulary.  That's one of the variables that is

---

1  methodology of how this process flows, this was

2  activity that would have been conducted at the

3  AdvancePCS level with P&T committee's evaluation

4  prior to the handoff back to PCN.

5         Q.    Okay.

6         A.    So that -- I'm sorry, but let me

7  just -- we have not revisited as a committee the

8  entire group of drugs which would be estrogen

9  replacement.

10                       * * *

11          (Whereupon, Gibson Exhibits 21 and

12          22 were marked for identification.)

13                       * * *

14               MR. DOBIE:  For the record, Exhibit

15 21 is a copy of the PCN preferred drug list

16 for 2004 as -- as provided on the Internet.

17               Exhibit 22 is copy of the PCN

18 Medicaid formulary for 2004 available the

19 same way.

20 BY MR. DOBIE:

21        Q.    And sir, first, can you identify

22 this as the PCN formulary for 2004?

23        A.    I can.  It is not a complete list,

24 but I can.

5/19/2004  Gibson, David

1    Q.     But at least it covers the women's
2    health category with osteoporosis, calcium
3    regulator agents, correct, and estrogens?
4    A.     To the second-tier level, yes.
5    Q.     And you mentioned that perhaps the
6    situation at PCN may have been that you inherited
7    the AdvancePCS formulary?
8    A.     Yes.
9    Q.     Right.  Well, if in 2002 Cenestin
10   was the product that was on the second tier at
11   AdvancePCS and Premarin was not on the formulary,
12   can you explain how it is that PCN, in creating
13   its formulary, put Premarin on but not Cenestin?
14   A.     I can speculate.  I wasn't part of
15   the decision.
16   Q.     I don't want you to speculate.  Do
17   you know -- do you know how the decision was made?
18   A.     I'm sure that there was -- no.  The
19   answer is no.
20   Q.     And did you at any point after
21   getting involved in litigation relating to
22   Cenestin and Premarin going back to 2001 -- have
23   you ever asked any of the staff members at PCN to
24   review Cenestin?

1    A.     No.
2    Q.     And have you ever asked them to
3    undertake any review of Premarin?
4    A.     No.
5    Q.     Do you know what the financial
6    ramifications are of having Premarin on the PCN
7    preferred drug list as opposed to Cenestin?
8    A.     The rough numbers, yes, and that is
9    demonstrated in my report on Page 42 with the
10   rebate example.
11   Q.     Okay.  But I'm talking about PCN.
12   We can look at your rebate example for a moment.
13   This rebate example, this doesn't -- this isn't
14   PCN; correct?
15   A.     No.  What this is is an example --
16   the thrust of this particular example is why it
17   is -- why a -- why a PBM could not risk breaking
18   an exclusive contract with Cenestin and how
19   Cenestin could never make up the difference.
20   Q.     All right.  Well, let's back up.
21   We'll come back to this soon enough.
22   Do you know whether or not PCN had
23   an exclusive contract with Wyeth?
24   A.     I don't know.

5/19/2004  Gibson, David

1    Q.     And -- and do you know whether or
2    not it has any sort of reimbursement agreement
3    with Wyeth?
4    A.     I do not.
5    Q.     And so in terms of why it is that
6    PCN has Premarin on the formulary as opposed to
7    Cenestin, you're speculating that, in fact, there
8    is a reimbursement agreement that offers larger
9    rebates to PCN than what Cenestin rebates they
10   could receive from --
11   A.     I do not know.
12   Q.     You don't know.  Okay.
13   Do you know -- you mentioned
14   yesterday that -- that Cenestin is now on the
15   third tier at PCN.
16   A.     Yes.  If you type in the drug finder
17   on the -- on the website and type in "Cenestin,"
18   it will indicate that it's on formulary, but when
19   you print out the preferred list, which is what
20   this is, it does not appear on it.  So it's -- it
21   is -- it is not a second-tier product.
22   Q.     Is the -- do you know how it ended
23   up being on the third tier?
24   A.     No.

1    Q.     The products that are listed on the
2    preferred drug list, estradiol, estropipate, and
3    Premarin, are these all products that are viewed
4    as substitutable for Premarin?
5    A.     These are -- these are drugs that
6    are clinically accepted as -- for use in hormone
7    replacement therapy.
8    Q.     And are they substitutable, to your
9    understanding?
10   A.     Which of the drugs you were
11   indicating?
12   Q.     Would estradiol and estropipate and
13   Premarin all be substitutable one for the other?
14   A.     Yes.
15   Q.     And is the idea to have a number of
16   different products on the formulary so that the
17   doctors that are using the PCN formulary have
18   some -- some options?
19   A.     Correct.  And again just to say I'm
20   speculating there, just like I would have had to
21   speculate earlier.  I don't know that for a fact,
22   but it -- it's reasonable that they were putting
23   it there as an option.
24   Q.     You're the head of the P&T

1  committee.  Do you -- do you want to have a number
2  of different options like that on the formulary?
3       A.    Yes.
4       Q.    Now, on Page 40 of your report, you
5  talk about how -- let's see here.
6             In the second sentence after "Rebate
7  definition," you have Wyeth leveraged its dominant
8  position in the oral estrogen -- oral conjugated
9  estrogen market, took the above rebate contracting
10  to a more aggressive level.  "Wyeth entered into
11  contracts with PBMs and MCOs to inhibit a
12  competitor's entrance into the marketplace."
13             Let me ask you first.  You mentioned
14  that Wyeth entered into contracts, plural.  Do you
15  have any knowledge of there being multiple
16  contracts that Wyeth entered into that inhibited a
17  competitor's entrance into the marketplace?
18       A.    I am aware that the contracting
19  manual that Wyeth created in 1995 had a structure
20  for creating rebate agreements within their
21  contracts and that -- that one of the critical
22  features was to have the PBM list Premarin and its
23  family of drugs as the sole conjugated estrogen,
24  and that appeared in most of the contracts that I

---

1  factors, including administrative fees and so
2  forth, that I also cite in my report, but I was
3  particularly interested in this rebate structure.
4       Q.    Do you know how many contracts you
5  reviewed in total?
6       A.    I'd say I probably looked at
7  somewhere between 50 and a hundred.
8       Q.    Okay.  And do you -- is it your
9  testimony that most of those had the sole
10  conjugated estrogen language?
11       A.    Yes, most of them seem to have the
12  sole conjugated estrogen exclusive language in the
13  contract.
14       Q.    And in -- I just want to be clear,
15  because we got the list of those that you've seen
16  and we haven't seen anything like 50 or a hundred
17  contracts being on that list that you were
18  provided.
19       A.    All right.  Well, whatever was on
20  the list --
21       Q.    That's how many you reviewed.
22       A.    -- is the number.  I'm just pulling
23  a number.  It seemed like a lot of contracts I
24  looked at, but I didn't click it off and count how

---

1  reviewed.
2       Q.    Okay.  Do you know whether or not
3  the sole conjugated estrogen language appears
4  in -- you say most of those that you reviewed.
5  How many contracts did you review?
6       A.    I don't recall how many.  You've
7  seen the documents that I have reviewed and you
8  know the documents that I've cited in my report.
9       Q.    Right.  And what I saw was you
10  didn't actually receive too many entire contracts.
11  You got pages of certain contracts.  Is that
12  correct?
13       A.    Whatever was in the -- whatever was
14  in the -- in the pages that you were provided.
15       Q.    Okay.  And so when -- when we pulled
16  the pages that we were provided, it looked like
17  you had received pages of certain contracts that
18  had the sole conjugated estrogen language.
19             Does that -- does that refresh your
20  memory of how you looked --
21       A.    Yes.
22       Q.    -- at these contracts?
23       A.    As I recall, I had the terms for the
24  rebate agreements, and -- and there were other

---

1  many I reviewed.
2       Q.    But most of those that you were
3  provided had the sole conjugated estrogen
4  language?
5       A.    Correct.
6       Q.    Are you aware of the fact that, in
7  fact, most of the reimbursement agreements that
8  Wyeth had with managed care do not have the sole
9  conjugated estrogen language?
10       A.    In which year?
11       Q.    In any year.
12       A.    In any year?
13       Q.    From '99 to -- to the present.
14       A.    I'm not aware of that.
15       Q.    The example that you cite on Page 40
16  here is actually to the -- not to the contract
17  resource manual, but that's actually pages from
18  the Medco agreement.  Did you review the Medco
19  agreement?
20       A.    I did.
21       Q.    And does -- does the -- does the
22  Medco agreement or the amendment to the Medco
23  agreement somehow factor into your opinions?
24       A.    Yes.

5/19/2004  Gibson, David
5/19/2004  Gibson, David

1    Q.    How so?

2    A.    If you could give me the agreement,

3    I'll -- I don't -- I don't -- I'm not -- I don't

4    have on the top of my mind what was in the

5    agreement.  So if you can give me the agreement, I

6    could answer that.

7    Q.    You know what?  I don't have it

8    handy.  It wasn't one of the things that I was

9    going to walk you through.  I assumed that since

10   you had it cited in your report you would know

11   what you were referring to.

12   A.    I would have -- because I cited it

13   in my report, I would have indicated that there

14   were factors in the agreement that would have

15   inhibited Cenestin's entrance into the market.  I

16   didn't -- I didn't in citing this indicate what

17   exact things they did in the contract but that

18   there were inhibitors.

19   Q.    Do you know whether or not these

20   contracts allowed a P&T committee for any PBM to

21   simply add another product to formulary if in

22   their clinical judgment that was the most

23   appropriate thing without having any impact on

24   rebate dollars?

---

1         MR. COHEN:  Object to the form.

2    A.    Again, remember how a P&T committee

3    works.  A P&T committees determines whether a drug

4    is acceptable.  It doesn't determine what its

5    position on a formulary is going to be or what

6    relative positions it's going to have on the

7    formulary.  So in general, a P&T committee might

8    say that a drug needs a bit more time coming into

9    the market, but you -- you -- it's not common for

10   the P&T committee to be involved in the

11   micromanagement of the formulary.

12   BY MR. DOBIE:

13   Q.    It is common for P&T committees to

14   say that it might -- a product might need to be on

15   the market a little bit longer before they would

16   add it, though; correct?

17   A.    That -- that would be an acceptable

18   conclusion.

19   Q.    And -- and your idea that P&T

20   committees decide whether a product is acceptable

21   or not for inclusion on the formulary but don't

22   get involved in the question as to whether and

23   where it should fall as either a first, second or

24   third tier or in a three-tier formulary or some

---

1    A.    Let me -- on Page 66, I have four

2    documents cited where Premarin was required to be

3    the exclusive and sole conjugated estrogen or

4    preferred estrogen on formulary, and I cited

5    MedImpact, National Prescription Administrators,

6    and Caremark.  Do you see that?

7    Q.    I do.

8    A.    Now, I -- whether or not there was

9    language in the contract that said that the --

10   that either the client or the P&T committee

11   couldn't override for some medical reason -- I

12   don't recall that being in there, but I wouldn't

13   be surprised -- it would entail a fair amount of

14   liability to say that this contract would

15   supersede medical judgment or medical -- the

16   medical literature.

17   Q.    All right.  So you don't disagree

18   with the notion that PBMs, despite the Wyeth

19   contract, could have had a meeting of their P&T

20   committees and if they decided that clinically

21   they thought Cenestin was a better product to have

22   on formulary, that they could have added Cenestin

23   over Premarin irrespective of the -- of the

24   contract?

---

1    other structure, that's based upon your

2    experience; correct?

3    A.    It's my experience.  The one -- the

4    one alteration to what you just said is that if we

5    list a drug as unique, that puts it in a different

6    category.

7    Q.    All right.  And -- and to go back to

8    my question about these contracts that you're

9    referring to, you're saying it's not usually the

10   case that the P&T committee would -- would, in

11   fact, decide to take a drug like Cenestin and put

12   it on the formulary and take Premarin off.  You're

13   not disputing that the agreements, though, would

14   have given the PBMs the option of doing so if they

15   had wanted to do so?

16   A.    For medical reasons?

17   Q.    If they determined in their sole

18   judgment that they wanted to add Cenestin and take

19   Premarin off, they could have done so; correct?

20        MR. COHEN:  Object to the form.

21   A.    The P&T could do that or --

22   BY MR. DOBIE:

23   Q.    The PBM.

24   A.    The PBM could do that.

1    Q.    Right.  Because the contracts --
2    here's what I'm getting at.
3          Did you read enough of them to see
4    that they all have either a 60- or a 90-day out
5    clause to basically get out of the contract or a
6    provision that says that the P&T committee, if
7    they review a product and decide they want to put
8    another product on and take the existing Wyeth
9    contract off, they have the option of doing so?
10   A.    I'm aware of that.
11   Q.    Okay.  Let's talk about Page 43 of
12   your report.  You have a heading there that talks
13   about factors influencing rebate levels.
14         Is it your experience that generally
15   the number of drug product classes of the
16   pharmaceutical manufacturers' products that are
17   included in the formulary can impact the amount of
18   rebates?
19   A.    The question -- let me repeat the
20   question.  I just want to make sure I've got --
21   Q.    I'll restate it.  You've set forth
22   here a number of factors that may influence the
23   level of rebates provided to PBMs; correct?
24   A.    Correct.

1    Q.    And is one of those factors the
2    number of drug product classes of the
3    pharmaceutical manufacturers' products that the
4    PBM includes on the formulary?
5    A.    Most formularies have drugs in all
6    of the classes.  Where -- where am I not getting
7    your answer?
8    Q.    I'm reading your -- your No. 1 here,
9    okay, and I just want to make sure I understand
10   this.
11         Is it true that one of the factors
12   that may influence the level of rebates that's
13   provided to the PBM or the MCO is the number of
14   drug product classes of the pharmaceutical
15   manufacturers' products that the PBM includes on
16   the formulary?
17   A.    Yes.
18   Q.    Okay.
19   A.    And that's consistent with Wyeth's
20   own documents.  I believe they refer to it as the
21   contracting platform.
22   Q.    All right.
23         THE VIDEOGRAPHER:  We're going off
24   the record.  The time is 11:42 a.m.

1              * * *
2              (Whereupon, a short recess was
3         taken.)
4              * * *
5              THE VIDEOGRAPHER:  We're back on the
6         record.  The time is 11:49 a.m.
7    BY MR. DOBIE:
8         Q.    Sir, if I can draw your attention to
9    Page 40 of your report, and we covered this
10   briefly already, but in the -- in the third
11   paragraph, that talks about the formulary position
12   and the number of formulary drugs within drug
13   product categories are key factors which impact
14   the drug's sales volume and market share within
15   the therapeutic class.  Remember we discussed that
16   yesterday briefly?
17         You have to respond verbally.
18   A.    Correct.
19   Q.    All right.  What I wanted to ask you
20   about is other things that -- beyond a formulary
21   position that may impact the drug's sales volume
22   and the market share.
23         Would you agree that physician
24   demand can impact the formulary -- can impact the

1    drug's sales volume and market share?
2    A.    Yes, particularly in the nonmanaged
3    care market --
4    Q.    And --
5    A.    -- with Medicare.
6    Q.    And even within the managed care
7    market, physician demand can influence a drug's
8    sales volume and market share; correct?
9    A.    Yes.
10   Q.    And consumer demand can in turn
11   impact a drug's sales volume and market share?
12   A.    Yes.
13   Q.    And attractive pricing, same thing?
14   Can impact drug's sales volume and market share?
15         MR. COHEN:  Object to the form.
16   A.    Drug pricing is probably the weakest
17   because both the prescribing physician and the
18   receiving patient are virtually blinded to that
19   variable.
20   BY MR. DOBIE:
21   Q.    Okay.  And how about FDA indications
22   for a product; can that impact a drug's sales
23   volume and market share?
24   A.    Yes.

1    Q.    How about available dosages of a
2    product; can that impact a drug's sales volume and
3    market share?
4    A.    Yes.
5    Q.    But I understand your view, which is
6    that essentially the formulary position itself can
7    have a significant impact on the -- on the success
8    of a drug product in terms of sales volume and
9    market share; right?
10    A.    That was my opinion and it was
11    Wyeth's opinion.
12    Q.    All right.  And is it your view
13    that -- that formulary position causes physicians
14    to prescribe a certain drug?
15    A.    Yes.
16    Q.    All right.  And if that's the case,
17    then don't you think that -- that a particular PBM
18    could essentially decide not to put Premarin on
19    formulary, not to have an agreement with Wyeth,
20    and instead put Cenestin on formulary, provided
21    that Cenestin offered a lower price and a greater
22    rebate?
23    A.    It would be highly unlikely.
24    Q.    But they could do that; right?

1    assuming that Duramed or now Barr Labs was willing
2    to pay larger rebates or offer a lower cost
3    product?
4    A.    It would be highly unlikely that any
5    PBM would have offered Cenestin as a replacement
6    for a well-established drug like Premarin.
7    Q.    Okay.  And why is that?
8    A.    Because it never was designed or
9    viewed as a replacement product.  It was -- it was
10    a product that some patients would have used or
11    preferred.
12    Quickly, a number of patients found
13    the use of pregnant mares to be objectionable and
14    wanted an alternative.  Some women found the whole
15    idea of taking a product from that source as
16    being -- they were squeamish about it.  Some women
17    found, particularly active women, that when they
18    sweat with Premarin, their sweat, they reported,
19    smelled like urine and they found that offensive.
20    So it would have been a percentage
21    of the market that this -- oh, and some -- some
22    people seemed to be persuaded that there was a
23    newer delivery technology that allowed for a more
24    sustained delivery of the drug to the system.

1    A.    They could.  In the -- in the
2    abstract universe of possibilities, yes.
3    Q.    Okay.  But if -- if formulary --
4    here's -- here's what I'm getting at.  If
5    formulary -- maybe -- maybe -- maybe I don't
6    understand.
7    We just went through sort a litany
8    of different things that -- that go to
9    pharmaceutical demand, physician demand, consumer
10    demand, pricing being lesser and dosage forms and
11    so on.
12    I thought you were saying that the
13    most important thing is formulary placement.  Do
14    I -- am I incorrect in that or do you think
15    they're all relatively --
16    A.    No.  I think that formulary
17    placement in the managed care environment is
18    probably the cardinal issue --
19    Q.    In terms of whether --
20    A.    -- driving demand.
21    Q.    In terms of driving demand.  Okay.
22    So if that's the case, why not --
23    forget about PCN.  Why not simply remove Premarin
24    from formulary and put Cenestin on formulary

1    So for all of those reasons, there
2    were people that would have preferred Cenestin to
3    Premarin if it occurred.  Wyeth's own documents
4    show that it's critical which drug a patient gets
5    started on initially.  You know, the new starts
6    are referred to in many of Wyeth's documents that
7    I -- that I reviewed, and that's consistent with
8    my experience.  So that it would be very traumatic
9    to have all of these patients currently on a
10    product like Premarin and do a complete
11    replacement.
12    Q.    Are you familiar with situations at
13    PCN or with AdvancePCS where they've gone from
14    having a -- let's say a PPI, one product being the
15    preferred drug that everybody within the system
16    can buy at the preferred price and they switch to
17    another PPI?
18    A.    It's not an analogous situation,
19    because in most classes you have loyalty within
20    the class but you don't have a situation where
21    there is one dominant drug with a new competitor
22    coming in that you would replace the well-
23    established drug with.  You -- you generally have
24    subsets of the market with each of the products

1   that are available.

2       Q.     All right.  And so you're saying

3   that Premarin in essence had consumers that were

4   loyal to the brand as opposed to the class?

5       A.     That's what makes this whole

6   discussion so fascinating is that you have a

7   manufacturer and a product that are very well

8   established, that as a result of that position

9   provide substantial rebate revenue and contracts

10  that place those revenues at risk with the out

11  clause that you referenced earlier that make it

12  very difficult for a new competitor to come in and

13  compete on the basis of patient acceptance, doctor

14  acceptance, price, or any other variable that we

15  went through on the list.

16      Q.     Okay.  But if -- if on the other

17  hand, let's say, Duramed had instead launched this

18  product after obtaining all the several FDA

19  indications that Premarin had, had done more

20  clinical studies, had done head-to-head

21  comparisons and things that you talked about the

22  physicians are looking for, had done an economic

23  model study for this product, all of those things,

24  don't you think that -- that a P&T committee could

1   have made a decision to simply have switched to

2   Cenestin and they could have essentially moved

3   their patients to that product from Premarin,

4   again assuming that it's the formulary position

5   that derives the success and market share of the

6   product?

7       A.     In the abstract, they -- they had

8   the opportunity to do that.  It would have

9   produced an avalanche of complaints, because the

10  patient is being asked to change a pattern that

11  they've had for a number of years.

12      Q.     Okay.  And here's what I guess I

13  don't understand.

14          Are you saying, like in the PPI

15  category, there are -- you are aware of

16  situations, right, where PBMs have switched, you

17  know, from one year to the next of what's the

18  preferred PPI?

19      A.     Yes.

20      Q.     All right.  And are you familiar

21  with years where a PBM will switch from the

22  preferred oral contraceptive from one year to the

23  next?

24      A.     Yes.

1       Q.     Okay.  So -- so why could they not

2   do the same thing as it relates to Cenestin and

3   Premarin?

4       A.     Okay.  I thought I -- we can go over

5   it again.  It's a unique class -- not a class.

6   It's a unique group of compounds within this --

7       Q.     Premarin?

8       A.     Yes.  Within the conjugated estrogen

9   with a high degree of patient loyalty.  And the

10  introduction of a product like Cenestin would

11  appeal to a subset of people who even knew that it

12  was derived from mare's urines or had observed

13  that they were -- their -- their perpsiration

14  smelled like urine or that had read about the

15  delivery mechanism for the drug.  That's a very

16  small segment of the market.

17          So it -- it was expected that --

18  that this product would be a viable competitor for

19  a subsegment of the conjugated estrogen market but

20  not be a replacement.

21      Q.     What -- what do you think --

22  Cenestin -- when you talk about just a viable

23  competitor in the marketplace, what do you see

24  as -- as where it -- where it would have been?  Do

1   you have an opinion on htat?

2       A.     I don't.  I can tell you that it

3   was -- it was Wyeth's goal to hold it at 2 percent

4   or less.  My bet is that had it not had all the

5   factors we've been discussing, it would have been

6   more than that.  I don't have the competence to

7   tell you how much.

8       Q.     You talk about in your report -- you

9   have a number of pages that talk about the

10  Cenestin impact model.

11      A.     Yes.

12      Q.     That's on Pages 74 and 76.  That

13  sort of relates a little bit I think to the

14  discussion that we're having or it may.

15          All right.  You talk about on Pages

16  74 through 78 the fact that Wyeth generated

17  analysis that could be used with various managed

18  care companies about the impact that would happen

19  if a particular managed care organization -- your

20  example is Pacificare -- if they moved from

21  Premarin to Cenestin in terms of the loss of

22  rebates; right?

23      A.     I believe it goes from 74 to 76.

24      Q.     76.

1   A.   Okay.  Yes.

2   Q.   And -- and based upon what you were

3   telling me yesterday, it sounded like managed care

4   organizations do their own analysis in terms of --

5   or should do their own analysis of the impact of

6   moving from one product to another within a

7   particular therapeutic class; is that true?

8   A.   That's reasonable.  However, these

9   were all generated by Wyeth itself and created by

10  account and presented to them -- it's my

11  understanding it was presented to each of the

12  accounts.  So it was -- whether they did it or --

13  themselves or not, Wyeth made very clear what the

14  effect would be if they violated the exclusive

15  arrangement within the contract and the market

16  share for Premarin decreased.

17  Q.   Okay.  But as I understand what

18  you're saying then, this information, though, is

19  no different than what the customer might be

20  generating on their own anyway?

21  A.   They might.  Correct.

22  Q.   All right.  And so -- so it's

23  just -- your complaint is that Wyeth did this

24  themselves as opposed to the customer?

1   A.   No.  What -- my -- my complaint

2   isn't that they did it at all.  I'm including it

3   as a rather clear example of the downside that a

4   monopolist can exert in a marketplace.

5   Q.   Is -- and so is it -- is it your

6   conclusion that Wyeth is a monopolist?

7   A.   We went over this earlier and I

8   defined for you how I viewed it.  I'm not a lawyer

9   and I'm not defining this from a legal

10  perspective.  Another way -- you could substitute

11  another term for this, what I'm testifying, that

12  it is a dominant market player, that a dominant --

13  established dominant market player can -- can hurt

14  customers to compete, whereas not -- groups that

15  are -- do not meet that category have to compete

16  on the basis of positives.

17  Q.   Okay.  But here's what I'm getting

18  at.  If the customers have this information

19  anyway, all right, what's the big deal about Wyeth

20  doing this type of analysis itself?  Don't you

21  think that a well-trained sales force should have

22  information about the financial ramifications of

23  their contract relationships with their customers?

24  MR. COHEN:  Object to the form.

1   A.   I do think they should.

2   BY MR. DOBIE:

3   Q.   All right.  And do you know, in

4   fact, whether or not any of these market cost

5   analysis like this Pacificare one were actually

6   presented to any customers?

7   A.   It's my understanding that they were

8   presented, but I don't know.  I read various

9   documents on this list, including memoranda

10  wherein there were reactions to the presentations

11  by the customers themselves.  I don't have a list

12  of every single account and what their reaction to

13  it was when this was presented to them.

14  Q.   Here's the reason I ask.  I can only

15  think of one, all right, in the record.  I've been

16  living in this case for a long time.

17  Are you saying you've seen other

18  documents that would indicate that this cost

19  analysis was presented -- and Brooke, maybe you

20  know of another one, but I can only think of one

21  where this cost analysis was presented to a

22  customer.  So I'm curious what the basis is for

23  your -- for your testimony that this market cost

24  analysis was, in fact, presented to customers?

1   A.   Well, I suspect --

2   MR. COHEN:  Objection.  I just want

3   to object to the form to the extent you're

4   referring to this cost analysis as opposed

5   to oral representations or that kind of

6   thing.

7   A.   Let me see.  I have multiple

8   examples where documents reference conversations

9   with the client as to the contract terms.  I don't

10  have a clear paper trail as to how often this was

11  actually presented.

12  An example of that is on Page 73 at

13  the bottom, where the document -- it's an internal

14  Wyeth document concerning Foundation Health Plan

15  dated May of '99 where the value of the Premarin

16  contract in face of Cenestin, decreasing market

17  share, and key accounts was discussed.  So that's

18  the sort of document that it's -- it's inferred,

19  but it's not -- it doesn't say there that he sat

20  down and went over it.

21  BY MR. DOBIE:

22  Q.   Do you -- do you think it would have

23  been possible, for example, at Pacificare or any

24  of these other companies to have moved a portion

1  of their business to Cenestin and not achieved any
2  loss of rebate dollars?
3      A.     I think if they had a contract
4  with -- with Wyeth that was an exclusive or with
5  had some of the other factors that I've put in my
6  report, that there was a clear threat that using
7  the 30- or 60-day opt-out clause, that Wyeth could
8  cancel their contract or their rebate contract --
9  their reimbursement contract and that that would
10  have a substantial effect on the organization's
11  bottom line.
12      Q.     Okay.  You cite Aetna in your -- in
13  your report.  Do you know, isn't that, in fact,
14  what happened and what has happened at Aetna?
15  They've decided to take rebate dollars from
16  Duramed and a number of other companies and put
17  Premarin on the third tier?
18      A.     I'm aware that that was the case,
19  and it was unique, and it was very -- a very
20  interesting case and -- and taught us a lot about
21  the market, which I discussed in my report.
22      Q.     Okay.  And one of the things in the
23  marketplace is somebody like Aetna can actually be
24  better off financially by having Premarin on the

1  prescriptions in the first place and instead put
2  the cost on the patients and by basically putting
3  Premarin on a third-tier copay.
4      A.     That question implies that the
5  business transaction would be that the patient
6  would pay for the drug but that the PBM would
7  charge the client for the product.
8      Q.     Well, in the Aetna example, okay,
9  it's not really a PBM.  In the Aetna example --
10  let me ask you this:  Are you aware that what has
11  happened at Aetna is just that?  They put Premarin
12  on third tier, where there's a $25 copay or
13  higher, depending on the specific plan, and
14  that -- and are no longer receiving rebate dollars
15  from Wyeth but instead are receiving rebate
16  dollars on Cenestin and other products.
17      Were you aware of that?
18  A.     Yes.
19      Q.     Okay.  And so isn't that a contract
20  strategy that Duramed could have employed as it
21  relates to this product right out of the box?
22      A.     It could have.  It is not a -- it is
23  germane to an underwriter like Aetna.
24      Q.

1  third tier, forcing its patients to pay for the
2  product at the third-tier copay, but in turn get
3  rebate dollars on Cenestin and other generic
4  products; right?
5      A.     I'm --
6      MR. COHEN:  Object to the form.
7      A.     I'm not sure that that happened and
8  I'm not sure that was the end result.  I don't
9  know.  I know that if Premarin had these kinds of
10  rebate structures with Aetna and they moved the
11  patients to -- they moved Premarin to the third
12  tier and lost the rebate dollars and replaced it
13  with Cenestin, with even an enhanced rebate
14  contract, that it may not have and in all
15  likelihood would not have made up the difference.
16  BY MR. DOBIE:
17      Q.     Okay.  But there's two ways that a
18  plan could be reimbursed for the loss of rebate
19  dollars.  Okay.  On the one hand, they can get the
20  rebate dollars from -- like in the case of Aetna,
21  they might be able to get them from -- for
22  Cenestin and the other products that they put on
23  formulary.  The other thing they can do is take
24  away the obligation to pay for Premarin

1      A.     It is -- it does not apply to the
2  PBM.
3      Q.     But certainly with the groups like
4  Aetna or a Blue Shield of California, any of these
5  groups that are -- that are -- have that business
6  model, an underwriter, Aetna -- what are the
7  others -- CIGNA, Humana, those groups, they could
8  have all -- Duramed could have approached them
9  with such -- with such a proposal but, in fact,
10  didn't?
11      A.     They could have.  It would have --
12  it would have placed them in an unfavorable light
13  with the customers and the -- the balancing act
14  that they would -- would have to calculate is how
15  much pain they would be willing to impose on the
16  customers to implement that strategy.
17      Q.     All right.  And -- and the reason
18  why there would be pain to Aetna or whatever
19  company tried to achieve that strategy is that you
20  might have patient pushback in terms of they still
21  want Premarin?
22      A.     Exactly.  Human beings don't like
23  change.
24      Q.     All right.  And -- and I guess what

5/19/2004  Gibson, David

1   I'm getting back to then is the -- it's not simply
2   formulary position that determines the success of
3   a product then.  It's -- patient demand can play a
4   major role and doctor demand can play a major role
5   in terms of the success of a product irrespective
6   of formulary position; right?
7       A.    Right.
8       Q.    Okay.  Now, you also mentioned --
9   let me just ask you one more thing about that.
10      Do you think that -- that Cenestin
11  could have achieved as much of -- well, I don't
12  want you to speculate.  We don't have much time.
13  Strike that question.
14      Oh, spillover you talk about on Page
15  52.  In the third paragraph on Page 52, you say
16  the later phenomenon is referred to within the
17  industry as the spillover effect.  Do you see
18  that?
19      A.    Yes.
20      Q.    And you're referring to situations
21  where doctors essentially get used to writing a
22  particular prescription because of a formulary and
23  then they'll write it in a -- in a situation even
24  where there's not a formulary?

---

1       A.    That's correct.
2       Q.    Okay.  Here's what I'm wondering
3   about spillover.  To what extent do you believe
4   that spillover may also -- that there may be
5   spillover from other experience -- experiences
6   that physicians encounter?
7       Let me give you an example.  I mean,
8   suppose a doctor writes a Cenestin prescription
9   and it's a .625.  The woman takes it for two --
10  two weeks and like the folks in the study need to
11  titrate up to a larger -- basically a double dose.
12  They get a call from the patient and the patient
13  says this isn't working.  The doctor checks, sees
14  that there isn't a 1.25 dose for the product, and
15  then, you know, is basically confronted with the
16  question of what to do.
17      Would -- would that experience of
18  having a problem with a patient needing to titrate
19  up -- could that spill over into their prescribing
20  habits in the future?
21      MR. COHEN:  Object to the form.
22      A.    It could.  Most physicians, if they
23  had a reason to put the patient on Cenestin, like
24  the ones we discussed earlier, would simply double

---

1   the dose, you know, give the patient two tablets.
2   It's not -- it's not -- it's not something that's
3   hard for them to write, you know, a 30-day
4   supply -- for a 30-day supply, 30 tablets or 60
5   tablets.  It's just a change of one number on the
6   script.
7   BY MR. DOBIE:
8       Q.    But the difference would be
9   is the patient would be out of -- out of pocket to
10  the extent that they had to double dose, wouldn't
11  wouldn't they?
12      A.    If it's on formulary, are we talking
13  about now, with the copayment structure?
14      Q.    Let's -- I mean, do health plans
15  allow -- it would have been double the cost, would
16  it not, to -- for the health plan or the patient
17  to have taken two .625 Cenestin pills as opposed
18  to one Premarin at 1.25 dosage; right?
19      A.    I understand your --
20      MR. COHEN:  Object to the form.
21      A.    I understand your point.  However,
22  it didn't make a difference to the patient, in
23  that you are writing for a one-month supply of the
24  drug, and that produces one copayment.

