A step therapy protocol may require a physician to prescribe older and less expensive drugs in a therapeutic class before prescribing newer and more expensive equivalents.

*Copied in Gibson's report on page 47.*

D. **Pharmacy's Relationship with Pharmaceutical Manufacturers**

Pharmacy retailers have minimal control over which drug product is dispensed and minimal impact on influencing the market share of a given drug product because up to 90% of drug product selection is directed by formularies or preferred drug lists of PBM clients.

The physician and the member's pharmacy plan design have the largest influence over which drug is prescribed and dispensed. However, there are some measures that retail pharmacies can put in place to positively impact sales and/or market share of a pharmaceutical manufacturer's product, for which the pharmacy may receive some type of reimbursement. The following will illustrate where pharmacies can influence market share movement:

1. Patient compliance programs or "refill reminder letters"

2. Creation of a preferred drug list, which is communicated to their pharmacist(s) and/or supported internally by their pharmacy computer system.

3. Providing promotional/educational information targeted to specific pharmacy customers receiving medications within an identified therapeutic class.

4. Providing educational materials to their pharmacist(s) including specific drug and/or therapy information.

In some instances a pharmaceutical manufacturer may reimburse pharmacies for performing more aggressive measures such as direct patient mailings and/or physician intervention calls to direct drug therapy selection to a specific manufacturer's product.

## E. Pharmacy incentive programs

Pharmacies are sometimes approached by brand drug manufacturers and/or PBMs to participate in programs designed to improve the pharmaceutical therapy being provided to their patients. Examples of such programs are:

1. **Dispensing compliance programs**

   Retail pharmacy dispensing compliance programs are often recommended, incentivized, or mandated by the PBM contracted to the retail pharmacy. Some PBM contracts with retail pharmacies require credentialing standards of their pharmacies. Often times such credentialing standards will require a targeted percentage of prescriptions to be dispensed as generic drugs (generic fill rate) as well as an identified percentage of brand drugs dispensed which are on the PBM's formulary (formulary compliance rate). Some PBMs provide financial incentives to their retail pharmacy providers if they achieve a certain level of formulary compliance. The industry's largest PBM, AdvancePCS offers a unique program called the "Performance Drug Program" which administers a payment from drug manufacturers to pharmacists for their efforts in switching a patient's drug

therapy from a "non-preferred" drug to a "preferred" formulary drug of the manufacturer funding the payment.

## 2. Pharmacist education programs

Depending upon their state of licensure pharmacists must participate in continuing education (CE) programs to qualify for renewal of their pharmacist license (e.g. California pharmacists must complete 30 hours of CE during each 24 month licensure period). Pharmaceutical manufacturers and/or PBMs often times provide CE programs as well as educational materials to pharmacists to improve their knowledge about pharmaceutical therapy as well as specific drug product information. Offering CE credits provides an incentive for pharmacists to participate in the educational programs.

Some pharmaceutical manufacturers also provide pharmacies administration fees to provide educational materials to their pharmacists as well as fees for distributing information to patients and physicians. In these instances the educational materials will pertain to pharmaceutical therapy and/or disease states for which their pharmaceutical products may be prescribed.

*Bystrom Expert Report*
June 30, 2002
Page 22

## VI. Wyeth used rebate contracts with PBMs and pharmacies to exclude Cenestin from the market.

### A. Introduction

Wyeth (American Home Products, AHP) is one of the world's largest research-driven pharmaceutical and health care products companies.

Wyeth employs in excess of 52,000 people worldwide, with their Pharmaceutical products division comprised of over 38,000 employees.

In 1999 Wyeth posted sales in excess of $13 billion, listing their total assets in excess of $23 billion. In 1999 Wyeth's Premarin family of products approached sales of $1.8 billion, up 8 percent from year prior. [8]

Wyeth's pharmaceutical products marketing task force is structured into several layers, or divisions. In addition to senior corporate management personnel, these divisions include, area managers, district managers, national account managers and field sales force.

In the United States Wyeth markets their pharmaceutical products and services directly to most all major constituents within the health care industry; pharmacy benefit management Companies, managed care organizations, governmental agencies, physician groups and retail pharmacy organizations.

*Copied in Gibson's report on page 54.*

### B. Wyeth's "Preemptive Premarin Plan" to exclude Cenestin

Wyeth entered into extensive rebate contracts with every major PBM and MCO to gain formulary position for their Premarin Family of products, most often at the exclusion of their conjugated estrogen competitor, Cenestin.

Wyeth viewed Cenestin as a challenge to their dominant market share position of Premarin. In February of 1999 Wyeth developed and introduced to their senior management a business strategy called the "Premarin Preemptive Plan". Webster's dictionary definition of "preempt" is "*to seize upon to the exclusion of others*". Wyeth implemented their preemptive plan to seize upon the conjugated estrogen category at the exclusion of Cenestin.

