**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **J.B.D.L. Corp. d/b/a BECKETT APOTHECARY, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WYETH-AYERST LABORATORIES, INC., et al.,**<br><br>**Defendants.** | **Civil Action No. C-1-01-704**<br><br>**Judge Sandra S. Beckwith**<br>**Magistrate Judge Timothy S. Hogan** |
| **CVS MERIDIAN, INC. AND RITE AID CORP.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WYETH,**<br><br>**Defendant.** | **Civil Action No. C-1-03-781**<br><br>**Judge Sandra S. Beckwith** |

**DEFENDANTS' MOTION TO PROHIBIT PLAINTIFFS FROM INTRODUCING CERTAIN EVIDENCE BASED ON THE TESTIMONY OR ANALYSIS OF JEFFREY LEITZINGER AND KEITH LEFFLER**

Defendants Wyeth Pharmaceuticals (formerly known as Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly known as American Home Products Corporation) (collectively "Wyeth") through its attorneys, hereby respectfully move this Court to prohibit Plaintiffs J.B.D.L. Corporation, et al., and CVS Meridian, Inc. and Rite Aid Corporation (collectively "plaintiffs") from introducing certain evidence based on the testimony or analysis of Jeffrey Leitzinger and Keith Leffler. In support of this motion, Wyeth submits and incorporates the attached memorandum of law.

Dated: May 13, 2005

Grant S. Cowan, Esq.
**FROST BROWN TODD LLC**
2200 PNC Center
201 E. Fifth Street
Cincinnati, Ohio 45202-4182
(513) 651-6800
(513) 651-6981
gcowan@fbtlaw.com

Douglas L. Wald, Esq.
David S. Eggert, Esq.
Asim Varma, Esq.
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Dan K. Webb, Esq.
W. Gordon Dobie, Esq.
Peggy M. Balesteri
**WINSTON & STRAWN**
35 West Wacker Drive
Chicago, Illinois 60601-9703
(312) 558-5600

Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **J.B.D.L. Corp. d/b/a BECKETT APOTHECARY, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WYETH-AYERST LABORATORIES, INC., et al.,**<br><br>**Defendants.** | **Civil Action No. C-1-01-704**<br><br>**Judge Sandra S. Beckwith**<br>**Magistrate Judge Timothy S. Hogan** |
| **CVS MERIDIAN, INC. AND RITE AID CORP.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WYETH,**<br><br>**Defendant.** | **Civil Action No. C-1-03-781**<br><br>**Judge Sandra S. Beckwith** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO PROHIBIT PLAINTIFFS FROM INTRODUCING
CERTAIN EVIDENCE BASED ON THE TESTIMONY OR
ANALYSIS OF JEFFREY LEITZINGER AND KEITH LEFFLER
REGARDING THEIR "BEFORE AND AFTER" MODELS**

Defendants Wyeth Pharmaceuticals (formerly known as Wyeth-Ayerst Laboratories, Inc.) and Wyeth (formerly known as American Home Products Corporation) (collectively "Wyeth") submit this Memorandum in Support of Its Motion for an Order precluding Plaintiffs J.B.D.L. Corporation, et al. and CVS Meridian, Inc. and Rite Aid Corporation (collectively "plaintiffs") from introducing certain evidence

based on the testimony or analysis of Jeffrey Leitzinger and Keith Leffler. In support of this motion, Wyeth states as follows:

**INTRODUCTION AND SUMMARY**

Plaintiffs proffer the testimony of Jeffrey Leitzinger and Keith Leffler (collectively "plaintiffs' economic experts") in support of their claim that Wyeth's allegedly anticompetitive rebate contracts with managed care organizations (MCOs) caused them injury.[1] Plaintiffs' economic experts opine that plaintiffs were injured in the following round-about way: (1) Wyeth's contracts with MCOs allegedly foreclosed Cenestin from many MCO formularies, and (2) thereby reduced the competitive threat that Cenestin would otherwise have posed to Premarin, which (3) created the market conditions under which Wyeth was able to artificially inflate the list prices (4) that plaintiffs paid for Premarin. Plaintiffs seek to recover "overcharges" based on the difference between Wyeth's "actual" list prices for Premarin and the "theoretical" list prices that Wyeth would have charged "but for" the existence of the allegedly anticompetitive MCO contracts.

