# EXHIBIT 4

KEITH LEFFLER, NOVEMBER 03, 2004

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

J.B.D.L. CORP., d/b/a )
BECKETT APOTHECARY, et al., )
   Plaintiffs, )
   -vs- ) No. C-1-01-704
WYETH, )
   Defendant. )
----------------------- )
CVS MERIDIAN, INC. and )
RITE AID CORPORATION, )
   Plaintiffs, )
   -vs- ) No. C-1-03-781
WYETH, )
   Defendant. )

THE VIDEOTAPED DEPOSITION OF KEITH LEFFLER
VOLUME II
NOVEMBER 3, 2004

### Page 2

The videotaped deposition of KEITH LEFFLER, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before CORINNE T. MARUT, C.S.R. No. 84-1968, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, at the offices of Winston & Strawn, Suite 4500, 35 West Wacker Drive, Chicago, Illinois, on the 3rd day of November, A.D. 2004, commencing at 9:05 a.m.

### Page 3

PRESENT:

  HANGLEY, ARONCHICK, SEGAL & PUDLIN,
  (30 North Third Street, Suite 700,
  Harrisburg, Pennsylvania 17101,
  717-364-1004), by:
  MR. GORDON EINHORN,
    appeared on behalf of Plaintiffs
    CVS Meridian, Inc. and Rite Aid
    Corporation;

  SCHIFFRIN & BARROWAY, LLP,
  (Three Bala Plaza East, Suite 400,
  Bala Cynwyd, Pennsylvania 19004,
  610-822-0276), by:
  MR. KENDALL S. ZYLSTRA,
    appeared on behalf of the Plaintiff
    Class of Direct Purchasers;

### Page 4

PRESENT (Continued):

  WINSTON & STRAWN, LLP,
  (35 West Wacker Drive,
  Chicago, Illinois 60601-9703,
  312-558-6113), by:
  MR. GORDON DOBIE,
    -and-
  WYETH,
  (Five Giralda Farms,
  Madison, New Jersey 07940), by:
  MR. ELLIOT FEINBERG,
    appeared on behalf of the Defendant,
    Wyeth.

ALSO PRESENT:
  ANDREA SHEPARD, Ph.D.,
    Principal, Cornerstone Research.

VIDEOTAPED BY:
  MR. ALUN HARRIS-JOHN,
    Esquire Deposition Services

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

1 (Pages 1 to 4)

ESQUIRE DEPOSITION SERVICES - CHICAGO

KEITH LEFFLER, NOVEMBER 03, 2004

Page 181

1 through 1998?
2  A. Yes. I don't have any reason to think
3 it would affect its pricing calculus. But I would
4 expect it to take it into account.
5  Q. All right. And in response to a number
6 of my questions, you say that, for example,
7 Mr. Edinburg, you said that he was just wrong. But
8 in fact --
9  A. I can't say he is wrong. In my opinion
10 he's wrong.
11  Q. But if Wyeth's beliefs were wrong and,
12 in fact, that was the reason why Wyeth did price
13 the product the way it did, that would not be --
14 that would not be an anti- -- that the price
15 increases that it then took would not have been
16 caused by the -- the contracts that you talk about
17 as being anticompetitive, correct?
18  A. Yes.
19  Q. Now, in -- in paragraph 33 on page 22.
20  A. Okay.
21  Q. You say, the very last line, "Wyeth's
22 market power was increased as a result of its
23 efforts to strengthen and enforce its contractual
24 barriers and impede Cenestin's entry."

Page 182

1 Do you see that?
2  A. Yes.
3  Q. Now, is it true, sir, that -- certainly
4 it's not the case that Wyeth's market power
5 increased over the period when Cenestin wasn't on
6 the market, right?
7  A. I'm sorry?
8  Q. I mean, it's -- you're talking about
9 Wyeth's market power increasing as a result of its
10 efforts to strengthen and enforce its contractual
11 barriers impeding Cenestin's entry. That's the
12 last sentence of your paragraph 33.
13  A. Yes.
14  Q. I guess what I'm wondering is: Isn't it
15 true that Wyeth actually had more market power in
16 the period before Cenestin was even on the market?
17  A. Holding constant the -- I certainly
18 agree with you that a firm has more market power,
19 everything else the same, the fewer and less strong
20 the competitors it faces.
21  Q. Okay. But when you say holding
22 everything else the same, in this case in the
23 actual world Wyeth did have more market power
24 before Cenestin was on the market, correct?

