Case 1:01-cv-00704-SSB-TSH    Document 170-6    Filed 05/13/2005    Page 11 of 17

70 WALR 423                                                                                                Page 16
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

requirements; and its reputation for customer service, product testing and delivery, and technical know-how. In addition plaintiff showed the principal buyer's need for the product. [FN138] The jury accepted case four and awarded $2,033,295 in damages. The trial court set aside the verdict on the ground that the ten percent price discount was arbitrary, but the court of appeals reversed and reinstated the award. [FN139] The existence of alternative scenarios, even ones based on purely hypothetical variations, manifestly played a role in the court's conclusion that the award was not speculative. The alternatives presented appeared to depict the full range of possible outcomes. The jury was permitted to choose an apparently conservative scenario based on its members' general experience.

VI. CONCLUSION

Courts' insistence on an evidentiary and theoretical basis for damages--which they express by rejecting "speculative" damages--is consistent with the idea of optimal damages. If damages lack an evidentiary basis, the substantive law would be thwarted by permitting ***463** recovery where no demonstrable anticompetitive consequences occurred. By the same token, an unreasonably strict standard of proof would weaken the damage action as a deterrent.

The cases suggest there are two principal defects in the proof of antitrust damages that provoke judicial references to speculativeness. First, the base-period experience and the damage-period experience must be comparable. Courts will accept a projection only if the plaintiff or a firm quite like it performed as well, or nearly so, as the projected scenario when the defendant's illegal conduct was not a factor. The degree of comparability that is required depends upon the court's perception of the tendencies of the alleged practice. Second, the but-for scenario must account for rational maximizing responses by all actors in the market during the damage period. One may not assume a free path to profitability in assuming that the defendant had not acted illegally.

Plaintiffs often try to avoid problems of speculativeness by presenting their models as "conservative." Typically, this approach requires the plaintiff to account for all adverse factors and assume one of the less rosy scenarios. The apparent appeal of this approach to courts, despite its arbitrary elements, says much about the nature of speculativeness as a legal construct. Proof of antitrust damages must be practical given the proof normally available. If the causal factor is explicitly acknowledged, not tacitly assumed, and an admittedly arbitrary range of alternative values is presented, courts are apparently willing to permit juries to rely on general experience in making a choice of one of the values.

[FNa1]. Huber Hurst Professor of Business and Legal Studies, Department of Economics, University of Florida. B.A. 1964, M.A. 1966, Ph.D. 1968, Michigan State University. The financial support of the College of Business Administration is gratefully acknowledged.

[FNaa1]. J. Will Young Professor of Law, Mississippi College School of Law. B.A. 1973, Tulane University; J.D. 1975, University of New Mexico; LL.M. 1979, University of Chicago. The financial support of the Law School is gratefully acknowledged.

We would like to thank Craig Callen, Robert Emerson, Amanda Esquibel, Herbert Hovenkamp, and John Lopatka for comments on earlier drafts, and Richard Monohan for research and editorial assistance.

[FN1]. 15 U.S.C. § 15(a) (1988) (antitrust plaintiff may recover three times the damages "by it sustained").

[FN2]. Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 317 (1965) (reasoning that "[p]rivate antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                    Page 17

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

quoted in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 336 (1971); Leh v. General Petroleum Corp., 382 U.S. 54, 59 (1965). On its effectiveness, see Amanda Kay Esquibel, Note, Protecting Competition: The Role of Compensation and Deterrence for Improved Antitrust Enforcement, 41 Fla.L.Rev. 153, n.76 (1989).

[FN3]. See generally, William H. Page, The Scope of Liability for Antitrust Violations, 37 Stan. L. Rev. 1445, 1483-85 (1985) (distinguishing concepts of antitrust injury and standing).

[FN4]. Id. at 1456-59. One measure of the optimal penalty is the "net harm to persons other than the offender." William M. Landes, Optimal Sanctions for Antitrust Violations, 50 U. Chi. L. Rev. 652, 656 (1983). In practical terms, this amount is the sum of the deadweight welfare loss from the offense and any monopolistic wealth transfer to the offender minus net benefits during the period of below cost pricing.

[FN5]. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."). See also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 & 123-24 (1969)) ("proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy"); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696-702 & n.7 (1962).

[FN6]. Story Parchment Co., 282 U.S. at 563-66.

[FN7]. Bigelow, 327 U.S. at 264. Accord Zenith, 395 U.S. at 123-24; Knutson v. Daily Review, Inc., 548 F.2d 795, 811-12 (9th Cir.1976), cert. denied, 433 U.S. 910 (1977); Flintkote Co. v. Lysfjord, 246 F.2d 368, 391-92 (9th Cir.) (finding proof of amount of antitrust damages not governed by common law requirement of reasonable certainty), cert. denied, 355 U.S. 835 (1957).

[FN8]. Bigelow, 327 U.S. at 264-65:
   Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.
See also Story Parchment, 282 U.S. at 563:
   Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.

[FN9]. Zenith, 395 U.S. at 124; Bigelow, 327 U.S. at 264. See also Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1205 (1st Cir.1987) ("If the plaintiff's proffered evidence permits no more than 'pure speculation and guesswork,' then the damage evidence is insufficient as a matter of law."); In re Corrugated Container Antitrust Litig., 756 F.2d 411, 417-18 (5th Cir.1985) ("In an antitrust case, once a plaintiff proves that it has been injured, it is entitled to utilize any just and reasonable method short of speculation to calculate the amount of its damages based on relevant data.").

[FN10]. As elsewhere in the law of evidence, determinations of speculativeness control the jury: if there is no evidence from which a rational jury could conclude that the plaintiff's account of events is more likely true than not, then the defendant must win on summary judgment or directed verdict; the jury cannot be asked to speculate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423            Page 18
70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

[FN11]. Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 542 (1983); Hawaii v. Standard Oil Co., 405 U.S. 251, 262-263 n.14 (1972). The Court in Associated noted that
> [t]he common law [of tort] required the plaintiff to prove, with certainty, both the existence of damages and the causal connection between the wrong and the injury. No damages could be recovered for uncertain, conjectural, or speculative losses. Even if the injury was easily provable, there would be no recovery if the plaintiff could not sufficiently establish the causal connection.

Associated, 459 U.S. at 533 n.26 (citations omitted).

[FN12]. Southern Pac. Communications Co. v. AT & T, 556 F.Supp. 825, 974 (D.D.C. 1982) ("[c]ourt must have a basis for assuring itself that other causes of plaintiffs' injury have been 'filtered out' of the damage claim"), aff'd, 740 F.2d 980 (D.C. Cir.1984), cert. denied, 470 U.S. 1005 (1985). See also Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483 (8th Cir.1992), cert. denied, 113 S.Ct. 1048 (1993).
> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of 'speculation or guesswork' not permitted for antitrust jury verdicts.

Id. at 1494 (citing Bigelow, 327 U.S. at 264).

