# EXHIBIT 11

KEITH LEFFLER, JUNE 17, 2004

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE SOUTHERN DISTRICT OF OHIO
 3              WESTERN DIVISION
 4
 5   J.B.D.L. CORP, d/b/a        )
 6   BECKETT APOTHECARY, et al., )
 7        Plaintiffs,            )
 8   vs.                         ) No C-1-01-704
 9   WYETH,                      )
10        Defendant.             )
11   ----------------------------)
12   CVS MERIDIAN, INC. and      )
13   RITE AID CORPORATION,       )
14        Plaintiffs,            )
15   vs.                         ) No C-1-03-781
16   WYETH,                      )
17        Defendant.  ) June 17, 2004
18
19        The videotaped deposition of
20   KEITH LEFFLER, called for examination, taken
21   pursuant to the Federal Rules of Civil Procedure
22   of the United States District Courts pertaining
23   to the taking of depositions, taken before
24        (CAPTION CONTINUED)
```

Page 2

```
 1   KAY A. LEVINE, CSR No. 84-3654, a Notary Public
 2   within and for the County of Cook, State of
 3   Illinois, and a Certified Shorthand Reporter of
 4   said state, at Suite 4700, 35 West Wacker Drive,
 5   Chicago, Illinois, on the 17th day of June, A.D.
 6   2004, at 9:40 a.m.
 7
 8   PRESENT:
 9       WINSTON & STRAWN, LLP,
10       (35 West Wacker Drive,
11       Chicago, Illinois 60601-9703,
12       312-558-6113), by:
13       MR. GORDON DOBIE and
14       MS. PEGGY BALESTERI,
15          appeared on behalf of the Defendant
16          Wyeth;
17       HANGLEY, ARONCHICK, SEGAL & PUDLIN,
18       (30 North Third Street, Suite 700,
19       Harrisburg, Pennsylvania 17101,
20       717-364-1004), by:
21       MR. GORDON EINHORN,
22          appeared on behalf of Plaintiffs
23          CVS Meridian, Inc. and Rite Aid
24          Corporation;
```

Page 3

```
 1   PRESENT: (Continued)
 2       THE WEXLER FIRM, LLP,
 3       (One North LaSalle Street, Suite 2000,
 4       Chicago, Illinois 60602,
 5       312-346-2222), by:
 6       MR. TIMOTHY A. SCOTT,
 7          appeared on behalf of the indirect
 8          payor plaintiffs.
 9
10   ALSO PRESENT:
11       ANDREA SHEPARD, Ph.D.,
12          Principal, Cornerstone Research.
13       MR. JASON D. SMITH,
14          Wyeth.
15       MR. BRIAN BRUCE,
16          Videographer.
17
18
19
20
21
22
23   REPORTED BY: KAY A. LEVINE, CSR, RPR
24       CSR Certificate No. 84-3654.
```

Page 4

```
 1          (WHEREUPON, a certain document
 2           was marked Leffler Deposition
 3           Exhibit No. 1, for
 4           identification, as of 6/17/04.)
 5       THE VIDEOGRAPHER: Good morning. We are
 6   going on the video record at 9:40 a.m. My name is
 7   Brian P. Bruce, Senior. I'm a legal videographer
 8   associated with Esquire Deposition Services
 9   located at 155 North Wacker Drive in Chicago,
10   Illinois. The court reporter today is Kay Levine,
11   also from Esquire Deposition Services.
12           Here now begins the videotaped
13   deposition of Keith Leffler, taking place at
14   35 West Wacker Drive, suite 4200A in Chicago,
15   Illinois. Today's date is June 17th in the year
16   2004. This deposition is being taken in the
17   matter captioned CVS Meridian, Incorporated and
18   Rite Aid Corporation versus Wyeth.
19           This matter is pending in the United
20   States District Court for the Southern District of
21   Ohio, Western Division, and bears Case No.
22   C-1-03-781. This deposition is being taken on
23   behalf of the defendant, and the party at whose
24   instance this deposition is being recorded on an
```

1 (Pages 1 to 4)

**Page 153**

1 degree. Could they switch some? Yes.
