# EXHIBIT 12

```
                                                              1
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4                     -    -    -
 5   J.B.D.L. CORP., d/b/a        :CIVIL ACTION
     BECKETT APOTHECARY, et al.:
 6        v.                      :
                  Plaintiffs      :
 7                                :
     WYETH-AYERST LABORATORIES    :
 8   INC., et al.                 :
                  Defendants      :NO. C-1-01-704
 9                     -    -    -
                   MAY 27, 2004
10                     -    -    -
11        Videotaped Oral deposition of
12   JEFFREY J. LEITZINGER, PH.D., taken
13   pursuant to notice, was held at the law
14   offices of REED SMITH, One Liberty Place,
15   1650 Market Street, Suite 2500,
16   Philadelphia, Pennsylvania, beginning at
17   9:42 a.m., on the above date, before
18   Nancy D. Ronayne, a Court Reporter and
19   Commissioner of Deeds in the Commonwealth
20   of Pennsylvania.
21
22         ESQUIRE DEPOSITION SERVICES
                   15th Floor
23         1880 John F. Kennedy Boulevard
           Philadelphia, Pennsylvania 19103
24                (215) 988-9191
```

JEFFREY J. LEITZINGER, PH.D.

254

1  analysis about the impact as to each and
2  every class member.
3      Q.  What individual analysis
4  would you need to know to come to a
5  conclusion as to whether a particular
6  member of the class was harmed?
7          MR. CRAMER: Objection to
8      form, misstates the testimony.
9          THE WITNESS:  Well if you
10     were to try for some reason to
11     analyze that question on a class
12     member by class member basis,
13     without having spent a lot of time
14     thinking about how exactly what
15     would be the most effective way to
16     undertake that inquiry, it seems
17     to me it would involve trying to
18     determine whether the increases in
19     Premarin prices that are the, the
20     source of the class-wide
21     overcharge did in fact result in
22     higher prices paid for Premarin as
23     to each class member.
24 BY MS. VARMA:

255

1      Q.  And you haven't investigated
2  that question right now?
3          MR. CRAMER:  Which question?
4  BY MS. VARMA:
5      Q.  The question whether each
6  and every class member was harmed?
7      A.  Well, I have-- I have not
8  tried to go undertake some individualized
9  analysis class member by class member to
10 see whether that was the case.  I do-- I
11 do hold the view that the affect of this
12 increase in prices that is the crux of
13 the anticompetitive impact would be class
14 wide.
15     Q.  Class wide, okay.  And have
16 you determined with respect to the
17 damages you attribute to the shift in
18 share that would happen in the but-for
19 world between Premarin and Cenestin, in
20 other words, the additional but-for
21 Cenestin share, whether each and every
22 class member was injured in that way?
23         MR. CRAMER:  Objection to
24     form.

256

1          THE WITNESS:  No, I have not
2      done an analysis of that sort.
3  BY MS. VARMA:
4      Q.  Let me take you to page 14
5  of your report.  Premarin Profitability
6  and Margins.  And let me ask you a
7  question independent of the report.  Do
8  you have an opinion on whether Premarin
9  had market power, Wyeth had market power
10 in Premarin in 1998?
11     A.  Yes, I do and I believe that
12 they did.
13     Q.  And was that market power
14 substantial as you've used the term
15 substantial in this deposition?
16     A.  Yes.
17     Q.  If Wyeth had market--
18 substantial market power prior to
19 Cenestin's entry, why was it not charging
20 the price levels that it charged after
21 Cenestin's entry?
22         MR. CRAMER: Objection to
23     form.
24         THE WITNESS:  Well, I'm not

257

1      sure I have an opinion that takes
2      the form of in some way having
3      identified the particular factors
4      that went into price setting in
5      1998.  I don't know the extent to
6      which in 1998 they-- what Premarin
7      was thinking about in terms-- I'm
8      sorry, what Wyeth was thinking
9      about in terms of prospect for
10     generic entry.  I'm-- I also don't
11     know how they might have seen
12     prior to the time that they had
13     occasion to actively employ their
14     contractual restrictions as a
15     means for limiting Cenestin's
16     competition, what they-- what
17     their mind set was about the role
18     that that might play in terms of
19     limiting competition from the
20     other ERT firms.  Those are
21     potential factors that might
22     underlie the difference in
23     pricing.  But I don't-- I haven't
24     gone as far as to explicitly

JEFFREY J. LEITZINGER, PH.D.

**Page 258**

1  conclude that that-- that that is
2  the reason.
3  BY MS. VARMA:
4  Q. The market share rebate
5  contracts were in effect through '96 and
6  '98, were they not?
7  A. Yes.
8  Q. Would you agree with me that
9  the entry of a competitor does not
10 increase the incumbent's market power?
11     MR. CRAMER: Asked and
12     answered.
13     THE WITNESS: Taking that
14     event by itself and holding
15     everything else constant, yes, I
16     would agree with you.
17     MR. CRAMER: You went into
18     these things five hours ago.
19     MS. VARMA: That's why it
20     was an easy one to answer.
21 BY MS. VARMA:
22 Q. On page 14 you have a
23 statement: A basic economic proposition
24 is that firms operating in competitive

**Page 259**

1  markets will have prices that reflect
2  marginal costs. By reflect marginal
3  costs do you intend to mean here that in
4  competitive markets prices will equal
5  marginal costs?
6  A. Yes. I think that-- I think
7  that was the intention in that-- in that
8  language that is it was stating what is
9  otherwise referred to as the perfectly
10 competitive outcome.
11 Q. Is it your opinion that
12 brand name drugs are priced even in
13 competitive markets at marginal cost?
14     MR. CRAMER: Objection to
15     form.
16     THE WITNESS: I don't as a
17     general matter hold a view that
18     brand name pharmaceutical products
19     are priced at marginal costs. I'm
20     also though of the view I'm not
21     sure I have seen given the
22     organization and structure of this
23     industry any instance in which
24     there is a brand name

**Page 260**

1  pharmaceutical product selling in
2  what would be described as a-- as
3  a competitive market, certainly
4  competitive in the sense-- in the
5  sense of the kind of market that
6  produces prices equal to marginal
7  costs.
8  BY MS. VARMA:
9  Q. Are you aware of any brand
10 of drugs whose price equals marginal
11 cost?
12 A. I don't think so. No.
13 Q. Does that lead you to the
14 conclusion that every branded drug has
15 market power?
16 A. They either-- in my
17 experience they either have it or they
18 have lost it as a result of generic entry
19 but have made a-- a corporate resource
20 decision to essentially cede the market
21 to the generics and hence have, are
22 charging prices that are greatly out of
23 line with the competitive alternative in
24 the market.

**Page 261**

1  Q. Okay. There's another
2  statement, next statement in the
3  sentence, two statements down: In 1999
4  Premarin accounted for 20 percent of
5  Wyeth's global sales and 36 percent of
6  profit.
7     MR. CRAMER: Operating
8     profit.
9  BY MS. VARMA:
10 Q. Operating profit. What's
11 the significance of Premarin accounting
12 for 20 percent of Wyeth's global sales to
13 your analysis?
14 A. I don't know that fact alone
15 is of any significance except to
16 understand that Premarin is a very
17 important and lucrative product.
18 Q. How does that tell you
19 anything about whether Wyeth has market
20 power, sale of Premarin?
21 A. The fact that Premarin
22 accounts for 20 percent of Wyeth's global
23 sales I think standing alone does not
24 tell you anything about whether or not