# EXHIBIT 13

MARJORIE FERRELL, et al vs. WYETH-AYERST

Videotaped Deposition of Gary French, Ph.D. - Volume II

October 24, 2002

COURT REPORTERS, ETCetera, INC.

(410) 653-1115   (202) 628-DEPO   1-800-947-DEPO

Case 1:01-cv-00704-SSB-TSH   Document 170-12   Filed 05/13/2005   Page 3 of 4

MARJORIE FERRELL, et al vs. WYETH-AYERST
Videotaped Deposition of Gary French, Ph.D. - Volume II
October 24, 2002

Page 519

1 my work, so you're asking me questions that I'd
2 have to think a lot more about, probably would
3 want to do further analysis than just these
4 tables that were created for pass-through.
5     Q. Let's follow through this hypothetical
6 that I have that the price increase on March 1st,
7 2000 was anti-competitive and was the first
8 anti-competitive price increase of the period.
9 When prices were raised again on September 1st of
10 2000, I take it that the anti-competitive
11 increase that took place on March 1st of 2000
12 would have been carried through in the prices
13 that existed as of that time, right?
14     MR. GUSTAFSON: Object to the form of
15 the question.
16     Q. Or is that wrong?
17     A. I don't know that I can answer the
18 question. I mean this is looking at things in a
19 very mechanical, strange way. I mean, normally
20 to determine whether something is monopolistic or
21 higher than a competitive price, you compare the

Page 520

1 price to a competitive price, not to the same
2 prices as the -- I don't -- as I've said, I think
3 that Wyeth for decades has had monopoly power, so
4 probably every price on this table reflects a
5 degree of monopoly power, but you're adding in
6 your earlier questions something relating it to
7 the claims in this case.
8     Q. Right.
9     A. And I don't know that I can separate
10 that with just this information, so I don't think
11 I can answer those questions.
12     Q. Assuming that the March 1st, 2000
13 price increase reflected some anti-competitive
14 component, that some portion or all of it were in
15 a competitive -- is it possible that the
16 September 1st, 2000 increase would have added an
17 additional anti-competitive increment on top of
18 the March 1st, 2000 increment?
19     MR. GUSTAFSON: Object to the form of
20 the question. Incomplete.
21     A. I guess it's possible, but it's also

Page 521

1 true that for reasons that have nothing to do
2 with anti-competitive conduct, prices might have
3 been going up anyway, so you'd have to look at
4 other factors to make sure. I mean you could
5 have one price increase that is wholly or 100
6 percent monopolistic, no business or economic
7 reason for it to go up other than that they have
8 the monopoly power to extract it. Then you can
9 have another price increase where the only reason
10 they increase is because their costs went up by
11 that much and that's a legitimate price increase.
12 You wouldn't compound the two or add them
13 together, but I don't have that kind of
14 information to know at this point in the case.
15     Q. So it's not your view necessarily that
16 the amount of the anti-competitive overcharge
17 would have been greater at the end of the class
18 period than it was earlier in the class period?
19     A. No.
20     MR. GUSTAFSON: Object to the form of
21 the question.

Page 522

1     A. It's not necessarily my view that that
2 would be true. I haven't done the empirical work
3 yet to quantify the extent of the overcharge.
4     Q. Would it have made sense from an
5 economic point of view and have been profit
6 maximizing from Wyeth's prospective to take full
7 advantage of whatever anti-competitive increase
8 it could make based on the elimination of
9 Cenestin as a competitor as quickly as possible
10 after it had known Cenestin as its competitor?
11     MR. GUSTAFSON: Object to the form of
12 the question.
13     A. I don't know that that question makes
14 sense. It never really had Cenestin as a viable
15 competitor. So what happened before Cenestin
16 entered and what happened after Cenestin entered
17 were pretty similar competitive situations for
18 Wyeth because of its own actions.
19     Q. So that you wouldn't have expected any
20 major differences in pricing patterns for Wyeth
21 before and after the conduct alleged in this

Case 1:01-cv-00704-SSB-TSH    Document 170-12    Filed 05/13/2005    Page 4 of 4

MARJORIE FERRELL, et al vs. WYETH-AYERST                                          October 24, 2002
Videotaped Deposition of Gary French, Ph.D. - Volume II

Page 523

1 case? Because in your view it was a monopolist
2 in both cases and had no viable competitor?
3   A.  I wouldn't say there would be zero or
4 no difference at all, but I wouldn't necessarily
5 expect that there would be a difference either.
6 It's -- I haven't studied those questions enough
7 to know for sure.
8   Q.  Let's see.  Now, if you look up --
9 we're still on Exhibit 4, and you have a -- you
10 break out separately cash and third-party prices.
11 Why did you do that?
12   A.  Well, just to see if there was much
13 difference between the two segments and there is
14 a little bit of difference in terms of the price
15 increases and the way the difference goes doesn't
16 surprise me.
17   Q.  Right, that at least for the first --
18 well, it's uniformly the case that the percentage
19 increase for the cash customers is greater than
20 the percentage price increase for the third-party
21 customers, right?

Page 524

1   A.  That's correct, but here you must
2 understand that the third-party price is IMF -- I
3 mean IMA -- IMS third-party price and it does not
4 include the rebate component, so it's not the
5 full picture necessarily.
6   Q.  Right.  This is only half a price,
7 really?
8   A.  Well, I don't know about half.  It's
9 not the full net to third-party price.  It's sort
10 of a gross price before you subtract rebates and
11 the rebates are given quarterly I think for a
12 large volume of transactions and it's not obvious
13 what they are on a per pill basis unless you do
14 some work and have some data to work with which
15 presumably will happen later in discovery, but we
16 don't have that at this point.  That was probably
17 one reason for breaking it out to show that where
18 you don't have that sort of incompleteness in the
19 data, the cash paying price, you can see what's
20 happening.  It's a little different with the
21 third-party price, but some of that -- when you

Page 525

1 look at the rebates, you don't know if the
2 percentage -- it might be 4.3 percent if you
3 could take the rebates into account, but it might
4 not.  It's not clear.
5   Q.  It might be 4.3?  It might be 2.9?
6 You don't know until you look at it, right?
7   A.  No, you don't know for sure until you
8 look at it and that's part of the reason why I
9 showed them separately because one of them is
10 very clean, the other one's not so clean.
11   Q.  So why didn't you attempt to look at
12 the information concerning rebates to factor that
13 in?
14   A.  Don't have the discovery yet.  Can't
15 do it.
16   Q.  Have you looked through the discovery
17 to see whether or not that's in there, that's
18 been made available in the Duramed case?
19   A.  Well, I saw the Wyeth documents and
20 there was some data about rebates in there, but I
21 didn't think it was comprehensive what I've seen.

Page 526

1 Maybe it's there and I missed it, but I wouldn't
2 want to rely on what was in the Duramed case and
3 what kind of came to me secondhand that way.  I'd
4 want to be able to ask for exactly what I needed
5 and be certain that that's what the defendants
6 were responding to when they provided the
7 information.  I don't know what the discovery
8 requests were by Duramed.
9   Q.  That didn't seem to hold you back in
10 connection with your first report.  You didn't
11 ask for any independent documents.  You just
12 looked at the documents that had been produced in
13 the Duramed litigation, right?
14       MR. GUSTAFSON:  Object to the
15 question, argumentative.
16   A.  I was not trying to measure something
17 like rebates and I did not use anything analogous
18 to that in the first report.
19   Q.  You looked at pricing data, didn't
20 you?
21   A.  Yeah, pricing data is IMS data.  I