---

1   BY MR. DOBIE:
2       Q.    Okay.  But it would have been twice
3   the cost for the plan?
4       A.    It -- it would have been twice the
5   cost to the plan from the one tablet.
6       Q.    And in a physician looking at
7   Cenestin -- I'm just wondering about spillover
8   here -- whether having had that experience with
9   having to double dose and basically prescribe
10  twice the amount of the product at twice the cost
11  of Premarin, would that -- that experience spill
12  over in terms of whether -- their willingness to
13  write a prescription for that product again?
14      MR. COHEN:  Object to the form.
15      A.    Yes, it would.
16  BY MR. DOBIE:
17      Q.    And do you think that you could have
18  spillover from physicians having written
19  prescriptions for Premarin for 20 years that could
20  spill over into their willingness to write
21  prescriptions for Cenestin or other products?
22      A.    I think -- I think that unless there
23  was a -- either a strong demand on the part of the
24  patient like -- for the reasons we discussed for

**Page 466**

1  Cenestin or there was a push by the plan to
2  preferentially position it, that physicians would
3  continue to use Premarin as their preferred
4  conjugated estrogen.
5      Q.    Okay.  And so the prescribing habit,
6  if you will, that can spill over into their --
7  into their writing the prescriptions irrespective
8  of formulary position; right?
9      A.    Would you mind repeating that?
10     Q.    Yes.  I'm going back to what you
11 said about how physicians frequently don't even
12 know what's on formulary.  So I guess I'm just
13 wondering if whether physician prescribing habit
14 can spill over such that they'll -- they will
15 write a Premarin prescription irrespective of what
16 is on formulary.
17     A.    Yes.  In a -- in a way you're
18 touching on one of the critical parts of this
19 case, that being that to concentrate the Premarin
20 preemptive plan in the market just as Cenestin's
21 coming on the market, which is a very vulnerable
22 period for a new drug -- that's when all the buzz
23 is out there.  That's when the articles have been
24 written, are in the non-peer-reviewed press.

**Page 467**

1  Magazine articles are written about it.  The
2  physicians during that vulnerable phase will read
3  about it and may -- may want to try the drug.  Or
4  the patients may have read about it and they want
5  to give the drug an opportunity.
6          It's at that vulnerable phrase that
7  they write the drug and they start getting all of
8  these phone calls back from the pharmacy that it's
9  not on formulary, that the cost is greater for the
10 copayments.  All of those negative factors start
11 flooding back into his office and the physician
12 will say, Hey, this isn't worth it.  I'm not going
13 to give this drug a try.
14     (Pause.)
15     THE VIDEOGRAPHER:  Proceed.
16 BY MR. DOBIE:
17     Q.    Okay.  I'm just asking about sort of
18 the other part of that -- that spillover, which is
19 that you will have spillover as well from -- just
20 simply from physician prescribing habits; right?
21     A.    Yes.  The term "spillover" is
22 generally not applied to a dominant market player
23 like Premarin.
24     Q.    Okay.

**Page 468**

1      A.    It's -- one of the values of one
2  drug in a class of four that are roughly equal to
3  be placed as a preferred drug will have a definite
4  spillover effect into the noncontracted business.
5  Premarin was so -- such a dominant player in the
6  conjugated market at -- in 1999 that it --
7  whatever spillover effect had been in place for 10
8  years.
9      Q.    You mention how the -- you said that
10 the launch is a -- is a vulnerable time.
11         Would you say it's a critical time
12 as it relates to the -- to what the uptake is
13 going to be in the marketplace?
14     A.    I think it's a critical time.
15     Q.    All right.
16     A.    If a drug at the point of
17 introduction to the market is -- is discriminated
18 against effectively by marketing techniques, it --
19 it has a disproportionate damaging effect.
20     Q.    Okay.  In terms of other things that
21 could have a disproportionate damaging effect,
22 could that also include a decision on the part of
23 the company to not seek formulary position?
24     A.    Could you --

**Page 469**

1      Q.    Yes.  There's -- I assume that
2  there's a number of different things that can go
3  wrong in connection with a launch, some of which
4  can be caused by competitors and some of which can
5  have to do with the company's own marketing
6  program or the attributes of the particular
7  product; correct?
8      A.    Correct.
9      Q.    Okay.  And some of the things you
10 told me about on the -- on the Wyeth side, but if
11 we look at it from the -- from the Duramed side,
12 other things that could have impacted the launch
13 of that product would be, for example, not having
14 a large enough sales force.  That could impact the
15 success of the product; right?
16     A.    Yes.
17     Q.    And, in fact, have you seen the
18 literature that indicates that the size of the
19 sales force can be one of the most important
20 indications of the success of a product in the
21 marketplace?  And Pfizer is often cited as an
22 example there.
23     A.    What year are you talking about?
24     Q.    In '99 and 2000.

1    A.    In '99?

2    Q.    Yes, sir.

3    A.    In '99, it was.

4    Q.    Okay.  And would you say making a

5    decision -- or not having samples to offer to

6    physicians, could that be something that would go

7    to the success of the launch in the marketplace?

8    A.    It would be a factor.

9    Q.    And -- and making a decision not to

10   contract with certain major managed care

11   organizations, could that be a factor that would

12   go to the success of the product in the

13   marketplace?

14   A.    So that -- so that the -- there was

15   no -- no attempt made in the contracting

16   environment to be placed on the formulary?

17   Q.    I'm just saying, would a -- would a

18   decision on the part of Duramed to not seek

19   formulary status at certain major managed care

20   organizations -- could that also impact the

21   success of Cenestin in the marketplace during this

22   launch period?

23   A.    Yes.

24   Q.    And would Cenestin, not have having

1    the same indications as Premarin -- could that

2    also impact the launch of Cenestin in the

3    marketplace at the time that they launched it?

4    A.    Yes.

5    Q.    And would you say not having as many

6    studies -- head-to-head studies or other

7    literature supporting the product could have

8    impacted the success of Cenestin in the

9    marketplace at the time of launch?

10   A.    Yes.

11   Q.    And do you think that -- that if --

12   if those things were found to be true, that that

13   in turn along with -- I understand you believe for

14   Wyeth's conduct -- could carry over into -- into

15   other years as well?

16   A.    Yes.

17   Q.    The Aetna situation we talked about

18   briefly is on Page 59 of your report.  You -- you

19   talk about the success that -- or I guess the

20   losses that Premarin has had in -- in

21   prescriptions as a result of going to third tier;

22   right?

23   A.    Right.

24   Q.    We talked about this briefly.

1    Again, you haven't made any examinations in terms

2    of whether Cenestin has done any better at -- at

3    Aetna, have you?

4    A.    At Aetna?

5    Q.    Yes, sir.

6    A.    No.

7    Q.    And -- and you haven't made any

8    examinations as to whether Cenestin has done any

9    better at any other places where it's gone on

10   formulary like AdvancePCS, Humana, or Express

11   Scripts?

12   A.    Correct.

13   Q.    And then in terms of what you're

14   citing here about the impact of -- the impact to

15   Premarin as a result of going to a third-tier

16   formulary position, have you made any analysis as

17   to what extent that loss could be attributed to

18   the fact that its competitors have increased the

19   amount of detailing or the share of voice that

20   they are applying to Aetna, for example?

21   A.    No.

22   Q.    And have you made any examination in

23   terms of to what extent Cenestin, having been on

24   the market for a longer time period, may have had

1    on it improving its position, if at all, at Aetna?

2    A.    I kind of got lost in that question.

3    Q.    All right.  Let me -- let me try

4    that again.

5    Do you know whether or not any of

6    Premarin's loss of market share could be

7    attributed to other factors, is sort of what

8    I'm -- what I'm curious about, and whether you've

9    considered at all that their loss may be

10   attributed to the fact that estradiol, for

11   example, the generic, is doing much better?

12   A.    This -- this chart --

13   Q.    Yes, sir.

14   A.    -- was included for two reasons.

15   One, it was included to show the internal

16   consistency in the document of the damage that

17   occurs to a product when it goes from second to

18   third tier.  And that's consistent with prior

19   documents that I reference in my report from Wyeth

20   itself.  And secondly, it was included as a

21   fascinating, albeit serendipitous, experiment

22   wherein two roughly equal underwriters, CIGNA and

23   Aetna, behaved differently in their formulary

24   structuring, and that being that Aetna moved the

1  product from second to third tier and CIGNA did
2  not, and it gave an opportunity to look at what
3  the effect of WHI was on the products.
4      Q.   Okay.  And -- and so you've cited
5  the quotes from Margaret Glassman in terms of her
6  view that WHI could only -- could only account for
7  15 percent of the decrease and that the 27 percent
8  doesn't relate to WHI.
9      A.   Correct.
10      Q.   Right?
11      A.   This was an interchange with Kate
12  Moore and Margaret Glassman in the cited reference
13  from Wyeth's own internal documents.
14      Q.   Right.  These are e-mails back and
15  forth between them?
16      A.   Correct.
17      Q.   Do you know what position either of
18  them hold?
19      A.   Well, let's see.
20      Q.   You've got -- actually, you've got
21  in your report -- you say Glassman is an analyst
22  at Wyeth?
23      A.   Yes, I thought I had that in my
24  report.

1      Q.   All right.  And do you know whether
2  she undertakes this type of analysis typically at
3  Wyeth?
4      A.   I'm not familiar with her scope of
5  duties at --
6      Q.   All right.
7      A.   -- Wyeth.
8      Q.   And I guess what I'm wondering, have
9  you yourself undertaken anything to examine
10  whether or not the decrease in performance at
11  Aetna has to do with anything beyond it not being
12  WHI?
13           Let me restate that.  Have you
14  undertaken anything to determine yourself whether
15  or not Premarin's decrease in sales there has to
16  do with something other than WHI?
17      A.   I did cite -- let me find where it
18  are here.
19           I did cite what were copayment
20  differentials in the market on Page 36 and I cited
21  Wyeth's own internal documents on Page 35
22  demonstrating that differentials in cost that are
23  exposed to the patient will make a difference in
24  market share.  So the report that we're discussing

1  now is consistent roughly with these internal
2  documents that Wyeth had, and of particular
3  interest to add to that was that it occurred
4  during the time frame of WHI's coming out.
5      Q.   All right.  I understand that.  I
6  guess what I'm -- what I'm trying to understand is
7  whether or not you've tried to make an analysis,
8  sir, in terms of whether other factors may have
9  influenced the decline in Wyeth's market share at
10  Atena.
11      A.   No.
12      Q.   So you don't know sitting here today
13  whether or not its decline there relates to only
14  moving to third tier or whether it may also relate
15  in part to things like new marketing strategies of
16  competitors, more detailing by competitors, things
17  like that?
18      A.   All of the things like that would
19  have a factor.  However, it is Wyeth's own
20  position or their consultant's -- this happened to
21  be Putnam Associates that was working for Wyeth --
22  that copayment amounts at various levels
23  definitely affect and move market.  And the
24  experience at Aetna would support that.  It

1  doesn't address the universe of possibilities, but
2  the -- if not the major, certainly one of the
3  major factors driving the change in market
4  position would have been the copayment structure
5  for third versus second tier.
6      Q.   Okay.  And that's -- that's
7  something that happened in 2003?  All this -- is
8  that an example that you're talking about?
9      A.   What page was my Aetna example --
10      Q.   Yes.
11      A.   -- you're talking about?
12      Q.   It's on 59.  You say Premarin was
13  switched to third tier in January of 2003.
14      A.   That would have been the date, yes.
15      Q.   Okay.  And do you know at the time
16  when Cenestin went on the marketplace how
17  prevalent third tier was?
18      A.   It was not as prevalent.
19      Q.   All right.  Do you know whether it
20  was less than -- on the PBM side, if it was less
21  than 25 percent?
22      A.   Let's see.  I have a --
23      Q.   You've got an HMO example.
24      A.   -- chart for that.

1    Q.    You don't have a PBM example.

2    A.    What I have in the way of objective

3    data on that would have been in the -- in the

4    graph that I cited.

5    Q.    Right.  And -- and you don't have a

6    PBM example, so I'm asking whether you know what

7    percentage of the marketplace on the PBM side was

8    third tier during 1999, the year of the Cenestin

9    launch.

10    A.    In general, the PBM stats correlate

11    with the HMO market.

12    Q.    You're not aware of the fact that

13    HMO went to third tier before most PBMs?

14    A.    I'm aware that they did, but I'm

15    saying roughly on any given, say, year to two-year

16    cycle, they're -- they're quite similar.

17    Q.    Okay.  And -- and do you know, for

18    example -- you would agree that the difference in

19    the copayment, whether it's a -- I'm sorry.

20    You'd agree that the difference in

21    going from a second to a third tier, the extent to

22    which that matters to patients can vary depending

23    upon the dollar amount of the -- of the copayment

24    difference; right?

1    A.    Correct.

2    Q.    So if there's only a $5 difference

3    from going from second to third tier, that can be

4    different than a $15 difference; correct?

5    A.    Correct.

6    Q.    And --

7    A.    Those numbers don't generally exist

8    in the real world.

9    Q.    Well, in 1999, do you know whether

10    that -- whether copay differentials tended to be

11    closer to $5 in difference or whether they were

12    closer to 15?

13    A.    The differentials between the copays

14    for -- for the first tier, which would be

15    generics, were usually around $5.  The copays for

16    second tier were usually somewhere between 10 and

17    15 dollars.  Third tier may not be paid at all

18    because they didn't exist.

19    Q.    Okay.  But in the three-tier -- in a

20    three-tier formulary, in those situations, do you

21    know in 1999 what the -- what the typical

22    difference was?

23    A.    The third tier in 1999 is cited on

24    Page -- is demonstrated on Page 34, and it was a

1    very small portion of the market.  The --

2    Q.    Around 21 percent?

3    A.    Well, the three-tier doesn't come

4    through well in this -- in this reproduction of

5    the slide, because it's different colors, but it

6    looks to me that throughout the graph the

7    commercial is the top bar and the --

8    Q.    Meaning one tier?

9    A.    No.  There's three bars for each of

10    the -- each of the segments --

11    Q.    Okay.

12    A.    -- you know, so that, for instance,

13    on one tier you have four bars.

14    Q.    Okay.

15    A.    You see that?

16    Q.    Yes.

17    A.    Under the three-tier, it looks as

18    thought either it was 2.7 percent or didn't exist

19    for commercial.

20    MR. COHEN:  Gordon, can I just show

21    him a better copy?

22    MR. DOBIE:  Yes, sure.  I'm

23    struggling for one myself.

24    MS. WARD:  Jay, can I just ask a

1    clarifying question?  Was it produced in

2    color to us?

3    MR. COHEN:  No, we didn't do a color

4    copy.  No.

5    A.    But this -- this particular quality

6    of this copy, it's clear what we've got here.

7    We've got -- commercial is -- 2.7 percent of the

8    commercial market in 1999 was three tier.  And in

9    Medicaid they had 18.9 percent.

10    BY MR. DOBIE:

11    Q.    Okay.

12    A.    Oh, I see.  I see.  Yes.  Okay.  Let

13    me -- let me -- let me amend that.

14    It looks -- and I misread this.  I

15    was putting the 21.9 on the preferred-

16    nonpreferred, and that's not correct.  There's

17    four bars in there.

18    Q.    So the commercial is 21.9?

19    A.    So it would be 21.9.

20    Q.    No --

21    A.    Medicaid would not exist.  Medicare

22    would be 2.7 and overall would be 18.9.

23    Q.    18.9 percent if you're on the HMO

24    side.

5/19/2004  Gibson, David

1    Okay.  What I was asking was whether
2  you know in 1999 what the difference was in copay
3  differentials between second and third tier.
4    A.    And the second tier was just coming
5  in, but it was usually double the copay amount for
6  second tier.
7    Q.    So you --
8    A.    So it was 15, you would expect it to
9  be around 30.
10    Q.    Okay.  And -- and we covered this
11  yesterday, but I just want to make sure, now that
12  we're doing it in the context of these documents,
13  that I have your testimony and best -- best
14  understanding to this.
15    It's your testimony that during this
16  time period if Cenestin was placed on a third tier
17  in this group of HMOs that it would have been
18  reimbursed at -- or the -- strike that.
19    It's your belief that the patient
20  would have paid the third-tier copay of $30 even
21  if the cash price for that product at that time
22  was $15?
23    A.    I would -- what I -- what I -- what
24  I discussed yesterday was I think that's a very

---

5/19/2004  Gibson, David

1  predominance of that type of behavior is more
2  common in the independent pharmacies than the
3  chains and it's more common in the mail orders.
4    Q.    And have you ever --
5    A.    And the mail orders are more common
6  with generics.
7    Q.    Okay.  And have you ever had any
8  discussions with anybody that is a plaintiff in
9  this case in terms of -- and that's an independent
10  pharmacy, J.B.D.L., in terms of what they were
11  doing?  Were they charging the cash price --
12    A.    No, I did not.
13    Q.    Let him finish the question.
14    -- the cash price or the -- or the
15  copay?
16    A.    No.
17                    * * *
18    (Whereupon, Gibson Exhibit 23 was
19  marked for identification.)
20                    * * *
21  BY MR. DOBIE:
22    Q.    We've handed you Exhibit 24.
23    A.    No.  This is an authoritative
24  article.

---

5/19/2004  Gibson, David

1  common practice.
2    Q.    Okay.  And that's --
3    A.    Whether people will admit to it or
4  not is questionable.  But that was a fairly common
5  practice.
6    Q.    Okay.  And that's -- and you reached
7  that conclusion without having the benefit of the
8  Duramed documents that I showed you this morning;
9  correct?
10    A.    Correct.
11    Q.    Okay.  Let me -- let me just follow
12  up on this then in terms of that being a common
13  practice.
14    In those situations where that
15  happens and the -- and the patient is charged the
16  $30 copay as opposed to the $15 cash price for
17  Cenestin, who gets the $30?
18    A.    The pharmacy.
19    Q.    Okay.  So in the case of CVS and
20  Rite Aid, for example, they were doing that here
21  in 1999, they were charging patients $30 for
22  Cenestin as opposed to the $15 cash price, they
23  would have profited from that?
24    A.    They would.  The practice -- the

---

5/19/2004  Gibson, David

1    MR. DOBIE:  22?
2    MS. WARD:  23.
3    MR. COHEN:  David, she needs that
4    back.
5    THE WITNESS:  Oh.  Sorry.
6  BY MR. DOBIE:
7    Q.    It's Exhibit 23, and as you
8  mentioned, this is an article that you wrote
9  having to do with whether we were spending too
10  much on pharmaceutical products; right?
11    A.    Correct.
12    Q.    And generally speaking, your sort of
13  macroeconomic view is that -- is that America
14  should be spending more for pharmaceutical
15  products?
16    A.    My general macro view is that
17  Americans should be taking more pharmaceutical
18  products.  Whether they should be spending more or
19  not is another issue.
20    Q.    All right.  Well, that's what your
21  headline says; right?
22    A.    Right.  But that's -- what the core
23  of the article is that half the drugs prescribed
24  are not filled.

1    Q.      And I want to ask you about -- on
2    the very first page, there's a discussion about
3    HMOs having erected costly and uniformly
4    inexpensive -- ineffective cost containment
5    strategies?
6    A.      Yes.
7    Q.      And you note that HMOs' prior
8    authorization requirements represent an expensive
9    and labor intensive -- to manage; right?
10   A.      Correct.
11   Q.      And you say that "Many plans quote
12   costs of $10 to $25 per prior authorization
13   request, with more than 80 percent of the requests
14   being approved"; right?
15   A.      Right.
16   Q.      So do I have it right that first --
17   in the first instance, your -- your understanding
18   is that most times when a -- when a patient or a
19   physician seek prior authorization, it's approved
20   in 80 percent of the -- 80 percent of the cases?
21   A.      Yes.  It may not be approved right
22   away, but if you look back on all the denials
23   within a managed care environment, six months
24   later 80 percent will have either been authorized

1    went out to customers that they could present to
2    customers to seek prior authorization for the
3    approval of Cenestin prescriptions in those
4    instances where a patient had Cenestin on a
5    formulary that was -- that was either in the third
6    tier or in a nonapproved position?
7    A.      I have no knowledge of that.  I'd
8    find it unusual, because the prior authorization
9    forms are different for the different PBMs and
10   they are not generated by the pharmaceutical
11   manufacturer.  You may find that they issued a
12   series of talking points or something to fill in
13   under the request.  I don't know.
14   Q.      Okay.  Is it true, sir, that with --
15   that most prior authorization requests do cost 10
16   to 25 dollars?
17   A.      Now, understand what we're talking
18   about in -- in this article.  I'm talking about
19   medical management, not pharmacy management.
20   Q.      Who is -- who is the 10 to 25
21   dollars in cost?
22   A.      This is medical management.
23   Q.      Okay.  And medical management refers
24   to what entity?

1    at the time of request or within a six-month
2    period.
3    Q.      Right.  And -- okay.  So you go on
4    to say then that "Upon review at six months, the
5    approval rate approaches 100 percent."
6    A.      Yes.
7    Q.      So -- so your experience is that
8    generally managed care companies at the end of the
9    day approve prior authorization requests?
10   A.      Generally.
11   Q.      And were you aware, sir, that
12   Cenestin reject -- I'm sorry, that Duramed
13   rejected the strategy of asking -- or seeking to
14   have physicians complete prior authorization forms
15   for the product?
16   A.      Say that again.
17   Q.      Were you aware that Duramed decided
18   not to -- not to have its sales force seek prior
19   authorizations for its products?
20   A.      Duramed doesn't have prior
21   authorization requests.  That would be the PBM.
22   Q.      Okay.  Do you know whether or not it
23   was ever recommended to them that they have
24   forms in their sales force materials when they

1    A.      That would be the HMO with its
2    infrastructure of medical management that consumes
3    somewhere between 5 and 6 percent of premium.
4    Q.      Okay.  So in the instance of like
5    a -- so this would be like a Aetna?
6    A.      Be like an Aetna or a -- or a United
7    or a HealthNet.
8    Q.      Okay.  And does the fact that it
9    would cost 10 or 25 dollars to do a prior
10   authorization for a product -- is that -- does
11   that -- is that consistent with the fact that a
12   group like Aetna might decide not to bother with
13   prior authorizations for an inexpensive product,
14   pharmaceutical product generally?
15   A.      It might.  It's -- if you want my
16   opinion, I'll give it at the risk of sounding like
17   an advocate.
18   Q.      Well, I've shown you this morning
19   Exhibit 18, where Aetna is -- according to
20   Duramed, is going to allow the prescriptions to be
21   filled at the same copay level as the formulary
22   products.  And -- and I'm wondering if the fact
23   that it would cost 10 to 25 dollars per prior
24   authorization request, whether that might be a

1   reason why somebody like Aetna might decide to
2   just allow Cenestin prescriptions to be filled at
3   the same copay level as Premarin rather than have
4   its members go through -- or patients go through
5   prior authorization requests.
6        A.     You are mixing apples and oranges.
7   The price quoted here is medical management cost,
8   which is not automated.  The prior authorization
9   in a PBM setting is much more an automated process
10  handled at a lower level.  It only bounces up to
11  senior management if it's denied.
12       Q.     Okay.  I'm talking Aetna, though, as
13  an example.  That is an HMO; right?
14       A.     It is an HMO, but I -- I'm not
15  certain whether they have their own internal PBM
16  or they instructed their PBM to administer it in
17  the fashion that they did.  But I'm just saying
18  that the cost per prior authorization to process
19  in medical management is considerably greater than
20  the prior authorization process for a PBM.
21       Q.     Okay.  Well, you mentioned United.
22  That's a -- that is an HMO; right?
23       A.     Correct.
24       Q.     Okay.  And United if -- again

1   interesting examples in Wyeth's own documents
2   where they placed the requirement for prior
3   authorization for Cenestin as one of their
4   contracting points.
5        Q.     Okay.
6        A.     That would -- that certainly caught
7   my eye.
8        Q.     Which -- where did you find that
9   there was a requirement for there to be a prior
10  authorization?
11       A.     On Page 67 and 68.
12       Q.     Okay.  And the example that you cite
13  is MedImpact?
14       A.     Wellpoint.
15       Q.     I'm sorry.
16       A.     Page 67 and 68 under "NDC blocks,"
17  Item 7.
18       Q.     And it's your testimony that Wyeth
19  required them to put NDC blocks in place at
20  Wellpoint?
21       A.     I haven't testified to it yet.  I
22  am --I am pointing out an example where a
23  contract -- a document from Wyeth which was the
24  reimbursement agreement with Wellpoint stipulated

1   looking --
2        A.     Where did I mentioned that in --
3        Q.     No.  You mentioned it in response to
4   my question a moment ago --
5        A.     Oh, I see.
6        Q.     -- another HMO.  Okay.  At United,
7   they say that although Cenestin is considered
8   nonformulary, however it's being reimbursed in the
9   majority of their plans to the $13 copay level.
10  And again I'm just wondering, is the fact that it
11  would cost 10 to 25 dollars per prior
12  authorization request for a group like United
13  Healthcare, whether that might be a reason why
14  they would simply allow the prescription to go
15  through at the same copay level.
16       A.     To answer that, I'd have to
17  speculate.  I --
18       Q.     You don't know?
19       A.     It's reasonable, but I don't know.
20       Q.     Okay.  Generally speaking, would you
21  agree that prior authorizations are more often
22  used with expensive products as opposed to
23  inexpensive products?
24       A.     Generally.  There were very

1   that a NDC block be in place and to overcome an
2   NDC block in general in the industry requires a
3   prior authorization.
4                      * * *
5           (Whereupon, Gibson Exhibit 24 was
6        marked for identification.)
7                      * * *
8   BY MR. DOBIE:
9        Q.     Okay.  Let me show you what we've
10  marked as Exhibit 24.  This is the document that
11  you've cited in your report.
12       A.     This is -- this is Wyeth 23418.
13  Okay.
14       Q.     This is an amendment that's an
15  agreement between Wellpoint and Wyeth that you
16  referenced; correct?
17       A.     Correct.
18       Q.     And if you look on the first page,
19  this is the language of the contract that you're
20  referring to; right?
21       A.     Correct.
22       Q.     And, in fact, it doesn't say that
23  they're required to put in NDC blocks.  It says
24  that "Wellpoint shall use reasonable efforts to

1  ensure the use of Wyeth-Ayerst HRT products and
2  discourage the use of of nonformulary products
3  through appropriate means that may include the use
4  of NDC blocks and/or differential copays where the
5  benefit design allows."  Do you see that?
6       A.    I do.
7       Q.    Okay.  So they weren't required to
8  use NDC blocks.  They had a choice of using NDC
9  blocks, differential copays, and only where the
10 benefit design allowed; right?
11      A.    Correct.
12      Q.    And -- and this related to -- this
13 actually related to -- not to Premarin but to
14 Prempro and Premphase, right, not Premarin?
15      A.    Correct.
16      Q.    Okay.  And so do you have any other
17 examples where a -- any sort of plan was, quote,
18 required to put NDC blocks in place?
19      A.    If you'll give me --
20      Q.    Sure.
21      A.    -- just a minute here, I'd like --
22 I'd like to go through my report.
23            MR. COHEN:  I just want to insert a
24      late objection to the form of that question.

1  The report doesn't say "required."  It says
2  "may be required."
3            MR. DOBIE:  I was responding to his
4  testimony.
5            MR. COHEN:  While we're waiting,
6  Gordon, how are we looking on time because
7  it's approaching 1 o'clock.
8            MR. DOBIE:  I know.  Let's -- let's
9  keep going.  We're not doing bad.
10           MR. COHEN:  Any estimate?  Because
11 he's got a flight to catch.
12           MR. DOBIE:  I know.
13      A.    I do not have -- what I was -- what
14 I was looking for was exhibit on Page 57, which
15 indicates the percentage of the market that
16 requires prior authorization for each of the
17 products.  This an internal document from Wyeth.
18 See that?
19 BY MR. DOBIE:
20      Q.    I do.  Did you interpret this as
21 this is the percentage of the marketplace that has
22 prior authorization for Cenestin?
23      A.    Yes.
24      Q.    Okay.  Have you ever used Scott

1  Levin data before?
2       A.    I've seen and used it in other
3  instances.  I don't recall exactly where.
4       Q.    Do you --
5       A.    It's a respected name.
6       Q.    Okay.  Do you know that -- do you
7  have any reason to dispute the fact that what this
8  is referring to by "prior authorization" with
9  these percentages is of those plans that actually
10 put prior authorization in for Cenestin or other
11 products in this category, those that -- strike
12 that.
13            Are you aware of the fact that what
14 the Scott Levin data is referring to is that of --
15 for those HMOs that that use prior authorization
16 for either the ERT or HRT class that that's the
17 percentage that would -- would have applied it
18 to -- whether it's Ativella, Cenestin, FemHRT, or
19 the others?
20            MR. COHEN:  Object to the form.
21      A.    That's not the way I interpreted --
22 BY MR. DOBIE:
23      Q.    Okay.  You --
24      A.    -- the report.

1       Q.    You believe that in the fall of 2001
2  50 percent or 49 percent of the market had prior
3  authorization in place for Cenestin?
4       A.    That's the way I interpreted the
5  chart.
6       Q.    Okay.  Have you ever had any
7  discussions with anyone to try to get behind
8  those -- those numbers and understand what that
9  means?
10      A.    I know that if you are not on the
11 second tier, it's not unusual to selectively have
12 prior authorization on other products either for
13 cost or for the opportunity to influence decision
14 making and drug selection.
15      Q.    Okay.  So is it your belief, knowing
16 as you -- you've written an article on this, that
17 prior authorizations would cost 10 to 25 dollars
18 every time you get it, that 50 percent of the
19 market in the fall of 2001 was doing a prior
20 authorization for Cenestin?
21      A.    First of all, we've been over this.
22 It isn't 10 to 25 dollars for -- for a PBM to do a
23 prior authorization.  It is -- so that first part
24 of that question, we -- to break up the apples and

1   oranges.

2           The thing that's very interesting to

3   me about prior authorizations is the way the

4   industry is bifurcating between PBMs and medical

5   managers.  The PBMs are keeping in place the tools

6   like prior authorization when the rest of the

7   industry is moving away from it because it's not

8   effective.  What I infer from that is that it's

9   now used more in the industry to steer market

10  share than to -- for any other purpose.

11      Q.     Okay.  But sir, the data that you

12  have in this chart on Page 57, that's from a Wyeth

13  document; right?

14      A.     Yes.  It's referenced.

15      Q.     Okay.  And -- and this prior

16  authorization relates only to HMOs; correct?

17      A.     Percentage of HMO lives, that's

18  correct.

19      Q.     Okay.  And so for HMOs, it would

20  cost 10 or 25 dollars to do a prior authorization,

21  according to your article, for Cenestin; right?

22      A.     I'm having trouble getting this

23  across.

24           An HMO -- many of them outsource the

---

1   is included within this group or a hundred; right?

2      A.     Right.  I don't have the methodology

3   behind their obtaining the data and the normative

4   data.

5      Q.     And you don't know whether or not

6   this refers to all of the HMOs that were -- were

7   pulled or only those HMOs that had prior

8   authorizations in place for this class of

9   products; right?

10      A.     As I read this document, which is

11  cited in the report, I did not recall those

12  qualifiers being in place.  If they were, I would

13  have cited it or I would have included it in the

14  report.

15      Q.     How about on the NDC block side?

16  You -- I had asked you a question, we sort of got

17  distracted, about whether or not you were familiar

18  with any situation in the marketplace where there

19  was an NDC block in place for Cenestin.  And we

20  talked about the Wellpoint contract.  Anything

21  else that you're -- that you're familiar with?

22      A.     That -- the section of the report

23  that I pulled that from is what I -- comes to mind

24  right now.  I know that the Premarin preemptive

---

1   management of their pharmacy benefit to a PBM.  If

2   they have a captive internally like Pacificare

3   did, they would flip that prior authorization into

4   the norms for the PBM industry.