*Copied in Gibson's report on page 65.*

1. According to Wyeth document WYE117998, the objective of their preemptive plan was targeted at Cenestin:

   *"Hold Cenestin to <2% TRx share in 1999"*

2. Wyeth document WYE117999 identified Wyeth's preemptive strategies:

   - *"Distance Cenestin from Premarin"*
   - *"Limit distribution"*
     - *"Modify Shared Success"*
   - *"Limit contracting opportunities"*
     - *"Quantify value of Wyeth contracts"*

*Copied in Gibson's report on page 69.*

---

[8] www.wyeth.com

*Bystrom Expert Report*
June 30, 2002
Page 23

o    *"Enforce preferred brand status"*

Copied in Gibson's report on page 69.

3.  Wyeth's preemptive plan included tactics to modify and accelerate discounts provided to retail pharmacies participating in Wyeth's "Shared Success Program", as described by Wyeth documents WYE118026, WYE118027, WYE118028 & WYE118029.

4.  Wyeth's rebate contracts provided significant rebate dollars for PBMs & HMOs if they protected Premarin's market share from competition like Cenestin. Wyeth leveraged their exclusive contracts and rebate dollars to keep Cenestin off their formularies. In addition to entering reimbursement agreements with Advance Paradigm, PCS and IPS, Wyeth also entered into agreements with Health Net and Foundation Health, who utilized PBM services from Advance Paradigm and IPS.

Copied in Gibson's report on pages 72-73.

AdvancePCS is the largest PBM in the industry today, administering pharmacy benefits for 85 million reported lives. AdvancePCS has grown through acquisition by Advance Paradigm of PCS and IPS.

a.  Wyeth document WYE118068, an internal Wyeth memo about a phone call with Advance Paradigm, dated Feb. 19, 1999 states:

    *"Our position is protected with API (Advance Paradigm, Inc.) as far as our contractual language regarding Premarin. It reads as follows: 'Premarin, Prempro and Premphase ("Premarin Products") must be listed on the Formulary and Plan Formulary as the sole conjugated estrogen-containing products."*

    *"Karl wants to identify partnering strategies and tactics on how we can together with API blunt the launch of Cenestin. He spoke of mailings, programs etc. that API would be willing to work with W-A to target the current Premarin users as well as target new Rx's."*

b.  Wyeth document WYE118069, an internal Wyeth memo with the subject heading of "Likelihood of Cenestin added to Plan Formularies", dated Feb. 24, 1999 states:

    *"Charles- Per your voicemail as far as determining the estimate of plans that will add Cenestin to formularies, the decision will be solely dictated by how Duramed's product will be classified."*

    *"If the product is classified as a conjugated estrogen we are protected by contractual language for API (Advance Paradigm, Inc.) and NPA (National Prescription Administrators) therefore the percentage will be 0% for both."*

c.  Wyeth document WYE118176, an internal Wyeth memo, dated March 26, 1999 states:

    *"...In addition we must reinforce those managed care contractual arrangements that identify Premarin as the exclusive conjugated estrogen on formulary."*

Copied in Gibson's report on pages 68-69.

d.  Wyeth document WEY118386, an internal Wyeth communication regarding IPS and Foundation Health, dated Sept. 14th, 2001, indicates:

*"Our contract states that Premarin must be the exclusive conjugated estrogen on formulary"*

*"Our goal is to restrict Cenestin to either the 3ʳᵈ tier of a three tier co-pay structure or to non-formulary status regardless of its name."*

*"Please review this information and use it to formulate a plan for keeping Cenestin in a non-formulary status"*

e.   Wyeth document WYE118373, an internal Wyeth memo regarding "IPS-Premarin Rebate", dated Feb. 22, 1999, states:

*"I have called Kevin Nagle (of IPS) and left him a message regarding Duramed and have asked to meet with him on March 12ᵗʰ.  I would like to discuss the possibility of NDC blocking Cenestin in light of our lucrative contract."*

f.   Wyeth document WYE118385, an internal Wyeth memo to Wyeth's "Foundation Health Systems Team" dated September 14, 2001, recaps a conference call indicating:

*"Our contract states that Premarin must be the exclusive conjugated estrogen on formulary"*

*"Our goal is to restrict Cenestin to either the 3ʳᵈ tier of a three tier co-pay structure or to non-formulary status regardless of its name"*

*"Please review this information and use it to formulate a plan for keeping Cenestin in a non-formulary status"*

g.   Wyeth document WYE118389, an internal Wyeth document referencing discussions with IPS, dated April 11, 1999, states:

> Copied in Gibson's report on page 73.