To calculate the theoretical "but for" list prices of Premarin, plaintiffs' economic experts purport to rely upon a "before and after" methodology. Under a "before and after" methodology, an expert selects a time period "before" an alleged restraint is in effect, and compares the defendant's prices during this "pre-restraint" period to the defendant's prices "after" the restraint is implemented. In this case, plaintiffs' "before and after" methodology is so fundamentally flawed that any conclusions derived from it

[1] Leitzinger is the economic expert for the direct purchaser class. Leffler is the economic expert for opt-out plaintiffs CVS and Rite Aid.

are wholly unreliable, and hence inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*First,* a *sine qua non* of any "before and after" analysis is that the alleged restraint *does not exist* in the so-called "before" period. Only if this condition is satisfied can the "before" period be compared to the "after" period. If – as here – the challenged restraint exists in *both* the "before" period and the "after" period, a "before and after" comparison is meaningless. *See, e.g.*, *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 286 (S.D.N.Y. 2000) ("[i]n assessing the reliability of an expert opinion, a resort to common sense is not inappropriate"). It is undisputed that Wyeth widely employed the challenged MCO contract clauses throughout the "before" period proposed by plaintiffs' economic experts, as well as throughout the proposed "after" period. In short, there is no real "before" period to compare to an "after" period.

*Second*, the economic theory that underlies plaintiffs' entire case against Wyeth is that Wyeth was able to raise prices because it *increased its market power* by foreclosing Cenestin from the market. Under this theory, a "before and after" methodology only makes sense if the plaintiffs' expert compares prices from a "before" period in which Wyeth has *less market power* with an "after" period in which Wyeth has *increased market power*. However, it is indisputable that plaintiffs did just the opposite here. Wyeth obviously had *more* market power during the "before" period – because Cenestin *didn't even exist at that time* – compared to the "after" period, when Cenestin *was on the market and Premarin suffered a steady decline in market share*. Regardless of how much Wyeth's contracts allegedly impaired Cenestin's ability to compete, it is simply

nonsensical for plaintiffs' experts to contend that Wyeth had *more* market power when Cenestin was competing against it than it had before Cenestin ever entered the market.

For these reasons, the economic analysis of plaintiffs' economic experts does not meet the economic or legal standards for determining injury and should be excluded from evidence at trial. *E.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion inadmissible because it did not "incorporate all aspects of the economic reality of . . . market"); *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1507 (D. Kan. 1995) (excluding testimony of economic expert that was "based on unjustified assumptions and does not account for changes in other relevant market conditions").

**DESCRIPTION OF PLAINTIFFS' ECONOMIC EXPERTS' METHODOLOGY FOR DETERMINING CAUSATION AND INJURY**

Because no plaintiff was directly affected by any of the challenged rebate contracts that Wyeth had with MCOs, plaintiffs' economic experts opine that these contracts hindered Cenestin's ability to compete against Premarin, and thereby enabled Wyeth to increase its list prices to anticompetitive levels. Leffler Rep. at 26 (Exh. 1); Leitzinger Rep. at 30, 35 (Exh. 2). In order to establish that Wyeth's unilateral price increases were "caused" by Wyeth's MCO contracts, and to establish the amount by which these price increases supposedly exceeded competitive levels, plaintiffs rely upon the "before and after" analysis performed by Drs. Leffler and Leitzinger.

A "before and after" model generally compares a defendant's prices in two distinct time periods – during the period in which the allegedly illegal restraint is in effect (the "after" period) and during a period prior to the existence of the alleged restraint (the

"before" period). The effect of the restraint is then calculated by the difference in prices between the two periods.[2] Such "before and after" models are sometimes used in the field of economics for purposes of determining injury and/or causation, but *only if* they satisfy certain basic prerequisites. First, the two sets of time periods utilized must be generally comparable except for the effect of the alleged violation.[3] A "before and after" model "cannot be properly applied unless an appropriate normative period (i.e., one without the alleged violation) . . . has been identified."[4] Second, all assumptions underlying the model must be reasonable in light of the record evidence. A model should be excluded when there is "no basis for critical assumptions, the assumptions were shown to be false or contrary to common sense, or the damage model failed to take into account essential facts."[5]

Plaintiffs' economic experts conclude that the "before" period should consist of a period of time prior to the entry of Cenestin into the market and that the "after" period should begin around the time that Cenestin entered the market. Specifically, Leitzinger

---

2 *See* ABA, Antitrust Law Developments (Fifth) at 876-77 (Exh. 3).