Page 183

1  A. In a static sense, yes, at a point in
2 time, yes.
3  Q. In the sense of before Cenestin was on
4 the market, Wyeth had more market power, right?
5  A. It faced less substitutes.
6  Q. All right. Now, you say in -- this is
7 footnote 40 on page 22, if I understand this right.
8 You say that "It was only in early 1999, not long
9 before the price increases at issue, that Wyeth
10 learned its sole conjugated estrogen provision
11 would be applicable to Cenestin"?
12  A. Yes.
13  Q. So, here you're saying that Wyeth didn't
14 understand that it had effective contracts for
15 Cenestin until sometime, what, in 1999, early '99?
16  A. Well, this particular provision of the
17 contracts.
18  Q. So, Wyeth didn't know it had these
19 provisions until sometime in early 1999?
20  A. No, it knew it had the provisions. It
21 didn't know the FDA was going to label Cenestin as
22 a -- as a conjugated estrogen.
23  Q. Okay. So, until early 1999 Wyeth didn't
24 know that it had a contract that would be effective

Page 184

1 against Cenestin because it didn't know that the
2 product was going to be labeled a conjugated
3 estrogen?
4  A. No, it had its rebate provisions in
5 place. Its rebate provisions were independent of
6 whether Cenestin was a sole conjugated estrogen or
7 not. It also had sole conjugated estrogen
8 provisions.
9  Q. Oh, in paragraph 35, you talk about how
10 "James suggests that these programs," which I think
11 are --
12  A. Okay, I see.
13  Q. This is the shared success and the
14 market share contracts and so on.
15  -- "would not have impacted Premarin's
16 pricing until many months after the entry of
17 Cenestin."
18  And you say, "This ignores the vast
19 experience that Wyeth had in the market. In my
20 opinion, it's reasonable to assume that Wyeth would
21 be able to anticipate the impact of its programs,
22 policies and offensive responses to Cenestin."
23  Right?
24  A. Um-hmm.

KEITH LEFFLER, NOVEMBER 03, 2004

Page 185

1  Q. And the enforcement mechanisms that
2  you're talking about are what, like market share
3  agreements and that type of thing?
4  A. Yes.
5  Q. Now, again, you haven't yourself made a
6  foreclosure analysis, right?
7  A. If by foreclosure analysis you mean an
8  analysis of exclusive contracts and the extent of
9  market foreclosed by such exclusive contracts,
10 since I don't view these as exclusive contracts I
11 have not. If you mean something else, I don't
12 know.
13 Q. Okay. And you don't know whether or not
14 there were in effect NDC blocks or not, correct?
15 A. Right.
16 Q. And we talked before, you said a new
17 rebate deal with retailers, that Shared Success
18 program. Is that another one of the enforcement
19 mechanisms that you're talking about?
20 A. No, I don't think I'm -- not in this
21 context.
22 Q. What evidence are you aware of that
23 Wyeth knew at the time of Cenestin's launch which
24 enforcement mechanisms MCOs would actually have in

Page 186

1  place with -- at the time of the launch of
2  Cenestin?
3  A. It had in place its rebate contracts,
4  and it was aware that it had in place its rebate
5  contracts and I would certainly expect that Wyeth
6  would know that such contractual provisions, when
7  it understood the type of entry that Cenestin was
8  coming in with, would be effective at curtailing
9  that entry.
10 Q. All right. Certainly it had no prior
11 experience with the sole conjugated estrogen
12 language, though, right?
13 A. Yes. I only hesitate because I'm not
14 sure about in the early '90s, but I don't think
15 it's relevant.
16 Q. Now, since your -- since your last
17 deposition, sir, did you get a copy of the
18 transcript?
19 A. Yes.
20 Q. Did you review it?
21 A. Yes.
22 Q. Did you have any changes?
23 A. I don't recall. I mean, there were
24 typos, the usual stuff. I didn't recall anything

Page 187

1  that -- that I said, gee, I either screwed up that
2  answer or I was misquoted.
3         (WHEREUPON, a certain document was
4         marked Leffler Deposition Exhibit
5         No. 11, for identification, as of
6         11/3/04.)
7  BY MR. DOBIE:
8  Q. Let me show you what's been marked as
9  Exhibit 11, and for the record Exhibit 11 is a copy
10 of your deposition, correct, sir?
11 A. It is.
12 Q. And you were asked some questions about
13 a document that you reference in paragraph 36? You
14 say in 36, "Both Professor Carlton and Professor
15 James claim that I've misinterpreted the Wyeth
16 document."
17 A. Yes, I just had to get the context.
18 Yes, I now know the document you're talking about.
19 Q. All right. And that was a document --
20 that's the Strickland memo. Do you remember that?
21 A. I remember the memo, yeah.
22 Q. And did you read your testimony that
23 you -- that you gave and do you remember testifying
24 about the Strickland memo at length in your prior

Page 188

1  deposition?
2  A. I remember you asking me about it. I
3  read the whole thing so I'm sure I read it.
4  Q. Did you have any changes to any of the
5  answers that you gave in response to the questions
6  I asked you about the Strickland memo, what we
7  marked as Exhibit 5 from your prior deposition?
8  A. I don't recall that I -- I didn't make
9  any. I don't recall when I read it if I -- there
10 was nothing that I thought was worthy of making a
11 formal change.
12 Q. Oh. In paragraph 38 on page 25, you
13 talk about the -- how competition from a branded
14 competitor is different from a generic competition.
15 We have covered some of this already.
16 A. Yes.
17 Q. And you reference how Professor James
18 has come up with five illustrative events that
19 provide information or don't provide information
20 relative to the expected reaction of Wyeth to the
21 entry of Cenestin absent the anticompetitive
22 contractual provisions, correct?
23 A. Yes.
24 Q. And let me show you these documents I

47 (Pages 185 to 188)