[FN13]. The law could eliminate the issue of speculativeness by providing for a specified civil penalty or liquidated damages that the plaintiff could recover simply by proving that a certain type of violation took place. Alternatively, the law could provide for calculation of the optimal fine by some mechanism, then assign private plaintiffs the right to sue for that amount. Landes, supra note 4, at 671-72; Frank H. Easterbrook, Detrebling Antitrust Damages, 28 J.L. & Econ. 445, 462-67 (1985).

[FN14]. Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d 1356, 1367 (9th Cir.1986) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."), cert. denied, 484 U.S. 826 (1987).

[FN15]. DeLong Equip. Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1205 (11th Cir.) (reasoning that damage issue raises "hypothetical question" of "what would have occurred if the defendants had not violated the antitrust laws"), cert. denied, 114 S.Ct. 604 (1993); National Farmers' Org., Inc. v. Associated Milk Producers, Inc., 850 F.2d 1286, 1306 (8th Cir.) ("[A]n antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct."), cert. denied, 489 U.S. 1081 (1989); Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1511 (9th Cir.1985) ("[T]he amount of damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."); Fishman v. Estate of Wirtz, 807 F.2d 520, 550 (7th Cir.1986) ("[A]n antitrust plaintiff is given an exceedingly difficult task: quantifying the difference between what actually happened and what would have happened in a hypothetical free market."); Lehrman v. Gulf Oil Corp., 464 F.2d 26, 47 (5th Cir.) (measure of damages is "what financial advantage would the plaintiff have gained but for the actions of the defendant"), cert. denied, 409 U.S. 1077 (1972). Bigelow, 327 U.S. at 264 (antitrust damages measured "by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions").

[FN16]. Perma-Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 140 (1968) ("The possible beneficial byproducts of a restriction from a plaintiff's point of view can of course be taken into consideration in computing damages . . . ."); Los Angeles Memorial Coliseum Comm'n, 791 F.2d at 1366-68 ("if benefits accrued to [plaintiff] because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                           Page 19

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

conduct"). See also Phillip Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv. L. Rev. 1127, 1136 (1976) (requiring "offset [of] injuries which plaintiffs may have suffered at the hands of defendants with benefits which they may have derived from the very activities they attack.").

[FN17]. Aaron Director & Edward H. Levi, Law and the Future: Trade Regulation, 51 Nw. U. L. Rev. 281, 290 (1956); Ward S. Bowman, Tying Arrangements and the Monopoly Problem, 67 Yale L.J. 19, 21-23 (1957).

[FN18]. See Olmstead v. Amoco Oil Co., 725 F.2d 627, 629-31 (11th Cir.1984); Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.), cert. denied, 459 U.S. 857 (1982). See also Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52 (9th Cir.1971) (overcharge on tied products must be reduced by value of tying product, the Chicken Delight trademark), cert. denied, 405 U.S. 955 (1972); Herbert Hovenkamp, Federal Antitrust Policy: The law of Competition and Its Practice 613-14 (1994).

[FN19]. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927); Graphic Prods. Distribs. v. ITEK Corp., 717 F.2d 1560, 1580 (11th Cir.1983); Wolfe v. National Lead Co., 225 F.2d 427, 431 (9th Cir.) ("[T]he only way of ascertaining whether the business was more profitable in one year than another is by comparing the net profits for one year with another...."), cert. denied, 350 U.S. 915 (1955).

[FN20]. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 503-04 (1968) (damages from lease-only policy must account for capital costs that plaintiff saved by not purchasing machines).

[FN21]. Id. at 487 (finding damages from monopolist's illegal lease-only policy equal to rental price less the hypothetical purchase price).

[FN22]. See Hovenkamp, supra note 18, at 614-15 (1994). See also Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir.1979) (finding that "true measure of damages . . . is the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market"), cert. denied, 444 U.S. 1093 (1980). Analogously, if a plaintiff alleges that the defendant has used a tying arrangement to price discriminate, it should recover the difference between the price actually paid and the single monopoly price.

[FN23]. Pierce v. Ramsey Winch Co., 753 F.2d 416, 436 (5th Cir.1985).

[FN24]. Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir.), cert. denied, 454 U.S. 1125 (1981). See generally Neil W. Hamilton & Virginia B. Cone, Mitigation of Antitrust Damages, 66 Or.L.Rev. 339 (1987).

[FN25]. H.L.A. Hart & Tony Honoré, Causation in the Law 311 (2d ed. 1985) ("[L]ost opportunity is translated into money with the help of the notion of economic man, maximizing his gains and minimizing his losses. The norm taken in order to decide what loss defendant has 'caused' is a plaintiff making the best he can of his opportunities....").

[FN26]. Fishman v. Estate of Wirtz, 807 F.2d 520, 556-57 & n.34 (7th Cir.1986) (equating mitigation and opportunity cost); Fontana Pipe & Fabrication v. Ameron, Inc., 993 F.2d 882 (9th Cir.1993) (upholding as damages the difference between profits of a plant plaintiff would have purchased and profits of plant plaintiff was forced to build from scratch).

[FN27]. Page, supra note 3, at 1450-59.

[FN28]. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n.5 (1986). The Court cited Page, supra note 3,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                         Page 20
70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

at 1483-85 (distinguishing concepts of antitrust injury and standing). The lower courts have further developed the doctrines along these lines.

Over time, courts have developed a two-pronged analysis to determine whether a plaintiff has antitrust standing. As a necessary first step, courts must determine whether the plaintiff suffered an antitrust injury. If the answer to that question is yes, they must then determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws. Balaklaw v. Lovell, 14 F.3d 793, 798 n.9 (2d Cir.1994). See also Greater Rockford Energy & Technology Corp. v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir.1993):

Antitrust injury involves a causation requirement in order to define the class of potential plaintiffs eligible to bring suit . . . . Standing, on the other hand, examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction.

(citations omitted), cert. denied, 114 S.Ct. 1054 (1994); Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449 (11th Cir.1991).

[FN29]. Page, supra note 3, at 1460-61.

[FN30]. Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332 (1982) (finding horizontal maximum price fixing per se illegal). Albrecht v. Herald Co., 390 U.S. 145 (1968) (finding vertical maximum price fixing per se illegal).

[FN31]. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (finding antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.").

[FN32]. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990). See Roger D. Blair & Gordon L. Lang, Albrecht After ARCO: Maximum Resale Price Fixing Moves Toward the Rule of Reason, 44 Vand.L.Rev. 1007 (1991).

[FN33]. See, e.g., Roger D. Blair & Jeffrey L. Harrison, Rethinking Antitrust Injury, 42 Vand.L.Rev. 1539 (1989); Page, supra note 3.

[FN34]. Landes, supra note 4, at 656 defines the optimal penalty as the "net harm to persons other than the offender." Because Landes advocates a single penalty, not a series of suits by individuals, his notion of net harm necessarily contemplates netting of benefits and harms among classes of affected persons.