2    Q. Well, you mentioned Kaiser earlier. Do
3 you think, for example, with Kaiser that they
4 could move share in a fairly dramatic way?
5    A. Yes. Certainly as compared to a
6 typical PBM.
7    Q. Right. So just as an example, would it
8 be anti-competitive for Wyeth to offer Premarin to
9 Kaiser at a deep discount in exchange for high
10 market share in your view?
11    A. I don't know. Kaiser is probably not
12 alone enough to have any significant competitive
13 impact.
14    Q. So if Wyeth offered essentially an
15 exclusive type arrangement with a closed plan like
16 a Kaiser, just sort of given the size of that
17 market, you're saying that might not raise
18 competitive concerns?
19    A. Probably not. I think that's what they
20 did, and I'm certainly not emphasizing that
21 anywhere in this document.
22    Q. And you don't disagree that Kaiser
23 could then sort of switch if they wanted to and
24 move patients to Cenestin.

**Page 154**

1    A. I presume that at least Wyeth must have
2 felt they could, because I'm aware that the price
3 offered Kaiser was pretty close to marginal cost.
4 And so I don't think Wyeth would do that unless
5 they believed that Kaiser could effectively do
6 something like that, so I will go with their
7 judgment.
8      On my own I would probably -- wouldn't
9 be sure I'd have to start thinking about the
10 doctors and what they're going to do in response
11 and lots of complicated stuff.
12    Q. If it would be okay for Wyeth to offer
13 a contract like this to a Kaiser, why would it not
14 be okay to offer it to, let's say, a Rocky
15 Mountain or even somebody a little bit bigger like
16 an Aetna?
17    A. By this you mean simply a low price for
18 exclusivity?
19    Q. Yes, sir.
20    A. If those were the contracts at issue
21 here, I would do probably more typical analysis of
22 exclusive contracts. These are not exclusive
23 contracts in my mind at all, so that's not the
24 analysis I'm bringing to bear on it. But I would

**Page 155**

1 probably start doing analysis of the type of what
2 percent of the markets foreclose, the standard
3 exclusive dealing type analysis, and it could or
4 could not be anti-competitive.
5    Q. But you didn't undertake that type of
6 analysis in terms of what percentage of the market
7 was foreclosed for this case, right?
8    A. No, I don't view this as a foreclosure
9 case, or a case of exclusive dealing.
10    Q. Are you aware of the amount of time
11 that it typically takes for a PBM to review a
12 product before they put it on formulary?
13    A. Oh, I've read -- certainly not from
14 personal experience, but I've certainly reviewed
15 things that relate to that.
16    Q. And have you seen the evidence that
17 indicates that it's typically anywhere from
18 six months to a year, year and a half, before a
19 PBM or an HMO will review a new product?
20    A. I'm sure it varies widely, but what it
21 would average, I would probably be comfortable
22 with that encompassing most of the cases. At the
23 same time I'm sure if some blockbuster drug comes
24 out, the review can be very quick. Or if some

**Page 156**

1 drug comes out that offers tremendous cost
2 savings, that that process can be sped up a lot.
3    Q. Now, have you factored that into your
4 analysis at all in terms of determining what
5 Premarin would have been priced at in the "but
6 for" world?
7    A. No. I mean yes, in the extent of
8 that's factored in, I presume, to Wyeth's analysis
9 themselves.
10    Q. But here's what I'm getting at. If
11 Wyeth didn't really even have to worry about
12 Cenestin being put on a formulary for six months
13 or so after they launched the product, wouldn't it
14 make more sense to begin the damage analysis at
15 six months after launch?
16    A. No. I mean, it might, but I don't
17 think it does here.
18    Q. Why?
19    A. What's significant is when, at what
20 point, is Wyeth's pricing decisions altered
21 because of their recognition that they can take
22 actions to preempt Cenestin's entry attempts. And
23 what I've seen indicates that that occurred in
24 early 1999.