5      Q.     Okay.  Do you know whether or not

6   the prior authorization figures that are located

7   here are based upon every HMO in the industry as

8   opposed to, let's say, fewer than 10?

9      A.     Let's see.  What page are you on

10  now?

11      Q.     I'm looking at your Page 57.

12      A.     57.  It is my understanding that

13  this was normative data for the industry and it

14  was not footnoted as being as being -- as being --

15  tracking a particular group of companies.

16      Q.     Okay.  So -- but as you're

17  presenting it here in the report, do you mean -- I

18  mean, do you mean to be telling the jury that it's

19  your belief that 49 percent of HMOs had prior

20  authorization in place for Cenestin in the fall of

21  2001?

22      A.     Correct.

23      Q.     Okay.  And in deciding to do that,

24  you don't know whether or not that's 10 HMOs that

---

1   plan called for attempting to put those into

2   place.  I don't recall if the contracting manual

3   included that.  I believe I remember it did.  But

4   being able to cite for you contract examples --

5      Q.     I guess I'm wondering is, are you

6   aware of whether or not NDC blocks were, in fact,

7   put in place at any PBM or HMO?

8           MR. COHEN:  With respect to

9      Cenestin?

10          MR. DOBIE:  Yes, sir.

11      A.     I'm having trouble finding it now,

12  but there was -- there -- I cited examples where

13  the PBMs would try to come up with ways to enhance

14  their performance rebates, and I -- as I recall,

15  they discussed using techniques like blocks.  I

16  don't recall that there was a link to it being a

17  contractual requirement.

18  BY MR. DOBIE:

19      Q.     There's a -- if you turn, sir, to --

20  and so the answer is you're not familiar with --

21  with whether it actually -- NDC blocks were, in

22  fact, put in place as it relates to Cenestin?

23      A.     I'm saying that I cannot testify now

24  and cite to you an example of it.

1  Q.   All right.  You mentioned in Page 42
2  of your report -- you have discussion of the
3  Medicaid rebate program, and I want to make sure I
4  understand the significance of that.
5       It's your testimony, as I
6  understand, sir, that -- that Wyeth could not
7  offer greater than a 15 percent rebate because of
8  Medicaid rules?
9  A.   Correct.  I was discussing
10 specifically the Omnibus Budget Reconciliation Act
11 and its requirements.
12 Q.   Okay.  And --
13 A.   And it's -- that's an important
14 upper limit that they can't butt into without
15 changing their -- their structures with Medicaid.
16                    * * *
17      (Whereupon, Gibson Exhibit 25 was
18      marked for identification.)
19                    * * *
20 BY MR. DOBIE:
21 Q.   All right.  And let me hand you
22 Exhibit 855 -- this is now Exhibit 25.  This is a
23 document from Wyeth.  It's the pricing and
24 contracting strategy as of April 20 -- April 2001.

1  have larger than 15 percent discounts on the
2  commercial side; correct?
3  A.   It could if it had similar numbers
4  for all their government contracts.
5  Q.   All right.  And do you have any
6  reason to think that they didn't have similar
7  numbers for their other federal government
8  contracts?
9  A.   I have no basis to give an opinion
10 on that.
11 Q.   Okay.
12 A.   This is the first time I've seen
13 this.
14 Q.   Understood.  And, in fact, if you'd
15 look at the top of that same page, you could see
16 that Wyeth did offer 25 percent performance
17 rebates to Harvard, CIGNA, and Humana; correct?
18 A.   That's what it indicates here, yes.
19 Q.   All right.  And you weren't aware of
20 that before?
21 A.   I was not aware that it was that
22 great.
23 Q.   And by the same token, at the top of
24 the page, you see that there are existing

1  Have you ever seen this document before, sir?
2  A.   No.
3  Q.   All right.  If you look at the
4  second page of the document, there's a heading
5  that says "Government Strategy."
6  A.   Yes.
7  Q.   And under "Medicaid," it's sort of
8  in the middle of the page, there's a discussion of
9  the discount from AMP and you see that the
10 discount is, in fact, 64 percent, 62 percent, and
11 as much as 65 percent depending on the particular
12 Premarin strength?
13 A.   Yes.
14 Q.   All right.  But you weren't aware
15 that Wyeth discounted to that extent on the
16 Medicaid side of the business?
17 A.   What I was referring to in -- where
18 we started this was that there's an upper limit to
19 how far you can discount in general on commercial
20 side, that -- that there is no limit to where you
21 can go on government contracts.
22 Q.   Right.  So to the extent that Wyeth
23 has made these significant discounts on the
24 government side, on Medicaid, it could actually

1  contracts with PBMs that have discounts up to 22
2  percent; right?
3  A.   Again, it gets us back into our
4  discussion which we enjoyed so much yesterday of
5  how you define your rebates and what goes into
6  them.  Rebates can be defined as rebates off of
7  the actual product acquisition or the product
8  dispensing transaction or they can be
9  administrative fees which can help you get around
10 the 15 percent and they can be involving the mail
11 order.
12 Q.   Okay.  But your report, sir, says
13 that the size of the rebate can range up to 15
14 percent of the direct -- the DCP price; right?
15 "Rebates greater than 15 percent are rare, since
16 they might cause manufacturers to exceed their
17 'Medicaid best price' rebates and trigger
18 repricing of government contracts."
19      Now that you've seen Exhibit 25, do
20 you think that that's applicable as it relates to
21 Premarin during this time period?
22 A.   Once again, we don't -- I don't have
23 enough data to render an opinion here.  I will
24 tell you that the 15 percent number that I put in

1    here and footnoted is consistent with the general
2    industry's approach to rebates and I am not quite
3    certain how they calculated these percentages.
4        Q.    Do you know whether Duramed has
5    offered rebates in the -- either on the Medicaid
6    or MediCal -- state Medicaid level formularies
7    that exceed 15 percent?
8        A.    I'm -- I'm not aware -- I'm not
9    knowledgeable of it.
10       Q.    Do you know whether or not Duramed
11   has offered or Barr Labs has offered rebates that
12   exceed 15 percent for Cenestin?
13       A.    In the commercial market --
14       Q.    Yes, sir.
15       A.    -- or the Medicare?
16       Q.    Yes, sir.
17       A.    I think the -- it would be unusual
18   for them to without bringing it in tangentially,
19   as I mentioned with other -- in other buckets.
20       Q.    So -- but assuming that they offered
21   the government rebates that were of equal size, if
22   not significantly greater, then they certainly
23   would be in a position to offer the commercial
24   market greater rebates; right?

1        A.    Again, assuming that they offered
2    these levels of rebates throughout their
3    government, both federal and state, contracts,
4    yes.  We don't know from this document.
5        Q.    And you haven't seen the Duramed
6    documents relating to their rebate agreements with
7    MediCal, for example?
8        A.    No.
9        Q.    And their rebate agreements with any
10   other state?
11       A.    Correct.
12       Q.    And you haven't reviewed the Duramed
13   contracts or the Barr contracts as it relates to
14   the size of the rebates that they've actually
15   offered other managed care organizations?
16       A.    Those are generally proprietary and
17   not available for inspection by disinterested
18   third parties.
19       Q.    Okay.  Well, as an expert witness in
20   this case, you haven't asked your counsel to
21   review the Duramed or Barr agreements as it
22   relates to the size of the rebates --
23       A.    That's correct.
24       Q.    -- that they're offering.

1            MR. DOBIE:  Let's -- let's take a
2    two-minute break.
3            THE VIDEOGRAPHER:  We're going off
4    the record.  The time is 1:15 p.m.
5            This is the end of Tape No. 2.  The
6    time is 1:16 p.m.  We're off the record.
7            * * *
8            (Whereupon, a short recess was
9    taken.)
10           * * *
11           THE VIDEOGRAPHER:  This is the
12   beginning of Tape No. 3.  The time is 1:25
13   p.m.  We're back on the record.
14   BY MR. DOBIE:
15       Q.    Dr. Gibson, just a few things to
16   clarify.
17           First, you have not quantified the
18   extent to which NDC blocks were, in fact, employed
19   against Cenestin; correct?
20       A.    That's correct.
21       Q.    And you have not quantified the
22   extent to which prior authorizations were put in
23   effect against Cenestin; correct?
24       A.    Based on contracts.

1        Q.    Based upon -- in the marketplace.
2        A.    Well, this -- this graph that we
3    were discussing just before the break --
4        Q.    Other than that graph that we were
5    talking about before the break, you have not in
6    any way quantified the amount or frequency of
7    prior authorizations that Cenestin may have faced
8    in the marketplace; correct?
9        A.    Correct.
10       Q.    And that is really the sole basis
11   for your belief that Cenestin faced prior
12   authorizations in any significant extent; correct?
13       A.    Correct.
14       Q.    And did you do any study to
15   determine whether or not it was more common that
16   physicians were not writing Cenestin prescriptions
17   because of problems with the product, lack of
18   indications, lack of a clinical history, things
19   like that, versus formulary placement?
20       A.    I will give you an opinion.  I don't
21   have a study that I did.  Are you asking me if I
22   did a study?
23       Q.    Yes, did you do a study?
24       A.    I didn't do a study.

1    Q.    Okay.  And in order to know -- in
2    order to really know for certain whether or not
3    physicians were not writing Cenestin because of
4    problems with the product versus formulary
5    placement, you would have to do such a study;
6    right?
7    A.    It's late in the day.  You have to
8    understand all that I've said up to this point
9    about Cenestin being a niche player, not a
10   replacement product.
11   Q.    Understood.
12   A.    I believe that the hassle factor for
13   a physician to try a new drug in a niche market
14   would have been substantial with the enforcement
15   mechanisms of the formulary, including NDC blocks
16   and prior authorizations.
17   Q.    Okay.  I guess what I'm trying to
18   understand is, it's your opinion that they would
19   have been, but you have not actually quantified or
20   determined whether or not, in fact, that's the
21   reason why physicians weren't writing the
22   prescriptions?
23   A.    I did cite instances from the
24   documents where physicians tried the drug,

1    Q.    Do you know, in the period before it
2    went on the third tier for three-tier formularies
3    at PCN, whether Cenestin prescriptions just sailed
4    through and were reimbursed just like Premarin?
5    A.    It would depend on the client and
6    how they set up the terms for the third tier.
7    Q.    Okay.  And -- and I guess what I'm
8    asking, do you know how it was handled within PCN
9    client plans before Cenestin was added to the
10   third tier?
11   A.    I know generally.
12   Q.    And what is your understanding of
13   how it was handled?
14   A.    Generally the -- PCN would present
15   to the client a tiered structure that had
16   increasing copayment amounts, and if there was not
17   a third tier, it would generally not have been
18   paid for.
19   Q.    And in those instances -- so it's
20   your belief that at PCN the Cenestin prescriptions
21   would have been not reimbursed in the time period
22   before it went on third tier?
23   A.    That would be my bet.  I haven't
24   checked it, but that would be my likely bet.

1    Cenestin, and met this enforcement mechanism and
2    indicated they would stop trying to use the drug.
3    Q.    But even in those 12 instances, as
4    we discussed before, you don't even know whether
5    or not Premarin was even on formulary or whether
6    or not the particular plan had a contract with
7    Wyeth at all or whether the product was simply
8    rejected because the plan decided that they did
9    not like Cenestin; right?
10   A.    Correct.
11   Q.    Okay.  Let me just ask you a couple
12   of followups here.
13   A.    That was mixing apples and oranges
14   on that -- why that was in the report.  That was
15   in the report to illustrate the effectiveness of
16   the enforcement mechanism that backs a formulary.
17   Q.    Do you -- do you know whether or not
18   any of these enforcement mechanisms were ever used
19   with Cenestin at PCN?
20   A.    I don't.  I know that -- I know that
21   if Cenestin were not on the second tier, it would
22   face a higher copayment.  I don't believe that it
23   has gone beyond that at PCN, but I can't testify
24   that for sure.

1    Q.    All right.  But you don't know?
2    A.    I don't know.
3    Q.    And since it's gone on third tier,
4    is it your expectation that most plans have put
5    Cenestin on third tier?
6    A.    Yes.  That's the reason the whole
7    third tier came into existence.  There was a huge
8    backlash in the market against the restrictiveness
9    of just two-tier plans.
10   Q.    Right.
11   A.    So the third tier came in to respond
12   to that market demand and now just about
13   everything is on the third tier.
14   Q.    And do you know whether or not
15   Cenestin is reimbursed at the third-tier level or
16   whether it's reimbursed at second tier just by
17   being on the third tier?
18   A.    I don't.
19   Q.    You mentioned -- you mentioned I
20   think a little bit earlier about the significance
21   in your view of the -- of the launch period, the
22   time of the product.
23   A.    Yes, I did.
24   Q.    Do you think that there's a

1   difference from what you've seen between

2   Cenestin's success -- strike that.

3          Is there a difference in your view

4   between how -- how many -- how many plans Cenestin

5   was on in, let's say, 2002 versus 1999?

6      A.    How many plans Cenestin was on

7   where?

8      Q.    It's a poorly phrased question.

9          Is -- is it your belief that these

10  things you're talking about that would be a

11  disadvantage to Cenestin -- is it your -- is it

12  your view that those things were happening more in

13  1999 or 2002 or do you think it was all about the

14  same?

15     A.    I think it was much more evident

16  earlier.  That was part of that movement in the

17  market to less restrictive products.  It was back

18  during the time when Cenestin was being introduced

19  that the formulary was much more restrictive than

20  it is today.

21     Q.    And that's -- that's true not just

22  as it relates to Cenestin, but generally now, I

23  think as you've indicated, formularies are more

24  open than they were in 1999?

4/1/2005  2:25 PM                                          514

---

1      A.    That would generally be an officer

2   of the company.  I'm not an officer of the

3   company.

4      Q.    Have you had discussions with

5   anybody at PCN about the subpoena that we served

6   on Mr. Scull to obtain PCN's documents?

7      A.    After I got the subpoena, I called

8   Mr. Scull and I told him that I had received this

9   and I sent him a copy of it and I requested that

10  he take responsibility for it, in that it was

11  documents dealing with PCN, and it was my

12  understanding that he did and that he referred the

13  matter to PCN's law firm, which was something or

14  other and Pillsbury out in San Francisco, and that

15  I got a phone call from the lawyer -- I believe

16  her name was Maureen -- who was with the firm and

17  that she was having conversations both with you

18  and with -- with Mr. Cohen.  So that's pretty much

19  the extent of what I know about this.

20     Q.    Did you discuss with her the -- let

21  me -- let me sort of back up.

22          How many discussions did you have

23  with Mr. Scull about the subpoenas?

24     A.    One.

4/1/2005  2:25 PM                                          516

---

1      A.    That's correct.

2              * * *

3          (Whereupon, Gibson Exhibit 26 was

4      marked for identification.)

5              * * *

6   BY MR. DOBIE:

7      Q.    Let me show you what's been marked

8   as Exhibit 26.  This is a copy of the subpoena,

9   Dr. Gibson, that you received in this case to

10  produce documents.  And we haven't received any

11  documents.  Does that mean you don't have any of

12  the documents that are requested in the subpoena?

13     A.    I have -- I have none of the

14  documents and I have no custody of the documents

15  and if I did, I'd have no authority to release

16  them.

17     Q.    Okay.  So you don't even have a copy

18  of the PCN formulary or preferred drug list?  You

19  don't keep one of those?

20     A.    I pulled down the same copy that you

21  got off the Net.

22     Q.    Okay.  And -- and as medical

23  director, you don't have any authority in your

24  view to provide any of these documents?

4/1/2005  2:25 PM                                          515

---

1      Q.    And how many discussions did you

2   have with the lawyer at Pillsbury?

3      A.    One.

4      Q.    All right.  And do you know whether

5   or not there's addtional documents that -- that

6   PCN is producing in response to this subpoena?

7      A.    I don't know.  I heard while I've

8   been here that you'd had conversations with the

9   law firm and that there were more -- you were

10  expecting more documents, but that's the first I'd

11  heard of that.

12     Q.    Okay.  Did you -- at any time in

13  your discussions with anybody involved in this in

14  connection with PCN, have you requested that any

15  documents be withheld from this litigation?

16     A.    No.

17     Q.    And do I take it you don't have any

18  objection at least to these documents being

19  produced?

20     A.    No, not at all.

21         MR. DOBIE:  Sir, I appreciate your

22     patience with this.  I don't have any other

23     questions for you at this time and I hope

24     you make your flight.

4/1/2005  2:25 PM                                          517

```
1          THE WITNESS:  Thank you.
2          MR. DOBIE:  Thank you very much.
3          THE WITNESS:  I wish I could say I
4    enjoyed the experience, but I enjoyed
5    getting to know you.
6          THE VIDEOGRAPHER:  This concludes
7    the videotape deposition of David Gibson.
8    The time is 1:37 p.m.  We're now off the
9    record.
10              * * *
11         (Whereupon, the deposition concluded
12    at 1:37 p.m.)
13              * * *
14
15
16
17
18
19
20
21
22
23
24
```

```
1              - - - - - - -
2              E R R A T A
3              - - - - - - -
4    PAGE    LINE        CHANGE
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
```

```
1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8    sheet and date it.
9          You are signing same subject to the
10   corrections you have noted on the errata sheet,
11   which will be attached to your deposition.
12          It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be accurate
17   and may be used in court.
18
19
20
21
22
23
24
```

```
1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, _____, do hereby
4    certify that I have read the foregoing pages,
5    _____, and that the same is a correct
6    transcription of the answers given by me to the
7    questions herein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet.
10
11   _____
12   DATE
13
14
15   Subscribed and sworn to before me this
16
17   _____ day of _____,
18   200_.
19
20   My commission expires: _____
21
22   _____
23   Notary Public
24
```

5/19/2004  Gibson, David

1   C E R T I F I C A T E

2

3

4        I hereby certify that the witness was

5   duly sworn by me and that the deposition is a true;

6   record of the testimony given by the witness.

7

8        It was requested before completion of

9   the deposition that the witness, DAVID J. GIBSON,

10  M.D., have the opportunity to read and sign the

11  deposition transcript.

12

13

14

15        _____

          McKINLEY WISE, CM

16        Dated:  May 28, 2004

17

18  (The foregoing certification of this transcript does

19  not apply to any reproduction of the same by any

20  means, unless under the direct control and/or

21  supervision of the certifying shorthand reporter.)

22

23

24

5/19/2004  Gibson, David

1            LAWYER'S NOTES

2   PAGE   LINE

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

**$**

**$10** [486:12]
**$13** [377:18] [491:9]
**$15** [479:4] [482:22] [483:16
,22]
**$25** [460:12] [486:12]
**$30** [482:20] [483:16,17,21]
**$300** [339:23]
**$5** [479:2,11,15]

**.**

**.625** [389:9] [463:9] [464:17]

**0**

**01** [326:9]
**02** [390:9]
**03** [390:11]
**0326** [326:]
**04** [390:11]

**1**

**1** [326:9] [330:3] [369:7]
[422:22] [443:8] [495:7]
**1.25** [463:14] [464:18]
**1:15** [508:4]
**1:16** [508:6]
**1:25** [508:12]
**1:37** [518:8,12]
**10** [372:11] [468:7] [479:16]
[488:15,20] [489:9,23]
[491:11] [497:17,22] [498:
20] [499:8,24]
**10:25** [394:2]
**10:35** [394:8]
**100** [487:5]
**11:12** [422:22]
**11:14** [423:6]
**11:42** [443:24]
**11:49** [444:6]
**12** [349:20] [386:19,23]
[387:2,17,20] [388:3,13,14]
[511:3]
**125** [422:9]
**125person** [422:9]
**125-person** [422:9]
**131728** [419:22]
**14** [394:11]
**15** [328:9] [349:11,15]
[350:15] [368:18,21] [372:
13] [397:19] [474:7] [479:12
,17] [482:8] [502:7] [504:1]
[505:10,13,15,24] [506:7,12]
**15th** [326:23]
**16** [328:11] [361:1,6,13]
[363:20,23] [366:14,16]
[367:23] [368:22] [369:9]
[370:14] [371:2] [372:6]
[387:8]
**1650** [326:16]
**17** [328:12] [353:20] [354:1]
[356:10,11] [366:20] [367:

1,2] [371:11] [387:8] [411:17]
**18** [328:13] [352:13,24]
[353:6] [356:9] [371:6,13,14]
[374:10] [383:19] [387:8]
[389:23] [489:19]
**18.9** [481:9,22,23]
**1818** [327:]
**1880** [326:] [330:14]
**19** [326:11] [328:14] [352:14
,18,24] [353:11,12] [419:3,8
,9]
**19103** [326:17] [327:5]
**191037301** [326:17]
**19103-7301** [326:17]
**1995** [434:19]
**1999** [393:8] [396:7] [405:3]
[413:3,20] [414:2] [417:5]
[426:23] [468:6] [478:8]
[479:9,21,23] [481:8]
[482:2] [483:21] [514:5,13
,24]
**19th** [330:8]

**2**

**2** [330:3] [398:2] [423:5]
[453:3] [508:5]
**2.7** [480:18] [481:7,22]
**20** [328:15] [354:17] [423:20
,22] [465:19] [502:24]
**200** [521:18]
**2000** [367:4] [369:5] [374:18]
[392:15] [396:12,17] [397:
3,4,13] [398:11,20,24]
[406:18,19] [414:2] [417:14]
[427:16] [469:24]
**2001** [367:3] [370:15] [390:
4] [391:24] [427:12,16]
[428:8] [430:22] [497:1,19]
[499:21] [502:24]
**2002** [391:24] [408:20]
[428:12,15] [430:9] [514:5
,13]
**2003** [428:13] [477:7,13]
**2004** [326:11] [330:8] [396:
7] [405:5] [426:24] [427:17]
[429:16,18,22] [522:16]
**21** [328:16] [429:11,15]
[480:2]
**21.9** [481:15,18,19]
**215** [326:24] [327:]
**2154960300** [327:]
**215-496-0300** [327:]
**22** [328:17] [340:11] [350:15
,18] [429:12,17] [485:1]
[505:1]
**23** [328:18] [484:18] [485:2
,7]
**23418** [493:12]
**24** [328:19] [354:15] [356:22]
[484:22] [493:5,10]
**25** [328:20] [355:6] [356:8,22]
[372:9] [416:2,5] [477:21]
[488:16,20] [489:9,23]
[491:11] [497:17,22] [498:
20] [502:17,22] [504:16]

[505:19]
**2500** [326:15] [327:]
**26** [328:21] [420:14] [515:3
,8]
**27** [367:4] [474:7]
**28** [522:16]
**29** [424:5]

**3**

**3** [508:12]
**3,000** [407:8,9] [408:5,10]
**30** [369:3,12] [370:3,19]
[372:12] [458:7] [464:3,4]
[482:9] [519:14]
**30,000** [338:11]
**30day** [464:3,4]
**30-day** [464:3,4]
**31** [399:6]
**312** [327:]
**3125585691** [327:]
**312-558-5691** [327:]
**331** [328:3]
**34** [479:24]
**349** [328:10]
**35** [327:] [372:12] [398:2]
[475:21]
**36** [475:20]
**361** [328:11]
**366** [328:12]
**371** [328:13]

**4**

**40** [372:10] [434:4] [437:15]
[444:9]
**419** [328:14]
**42** [431:9] [502:1]
**423** [328:15]
**429** [328:16,17]
**43** [442:11]
**45** [374:20]
**484** [328:18]
**49** [497:2] [499:19]
**493** [328:19]
**496** [327:]

**5**

**5** [489:3]
**50** [355:10,13,18] [356:20,22]
[357:2,17] [372:10,12]
[416:3,5] [436:7,16] [497:2
,18]
**502** [328:20]
**515** [328:21]
**52** [462:15]
**558** [327:]
**57** [495:14] [498:12] [499:11
,12]
**59** [471:18] [477:12]

**6**

**6** [397:20] [489:3]
**60** [442:4] [458:7] [464:4]

**60601** [327:10]
**60day** [458:7]
**60-day** [458:7]
**62** [361:13] [369:3,12]
[370:7,20] [503:12]
**64** [503:10]
**65** [503:11]
**66** [439:1]
**67** [492:11,16]
**68** [492:11,16]

**7**

**7** [492:17]
**70** [361:24] [362:19] [365:24]
[381:1] [388:8] [395:20]
[396:3,13,15] [397:1,14]
[398:3,21]
**71** [361:24] [362:19] [366:1]
**73** [457:12]
**74** [453:12,16,23]
**75** [368:1] [369:2,17] [370:16]
[372:7,8,19,22]
**76** [453:12,23,24]
**78** [386:14] [453:16]
**79** [386:14]

**8**

**8** [369:22]
**80** [486:13,20,24]
**855** [502:22]

**9**

**9:08** [326:17] [330:9]
**9:31** [350:6,12]
**90** [350:20] [352:6] [374:19]
[395:20] [396:3,14,16]
[397:14] [398:3,21] [442:4]
**90day** [442:4]
**90-day** [442:4]
**988** [326:24]
**9889191** [326:24]
**988-9191** [326:24]
**99** [406:18,19] [413:1]
[417:14] [427:16] [437:13]
[457:15] [469:24] [470:1,3]
**992000** [413:1]
**99-2000** [413:1]

**A**

**a.m** [326:17] [330:9] [350:6
,12] [394:2,8] [422:22]
[423:6] [443:24] [444:6]
**able** [333:22] [347:16]
[459:21] [501:4]
**aboard** [428:1]
**above** [434:9]
**absolutely** [402:8]
**abstract** [447:2] [451:7]
**accept** [398:22]
**acceptable** [440:4,17,20]
**acceptance** [450:13,14]
**accepted** [373:14] [374:18]

[433:6]
**accepts** [345:17]
**access** [365:7] [368:1,7,13 ,17] [369:18] [370:16] [373:6,11] [378:18] [384:19] [391:22] [393:7]
**according** [489:19] [498:21]
**account** [344:18,19] [350:20] [352:6] [454:10] [456:12] [474:6]
**accounts** [388:11] [454:12] [457:17]
**accurate** [353:17] [361:19] [519:16]
**achieve** [461:19]
**achieved** [458:1] [462:11]
**acknowledgment** [521:1]
**acquisition** [505:7]
**acronyms** [400:8]
**across** [342:14] [359:14,17] [362:5] [414:17] [498:23]
**act** [341:11,20,24] [342:5,9] [343:3,11,17] [461:13] [502:10]
**acted** [382:18]
**action** [326:6]
**active** [388:11] [417:7] [448:17]
**activities** [339:2] [340:4] [414:15]
**activity** [340:1] [429:2]
**actual** [505:7]
**actually** [335:16] [359:6] [360:4] [376:10] [380:5] [398:8,13] [435:10] [437:16 ,17] [456:5] [457:11] [458:23] [474:20] [494:13] [496:9] [501:21] [503:24] [507:14] [510:19]
**add** [347:23] [349:6] [399:2] [438:21] [440:16] [441:18] [476:3]
**added** [439:22] [512:9]
**adding** [381:15] [403:9] [404:17] [406:3] [428:16]
**addition** [337:21] [407:5] [427:5]
**addons** [347:23]
**add-ons** [347:23]
**address** [477:1]
**addtional** [517:5]
**administer** [355:23] [357:12] [359:13,17] [490:16]
**administers** [428:4]
**administrative** [332:13] [333:2,18,23] [394:16] [436:1] [505:9]
**administrator** [353:14]
**administrators** [357:3] [439:5]
**adminstered** [358:14]
**admit** [483:3]
**admitted** [365:14]
**advancepcs** [372:2,7] [429:3] [430:7,11] [449:13] [472:10]

**advantage** [343:8]
**advantageous** [391:24]
**advising** [376:8]
**advocate** [378:24] [379:6] [380:4] [381:16] [383:15] [489:17]
**advocates** [421:14]
**aetna** [376:16,20] [377:2] [390:17] [391:18] [393:2,3] [458:12,14,23] [459:10,20] [460:8,9,11,23] [461:4,6,18] [471:17] [472:3,4,20] [473:1,23,24] [475:11] [476:24] [477:9] [489:5,6,12 ,19] [490:1,12]
**affect** [403:3] [410:17] [476:23]
**again** [334:14] [354:24] [355:20] [365:12] [368:4] [371:1,18] [372:16] [375:22] [381:1] [392:9] [397:5] [410:2,16] [411:9] [412:4] [426:22] [433:19] [440:2] [451:4] [452:5] [465:13] [472:1] [473:4] [487:16] [490:24] [491:10] [505:3,22] [507:1]
**against** [341:7] [373:16,21] [468:18] [508:19,23] [513:8]
**agent** [337:11]
**agents** [405:8,9] [430:3]
**aggressive** [434:10]
**ago** [413:22] [491:4]
**agree** [345:2] [346:20] [347:4] [365:21] [398:23] [402:3] [403:15] [408:21] [409:4,9] [411:5] [423:13] [424:19] [425:23] [444:23] [478:18,20] [491:21]
**agreement** [363:8] [375:15] [432:2,8] [437:18,19,22,23] [438:2,5,14] [446:19] [492:24] [493:15]
**agreements** [428:5] [434:20] [435:24] [437:7] [441:13] [507:6,9,21]
**aid** [483:20]
**al** [326:9]
**albeit** [473:21]
**alike** [418:2]
**allow** [358:5] [376:22] [464:15] [489:20] [490:2] [491:14]
**allowed** [438:20] [448:23] [494:10]
**allows** [494:5]
**almost** [346:2] [362:5] [401:3]
**along** [387:7] [471:13]
**already** [399:11] [409:23] [410:8] [444:10]
**alsoran** [428:21]
**also-ran** [428:21]
**alteration** [441:4]
**alternative** [448:14]

**although** [423:14] [428:12] [491:7]
**am** [336:24] [358:16] [362:24] [382:9] [383:7] [390:12] [405:18] [417:18] [434:18] [443:6] [447:14] [492:22] [506:2]
**amend** [481:13]
**amendment** [328:19] [437:22] [493:14]
**america** [485:13]
**americans** [485:17]
**among** [343:22] [420:9]
**amount** [332:7,12] [333:11 ,19] [334:24] [335:4] [363:24] [394:24] [398:20,24] [439:13] [442:17] [465:10] [472:19] [478:23] [482:5] [509:6]
**amounts** [333:1] [401:20] [476:22] [512:16]
**amp** [503:9]
**analogous** [449:18]
**analogy** [412:4]
**analyis** [408:9]
**analysis** [408:13] [453:17] [454:4,5] [455:20] [456:5,19 ,21,24] [457:4] [472:16] [475:2] [476:7]
**analyst** [474:21]
**and/or** [494:4] [522:20]
**annual** [338:11] [339:17,22]
**answer** [329:2] [332:21] [334:10] [337:2] [340:18] [341:13] [353:4,16] [355:16] [358:18,19] [366:9,11] [379:16] [382:1,11] [404:24] [412:19] [418:21] [427:4] [430:19] [438:6] [443:7] [491:16] [501:20]
**answering** [388:12]
**answers** [521:6]
**anti** [405:9]
**antibiotic** [412:13]
**antitnf** [405:9]
**anti-tnf** [405:9]
**anybody** [484:8] [516:5] [517:13]
**anyone** [351:23] [497:7]
**anything** [352:22] [358:20] [362:10] [365:10] [385:21] [386:22] [414:4] [436:16] [475:9,11,14] [500:20]
**anyway** [384:22] [454:20] [455:19]
**anywhere** [379:6]
**apart** [384:7]
**apothecary** [326:]
**apparent** [410:4]
**appeal** [452:11]
**appear** [353:17] [432:20]
**appeared** [434:24]
**appears** [352:23] [435:3]
**apples** [490:6] [497:24] [511:13]
**applicable** [381:12] [505:20]
**applied** [373:21] [467:22]