*"I will be meeting with the account on 4/19 and will discuss the status of 4Q98 rebates as well as the contractual language which prohibits any other conjugated estrogen from formulary status.*

*I have spoken to Gina Warren, Pharm D., at IPS, who is preparing a monograph on Cenestin and she is aware of the contractual prohibition.*

*I have asked all other AAMs to meet with their FHS contacts and reinforce the contractual language with the (client)*

*I am confident, IPS and FHS will comply with the contract and Cenestin will remain non-formulary.  Adjustments on rebates would be an additional enhancement to their contractual compliance."*

*Bystrom Expert Report*
June 30, 2002
Page 25

h.  Wyeth document WYE118351, an internal Wyeth memo regarding a meeting with Health Net, dated Sept. 14, 2001, states:

> *"Alan is aware of the exclusionary language in our contract and given the limited indications for the Cenestin product, did not see a role for it on formulary."*

> *"The product (Cenestin) will be blocked in the two tiered copay plans upon launch, and unless P&T has some reason to add it (like a difficult to refuse deal from Duramed) Alan said it would stay blocked and not available."*

i.  Wyeth document WYE117146, an internal Wyeth memo regarding Kaiser and Foundation Health Plan, dated May 4, 1999, states:  *Key Issues:*   [Copied in Gibson's report on page 73.]

> *"'Value' of Premarin contract in face of Cenestin and decreasing market share in key accounts."*

> *"Contracting language prohibiting any other conjugated estrogen needs to be communicated to all plans."*

j.  Wyeth document WYE118379, an internal Wyeth memo dated Sept. 14, 2001, regarding a meeting with IPS on 3/12/2001 states:

> *"Kevin left a message for the Duramed account manager while I was present and he intends to be as helpful as possible in identifying the risks we might face with this new market entry.  I did discuss both Health Net's and Intergroup's slipping Premarin market share and the risk of lost rebates…They both agreed that formulary position would possibly violate the contract language if it (Cenestin) is launched as a conjugated estrogen; at the very least formulary position would erode market share even further.  Until a specific plan requests the product or a P&T review occurs, the product will be non-formulary and listed as 'NDC not covered'."*

k.  Duramed document DUR000035, a "Viking – Managed Care Update" to Duramed on a June 1999 meeting with PCS indicates:

> *"The Wyeth-Ayerst agreement bundles oral contraceptives and Premphase and Prempro with Premarin.  A negative decision by PCS on Premarin would result in the loss of revenue from these products as well."*

l.  Wyeth document WYE154418, an internal Wyeth memo discussing rebate strategy for IPS, indicates:   [Copied in Gibson's report on page 77.]

> *"If we can adjust the Baseline on a quarterly basis we will have an incentive for IPS and the plans to NDC block Cenestin and where necessary place the product in the highest co-pay category…"*

*Bystrom Expert Report*
June 30, 2002
Page 26

m.   Wyeth document WYE117191, an internal Wyeth memo dated February 28, 1999, indicates "February Highlights": *[Copied in Gibson's report on page 77.]*

*"Review Premarin baseline level for Key FHS plans and determine best strategy for preserving value"*

n.   Wyeth document WYE118373, an internal Wyeth memo dated Feb. 22, 1999 regarding "IPS-Premarin Rebate" states:

*"If we can adjust the Baseline on a quarterly basis we will have an incentive for IPS and the plans to NDC block Cenestin and where necessary place the product in the highest co-pay category."*

o.   Wyeth document WYE118389, an internal Wyeth memo dated April 11, 1999, regarding IPS rebates, indicates: *[Copied in Gibson's report on page 77.]*

*"Adjustments on rebates would be an additional enhancement to their contractual compliance"*

p.   Wyeth document WYE118068, internal Wyeth memo dated February 19, 1999 indicates their confidence regarding Premarin being the sole conjugated estrogen on Advance Paradigm's formulary:

*"Our position is protected with API as far as our contractual language regarding Premarin.  It reads as follows:  Premarin, Prempro and Premphase ('Premarin Products') must be listed on the Formulary and Plan Formulary as the sole conjugated estrogen-containing products."*

(Wyeth was able to exclude Cenestin from Advance's formulary until its contract expired in December of 2001.  Cenestin was subsequently added to AdvancePCS' formulary, on February 4, 2002.)

5.   Wyeth's plan was to protect Premarin's market share and prevent Cenestin from appearing on the formularies of the largest PBMs/HMOs that control the majority of health plan members in the U.S. *[Copied in Gibson's report on page 65.]*

Below are examples of Wyeth's contracting tactics with Medco, the nation's 2nd largest PBM reporting 65 million covered lives today.

a.   Wyeth document #WYE118176, an internal Wyeth memo, dated March 26, 1999 states: *[Copied in Gibson's report on pages 68-69.]*

1.   *"The approval of Cenestin is a significant challenge to our women's health care franchise…"*

2.   *"…we must reinforce those managed care contractual arrangements that identify Premarin as the exclusive conjugated estrogen on formulary."*

b.   Wyeth document #WYE117254, an internal Wyeth memo dated May 10, 1999, defining opportunities with Medco, states: *[Copied in Gibson's report on page 72.]*

*Bystrom Expert Report*
June 30, 2002
Page 27

"My impression is that we can gain the following by making the change as defined above; (1) Cenestin placed on 'prior authorization' and…"

Copied in Gibson's report on page 72.

c.  Wyeth document WYE012691, page 9 of Wyeth's amendment dated January 1, 2000 to Medco's Pharmacy Supply Agreement dated October 1, 1995, states:

Copied in Gibson's report on page 67.