3 *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of "hopelessly flawed" before and after model where expert "did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred.").

4 *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1504 n. 15 (D. Kan. 1995).

5 ABA, Antitrust Law Developments (Fifth) at 879-80 (Exh. 3); *see also In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1507 (D. Kan. 1995) ("Because Dr. Hoyt's opinion is based on unjustified assumptions and does not account for changes in other relevant market conditions, it would not assist a trier of fact to determine the fact or amount of plaintiffs' damages"); *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (finding that proffered expert's study "rests on unsupported assumptions and ignores distinctions crucial to arriving at a valid conclusion.").

determined that the "before" period runs from January 1, 1996 through December 31, 1998,[6] while Leffler's "before" period runs from January 1, 1994 to February 1999.[7] Leitzinger's "after" period begins in April 1999 (the month immediately after Cenestin was approved by the FDA), while Leffler's "after" period begins in March 1999. Dr. Leitzinger acknowledged that Wyeth would have increased prices to some degree even in a "but for" world without the challenged MCO contracts, so he "modeled the but-for world to include annual Premarin [list] price increases for 1999 and thereafter at the same average rate observed for Premarin" in his "before" period -- i.e., 7.58% per year.[8] Dr. Leffler engaged in a substantially identical model, and calculated the "but for" rate of Wyeth's theoretical price increases to be 7.5%.[9] Both experts then calculated the alleged price overcharge by comparing the "but for" rate of increase to the actual rate of increase of Wyeth prices.

## ARGUMENT

### I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ON ANTITRUST INJURY

To be admissible, expert testimony must (1) "assist the trier of fact," (2) be "based upon sufficient facts or data," (3) be "the product of reliable principles and methods," and (4) have "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. When faced with a proffer of expert testimony, the district court is to serve as the "gatekeeper" and make a "preliminary assessment of whether the reasoning or

6 Leitzinger Rep. at 47 (Exh. 2).

7 Leffler Rep. at 27 (Exh. 1).

8 Leitzinger Rep. at 47 (Exh. 2)

9 Leffler Rep. at 27 (Exh. 1).

methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-3 (1993). Rule 702 of the Federal Rules of Evidence dictates that an expert opinion account for and not "ignore [ ] inconvenient evidence," and that it "incorporate all aspects of the economic reality of the [relevant] market." *Concord Boat*, 207 F.3d at 1056-7 (8th Cir. 2000). Moreover, expert testimony may not be "speculative," but must be reasonably grounded in the record. *Concord Boat*, 207 F.3d at 1057 ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.") (internal quotations and citation omitted).

To determine issues of causation and injury, the fundamental task is to isolate the effect of a defendant's allegedly anticompetitive conduct. Expert testimony on causation or injury that fails to isolate the effects of the alleged competitive conduct from other factors (such as lawful, competitive conduct by the defendant) cannot form the basis of a jury verdict. *See Concord Boat*, 207 F.3d at 1055 (8th Cir. 2000) (expert antitrust damages opinion that failed to "segregate any lawful acts and unrelated market events that might have contributed to . . . [the defendant's] market share from any anticompetitive conduct" inadmissible); *Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1505 (D. Kan. 1995) (excluding "before and after" model that "does not account for other

undisputed market factors, such as increasing competition from foreign manufacturers with lower production costs”).

## II. THE “BEFORE AND AFTER” THEORY PROFFERED BY LEITZINGER AND LEFFLER IS ECONOMICALLY INVALID

The “before and after” model put forth by plaintiffs’ economic experts has two fundamental defects which require its exclusion from evidence at trial. First, plaintiffs’ economic experts selected an invalid “before” (or normative) period because it is undisputed that Wyeth widely employed the challenged contract clauses *before* 1999, just as it did *after* 1999.[10] Since the challenged restraints exist in *both* the proposed “before” and “after” periods, a “before and after” comparison is completely meaningless.

Second, it is undisputed that Wyeth had *more* market power during the “before” period, since *Cenestin didn’t even exist at that time* and Wyeth’s market share was larger, as compared to the “after” period, when Cenestin was on the market (and Wyeth’s market share had declined). Because plaintiffs’ “before and after” analysis is built upon the indisputably erroneous premise that Wyeth had *more* market power during the “after” period (when the array of competing drugs included Cenestin) than it had during the “before” period (when the array of competing drugs did not include Cenestin), the analysis is inherently unreliable and should not be presented to the jury.