[FN35]. See Roger D. Blair & David L. Kaserman, The Albrecht Rule and Consumer Welfare: An Economic Analysis, 33 U. Fla. L. Rev. 461 (1981).

[FN36]. Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1908). For discussion, see Jeffrey L. Harrison, The Lost Profits Measure of Damages in Price Enhancement Cases, 64 Minn.L.Rev. 751, 760 (1980).

[FN37]. Associated Gen. Contractors of Cal., Inc., v. California State Council of Carpenters, 459 U.S. 519, 540-45 (1983) listed several factors to be considered in determining standing: (1) the directness of the asserted injury; (2) the existence a class of better-situated plaintiffs; (3) the speculativeness of the asserted injury; (4) the danger of duplicative recoveries because of the difficulty of identifying damages and apportioning them among direct and indirect victims of the asserted conduct; and (5) the causal connection between the antitrust violation and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                          Page 21
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

plaintiff's harm.

[FN38]. See supra note 28.

[FN39]. Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

[FN40]. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494 (1968).

[FN41]. J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what the plaintiff's situation would have been in the absence of the defendant's antitrust violation.").

[FN42]. Todd Marcus Young, Comment, Unestablished Businesses and Treble Damage Recovery Under Section Four of the Clayton Act, 49 U. Chi. L. Rev. 1076, 1079 n.14 (1982) (95% of all new businesses fail).

[FN43]. McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir.1988) (rejecting plaintiff's "expert" projection of costs based on "experience plus inflation").

[FN44]. Webb v. Utah Tour Brokers Ass'n, 568 F.2d 670, 678 (10th Cir.1977) (emphasis added).

[FN45]. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24 (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)) (emphasis added).

[FN46]. For example, one court reasoned:
   [G]iven the assumption of predatory pricing conduct, Malcolm's business would be directly injured by depressed market prices. Regardless of a businessman's reaction to predatory pricing some injury will almost certainly follow: if he retains his price he will lose volume and if he lowers his price he will have a smaller margin of profit on each unit sold. His total revenues, and hence profits, will usually decrease in a depressed market. Malcolm, in this case, provided the district court and jury with evidence of injury caused by the violation when he testified that a particular price generally prevailed, on his entry to the market he set a slightly lower price, and after his entry into the market his competitors dropped to a predatorily low price. This evidence easily translates into a finding of lost revenue and, hence, profits for Malcolm's business.
Malcolm v. Marathon Oil Co., 642 F.2d 845, 855-56 (5th Cir.) (footnotes omitted), cert. denied, 454 U.S. 1125 (1981). In Malcolm, the court's reasoning was also influenced by evidence of intent to harm competition. The court suggested that "[i]n cases where the defendants' acts are motivated by intent to injure the plaintiff, the inferential leap to the finding of fact of damage, is not great." Id. at 855.

[FN47]. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1262 (9th Cir.1981), cert. denied, 455 U.S. 1018 (1982).

[FN48]. Knutson v. Daily Review, Inc., 548 F.2d 795 (9th Cir.1976), cert. denied, 433 U.S. 910 (1977).
   Rather than imposing the nearly impossible burden of proving what each dealer would have done if he had been free to make his own pricing decision, we assume that, absent evidence to the contrary, a dealer would have raised his prices had it been profitable to do so; that is, dealers are profit maximizers.
Id. at 812. See also Northwest Publications Inc. v. Crumb, 752 F.2d 473, 477 (9th Cir.1985).

[FN49]. Roger D. Blair & Virginia G. Maurer, Umbrella Pricing and Antitrust Standing: An Economic Analysis, 1982 Utah L. Rev. 763, 779-85.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                              Page 22

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

[FN50]. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 583 (1986) (finding plaintiff television manufacturers would not have been injured by alleged price fixing conspiracy of other manufacturers because they would have benefited from artificially higher prices); Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 868-69 (9th Cir.1991) (reasoning that existing competitor in the market would have benefited, not been injured, by defendant's conduct that allegedly chilled entry into the market), cert. denied, 112 S.Ct. 1667 (1992); Belcher Oil Co. v. Florida Fuels, Inc., 749 F.Supp. 1104, 1108 (S.D. Fla. 1990) (finding seller was not injured by competitors' alleged minimum price fixing scheme).

[FN51]. Pierce v. Ramsey Winch Co., 753 F.2d 416, 440 (5th Cir.1985), illustrates what is at stake on the mitigation issue. The plaintiff's overall profits had actually increased after the defendant, a winch manufacturer, terminated the plaintiff's distributorship. Although the increased profits were attributable to sales of products other than winches, the defendant argued that the increased profits may have been attributable to the plaintiff's diversion of resources from selling winches. The court found, however, that the proof of lost profits on winches alone was (barely) sufficient to support the jury's award. It noted that the plaintiff's expert testified that the plaintiff's sales records showed that the increased profits were from trailer sales, and that the defendant had failed to cross examine the expert on the issue. Moreover, the plaintiff had testified that it could have continued its winch sales during the damage period.

[FN52]. Matsushita, 475 U.S. at 597-98.

[FN53]. Note, Private Treble Damages Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv. L. Rev. 1566, 1573 (1967) ("In some cases, evidence establishing the violation will support the inference that plaintiff must have suffered some harm. . . .").

[FN54]. Hart and Honoré, supra note 25, at 51-52 (describing differences between human and physical causation).

[FN55]. Graphic Prods. Distribs. v. Itek Corp., 717 F.2d 1560, 1579 n.35 (11th Cir.1983); Greene v. General Foods Corp., 517 F.2d 635, 665 (5th Cir.1975), cert. denied, 424 U.S. 942 (1976). But see J.T. Gibbons, Inc. v. Crawford Fitting Co., 704 F.2d 787, 792-94 (5th Cir.1983) (allowing no damages where refusal to deal by one supplier did not limit plaintiff's ability to obtain product or increase plaintiff's costs; plaintiff's losses shown to be result of decline in orders by its sole customer).

[FN56]. Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1496 (8th Cir.1992). Of the 100 companies with which the plaintiff contended it had negotiated sales, it could only provide evidence of lost sales with two. The court found that the evidence involving these two companies demonstrated only that the defendant's conduct "was one factor among many, and not a controlling or major factor, which [the] two companies took into account in deciding whether to purchase a used machine from [the plaintiff]." Id. at 1497.

[FN57]. For a fuller presentation of the economics, see William H. Page, Optimal Antitrust Penalties and Competitors' Injury, 88 Mich.L.Rev. 2151 (1990); Blair & Maurer, supra note 49; Charles C. Van Cott, Note, Standing at the Fringe: Antitrust Damages and the Fringe Producer, 35 Stan. L. Rev. 763 (1983); Comment, Standing of Purchasers From Nonconspirators to Challenge Price-Fixing Conspiracy: Mid-West Paper Products v. Continental Group, Inc., 93 Harv. L. Rev. 598 (1980).