Page 157

1 Q. So early '99, and you mentioned earlier
2 that's when Wyeth had a price increase.
3 A. I think in March was the actual price
4 increase.
5 Q. And here's what I'm confused by. How
6 could -- certainly Wyeth had whatever market power
7 it had before Cenestin came on the marketplace,
8 right?
9 A. Yes.
10 Q. I mean, it didn't get more market power
11 by Cenestin, one additional product joining the
12 marketplace, coming into the market, correct?
13 A. Correct.
14 Q. Why then does it make sense to -- why
15 are you assuming that Premarin would have been
16 priced at a lower price at some time period before
17 Wyeth even had to worry about Cenestin, either on
18 the marketplace or being reviewed by managed care
19 organizations for formulary placement?
20 A. I think Wyeth correctly perceives its
21 pricing problem as a long-run problem, and it's
22 not in its best interest to exploit things on a
23 very short-term basis. So it's making its pricing
24 decisions just in the context of what's our best

Page 158

1 price now.
2 I think consumers react and these
3 purchasers would react in a very adverse manner if
4 what Wyeth did is it said, Well, it's March so
5 we're going to jack up that price by 50 percent
6 and then we'll lower it six months later when we
7 need to lower it, that it's just not the way a
8 business firm is going to be successful in its
9 business relationships with its customers.
10 Q. And what evidence have you seen that
11 that was, in fact, Wyeth's thinking process which
12 you're speculating happened, that Wyeth was
13 anticipating Cenestin and raising its price in
14 anticipation of its launch even before the product
15 was on the market and even before it would have
16 been reviewed by managed care organizations for
17 formulary placement?
18 A. My conclusion, I think, is to the
19 contrary, that what happened is Wyeth recognized
20 that, in fact, it would be able to take actions to
21 increase the difficulty of Cenestin's entry and
22 thereby realized that the constraints that it saw
23 on its pricing were removed and thereby were able
24 to effectuate profitably higher increases than

Page 159

1 otherwise.
2 Q. Let me make sure I understand this.
3 Your basic theory of damages is that Wyeth would
4 have continued to price in the "but for" world --
5 let me restate it.
6 In the "but for" world, your theory of
7 damages is that Wyeth would have continued to
8 price as it had in the past, right?
9 A. Yes, in the recent past.
10 Q. In the recent past. And that in the
11 actual world is it your assumption that Wyeth was
12 able to raise its prices because of new contracts
13 with managed care organizations?
14 A. Not necessarily new contracts, but that
15 through the existing contracts and the plan and
16 pressure and information it was providing to the
17 holders of those contracts that that was
18 recognized as an effective tool in combatting
19 Cenestin's entry into the marketplace.
20 Q. All right. And is it your belief that
21 Wyeth's market power actually increased after the
22 launch of Cenestin?
23 A. No.
24 Q. Have you examined at all the extent to

Page 160

1 which Cenestin may have performed better in the
2 non-MCO and PBM sector of the market?
3 A. Only the evidence that I've seen from
4 Wyeth's experts. I've done no independent
5 examination of that issue. I don't dispute the
6 evidence that I've read from others.
7 Q. The evidence that Cenestin hasn't done
8 better, in fact, does worse in the cash and
9 Medicaid portion of the market.
10 A. As I say, I haven't examined the data
11 itself, but I've seen what the statistics offered
12 by some certainly reasonable economist.
13 Q. Have you examined at all or looked at
14 what's happened to Cenestin's sales in the period
15 from 2002 through the present into 2004?
16 A. Again, I -- the most recent data I've
17 seen is -- I think ends in about '03, and that's
18 plaintiffs' data. The IMS data ends before that,
19 so that's the extent of my knowledge.
20 Q. Are you aware of whether or not Wyeth
21 continues to have sole conjugated estrogen
22 language contracts?