[496:17]
**apply** [461:1] [522:19]
**applying** [348:13] [472:20]
**appreciate** [517:21]
**approach** [506:2]
**approached** [461:8]
**approaches** [487:5]
**approaching** [495:7]
**appropriate** [348:8] [416:17] [438:23] [494:3] [519:5]
**approval** [336:7] [409:18] [411:1] [487:5] [488:3]
**approve** [336:1] [418:6] [487:9]
**approved** [326:19] [336:10] [376:10] [411:6] [486:14,19 ,21]
**approximately** [350:20] [353:21] [354:8,19]
**april** [398:11] [502:24]
**area** [356:12] [412:6] [414:9]
**arent** [332:15] [342:16] [379:5]
**argumentative** [380:8]
**argus** [355:22] [356:4] [357:5,11]
**arington** [328:12] [367:5,9,21]
**arise** [410:2]
**arising** [410:5]
**arm** [405:14]
**around** [338:11] [408:18,19] [479:15] [480:2] [482:9] [505:9]
**arraigned** [373:16]
**arrangement** [378:16] [397:6] [454:15]
**arrangements** [357:7]
**arrived** [379:3]
**arriving** [386:17]
**arthritis** [402:24]
**article** [328:18] [484:24] [485:8,23] [488:18] [497:16] [498:21]
**articles** [466:23] [467:1]
**ask** [332:3] [350:14] [352:12] [355:5] [357:22] [358:9] [393:10] [394:10] [402:11,20] [403:11,20] [417:9] [419:9] [434:13] [444:19] [456:14] [460:10] [462:9] [480:24] [486:1] [511:11]
**asked** [410:10] [430:23] [431:2] [451:10] [500:16] [507:20]
**asking** [358:13] [374:22] [376:3] [384:5] [388:13] [403:1] [416:16] [421:6] [467:17] [478:6] [482:1] [487:13] [509:21] [512:8]
**assess** [403:17] [408:22,24]
**assessing** [402:6]
**assigned** [410:1]
**associates** [476:21]
**association** [337:13]
**assume** [334:21] [338:20] [344:22] [359:16] [369:16]

[411:12] [415:8] [416:6]
[425:17] [469:1]
**assumed** [438:9]
**assuming** [382:2] [448:1]
[451:4] [506:20] [507:1]
**atena** [476:10]
**ativella** [496:18]
**attached** [519:11] [521:9]
**attempt** [470:15]
**attempting** [501:1]
**attention** [350:15] [352:13]
[393:4] [412:15] [419:8]
[426:24] [444:8]
**attest** [373:9]
**attesting** [417:18]
**attitude** [417:19] [419:17]
**attitudes** [416:22]
**attorney** [519:13]
**attractive** [445:13]
**attributed** [472:17] [473:7,10]
**attributes** [420:6] [469:6]
**attributing** [407:17]
**authoritative** [394:22,24]
[484:23]
**authority** [515:15,23]
**authorization** [358:21,23]
[359:1,9] [364:8] [365:16]
[385:20] [486:8,12,19]
[487:9,14,21] [488:2,8,15]
[489:10,24] [490:5,8,18,20]
[491:12] [492:3,10] [493:3]
[495:16,22] [496:8,10,15]
[497:3,12,20,23] [498:6,16
,20] [499:3,6,20]
**authorizations** [487:19]
[489:13] [491:21] [497:17]
[498:3] [500:8] [508:22]
[509:7,12] [510:16]
**authorized** [486:24]
**automated** [490:8,9]
**available** [358:5,15] [369:22]
[370:3] [374:17] [389:9]
[399:9,10,11,15] [400:15,17]
[427:16] [428:23] [429:18]
[446:1] [450:1] [507:17]
**avalanche** [451:9]
**avenue** [426:18]
**average** [395:20] [396:4,14]
**aware** [331:15] [345:16,22]
[350:22,24] [359:2] [374:15
,24] [375:7,9,12] [376:4]
[377:1,19] [378:5] [384:2,6
,8,16] [390:2] [394:21,23]
[405:13] [407:9] [419:16]
[421:16] [422:8,12,14]
[428:18] [434:18] [437:6,14]
[442:10] [451:15] [458:18]
[460:10,17] [478:12,14]
[487:11,17] [496:13] [501:
6] [503:14] [504:19,21]
[506:8]
**away** [340:8] [388:15,18]
[459:24] [486:22] [498:7]

B

**back** [333:1,20] [336:2]
[350:11] [357:23] [368:11]
[370:9] [373:19] [375:11]
[378:3] [383:17] [388:7]
[391:8] [394:7] [395:15]
[405:3] [410:8,9] [413:10,19]
[422:7] [423:6] [426:23]
[428:8,19] [429:4] [430:22]
[431:20,21] [441:7] [444:5]
[462:1] [466:10] [467:8,11]
[474:14] [485:4] [486:22]
[505:3] [508:13] [514:17]
[516:21]
**background** [379:3]
**backlash** [513:8]
**backs** [511:16]
**backup** [341:14]
**bad** [495:9]
**balancing** [461:13]
**bar** [480:7]
**barr** [448:1] [506:11] [507:13
,21]
**bars** [480:9,13] [481:17]
**based** [334:19] [347:23]
[368:15] [381:20] [383:8]
[399:13] [407:16] [410:18]
[413:12] [421:22] [428:4]
[441:1] [454:2] [499:7]
[508:24] [509:1]
**basically** [342:14] [353:12]
[360:10] [372:21] [373:1]
[384:20] [442:5] [460:2]
[463:11,15] [465:9]
**basis** [340:5] [341:7] [344:20]
[411:24] [412:21] [421:1]
[450:13] [455:16] [456:22]
[504:9] [509:10]
**bates** [374:14]
**beckett** [326:]
**become** [399:9]
**becomes** [401:12,14] [410:
3]
**becoming** [356:1]
**beginning** [326:17] [423:5]
[508:12]
**begins** [330:3]
**behalf** [330:13]
**behaved** [473:23]
**behavior** [484:1]
**behind** [364:17] [497:7]
[500:3]
**beings** [461:22]
**belief** [482:19] [497:15]
[499:19] [509:11] [512:20]
[514:9]
**believe** [335:20,21] [352:8]
[354:12] [356:23] [370:13]
[395:18] [396:2,12] [420:15]
[443:20] [453:23] [463:3]
[471:13] [497:1] [501:3]
[510:12] [511:22] [516:15]
**beneficiary** [359:14]
**benefit** [332:17,23] [333:13
,16] [340:9] [341:4] [352:17
,20] [355:23] [356:3] [358:14]
[359:18] [401:16] [427:21]

[428:4] [483:7] [494:5,10]
[499:1]
**benefits** [328:10] [332:8]
[347:23] [401:9]
**best** [341:8] [365:1] [398:18]
[416:1] [482:13] [505:17]
**bet** [396:18] [453:4] [512:23
,24]
**better** [390:14] [391:4]
[392:24] [439:21] [458:24]
[472:2,9] [473:11] [480:21]
**betweeen** [397:14]
**beyond** [386:23] [387:2]
[415:14] [422:9] [444:20]
[475:11] [511:23]
**bifurcating** [498:4]
**big** [351:1] [372:23] [377:23]
[455:19]
**bigger** [412:5]
**biggest** [385:6]
**bind** [344:5] [345:4]
**biologic** [405:8]
**bit** [440:8,15] [453:13]
[513:20]
**black** [400:22]
**blind** [407:22]
**blinded** [402:16] [445:18]
**block** [385:21] [493:1,2]
[500:15,19]
**blocks** [492:16,19] [493:23]
[494:4,8,9,18] [501:6,15,21]
[508:18] [510:15]
**blue** [357:9] [461:4]
**board** [336:17,18,22] [337:
5,6,8,19] [362:6]
**book** [374:20]
**bother** [489:12]
**bottom** [367:13] [457:13]
[458:11]
**boulevard** [326:] [330:15]
**bounce** [414:13]
**bounces** [490:10]
**box** [400:23] [460:21]
**bracketed** [393:6]
**brain** [415:15]
**brand** [398:2] [450:4]
**branded** [359:19,21] [360:12]
[378:9]
**break** [363:24] [393:21,23]
[497:24] [508:2] [509:3,5]
**breakdown** [361:9] [362:19]
**breaking** [431:17]
**breakout** [362:1]
**bridge** [342:19]
**briefly** [444:10,16] [471:18,24]
[506:18]
**bringing** [412:8] [428:1]
[506:18]
**broadens** [400:17]
**broader** [378:18] [386:23]
**broken** [361:10]
**brooke** [327:] [456:19]
**buckets** [506:19]
**budget** [502:10]
**bullet** [367:24] [424:8]
**business** [339:7,16] [340:2]
[341:4,17] [342:2,18]

[343:6,20] [347:2,22] [367:
3] [370:15] [374:20] [458:1]
[460:5] [461:5] [468:4]
[503:16]
**businesses** [342:17]
**butt** [502:14]
**buttressing** [416:20]
**buy** [449:16]
**buyers** [339:5]
**buzz** [466:22]

C

**c101704** [326:9]
**c-1-01-704** [326:9]
**calcium** [430:2]
**calculate** [332:23,24] [333:
2] [461:14]
**calculated** [506:3]
**calculating** [333:4]
**calculations** [399:14]
**california** [337:12,14]
[349:17] [350:1] [357:10]
[416:7] [461:4]
**call** [463:12] [516:15]
**callback** [385:13]
**called** [335:1] [404:23]
[427:7] [501:1] [516:7]
**calling** [404:3]
**calls** [339:16] [467:8]
**cancel** [458:8]
**cannot** [424:24] [425:1,2]
[501:23]
**cant** [332:20] [349:5] [370:23]
[502:14] [511:23]
**captive** [499:2]
**cardinal** [447:18]
**care** [339:4,7,8] [349:17]
[350:1] [367:3,20] [368:2,23]
[369:17] [370:17] [371:19,21]
[375:15] [376:8] [389:1]
[404:3] [415:10] [437:8]
[445:3,6] [447:17] [453:18
,19] [454:3] [470:10,19]
[486:23] [487:8] [507:15]
**careful** [359:12]
**carefully** [519:4]
**caremark** [372:3,8] [377:22]
[378:4,6,13,17] [379:7,22]
[380:1,14,20] [381:4,11,14]
[382:1] [383:17,18] [384:3
,16] [386:8] [388:8] [439:6]
**cares** [375:10]
**carlo** [337:12]
**carry** [471:14]
**carter** [328:11,12,13] [367:
5,6,13,19] [368:19] [369:16]
[370:17] [371:22]
**carters** [363:18]
**carve** [353:7] [355:20]
**carved** [352:17,20]
**carvein** [353:7]
**carve-in** [353:7]
**carveout** [355:20,21]
**carving** [356:2]
**case** [331:13,16,24] [341:3]

[344:21] [360:3] [361:8]
[363:19] [364:11] [382:19,23]
[383:1,8] [386:24] [393:5]
[402:22] [406:11] [416:19]
[419:14] [420:1] [427:12]
[441:10] [446:16] [447:22]
[456:16] [458:18,20] [459:
20] [466:19] [483:19] [484:
9] [507:20] [515:9]
**cases** [387:9] [486:20]
**casey** [328:11]
**cash** [482:21] [483:16,22]
[484:11,14]
**casio** [414:13]
**catch** [495:11]
**categories** [400:11] [410:1]
[428:22] [444:13]
**category** [400:14] [401:4,12]
[428:22] [430:2] [441:6]
[451:15] [455:15] [496:11]
**cates** [336:14]
**cathy** [335:22]
**caught** [492:6]
**cause** [505:16]
**caused** [469:4]
**causes** [446:13]
**cenestin** [360:5,10,15]
[361:14] [363:11] [364:1,20]
[367:24] [369:21] [370:15]
[372:23] [373:21] [374:5,16]
[375:13,18] [376:8,10,20]
[377:2,16] [378:7,14,17]
[383:22] [384:3] [385:7,18
,22] [386:3,24] [387:3,15]
[388:15,17] [389:1,6,11]
[390:4,14] [391:9,19,22]
[392:3,23] [403:20] [404:3
,11] [405:3,6,16] [406:4]
[411:12,14,21,23] [412:10
,23] [413:6,17] [414:24]
[415:3,16,22] [416:12]
[417:4,9,16] [418:2] [420:22]
[421:2,14] [422:9] [426:18]
[427:8] [428:7,16,20]
[430:9,13,22,24] [431:7,18
,19] [432:7,9,14,17] [439:21
,22] [441:11,18] [446:20,21]
[447:24] [448:5] [449:2]
[451:2] [452:2,10,22]
[453:10,21] [457:16] [458:
1] [459:3,13,22] [460:16]
[462:10] [463:8,23] [464:17]
[465:7,21] [466:1] [470:21
,24] [471:2,8] [472:2,8,23]
[477:16] [478:8] [482:16]
[483:17,22] [487:12] [488:
3,4] [490:2] [491:7] [492:3]
[495:22] [496:10,18] [497:
3,20] [498:21] [499:20]
[500:19] [501:9,22] [506:12]
[508:19,23] [509:7,11,16]
[510:3,9] [511:1,9,19,21]
[512:3,9,20] [513:5,15]
[514:4,6,11,18,22]
**cenestins** [391:1] [438:15]
[466:20] [514:2]

**ceo** [337:12,21]
**cephalosporin** [412:14]
**cephalosporins** [412:17]
**certain** [331:11,22] [334:19]
[387:23] [435:11,17] [446:
14] [470:10,19] [490:15]
[506:3] [510:2]
**certainly** [461:3] [477:2]
[492:6] [506:22]
**certification** [522:18]
**certified** [382:22]
**certify** [521:4] [522:4]
**certifying** [522:21]
**chains** [484:3]
**chairman** [336:16,18]
**change** [340:7] [366:6,11]
[451:10] [461:23] [464:5]
[477:3] [520:4]
**changeover** [335:21]
**changes** [521:8]
**changing** [502:15]
**charge** [339:13] [460:7]
**charged** [333:18] [339:5]
[483:15]
**charging** [332:13] [339:15,17
,21] [483:21] [484:11]
**chart** [352:23,24] [353:6,8]
[362:2] [369:20] [370:6]
[372:6] [381:2] [473:12]
[477:24] [497:5] [498:12]
[509:4]
**checked** [512:24]
**checks** [463:13]
**chicago** [327:10]
**chief** [336:24] [337:7]
**chitchat** [352:3]
**chitchatted** [414:1]
**choice** [494:8]
**cholelithiasis** [407:20]
**cigna** [461:7] [473:22]
[474:1] [504:17]
**circle** [356:14,16] [370:23]
**citation** [398:7]
**cite** [354:9,15] [373:8]
[405:18] [421:12] [436:2]
[437:15] [458:12] [475:17,19]
[492:12] [501:4,24] [510:23]
**cited** [354:13] [368:16]
[386:13] [387:9] [398:14]
[424:2,21] [435:8] [438:10
,12] [439:2,4] [469:21]
[474:4,12] [475:20] [478:4]
[479:23] [493:11] [500:11,13]
[501:12]
**citing** [438:16] [472:14]
**city** [355:22]
**civil** [326:6]
**claims** [357:3]
**clarify** [508:16]
**clarifying** [481:1]
**class** [334:22] [347:15]
[399:12] [400:21] [417:11]
[421:17] [423:10] [444:15]
[449:20] [450:4] [452:5]
[454:7] [468:2] [496:16]
[500:8]

**classes** [442:15] [443:2,6,14]
[449:19]
**classified** [355:11,19]
[358:1] [399:13] [428:21]
**classify** [340:22]
**clause** [442:5] [450:11]
[458:7]
**clear** [357:8] [405:12] [436:
14] [454:13] [455:3] [457:10]
[458:6] [481:6]
**clearly** [355:19] [384:17]
**click** [436:24]
**client** [332:23,24] [340:13,17]
[341:2,4,6,11] [342:12,13]
[343:8] [344:16] [345:18]
[346:1,10,22] [347:1]
[357:7] [394:15] [397:6,7,8
,10,11] [410:3] [428:1]
[439:10] [457:9] [460:7]
[512:5,9,15]
**clients** [341:8,24] [342:6,10]
[343:12] [344:6,12] [345:10]
[346:3,16,21] [381:17]
[397:5] [401:15] [402:23]
**clinical** [402:15,16] [407:9]
[408:22] [420:23] [421:3,13]
[423:17] [438:22] [450:20]
[509:18]
**clinically** [433:6] [439:20]
**closed** [358:3] [359:6]
[361:11] [369:22] [372:9,11
,13] [373:1]
**closer** [479:11,12]
**cm** [522:]
**cohen** [327:] [331:23] [332:
18] [334:1,8] [335:15]
[345:7,19] [346:13] [347:3]
[348:24] [351:9] [358:8]
[360:17] [363:13] [364:12]
[365:4,19] [366:7] [369:19]
[370:22] [371:13] [374:21]
[375:1] [378:10] [379:10]
[380:7] [381:5,18] [382:3,8
,14] [384:5] [386:7] [387:6]
[390:5] [392:17] [393:18,22]
[395:21] [417:24] [421:5]
[422:17] [426:3] [440:1]
[441:20] [445:15] [455:24]
[457:2] [459:6] [463:21]
[464:20] [465:14] [480:20]
[481:3] [485:3] [494:23]
[495:5,10] [496:20] [501:8]
[516:18]
**color** [481:2,3]
**colors** [480:5]
**column** [397:21]
**coming** [405:4] [415:6,16]
[440:8] [449:22] [466:21]
[476:4] [482:4]
**comment** [416:20]
**commercial** [407:19]
[481:7,8,18] [503:19]
[504:2] [506:13,23]
**commission** [521:20]
**committee** [335:8,9,12]
[336:6,8,11] [399:16]

**[400:7,8,9]** [401:3,10]
[403:16] [404:15] [405:20]
[408:21] [409:11,15,20]
[410:13] [411:6] [416:16]
[417:7] [427:23] [428:12]
[429:7] [434:1] [438:20]
[439:10] [440:2,7,10]
[441:10] [442:6] [450:24]
**committees** [399:8] [404:5
,8] [406:6] [429:3] [439:20]
[440:3,13,20]
**common** [356:1] [440:9,13]
[483:1,4,12] [484:2,3,5]
[509:15]
**commonly** [405:4]
**community** [411:15,23]
[412:22] [416:12] [417:3,14
,15,18,19]
**companies** [339:12] [351:1
,3,6] [353:22] [354:17]
[355:11,22] [362:1] [364:19]
[366:2] [395:4] [453:18]
[457:24] [458:16] [487:8]
[499:15]
**company** [337:22,24] [338:
3] [347:15] [354:15] [365:1]
[388:9] [461:19] [468:23]
[516:2,3]
**companys** [469:5]
**compare** [332:16] [333:21]
**compared** [393:1]
**comparisons** [450:21]
**compete** [347:22] [450:13]
[455:14,15]
**competence** [453:6]
**competing** [347:21]
**competitive** [341:7] [402:12]
**competitor** [449:21] [450:12]
[452:18,23]
**competitors** [347:21] [434:
12,17] [469:4] [472:18]
[476:16]
**complaint** [454:23] [455:1]
**complaints** [451:9]
**complete** [429:23] [449:10]
[487:14]
**completely** [341:14] [344:7
,8] [345:5,24]
**completion** [522:8]
**complex** [334:9] [358:9]
**complication** [401:1] [410:
4]
**complications** [403:5]
**compounds** [452:6]
**computer** [414:3]
**concentrate** [466:19]
**concentrated** [427:2]
**concentrates** [351:20]
**concentration** [348:4]
[351:16,24]
**concern** [351:19]
**concerning** [332:12] [346:10]
[399:9] [419:11,17] [457:14]
**concerns** [351:15]
**concluded** [518:11]
**concludes** [518:6]

conclusion [412:22] [440:18] [455:6] [483:7]
conclusions [344:21] [364:11] [365:18] [368:6] [371:3] [372:16,20]
conduct [341:3] [471:14]
conformance [425:21]
confronted [463:15]
confused [399:23]
conjugated [362:4,21] [411:19] [413:4,6] [415:5] [421:17] [422:1] [423:9] [434:8,23] [435:3,18] [436:10,12] [437:3,9] [439:3] [452:8,19] [466:4] [468:6]
connection [337:18] [338:5] [344:17] [348:14] [358:22] [469:3] [517:14]
consequences [406:3]
considerably [490:19]
considerations [409:5]
considered [371:2] [377:16] [400:13] [428:16] [473:9] [491:7]
considering [416:18]
consistency [473:16]
consistent [353:8] [408:3] [424:12] [443:19] [449:7] [473:18] [476:1] [489:11] [506:1]
consistently [340:23] [343:13]
constantly [402:11,20]
consultant [414:9]
consultants [401:15] [427:2,22] [476:20]
consulting [335:23] [349:18]
consumer [445:10] [447:9]
consumers [450:3]
consumes [489:2]
contact [414:16]
containment [486:4]
contending [423:9]
context [340:19] [342:23] [347:15] [409:2] [482:12]
continue [375:10,16] [376:20] [378:7,8] [383:23] [384:3] [466:3]
continued [326:13]
continues [367:24] [370:16]
contraceptive [451:22]
contract [332:5] [334:24] [338:6,11] [346:23] [353:15] [362:20,21,22] [378:14] [379:15,22] [380:9,13,21,23] [381:3,11,14,24] [384:18,19] [387:19] [388:4,19] [389:13] [431:18,23] [436:13] [437:16] [438:17] [439:9,14,19,24] [442:5,9] [454:15] [455:23] [457:9,16] [458:3,8,9] [459:14] [460:19] [470:10] [492:23] [493:19] [500:20] [501:4] [511:6]

contracted [380:18]
contracting [328:20] [355:24] [376:22] [434:9,18] [443:21] [470:15] [492:4] [501:2] [502:24]
contractors [426:5]
contracts [333:8] [344:3] [346:12] [356:6] [380:1] [381:21] [387:22] [388:22] [389:16] [400:19] [401:13] [434:11,14,16,21,24] [435:5,10,11,17,22] [436:4,17,23] [438:20] [441:8] [442:1] [450:9] [503:21] [504:4,8] [505:1,18] [507:3,13] [508:24]
contractual [342:18] [362:3] [378:15] [379:8] [388:10] [395:4] [501:17]
contrary [372:18]
contrast [405:12]
control [522:20]
conversation [349:6]
conversations [413:23] [415:5,9,18,21] [416:6] [457:8] [516:17] [517:8]
convoluted [343:6]
copay [358:6] [359:8] [363:11] [364:7] [374:17] [376:11,23] [377:18] [378:8] [383:23] [384:4] [385:8,19] [386:4] [387:4] [459:2] [460:3,12] [479:10] [482:2,5,20] [483:16] [484:15] [489:21] [490:3] [491:9,15]
copayment [365:10,15] [373:14] [401:20] [428:3] [464:13,24] [475:19] [476:22] [477:4] [478:19,23] [511:22] [512:16]
copayments [467:10]
copays [401:24] [479:13,15] [494:4,9]
copy [349:16] [361:7] [367:2] [429:15,17] [480:21] [481:4,6] [515:8,17,20] [516:9]
core [485:22]
corp [326:6]
corporation [338:18]
correct [331:24] [332:1] [333:23,24] [334:7] [336:11,20] [338:7,21] [342:22] [348:6,23] [355:16] [356:23] [363:12] [370:4] [371:4] [372:1,4] [374:8] [379:17] [380:15,21] [381:9] [382:2,4] [386:20,21] [388:2,6,7,19] [389:14,18,19] [393:11] [394:17,18] [398:12,14,15] [402:1] [403:18] [404:18,19] [405:17] [407:2,3] [414:19] [416:24] [418:8,9] [420:1,11,16,17] [424:3,4,19,24] [425:4] [426:21] [427:9] [428:9,13,14] [430:3]

[431:14] [433:19] [435:12] [437:5] [440:16] [441:2,19] [442:23,24] [444:18] [445:8] [447:21] [463:1] [469:7,8] [472:12] [474:9,16] [479:1,4,5] [481:16] [483:9,10] [485:11] [486:10] [490:23] [493:16,17,21] [494:11,15] [498:16,18] [499:22] [502:9] [504:2,17] [507:11,23] [508:19,20,23] [509:8,9,12,13] [511:10] [515:1] [521:5]
corrections [519:4,6,10] [521:8]
correctly [412:18]
correlate [478:10]
cost [332:16,17] [333:16,18,23] [334:21] [448:2] [456:4,18,21,23] [457:4] [460:2] [464:15] [465:3,5,10] [467:9] [475:22] [486:4] [488:15,21] [489:9,23] [490:7,18] [491:11] [497:13,17] [498:20]
costly [486:3]
costs [332:24] [333:13] [334:15,18] [339:6] [486:12]
couldnt [439:11]
counsel [330:16] [331:12,22] [393:10,14,16,17] [507:20]
count [436:24]
country [414:17]
couple [511:11]
course [360:2]
court [326:2,20] [330:6,18] [331:2] [519:17]
cover [340:8] [354:17] [367:4]
coverage [375:13,18] [398:10]
covered [354:15] [385:5] [400:20] [444:9] [482:10]
covers [430:1]
crannies [343:7]
created [379:17] [434:19] [454:9]
creating [380:5] [381:15] [382:12] [430:12] [434:20]
criteria [411:16]
critical [434:21] [449:4] [466:18] [468:11,14]
cross [357:9]
curious [456:22] [473:8]
currently [336:16] [342:5] [345:23] [346:9] [400:15] [449:9]
custodian [335:16]
custody [515:14]
custom [401:23]
customer [347:23,24] [395:15] [396:6] [454:19,24] [456:22]
customers [426:9,11] [455:14,18,23] [456:6,11,24] [461:13,16] [488:1,2]
customize [401:23]

cvs [483:19]
cycle [478:16]

D

d/b/a [326:6]
daily [340:5] [349:24] [414:16]
damage [347:24] [473:16]
damaging [468:19,21]
dangerous [412:11]
data [331:12] [354:24] [355:2,15] [357:15] [360:8] [393:9,11,14] [399:9] [406:12] [408:24] [478:3] [496:1,14] [498:11] [499:13] [500:3,4] [505:23]
date [330:8] [349:21] [477:14] [519:8] [521:12]
dated [367:4] [457:15] [522:16]
david [326:13] [328:2] [330:4] [331:5] [485:3] [518:7] [522:9]
day [330:3] [487:9] [510:7] [521:17]
days [519:14]
dcp [505:14]
deal [401:19] [455:19]
dealing [516:11]
deals [425:18]
decade [407:4]
decide [347:2] [359:6] [440:20] [441:11] [442:7] [446:18] [489:12] [490:1]
decided [374:2] [439:20] [458:15] [487:17] [511:8]
decides [352:16]
deciding [499:23]
decision [359:3] [401:3,11] [409:5] [424:7,8] [425:7] [430:15,17] [451:1] [468:22] [470:5,9,18] [497:13]
decisionmaking [424:7,8]
decision-making [424:7,8]
decline [476:9,13]
declined [340:23]
decrease [474:7] [475:10,15]
decreased [454:16]
decreasing [457:16]
deemed [519:16]
define [347:8] [356:12] [425:3] [505:5]
defined [391:11] [455:8] [505:6]
defining [369:21] [455:9]
definite [468:3]
definitely [476:23]
definition [347:18] [348:3,13] [349:2] [370:6] [373:4] [434:7]
definitions [364:4]
definitive [407:22]
degree [452:9]
deliberative [424:16]
delivery [448:23,24] [452:15]

**delta** [356:7]

**demand** [376:21] [426:14] [444:24] [445:7,10] [447:9 ,10,20,21] [462:3,4] [465:23] [513:12]

**demanding** [403:2]

**demonstrate** [366:6]

**demonstrated** [431:9] [479:24]

**demonstrating** [475:22]

**denials** [486:22]

**denied** [490:11]

**department** [397:23]

**depend** [512:5]

**depending** [460:13] [478:22] [503:11]

**depends** [411:9]

**deponent** [521:1]

**deposing** [519:13]

**deposition** [326:13,22] [329:1] [330:4,9,14] [360:7] [363:18] [364:2] [365:22] [418:17] [518:7,11] [519:3 ,11,14,16] [522:5,9,11]

**depression** [402:18]

**derived** [396:9] [452:12]

**derives** [451:5]

**describe** [388:24]

**describes** [419:22]

**description** [328:8] [350:18]

**design** [401:15] [414:14] [428:3] [494:5,10]

**designed** [359:5] [448:8]

**desire** [425:9,10]

**despite** [439:18]

**detailing** [472:19] [476:16]

**determine** [361:18] [401:13] [440:4] [475:14] [509:15]

**determined** [441:17] [510:20]

**determines** [440:3] [462:2]

**develop** [426:10]

**developed** [406:3]

**developing** [426:11]

**device** [414:4]

**diagnostic** [328:14]

**didnt** [352:10] [355:3] [364: 2] [367:14] [381:14,24] [387:12] [393:8,9,10,14] [417:23] [419:20] [435:10] [436:24] [438:16] [461:10] [464:22] [479:18] [480:18] [481:3] [504:6] [509:24]

**diet** [410:3]

**difference** [356:7] [431:19] [459:15] [464:8,22] [475:23] [478:18,20,24] [479:2,4,11 ,22] [482:2] [514:1,3]

**different** [349:21,22,23] [363:5] [397:5] [408:4] [417:22] [433:16] [434:2] [441:5] [447:8] [454:19] [469:2] [479:4] [480:5] [488:9]

**differential** [421:18] [494:4 ,9]

**differentials** [475:20,22]

[479:10,13] [482:3]

**differentiated** [397:9]

**differently** [473:23]

**difficult** [450:12]

**difficulty** [333:3]

**direct** [327:] [355:24] [398: 1,4] [505:14] [522:20]

**direction** [329:2] [416:14]

**directly** [388:21]

**director** [367:20] [368:23] [371:21] [515:23]

**directors** [336:22]

**disadvantage** [514:11]

**disadvantaged** [373:1] [374:5] [385:23] [386:18] [387:15]

**disagree** [363:15] [420:19] [426:6] [439:17]

**disclose** [344:2,10,11,14] [345:5]

**discloses** [345:24]

**disclosing** [346:9]

**discount** [503:9,10,19]

**discounted** [503:15]

**discounts** [503:23] [504:1] [505:1]

**discourage** [494:2]

**discriminated** [468:17]

**discuss** [342:4] [516:20]

**discussed** [357:10] [418:15] [444:15] [457:17] [458:21] [463:24] [465:24] [482:24] [501:15] [511:4]

**discussing** [362:17] [453:5] [475:24] [502:9] [509:3]

**discussion** [350:8] [377:8] [423:1] [450:6] [453:14] [486:2] [502:2] [503:8] [505:4]

**discussions** [351:23] [484: 8] [497:7] [516:4,22] [517:1 ,13]

**disease** [407:19,20]

**disinterested** [507:17]

**dispensing** [385:12] [388:20] [505:8]

**disproportionate** [468:19,21]

**dispute** [331:18,19] [496:7]

**disputing** [441:13]

**distracted** [500:17]

**distributed** [336:6] [338:19]

**distribution** [354:4]

**district** [326:2,3,20] [330:6]

**division** [326:4]

**dobie** [327:8] [328:3] [330:20 ,23] [331:3,7] [333:9] [334: 2,11] [335:18] [345:12,21] [346:19] [347:5] [349:1,14] [350:3,13] [351:13] [358:17] [360:21] [361:4] [363:16] [364:15] [365:11] [366:3,12 ,23] [369:24] [370:24] [371:9,14,16] [375:2,4] [377:12] [378:19] [379:11] [380:11] [381:6,22] [382:5 ,10,16] [384:8,11] [386:9,11]

[387:7,16] [390:7] [392:19,21] [393:24] [394:9] [395:23] [396:1] [418:4,24] [419:6] [421:9] [423:7] [424:1] [426:8] [429:14,20] [440:12] [441:22] [444:7] [445:20] [456:2] [457:21] [459:16] [464:7] [465:1,16] [467:16] [480:22] [481:10] [484:21] [485:1,6] [493:8] [495:3,8,12 ,19] [496:22] [501:10,18] [502:20] [508:1,14] [515:6] [517:21] [518:2]

**doctor** [403:7] [450:13] [462:4] [463:8,13]

**doctors** [339:10,11] [413:24] [414:10,23] [433:17] [462: 21]

**document** [328:9] [349:16,19] [361:7] [364:6] [365:14] [366:24] [367:15] [370:18] [371:11,17] [372:18] [374: 12,23] [375:1] [376:1] [380:5] [381:16,19] [384:6 ,7] [387:12] [395:5] [398:13] [419:10,22] [423:20] [424: 2,20] [457:13,14,18] [473:16] [492:23] [493:10] [495:17] [498:13] [500:10] [502:23] [503:1,4] [507:4]

**documents** [329:8] [331:11 ,14,22] [332:6] [360:19] [362:12,14] [364:22] [372: 5] [373:8] [374:1,3,6] [382: 13] [386:5,16] [387:5] [397:19] [426:16] [435:7,8] [439:2] [443:20] [449:3,6] [456:9,18] [457:8] [473:19] [474:13] [475:21] [476:2] [482:12] [483:8] [492:1] [507:6] [510:24] [515:10,11 ,12,14,24] [516:6,11] [517: 5,10,15,18]

**doesnt** [346:24] [365:9] [369:2] [380:6] [382:13] [425:24] [431:13] [440:4] [457:19] [474:8] [477:1] [480:3] [487:20] [493:22] [495:1]

**doing** [333:3] [339:7] [342: 17] [346:17,18,22] [380:3] [384:20] [414:5,6] [427:7] [441:14] [442:9] [455:20] [473:11] [482:12] [483:20] [484:11] [495:9] [497:19] [519:7]