"Wyeth-Ayerst shall pay an additional Premarin/Prempro/Premphase Market Share Rebate to Medco each Contract Quarter in an amount equal to 0.75% of the Medco mail service volume of Premarin/Prempro/Premphase for such Contract Quarter for each 10% or portion thereof that the Medco Mail Service Market Share of Cenestin….is below the National Market Share of such Products for such Contract Quarter."

d.  Wyeth document WYE117253, an internal Wyeth memo about a meeting between Wyeth and Medco, dated May 10, 1999 states:

Copied in Gibson's report on pages 72-73.

"The purpose of this meeting was to evaluate current programs and to discuss tentative plans for moving forward. Each party came to the meeting with their list of needs. Objectives I established for this meeting included; (1) Gain commitment to make Cenestin "non-formulary drug" as per contract Premarin is the "exclusive conjugated estrogen on formulary and the preferred oral estrogen therapy."

"After reviewing our contractual arrangement for Premarin, Art agreed that Premarin is the sole conjugated estrogen per terms of the contract. Art will talk with Glen Taylor to determine if "prior authorization" can be put in place for Cenestin."

e.  Wyeth document WYE117152 & WYE117153, an attachment "April Monthly Highlights" attached to an internal Wyeth memo dated May 5, 1999, states:

"Cenestin has not been reviewed at present. I believe Wyeth can be successful in getting Medco to take some very positive actions but we will need to redefine Premarin goals in the current Agreement."

6.  Wyeth's existing rebate contracts with the largest PBMs/MCOs required that Premarin be the sole conjugated estrogen on their formularies. Wyeth considered it a breach of their rebate contract by the PBMs/MCOs if they were to allow Cenestin on their formularies. Wyeth enforced their contracts to prevent Cenestin from appearing on the formularies. Wyeth notified Express Scripts, the third largest PBM in the U.S. with over 35 million reported lives, that it was a violation to their agreement to list Cenestin on their formulary or on the formularies of their clients.

Copied in Gibson's report on page 27.

a.  Wyeth document #WYE118139, an attachment to an internal Wyeth memo, dated March 9, 1999 illustrates Wyeth's dominant formulary position with PBMs & HMOs:

*Bystrom Expert Report*
June 30, 2002
Page 28

**Wyeth had exclusive conjugated formulary status for Premarin with 10 PBMs/HMOs representing 142+ million members.**

**Wyeth had preferred oral estrogen formulary status for Premarin with 10 PBMs/HMOs representing 169+ million members.**

> Copied in Gibson's report on page 71.

b.  Wyeth document WYE117064, an internal Wyeth memo regarding Wyeth's formulary relationship with Express Scripts, ValueRx/DPS dated Nov. 4, 1999, states:

> *"Express Scripts accepted Cenestin as part of their Bid Grid. Upon our objection, they notified Duramed that they would NOT accept a contract on the product."*

c.  Viking Document VK0108, a letter from Express Scripts to Duramed, dated Nov. 4, 1999, states:

> *"Please let this letter serve as notification that Express Scripts, Inc. (ESI) has chosen not to contract with Duramed Pharmaceuticals, Inc. as a result of the 2000 Bid Enhancement process."*

> *"When we requested your bid, we didn't realize there was a pre-existing relationship with Wyeth-Ayerst that prevents us from entering into a contractual relationship with Duramed at this time. For consistency, we will be unable to contract with you on the Diversified Pharmaceutical Services, Inc. (DPS) side as well. We are very sorry that we didn't realize this sooner."*

d.  Wyeth document WYE025546, an internal Wyeth memo, dated Nov. 9, 1999, states:

> *"A signed agreement with Duramed, which had added Cenestin to the Express Scripts formulary, was reversed by quick, concerted action between national account sales and CD&A. To date, no known managed care accounts have Cenestin on formulary."*

> Copied in Gibson's report on page 71.

e.  Wyeth document WYE051073, Wyeth's "Managed Care National Accounts Action Steps", instructs Wyeth employees:

> *"-Continue to position Premarin Family as preferred ERT/HRT agents at each National Account*

> *-Ongoing evaluation of each National Account relative to performance and rebates*

> *-Enforce terms of contract"*

f.  Wyeth document WYE051074, Wyeth's "Premarin Defense Strategy", instructs Wyeth employees:

> *"Key Financial Implications -Contract & Impact on rebates"*

g.  Duramed document DUR000037, Viking's Managed Care Update on Cenestin memo to Duramed regarding their November 1999 meeting with Express Scripts / DPS, states:

*Bystrom Expert Report*
June 30, 2002
Page 29

"*Following review for the 2000 formulary program, Cenestin was initially placed in a preferred position along with Premarin. However, shortly after notification was sent to the manufacturers announcing the decision, Wyeth-Ayerst brought to the attention of Express Scripts a pre-existing agreement they had in place with Express which prohibits the addition of any other conjugated estrogen products to their formulary. This agreement was overlooked by Express during the review process, and they subsequently reversed their decision and decided against the addition of Cenestin.*"

    h.  Wyeth document WYE023598, an internal Wyeth memo, dated July 20, 2000, states:

> "*I met with Jim Hill on Tuesday, July 18th to discuss a number of topics.*"
>
> "*First on his list was Premarin. He started out by saying that they had a small but persistent group of clients who were insisting on having Cenestin available and he "needed" to renegotiate the contract. I replied that under no circumstances would we agree to do this and reminded hi that they are receiving over $40 million in rebates per hear that would be at risk.*"

*Copied in Gibson's report on page 71.*

7.  Wyeth communicated to their clients that a breach of their rebate contract would result in Wyeth not paying rebates on Premarin and /or all Wyeth products.

    a.  Wyeth document WYE157990, an October 6, 1999 letter from Wyeth-Ayerst to Rocky Mountain HMO states:

> "*According to the terms of the MedImpact Agreement, should Rocky Mountain HMO add Cenestin™ to its formulary or take any action against our oral contraceptives, we will exercise the thirty (30) day no cause termination option in the agreement, and inform MedImpact that Rocky Mountain HMO is no longer eligible to participate in the MedImpact/Wyeth-Ayerst Reimbursement Agreement.*"

    b.  Wyeth document WYE157987, An Dec. 14th, 1999 letter from Rocky Mountain Health Maintenance Organization to Wyeth-Ayerst states:

> "*RMHMO is seriously concerned about the statements made in your letter regarding Wyeth-Ayerst exercising a 30-day no cause termination option if RMHMO adds Cenestin™ to its formulary or takes 'other action' against Wyeth-Ayerst oral contraceptives. We are all well aware of the large market share Wyeth-Ayerst has with its Premarin Family in that category of pharmaceuticals. We seriously question the appropriateness and legality of Wyeth-Ayerst's attempt to use such market share to influence RMHMO's decisions with regard to its formulary for other pharmaceutical products.*"

8.  As part of their "Premarin Preemptive Plan" Wyeth developed a "Cenestin Impact Model" for their national account representatives to share with their PBM/HMO clients. Wyeth's Cenestin Impact Model illustrated and quantified to each

*Bystrom Expert Report*
June 30, 2002
Page 30

PBM/MCO the value of their contract that would be at risk if they were to add
Cenestin to their formulary.

    a.  Wyeth Document WYE117955, Internal Wyeth memo dated Feb. 3, 1999
from Kevin Wlazelek to Charles Schneider states:

> *"Charles, the attached Excel files include directions for use, key
> assumptions, summary, and detail sheets pertaining to all national
> accounts.  Please be advised that each National Account Manager has
> been mailed a similar account specific file."*

    b.  Wyeth document WYE117988, & WYE117989, attachments to an internal
Wyeth memo dated February 9, 1999 from Pat Organsky to Charles
Schneider indicate:

> *"Premarin Defense Cost Tools:  Cost Acquisition Model and Managed
> Care Cost Analysis (Demonstrates Value of Wyeth-Ayerst Contract)"*

9.  The Cenestin Impact Model clearly illustrated to the PBMs/HMOs the loss of Wyeth
rebate dollars that would occur if they placed Cenestin on their formularies with a
resulting in a loss of market share for Premarin.  Not only did Wyeth demonstrate
loss of rebate dollars for their Premarin product, the Cenestin Impact Model
communicated a potential total loss of rebate dollars for all Wyeth products, which
would result from allowing Cenestin on their formularies.

> *Copied in Gibson's report on page 74.*

    a.  Aetna document AT00264, was a "Managed Care Cost Analysis" which
illustrated a potential loss of over $3 million if *"Business Shifted to Cenestin
(market share)"*

    b.  Wyeth document WYE118080, an internal Wyeth memo dated March 8, 1999
illustrated the fact that the Cenestin Impact Model went out to all of Wyeth's
National Account Managers:

> *"The attached Excel files include directions for use, key assumptions,
> summary, and detail sheets pertaining to all national accounts.  Please be
> advised that each National Account Manager has been mailed a similar
> account specific file."*

    c.  Wyeth document WYE118196, a draft memo from Wyeth to Wellpoint dated
April 6, 1999 conveying Wyeth's Cenestin Impact Model to WellPoint, as well
as reminding WellPoint of their exclusive agreement for Premarin:

> *Copied in Gibson's report on page 73.*

> *"I have enclosed some documents which might serve as a good discussion point
> for us regarding the market entry of Cenestin, Duramed's new 'synthetic
> conjugated estrogen, A'.  It probably makes sense for us to schedule an
> appointment so we may discuss this issue further, but in the meantime I
> thought it might be helpful for you to review the model and determine how it
> might be of use to you in your analysis."*

> *"For your consideration, our contract dated October 1, 1996, includes
> language which pertains to this issue.  Page 10, Section HB I states 'Premarin,
> Prempro and Premphase must be listed on the Formulary and Plan Formulary
> as the sole conjugated estrogen-containing products....'"*

d.  Wyeth document WYE118323, an internal Wyeth memo dated April 13, 1999 spoke about the upcoming meeting between Wyeth and Prescription Solutions indicating preparations being made for a "Showdown":

> *"Wish me luck...I have three meetings at Prescription Solutions Attached is one of several documents I have prepared for my 'show down'."*

e.  Wyeth document WYE118325, attached to the above Wyeth memo, dated April 13, 1999, indicates:

> *"Contract Language: Exhibit A, Section II A: (page 24 of 33)*
>
> *Premarin, Prempro and Premphase ('Premarin Family') must be the sole conjugated estrogen-containing products listed on the Formulary and all Health Plan Formularies with a co-pay no less favorable than any branded product in this therapeutic category."*
>
> *"Estimated Economic Impact\*:*
>
> *   *Premarin Family market share of less than 70.0% results in no rebates:*
> *   *An 8% drop in the Premarin Family market share would result in an annual loss of rebates in the amount of $3.7 million*
> *   *A 50% drop in the Premarin Family market share would result in an annual loss of rebates in the amount of $3.06 million"*

f.  Wyeth document WYE118331, an internal Wyeth memo to Wyeth's "Prescription Solutions Team", dated August 6, 1999, states:

> *"It is imperative that when you meet with your Regional Pharmacy Directors you confirm NDC blocks are in place. This account can NOT afford to loose any market share to Cenestin!"*

g.  Wyeth document WYE132292, part of Wyeth's Premarin Preemptive Plan, indicates:

> *"Quantify the value of Wyeth contract*
>
>  i.  *Example: Pacificare*
>
>   1.  *4.5 million members*
>   2.  *Premarin Family rebates > $3.8M*
>   3.  *All other Wyeth product rebates > $3.3M"*

h.  Prescription Solutions document RxS0064, an internal Wyeth memo, dated May 10, 2001, states:

> *"I know we briefly addressed this yesterday, however, it would be my assessment that it is a violation of the contract adding one more agent in this category, but before communicating to Bob T. wanted obtain your feedback."*

i.  Prescription Solutions document RxS 0662, a subsequent memo from Andrew Marbach of Wyeth to Robert Taketomo of Prescription Solutions, dated May 11, 2001, states:

*Bystrom Expert Report*
June 30, 2002
Page 32

"*As you can see from the attachments, my management feels that the addition of Cenestin to the formulary is a violation of the Reimbursement Agreement per the language on page 24 / Section II / Paragraph A of the agreement. Before you go forward with this, I think it would be prudent to have a discussion on this issue. I will be at your offices on May 17ᵗʰ…*"

10. In some instances, where Wyeth felt Premarin's exclusive formulary position was at risk with a PBM/HMO client, Wyeth revised their agreement to increase the rebate dollars paid to the client and lowered the market share performance requirement for their client to achieve the increased rebate amounts.

Copied in Gibson's report on page 77.

  a. Wyeth document WYE118320, an internal Wyeth memo dated February 24, 2999, indicates:

"*At our Fast Start meeting in Dallas Bob Repella stated the importance of us being able to amend our national account contracts so our clients' Premarin performance parameters would be adjusted according to changes in the National Premarin performance. We had discussed trying to make this offer not appear as a defense strategy to the market entry of Cenestin – which will require that we do something quickly*"

  b. Wyeth documents WYE000036 & WYE000037, an internal Wyeth memo with "Pricing Committee Meeting notes of Oct. 27, 1998" regarding Aetna/US Healthcare indicates:

Copied in Gibson's report on pages 77-78.