### A. The Allegedly Unlawful Contract Provisions Existed in Both “Before” and “After” Periods

It is axiomatic that a “before and after” model is invalid if the allegedly unlawful conduct existed in both the “before” and “after” periods. The whole purpose of a “before

---

[10] *See* Leffler Dep. (11/3/04) at 183-86 (Exh. 4); Leffler Rep. at 21-23 (Exh. 1); Leitzinger Rep. at 31 (Exh. 2); Leitzinger Dep. (5/27/04) at 258 (Exh. 12).

and after" model is to distinguish between two distinct worlds – one in which the allegedly violative conduct exists (here, the "after" world) and one in which the challenged conduct does not exist (here, the "before" world). *See*, *e.g.*, *Home Placement Service, Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 n.7 (1st Cir. 1987) ("The 'before and after' method . . . 'compares the plaintiff's profit record *prior to the violation* with that subsequent to it") (quoting *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974), *cert. denied*, 420 U.S. 929 (1975) (emphasis added)).[11] If – as here – the challenged conduct exists in *both* worlds, a comparison of the two worlds obviously cannot be used to measure the impact of the challenged conduct. Because the challenged conduct in this case (Wyeth's allegedly anticompetitive MCO contracts) existed in both the "before" and "after" periods, the "before and after" models are fundamentally invalid as a basic matter of economics and should be excluded from evidence at trial.

Plaintiffs complain about two aspects of Wyeth's contracts with MCOs. First, plaintiffs challenge Wyeth's "market share incentive rebates," which provide rebates to MCOs based on Premarin's share of the total reimbursements that the MCO makes for

---

[11] *See also* Areeda & Hovenkamp, II Antitrust Law ¶ 391e, at 484 (Exh. 5) ("In the before and after model of damages, the plaintiff uses its experience *prior to the antitrust violation* to infer what its experience would have been but for the violation") (emphasis added); *id* ("In an overcharge case, . . . the plaintiff uses the prices it paid *prior to the monopolization or price-fixing activity* as a basis for inferring what the prices would have been but for the alleged overcharges") (emphasis added); R. Blair & W. Page, "Speculative Antitrust Damages," 70 Wash. L. Rev. 423, 443 (April 1995) (Exh. 6) (in the "before and after method" plaintiff must show "how it actually performed *when it was not burdened by the defendants' illegal actions*") (emphasis added); R. Hall & V. Lazear, *Reference Manual on Scientific Evidence*, "Reference Guide on Estimation of Economic Losses in Damages Awards," at 512 (Exh. 7) ("compare market conditions in a period affected by the misconduct with conditions in another period, *during which the misconduct is known to be absent*") (emphasis added); ABA Section of Antitrust Law, "Proving Antitrust Damages, Legal and Economic Issues at 37 (Exh. 8) (method must look to a period "before (or after) the illegal conduct affected the market").

ET products. *During both the "before" and the "after" periods, virtually all of Wyeth's MCO contracts contained market-share rebate provisions.*

The second challenged aspect of Wyeth's MCO contracts is a provision contained in some of its MCO contracts providing that Premarin shall be the "sole conjugated estrogen" on the MCO's formulary. Plaintiffs contend that the "sole conjugated estrogen" provision in Wyeth's contracts resulted in the exclusion of Cenestin from MCO formularies and diminished the competitive threat posed by Cenestin. *But the "sole conjugated estrogen" clauses also were present during both the "before" and "after" time periods.*

These two contractual provisions constitute the predicate for plaintiffs' claims in this case. As a matter of economic logic and common sense, a valid "before and after" model would need to include a period "before" Wyeth's implementation of the contract provisions at issue. However, plaintiffs' economic experts clearly failed to comply with this requirement. Wyeth first implemented the challenged contractual provisions in the late 1980's and it is undisputed that they remained in effect throughout the entire "before" and "after" periods proposed by plaintiffs' economic experts. Indeed, plaintiffs' economic experts concede that the challenged provisions were in effect during the "before" periods[12] as well as the "after" periods. In short, there simply is no "before" period in this case to compare with any "after" period.