[FN58]. See, e.g., Mid-West Paper Prods. Co. v. Continental Group, 596 F.2d 573, 583-87 (3d Cir.1979) ("[I]t cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor of the price-fixers have been injured by the illegal overcharge."). But see Beef Indus. Antitrust Litig. v. A & P., 600 F.2d 1148, 1166 n.24 (5th Cir.1979), cert. denied, 449 U.S. 905 (1980); In re Arizona Dairy Prods.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                  Page 23

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

Litig., 627 F.Supp. 233, 236 (D.Ariz. 1985); In re Uranium Antitrust Litig., 552 F.Supp. 518, 523-26 (N.D. Ill. 1982).

[FN59]. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24 (1969) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946).

[FN60]. Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1511 (9th Cir.1985): Damages may be proven by (1) comparing the plaintiff's profits before or after the alleged anticompetitive activity with the profits made while the plaintiff was subjected to the anticompetitive activity; (2) examining the profits of a business comparable to the plaintiff's business which was not affected by the anticompetitive activity; or (3) projecting the market share which the plaintiff would have attained absent the anticompetitive activity, and then projecting plaintiff's profits accordingly. For a brief survey of these approaches, see Richard C. Hoyt, Dale C. Dahl, and Stuart D. Gibson, Comprehensive Models for Assessing Lost Profits to Antitrust Plaintiffs, 60 Minn.L.Rev. 1233 (1976).

[FN61]. Indeed, in early cases, the courts spoke of this method as the exception to the otherwise inherent speculativeness of lost profits as a measure of damages:
   While the law seldom looks favorably upon recovery of losses of expected profits there is notable exception to the general rule to the effect that lost profits from destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business generally has it in his power to prove the amount of his expenses of operation and the income he has derived from it for a long time before, and for the time during the interruption of which he complains.
Roseland v. Phister Mfg. Co., 125 F.2d 417, 420 (7th Cir.1942). See also Loder v. Jayne, 142 F. 1010 (E.D. Pa.), rev'd, 149 F. 21 (3d Cir.1906); Central Coal & Coke Co. v. Hartman, 111 F. 96 (8th Cir.1901).

[FN62]. See, e.g., Cecil Corley Motor Co. v. General Motors Corp., 380 F.Supp. 819, 857 (M.D. Tenn. 1974) (awarding defendant judgment notwithstanding the verdict where plaintiff failed "to allocate or proportionalize the expenses to each of its four product lines and related operations"). But see Arthur Murray, Inc. v. Reserve Plan, Inc., 406 F.2d 1138, 1141-42 (8th Cir.1969) (upholding estimate of profit in a particular product line).

[FN63]. 273 U.S. 359, 378-79 (1927).

[FN64]. Id. at 379. See also Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (7th Cir.1946).

[FN65]. Pacific Coast Agric. Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1207 (9th Cir.) (holding plaintiff must make "some showing that the market conditions in the two periods were similar but for the impact of the violation"), cert. denied, 425 U.S. 959 (1976).

[FN66]. Malcolm v. Marathon Oil Co., 642 F.2d 845, 858 (5th Cir.1981) ( "Each sale and the amount of loss on the transaction need not be shown; averages may be used to show that the plaintiff generally lost money over a period of time.").

[FN67]. Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1498 (8th Cir.1992).

[FN68]. Eiberger v. Sony Corp. of Am., 622 F.2d 1068 (2d Cir.1980) (upholding last year before business destroyed where business was consistently improving); Malcolm, 642 F.2d at 864 (upholding last eight months before business destroyed).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                        Page 24

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

In Key Enterprises, for example, the plaintiff had been a successful supplier of durable medical equipment (wheelchairs, hospital beds, walkers, and the like) for 19 months. The plaintiff's monthly sales revenues grew steadily over the September 1983-March 1985 period. In April 1985, the plaintiff was foreclosed from the market, precipitating the antitrust suit. The plaintiff's experience in the six-month period preceding the suit provided the base for projecting its but-for condition in the damage period. Key Enters. of Del. v. Venice Hosp., Sammett Corp., 919 F.2d 1550 (11th Cir.1990). The damage model is offered here only for illustration. The case was settled after the 1990 panel opinion while the petition for rehearing was under consideration and the panel's mandate was stayed. The Eleventh Circuit granted the petition for rehearing without knowledge of the settlement. Key Enters. of Del. v. Venice Hospital, 979 F.2d 806 (11th Cir.1992). The court subsequently determined that the grant of the rehearing was improvident, because the case had become moot; and that the proper procedure was to dismiss the appeal, vacate the district court's judgment, and remand to the district court with instructions to dismiss the case. Key Enters. v. Venice Hosp., 9 F.3d 893 (11th Cir.1993).

[FN69]. Pierce v. Ramsey Winch Co., 753 F.2d 416, 439-40 (5th Cir.1985). The court upheld as a basis for comparison the plaintiff's average profit per unit on a sample of 88 of the 200 units it sold in the month prior to its termination, despite the defendant's evidence that the average profit per unit for that year was only one tenth of the plaintiff's figure. Id. at 440-41.

[FN70]. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir.1969) (rejecting profit projection based on abnormally profitable six-month period), cert. denied, 396 U.S. 1062 (1970). R. S. E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966-68 (M.D. Pa. 1981) (rejecting plaintiff's use of most profitable portions of two different years as base periods). In Amerinet, 972 F.2d at 1495, the court found that the plaintiff was already facing a decline in its business prior to the defendant's conduct and that factors other than the defendant's conduct substantially contributed to the plaintiff's eventual failure. The plaintiff's own expert testified that the plaintiff "was in a period of decline prior to [the defendant's] alleged antitrust violations and needed substantial revenues from its new and unestablished entry into the field of used . . . printers in order to survive." Id. Moreover, the plaintiff had been involved in suits against several prior employees in which it had stated in its complaints that it had been materially harmed in 1986 and 1987 by elements other than the defendant's unlawful conduct. Id. at 1496.

[FN71]. Tire Sales Corp. v. Cities Serv. Oil Co., 637 F.2d 467 (7th Cir.1980), cert. denied, 451 U.S. 920 (1981). The district court had rejected the use of 1969 as a test year because "1970 was the last calendar year of plaintiff's contract with Citgo and because 1969 was one of only two profitable years in a 5-year period." Id. at 475. The court of appeals reversed, finding that 1970 was an abnormal year because plaintiff had already been replaced as distributor in part of that year. The court continued: "Moreover, since plaintiff's gross sales had been increasing progressively in 1967, 1968 and 1969, and since losses in the 5-year period are to some extent attributable to such exceptional events as destruction by a tornado, there were still other reasons to use 1969 to calculate plaintiff's future earnings absent antitrust violations by Citgo from January 1, 1971, when Berry Tire officially replaced plaintiff, and December 1, 1975, when plaintiff closed down." Id.