23 A. No.
24 Q. And so in doing a damage analysis, you

KEITH LEFFLER, JUNE 17, 2004

Page 189

1  Q. What evidence are you aware of that
2  Duramed either did or didn't seek reimbursement
3  agreements with managed care organizations?
4  A. The evidence is that I know they had
5  some, so they obviously accepted them if they had
6  the opportunity to accept them, or at least at
7  certain -- at the levels that they, in fact, had
8  such contracts, they revealed that they liked such
9  a deal.
10  Q. And if the evidence indicated that, for
11  example, Duramed decided not to seek a rebate
12  agreement for PCS, would that impact your
13  conclusions in any way?
14  A. Not without knowing a lot more.
15  Q. Let me show you a document that was
16  previously marked as Exhibit 120. And for the
17  record Exhibit 120 is a document that was produced
18  by Duramed. And let me ask you about the first
19  page because it involves PCS Health Systems.
20  A. Yes.
21  Q. And PCS is the pharmacy benefit manager
22  that was owned by Rite Aid during 1999, correct?
23  A. Yes.
24  Q. And if you look down in the fourth

Page 190

1  paragraph on the very first page, it notes that:
2    The coverage for Cenestin in the vast
3  majority of PCS plans without a rebate agreement
4  is a position few products enjoy. It is likely
5  that Viking Health Care Solutions will continue to
6  recommend this strategy in the future as it
7  provides extensive Cenestin coverage with no
8  rebate liability.
9    Do you see that?
10  A. Yes.
11  Q. All right. Now -- and if you look
12  under 6/99, June '99, so that's down another one,
13  two, three, four, five -- six paragraphs, it notes
14  that, in summary, Cenestin is available and
15  covered on an unrestricted basis for 40 million of
16  the 42 million PCS lives, or approximately
17  95 percent of their book of business.
18    Do you see that?
19  A. I do.
20  Q. And looking at this document -- let me
21  ask you first. Have you ever seen this document
22  before?
23  A. It looks familiar. I'd have to look at
24  the list. You probably know.

Page 191

1  Q. Do you -- I don't think it's on your
2  list. Is it?
3  A. (No response.)
4  Q. 10733, no, it's not on your list.
5  A. Okay. I've seen things like it then,
6  you know, summaries of contracts.
7  Q. And looking at this, do you think it
8  would be unreasonable for Duramed to seek an
9  agreement with PCS, in light of the fact that its
10  product was available and covered on an
11  unrestricted basis for 40 million of the
12  42 million PCS lives?
13  A. Would it be -- ask it -- what am I --
14  Q. Do you think it would be unreasonable
15  for Duramed to take the position that it would not
16  seek a rebate agreement with PCS in light of the
17  fact that Cenestin is available and covered on an
18  unrestricted basis for 40 million of the 42
19  million PCS lives?
20  A. That's certainly not sufficient for me
21  to reach that conclusion.
22  Q. All right. Either way? I mean, in
23  other words, you don't know whether it's a good
24  discussion or not a good decision?

Page 192

1  A. I don't -- I don't know. I'd have to
2  know what their market share is, what they think
3  their market share could be if they offered some
4  discount. We're basically asking can they
5  motivate PCS to take some actions that increase
6  the sales of Cenestin and then want to know is
7  the increased revenue from any increased sales
8  more than offset by the reduced price.
9  Q. And you haven't made that analysis to
10  this point.
11  A. No.
12  Q. All right. Why don't we change tapes
13  here.
14    THE VIDEOGRAPHER: This will conclude
15  videotape number two. We are now going off the
16  record. The time is 3:07 p.m.
17    (WHEREUPON, a recess was had.)
18    THE VIDEOGRAPHER: We are now back on the
19  record. The time is 3:22 p.m. This is videotape
20  number three of the deposition of Keith Leffler,
21  taking place at 35 West Wacker Drive, Suite 4200A,
22  in Chicago, Illinois, on June 17th in the year
23  2004.