**dollar** [396:11] [478:23]

**dollars** [344:14] [396:13] [406:4] [438:24] [458:2,15] [459:3,12,19,20] [460:14,16] [479:17] [488:16,21] [489: 9,23] [491:11] [497:17,22] [498:20]

**dominant** [434:7] [449:21] [455:12,13] [467:22] [468: 5]

**dominate** [353:22] [354:9]

**dominating** [347:15]

**done** [364:16] [390:14] [391:19] [392:23] [407:22] [408:9] [409:12] [416:21,24] [420:1] [441:19] [450:19,20 ,22] [472:2,8]

**dont** [330:23] [331:17] [334:22] [337:2,15] [341:13] [343:19,23] [347:11] [348: 1] [351:10] [352:4,8] [353:23] [354:21] [356:23] [357:21] [358:18] [359:10] [364:3,8 ,24] [365:21] [367:8,17] [370:5] [373:4] [375:3] [379:24] [382:24] [385:4] [387:18] [388:4,16,22] [389:5] [390:20] [391:6] [392:5,12,16,20] [395:14] [398:17] [402:1,20] [404:24] [405:7] [408:12,16] [418:13 ,24] [419:13,15] [422:20] [424:18] [430:16] [431:24] [432:12] [433:21] [435:6] [438:3,7] [439:12,17] [440:21] [446:17] [447:5] [449:20] [450:24] [451:13] [453:2,6] [455:20] [456:8,11] [457:9] [459:8] [461:22] [462:11,12] [466:11] [476: 12] [478:1,5] [479:7] [488:13] [491:18,19] [496:3] [499:24] [500:2,5] [501:2,16] [505:22] [507:4] [509:20] [511:4,20 ,22] [513:1,2,18] [515:11,17 ,19,23] [517:7,17,22]

**dosage** [447:10] [464:18]

**dosages** [446:1]

**dose** [463:11,14] [464:1,10] [465:9]

**double** [407:22] [463:11,24] [464:10,15] [465:9] [482:5]

**down** [361:10] [363:24] [457:20] [515:20]

**downside** [455:3]

**dr** [330:20,22] [331:8] [394: 10] [508:15] [515:9]

**draw** [350:14] [419:8] [444: 8]

**drive** [327:] [425:21]

**driven** [424:9]

**driving** [447:20,21] [477:3]

**drug** [328:16] [333:4,6] [335:1] [350:21] [352:6] [358:4,5,14] [365:24] [373:6,11] [398:2,9] [399:4 ,14] [400:12,21,24] [401:11 ,16] [402:14,17,19] [403:5] [406:7] [409:7,10,24] [410:6,13,18,22,24] [411:6 ,9,10] [412:2,3,8] [416:18,23] [417:8,10] [425:1,2] [426:20] [428:21] [429:15] [431:7] [432:16] [433:2] [440:3,8] [441:5,11] [442:15] [443:2 ,14] [444:12] [445:16]

[446:8,14] [448:6,24] [449:
4,15,21,23] [452:15] [460:6]
[464:24] [466:22] [467:3,5
,7,13] [468:2,3,16] [497:14]
[510:13,24] [511:2] [515:18]
**drugs** [347:15] [399:9,12]
[400:9,17,20] [401:4,5,7]
[402:22] [403:2] [409:21,23]
[410:8] [412:24] [413:2]
[414:19] [421:17] [423:12]
[429:8] [433:5,10] [434:23]
[443:5] [444:12,14,21]
[445:1,7,11,14,22] [446:2]
[485:23]
**drugstores** [414:8]
**duly** [522:5]
**dur** [377:24]
**dur10671** [374:14]
**dur10672** [377:15]
**durable** [339:12]
**duramed** [361:7] [364:24]
[367:20,22] [368:24] [371:
18,20,22] [374:16] [375:10
,16] [383:1] [404:1,21]
[405:12] [407:2] [419:14]
[427:6,14,16] [448:1]
[450:17] [458:16] [460:20]
[461:8] [469:11] [470:18]
[483:8] [487:12,17,20]
[489:20] [506:4,10] [507:5
,12,21]
**durameds** [374:6] [386:5]
[387:5]
**during** [336:5] [413:1]
[414:5] [419:14] [467:2]
[470:21] [476:4] [478:8]
[482:15] [505:21] [514:18]
**duties** [475:5]

E

**earlier** [354:13,14] [433:21]
[450:11] [455:7] [463:24]
[513:20] [514:16]
**easy** [343:7]
**economic** [402:20] [404:13
,16,21] [405:7,10,13,15,23]
[406:2,5] [409:4] [450:22]
**ed** [337:10]
**edits** [373:13]
**effect** [454:14] [458:10]
[462:17] [468:4,7,19,21]
[474:3] [508:23]
**effective** [373:15] [498:8]
**effectively** [364:23] [468:18]
**effectiveness** [402:17]
[423:17] [511:15]
**effects** [421:18,19]
**efficacy** [406:12] [409:6]
**effort** [340:20] [345:9]
[363:22]
**efforts** [493:24]
**either** [344:5] [345:4] [352:
16,23] [362:3] [400:11]
[405:15] [439:10] [440:23]
[442:4] [465:23] [474:17]

[480:18] [486:24] [488:5]
[496:16] [497:12] [506:5]
**elect** [401:16,21]
**else** [347:2] [362:11] [391:9]
[400:12] [411:11] [414:5]
[500:21]
**email** [328:11,13]
**e-mail** [328:11,13]
**emails** [474:14]
**e-mails** [474:14]
**employed** [333:13] [460:20]
[508:18]
**employees** [338:1]
**employer** [343:16] [352:16]
**employers** [398:5]
**enbrel** [402:23]
**encounter** [463:6]
**encouraged** [333:5,6]
**end** [332:21] [334:6,14]
[335:2] [378:16] [396:21,24]
[400:10] [422:21] [459:8]
[487:8] [508:5]
**ended** [432:22]
**endrun** [378:16]
**end-run** [378:16]
**enforcement** [425:20]
[510:14] [511:1,16,18]
**enhance** [414:10] [501:13]
**enhanced** [459:13]
**enjoyed** [505:4] [518:4]
**enormous** [373:10]
**enough** [355:24] [418:2]
[431:21] [442:3] [469:14]
[505:23]
**ensure** [494:1]
**entail** [439:13]
**entered** [434:10,14,16]
**entire** [350:21] [429:8]
[435:10]
**entities** [355:21]
**entitled** [328:9]
**entity** [341:2] [488:24]
**entrance** [434:12,17] [438:
15]
**environment** [342:2] [402:16]
[447:17] [470:16] [486:23]
**equal** [366:1] [468:2] [473:22]
[506:21]
**equation** [423:15]
**equivalent** [411:24] [413:1,18]
[416:13] [417:4,16] [418:12]
**erected** [486:3]
**errata** [519:6,7,10,13]
[521:9]
**ert** [496:16]
**esquire** [326:22] [327:8,]
[330:13]
**essence** [339:14] [352:15]
[357:2] [411:11] [450:3]
**essentially** [411:15] [446:6
,18] [451:2] [462:21]
**established** [411:20] [412:
7] [413:4] [449:23] [450:8]
[455:13]
**estimate** [397:24] [398:19]
[415:24] [416:1] [495:10]

**estradiol** [389:17] [433:2,12]
[473:10]
**estrogen** [362:4,21,22]
[363:9] [391:23] [411:19]
[412:24] [413:6] [415:6]
[418:12] [429:8] [434:8,9,23]
[435:3,18] [436:10,12]
[437:3,9] [439:3,4] [452:8,19]
[466:4]
**estrogenlanguage** [362:21]
**estrogen-language** [362:21]
**estrogens** [413:4] [420:15]
[421:17] [422:1] [423:9]
[430:3]
**estropipate** [433:2,12]
**et** [326:9]
**evaluate** [334:4]
**evaluated** [399:10] [400:2]
**evaluates** [400:10]
**evaluation** [402:5] [429:3]
**even** [357:24] [358:6] [379:
22] [380:14,16,20] [405:5]
[424:20] [445:6] [452:11]
[459:13] [462:23] [466:11]
[482:20] [511:3,4,5] [515:17]
**events** [414:1]
**eventually** [338:24]
**ever** [351:14,15] [367:15]
[371:11] [382:18,22] [404:
11] [419:9] [428:16] [430:23]
[431:2] [484:4,7] [487:23]
[495:24] [497:6] [503:1]
[511:18]
**every** [332:8] [346:2,11]
[387:12] [456:12] [497:18]
[499:7]
**everybody** [449:15]
**everything** [428:8] [513:13]
**evidence** [339:23] [410:17]
**evident** [514:15]
**evolved** [426:24]
**exact** [438:17]
**exactly** [354:21] [360:15]
[370:5] [461:22] [496:3]
**examination** [390:18]
[391:8,19] [472:22]
**examinations** [472:1,8]
**examine** [360:3] [363:23]
[475:9]
**examined** [386:22]
**example** [333:11] [343:4]
[345:15] [357:8] [374:10,15]
[387:17] [388:23] [389:15,21]
[391:18] [392:3] [402:23]
[423:19] [431:10,12,13,15
,16] [437:15] [453:20]
[455:3] [457:12,23] [460:8
,9] [463:7] [469:13,22]
[472:20] [473:11] [477:8,9
,23] [478:1,6,18] [483:20]
[490:13] [492:12,22] [501:
24] [507:7]
**examples** [386:15,19,23]
[387:2,14,22] [388:13,14]
[457:8] [492:1] [494:17]
[501:4,12]

**exceed** [505:16] [506:7,12]
**exceedingly** [410:21]
**except** [353:13] [521:7]
**exception** [358:4] [383:19]
**exclude** [409:10] [410:13]
**exclusive** [362:4] [387:19,22]
[389:17] [431:18,23] [436:
12] [439:3] [454:14] [458:4]
**executive** [336:24] [337:7]
[367:19] [368:20,23] [371:
21]
**executives** [376:9]
**exert** [455:4]
**exhibit** [349:11,15,20]
[350:15] [361:1,6,13]
[363:20,23] [366:14,16,20]
[367:1,2,23] [368:18]
[369:9] [370:14] [371:2,6,11]
[372:6] [374:10] [377:14]
[383:19] [387:8] [389:23]
[397:19] [419:1,3,8,9]
[423:20,22] [429:14,17]
[484:18,22] [485:7] [489:19]
[493:5,10] [495:14] [502:17
,22] [505:19] [515:3,8]
**exhibits** [328:7] [429:11]
**exist** [336:9] [380:6] [382:13]
[479:7,18] [480:18] [481:21]
**existence** [513:7]
**existing** [442:8] [504:24]
**expand** [402:9]
**expansion** [405:1]
**expect** [392:9] [482:8]
**expectation** [513:4]
**expected** [452:17]
**expecting** [517:10]
**expenses** [338:20] [344:12]
**expensive** [333:6] [402:22]
[403:2] [486:8] [491:22]
**experience** [357:24] [382:21]
[383:9] [399:17,20] [410:20]
[413:13] [441:2,3] [442:14]
[449:8] [463:5,17] [465:8,11]
[476:24] [487:7] [518:4]
**experiences** [463:5]
**experiment** [473:21]
**expert** [347:10] [348:12]
[378:21] [382:7,19,21,23]
[383:3,6] [385:22] [421:2,7]
[507:19]
**expires** [521:20]
**explain** [355:17] [400:6]
[430:12]
**explained** [348:22]
**exposed** [475:23]
**express** [348:21] [372:3,10]
[376:9] [378:1,3] [389:21]
[390:2,3,15,19] [391:4]
[472:10]
**expressed** [343:10]
**extensive** [375:18]
**extent** [334:15] [360:3,8,14]
[373:20] [385:18,22] [406:
13,14] [421:6] [457:3]
[463:3] [464:10] [472:17,23]
[478:21] [503:15,22] [508:

18,22] [509:12] [516:19]
**eye** [492:7]

———————————

F

**face** [457:16] [511:22]
**faced** [509:7,11]
**fact** [341:20] [342:13] [346:
9,18] [352:5] [359:19]
[360:9] [361:18] [364:1,10
,18] [366:5] [373:21] [380:21]
[383:20] [385:6,23] [386:2]
[387:1] [397:18] [398:18]
[403:16] [404:8] [405:14]
[406:11,15] [409:11] [417:
21] [418:11] [426:13] [432:
7] [433:21] [437:6,7] [441:11]
[453:16] [456:4,24] [458:13]
[461:9] [469:17] [472:18]
[473:10] [478:12] [489:8,11
,22] [491:10] [493:22]
[496:7,13] [501:6,22]
[503:10] [504:14] [508:18]
[510:20]
**factor** [385:24] [425:6]
[437:23] [470:8,11] [476:19]
[510:12]
**factored** [423:15]
**factors** [425:6,12,19] [436:
1] [438:14] [442:13,22]
[443:1,11] [444:13] [453:5]
[458:5] [467:10] [473:7]
[476:8] [477:3]
**facts** [366:5]
**fail** [519:15]
**failed** [340:17]
**failure** [340:12]
**fair** [397:15] [439:13]
**fairly** [339:17,21] [397:7]
[483:4]
**fall** [361:14] [373:7] [401:4]
[440:23] [497:1,19] [499:20]
**familiar** [333:12] [358:23]
[359:22,24] [422:11] [449:
12] [451:20] [475:4] [500:17
,21] [501:20]
**family** [328:14] [419:11]
[434:23]
**far** [340:4] [349:4] [385:5,15]
[503:19]
**fascinating** [450:6] [473:21]
**fashion** [347:17] [490:17]
**favorably** [400:16]
**fbi** [337:10,11]
**fda** [400:23] [401:7] [402:14]
[409:18] [410:22] [411:4]
[417:21] [422:10] [445:21]
[450:18]
**features** [434:22]
**federal** [359:15] [504:7]
[507:3]
**fee** [339:17,22]
**fees** [332:13] [333:2] [339:5]
[340:3] [394:16] [436:1]
[505:9]
**femhrt** [496:18]

**few** [331:10] [401:5,7]
[508:15]
**fewer** [499:8]
**fibrosis** [410:5]
**fiduciaries** [341:11,21,24]
[342:6,21] [344:6]
**fiduciary** [340:12,17,22]
[341:1,5] [342:9,11] [343:17]
[345:4,18]
**fighting** [339:3]
**figure** [356:8,17] [364:17]
**figures** [499:6]
**fill** [488:12]
**filled** [376:23] [425:1] [485:
24] [489:21] [490:2]
**final** [336:12]
**financial** [366:1] [403:9]
[404:16,22] [431:5] [455:22]
**financially** [458:24]
**find** [339:23,24] [394:12]
[396:17] [405:9] [475:17]
[488:8,11] [492:8]
**finder** [432:16]
**finding** [501:11]
**fine** [331:2]
**finish** [356:18] [421:23]
[484:13]
**finished** [353:5]
**finneran** [364:5]
**finnerans** [363:17]
**firm** [516:13,16] [517:9]
**first** [338:14] [341:5] [345:15]
[354:16] [367:24] [377:15]
[378:5] [381:20] [403:15]
[423:15] [424:7] [428:13]
[429:21] [434:13] [440:23]
[460:1] [479:14] [486:2,16
,17] [493:18] [497:21,23]
[504:12] [508:17] [517:10]
**five** [350:19,24] [351:16]
[352:5]
**flags** [340:1]
**flight** [495:11] [517:24]
**flip** [499:3]
**flooding** [467:11]
**floor** [326:23]
**florida** [389:1]
**flow** [352:19]
**flows** [352:15] [388:21]
[429:1]
**focus** [399:8]
**focused** [393:3]
**focusing** [393:4]
**folks** [401:12] [463:10]
**follow** [331:8] [335:7] [403:
13] [423:8] [483:11]
**followed** [345:14]
**followup** [332:2] [336:12]
**followups** [511:12]
**footnote** [355:4] [370:12]
**footnoted** [360:20] [499:14]
[506:1]
**force** [405:14] [455:21]
[469:14,19] [487:18,24]
**forcing** [459:1]
**foregoing** [521:4] [522:18]

**forget** [447:23]
**form** [332:18] [334:1,8]
[345:19] [346:13] [347:3]
[348:24] [351:9] [358:8]
[360:17] [363:13] [364:12]
[365:4,19] [366:7] [369:19]
[370:22] [378:10] [379:10]
[380:7] [381:18] [382:3,8,14]
[390:5] [417:24] [421:5]
[422:17] [426:3] [440:1]
[441:20] [445:15] [455:24]
[457:3] [459:6] [463:21]
[464:20] [465:14] [494:24]
[496:20] [521:8]
**former** [337:11]
**forms** [447:10] [487:14,24]
[488:9]
**formularies** [393:7] [396:20]
[399:5] [401:23] [425:17]
[426:21] [443:5] [506:6]
[512:2] [514:23]
**formulary** [328:17] [358:16
,20] [359:9,22] [360:11]
[361:8,9,15] [365:2] [370:20]
[372:9,13] [373:2,12]
[374:19] [376:12,24] [378:
15] [383:21] [384:18] [389:
11] [390:4,9,15] [391:5,10,11
,12,20] [392:4,8,15,24]
[400:14,19] [401:18,22]
[402:4] [403:10] [404:17]
[409:10] [410:7,14] [423:13]
[425:19,20,22,24] [426:4,10
,11] [427:9,24] [428:2,17]
[429:18,22] [430:7,11,13]
[432:6,18] [433:16,17]
[434:2] [438:21] [439:4,22]
[440:5,7,11,21,24] [441:12]
[442:17] [443:4,16] [444:11
,12,20,24] [446:6,13,19,20]
[447:3,5,13,16,24] [451:4]
[459:23] [462:2,6,22,24]
[464:12] [466:8,12,16]
[467:9] [468:23] [470:16,19]
[472:10,16] [473:23] [479:
20] [488:5] [489:21] [509:19]
[510:4,15] [511:5,16]
[514:19] [515:18]
**forth** [436:2] [442:21] [474:
15]
**found** [448:12,14,17,19]
[471:12]
**foundation** [349:17] [350:1]
[363:14] [457:14]
**four** [353:22] [354:9] [371:24]
[372:2] [439:1] [468:2]
[480:13] [481:17]
**fourth** [338:15] [412:14,16]
**fourthgeneration** [412:14,16]
**fourth-generation** [412:14
,16]
**fpi** [336:13,15,19,23] [337:1
,9,10] [338:9,17]
**frame** [393:6] [476:4]
**frames** [426:23]
**francisco** [516:14]

**fraud** [339:4]
**fraudulent** [340:1]
**frequency** [509:6]
**frequently** [466:11]
**frustrated** [389:2]
**fudiciary** [343:11]
**fuduciaries** [343:3]
**full** [377:15]
**funds** [427:3]
**future** [375:17] [463:20]

———————————

G

**gaining** [391:22] [409:18]
**gallbladder** [407:20]
**gave** [353:8] [413:17] [474:
2]
**general** [348:10] [358:2]
[373:5] [391:21] [400:16]
[402:12] [403:1] [405:5]
[409:8,20] [410:7] [411:18]
[413:5,8,14] [417:3] [440:7]
[478:10] [485:16] [493:2]
[503:19] [506:1]
**generally** [347:22] [349:8]
[357:23] [358:2] [383:4]
[394:15] [399:8,15,21,22]
[401:19] [402:4] [409:15]
[415:7,11] [442:14] [449:23]
[467:22] [479:7] [485:12]
[487:8,10] [489:14] [491:20
,24] [507:16] [512:11,14,17]
[514:22] [516:1]
**generate** [376:21] [385:12]
**generated** [453:16] [454:9]
[488:10]
**generating** [454:20]
**generic** [411:15,16] [412:4]
[416:22] [418:3] [459:3]
[473:11]
**generics** [479:15] [484:6]
**germane** [460:23]
**gets** [449:4] [483:17] [505:3]
**getting** [430:21] [442:2]
[443:6] [447:4] [455:17]
[462:1] [467:7] [498:22]
[518:5]
**gibson** [326:14] [328:2,7]
[330:4,20,22] [331:5,8]
[349:11] [361:1] [366:20]
[371:6] [394:10] [419:3]
[423:22] [429:11] [484:18]
[493:5] [502:17] [508:15]
[515:3,9] [518:7] [522:9]
**give** [337:15] [349:7] [353:1]
[355:16] [356:14] [361:23]
[366:9] [378:18] [379:2]
[383:7,8] [395:16] [415:23]
[416:1] [438:2,5] [463:7]
[464:1] [467:5,13] [489:16]
[494:19] [504:9] [509:20]
**given** [333:14] [335:1]
[358:15] [400:18] [441:14]
[478:15] [521:6] [522:6]
**giving** [381:20]
**glassman** [474:5,12,21]

**5/19/2004  Gibson, David**

go [333:20] [338:20] [340:3
,4] [350:3] [357:14] [370:9]
[374:10] [378:8] [383:17,23]
[384:4] [388:7] [397:8]
[410:9] [413:19] [425:6]
[441:7] [447:8] [452:4]
[469:2] [470:6,12] [487:3]
[490:4] [491:14] [494:22]
[503:21]
**goal** [424:15] [453:3]
**goes** [346:22] [453:23]
[473:17] [505:5]
**going** [350:5] [352:18]
[357:16] [384:21] [385:7]
[386:14] [391:20] [394:1]
[405:16] [413:10] [418:6]
[428:8] [430:22] [438:9]
[440:5,6] [443:23] [466:10]
[467:12] [468:13] [471:21]
[472:15] [478:21] [479:3]
[489:20] [495:9] [508:3]
**gone** [334:16] [389:8] [399:
1] [426:19] [449:13] [472:9]
[511:23] [513:3]
**good** [330:2] [422:3]
**goods** [339:12]
**gordon** [327:8] [374:22]
[381:5] [393:22] [480:20]
[495:6]
**government** [337:14] [503:
5,21,24] [504:4,7] [505:18]
[506:21] [507:3]
**graph** [356:21] [420:3,4,6]
[478:4] [480:6] [509:2]
**gray** [356:12]
**great** [345:9] [401:19] [504:
22]
**greater** [446:21] [467:9]
[490:19] [502:7] [505:15]
[506:22,24]
**group** [339:14] [376:7]
[429:8] [452:6] [482:17]
[489:12] [491:12] [499:15]
[500:1]
**groups** [455:14] [461:3,5,7]
**guess** [451:12] [461:24]
[466:12] [471:19] [475:8]
[476:6] [501:5] [510:17]
[512:7]
**guidelines** [421:13]

**H**

**habit** [466:5,13]
**habits** [463:20] [467:20]
**half** [485:23]
**hallways** [413:23]
**hand** [419:7] [450:17] [459:
19] [502:21]
**handed** [371:10] [484:22]
**handle** [395:14]
**handled** [490:10] [512:8,13]
**handoff** [429:4]
**handy** [438:8]
**happen** [355:4] [453:18]
**happened** [458:14] [459:7]

[460:11] [476:20] [477:7]
**happening** [359:23] [514:12]
**happens** [483:15]
**happy** [382:15] [418:16,23]
**hard** [373:13] [395:16]
[464:3]
**hardware** [414:14]
**harvard** [504:17]
**hassle** [510:12]
**havent** [331:11,21] [366:13]
[371:1,2] [416:24] [418:15]
[420:19] [436:16] [472:1,7]
[492:21] [507:5,12,20]
[512:23] [515:10]
**having** [340:5] [364:9]
[365:6] [367:17] [368:7]
[369:18] [376:11] [387:11]
[419:13] [431:6] [438:23]
[449:14] [453:14] [458:24]
[463:18] [465:8,9,18]
[469:13] [470:5,24] [471:5]
[472:23] [483:7] [485:9]
[486:3] [498:22] [501:11]
[516:17]
**hawaii** [416:10]
**head** [337:16] [402:11,14,15]
[403:19,21] [404:2,11]
[428:11] [433:24] [450:20]
[471:6]
**heading** [340:11] [342:23]
[397:22] [442:12] [503:4]
**headline** [485:21]
**headto** [402:14]
**head-to** [402:14]
**headtohead** [402:11] [403:
19,21] [404:2,11] [450:20]
[471:6]
**head-to-head** [402:11]
[403:19,21] [404:2,11]
[450:20] [471:6]
**health** [335:5,11,15] [339:4
,7,8] [344:3] [349:17] [350:
1] [374:16] [375:9,10,15]
[388:5] [389:10] [395:10]
[396:14] [397:21,22,24]
[406:23] [407:23] [408:14]
[422:5] [430:2] [457:14]
[464:14,16]
**healthcare** [377:5,13,20]
[491:13]
**healthnet** [489:7]
**heard** [517:7,11]
**hearing** [358:11]
**heart** [407:18]
**heavily** [422:4]
**held** [326:14] [330:10]
[350:8] [377:8] [423:1]
**hell** [330:19]
**help** [505:9]
**helpful** [370:11] [403:16]
[404:1,14]
**herbs** [411:17]
**hereby** [521:3] [522:4]
**herein** [521:7]
**heres** [333:16] [335:3]
[360:22] [399:23] [442:2]

**hes** [369:11] [421:7] [495:11]
**hey** [467:12]
**hide** [343:7,23]
**high** [396:21] [400:22,24]
[452:9]
**higher** [334:13] [396:6]
[460:13] [511:22]
**highly** [364:13] [365:23]
[446:23] [448:4]
**hired** [371:20]
**history** [394:22] [509:18]
**hmo** [361:8] [477:23] [478:11
,13] [481:23] [489:1] [490:13
,14,22] [491:6] [498:17,24]
[499:7] [501:7]
**hmos** [360:16] [482:17]
[486:3,7] [496:15] [498:16
,19] [499:19,24] [500:6,7]
**hold** [336:15] [347:9] [453:3]
[474:18]
**hope** [517:23]
**hormone** [412:6] [433:6]
**hospital** [406:14]
**hospitalization** [406:8]
**hospitalizations** [403:6]
**hospitals** [339:11] [413:24]
**host** [425:18]
**hot** [340:19]
**houses** [427:1]
**however** [377:17] [384:19]
[410:19] [454:8] [464:21]
[476:19] [491:8]
**hrt** [494:1] [496:16]
**htat** [453:1]
**huge** [401:9] [513:7]
**human** [349:18] [397:24]
[461:22]
**humana** [392:8,18,19]
[461:7] [472:10] [504:17]
**hundred** [353:21] [354:8,19]
[355:14] [356:20,23] [357:
15] [436:7,16] [500:1]
**hundreds** [414:18,19]
**hurt** [455:13]
**hypothetical** [366:10]

**I**

**id** [355:15] [364:13] [382:15]
[398:22] [416:2] [422:18]
[436:6] [488:7] [491:16]
[494:21,22] [515:15] [517:
10]
**idea** [380:13] [433:15]
[440:19] [448:15]
**ideas** [414:13]
**identification** [349:12]
[361:2] [366:21] [371:7]
[419:4] [423:23] [429:12]
[484:19] [493:6] [502:18]
[515:4]
**identified** [377:23] [424:23]
**identify** [429:21]
**ii** [326:1] [407:24] [422:5]

**ill** [340:18] [353:3] [361:24]
[438:3] [442:21] [489:16]
**illinois** [327:10]
**illustrate** [511:15]
**im** [331:2,15,17] [337:7]
[346:15,17] [348:3,12]
[353:20,24] [354:19,22]
[358:11,12] [359:24] [360:
22] [363:4] [365:20,21]
[366:9] [368:22] [369:8,20]
[372:19] [373:3,4,23]
[375:11,24] [376:2,3]
[378:18] [379:2] [381:19]
[387:23] [388:13] [393:16]
[395:7,9,23] [399:23]
[400:3] [405:11] [412:4]
[413:2,3] [415:4] [416:20]
[417:6] [418:16,18,23]
[419:19] [420:4] [421:16]
[422:4,11,19] [428:18]
[429:6] [430:18] [431:11]
[433:19] [436:22] [437:14]
[438:3] [442:2,10] [443:8]
[447:4] [455:2,8,9,11,17]
[456:22] [458:18] [459:5,7
,8] [462:1] [463:2] [465:7]
[466:10,12] [467:12,17]
[470:17] [473:8] [475:4,8]
[476:6] [478:6,14,19]
[480:22] [487:12] [488:18]
[489:22] [490:12,14,17]
[491:10] [492:15] [498:22]
[499:11] [501:5,11,23]
[506:8] [510:17] [512:7]
[516:2]
**impact** [383:21] [385:21]
[426:1] [438:23] [442:17]
[444:13,21,24] [445:11,14
,22] [446:2,7] [453:10,18]
[454:5] [469:14] [470:20]
[471:2] [472:14]
**impacted** [469:12] [471:8]
**imperative** [519:12]
**implement** [461:16]
**implications** [404:16,17]
[405:15]
**implies** [460:4]
**important** [402:10] [423:16]
[425:11,13] [447:13] [469:
19] [502:13]
**impose** [347:16] [461:15]
**impression** [413:14,17]
**improved** [391:2]
**improves** [400:18]
**improving** [473:1]
**inaccurate** [352:23] [407:21]
[427:19]
**inc** [326:9] [327:12]
**incentive** [358:3]
**incentivebased** [358:3]
**incentive-based** [358:3]
**incidence** [406:8] [407:17,18
,19]
**include** [365:22] [387:12]
[402:6] [409:11] [468:22]
[494:3]

**included** [390:20] [442:17] [473:14,15,20] [500:1,13] [501:3]
**includes** [443:4,15]
**including** [345:14] [425:19] [436:1] [455:2] [456:9] [510:15]
**inclusion** [374:18] [384:18] [389:12] [402:4] [440:21]
**incorporate** [368:5]
**incorporated** [365:17]
**incorrect** [447:14]
**increase** [334:19]
**increased** [472:18]
**increasing** [512:16]
**incurring** [333:14]
**independent** [427:3] [484:2 ,9]
**index** [329:1]
**indicate** [332:6] [354:16] [386:16] [388:10] [432:18] [438:16] [456:18]
**indicated** [386:5] [387:4,8,21] [388:5] [394:24] [420:13] [427:6] [438:13] [511:2] [514:23]
**indicates** [367:19] [370:2] [406:12] [469:18] [495:15] [504:18]
**indicating** [433:11]
**indications** [389:7] [408:2] [418:7] [445:21] [450:19] [469:20] [471:1] [509:18]
**indicators** [339:24]
**individual** [401:21] [426:20]
**individuals** [337:14,17] [363:19] [388:17]
**industry** [332:22] [340:19,21] [342:5,7] [343:14,22] [345:10] [346:3] [350:18] [353:7,23] [354:9] [356:1] [359:23] [373:15] [383:9] [395:12] [399:21] [403:1] [424:15] [462:17] [493:2] [498:4,7,9] [499:4,7,13]
**industrys** [506:2]
**ineffective** [486:4]
**inexpensive** [414:24] [486:4] [489:13] [491:23]
**infer** [388:22] [498:8]
**inferred** [457:18]
**influence** [426:5] [442:22] [443:12] [445:7] [497:13]
**influenced** [476:9]
**influences** [426:13]
**influencing** [425:7] [442:13]
**information** [332:11] [346:10] [354:11,18] [404:15] [421:14] [454:18] [455:18,22]
**infrastructure** [489:2]
**inherited** [430:6]
**inhibit** [434:11]
**inhibited** [434:16] [438:15]
**inhibitor** [402:18]
**inhibitors** [373:13] [425:14 ,16] [438:18]

**inhouse** [357:11]
**initial** [422:9]
**initially** [449:5]
**initiative** [406:24] [407:23] [408:14] [422:5]
**injectables** [405:8]
**insert** [494:23]
**inspection** [507:17]
**instance** [339:10] [363:9] [379:24] [393:8] [404:4] [410:2] [412:12] [413:11] [423:15] [428:10] [480:12] [486:17] [489:4]
**instances** [341:4] [359:10] [372:24] [425:24] [488:4] [496:3] [510:23] [511:3] [512:19]
**instead** [446:20] [450:17] [460:1,15]
**institute** [339:2]
**instructed** [490:16]
**instructions** [519:1]
**insurers** [398:4]
**intended** [364:7]
**intensive** [486:9]
**intent** [338:24] [339:3]
**intention** [348:20]
**interchange** [474:11]
**interchangeably** [420:16] [476:3]
**interest** [341:2,8] [387:10] [476:3]
**interested** [393:15] [406:6] [418:14] [436:3]
**interesting** [332:19] [387:14] [458:20] [492:1] [498:2]
**interestingly** [355:24]
**internal** [360:19] [364:21] [457:13] [473:15] [474:13] [475:21] [476:1] [490:15] [495:17]
**internally** [499:2]
**internet** [429:16]
**interpret** [379:4] [495:20]
**interpretation** [364:14]
**interpreted** [379:18] [496:21] [497:4]
**interpreting** [376:2] [381:19]
**introduced** [514:18]
**introduction** [452:10] [468:17]
**investigated** [386:2] [390:16]
**investigation** [360:14] [361:17,21] [364:17] [390:13] [392:22]
**investigator** [340:5]
**involve** [413:23]
**involved** [340:5] [362:3] [363:19] [365:16] [382:20] [414:7,8] [415:22] [428:1,6 ,10] [430:21] [440:10,22] [517:13]
**involvement** [414:9]
**involving** [505:10]
**irrelevant** [368:9] [373:6]
**irrespective** [358:15] [359: 21] [389:12] [439:23] [462:

5] [466:7,15]
**isnt** [334:16] [345:2] [356:12] [357:24] [380:6] [381:17] [406:10] [426:9] [431:13] [455:2] [458:13] [460:19] [463:13,14] [467:12] [497: 22]
**issue** [334:9] [352:11] [412:9] [413:11] [422:4] [423:16] [447:18] [485:19]
**issued** [348:17] [488:11]
**issues** [362:16]
**item** [376:16] [377:4] [492:17]
**itself** [345:4] [412:10] [446: 6] [454:9] [455:20] [473:20]
**ive** [343:13] [346:6] [349:7] [353:5] [355:2] [364:22] [371:10] [395:3] [408:11,13] [409:2] [410:20] [435:8] [442:20] [456:15] [458:5] [489:18] [496:2] [504:12] [510:8] [517:7]

_____

J

**j.b.d.l** [326:6] [330:5] [484:10]
**january** [477:13]
**jay** [327:] [480:24]
**jeff** [367:5,9,21]
**jfk** [330:14]
**john** [326:] [371:18]
**judge** [382:22]
**judgment** [438:22] [439:15] [441:18]
**jury** [348:21] [379:1] [499:18]

_____

K

**kansas** [355:22]
**kate** [474:11]
**keep** [352:16] [376:21] [495:9] [515:19]
**keeping** [336:4] [341:8] [498:5]
**keeps** [335:2]
**kennedy** [326:]
**kept** [336:5]
**key** [364:3] [444:13] [457:17]
**kind** [340:7] [357:22] [405:23] [457:5] [473:2]
**kinds** [459:9]
**knew** [452:11]
**know** [333:17,19] [334:17,18] [335:4] [346:2,5] [354:10] [357:20] [359:10] [363:22] [364:3] [365:2] [367:6,9,14] [368:12,15] [370:5,8] [373:4,11] [374:9] [375:19] [376:6] [379:21,24] [380:1 ,22] [382:24] [384:12] [387:3,18] [388:4,16,22] [389:5] [390:8] [391:3,6,7,9] [392:2,5,7,11,12,14,20] [393:17] [396:19] [404:7,10 ,20] [405:1] [406:7,10] [408:12] [427:11,13,15]

[428:19,20] [430:17] [431:5 ,22,24] [432:1,11,12,13,22] [433:21] [435:2,8] [436:4] [438:7,10,19] [449:5] [451:17] [456:3,8,20] [458:13] [459:9] [463:15] [464:1,3] [466:12] [473:5] [474:17] [475:1] [476:12] [477:15,19] [478:6,17] [479:9,21] [480:12] [482:2] [487:22] [488:13] [491:18,19] [495:8,12] [496:6] [497:10] [499:5,24] [500:5,24] [506:4,10] [507:4] [510:1,2] [511:4,17,20] [512:1,8,11] [513:1,2,14] [516:19] [517:4,7] [518:5]
**knowing** [380:20] [381:13] [428:24] [497:15]
**knowledge** [348:10] [380:17] [381:21,23] [395:12] [434: 15] [488:7]
**knowledgeable** [506:9]
**kodroff** [327:4]

_____

L

**labor** [486:9]
**laboratories** [326:] [327:]
**labs** [448:1] [506:11]
**lack** [363:14] [401:8] [509:17 ,18]
**lacked** [411:17]
**language** [380:5] [381:15] [382:12] [435:3,18] [436:10 ,12] [437:4,9] [439:9] [493: 19]
**large** [351:1,23] [469:14]
**larger** [334:5] [432:8] [448: 2] [463:11] [504:1]
**last** [333:17] [338:8,10] [354:7] [360:7] [361:12] [369:8,10] [375:8]
**late** [494:24] [510:7]
**later** [462:16] [486:24]
**launch** [389:10] [404:11] [468:10] [469:3,12] [470:7 ,22] [471:2,9] [478:9] [513: 21]
**launched** [403:22] [450:17] [471:3]
**law** [326:15] [330:11] [341: 22] [359:15] [516:13] [517: 9]
**lawyer** [455:8] [516:15] [517:2]
**lawyers** [331:23] [523:1]
**learned** [374:16,22]
**least** [372:23] [374:19] [392:10] [398:19] [405:14] [430:1] [517:18]
**left** [353:13]
**lefthand** [353:13]
**left-hand** [353:13]
**legal** [347:9] [348:12] [455: 9]

**legitimate** [409:9] [410:12]
**less** [397:10] [399:3] [425:11]
[453:4] [477:20] [514:17]
**lesser** [447:10]
**let** [331:8] [336:2] [340:18]
[350:14] [352:12] [355:17]
[356:18] [357:22] [359:11]
[361:5] [366:24] [367:1]
[368:11] [371:10] [375:11,21]
[376:1] [391:8] [395:23]
[397:20] [402:8] [403:13,20]
[419:8] [422:6,7] [428:19]
[429:6] [434:13] [439:1]
[442:19] [457:7] [460:10]
[462:9] [463:7] [473:3]
[475:13,17] [481:12,13]
[483:11] [484:13] [493:9]
[502:21] [511:11] [515:7]
[516:20,21]
**lets** [333:15] [335:19] [344:
2] [345:14] [349:24] [350:3]
[354:13] [355:15] [359:8,16]
[363:7] [368:11] [377:22]
[382:17] [383:17] [389:7]
[399:4] [410:9] [417:12]
[431:20] [434:5] [442:11]
[449:14] [450:17] [464:14]
[474:19] [477:22] [495:8]
[499:8,9] [508:1] [514:5]
**level** [363:11] [374:17]
[376:11,23] [377:18] [385:
19] [386:4] [387:4] [412:11]
[429:3] [430:4] [434:10]
[442:23] [443:12] [489:21]
[490:3,10] [491:9,15]
[506:6] [513:15]
**levels** [442:13] [476:22]
[507:2]
**leveraged** [434:7]
**levin** [496:1,14]
**liability** [375:19] [439:14]
**liberty** [326:16] [330:10]
**licensed** [402:14]
**light** [365:24] [369:15]
[370:14] [398:16] [408:7]
[461:12]
**likelihood** [400:18,24]
[459:15]
**likely** [368:16] [375:15]
[397:10] [410:6] [512:24]
**limit** [502:14] [503:18,20]
**limited** [389:7]
**line** [329:3,9,15] [458:11]
[520:4] [523:2]
**lines** [387:7]
**link** [501:16]
**list** [328:16] [339:21] [373:7
,8] [387:13] [429:15,23]
[431:7] [432:19] [433:2]
[434:22] [436:15,17,20]
[441:5] [450:15] [456:9,11]
[515:18]
**listed** [359:4] [362:2] [367:12]
[370:8] [373:17] [388:9]
[433:1]
**listing** [361:8]

**lists** [369:21]
**litany** [447:7]
**literature** [402:7] [403:17]
[410:18] [439:16] [469:18]
[471:7]
**litigation** [378:21] [428:7]
[430:21] [517:15]
**little** [356:13] [384:20]
[440:15] [453:13] [513:20]
**live** [402:15]
**liver** [401:1]
**lives** [354:15,17] [361:10,14]
[362:2] [363:24] [365:6,7]
[368:2,7] [369:17,23]
[370:6,17,20] [372:7,8]
[373:5] [374:20] [406:9]
[498:17]
**living** [456:16]
**llp** [326:15] [327:9]
**located** [330:14] [499:6]
**long** [456:16]
**longer** [387:11] [440:15]
[460:14] [472:24]
**longs** [414:8]
**look** [352:14,20] [353:3]
[360:23] [366:8] [368:18]
[374:11] [377:4,22] [380:1
,24] [381:2] [400:16] [401:2]
[404:8] [407:14] [426:22]
[428:2,3] [431:12] [469:11]
[474:2] [486:22] [493:18]
[503:3] [504:15]
**looked** [356:17] [362:12]
[366:13,15,16] [376:15]
[404:5] [435:16,20] [436:6
,24]
**looking** [353:5] [372:6]
[374:1,6,10] [375:8] [381:7]
[383:18] [397:19] [405:2]
[409:21,22] [410:8] [424:5]
[450:22] [465:6] [491:1]
[495:6,14] [499:11]
**looks** [353:6] [376:13]
[400:9] [409:15] [410:23]
[480:6,17] [481:14]
**loss** [406:4] [453:21] [458:2]
[459:18] [472:17] [473:6,9]
**losses** [471:20]
**lost** [459:12] [473:2]
**lot** [400:22] [403:12] [412:15]
[436:23] [458:20]
**lots** [415:13]
**low** [376:22] [396:24] [397:
4]
**lower** [412:12] [446:21]
[448:2] [490:10]
**loyal** [450:4]
**loyalty** [449:19] [452:9]

────────────

M

────────────

**m.d** [326:14] [328:2] [331:5]
[522:10]
**mac** [330:18,24]
**macro** [485:16]
**macroeconomic** [485:13]

**magazine** [467:1]
**mail** [343:24] [356:6] [383:20]
[396:9] [484:3,5] [505:10]
**mailorder** [383:20]
**mail-order** [383:20]
**major** [352:11] [363:3]
[414:9] [426:1,5,12] [462:4]
[470:10,19] [477:2,3]
**majority** [372:24] [375:14]
[377:18] [393:5] [491:9]
**making** [401:3] [412:5]
[416:20] [470:4,9] [497:14]
**manage** [357:12] [486:9]
**managed** [367:3,20] [368:2
,23] [369:17] [370:17]
[371:19,21] [376:8] [389:1]
[404:3] [437:8] [445:6]
[447:17] [453:17,19] [454:
3] [470:10,19] [486:23]
[487:8] [507:15]
**management** [343:10]
[488:19,22,23] [489:2]
[490:7,11,19] [499:1]
**managers** [340:9] [498:5]
**manual** [434:19] [437:17]
[501:2]
**manufacturer** [395:13]
[450:7] [488:11]
**manufacturers** [344:15]
[394:14,17] [395:8,19,22]
[398:1] [442:16] [443:3,15]
[505:16]
**manufacturing** [414:13]
**mares** [448:13] [452:12]
**margaret** [474:5,12]
**mark** [418:24]
**marked** [329:14] [349:12]
[361:2,5] [366:21] [367:1]
[371:7] [419:4,7] [423:20,23]
[429:12] [484:19] [493:6,10]
[502:18] [515:4,7]
**market** [326:16] [327::
[347:16,22] [348:5] [350:21]
[351:17,20,24] [352:7]
[365:9] [373:16] [389:8]
[390:16,19] [391:4] [393:1]
[399:10] [403:3] [405:4]
[409:21,23,24] [411:12,20
,21] [412:17] [414:20]
[415:6,16] [416:21] [419:10]
[425:21] [426:24] [427:5]
[434:9] [438:15] [440:9,15]
[444:14,22] [445:1,3,7,8,11
,14,23] [446:3,9] [448:21]
[449:24] [451:5] [452:16,19]
[454:15] [455:12,13] [456:
4,23] [457:16] [458:21]
[466:20,21] [467:22] [468:
6,17] [472:24] [473:6]
[475:20,24] [476:9,23]
[477:3] [478:11] [480:1]
[481:8] [495:15] [497:2,19]
[498:9] [506:13,24] [510:13]
[513:8,12] [514:17]
**marketed** [412:3]
**marketing** [427:1] [468:18]

[469:5] [476:15]
**marketplace** [328:10]
[351:7] [360:4] [374:7]
[385:23] [404:2] [413:5]
[426:19] [434:12,17] [452:
23] [455:4] [458:23] [468:13]
[469:21] [470:7,13,21]
[471:3,9] [477:16] [478:7]
[495:21] [500:18] [509:1,8]
**markets** [351:21]
**marty** [367:4,6,12,19] [371:
22]
**maskita** [335:23]
**matched** [387:23]
**materials** [487:24]
**matter** [330:4] [401:12]
[516:13]
**matters** [478:22]
**maureen** [516:16]
**may** [326:11] [330:8] [333:21]
[338:23] [390:21] [394:13]
[395:19] [398:24] [399:2]
[401:16] [411:13] [430:6]
[442:22] [443:12] [444:21]
[453:14] [457:15] [459:14]
[463:4] [467:3,4] [472:24]
[473:9] [476:8,14] [479:17]
[486:21] [488:11] [494:3]
[495:2] [509:7] [519:16,17]
[522:16]
**maybe** [447:5] [456:19]
**mckinley** [326:18] [522:]
**mco** [443:13]
**mcos** [434:11]
**mean** [335:15] [340:16]
[344:9] [364:4,7] [365:15]
[385:11] [389:15] [463:7]
[464:14] [499:17,18] [515:
11]
**meaning** [379:20] [480:8]
**means** [494:3] [497:9]
[522:20]
**meant** [365:15]
**mechanism** [452:15] [511:
1,16]
**mechanisms** [510:15]
[511:18]
**medco** [372:12] [376:9]
[392:4] [437:18,22]
**medicaid** [328:17] [429:18]
[481:9,21] [502:3,8,15]
[503:7,16,24] [505:17]
[506:5,6]
**medical** [353:14] [396:20]
[402:6] [411:14,23] [412:22]
[416:12] [417:3,14,15,17,19]
[439:11,15,16] [441:16]
[488:19,22,23] [489:2]
[490:7,19] [498:4] [506:6]
[507:7] [515:22]
**medicare** [445:5] [481:21]
[506:15]
**medications** [410:3]
**medicine** [412:7] [414:1]
**medimpact** [439:5] [492:13]
**meet** [411:16] [455:15]

**5/19/2004  Gibson, David**

**meeting** [336:7] [376:8] [439:19]
**meetings** [346:6] [428:13]
**member** [339:22] [416:16]
**members** [337:8] [345:6] [358:6] [430:23] [490:4]
**memmo** [328:12]
**memo** [367:4] [368:19]
**memoranda** [456:9]
**memory** [435:20]
**mention** [468:9]
**mentioned** [331:10] [336:14] [338:16] [348:18] [389:20] [391:17] [394:21] [404:14] [428:22] [430:5] [432:13] [434:13] [462:8] [485:8] [490:21] [491:2,3] [502:1] [506:19] [513:19]
**mercer** [349:17]
**merck** [372:3,11] [395:6]
**merckmedco** [372:3] [395:6]
**merck-medco** [372:3] [395:6]
**merit** [400:2] [401:8]
**met** [511:1]
**methodology** [364:3] [429:1] [500:2]
**michael** [327:] [330:12]
**michelotti** [337:12]
**micromanagement** [440:11]
**middle** [503:8]
**million** [354:17] [374:20]
**mind** [341:9] [438:4] [466:9] [500:23]
**minimal** [383:21] [401:9]
**minimum** [368:1] [370:16]
**minute** [353:1] [361:23] [494:21]
**minutes** [335:9,13,17] [336:2,4,5,8,9]
**misread** [481:14]
**mixing** [490:6] [511:13]
**model** [339:16] [341:17] [343:20] [402:21] [404:13] [405:13] [450:23] [453:10] [461:6]
**models** [403:3] [405:7,10,24] [406:2,6]
**modifications** [426:7]
**modifying** [427:23]
**moment** [357:23] [399:5] [431:12] [491:4]
**money** [332:7,12] [343:7,23] [352:15,19]
**moneys** [338:18]
**monitor** [340:3]
**monopolist** [347:24] [348:1,9] [455:4,6]
**monopoly** [347:7,8,13,14,19] [348:14,21] [349:3,9]
**months** [486:23] [487:4]
**moore** [474:12]
**morning** [330:2] [483:8] [489:18]
**move** [340:8] [476:23]

**moved** [451:2] [453:20] [457:24] [459:10,11] [473:24]
**movement** [514:16]
**moving** [373:16] [395:17] [405:2] [454:6] [476:14] [498:7]
**mr** [328:3] [330:20,23] [331:3,7,22] [332:18] [333:9] [334:1,2,8,11] [335:15,18] [336:14] [345:7,12,19,21] [346:13,19] [347:3,5] [348:24] [349:1,14] [350:3,13] [351:9,13] [358:8,17] [360:17,21] [361:4] [363:13,16,17,18] [364:5,12,15] [365:4,11,19] [366:3,7,12,23] [367:4] [368:19] [369:16,19,24] [370:17,22,24] [371:9,13,14,16] [374:21] [375:1,2,4] [377:12] [378:10,19] [379:10,11] [380:7,11] [381:5,6,18,22] [382:3,5,8,10,14,16] [384:5,8,11] [386:7,9,11] [387:6,7,16] [390:5,7] [392:17,19,21] [393:17,22,24] [394:9] [395:21,23] [396:1] [417:24] [418:4,24] [419:6] [421:5,9] [422:17] [423:7] [424:1] [426:3,8] [429:14,20] [440:1,12] [441:20,22] [444:7] [445:15,20] [455:24] [456:2] [457:2,21] [459:6,16] [463:21] [464:7,20] [465:1,14,16] [467:16] [480:20,22] [481:3,10] [484:21] [485:1,3,6] [493:8] [494:23] [495:3,5,8,10,12,19] [496:20,22] [501:8,10,18] [502:20] [508:1,14] [515:6] [516:6,8,18,23] [517:21] [518:2]
**ms** [480:24] [485:2]
**multiple** [400:20] [434:15] [457:7]
**multitude** [409:16]
**myself** [480:23]

**N**

**name** [335:22] [398:2] [496:5] [516:16]
**names** [337:15]
**narrow** [425:4]
**national** [391:4] [393:1] [439:5]
**nature** [351:21]
**navigating** [328:9]
**ndc** [385:20] [492:16,19] [493:1,2,23] [494:4,8,18] [500:15,19] [501:6,21] [508:18] [510:15]
**necessarily** [341:8] [360:1] [417:9] [425:24]
**necessary** [519:4]

**need** [341:14] [405:9] [409:6] [440:14] [463:10]
**needed** [403:8]
**needing** [463:18]
**needs** [414:14] [440:8] [485:3]
**neeley** [328:13] [371:19]
**negative** [467:10]
**negotiate** [401:13]
**negotiated** [397:6]
**negotiates** [346:23]
**negotiations** [399:15]
**net** [515:21]
**network** [338:6]
**networks** [356:4] [357:13]
**new** [340:8] [399:9] [402:22] [403:5] [405:8] [412:8,13] [415:5] [417:11] [449:5,21] [450:12] [466:22] [476:15] [510:13]
**newer** [448:23]
**newsletter** [350:2]
**next** [336:7] [376:16] [377:4,14,24] [384:16] [419:1] [451:17,23]
**niche** [510:9,13]
**no** [326:9] [328:8] [330:3] [331:18,19] [337:2,20,23] [338:2] [341:22] [345:3,20] [347:11] [348:12] [352:3] [354:9] [357:4] [360:6,20] [363:21] [364:8] [365:16] [366:18] [367:8,10] [372:9] [373:3] [374:14] [375:18] [377:3,21] [379:12] [384:10,14] [385:3] [388:7] [393:12] [403:23] [404:9,12,24] [412:16] [413:12] [415:1,17] [417:1] [420:12,21] [421:11] [422:13,22] [423:5,11] [424:14] [427:18] [430:18,19] [431:1,4,15] [432:24] [443:8] [447:16] [454:19] [455:1] [460:14] [470:15] [472:6,21] [476:11] [480:9] [481:3,4,20] [484:12,16,23] [488:7] [491:3] [503:2,20] [504:9] [507:8] [508:5,12] [515:14,15] [517:16,20]
**non** [466:24]
**nonapproved** [488:6]
**noncompetitive** [347:17]
**noncontracted** [468:4]
**none** [329:5,11,17] [515:13]
**nonformulary** [377:17] [491:8] [494:2]
**nonmanaged** [445:2]
**nonpeerreviewed** [466:24]
**non-peer-reviewed** [466:24]
**nonpreferred** [481:16]
**nonprofit** [338:18]
**nooks** [343:6]
**normal** [378:8] [383:23] [384:4]
**normally** [358:7]
**normative** [499:13] [500:3]

**norms** [499:4]
**notary** [521:23]
**note** [354:3] [371:23] [399:24] [486:7]
**noted** [330:16] [519:10] [521:9]
**notes** [350:19] [367:23] [377:16] [397:23] [424:6] [523:1]
**nothing** [400:12]
**notice** [326:14]
**notion** [439:18]
**november** [369:4]
**nuance** [347:20] [348:2]
**number** [354:15] [355:19,21] [356:21,22] [361:9] [362:2,12] [387:10] [395:16] [397:17] [406:9] [417:10] [433:15] [434:1] [436:22,23] [442:15,22] [443:2,13] [444:12] [448:12] [451:11] [453:9] [458:16] [464:5] [469:2] [505:24]
**numbers** [356:15,19] [370:8] [431:8] [479:7] [497:8] [504:3,7]

**O**

**oath** [330:21]
**ob** [415:9] [420:9]
**obgyn** [420:9]
**ob-gyn** [420:9]
**obgyns** [415:9]
**ob-gyns** [415:9]
**object** [332:18] [334:1,8] [345:7,19] [346:13] [347:3] [348:24] [351:9] [358:8] [360:17] [363:13] [364:12] [365:4,19] [366:7] [369:19] [370:22] [378:10] [379:10] [380:7] [381:18] [382:3,8,14] [390:5] [417:24] [421:5] [422:17] [426:3] [440:1] [441:20] [445:15] [455:24] [457:3] [459:6] [463:21] [464:20] [465:14] [496:20]
**objection** [457:2] [494:24] [517:18]
**objectionable** [448:13]
**objective** [382:7] [383:12] [478:2]
**objectively** [379:1]
**obligation** [459:24]
**observational** [406:21] [407:3]
**observed** [452:12]
**obtain** [393:9] [422:16] [516:6]
**obtained** [425:2]
**obtaining** [450:18] [500:3]
**occasionally** [399:12] [401:6] [403:10]
**occasions** [347:7]
**occurred** [360:4] [382:24] [383:9,10] [407:4] [449:3]

[476:3]
occurring [340:2]
occurs [395:1] [473:17]
oclock [495:7]
october [367:4]
odonnell [337:10]
off [350:3,5,9] [373:8] [377:
9] [394:1] [422:23] [423:2]
[436:24] [441:12,19] [442:
9] [443:23] [458:24] [505:6]
[508:3,6] [515:21] [518:8]
offensive [448:19]
offer [333:22] [448:2] [470:
5] [502:7] [504:16] [506:23]
offered [404:21] [446:21]
[448:5] [506:5,11,20]
[507:1,15]
offering [405:12] [418:18]
[507:24]
offers [432:8]
office [467:11]
officer [336:24] [337:7]
[516:1,2]
officers [337:22]
offices [326:15] [330:11]
often [457:10] [469:21]
[491:21]
oh [371:14] [448:21] [462:14]
[481:12] [485:5] [491:5]
ohio [326:3] [330:7]
okay [330:24] [346:20]
[347:6,12] [349:15,20]
[350:16,17] [352:21] [353:
1,5,19] [354:2,6] [355:9]
[357:14] [358:19,22] [360:
22] [361:21] [362:7,18]
[363:4,5,17] [364:5,16]
[365:12] [367:11] [368:18]
[369:10,15] [371:17] [373:
19,24] [374:9] [375:5]
[379:5,14,19] [380:3,12,19]
[381:2,10,13,23] [382:6,11
,17] [383:5,11,17] [384:2,24]
[385:10] [386:19] [387:17]
[388:1,23] [389:15] [390:1
,18] [391:7] [392:2] [393:10]
[394:19] [395:7] [396:19]
[397:12,18] [399:4] [403:13]
[405:11] [406:22] [410:9,11
,12] [411:3] [412:18] [414:18
,22] [415:8,20] [416:4]
[418:19] [420:6] [421:1,12]
[422:6,12] [425:23] [429:5]
[431:11] [432:12] [435:2,15]
[436:8] [442:11] [443:9,18]
[445:21] [447:3,21] [448:7]
[450:16] [451:12] [452:1,4]
[454:1,17] [455:17] [458:12
,22] [459:17,19] [460:8,19]
[462:8] [463:2] [464:8]
[465:2] [466:5] [467:17,24]
[468:20] [469:9] [470:4]
[474:4] [477:6,15] [478:17]
[479:19] [480:11,14] [481:
11,12] [482:1,10] [483:2,6,11
,19] [484:7] [487:3,22]

[488:14,23] [489:4,8] [490:
12,21,24] [491:6,20] [492:5
,12] [493:9,13] [494:7,16]
[495:24] [496:6,23] [497:6
,15] [498:11,15,19] [499:5,16
,23] [502:12] [504:11]
[505:12] [507:19] [510:1,17]
[511:11] [512:7] [515:17,22]
[517:12]
omni [335:9] [399:18]
omnibus [502:10]
once [373:7] [401:10] [505:
22]
one [326:15] [330:10] [335:
23] [336:12] [338:14] [344:
5] [346:11] [355:13] [363:2]
[371:19] [377:22] [379:7]
[388:24] [389:9] [395:15]
[397:18] [400:11] [408:4]
[410:1,16] [411:1,7] [416:17]
[417:12] [422:11] [427:24]
[428:10] [433:13] [434:21]
[438:8] [441:3,4] [443:1,11]
[449:14,21] [451:17,22]
[454:6] [456:5,15,20]
[458:22] [459:19] [462:9]
[464:5,18,23,24] [465:5]
[466:18] [468:1] [469:19]
[473:15] [477:2] [480:8,13
,23] [492:3] [515:19] [516:24]
[517:3]
onemonth [464:23]
one-month [464:23]
ones [463:24]
open [358:2] [359:5] [360:10]
[361:10,15] [363:10] [364:
1,4] [365:7,16] [369:3,12]
[370:6,20] [372:8,9,10,12]
[373:5,18] [514:24]
operating [341:9]
operational [339:1,6]
opinion [344:4,20] [366:6,11]
[383:8] [385:22] [421:2,7]
[446:10,11] [453:1] [489:16]
[504:9] [505:23] [509:20]
[510:18]
opinions [344:24] [360:3]
[379:1,3] [437:23]
opportunity [384:17,19]
[451:8] [467:5] [474:2]
[497:13] [522:10]
opposed [339:15] [374:6]
[382:12] [397:8] [405:16]
[422:1] [431:7] [432:6]
[450:4] [454:24] [457:4]
[464:17] [483:16,22] [491:
22] [499:8]
opt [458:7]
option [427:15,23] [433:23]
[441:14] [442:9]
options [433:18] [434:2]
optout [458:7]
opt-out [458:7]
oral [362:22] [363:9] [434:8]
[451:22] [457:5]
oranges [490:6] [498:1]

[511:13]
order [343:24] [381:16]
[396:9] [422:16] [505:11]
[510:1,2]
orders [356:6] [484:3,5]
organization [341:9] [453:19]
organizations [454:4]
[458:10] [470:11,20] [507:
15]
original [519:13]
osteoporosis [430:2]
otherwise [396:21]
outcome [408:24]
outsource [498:24]
overall [339:3] [401:2]
[403:4] [422:5] [481:22]
overcome [493:1]
override [358:20] [439:11]
overview [367:3]
own [356:5] [357:12,13]
[364:21] [365:2] [370:18]
[401:22] [420:20] [423:10]
[426:10,11,16] [427:22]
[443:20] [449:3] [454:4,5,20]
[469:5] [474:13] [475:21]
[476:19] [490:15] [492:1]


P
_____

p&t [335:8,9,12] [336:5,8]
[399:7] [400:8,9] [403:16]
[404:15] [405:20] [406:6]
[408:21] [409:11,20] [410:
12] [411:6] [416:16] [417:7]
[427:22] [428:11] [429:3]
[433:24] [438:20] [439:10,19]
[440:2,3,7,10,13,19] [441:
10,21] [442:6] [450:24]
p.c [327:4]
p.m [508:4,6,13] [518:8,12]
pacificare [453:20] [456:5]
[457:23] [499:2]
page [328:8] [329:3,9,15]
[340:11] [350:15,17] [352:
13,14,18,24] [353:11,12,20
,24] [354:1,14] [355:6]
[356:8,9,22] [361:12,24]
[362:19] [365:24] [367:13,23]
[369:6,7,8,9,10] [374:11,12
,13] [377:14,15,24] [381:1]
[386:14] [388:8] [393:19]
[394:11] [397:20] [399:6,7]
[419:21] [424:5] [431:9]
[434:4] [437:15] [439:1]
[442:11] [444:9] [457:12]
[462:14,15] [471:18] [475:
20,21] [477:9] [479:24]
[486:2] [492:11,16] [493:18]
[495:14] [498:12] [499:9,11]
[502:1] [503:4,8] [504:15,24]
[520:4] [523:2]
pages [435:11,14,16,17]
[437:17] [453:9,12,15]
[521:4]
paid [337:18] [338:12]
[339:1] [426:24] [479:17]

[482:20] [512:18]
pain [461:15,18]
panel [339:22]
panichelli [327:] [330:13]
paper [457:10]
paragraph [354:5] [375:21,24]
[376:2,4,19] [377:15]
[378:11,13] [379:7] [380:15
,17] [444:11] [462:15]
part [332:22] [344:24] [356:
11] [360:19] [366:17] [368:
8] [430:14] [465:23] [467:18]
[468:22] [470:18] [476:15]
[497:23] [514:16]
particular [335:5] [351:11]
[355:4] [358:1,4] [359:7,18]
[363:7] [372:6] [392:17]
[404:4] [425:9,11] [426:21]
[427:7,8] [431:16] [446:17]
[453:19] [454:7] [462:22]
[469:6] [476:2] [481:5]
[499:15] [503:11] [511:6]
particularly [343:24] [402:21]
[409:13] [436:3] [445:2]
[448:17]
parties [507:18]
parts [466:18]
pass [394:13,16,20] [395:1
,9] [396:3] [398:3]
passed [395:15,19] [396:6,13]
[398:20,24]
past [340:20] [393:6]
patience [517:22]
patient [339:15] [385:15]
[424:9] [425:9] [426:13]
[445:18] [449:4] [450:13]
[451:10] [452:9] [460:5]
[461:20] [462:3] [463:12,18
,23] [464:1,9,16,22] [465:24]
[475:23] [482:19] [483:15]
[486:18] [488:4]
patients [373:10] [386:16]
[387:14] [448:10,12] [449:
9] [451:3] [459:1,11] [460:2]
[467:4] [478:22] [483:21]
[490:4]
pattern [451:10]
patterns [426:2]
pause [467:14]
pay [339:6] [351:8] [352:18]
[448:2] [459:1,24] [460:6]
paying [335:1] [384:21]
[385:16]
payment [334:5] [338:14]
pbm [333:7,21] [334:6]
[340:12] [341:3,6] [345:3,16
,23] [346:3,23,24] [352:19]
[353:15] [354:3] [355:21]
[356:13] [357:6] [358:1,14]
[359:3] [361:9,13] [369:11]
[370:20] [395:14] [400:7]
[401:18] [428:1,4] [431:17]
[434:22] [438:20] [441:23,24]
[443:4,13,15] [446:17]
[448:5] [451:21] [460:6,9]
[461:2] [477:20] [478:1,6,7]