"*Reestablish the Premarin Family rebates schedule, which was applicable in 1997 with some revision…*"

"*In turn for the concessions Aetna would:*

    *Assure that the Premarin Family products are the sole multi-estrogen component EHT/HRT products listed in the formulary.*"

  c. Wyeth document WYE032576, an internal Wyeth memo undated, states:

"*Charles explained to the Pricing Committee in 1997 Aetna received rebates for Premarin @ 3% . With the signing of the new contract, Wyeth-Ayerst took those rebates away. Charles proposed if Aetna agrees to include additional language regarding blockage of Cenestin, then Wyeth should in turn reinstate the 3% Premarin rebates. The addition of this language should/could help/maintain our current market share. This was approved by the Pricing Committee.*"

  d. Wyeth document WYE032575, an internal Wyeth memo dated July 1, 1999, states:

"*We just had a meeting with regards to Aetna's fourth quarter 1998 payment. The dollar increase with the new amendment comes in around $800,000.*"

  e. Wyeth document WYE03310, an internal Wyeth memo dated July 22, 1999, states:

"*The rational for the creation of a revised HRT/ERT addendum is as follows:*

    ▪ *To motivate MVP into closing the HRT/ERT category by designating the Premarin Family as 'sole conjugated' estrogen*

*products and thereby preventing Cenestin from gaining formulary status."*

f.   Duramed document DUR010786, a Viking Managed Care Update submitted 11/99, states:

> *"I did speak with Dan concerning Caremark's decision regarding Cenestin and/or Premarin before he left 11/12/99. Based on Wyeth's last proposal it appears that they will go with Premarin. Dan said that the contract would net Caremark more than $1,000,000 in profits annually."* Wyeth's contract with Caremark was not only very lucrative for Caremark placing Wyeth's products on their formulary; it required Premarin to be the sole conjugated estrogen on Caremark's formulary.

> Copied in Gibson's report on page 78.

g.   Wyeth document WYE051532, an internal Wyeth memo dated January 28, 2999 ranks Wyeth clients relative to their contracts being at risk.

> *"Contracts at risk represent those National Accounts which received a significantly lower percent Rebate to Gross sales than the average for all National Accounts while achieving a market share that is close to or above the National Market Share." (PROVANTAGE was one of Wyeth's clients listed 'at Risk")*

h.   Wyeth document WY117941, an internal Wyeth memo dated January 25, 1999, indicates about ProVantage:

> *"Maren Spangler told me Friday that she had received a voice mail message from someone at Duramed requesting an appointment to present a 'very aggressive' proposal for their upcoming new product. As we have discussed, the concern here is the structure of their evaporating tiers and the fact that they are not earning any Premarin rebates."*

i.   Wyeth document WYE049692, an internal Wyeth memo dated April 13, 1999, indicates about ProVantage:

> *"The ProVantage Reimbursement Agreement Amendment has been signed and forwarded to Lois Rulli. The effect of the amendment is to roll back the Premarin, Prempro and Premphase baseline rebate level to what is was at the beginning of the contract. It is effective as of 3Q98. Please ask Lois for a copy of the amendment and then you can process the submission you have in house – they should earn Premarin rebates as a result of the amendment."*

> Copied in Gibson's report on page 78.

j.   Wyeth document WYE013298, an amendment dated March 16, 1999 which amends the January 1, 1997 Reimbursement Agreement between ProVantage and Wyeth-Ayerst, states:

> *"That part of Schedule C2 which outlines the Product Performance Rebates for HRT is amended and replaced…"*

C. Wyeth devised a program, "Shared Success", targeted at retail pharmacies to gain their support in increasing market share of Wyeth's products. Wyeth entered into "Shared Success Program" agreements with retail pharmacies offering purchase discounts in exchange for increasing the pharmacies' market share of Premarin and other select Wyeth products.

1. AHP document AHP027225, a Shared Success Program Agreement between Wyeth and Alco Pharmaceuticals, Inc. dated September 22, 1998 states:

   *"Customer shall use reasonable efforts to increase its market share of Products (Wyeth products – including Premarin)"*

2. In April of 1999 Wyeth amended their Shared Success Program Agreement to modify their shared success tiers and provide an initial "acceleration discount" their customers could earn by further supporting the utilization of the Premarin Family as described in documents AHP092756 through AHP092759.

   *Additional discounts could be earned through further supporting the utilization of the Premarin Family by:*

   a. *Communication of Premarin information to their pharmacists*

   b. *Providing continuing education programs to their pharmacists on hormone replacement therapy, provided by Wyeth.*

   c. *Assuring Wyeth that there would be no unusual or artificial pricing structure for any estrogen product that would disadvantage any Premarin Family product.*

## VII.  Conclusion

The distribution and sales of pharmaceutical products is a complex process that is influenced by well-defined contractual relationships between pharmaceutical manufacturers, managed care organizations, health care providers and pharmacy benefit managers.

The single most influential factor within the managed health care industry that can determine the level of success a pharmaceutical brand product will realize, relative to achieving market share, is whether or not the product is listed on the drug formularies of the industry's largest PBMs and MCOs.

Formulary positioning may be considered the "holy grail" among brand pharmaceutical manufacturers.  Although formulary positioning does not guarantee successful product sales and market share penetration, lack of formulary positioning can be considered the "death knell" for a brand pharmaceutical product.