Courts have routinely excluded the testimony of economic experts where – as here – the "before" and "after" periods are improperly defined. For example, in *In re*

12 *See* Leffler Dep. (11/3/04) at 183-86 (Exh. 4); Leffler Rep. at 21-23 (Exh. 1); Leitzinger Rep. at 31 (Exh. 2); Leitzinger Dep. (5/27/04) at 258 (Exh. 12).

*Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497 (D. Kansas 1995), plaintiffs alleged that defendants engaged in a conspiracy to fix the prices of aluminum phosphide products from January 1, 1998 through December 31, 2002 ("conspiracy period"). Plaintiffs' economic expert, Dr. Richard Hoyt, purported to apply a "before and after" model to assess damages from the alleged conspiracy. The court excluded Dr. Hoyt's model, finding that it "ignores the *before* component of the 'before and after' model" and thus did "not address in any way the pre-conspiracy period." *Id.* at 1502. By failing to consult data both before and after the conspiracy, the court found that Hoyt failed to account for the other factors (besides the conspiracy) that contributed to the price difference he attributed to the conspiracy. *Id.* at 1504. Thus, the court concluded that Hoyt's "choice of a normative period is not consistent with accepted economic practice" and excluded his testimony. *Id.* at 1503. The same is true here.[13]

**B. Wyeth Had Greater Market Power in the "Before" Period Than in the "After" Period**

Plaintiffs' theory of this case is that Wyeth's artificially high prices reflect the fact that Wyeth increased its market power by thwarting Cenestin's ability to compete. Thus, their experts' "before and after" analysis had to compare a "before" period in which Wyeth had less market period (and thus lower prices) with an "after" period in which it had more market power (and thus higher prices).

---

13 *See also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998) (before and after method was unavailable because the alleged violation "embraced the entire period and region in which the necessary data are obtainable"); *Allegheny Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*, 690 F.2d 411, 414 (4th Cir. 1982) (excluding expert testimony where before-and-after model utilized a base year in which there "was an abnormal period of reduced price competition").

Yet plaintiffs' experts did no such thing. Their "before and after" model is fatally defective because it is indisputable that Wyeth had *more* market power during the "before" period (because *Cenestin didn't even exist at that time* and Wyeth had a greater market share) as compared to the "after" period (when Wyeth had to compete against Cenestin in addition to the other ET competitors, and when Wyeth's market share had declined).[14] The only difference from a competitive standpoint between the "before" period and the "after" period is that Wyeth faced competition from an additional competitor, Cenestin, in the "after" period. Wyeth employed the exact same contractual provisions in both periods, and faced competition from all of the other ET products (with the exception of Cenestin) in both periods.

Regardless of the impact, if any, that the challenged contracts had in reducing Cenestin's ability to compete vigorously, Wyeth plainly faced more competition from Cenestin in 1999-2002 (when Cenestin was on the market) than it did prior to 1999 (when Cenestin was not even on the market). Because it faced *no competition whatsoever* from Cenestin in the "before" period, and because plaintiffs contend that everything else remained constant between the two periods, it is undisputed that Wyeth faced less competition – and hence had more market power – before 1999 (i.e., the "before" period) than it had after 1999 (the "after" period). As stated by Wyeth's economic expert Dr. Dennis Carlton, "even if the challenged contracts somehow blunted the impact of Cenestin's entry – as plaintiffs' claim – Wyeth could not have achieved

[14] Wyeth's market share in 1998 was over 75%. It declined every year between 1999 and 2003, and by 2003 was approximately 68%. *See* Oral ET market share summary (Exh. 9).

greater market power than it did before Cenestin entered."[15] Plaintiffs' economic experts have acknowledged the obvious fact that Wyeth's market power did not increase in the "after" period, and likely decreased.[16] This is also evidenced by the fact that Premarin's market share fell each year between 1999-2003.

A "before and after" model based – as here – on the premise that the challenged conduct *increased* a defendant's market power is utterly useless where the defendant had less market power in the violation ("after") period than in the normative ("before") period. Tellingly, the economic expert for plaintiffs in one of the coordinated indirect purchaser cases against Wyeth has conceded that a "before and after" analysis is not appropriate in this case because "what happened before Cenestin entered and what happened after Cenestin entered were pretty similar competitive situations for Wyeth . . . ."[17]

The fact that Wyeth's market power did not increase in the "after" period means that there is no basis for the assumption of plaintiffs' economic experts that the higher

---

[15] Carlton Rep. at 39-40 (Exh. 10).