[FN72]. Peltier v. Exxon Corp., 527 F.2d 757, 760 (9th Cir.1975); General Elec. Credit Corp. v. Grubbs, 478 F.2d 53, 58-59 (5th Cir.) (denying recovery when plaintiff "had been operating at a loss prior [to the illegal acts and] it was only a matter of time until his business failed"), cert. denied, 414 U.S. 854 (1973).

[FN73]. In one case, the plaintiff offered an expert who admitted that "the cause of the decline in sales theoretically could have been anything," McGlinchy v. Shell Chem. Co., 845 F.2d 802, 806 (9th Cir.1988), and "did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred." Id. at 807. See also Pacific Coast Agric. Export Assn. v. Sunkist Growers, Inc., 526 F.2d 1196, 1206-07 (9th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-00704-SSB-TSH    Document 170-6    Filed 05/13/2005    Page 10 of 17

70 WALR 423                                                                                                           Page 25
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

Cir.1975).

[FN74]. Isaksen v. Vermont Castings, Inc., 825 F.2d 1158, 1165 (7th Cir.1987), cert. denied, 486 U.S. 1005 (1988).

[FN75]. In In re Fertilizer Antitrust Litig., 1983-1 Trade Cas. (CCH) ¶ 65,418 (E.D. Wash. 1983), the court excluded the plaintiff's damage model in a price-fixing case because prices in the test period had been subject to federal price controls. The court reasonably concluded that removal of the controls may have played a role in the price increase during the damage period.

[FN76]. In Allegheny Pepsi-Cola v. Mid-Atl. Coca-Cola Bottling Co., 690 F.2d 411, 414-15 (4th Cir.1982), the plaintiff claimed it suffered losses as a result of a predatory pricing conspiracy, and sought to prove damages by the differences in prices before and after the defendant's entry. But the court found that the prior period had been an atypical, noncompetitive one in which prices were unusually high; the plaintiff's harm was simply the result of a return to competition. This conclusion is sensible, because price reductions typically accompany a new entry.

[FN77]. ILC Peripherals Leasing Corp. v. IBM, 458 F.Supp. 423, 435 (N.D. Cal. 1978) ("Memorex offered no evidence of the effect of the recession on its operations and hence its damage claim."), aff'd mem., 636 F.2d 1188 (9th Cir.1980), cert. denied, 452 U.S. 972 (1981).

[FN78]. William Inglis & Sons Baking Co. v. Continental Baking Co., 942 F.2d 1332, 1341 (9th Cir.1991).

[FN79]. See Hovenkamp, supra note 18, at 607 (1994). If the price of a substitute for the product increases, demand for the product, and hence its price, will increase.

[FN80]. See also In re Corrugated Container Antitrust Litig., 756 F.2d 411, 418-19 (5th Cir.1985) (affirming verdict for defendant when plaintiff's evidence of overcharge met by defendant's evidence that its "price increases were caused by increases in the cost of linerboard, fuel, and labor").

[FN81]. United States Football League v. National Football League, 842 F.2d 1335, 1377 (2d Cir.1988) (holding defendant's evidence of "self-destructive USFL decisions" justified a jury award of $1).

[FN82]. MCI Communications Corp. v. AT & T, 708 F.2d 1081, 1161 (7th Cir.), cert. denied, 464 U.S. 891 (1983); Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1353 (3d Cir.1975) ("Plaintiff's own experts conceded that the damage figures they tendered were attributable at least in part to the lawful competition of Chrysler's factory dealerships. On the evidence adduced, the jury rationally could not have reduced these figures to reflect only losses due to unlawful competition."); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 911 (2d Cir.), cert. denied, 369 U.S. 865 (1962); ILC Peripherals Leasing Corp. v. IBM, 458 F.Supp. 423, 435 (N.D. Cal. 1978) ("[D]uring the relevant time period, IBM introduced a number of products in the markets defined by Memorex as to which no challenge is made."), aff'd mem., 636 F.2d 1188 (9th Cir.1980), cert. denied, 459 U.S. 972 (1981). Distinguishing lawful and unlawful conduct is no mean feat. For a concise treatment, see Frank Easterbrook, On Identifying Exclusionary Conduct, 61 Notre Dame L. Rev. 972 (1986).

[FN83]. Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n, 663 F.2d 253, 271 (D.C. Cir.1981), cert. denied, 455 U.S. 928 (1982).

[FN84]. In Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1044-45 (4th Cir.1987), cert. denied, 486 U.S. 1017 (1988), the defendant successfully showed that part of the plaintiff's harm was the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                       Page 26

70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

result of lawful competitive actions by the defendant, contradicting a specific assumption of the plaintiff's expert. See also Coleman Motor, 525 F.2d at 1352 (test period not comparable to damage period because it predated defendant's entry into market; relevant comparison is between period of lawful competition and period of illegal activity.) But see National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1307 (8th Cir.1988), cert. denied, 489 U.S. 1081 (1989):

> An antitrust plaintiff's damage claim is not . . . rendered speculative or unreasonable merely because it fails to provide for a specific reduction in the event that allegations of certain unlawful conduct are rejected. In other words, if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced. Rather, if acts A and B support the entire damage award, it must be sustained.

The court added that, on remand to determine if the proof supported the entire award, the district court should "avoid tightly compartmentalizing the plaintiff's proof," because "some of the appellees' conduct, if viewed in isolation, was lawful, yet formed part of the mosaic that constituted the unlawful conspiracy." Id. (citations omitted). The court also noted that:

> [t]he fact that the appellees' illegal conspiracy was composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery. Similarly, the Court should recognize that the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct. In such a situation, the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury.

Id. at 1307. The court pointed out that the defendants had contributed to the uncertainty of proof by destroying documents. Id.

[FN85]. MCI, 708 F.2d at 1162-63 (citations omitted).

[FN86]. Farley Transp. Co. v. Santa Fe Transp. Co., 786 F.2d 1342, 1347-48 (9th Cir.1985).

[FN87]. The plaintiff improperly assumed

> [t]hat all of Santa Fe's Plan V shipping business, or at least all of the newly attracted business, was infected by the unlawful scheme to deviate from the required tariff rates. No evidence was produced showing the number of trailers that were diverted from the plaintiffs because of the illegal price-cutting activities, as opposed to legitimate competition. Accordingly, the jury was required to speculate..

Id. at 1351. The court explained more fully:

> The missing link was evidence allowing at least a reasonable inference as to the amount of customer business diverted to Santa Fe Plan V because of, rather than without regard to, lower rates attributable to the illegal scheme to deviate from the tariff. . . . Any effort to prove that customers were motivated by unlawful lower shipping rates in directing their business to the Santa Fe Plan V would naturally require an initial showing that material savings were in fact provided those customers. The next step, then, would be presentation of evidence that those savings, attributable to the unlawful scheme, were the impetus for the diversion of customer business, instead of some other attractive element of the Santa Fe Plan V approach to piggyback shipping.