24    My name is Brian P. Bruce, Senior. I'm

48 (Pages 189 to 192)

KEITH LEFFLER, JUNE 17, 2004

Page 193

1  a legal videographer associated with Esquire
2  Deposition Services located at 155 North Wacker
3  Drive in Chicago, Illinois. Counsel?
4  BY MR. DOBIE:
5     Q.  Dr. Leffler, let me follow up on a
6  question that you answered before the break. You
7  mentioned that you believe that Wyeth's market
8  power did not increase after the launch of
9  Cenestin. Is it your view that Wyeth had greater
10 market power in 2000 or in 1998?
11    A.  I'm not sure, but approximately the
12 same, but if anything, more in '98.
13    Q.  Well, if it had more market power in
14 1998, how do you explain that Wyeth didn't
15 increase its prices more in 1998?
16    A.  What's important in 1998 is its
17 perceptions not only of its current market power
18 but its anticipated future market power, and what
19 changed is its anticipations about its future
20 market power.
21    Q.  So it's your view that Wyeth wasn't
22 pricing consistent with its true market power in
23 1998.
24    A.  No. It's that Wyeth is not priced

Page 194

1  moment by moment depending upon its current
2  perceptions, but that it sets overall pricing
3  strategies based on its current and anticipated
4  future market position.
5     Q.  Well, if it had more market power in
6  1998 then 2000, then certainly it was in a
7  position that it could have raised or that some of
8  its decision to raise its prices in the period
9  after Cenestin was on the marketplace had to do
10 with its market power as opposed to the existence
11 of the rebate agreements, correct?
12    A.  I didn't get it.
13    Q.  I mean, if Wyeth had additional market
14 power that would have allowed it to raise its
15 prices more than it did in the earlier period,
16 then to the extent that it later did raise its
17 prices in, let's say, '99 or 2000, wouldn't you
18 say that some of that decision to raise prices had
19 nothing to do with the -- its reimbursement
20 agreements with managed care organizations?
21    MR. EINHORN:  Objection.
22 BY THE WITNESS:
23    Q.  Well, I believe to the contrary that
24 what happened was its perceptions of its market

Page 195

1  power in 2000 or its belief about its market power
2  in 2000 and in the future were that it had more
3  market power than it anticipated back in 1998.
4  And therefore it set higher prices than it
5  otherwise would have set and that that change
6  flowed from its ability to use contracts to impede
7  Cenestin.
8  BY MR. DOBIE:
9     Q.  All right. And let me make sure I'm
10 understanding. Is it because of Wyeth's
11 perception that it had more market power than it
12 did through these agreements that allowed it to
13 then raise its prices?
14    A.  I believe its perception was correct,
15 but, in fact, it's the firm's perceptions of its
16 market power which always controls their pricing.
17 And that's true not only here but in every single
18 case. I think, in fact, its perceptions were
19 accurate, but I only use the word, perceptions,
20 because that's always what we're talking about.
21    Q.  Let me make sure I understand that.
22 Are you saying that its prices were set on the
23 basis of its actual market power or based on its
24 perceptions?

Page 196

1     A.  Prices are always based on perceptions,
2  not actuals. Firms don't know their actuals.
3     Q.  If Wyeth's market power did not
4  increase in the '99 to 2001 period as compared to
5  1998, what's your explanation for the increasing
6  rate of price increases in this later period?
7     A.  A change in its expectations of reduced
8  market power because of the entrance of Cenestin
9  that impacted its pricing in the '98, '97 period,
10 and then its recognition that, in fact, the
11 reduced market power has not come to pass. And
12 therefore its perceptions of its market power are
13 higher than they were before and therefore it
14 reacts to that by setting higher prices.
15    Q.  You mentioned this morning that to the
16 extent that there are other factors that resulted
17 in Wyeth increasing the prices of Premarin apart
18 from the contracts, that that would not be
19 anti-competitive on their part.
20       And let me ask you about some of those.
21 Maybe you -- to the extent that Wyeth decided to
22 increase the prices of its product, Premarin,
23 because of the introduction of a true generic of
24 the product, would you agree that that's something

49 (Pages 193 to 196)