,10] [487:21] [490:9,15,16,20]
[497:22] [499:1,4] [501:7]
**pbmlike** [355:21]
**pbm-like** [355:21]
**pbms** [332:16] [333:21]
[334:12] [340:12,16,21]
[341:7,10,12,20] [342:5,13
,20] [343:3,21] [344:1,14]
[345:14] [346:9] [353:21]
[354:8,20] [355:11,13,18,19]
[356:20] [357:2,17] [358:24]
[360:16] [371:24] [372:2,23]
[377:23] [385:6] [394:13]
[395:8,10] [396:2,8,13]
[397:24] [404:22] [424:6]
[426:12] [427:5] [434:11]
[439:18] [441:14] [442:23]
[451:16] [478:13] [488:9]
[498:4,5] [501:13] [505:1]
**pca** [375:14]
**pcn** [332:4,5,10,12,22]
[333:12,18] [335:3,8,10,24]
[336:9] [342:9,11] [343:10
,14,16] [345:14] [394:23]
[396:19] [399:18] [428:12,16]
[429:4,15,17,22] [430:6,12
,23] [431:6,11,14,22] [432:
6,9,15] [433:17] [447:23]
[449:13] [511:19,23] [512:
3,8,14,20] [515:18] [516:5,11]
[517:6,14]
**pcns** [343:18] [516:6,13]
**pcp** [420:9]
**pcs** [363:7,10] [374:16]
[375:8]
**peer** [402:6] [403:17] [466:24]
**peerreviewed** [402:6]
[403:17]
**peer-reviewed** [402:6]
[403:17]
**peers** [410:20]
**penalties** [373:9]
**pennsylvania** [326:17,]
[327:5] [330:11,15]
**people** [339:8] [352:3]
[371:20] [388:15] [448:22]
[449:2] [452:11] [483:3]
**per** [334:22] [406:8] [486:12]
[489:23] [490:18] [491:11]
**percent** [350:21] [352:6]
[361:10,11,13] [368:1]
[369:2,3,12,17,22] [370:3,7
,17,19,20] [372:7,8,9,10,11
,12,13,19,22] [374:19]
[395:20] [396:3,5,14,15]
[397:1,14] [398:2,3,21]
[420:15] [453:3] [474:7]
[477:21] [480:2,18] [481:7
,9,23] [486:13,20,24] [487:
5] [489:3] [497:2,18] [499:19]
[502:7] [503:10,11] [504:1
,16] [505:2,10,14,15,24]
[506:7,12]
**percentage** [334:18] [395:15]
[448:20] [478:7] [495:15,21]
[496:17] [498:17]

**percentages** [496:9] [506:3]
**perceptions** [420:14]
**perform** [340:12,17]
**performance** [388:20]
[390:17,19] [391:1] [403:9]
[475:10] [501:14] [504:16]
**performed** [409:17]
**perhaps** [348:2] [352:2]
[430:5]
**period** [370:19] [379:23]
[413:1,3] [414:5] [466:22]
[470:22] [472:24] [482:16]
[487:2] [505:21] [512:1,21]
[513:21]
**periods** [417:20]
**perpsiration** [452:13]
**person** [335:21,22]
**personally** [367:14]
**perspective** [332:22] [455:
10]
**persuaded** [448:22]
**pfizer** [469:21]
**pharma** [427:1]
**pharmaceutical** [332:7]
[334:15,17] [351:18] [352:
1,15,19] [356:5] [400:1]
[442:16] [443:3,14] [447:9]
[485:10,14,17] [488:10]
[489:14]
**pharmaceuticals** [350:20]
[351:7,8] [367:21,22]
**pharmacies** [339:12] [484:
2]
**pharmacist** [388:21]
**pharmacists** [335:23]
[337:13] [338:6] [339:10,12]
[424:17]
**pharmacy** [328:9] [332:17,23]
[333:13,16] [340:9] [352:17]
[356:2] [386:17] [414:11]
[427:21] [467:8] [483:18]
[484:10] [488:19] [499:1]
**pharmoeconomic** [409:1]
**phase** [467:2]
**phenomenon** [462:16]
**philadelphia** [326:16,]
[327:5] [330:10,15]
**phone** [467:8] [516:15]
**phrase** [467:6]
**phrased** [514:8]
**physician** [414:15] [416:22]
[419:23] [420:14] [424:9]
[425:2,10] [426:1] [444:23]
[445:7,17] [447:9] [465:6]
[466:13] [467:11,20] [486:
19] [510:13]
**physicians** [373:10] [376:21]
[388:24] [389:2] [413:5,7,9
,12,13,15] [414:12,17]
[415:10,13,21] [416:3,6]
[418:11,14] [419:16] [420:
9,15] [424:17] [446:13]
[450:22] [463:6,22] [465:18]
[466:2,11] [467:2] [470:6]
[487:14] [509:16] [510:3,21
,24]

**picked** [355:2]
**picture** [352:14] [405:2]
**pills** [464:17]
**pillsbury** [516:14] [517:2]
**place** [326:16] [330:10]
[347:24] [378:14] [450:10]
[460:1] [468:7] [492:19]
[493:1] [494:18] [497:3]
[498:5] [499:20] [500:8,12
,19] [501:2,7,22]
**placebo** [402:13]
**placebocontrolled** [402:13]
**placebo-controlled** [402:13]
**placed** [390:3] [461:12]
[468:3] [470:16] [482:16]
[492:2]
**placement** [447:13,17]
[509:19] [510:5]
**places** [343:23] [399:24]
[472:9]
**placing** [339:14]
**plaintiff** [484:8]
**plaintiffs** [327:] [331:13]
**plan** [334:13,15] [334:14]
[335:2] [342:14] [343:4]
[345:6,23] [346:1] [347:1]
[352:16] [358:1,7,14]
[359:5,13,17] [363:10]
[367:3] [370:15] [374:19]
[389:6,11] [391:20] [392:24]
[401:16] [407:15] [426:21]
[427:8] [457:14] [459:18]
[460:13] [464:16] [465:3,5]
[466:1,20] [494:17] [501:1]
[511:6,8]
**plans** [332:5,11,15] [344:3]
[345:18] [346:10] [360:9]
[363:7] [375:14] [377:18]
[387:6] [388:5] [389:1,16]
[395:10] [396:14] [397:21,22]
[401:21] [426:20] [427:7,9]
[464:14] [486:11] [491:9]
[496:9] [512:9] [513:4,9]
[514:4,6]
**platform** [443:21]
**play** [462:3,4]
**player** [455:12,13] [467:22]
[468:5] [510:9]
**plays** [357:7]
**please** [421:23] [519:3,7]
**plural** [434:14]
**pocket** [385:16] [464:9]
**point** [338:23] [355:4] [362:
16] [367:24] [378:12] [385:
12] [388:8] [389:14] [409:3
,19] [412:5] [422:3] [424:8]
[430:20] [464:21] [468:16]
[510:8]
**pointing** [492:22]
**points** [488:12] [492:4]
**pool** [359:14,18]
**poorly** [514:8]
**population** [406:9]
**portion** [340:10] [457:24]
[480:1]
**position** [332:16] [333:20]

[334:4] [336:15,22] [337:3,6
,18] [341:5,14] [343:14,18]
[365:1] [391:12] [417:22]
[418:1,6] [426:4] [428:24]
[434:8] [440:5] [444:11,21]
[446:6,13] [450:8] [451:4]
[462:2,6] [466:2,8] [468:23]
[472:16] [473:1] [474:17]
[476:20] [477:4] [488:6]
[506:23]
**positioning** [365:9] [366:1]
[400:19] [401:13] [425:19]
**positions** [440:6]
**positives** [455:16]
**possibilities** [447:2] [477:1]
**possible** [357:24] [457:23]
**power** [351:6,11]
**ppi** [449:14,17] [451:14,18]
**practice** [341:23] [345:13]
[483:1,5,13,24]
**practices** [340:2] [415:19]
**practicing** [414:15]
**pre** [406:23]
**predominance** [484:1]
**preemptive** [407:15] [466:20]
[500:24]
**prefer** [334:5]
**preferentially** [466:2]
**preferred** [328:16] [362:4,21]
[363:9] [365:8] [373:7,8]
[391:13,14] [428:23] [429:
15] [431:7] [432:19] [433:2]
[439:4] [448:11] [449:2,15
,16] [451:18,22] [466:3]
[468:3] [481:15] [515:18]
**pregnant** [448:13]
**premarin** [328:14] [360:16]
[363:12] [366:2] [383:20]
[385:8] [386:4] [387:4]
[405:7,16] [406:14] [407:10
,14] [411:15,18,24] [412:23]
[413:18] [415:3,7,22]
[416:12] [417:4,16] [418:7
,12] [419:11,18] [420:7,14,23]
[421:3,15] [422:22] [428:7]
[430:11,13,22] [431:3,6]
[432:6] [433:3,4,13] [434:22]
[439:2,23] [441:12,19]
[446:18] [447:23] [448:6,18]
[449:3,10] [450:3,19]
[451:3] [452:3,7] [453:21]
[454:16] [457:15] [458:17,24]
[459:9,11,24] [460:3,11]
[461:21] [464:18] [465:11,19]
[466:3,15,19] [467:23]
[468:5] [471:1,20] [472:15]
[477:12] [490:3] [494:13,14]
[500:24] [503:12] [505:21]
[511:5] [512:4]
**premarins** [473:6] [475:15]
**premium** [489:3]
**premphase** [494:14]
**prempro** [494:14]
**preparation** [366:17]
**prepare** [403:21]
**prepared** [349:16] [366:9]

[375:6] [384:9] [404:1]
**preparing** [340:14] [363:20] [364:6] [365:14]
**preponderance** [410:17]
**prescribe** [425:10] [446:14] [465:9]
**prescribed** [387:15] [406:16] [485:23]
**prescribing** [414:12] [426:1] [445:17] [463:19] [466:5,13] [467:20]
**prescription** [386:17] [398:9] [424:8,24] [425:1,3] [439:5] [462:22] [463:8] [465:13] [466:15] [491:14]
**prescriptions** [376:23] [378:6,7] [383:22] [384:21] [385:7,19] [386:3] [389:2] [460:1] [465:19,21] [466:7] [471:21] [488:3] [489:20] [490:2] [509:16] [510:22] [512:3,20]
**present** [392:1] [393:7] [428:16] [437:13] [488:1] [512:14]
**presentation** [328:15]
**presentations** [456:10]
**presented** [417:8] [454:10,11] [456:6,8,13,19,21,24] [457:11]
**presenting** [406:20] [421:7] [499:17]
**president** [367:21] [398:9]
**press** [466:24]
**pretty** [353:6] [378:11] [516:18]
**prevalent** [477:17,18]
**prevent** [425:14]
**prewomens** [406:23]
**pre-womens** [406:23]
**price** [334:13] [399:14] [405:6] [446:21] [449:16] [450:14] [482:21] [483:16,22] [484:11,14] [490:7] [505:14,17]
**prices** [398:3,10]
**pricing** [328:20] [445:13,16] [447:10] [502:23]
**primarily** [421:22]
**primary** [341:2] [415:10]
**principally** [363:1] [374:3] [416:7,8]
**print** [432:19]
**prior** [358:21,22,24] [359:9] [364:8] [365:16] [372:5] [379:22] [380:17] [382:21] [385:20] [429:4] [473:18] [486:7,12,19] [487:9,14,18,20] [488:2,8,15] [489:9,13,23] [490:5,8,18,20] [491:11,21] [492:2,9] [493:3] [495:16,22] [496:8,10,15] [497:2,12,17,19,23] [498:3,6,15,20] [499:3,6,19] [500:7] [508:22] [509:7,11] [510:16]

**probably** [394:13] [399:3] [409:19] [416:2] [428:20] [436:6] [445:16] [447:18]
**problem** [385:15] [463:18]
**problems** [509:17] [510:4]
**procedures** [425:20]
**proceed** [377:11] [467:15]
**process** [336:3] [354:4] [401:8] [409:18] [410:22] [424:7,9,16] [429:1] [490:9,18,20]
**proclaim** [345:10]
**produce** [515:10]
**produced** [361:7] [451:9] [481:1] [517:19]
**produces** [464:24]
**producing** [400:24] [517:6]
**product** [357:10] [358:5] [359:4,7,8,18,20,21] [362:5] [365:3] [373:17,18] [378:9] [389:18] [391:13,14] [402:5] [403:22] [404:17] [406:13,21] [408:2] [409:12] [414:24] [418:3] [423:17] [425:10,11] [430:10] [432:21] [438:21] [439:21] [440:14,20] [442:7,8,15] [443:2,14] [444:13] [445:22] [446:2,8] [448:3,9,10,15] [449:10,14] [450:7,18,23] [451:3,6] [452:10,18] [454:6] [459:2] [460:7,21] [462:3,5] [463:14] [465:10,13] [469:7,13,15,20] [470:12] [471:7] [473:17] [474:1] [482:21] [487:15] [489:10,13,14] [505:7] [509:17] [510:4,10] [511:7] [513:22]
**production** [329:8]
**products** [334:13] [335:5] [341:6] [351:18] [352:1] [358:4] [374:18] [376:24] [391:23] [399:12] [400:1,16] [401:14] [405:6] [413:18] [416:13] [417:4,16,23] [418:12] [419:12] [433:1,3,16] [442:16] [443:3,15] [449:24] [459:4,22] [460:16] [465:21] [474:3] [485:10,15,18] [487:19] [489:22] [495:17] [496:11] [497:12] [500:9] [514:17]
**professional** [326:18] [414:10]
**profile** [376:22]
**profit** [396:11]
**profited** [333:7] [483:23]
**profits** [344:2]
**program** [469:6] [502:3]
**programs** [374:19]
**projected** [403:8]
**prominent** [357:8]
**proof** [412:11]
**proposal** [375:10] [379:18] [380:10] [461:9]

**propounded** [521:7]
**proprietary** [507:16]
**protocols** [421:13]
**proved** [407:6]
**proven** [407:13]
**provide** [332:10,11] [334:21,23,24] [379:1] [421:2] [450:9] [515:24]
**provided** [332:6] [333:11] [393:18] [429:16] [435:14,16] [436:18] [437:3] [442:23] [443:13] [446:20]
**provider** [339:14]
**providers** [339:5]
**provides** [375:17]
**provision** [442:6]
**public** [339:3] [521:23]
**publications** [350:2]
**published** [373:12]
**pull** [355:15]
**pulled** [386:15] [387:9] [435:15] [500:7,23] [515:20]
**pulling** [436:22]
**pulmonary** [410:5]
**purchase** [339:8] [351:17]
**purchaser** [327:]
**purpose** [498:10]
**pursuant** [326:14]
**purview** [339:4] [401:14]
**push** [334:13] [466:1]
**pushback** [461:20]
**put** [340:18] [347:24] [363:23] [364:22] [376:11,12] [401:16,21] [414:16] [426:20] [427:8] [430:13] [441:11] [442:7] [446:18,20] [447:24] [458:5,16] [459:22] [460:1,11] [463:23] [492:19] [493:23] [494:18] [496:10] [501:1,7,22] [505:24] [508:22] [513:4]
**putnam** [476:21]
**puts** [401:11] [441:5]
**putting** [433:22] [460:2] [481:15]

---

**Q**

**qualifiers** [424:22] [500:12]
**qualify** [358:7]
**quality** [481:5]
**quantified** [508:17,21] [509:6] [510:19]
**quarrel** [398:17]
**quarter** [338:14]
**quarterly** [338:12]
**question** [332:19,20] [335:7] [353:4] [356:18] [358:12,16] [370:10,13] [382:1] [388:12] [395:24] [408:3] [410:9] [412:19] [417:12] [421:23] [427:5,13] [440:22] [441:8] [442:19,20] [460:4] [462:13] [463:16] [473:2] [481:1] [484:13] [491:4] [494:24] [497:24] [500:16]

[514:8]
**questionable** [483:4]
**questions** [329:14] [358:10] [379:16] [382:11] [418:22] [517:23] [521:7]
**quickly** [448:12]
**quite** [395:17] [478:16] [506:2]
**quote** [331:11] [395:11] [412:22] [486:11] [494:17]
**quoted** [419:15] [426:15] [490:7]
**quotes** [474:5]

---

**R**

**raise** [339:24]
**raising** [362:17]
**ramifications** [431:6] [455:22]
**randomized** [408:22]
**range** [395:13] [396:16,22] [397:1,13,15] [405:6] [505:13]
**ranging** [398:1]
**rare** [403:11] [410:22,24] [411:6] [505:15]
**rarely** [402:11]
**rate** [487:5]
**rather** [342:15] [364:23] [455:3] [490:3]
**reached** [368:6] [372:17,20] [483:6]
**reaching** [360:2] [364:11] [365:18] [371:2]
**reaction** [343:15] [456:12]
**reactions** [456:10]
**read** [363:17] [364:2] [365:20,22] [367:14] [387:10,12] [390:21] [408:11,13,14,15,17,18] [422:19] [442:3] [452:14] [456:8] [467:2,4] [500:10] [519:3] [521:4] [522:10]
**reading** [355:3] [375:24] [378:18] [443:8]
**real** [479:8]
**reality** [425:15]
**really** [402:10] [405:7] [416:14] [460:9] [509:10] [510:2]
**reason** [331:18,19] [342:23] [343:5] [355:5] [384:12] [393:4] [396:7] [398:17] [420:18] [439:11] [456:14] [461:17] [463:23] [490:1] [491:13] [496:7] [504:6] [510:21] [513:6] [519:5]
**reasonable** [369:16] [433:22] [454:8] [491:19] [493:24]
**reasons** [389:10] [395:16] [409:10] [441:16] [449:1] [465:24] [473:14]
**rebate** [332:24] [333:5,8] [344:14] [375:18] [394:14] [396:6,10,11,13] [399:15]

[400:19] [406:4] [431:10,12
,13] [434:6,9,20] [435:24]
[436:3] [438:24] [442:13]
[446:22] [450:9] [458:2,8,15]
[459:3,10,12,13,18,20]
[460:14,15] [502:3,7]
[505:13] [507:6,9]

**rebates** [333:19,22] [357:12]
[394:20] [395:1,8,9,13,19]
[396:3] [398:1,4,20,24]
[423:14] [432:9] [442:18,23]
[443:12] [448:2] [453:22]
[501:14] [504:17] [505:5,6
,15,17] [506:2,5,11,21,24]
[507:2,14,22]

**rebut** [364:22]

**recall** [352:2] [354:21]
[367:17] [371:15] [375:3]
[390:20] [394:13] [408:16]
[418:13] [419:13,15,20]
[435:6,23] [439:12] [496:3]
[500:11] [501:2,14,16]

**receipt** [519:14]

**receive** [336:1] [344:15]
[398:1] [432:10] [435:10]

**received** [331:11,21,22]
[333:20] [394:14,15,16]
[435:17] [515:9,10] [516:8]

**receiving** [445:18] [460:14,15]

**recess** [394:4] [444:2]
[508:8]

**recollection** [390:23,24]

**recommend** [375:11,16]

**recommendation** [376:19]

**recommended** [375:13]

**recommendeded** [487:23]

**reconciliation** [502:10]

**record** [330:17] [349:15]
[350:3,6,9,12] [361:6]
[367:2] [377:9] [394:2,8]
[422:23] [423:2,6] [429:14]
[443:24] [444:6] [456:15]
[508:4,6,13] [518:9] [522:6]

**red** [339:24]

**reduce** [403:5,6,7] [406:8]

**reduction** [407:17,18,19]

**reed** [326:15] [330:11]

**reevaluation** [410:6]

**refer** [443:20]

**reference** [457:8] [473:19]
[474:12]

**referenced** [337:11] [450:11]
[493:16] [498:14]

**referred** [449:6] [462:16]
[516:12]

**referring** [369:6,8,17] [370:
18] [413:16] [421:21,24]
[438:11] [441:9] [457:4]
[462:20] [493:20] [496:8,14]
[503:17]

**refers** [488:23] [500:6]

**reflect** [395:3]

**refresh** [435:19]

**regardless** [359:3] [363:6]

**regards** [376:20]

**registered** [326:18]

**regulator** [430:3]

**reimburse** [359:7] [363:11]
[364:7]

**reimbursed** [359:19,20]
[360:15] [377:17] [386:4]
[387:3] [459:18] [482:18]
[491:8] [512:4,21] [513:15
,16]

**reimbursement** [432:2,8]
[437:7] [458:9] [492:24]

**reimbursing** [360:9]

**reject** [487:12]

**rejected** [389:6,11] [487:13]
[511:8]

**rejecting** [389:1]

**relate** [409:17] [474:8]
[476:14]

**related** [494:12,13]

**relates** [351:7,24] [361:14]
[364:20] [373:24] [388:3,14]
[422:9] [452:2] [453:13]
[460:21] [468:12] [476:13]
[498:16] [501:22] [505:20]
[507:13,22] [514:22]

**relating** [430:21] [507:6]

**relationship** [340:23] [341:
1] [414:11]

**relationships** [395:4] [455:
23]

**relative** [400:2] [440:6]

**relatively** [447:15]

**release** [515:15]

**relevant** [364:9] [385:5,9,10]
[402:21] [410:19] [415:18]

**reliant** [396:11]

**relief** [422:16]

**relying** [362:23] [422:4]

**remaining** [405:15]

**remember** [340:14] [440:2]
[444:15] [501:3]

**remove** [353:13] [447:23]

**renal** [401:1]

**render** [505:23]

**renting** [356:4]

**repeat** [442:19]

**repeating** [466:9]

**replace** [449:22]

**replaced** [459:12]

**replacement** [411:19]
[412:6] [429:9] [433:7]
[448:5,9] [449:11] [452:20]
[510:10]

**report** [340:10] [344:22]
[347:7,13] [348:14] [349:23]
[352:4] [353:9,19,20]
[355:7] [360:19] [361:24]
[362:17] [364:14,22] [365:
5] [366:17] [368:5] [371:23]
[372:17,21] [374:2] [375:6]
[381:7,8,10,24] [384:9]
[385:2,5] [386:14] [387:21]
[390:21] [394:11] [395:11]
[398:9] [399:6,24] [400:10]
[405:18] [406:19] [424:3,21]
[425:18] [431:9] [434:4]
[435:8] [436:2] [438:10,13]

**regulator** and so on
[442:12] [444:9] [453:8]
[458:6,13,21] [471:18]
[473:19] [474:21,24] [475:
24] [493:11] [494:22] [495:
1] [496:24] [499:17] [500:11
,14,22] [502:2] [505:12]
[511:14,15]

**reported** [448:18]

**reporter** [326:19] [330:18]
[331:2] [522:21]

**reporting** [365:6]

**represent** [486:8]

**representations** [457:5]

**representative** [386:15]

**representing** [327:]

**repricing** [505:18]

**reproduction** [480:4] [522:
19]

**request** [329:8] [393:18]
[486:13] [487:1] [488:13]
[489:24] [491:12]

**requested** [405:5] [515:12]
[516:9] [517:14] [522:8]

**requests** [486:13] [487:9,21]
[488:15] [490:5]

**required** [341:20] [439:2]
[492:19] [493:23] [494:7,18]
[495:1,2]

**requirement** [492:2,9]
[501:17]

**requirements** [486:8] [502:
11]

**requires** [493:2] [495:16]

**research** [355:3] [356:24]
[362:9] [386:13] [419:11]
[420:20] [422:6,8]

**researching** [360:18]

**resource** [437:17]

**resources** [349:18]

**respect** [358:3] [360:5]
[386:7] [387:19] [501:8]

**respected** [496:5]

**respond** [444:17] [513:11]

**responding** [358:12] [495:3]

**response** [491:3] [517:6]

**responsibility** [516:10]

**responsive** [349:8]

**rest** [388:11] [498:6]

**restate** [395:24] [442:21]
[475:13]

**restriction** [379:8]

**restrictions** [378:15]

**restrictive** [380:13] [514:17
,19]

**restrictiveness** [513:8]

**result** [450:8] [459:8] [471:
21] [472:15]

**results** [420:23] [421:3]

**resumed** [331:5]

**retail** [414:11]

**retailers** [356:5]

**return** [519:12]

**reuptake** [402:18]

**revenue** [344:16] [346:11]
[396:8] [450:9]

**revenues** [338:3,8,16]

[344:11,13] [345:6] [346:1]
[450:10]

**review** [328:14] [375:21]
[383:8] [391:21] [422:18]
[430:24] [431:3] [435:5]
[437:18] [442:7] [487:4]
[507:21]

**reviewed** [387:13] [389:6]
[390:3] [435:1,4,7] [436:5,21]
[437:1] [449:7] [507:12]

**reviewing** [393:15]

**revisited** [429:7]

**reward** [403:6]

**rheumatoid** [402:24]

**right** [330:23] [331:3,20]
[333:10] [334:12] [335:5]
[340:20] [343:9] [345:1,22]
[346:8,12] [348:11] [351:22]
[352:12] [355:5] [356:19,21
,22] [357:1,20] [359:16]
[362:10] [366:4,13] [367:18]
[368:10] [369:6] [370:1,9]
[371:24] [372:3,22] [373:2
,22] [374:13] [375:24]
[376:6,15] [380:6] [381:8,17]
[382:6] [385:14,17] [386:1]
[389:13] [390:8] [393:14]
[395:1] [397:21] [398:11]
[400:3] [403:17,24] [407:8]
[408:1] [411:5] [413:15]
[415:10,12] [417:2,21]
[418:5] [419:21] [420:2,8,20]
[424:18] [425:8] [426:17,19]
[427:4] [430:9] [431:20]
[435:9] [436:19] [439:17]
[441:7] [442:1] [443:22]
[444:19] [446:9,12,16,24]
[450:2] [451:16,20] [453:15
,22] [454:22] [455:19]
[456:3,15] [459:4] [460:21
,24] [461:17,24] [462:6,7]
[464:18] [466:8] [467:20]
[468:15] [469:15] [471:22,23]
[473:3] [474:10,14] [475:1
,6] [476:5] [477:19] [478:5,24]
[485:10,20,21,22] [486:9,14
,15,16,21] [487:3] [490:13,22]
[493:20] [494:10,14] [498:
13,21] [500:1,2,9,24] [502:
1,21] [503:3,14,22] [504:5,19]
[505:2,14] [506:24] [510:6]
[511:9] [513:1,10] [517:4]

**risk** [399:13] [431:17] [450:
10] [489:16]

**riskbenefit** [399:13]

**risk-benefit** [399:13]

**risks** [401:9]

**rite** [483:20]

**role** [354:4] [357:8] [378:20
,24] [383:6] [424:6] [462:4]

**roseman** [327:4]

**rough** [431:8]

**roughly** [468:2] [473:22]
[476:1] [478:15]

**rule** [343:2] [345:2,8]

**rules** [383:3] [502:8]

5/19/2004  Gibson, David

**run** [341:9] [387:11]
**running** [362:19]
**rx** [424:7]
**rxphysician** [414:4,7]

———

S

**sacramento** [418:16]
**safety** [409:6] [423:18]
**sailed** [512:3]
**salary** [338:22,24]
**sales** [398:2] [405:14]
[444:14,21] [445:1,8,11,14
,22] [446:2,8] [455:21]
[469:14,19] [475:15] [487:
18,24]
**samples** [470:5]
**san** [516:14]
**sat** [457:19]
**saw** [435:9]
**say** [331:16,20] [333:15]
[334:12] [341:16,18] [344:
2,23] [346:7] [351:5] [354:7]
[355:10] [359:8,11] [360:1]
[363:7] [365:8,9,23] [369:2]
[371:13] [379:13] [381:3,11]
[389:7] [401:19] [406:9]
[411:22] [412:13,14] [413:
7] [416:2] [417:3] [427:16]
[433:19] [435:4] [436:6]
[439:14] [440:8,14] [449:14]
[450:17] [457:19] [462:15]
[467:12] [468:11] [470:4]
[471:5] [474:21] [477:12]
[478:15] [486:11] [487:4,16]
[491:7] [493:22] [495:1]
[499:8] [514:5] [518:3]
**saying** [331:21] [341:19]
[346:15,16] [373:3,4,23]
[392:18] [393:13] [412:24]
[413:2,3] [415:4] [417:6,13]
[441:9] [447:12] [450:2]
[451:14] [454:18] [456:17]
[470:17] [478:15] [490:17]
[501:23]
**says** [340:11] [365:5] [369:
3] [370:19] [374:23] [375:1]
[379:7] [384:15] [422:11]
[442:6] [463:13] [485:21]
[493:23] [495:1] [503:5]
[505:12]
**science** [407:15]
**scientific** [399:8] [400:2]
**scope** [475:4]
**scott** [495:24] [496:14]
**script** [388:15,17,18] [464:
6]
**scripts** [372:3,10] [376:9]
[378:1,3] [384:3] [389:21,22]
[390:3,15,19] [391:5]
[472:11]
**scull** [516:6,8,23]
**second** [350:4] [354:4]
[367:23] [374:11,12,13]
[376:19] [388:24] [391:23]
[392:12,15] [397:21] [400:

14] [401:17] [402:9,19]
[405:21] [430:4,10] [432:21]
[434:6] [440:23] [473:17]
[474:1] [477:5] [478:21]
[479:3,16] [482:3,4,6]
[497:11] [503:4] [511:21]
[513:16]
**secondary** [409:5]
**secondly** [473:20]
**secondtier** [430:4] [432:21]
**second-tier** [430:4] [432:21]
**section** [500:22]
**seek** [468:23] [470:18]
[486:19] [487:18] [488:2]
**seeking** [487:13]
**seem** [436:11]
**seemed** [436:23] [448:22]
**seen** [349:18] [362:13]
[367:15,17] [371:11] [376:
1] [395:3] [403:21] [418:10]
[419:9,13,14] [435:7]
[436:15,16] [456:17] [469:
17] [496:2] [503:1] [504:12]
[505:19] [507:5] [514:1]
**segment** [351:20] [383:20]
[452:16]
**segments** [480:10]
**selection** [423:12] [497:14]
**selective** [334:19] [351:11]
**selectively** [497:11]
**self** [398:4]
**selfinsured** [398:4]
**self-insured** [398:4]
**selling** [341:6] [407:15]
**senior** [490:11]
**sense** [397:12] [425:4]
**sent** [516:9]
**sentence** [354:7] [375:8]
[384:16] [397:23] [425:4,5]
[434:6]
**separate** [384:7]
**serendipitous** [473:21]
**series** [488:12]
**serious** [410:4]
**serotonin** [402:18]
**served** [516:5]
**services** [326:22] [330:14]
[341:6]
**servicess** [397:24]
**serving** [337:21]
**set** [442:21] [512:6]
**setting** [356:5] [490:9]
**several** [340:21] [414:6]
**shall** [493:24]
**share** [348:5] [351:24]
[373:16] [391:4] [393:1]
[444:14,22] [445:1,8,11,14
,23] [446:3,9] [451:5] [454:
16] [457:17] [472:19] [473:
6] [475:24] [476:9] [498:10]
**shareholders** [338:19]
**sheet** [519:6,8,10,13] [521:
9]
**shield** [357:9] [461:4]
**short** [334:9] [341:12]
[353:15] [394:4] [404:24]

[444:2] [508:8]
**shorthand** [522:21]
**show** [361:5] [366:24]
[367:1] [371:10] [397:20]
[449:4] [473:15] [480:20]
[493:9] [515:7]
**showed** [395:5] [406:3]
[483:8]
**showing** [403:3]
**shown** [360:8] [407:21]
[489:18]
**shows** [361:13] [372:7]
[420:17]
**side** [342:16] [353:13]
[369:11] [376:22] [427:1]
[469:10,11] [477:20] [478:
7] [481:24] [500:15] [503:16
,20,24] [504:2]
**sidelined** [424:16]
**sign** [519:7] [522:10]
**significance** [502:4] [513:20]
**significant** [351:6] [371:24]
[425:14] [426:5] [446:7]
[503:23] [509:12]
**significantly** [506:22]
**signing** [519:9]
**similar** [399:11] [400:15,16]
[401:4] [411:11] [415:7]
[420:23] [421:3] [478:16]
[504:3,6]
**simply** [334:6] [338:20]
[359:3] [438:21] [447:23]
[451:1] [462:1] [463:24]
[467:20] [491:14] [511:7]
**single** [456:12]
**sir** [332:4] [346:5] [349:18]
[350:22] [353:2,10] [355:5
,8] [358:23] [360:13] [361:13]
[367:6] [368:19,22] [369:11]
[371:10,23] [373:23] [374:
14] [375:2,23] [377:2,13]
[378:20] [379:5] [381:2]
[382:7,19] [383:12,18]
[385:4] [386:12] [388:13]
[389:24] [391:15] [398:16]
[405:19,22] [406:11] [408:
5] [411:22] [412:1] [413:9,21]
[414:23] [415:3] [418:16]
[419:8,24] [420:5,22]
[421:10] [423:8,13,20]
[425:8] [426:9] [428:6]
[429:21] [444:8] [470:2]
[472:5] [473:13] [476:8]
[487:11] [488:14] [498:11]
[501:10,19] [502:6] [503:1]
[505:12] [506:14,16] [517:
21]
**sitting** [342:15] [476:12]
**situation** [364:19] [374:4]
[377:2,20] [430:6] [449:18
,20] [462:23] [471:17]
[500:18]
**situations** [358:24] [449:12]
[451:16] [462:20] [479:20]
[483:14]
**six** [486:23] [487:1,4]