Wyeth-Ayerst, one of the world's largest brand pharmaceutical manufacturers, considered Cenestin to be a potential threat to Premarin's dominant position in the estrogen replacement therapy category of pharmaceuticals.  Motivated by this concern Wyeth devised and implemented a preemptive strategy designed to exclude Cenestin from the conjugated estrogen market.

Wyeth leveraged their market share dominance and lucrative financial payments to PBMs and MCOs to achieve and maintain exclusive positioning of their Premarin family of products on PBM and MCO formularies dominating the health care market.

Wyeth devised their preemptive strategy not only to insure their Premarin family of products would be listed on PBM and MCO formularies; their strategy also included specific tactics designed to keep Cenestin off PBM and MCO formularies.  Wyeth's tactics were both protective and predatory in their effort to maintain market share dominance of the estrogen replacement therapy category of pharmaceuticals.

Signature Page

Signature: _Dale Bystrom_

Dale Bystrom, R.Ph.

Date: _6/30/02_

# Attachment-A

**Dale A. Bystrom, RPh.**
**1929 Scenic Drive**
**Modesto, CA. 95355**

*Title:*           Director of Business Alliances, Longs Drug Stores
               Vice President of PBM Services, Nex2, Inc.

*Education:*        University of the Pacific School of Pharmacy, B.S. Degree in Pharmacy.
               Graduated October 1968
               Kellogg Executive Programs, Northwestern University, Illinois, 1992-93

*Experience:*

1966 - 1968    Intern Pharmacist, Longs Drug Stores California, Inc.
1968 - 1969    Staff Pharmacist, Longs Drug Stores Modesto, California, Inc.
1970 - 1979    Pharmacy Manager, Longs Drug Stores Carmel, California, Inc.
1980 - 1986    Store Manager, Longs Drug Stores Modesto, California, Inc.
1986 - 1988    General Merchandise Manager, Longs Drug Stores Walnut Creek, California, Inc.
1988 - 1990    Vice President of Marketing, American Drug Stores Oakbrook, Illinois
1991 - 1995    Director of Managed Care Pharmacy Services, Longs Drugs Walnut Creek, CA.
1995 – 1997    Vice President of Managed Care Services, Integrated Health Concepts PBM, a subsidiary of Longs Drug Stores California, Inc.
1997 – 1999    General Manager, RxAmerica PBM Salt Lake City, UT.
1999 –         Director of Business Alliances, Longs Drug Stores Walnut Creek, CA.
1999 -         Vice-President of PBM Services, Nex2, Inc., Salt Lake City, UT.

*Professional Activities:*

        Member of American Pharmaceutical Association
        Member of California Pharmaceutical Association
        Member of Hawaii Pharmaceutical Association
        Member of Pharmacy Advisory Committee for California Medi-Cal
        Member of American Managed Care Pharmacy Association
        Member of National Association of Chain Drug Stores
        Member of National Council of Prescription Drug Programs

*Significant Recent Career Achievements:*

**Development of Nex2's PBM Network:**

As Vice President of PBM Services for Nex2, Inc., Dale developed the strategy and implemented the contracting process to build the national PBM network for Nex2. As of February 2002 Nex2's contracted network of thirteen national PBMs consisted over 260 million covered PBM

lives with 60 months of their associated prescription histories. There are fifteen additional PBMs in Nex2's contracting pipeline.

### Development of Longs' Internet Strategy:

Dale led the team effort resulting in the development of the Internet strategy for Longs website, Longs.com. and its associated service offerings. Subsequent to the establishment of Longs.com, Dale has developed business alliances linking Longs.com with numerous health care organizations for which Longs is a pharmacy provider.

### Merger of IHC with RxAmerica:

Dale developed the strategy for and implemented the merger of Longs' subsidiary PBM, Integrated Health Concepts, with RxAmerica, a PBM owned by American Stores / Albertsons. After acting as Co-General Manager of RxAmerica for two years Dale lead the analysis and assessment efforts leading to Longs' acquisition of Albertson's equity in RxAmerica. RxAmerica is now a wholly owned subsidiary of Longs Drug Stores.

### Development of Integrated Health Concepts (IHC):

IHC was conceived and developed as a subsidiary company for Longs by Dale in May of 1995. IHC was a fully functional Pharmacy Benefits Management Company (PBM) with over one million lives under IHC program management. IHC administered a pharmacy network comprising over 45,000 pharmacies nationally.

### Chain Pharmacy Network Contract Administration:

As Vice President of Managed Care Pharmacy for Longs Drug Stores, Dale negotiated and administered all third party contracts for Longs national participation.

### _Industry Advisory Panel Participation:_

- State of California Medical advisory task force
- Health Net
- Blue Cross of Calif.
- Cigna of Northern California
- Blue Shield of California
- Parke-Davis
- Warner Lambert
- Merck
- Lilly