[16] *See* Leffler Dep. (6/17/04) at 157 (Exh. 11) ("Q. [Wyeth] didn't get more market power by Cenestin, on addition product joining the marketplace, coming into the market, correct? A. Correct."); *id.* at 193 ("Q. Is it your view that Wyeth had greater market power in 2000 or in 1998? A. I'm not sure, but approximately the same, but if anything, more in '98."); Leffler Dep. (11/3/04) at 182-83 (Exh. 4); Leitzinger Dep. (5/27/04) at 258 (Exh. 12) ("Q. Would you agree with me that the entry of a competitor does not increase the incumbent's market power? . . . A. Taking that event by itself and holding everything else constant, yes, I would agree with you.").

[17] French Dep. (10/24/02) at 522 (Exh. 13). *See also* French Dep. (4/11/02) at 415-416 (Exh. 14) ("Q. Were those viable benchmark methods in this case before or an after method? A. Probably not. Q. Why would a before method not have worked here for the benchmark? A. I'm not sure there's a period when Premarin faced meaningful competition. Q. That would be based on the theory that even before the entry of Cenestin, they held a monopoly position in the marketplace, right? A. Yes. Q. And after the anti-competitive conduct, I gather your position is that the anti-competitive conduct is still ongoing? A. Yes. Q. So that doesn't work. A. Not my position. It's my belief.").

rate of Premarin list price increases in that latter period is attributable to Wyeth's MCO contracts. To the contrary, the fact that the "before" and "after" periods are virtually identical from a competitive standpoint (other than the absence of Cenestin in the before period) actually disproves plaintiffs' case; it shows that the increased rate of Premarin list price increases *could not* have been caused by the challenged contracts but must instead have been the result of other market factors.

The inexplicable and indefensible selection of an invalid "before" and "after" period is fatal to plaintiffs' theory of antitrust injury. *E.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion inadmissible because it did not "incorporate all aspects of the economic reality of . . . market"); *In re Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497, 1507 (D. Kan. 1995) (excluding testimony of economic expert that was "based on unjustified assumptions and does not account for changes in other relevant market conditions"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 286 (S.D.N.Y. 2000) ("[i]n assessing the reliability of an expert opinion, a resort to common sense is not inappropriate"); *Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."). Drs. Leffler and Leitzinger should not be permitted to opine that Wyeth's price increases were caused by the MCO contracts at issue in this case.

**CONCLUSION**

For all the reasons set forth herein, Jeffrey Leitzinger's and Keith Leffler's testimony regarding causation and injury, and in particular their testimony concerning the "before and after" method, should be excluded from evidence at trial.

Dated: May 13, 2005

Respectfully submitted,

s/*Grant S. Cowan*
Grant S. Cowan (0029667)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH 45202-4182
Telephone: (513) 651-6745
Facsimile: (513) 651-6981
gcowan@fbtlaw.com
Trial Attorney for Defendants
Wyeth and Wyeth Pharmaceuticals

OF COUNSEL

Dan K. Webb
W. Gordon Dobie
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Douglas L. Wald
David S. Eggert
ARNOLD & PORTER LLP
Thurman Arnold Building
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a copy of the foregoing Motion To Prohibit Plaintiffs From Introducing Certain Evidence Based On The Testimony Or Analysis Of Jeffrey Leitzinger And Keith Leffler and Memorandum In Support thereof has been served electronically on all counsel of record with CM/ECF Registration on this 13th day of May, 2005, and by regular U.S. mail, postage prepaid upon the following:

Eliot G. Long, Esq.
**BUCHANAN INGERSOLL PC**
1835 Market Street
14th Floor
Philadelphia, PA 19103

Krishna Narine, Esq.
**SCHIFFRIN & BARROWAY LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004

Marc H. Edelson, Esq.
**HOFFMAN & EDELSON**
45 West Court Street
Doylestown, PA 18901

Barry S. Taus, Esq.
**GARWIN BRONZAFT GERSTEIN & FISHER L.L.P.**
1501 Broadway, Suite 1416
New York, NY 10036

s/*Grant S. Cowan*
Grant S. Cowan, Esq.
Frost Brown Todd LLC