Id. at 1352.

[FN88]. Id. at 1351 (citation omitted) (quoting Coleman Motor, 525 F.2d at 1353).

[FN89]. Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc., 891 F.2d 1127, 1144 n.8 (4th Cir.1989), rev'd on other grounds, 499 U.S. 365 (1991). See also Eastern Auto Distrib. v. Peugeot Motors, Inc., 795 F.2d 329, 338 (4th Cir.1986); accord United States Football League v. National Football League, 842 F.2d 1335, 1378-79 (2d Cir.1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                                    Page 27
70 Wash. L. Rev. 423

**(Cite as: 70 Wash. L. Rev. 423)**

[FN90]. National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1307 (8th Cir.1988), cert. denied, 489 U.S. 1081 (1989).

[FN91]. Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1242-43 (7th Cir.1982), aff'd, 465 U.S. 752 (1984) (citations omitted). See also Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 813 (3d Cir.1984) (finding that where plaintiff's theory is "that all the [defendant's] acts taken together show the willful acquisition or maintenance of a monopoly which damaged and forced Columbia out of business," plaintiff need not segregate proof of amount of damages attributable to a particular act), cert. denied, 477 U.S. 908 (1986).

[FN92]. Shannon v. Crowley, 538 F.Supp. 476, 480 n.10 (N.D. Cal. 1981).

[FN93]. Fishman v. Estate of Wirtz, 807 F.2d 520, 551 (7th Cir.1986); See also Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir.), cert. denied, 343 U.S. 942 (1952).

[FN94]. See H. Hovenkamp, supra note 18, at 625-26.

[FN95]. Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir.) (footnotes omitted), cert denied, 436 U.S. 956 (1978). Other circuits state similar tests. See, e.g., Solinger v. A & M Records, Inc., 580 F.2d 1304, 1309 (9th Cir.), cert. denied, 441 U.S. 908 (1979); Martin v. Phillips Petroleum Co., 365 F.2d 629, 633-34 (5th Cir), cert. denied, 385 U.S. 991 (1966). A plaintiff who is already in the relevant line of business and alleges it was prevented from expanding into a new market may face a lighter burden: "[t]he Court does not believe that a going concern, which is the victim of an anti-competitive practice, must forego damages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output." Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 986 n.20 (5th Cir.1977).

[FN96]. In re Dual-Deck Video Cassette Recorder Antitrust Litig., 11 F.3d 1460, 1464-66 (9th Cir.1993) (applying Solinger) (plaintiff had "no experience, no affirmative action to enter the market, no demonstrated ability to raise the money to enter the market;" damage claim was "pie in the sky"); Hayes v. Solomon, 597 F.2d 958, 973-74 (5th Cir.1979) (inadequate plans, contracts, and finances to demonstrate intent and preparation) (applying Martin, 111 U.S. 1078 (1980). But cf. Neumann v. Vidal, 710 F.2d 856, 858-60 (D.C. Cir.1983) (applying Hecht) (sufficient evidence of experience, financial resources, and steps toward entry to create jury issue).

[FN97]. Amerinet, Inc., v. Xerox Corp., 972 F.2d 1483, 1498 (8th Cir.1992).

[FN98]. Hovenkamp, supra note 18, at 626.

[FN99]. Id.

[FN100]. Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1206 (1st Cir.1987) (plaintiff must show "product, firm, and market comparability"). For a statistical approach, see Roger D. Blair & Amanda K. Esquibel, Yardstick Damages in Lost Profit Cases: An Econometric Approach, 72 Denver U. L. Rev. 113 (1994).

[FN101]. William Inglis & Sons Baking Co. v. Continental Baking Co., 942 F.2d 1332, 1341 (9th Cir.1991). In effect, the court rejected the use of an average across an array of firms. In other contexts, however, courts have relied upon averages for determining lost income and expected work life.

[FN102]. Home Placement, 819 F.2d at 1206 n.9. The differences were as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-00704-SSB-TSH    Document 170-6    Filed 05/13/2005    Page 13 of 17

70 WALR 423                                                                Page 28
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

|            | Vacancy Rate | Population | Housing Units | Rental Units | Available Rental Units |
|------------|--------------|------------|---------------|--------------|------------------------|
| Nashville  | 7.2%         | 699,271    | 169,216       | 63,794       | 4,593                  |
| Providence | 5.8%         | 854,400    | 285,026       | 116,860      | 6,544                  |

[FN103]. Id. at 1207.

[FN104]. Id. at 1208.

[FN105]. Id.

[FN106]. National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1297 (8th Cir.) (plaintiff's performance in a different federal milk marketing order was an adequate yardstick), cert. denied, 489 U.S. 1081 (1989); Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 394 n.7 (8th Cir.1987) (finding sales in West Coast and Midwest markets sufficiently comparable); Syufy Enters. v. American Multicinema, Inc., 793 F.2d 990, 1002-03 (9th Cir.1986), cert. denied, 479 U.S. 1031 (1987); King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147, 1161-62 (10th Cir.) (finding profits of plaintiff's gas station in other markets sufficient as yardsticks to create jury question), cert. denied, 454 U.S. 1164 (1982); Malcolm v. Marathon Oil Co., 642 F.2d 845, 858 & 860 n.24 (5th Cir.), cert. denied, 454 U.S. 1125 (1981).

[FN107]. Phillips v. Crown Cent. Petroleum Corp., 602 F.2d 616, 631-32 (4th Cir.1979) (finding prices paid to gasoline station in same area as plaintiff were a sufficient yardstick), cert. denied, 444 U.S. 1074 (1980). See also Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1044 n.21 (4th Cir.1987) (finding independent parts distributor could use independent garage market for replacement parts as yardstick), cert. denied, 486 U.S. 1017 (1988).

[FN108]. Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 911-13 (2d Cir.) (upholding directed verdict where plaintiff failed to establish damages in the market for a full line of shoe machinery when its calculation was based upon its success in only some of the lines), cert. denied, 369 U.S. 865 (1962). See also Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1261-62 (9th Cir.1981) (rejecting plaintiff's market share in small vessel market as a basis for projecting market share in large vessel market, from which it was allegedly foreclosed), cert denied, 455 U.S. 1018 (1982).

[FN109]. In Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1421 (11th Cir.1987), the plaintiff ticketing agency sued a stadium, alleging damages from its practice of conditioning stadium leases on the use of a ticketing agency linked to the Coliseum. The court limited the plaintiff's damages to the profits it would have made from the single promoter that plaintiff was able to prove would have used its service but for the tie. The plaintiff suggested as a yardstick its business at other venues in Atlanta, but the court rejected this experience as insufficiently comparable.