**sixmonth** [487:1]
**six-month** [487:1]
**size** [389:9] [469:18] [505:13]
[506:21] [507:14,22]
**skeptical** [364:13] [365:21]
**skip** [378:1]
**slide** [480:5]
**slight** [405:1]
**small** [339:18,21] [452:16]
[480:1]
**smelled** [448:19] [452:14]
**smith** [326:15] [330:11]
**soft** [373:13]
**sole** [362:20] [434:23]
[435:3,18] [436:9,12]
[437:3,8] [439:3] [441:17]
[509:10]
**solutions** [375:16]
**solvey** [389:16]
**somebody** [468:23] [490:1]
**somehow** [341:20] [437:23]
**someone** [347:2]
**something** [349:6] [363:5]
[403:11] [410:1] [411:11]
[412:10] [464:2] [470:6]
[475:16] [477:7] [488:12]
[516:13]
**sometimes** [334:13] [400:1]
**somewhere** [436:7] [479:16]
[489:3]
**soon** [431:21]
**sophisticated** [351:3]
[397:8,11]
**sorry** [353:20,24] [354:19]
[368:22] [372:19] [375:11]
[395:23] [429:6] [478:19]
[485:5] [487:12] [492:15]
**sort** [400:3] [432:2] [447:7]
[453:13] [457:18] [467:17]
[473:7] [485:12] [494:17]
[500:16] [503:7] [516:21]
**sounded** [454:3]
**sounding** [489:16]
**source** [448:15]
**sources** [344:11,12,13,16]
[345:5,24] [346:1] [354:13]
[394:22,24] [395:12] [426:
15]
**southern** [326:3] [330:6]
**space** [519:5]
**speak** [413:8] [417:13,17]
**speaking** [332:21] [358:2]
[402:4] [426:12] [485:12]
[491:20]
**specialty** [356:3]
**specific** [460:13]
**specifically** [502:10]
**spector** [327:4]
**speculate** [430:14,16]
[433:21] [462:12] [491:17]
**speculating** [432:7] [433:20]
**spend** [332:7] [335:4]
**spending** [398:10] [403:4]
[485:9,14,18]
**spent** [333:17] [335:4]
**spices** [411:17]

**spill** [463:19] [465:11,20] [466:6,14]
**spillover** [462:14,17] [463:3 ,4,5] [465:7,18] [467:18,19 ,21] [468:4,7]
**spoke** [413:16]
**square** [356:14] [370:23] [400:3]
**squared** [356:16]
**squeamish** [448:16]
**staff** [335:21] [339:1] [430:23]
**stand** [377:6]
**standard** [342:4,7] [401:17]
**start** [332:20] [335:19] [345:14] [467:7,10]
**started** [330:24] [449:5] [503:18]
**starting** [386:14]
**starts** [449:5]
**state** [337:14] [353:20] [394:12] [416:11] [506:6] [507:3,10] [519:5]
**stated** [376:4] [400:10]
**statement** [350:17] [372:18] [394:11] [412:1] [416:21] [424:19,23]
**statements** [400:4]
**states** [326:2,20] [330:6] [356:2] [376:18] [378:13] [383:19] [384:6] [414:19] [417:15] [424:7]
**stating** [370:14]
**stats** [478:10]
**status** [358:16] [362:3] [365:2,7] [381:3,11] [388:10] [425:24] [470:19]
**stays** [406:14,15]
**steer** [498:9]
**stenographic** [330:17]
**step** [357:23]
**stipulated** [492:24]
**stop** [405:21] [511:2]
**strategies** [476:15] [486:5]
**strategy** [328:20] [375:17,20] [460:20] [461:16,19] [487: 13] [502:24] [503:5]
**strawn** [327:9]
**street** [326:16] [327:]
**strength** [503:12]
**stretching** [412:4]
**strict** [411:16]
**strike** [359:1] [360:12] [372:19] [387:1] [412:20] [462:13] [482:18] [496:11] [514:2]
**stroke** [407:18]
**strong** [409:13] [465:23]
**strongly** [400:13]
**structure** [333:5] [344:24] [353:13] [358:20] [428:2] [434:19] [436:3] [441:1] [464:13] [477:4] [512:15]
**structured** [353:7] [424:16]
**structures** [365:10] [373:14] [428:3] [459:10] [502:15]
**structuring** [473:24]

**struggling** [480:23]
**studies** [402:10,12,13,15,21] [403:20] [406:20,21,24] [407:1,4,9,16,22] [408:6,10 ,12,13,15] [409:1,16,17] [417:10] [418:10] [421:20,24] [450:20] [471:6]
**study** [402:19] [403:21] [404:2,11,21,22] [409:12,13 ,14] [410:14,16] [411:1,7] [416:17] [420:11,13] [422: 10,14,18] [450:23] [463:10] [509:14,21,22,23,24] [510:5]
**subcontract** [357:11]
**subcontractors** [356:3]
**subject** [519:9]
**submitted** [422:10]
**subpoena** [328:21] [515:8,12] [516:5,7] [517:6]
**subpoenas** [516:23]
**subscribed** [521:15]
**subsegment** [452:19]
**subsequent** [403:6]
**subset** [452:11]
**subsets** [449:24]
**substance** [521:8]
**substantial** [450:9] [458:10] [510:14]
**substitutable** [433:4,8,13]
**substitute** [455:10]
**substituted** [333:4] [380:9,12 ,19]
**substitutions** [334:20]
**success** [446:7] [451:5] [462:2,5] [469:15,20] [470:7,12,21] [471:8,19] [514:2]
**successfully** [406:15]
**suggesting** [363:5]
**suite** [327:]
**sums** [378:11]
**supersede** [439:15]
**supervision** [522:21]
**supply** [464:4,23]
**support** [329:1] [426:16] [476:24]
**supporting** [411:8] [471:7]
**suppose** [349:5] [463:8]
**supposed** [378:24] [383:15]
**sure** [331:17] [348:3] [354:23] [369:20] [393:24] [400:5] [430:18] [442:20] [443:9] [459:7,8] [480:22] [482:11] [494:20] [502:3] [511:24]
**surgeons** [415:16]
**surprised** [359:11] [360:1] [365:23] [366:5] [392:6] [397:16] [419:19] [422:19] [439:13]
**surprising** [396:16]
**survey** [413:11] [416:21] [419:23,24]
**surveyed** [419:17]
**suspect** [457:1]
**sustained** [448:24]

**swear** [330:19]
**sweat** [448:18]
**switch** [399:5] [449:16] [451:21]
**switched** [451:1,16] [477:13]
**sworn** [521:15] [522:5]
**symptoms** [406:16] [422:16]
**system** [360:11] [361:15] [370:21] [375:9] [384:22] [448:24] [449:15]
**systematic** [409:22]
**systems** [374:16]

---

T

---

**table** [342:15] [368:15]
**tablet** [465:5]
**tablets** [422:15] [464:1,4,5]
**taken** [326:14] [343:13] [394:5] [444:3] [464:17] [508:9]
**taking** [448:15] [485:17]
**talk** [340:9] [373:20] [399:4 ,7] [415:2] [434:5] [442:11] [452:22] [453:8,9,15] [462:14] [471:19]
**talked** [335:8] [414:23] [415:13] [450:21] [471:17,24] [500:20]
**talking** [394:19] [395:7,9] [405:24] [406:17] [411:10,12] [415:15] [416:15] [420:3,4] [425:17] [431:11] [464:12] [469:23] [477:8,11] [488:12 ,17,18] [490:12] [509:5] [514:10]
**talks** [442:12] [444:11]
**tangentially** [506:18]
**tape** [508:5,12]
**target** [395:17]
**taught** [458:20]
**teamster** [342:14]
**teamsters** [333:15] [343:4]
**techniques** [468:18] [501:15]
**technology** [448:23]
**tell** [339:3] [348:11] [358:11] [366:10] [376:2] [396:5] [402:8,15] [413:12] [418:14] [453:2,7] [505:24]
**telling** [346:3,16,21] [358:13] [416:18] [454:3] [499:18]
**tended** [479:10]
**term** [347:7,13,14] [348:19] [408:12] [455:11] [467:21]
**terms** [332:16] [333:22] [345:13] [360:14] [381:3] [391:19] [392:23] [404:3] [418:11] [432:5] [435:23] [446:8] [447:19,21] [453:21] [454:4] [457:9] [461:20] [462:5] [465:12] [468:20] [472:1,13,23] [474:5] [476:8] [483:12] [484:9,10] [512:6]
**testified** [364:5] [409:2] [492:21]

**testify** [501:23] [511:23]
**testifying** [346:17] [380:4] [455:11]
**testimony** [328:2] [346:14] [357:15] [365:12] [414:22] [436:9] [456:23] [482:13,15] [492:18] [495:4] [502:5] [522:6]
**tests** [403:7]
**thank** [518:1,2]
**thats** [330:24] [331:16,17] [333:15,18] [339:14] [342: 23] [343:7] [345:13] [346:8 ,14,15,16] [348:2,18] [356: 11] [362:8] [363:2] [365:15] [372:21] [373:3] [376:13] [378:18] [384:13] [388:7] [395:16] [397:14] [398:8,13] [403:11] [405:23] [406:5] [409:19,24] [411:11] [416: 14] [418:20] [419:24] [420: 17] [422:3,11] [425:4] [427:18,19,24] [436:21] [437:17] [441:1] [443:12,19] [446:16] [447:22] [449:7] [450:5] [452:15] [453:12] [454:8] [457:17] [463:1] [464:2] [466:22,23] [473:18] [477:6] [481:16] [482:24] [483:2,6] [484:9] [485:20,22] [490:22] [493:14] [496:16,21] [497:4] [498:2,12,17] [499:24] [502:13] [504:18] [505:20] [507:23] [508:20] [510:20] [513:6] [514:21] [515:1] [516:18] [517:5]
**themselves** [340:22] [344:6] [401:15] [454:13,24] [456: 11]
**therapeutic** [334:22] [409:6] [423:10] [444:15] [454:7] [433:7]
**therapy** [411:20] [412:6] [433:7]
**theres** [340:20] [343:6] [345:9] [350:17] [351:11] [354:9,16,19] [355:21] [356:11] [397:22] [400:12] [401:5] [407:9] [409:14,15 ,16] [410:17] [411:7] [414:18] [421:18] [459:17] [460:12] [462:24] [469:1,2] [479:2] [480:9] [481:16] [486:2] [501:19] [503:4,8,18] [513:24] [517:5]
**theyll** [462:23] [466:14]
**theyre** [333:11,12,16,20] [334:3] [336:2] [342:17] [345:11] [346:17,18,21,22] [352:18] [396:10] [399:10] [405:24] [406:1] [409:22] [447:15] [478:16] [493:23] [507:24]
**theyve** [365:13] [408:8] [449:13] [451:11] [458:15] [507:14]
**thing** [332:2] [387:11] [395:

2,3] [406:1] [438:23] [445:13]
[447:13] [452:2] [457:6]
[459:23] [462:9] [498:2]
**things** [331:9] [340:9] [344:
5] [363:3] [365:20] [401:22]
[403:14] [405:19] [414:7]
[438:8,17] [444:20] [447:8]
[450:21,23] [458:22] [468:
20] [469:2,9,12] [471:12]
[476:15,16,18] [508:15]
[509:18] [514:10,12]
**think** [341:12] [342:1] [343:
18] [347:20] [349:5] [351:10]
[356:13] [357:1,6,19]
[358:11] [362:8] [364:8,21
,24] [369:16] [378:12,22,23]
[385:4,9] [394:20] [396:15
,21,24] [397:4,14] [403:24]
[404:4] [408:8] [412:24]
[413:8] [416:4] [424:15,22]
[426:4] [446:17] [447:14,16]
[450:24] [452:21] [453:13]
[455:21] [456:1,15,20]
[457:22] [458:3] [462:10]
[465:17,22] [468:14] [471:
11] [482:24] [504:6] [505:20]
[506:17] [513:20,24] [514:
13,15,23]
**third** [368:8,13,14,17]
[369:2,12,18] [370:2,18,19]
[372:9,11,13,24] [377:14]
[392:10] [400:21] [432:15,23]
[440:24] [444:10] [458:17]
[459:1,2,11] [460:3,12]
[462:15] [471:21] [472:15]
[473:18] [474:1] [476:14]
[477:5,13,17] [478:8,13,21]
[479:3,17,23] [482:3,16,20]
[488:5] [507:18] [512:2,6,10
,17,22] [513:3,5,7,11,13,15
,17]
**thirdtier** [368:17] [459:2]
[460:3] [472:15] [482:20]
[513:15]
**third-tier** [368:17] [459:2]
[460:3] [472:15] [482:20]
[513:15]
**thirty** [519:14]
**though** [358:23] [376:13]
[380:14,16] [397:13] [424:
20] [440:16] [441:13] [454:
18] [490:12]
**thought** [439:21] [447:12]
[452:4] [474:23] [480:18]
**thousand** [406:9]
**threat** [458:6]
**three** [359:6] [361:11] [369:
4] [385:6] [400:11] [428:22]
[440:24] [479:19,20] [480:
3,9,17] [481:8] [512:2]
**threetier** [359:6] [440:24]
[479:19,20] [480:3,17]
[512:2]
**three-tier** [359:6] [440:24]
[479:19,20] [480:3,17]
[512:2]

**throughout** [343:14] [373:15]
[480:6] [507:2]
**thrust** [431:16]
**thumbing** [398:8]
**tier** [354:16] [358:15] [361:11]
[368:8,13,14] [369:3,4,12,18]
[370:2,18,19] [372:9,11,13
,24] [391:23] [392:10,13,15]
[400:18] [401:17] [430:10]
[432:15,23] [440:24] [458:
17] [459:1,12] [460:12]
[471:21] [473:18] [474:1]
[476:14] [477:5,13,17]
[478:8,13,21] [479:3,14,16
,17,23] [480:8,13] [481:8]
[482:3,4,6,16] [488:6]
[497:11] [511:21] [512:2,6
,10,17,22] [513:3,5,7,11,13
,16,17]
**tiered** [512:15]
**time** [330:9] [350:6,12]
[351:19] [370:19] [377:16]
[379:23] [380:14] [381:20]
[384:9] [385:1] [389:9]
[393:6] [394:2,8] [403:22]
[408:18] [413:1,22] [414:5
,6] [417:8,12,19] [422:22]
[423:5] [426:23] [427:21]
[428:15] [440:8] [443:24]
[444:6] [456:16] [462:12]
[468:10,11,14] [471:3,9]
[472:24] [476:4] [477:15]
[482:16,21] [487:1] [495:6]
[497:18] [504:12] [505:21]
[508:4,6,12] [512:21]
[513:22] [514:18] [517:12,23]
[518:8]
**times** [331:10] [486:18]
**title** [349:21]
**titrate** [463:11,18]
**today** [345:2] [382:7] [396:7]
[405:5] [476:12] [514:20]
**todays** [330:8]
**together** [363:23]
**token** [345:1] [504:23]
**told** [333:16] [349:4] [469:10]
[516:8]
**tools** [498:5]
**top** [337:16] [346:2] [350:19]
[352:5] [353:11,22] [354:9]
[378:13] [399:7] [424:5]
[438:4] [480:7] [504:15,23]
**topic** [340:19] [421:8]
**topics** [340:7] [399:5]
**toptier** [346:2]
**top-tier** [346:2]
**total** [333:13] [335:3] [436:5]
**touch** [413:24]
**touching** [466:18]
**towards** [419:17]
**toxicity** [400:22] [401:1]
**tracking** [499:15]
**trail** [457:10]
**transaction** [460:5] [505:8]

**transcript** [519:15,16]
[522:11,18]
**transcription** [521:6]
**transparent** [341:15] [343:
19,21,22] [344:7,8] [345:5,11
,24] [346:4]
**traumatic** [449:8]
**treat** [359:7] [406:15,16]
**treatment** [402:24] [421:12]
**trials** [408:22]
**tried** [349:7] [426:20] [461:
19] [476:7] [510:24]
**trigger** [410:5] [505:17]
**trouble** [498:22] [501:11]
**true** [331:17] [332:4] [334:6
,16] [372:21] [374:1] [384:13]
[385:6,18] [386:2] [396:21]
[426:9] [443:11] [454:7]
[471:12] [488:14] [514:21]
[522:5]
**trueup** [334:6]
**true-up** [334:6]
**trust** [337:2]
**trustworthy** [342:2]
**try** [382:17] [417:12] [467:3
,13] [473:3] [497:7] [501:13]
[510:13]
**trying** [376:10,14] [379:2]
[400:3] [417:2] [427:5]
[476:6] [510:17] [511:2]
**turn** [346:24] [352:12]
[355:6] [367:22] [397:20]
[419:21] [426:13] [445:10]
[459:2] [471:13] [501:19]
**turned** [388:15,18] [408:2]
**turning** [361:12]
**twice** [465:2,4,10]
**twominute** [508:2]
**two-minute** [508:2]
**twothirds** [422:15]
**two-thirds** [422:15]
**twotier** [513:9]
**two-tier** [513:9]
**twoyear** [478:15]
**two-year** [478:15]
**type** [402:19] [419:24]
[420:11] [432:16,17] [455:
20] [475:2] [484:1]
**typical** [479:21]
**typically** [475:2]

---

U

**u.s** [353:21] [354:8,20]
[397:23]
**uh** [355:12] [369:1] [376:17]
**uhhuh** [355:12] [369:1]
[376:17]
**uh-huh** [355:12] [369:1]
[376:17]
**unable** [378:14]
**unacceptable** [399:13]
**unaware** [393:16]
**underlying** [388:21]
**understand** [330:21] [331:12]
[343:1] [363:10] [366:4]

[378:20] [383:11,14] [408:1]
[412:18] [416:15] [428:12]
[443:9] [446:5] [447:6]
[451:13] [454:17] [464:19,21]
[471:13] [476:5,6] [488:17]
[497:8] [502:4,6] [510:8,18]
**understanding** [341:19]
[348:7] [364:9] [374:4,7]
[383:2,5] [385:1] [399:21]
[427:19] [428:5] [433:9]
[454:11] [456:7] [482:14]
[486:17] [499:12] [512:12]
[516:12]
**understood** [504:14] [510:
11]
**undertake** [431:3]
**undertaken** [419:23] [420:10
,19] [475:9,14]
**undertakes** [475:2]
**underwriter** [427:21] [460:
23] [461:6]
**underwriters** [473:22]
**undisputed** [365:13]
**unfavorable** [461:12]
**uniformly** [359:14,17]
[486:3]
**union** [333:15] [343:4]
**unique** [399:11] [400:12]
[401:6] [416:19] [417:11]
[423:10] [441:5] [452:5,6]
[458:19]
**united** [326:2,19] [330:5]
[338:6] [377:5,13,20]
[414:19] [417:15] [489:6]
[490:21,24] [491:6,12]
**universal** [362:5]
**universe** [447:2] [477:1]
**unless** [409:23] [465:22]
[522:20]
**unlikely** [446:23] [448:4]
**unsophisticated** [397:7,10]
**until** [367:14] [428:13]
**unusual** [396:18] [488:8]
[497:11] [506:17]
**updated** [408:8]
**updates** [349:24]
**upfront** [334:5]
**up-front** [334:5]
**upon** [362:23] [396:11]
[399:8,13] [441:1] [454:2]
[478:23] [487:4] [499:7]
[509:1]
**upper** [502:14] [503:18]
**upside** [384:20]
**uptake** [468:12]
**urine** [448:19] [452:14]
**urines** [452:12]
**us** [349:4] [400:6] [458:20]
[481:2] [505:3]
**usage** [421:13]
**use** [333:7] [343:3] [347:6,12
,13,14,19] [348:19] [355:22]
[374:3] [401:9] [403:4]
[406:7,13] [407:4] [408:12]
[411:18] [413:3] [421:14]
[433:6] [448:13] [466:3]

**5/19/2004  Gibson, David**

[493:24] [494:1,2,3,8]
[496:15] [511:2]
**used** [402:13] [412:9,13]
[420:16] [448:10] [453:17]
[462:21] [491:22] [495:24]
[496:2] [498:9] [511:18]
[519:17]
**using** [356:3] [433:17]
[458:6] [494:8] [501:15]
**usually** [395:1] [409:14]
[410:16] [441:9] [479:15,16]
[482:5]
**utilization** [398:10] [425:21]

V

**value** [457:15]
**values** [468:1]
**variable** [445:19] [450:14]
**variables** [427:24]
**various** [347:7] [360:9]
[404:22] [453:17] [456:8]
[476:22]
**vary** [478:22]
**vasomotor** [422:16]
**vast** [375:14]
**vendor** [340:3]
**vendors** [339:7,9,20] [340:
2]
**ventured** [394:22]
**verbally** [444:17]
**verified** [355:1]
**versus** [330:5] [334:6]
[402:19] [477:5] [509:19]
[510:4] [514:5]
**viable** [452:18,22]
**videographer** [327:] [330:2
,12] [350:5,11] [377:6,11]
[394:1,7] [422:21] [423:4]
[443:23] [444:5] [467:15]
[508:3,11] [518:6]
**videotape** [326:13] [330:3]
[422:22] [423:5] [518:7]
**view** [341:10,23] [343:2,10
,16] [344:1] [345:3,17]
[348:21] [349:3,8] [352:10]
[368:11] [391:21] [404:14]
[407:12] [408:5] [410:15]
[418:11] [420:22] [424:13]
[425:8] [427:17] [446:5,12]
[474:6] [485:13,16] [513:21]
[514:3,12] [515:24]
**viewed** [411:14,23] [412:23]
[413:6] [415:7] [416:12]
[417:3,15] [433:3] [448:9]
[455:8]
**viewing** [425:5]
**views** [409:11]
**viking** [371:21] [375:9,12,15]
[376:7] [378:5]
**vikings** [376:19]
**violated** [454:14]
**violation** [359:15]
**virtually** [445:18]
**visit** [416:5]
**visited** [410:21] [416:2]

**visits** [403:7] [416:5]
**voice** [472:19]
**volume** [326:1] [444:14,21]
[445:1,8,11,14,23] [446:2,8]
**vs** [326:]
**vulnerable** [466:21] [467:2
,6] [468:10]

W

**wacker** [327:]
**waiting** [495:5]
**walk** [438:9]
**want** [339:13] [340:7] [394:
10] [406:7] [418:15,21]
[430:16] [434:1] [436:14]
[442:7,20] [443:9] [457:2]
[461:21] [462:12] [467:3,4]
[482:11] [486:1] [489:15]
[494:23] [502:3]
**wanted** [332:2] [335:7]
[441:15,18] [444:19] [448:
14]
**wants** [348:1]
**ward** [327:] [480:24] [485:2]
**warnings** [400:23]
**wasnt** [354:14] [377:21]
[412:7] [430:14] [438:8]
**ways** [338:19] [459:17]
[501:13]
**weak** [410:14,18]
**weakest** [445:16]
**website** [432:17]
**weeks** [463:10]
**well** [338:23] [346:20]
[357:4] [363:2] [367:12]
[368:11] [373:19] [378:3]
[406:10] [411:20] [412:7]
[413:4] [421:4] [422:3]
[426:16] [430:9] [431:20,21]
[436:19] [448:6] [449:22]
[450:7] [455:21] [457:1]
[460:8] [462:11] [467:19]
[471:15] [474:19] [479:9]
[480:3,4] [485:20] [489:18]
[490:21] [507:19] [509:2]
**wellestablished** [448:6]
**well-established** [448:6]
**wellpoint** [492:14,20,24]
[493:15,24] [500:20]
**welltrained** [455:21]
**well-trained** [455:21]
**went** [334:18] [339:20]
[385:19] [390:15] [404:2]
[411:18] [447:7] [450:15]
[455:7] [457:20] [477:16]
[478:13] [488:1] [512:2,22]
**werent** [393:15] [394:21,23]
[418:6] [428:13] [494:7]
[503:14] [504:19] [510:21]
**west** [327:]
**western** [326:4]
**weve** [335:20] [385:5] [453:
5] [481:6,7] [484:22] [493:9]
[497:21]
**whatever** [435:13] [436:19]

[461:18] [468:7]
**whats** [336:3] [343:15]
[361:5] [367:1] [376:4]
[383:5] [387:8] [411:24]
[419:7] [421:1] [451:17]
[455:19] [466:12] [515:7]
**whereas** [455:14]
**wherein** [354:13] [357:11]
[456:10] [473:22]
**whereupon** [349:11] [350:8]
[361:1] [366:20] [371:6]
[377:8] [394:4] [419:3]
[423:1,22] [429:11] [444:2]
[484:18] [493:5] [502:17]
[508:8] [515:3] [518:11]
**whether** [334:4,6] [356:20]
[358:13] [359:2,4] [361:18]
[362:20] [363:6] [364:10,18]
[368:12] [374:4,22] [376:3
,6] [379:8,21] [380:20]
[382:24] [386:2,24] [387:3
,18] [388:4,16] [389:5]
[390:14] [391:3] [392:3,7,11
,14,23] [404:7,10,20] [416:
17,22] [418:11] [421:6]
[427:11,15] [431:22] [432:
1] [435:2] [438:19] [439:8]
[440:3,20,22] [447:19]
[454:12] [456:4] [465:8,12]
[466:13] [472:2,8] [473:5,8]
[475:1,10,14] [476:7,8,13,14]
[477:19] [478:6,19] [479:9
,10,11] [482:1] [483:3]
[485:9,18] [487:22] [489:24]
[490:15] [491:13] [496:18]
[499:5,24] [500:5,17]
[501:6,21] [506:4,10]
[509:15] [510:2,20] [511:4
,5,7,17] [512:3] [513:14,16]
[517:4]
**whi** [408:3,7,19] [474:3,6,8]
[475:12,16]
**whichever** [401:11]
**whis** [476:4]
**whole** [412:6] [425:18]
[448:14] [450:5] [513:6]
**wholesale** [350:21] [352:6]
**wholesalers** [350:18,19]
[351:1,16] [352:1,5]
**why** [330:23] [347:12]
[352:9] [358:18] [370:13]
[378:12] [389:10] [418:14,20
,24] [431:16,17] [432:5]
[447:22,23] [448:7] [452:1]
[461:18] [490:1] [491:13]
[510:21] [511:14]
**will** [330:16] [333:3] [337:15]
[339:1,16,23] [347:16]
[349:6] [355:22,23] [359:14]
[361:24] [374:17] [375:16]
[383:21] [384:21] [396:5]
[400:7] [401:18] [403:5,6,7]
[406:7] [410:16] [413:12]
[415:14] [426:10] [432:18]
[451:21] [466:6,14] [467:2
,12,19] [468:3] [475:23]

[483:3] [486:24] [505:23]
[509:20] [519:11]
**willing** [448:1] [461:15]
**willingness** [465:12,20]
**winston** [327:9]
**wise** [326:18] [330:18]
[522:]
**wish** [518:3]
**withdrawal** [410:6]
**withheld** [517:15]
**within** [340:2,19] [358:20]
[361:14] [370:20] [373:9]
[383:1] [395:4] [396:16]
[399:12] [401:17] [407:23]
[426:11] [434:20] [444:12,14]
[445:6] [449:15,19] [452:6
,8] [454:6,15] [462:16]
[486:23] [487:1] [500:1]
[512:8] [519:14]
**without** [358:24] [359:9]
[375:14] [376:11] [380:20]
[385:20] [425:1,2] [438:23]
[483:7] [502:14] [506:18]
**witness** [329:2] [330:19]
[374:24] [383:3] [384:10]
[393:20] [485:5] [507:19]
[518:1,3] [519:1] [522:4,6,9]
**witnesses** [365:13]
**woman** [463:9]
**women** [422:15] [448:14,16
,17]
**womens** [407:23] [408:14]
[422:5] [430:1]
**wonder** [393:20]
**wondering** [463:2] [465:7]
[466:13] [475:8] [489:22]
[491:10] [501:5]
**word** [345:7] [355:20] [379:
7,15] [380:9] [397:22]
[406:1]
**words** [333:6] [352:17]
[391:5] [396:10] [403:4]
**work** [356:13] [371:20]
[376:21]
**working** [331:23] [413:13]
[414:3,8,10,12] [463:13]
[476:21]
**works** [399:21] [400:13]
[440:3]
**world** [479:8]
**worth** [467:12]
**worthy** [424:14]
**wouldnt** [334:18] [359:11]
[360:1] [392:5] [396:16]
[404:5] [439:12] [464:10,11]
**write** [462:23] [464:3] [465:
13,20] [466:15] [467:7]
**writes** [335:16,19,22] [463:
8]
**writing** [425:3] [462:21]
[464:23] [466:7] [509:16]
[510:3,21]
**written** [465:18] [466:24]
[467:1] [497:16]
**wrong** [358:12] [380:22]
[407:7,13] [408:6] [425:7]

**5/19/2004  Gibson, David**

[469:3]

**wrote** [385:2] [485:8]

**wyeth** [326:] [327:] [330:5]
[362:14,15,20] [363:8]
[368:16] [373:9] [374:3]
[378:16] [379:9,22] [380:13
,17] [381:14] [387:18]
[388:4,19] [389:12] [405:13]
[406:3,11] [427:6] [431:23]
[432:3] [434:7,10,14,16,19]
[437:8] [439:18] [442:8]
[446:19] [453:16] [454:9,13
,23] [455:6,19] [457:14]
[458:4,7] [460:15] [469:10]
[473:19] [474:22] [475:3,7]
[476:2,21] [492:18,23]
[493:12,15] [494:1] [495:17]
[498:12] [502:6,23] [503:15
,22] [504:16] [511:7]

**wyethayerst** [326:] [327:]
[494:1]

**wyeth-ayerst** [326:] [327:]
[494:1]

**wyeths** [360:18] [362:3]
[364:21] [379:18] [380:1]
[426:16] [443:19] [446:11]
[449:3,6] [453:3] [471:14]
[474:13] [475:21] [476:9,19]
[492:1]

---

Y

---

**year** [332:8,13] [333:14,17]
[334:7,14] [335:3] [338:8,10]
[339:23] [391:16,17] [396:
17] [397:2] [398:19] [406:17]
[437:10,11,12] [451:17,22]
[469:23] [478:8,15]

**years** [340:21] [451:11,21]
[465:19] [468:8] [471:15]

**yes** [332:9,14,21] [334:10]
[335:11] [338:4] [341:12]
[343:5] [347:4] [348:16]
[350:23] [351:2,4] [353:2,10
,15,16,18] [355:8] [358:18,19]
[361:20] [363:3] [368:22]
[369:11] [374:14] [375:2,23]
[379:12] [383:4,13,16]
[384:23] [386:12] [389:24]
[390:6,10] [391:15] [395:11]
[398:22] [399:22] [405:19,22]
[407:11] [408:23] [409:3,8]
[411:2] [413:21] [414:21]
[415:11,14] [420:4,10,24]
[427:10] [428:10] [430:4,8]
[431:8] [432:16] [433:14]
[434:3] [435:21] [436:11]
[437:24] [443:17] [445:2,9
,12,24] [446:4,15] [447:2]
[451:19,24] [452:8] [453:11]
[454:1] [460:18] [462:19]
[465:15] [466:10,17] [467:
21] [469:1,16] [470:2,23]
[471:4,10,16] [472:5]
[473:13] [474:23] [477:10,14]
[480:16,22] [481:12] [486:

6,21] [487:6] [495:23] [498:
14] [501:10] [503:6,13]
[504:18] [506:14,16] [507:
4] [509:23] [513:6,23]

**yesterday** [331:9,10] [336:13]
[340:8] [343:4] [357:10]
[394:20] [395:5] [400:20]
[413:10] [432:14] [444:16]
[454:3] [482:11,24] [505:4]

**yet** [382:1] [492:21]

**youd** [337:15] [345:2] [366:
4] [478:20] [504:14] [517:8]

**youll** [353:1] [394:12] [494:
19]

**youre** [330:21] [331:21]
[333:12] [347:21] [362:22]
[369:6] [374:13,21,22]
[380:4,5] [381:7,20] [383:14]
[388:12] [392:18] [393:13]
[405:13] [412:24] [420:3]
[421:6] [423:9] [425:16]
[426:12] [432:7] [433:24]
[441:8,9,12] [450:2] [454:18]
[457:3] [462:20] [466:17]
[472:13] [477:8,11] [478:12]
[481:23] [493:19] [499:16]
[500:21] [501:20] [514:10]

**yourself** [347:9] [398:14]
[424:20] [475:9,14]

**youve** [348:15,22] [349:4]
[362:13] [368:6] [374:2]
[403:21] [419:9] [424:23]
[428:6,11] [435:6] [436:15]
[442:21] [456:17] [473:8]
[474:4,20] [476:7] [477:23]
[493:11] [497:16] [505:19]
[514:1,23]

---

Z

---

**zero** [338:10]