[FN110]. Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1511 (9th Cir.1985) (internal citations omitted). R.S.E., Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954, 966 (M.D. Pa. 1981):
  Perhaps the most blatant defect in plaintiff's damage model for lost profits is its failure to account for any lawful

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

competition. Surely plaintiff cannot have expected the defendants to sit idly by while it proceeded to grasp 25% of the road construction market and maintain its roughly 12% of the blacktop production market, when each market began to dry up. As defendants point out, they were well integrated, established firms in the area. To postulate damages on the assumption that they would not individually react by reducing their prices and therefore require plaintiff to further reduce its price, thus reducing its net profit, is absurd.

[FN111]. See Gray v. Shell Oil Co., 469 F.2d 742, 749 (9th Cir.1972) (excluding accountant's exhibit that assumed plaintiff "could have raised . . . retail gasoline prices six cents a gallon 'without losing any volume'"), cert. denied, 412 U.S. 943 (1973). On the law of demand, see George J. Stigler, The Theory of Price 20-28 (4th ed. 1987); Richard A. Posner, Economic Analysis of Law 4-5 (4th ed. 1992).

[FN112]. See Knutson v. Daily Review, Inc., 468 F.Supp. 226, 240 (N.D. Cal. 1979), aff'd, 664 F.2d 1120 (9th Cir.1981).

[FN113]. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1262 (9th Cir.1981), cert denied, 455 U.S. 1018 (1982). The plaintiff's expert stated that it could not have made the projected profits unless it achieved a fourteen percent market share. But, in assuming that market share, the expert failed to account for the defendant's predictable price cuts in response to its entry.

[FN114]. In Dolphin Tours, the plaintiff alleged it had been excluded from the market for Japanese tours of the United States. The court of appeals reversed the trial court's grant of summary judgment for defendant on the damage issue, finding that on remand the plaintiff could remedy the difficulties with its scenario of the but-for world. The court found that, for purposes of summary judgment, a report prepared by the plaintiff's witnesses provided a reasonable estimate of the plaintiff's lost profits by projecting market shares and profits at the existing price differential and at one less favorable to plaintiff. The report did not sufficiently address the possibility of comparable American tour groups entering the market, or of lower-priced Japanese tours being offered, thus limiting the plaintiff's market share. But the court held that the plaintiff's expert could provide this information at trial. 773 F.2d at 1512.

[FN115]. In DeLong Equipment Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1204 (11th Cir.), cert. denied, 114 S.Ct. 604 (1993), in which a distributor had been denied access to a product, the court allowed as damages for past profits an estimate of the distributor's lost profits on sales to a single end user. The model assumed that the distributor would have accounted for the end user's entire purchases of the product. The only adjustment for possible competition by other distributors (as to past profits) was a ten percent reduction in price, which the expert claimed to be "the functional and mathematical equivalent of assuming that a significant portion of [the purchaser's] media business would go to other distributors or manufacturers." Id. The court upheld an award of damages despite the apparently arbitrary choice of the ten percent figure.

[FN116]. J.T. Gibbons, Inc. v. Crawford Fitting Co., 704 F.2d 787, 792-94 (5th Cir.1983) (allowing no damages where termination by one supplier did not limit plaintiff's ability to obtain product or increase plaintiff's costs).

[FN117]. Keener v. Sizzler Family Steak Houses, 597 F.2d 453, 457 (5th Cir.1979) (rejecting plaintiff's bare assertion that "if he had been free to raise prices, he could have increased his volume 'anywhere from one to three percent'").

[FN118]. McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir.1988). See also Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816 (1st Cir.) (finding unfounded prediction of growth by plaintiff but for defendant's action insufficient), cert. denied, 488 U.S. 955 (1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 70 Wash. L. Rev. 423)**

[FN119]. Park v. El Paso Bd. of Realtors, 764 F.2d 1053, 1067 (5th Cir.) (rejecting estimate that plaintiff would have been able to achieve a twenty percent market share and a profit margin of thirty percent without provoking responsive price cuts by competitors), cert. denied, 474 U.S. 1102 (1986); American Bearing Co. v. Litton Indus., Inc., 540 F.Supp. 1163, 1173 (E.D. Pa.) (rejecting expert's projection of market shares of 12.5%, 37%, and 50% in successive years, when the estimates failed to account for defendant's probable responsive price cuts), aff'd, 729 F.2d 943 (3d Cir.), cert. denied, 469 U.S. 854 (1984); Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 391 (6th Cir.) (rejecting 247% annual growth rate in competitive market), cert. denied, 372 U.S. 907 (1963).

[FN120]. In Park, 764 F.2d at 1058, the plaintiff alleged that it had been excluded from the El Paso market for real estate services. It started its real estate brokerage in 1975, charging flat fees to homeowners instead of the standard practice of commissions based on the price of the home. Its business increased until 1979, then declined sharply until 1982, when it finally left the market. The plaintiff's expert estimated that, but for the boycott by the defendant board of realtors, the plaintiff's lower flat rate would have allowed it to gain twenty percent of the market by 1983, and that only at that point would the defendants have begun competing on price. Id. at 1067. The court rejected this projection as speculative. Id. The expert offered no evidence that homeowners chose brokers based on price or that the other brokers would not have protected their market shares by competing at an earlier date. He offered no analysis of other real estate markets and could not point to another real estate business in the country that possessed twenty percent of the market. The largest El Paso firm at the time had less than seven percent. Id.
In Pierce v. Ramsey Winch Co., 753 F.2d 416, 439 (5th Cir.1985), the plaintiff's expert testified that the plaintiff's sales of winches would have steadily risen from 250 in October of 1978 (the month it was unlawfully terminated) to 520 per month by December of 1979, at which point it would have leveled off. The expert based this prediction on the expert's impression that this was "the way sales were running." Id. at 441. The court found this statement inadequate to support the verdict, but nevertheless found adequate support elsewhere in the record: (1) the fact that the defendant's winches were the "Cadillac" of winches; (2) the defendant's statement to the plaintiff that distributors of the defendant's winch often made $300,000 per year; (3) the plaintiff's opinion that, given sufficient supplies, it could sell 600 to 700 of the defendant's winches per month; and (4) a different distributor's projected sales for the same period. Id.at 440-41. The court stated that it would have been "more comfortable with [the] projection if it had been tied to the history of a similar distributor--a 'yardstick' for comparison purposes." Id. at 440. Admitting that the issue was close, the court found sufficient evidence to create an issue for the jury. Id. at 441..

[FN121]. For example, in Key Enterprise, see supra note 68, the plaintiff's actual monthly sales increased steadily until shortly before the foreclosure. A simple linear regression line drawn through these points would have projected a 250% increase in monthly sales over five years. This amount would have substantially exceeded the total market's sales. Consequently, the plaintiff chose to offer a damage theory that projected constant sales over the five years at an amount equal to the average monthly sales for the six months prior to foreclosure.

[FN122]. Mid-Texas Communications Sys., Inc. v. AT&T, 615 F.2d 1372, 1391-92 (5th Cir.) (rejecting arbitrary 27-year damage period), cert. denied sub nom. Woodlands Telecommun-ications Corp. v. Southwestern Bell Tel. Co., 449 U.S. 912 (1980).

[FN123]. McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir.1988) (rejecting plaintiff's testimony that expenses would remain constant at $60,000 for nine years).

[FN124]. Malcolm v. Marathon Oil Co., 642 F.2d 845, 864 (5th Cir.) (permitting inference of duration of business based upon "plaintiff's age, health, and desire to remain in the business"), cert. denied, 454 U.S. 1125 (1981); Arnott v. American Oil Co., 609 F.2d 873, 888 (8th Cir.1979), cert. denied, 446 U.S. 918 (1980). Cf. Simpson v. Union Oil Co., 396 U.S. 13, 15-16 (1969) (Black, J., dissenting):

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423 Page 31
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

At the time the cause of action arose petitioner's life expectancy was about 25 years. The jury had a right to believe that his business would have grown through those 25 years, and no one can say with any absolute assurance that the jury verdict was in excess of the immediate and long-term returns he might have realized from his business during that period.

[FN125]. Simpson v. Union Oil Co., 411 F.2d 897, 909 (9th Cir.), Malcolm v. Marathon Oil Co., 642 F.2d 845, 864 (5th Cir.) (permitting inference of duration of business based upon "plaintiff's age, health, and desire to remain in the business"), cert. denied, 454 U.S. 1125 (1981), rev'd per curiam on other grounds, 396 U.S. 13 (1969).

[FN126]. White & White, Inc. v. American Hosp. Supply Corp., 540 F.Supp. 951, 1039 (W.D. Mich. 1982) (stating "[a]ssuming defendant's full compliance [with injunction], the court is unable to find with any degree of certainty that plaintiffs will continue to sustain further damage."), rev'd on other grounds, 723 F.2d 495 (1983). The possibility (not certainty) of injunctive relief poses a vexing problem for damage calculations. It is not simply a matter of cutting off the flow of future damages when the injunction takes effect. In most instances, separate damage calculations, with and without injunctive relief, are necessary.

[FN127]. Burton Supply Co. v. Wheel Horse Prods., Inc., 1974-2 Trade Cas. (CCH) ¶ 75,224, at 97,518 (N.D. Ohio 1974). But see Arnott, 609 F.2d at 887 (permitting damages beyond term of contract based on renewal expectancy).

[FN128]. In Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370 (7th Cir.1986), cert. denied, 480 U.S. 934 (1987), a recently-formed seller of telex terminals sued Western Electric for refusing to provide it with lists of independent telex vendors. For its first few months in business, the plaintiff was able to sell 1800 terminals, or twenty percent of the market. Id. at 372-73. After the refusal, the plaintiff was quickly driven out of business. Id. The plaintiff's expert testified that the plaintiff would have sold an additional 10,000 terminals over the next three years (in addition to the 1800 already sold), earning $54 million. The district court awarded $54 million ($24 million for antitrust damages and $30 million for breach of contract) then, without explanation, remitted the award to $12 million. Id. at 382-83. The circuit court reversed, holding that the damages were speculative. The court found that the plaintiff corporation had originally been organized as a tax shelter and had expected profits only to be $1.4 million over the next 10 years. The profits estimated by the plaintiff in its damage study ($54 million) represented a 191% return on its investment. The court of appeals reasoned that "a rate of return so far in excess of market rates of return would be a magnet drawing productive resources into the market--and confronting Olympia with competition from far more experienced firms." Id. at 382. The court also rejected the $12 million awarded by the district court, which represented a 41% return, because the record contained "no basis for a rational estimation of Olympia's damages." Id. at 383.

[FN129]. Pierce v. Ramsey Winch Co., 753 F.2d 416, 429 n.15 (5th Cir.1985); Graphic Prods. Dist., Inc. v. Itak Corp., 717 F.2d 1560, 1580 n.37 (11th Cir.1983); Lehrman v. Gulf Oil Corp., 500 F.2d 659, 663-64 (5th Cir.1974), cert. denied, 420 U.S. 929 (1975).

[FN130]. This is consistent with the efficient markets hypothesis of modern finance. Whatever information is available will be incorporated in the value of assets. As a result, one cannot beat the market without information that is unknown to anyone else. For a brief examination, see J. Fred Weston and Eugene F. Brigham, Managerial Finance 741-45 (7th ed. 1981).

[FN131]. Fishman v. Estate of Wirtz, 807 F.2d 520, 552 (7th Cir.1986): "[W]e know of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain. [Moreover,] [w]e know of no requirement that damages must always be computed as of the time of the injury or, if not, reduced

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 WALR 423                                                                                                           Page 32
70 Wash. L. Rev. 423
**(Cite as: 70 Wash. L. Rev. 423)**

by some appropriate discount rate to produce a value as of that date." Id.

[FN132]. Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 561 (1931) (holding damages include both lost past profits and reduced value of its business); Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d 61, 82 n.47 (1st Cir.1969); Atlas Bldg. Prods. v. Diamond Block & Gravel Co., 269 F.2d 950, 958-59 (10th Cir.1959) (same), cert. denied, 363 U.S. 843 (1960). In Farmington, because the business had not been in existence for ten years, the court determined that the going-concern value could not be determined. Id. at 80-81.

[FN133]. William Inglis & Sons Baking Co. v. Continental Baking Co., Inc., 981 F.2d 1023, 1024 (9th Cir.1992):
   The amount paid for the bakery fixtures and equipment has an impact on damages. This amount was paid for assets of Inglis. It would be double-dipping for Inglis to have received an amount for the bakery fixtures and now to receive damages representing its lost future profits, because, once the bakery fixtures were sold, they could no longer be used to generate profit. Put another way, as things stand Inglis received the proceeds from the sale of the fixtures and equipment but not a profit stream from the use of these assets. If the violation had not occurred, Inglis would have received the profit stream but not had the proceeds of their sale. Inglis' net damage is the difference between the lost profit stream and the proceeds it did receive. Consequently, before the damages are trebled the amount allocable to the bakery fixtures should be deducted from the profit stream to determine damages.

[FN134]. In re Wyoming Tight Sands Antitrust Cases, No. 85-2349, 1990 WL 155542, at 13 (D.Kan., Sept. 6, 1990) (rejecting defendant's motion to exclude alternative damage theories, because "as long as each theory is a reasonable approximation of competitive terms which Pipeline could have been expected to demand at the time, it is for the jury to decide which theory to apply").

[FN135]. See Fontana Pipe & Fabrication v. Ameron, Inc., 1993 WL 159908, at 2-3 (9th Cir., May 14, 1993).

[FN136]. DeLong Equipment Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1205 (11th Cir.), cert. denied, 114 S.Ct. 604 (1993).

[FN137]. Each of the cases included the accountant's projection of lost profits prior to 1994. Id. at 1205.

[FN138]. Id. at 1203.

[FN139]. Id. at 1204-06.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.